# EXHIBIT A

# State Court Record

7|23|14

FILED

CLERK SUPERIOR COURT

1  **JACOBSON LAW FIRM**
2  2730 EAST BROADWAY BLVD., SUITE 160
   TUCSON, ARIZONA 85716                             14 JUL 23  PM 5: 44
3  TELEPHONE (520) 885-2518
   FACSIMILE (520) 844-1011
4  jeff@jhj-law.com                                  K. YLVISAKER, DEPUTY
   Jeffrey H. Jacobson, PCC #65402; SB#019502
5  Attorney for Plaintiff

6              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

7                    **IN AND FOR THE COUNTY OF PIMA**    C20143985

8                                                         C20143985
   CARRIE FERRARA CLARK,                 Case No.
9
                  Plaintiff,
10                                        **COMPLAINT**
11 vs.
                                          (Sex Discrimination; Hostile Work
12 CITY OF TUCSON,                        Environment; Retaliation)

13             Defendant.                  Assigned to:
                                                        Gus Aragon
14

15
        Plaintiff, through undersigned counsel, for her Complaint against the Defendant,
16
   alleges as follows:
17
                   **PARTIES, JURISDICTION AND VENUE**
18
        1.    Plaintiff Carrie Ferrara Clark is a resident of Pima County, Arizona.

19      2.    Defendant City of Tucson is a municipal corporation in Pima County,

20 Arizona.

21      3.    Defendant is an employer within the meaning of the Civil Rights Act of

22 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e et seq. (Title

23 VII), and the Arizona Civil Rights Act (ACRA), A.R.S. § 41-1461(6)(a).

        4.    Plaintiff is an employee of the City of Tucson Fire Department (TFD) within
24
   the meaning of 42 U.S.C. § 2000e(f).

25      5.    The Arizona Superior Court, Pima County, has jurisdiction in this case

26 pursuant to A.R.S. § 41-1481(D).

                                          1



6.    Venue in Pima County is proper pursuant to A.R.S. § 12-401.

7.    Plaintiff alleges that Defendant City of Tucson is legally responsible for the acts and/or omissions giving rise to this cause of action and is legally and proximately responsible for damages as alleged herein pursuant to A.R.S. § 41-1481(G).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.    Prior to filing this civil action, Plaintiff timely filed a written charge of discrimination with the Arizona Attorney General's Office, Civil Rights Division, pursuant to the Arizona Civil Rights Act, § 41-1481(A).  After its investigation, the Attorney General's Office issued Plaintiff a Right to Sue letter on April 24, 2014.  Exhibit A.

9.    Plaintiff has timely filed her Complaint pursuant to the Arizona Civil Rights Act, § 41-1481(D).

## GENERAL ALLEGATIONS

10.    Plaintiff has been an employee of the City of Tucson's Fire Department (TFD) since 2007.

11.    Plaintiff is currently employed as a Paramedic with TFD.

12.    Plaintiff gave birth to her son on July 19, 2012, Plaintiff returned to work on October 27, 2012.

13.    When she returned to work, Plaintiff was a Swing Paramedic on "C" Shift, where she was scheduled to work at different fire stations depending on TFD's needs.

14.    Before she returned to work, because Plaintiff knew she would be pumping breast milk throughout her work day, she notified Battalion Chief (BC) Paul McDonough, of her need for a private lactation room while on duty.

15.    At the time, TFD did not have any procedures in place for dealing with Plaintiff's request.

16.    Initially, BC McDonough and Plaintiff discussed having her work from Station 20 so as not to displace other employees and to bring as little attention to her situation as possible.

2

17.     BC McDonough and Plaintiff were both aware that working from Station 20 was only temporary because she would be filling a temporary vacancy at that Station until the end of the year.

18.     On or about October 27, 2012, Paramedic Jeff Todd, who was then-assigned to Station 12, told Plaintiff that he wanted to move to another station and would like to help her.

19.     On or about October 28, 2012, Paramedic Todd sent an email to BC Brian Stevens formally requesting a transfer from Station 12 to fill the vacancy at Station 20, knowing this would help Plaintiff because her home is close to Station 12. TFD, however, ignored Paramedic Todd's request.

20.     BC McDonough asked Plaintiff's husband, TFD Fire Captain Gordon Clark, whether Station 12 was a better fit for Plaintiff and if she would rather be there than at Station 20. Captain Clark responded, "absolutely."

21.     Station 12 was a perfect fit for Plaintiff because it has a private room suitable to express and pump her breast milk and available refrigerator storage space.

22.     At the time, Station 12 had two other mothers on Plaintiff's shift, as well as a mother on a different shift, one of whom was also pumping breast milk.

23.     On or about October 30, 2012, BC Stevens and Deputy Chief (DC) Ed Nied met with TFD's Human Resources Manager Joann Acedo regarding Paramedic Todd's temporary transfer request to Station 12.

24.     TFD denied Paramedic Todd's transfer request even though TFD had previously granted other transfers between male coworkers for various reasons.

25.     TFD also granted Paramedic Todd's request to leave Station 12 and assigned him to a Swing position. Contrary to Section 201 of the Rules of Assignment in TFD's Manual of Operations, TFD put Paramedic Todd's Station 12 assignment out to bid.

26.     On or about November 9, 2012, Plaintiff submitted a memorandum formally requesting a temporary assignment to Station 12. In her memorandum, Plaintiff explained the reasons for her request. Plaintiff's memorandum was preceded by memoranda prepared

3

by Paramedic Todd and BC McDonough requesting Plaintiff's temporary assignment to Station 12.

27.   As a result of the uncertainty surrounding her work assignment location, Plaintiff experienced stress and anxiety. This contributed to her inability to produce enough milk for her son during the 24 hours she was at work, necessitating either Plaintiff's husband or mother to come to her work location to pick up additional milk during her shift.

28.   On or about November 12, 2012, BC McDonough brought Plaintiff to headquarters to meet with DC Nied and DC Rodriguez.

29.   Plaintiff attempted to explain her situation but was met with insensitive and inappropriate questions from DCs Nied and Rodriguez.

30.   Following the meeting, Plaintiff was advised that she would remain at Station 12 for only five additional days.

31.   Due to the efforts of BC McDonough and as a result of other vacancies at Station 12, Plaintiff was able to remain at Station 12 through January 1, 2013.

32.   Beginning in January 2013, Plaintiff was given swing assignments to locations which were not equipped with appropriate lactation rooms. When Captain Clark mentioned this to TFD's scheduler, Captain Rick L'Heureux, he responded, "I don't think she deserves any special accommodations."

33.   Plaintiff had to use vacation and sick leave time when she was assigned to stations that did not have a private space for lactation.

34.   This situation exacerbated Plaintiff's stress and anxiety because she never knew from day to day if she would be assigned to work at a station that would allow her to privately express and store her breast milk.

35.   In approximately mid-January 2013, Plaintiff met with Marty Macias, an investigator in the City's Office of Equal Opportunity Programs (OEOP) to discuss the discrimination she was experiencing.

36.   Ms. Macias told Plaintiff that she had a valid claim and gave Plaintiff a complaint form to fill out. Plaintiff, however, chose not to file a formal complaint at that time, hoping that the situation would improve.

4

1      37.    Plaintiff continued to be assigned to stations that were not equipped with an
2  appropriate lactation room.

3      38.    On or about March 20, 2013, after receiving another assignment that was not
4  equipped with an appropriate lactation room, Plaintiff made repeated telephone calls to DC
   Rodriguez and Assistant Chief (AC) Mike Fischback, leaving messages that it was urgent
5  she speak with them. Her calls to DC Rodriguez and AC Fischback, however, were not
6  returned.

7      39.    Shortly before 5:00 p.m. on March 20, 2013, AC Fischback answered
8  Plaintiff's fourth phone call, immediately put her on hold, and returned with DC Rodriguez
9  and HR Manager Acedo.

10      40.    Plaintiff explained that she had again been assigned to work at Station 9 that
11  night which was not equipped with an appropriate lactation room. DC Rodriguez
    responded that Station 9 was, "the only thing we have open for you tonight."
12

13      41.    HR Manager Acedo told Plaintiff that "per the law," Station 9 was on an
    "approved list" because the Chief's combined office/bedroom and the Emergency Captain's
14  combined office/bedroom both had closing doors. HR Manager Acedo advised Plaintiff to
15  just ask them to leave their rooms when she needed to pump.

16      42.    Plaintiff then explained that she pumped milk every 2-3 hours, including
17  throughout the night, and that awakening her supervisors to leave their rooms so she could
18  pump was unreasonable. HR Manager Acedo then told Plaintiff, "your pumping seems
19  excessive to me." Plaintiff responded that this was normal for a newborn baby. HR
    Manager Acedo replied, "well, it seems to me that you're not fit for duty."
20

21      43.    Exasperated and frustrated with HR Manager Acedo's lack of understanding
    and her offensive comments, Plaintiff responded, "you are out of your friggin' mind if you
22  think I would awaken and ask a Chief or Captain to leave their assigned room every 2-3
23  hours to pump." In response, both DC Rodriguez and AC Fischback agreed that Station 9
24  was not an acceptable location for pumping breast milk.

25      44.    Plaintiff was so distraught that she was in tears and was unable to work her
26  shift.

45.     On or about March 26, 2012, Plaintiff was summoned to TFD headquarters for a meeting with DC Rodriguez, AC Fischback and DC Nied.

46.     Under normal TFD practice, her supervisor, BC McDonough, should have also been in attendance, but was not present.

47.     Per the terms of City of Tucson Administrative Directives and the International Association of Fire Fighters Local 479 and City of Tucson Contract (CBA), Plaintiff called her C Shift Union Griever, Sloan Tamietti, to accompany her to the meeting.

48.     Union Griever Tamietti called DC Rodriguez.  DC Rodriguez told Union Griever Tamietti, "labor doesn't need to be here for this."

49.     Plaintiff told Union Griever Tamietti that she wanted him there anyway, and eventually he was allowed to join them.

50.     During the meeting, Plaintiff was handed a letter stating that she was being written up for using the phrase "you're out of your friggin' mind" during the March 20, 2013, phone call.

51.     AC Fischback then told Plaintiff that until August 2013, when her son would turn one year old, she would be assigned to work exclusively at Station 6 because the other TFD stations did not have conforming lactation rooms.

52.     Station 6 is located at the far southeast boundary of the City on Wilmot off of I-10, and primarily responds to calls from the federal and state prisons on Wilmot.

53.     Plaintiff asked AC Fischback for the list of approved stations but was told she could not have the list until it was revised because OEOP had just listed the stations that had a room with a locking door, and had not taken into account that some of those rooms were commander bedrooms.

54.     Plaintiff then asked about working overtime and about trades.  AC Fischback told her that they had not "thought about that yet."

55.     TFD never provided the approved list to Plaintiff, and as a result, because she was exclusively assigned to Station 6, Plaintiff was deprived of overtime earning opportunities and with one exception, station trades.

6

56.     Plaintiff then asked why she could not work at Station 12, whereupon AC Fischback responded that Station 12 was not on the approved list.

57.     Plaintiff pointed out that the only other nursing mother at the time in TFD, Arianne Phaneuf, was assigned to Station 12. AC Fischback replied, "well, that's what happens when you file a complaint with EEO."

58.     Plaintiff told AC Fischback that she had not filed a complaint. He responded, "well, someone called and got them involved."

59.     Plaintiff's reassignment to a firefighter position at Station 6 occurred without formal notice via a TFD Employee Personnel Record Update Form and at the displeasure of the existing Station 6-assigned employee who was displaced as a result.

60.     Plaintiff continues to be approached by coworkers who ask if she is the one who complained about breastfeeding locations.

61.     On or about July 19, 2013, TFD issued a new nursing room policy. Shortly after the new policy was enacted, both Plaintiff and her husband, Captain Clark, were told by several individuals that the policy had become known as the "Carrie Clause."

62.     While working at Station 6, an extra duty Captain, Jamie Sieminski, walked in, threw up his hands, and said, "oh, is this the nursing room? I don't want to come in here if this is the nursing room." Captain Nate Webber overheard Captain Sieminski's remark, and asked what he meant, to which Captain Sieminski replied, "oh, you haven't heard about the new nursing room policy?" Plaintiff, who was embarrassed by the flippant remarks, then left the room.

63.     In August 2013, during her first shift at Station 6 after her son's first birthday, Plaintiff received a call from HR Manager Acedo, advising Plaintiff that her time at Station 6 was up and that if she wanted more time she needed to formally request it through a memorandum.

64.     In a subsequent meeting with Plaintiff, AC Brad Olson permanently assigned Plaintiff to Station 6.

//

//

7

1     65.     Although working conditions improved significantly at Station 6 due to the

2 efforts of AC Olson, it did not eliminate the damage that had previously been done to

3 Plaintiff since her return to work after her son's birth.

4     66.     On July 31, 2013, Plaintiff filed a written charge of discrimination with the

5 Arizona Attorney General's Office, Civil Rights Division pursuant to the Arizona Civil

Rights Act, § 41-1481(A).

6     67.     In January 2014, Plaintiff informed TFD that she was again pregnant.

7     68.     On April 24, 2014, the Attorney General's Office issued Plaintiff a Right to

8 Sue letter.

9     69.     On or about May 22, 2014, Captain Ted McDonough singled Plaintiff out and

10 instructed Plaintiff to perform firefighting drills that none of the other members of her crew

11 were required to perform. When Plaintiff repeatedly asked Captain McDonough why she

12 was being singled out, he ignored her and would not reply to her questions.

    70.     On May 22, 2014, Plaintiff filed a notice of claim against the City of Tucson

13 for sex discrimination and retaliation that she had experienced since returning to work in

14 October 2012.

15     71.     Plaintiff was assigned to light duty on June 16, 2014.

16     72.     Up to the time Plaintiff went on her light duty assignment, HR Manager

17 Acedo was frequently contacting Plaintiff asking her if she still had the same need to pump

18 her breast milk, or words to that effect.

19     73.     On or about June 17, 2014, BC Tim Nofs asked her to submit a memo about

20 the May 22nd incident when Captain McDonough took her out to drill by herself because

TFD administration wanted to pursue disciplinary action against her for insubordination.

21     74.     On June 19, 2014, Plaintiff started her day at 6:00 a.m. in her light duty

22 assignment (in the fire prevention division), planning to work a 10-hour shift. Plaintiff's

23 supervisor, Ken Brouillette, was aware of her schedule. At approximately 2:40 p.m.,

24 Plaintiff left to exercise as she is required to do pursuant to TFD's Manual of Operations.

25     75.     At approximately 2:45 p.m., HR Assistant Veronica Muñoz called Plaintiff

26 and said that HR Manager Acedo told her that Plaintiff was not authorized to leave, and that

8

1   she could not exercise without a doctor's note. Further, Plaintiff was told that she was not
2   allowed to come in to work before 7:00 a.m.

3       76.    Plaintiff proceeded to obtain a doctor's note which indicated that she was
4   authorized to engage in low-impact exercise.

5       77.    Upon information and belief, TFD has never required a pregnant employee
    who is on a light duty assignment to provide a doctor's note in order to exercise.

6       78.    On or about June 19 or 20, 2014, at HR Manager Acedo's direction, TFD's
7   HR department changed Plaintiff's computerized time entry for June 18, 2014, and
8   withdrew 6 hours from her vacation time bank instead of 3 hours. The three additional
9   hours withdrawn without Plaintiff's consent represented the one-hour differential between
10  6:00 a.m. and 7:00 a.m., the 1.5 hours she exercised and .5 for lunch. Plaintiff's schedule
11  was also changed to begin her day at 7:00 a.m.

12      79.    Also on June 19, 2014, a meeting or meetings occurred between Mr.
13  Brouillette, AC Joe Gulotta and HR Manager Acedo, amongst others. Eventually, it was
    decided that Plaintiff would be allowed to exercise, but only at Station 1. They also
14  decided that Plaintiff would not be allowed to flex her time and that her schedule would be
15  7:00 a.m. to 5:30 p.m. every day.

16      80.    Upon information and belief, other than what is articulated in the TFD
17  Manual of Operations, TFD has never restricted the exercise location for any employee.

18      81.    Upon information and belief, other TFD employees on light duty are allowed
19  to start their shifts at 6:00 a.m. and are allowed to flex their time.

20      82.    Since returning to work in October 2012, and continuing to this day, TFD has
    subjected Plaintiff to sex discrimination resulting in a hostile work environment including,
21  but not limited to, the incidents discussed above.

22      83.    Since TFD became aware that Plaintiff had contacted the OEOP in January
23  2013, and continuing to this day (including, but not limited to, the incidents discussed
24  above), TFD has continued to retaliate against the Plaintiff in reprisal for Plaintiff reporting
25  the FLSA violations.

26  //

9

## COUNT ONE
### (Sex Discrimination/Retaliation in Violation of the Fair Labor
### Standards Act, 29 U.S.C. § 207(r) and § 215)

84.     Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-83 above as though fully set forth herein.

85.     The Fair Labor Standards Act (FLSA), as amended by the Patient Protection and Affordable Care Act, 29 U.S.C. § 207(r), requires an employer to provide a suitable location and break times for the purpose of expressing breast milk for one year after a child's birth each time an employee has need to express the milk. The location must be a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public.

86.     TFD did not provide Plaintiff with an appropriate lactation room on a consistent basis until March 23, 2013, almost five months after she had returned to work.

87.     Further, TFD retaliated against Plaintiff for her repeated and continued reports of her belief that TFD was violating federal law by not providing her with an appropriate lactation room on a consistent basis.

88.     TFD also engaged in a pattern of hostile and belittling behavior toward Plaintiff, causing her serious emotional anguish.

89.     Further, in reprisal for reporting the FLSA violation, TFD retaliated against her by disciplining her and relegating her to work only at Station 6.

90.     TFD intentionally discriminated against Plaintiff in violation of the FLSA and acted with malice or with reckless indifference to Plaintiff's federally protected rights.

91.     As a result of TFD's actions as alleged herein, Plaintiff has suffered damages, including, without limitation, loss of wages and associated benefits, and emotional distress, for which she should be compensated in an amount to be determined at trial pursuant to 29 U.S.C. § 216(b).

//

//

//

10

1

2

## COUNT TWO
### (Sex Discrimination in Violation of Title VII of the
### Civil Rights Act of 1964, as Amended)

3

4

92.   Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-91 above as though fully set forth herein.

5

6

7

93.   TFD is an employer within the meaning of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e et seq. (Title VII) and in particular, 42 U.S.C. § 2000e(b).

8

9

94.   TFD's actions as alleged herein constitute discrimination on the basis of sex in violation of Title VII, and specifically, 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e(k).

10

95.   TFD intentionally discriminated against Plaintiff and acted with malice or with reckless indifference to Plaintiff's federally protected rights.

11

12

13

14

96.   As a result of TFD's discrimination, Plaintiff has suffered damages, including, without limitation, loss of wages and associated benefits, emotional distress, mental anguish, and loss of enjoyment of life for which she should be compensated in an amount to be determined at trial pursuant to 42 U.S.C. § 2000e-5.

15

16

## COUNT THREE
### (Sex Discrimination/Hostile Work Environment in Violation of
### the Arizona Civil Rights Act, A.R.S. § 41-1463(B)(1))

17

18

97.   Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-96 above as though fully set forth herein.

19

20

98.   Plaintiff was subjected to sex discrimination by TFD which resulted in a hostile work environment.

21

22

23

99.   Pursuant to the Arizona Civil Rights Act (ACRA), A.R.S. § 41-1463(B)(1), it is an unlawful employment practice for an employer to discriminate against any individual with respect to compensation, terms, conditions or privileges of employment because of sex.

24

25

100.   TFD deliberately and unlawfully discriminated against Plaintiff based upon her sex in violation of the ACRA, A.R.S. §§ 41-1461, et seq.

26

11

101. As a result of TFD's discrimination, Plaintiff has suffered lost wages and the value of lost benefits, and other damages for which she should be compensated in an amount to be determined at trial.

## COUNT FOUR
### (Retaliation in Violation of the Arizona
### Civil Rights Act, A.R.S. § 41-1464(A))

102. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-101 above as though fully set forth herein.

103. Pursuant to A.R.S. § 41-1464(A), it is an unlawful employment practice for an employer to discriminate against any of its employees because the employee opposed any practice which is an unlawful employment practice.

104. Plaintiff complained to management and opposed conduct which she reasonably believed to be an unlawful employment practice under the ACRA.

105. TFD unlawfully discriminated against Plaintiff in violation of A.R.S. § 41-1464(A) by subjecting her to materially adverse employment actions and by subjecting her to severe or pervasive conduct which changed the terms and conditions of Plaintiff's employment and created a hostile work environment because she opposed conduct which she reasonably believed to be an unlawful employment practice under the Arizona Civil Rights Act.

106. As a result of TFD's unlawful retaliation, Plaintiff suffered monetary damages for which she should be compensated in an amount to be determined at trial pursuant to A.R.S. § 41-1481(G).

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against the Defendant as follows:

1. For compensatory damages in a just and reasonable amount;

2. For punitive damages in a just and reasonable amount;

3. For Plaintiff's costs and attorney's fees in this matter pursuant to A.R.S. § 41-1481(J), 42 U.S.C. § 2000e-5(k), and 29 U.S.C. § 216(b);

12

1    4.    For such other and further relief as the Court deems reasonable and just.

2

3            DATED this 23rd day of July, 2014.

4

5                          **JACOBSON LAW FIRM**

6

7                          Jeffrey H. Jacobson
                           Attorney for Plaintiff
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

13

# Exhibit A

## OFFICE OF THE ATTORNEY GENERAL
## Civil Rights Division

# NOTICE OF RIGHT TO SUE

Mrs. Carrie A. Clark          vs.          City of Tucson, Fire Department
*(Charging Party)*                                    *(Respondent)*

CRD No.: T0012013000486                      EEOC No.: 35A-2013-00456C

On July 31, 2013, you filed a charge with the Civil Rights Division alleging employment discrimination. Arizona law provides that you may bring a civil action in Superior court of the county where the alleged discriminatory action took place. Should you decide to file a civil action, you must do so **within 90 days** of the date you receive this Notice or **within one year** of the date you filed the charge, **whichever comes first.** A.R.S. ' 41-1481(D.)

This NOTICE OF RIGHT TO SUE is being issued for the following reason(s):

☐ This office has made a final determination or has otherwise completed its processing of your charge and will be taking no further action.

☒ The Civil Rights Division has not completed the processing of your charges, but there are approximately 90 days left before the expiration of the **one year deadline** for filing a civil action in Superior Court.

☐ Although your charge was sent to the Equal Employment Opportunity Commission for processing, you may also have a right to sue under the Arizona Civil Rights Act, and there are approximately 90 days left before the expiration of the **one year deadline** for filing a civil action in Superior Court.

☐. Charging Party has submitted a written request.

If you have any questions concerning this notice, please contact (520) 628-6500. If you need legal assistance, you should seek the advice of an attorney.

Sincerely,

Karen J. Hartman-Tellez, Chief Counsel
Civil Rights Compliance Section

BY:

*Ernest Granillo, Compliance Manager*

Sent by regular mail this 24th day of April, 2014

cc: Ms. Julianne K. Hughes Esq. (Respondent's Attorney)

**In the Superior Court of the State of Arizona**
**In and For the County of Pima**

Case Number _____ **C20143985**

**CIVIL COVER SHEET- NEW FILING ONLY**
(Please Type or Print)

Plaintiff's Attorney: Jeffrey H. Jacobson

Attorney Bar Number: 019502

Gus Aragon        JUN 2 3 2014

Plaintiff's Name(s):

Plaintiff's Address:

CARRIE FERRARA CLARK

6136 E. West Miramar Drive
Tucson, Arizona 85715

Defendant's Name(s):  CITY OF TUCSON

EMERGENCY ORDER SOUGHT:  ☐ Temporary Restraining Order        ☐ Provisional Remedy   ☐ OSC
☐ Election Challenge   ☐ Employer Sanction   ☐ Other _____
                                                              (Specify)

☐ RULE 8(i) COMPLEX LITIGATION DOES NOT APPLY. (Mark appropriate box under **Nature of Action**)

☐ RULE 8(i) COMPLEX LITIGATION APPLIES. Rule 8(i) of the Rules of Civil Procedure defines a "Complex Case" as civil actions that require continuous judicial management. A typical case involves a large number of witnesses, a substantial amount of documentary evidence, and a large number of separately represented parties.
(Mark appropriate box on page two as to complexity, **in addition** to the Nature of Action case category).

## NATURE OF ACTION

(Place an **"X"** next to the **one** case category that most accurately describes your primary case.)

**TORT MOTOR VEHICLE:**
☐ Non-Death/Personal Injury
☐ Property Damage
☐ Wrongful Death
**TORT NON-MOTOR VEHICLE:**
☐ Negligence
☐ Product Liability – Asbestos
☐ Product Liability – Tobacco
☐ Product Liability – Toxic/Other
☐ Intentional Tort
☐ Property Damage
☐ Legal Malpractice
☐ Malpractice – Other professional
☐ Premises Liability
☐ Slander/Libel/Defamation
☐ Other (Specify) _____

**MEDICAL MALPRACTICE:**
☐ Physician M.D.      ☐ Hospital
☐ Physician D.O      ☐ Other

**CONTRACTS:**
☐ Account (Open or Stated)
☐ Promissory Note
☐ Foreclosure
☐ Buyer-Plaintiff
☐ Fraud
☐ Other Contract (i.e. Breach of Contract)
☐ Excess Proceeds-Sale
☐ Construction Defects (Residential/Commercial)
☐ Six to Nineteen Structures
☐ Twenty or More Structures
**OTHER CIVIL CASE TYPES:**
☐ Eminent Domain/Condemnation
☐ Eviction Actions (Forcible and Special Detainers)
☐ Change of Name

**OTHER CIVIL CASE TYPES : (Continued)**
☐ Transcript of Judgment
☐ Foreign Judgment
☐ Quiet Title
☐ Forfeiture

July 15, 2010

☐ Election Challenge
☐ NCC- Employer Sanction Action (A.R.S. §23-212)
☐ Injunction against Workplace Harassment
☐ Injunction against Harassment
☐ Civil Penalty
☐ Water Rights(Not General Stream Adjudication)
☐ Real Property
☐ Sexually Violent Person (A.R.S. §36-3704)
  (Except Maricopa County)
☐ Minor Abortion (See Juvenile in Maricopa County)
☐ Special Action Against Lower Courts
  (See lower court appeal cover sheet in Maricopa)
☐ Immigration Enforcement Challenge (§§1-501, 1-502, 11-1051)

**UNCLASSIFIED CIVIL:**
☐ Administrative Review
  (See lower court appeal cover sheet in Maricopa)
☐ Tax Appeal
(All other tax matters must be filed in the AZ Tax Court)
☐ Declaratory Judgment
☐ Habeas Corpus
☐ Landlord Tenant Dispute- Other

☐ Restoration of Civil Rights (Federal)
☐ Clearance of Records (A.R.S. §13-4051)
☐ Declaration of Factual Innocence (A.R.S. §12-771)
☐ Declaration of Factual Improper Party Status
☐ Vulnerable Adult (A.R.S. §46-451)
☐ Tribal Judgment
☐ Structured Settlement (A.R.S. §12-2901)
☐ Attorney Conservatorships (State Bar)
☐ Unauthorized Practice of Law (State Bar)
☐ Out-of-State Deposition for Foreign Jurisdiction
☐ Secure Attendance of Prisoner
☐ Assurance of Discontinuance
☐ In-State Deposition for Foreign Jurisdiction
☐ Eminent Domain– Light Rail Only
☐ Interpleader– Automobile Only
☐ Delayed Birth Certificate (A.R.S. §36-333.03)
☒ Employment Dispute- Discrimination
☐ Employment Dispute-Other
☐ Other _____
          (Specify)

## COMPLEXITY OF THE CASE

If you marked the box on page one indicating that Complex Litigation applies, place an "X" in the box of no less than one of the following:

☐ Antitrust/Trade Regulation
☐ Construction Defect with many parties or structures
☐ Mass Tort
☐ Securities Litigation with many parties
☐ Environmental Toxic Tort with many parties
☐ Class Action Claims
☐ Insurance Coverage Claims arising from the above-listed case types
☐ A Complex Case as defined by Rule 8(i) ARCP

Additional Plaintiff(s)

_____

_____

_____

Additional Defendant(s)

_____

_____

_____

1 | **JACOBSON LAW FIRM**
2730 EAST BROADWAY BLVD., SUITE 160
2 | TUCSON, ARIZONA 85716
TELEPHONE (520) 885-2518
3 | FACSIMILE (520) 844-1011
4 | jeff@jhj-law.com
Jeffrey H. Jacobson, PCC #65402; SB#019502
5 | Attorney for Plaintiff

FILED
TOWN L. HELLON
CLERK SUPERIOR COURT

14 JUL 23 PM 5: 44

K. YLVISAKER, DEPUT'

6 | **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

7 | **IN AND FOR THE COUNTY OF PIMA**

8 | CARRIE FERRARA CLARK,                Case No.      **C 2 0 1 4 3 9 85**
9
10 |                    Plaintiff,        **CERTIFICATE ON COMPULSORY**
                                          **ARBITRATION**
11 | vs.

12 | CITY OF TUCSON,
                                          Assigned to:
13 |                    Defendant.                            Gus Aragon

14

15 | The undersigned attorney certifies the largest award sought by the Plaintiff,

16 | including punitive damages, but excluding interest, attorney's fees and costs, exceeds the

17 | limits set by Rules 72 through 76 of the Arizona Rules of Civil Procedure. This case is not
subject to arbitration.

18
19 | DATED this $23^d$ day of July, 2014.

20 |                              **JACOBSON LAW FIRM**

21
22
23 | Jeffrey H. Jacobson
Attorney for Plaintiff
24
25
26

1

# Pima County Clerk of the Superior Court



| **Case Number:** | C20143986 |
|---|---|
| **Case Caption:** | NELDA A CHIMIENTI VS. JOSEPH DONOVAN ET AL. |

**Document Type:**      Open

**Document Subtype:**   Petition & Complaint

**Document Caption:**   Petition & Complaint

**File Date:**          7/23/14                     **Record last modified:** 7/23/2014  5:51:42PM  **by user:** ltenenholtz

*1 9 2 7 6 2 0 6 *

7|23|14
FILED

1 │ RUSSO, RUSSO & SLANIA, P.C.
   │ Steven Russo, State Bar No. 005607
2 │ Joseph D. Chimienti, State Bar No. 027955          14 JUL 23 PM 5: 53
   │ 6700 N. Oracle Rd., Suite 100
3 │ Tucson, Arizona 85704
   │ (520)529-1515
4 │ stever@rrs-law.com                                 K. YLVIS.....  DEPUTY
   │ joec@rrs-law.com
5 │ Attorneys for Plaintiff

6 │        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

7 │              IN AND FOR THE COUNTY OF PIMA          C

8 │                                                       C20143986
   │ NELDA A. CHIMIENTI, an individual,        Case No.: _____
9 │

10 │                      Plaintiff
    │ v.                                          **COMPLAINT**
11 │

12 │ JOSEPH AND JILL DONOVAN, husband
    │ and wife, Arizona residents,              Assigned to the Hon. _____
13 │
    │                      Defendants           STEPHEN VILLARREAL
14 │

15 │        Plaintiff Nelda A. Chimienti, by and through undersigned counsel, alleges as

16 │ follows:

17 │                  **PARTIES, JURISDICTION, AND VENUE**

18 │     1.    Plaintiff Nelda A. Chimienti is a resident of Pima County, Arizona.

19 │     2.    Defendants Joseph and Jill Donovan are Pima County residents.

20 │     3.    The events complained of herein occurred in the County of Pima, State of

21 │ Arizona.

22 │     4.    Jurisdiction and venue are proper in this Court.

23 │        **STATEMENT OF FACTS APPLICABLE TO ALL COUNTS**

24 │     5.    Plaintiff Nelda A. Chimienti is the owner of real property located at 7307

25 │ North Paseo Montalban, Tucson, Arizona 85704.

26 │     6.    Defendants are the owners of real property located at 7313 North Paseo

27 │ Montalban, Tucson, Arizona 85704.

28 │

1

1       7.     Plaintiff's property and Defendants' property lie within the Casas Adobes

2 West No. II Subdivision of Pima County Arizona.

3       8.     Plaintiff's property and Defendants' property are subject to Covenants

4 Conditions and Restriction for Casas Adobes West No. II Subdivisions recorded with the

5 Pima County Recorder on November 6, 1974 at Docket 4887, Page 494 (the "CC&Rs")

6 attached as Exhibit A.

7       9.     The CC&Rs are currently operative and in effect.

8       10.     Around 2006, Defendants' constructed an addition to their residential home

9 that has encroached on the Plaintiff's property.

10       11.     Defendants' add-on was completed in violation of the CC&Rs and in

11 violation of setback requirements.

12       12.     In 2014, Defendants again modified their property to alter the flow of

13 drainage water.

14       13.     Defendants made these modifications in spite of Plaintiff's objections.

15       14.     Plaintiff has been damaged by Defendants' actions.

16
                           **COUNT I**

17               **Breach of Covenants on Real Property**

18       15.     Defendants' property is subject to the CC&Rs.

19       16.     Defendants' addition to the property was constructed in violation of the

20 CC&Rs and applicable setback requirements.

21       17.     Defendants' modification of the drainage on the property is in violation of

22 the CC&Rs and is causing damage to Plaintiff's property.

23       18.     Some pertinent parts of the CC&Rs state:

24               "2. No Building shall be erected, placed or altered on any lot until the

25               construction plans and specification and plan showing the location of the

26               structure have been approved by the Architectural Control Committee as to

27               quality of workmanship and materials, harmony of external design with

28

1   existing structures, and as to location with respect to topography and finish

2   grade elevation. . .

3   8a. No building or covered porches or pergolas thereof shall be erected,

4   placed or permitted at any point on any of said lots nearer than ten (10) feet

5   to the side lines thereof, except on corner lots, where the minimum setback

6   from the side street line must be fifteen (15) feet. . .

7   8c. For the purposes of this covenant, eaves, steps, and open porches shall

8   not be considered as part of a building, provided, however, that this shall

9   not be construed to permit any portion of a building on a lot to encroach

10  upon another lot."

11       19.   Plaintiff has been damaged by Defendants' breach of the CC&Rs.

12       20.   Plaintiff's property value has been diminished by Defendants' breach of the

13  CC&Rs.

14       21.   Plaintiff has lost the quiet enjoyment of her property by Defendants' breach

15  of the CC&Rs.

16                              **COUNT II**
                   **Negligence/Nuisance – Altering Watercourse**

17       22.   Plaintiff restates all prior allegations and incorporates them fully into Count

18  II.

19       23.   Defendants owe a duty to other property owners not to interfere with the

20  others' use and enjoyment of their property.

21       24.   Defendants owe a duty to adjacent property owners not to alter the drainage

22  of their property in such a way that the resulting drainage damages the neighboring

23  property.

24       25.   Defendants' additional structure and modified draining have redirect the

25  drainage and flow of water from the Defendants' property to the Plaintiff's property.

26

27

28

3

1      26.    Defendants' property alteration and drainage alteration have caused Plaintiff

2  damages, diminished the value of Plaintiff's property, and cause Plaintiff's loss of quiet

3  enjoyment of her property.

### COUNT III
### Trespass/Encroachment

27.    Plaintiff restates all prior allegations and incorporates them fully into Count

III.

28.    Defendants cannot intentionally enter the property of another without the

owner's consent.

29.    Defendants cannot intentional cause their property or items to enter the land

of another without the landowner's consent.

30.    Defendants have encroached upon the Plaintiff's property by building an

additional structure.

31.    Defendants have additionally trespassed on Plaintiff's property by

intentionally causing the diversion of water flow on to the Plaintiff's property.

32.    Defendants have taken such actions knowing of Plaintiff's objections.

33.    Defendants' intentional actions have caused Plaintiff damages.

### COUNT IV
### Property Damage

34.    Plaintiff restates all prior allegations and incorporates them fully into Count

IV.

35.    Defendants have a duty not to intentionally damage the property of another.

36.    Defendants' actions damaged Plaintiff's property by (i) causing debris to

flow onto Plaintiff's property; (ii) changing the drainage flow of water onto the Plaintiff's

property; (iii) encroaching on Plaintiff's property.

37.    Defendants' actions have deprived Plaintiff the full use and quiet enjoyment

of her property and diminished the value of her property.

4

1

2

**COUNT V**
**Injunctive Relief**

3

4

38.    Plaintiff restates all prior allegations and incorporates them fully into Count V.

5

39.    Judges may grant injunctions pursuant to A.R.S. §12-1801.

6

7

40.    An injunction is a proper remedy against continued series of trespasses, past and prospective, even when the defendant can respond in money damages.

8

41.    Monetary damages alone are insufficient to alleviate the Plaintiff's harm.

9

10

42.    Only the complete removal of the new drainage system and assurance that a new modification will not be put into place can sufficiently remedy Plaintiff's damages.

11

12

43.    Additionally, the Plaintiff's diminished property value will not be adequately remedied absent the removal of the new drainage system.

13

14

**COUNT VI**
**Punitive Damages**

15

16

44.    Plaintiff restates all prior allegations and incorporates them fully into Count VI.

17

18

45.    Defendants have acted in all matters alleged herein with reckless indifference to the rights and interests of the Plaintiff.

19

20

46.    Defendants intentionally acted in a manner in effort to benefit their property to the detriment of the Plaintiff.

21

22

47.    Defendants' intentional and reckless conduct has been repetitive and continuous.

23

**JURY REQUEST**

24

48.    Plaintiff Nelda A. Chimienti hereby requests trial by jury.

25

26

27

28

5

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Nelda A. Chimienti requests a judgment against Defendants as follows:

    (a)    Injunctive relief:

        i.  An order that the Defendants remove the drainage system that has been added to the property.

        ii.  An order that the Defendants abstain and refrain from conducting construction activities and drainage modifications in violation of the CC&Rs.

    (b)    General damages in a just and reasonable amount in compensation to Plaintiff for the damages to and diminished value of the Plaintiff's property and for the loss of quiet enjoyment thereof.

    (c)    Punitive damages in a just and reasonable amount.

    (d)    Full recovery of the costs of this litigation, costs of court, and reasonable attorneys' fees pursuant to A.R.S. §12-341.01; and

    (e)    Such other and further relief to which Plaintiff Nelda A. Chimienti may be justly entitled.

DATED this 23rd day of July, 2014

                        RUSSO, RUSSO & SLANIA, P.C.

                        Steven Russo
                        Joseph D. Chimienti
                        Attorneys for Plaintiffs

6

# Exhibit A

Nelda A. Chimienti v. Joseph and Jill Donovan
Pima County Superior Court
Complaint



BEST COPY

STATE OF ARIZONA }
COUNTY OF PIMA. } ss.

I hereby certify that the within instrument was filed for record in Pima County, State of Arizona

IDA MAE SMYTH
County Recorder

By _____ Deputy

Witness my hand and Official Seal.

Indexed : Paged Blotted

No. **91871**

Book............ 48 #7 ...... Page 494-499

Date............ 1974 NOV 6 AM 11 21

Request of:

TRANSAMERICA TITLE INSURANCE COMPANY

Fee: 2 50

7596

9843 1974 SEP 3 PM 4 15 684-689

THIS INSTRUMENT IS BEING RE-RECORDED TO CORRECT THE NAME OF THE DECLARANT.

## DECLARATION OF

### COVENANTS, CONDITIONS AND RESTRICTIONS

### FOR CASAS ADOBES WEST II

THIS DECLARATION is made this 29th day of August, 1974, by P.A.T. HOMES, INC., 4400 East Broadway, Tucson, Arizona, hereinafter called "Declarant", as present owner of the second beneficial interest in Transamerica Title Company, Trust Number 7661, being properly authorized so to act by terms of the Trust, and TRANSAMERICA TITLE COMPANY 177 North Church Avenue, Tucson, Arizona, as Trustee, thereunder, hereinafter called "Trustee", solely as bare legal title holder and not personally, and acting at the proper direction of said Beneficiary - "Declarant", executes this Declaration of Reservations, Covenants, Conditions, and Restrictions, to run with the real property herein described for the purposes as hereinafter set forth:

Lots 1 through 148, inclusive, of CASAS ADOBES WEST II according to the plat of record in the Office of County Recorder of Pima County, Arizona, in Book 26 of Maps and Plats, Page 60, Section 34, T-12-S, R-13-E, G.&S.R.B.& M. thereof;

BOOK 4887 PAGE 494

BEST COPY

and desiring to establish the nature of the use and enjoyment of said property does hereby declare that the following conditions, restrictions and stipulations shall apply to all of the above lots, and does further declare that all conveyance of these lots shall be made subject to the following conditions, restrictions, and stipulations;

1.   No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to re-main on any lot other than one detached single-family one story dwelling and a private garage for not more than three cars.

2.   No building shall be erected, placed or altered on any lot until the construction plans and specifications and a plan showing the location of the structure have been approved by the Architectural Control Committee as to quality of workmanship and materials, harmony of external design with existing structures, and as to location with respect to topography and finish grade elevation.  No fence or wall shall be erected, placed or altered on any lot nearer to any street than the minimum building set-back lines unless similarly approved.

3.   All improvements and construction shall meet with FHA requirements.

4.   Owner reserves the right to approve all plans for con-struction contemplated on said lots.

5.   All dwellings shall be of a quality of workmanship and materials substantially the same or better than that which can be produced on the date these covenants are recorded for the minimum permitted dwelling size.  The ground floor area of the main structure, exclusive of one-story open porches and garages, shall be not less than 1200 square feet  for a one-story dwelling.

BOOK 1843 PAGE 634        BOOK 4887 PAGE 495

BEST COPY

6.  No garage or other buildings whatsoever shall be erected
on any of said lots until a contract with a reliable and responsible
contractor shall have been entered into for the construction of a
dwelling which shall comply with the conditions, restrictions and
stipulations herein contained, and prior to the erection of the
main building herein permitted on any of said lots, no garage or
other outbuilding shall be used for residential purposes.

7.  No structure of a temporary character, trailer, basement,
tent, shack, garage, barn or other outbuilding shall be used on any
lot at any time as a residence either temporarily or permanently.

8.  No dwelling shall be erected or placed on any lot having a
width less than one hundred (100) feet at the minimum building set-
back line, except that this provision shall not apply to any lot
which is not rectangular in shape. No dwelling shall be erected
or placed on any lot having an area of less than 24,000 square feet.

8a. No building or the covered porches or pergolas thereof
shall be erected, placed or permitted at any point on any of said
lots nearer than ten (10) feet to the side lines thereof, except
on corner lots, where the minimum setback from the side street line
must be fifteen (15) feet. No dwelling shall be located on any
interior lot nearer that forty (40) feet to the rear lot line.

8b. No building or the covered porches or pergolas thereof
shall be erected, placed or permitted at any point on any of said
lots nearer than thirty (30) feet from the street front line of
said lots.

8c. For the purpose of this covenant, eaves, steps, and open
porches shall not be considered as part of a building, provided,
however, that this shall not be construed to permit any portion of
a building on a lot to encroach upon another lot.

9.  Easements for the installation and maintenance of utilities
and drainage facilities are reserved as shown on the recorded plat
and in all docket entries pertaining thereto.  Within drainage
easements no structure, planting or other material shall be placed
or permitted to remain which may damage or interfere with, or which
may change the direction of flow of, drainage channels in the ease-
ments, or which may obstruct or retard the flow of water through
drainage channels in the easements.  The easement area of each lot
and all improvements in it shall be maintained continuously by the
owner of the lot, except for those improvements for which a public
authority or utility company is responsible.

10.  No hogs, goats, cows, horses, or sheep shall be kept on
any of said property; provided, however, that nothing in this
restriction shall be construed as preventing or in any way inter-
fering with the keeping of ordinary pet animals.

11.  No noxious or offensive activity shall be carried on upon
any lot, nor shall anything be done thereon which may be or become
an annoyance or nuisance to the neighborhood.

12.  No sign of any kind shall be displayed to the public view
on any lot except one professional sign of not more than one square
foot.  During the construction and sales period, appropriate signs
may be erected as required by owner.

13.  No oil drilling, oil development operations, oil refining,
quarrying or mining operations of any kind shall be permitted upon
or in any lot, nor shall oil wells, tanks, tunnels, mineral excava-
tions or shafts be permitted upon or in any lot.  No derrick or other
structure designed for use in boring for oil or natural gas shall be
erected, maintained or permitted upon any lot.

BOOK 1343 PAGE 035      BOOK 4887 PAGE 496

- 2 -

BEST COPY

14. No lot shall be used or maintained as a dumping ground for
rubbish. Trash, garbage or other waste shall not be kept except in
sanitary containers. All incinerators or other equipment for the
storage or disposal of such material shall be kept in a clean and
sanitary condition.

15. No vehicle of any type which is abandoned or inoperable
shall be stored or kept on any lot within this subdivision (or street
if the subdivision contains private streets) in such a manner as to
be seen from any other lot or from any streets or alleyways within
this subdivision.

16. The native growth on said property, including cacti and
palo verde trees, shall not be destroyed or removed from any of the
lots in said subdivsion by any of the lot owners, except such
native growth as may be necessary for the construction and maintenance
of roads, driveways, residences, garages, and other outbuildings, and
laws, and/or walled in service yards and patios, which native growth
shall not be removed prior to commencement of construction.

17. No fence, wall, hedge or shrub planting which obstructs
sight-lines at elevations between two (2) and six (6) feet above the
roadways shall be placed or permitted to remain on any corner lot
within the triangular area formed by the street property lines and
a line connecting them at points twenty-five (25) feet from the
intersection of the street lines, or in the case of a rounded
property corner from the intersection of the street lines extended.
The same sight-line limitations shall apply on any lot within ten (10)
feet from the intersection of a street property line with the edge
of a driveway or alley pavement. No tree shall be permitted to re-
main within such distance of such intersections unless the foliage
line is maintained at sufficient height to prevent obstruction of
such sight-lines.

18. The Architectural Control Committee is composed of:
J. William Mandelbaum, 10509 Tanque Verde Road, Tucson, Arizona;
Stanley P. Abrams, 203 H South Kolb Road, Tucson, Arizona, and
James L. Pabich, 9230 E. Visco Place, Tucson, Arizona. A majority
of the committee may designate a representative to act for it. In
the event of death or resignation of any member of the committee,
the remaining members shall have full authority to designate a
successor. Neither the members of the committee, nor its designated
representative shall be entitled to any compensation for services
performed pursuant to this covenant. At any time, the then record
owners of a majority of the lots shall have power through a duly
recorded written instrument to change the membership of the committee
or to withdraw from the committee or restore to it any of its powers
and duties.

19. The committee's approval or disapproval as required in
these covenants shall be in writing. In the event the committee,
or its designated representative, fails to approve or disapprove
within thirty (30) days after plans and specifications have been
submitted to it, or in any event, if no suit to enjoin the con-
struction has been commenced prior to the completion thereof,
approval will not be required and the related covenants shall be
deemed to have been fully complied with.

20. After interest of owner has terminated, a committee of
property owners may be appointed to carry out the provisions of
said restrictions.

It is expressly understood and agreed that CASAS ADOBES
WEST II has been platted and laid out as a choice and attractive
residential district, and that these covenants and restrictions
are made for the lots herein described.

BEST COPY

These covenants are to run with the land and shall be binding on all parties and all persons claiming under them for a period of thirty-five years from the date these covenants are recorded, after which time said covenants shall be automatically extended for successive periods of ten (10) years unless an instrument signed by a majority of the then owners of the lots has been recorded, agreeing to change said covenants in whole or in part.

If any person shall violate or attempt to violate any of said restrictions or covenants herein before August 1, 2009, or such time later as may be set up by the provisions of the paragraph preceding this one, it shall be lawful for any other persons owning any other lots in said devrlopment or subdivision to prosecute any proceedings at law or in equity against such person or persons violating or attempting to violate any such covenants or restrictions and either to prevent them or him from so doing or to recover damages for such violation.

Should any of the covenants or restrictions herein be held invalid or void, such invalidity or voidance of any covenants or restrictions shall not affect the rest of this instrument or any valid covenant or restrictions herein contained.

Any violation of the foregoing provisions, conditions, restrictions or covenants shall not defeat or render invalid the lien of any mortgage or deed of trust made in good faith for value as to any portion of said property acquired by any person through foreclosure or by deed in lieu of foreclosure for any violation of the provisions, conditions, restrictions and covenants herein contained occurring after the acquisition of said property through foreclosure or by deed in lieu of foreclosure.

After the date hereof, each party who acquires any interest in all or in any part of the property described herein, further agrees that upon such acquisition of any interest in all or part of the real property, said acquiring party shall look only to the other property owner or owners acquiring an interest in said property for any performance or relief deemed equitable or necessary for the enforcement of the covenants, conditions, and restrictions contained herein.

IN WITNESS WHEREOF, P.A.T. HOMES, INC., an Arizona corporation, has caused its corporate name and seal to be hereunto affixed by its officers hereunto duly authorized this 29th day of August 1974.

P.A.T. HOMES, INC., an Arizona corporation, as second beneficiary under Trust No.6578, duly authorized

BY: _____
    Stanley P. Abrams, President

COUNTY OF PIMA    )
                 ) SS
STATE OF ARIZONA )

Signed and subscribed before me this 29th day of August 1974 by Stanley P. Abrams, President of P.A.T. Homes, Inc.

My Commission Expires April 7, 1976

_____
          Notary

RATIFIED AND APPROVED:

TRANSAMERICA TITLE COMPANY, As Trustee solely as bare legal title holder, and not personally.

BY: _____
                    Trust Officer

BOOK 4887 PAGE 498

BOOK 1843 PAGE 687

BEST COPY

STATE OF ARIZONA    } ss.    I hereby certify that th  within    No.   73757
COUNTY OF PIMA      }         instrument was filed for record    Book   5324
Witness my hand and Official Seal.  in Pima County, State of Arizona    Date
                                                                  Request of
| Indexed | Paged | Blotted |       JDA MAE SMYTH
                                    County Recorder
                                         Deputy

AMENDMENT TO DECLARATION OF
COVENANTS, CONDITIONS AND RESTRICTIONS
FOR CASAS ADOBES WEST_11

KNOW ALL MEN BY THESE PRESENTS:

That P.A.T. Homes, Inc., an Arizona corporation, with its
principal place of business located at 4400 East Broadway, Tucson,
Arizona, is the owner of a majority of the lots in Casas Adobes
West 11, being a subdivision of record in Pima County, Arizona,
according to the plat of which is recorded in Book 26 of Maps
and Plats, page 60, in the Office of the County Recorder.

Whereas, on August 29, 1974, P.A.T. Homes, Inc., imposed on
the above described subdivision a certain Declaration of Covenants,
Conditions and Restrictions and caused the same to be recorded
in the Office of the County Recorder on September 3, 1974, in Book
4843 at page 684.

Whereas, said Declaration provides that an instrument signed
by a majority of the owners of the lots may agree to change the
covenants in whole or in part; and

Whereas, P.A.T. Homes, Inc., as the majority owner of said
lots, desires to amend the existing Declaration for the purpose
of establishing an amended plan for the improvement, development,
use and sale of the above described property;

Now, therefore, P.A.T. Homes, Inc., amends the aforesaid
Declaration by deleting Lot 148 from the coverage of said Declaration
so that henceforth said Declaration shall cover Lots 1 through
147, inclusive.

Except as hereinabove modified, the covenants, conditions
and restrictions imposed by said Declaration shall remain in full
force and effect.

In witness whereof, P.A.T. Homes, Inc., has executed the
foregoing this 30ᵗʰ day of June, 1976.

                                    P.A.T. HOMES, I.C.

                                    By
                                       Stanley P. Abrams
                                       President

STATE OF ARIZONA)
                ) ss
COUNTY OF PIMA  )

Before me, a Notary Public, in and for the County of Pima,
State of Arizona, on this day personally appeared Stanley P. Abrams,
known to me to be the President of P.A.T. Homes, Inc., and as
such acknowledged to me that he executed the same for said corporation
for the purpose and consideration therein expressed as its free
act and deed and by him voluntarily executed.

Given under my hand and seal of office this 30ᵗʰ day of
June, 1976.

My commission expires:                 Notary Public
May 23, 1979

                                 BOOK 5324 PAGE 641



*Pima County Clerk of Superior Court*
*Tucson, Arizona*



| | | Receipt Number: | 2351730 |
|---|---|---|---|

| Received for: | CARRIE FERRARA CLARK | Date: | 7/23/2014 |
|---|---|---|---|
| Received from: | JACOBSON LAW FIRM | Case Number: | C20143985 |
| Amount Received: | $244.00 | Clerk Number: | 2,016 |

Caption:         CARRIE FERRARA CLARK VS. CITY OF TUCSON

Cash: $0.00              Check: $244.00              Charge: $0.00              ACH: $0.00

*Begin Financial Docket*

Civil Complaint                                                        $244.00      PAID

*End Financial Docke*

Change Returned:   $0.00

Amount Refunded:   $0.00



FILED
TGHA ~~~ LOT
CLERK. ~~~ COURT

14 OCT 20 PM 2: 47

**OCT 20 2014**

A. YEVISANED. DEPUTY

First Legal Network LLC
10 E. Broadway Blvd  Suite 105
Tucson, AZ 85701
(520) 798-2200 FAX: (520) 798-2201

IN THE ARIZONA SUPERIOR COURT
STATE OF ARIZONA COUNTY OF PIMA

**CARRIE FERRARA CLARK**

CASE NO. C20143985

VS

**CITY OF TUCSON**

STATE OF ARIZONA          )
PIMA COUNTY               )

AFFIDAVIT OF SERVICE

THE AFFIANT, being sworn, states: That I am a private process server registered in
PIMA COUNTY and an Officer of the Court.  On 10/16/14 I received the SUMMONS;
COMPLAINT; EXHIBIT A; CERTIFICATE OF COMPULSORY ARBITRATION

from JACOBSON LAW FIRM and by JEFFREY J. JACOBSON in each instance I personally
served a copy of each document listed above upon:
CITY OF TUCSON, BY SERVICE UPON THE CITY CLERK, ROGER RANDOLPH on 10/17/14 at 11:00
am at 255 W. ALAMEDA, 9TH FL. TUCSON, AZ 85701 in the manner shown below:
by leaving true copy(ies) of the above documents with SABRINA NAVARRO, DEPUTY CITY
CLERK

Description: HISPANIC, Female, Approx. 27 yrs. of age, 5' 1" tall, Weighing
120lbs., BROWN Eyes, BLACK Hair,

JOHN P. HOGAN                    Affiant
Sworn to before me the  Oct 17, 2014

Priscilla C. Dominguez
PRISCILLA C. DOMINGUEZ
NOTARY PUBLIC
My Commission expires         PIMA COUNTY
                              My Comm. Exp. Dec. 21, 2015
10-14A07162  27776
ORIGINAL         00

| Service - Routine | $ 16.00 |
| Min Mileage | $ 16.00 |
| Rush | $ 35.00 |
| Notary | $ 10.00 |
| TOTAL $ | 77.00 |



AX0210-14A07162

1 | **JACOBSON LAW FIRM**
2730 EAST BROADWAY BLVD., SUITE 160
2 | TUCSON, ARIZONA 85716
TELEPHONE (520) 885-2518
3 | FACSIMILE (520) 844-1011
jeff@jhj-law.com
4 | Jeffrey H. Jacobson, PCC #65402; SB#019502
5 | Attorney for Plaintiff

6 | ## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

7 | ### IN AND FOR THE COUNTY OF PIMA

**C20143985**

8 | CARRIE FERRARA CLARK,                   Case No.
9 |
                    Plaintiff,            **SUMMONS**
10 |
11 | vs.
12 | CITY OF TUCSON,                        Assigned to:     Gus Aragon
13 |                    Defendant.

14 | THE STATE OF ARIZONA to the above-named Defendant:

15 |    I.   A lawsuit has been filed against you.

16 |    II.   If you do not want a Judgment taken against you for the relief demanded in
17 | the accompanying Complaint, you must file a Response in writing in the
18 | Office of the Clerk of Court, Pima County Superior Court, 110 West
19 | Congress, Tucson, Arizona 85701-1348, accompanied by the necessary filing
20 | fee. A copy of the Response must also be mailed to the attorney whose name
21 | appears below.

22 |    III.   The Response must be filed within TWENTY (20) DAYS, exclusive of the
23 | date of service, if served within the State of Arizona, or within THIRTY (30)
24 | DAYS, if served outside the State of Arizona.

25 |    IV.   This is a legal document. If you do not understand its consequences, you
26 | should seek the advice of an attorney.

1

1   WITNESS My Hand and Seal of the Superior Court.

2                                   DATED:        JUL 2 3 2014

3                                   CLERK OF THE SUPERIOR COURT

4                                                TONI L. HELLON

5                                   By_____

6                                        Deputy Clerk    LAURA TENENHOLTZ

7

8

9   Party requesting summons:

10  Jeffrey H. Jacobson
    Jacobson Law Firm
11  2730 East Broadway, Suite 160
12  Tucson, Arizona 85716
    *Attorney for Plaintiff*
13

14

15

16

17

18

19

20

21

22

23

24

25

26
                                        2