**JACOBSON LAW FIRM**
2730 EAST BROADWAY BLVD., SUITE 160
TUCSON, ARIZONA 85716
TELEPHONE (520) 885-2518
FACSIMILE (520) 844-1011
jeff@jhj-law.com
Jeffrey H. Jacobson, PCC #65402; SB#019502
Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF TUCSON,<br><br>Defendant. | No. CV-14-02543-TUC-CKJ<br><br>**AMENDED COMPLAINT**<br><br>(Sex Discrimination; Hostile Work Environment; Retaliation) |

Plaintiff, through undersigned counsel, for her Amended Complaint against the Defendant, alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff Carrie Ferrara Clark is a resident of Pima County, Arizona.

2. Defendant City of Tucson is a municipal corporation in Pima County, Arizona.

3. Defendant is an employer within the meaning of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e et seq. (Title VII), and the Arizona Civil Rights Act (ACRA), A.R.S. § 41-1461(6)(a).

4. Plaintiff is an employee of the City of Tucson Fire Department (TFD) within the meaning of 42 U.S.C. § 2000e(f).

5. Plaintiff filed her original complaint in Pima County Superior Court.

6. Defendant filed a Notice of Removal to the United States District Court for the District of Arizona pursuant to 28 U.S.C. §1446 and LRCiv 3.6.

7. Plaintiff alleges that Defendant City of Tucson is legally responsible for the acts and/or omissions giving rise to this cause of action and is legally and proximately responsible for damages as alleged herein pursuant to A.R.S. § 41-1481(G).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. Prior to filing this civil action, Plaintiff timely filed a written charge of discrimination with the Arizona Attorney General's Office, Civil Rights Division, pursuant to the Arizona Civil Rights Act, § 41-1481(A). After its investigation, the Attorney General's Office issued Plaintiff a Right to Sue letter on April 24, 2014. Exhibit A.

9. On or about March 27, 2015, Plaintiff filed a formal administrative complaint with the City of Tucson regarding Captain Jeff Langejans' conduct.

10. Plaintiff timely filed her Complaint pursuant to the Arizona Civil Rights Act, § 41-1481(D).

## GENERAL ALLEGATIONS

11. Plaintiff has been an employee of the City of Tucson's Fire Department (TFD) since 2007.

12. Plaintiff was employed as a Paramedic with TFD.

13. Plaintiff gave birth to her son on July 19, 2012, and returned to work on October 27, 2012.

14. When she returned to work, Plaintiff was a Swing Paramedic on "C" Shift, where she was scheduled to work at different fire stations depending on TFD's needs.

15. Before she returned to work, because Plaintiff knew she would be pumping breast milk throughout her work day, she notified Battalion Chief (BC) Paul McDonough, of her need for a private lactation room while on duty.

16. At the time, TFD did not have any procedures in place for dealing with Plaintiff's request.

17. Initially, BC McDonough and Plaintiff discussed having her work from Station 20 so as not to displace other employees and to bring as little attention to her situation as possible.

2

18. BC McDonough and Plaintiff were both aware that working from Station 20 was only temporary because she would be filling a temporary vacancy at that Station until the end of the year.

19. On or about October 27, 2012, Paramedic Jeff Todd, who was then-assigned to Station 12, told Plaintiff that he wanted to move to another station and would like to help her.

20. On or about October 28, 2012, Paramedic Todd sent an email to BC Brian Stevens formally requesting a transfer from Station 12 to fill the vacancy at Station 20, knowing this would help Plaintiff because her home is close to Station 12. TFD, however, ignored Paramedic Todd's request.

21. BC McDonough asked Plaintiff's husband, TFD Fire Captain Gordon Clark, whether Station 12 was a better fit for Plaintiff and if she would rather be there than at Station 20. Captain Clark responded, "absolutely."

22. Station 12 was a perfect fit for Plaintiff because it has a private room suitable to express and pump her breast milk.

23. At the time, Station 12 had two other mothers on Plaintiff's shift, as well as a mother on a different shift, one of whom was also pumping breast milk.

24. On or about October 30, 2012, BC Stevens and Deputy Chief (DC) Rodriguez met with TFD's Human Resources Manager Joann Acedo regarding Paramedic Todd's temporary transfer request from Station 12.

25. TFD denied Paramedic Todd's transfer request even though TFD had previously accommodated other transfers between male coworkers for various reasons.

26. TFD also granted Paramedic Todd's request to leave Station 12 and assigned him to a Swing position. Personnel opting to swing is not explicitly covered by TFD Manual of Operations Section 201, Rules of Assignment, and therefore the bidding of the spot was not mandatory, as expressed by BC McDonough (formerly the DC of Operations) to Captain Clark.

27. On or about November 9, 2012, Plaintiff submitted a memorandum formally requesting a temporary assignment to Station 12. In her memorandum, Plaintiff explained

3

the reasons for her request. Plaintiff's memorandum was preceded by memoranda prepared by Paramedic Todd and BC McDonough requesting Plaintiff's temporary assignment to Station 12.

28. As a result of the uncertainty surrounding her work assignment location, Plaintiff experienced stress and anxiety. This contributed to her inability to produce enough milk for her son during the 24 hours she was at work, necessitating either Plaintiff's husband or mother to come to her work location to pick up additional milk during her shift.

29. On or about November 12, 2012, BC McDonough brought Plaintiff to headquarters to meet with DC Nied and DC Rodriguez.

30. Plaintiff attempted to explain her situation but was met with insensitive and inappropriate questions from DCs Nied and Rodriguez.

31. Following the meeting, Plaintiff remained at Station 12 for seven additional days.

32. Due to the efforts of BC McDonough and as a result of other vacancies at Station 12, Plaintiff was able to remain at Station 12 through January 1, 2013.

33. Beginning in January 2013, Plaintiff was given swing assignments to locations which were not equipped with appropriate lactation rooms. When Captain Clark mentioned this to TFD's scheduler, Captain Rick L'Heureux, he responded, "I don't think she deserves any special accommodations."

34. Plaintiff had to use vacation and sick leave time to avoid being assigned to stations that did not have a private space for lactation.

35. This situation exacerbated Plaintiff's stress and anxiety because she never knew from day to day if she would be assigned to work at a station that would allow her to privately express and store her breast milk.

36. In approximately mid-January 2013, Plaintiff met with Marty Macias, an investigator in the City's Office of Equal Opportunity Programs (OEOP) to discuss the discrimination she was experiencing.

/ /

/ /

37. Ms. Macias told Plaintiff that she had a valid claim and gave Plaintiff a complaint form to fill out. Plaintiff, however, chose not to file a formal complaint at that time, hoping that the situation would improve.

38. Plaintiff continued to be assigned to stations that were not equipped with an appropriate lactation room.

39. On or about March 20, 2013, after receiving another assignment that was not equipped with an appropriate lactation room, Plaintiff made repeated telephone calls to DC Rodriguez and Assistant Chief (AC) Mike Fischback, leaving messages that it was urgent she speak with them. Her calls to DC Rodriguez and AC Fischback, however, were not returned.

40. Shortly before 5:00 p.m. on March 20, 2013, AC Fischback answered Plaintiff's fourth phone call, immediately put her on hold, and returned with DC Rodriguez and HR Manager Acedo.

41. Plaintiff explained that she had again been assigned to work at Station 9 that night which was not equipped with an appropriate lactation room. DC Rodriguez responded that Station 9 was, "the only thing we have open for you tonight."

42. HR Manager Acedo told Plaintiff that "per the law," Station 9 was on an "approved list" because the Chief's combined office/bedroom and the Emergency Captain's combined office/bedroom both had closing doors. HR Manager Acedo advised Plaintiff to just ask them to leave their rooms when she needed to pump.

43. Plaintiff then explained that she pumped milk every 2-3 hours, including throughout the night, and that awakening her supervisors to leave their rooms so she could pump was unreasonable. HR Manager Acedo then told Plaintiff, "your pumping seems excessive to me." Plaintiff responded that this was normal for a newborn baby. HR Manager Acedo replied, "well, it seems to me that you're not fit for duty."

44. Exasperated and frustrated with HR Manager Acedo's lack of understanding and her offensive comments, Plaintiff responded, "you are out of your friggin' mind if you think I would awaken and ask a Chief or Captain to leave their assigned room every 2-3

5

hours to pump." In response, both DC Rodriguez and AC Fischback agreed that Station 9 was not an acceptable location for pumping breast milk.

45. Plaintiff was so distraught that she was in tears and was unable to work her shift.

46. On or about March 26, 2012, Plaintiff was summoned to TFD headquarters for a meeting with DC Rodriguez and AC Fischback.

47. Under normal TFD practice, her supervisor, BC McDonough, should have also been in attendance, but was not present.

48. Per the terms of City of Tucson Administrative Directives and the International Association of Fire Fighters Local 479 and City of Tucson Contract (CBA), Plaintiff called her C Shift Union Griever, Sloan Tamietti, to accompany her to the meeting.

49. Union Griever Tamietti called DC Rodriguez. DC Rodriguez told Union Griever Tamietti, "labor doesn't need to be here for this."

50. Plaintiff told Union Griever Tamietti that she wanted him there anyway, and eventually he was allowed to join them.

51. During the meeting, Plaintiff was handed a letter stating that she was being written up for using the phrase "you're out of your friggin' mind" during the March 20, 2013, phone call.

52. AC Fischback then told Plaintiff that until August 2013, when her son would turn one year old, she would be assigned to work exclusively at Station 6 because the other TFD stations did not have conforming lactation rooms.

53. Station 6 is located at the far southeast boundary of the City on Wilmot off of I-10, and primarily responds to calls from the federal and state prisons on Wilmot.

54. Plaintiff asked AC Fischback for the list of approved stations but was told she could not have the list until it was revised because OEOP had just listed the stations that had a room with a locking door, and had not taken into account that some of those rooms were commander bedrooms.

55. Plaintiff then asked about working overtime and about trades. AC Fischback told her that they had not "thought about that yet, we will have to get back to you on that."

56. TFD never provided the approved list to Plaintiff, and as a result, because she was exclusively assigned to Station 6, Plaintiff was deprived of overtime earning opportunities and with one exception, station trades.

57. Plaintiff then asked why she could not work at Station 12, whereupon AC Fischback responded that Station 12 was not on the approved list.

58. Plaintiff pointed out that the only other nursing mother at the time in TFD, Arianne Phaneuf, was assigned to Station 12. AC Fischback replied, "well, that's what happens when you file a complaint with EEO."

59. Plaintiff told AC Fischback that she had not filed a complaint. He responded, "well, someone called and got them involved."

60. Plaintiff's reassignment to a firefighter position at Station 6 occurred without formal notice via a TFD Employee Personnel Record Update Form and at the displeasure of the existing Station 6-assigned employee who was displaced as a result.

61. Plaintiff continues to be approached by coworkers who ask if she is the one who complained about breastfeeding locations.

62. On or about July 19, 2013, TFD issued a new nursing room policy. Shortly after the new policy was enacted, both Plaintiff and her husband, Captain Clark, were told by several individuals that the policy had become known as the "Carrie Clause."

63. While working at Station 6, an extra duty Captain, James Sieminski, walked in, threw up his hands, and said, "oh, is this the nursing room? I don't want to come in here if this is the nursing room." Captain Nate Weber overheard Captain Sieminski's remark, and asked what he meant, to which Captain Sieminski replied, "oh, you haven't heard about the new nursing room policy?" Plaintiff, who was embarrassed by the flippant remarks, then left the room.

64. In August 2013, during her first shift at Station 6 after her son's first birthday, Plaintiff received a call from HR Manager Acedo, advising Plaintiff that her time at Station 6 was up and that if she wanted more time she needed to formally request it through a memorandum.

65. In a subsequent meeting with Plaintiff, AC Brad Olson permanently assigned Plaintiff to Station 6.

66. Although working conditions improved significantly at Station 6 due to the efforts of AC Olson, it did not eliminate the damage that had previously been done to Plaintiff since her return to work after her son's birth.

67. On July 31, 2013, Plaintiff filed a written charge of discrimination with the Arizona Attorney General's Office, Civil Rights Division pursuant to the Arizona Civil Rights Act, § 41-1481(A).

68. In January 2014, Plaintiff informed TFD that she was again pregnant.

69. On April 24, 2014, the Attorney General's Office issued Plaintiff a Right to Sue letter.

70. On or about May 22, 2014, Captain Ted McDonough singled Plaintiff out and instructed Plaintiff to perform firefighting drills that none of the other members of her crew were required to perform. When Plaintiff repeatedly asked Captain McDonough why she was being singled out, he ignored her and would not reply to her questions.

71. On May 22, 2014, Plaintiff filed a notice of claim against the City of Tucson for sex discrimination and retaliation that she had experienced since returning to work in October 2012.

72. Plaintiff was assigned to light duty on June 16, 2014.

73. Up to the time Plaintiff went on her light duty assignment, HR Manager Acedo was frequently contacting Plaintiff asking her if she still had the same need to pump her breast milk, or words to that effect.

74. On or about June 17, 2014, BC Tim Nofs asked her to submit a memo about the May 22nd incident when Captain McDonough took her out to drill by herself because TFD administration wanted to pursue disciplinary action against her for insubordination.

75. On June 19, 2014, Plaintiff started her day at 6:00 a.m. in her light duty assignment (in the fire prevention division), planning to work a 10-hour shift. Plaintiff's supervisor, Ken Brouillette, was aware of her schedule. At approximately 2:40 p.m., Plaintiff left to exercise as she is required to do pursuant to TFD's Manual of Operations.

76. At approximately 2:45 p.m., HR Assistant Veronica Muñoz called Plaintiff and said that HR Manager Acedo told her that Plaintiff was not authorized to leave, and that she could not exercise without a doctor's note. Further, Plaintiff was told that she was not allowed to come in to work before 7:00 a.m.

77. Plaintiff proceeded to obtain a doctor's note which indicated that she was authorized to engage in low-impact exercise.

78. Upon information and belief, TFD has never required a pregnant employee who is on a light duty assignment to provide a doctor's note in order to exercise.

79. On or about June 19 or 20, 2014, at HR Manager Acedo's direction, TFD's HR department changed Plaintiff's computerized time entry for June 18, 2014, and withdrew 6 hours from her vacation time bank instead of 3 hours. The three additional hours withdrawn without Plaintiff's consent represented the one-hour differential between 6:00 a.m. and 7:00 a.m., the 1.5 hours she exercised and .5 for lunch. Plaintiff's schedule was also changed to begin her day at 7:00 a.m.

80. Also on June 19, 2014, a meeting or meetings occurred between Mr. Brouillette, AC Joe Gulotta and HR Manager Acedo, amongst others. Eventually, it was decided that Plaintiff would be allowed to exercise, but only at Station 1. They also decided that Plaintiff would not be allowed to flex her time and that her schedule would be 7:00 a.m. to 5:30 p.m. every day.

81. Upon information and belief, other than what is articulated in the TFD Manual of Operations, TFD has never restricted the exercise location for any employee.

82. Upon information and belief, other TFD employees on light duty are allowed to start their shifts at 6:00 a.m. and are allowed to flex their time.

83. Since returning to work in October 2012, and continuing to this day, TFD has subjected Plaintiff to sex discrimination resulting in a hostile work environment including, but not limited to, the incidents discussed above.

84. Since TFD became aware that Plaintiff had contacted the OEOP in January 2013, and continuing to this day (including, but not limited to, the incidents discussed

above), TFD has continued to retaliate against the Plaintiff in reprisal for Plaintiff reporting the FLSA violations.

85. In or around June or July 2014, Plaintiff competed for a position in the Fire Prevention Division (Division).

86. Based upon her written test score and oral interview, Plaintiff was ranked first on the list for the position.

87. Based upon the rankings on the promotional list, Plaintiff was promoted to the position of Fire Inspector.

88. After Plaintiff's promotion to Fire Inspector, Capt. Jeff Langejans, a captain in the Division, told Plaintiff's co-workers that Plaintiff could not have been ranked first for the position, and that she must have cheated on the promotional process.

89. Capt. Langejans told Plaintiff's co-workers that her husband, who was also a captain in the Division, had provided Plaintiff with the answers to the exam.

90. Capt. Langejans passed his allegations up the chain of command, in an effort to have Plaintiff and her husband discredited and removed from the Division.

91. Plaintiff's husband had no involvement in the testing process.

92. In addition to placing first on the promotional list for the Fire Inspector position, Plaintiff had ranked first on the paramedic promotional list and was academically at the top of her class through the majority of her firefighter academy.

93. In or about August 2014, Capt. Langejans became aware of Plaintiff's discrimination complaint against TFD.

94. Capt. Langejans approached one of Plaintiff's co-workers and told him to look up articles about the lawsuit and read the comments about Plaintiff.

95. According to Plaintiff's co-worker, Capt. Langejans enjoyed reading negative comments posted about Plaintiff.

96. According to Plaintiff's co-worker, Capt. Langejans began spreading rumors around the Division that Plaintiff and her husband were having marital problems.

97. Capt. Langejans told one of Plaintiff's co-workers that TFD should have anticipated a complaint such as Plaintiff filed "the day they started hiring females."

98.     Capt. Langejans became obsessed with Plaintiff and her husband, and devised a detailed plan to have Plaintiff's husband removed from the Division before Plaintiff started work as a Fire Inspector.

99.     Capt. Langejans told Inspector Sisterman that he thinks "it would be very easy to kill his enemies and get away with it" regarding Plaintiff and her husband.

100.    From September through November 2014, Plaintiff was on family leave after the birth of her second child.

101.    While Plaintiff was on family leave, Capt. Langejans made derogatory and discriminatory remarks about Plaintiff, pregnant women and women in general working at TFD, stating that women over 40 should no longer be allowed to work in fire suppression because they "look like crap," don't age well and can't do the job.

102.    While Plaintiff was on family leave, Capt. Langejans made derogatory remarks to Plaintiff's co-workers, stating that she had cheated on the exam, that Plaintiff and her husband were going to ruin the Division, that he wanted to have Plaintiff's husband removed from the Division, and that the other inspectors should lock their computers because they "can't trust the Clarks."

103.    On or about November 24, 2014, Plaintiff returned from family leave to begin her new position as a Fire Inspector.

104.    After Plaintiff returned to work, Plaintiff's co-workers advised her of the derogatory and discriminatory comments Capt. Langejans had made about her in her absence.

105.    After Plaintiff's return to work, Capt. Langejans continued to make derogatory, discriminatory and inappropriate comments about Plaintiff, which created an intimidating and hostile work environment continuing to this day, and which TFD has failed or refused to address.

106.    After a December 3, 2014, supervisors' meeting, Capt. Langejans approached Inspectors Tom Sisterman, John Vincent and Pete December and told them that he had advised the other supervisors at that meeting that Plaintiff's husband should be removed

from the Division, that the Clarks were going to ruin the Division, and that they were the reason for poor morale in the Division.

107. Inspector Vincent responded that Capt. Langejan was the reason for poor morale in the Division as a result of his hostility and drama towards the Clarks.

108. On December 5, 2014, Inspectors Sisterman, Vincent and December informed Captain Clark of the statements made by Captain Langejans. Captain Clark immediately notified his chain of command.

109. Plaintiff took her complaints about Capt. Langejans' conduct to her Chief, Mike Carsten.

110. Inspectors Sisterman and Vincent lodged a complaint through their chain of command, requesting that they be removed from Capt. Langejan's supervision and that TFD initiate an investigation into his actions against Plaintiff.

111. Again, TFD failed or refused to address the complaints against Capt. Langejans.

112. On January 14, 2015, Captain Clark was informed of Captain Langejans statements (referring to Captain Clark) about "killing his enemies." Captain Clark submitted a memorandum reporting the wrongful conduct through his chain of command to Fire Chief Critchley.

113. Inspectors Sisterman and Vincent took their complaints to Chief Critchley as well, and an investigation was initiated.

114. On January 27, 2015, during a meeting with Capt. Langejans and the Union president and vice president, Capt. Langejans denied his statements and conduct towards Plaintiff. On January 28, 2015, during another meeting with Captain Langejans and the Union president and vice president, Captain Langejans then admitted his statements and conduct towards Plaintiff.

115. In approximately February 2015, after the investigation was concluded, Chief Laura Baker advised Plaintiff that no one in the Division would be removed, and that everyone needed to "move past this."

116. Plaintiff told Chief Baker that she was not comfortable being around Capt. Langejans and that she felt harassed and intimidated by him on a daily basis.

117. Chief Baker responded, "That's okay, you don't have to get along."

118. Capt. Langejans' harassing and intimidating conduct towards Plaintiff has created a hostile work environment.

119. Capt. Langejans' conduct has violated City of Tucson administrative directives and TFD's policies.

120. Upon information and belief, the only disciplinary action taken by TFD against Capt. Langejans was to issue a written reprimand.

121. TFD's failure to act upon Plaintiff's complaints against Capt. Langejans is in retaliation for Plaintiff's lawsuit against TFD for violating the FLSA.

122. On or about March 25, 2015, as a result of TFD's refusal and failure to take action against Capt. Langejans, Plaintiff filed a formal administrative complaint with the City of Tucson.

## COUNT ONE
### (Sex Discrimination/Retaliation in Violation of the Fair Labor Standards Act, 29 U.S.C. § 207(r) and § 215)

123. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-122 above as though fully set forth herein.

124. The Fair Labor Standards Act (FLSA), as amended by the Patient Protection and Affordable Care Act, 29 U.S.C. § 207(r), requires an employer to provide a suitable location and break times for the purpose of expressing breast milk for one year after a child's birth each time an employee has need to express the milk. The location must be a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public.

125. TFD did not provide Plaintiff with an appropriate lactation room on a consistent basis until March 23, 2013, almost five months after she had returned to work.

126. Further, TFD retaliated against Plaintiff for her repeated and continued reports of her belief that TFD was violating federal law by not providing her with an appropriate lactation room on a consistent basis.

13

127. TFD also engaged in a pattern of hostile and belittling behavior toward Plaintiff, causing her serious emotional anguish.

128. Further, in reprisal for reporting the FLSA violation, TFD retaliated against her by disciplining her and relegating her to work only at Station 6.

129. TFD intentionally discriminated against Plaintiff in violation of the FLSA and acted with malice or with reckless indifference to Plaintiff's federally protected rights.

130. As a result of TFD's actions as alleged herein, Plaintiff has suffered damages, including, without limitation, loss of wages and associated benefits, and emotional distress, for which she should be compensated in an amount to be determined at trial pursuant to 29 U.S.C. § 216(b).

## COUNT TWO
### (Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964, as Amended)

131. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-130 above as though fully set forth herein.

132. TFD is an employer within the meaning of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e et seq. (Title VII) and in particular, 42 U.S.C. § 2000e(b).

133. TFD's actions as alleged herein constitute discrimination on the basis of sex in violation of Title VII, and specifically, 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e(k).

134. TFD intentionally discriminated against Plaintiff and acted with malice or with reckless indifference to Plaintiff's federally protected rights.

135. As a result of TFD's discrimination, Plaintiff has suffered damages, including, without limitation, loss of wages and associated benefits, emotional distress, mental anguish, and loss of enjoyment of life for which she should be compensated in an amount to be determined at trial pursuant to 42 U.S.C. § 2000e-5.

/ /
/ /
/ /

## COUNT THREE
### (Sex Discrimination/Hostile Work Environment in Violation of the Arizona Civil Rights Act, A.R.S. § 41-1463(B)(1))

136. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-135 above as though fully set forth herein.

137. Plaintiff was subjected to sex discrimination by TFD which resulted in a hostile work environment.

138. Pursuant to the Arizona Civil Rights Act (ACRA), A.R.S. § 41-1463(B)(1), it is an unlawful employment practice for an employer to discriminate against any individual with respect to compensation, terms, conditions or privileges of employment because of sex.

139. TFD deliberately and unlawfully discriminated against Plaintiff based upon her sex in violation of the ACRA, A.R.S. §§ 41-1461, et seq.

140. As a result of TFD's discrimination, Plaintiff has suffered lost wages and the value of lost benefits, and other damages for which she should be compensated in an amount to be determined at trial.

## COUNT FOUR
### (Retaliation in Violation of the Arizona Civil Rights Act, A.R.S. § 41-1464(A))

141. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-140 above as though fully set forth herein.

142. Pursuant to A.R.S. § 41-1464(A), it is an unlawful employment practice for an employer to discriminate against any of its employees because the employee opposed any practice which is an unlawful employment practice.

143. Plaintiff complained to management and opposed conduct which she reasonably believed to be an unlawful employment practice under the ACRA.

144. TFD unlawfully discriminated against Plaintiff in violation of A.R.S. § 41-1464(A) by subjecting her to materially adverse employment actions and by subjecting her to severe or pervasive conduct which changed the terms and conditions of Plaintiff's employment and created a hostile work environment because she opposed conduct which

she reasonably believed to be an unlawful employment practice under the Arizona Civil Rights Act.

145. As a result of TFD's unlawful retaliation, Plaintiff suffered monetary damages for which she should be compensated in an amount to be determined at trial pursuant to A.R.S. § 41-1481(G).

## COUNT FIVE
### (Retaliation in Violation of the Arizona Civil Rights Act, A.R.S. § 41-1464(A))

146. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-145 above as though fully set forth herein.

147. Pursuant to A.R.S. § 41-1464(A), it is an unlawful employment practice for an employer to discriminate against any of its employees because the employee opposed any practice which is an unlawful employment practice.

148. Plaintiff complained to management about Capt. Langejans' conduct and the hostile work environment created thereby.

149. TFD's failure and refusal to take action against Capt. Langejans was in retaliation against Plaintiff for filing her lawsuit alleging FLSA violations.

150. TFD's failure and refusal to take action against Capt. Langejans resulted in a hostile work environment.

151. As a result of TFD's unlawful retaliation, Plaintiff has suffered monetary damages for which she should be compensated in an amount to be determined at trial pursuant to A.R.S. § 41-1481(G).

## JURY TRIAL DEMAND

Plaintiff requests that the Court set this case for a jury trial.

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against the Defendant as follows:

1. For compensatory damages in a just and reasonable amount;
2. For punitive damages in a just and reasonable amount;

3. For Plaintiff's costs and attorney's fees in this matter pursuant to A.R.S. § 41-1481(J), 42 U.S.C. § 2000e-5(k), and 29 U.S.C. § 216(b);

4. For such other and further relief as the Court deems reasonable and just.

DATED this 11th day of August, 2015.

**JACOBSON LAW FIRM**

*s/ Jeffrey H. Jacobson*
Jeffrey H. Jacobson
Attorney for Plaintiff

Filed via the CM/ECF system and copy electronically provided this 11th day of August, 2015, to:

Michelle Saavedra
Principal Assistant City Attorney
Office of the City Attorney, Civil Division
255 West Alameda, 7th Floor
Tucson, AZ 85701

Michael W.L. McCrory
Principal Assistant City Attorney
Office of the City Attorney, Civil Division
255 West Alameda, 7th Floor
Tucson, AZ 85701

*s/Kate Manns*
Kate Manns

# Exhibit A

OFFICE OF THE ATTORNEY GENERAL
Civil Rights Division

# NOTICE OF RIGHT TO SUE

<u>Mrs. Carrie A. Clark</u>           vs.           <u>City of Tucson, Fire Department</u>
(Charging Party)                                                    (Respondent)

CRD No.: T0012013000486                          EEOC No.: 35A-2013-00456C

On July 31, 2013, you filed a charge with the Civil Rights Division alleging employment discrimination. Arizona law provides that you may bring a civil action in Superior court of the county where the alleged discriminatory action took place. Should you decide to file a civil action, you must do so **within 90 days** of the date you receive this Notice or **within one year** of the date you filed the charge, **whichever comes first**. A.R.S. ' 41-1481(D.)

This NOTICE OF RIGHT TO SUE is being issued for the following reason(s):

☐ This office has made a final determination or has otherwise completed its processing of your charge and will be taking no further action.

☒ The Civil Rights Division has not completed the processing of your charges, but there are approximately 90 days left before the expiration of the **one year deadline** for filing a civil action in Superior Court.

☐ Although your charge was sent to the Equal Employment Opportunity Commission for processing, you may also have a right to sue under the Arizona Civil Rights Act, and there are approximately 90 days left before the expiration of the **one year deadline** for filing a civil action in Superior Court.

☐ Charging Party has submitted a written request.

If you have any questions concerning this notice, please contact (520) 628-6500. If you need legal assistance, you should seek the advice of an attorney.

Sincerely,

Karen J. Hartman-Tellez, Chief Counsel
Civil Rights Compliance Section

BY:

_____
Ernest Granillo, Compliance Manager

Sent by regular mail this <u>24th</u> day of <u>April, 2014</u>

cc: Ms. Julianne K. Hughes Esq. (Respondent's Attorney)