Michelle R. Saavedra
Michael W.L. McCrory
Principal Assistant City Attorneys for
MICHAEL G. RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
Pima County Computer No. 66163
Michael.McCrory@tucsonaz.gov
State Bar Computer No. 3899
Pima County Computer No. 37268
Telephone: (520) 791-4221
Fax: (520) 623-9803
*Attorneys for Defendant City of Tucson*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK, | 4:14-cv-02543 |
| Plaintiff, | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | (Hon. Cindy Jorgenson) |
| CITY OF TUCSON, | |
| Defendant. | |

Defendant City of Tucson ("City") moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing all claims brought by the plaintiff Carrie Clark ("Plaintiff"). The City's motion is based upon the following Points and Authorities and the Defendant's Statement of Facts ("DSOF") that is filed concurrently with this motion and incorporated herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      Introduction

Plaintiff has sued the City alleging violations of federal and state employment laws while she was employed with the Tucson Fire Department ("TFD"). (Doc. 42). TFD is a municipal fire department managed as a paramilitary organization that responds to public safety matters and emergencies such as fires, hazardous material discharges, collapsed buildings, automobile accidents and critical individual medical conditions. (DSOF 1, 3).

1

In the fall of 2012, Plaintiff was a paramedic in the Operations Division assigned to swing shift who was off work for the birth of her first child.  (DSOF 12, 13).  She returned to work on October 27, 2012, with the need that she be able to express breast milk while she was at work.  (DSOF 15).

This case began with Plaintiff's claims that she was not provided a private area to express milk after returning to work at TFD on October 27, 2012.  Plaintiff wanted to be assigned to a specific station that was closest to her mother's home.  (DSOF 16, 26).  She complained that other stations did not have private bedrooms for her to use.  In fact all stations had private rooms that complied with federal law and she never worked at a station that didn't meet her needs.  (DSOF 36-48).

She complained TFD did not let her exchange assignments with another paramedic – even though she knew that violated standard Rules of Assignment.  (DSOF 16-20).  She objected to having to go to different stations on swing shift – then objected to being assigned a set shift at a single station that met her needs without impacting public safety.  (DSOF 22, 29, 66-67)  Plaintiff's meetings with her chain of command and human resources resulted in new complaints that they weren't nice and didn't give her the specific station she wanted. (DSOF 52-59).  Plaintiff received a verbal warning for her admitted rudeness to superiors and complained that it was retaliatory.  (DSOF 60-62).  She complained TFD didn't have a policy for nursing mothers in place when she returned to work – then complained when TFD later issued a policy.  (DSOF 78-79, 81-85).  Upon deciding she preferred the temporary assignment to Station 6, she demanded being allowed to stay there for almost an additional year beyond the expiration of the one year from her child's birth, claiming the need to continue expressing breast milk.  (DSOF 81).  Although she had no complaints about her supervisor at Station 6, she alleges discrimination because she was required to pull a hose during a mandatory drill.  (DSOF 90, 92-98).

In June, 2014, Plaintiff went on light duty in an administrative position when she was pregnant with her second child.  (DSOF 99).  She claims she was subjected to unfair

2

rules requiring she report to work at set times in retaliation for her complaints about the lack of lactation rooms in Operations.  (DSOF 101-106).  Plaintiff went on leave for the birth of her second child and returned as a Fire Inspector assigned to the Fire Prevention unit.  Plaintiff's husband, Gordon Clark ("G. Clark"), was assigned to Fire Prevention as a captain.  (DSOF 107-110).  At Fire Prevention, she became embroiled in conflict with Captain Jeffrey Langejans ("Langejans") who was not her supervisor and several men in the unit who claimed Langejans harassed and targeted those he didn't like – both male and female.  (DSOF 110-120).  The complaints were investigated by TFD management resulting in disciplinary action against Langejans for comments deemed inappropriate.  (DSOF 121-125, 127).  Plaintiff was not satisfied with the level of discipline and filed a complaint with the City's Equal Opportunities Programs Division ("EOPD").[1]  (DSOF 130).  EOPD conducted a thorough investigation and made findings and recommendations; they found no discrimination or retaliation but determined that having Plaintiff and her husband as a captain in Fire Prevention violated the City's nepotism policies.  (DSOF 131-135).  The nepotism issue, and the supervisory and chain of command problems it created, resulted in G. Clark's transfer out of Fire Prevention – another matter she claims as retaliation.  (DSOF 139).

The one constant in all her complaints is their overall general vagueness.  Plaintiff provides no specifics as to who discriminated against her and lacks any evidence that any conduct was based on her sex.  There is no nexus between the allegations from one assignment and set of managers to those in subsequent time periods, and no evidence of any overall discriminatory or retaliatory policy or practice by the Fire Chief, TFD or the City.  Most significant for this case, Plaintiff has no admissible evidence that males were treated any differently than she was or that she was subject to any adverse employment action.

---

[1] The same office was previously called the Office of Equal Opportunity Programs ("OEOP").  For consistency, "EOPD" is used in this DSOF for both time frames. Documents and deposition testimony will still refer to "OEOP" where applicable.

On July 31, 2013, Plaintiff filed an EEO complaint with the Arizona Civil Rights Division.  (DSOF 87).  She received a right to sue letter on April 24, 2014.  (DSOF 89).  On May 22, 2104, Plaintiff served a notice of claim on the City pursuant to A.R.S. §12-821.01.  (DSOF 91).  On July 23, 2014, Plaintiff filed her original state court complaint alleging her swing shift assignments violated the Fair Labor Standards Act protections for expressing milk, discrimination based upon her sex and retaliation for having raised the issue.  The City denies that it violated the FLSA or has discriminated or retaliated against Plaintiff, and alleges that all employment actions taken regarding Plaintiff were for legitimate business reasons.

The City removed the case to this Court.  (Doc. 1).  Plaintiff subsequently filed an amended complaint and on May 5, 2016, filed a Second Amended Complaint ("SAC") (Doc. 42).  The SAC claimed that Plaintiff was subject to further discrimination and retaliation after she was assigned to a separate division – Fire Prevention.  The City answered (Doc. 44).  Discovery was completed on April 3, 2017, with the exception of matters subject to the motion regarding the application of marital privilege to the depositions of Plaintiff and her husband, Gordon Clark ("G. Clark").  The continuation of the depositions of Plaintiff and G. Clark do not affect this motion.

## II.    Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  A material fact is one that might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  In order to defeat summary judgment, Plaintiff must tender evidence through affidavits, declarations, documents and/or other discoverable materials that demonstrate there are facts that a reasonable jury could consider to hold in her favor.  (*Id.*); *Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers*, 971 F.2d 347, 355 (9th Cir.1987).  The mere existence of a scintilla of evidence or allegations that are conclusory or speculative will not suffice to defeat summary judgment.  *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996).

Plaintiff's employment discrimination claims are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff must first establish the factual basis to support a prima facie case. Once she establishes her case, the burden shifts to the City to articulate legitimate, nondiscriminatory reasons for any adverse actions it has taken. Once the City provides factual support for those reasons, the burden shifts back to the Plaintiff to present facts showing the asserted reasons are pretextual. *Peterson v. Hewlett–Packard Co.*, 358 F.3d 599, 603 (2004); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).

In reviewing the motion, the Court will view the facts and inferences in the light most favorable to the non-moving party. In a discrimination case, however, this does not require the court to make a credibility determination on the defendant's evidence, even if it has reason to disbelieve that evidence. *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004).

## III.    Argument

### A.    Count 1: TFD did not violate FLSA and Plaintiff's assignment to Station 6 was not retaliatory.

#### i.    TFD provided rooms in compliance with FLSA.

Under Count 1, Plaintiff alleges TFD failed to provide her with an appropriate lactation room on a consistent basis until March 23, 2013, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(r) and §215.[2] (Doc. 42 ¶ 134). She also claims that her assignment to Station 6 was in retaliation for her complaints that TFD was in violation FLSA. (Doc. 42 ¶ 135). § 207(r) in pertinent part provides:

(r)(1) An employer shall provide—

---

[2] Count 1 is labeled as a claim for sex discrimination, this statute does provides a remedy for refusal to provide for time and a place for lactation but does not address discrimination.

> (A) a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and
>
> (B) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

§ 215 provides certain remedies for violations of § 207.

In this case, Plaintiff admits that no one ever told her she could not have time to express milk and she has made no claim under 29 U.S.C. § 207(r)(1)(A). (DSOF 50). She never actually worked at a station that violated 29 U.S.C. § 207(r)(1)(B). (DSOF 41-47). Also, Plaintiff never worked at a station where she had to use a bathroom to pump breast milk. (DSOF 48).

Contrary to her assertions, Plaintiff's assignments were made to accommodate her preferences, not to discriminate against her. When first planning to return to work, Plaintiff requested an assignment to a regular shift at Station 20 where the regular paramedic was on military deployment. (DSOF 15). Her supervisor was willing to make that temporary assignment, but then Plaintiff did not want to disturb the paramedic in the position so she started back at Station 12. (*Id.*). On her first day back, she discovered the extent of her need to express milk and the need for her mother to pick up the milk while she was working. Station 12 was more convenient for her mother. (DSOF 16, 26). She initially sought to exchange positions with the paramedic at Station 12, knowing this was contrary to policy and established bidding procedures. (DSOF 16-20, 26). She was again offered Station 20 but declined. (DSOF 22). She also declined a regular paramedic position at Station 16 because she had a personality conflict with the supervising captain. (*Id.*). Plaintiff had no right to a permanent assignment at Station 12 because she was on swing shift. She repeatedly complained about not being assigned to Station 12 and rejected proffered assignments to a regular shift at other stations. (DSOF 22, 29). Plaintiff, however, was assigned to Station 12 "[d]ue to the efforts of BC McDonough and as a result of other vacancies at Station 12 through January 1, 2013." (*See* Doc. 42 ¶ 32; DSOF 22, 41). After that, the Captain who scheduled swing shift personnel relied on a list

6

Plaintiff provided of the stations where she did not want to work and he facilitated her requests.  (DSOF 35-37).

On March 20, 2013, Plaintiff was assigned to Station 9, which ultimately DC Rodriguez and AC Fischback agreed was not an acceptable location for pumping breast milk.  (Doc. 42 ¶ 44; DSOF 52-53).  Plaintiff did not work at Station 9 on that date.  (Doc. 42 ¶ 45).  Plaintiff was then told "that until August 2013, when her son would turn one year old, she would be assigned to work exclusively at Station 6."  (Doc. 42 ¶ 52; DSOF 66-69).  Plaintiff's real objection to being assigned a regular shift at Station 6 was that TFD did not assign her to the only station where she wanted to work – Station 12.

Plaintiff's complaint about the lack of proper facilities was in fact a demand that she have a private dorm room.  (DSOF 51).  She considered any other room to be inadequate.  Under the statutory requirements and the Department of Labor guidelines, no such room is necessary.  As stated by the U.S. Department of Labor, Wage and Hour Division:

> "The location provided must be functional as a space for expressing breast milk.  If the space is not dedicated to the nursing mother's use, it must be available when needed in order to meet the statutory requirement.  A space temporarily created or converted into a space for expressing milk or made available when needed by the nursing mother is sufficient provided that the space is shielded from view, and free from any intrusion from co-workers and the public."  (DSOF 42).

Plaintiff's allegation that an appropriate lactation room was not provided, if true, would state a violation of § 207(r).  However, such a violation is not an independent basis for relief in the form of damages.  Instead, the only way that an individual can get damages for a violation of § 207(r) is if that person is not paid minimum wages or overtime as required by FLSA.  *Lico v. TD Bank*, No. 14-CV-4729 JFB AKT, 2015 WL 3467159, at *2–3 (E.D.N.Y. June 1, 2015); see also: *Hicks v. City of Tuscaloosa*, No. 7:13-CV-02063-TMP, 2015 WL 6123209, at *28–29 (N.D. Ala. Oct. 19, 2015); *Frederick v. New Hampshire*, No. 14-CV-403-SM, 2015 WL 5772573, at *7 (D.N.H. Sept. 30, 2015).  There is no evidence that Plaintiff lost any pay, let alone the minimum wage

required by FLSA, thus she has no basis for any claim for damages under § 207(r). (DSOF 69).

There is no factual or legal basis for Plaintiff's claim that TFD violated FLSA by sending her to a station that lacked the private, shielded space between October 27, 2012 and March 13, 2013.

### ii. Plaintiff's assignment to Station 6 was not retaliatory.

Also, under Count 1, Plaintiff alleges that her assignment to Station 6 was in retaliation for her complaints of FLSA violations. (Doc. 42 ¶ 137). There is no basis for her retaliation claim here. The hypocrisy of this claim is that the temporary assignment to a regular shift at Station 6 was precisely the accommodation she demanded. One of Plaintiff's principal complaints was the fact she was on swing shift and not in a permanent position. (DSOF 29). The temporary assignment to Station 6 resolved her complaints that she had to go to too many different stations on swing shift. (DSOF 66-67). At Station 6, she remained a paramedic, acted as a paramedic, was paid as a paramedic. (DSOF 69) Although she claims the assignment was unfavorable because it was on the far side of the city, she later demanded to stay at Station 6, and complained that Acosta's efforts to determine when her temporary need for that station ended were harassment. (Doc. 42 ¶ 64, 72; DSOF 77, 80-81, 86).

Even if Plaintiff could present a *prima facie* case that she was retaliated against when assigned to Station 6, the decision to assign her there was based on the legitimate, non-discriminatory public safety requirements of TFD's mission. On March 20, 2013, when Plaintiff blew up at the prospect of being assigned to Station 9, it came out that she needed to express milk for 30-40 minutes every 3-4 hours throughout her shift. (DSOF 56). Since a paramedic must be available at all times for emergency response and those calls cannot be scheduled, the Chiefs were legitimately concerned about Plaintiff's reliability given the frequency of her pumping. (DSOF 57-59). This concern was validated by Plaintiff's statement that she took a medic truck out of service two times so she could pump milk at the station. (DSOF 58). Station 6 provided a structure where the

frequency of her pumping could be accommodated without endangering public safety. The shift to which she was assigned had a captain who was also a paramedic.  Thus, if Plaintiff was unable to respond to a call, the crew could go shorthanded but there would still be a paramedic.  (DSOF 67).

The burden thus shifts to the Plaintiff to show that the stated reasons were pretextual.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062–63 (9th Cir. 2002); *Bowen v. M. Caratan, Inc.*, 142 F. Supp. 3d 1007, 1025 (E.D. Cal. 2015).  "An employee can prove pretext either: (1) 'directly, by showing that unlawful discrimination more likely motivated the employer'; or (2) 'indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable.'  *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1280 (9th Cir. 2017) (quoting *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 849 (9th Cir. 2004)).  Plaintiff cannot show any unlawful motivation and the assignment to Station 6 where her duties as a paramedic could be covered if she was unable to perform them is devoid of artifice.

### B.    Counts 2 and 3 alleging sex discrimination must be dismissed.

Count 2 alleges that TFD discriminated against Plaintiff in violation of Title VII, 42 U.S.C. § 2000e(b), 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e(k) and seeks damage pursuant to 42 U.S.C. § 2000e-5.  (Doc. 42 ¶¶ 140-144).  Count 3 makes the same allegations under the Arizona Civil Rights Act ("ACRA"), A.R.S. § 41-1463(B)(1).  (Doc. 42 ¶¶ 145-149).  To establish her claim of discrimination, Plaintiff must show direct evidence of discriminatory intent or evidence that gives rise to the inference of discriminatory intent under the framework set forth in *McDonnell Douglas Corp. v. Green.  Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003), as amended (Jan. 2, 2004).  The ACRA is subject to the same analysis as is applied under federal discrimination law.  *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004).

**i.        There is no direct evidence of discriminatory intent.**

The only statement that Plaintiff can cite in the almost three years subject to this lawsuit is a single comment Chief Fischback made on March 26, 2012, when Plaintiff was given a verbal counseling for rude behavior to her superiors.  (DSOF 62, 62-65).  During the discussion, Plaintiff again asked to be assigned to Station 12.  (DSOF 64).  Fischback told her that he couldn't do that because a complaint had been filed and Station 12 was not on the approved list.  (*Id.*).  Fischback immediately apologized for the comment to Plaintiff and her union representative who was also present.  (*Id.*).

Fischback's comment was an accurate statement that simply reflected the irony of Plaintiff's position.  Her talking to EOPD led them to investigate and in turn to report that the room available at Station 12 did not have a lock.  (DSOF 42)  Although Plaintiff had previously been assigned there without any problems, TFD now had a problem because an independent branch of the City told them that doing so might violate the law.  Even if one could discern an inkling of discriminatory intent in Fischback's comment, the only employment decisions involving Fischback were Plaintiff's assignment to Station 6 and the verbal counseling.  Like the assignment, the verbal counseling was a legitimate, non-discriminatory decision.  Plaintiff's rude comments and behavior patently justified the counseling.  (DSOF 60-62).  Plaintiff has no evidence that Fischback made or influenced any other alleged adverse employment decision.  Any intent he may have had cannot be attributed to those decisions.  *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1281 (9th Cir. 2017).  In addition, it is the *only* such comment that Plaintiff ever heard in the almost three years covered by this lawsuit.  (DSOF 65).  A single ambiguous comment, particularly over such a long time period, cannot be the basis for inferring discrimination.  *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 747 (9th Cir. 2003); *Brooks v. City of San Mateo*, 229 F.3d 917, 927 (9th Cir. 2000); *Yanz v. Petersen*, 81 F. App'x 959, 960–61 (9th Cir. 2003).

1        **ii.        There is no evidence of discrimination.**

2        Absent direct evidence, Plaintiff must show that: "(1) she belongs to a protected

3   class, (2) she was performing according to her employer's legitimate expectations, (3) she

4   suffered an adverse employment action, and (4) other employees with qualifications

5   similar to her own were treated more favorably." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d

6   1217, 1220 (9th Cir. 1998) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct.

7   1817).   There is no dispute she belongs to a protected class.   There is clearly a basis to

8   find she did not meet TFD's legitimate expectations in a number of incidents including

9   proposing a prohibited, member initiated exchange of positions (DSOF 16-20), taking a

10  truck out of service (DSOF 58), rude behavior to superiors (DSOF60-62) and walking off

11  the job after dropping a hose during a drill (DSOF92-98).   Plaintiff's real problem is that

12  she cannot show any adverse employment action or that any other employees were treated

13  more favorably.

14      **a.        Plaintiff cannot show any adverse employment action from**

15              **her return to work to her light duty assignment.**

16      Plaintiff alleges there were four adverse employment actions taken against her.

17  (DSOF 143).   "To establish an adverse employment action in this non-retaliation case,

18  Plaintiff must establish that the challenged action "materially affects the compensation,

19  terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080,

20  1089 (9th Cir. 2008).

21      First, she claims the failure to provide proper lactation rooms before the assignment

22  to Station 6 was adverse.   (DSOF 143).   Plaintiff was assigned to swing shift prior to

23  returning to work and the continuation of the same assignment cannot be an adverse

24  employment action.   (DSOF 12-13).   She had no statutory right to preferential treatment.

25  As set forth in the previous section, TFD provided private rooms which were shielded

26  from view and interruption and Plaintiff never worked at a station that did not meet her

27  specifications.   (DSOF 37, 41-48).   Her conditions of employment were not materially

28  affected when her needs were met.

The second alleged adverse action was that the assignment to Station 6 was more expensive and inconvenient because it was farther from her home fails to state an adverse employment action.  (DSOF 143).  As set forth in Sec. III (A)(ii) above, the assignment to Station 6 met her own demand for a stable situation off of swing shift.  The choice by TFD management of that specific station was dictated by the presence of another paramedic who could respond if Plaintiff had to express milk.  (DSOF 67).  This is a legitimate non-discriminatory reason for the assignment and Plaintiff cannot present any evidence that this reason was pretextual.  Plaintiff later insisted on staying at Station 6 which directly refutes her claim the transfer to that station was adverse.  (DSOF 81).

The third alleged adverse employment action is Plaintiff's claim that Plaintiff's job duties were shifted to a firefighter position without formal notice.  (DSOF 143).  Although Plaintiff was filling a firefighter slot when she was assigned to Station 6, there was no reduction in rank or loss of pay.  (DSOF 67)  She continued to serve as a paramedic without any change in duties and the position was subsequently reclassified to include paramedic duties.  (*Id.*).  The fact that TFD put her in a firefighter slot shows the lengths to which it was willing to go to accommodate Plaintiff and her needs.  The use of a budget position for a lower rank without changing any of Plaintiff's duties did not materially affect the conditions of her employment.

The fourth alleged adverse action is Plaintiff's claim that she was denied trades and overtime at Station 6.  (DSOF 143).  There is no factual basis to support this assertion.  Plaintiff was never told that she could not work trades or work overtime.  (DSOF 70).  Overtime at TFD is based upon a member putting her name on the list of people who are seeking overtime shifts.  (DSOF 71).  Plaintiff has only put her name on the list for overtime once.  (DSOF 72).  That one time was in November 2013 when she was working at Station 6.  (*Id.*).  On that occasion, she was scheduled and worked the overtime shift.  (*Id.*).  Trades are a process permitted by FLSA whereby individual members of a fire department may trade shifts.  (DSOF 73).  TFD permits employees to trade, but does not participate in arranging or enforcing trades.  (*Id.*).  TFD policy allows a supervisor to

approve a voluntary trade with a replacement of equal qualifications.   (DSOF 74). Plaintiff was able to work a trade at Station 19.  (DSOF 75).  The only time Plaintiff was denied approval of a trade was with respect to her request to trade with her husband, G. Clark, who held the higher rank of captain.  (DSOF 76).  TFD's policy of only allowing trades between members with equal qualifications was enforced with males and females. (*Id.*).  No one at TFD prohibited Plaintiff from working overtime or from trading with a member of the same rank.  There is no evidence that her ability to request and work overtime and trades was materially affected.

The only other pertinent event prior to her assignment to Fire Prevention and conflict with Langejans was the drill where Plaintiff alleges she was singled out.  (Doc. 42 ¶ 69).  The incident took place in May, 2014.  (DSOF 92-98).  That is over 10 months after the nursing room policy came out and after Plaintiff filed her ACRD complaint. (DSOF 78, 87).  She has no complaint about her treatment at Station 6 during that 10 months.  (DSOF 90).  Drills are a common tool to insure members of the department retain their skills.  (DSOF 92).  Being asked to perform a routine function of the job is not an adverse employment action.  *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000) (employee suffered no adverse employment action because, *inter alia,* she "was not handed different or more burdensome work responsibilities").

### b.   Plaintiff has no evidence of discriminatory intent from her return to work to her light duty assignment.

Plaintiff admitted that her superiors tried to find her a stable location when she returned to work and that the schedulers tried to accommodate her or didn't even know of her requirements.  (DSOF 29).  There is no evidence TFD intentionally skipped over assignments that were better for her.  Plaintiff has no facts showing that any scheduling decision was discriminatory.

The decision to transfer Plaintiff to Station 6 was made by DC Rodriguez and DC Fischback.  (DSOF 67).  The one truthful comment by Chief Fischback discussed above was made after the assignment and only in reference to Station 12.  (DSOF 64).  There is

no evidence that his participation in the decision to assign Plaintiff to Station 6 was motivated by bias, particularly since it was to accommodate her wishes.   There is no evidence that Chief Rodriguez had any bias toward women or nursing mothers.  Plaintiff cannot establish any discriminatory motive in the transfer to Station 6.

The decision to put Plaintiff in what had been a firefighter position at Station 6 was initially made by Chiefs Rodriguez and Fischback when they assigned her.  (DSOF 67). There is no evidence that they sought out that position because it was of lower rank.  The use of that position allowed the assignment of two paramedics to the same unit which was essential for protecting public safety.  (*Id.*).

With respect to the claim Plaintiff was denied overtime or trades, she only asserts that DC Rodriguez left the question open.  (DSOF 70).  She does not show how that is based on any discriminatory animus.   Her supervisor at Station 6 was Capt. T McDonough.  (DSOF 13).  She has no evidence he denied her overtime or trades or that he has any discriminatory animus to women or nursing mothers.

Plaintiff has no evidence the one drill while at Station 6 was discriminatory nor does she explain how that individual captain was biased.   In fact, Plaintiff was comfortable under that captain for more than a year and insisted on staying at that station under his command.  (DSOF 81).

Plaintiff has no evidence that males were treated more favorably with respect to any of these decisions.

### c.      Plaintiff's treatment while on light duty was not discriminatory.

On June 16, 2014, Plaintiff was assigned to light duty at Fire Prevention due to the pregnancy with her second child.   (DSOF 99).   She includes in her SAC various allegations of problems she experienced on light duty.  (Doc. 42 ¶¶ 74-81).  None of these provide any support for her claim of discrimination.

At Fire Prevention, Plaintiff was in a different division of TFD and subject to different supervisors.   (DSOF 1, 4, 5, 13).   Her new supervisor, Ken Brouillette

14

("Brouillette") was sympathetic to her situation since he had filed a lawsuit against a previous employer.  (DSOF 100).  With the exception of Chief Critchley and HR Manager Acosta, no one she worked with at Fire Prevention was involved in any of the 2012, 2013 and 2014 incidents described above.  (DSOF 13).  Neither Chief Critchley nor Acosta made any of the light duty decisions Plaintiff challenges.

The incidents alleged by Plaintiff during this time period consist of legitimate minor corrections to her work.  Plaintiff had two changes to her time records, one replacing 3 work hours with 3 vacation hours on one day for various reasons, and another when she was docked one half hour for leaving work early.  (DSOF 101, 105).  Plaintiff does not dispute the underlying facts TFD relied on for these changes – she did claim work prior to scheduled hours on the one day and she was absent from work on both occasions.

Plaintiff complains she was asked to document her medical status before exercising.  (DSOF 102-103).  She was on light duty due to a medical condition, pregnancy, which prevented her from performing the physical duties of her regular job.  The physical limitations that restricted her job performance also would affect her exercising.  The purpose of light duty is to find a position that fits within physical limitations and that includes exercise requirements.

Plaintiff was told that she had to be at work when her supervisor was at work and that she couldn't leave the workplace to exercise at another location.  (DSOF 104, 106).  There is nothing unreasonable or discriminatory in being told to be present at the workplace.

Plaintiff disagrees with TFD's explanations of why these actions were taken yet offers no evidence that these actions were motivated by discrimination or retaliation.  There is no evidence that any of these people held animus against the Plaintiff due to her need to express milk, her second pregnancy, or her 2013 EOPD and ACRD complaints.  There is no evidence that any putative animus in TFD's Operations Division carried over for two years to Fire Prevention to manifest itself in relatively minor employment matters.

1

2

**d.**    **There is no evidence that males who were similarly situated were treated more favorably.**

3     Plaintiff admitted she was in a unique situation in terms of her return to work while

4 on swing shift and stated that she cannot be compared to other women who were

5 expressing milk. (DSOF 15, 23, 29). She cannot present any admissible evidence on any

6 of the incidents discussed above that males were treated more favorably. To prove

7 discrimination based on sex and survive summary judgment, Plaintiff must show that

8 males who were similarly situated in all material respects were treated more favorably.

9 *Moran v. Selig*, 447 F.3d 748 (9th Cir. 2006). She cannot do that.

10    **C.**    **Count 3:  There is no basis for Plaintiff's claim of a hostile work**

11           **environment.**

12    Count 3 of Plaintiff's SAC includes the allegation that the sex discrimination

13 resulted in a hostile work environment under the ACRA. "In order to prevail on her

14 hostile work environment claim, [Plaintiff] must show that her workplace was permeated

15 with discriminatory intimidation ... that was sufficiently severe or pervasive to alter the

16 conditions of her employment and create an abusive working environment. The working

17 environment must both subjectively and objectively be perceived as abusive." *Brooks v.*

18 *City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (internal quotations and citations

19 omitted].

20    Plaintiff has no evidence to meet this standard. She admits that the main problem

21 on her initial return to work was her assignment to swing shift. (DSOF 29). The

22 scheduling captain tried to accommodate her needs and preferences. (DSOF 35-37). Her

23 complaints about the tone and demeanor of the March 20, 2013, telephone call are neither

24 severe nor pervasive. (DSOF 54, 56, 59) Her assignment to Station 6 ultimately resulted

25 in her insistence on remaining because she was comfortable there. (DSOF 81). There is

26 no basis in these facts for a claim of hostile work environment.

27    Plaintiff complains about being mocked when the new nursing room policy came

28 out. (Doc. 42 ¶¶ 62-63). TFD issued a policy regarding nursing rooms in July, 2013.

(DSOF 78).  When Plaintiff subsequently sought to keep her assignment to Station 6, she mentioned she wanted to stay there because felt she was being mocked by comments about the new policy.  (DSOF 81-85).  She did not personally hear any mocking or joking comments about the new policy.  (DSOF 79, 82).  When TFD management responded that it would not tolerate mocking conduct, Plaintiff and G. Clark both told their superiors that the comments were people being insensitive, that they did not want it pursued as a complaint, and would not provide names of those making comments.  (DSOF 83-85).  The City is not liable for complying with her wishes not to pursue the matter.  *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1186–87 (9th Cir. 2005), amended on denial of reh'g, 433 F.3d 672 (9th Cir. 2006), amended on denial of reh'g, 436 F.3d 1050 (9th Cir. 2006). Plaintiff did not assert the mocking rose to the level of a complaint at the time it happened and in any event, the federal and state employment discrimination laws do not create a general code of civility.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

**D.      Count 4:  There was no Retaliation in Violation of ACRA**

Plaintiff's Count 4 alleges retaliation under the ACRA but frames it as a claim for hostile work environment.  As set forth above, there is no factual or legal basis for a claim of retaliation or hostile work environment from the time she returned to work in October 2012 until she went on leave for her second pregnancy.

**E.      Counts 5 and 7 alleging retaliation for the Langejans incidents should be dismissed.**

Count 5 and 7 allege that TFD failed and refused to take action against Langejans in retaliation against Plaintiff, thereby violating the Arizona Civil Rights Act, A.R.S. § 41-1464(A) and Title VII, 42 U.S.C. § 2000e-3(a), respectively.  She further alleges the failure and refusal to take action against Langejans resulted in a hostile work environment.

TFD did take action on the complaints against Langejans.  It conducted an investigation that involved interviewing virtually everyone in Fire Prevention.  (DSOF

112-124).  As a result of that investigation, TFD disciplined Langejans.  (DSOF 125).  That discipline was recommended by a deputy chief and assistant chief who were not involved in any of Plaintiff's allegations prior to her work at Fire Prevention.  (DSOF 127).  The discipline was reviewed and approved by the department's Discipline Review Board which includes other members who were not directly involved and a union representative.  (*Id.*).   TFD also provided training for everyone in the division on maintaining a respectful workplace.  (DSOF 125, 129).  Based on this investigation, TFD concluded there was not a hostile work environment in Fire Prevention.  (DSOF 128).

The only thread that ties any of these allegations to Plaintiff's earlier ones about expressing milk is the allegation that Langejans read about Plaintiff's filing of this lawsuit and then started spreading rumors about Plaintiff and making discriminatory comments about women, thus creating a hostile environment.  (Doc. 42 ¶¶ 92-110).  After years of discovery, these allegations remain a collection of hearsay and rumors.

There were complaints about Langejans.  (DSOF 113-120).  Those came from three males and Plaintiff's husband, charging that Langejans targeted employees he didn't like.  (*Id.*).  The complaints focused on reports of Langejans conflicts with G. Clark and claims Langejans targeted both male and female employees, mostly before any issue with Plaintiff arose.  (*Id.*).  When Plaintiff started working as a Fire Inspector in November 2014, Langejans comments were directed at both Plaintiff and her husband.  (*Id.*).  Plaintiff did not make any complaint at that time.

Although the complaints alleged a "hostile work environment," it is clear that they referred to Langejans personal hostility to others, not any hostility based on sex.  TFD's investigation found that 26 of 31 employees did not believe there was a hostile work environment at Fire Prevention.  (DSOF 124).  Of the five who thought there was a hostile work environment, they referred to Langejans targeting of both male and female employees.  (*Id.*).  There is no basis for a Title VII or ACRA claim of hostile work environment where 84% of the employees deny it exists and the others assert it involves hostility toward specific males and females.

1    Following the full investigation by TFD and the discipline of Langejans, Plaintiff

2    submitted a complaint to EOPD asserting, as she does in these two counts, that Langejans

3    created a hostile work environment and TFD failed to address that.  (DSOF 130).  EOPD

4    conducted a full investigation which included 35 interviews of 33 people working in or

5    supervising Fire Prevention.   (DSOF 131).   Another female in Fire Prevention told

6    investigators that she had not heard any supervisor make discriminatory comments.  She

7    did not think there was a hostile work environment or that any co-workers were singled

8    out. (DSOF 135).

9    EOPD found no basis for a claim of discrimination or retaliation.  (DSOF 131).

10   EOPD's findings and recommendations were reviewed by Julianne Hughes ("Hughes") of

11   the City Manager's Office.  (DSOF 136).  She concurred that there was not sufficient

12   evidence to support a claim of discrimination or retaliation against Plaintiff and concurred

13   that Langejans had violated City Administrative Directives.  (*Id.*).  In response to EOPD's

14   finding that the discipline of Langejans was insufficient, Hughes had TFD submit a

15   response.  (*Id.*).   After reviewing TFD's response, and based upon her own extensive

16   knowledge of TFD's past disciplinary practices, Hughes concurred with TFD that the

17   written reprimand was appropriate discipline. (DSOF 138).

18   Plaintiff's allegation that TFD and the City refused and failed to take action against

19   Langejans in retaliation against Plaintiff is patently false.  Plaintiff has no evidence that

20   those involved in the TFD decision to investigate the Langejans claims and then issue

21   discipline had any reason to retaliate against her.  She has no evidence that EOPD's

22   investigator, who found no basis for her claim was biased or seeking to retaliate against

23   her and no such evidence regarding the City Manager's Office.  Plaintiff's Counts 5 and 7

24   must be dismissed.

25   **F.    Counts 6 and 8 alleging retaliation for transfer of G. Clark should be**

26   **dismissed.**

27   Plaintiff's final Counts 6 and 8 is that her husband was transferred from Fire

28   Prevention to a less desirable field position in retaliation against Plaintiff in violation of

19

Arizona Civil Rights Act, A.R.S. § 41-1464(A) and Title VII, 42 U.S.C. § 2000e-3(a) respectively.

G. Clark was transferred because TFD was in violation of the City's nepotism policy by allowing both husband and wife to work in Fire Prevention.  (DSOF 131, 137, 139).  The violation wasn't raised by TFD.  Instead, it was the City's EOPD office and City Manager's Office that identified the problem and directed it be corrected.  (DSOF 131, 137).  EOPD found this was not a hypothetical problem since the captain who supervised Plaintiff complained that he was uncomfortable doing so with her husband, a peer, in the same division.  (DSOF 132).  Plaintiff has no evidence disputing that TFD was in violation of the City's AD or that those making the decision to enforce the AD were motivated to discriminate or retaliate against her.

In carrying out the direction to follow the City's AD, TFD had to move either Plaintiff or her husband.  Plaintiff's husband was the next person on the list for promotion to Battalion Chief where he would be reassigned to Operations.  (DSOF 140).  AC Baker knew of the prospective promotion and consistent with her prior succession plans wanted G. Clark to move back into Operations as a captain to refresh his skills in that job before being promoted to Battalion Chief.  (*Id.*).  TFD moved other personnel besides the Clarks to comply with the City's AD.  (DSOF 142).  This is a legitimate, non-discriminatory basis for the transfer of Plaintiff's husband that was intended to be beneficial to his career advancement.  There is no evidence this was pretextual.

## IV.    Conclusion

Plaintiff has a long list of perceived slights over about a three year period that she hurls broadly as evidence of discrimination or hostile work environment or retaliation.  Analysis of each of these specific allegations demonstrates that there is no evidence of any discriminatory or retaliatory motive, that there were no adverse employment actions as contemplated by law, and that the actions taken were for legitimate, non-discriminatory reasons for which plaintiff has no evidence showing they were pretextual.  Taken as a whole, Plaintiff's complaint alleges a variety of disparate events involving different

personnel on different issues at different times.  Plaintiff completely fails to connect these disparate allegations with any evidence that would show a TFD or City policy or practice to discriminate or retaliate against her.  All of her claims must therefore be dismissed.

DATED May 11, 2017.

MICHAEL G. RANKIN
City Attorney

By:     s/Michael W.L. McCrory
        Michelle Saavedra
        Michael W. L. McCrory
        Principal Assistant City Attorneys

I hereby certify that on May 11, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Jeffrey H. Jacobson
JACOBSON LAW FIRM
2730 East Broadway Blvd., Suite 160
Tucson, AZ 85716
        *Attorney for Plaintiff*

By E. Ramirez/lc