Michelle R. Saavedra
Michael W.L. McCrory
Principal Assistant City Attorneys for
MICHAEL G. RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
Pima County Computer No. 66163
Michael.McCrory@tucsonaz.gov
State Bar Computer No. 3899
Pima County Computer No. 37268
Telephone: (520) 791-4221
Fax: (520) 623-9803
*Attorneys for Defendant City of Tucson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK, | 4:14-cv-02543 |
| Plaintiff, | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | (Hon. Cindy Jorgenson) |
| CITY OF TUCSON, | |
| Defendant. | |

Defendant City of Tucson ("City") moves pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing all claims brought by the plaintiff Carrie Clark ("Plaintiff"). The City's motion is based upon the following Points and Authorities and the Defendant's Statement of Facts ("DSOF") that is filed concurrently with this motion and incorporated herein.

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.     Introduction

Tucson Fire Department ("TFD") is a municipal fire department managed as a paramilitary organization that responds to public safety matters and emergencies such as fires, hazardous material discharges, collapsed buildings, automobile accidents and critical individual medical conditions. (DSOF 1, 3). Plaintiff is a TFD employee who sued the City alleging it violated federal employment laws. (Doc. 87). In the fall of 2012, Plaintiff

1

was a paramedic in TFD's Operations Division assigned to swing shift and she took time off work for the birth of her first child. (DSOF 12, 13). This case stems from Plaintiff's claim that she was not consistently provided a private area to express milk from her return to work on October 27, 2012 until March 23, 2013. (Doc. 87, ¶183). When she returned to work, she did not want to be on swing shift and wanted TFD to assign her to a specific station located closer to her mother's home. (DSOF 18-19, 29). Although she complained other stations did not have private bedrooms for her to use, all stations had rooms that complied with federal law, and she never worked at a station that didn't meet her needs. (DSOF 38-51).

She complained TFD did not let her exchange assignments with another paramedic – even though she knew that violated standard Rules of Assignment. (DSOF 19-23). She objected to having to go to different stations on swing shift – then objected to being assigned a set shift at a single station that met her needs without impacting public safety. (DSOF 25, 32, 69-70). Plaintiff's meetings with her chain of command and human resources resulted in new complaints that they weren't nice and didn't give her the specific station she wanted. (DSOF 55-62). Plaintiff received a verbal warning for her admitted rudeness to superiors and complained that it was retaliatory. (DSOF 63-65). She complained TFD didn't have a policy for nursing mothers in place when she returned to work – then complained when TFD later issued a policy. (DSOF 82-83, 85-89). She complained about a temporary assignment to Station 6, and then later she demanded to stay there for almost an additional year beyond the expiration of the one year from her child's birth, and claimed she still needed to express milk. (DSOF 90). Although she had no complaints about her supervisor at Station 6, she alleges discrimination because she was required to pull a hose during a mandatory drill. (DSOF 90, 92, 95, 97-101).

In June 2014, per her request, Plaintiff went on light duty in an administrative position due to the pregnancy of her second child. (DSOF 104). She claims she was subjected to unfair rules requiring she report to work at set times and that she remain at the station for exercising in retaliation for her complaints about the lack of lactation rooms

2

in Operations. (Doc. 87, ¶¶74-81). Plaintiff went on leave for the birth of her second child and returned as a Fire Inspector assigned to the Fire Prevention unit. (DSOF 114-115). Plaintiff's husband, Gordon Clark ("G. Clark"), was assigned to Fire Prevention ("Prevention") as a captain. At Prevention, she became embroiled in conflict with Captain Jeffrey Langejans ("Langejans") who was not her supervisor and several men in the unit who claimed Langejans harassed and targeted those he didn't like – both male and female. (DSOF 119-127). The complaints were investigated by TFD management resulting in disciplinary action against Langejans for comments deemed inappropriate. (DSOF 128-133, 135-136). Plaintiff was not satisfied with the level of discipline and filed a complaint with the City's Equal Opportunities Programs Division ("EOPD").[1] (DSOF 143). EOPD conducted a thorough investigation and made findings and recommendations; they found no discrimination or retaliation but determined that having Plaintiff and her husband as a captain in Fire Prevention violated the City's nepotism policies. (DSOF 144-150). The nepotism issue, and the supervisory and chain of command problems it created, resulted in G. Clark's transfer out of Fire Prevention – another matter she claims as retaliation. (DSOF 154-161).

The one constant in all her complaints is their overall general vagueness. Plaintiff provides no specifics as to who discriminated against her and lacks any evidence that any conduct was based on her sex. There is no nexus between the allegations from one assignment and set of managers to those in subsequent time periods, and no evidence of any overall discriminatory or retaliatory policy or practice by the Fire Chief, TFD, or the City. Most significant for this case, Plaintiff has no admissible evidence that males were treated any differently than she was or that she was subject to any adverse employment action.

---

[1] The same office was previously called the Office of Equal Opportunity Programs ("OEOP"). For consistency, "EOPD" is used in this DSOF for both time frames. Documents and deposition testimony will still refer to "OEOP" where applicable.

On July 31, 2013, Plaintiff filed an EEO complaint with the Arizona Civil Rights Division. (DSOF 91). She received a right to sue letter on April 24, 2014. (DSOF 94). On May 22, 2014, Plaintiff served a notice of claim on the City pursuant to Ariz. Rev. Stat. Ann. § 12-821.01. (DSOF 96). On July 23, 2014, Plaintiff filed her original state court complaint alleging her swing shift assignments violated the Fair Labor Standards Act ("FLSA") protections for expressing milk, discrimination based upon her sex and retaliation for having raised the issue. (Doc. 1-3).

The City removed the case to this Court. (Doc. 1). Plaintiff subsequently filed three amended complaints. Her Third Amended Complaint ("TAC") was filed on May 16, 2017. (Doc. 87). Plaintiff's TAC alleges the City violated the Fair Labor Standards Act ("FLSA") and then retaliated against her when she complained of the alleged violations (Counts One and Two, respectively), that the City discriminated against her based on her sex in violation of Title VII of the Civil Rights Act, and then retaliated against her also in violation of Title VII (Counts Three, Four, and Five). (Doc. 87).

The City denies it violated the FLSA or Title VII and that Plaintiff was discriminated or retaliated against, and alleges that all employment actions taken regarding Plaintiff were for legitimate business reasons.

## II.    Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. A material fact is one that might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to defeat summary judgment, Plaintiff must tender evidence through affidavits, declarations, documents and/or other discoverable materials that demonstrate there are facts that a reasonable jury could consider to hold in her favor. (*Id.*); *Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers*, 971 F.2d 347, 355 (9th Cir.1987). The mere existence of a scintilla of evidence or allegations that are conclusory or speculative will not suffice to defeat summary judgment. *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996).

4

In reviewing the motion, the Court will view the facts and inferences in the light most favorable to the non-moving party. In a discrimination case, however, this does not require the court to make a credibility determination on the defendant's evidence, even if it has reason to disbelieve that evidence. *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004).

## III.     Argument

### A.     There is no legal or factual basis for the alleged violation of FLSA

#### 1.     Plaintiff has no legal basis for Count One

Under Count One, Plaintiff claims the City violated section 207(r) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207(r), which requires an employer to provide a suitable location and break times for the purpose of expressing breast milk for one year after a child's birth. (Doc. 87, ¶182). Plaintiff has acknowledged the applicable law for this claim provides that "'damages in a private suit under § 207(r) are limited to wages lost as a result of the employer's failure to provide an adequate space for lactation.' *Mayer v. Prof'l Ambulance, LLC*, 211 F. Supp. 3d 408, 413 (D.R.I. 2016)." (Plaintiff's Cross-Motion for Summary Judgment (Doc. 84, pg. 3)). *See also*: *Lico v. TD Bank*, No. 14-CV-4729 JFB AKT, 2015 WL 3467159, at *2–3 (E.D.N.Y. June 1, 2015); *See also*: *Hicks v. City of Tuscaloosa*, No. 7:13-CV-02063-TMP, 2015 WL 6123209, at *28–29 (N.D. Ala. Oct. 19, 2015); *Frederick v. New Hampshire*, No. 14-CV-403-SM, 2015 WL 5772573, at *7 (D.N.H. Sept. 30, 2015). There is no evidence that Plaintiff lost any pay, let alone the minimum wage FLSA requires, thus she has no basis for any claim for damages under § 207(r).

#### 2.     TFD complied with FLSA

Plaintiff appears to claim that the fact she was assigned to swing shift was itself a violation of FSLA, 29 U.S.C. § 207(r).[2] In January 2012, Plaintiff was assigned to swing

---

[2] This theory is not included in Plaintiff's Response to the City's Third Non-Uniform Interrogatories ("NUI") No. 11. However, Plaintiff's attorney lists "[n]ot having a consistent assignment" as an adverse employment action that is a basis for her FLSA retaliation claim in response to NUI No. 12. (DSOF 214).

shift following her one year probationary period as a paramedic. (DSOF 16). That was well before she had a need to express milk. Furthermore, the FLSA and § 207(r) do not require an employer to provide preferential assignments or scheduling to nursing mothers. TFD offered Plaintiff a temporary position at Station 20 before her return and again on November 13, 2012. (DSOF 18, 25). Initially Plaintiff accepted the offer to work at Station 20. (DSOF 18). She subsequently chose not to take that assignment. (*Id.*). First, she didn't want to displace other employees or bring attention to herself, and later because it was too far to drive. (*Id.*; DSOF 25).

Plaintiff alleges TFD did not provide her with an appropriate lactation room on a consistent basis until March 23, 2013. (Doc. 87, ¶183). Her claim is based on EOPD investigator, Matthew Larsen's ("Larsen") conclusion that certain stations were not in "compliance" with FLSA because the available room did not have doors with locks. (DSOF 33, 35). Under the statutory requirements, and the Department of Labor guidelines, this is not necessary. As stated by the U.S. Department of Labor, Wage and Hour Division:

> "The location provided must be functional as a space for expressing breast milk. If the space is not dedicated to the nursing mother's use, it must be available when needed in order to meet the statutory requirement. A space temporarily created or converted into a space for expressing milk or made available when needed by the nursing mother is sufficient provided that the space is shielded from view, and free from any intrusion from co-workers and the public." (DSOF 45).

Every station where Plaintiff worked did in fact have a room in compliance with the law. (DSOF 50-51). She testified that every station she worked at during this time period had a room where she could express milk in private, she never had to use a bathroom, and was never told she could not have time to express milk. (DSOF 51, 53). Plaintiff's attorney alleges that on January 23-4, she was assigned to Station 3 and on January 25-6, to Station 19, and that both were not compliant with federal law. (DSOF 214, NUI No. 11(a)). Plaintiff's attorney, however, cannot create a disputed fact by contradicting his client's

sworn testimony.  (DSOF 43-4); *Jackson v. Cty. of San Bernardino*, 191 F. Supp. 3d 1100 (C.D. Cal. 2016).  Moreover, both stations complied with federal law.  (DSOF 45).

In summary, Plaintiff's complaint really stems from her objection to a swing shift assignment, her desire to work at a station closer to her mother's home, and her expectation TFD provide her a private dorm room to express milk.  (DSOF 18-19, 29, 54).  Federal law requires employers to provide a place that is private and shielded – it does not require a private bedroom with a lock, nor that the provided place is the most convenient for the nursing mother.  The facts show that TFD complied with FLSA and that there is no basis for Plaintiff's claim under Count One.

**B.    Plaintiff fails to identify any individual who retaliated against her in violation of her FLSA rights**

Under Count Two, Plaintiff alleges that she was subject to retaliation for protected activity under FLSA, 29 U.S.C. § 215(a)(3) and 216.  (Doc. 87).  "To demonstrate retaliation under this provision of the FLSA, the Ninth Circuit has held that a plaintiff must show that her protected activities were a "substantial factor" in the complained of adverse employment action.  *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996).  Protected activities are a "substantial factor" where the adverse actions would not have been taken "but for" the protected activities."  *Contreras v. Corinthian Vigor Ins. Brokerage, Inc.*, 103 F. Supp. 2d 1180, 1184 (N.D. Cal. 2000).

Plaintiff may produce either direct or circumstantial evidence that a specific action is linked to Plaintiff's protected activities.  Where there is direct evidence of retaliatory animus, the burden shifts to the City to show that the adverse action would have been taken regardless of Plaintiff's protected activities.  Where Plaintiff relies on circumstantial evidence, she must proceed under the *McDonnell* burden shifting analysis.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  That analysis requires Plaintiff to initially present evidence that there was an adverse employment action that is causally related to her FLSA complaint.  If she produces such evidence, the burden shifts to the City to show there was a legitimate non-retaliatory

7

reason for the action. Once the City shows such a reason, the burden shifts back to Plaintiff to show the proffered reason is pretextual. *Villiarimo v. Aloha Island Air, Inc.*, *281 F.3d 1054, 1062–63 (9th Cir. 2002)*; *Bowen v. M. Caratan, Inc.*, *142 F. Supp. 3d 1007, 1025 (E.D. Cal. 2015)*.

In response to NUI No. 11(b), Plaintiff's attorney lists 13 individuals as those responsible for alleged "hostile and belittling behavior towards [her]"[3]. (DSOF 214, NUI 11(b)). Five of those individuals, Laura Baker, Mike Garcia, Joe Gulotta, Phil Morgan and Ken Brouillette were her supervisors when she was in Fire Prevention after November 2014 – more than a year after her alleged FLSA complaints. (DSOF 13(f)). Those five had no involvement in her assignments while in Operations. Plaintiff does not identify anything they did violated FLSA. Plaintiff does not provide any factual basis to conclude any of these individuals even knew about her FLSA complaint or that they were in anyway opposed to it.

Plaintiff lists Captain Langejans for the time period when she was in Prevention. (DSOF 214, NUI No. 11(b)). Plaintiff's sole allegation regarding Langejans and FLSA is based on hearsay statements that he made negative comments about her when the local newspaper reported the filing of the complaint. (Doc. 87, ¶97). That is the only negative response to her filing the FLSA complaint and the lawsuit that Plaintiff can attribute to anyone in TFD management. Langejans, however, was not her supervisor, had no role in the terms and conditions of her employment and apparently was simply conversing with other unit members. (DSOF 13(f), 118). That is not a basis for admission of the statements. *Hernandez v. Arizona*, *702 F. Supp. 2d 1119, 1127 (D. Ariz. 2010)*.

---

[3] Plaintiff's TAC includes an allegation under Count One that "TFD also engaged in a pattern of hostile and belittling behavior toward Plaintiff, causing her serious emotional anguish." (Doc. 87, ¶184). The City submitted an NUI corresponding to this factual allegation under NUI 11(b). This factual allegation, however, is not relevant to Count One, but could apply to Count Two's allegation that she was retaliated against for her complaints about lactation rooms under FLSA. Thus, the City addresses these allegations as though it were alleged as the factual basis for her retaliation claim under Count Two.

The distinction between Plaintiff's work in Operations when she returned from the birth of her first child and made her FLSA complaints, and the subsequent work in Prevention is critical. Plaintiff's informal complaints were regarding the assignments while she was on swing shift and her temporary assignment to Station 6 from October 2012 to March 2013. (*See* DSOF 28-32, 36, 55-64). There is then a break in her supervisors with her assignment to Station 6. (DSOF 13(d)). Plaintiff was so satisfied with that assignment that she insisted on staying in the temporary position long after the one year period under FSLA, 29 U.S.C. § 207(r). (DSOF 80-81, 84, 90). TFD could have reassigned her to swing shift at the end of the one year – July 19, 2013 – but did not do so. Captain Ted McDonough ("T. McDonough") gave her a positive evaluation in December 2013, which was after she complained about lack of private rooms to express milk. (DSOF 92). She was also allowed to test for the Inspector position in June or July of 2014, and laterally transferred to Inspector prior to her return from the birth of her second child in November 2014. (DSOF 114-115). Plaintiff cannot explain why TFD and the individuals involved in these decisions took positive steps to advance her career yet allegedly harbored hidden bias.

The lack of connection between alleged events is particularly evident from the listing of Captain Ted McDonough ("T. McDonough") in response to NUI No. 11(b) as one of the individuals responsible for everything that happened to Plaintiff. (DSOF 214). T. McDonough was not involved in any of the disputes over swing shift assignments. (DSOF 13(b-c)). He was her first level supervisor when she was temporarily assigned to Station 6 and he gave her the positive evaluation, as mentioned above. (DSOF 13(d), 92). There can be no inference that he had any discriminatory animus. *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1161–62 (C.D. Cal. 2013).

Plaintiff complains about only one incident in the approximate 16 months under T. McDonough's direct supervision – the spontaneous drill on May 22, 2014. (Doc. 87, ¶69; DSOF 97). Plaintiff objected to the drill. (DSOF 98-103). She dropped her hose in the middle of the exercise and walked off the job. (*Id.*). She was subject to potential

discipline for insubordination but was not disciplined.  (DSOF 102-103).  Being asked to perform a routine function of the job is not an adverse employment action.  *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000) (employee suffered no adverse employment action because, *inter alia,* she "was not handed different or more burdensome work responsibilities").  In addition, Plaintiff cannot connect this incident and T. McDonough's actions with any other allegations and a single incident by itself does not establish a claim.  *Brooks v. City of San Mateo*, 229 F.3d 917, 926–27 (9th Cir. 2000).

Also in response to NUI No. 11(b), Plaintiff listed Rick L'Heureux.  (DSOF 214).  His only involvement was in the swing shift assignments between October 2012 and March 2013.  (DSOF 38-40, 42).  Even with the swing shift assignments, L'Heureux did not make each assignment.  (DSOF 39).  More importantly, every station Plaintiff was assigned and worked complied with FLSA.  (DSOF 50; *see also* Section III.A(2), *supra*)).

For the others listed, JoAnn Acosta, Jim Critchley, Ed Nied, Rob Rodriquez, and Mike Fishback, Plaintiff makes no effort to provide an evidentiary link to any specific action or specify incidents where they were involved in conduct she alleges is actionable.  "As the Seventh Circuit observed in its now familiar maxim, "[j]udges are not like pigs, hunting for truffles buried in briefs."  *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

**C.      There is no factual or legal basis for Plaintiff's claims of sex discrimination and retaliation under FLSA or Title VII**

**1.      The applicable legal standard**

Plaintiff alleges the City retaliated against her in violation of FLSA, and that it discriminated and retaliated against her under Title VII of the Civil Rights Act of 1964.  (Doc. 87, Counts Two, Three, Four, and Five).  The City submitted its Third Set of Non-Uniform Interrogatories ("NUI") in an effort to get Plaintiff to clearly specify the factual basis for each claim.  (DSOF 214).  In response to the NUIs that relate to her FLSA claims, Plaintiff provided a description of all the events she claims are adverse in the past

four years of litigating this matter. (DSOF 214, NUI Nos. 11 and 12). Plaintiff's responses to the NUIs that relate to her Title VII claims merely refer back to the responses that relate to her FLSA claims. (DSOF 214, NUI Nos. 13-15). While these legal theories do overlap, this over simplification ignores the fact that Plaintiff must show for each incident who acted for the City, either direct or circumstantial evidence that the individual had an actionable motive, whether the motive was in response to Plaintiff's protected FLSA activity, and/or whether the motive was based on Plaintiff's sex.

Under Count Three, Plaintiff alleges a Title VII claim for discrimination based on pregnancy and sex, 42 U.S.C. § 2000e(b), 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e(k). To establish her claim of discrimination, Plaintiff must show direct evidence of discriminatory intent or evidence that gives rise to the inference of discriminatory intent under the framework set forth in *McDonnell Douglas Corp. v. Green,*411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Absent direct evidence, Plaintiff must show that: "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (citing *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817). There is no dispute she belongs to a protected class.

Plaintiff's employment discrimination claims are also subject to the *McDonnell* burden-shifting analysis. *McDonnell, supra.* Plaintiff must first establish the factual basis to support a prima facie case. Once she establishes her case, the burden shifts to the City to articulate legitimate, nondiscriminatory reasons for any adverse actions it has taken. Once the City provides factual support for those reasons, the burden shifts back to the Plaintiff to present facts showing the asserted reasons are pretextual. *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004); *Godwin, supra.*

Plaintiff's refusal to distinguish the facts applicable to specific claims obscures the different legal principles that apply. While an adverse employment action is required for both the discrimination and the retaliation claims, they are not defined the same way. An adverse action for Plaintiff's discrimination claim is one that materially alters the terms and conditions of her employment. *Davis v. Team Elec. Co.*, 520 F.3d 1080 (9th Cir. 2008). An adverse employment action for her retaliation claim is viewed more broadly as any adverse treatment that is likely to deter plaintiff or other employees from engaging in protected activities. *Ray v. Henderson*, 217 F.3d 1234, 1242–43 (9th Cir. 2000); *Moore v. Marriott Int'l, Inc.*, No. CV-12-00770-PHX-BSB, 2014 WL 5581046, at *9 (D. Ariz. Oct. 31, 2014). Likewise, causation must be proven for each claim based on different standards. For her discrimination claim, Plaintiff must show that bias against women was a substantial motivating factor. For her retaliation claim, Plaintiff must show that the harm would not have occurred "but for" the retaliatory motive. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2524–25, 186 L. Ed. 2d 503 (2013).

Plaintiff essentially adopts a spaghetti approach of heaving the entire contents of the pot at the wall hoping something will stick. *Breeser v. Menta Grp., Inc., NFP*, 934 F. Supp. 2d 1150, 1154–55 (D. Ariz. 2013), aff'd sub nom. *Breeser v. Menta Grp., Inc.*, 622 F. App'x 649 (9th Cir. 2015). In doing so, it is not clear how she intends to prove discrimination or retaliation – whether by direct or circumstantial evidence, whether she alleges disparate treatment or impact, temporal proximity between events or attributing bias or motive from one person to another. This approach makes it difficult for the Defendant and the Court to analyze each alleged incident. The City will nonetheless address the applicability of her claims to each incident, attempting to discern the basis of her claims for liability for each. These follow the chronological order of the DSOF.

### 2. Plaintiff's putative direct evidence

Plaintiff asserts that three statements made by three individuals over the four years of this litigation are direct evidence of TFD's bias and intent to retaliate against her. (DSOF 214, NUI No. 12(b)). They are Rick L'Heureux's comment to G. Clark during

12

Plaintiff's swing shift assignments that she "didn't need special accommodations," JoAnn Acosta's comment that Plaintiff's pumping "seems excessive to me" and that she was "not fit for duty," and AC Mike Fischback's comment when he told her that she couldn't be assigned to Station 12, "that's what happens when you file a complaint with EEO." (*Id.*). None of these demonstrate either a bias against women, pregnant women, or those who engaged in protected activity.

L'Heureux's comment is in the context of Plaintiff's request to trade positions with another paramedic in violation of TFD's Rules of Assignment (DSOF 19-23), her desire not to be assigned where she might displace someone else (DSOF 18), or where she had a personal conflict with the shift captain (DSOF 25), her demand to have assignments close to her or her mother's house, and for stations with private dorm rooms (DSOF 19, 29, 54). These are all demands for special accommodations that exceed any legal requirement. L'Heureux's comment is also in the context that all fire stations had rooms that complied with the requirement for a place to express milk that is shielded from view and intrusion. (DSOF 44-45, 50). L'Heureux's comment is an accurate statement – Plaintiff is entitled to what the law requires, not what she prefers. In addition, Plaintiff cannot tie this comment to any action by L'Heureux regarding any specific assignment. She cannot tie it to anyone else at TFD and cannot establish that anyone besides her and her husband ever knew of the comment. The comment is also isolated from any other event in the four years of litigation.

Acosta's comments were made in response to Plaintiff's statements that she had to pump every two to three or four hours, and that it took 30 to 40 minutes each time. (Doc. 87, ¶43; DSOF 59). Plaintiff's job as a paramedic required that she be available to respond to a public safety emergency at all times during her shift. (DSOF 6). Having Plaintiff unavailable for the amount of time she claimed was incompatible with her performing her duties and maintaining public safety. (*See* DSOF 59). Plaintiff also told Acosta and the two chiefs that she had taken a truck out of service. (DSOF 61). That is also incompatible with public safety. (*See* DSOF 59). Acosta and the chiefs needed to

address the amount of time Plaintiff was unavailable regardless of the cause. That involved considering whether she was in fact fit for duty as a front line paramedic, or whether she should be assigned to another position where her time was more flexible. (DSOF 62). Plaintiff cannot tie these comments to any employment action. Acosta had no authority over assignments. (DSOF 71). Her role was to make sure Plaintiff knew about the alternatives available such as light duty if she needed them – i.e. to provide assistance to Plaintiff. (*See* DSOF 62).

Fischback's comment is an accurate statement in the context in which it was made. Plaintiff's discussion with EOPD resulted in that office's investigation and EOPD telling TFD that Station 12 did not comply with FLSA because the available room did not have a lock. (DSOF 28-35). When Plaintiff subsequently renewed her request to be assigned to Station 12, Fischback was confronted with the problem that if he did so, it would be directly in conflict with EOPD's findings. There is no reason to believe that Fischback intended to retaliate against her and this is the *only* such comment Plaintiff ever heard in the almost four years covered by this lawsuit. (DSOF 68). A single ambiguous comment, particularly over such a long time period, cannot be the basis for inferring discrimination. *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 747 (9th Cir. 2003); *Brooks v. City of San Mateo*, 229 F.3d 917, 927 (9th Cir. 2000); *Yanz v. Petersen*, 81 F. App'x 959, 960–61 (9th Cir. 2003).

None of these constitute direct evidence of bias or a retaliatory motive. They are isolated comments by different individuals in different contexts. Such stray comments are not sufficient to support Plaintiff's claims. *Godwin*; *Hernandez v. Arizona*, 702 F. Supp. 2d 1119, 1128–29 (D. Ariz. 2010).

### 3. Plaintiff's return to work and swing shift assignments from October 2012 to March 2013

Plaintiff's assignment to swing shift was based on the standard policy for assignments. (DSOF 12, 13(b)). That assignment was prior to her return from the birth of her first child and any need to express milk. (*Id.*). Plaintiff has no evidence she was

14

treated differently than any other employee.  Also, there is no adverse employment action where the employee is not given different or more burdensome work duties.  *Kortan*, *supra*.  Nor is there adverse action where it does not materially alter the terms and conditions of employment.  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).  She had no statutory right to insist that her employer accept her personal preferences.  *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1030–31 (8th Cir. 2008); *Smith v. Pyro Min. Co.*, 827 F.2d 1081, 1097 (6th Cir. 1987).

Plaintiff had not filed a complaint containing "some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged," thus she had not engaged in any protected activity under FLSA or Title VII at this point and there can be no retaliation claim.  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14, 131 S. Ct. 1325, 1334, 179 L. Ed. 2d 379 (2011).

Any claim that her assignments while on swing shift were discriminatory or retaliatory is meritless.  She has no evidence she was treated differently than any other TFD employee on swing shift and all of Plaintiff's swing shift assignments complied with FLSA.  (*See* Section III.A(2), *supra*.).

TFD's denial of Plaintiff's request to exchange assignments with another member so she could work at Station 12 was not discriminatory or retaliatory.  Her request violated TFD's Rules of Assignment and she knew it.  (DSOF 19-23).  Also, Station 12 had already been put up for bid and a senior paramedic won the bid.  (DSOF 25).  TFD's denial was consistent with policies.

### 4.    Plaintiff's objection to working at Station 9 and confrontation with supervisors on March 20, 2013.

On March 20, 2013, Plaintiff was assigned the swing shift at Station 9.  (DSOF 55).  She refused to go and tried to call DC Rodriguez.  (*Id.*).  When she finally reached AC Fischback at the end of the day, he had Acosta and DC Rodriguez join him on the call.  (*Id.*).  Station 9 was the only station available and EOPD found it compliant with FLSA because the chiefs' offices could be used.  (DSOF 56, 58).  Plaintiff was upset at that

suggestion and responded that it wouldn't work because of the frequency and amount of time she needed to pump extended all 24 hours and would interfere with the chiefs sleeping. (DSOF 58-59). She also told them she took a medic truck out of service on one or two occasions to express milk. (DSOF 61). The chiefs felt that was unacceptable since medic trucks needed to be available to respond quickly to emergencies. (*Id.*). Acosta and the chiefs were concerned Plaintiff was not fit for duty given the amount of time she was unavailable while she expressed milk. (DSOF 62). Acosta wanted to be sure Plaintiff understood she could be assigned light duty if she could not perform the essential functions of her job. (*Id.*). In response, Plaintiff became more angry and upset, told the chiefs and Acosta they "were out of their friggin' minds" and hung up on them two times during the conversation. (DSOF 63-64). On March 26, 2013, Chief Fischback gave her an educational counseling to not use such language when talking to her superiors. (DSOF 65). Acosta was not involved in the educational counseling. (DSOF 66).

Plaintiff's conduct and language to superiors is objectively unreasonable. While she could have been subject to more severe discipline, she only received an educational counseling advising her that her language and behavior were inappropriate. The discipline was appropriate to Plaintiff's conduct. To support a retaliation claim, the employer's action must be materially adverse so that it would deter the employee from engaging in protected conduct. *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000); *Shaninga v. St. Luke's Med. Ctr. LP*, No. CV-14-02475-PHX-GMS, 2016 WL 1408289, at *10 (D. Ariz. Apr. 11, 2016). Using polite language in talking with superiors is not a burdensome or materially adverse requirement. "Several courts within the Ninth Circuit have held that a warning letter is not an adverse employment action. *See Hoang v. Wells Fargo Bank, N.A.*, 724 F. Supp. 2d 1094, 1104 (D. Or. 2010) (a warning letter which affected no materially adverse change in the terms and conditions of the plaintiff's employment was not an adverse employment action); *Tudor Delcey v. A—Dec, Inc.*, 2008 WL 123855, at *4 and *9 (D.Or. Jan.9, 2008) (a written warning was not an adverse employment action because it had no impact on the employee's status); *Silva v. Chertoff*, No. CV 04-220-

TUC-CKJ, 2007 WL 1795786, at *7 (D. Ariz. June 20, 2007) (a letter of reprimand without any employment consequences was not an adverse employment action)." *Moore v. Marriott Int'l, Inc.*, No. CV-12-00770-PHX-BSB, 2014 WL 5581046, at *10 (D. Ariz. Oct. 31, 2014).

5.      **Plaintiff's assignment to Station 6, her ability to earn overtime or make trades, TFD's issuance of a new policy and reaction from co-workers, and Acosta's follow up emails.**

Plaintiff alleges that her assignment to Station 6 was retaliatory.  (Doc. 87, ¶190). There is no merit to this claim.  Chiefs Fischback and Rodriquez decided to temporarily assign her to Station 6 when they discovered during the March 20th call her frequent unavailability to respond to emergencies due to her pumping.  (*See* DSOF 59, 62, 70). The captain on her shift at Station 6 was also a paramedic so if Plaintiff was unable to respond to a call, the captain could perform the medic function rather than have a truck go out without any medic.  (DSOF 70).  Station 6 also had the fewest calls of any station so there was much less chance of a call coming in when Plaintiff was unable to respond. (*Id.*).

At Station 6, she remained a paramedic, performed and was paid as a paramedic. (DSOF 72.).  She may have felt this station was less favorable because it was on the far side of the city, but she could have been assigned there or many other stations that are far from her home while on swing shift. Also, she later demanded to stay at Station 6 and complained that  Acosta's efforts to determine when her temporary need for that station ended were harassment.  (DSOF 80-81, 84-85, 90). The temporary assignment to a regular shift at Station 6 was precisely the accommodation she demanded.  One of Plaintiff's principal complaints was the fact she was on swing shift and not at a single station. (DSOF 32).  The temporary assignment to Station 6 resolved this complaint.  (DSOF 69-70).

Plaintiff claims that she was denied trades and overtime at Station 6.  (DSOF 214, NUI 12(b)).  There is no factual basis to support this assertion.  Plaintiff was never told

17

she could not work trades or work overtime.  (DSOF 73).  The hypocrisy of her claim is evident from her own complaint where she states she did trade shifts with G. Clark.  (Doc. 87, ¶¶84-85).  TFD permits employees of equal qualifications to trade shifts, but does not participate in arranging or enforcing trades.  (*Id.*).  Plaintiff worked a trade at Station 19.  (DSOF 78).  The only time Plaintiff was denied approval of a trade was with respect to her request to trade with her husband, G. Clark, due to the fact that he held the higher rank of captain.  (DSOF 79).  TFD's policy of only allowing trades between members with equal qualifications was enforced with males and females.  (*Id.*).  Overtime at TFD is based upon a member putting his/her name on the list of people who are seeking overtime shifts.  (DSOF 74).  Plaintiff only put her name on the list for overtime once and she worked the overtime shift.  (DSOF 75).  No one at TFD prohibited Plaintiff from working overtime or from trading with a member of the same rank.

In July 2013, TFD issued a new nursing room policy.  (Doc. 82, ¶62; DSOF 82).  Plaintiff complains about comments she was told others made about her when the new nursing room policy came out.  (*Id.*).  She did not personally hear any mocking or joking comments about the new policy.  (DSOF 83, 86).  When Plaintiff told TFD management about the comments, or that she was mocked and joked about, they told her that conduct would not be tolerated and they attempted to address the issue.  (DSOF 85-89).  Plaintiff and G. Clark both told their superiors the comments were people being insensitive, they did not want it pursued as a complaint, and they would not provide names of those making comments.  (DSOF 88-89).  The City is not liable for complying with her wishes not to pursue the matter.  *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1186–87 (9th Cir. 2005), amended on denial of reh'g, 433 F.3d 672 (9th Cir. 2006), amended on denial of reh'g, 436 F.3d 1050 (9th Cir. 2006).  Plaintiff did not assert the mocking rose to the level of a complaint at the time it happened moreover, the federal employment discrimination laws do not create a general code of civility.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Plaintiff alleges Acosta harassed her with "repeated contacts wanting to know if Plaintiff still had the same need to pump her breast milk, or words to that effect." (DSOF 214, NUI 12(b)). Her assignment to Station 6 was temporary. Pursuant to the procedures TFD implemented to account for staff assignments, Acosta sent emails to Plaintiff to see if she still had the need for the assignment, after a year passed. (DSOF 81). The willingness of Acosta and TFD Operations chiefs to further accommodate Plaintiff's desire to remain at Station 6 while she continued to express milk, long past the year required by FLSA, was providing assistance, not harassment.

### 6. The May 22, 2014, drill at Station 6.

Plaintiff alleges that Capt. T. McDonough singled her out for a drill on May 22, 2014. (DSOF 97-103). She was not singled out and drills are a common tool to insure members of the department retain their skills. (*See* DSOF 97). Being asked to perform a routine function of the job is not an adverse employment action. *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000).

There is no basis for Plaintiff to claim this action was retaliatory. The incident was over 10 months after the nursing room policy came out and after Plaintiff filed her ACRD complaint. (DSOF 82, 91). While actions in close temporal proximity to protected activity may provide an inference of retaliation, a long passage of time does not suggest any causality. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001); *See, e.g., Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir. 2006) (holding eight month gap insufficient to support an inference of retaliatory motive under facts presented); *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 647 (9th Cir. 2003) (holding thirteen month gap insufficient to support an inference of retaliatory motive under facts presented).

### 7. Plaintiff's assignment to light duty in Fire Prevention.

Plaintiff requested light duty due to her pregnancy with her second child. (DSOF 104). On June 16, 2014, Plaintiff was assigned to light duty at Fire Prevention. (*Id.*). She includes in her TAC various allegations of problems she experienced on light duty. (Doc.

87 ¶¶74-81).  Her attorney also responded to NUI No. 12(b), and included an allegation that hours were withdrawn from her leave and that Plaintiff was told where she could exercise.  (DSOF 214).  None of these provide any support for her claims of discrimination or retaliation.

At Fire Prevention, Plaintiff was in a different division of TFD and subject to different supervisors.  (DSOF 1, 4, 5, 13).  With the exception of Chief Critchley and HR Manager Acosta, no one she worked with at Fire Prevention was involved in any of the 2012, 2013, or 2014 incidents described above.  (DSOF 13).  Neither Chief Critchley nor Acosta made any of the light duty decisions Plaintiff challenges.

The incidents alleged by Plaintiff during this time period consist of legitimate minor corrections to her work time.  Plaintiff had two changes to her time records, one replacing 3 work hours with 3 vacation hours on one day for various reasons, and another when she was docked one half hour for leaving work early.  (DSOF 106).  Plaintiff does not dispute the underlying facts TFD relied on for these changes.  There is no evidence to suggest that these changes were anything other than the normal handling of time records.  *Ibanez v. Donahoe*, No. EDCV1400462VAPSPX, 2015 WL 7292763, at *5 (C.D. Cal. Nov. 18, 2015) (C.D. Cal. Nov. 18, 2015).

Plaintiff complains she was asked to document her medical status before exercising.  (Doc. 87, ¶¶75-77, 79).  She was on light duty due to a medical condition, her pregnancy, which prevented her from performing the physical duties of her regular job.  The physical limitations that restricted her job performance also could affect her exercising.  It was standard procedure when someone was assigned light duty due to medical conditions that the person is not allowed to continue with exercising while on duty without a doctor's note stating their limitations.  (DSOF 107).

Plaintiff also complains that she was told she had to be at work when her supervisor was and she couldn't leave the workplace to exercise at another location.  (Doc. 87, ¶¶75, 79-81).  These requirements were consistent with TFD policy and practice.  Light duty employee's schedules coincide with their supervisor's work schedule and when there are

adequate facilities at the station, there is no reason for an employee to leave the building to exercise. (DSOF 109, 111). There is nothing unreasonable or discriminatory in being told to be present at the workplace. Complying with reasonable policies is not actionable. *Kortan*, *supra*.

Plaintiff disagrees with TFD's explanations of why these actions were taken yet offers no evidence these actions were motivated by discrimination or retaliation. There is no evidence that any of these people held animus against the Plaintiff due to her need to express milk, her second pregnancy, or her 2013 EOPD and ACRD complaints. There is no evidence that any putative animus in TFD's Operations Division carried over for two years to Fire Prevention to manifest itself in relatively minor employment matters. *Sanders v. Foxx*, 644 F. App'x 781, 782–83 (9th Cir. 2016).

### 8. Plaintiff's allegations pertaining to Capt. Langejans.

In response to NUI No. 11(b), Plaintiff alleges that Capt. Langejans "carried out a pattern of hostile, discriminatory, retaliatory, and belittling behavior towards Plaintiff and Defendant failed to take prompt, effective remedial action to end the harassment." (DSOF 214). Also in response to NUI No. 12, Plaintiff raises similar allegations pertaining to Capt. Langejans and refers to her TAC ¶¶92-124. (*Id.*). Plaintiff's TAC, however, lacks any legal claims for harassment and only ties Capt. Langejans to the pending claims under Count Four. (*See* Doc. 87).

Under Count Four, Plaintiff alleges that "[t]he City, instead of taking appropriate corrective action against Capt. Langejans, turned the investigation against Plaintiff" then she goes on to allege that the City used the nepotism violation as an excuse to retaliate against her. (Doc. 87, ¶¶202-203). She includes these allegations as a factual basis for her retaliation claim under Title VII. Plaintiff's claim lacks any merit.

Capt. Langejans worked in Prevention, but he was not Plaintiff's supervisor. (DSOF 118). TFD received complaints from other members in Prevention regarding Capt. Langejans. (DSOF 120-127). TFD investigated all the complaints and he was disciplined for some of his remarks to other TFD members. (DSOF 128-133). EOPD also

investigated complaints regarding Langejans. (DSOF 143-150). The investigations resulted in findings that no harassment, discrimination, or retaliation occurred in the workplace. (DSOF 135, 144, 151). The City's EOPD investigation, not TFD's, resulted in a finding that TFD was in violation of the City's AD on nepotism and the City Manager's Office concurred with that finding. (DSOF 144, 151). TFD was instructed to make changes so it would no longer be in violation of the City AD. (DSOF 154-155). As a result of this directive, TFD transferred G. Clark out of Prevention and back to Operations, but AC Baker had already planned to send him back out to Operations due to his impending promotion to Battalion Chief and her succession plan for the Division. (DSOF 134, 157-159; *see also* Section III.C.9., *infra*.).

### 9. Enforcement of the City's nepotism policy.

Plaintiff alleges her husband was transferred from Fire Prevention to a less desirable field position in retaliation against Plaintiff. (Doc. 87, ¶137). This claim has no merit. TFD transferred G. Clark to ensure compliance with the City's nepotism policy. (DSOF 154, 157-158). G. Clark was also on a list to be promoted to battalion chief and Chief Critchley and AC Baker wanted him to go back out to the field to refresh his skills; his movement was already part of a succession plan. (DSOF 158-159). Carrying out an employment action that was planned prior to any alleged protected activity does not indicate discrimination or retaliation. "Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 1510–11, 149 L. Ed. 2d 509 (2001).

Contrary to Plaintiff's belief, TFD did move other personnel besides her and her husband to comply with the City's AD. (DSOF 161). Plaintiff has no evidence disputing TFD was in violation of the City's AD or that those who made the decision to enforce the AD were motivated to discriminate or retaliate against her. This was a legitimate, non-discriminatory basis for the transfer of Plaintiff's husband intended to benefit his career

advancement and ensure compliance with City policy.  There is no evidence this was pretextual.

### 10. The decision to transfer Plaintiff out of Fire Prevention and back to Operations.

On April 27, 2016, Plaintiff was informed she would be transferred from Prevention back out to Operations.  (Doc. 87, ¶148).  She alleges the decision to transfer her back out to Operations was done in retaliation for her lawsuit against TFD (the City).  (*Id.* ¶154).  Chief Critchley made the decision to transfer Plaintiff.  (DSOF 175).  Since he is the same person who laterally transferred her in the first place, there is no basis to infer that the move was based on any animus against her rather than the effective operation of his department and her ability to succeed at another location.  *Day v. Sears Holdings Corp.*, *supra*.

Chief Critchley testified, and it is undisputed, that he made the decision to move her back to Operations for several reasons.  It was due to the "drama that was going on in fire prevention for the past years [it] was not healthy for anybody down there."  (DSOF 177).  He was required to cut positions and he was doing what he could to move people back out to Operations.  (*Id.*).  He needed to have a certain amount of people in operations for the SAFER grant.  (*Id.*).  "[B]asically [he was] trying to protect positions on the fire department…" (*Id.*).  He also became aware that one of the other Inspectors in Prevention broke down crying "because of a discussion that [had happened] with Carrie Clark."  (*Id.*, l. 23-25).  That is when "[he] made the decision, well, then let's get Carrie somewhere where she can be successful...[he] needed medics, and this came up, and [he] made the decision to move Carrie, and [he] thought she could find a place as a medic in the operations."  (*Id.*).  Plaintiff's conduct certainly justified the transfer, and the improvement in the operation of the Prevention Division after she was moved confirmed it was the correct decision.  (DSOF 176).

### 11. Plaintiff's voluntary demotion.

Plaintiff was ordered to report to the TFD Fire Academy on May 2, 2016 for refresher training. (Doc. 87, ¶156). Plaintiff went to see the City Physician, Dr. Lundell, for her annual health/fitness examination on May 6, 2016, and presented her with a note from her personal physician stating she could not perform her full duties. (DSOF 186). Dr. Lundell agreed and told Plaintiff to contact TFD Human Resources regarding potential light duty. (*Id.*). On May 11, 2016, Plaintiff provided TFD the necessary documentation and she was placed on light duty from May 11, 2016 until June 25, 2016. (DSOF 187-188).

Effective June 26, 2016, Plaintiff chose to demote to a firefighter position because she did not want to go back on swing shift as a paramedic and she would not have enough seniority to choose the station where she would work. (DSOF 198). Prior to requesting the voluntary demotion, she spoke about her plan with her supervisor at the time, DC Sharon McDonough, who encouraged her not to demote, to move on and to work to become a captain. (*Id.*). Plaintiff's voluntary decision to change her work status to be more comfortable is not a basis for a federal claim. *Sturgill v. United Parcel Serv., Inc., supra.*; *Smith v. Pyro Min. Co., supra.*

### 12. Plaintiff's "150 Club" pay.

For firefighters who are certified paramedics but do not have the rank of paramedic, TFD offers a payment of $150 per month provided the individual is available for a minimum number of paramedic assignments. (DSOF 201). When Plaintiff chose to demote from paramedic to firefighter she became eligible for this pay, which is known within TFD as the "150 Club." (DSOF 200). To obtain the pay, Plaintiff had to submit forms requesting it since it also involved the assignment of additional duties. (*Id.*) Acosta twice sought to get Plaintiff to sign the necessary form prior to demoting. (DSOF 202-203). Plaintiff did not do so until after she had already demoted and started her new position. (DSOF 204). As a result of Plaintiff's delay in submitting the forms, she lost the

pay for that pay period. (DSOF 205). Plaintiff has no basis for a claim for her own inaction.

### 13. Gordon Clark's failure to pass probation.

After Plaintiff's husband, G. Clark was promoted to battalion chief, he was subject to a one year probationary period. On December 15, 2016, Chief Critchley decided that G. Clark's performance as a chief officer and part of management was not satisfactory. (DSOF 206-208). He informed G. Clark that he did not pass probation and was returned to the rank of captain. (*Id.*). This was not a demotion; it was failure to pass probation.

Chief Critchley had particular problems with G. Clark's communication with peers and superiors and his leadership skills. (DSOF 209). There were specific examples when G. Clark operated in a manner directly contrary to the Chief's direction. (*Id.*). There were specific communication problems, including when G. Clark did not tell his superiors he was interviewed at his station by a federal agency about his activities with firearms. (DSOF 210). The Chief also received input from another battalion chief who stated that he would never trade shifts with G. Clark again because he couldn't trust him to administer his position responsibly. (DSOF 211).

Since Chief Critchley was the person who promoted G. Clark in the first place, there can be no inference that he had any discriminatory or retaliatory motive in later failing him on probation and returning him to his prior status. *Sturgill v. United Parcel Serv., Inc.*, *supra.*; *Smith v. Pyro Min. Co.*, *supra.*

### D. There is no basis for Count 4 and 5.

Count 4 of the TAC alleges retaliation in violation of 42 U.S.C. § 2000e-3 for the transfer of G. Clark from Prevention following Plaintiff's March 2015, EOPD complaint. As set forth above, the City Manager's Office required enforcement of existing policies on nepotism. (Section III.C.9., *supra.*). Plaintiff has no evidence that it was discriminatory or retaliatory and this Count must be dismissed.

Count 5 alleges a general claim of retaliation/discrimination. This is addressed above. (Section III.C.1-13, *supra.*).

## IV. Conclusion

Plaintiff has a long list of perceived slights over a four year period that she hurls broadly as evidence of discrimination, hostile work environment, or retaliation. Analysis of each of these specific allegations demonstrates there is no evidence of any discriminatory or retaliatory motive, there were no adverse employment actions as contemplated by law, and the actions taken were for legitimate, non-discriminatory reasons for which plaintiff has no evidence showing they were pretextual. Taken as a whole, Plaintiff's complaint alleges a variety of disparate events involving different personnel on different issues at different times. Plaintiff completely fails to connect these disparate allegations with any evidence that would show a TFD or City policy or practice to discriminate or retaliate against her. All of her claims must therefore be dismissed.

DATED August 18, 2017.

MICHAEL G. RANKIN
City Attorney

By:    s/Michael W.L. McCrory
Michelle Saavedra
Michael W. L. McCrory
Principal Assistant City Attorneys

I hereby certify that on August 18, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Jeffrey H. Jacobson
JACOBSON LAW FIRM
2730 East Broadway Blvd., Suite 160
Tucson, AZ 85716
*Attorney for Plaintiff*

By E. Ramirez