Michelle R. Saavedra
Michael W.L. McCrory
Principal Assistant City Attorneys for
MICHAEL G. RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
Pima County Computer No. 66163
Michael.McCrory@tucsonaz.gov
State Bar Computer No. 3899
Pima County Computer No. 37268
Telephone: (520) 791-4221
Fax: (520) 623-9803
*Attorneys for Defendant City of Tucson*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK, | 4:14-cv-02543 |
| Plaintiff, | **DEFENDANT'S STATEMENT OF FACTS** |
| vs. | |
| CITY OF TUCSON, | (Hon. Cindy Jorgenson) |
| Defendant. | |

Defendant City of Tucson ("City") submits pursuant to Rule 56 of the Federal Rules of Civil Procedure the following Defendant's Statement of Facts ("DSOF") in support of Defendant's Motion for Summary Judgment. This DSOF sets forth facts, including some facts as alleged by the Plaintiff which the City may dispute at trial but which are set forth here as true in conformance with the standard for summary judgment.

The DSOF has a table of contents for the convenience of the Court and the parties. In addition, there is a summary of the allegations in the Plaintiff's Third Amended Complaint ("TAC" (Doc. 87)) in italics at the start of some sections. This summary is not intended to fully state Plaintiff's claims or in any way limit those claims, it is only to provide context for the factual matters that follow.

1

**TABLE OF CONTENTS**

2

A.  THE STRUCTURE OF THE TUCSON FIRE DEPARTMENT ................................... 4

3

B.  PLAINTIFF'S INITIAL SWING SHIFT ASSIGNMENTS ........................................ 9

4

    i.  Initial return to work and request to exchange positions ............................ 9

5

    ii.  Plaintiff's November 13, 2012 meeting with Deputy Chiefs ................................ 11

6

    iii.  Plaintiff's contact with EOPD ............................................................... 12

7

    iv.  Compliance of fire stations for Plaintiff's initial assignments from October 27,
       2012 through March 13, 2013 .................................................................... 14

8

9

C.  PLAINTIFFS OBJECTION TO WORKING IN STATION 9 AND
    CONFRONTATION WITH SUPERVISORS ON MARCH 20, 2013........................ 17

10

    i.  Plaintiff's telephone call and the questions about the frequency of her pumping and
       fitness for duty........................................................................................ 17

11

12

    ii.  Plaintiff's statement on the call that "You're out of your friggin' minds," telephone
       hang-ups and subsequent discipline ......................................................... 19

13

14

D.  PLAINTIFF'S ASSIGNMENT TO STATION 6, HER ABILITY TO EARN
    OVERTIME OR MAKE TRADES,  ACOSTA'S FOLLOW UP EMAILS, TFD
    ISSUANCE OF A NEW POLICY AND REACTION FROM CO- WORKERS ....... 20

15

16

    i.  Plaintiff's assignment to Station 6 ......................................................... 21

17

    ii.  Plaintiff's questions regarding overtime and trades .............................. 22

18

    iii.  Acosta's follow up emails regarding how long Plaintiff needed to stay at Station 6
        .......................................................................................................... 23

19

20

    iv.  The issuance of TFD's new policy on rooms for lactating mothers and reaction of
        co-workers ............................................................................................ 24

21

    v.  Plaintiff's desire to stay at Station 6 ..................................................... 24

22

E.  PLAINTIFF'S EEO CHARGE ...................................................................... 25

23

F.  THE MAY, 22, 2014, DRILL AT STATION 6 ............................................... 26

24

G.  PLAINTIFF'S ASSIGNMENT TO LIGHT DUTY IN FIRE PREVENTION .......... 27

25

H.  PLAINTIFF'S CONFLICT WITH LANGEJANS ............................................. 29

26

    i.  Plaintiff's assignment and the structure of Fire Prevention..................... 30

27

    ii.  The Langejans complaints, the TFD investigation, and imposition of discipline .. 30

28

iii.   Plaintiff's personal knowledge of hostile work environment ................................ 34

iv.   Plaintiff's first EOPD complaint, Case # WC1503001 ........................................... 35

I.   ENFORCEMENT OF THE CITY'S NEPOTISM POLICY ........................................ 37

J.   PLAINTIFF'S ADDITIONAL INTERNAL COMPLAINTS .................................... 39

K.   PROMOTION OF PLAINTIFF'S HUSBAND, GORDON CLARK ........................ 39

L.   PLAINTIFF'S SECOND EOPD COMPLAINT, CASE WC 16-03-001 ................... 40

M.   PLAINTIFF'S TRANSFER OUT OF FIRE PREVENTION .................................... 41

i.   Plaintiff's reassignment to Operations .................................................... 41

ii.   Plaintiff's medical status ....................................................................... 43

iii.   Plaintiff's return to light duty ................................................................. 44

N.   PLAINTIFF'S ATTENDANCE AT DEPOSITIONS. ................................................. 45

O.   PLAINTIFF'S THIRD EOPD COMPLAINT, CASE WC16-06-001 ....................... 45

P.   PLAINTIFF'S VOLUNTARY DEMOTION ............................................................. 45

Q.   PLAINTIFF'S "150 CLUB" PAY ............................................................................. 47

R.   GORDON CLARK'S FAILURE TO PASS PROBATION ....................................... 48

S.   PLAINTIFF'S DISCOVERY RESPONSE ............................................................... 50

**A.      The structure of the Tucson Fire Department**

1.      Tucson Fire Department ("TFD") is a municipal fire department which responds to public safety matters and emergencies such as fires, hazardous material discharges, collapsed buildings, automobile accidents and critical individual medical conditions.   TFD responds to approximately 90,000 calls for service annually with about 80,000 of those involving medical calls.   Commission fire suppression personnel consist of ranks within the department that include Firefighter, Paramedic, Fire Engineer, Fire Prevention Inspector/Investigator, Fire Captain, Fire Battalion Chief ("BC"), Fire Deputy Chief ("DC"), Fire Assistant Chief ("AC") and Fire Chief.   The Fire Chief directly supervises the Assistant Chiefs in the three divisions, Operations, Support Services and Administrative Support Services.   The organizational structure of TFD is set forth in Attachment 1 to Exhibit 1, Declaration of Michael Garcia ("Garcia Declaration"), ¶3.

2.      The Fire Chief is responsible for the direction of all fire service activities and the planning, development and implementation of programs to protect life and property from fire and hazardous materials released.   The Fire Chief is responsible for the establishment of departmental policies, administrative and command structure, personnel assignments and rules necessary for the operation of the department and is the appointing authority and final decision maker on the hiring, suspension or termination of all TFD employees.   (*See* Exhibit 2, Declaration of Fire Chief Jim Critchley ("Critchley Declaration"), ¶3).

3.      Because of the demands upon personnel in emergency situations, the commissioned fire suppression personnel are organized in a paramilitary structure where respect for the chain of command, respect for superior officers and compliance with direct orders is essential to the proper functioning of the department.  (*See* Exhibit 2, Critchley Declaration, ¶4).

4.      TFD also has civilian non-suppression personnel including a human resources officer, a financial officer, 911 communication staff, administrative assistants

and secretaries.  Some other positions such as the Fire Marshal and Fire Inspectors may be filled by civilian non-suppression personnel.  (*See* Exhibit 2, Critchley Declaration, ¶5).

5.     The Fire Prevention division oversees inspections of proposed building plans and existing facilities for compliance with the fire prevention requirements of the Tucson Code and adopted building and fire codes.  Paramedics may qualify for a lateral move to a Fire Inspector position by taking a written test and oral interview.  (*See* Exhibit 2, Critchley Declaration, ¶6; Exhibit 3, Deposition of JoAnn Acosta ("Acosta Depo"), pg. 136:9-16)).

6.     Paramedics are responsible for pre-hospital management and stabilization of the critically ill and injured persons in the course of providing emergency responses. Paramedics utilize definitive medical techniques under the direction of a licensed physician via administrative guidelines, telecommunication and radio systems. Paramedics are required to exercise considerable initiative and independent judgment in critical medical emergencies, firefighting and rescue operations; all while working under the physical and mental stresses inherent in public safety work.  While on duty, a paramedic must be constantly available to provide an emergency response.  (*See* Exhibit 1, Garcia Declaration, ¶4).

7.     As a department of the City of Tucson, TFD is subject to a hierarchy of regulations and policies that include in descending order: the Tucson Code, the Civil Service rules and regulations, the City's overall policies that are set forth in the City's Administrative Directives ("ADs").  The Department's own policies are set forth in its Manual of Operations which includes Rules of Assignments.  (*See* Exhibit 4, TFD Manual of Operations/Rules of Assignment ("MOP")).   TFD is required to follow City Administrative Directives.  The MOP has policies for day-to-day operations.  TFD can go outside the MOP regarding staffing, assignments and transfers.  (*See* Exhibit 5, Deposition of Michael Fischback ("Fischback Depo"), pg. 13:8-14:19)).

8.      The Rules of Assignment establish that vacant positions shall be filled based on consideration of a multitude of factors including specific administrative and personnel factors stated in Rule 201.1.1 (A) and (B).  The personnel factors include:

1.      Special certifications and training, i.e. technical rescue, hazardous materials, etc., whereby a member may be transferred to an assignment where his/her ability may be more fully utilized.

2.      The desire for broader experience, i.e., working in a different type of company, or special duty assignment.

3.      A transfer may be necessary for the corrective rehabilitation of a member.

4.      To avert or correct a personality clash between members.

5.      To assign a member who is presently on a promotional list to an assignment where he/she may be used regularly in an acting capacity prior to being appointed.  It should be noted that the department is not required to make such assignments, but when practical, this policy will be continued.

6.      The assignment of a member for sickness rehabilitation, i.e., a member assigned to light or limited duty basis during which time he/she may be given a special assignment.

7.      The factors of special services and length of service weighed carefully from the administrative standpoint.  (*See* Exhibit 4, MOP).

9.      The Operations Division is divided into four battalions each comprised of 5 to 6 fire stations.  There are currently 22 Fire Stations throughout the City of Tucson. Each station has three regular alternating shifts, the "A", "B" and "C" shifts.  Each shift is for 24 hours.  Alternating shifts of 24 hours on and 24 hours off are worked until 5 on shift days have been worked; this is called a "tour."  After the completion of the 5th 24 hour shift, 6 consecutive days off are taken.  At the completion of one shift, another regularly scheduled shift provides similar coverage.  Fire personnel assigned to the A, B and C shifts

6

are permanently assigned to a single station until there is some change by management reassigning an individual or the individual obtaining a different assignment through a seniority bid process.  For each battalion, there is a Battalion Chief for each shift who is responsible for supervision and assignment of personnel within that battalion and shift. (*See* Exhibit 1, Garcia Declaration, ¶5).

10.     Each of the three shifts is fully staffed with adequate personnel to meet the minimum constant staffing requirements for each unit.  In addition, there are extra personnel assigned to each shift.  These personnel are in a "swing" pool and their assignment is referred to as "swing."  Swing personnel are associated with a battalion for purposes of evaluations and personnel tracking although they may work in various stations and battalions as needed due to daily staffing requirements.  Each shift has a reserve pool of swing personnel.  These reserve pools consist of staff from the four continuously staffed ranks – captain, engineer, paramedic and firefighter for all battalions.  Swing personnel fill the vacancies created by members' use of leave, such as vacation, sick leave, industrial injuries, etc. hence an employee "swings" from station to station as needed.  (*See* Exhibit 1, Garcia Declaration, ¶6).

11.     Swing shift personnel are subject to the rules of assignment.  If a person in an assigned position leaves, that position is usually put up to bid.  Bidding for the position is available for all personnel of that rank.  It is usually determined based on seniority unless a specialty certification is required. (*See* Exhibit 5, Fischback Depo, pg. 18:4-19:1).

12.     Plaintiff has been an employee of the TFD since 2007.  (*See* Doc. 87, ¶11) Plaintiff was promoted to the position of Paramedic effective January 2, 2011.  (*See* Exhibit 6, Clark Personnel Action Request)  She was assigned to swing shift on July 12, 2012.  (*See* Exhibit 7, Plaintiff's Responses to Defendant's First Set of Requests for Admission #6 ("Clark Response to RFA"))  From July 23, 2012 through October 21, 2012, Plaintiff was out on Family Medical Leave for the birth of her first child.  (*See* Exhibit 8, JoAnn Acosta Declaration ("Acosta Declaration"), ¶4)  Plaintiff returned to her swing shift position with TFD on October 27, 2012.  (*See* Doc. 87, ¶¶13-14).

7

13.     During the times material to this case, Plaintiff had different assignments.  In each of these assignments, Plaintiff was supervised by and reported to different chains of command:

a.     Plaintiff was promoted to paramedic on January 2, 2011.  At that time and pursuant to standard policies, she was assigned to Station 4 one year while on probation.  The assignment was not a permanent assignment.  She went on light duty for the birth of her first child in December, 2011, shortly before her one year at Station 4 ended.   In anticipation of the end of Plaintiff's probationary period, the paramedic position at Station 4 was put out for bid prior to Plaintiff going on maternity leave.  As of January 2012, her full time assignment was as a swing shift paramedic while she was temporarily assigned to light duty.

b.     Prior to and from her return to work on October 27, 2012, following the birth of her first child through November 13, 2012, Plaintiff was a paramedic assigned to C shift/swing shift.  Her first assignment was to Station 12 on October 27, 2012, and then to Station 21 on October 29, 2012.  Plaintiff was then assigned to PM12 "C" from November 5, 2012 to January 6, 2013.  During this time, Plaintiff's chain of command was BC Brian Stevens, BC Pat Quinn, DC Ed Nied, AC Mike Fischback and FC Jim Critchley.

c.     Plaintiff then resumed swing shift assignments to various stations through March 13, 2013.  During this time period, her captain, battalion chief and deputy chief level supervisors varied with the specific station assignment.   Above these supervisors were AC Michael Fischback and FC Jim Critchley.

d.     She was temporarily assigned as a paramedic/firefighter at Station 6 from March 20, 2013 until she went on light duty on June 16, 2014, for the birth of her second child.   During this time, Plaintiff's chain of command was Captain Ted McDonough, BC Tim Nofs, DC Ed Nied, AC Michael Fischback and FC Jim Critchley.

e.     From June 16, 2014 she remained on light duty until August 22, 2014, when she went on FML for the birth of her second child.  Prior to going on FML, she was on light duty assigned to Fire Prevention.

8

f.      Carrie Clark returned from FML on November 24, 2014, to her new position as a Fire Inspector in Fire Prevention.   Carrie Clark remained in that position through April, 2016, when she was reassigned.   During this time, Plaintiff's chain of command was Captain Philip Morgan, Captain Ken Brouillette, DC Mike Carsten, AC Laura Baker and FC Jim Critchley.  (*See* Exhibit 8, Acosta Declaration, ¶6(f)).

**B.      Plaintiff's initial swing shift assignments**

*Plaintiff alleges that when she returned to work following the birth of her first child, she was assigned to stations that did not have a private space to express milk as required by federal law.  She met with superiors but they refused to let her stay at Station 12 and were insensitive to her needs.  She initially contacted the City's EOPD. (See* Doc. 87 ¶¶13-38*).*

**i.      Initial return to work and request to exchange positions**

14.      When a firefighter or paramedic is on the initial one year of probation, the employee is assigned to a single station under a single command staff.  That assignment is not a permanent assignment and once the probationary period is completed, the employee is usually assigned to swing shift until the employee can bid for a permanent assignment at a single station.  Plaintiff was promoted to paramedic on January 2, 2011.  At that time and pursuant to standard policies, she was assigned to Station 4 for one year while on probation.   The assignment was not a permanent assignment.   (*See* Exhibit 8 Acosta Declaration, ¶¶5, 6(a))

15.      On December 15, 2011, Paul McDonough, Richard L'Heureux and one other firefighter, and approved, by Chief Brad Olsen found that Clark had satisfactorily completed her probation as a paramedic.  (*See* Exhibit 9, Memorandum authored by Paul McDonough, dated December 15, 2011).

16.      She went on light duty for the birth of her first child in December, 2011, shortly before her one year at Station 4 ended.  The paramedic position at Station 4 was put out for bid prior to Carrie Clark going on maternity leave.  As of January, 2012, her full

time assignment was as a swing shift paramedic while she was temporarily assigned to light duty.  (*See* Exhibit 8 Acosta Declaration, ¶6(a))

17.     When she was scheduled to return to work, Plaintiff was a swing paramedic on "C" shift in Battalion 1 where she was scheduled to work at different fire stations throughout the city depending on TFD's needs.   BC Paul McDonough ("BC P. McDonough") was the supervisor for Battalion 1 swing shift.  He could not assign Plaintiff to a vacant permanent position on either the A or B shift such as the position at Station 12 for more than a few shifts since that had to be done by the BC responsible for that station. (*See* Doc. 87 ¶14; Exhibit 10, Deposition of Carrie Clark, Volume 1 ("Clark Depo I"), pg. 58:13-59:12)).

18.     Before she returned to work, Plaintiff contacted BC P. McDonough because she knew she would be expressing breast milk throughout her work day.  (*See* Doc. 87 ¶15).  Plaintiff was offered and was willing to accept assignment to Station 20 where there was a temporary position through the end of the year for a swing paramedic while the person holding the position was deployed on military duty.  However, Plaintiff asked to be assigned to Station 12 on her first day back in deference to the schedule of another employee at Station 20.  (*See* Exhibit 10, Clark Depo I, pg. 52; Exhibit 11, Email from Carrie Clark through Gordon Clark's email dated October 21, 2012)  Plaintiff did not want to displace other employees or bring attention to her situation.  (*See* Doc. 87 ¶17).

19.     On October 27, 2012, Plaintiff returned to work at Station 12 where she discussed her situation with Paramedic Jeff Todd ("Todd"), who was then-assigned to Station 12.  Plaintiff had changed her mind and now wanted to stay at Station 12 where Todd was assigned.  She wanted to be at Station 12 because it was closer to where her mother lived.  Her mother was taking care of her son and picking up breast milk while Plaintiff was on her shifts.  (*See* Exhibit 10, Clark Depo I, pg. 54:1-18; Exhibit 7, Clark Response to RFA #10; Exhibit 12, Memorandum authored by Carrie Clark dated November 9, 2013).

20.     Todd told Plaintiff that he wanted to move to another station and would like to help her and sent an email to BC Brian Stevens formally requesting a transfer from Station 12 to fill the vacancy at Station 20.  (*See* Doc. 87 ¶20).  Plaintiff also sent a memorandum formally requesting temporary assignment to Station 12.  (*See* Doc. 87 ¶27).

21.     TFD Rules of Assignment §201.6.1 states: "No personnel initiated exchanging of positions will be honored." (*See* Exhibit 4, MOP).

22.     Plaintiff knew that Todd had personal conflicts with the Captain at Station 12 and issues regarding his evaluation.  (*See* Exhibit 10, Clark Depo I, pg. 54:19-55:6).

23.     Plaintiff knew that the Rules of Assignment prohibited member initiated exchange of positions.  (*See* Exhibit 10, Clark Depo I, pg. 60:13-20).

**ii.     Plaintiff's November 13, 2012 meeting with Deputy Chiefs**

24.     There were two Deputy Chiefs who were responsible for Operations, DC Ed Nied ("DC Nied"), DC Rob Rodriguez ("DC Rodriguez").  DC Nied was responsible for the stations generally east of Alvernon, which included Station 12 and DC Rodriguez was responsible for the stations generally west of Alvernon, which included Station 20.  (*See* Exhibit 13, Declaration of Rob Rodriguez ("Rodriguez Declaration"), ¶3).

25.     On November 13, 2012, Plaintiff met with DC Nied, DC Rodriguez and BC P. McDonough about her situation.  They explained that it was decided that the Station 12 position would be put up for bid by other TFD personnel before they knew about the requests from Todd and Plaintiff.  A paramedic from Station 16 who had more seniority than Plaintiff won the bid.  Plaintiff was asked by DC Nied if she would go to the position in Station 16 that would be vacated, but she said she did not want to go there because of personal conflicts with the captain at that station.  She was asked about going to Station 20 and responded that it was too far a drive from where she lives.  It was then decided to assign Plaintiff to Station 12 for one more tour that would go through the end of the year and then return her to swing shift.  (*See* Exhibit 14, Carrie Clark Interview with OEOP Martina Macias dated January 7, 2013 ("Clark OEOP Interview January 7, 2013"); Exhibit 10, Clark Depo I, pg. 10:12-12:6); Exhibit 13, Rodriguez Declaration, ¶6).

11

26.     During her meeting with the DC's, DC Nied said that he didn't understand what her problem was because there had been other women pumping on the job.  (*See* Exhibit 10, Clark Depo I, pg. 96:5-20)   Plaintiff thought DC Nied's comments were ignorant because he talked about other women previously dealing with the same issue without a problem.  Plaintiff felt this was ignorant because no two women have the same experience.  She thought he may have meant well, but she did not want to be compared to other women and other women had not been in her situation.  (*See* Exhibit 10, Clark Depo I, pg. 96:23-97:17; 99:20-22)   Her complaint was that the questions were more ignorant than inappropriate.  (*See* Exhibit 10, Clark Depo I, pg. 98:2-5).

27.     Plaintiff didn't think that Rodriguez and Acosta treated her fairly, but she doesn't know how Nied, Rodriguez and Acosta treat other women.  (*See* Exhibit 21, Clark Deposition, Volume II ("Clark Depo II"), pg. 310:12-19).

### iii.     Plaintiff's contact with EOPD

28.     The City has an internal office under the City Manager to process complaints about discrimination and wrongful conduct in the workplace.  The office is currently called the Equal Opportunity Programs Division "EOPD".   https://www.tucsonaz.gov/oeop.[1] The EOPD does not report to the Fire Chief and is independent from TFD.  (*See* Exhibit 10, Clark Depo I, pg. 13:8-18; Exhibit 3, Acosta Depo, pg. 25:1-27:13).

29.     On January 7, 2013, Plaintiff met with Martina Macias ("Macias"), an employment specialist with the City's EOPD.  Plaintiff told Macias about her situation at TFD.  She told Macias that she wanted to be at Station 12 because it was more convenient for her mother and that she had tried to exchange positions with Todd.  (*See* Doc. 87 ¶36; Exhibit 10, Clark Depo I, pg. 10:18-23; Exhibit 14, Clark OEOP Interview January 7, 2013).

---

[1] The same office was previously called the Office of Equal Opportunity Programs ("OEOP").   For consistency, "EOPD" is used in this DSOF for both time frames. Documents and deposition testimony will still refer to "OEOP" where applicable.

30.     Plaintiff met with Macias again on January 16, 2013.  Plaintiff reviewed her situation with Macias and concluded by telling her that she no longer needed to be assigned to Station 12 to be near her mother because her baby was already eating food. (*See* Exhibit 15, Carrie Clark Intake Interview with OEOP Martina Macias dated January 16, 2013; Exhibit 10, Clark Depo I, pg. 12:13-14:9).

31.     Plaintiff was given the form to file a complaint, but chose not to file a formal complaint with EOPD in January, 2013.  (*See* Doc. 87 ¶37).

32.     On March 12, 2013, Plaintiff telephoned EOPD to ask if she could drop off her complaint form.  Macias told her they needed to talk with her because they were going to look into situations at the stations she mentioned.  She told EOPD that she did not think anyone was vindictive or intentionally assigning her to stations that did not meet her needs and that some of the employees assigning stations did not know about her situation.  She said that she was the only woman "in history . . ." in her situation where she was on swing shift while expressing milk.  She again said that there wouldn't be any problems if TFD had accommodated her request to stay at Station 12.  She stated she needed to be on a permanent assignment rather than swing shift, but those are bid upon based on seniority. The only ones that had opened which she could have won were Stations 8 and 9, but neither of those had private rooms.  Macias told Plaintiff that EOPD was going to look into the matter.  (*See* Exhibit 16, Carrie Clark telephone call with OEOP Martina Macias dated March 12, 2013; Exhibit 10, Clark Depo I, pg. 15:14-16:7).

33.     On March 11 and 21, 2013, Matthew Larsen ("Larsen"), an investigator with EOPD, inspected the 21 TFD fire stations for compliance with FLSA and the Patient Protection and Affordable Care Act requirement for providing a private space for expressing milk.  Larsen was accompanied on some of the inspections by JoAnn Acosta ("Acosta"), the Human Resources Manager for TFD.  He found that 12 stations fully complied and that 9 stations did not "comply."  Larsen interpreted federal law as requiring a lock on the door although the law does not have such a requirement.  Thus for the 9 stations he said did not comply, all had an existing private room which Larsen found could

have been brought into compliance with a lock on the door.  For one station, station 9, he said that a "new door" would be needed.  (*See* Exhibit 17, Memorandum authored by OEOP Matthew Larsen dated March 22, 2013 ("Larsen Memo dated March 22, 2013")).

34.    Station 9 had a study room that had a window in the door which could have been covered up to shield the occupant from view.  (*See* Exhibit 10, Clark Depo I, pg. 34:10-20).

35.    On March 22, 2013, Larsen issued a memorandum stating the findings of his review of the fire stations.  (*See* Exhibit 17, Larsen Memo dated March 22, 2013).

36.    On March 26, 2013, Robert Barton ("Barton"), Program Manager for EOPD, sent a memorandum to Fire Chief Jim Critchley ("Chief Critchley").  The memorandum stated that after several requests, Plaintiff failed to initiate a formal complaint.  It further stated that after informal review of Plaintiff's information, EOPD had concluded that there was not a prima facie case of violation of the City's harassment/discrimination complaint. It also attached a copy of Larsen's memorandum regarding compliance of the fire stations with federal law regarding a private space for expressing milk and gave TFD 30 days to correct the deficiencies noted in the report [lack of locks on doors].  (*See* Exhibit 18, Memorandum authored by OEOP Robert Barton dated March 26, 2013).

37.    Acosta had previously expressed milk while working for a private employer by just using an office with a door that closed.  Based on this prior experience, she didn't think that locks were required, but she was not the person making the inspection or report. (*See* Exhibit 3, Acosta Depo, pg. 72:25-73:24).

       **iv.**    **Compliance of fire stations for Plaintiff's initial assignments from October 27, 2012 through March 13, 2013**

38.    As part of its investigation, EOPD interviewed Captain Richard L'Heureux ("L'Heureux") on March 22, 2013.  L'Heureux was the supervisor responsible for the duty roster of C shift, which included Plaintiff, from October, 2012 through May, 2013, when Plaintiff went on Family Medical Leave.  (*See* Exhibit 19, Richard L'Heureux Interview

with Barton dated March 22, 2013; Exhibit 20, Richard L'Heureux Declaration ("L'Heureux Declaration"), ¶9)).

39.     In making assignments, L'Heureux relied on the Rules of Assignment, classification, seniority and, where practical, individual preferences.  The staffers making assignments tried to go in order of specialty, battalion and seniority.  Most swing shift personnel have preferences for where they want to go, such as to the east or west side of Tucson based on where they live, and the staffers tried to accommodate these preferences. Making those accommodations was not effected by race, nationality or gender.  L'Heureux did not personally make each assignment for Plaintiff.  Other TFD staff members were also responsible for assigning Plaintiff.  (*See* Exhibit 20, L'Heureux Declaration, ¶6).

40.     Plaintiff gave L'Heureux a list of stations where she could not work when she returned from maternity leave and was breast feeding.  L'Heureux did not know of any problems with regard to Plaintiff's need to express breast milk from October 27, 2012 through March 13, 2013 or of any conflict between the stations where she was assigned and her breast pumping needs.  (*See* Exhibit 20, L'Heureux Declaration, ¶7).

41.     Prior to March 20, 2013, Plaintiff took leave time on several occasions when she thought she might be assigned to a station where she did not want to work.  She did not inform TFD schedulers that the purpose of taking leave was to avoid a specific station. (*See* Exhibit 10, Clark Depo I, pg. 120:23-122:2).

42.     There were no occasions when L'Heureux bumped another employee to place Plaintiff at a station that was not on the list of excluded stations.  There was one time he had to bump a paramedic with more seniority for a position at Station 20, but that was because Plaintiff had a specialty certification that applied to that station.  L'Heureux told the paramedic who was bumped the correct reason for his action.  There was no instance when someone else was re-assigned because Plaintiff made a special needs request and he never told anyone that that had happened.  (*See* Exhibit 20, L'Heureux Declaration, ¶8).

43.     Plaintiff was never directly told by another TFD employee that the person was upset at being moved because she had been assigned that person's position.  (*See* Exhibit 21, Clark Depo II, 250:2-5).

44.     Plaintiff remained at Station 12 which she had requested through January 5, 2013.  She then returned to swing shift on January 8, 2013 and worked at Station 4.  From January 8 through March 13, 2013, Plaintiff worked at stations 1, 3, 4, 5, 19 as well as the two stations she had requested – 12 and 20.  The Larsen investigation found that Stations 1, 4, and 5 had private rooms that met all standards required by the FLSA and the Patient Protection and Affordable Care Act that there be "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk."  (*See* Exhibit 17, Larsen Memo dated March 22, 2013).

45.     The same investigation found that Stations 3, 12 and 19 had private dorm rooms and that Stations 12 and 20 had a private study room that could be used.  The investigation found these did not comply with federal requirements because they lacked locks.  (*See* Exhibit 17, Larsen Memo dated March 22, 2013)  However, there is no requirement for a lock.  (*See* Exhibit 22, 29 USC §207(r)(1)(*B*)); Fact Sheet #73)

46.     The only stations to which Plaintiff was assigned and which she alleges did not comply with federal requirements are Stations 7 and 9.  (*See* Exhibit 10, Clark Depo I, pg. 31:17-32:19).

47.     Plaintiff did not work at either Station 7 or 9 during this time period.  (*See* Exhibit 23, Carrie Clark Telestaff Assignment Record from October 27, 2012, through October 31, 2013 ("Telestaff Record")).

48.     Station 7 was found in full compliance with federal requirement by the OEPD investigation because it also had a study room that could be used to express milk privately.  (*See* Exhibit 17, Larsen Memo dated March 22, 2013)  Plaintiff was going to be assigned to a two person medic unit at Station 7 which would have required her to be in a shared dorm room.  The captain at the station wouldn't agree to her being stationed there

16

with two person paramedic unit.  She was on one occasion assigned to a single paramedic unit at Station 7.  On that occasion she had a private dorm room that met her requirements. (*See* Exhibit 10, Clark Depo I, pg. 133:10-135:13).

49.    Station 9 had a study room which had a door with a window that could be covered to allow privacy.  (*See* Exhibit 10, Clark Depo I, pg. 34:10-23)  Station 9 also had private dorm rooms with a curtain that pulled across the opening to shield the occupant from view.  (*See* Exhibit 10, Clark Depo I, pg. 36:20-37:21).

50.    Every station where Plaintiff worked from October, 2012, to March, 2013, had a room available for her to express milk where she could have privacy and be unobserved.  (*See* Exhibit 7, Clark Response to RFA #14; Exhibit 23, Telestaff Record).

51.    Plaintiff never went to a station where she had to use a bathroom to pump breast milk.  (*See* Exhibit 10, Clark Depo I, pg. 132:3-5).

52.    By May 13, 2013, all stations had private rooms equipped with a lock.  (*See* Exhibit 24, Memorandum authored by Jim Critchley dated May 13, 2013).

53.    Plaintiff was never told she could not have time to express milk.  (*See* Exhibit 10, Clark Depo I, pg. 38:4-10).

54.    Plaintiff's expectation upon her return to work was that she have a private dorm room.  (*See* Exhibit 10, Clark Depo I, p. 29:16-30:5).

**C.    Plaintiffs objection to working in Station 9 and confrontation with supervisors on March 20, 2013**

*Plaintiff alleges that when she complained about being assigned to Station 9 on March 20, 2013, she was subject to inappropriate comments and harassed by management.  She further alleges the City then retaliated against her by then disciplining her with an educational counseling.* (Doc. 87 ¶¶39-51, 57-59).

### i.    Plaintiff's telephone call and the questions about the frequency of her pumping and fitness for duty

55.    On March 20, 2013, Plaintiff saw that when she was to report to work later that day, she was going to be assigned to Station 9.  Plaintiff felt this showed that TFD was

not understanding her situation, so she attempted to call Rodriguez.  She later got through to AC Michael Fischback ("Fischback")[2] around 5:00 p.m., who put her on speaker phone with Rodriguez and Acosta.  Acosta asked what the issue was and Plaintiff told her she had been assigned to Station 9 but couldn't work there.  (*See* Exhibit 10, Clark Depo I, pg. 137:19-138:18; 140:18-24).

56.     Station 9 was the only station available for her that night.  (*See* Exhibit 10, Clark Depo I, pg. 142:10-12)  Although the list provided by Larsen's investigation said that Station 9 met the requirements, Fischback and Rodriguez agreed it would be better to find another station.  (*See* Exhibit 25, Memorandum authored by Michael Fischback dated August 8, 2013; Exhibit 5, Fischback Depo, pg. 11:6-23).

57.     Plaintiff thought Acosta was inappropriate because Acosta just started out asking what the issue was without saying "hi" to her first.  (*See* Exhibit 10, Clark Depo I, pg. 141:17-25)  She also didn't like Acosta's tone that she thought was condescending and not tactful.  (*See* Exhibit 10, Clark Depo I, pg. 142:24-143:6).

58.     Acosta told Plaintiff that Station 9 had a private room she could use, which was the EC and Chief's rooms.  Plaintiff explained those wouldn't work because she would have to wake them up during the night.  (*See* Exhibit 10, Clark Depo I, pg. 143:15-144:23; 150:11-16; Exhibit 5, Fischback Depo, pg. 26:15-27:3).

59.     Plaintiff was upset and raised her voice in the phone conversation.  She had her baby crying in the background.  She said she needed to pump every three to four hours and that it took her 30 to 40 minutes each time. The Chiefs and Acosta were concerned that that was too much time to take out of the shift and that it would interfere with her being available for emergency calls.  Plaintiff was put on hold while Acosta, Rodriguez, and Fischback discussed the matter.  In response to questions from Rodriguez and Fischback about the frequency and length of pumping, Acosta said that in her personal experience it

---

[2] Fischback was Assistant Chief of Operations, training and emergency management from May 2011 to May, 2013, and then a Deputy Chief for Logistics after May, 2014.  (*See* Exhibit 5, Fischback Depo, pg. 9:10-12).

should not take that long, but that it varied with different women.  Acosta was also considering whether Plaintiff needed a light duty assignment so she could express milk without interfering with TFD operations.  (*See* Exhibit 3, Acosta Depo, pg. 46:14-48:19; 49:3-7; 51:8-20; Exhibit 13, Rodriguez Declaration, ¶¶10-12).

60.   Both Rodriguez and Fischback were struggling with the problem because the other women who had to pump while on duty had not had a problem and now that Plaintiff raised the issue they wanted to make sure they followed the law.  (*See* Exhibit 3, Acosta Depo, pg. 32:22-34:4).

61.   Plaintiff also told them that she had taken a medic truck out of service on one or two occasions in order to pump with permission of her BC.  Fischback and Rodriguez felt this was unacceptable since TFD needed to respond quickly to emergencies and if one medic truck was out of service they would have to get one from another location.  (*See* Exhibit 3, Acosta Depo, pg. 52:8-12; Exhibit 5, Fischback Depo, pg. 42:17-43:2; Exhibit 13, Rodriguez Declaration, ¶¶11, 14).

62.   Acosta asked whether Plaintiff was fit for duty.  The Chiefs and Acosta were concerned as to whether Plaintiff could perform the essential functions of the job.  They were also concerned that Plaintiff might have a medical condition and her personal physician might not know about the requirements of the job.  Acosta wanted to make sure Plaintiff was aware of possible employment alternatives if she could not perform her duties such as the possible assignment to light duty.  Only the City's doctors can determine whether someone is in fact fit for duty.  (*See* Exhibit 3, Acosta Depo, pg. 52:23-55:2; Exhibit 13, Rodriguez Declaration, ¶9-12).

### ii.   Plaintiff's statement on the call that "You're out of your friggin' minds," telephone hang-ups and subsequent discipline

63.   Plaintiff's tone of voice indicated that she was angry and upset and did not like the two Chiefs' and the HR manager's discussion of going to Station 6 because it was a long way from her home.  She asked if they were out of their "friggin" or "frinking" minds for suggesting she could use the Station 9 chief's private office to express milk.

(*See* Exhibit 10, Clark Depo I, pg. 150:24-151:5; Exhibit 5, Fischback Depo, pg. 23:24-25:1; 32:11-33:6; Exhibit 13, Rodriguez Declaration, ¶12).

64.     Fischback, Rodriguez and Acosta believed that she twice hung up on them. (*See* Exhibit 5, Fischback Depo, pg. 25:2-6; Exhibit 13, Rodriguez Declaration, ¶12).

65.     Fischback issued Plaintiff a verbal counseling for inappropriate conduct and rudeness to co-workers for saying they were out of their friggin' minds and hanging up on them.  Fischback and Acosta believed that from the facts that they talked for a while before they realized she was no longer on the other end, that the line went dead but remained lit up on the TFD phone, that she answered right away when they called back and her tone and anger at suggesting she go to Station 6 confirmed that she had hung up on them.  (*See* Exhibit 26, TFD Employee Counseling Form regarding Carrie Clark dated March 26, 2013; Exhibit 5, Fischback Depo, 29:7-33:6; Exhibit 3, Acosta Depo, pg. 80:20-83:10).

66.     Acosta was not involved in the verbal counseling.  (*See* Exhibit 3, Acosta Depo, pg. 83:11-84:3).

67.     In discussing the verbal counseling, Plaintiff asked Fischback why she couldn't work at Station 12.  Fischback knew that Station 12 was not considered in compliance by Larsen's list and told Plaintiff that a complaint had been filed and it was not on the approved list.  Plaintiff told him she had not filed a complaint.  Fischback then apologized for the comment to Plaintiff and her union representative who was also present. (*See* Exhibit 5, Fischback Depo, pg. 34:15-35:7).

68.     Plaintiff cannot recall any other similar comment that showed anyone else at TFD thought that she should not have gone to EOPD.  (*See* Exhibit 21, Clark Depo II, pg. 245:25-246:12).

**D.     Plaintiff's assignment to Station 6, her ability to earn overtime or make trades, Acosta's follow up emails, TFD issuance of a new policy and reaction from co-workers**

*Plaintiff alleges that her assignment to Station 6 on the far side of town was discriminatory and retaliatory, that she was denied her ability to earn overtime or make*

*shift trades while at Station 6, that she was harassed by Acosta about the her staying at Station 6 and that she was mocked and harassed when TFD issued a new policy on providing rooms for lactating mothers.* (*See* Doc. 87 ¶¶52-56, 60-65; 84-87).

### i.    Plaintiff's assignment to Station 6

69.    Starting on March 22, 2013, she was assigned to a non-swing shift position at Station 6 where she remained until she went on light duty and then maternity leave for her second child. (Doc. 87 ¶52, ¶74)  Station 6 is located at the far southeast boundary of the City on Wilmot off of I-10, and primarily responds to calls from the federal and state prisons on Wilmot. (Doc. 87 ¶53).

70.    In response to Plaintiff's call and complaints on March 20, 2013, Fischback and Rodriguez decided to assign Plaintiff to Station 6.  Plaintiff was given a position that was a permanent assigned slot so that she was no longer on swing shift.  Station 6 was a paramedic assessment unit ("PAU") that was normally staffed with a captain, engineer, medic and firefighter.  On the C shift, where Plaintiff was assigned, the captain was a medic, and the other assigned personnel were an engineer and two firefighters.  Fischback and Rodriguez bumped one of the firefighters who did not have a bid position to open a place for Plaintiff.  That was done because if she needed to express milk when a call came, the captain could provide the medic service when she could not.  In addition, the station had the fewest calls of any station, an average of 1.79 calls per 24 hours, which meant there was a greatly reduced chance that her need to express milk would conflict with the need for an emergency response.  (*See* Exhibit 5, Fischback Depo, pg. 41:12-43:21) Plaintiff had greater seniority than the firefighter who was in the position when she was assigned.  Plaintiff retained her paramedic certification and functioned as a paramedic while assigned to Station 6.  Although the position was for a firefighter before Clark's assignment, it was reclassified to be a Firefighter/Paramedic position after she was assigned.  (*See* Exhibit 27, Declaration of Ted McDonough ("McDonough Declaration").

71.    Acosta was not involved in any decision on where to assign Plaintiff. Assignments were made by Operations. Acosta had no authority over who was assigned to swing shift or to specific stations. (*See* Exhibit 3, Acosta Depo, pg. 87:14-89:14).

72.    Plaintiff's assignment to Station 6 did not result in any loss of pay and she continued to work as a paramedic. (*See* Exhibit 10, Clark Depo I, pg. 172:17-21).

### ii.    Plaintiff's questions regarding overtime and trades

73.    In the telephone discussions on March 20, 2013, Plaintiff asked what would happen regarding trades and overtime if she was assigned to Station 6. She was told Fischback and Rodriguez hadn't thought about that and would have to get back to her. She was not told that she couldn't trade or that she couldn't work overtime. She never followed up with Fischback. (*See* Exhibit 10, Clark Depo I, pg. 157:24-158:15; 176:13-177:3).

74.    Assignment of overtime shifts is based upon a list of eligible employees. The employee must put his or her name on the list to be eligible. Once on the list, overtime shifts are assigned to the person with the least amount of overtime. (*See* Exhibit 10, Clark Depo I, pg. 159:22-160:4).

75.    Plaintiff has only put her name on the list for overtime once. That one time was in November 2013 when she was working at Station 6. On that occasion, she was scheduled and worked the overtime shift. (*See* Exhibit 10, Clark Depo I, pg. 158:16-159:21).

76.    Commissioned personnel may also arrange a trade with another employee. A trade is where the person working the trade, firefighter A, will take a shift for another employee who is regularly assigned to a different shift, firefighter B. In theory, the person who receives the time off from the trade, firefighter A, will later return the trade and work a shift for the other person, firefighter B. The amount of time A works on B's shift is not included in the calculation of A's hours for overtime compensation. Trades have to be of equal rank. TFD recognizes that employees have the right to trade and allows them, but does not participate in arranging or enforcing trades. TFD policy requires that a supervisor

approve a voluntary trade with a replacement of equal qualifications.  (*See* Exhibit 13, Rodriguez Declaration, ¶15; Exhibit 28, Laura Baker Deposition ("Baker Depo"), pg. 22:9-27:4)).

77.     TFD policy requires that a supervisor approve a voluntary trade with a replacement of equal qualifications.  (*See* Exhibit 4, MOP, §203.6.1; Exhibit 13, Rodriguez Declaration, ¶15).

78.     Plaintiff had agreed prior to returning to work in October 2012 to a trade with another paramedic for a shift in the beginning of 2013.  She asked P. McDonough whether she could do the trade because she had not heard back from Fischback.  P. McDonough told her that he checked with Rodriguez and it was alright for her to work the trade.  She worked the trade at Station 19.  (*See* Exhibit 10, Clark Depo I, pg. 178:6-180:4).

79.     The only time Plaintiff was denied approval of a trade was with respect to her request to trade with her husband, Gordon Clark ("G. Clark"), who held the higher rank of captain.  (*See* Exhibit 21, Clark Depo II, pg. 277:15-24)  Males were treated the same way.  (*See* Exhibit 13, Rodriguez Declaration, ¶16).

### iii.     Acosta's follow up emails regarding how long Plaintiff needed to stay at Station 6

80.     On July 19, 2013, the one year period for an employer to provide lactation facilities under the FLSA expired.

81.     Plaintiff's assignment to Station 6 was temporary to resolve the problems with her having to express milk.  TFD had in prior years had trouble maintaining records of swing shift personnel who were given temporary assignments.  TFD had been implementing procedures to account for staff assignments.  As part of that, Acosta kept track of personnel who were in temporary assignments.  This typically included employees on military deployment.  It also included Plaintiff.  Acosta kept a tickler system to follow up with such employees on a regular basis to see if they still needed the temporary

assignment.  With Plaintiff, that follow up was by emails asking if she still needed to express milk.  (*See* Exhibit 3, Acosta Depo, pg. 89:6-92:14).

### iv.    The issuance of TFD's new policy on rooms for lactating mothers and reaction of co-workers

82.    On July 19, 2013, TFD issued a new policy for nursing rooms to comply with the Fair Labor Standards Act and the Patient Protection and Affordable Care Act. The policy stated that federal law required reasonable breaks and a place, other than a bathroom, that is shielded from view and free from intrusion to express milk for a period of one year following the birth of a child.  The policy provided that if safety issues arose from the need to express milk, alternate assignments could be considered.  The policy provided that a list of rooms available for lactation was available from the Human Resources Manager.  (*See* Exhibit 29, MOP §220).

83.    After the policy came out, Plaintiff heard from others that people were bashing her about it.  No one directly stated any bashing comment to her.  (*See* Exhibit 21, Clark Depo II, pg. 254:14-255:7).

### v.    Plaintiff's desire to stay at Station 6

84.    On July 19, 2013, Acosta informed Brad Olson ("Olson"), Assistant Chief for Operations, that the one year period provided by law for Plaintiff's temporary assignment to Station 6 had ended and Operations was able to reassign her.  (*See* Exhibit 30, Email from JoAnn Acedo (Acosta) to AC Brad Olson dated July 19, 2013; Exhibit 3, Acosta Depo, pg. 93:1-20; Exhibit 22, U.S.C. §207(r)(1)(A)); Fact Sheet #73).

85.    On July 27, 2013, Plaintiff sent a memorandum to BC Timothy Nofs ("Nofs") requesting that she be allowed to stay at Station 6 at least for the next few months, if not longer.  Plaintiff also stated that she was not comfortable moving to another station because she had been mocked and joked with by a department member about the new nursing room policy and that she had heard it was being called the "Carrie Clause" or the "Carrie Rule".  (*See* Exhibit 31, Memorandum authored by Carrie Clark dated July 27, 2013).

86.     Plaintiff does not know of anyone at Station 6 who bashed her because of the nursing room policy, made comments behind her back, or was upset about her bringing up the federal law.  (*See* Exhibit 21, Clark Depo II, 264:11-21).

87.     When Acosta became aware of Plaintiff's claim that she was being mocked and the subject of unwelcome humor, Acosta recommended that it be investigated since that was conduct that was not tolerated at TFD.  (*See* Exhibit 3, Acosta Depo, pg. 100:10-19; 107:1-108:13).

88.     On August 2, 2013, Plaintiff conferred with BC Nofs, DC Rodriguez and Captain T. McDonough ("Capt. T. McDonough") about her claims that she was being mocked.  She and both Chiefs concluded that they would chalk it up to people being insensitive.  She had "never had any desire to file any type of harassment claims."  Her husband, G. Clark, was teleconferenced with them and also did not want to pursue a harassment claim against anyone.  (*See* Exhibit 32, Memorandum authored by Carrie Clark dated September 18, 2013).

89.     Although the mocking was not Plaintiff's main issue in her July 27, 2013, memorandum, TFD took it seriously.  Plaintiff wasn't looking for them to do anything about it, it was just part of the reason she wanted to stay at Station 6.  (*See* Exhibit 10, Clark Depo I, pg. 221:19-222:8; 223:22-25).

90.     On November 3, 2013, Plaintiff talked with Rodriguez, Nofs and Acosta about her assignment status.  Plaintiff wanted to stay permanently at Station 6, but Rodriguez told her that the position has not been bid and it would have to be opened for bid once her special assignment was ended.  Rodriguez explained she would have to go back on swing shift and that the department needed paramedics on swing shift.  Plaintiff clarified an earlier request to stay at Station 6 to finish nursing her second child was not accurate, but she was still expressing milk for her first child and wanted to stay at Station 6.  Rodriguez agreed to let her stay longer and Acosta was to follow up in January.  (*See* Exhibit 33, Memorandum authored by Rob Rodriguez dated November 4, 2013).

**E.     Plaintiff's EEO charge**

91.     On July 31, 2013, Plaintiff filed her first charge with the Arizona Attorney General pursuant to the Arizona Civil Rights Act and the federal Equal Employment Opportunities Act.  (*See* Doc. 87 ¶66)  Plaintiff's charge was based on the allegations she was denied assignment to Station 12, denied the exchange with Todd, assigned to stations that lacked proper lactation facilities, harassed in the March 20 telephone call, given a verbal counseling and the denial of overtime and trades at Station 6.  (*See* Exhibit 34, Charge of Discrimination filed July 31, 2013).

92.     On December 23, 2013, Plaintiff was given a positive evaluation by Ted McDonough, Tim Nofs and Rob Rodriquez.   (*See* Exhibit 35, TFD Paramedic Performance Evaluation Form).

93.     In January 2014, Plaintiff informed TFD that she was again pregnant.  (*See* Doc. 87 ¶67).

94.     On April 24, 2014, the Arizona Attorney General's Office issued Plaintiff a Right to Sue letter.  (*See* Doc. 87 ¶68).

95.     Plaintiff does not complain about any conduct at TFD between her being allowed to stay at Station 6 in August, 2013 to May, 2014.  (*See* Doc. 87 ¶¶ 64-69).

96.     On May 22, 2014, Plaintiff served a notice of claim on the City.  (*See* Doc. 87 ¶70).

**F.     The May, 22, 2014, drill at Station 6**

*Plaintiff alleges she was singled out to perform a firefighting drill and threatened with discipline.*  (*See* Doc. 87 ¶69).

97.     On May 22, 2014, Plaintiff was on a crew under Capt. T. McDonough with and engineer, Ron Catlin ("Catlin"), and a firefighter (FF), Tyler McKendrick ("McKendrick").  On the way back from responding to a brush fire, Capt. T. McDonough turned into a park in a residential area and stopped the truck for a hose drill.  The drill consisted of Capt. T. McDonough telling them to act as though the engineer had just been injured.  FF McKendrick, who was ready to test for an engineer rank, was to act as

engineer and Plaintiff was to pull the fire hose.  (*See* Exhibit 36, Memorandum authored by Timothy Nofs dated May 22, 2014).

98.    Plaintiff asked several times what was happening, but didn't get answers. Because she felt that she was singled out for the drill, she told Capt. T. McDonough that if he didn't want her at his station, just say so and she would leave.  (*See* Exhibit 37, Memorandum authored by Carrie Clark dated June 19, 2014 ("Clark Memo dated June 19, 2014"); Exhibit 10, Clark Depo I, pg. 18:21-19:3)).

99.    Plaintiff felt she was singled out because she was a pregnant woman.  She thought the drill was unrealistic and the drill came shortly after Capt. T. McDonough had told Plaintiff that he had discussed concerns about pregnant women working in fire suppression.  Plaintiff didn't understand what his concerns were, but told him that as far as her doctor and she were concerned, it was fine.  (*See* Exhibit 21, Clark Depo II, pg. 270:12-271:15, 305:11-306:7).

100.    She then set/dropped/slammed the hose down and told him that she would just go home sick and walked back to the truck.  She was visibly upset, crying and talking on the telephone.  (*See* Exhibit 38, Memorandum authored by Ted McDonough dated May 22, 2014 ("McDonough Memo dated May 22, 2014"); Exhibit 39, Memorandum authored by Tyler McKendrick dated May 22, 2014 ("McKendrick Memo dated May 22, 2014")).

101.    After the Battalion Chief and EMS Captain were called to the scene and spoke with Plaintiff and the others, Plaintiff left and went home sick.  Plaintiff was offered a ride home, but declined.  (*See* Exhibit 37, Clark Memo dated June 19, 2014; Exhibit 38, McDonough Memo dated May 22, 2014; Exhibit 39, McKendrick Memo dated May 22, 2014).

102.    Nofs asked Plaintiff to submit a memorandum regarding the incident because TFD was considering discipline for insubordination.  (Doc. 87 ¶73).

103.    No discipline was imposed as a result of this incident.  (*See* Exhibit 27, McDonough Declaration ¶13).

**G.    Plaintiff's assignment to light duty in Fire Prevention**

*Plaintiff alleges that when she was assigned to light duty she was required to provide a doctor's note about her condition, had time deducted from when she was exercising away from the worksite, was prohibited from exercising away from the worksite, was denied the same flexibility in her daily schedule that was given to others.* (*See* Doc. 87 ¶¶71-72, 74-81).

104.    Plaintiff requested and was assigned to light duty on June 16, 2014, prior to the birth of her second child.  Precise work assignments for light duty personnel are decided by the Assistant Chiefs and Chief Critchley, typically at the beginning of each week depending on what needs there are. (*See* Exhibit 3, Acosta Depo, pg. 121:2-18).

105.    Plaintiff's supervisor was Ken Brouillette ("Brouillette").    Brouillette initially told her that he would take care of her and understood her position because he had filed a lawsuit against a fire department where he had worked previously.  (*See* Exhibit 21, Clark Depo II, pg. 339:15-340:19).

106.    On June 19, 2014, Plaintiff's computerized time entry for June 18, 2014, was changed to replace 3 hours of work time with 3 hours of vacation.  The changes were because Plaintiff's entry included one hour from 6:00 am to 7:00 am which was before her scheduled work time, .5 hours for lunch and 1.5 hours when Plaintiff was not at work because she was exercising.  (Doc. 87 ¶78).  On one occasion, Assistant Chief Joe Gulotta ("Gulotta") instructed Plaintiff's supervisor to deduct one half hour from her time report because she left work early.  (*See* Exhibit 21, Clark Depo II, pg. 330:18-333:22).

107.    TPD standard procedure under Acosta was that when someone was assigned light duty due to medical conditions that the person is not allowed to continue with exercising while on duty without a doctor's note stating the extent of exercise that is allowed by the person's physical limitations.  (*See* Exhibit 3, Acosta Depo, pg. 123:22-124:24).

108.    TFD's standard practice when someone returns to full duty following light duty assignment is to get a release from the individual's personal doctor and the City doctor.  (*See* Exhibit 3, Acosta Depo, pg. 131:132:17).

28

109.   A person's schedule for hours and days to be at work is set by the person's supervisor to coincide with the supervisor's schedule so the employee can be supervised during work hours.  (*See* Exhibit 3, Acosta Depo, pg. 125:11-25).

110.   Work time entered by an employee is recorded on TFD's Telestaff system. For a short time after it is entered, the employee or the employee's supervisor may go into Telestaff and reduce the time if the employee was not at work the full amount of time that was recorded.  After the initial period of about one day, the Telestaff entry is locked and can only be changed by HR or payroll personnel.  Time is reduced only where the employee didn't work and is reduced on the direction of the employee's supervisor.  (*See* Exhibit 3, Acosta Depo, pg. 126:1-130:13).

111.   Carrie Clark was instructed not to leave the location of her work at Fire Central for exercising because there were adequate facilities at Fire Central where she could exercise, there was no reason for her to leave the building to exercise and her supervisors needed to be able to monitor when she was at work.  (*See* Exhibit 8, Acosta Declaration, ¶9).

112.   On December 22, 2014, Plaintiff complained to her chain of command that her payroll status had not been properly changed on her return to work so that she wasn't getting specialty pay.  DC Carsten informed AC Baker that he had followed up with JoAnn Acosta and the matter had been handled.  (*See* Exhibit 40, Emails dated December 22, 2014 regarding payroll issue).  Acosta made sure the problem was corrected.  (*See* Exhibit 8, Acosta Declaration, ¶7).

113.   On December 29, 2014, JoAnn Acosta forwarded a list of wage adjustments for 9 employees which included 8 male employees and Plaintiff.  Both Plaintiff and a male employee had their wages adjusted based on information from S. Arnoldi.  (*See* Exhibit 41, Email dated December 29, 2014 from TFD payroll to JoAnn Acosta).

**H.     Plaintiff's conflict with Langejans**

*Plaintiff alleges there was a hostile work environment in Fire Prevention because she was harassed by Capt. Jeff Langejans who became obsessed with attacking her and*

29

*her husband, G. Clark, who also worked at Fire Prevention by claiming she had cheated on the examination for fire inspector, spreading rumors about her having marital problems, pointing out negative comments in the newspaper about her, complaining about women in the fire department and staring at her.  Plaintiff's complaints resulted in investigations by EOPD which then resulted in her husband being transferred out of Fire Prevention to a lower paying position.*  (Doc. 87 ¶¶88-125, 128-138).

       **i.**      **Plaintiff's assignment and the structure of Fire Prevention**

114.    In June or July, 2014, Plaintiff competed for a position in the Fire Prevention Division by taking a written test and oral interviews.  Paramedics may qualify for a lateral move to a Fire Inspector position by taking a written test and oral interview.  (*See* Exhibit 2, Critchley Declaration, ¶6).  Plaintiff was ranked first and was given the position as Fire Inspector.  (Doc. 87 ¶¶88-90).

115.    Plaintiff returned to work from Family Medical Leave for the birth of her second child on November 24, 2014 to a position as a Fire Inspector in Fire Prevention.  (Doc. 87 ¶106).

116.    Fire Prevention at that time was under the overall supervision of AC Ridings during November 2014 to January 2015 and then by AC Laura Baker ("Baker").  The Deputy Chief was Ed Nied from May 11, 2014 to October 2014.  Mike Carsten ("Carsten") was the Deputy Chief from October 19, 2014.  (*See* Exhibit 42, Laura Baker Declaration ("Baker Declaration"), ¶3) (signed version will be supplemented)).

117.    From November 2014 through April or May 2015, Plaintiff was supervised by Captain Phillip Morgan ("Morgan").  Following that she was supervised by Brouillette through the time period relevant to this case.  (*See* Exhibit 21, Clark Depo II, pg. 343:8-22).

118.    Plaintiff was never supervised by Langejans.  (*See* Exhibit 43, Jeff Langejans Deposition ("Langejans Depo"), pg. 15:14-16)).

      **ii.**      **The Langejans complaints, the TFD investigation, and imposition of discipline**

119.   Upon her return, Plaintiff heard rumors that Langejans had been making derogatory comments about her and her husband, G. Clark, to other personnel in Fire Prevention.  (Doc. 87 ¶¶91-93, 96-102, 104-105, 107-110).

120.   In December 2015, G. Clark lodged complaints about Langejans conduct with his chain of command.  AC Baker and DC Carsten met with both G. Clark and Langejans to discuss G. Clark's concerns.  Langejans apologized to G. Clark, who accepted the apology.  Both were told to move on and remain professional in there conduct toward each other.  (*See* Exhibit 42, Baker Declaration, Attachment 1, Memorandum of Laura Baker dated February 5, 2015 regarding Investigation of Fire Prevention Workplace ("Fire Prevention Investigation")); Exhibit 28, Baker Depo, pg. 47:22-48:19; 51:9-52:5).

121.   In January 13-15, 2015, DC Carsten received a memorandum complaining about Langejans conduct from G. Clark and three male employees in Fire Prevention, John Vincent ("Vincent"), Tom Sisterman ("Sisterman") and Joe Longo ("Longo").  Additional memorandums were sent by Vincent, Sisterman and G. Clark in January and February which were included in the TFD investigation.  (*See* Exhibit 42, Baker Declaration, Attachment 1, Fire Prevention Investigation).

122.   Sisterman stated he was reporting a hostile work environment caused by Langejans "targeting" Fire Prevention employees to get them removed from the Division. He reported that four males were "targeted" with harassment starting in 2006.  He reported the ongoing harassment against G. Clark that included what he believed were threats of violence against G. Clark, and to a lesser extent reported that there was harassment against the "Clarks" and against Plaintiff.  (*See* Exhibit 44, Memorandum authored by Tom Sisterman dated January 15, 2015 ("Sisterman Memo dated January 15, 2015")).

123.   Sisterman, reported that Langejans had made discriminatory comments about Carrie Clark, women in the fire service and pregnant women in the fire service.  (*See* Exhibit 44, Sisterman Memo dated January 15, 2015)  Langejans testified that the comments he made about women in the fire service were made in 1988 when women were first entering the service.  (*See* Exhibit 43, Langejans Depo, pg. 46:1-22)  Langejans did

31

not recall making any negative comments about pregnant women in the fire service.  (*See* Exhibit 43, Langejans Depo, pg. 47:20-48:1).

124.   Sisterman's second memorandum to Chief Critchley did not mention discrimination or hostility toward women.  (*See* Exhibit 45, Memorandum authored by Tom Sisterman dated January 30, 2015).

125.   Sisterman reported that Langejans had told him that G. Clark had the answers to the Fire Inspector test and that Plaintiff couldn't have gotten her score without cheating.  (*See* Exhibit 44, Sisterman Memo dated January 15, 2015)  Langejans stated that he shared with subordinates his concerns about the validity of Plaintiff's scores on the Fire Inspector test based on her performance and the fact he had given the promotional and certification materials to G. Clark.  (*See* Exhibit 43, Langejans Depo, pg. 41:22-43:19).

126.   Vincent's complaint also cited Langejans harassment of several male Fire Prevention employees and Plaintiff.   Vincent did not report any harassment or discrimination against women.  (*See* Exhibit 46, Memorandum authored by John Vincent dated January 16, 2015).

127.   G. Clark's complaint addressed the comments of others about Langejans dislike for G. Clark and re-iterated Sisterman's allegations and charged that Langejans had harassed numerous members of Fire Prevention.  He repeated negative comments from Langejans about Plaintiff that others told him about and what he heard about Langejans being out to get the Clarks.  He stated his disagreement with how TFD chiefs had handled the complaints about Langejans.  (*See* Exhibit 47, Memorandum authored by Gordon Clark dated January 14, 2015).

128.   On January 20, 2015, AC Baker initiated an investigation into the matters brought up in the memorandums regarding Langejans.  (*See* Exhibit 42, Baker Declaration ¶5, Attachment 1, Fire Prevention Investigation).

129.   On February 5, 2015, AC Baker submitted a memorandum to Chief Critchley summarizing the investigation, giving her findings and her recommendations.  In the investigation, AC Baker and DC Carsten interviewed 31 of the 32 employees in Fire

Prevention.  The one other employee was on FMLA.  Deputy Chief Anderson and Union representatives were present for several of the interviews.  (*See* Exhibit 42, Baker Declaration ¶¶ 6, 7, Attachment 1, Fire Prevention Investigation).

130.    The majority of the responses included that the interviewee knew about the conflict between Capt. Langejans and Capt. G. Clark.  Also, most had not had an issue with a supervisor or any inspectors in the division.  (*See* Exhibit 42, Baker Declaration ¶7, Attachment 1, Fire Prevention Investigation).

131.    Of the 31 people interviewed, five believed there was a hostile work environment including the three who submitted memos.  One of those only referred to his interactions with Langejans.  The charges that Langejans "targeted" several members of the division mostly consisted of examples where a supervisor was trying to ensure accountability within the division.  (*See* Exhibit 42, Baker Declaration ¶8, Attachment 1, Fire Prevention Investigation).

132.    On February 12, 2015, AC Baker along with Deputy Chief Carsten informed the staff in fire prevention that submitted complaints in January, 2015 and included Plaintiff, even though she did not submit a complaint, that the investigation was complete. AC Baker informed them to stop talking about others which creates an uncomfortable environment, all will remain in the division, though some uncomfortableness and tensions, and there was not a threat in the workplace. AC Baker also informed them that they all would participate in mandatory "Respectful Workplace" training. All were offered to participate in a voluntary mediation coordinated through EOPD and offered assistance through EAP (Employee Assistance Program).  (*See* Exhibit 42, Baker Declaration ¶10, Attachment 1, Fire Prevention Investigation).

133.    The decision to issue Langejans discipline in the form of a written reprimand was initially a recommendation from DC Carsten based upon TFD's disciplinary matrix. AC Baker informed Chief Critchley that Langejans would receive a written reprimand for making inappropriate comments and the entire department was to participate in "Respectful workplace" training.  Before imposing that discipline, it was reviewed by the

33

internal TFD Disciplinary Review Board ("DRB").   The DRB consists of a peer, administration and union representative.  It concurred that the discipline was consistent with TFD practices and policies. (*See* Exhibit 42, Baker Declaration ¶9, Attachment 1, Fire Prevention Investigation; Exhibit 28, Baker Depo, pg. 51:9-53:2).

134.   AC Baker noted that G. Clark had been told on December 5, 2015, that as part of the department's succession planning, he was to be moved back to the field to prepare for openings in Prevention at the end of the year and that G. Clark was on the promotional list for Battalion Chief.  The discussion of succession planning began prior to any of the complaints.  G. Clark did not want to return to the field but understood management's need to prepare.  AC Baker recommended that all members remain in the division at this time and that G. Clark be given the option to return to the field.  (*See* Exhibit 42, Baker Declaration ¶13, Attachment 1, Fire Prevention Investigation; Exhibit 28, Baker Depo, pg. 51:9-52:5).

135.   Based on the investigation, AC Baker concluded there was not a hostile work environment.  (*See* Exhibit 28, Baker Depo, pg. 55:6-11).

136.   Members of the Fire Prevention Division were assigned to attend "Respectful workplace" training on March 4, 2015 or thereafter.  (*See* Exhibit 28, Baker Depo, 57:18-58:15).

### iii.   Plaintiff's personal knowledge of hostile work environment

137.   Plaintiff did not hear anyone at Fire Prevention make any sexual comments about women.  (*See* Exhibit 48, Deposition of Carrie Clark, Volume 3 ("Clark Depo III"), pg. 422:16-18)).

138.   Plaintiff has testified that it was a hostile work environment because both males and females were uncomfortable working around Langejans.  She did not know of anything specifically based on the category of people who were female.  (*See* Exhibit 48, Clark Depo III, pg. 375:1-24).  Plaintiff never heard Langejans make any gender specific comments.  (*See* Exhibit 48, Clark Depo III, pg. 376:14-19).  The only thing that Plaintiff could say was gender specific hostility by Langejans was his staring at her.  She didn't

know if he did that to other women, had not noticed that he did, and no one had told her that he did.  (*See* Exhibit 48, Clark Depo III, pg. 376:20-377:20).  The only comments she attributed to Langejans were those she heard about second hand from Sisterman and Vincent.  (*See* Exhibit 48, Clark Depo III, pg. 377:25-378:3)  She never heard Langejans make sexist comments to the female support staff.  (*See* Exhibit 48, Clark Depo III, pg. 378:21-379:1).

139.   Plaintiff's supervisor was Capt. Phil Morgan.  She heard that Morgan did not want to supervise her, but she doesn't know why.  She admitted that Morgan could have been uncomfortable because G. Clark was a captain in the same area.  (*See* Exhibit 48, Clark Depo III, pg. 423:1-424:11).

140.   The only time Plaintiff was directly under Langejans' command was a handful of days when he was the only captain in the office and she was technically under his command.  Other than staring at her and intimidating her, Langejans had no direct effect on her employment.  There were also days when her husband, G. Clark, was the only captain in the office and she was technically under his command.  (*See* Exhibit 48, Clark Depo III, pg. 380:23-382:1).  Langejans did not affect Plaintiff's wages, benefits, evaluation, probation or schedule except where Plaintiff chose not to interact with him.  (*See* Exhibit 48, Clark Depo III, pg. 395:21-399:4).

141.   Plaintiff did not recall anyone making comments that were derogatory toward women other than those she was told were made by Langejans.  (*See* Exhibit 48, Clark Depo III, pg. 413:11-16).

142.   After the newspaper article reporting her lawsuit became public, other than the comments she heard had been made by Langejans, the only comments made directly to her were supportive comments from friends.  (*See* Exhibit 48, Clark Depo III, pg. 413:17-414:19).

### iv.   Plaintiff's first EOPD complaint, Case # WC1503001

143. Plaintiff disagreed with the results of the TFD investigation regarding the complaints made relating to Langejans, and on March 25, 2015, she filed a wrongful conduct complaint with EOPD.  (*See* Doc. 87 ¶125).

144. An investigation was conducted by EOPD's Larsen involving the interviewing of 33 individuals during 35 separate interviews.  Based upon those interviews, EOPD's Macias found that there was no prima facie case of retaliation or discrimination under the City's Administrative Directives.  Larsen also found that having both Clarks in Fire Prevention was a violation of the City's AD on nepotism.  (*See* Exhibit 49, Memorandum authored by Martina Macias dated June 18, 2015).

145. Larsen reported that he was told by Morgan that Morgan was uncomfortable being in a situation where he had to supervise the wife of a peer, G. Clark.  He felt he would lose peer support if he had issues with Plaintiff.  (*See* Exhibit 50, Larsen interview with Phil Morgan dated April 24, 2015 re: Case # WC1503001).

146. Brouillette told Larsen that there was tension within the division because the hostile work environment charges had been investigated, an employee disciplined and the employees told to move on.  Now it was being opened again so there was frustration in the office about when it would end.  (*See* Exhibit 51, Larsen interview with Ken Brouillette dated April 27, 2015 re Case # WC1503001 ("Brouillette Interview")).

147. Brouillette's only concern about possible retaliation was with respect to G. Clark.  G. Clark told Brouillette not to talk and socialize with Langejans.  G. Clark was on the promotion list for Battalion Chief and had told Brouillette that he wanted to be the chief over the Prevention division, and thus raised the possibility that he would be Brouillette's supervisor in the future and would remember if Brouillette was too close to Langejans.  (*See* Exhibit 51, Brouillette Interview, bates COT001451:214-1453:309).

148. Nicole Sprenger ("Sprenger") was a female Fire Inspector working in Fire Prevention since 1997 who was supervised by Brouillette.  (*See* Exhibit 52, Larsen interview with Nicole Sprenger dated June 4, 2015 re Case # WC1503001 ("Sprenger Interview"), bates COT001626:18-1627:63))  Sprenger told Larsen that she had never

heard any supervisor make any negative or discriminatory statements about others, had not felt that the work environment was so negative it would affect performing her job, had never been subject to retaliation, refrained from reporting misconduct or cautioned not to report misconduct.  (*See* Exhibit 52, Sprenger Interview, bates COT001629:139-177)  She had not witnessed any of her coworkers being isolated or picked on and would be comfortable reporting it if she did witness it.  (*See* Exhibit 52, Sprenger Interview, bates COT001630:197-206).

149.   On July 29, 2015, Assistant City Manager Julianne Hughes ("Hughes") concurred with the finding that there was not sufficient evidence to support allegations of discrimination or retaliation.  Hughes concurred that Langejans had violated City AD's.  She noted that many of the statements attributed to Langejans were anecdotal and some several years old.  She found that Langejans opinions and inferences regarding Plaintiff should not have been discussed with subordinates.  She instructed TFD to respond to EOPD's conclusion that the level of discipline was inappropriate.  (*See* Exhibit 53, Julianne Hughes Declaration ("Hughes Declaration") ¶7)).

150.   On August 18, 2015, AC Baker gave TFD's response to Larsen in a memorandum to Chief Critchley.  (*See* Exhibit 42, Baker Declaration ¶12 Attachment 2).

151.   After reviewing TFD's response and based upon her own extensive knowledge of TFD's past disciplinary practices, Hughes concurred with TFD that the written reprimand was appropriate discipline.  (*See* Exhibit 53, Hughes Declaration ¶8).

## I.    Enforcement of the City's nepotism policy

152.   Hughes also concurred that TFD had contravened the City's AD on nepotism by assigning Plaintiff to the same division where her husband, G. Clark, was a captain.  She directed TFD to take corrective action to comply with City ADs.  (*See* Exhibit 54, Memorandum of Julianne Hughes dated July 29, 2015; Exhibit 53, Hughes Declaration ¶6).

153.   Although Chief Critchley was satisfied with the way TFD used the City nepotism policy before the investigation, he was ordered by the City Manager's Office to

make changes and enforce the City policy.  (*See* Exhibit 55, Deposition of Jim Critchley ("Critchley Depo"), pg. 62:3-63:6)).

154.    Plaintiff understood that the nepotism policy meant that an employee could not be directly or indirectly supervised by a family member.  There were times at Fire Prevention when Capt. G. Clark was the only captain in the office and was therefore technically supervising Plaintiff.  (*See* Exhibit 48, Clark Depo III, pg. 389:18-390:6).

155.    On July 31, 2015, Plaintiff's husband, Capt. G. Clark, received notice that he would be transferred to a post as an Operations Shift Captain effective August 22, 2015, as a result of the conclusions of the EOPD investigation finding nepotism.  (*See* Doc. 87 ¶132).

156.    Following the EOPD investigation, Chief Critchley decided to move G. Clark from Fire Prevention to field operations.  This was done for two primary reasons. Both Chief Critchley and Chief Baker knew that G. Clark was the next person in line to be promoted to battalion chief and that there would soon be vacancies.  They wanted G. Clark to get back into field operations to refresh his skills so that he would be successful if promoted.  In addition, Chief Critchley had been directed by the City Manager's Office to enforce the City's nepotism policy.  (*See* Exhibit 55, Critchley Depo, pg. 61:23-62:25; Exhibit 42, Baker Declaration ¶13).

157.    AC Baker had considered transferring G. Clark back to operations between January and June, 2015, as part of TFD's succession planning.  She had spoken to G. Clark about transferring to the field in December, 2014.  She delayed the transfer due to the EOPD investigation.  (*See* Exhibit 42, Baker Declaration ¶13)

158.    When Gordon Clark ("G. Clark") was transferred he retained his rank as a captain.  His rate of pay was reduced because the rate for captains who are on regular four or five day shifts is adjusted to be higher so that it is comparable to the pay an Operations captain receives that includes automatic overtime and calculation over a distinct pay period.  (*See* Exhibit 8, Acosta Declaration ¶10).

159.   TFD moved other personnel to comply with the City's AD on nepotism including suppression personnel.  (*See* Exhibit 55, Critchley Depo, pg. 68:22-69:7; Exhibit 8, Acosta Declaration ¶11).

**J.     Plaintiff's additional internal complaints**

160.   On September 22, 2015, Plaintiff sent a memorandum to Rebecca Hill, Director of the City's Human Resources Department, alleging that the transfer of her husband, Gordon Clark, from Fire Prevention was in retaliation against her.  (*See* Exhibit 56, Memorandum authored by Carrie Clark dated September 22, 2015).

161.   On September 29, 2015, Ms. Hill sent a memorandum back to Plaintiff explaining that any complaint must be filed by the party who was harmed and that no complaint could now be filed because more than 30 days had passed since the employment action.  (*See* Exhibit 57, Memorandum authored by Rebecca Hill dated September 29, 2015).

162.   On or about October 26, 2015, Plaintiff submitted a memorandum to Tucson City Manager Michael Ortega alleging wrongful conduct and mismanagement in the Tucson Fire Department.  The memorandum primarily repeated the allegations that were the basis for EOPD, Case # WC1503001 and detailed Plaintiff's objections to EOPD's conclusions, the level of discipline given to Langejans and the subsequent enforcement of the City's nepotism policy.  The memorandum extensively described what Plaintiff argued were the inaccurate statements by Langejans that should have resulted in greater discipline. (*See* Exhibit 58, Memorandum authored by Carrie Clark dated October 26, 2015).

**K.     Promotion of Plaintiff's husband, Gordon Clark**

163.   On January 10, 2016, Chief Critchley promoted Plaintiff's husband, Gordon Clark from the rank of captain to the rank of battalion chief.  As a newly promoted battalion chief, Gordon Clark had to serve a one year probationary period.  (*See* Exhibit 55, Critchley Depo, pg. 37:13-20).

164.   At the time of the promotion, Gordon Clark was the next person on the list for promotion.  Chief Critchley had the ability to pass over Gordon Clark, but did not

39

1  because he thought he was going to be good.  (*See* Exhibit 55, Critchley Depo, pg. 44:2-
2  13).

3  165.  During his probationary period, Gordon Clark was treated the same as other
4  battalion chiefs were treated in their probationary periods.  (*See* Exhibit 55, Critchley
5  Depo, pg. 40:18-41:1; 42:2-15).

6  **L.  Plaintiff's second EOPD complaint, Case WC 16-03-001**

7  166.  On March 9, 2016, Plaintiff filed a second complaint alleging
8  mismanagement and misconduct by TFD.  The complaint primarily repeated the
9  allegations that were the basis for EOPD, Case WC1503001 and those in her
10  mismanagement and misconduct memorandum to the City Manager.  She again
11  complained about her husband being transferred out of Fire Prevention due to the
12  enforcement of the nepotism policy.  The complaint also detailed new allegations that
13  Langejans was staring at her in an intimidating manner and writing memorandums about
14  her.  She also complained about comments that Langejans had made to other TFD
15  personnel about her and her husband and that one inspector was getting more overtime
16  than others.  She stated she was raising concerns and issues of others who were afraid to
17  complain.  She attached a memorandum from Langejans to his supervisor which cited her
18  lack of proper uniform as evidence that she was not intimidated and alleged that a male
19  and a female inspector had been allowed to violate uniform policy without any discipline.
20  (*See* Exhibit 59, Wrongful Conduct Complaint dated March 9, 2016).

21  167.  On March 16, 2016, Langejans filed a complaint regarding Plaintiff's
22  conduct.  On May 4, 2016, Chief Critchley found the complaint to be unfounded.  (*See*
23  Exhibit 60, Memorandum authored by Jim Critchley dated May 4, 2016); Exhibit 55,
24  Critchley Depo, pg. 64:1-20)).

25  168.  Upon referral of Plaintiff's second EOPD complaint to TFD, AC Baker and
26  DC Carsten commenced an investigation of the allegations.  They interviewed Plaintiff and
27  four other male inspectors, Capt. Langejans, a female secretary and a female customer
28  service clerk.  (*See* Exhibit 42, Baker Declaration Attachment 3)

169.    On April 13, 2016, AC Baker sent a memorandum to Chief Critchley with her findings that some of Plaintiff's complaints were already addressed in EOPD case WC1503001.  Of the new claims, AC Baker found that they were all unfounded, that Plaintiff mischaracterized comments by TFD management and that Plaintiff's claims about what concerns other personnel had were not supported by those other personnel.  (*See* Exhibit 42, Baker Declaration Attachment 3).

**M.    Plaintiff's transfer out of Fire Prevention**

*Plaintiff alleges that she was given an educational counseling, transferred from Fire Prevention to Operations, referred for training, required to file paperwork for medical release to light duty and denied compensation when she attended depositions in her lawsuit in retaliation for her having filed this case.*  (Doc. 87 ¶¶141-164, 175-6, 180).

### i.    Plaintiff's reassignment to Operations

170.    On March 24, 2016, Plaintiff received a written educational counseling from her supervisor, Kenneth Brouillette.  The counseling began by describing how Brouillette had questioned Plaintiff about inspection paperwork.  He asked the questions because the paperwork was left on a counter.  She later questioned why he was asking about her work and he said that he was always able to check on inspectors work.  He also told her what originated the questions.  Brouillette noted that he had resolved another matter with her but she had still raised the same matter with his superior, violating the chain of command.  Brouillette gave Plaintiff his "expectations and plan for improvement" which included noting that it was alright to bring rule violations to his attention but her watching and criticism of other unit members was not acceptable.  For the future he expected that she would work on building relations with all employees in the unit and proceed through the proper chain of command when reporting concerns about the division.  (*See* Exhibit 61, Education Counseling ("Educational Counseling") dated March 24, 2016).

171.    During the counseling, Plaintiff received a text message with a picture of another male inspector who was out of uniform.  (*See* Exhibit 61, Education Counseling).

172.     As described in Brouillette's education counseling, Plaintiff was publicly criticizing other staff members.  She was also checking on other staff members such as having another staff member send her a photograph of an inspector she believed was in violation of the uniform policy.  Her denigration of another female inspector, Nikki Sprenger, left that other inspector in tears.  Most, if not all, of the personnel conflicts that were disrupting the Fire Prevention division involved Plaintiff.  Plaintiff also continued to openly contradict and undermine her superiors and her chain of command, including the Fire Chief, which is unacceptable in a paramilitary organization.   (*See* Exhibit 61, Educational Counseling).

173.     On April 27, 2016, Chief Critchley decided to transfer Plaintiff from her position as an inspector in the Fire Prevention Division back to field operations in her position as a Paramedic on swing shift.  The transfer was a lateral transfer, not a demotion.  The transfer was effective at the start of the next pay period, May 1, 2016, and Plaintiff was to report to the Public Safety Academy for required training on May 2, 2016.  (*See* Exhibit 62, Memorandum authored by Jim Critchley dated April 27, 2016 ("Critchley Memo dated April 27, 2016")).

174.     The reassignment of Mrs. Clark has provided relief of staff hours spent on investigations and follow-up on complaints. The prevention division seems to have less tension and stress amongst the personnel.  (*See* Exhibit 42, Baker Declaration ¶18)

175.     Chief Critchley testified that he made the decision to move Plaintiff back to Operations based on several factors: 1) due to the "drama that was going on in fire prevention for the past years [it] was not healthy for anybody down there;" 2) he was required to cut positions and he was doing what he could to move people back out to Operations; 3) he needed to have a certain amount of people in operations for the SAFER grant; 4) "basically [he was] trying to protect positions on the fire department…;" 5) he also became aware that one of the other Inspectors in Prevention broke down crying "because of a discussion that [had happened] with Carrie Clark." That is when "[he] made the decision, well, then let's get Carrie somewhere where she can be successful...[he]

42

needed medics, and this came up, and [he] made the decision to move Carrie, and [he] thought she could find a place as a medic in the operations." (*See* Exhibit 55, Critchley Depo, pg. 30:3-31:8)

176.    Chief Critchley believed that all of Plaintiff's internal complaints had been resolved prior to moving her to operations and those complaints did not affect the decision to move her to operations.  (*See* Exhibit 55, Critchley Depo, pg. 69:8-71:6).

### ii.    Plaintiff's medical status

177.    Dr. Stefanie Lundell was a doctor retained by the City to provide health/fitness examinations of fire department personnel.  The examinations determine whether each employee is physically able to perform the essential functions of the job of a firefighter based upon guidelines established by the National Fire Protection Association ("NFPA").  (*See* Exhibit 63, Declaration of Stefanie Lundell ("Lundell Declaration"), ¶¶3, 4)).

178.    Because of the limitations under the Health Insurance Portability and Accountability Act ("HIPPA"), Dr. Lundell can only provide TFD with summary information on whether an employee is fit for duty or if not, what restrictions there are, but she cannot discuss individual medical conditions without a release from the individual. (*See* Exhibit 63, Lundell Declaration ¶6).

179.    On June 5, 2015, Plaintiff saw Dr. Lundell.  Dr. Lundell performed the standard health/fitness examination which included physical tests and concluded that Plaintiff was fit for duty as a firefighter/paramedic.  (*See* Exhibit 63, Lundell Declaration ¶8).

180.    During the course of her visit with Dr. Lundell, Plaintiff informed the doctor that Plaintiff had some medical problems related to her pregnancy and would be seeing a personal physician in a few days.  Dr. Lundell gave Plaintiff a copy of the NFPA guidelines to provide to her personal physician.  (*See* Exhibit 63, Lundell Declaration ¶10).

181.    Some days later, Plaintiff contacted Dr. Lundell and informed her that Plaintiff had been diagnosed with a small umbilical hernia and that she was going to have

43

surgery for it in August or September.  Dr. Lundell told Plaintiff to contact the City doctors if her condition worsened.  (*See* Exhibit 63, Lundell Declaration ¶11).

182.    Following this call, Dr. Lundell still believed that Plaintiff was fit for duty. She certified her as such to TFD.  Pursuant to her HIPPA obligations, Dr. Lundell did not provide TFD with any information regarding her precise medical conditions.  (*See* Exhibit 63, Lundell Declaration ¶11).

183.    Plaintiff at some point told her supervisor, Brouillette, that she had been diagnosed has having a hernia and would have to have surgery at some point.  She did not ask for any accommodation at work.  (*See* Exhibit 64, Deposition of Carrie Clark ("Clark Depo IV"), pg. 527:10-528:11)).  She did not say that there was anything at her job she couldn't do.  There was no reason from her comments to Brouillette to think that she had restrictions.  She didn't speak to anyone else at TFD about her hernia.  (*See* Exhibit 64, Clark Depo IV, pg. 530:6-19)  She did not tell Brouillette to report it to the department. (*See* Exhibit 64, Clark Depo IV, pg. 545:25-546:2).

184.    Dr. Lundell did not see Plaintiff again until May 6, 2016.  At that time, Plaintiff provided a note from her personal physician saying that she could not perform her full duties.  Dr. Lundell performed a health/fitness examination and determined that Plaintiff could no longer perform the essential functions of a firefighter.  Dr. Lundell told Plaintiff to contact TFD Human Resources regarding potential light duty assignments.  Dr. Lundell did not disclose Plaintiff's specific medical conditions to TFD.  (*See* Exhibit 63, Lundell Declaration ¶12).

185.    The first time that TFD was provided with the necessary documentation that Plaintiff was not physically fit for regular duty was May 11, 2016.  (*See* Exhibit 65, Emails between JoAnn Acosta and Plaintiff regarding light duty paperwork ("Emails regarding light duty")).

### iii.    Plaintiff's return to light duty

186.    From May 11, 2016, until June 20, 2016, Plaintiff was given a light duty assignment in TFD Administration.  (*See* Doc. 87 ¶¶159,167)  She reported to DC Sharon

McDonough, or if she wasn't there, to AC Baker.  (*See* Exhibit 64, Clark Depo IV, pg. 570:8-20).

187.    Plaintiff cannot recall that Sharon McDonough did anything that was discriminatory or retaliatory.  (*See* Exhibit 64, Clark Depo IV, pg. 571:8-12)  The only thing the AC Baker did that was different was to ask her to report her arrival and departure by email each day.  (*See* Exhibit 64, Clark Depo IV, pg. 571:13-572:10)  Baker also failed to do anything about Plaintiff being treated differently regarding the "150 Club" pay.  (*See* Exhibit 64, Clark Depo IV, pg. 572:25-573:12).

188.    Plaintiff's light duty assignment was changed and on June 20, 2016, she was assigned to Communications.  (*See* Doc. 87 ¶167).

**N.    PLAINTIFF'S ATTENDANCE AT DEPOSITIONS.**

189.    TFD compensates employees for attendance at a deposition only when that attendance is required on behalf of the City.  It does not compensate employees for attendance at depositions in personal matters or attendance that is voluntary on the part of the employee.  (*See* Exhibit 8, Acosta Declaration ¶22).

**O.    Plaintiff's Third EOPD complaint, Case WC16-06-001**

190.    On or about May 27, 2016, Plaintiff filed a Wrongful Conduct Complaint (number 16-06-001) alleging that TFD's involuntary transfer to a Swing Shift Paramedic position was in retaliation for her ongoing lawsuit against TFD.  (*See* Doc. 87 ¶165).

191.    On June 13, 2016, Assistant City Manager Joyce Garland sent EOPD Investigator Macias a memorandum indicating that complaint number 16-06-001 did not meet the City of Tucson's criteria for retaliation.  (*See* Doc. 87 ¶166).

**P.    Plaintiff's voluntary demotion**

*Plaintiff alleges that TFD changed its seniority policy retroactively to retaliate against her and that but for the assignment to a swing shift paramedic, she would have delayed her hernia surgery, remained in Prevention and would not have voluntarily demoted to the position of firefighter.*  (See Doc. 87 ¶¶150-2, 155, 168-9).

192.    Plaintiff's transfer from Prevention to Operations was a lateral transfer, not a demotion.  The transfer was effective at the start of the next pay period, May 1, 2016.  (*See* Exhibit 62, Critchley Memo dated April 27, 2016).

193.    Plaintiff was initially assigned to training at the Public Safety Academy to refresh her skills prior to be assigned to the field.  While at the Academy, Plaintiff reported that she had a hernia that precluded her from performing the full duties of a firefighter.  (*See* Sec. M(ii) above).  As a result, she was returned to light duty and was not assigned to field operations.  (*See* Exhibit 65, Emails regarding light duty).

194.    On May 13, 2016, AC Mike Garcia and Acosta issued a Master Memo with the updated listing of seniority by rank.  The list reflected what the past practice was generally.  The document was issued due to the complexity of calculating seniority and the need for consistency.  The list had been agreed upon by the union representatives and Fire Administration.  The procedures set forth in the Memo were to be used officially as of May 1, 2016.  (*See* Exhibit 66, Memorandum regarding Seniority within Rank Report authored by Mike Garcia dated May 13, 2016).

195.    Effective June 26, 2016, Plaintiff demoted to a Firefighter position.  (*See* Doc. 87 ¶168).

196.    Plaintiff chose to demote to a firefighter position because she did not want to go back on swing shift as a paramedic because she would not have enough seniority to choose the station where she would work.  She didn't want to be around other TFD personnel who she heard had said things about her because of the lawsuit.  As a firefighter, she had sufficient seniority to bid and obtain the assignment at Station 23 where she wouldn't be around other TFD personnel and could essentially hide out.  Prior to requesting the voluntary demotion, she spoke about her plan with her supervisor, DC Sharon McDonough who encouraged her not to demote, to move on and to work to become a captain.  (*See* Exhibit 64, Clark Depo IV, pg. 576:2-578:25).

197.    Plaintiff testified that she could work with others who were involved in the lawsuit, but she didn't want to because it made her uncomfortable.  It wasn't worth it to

46

spend her work time with people she didn't get along with or had done something to her. (*See* Exhibit 64, Clark Depo IV, pg. 581:12-582:2).  She didn't want to work with crews that had people who didn't like her and didn't treat her nicely.  (*See* Exhibit 64, Clark Depo IV, pg. 609:13-23).

**Q.     Plaintiff's "150 Club" pay**

*Plaintiff alleges that she submitted paperwork to receive the additional $150 per month as a certified medic, but that TFD did not pay for the part of the pay period in retaliation against her.*  (See Doc. 87 ¶¶170-174).

198.     On June 27, 2016, HR Manager Acedo sent Plaintiff an email indicating that if she wished to be in the Paramedic Assignment Pay Program (also known as the "$150 Club") she should submit the appropriate form.  (*See* Doc. 87 ¶170).

199.     The Paramedic Assignment and Incentive Pay program provides qualified CEP personnel $150 per month in exchange for maintaining their Paramedic certification and for being available to work as a Paramedic during their assigned shift or on extra duty. The $150 is divided in equal amounts over the course of two paychecks.  (*See* Doc. 87 ¶171).

200.     When Plaintiff was working at Fire Central across from Acosta's office, Acosta asked Plaintiff to stop by her office on June 15, 2016, to complete her paperwork for her requested voluntary demotion to firefighter and participation in the $150 paramedic certification pay.  Plaintiff left the building without stopping at Acosta's office.  (*See* Exhibit 8, Acosta Declaration ¶18)

201.     On June 27, 2016, Acosta again asked Plaintiff to submit the form if she was still interested in participating in the $150 program.  Plaintiff again did not respond to Acosta.  Acosta could not assume that she wished to participate in the program because it required her to perform paramedic duties on certain occasions when she demoted to firefighter.  (*See* Exhibit 8, Acosta Declaration ¶19)

202.     Plaintiff finally submitted her form for the $150 paramedic certification pay on July 8, 2016.  She was paid as of the next pay period.  That was consistent with other

special payments such as second language pay and is paid on the first pay period after submission of appropriate forms.  (*See* Exhibit 8, Acosta Declaration ¶20)

203.     Had Plaintiff completed the forms when requested by Acosta, she would have received the $150 paramedic pay at the start of her demotion to firefighter.  (*See* Exhibit 8, Acosta Declaration ¶21)

**R.     Gordon Clark's failure to pass probation**

*Plaintiff alleges that G Clark's failure to pass probation as a battalion chief was in retaliation for her filing this lawsuit.*  (*See* Doc. 87, ¶¶177-8).

204.     Although there is a City civil service policy to provide a six month evaluation during a probationary period that was not done for Battalion Chiefs at TFD, including Gordon Clark.  Chief Critchley believes that if a person is going to be managing at a Chief officer level, it's not necessary to give a written document saying the person is doing well.  At the end of the first six months, Chief Critchley felt that Gordon Clark was doing great and did not think there was any need.  (*See* Exhibit 55, Critchley Depo, pg. 41:15-42:23).

205.     Chief Critchley made the decision that Gordon Clark did not pass his probation as a Battalion Chief.  (*See* Exhibit 55, Critchley Depo, pg. 44:14-16).

206.     On December 15, 2016, Chief Critchley provided Gordon Clark with a special evaluation.  That evaluation stated that Gordon Clark failed to meet expectations in the areas of general conduct and leadership.  He met expectations in 7 other areas.  The evaluation described Chief Critchley's determination that Gordon Clark took an emergency unit out of service for personal reasons without communicating with his supervisors, was the focus of a federal investigation where he was interviewed by federal agents for several hours at work, he showed a willingness to circumvent policy and protocol, he lacked the decision making skills of a chief officer and undermined the administration of the organization and his attitude and behavior toward TFD and City leadership was confrontational and counterproductive.  Chief Critchley informed Gordon Clark that he had failed probation and was returned to his former rank of captain as of the

next pay period.  Chief Critchley concluded that he hoped Gordon Clark would learn from this experience and compete again.   (*See* Exhibit 67, TFD Chief Officer Special Performance Evaluation of G. Clark dated December 15, 2016).

207.     Chief Critchley testified that his decision was based on leadership and communication issues.  Although Gordon Clark did well the first six months, after that there were events in operations meetings where he wasn't acting like a Chief Officer. Gordon Clark was counseled about those events.  Gordon Clark was good with those that worked under him, but wasn't good with peer communication or with communication with TFD leadership.  One example was the Chief's decision on the use of Prevention Trucks. Gordon Clark continued to argue about it after it was clear the Chief had made his decision.   Another example was that Gordon Clark questioned City policy on outside employment.  Chief Critchley told him to research it with City HR and Legal and bring it back to him.  Instead of contacting HR or Legal, Gordon Clark sought a legal opinion from another captain.  After that, the Chief received an outside employment form from a person under Gordon Clark that was directly contrary to the City policy.  When Chief Critchley asked the person about it, he was told that Gordon Clark and told the person to put it in. (*See* Exhibit 55, Critchley Depo, pg. 44:17-48:6).

208.     Chief Critchley was concerned about the federal agents interviewing Gordon Clark because there had been a big discussion at that station about the importance of informing the administration if other agencies wanted to interview fire personnel while at work.  Despite that, Gordon Clark didn't let any of his superiors know about the federal agents who interviewed him at the fire station contrary to that policy.  (*See* Exhibit 55, Critchley Depo, pg. 51:18-52:25).

209.     Chief Critchley also received a memorandum from BC Pat Quinn concerning Gordon Clark's failure to communicate when Gordon Clark worked a trade for BC Quinn. In the memorandum, BC Quinn stated that he would never trade with Gordon Clark again because he did not trust him to follow through with the required duties of a Battalion

Chief.   (*See* Exhibit 55, Critchley Depo, pg. 67:19-68:21; Exhibit 68, Memorandum authored by Patrick Quinn dated December 6, 2016).

210.   Chief Critchley received a written rebuttal to the special evaluation from Gordon Clark.  He reviewed it and discussed it with Assistant Chief Mike Garcia to check the specifics and to see if any of Gordon Clark's concerns were valid.  The review did not change Chief Critchley's concerns for Gordon Clark's leadership and communication skills.  (*See* Exhibit 55, Critchley Depo, pg. 58:12-60:9).

211.   Chief Critchley had discussed with Gordon Clark how his career could progress over the years both on and off duty.  Chief Critchley has always expected that Gordon Clark would be successful.  He still hopes that Gordon Clark will learn why he didn't fit the first time he was promoted to Battalion Chief.  (*See* Exhibit 55, Critchley Depo, pg. 71:13-72:4).

**S.    Plaintiff's Discovery Response**

212.   Following the Court's order granting leave to file the Third Amended Complaint, the City submitted Defendant's Third Set of Non-Uniform Interrogatories to Plaintiff to obtain specific details of the adverse employment actions and responsible City employees for each.  The City sought leave of the Court for those interrogatories because the order allowing the TAC limited further discovery to the new allegations.  Plaintiff opposed answering the interrogatories, but the Court ordered that she do so.  As the City explained to the Court, the purpose of the Third Non-Uniform Interrogatories was not to obtain new information, but to have Plaintiff specify the details for each incident she alleges is actionable so that the parties and the Court could address each.  Plaintiff's response is attached as Exhibit 69.  As is clear from that response, Plaintiff still refused to fully answer the interrogatories or provide specification as to which City employee was responsible for which adverse employment action that she claims is subject to liability.  Nor did Plaintiff respond to the City's requests to specify time frames for individual actions.  Neither the City nor the Court should be required to hunt for the facts or speculate as to which is tied to which allegation by which individual.  *Breeser v. Menta Grp., Inc.,*

1   *NFP*, 934 F. Supp. 2d 1150, 1155 (D. Ariz. 2013), aff'd sub nom. *Breeser v. Menta Grp.,*

2   *Inc.*, 622 F. App'x 649 (9th Cir. 2015).

3          DATED August 18, 2017.

4                                        MICHAEL G. RANKIN
                                         City Attorney
5

6                                        By:     s/Michael W. L. McCrory
                                                 Michelle Saavedra
7                                                Michael W. L. McCrory
                                                 Principal Assistant City Attorneys
8

9          I hereby certify that on August 18, 2017, I electronically transmitted the attached
10   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a
     Notice of Electronic Filing to the following CM/ECF registrants:
11

12   Jeffrey H. Jacobson
     JACOBSON LAW FIRM
13   2730 East Broadway Blvd., Suite 160
     Tucson, AZ 85716
14          *Attorney for Plaintiff*

15   By E. Ramirez
16

17

18

19

20

21

22

23

24

25

26

27

28

                                          51