**INDEX OF EXHIBITS TO
DEFENDANT CITY OF TUCSON'S STATEMENT OF FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

EXHIBIT 1 – Declaration of Michael Garcia

EXHIBIT 2 – Declaration of Jim Critchley

EXHIBIT 3 – Deposition of JoAnn Acosta

EXHIBIT 4 – MOP/Rule of Assignment

EXHIBIT 5 – Deposition of Mike Fischback

EXHIBIT 6 – Carrie Clark Personnel Action Request

EXHIBIT 7 – Plaintiff's Responses to Defendant City of Tucson's First Set of Requests for Admissions

EXHIBIT 8 – Declaration of JoAnn Acosta

EXHIBIT 9 – Memorandum authored by Paul McDonough dated December 15, 2011

EXHIBIT 10 – Deposition of Plaintiff Carrie Clark, Volume I

EXHIBIT 11 – Email from Carrie Clark through Gordon Clark's email dated October 21, 2012

EXHIBIT 12 – Memorandum authored by Carrie Clark dated November 9, 2013

EXHIBIT 13 – Declaration of Robert L. Rodriguez

EXHIBIT 14 – Carrie Clark Interview with OEOP Martina Macias dated January 7, 2013

EXHIBIT 15 – Carrie Clark Intake Interview with OEOP Martina Macias dated January 16, 2013

EXHIBIT 16 – Carrie Clark telephone call with OEOP Martina Macias dated March 12, 2013

EXHIBIT 17 – Memorandum authored by OEOP Matthew Larsen dated March 22, 2013

EXHIBIT 18 – Memorandum authored by OEOP Robert Barton dated March 26, 2013

EXHIBIT 19 – Richard L'Heureux Interview with OEOP Robert Barton dated March 22, 2013

EXHIBIT 20 – Declaration of Richard L'Heureux

EXHIBIT 21 – Deposition of Plaintiff Carrie Clark, Volume II

EXHIBIT 22 – 29 USC §207(r)(1)(B)); Fact Sheet #73

EXHIBIT 23 – Carrie Clark Telestaff Assignment Record from October 27, 2012, through October 31, 2013

EXHIBIT 24 – Memorandum authored by Jim Critchley dated May 13, 2013

EXHIBIT 25 – Memorandum authored by Michael Fischback dated August 8, 2013

EXHIBIT 26 – TFD Employee Counseling Form regarding Carrie Clark dated March 26, 2013

EXHIBIT 27 – Declaration of Ted McDonough

EXHIBIT 28 – Deposition of Laura Baker

EXHIBIT 29 – MOP Section 220, Nursing Room Policy, July 19, 2013

EXHIBIT 30 – Email from JoAnn Acedo to AC Brad Olson dated July 19, 2013

EXHIBIT 31 – Memorandum authored by Carrie Clark dated July 27, 2013

EXHIBIT 32 – Memorandum authored by Carrie Clark dated September 18, 2013

EXHIBIT 33 – Memorandum authored by Rob Rodriguez dated November 4, 2013

EXHIBIT 34 – Carrie Clark's Charge of Discrimination filed July 31, 2013

EXHIBIT 35 – Tucson Fire Department Paramedic Performance Evaluation Form

EXHIBIT 36 – Memorandum authored by Timothy Nofs dated May 22, 2014

EXHIBIT 37 – Memorandum authored by Carrie Clark dated June 19, 2014

EXHIBIT 38 – Memorandum authored by Ted McDonough dated May 22, 2014

EXHIBIT 39 – Memorandum authored by Tyler McKendrick dated May 22, 2014

EXHIBIT 40 – Emails dated December 22, 2014 regarding payroll issue

EXHIBIT 41 – Email dated December 29, 2014 from TFD payroll to JoAnn Acosta

EXHIBIT 42 – Declaration of Laura Baker

EXHIBIT 43 - Deposition of Jeff Langejans

EXHIBIT 44 – Memorandum authored by Tom Sisterman dated January 15, 2015

EXHIBIT 45 – Memorandum authored by Tom Sisterman dated January 30, 2015

EXHIBIT 46 – Memorandum authored by John Vincent dated January 16, 2015

EXHIBIT 47 – Memorandum authored by Gordon Clark dated January 14, 2015

EXHIBIT 48 – Deposition of Plaintiff Carrie Clark, Volume III

EXHIBIT 49 – Memorandum authored by Martina Macias dated June 18, 2015

EXHIBIT 50 – Larsen interview with Phil Morgan dated April 24, 2015 re Case # WC1503001

EXHIBIT 51 – Larsen interview with Ken Brouillette dated April 27, 2015 re Case # WC1503001

EXHIBIT 52 – Larsen interview with Nicole Sprenger dated June 4, 2015 re Case # WC1503001

EXHIBIT 53 – Declaration of Julianne Hughes

EXHIBIT 54 – Memorandum of Julianne Hughes dated July 29, 2015

EXHIBIT 55 – Deposition of Jim Critchley

EXHIBIT 56 – Memorandum authored by Carrie Clark dated September 22, 2015

EXHIBIT 57 – Memorandum authored by Rebecca Hill dated September 29, 2015

EXHIBIT 58 – Memorandum authored by Carrie Clark dated October 26, 2015

EXHIBIT 59 – Wrongful Conduct Complaint dated March 9, 2016

EXHIBIT 60 – Memorandum authored by Jim Critchley dated May 4, 2016

EXHIBIT 61 – Education Counseling dated March 24, 2016

EXHIBIT 62 – Memorandum authored by Jim Critchley dated April 27, 2016

EXHIBIT 63 – Declaration of Dr. Stefanie Lundell

EXHIBIT 64 – Deposition of Plaintiff Carrie Clark, Volume IV

EXHIBIT 65 – Emails between JoAnn Acosta and Carrie Clark re light duty paperwork

EXHIBIT 66 – Memorandum regarding Seniority within Rank Report authored by Mike Garcia Dated May 13, 2016

EXHIBIT 67 – TFD Chief Officer Special Performance Evaluation of G. Clark dated December 15, 2016

EXHIBIT 68 – Memorandum authored by Patrick Quinn dated December 6, 2016

EXHIBIT 69 – Plaintiff's Responses to Defendant's Third Set of Non-Uniform Interrogatories and Fourth Request for Production of Documents

# EXHIBIT 1

Michelle R. Saavedra
Michael W.L. McCrory
Principal Assistant City Attorneys for
MICHAEL G. RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
Pima County Computer No. 66163
Michael.McCrory@tucsonaz.gov
State Bar Computer No. 3899
Pima County Computer No. 37268
Telephone: (520) 791-4221
Fax: (520) 623-9803
*Attorneys for Defendant City of Tucson*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK,<br><br>              Plaintiff,<br><br>vs.<br><br>CITY OF TUCSON,<br><br>              Defendant. | No.  4:14-CV-02543-TUC-CKJ<br><br>**DECLARATION OF<br>MICHAEL GARCIA**<br><br>(Hon. Cindy Jorgenson) |

Pursuant to 28 U.S.C. §1746, I, Michael Garcia, declare and state as follows:

1.     I make this Declaration based on my personal knowledge and to the best of my recollection.

2.     I am currently employed by the Tucson Fire Department ("TFD") as an Assistant Chief.

3.     Tucson Fire Department ("TFD") is a municipal fire department which responds to public safety matters and emergencies such as fires, hazardous material discharges, collapsed buildings, automobile accidents and critical individual medical conditions.  TFD responds to approximately 90,000 calls for service annually with about 80,000 of those involving medical calls.  Commission fire suppression personnel consist of ranks within the department that include Firefighter, Paramedic, Fire Engineer, Fire Prevention Inspector/Investigator, Fire Captain, Fire Battalion Chief ("BC"), Fire Deputy

Chief ("DC"), Fire Assistant Chief ("AC") and Fire Chief.  The Fire Chief directly supervises the Assistant Chiefs in the three divisions, Operations, Support Services and Administrative Support Services.  The organizational structure of TFD is set forth in Attachment 1.

4.     Paramedics are responsible for pre-hospital management and stabilization of the critically ill and injured persons in the course of providing emergency responses. Paramedics utilize definitive medical techniques under the direction of a licensed physician via administrative guidelines, telecommunication and radio systems. Paramedics are required to exercise considerable initiative and independent judgment in critical medical emergencies, firefighting and rescue operations; all while working under the physical and mental stresses inherent in public safety work.  While on duty, a paramedic must be constantly available to provide an emergency response.

5.     The Operations Division is divided into four battalions each comprised of 5 to 6 fire stations. There are currently 22 Fire Stations throughout the City of Tucson. Each station has three regular alternating shifts, the "A", "B" and "C" shifts.  Each shift is for 24 hours.  Alternating shifts of 24 hours on and 24 hours off are worked until 5 on shift days have been worked; this is called a "tour". After the completion of the 5th 24 hour shift, 6 consecutive days off are taken. At the completion of one shift, another regularly scheduled shift provides similar coverage.  Fire personnel assigned to the A, B and C shifts are permanently assigned to a single station until there is some change by management reassigning an individual or the individual obtaining a different assignment through a seniority bid process. For each battalion, there is a Battalion Chief for each shift who is responsible for supervision and assignment of personnel within that battalion and shift.

6.     Each of the three shifts is fully staff with adequate personnel to meet the minimum constant staffing requirements for each unit.  In addition, there are extra personnel assigned to each shift. These personnel are in a "swing" pool and their assignment is referred to as "swing". Swing personnel are associated with a battalion for purposes of evaluations and personnel tracking although they may work in various stations

2

and battalions as needed due to daily staffing requirements.   Each shift has a reserve pool of swing personnel. These reserve pools consist of staff from the four continuously staffed ranks - captain, engineer, paramedic and firefighter for all battalions. Swing personnel fill the vacancies created by members' use of leave, such as vacation, sick leave, industrial injuries, etc. hence an employee "swings" from station to station as needed.

I state under penalty of perjury that the foregoing is true and correct. Executed on May 4, 2017.

_____
Michael Garcia

# ATTACHMENT 1



Rev. 4/30/17

# EXHIBIT 2

Michelle R. Saavedra
Michael W.L. McCrory
Principal Assistant City Attorneys for
MICHAEL G. RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
Pima County Computer No. 66163
Michael.McCrory@tucsonaz.gov
State Bar Computer No. 3899
Pima County Computer No. 37268
Telephone: (520) 791-4221
Fax: (520) 623-9803
*Attorneys for Defendant City of Tucson*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| CARRIE FERRARA CLARK, | No. 4:14-CV-02543-TUC-CKJ |
|---|---|
| Plaintiff, | **DECLARATION OF JIM CRITCHLEY** |
| vs. | |
| CITY OF TUCSON, | (Hon. Cindy Jorgenson) |
| Defendant. | |

Pursuant to 28 U.S.C. §1746, I, Jim Critchley, declare and state as follows:

1. I make this Declaration based on my personal knowledge and to the best of my recollection.

2. I am currently employed as the Tucson Fire Department ("TFD") Fire Chief.

3. The Fire Chief is responsible for the direction of all fire service activities and the planning, development and implementation of programs to protect life and property from fire and hazardous materials releases. The Fire Chief is responsible for the establishment of departmental policies, administrative and command structure, personnel assignments and rules necessary for the operation of the department and is the appointing authority and final decision maker on the hiring, suspension or termination of all TFD employees. (*See* Attachment 1, Tucson Code §13-1, attached hereto).

4.    Because of the demands upon personnel in emergency situations, the commissioned fire suppression personnel are organized in a paramilitary structure where respect for the chain of command, respect for superior officers and compliance with direct orders is essential to the proper functioning of the department.

5.    TFD also has civilian non-suppression personnel including a human resources officer, a financial officer, 911 communication staff, administrative assistants and secretaries. Some other positions such as the Fire Marshal and Fire Inspectors may be filled by civilian non-suppression personnel.

6.    The Fire Prevention division oversees inspections of proposed building plans and existing facilities for compliance with the fire prevention requirements of the Tucson Code and adopted building and fire codes. Paramedics may qualify for a lateral move to a Fire Inspector position by taking a written test and oral interview.

I state under penalty of perjury that the foregoing is true and correct.

Executed on May 5, 2017.

Jim Critchley

2

# ATTACHMENT 1

Print

Tucson, AZ Code of Ordinances

### Sec. 13-1. Duties of the fire chief.

The fire chief shall be responsible for the direction of all fire service activities including: emergency medical response, fire prevention, and fire safety education. The fire chief shall also be responsible for the planning and development of programs to protect life and property from fire and hazardous material releases. The fire chief shall also be responsible for the establishment of departmental policies, administrative and command structure, personnel assignments and rules necessary for the operation of the department.

(Ord. No. 5607, § 2, 12-13-82; Ord. No. 8609, § 1, 1-2-96)

# EXHIBIT 3

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3

4

   CARRIE FERRARA CLARK,              )
5                                     )
           Plaintiff,                 )
6                                     )
           vs.                        ) No.
7                                     ) CV-14-025430-TUC-
   CITY OF TUCSON,                    ) CKJ
8                                     )
           Defendant.                 )
9  _____)

10

11

12

13              DEPOSITION OF JoANN ACEDO-ACOSTA

14

15

16

17                       Tucson, Arizona
                        February 17, 2017
18                         9:00 a.m.

19

20

21         CHERI L. ALLEVA, RPR, CR #50467 (AZ)
              EATON, GREEN & WILLIAMS, INC.
22                549 N. Sixth Avenue
                 Tucson, Arizona 85705
23             (520)623-0593 800-759-9022

24

25

1    Q.   You mentioned EOPD earlier.  What is EOPD?

2    A.   EOPD is the equal opportunity division.  I

3  think they've changed their name in the last three or

4  four years, maybe four or five times.  Basically, they

5  initially were an independent department reporting to

6  the city manager that investigated ADA claims both by

7  City employees and just the general public, citizens,

8  you know, with accessibility; you know, if a citizen

9  couldn't get into a restaurant, they didn't have a

10  wheelchair ramp, something like that.  They also

11  investigated wrongful conduct and then discrimination

12  claims as well.

13         Through the years for -- due to budget cuts,

14  that whole division has just been changed.  Right now

15  they report in to human resources, and I don't -- I

16  think there may be two or three employees in that

17  division.  I don't know what their roles are because

18  they're immeshed with HR.  And I think that may be

19  separated out again.  I don't know.  But that's really

20  what they do.

21    Q.   Do you know when EOPD, or whatever acronym

22  they went by, changed from being an independent

23  department to part of HR?

24    A.   I don't.  I could guess, but I couldn't tell

25  you.

1    Q.    And so one of the acronyms that EOPD changed

2  to was OEOP, is that correct?

3    A.    That was before EOPD.  OEOP was before --

4    Q.    I think it's --

5    A.    -- when the program director was still there,

6  before she retired, and then they changed it.  I

7  couldn't tell you when that was.

8    Q.    And I think OEOP was the Office of Equal

9  Opportunity Programs, right, something like that?

10   A.    Something like that.

11   Q.    And that preceded EOPD.

12         Was OEOP independent as well, do you remember?

13   A.    Yes.  I believe that they reported to the city

14  manager or assistant city manager.

15   Q.    So now for the time frame that's really

16  relevant to this deposition, which is late 2012, 2013,

17  2014, I believe EOPD was an independent entity within

18  the City.  Is that correct?

19   A.    Yes.

20   Q.    And so what does it mean when you say

21  independent?  What was their authority, if any, over

22  TFD, for example?

23   A.    So what I mean by independent is they were a

24  separate department.  They didn't report to any other

25  department director.  They reported directly to the

1   city manager's office, I don't know specifically who in

2   the city manager's office.   So their role was

3   independent from reporting to any of the other

4   directors.

5           And so in a time where a department or a

6   situation needed to be investigated, they would take

7   that role on to do that investigation, separate,

8   independently from the department doing their

9   investigation.

10      Q.   So they were, in theory, not supposed to be

11   influenced by any particular department throughout

12   their investigation?

13      A.   Correct.

14      Q.   And they issue a report of findings or some

15   formal writing at the end of their investigations?

16      A.   Correct.   They would investigate, they would

17   work with the department contact, whomever that would

18   be, do their investigation and then prepare a report of

19   their findings.   There was no recommendation of a

20   discipline or anything like that, it was just the

21   factual findings.   And I believe they would send that

22   over to the department director in addition to the city

23   manager's office.

24           And then once that report was produced, then

25   it gave the department director, if it was required in

1    A.    Well, my understanding is that she wanted a

2    specific station, but that violated the rules of

3    assignment on how they assigned swing personnel.  At

4    the time I was new to the department, I wasn't at all

5    familiar with -- you know, they would just refer to

6    rules of assignment, rules of assignment.  I'm, like,

7    okay, whatever, that's your guys' stuff, I'm not going

8    to get involved with any of that stuff.  But that was

9    my understanding, basically, was that she wanted a

10   particular station and it violated the rules of

11   assignment.

12        But they needed my help because they didn't --

13   they wanted to make sure that they provided any

14   assistance that she had -- that she needed with respect

15   to pumping.

16   Q.    And do you know why she was asking for a

17   specific station?

18   A.    Not at that time, until after, until after the

19   call was completed.

20   Q.    So -- anticipating my next question -- what

21   happened next after the phone call?

22   A.    After the phone call, both calls were

23   completed, nothing.  Nothing specific that I remember.

24   I remember that we -- the three of us sat there and we

25   discussed the content of the call, the conversation of

EATON, GREEN & WILLIAMS, INC.

1   the call and how to move forward, if there was anything

2   to move forward on, what type of action plan we would

3   come to.   I can't tell you specifically what was said

4   because it was so long ago.

5          I remember actually kind of chuckling to

6   myself because they weren't sure -- I remember them

7   saying we just didn't know how to address any of this,

8   and so I remember telling them regardless of what the

9   situation is, it's just a medical condition, it's just

10  a medical thing, just -- you know, it shouldn't be any

11  different than anything else.   That was about it.   I

12  don't know the details.

13     Q.   So they were sort of struggling with, hey, how

14  does this situation fit into the rules of assignment,

15  is that a fair characterization?

16          MS. SAAVEDRA:   Form.

17  BY MR. JACOBSON:

18     Q.   And if it's not, tell me, please.

19     A.   I would say they were somewhat struggling,

20  maybe, with the idea.   They weren't sure what they

21  could do, what they couldn't do, because they didn't

22  want to violate any laws, that kind of thing.   So I

23  think they were just unsure.   I don't know.

24          I don't know, because, and one of the

25  questions I remember asking, well, how have we done

1    this in the past, and they're, like, we never had a
2    problem in the past.  So that's what kind of -- yeah, I
3    remember that specifically because that's what I tended
4    to ask starting there.
5            Prior to getting to Tucson Fire, Tucson Fire
6    wasn't one of the departments I supported in central
7    HR, so I wasn't sure about their history and what they
8    did and how they dealt with different things.  I wasn't
9    their analyst, so to speak.  The way the City was put
10   together back then was there was a lead analyst
11   assigned to one or several city departments to help
12   assist them through situations, employee relations, all
13   that stuff.  And so I was not the lead analyst assigned
14   to public safety, to either police or fire, I was
15   assigned to the other public works-type departments.
16   So I had that history with those departments, I didn't
17   have a history with Tucson Fire.  So pretty much for
18   the full -- I mean, still now, actually.
19           I asked them, well, what have you done in the
20   past, how have you addressed these type of situations
21   in the past.  That was -- I remember asking that
22   question because that was just kind of my customary
23   question I would ask when things would come up.
24      Q.   Pardon the pun, but you were really thrown
25   into the fire, weren't you?

EATON, GREEN & WILLIAMS, INC.

1      A.   Correct.

2      Q.   The allegation has been made in this case that

3  at some point in time you said to Carrie that her

4  pumping seemed excessive to you, or words to that

5  effect.  Do you recall making those statements?

6      A.   I don't recall exactly making those

7  statements.  I remember the conversation because I've

8  only spoken to her on two occasions.  The more recent

9  occasion had nothing to do with this issue.  But,

10  again, that phone call was a long time ago.

11      Q.   So tell me what you remember specific to the

12  issue of the allegation that you said to Carrie that

13  her pumping seemed excessive to you?

14      A.   I can give you what I remember of the phone

15  conversation.  I remember Chief Fischback calling her,

16  I remember the conversation.  I remember the

17  conversation, she was upset, I remember her baby

18  crying.  I remember that she had raised her voice.  And

19  there's certain -- being in the field that I am,

20  there's certain things that kind of raise a red flag to

21  me, and so those are the kind of things that kind of

22  raise -- like, I try to, being in, like I said, in HR

23  for so long, I try to diffuse situations.

24          And so I remember, like I said, she was very

25  upset, her voice was raised, I remember the baby crying

1    at some point.  And there was conversation about a

2    specific station that she wanted to be at.  Chief

3    Rodriguez and Chief Fischback were -- I was across from

4    Chief Fischback and Chief Rodriguez was on the side and

5    they basically led the conversation more, I was just

6    there as guidance, I guess, making sure that they --

7    that was typically what my role is when meeting with

8    them; unless I would call a meeting, then it was

9    basically me leading the conversation.

10           I do remember her saying that she had to pump

11    frequently, I remember her saying that it was either

12    two or three or three to four hours.  I asked, well,

13    how long does it take you from start to finish, she

14    said 30 to 40 minutes.  And I may have said that seems

15    excessive, and with that I was thinking to myself in a

16    24-hour shift, every three to four hours in an entire

17    tour, that could equal a whole shift.  Additionally, in

18    my mind I'm thinking, wow, if she's on calls, I knew

19    that she -- you know, I didn't -- I knew that the

20    business we were in is we had to be available for all

21    calls, so I'm thinking all of this.

22           And I remember the look on their face was

23    like, wow.  That was kind of their look.  And so I

24    believe we put her on hold, and they asked me does that

25    seem normal, and I'm, like, well, nothing's really

1    normal in these types of situations, they could vary.

2    In my personal experience, no, but there could be an

3    underlying condition that she has.  Sometimes, you

4    know, women can't lactate as often, so they need to

5    pump more.  And so I wasn't going too much into detail

6    with them about the different stuff and that was -- I

7    was only speaking of my personal opinion and situations

8    that I've been aware of from, not necessarily employees

9    but friends, that kind of thing.

10           And so I was, like, so maybe her physician

11   wasn't aware of the type of work she did, the fact that

12   she had to be available 24 hours a day during her shift

13   to take the call.  But then that's when -- I mean, I'm

14   sure I asked at that point what did you guys do before,

15   because I know we have other women on the department

16   and I know they have children, so did they just do it

17   on their own or what was the situation.  And they're,

18   like, they just did it, we never had a problem, you

19   know.

20       Q.   So they didn't know?

21       A.   Yeah.  And I said, well, in this case, you

22   know, what is your requirement.  Because being new, I

23   didn't know what had happened in the past, I didn't

24   know what was said or what had been -- what she had

25   been told coming back.  I didn't know specifically what

1    the requirements of her particular position was at that

2    particular station or swing, that kind of thing.

3        And so that was my attempt to say, well, you

4    know, maybe she needs to be on light duty so that way

5    she can express as much as she needs to without it

6    interfering with our business, and that's going out to

7    calls.

8        And that's kind of what I remember from the

9    call.  I was not at all familiar with any of the

10   stations, what they looked like.  The only station

11   really I was familiar with was station one, being

12   that -- you know, being new to the fire department,

13   people from either HR or other City departments, hey,

14   I'm going to go visit you, show me the station, and

15   that was kind of the big thing.  So I remember

16   constantly going over there and seeing how it was set

17   up.  I didn't realize that some of the stations were

18   really, really old until way after and they weren't all

19   set up like that.

20       Q.   Do you happen to recall which station Carrie

21   was requesting specifically during that call?

22       A.   I can't tell you, unless you give me something

23   to refer to.  I'm not familiar with, like I said, the

24   stations, I don't keep track of them.  I'm not -- I

25   don't work with them every day.  I can't tell you like

1    anything that -- it's an operations thing, kind of

2    thing.  I said, but what is it, how do you do the

3    assignments.  And so at that time they kind of just

4    gave me the down and dirty, quick version of what the

5    rules of assignment is.  And, like I said, I don't

6    get -- that's an operations thing, I don't get involved

7    in any of that stuff.

8         Q.   So you indicated that in your head, which

9    makes sense, you were thinking, well, if she needs to

10   express milk every two to three hours or three to four

11   hours, whatever it was, how is she going to be

12   available to run calls, and that was going through your

13   head, correct?

14        A.   Correct.  And, well, in addition to that, does

15   she have a medical condition that we can help her with,

16   she can take care of her -- do what she needs to do, we

17   bring her in as a light duty and that way she can do

18   what she needs to do without interfering with the

19   calls, making sure that it doesn't -- you know, she's

20   taking care of herself and we're taking care of her.

21        Q.   Was there any indication from the substance of

22   the call that her -- the frequency of her expressing

23   milk was actually interfering with calls or was that

24   just something that was kind of going through your

25   head?

1    A.   I remember that Chief Rodriguez asked her, or

2  Fischback, one of them asked her about putting her

3  truck out of service and she said that she was given

4  permission to do so.  And so they're looking at me,

5  I'm, like, I don't give permission, I don't do any of

6  that stuff.  So I'm just, like, well, that's on you

7  guys, kind of thing.

8         I remember that they had written stuff down,

9  they had asked her who had given her permission to put

10  her truck out of service.  And then she said she had

11  only done it one time or two times, I don't remember

12  exactly.  But then they had this kind of peculiar look

13  on their face, like, well, it just didn't match up; if

14  you're needing to pump every three to four hours for 30

15  to 40 minutes, we can do three hours every 30 minutes

16  [sic], you can't necessarily plan that and not get a

17  call because you don't know when the calls are going...

18  They were, like, how does that even make sense.  I'm,

19  like, you guys have to look at the call logs, I don't

20  know how to do that, you know, that kind of thing.  But

21  I remember them having that look on their face and that

22  was part of the conversation we had afterwards.

23    Q.   Do you recall saying anything to Carrie along

24  the lines of, well, maybe you're not fit for duty?

25    A.   Fit for duty, I remember saying that.  And in

1   the context of saying that is not necessarily -- the
2   City uses this term called fit for duty and it's an
3   evaluation and only the City physician, whether it be
4   the City physician assigned to firefighters -- we have
5   two City physicians.  We have two offices that are
6   technically the City physicians', which I didn't even
7   know about until after I got there.  But we have a City
8   physician assigned to everyone else but firefighters,
9   firefighter classifications, those.  And so only the
10  City physician can determine whether an employee is fit
11  for duty.  And that can mean a whole lot of things.
12          And so part of that evaluation, the fit for
13  duty, was basically saying if you're able to perform
14  the central functions of the job.  And in that context
15  to me, I'm, like, well, maybe your physician doesn't
16  know the full requirements, because personal
17  physicians, very, very few of them know what it
18  actually entails to be a firefighter or be in that
19  classification, all of those ranks.  And so part of our
20  procedures, part of the City procedures is that if an
21  employee goes out -- I mean, and I can specifically
22  speak on her case; if she, you know, she went out, we
23  need to make sure that her personal physician is aware
24  of what is required, the way -- if they just say, oh,
25  what do you do, oh, I do this.  Okay.  They don't know

1    the weight requirements, they don't know all the

2    different types of stuff, you know, the environment

3    that they work in.

4            And I've seen in my tenure that employees just

5    to get back to go to work, they will tell the

6    physician, I can do it, I can lift 35 pounds, but they

7    don't really -- it's just the fact that, well, I don't

8    want my employer to terminate me because I'm almost out

9    of time and I need to get back.  So that was my concern

10   in ensuring that we were taking care of her, like my

11   concern is for all the employees, we're taking care of

12   the employees, we're providing them the benefits.

13   Because, unfortunately, a lot of that stuff doesn't get

14   communicated down to the first-level employees.  They

15   don't understand what the benefits are, they don't

16   understand that there's help there, they don't

17   understand the process, they just figure I'm going to

18   burn my sick leave.

19           I deal with this constantly and I think they

20   just don't know what is out there.  And so that was my

21   attempt to say, well, we can help you, we can take care

22   of this.  I mean, I have several cases where situations

23   like that have happened; well, I didn't know that that

24   was available to me; absolutely, and this is how you

25   can do it.

1    Q.   So that was your mind-set at the time?

2    A.   Absolutely.

3    Q.   And the last question about this conversation.

4    Do you recall suggesting to Carrie that she should just

5    ask the chief or the EC to just leave their room when

6    she needed to express her breast milk?

7    A.   I remember the topic came up.  Like I said, I

8    don't know the structure of all of the stations.  And

9    so it was discussed, I don't know who brought it up

10   specifically, but I know it was station one, the EC has

11   an office and then they've got their dorm rooms.  Not

12   being familiar with any of the other stations, I don't

13   know what they look like, I don't know -- if they refer

14   to them as an EC office, then to me, in my mind-set,

15   it's an office, not -- and I understand if it's a dorm

16   room, it's got a bed, that kind of thing.

17        So if it was discussed, if it was can you do

18   that, it was purely -- because of when they said

19   office, office to me is office.  So it's not, like -- I

20   mean, I sometimes feel like I sleep in my office, I

21   could spend the night there so much as I'm there.  But

22   to me that's kind of what I refer to.

23        I was not aware and, I mean, from what I

24   remember of the conversation, it was a combined space

25   because it's an older station, which I wasn't aware of

EATON, GREEN & WILLIAMS, INC.

```
 1        A.    I do not.

 2        Q.    Generally speaking, do you recall whether or

 3   not some or all of the stations were in compliance with

 4   your knowledge of the Patient Protection and Affordable

 5   Care Act at the time that you inspected them?

 6             MS. SAAVEDRA:  Form.

 7             THE WITNESS:  Let's see.  Ask that question

 8   again.

 9             MS. SAAVEDRA:  Are you sure you're meaning to

10   refer to patient protection reform act?

11             MR. JACOBSON:  Patient Protection and

12   Affordable Care Act, PPACA.

13             MS. SAAVEDRA:  Okay.

14             MR. JACOBSON:  I could just say PPACA.

15             MS. SAAVEDRA:  Well, just for the record, I

16   think the question you asked earlier, you asked if she

17   had researched that.  I don't think that was her

18   testimony that she had researched that act.

19             THE WITNESS:  No.  What I did say is that I

20   researched what the requirements were for an employer.

21   BY MR. JACOBSON:

22        Q.    Okay.  So understanding that, and we can -- I

23   don't want to dig too deep into that because I think

24   it's not going to get us anywhere.

25             Based on your understanding of the law and
```

 1    your research at the time, as of March 11th, 2013, to

 2    your recollection were all the stations you visited

 3    that day in compliance with the laws you knew?

 4         A.    As the law that I, that I knew and what I

 5    believed, for the most part I would say yes.  And I

 6    would take that -- I would basically say that because I

 7    was in the same situation in Texas Instruments.  I also

 8    pumped, we had an area, so I refer to a lot, well, what

 9    did we do back then, what did I do, oh, it was just an

10    office, you know, and that was it, just away from

11    public, that kind of thing.  But with Matt Larsen, I

12    guess he went on -- he designated that certain ones

13    were not in compliance because they needed a lock on

14    it.  With my experience, it just had to be free from

15    interruption, no -- you know, it couldn't be in a

16    bathroom, they had to have their own space.  So it

17    could be anywhere basically, just a private space, free

18    from any -- the public traffic, that kind of thing.

19              And as far as I know, the public's not welcome

20    to just kind of come into the station and come whenever

21    they want, I mean.  I mean, even when I go, and I'm an

22    employee, I don't just walk in and kind of start

23    roaming through the hallways or anything like that.  So

24    that was just my initial inclination with that.

25         Q.    So when you were inspecting stations with Matt

1      A.   Correct.  That was a long time ago, so...

2      Q.   Showing you what's been marked as Exhibit 12.

3   Okay.  I'm going to ask you about Exhibit 12 in a

4   second.

5           Were you on a conference call with Ms. Clark,

6   I'm sorry, with Carrie, Chief Fischback and Chief

7   Rodriguez on or about March 20th, 2013?

8      A.   Yes.

9      Q.   Just tell me what you recall about that

10  conference call.

11     A.   I thought I did earlier.

12     Q.   So this is the same conference call?

13     A.   This is the same call, yeah.  Like I said,

14  I've only spoken to her on two occasions and this was

15  one.

16     Q.   Okay.  And there's an allegation -- sorry, go

17  ahead, read this.  I'm going to ask you a couple

18  questions about this, but please read it first.

19     A.   Okay.

20     Q.   There's an allegation that Carrie hung up on

21  the call at least once.  Do you recall that?

22     A.   I do.

23     Q.   Do you believe that she hung up on the call?

24     A.   I do.

25     Q.   And what leads you to believe that she hung up

1    on the call?

2         A.   She was very upset, as I mentioned before,

3    very emotional.   Her voice was very, how do I describe

4    it, high pitched, I guess.   You could just kind of tell

5    she was upset.   I remember her saying this and all of a

6    sudden it went dead, because I could no longer -- I

7    remember hearing the baby crying in the background and

8    then we didn't hear anything.   And I wasn't sitting

9    where I could see the phone console, so I remember

10   going over and asking Chief Fischback, did the line go

11   dead?   Because I know sometime in the conference rooms,

12   the lines are connected to the outlets on the ground

13   and if you hit it, the call's dead, right.   And so we

14   looked, there's an area on the phone, you know, like a

15   screen that will show you if the call's still there,

16   and it wasn't there.   So I said, did she hang up, and

17   we, Carrie, are you there, and we looked and nothing.

18   So then that's when Chief Fischback said, she hung up.

19   I said, she hung up?

20         Which was surprising to me because being in

21   the type of organization we're in, you just don't do

22   that.   I've seen that -- actually, working with

23   other -- working in human resources, there are times

24   that employees, it was mostly applicants that would

25   call and be upset because their application was denied

1    and then they'd hang up, right, like you don't know

2    what the heck you're doing and then hang up.  But

3    typical employees, they don't behave that way, so it

4    was surprising to me, so that's why it sticks in my

5    mind.

6        Q.   So how did -- did the conversation eventually

7    come back to continue, like somebody called somebody

8    else?

9        A.   I think Chief Fischback; again I said, call

10   her back, we need to finish this conversation, to make

11   sure that she didn't hang up or what -- you know, I

12   just didn't want to end it like that.

13       Q.   And so what do you recall, how did the

14   conversation restart when Chief Fischback called her?

15       A.   I just remember him calling again and just

16   continuing the conversation.  She was still upset.  I

17   don't think this time I heard the baby crying.  The

18   baby cried only for a little bit, but that was part of

19   the -- like, it just went dead.

20       Q.   So my question is, isn't it just an assumption

21   that she hung up, right?  I mean, the phone went dead,

22   right?

23       A.   Well, we weren't -- so I would say I don't

24   know what happened on her end of the call, but as far

25   as our end, we weren't touching the console, we were --

1    it was just there.  She was upset, she was emotional,

2    and then she finished it with this comment and then it

3    was done.  So it was kind of like, like, the way I took

4    is, like screw you and --

5        Q.   But there's another possibility, correct, and

6    that's just that her phone --

7        A.   Died, maybe, sure.

8        Q.   -- died or lost the cell signal, right?

9        A.   Anything could happen.  Any of that could have

10   happened, uh-huh.

11       Q.   And the quote here is that Carrie, Carrie

12   said, you know, you guys are out of your friggin'

13   minds, or something along those lines, correct?  You

14   recall that as well?

15       A.   I recall her saying that specifically, yes.

16       Q.   And this is a verbal counseling that Carrie

17   received after that phone call, correct?

18       A.   It appears so, yeah.  I don't get involved

19   with counseling.

20       Q.   Well, that was my next question.  Did you have

21   any role in this counseling being administered?

22       A.   No.  This is nonformal discipline, this is not

23   formal discipline.  I only get involved when it comes

24   to formal discipline.

25       Q.   Did you tell Chief Fischback or Chief

1    Rodriguez, hey, she hung up on us, she's got to be
2    counseled or disciplined?
3        A.   No.
4        Q.   Do you know who decided to issue this verbal
5    counsel?
6        A.   I imagine it was Chief Fischback because he
7    signed it as a supervisor.
8        Q.   Showing you what's been marked as Exhibit 13,
9    do you recognize that document?
10       A.   I mean, yeah, it was sent to me, so...
11       Q.   Right, I understand it was sent to you.
12       A.   I mean, I can't remember, you're talking, you
13   know, years ago.  I remember working with Chief Gulotta
14   because he was over logistics, and I had no idea how to
15   even start requesting facilities to put locks on doors
16   or anything like that.
17       Q.   So my question is, okay, so who was Chief --
18   who was Joe Gulotta at the time?
19       A.   He was assistant chief.
20       Q.   And who was Tom Paul?
21       A.   Tom Paul was a deputy chief over logistics.
22       Q.   And who was Karen Tenace?
23       A.   Karen Tenace was a fire administrator and so I
24   reported to her and Tom reported to Chief Critchley.
25       Q.   I apologize, I misspoke her name.  Tenace.

1   take a lunch break at some point?

2           (A discussion was held off the record.)

3   BY MR. JACOBSON:

4       Q.   I'll tell you what, just a couple more

5   questions and we'll take an early lunch.  Okay.

6           So now you've had a chance to review Exhibit

7   15.  Do you happen to know why Deputy Chief Nied sent

8   this memorandum to Chief Critchley?

9       A.   I do not.

10      Q.   And when it says -- so when it says Jim

11  Critchley through channels, you were not, to your

12  recollection, one of those channels?

13      A.   Correct.

14      Q.   I think you kind of answered this earlier, so

15  I'll -- not related to that one.  I think you kind of

16  answered this earlier, I just want to make it clear,

17  and I apologize if I'm repeating myself, from the time

18  that you became aware that Carrie was raising issues

19  about proper lactation facilities at TFD fire stations,

20  were you ever involved in the decision as to how and

21  where Carrie was going to be assigned?

22      A.   I was not involved.

23      Q.   Do you know who handled Carrie's assignments

24  while she was expressing breast milk?

25      A.   That would have had to have been somebody in

1  operations.

2      Q.   But you don't know for sure?

3      A.   I don't know specifically who.

4      Q.   And do you know who made the decisions about

5  Carrie's assignments while she was expressing breast

6  milk?

7      A.   No.   It had to be somebody in operations.

8      Q.   Do you know whether Chief Critchley was

9  involved in any of those assignment decision-making?

10      A.   I wouldn't know.

11      Q.   As the HR manager, are -- do you have any

12  input or decision-making authority as to who gets

13  placed into swing shift assignments?

14      A.   No.

15      Q.   Last set of questions before our break.   Did

16  you ever call Carrie to find out whether she was still

17  pumping breast milk for her son?

18      A.   I never called her.   I don't think I ever

19  called her.

20      Q.   About that topic?   Because I know you've been

21  on the phone with her, like on conference calls, so --

22      A.   So I have only been on a conference call with

23  her one time.   I don't ever remember any other occasion

24  talking to her on the phone.   I may have attempted to

25  call her and then -- but I don't remember ever speaking

EATON, GREEN & WILLIAMS, INC.

1   with her on the phone just one on one.

2        The only other occasion I did speak with her

3   is when she was on light duty and we were talking about

4   her badge and access to the building, but that was the

5   only occasion.

6   Q.   So other than -- let me ask it a different

7   way.  Did you ever talk to Carrie to find out whether

8   she was still pumping breast milk for her son?

9   A.   No, it was only through e-mail.

10   Q.   Okay.  So there were times where you sent

11   Carrie e-mails asking that question?

12   A.   Correct.

13   Q.   Okay.  How many times, if you recall, did you

14   e-mail Carrie with that question about whether she was

15   still pumping breast milk for her son?

16   A.   I don't remember the number of times.  I

17   remember I had -- it was a continuous time, the reason

18   being is that in the past, from what I was told prior

19   to me getting to Tucson Fire, operations had a

20   difficult time retaining documentation who was a swing

21   person and who wasn't.  They have this thing called

22   constant staffing and shift balancing and all that

23   operations stuff, and so the system that we used, one,

24   if somebody was given, like, a temporary assignment

25   somewhere for whatever reason, if they had the need,

1   and operations determined that, they would move that

2   person into that seat, so to speak, that spot, on the

3   scheduling system.

4          Way back, I guess, in previous versions of the

5   software there was the ability to identify an employee

6   who was on swing and didn't, didn't yet win rights to a

7   particular spot at a station on a shift.  So I remember

8   in conversation, because we were getting -- I was part

9   of implementing new versions of the software that we

10  were using, so I remember in conversations with Chief

11  Rodriguez is that they had a really difficult time

12  remembering who was who or who was on swing when they

13  would do this type of thing.  A lot of it came up when

14  people were on extended military leave and they would

15  fill that spot and then forget, oh, crap, we have --

16  sorry, I didn't mean to say crap.  But, oh, you know,

17  where is this person, why are we short a swing person

18  now, and then they'd have to go back through all the

19  files and it took so long to identify, oh, that person

20  really shouldn't be there, he's really a swing person.

21          So, but that being said, when Carrie was given

22  that assignment to station six, basically they're,

23  like, we got to make sure, you know, that we have some

24  way of making sure that we didn't forget, so to speak.

25  And so given that I have no authority over who gives

1   assignments or whatever, I basically went to them, I

2   was like, well, how long did you agree to put her

3   there, so then I can follow up, and so they said, well,

4   as long as she has the need to.  So I made sure putting

5   that, going through the City Attorney's office.

6          Like I said, I was new there.  I don't know

7   what relationship the previous HR managers had with the

8   attorney's office.  I know it wasn't that well with

9   human resources, even though I didn't -- I wasn't in

10  that supporting role, but being in HR, I had open

11  communications with the attorney's office.  So when I

12  was there I said, hey, this is what's going on, we're

13  okay with this because this is within the management

14  rights to do that, and they didn't have an issue with

15  it.

16          So every three months, I think it was three

17  months or four months, I don't remember right now, I

18  would send an e-mail, do you still need the special

19  assignment, so that way we could move her back.

20          And so part of my role or my group's role was

21  to also update changes, assignment changes for

22  employees.  There's a documentation, an internal

23  document that Tucson Fire has, it's called a PUF.  I

24  don't know what the acronym stands for off the top of

25  my head.  But when employee A at station one moves to

1   station four, this form is created and sent through,

2   and so part of our role is to make sure that the

3   software is accurate, because we also used it for

4   payroll purposes.

5           And so that was really what the point of that

6   was is to make sure that we didn't lose somebody else,

7   and so we kind of did that just to manage that.

8       Q.   So did you have, like, a -- it on your

9   calendar?

10      A.   Yes, it was a tickler.   I have to do that

11  because my memory's not very good.   So, yeah, it was a

12  tickler system I used on my calendar.   Do the same

13  thing when employees are due to return from military

14  leave, I have it on my calendar, that kind of thing.

15          MR. JACOBSON:   Okay.   This is probably a good

16  place to take a break.   We'll take lunch.

17          (A lunch recess was taken from 11:40 to

18  12:48.)

19  BY MR. JACOBSON:

20      Q.   We are back on the record.   I'll show you

21  what's been marked as Exhibit 16.   Go ahead and review

22  that document.

23          Sorry.   You know what, I'm going to set that

24  one aside right now.   For some reason I ended up with

25  them out of order.

1        Let's go with Exhibit 18.  Do you recognize

2   that document?

3        A.   I don't remember it, but, yeah, I must have

4   sent it.

5        Q.   So this appears to be an e-mail from you to

6   Chief Brad Olson with a bunch of carbon copy folks on

7   there, correct?

8        A.   Uh-huh.

9        Q.   Yes?

10       A.   Yes.

11       Q.   And you wrote this e-mail, correct?

12       A.   Yes.

13       Q.   Do you remember what prompted you to write

14   this e-mail?

15       A.   No, just advising them that -- I'm just

16   reading it verbatim -- advising them that her one-year

17   mark, that she had met her one-year mark, and that was

18   per the law there in giving -- informing them that she

19   can be put back to her, whatever swing or whatever the

20   case may be, her swing shift.

21       Q.   And before you sent this e-mail out do you

22   recall whether or not you talked to Carrie?

23       A.   I don't recall.  I must have got the

24   information from her, from -- because I don't typically

25   know when babies are born unless we have it documented

1    know whose notes these are.

2        Q.   And the last line appears to read, JoAnn to

3    send memo recapturing conversation.  Do you have any

4    recollection of doing something like that?

5        A.   Huh-uh.

6        Q.   No?

7        A.   No, I do not.  I guess this refers to her

8    special assignment at station six.

9        Q.   Yeah, I don't want you to guess or speculate.

10           At some point did you become aware that Carrie

11   had complained that she was being mocked and subject to

12   unwelcome humor?

13       A.   At station six?

14       Q.   Just -- yes, it would have been at six, I

15   believe.

16       A.   I do remember that.  I don't remember how I

17   became aware of it.  But what I did, what I did

18   recommend is that they investigate and ask her about

19   it, because it's not behavior that we tolerate.

20       Q.   I will come back to that, thank you, I just

21   want to make sure that you had a recollection of that.

22           I'm showing you what's been marked as Exhibit

23   22.  Do you recognize this document?

24       A.   I don't.  Do I read it?

25       Q.   Please.  Please.

1  Q.   And you said that you, did I understand you

2  correctly, and please correct me if I'm wrong, that you

3  suggested that an investigation or fact-finding take

4  place?

5  A.   Yes.   What I remember, somebody bringing it to

6  me that she was complaining because she was being

7  teased and joked about this policy, that it was

8  pointing to her, that it was as a result of her and the

9  situation.

10        Now, I don't know -- I know that they all talk

11  out there and, you know, rumors and, you know, you tell

12  one person and they add something else to it or

13  whatever the case may be.   But so when I found that

14  out, I'm, like, well, that's stupid, I thought to

15  myself, as far as, like, the Carrie clause, the act,

16  the words that they used, and so I recommended that you

17  guys need to go out there and ask her because we can't

18  just think that it's -- just let it go, it needs to be

19  addressed.   And that would be with anybody complaining

20  about anything like that.

21        Like I said, you know, whether it's a

22  light-duty policy, whatever it is, I think people tend

23  to associate, oh, yeah, I heard so and so, that

24  happened, so now they're going to -- there's going to

25  be that policy.   It's different in government sector

```
 1    than it is private sector.
 2        Q.    So to your knowledge, did a fact-finding or an
 3    investigation regarding the mocking and unwelcome humor
 4    ever occur?
 5        A.    Yes.    In fact, this documents that, that I
 6    remember Chief Rodriguez and Chief Olson went down to
 7    station six and met with her and then they conferenced
 8    in...
 9        Q.    Gordon?
10        A.    Gordon, uh-huh.
11        Q.    Do you know if they talked to anybody else
12    besides Carrie and Gordon?
13        A.    I don't think so and I don't remember.
14        Q.    Okay.    Would it be fair to say that TFD
15    struggled with Carrie's complaints about the fact that
16    TFD stations were not compliant with the PPACA?
17            MS. SAAVEDRA:   Form and foundation.
18            THE WITNESS:   I wouldn't say that TFD
19    struggled, I would say that it was just a new issue
20    that was brought up.  Or I wouldn't even say that it
21    was an issue, it was just something that had never been
22    brought up in the past, so they really weren't sure how
23    to deal with it and whether or not they were in
24    compliance.  So it was kind of new territory for them.
25    But I wouldn't call it an issue.
```

1    A.   No, not offhand.

2    Q.   Does this appear to be a request from Carrie

3  to the Fire Chief Jim Critchley asking to be put on

4  light duty until the end of her pregnancy?

5    A.   That's what it looks like, uh-huh.

6    Q.   And did you in fact become aware that Carrie

7  went on light duty on or about June 16th, 2014?

8    A.   Uh-huh.   Yes.

9    Q.   Who decided, if you know, what Carrie's

10  light-duty assignment would be?

11    A.   Those assignments are scheduled through

12  assistant chiefs and Chief Critchley.   Typically they

13  are assigned, you know, the beginning of the week or at

14  any point when we have someone moving to light duty.

15  I'll inform them, we have X employee, this is their

16  skill-set and where do we have a need, and so they'll

17  make the determination of where the light-duty employee

18  is placed.

19    Q.   So do you know who decided Carrie's light-duty

20  assignment in June or July 2014?

21    A.   I don't know specifically who made that

22  assignment.

23    Q.   Do you recall what Carrie's light-duty

24  assignment was in June 2014?

25    A.   I don't remember.   I mean --

1    Q.   Back in 2014?

2    A.   Yeah.  She does all the P card stuff and that

3 kind of stuff.

4    Q.   "P card" being purchase card?

5    A.   Purchase cards and budget stuff.  So minimal

6 work with budget.

7    Q.   Did you ever tell Ms. Montijo to notify you

8 when Carrie left work for the day?

9    A.   No.  She was not -- did not directly report to

10 me.

11    Q.   I'm going to turn your attention to June 19th,

12 2014.  This was a few days after Carrie went on light

13 duty.  Do you recall -- to refresh your recollection,

14 was Carrie working for Ken Brouillette?

15    A.   Quite possibly.  He's in prevention, in fire

16 prevention.

17    Q.   And who is Veronica Munoz?

18    A.   She was my administrative assistant.

19    Q.   And she works in the same office you do?

20    A.   Yeah.  She works across the hall from me, or

21 she worked.

22    Q.   Do you recall telling Veronica Munoz to call

23 Carrie after she left on June 19th, 2014, and tell her

24 that she wasn't allowed to exercise without obtaining a

25 doctor's note first?

1      A.    I don't remember the conversation between

2  Veronica and I.  We typically tag-teamed her, more so

3  me, on managing light-duty staff, and so there was a

4  process in basically getting all the documents, and she

5  was in charge at the time, just like my admin assistant

6  now, in ensuring that we had all the documentation from

7  the doctors and the policy was set.  She would manage

8  them if they were needing to take vacation or sick

9  leave, she was responsible for making sure that the

10  calendar was updated, that kind of stuff.

11      So I imagine that she realized we didn't have

12  all the documentation, because that was one of her main

13  responsibilities is to manage the medical files, not

14  just with light duty but with FML, military leave,

15  those type of things.  And so she knows that the

16  process is when somebody's on light duty, they're still

17  allowed to do physical training, but we need to make

18  sure that the doctor, their physician, whether it be

19  the City doctor or their personal doctor, documents

20  what they're allowed to do.  Obviously if they hurt

21  their shoulder, we can't be having them lift weights

22  over there, so that type of thing.

23      So that's just part of our procedure.  So if

24  she did ask that, it was part of the procedure.

25      Q.    So my question is, did you ever tell Ms. Munoz

1    that Carrie couldn't work out until she got a doctor's

2    note?

3       A.   I don't remember having a specific

4    conversation with her, but it could have been do we

5    have all the documentation that would follow up with

6    her regular; oh, well, I don't have it.  It needs to

7    have that on there, so follow up with her.

8            I'm just generally speaking, I don't remember

9    a specific instance where I went and told Veronica do

10   that specific thing.

11      Q.   And do you recall telling Carrie that her

12   start time would be 7:00 a.m. instead of 6:00 a.m.

13   while she was on light duty?

14      A.   No.  Those times are set by the supervisor.  I

15   was not her supervisor on light duty.  And so,

16   generally speaking, light-duty employees will have

17   their work time -- work schedule according to what

18   their supervisor's schedule is so they can be

19   supervised.

20      Q.   And so would you have had the authority to

21   change Carrie's work schedule from 6:00 a.m. to 7:00

22   a.m.?

23      A.   No.  I'm not her supervisor.  I don't have the

24   authority to change anybody's schedule unless they

25   report to me.

1     Q.  Did you ever become aware of an issue of

2  Carrie's telestaff being changed to withdraw vacation

3  time from her bank because of this schedule issue with

4  starting at 6:00 a.m. versus 7:00 a.m.?

5     A.  I vaguely remember being asked about looking

6  into telestaff or what was changed or how it was

7  changed.  But the system that we used, it's changing,

8  but the system that we used back then, it could record

9  who made the change, but because of our system, you

10  know, e-mails go away after 90 days, typically anything

11  that's changed by myself or the payroll staff, any of

12  us that have access to it, is typically on the

13  direction of either the employee or the supervisor

14  or -- because the way the system is, is after a certain

15  period of time, the next day the previous roster or

16  those days -- that day's time is locked out, so people

17  don't have access to it.  But if that day, let's say,

18  for example, I left early, I have the right, even not

19  in my position, I was just a secretary, I had the right

20  to change, to enter in time at that time.  There isn't

21  an approval process by the supervisor or nothing like

22  that.  Or the supervisor can go into my time and say I

23  left early.  But if it's after the next day at a

24  certain time period, myself nor my supervisor has

25  access to make that change.  It's only the payroll

1    staff or someone with administrator rights that can

2    make that change.  So typically that's what would

3    happen.

4        Q.   Okay.  So let me back up a second and see if I

5    understand what you just said.  And I apologize if I

6    got it wrong.  I want to make sure I get it right.

7             Do you have rights or permission to change an

8    employee's telestaff records?

9        A.   I do.

10       Q.   Who else does besides the employee themselves?

11       A.   Their supervisor.  If it's that same day, if

12   you're making the same -- that day the same change --

13   you're making a change on that same day, the employee

14   has the right to make a change, add in time, or their

15   supervisor can do that.

16       Q.   The next day, though --

17       A.   The next day, after a certain period of time,

18   a certain time in the day, it gets locked out.  At that

19   point only if you have administrator rights or if

20   you're a payroll staff.

21       Q.   So it's only those who are in payroll staff,

22   yourself.  Who else has administrator rights besides

23   the supervisor?

24       A.   The supervisor does not have administrator

25   rights.  I can't tell you back then who had

1   administrator rights, but it's typically people that

2   are involved with upgrades, system upgrades,

3   programming, codes, that kind of stuff.

4        Q.   Let me ask, does anyone on your staff besides

5   you have administrator rights?

6        A.   Yes.  Veronica had administrator rights, too.

7        Q.   So you and Veronica were the only people that

8   had administrator rights in HR to change an employee's

9   telestaff record the day after the record was entered?

10       A.   Yes and no.  Yes, Veronica and I had

11  administrator rights.  No, we were not the only ones

12  that had access to change after the previous day's time

13  was locked.  Anybody in HR payroll had that access as

14  well, but they didn't necessarily have the higher level

15  administrator access.

16       Q.   Gotcha.  So anybody in HR and payroll.

17       A.   Correct.

18       Q.   So were you aware of the fact that some time

19  had been removed from Carrie's telestaff and replaced

20  as vacation time surrounding her start time at 6:00

21  a.m. versus 7:00 a.m.?

22       A.   I was made aware after the fact and it was, I

23  believe, from a memo or somebody bringing it up, but

24  not at the time.  I'm not aware of every time changes

25  get made or anything like that.

1    Q.   Do you know who made that change to telestaff?

2    A.   I don't know offhand.   I'd have to pull up the

3    records to find out specifically who did.

4    Q.   Did you tell Randy Eslinger to withdraw

5    vacation time away from Carrie's telestaff?

6    A.   I don't remember if I did.   He is a payroll

7    clerk, so he has access to that.   I had two payroll

8    clerks.   For a short period of time I only had him.

9    But basically the process is, I mentioned either the

10   employee will pop in or e-mail in to say I need to make

11   this change or put me in vacation or put so and so

12   vacation last week, whatever the case may be.

13        So we didn't really have a clear record, a

14   clear process for documenting/retaining those records.

15   Now we do, we're getting there, but back then it was

16   just, oh, by the way.   That's the type of procedure I

17   walked into.

18   Q.   So if I understand your testimony, you may

19   have told Randy Eslinger to withdraw vacation time from

20   Carrie's telestaff, but you don't remember?

21   A.   I don't remember.   If I did, it was at the

22   direction of her supervisor.

23   Q.   Which would have been Ken Brouillette?

24   A.   Which would have been Ken or somehow

25   communicated from her through me, whether it be through

1   Veronica, whether it be through somebody.  I wouldn't

2   take it upon myself to remove somebody's time because I

3   felt like it.  I mean, you just don't do that.

4       Q.   That's what I was getting at.  So if you did

5   direct Randy Eslinger to do that, it would have been

6   because it was communicated to you either through

7   Carrie or Mr. Brouillette?

8       A.   Correct.  Or it could have even been the

9   chief.  I don't know.  Somebody who knows.  And that's

10  typically what happens with anybody; oh, so and so,

11  they left early, go ahead and change the time in, or

12  whatever the case may be.

13      Q.   And you're not aware of any -- strike that.

14           Are you aware of any rule in the light-duty

15  policy -- if you're not sure, you're not sure, that's

16  fine.  Are you aware of any rule in the light-duty

17  policy that says that you can't start light duty before

18  7:00 a.m.?

19      A.   There is no rule.

20      Q.   Either before or at -- before or during

21  Carrie's light-duty assignment in 2014, did you have

22  any meetings or discussions with anybody in TFD

23  regarding her work schedule?

24      A.   No.

25      Q.   Were you aware of the fact that Carrie

1   returned back to work from FMLA leave in November 2014,

2   around then, does that sound right?

3       A.   Possibly.

4       Q.   Do you recall telling Carrie that before she

5   could come back to work, she, in or around November

6   2014, that she had to get a note signed by both her

7   personal physician and her City -- and the City

8   physician that she was okay to come back to work?  And

9   I'll withdraw that.  Let me ask the question a

10  different way.

11          Do you remember telling anybody that before

12  Carrie came back to work in November -- in or around

13  November 2014, that she had to get a note signed by

14  both her personal physician and the City's physician?

15      A.   Are you asking come back to work or come to

16  light duty?

17      Q.   Come back to work.

18      A.   Full duty?

19      Q.   November 2014, yes.

20      A.   So that's our policy, so if I said it, I said

21  it to other people that have asked, not specifically

22  about her but with anybody coming back.

23      Q.   And which policy are you referring to?

24      A.   Basically our return to work.

25      Q.   Return-to-work policy.  Okay.

1      A.    Yeah.   And so if anybody is off for an

2   extended amount of time, depending on what the

3   situation is, they obviously have to have a release

4   back from their physician.   If it's nonwork related,

5   then they would have to have it from their personal

6   physician, and then they take that note to our City

7   physician and the City physician makes the final

8   determination as to whether they're okay to return to

9   full duty or they're not.   Because they're, as I

10  mentioned before, they're most aware of what the

11  requirements are, physical requirements, those type of

12  things, whereas personal physicians may not be.

13     Q.    And, again, you're citing the return-to-work

14  policy.   Is that an AD or is that a TFD policy?

15     A.    That's an AD in that that's basically -- it's

16  not -- specifically doesn't say a return-to-work

17  policy, it's more under, like, FML.

18     Q.    Showing you what's been marked as 29.

19     A.    You're making me read all this?

20     Q.    No.  Have you ever seen this document before?

21  If you need to read it, let me know.

22     A.    I don't remember if I have or not.

23     Q.    Do you recognize the handwriting on pages two

24  and three in the margins?  Does that look like your

25  handwriting?

1    Q.   Do you know why Chief Nofs inspected Paramedic

2  Clark's turnouts on or about May 29th, 2014?

3    A.   I don't know specifically why.  I don't assign

4  that.  I don't have anything to do with turnouts, so...

5    Q.   And you know -- essentially you know nothing

6  about the underlying circumstances that led to this

7  action and e-mail?

8    A.   Huh-uh.  No, I do not.

9    Q.   I started to get into this earlier.  Were you

10 aware of the fact that Carrie was promoted to the

11 position of fire inspector in mid-2014?

12       MS. SAAVEDRA:  Form.

13       THE WITNESS:  I was aware that she was

14 transferred in.  It's not a promotion because she was

15 at equal ranks of that.  But I did the paperwork, so,

16 yeah, all the administrative paperwork.

17 BY MR. JACOBSON:

18    Q.   Thank you.

19    A.   You're welcome.

20    Q.   She ended up in fire -- in inspection,

21 correct?

22    A.   As an inspector.

23    Q.   Did you subsequently become aware of issues

24 that arose between Carrie and Captain Langejans?

25    A.   I became aware that they were having problems

143

1  would have said they should be coming in like everybody

2  else when their supervisor...  This is what our

3  procedure is with the light duty, but I can't recall

4  somebody specifically coming in and asking me or

5  telling me, hey, there's a problem with her schedule or

6  something like that.  I don't remember.

7          MS. SAAVEDRA:  Okay.  That's it.

8          MR. JACOBSON:  Thank you.

9          MS. SAAVEDRA:  Read and sign.

10          (Whereupon the deposition concluded at 2:15.)

11          (Deposition Exhibits Number 1 through 31 were

12  marked for identification.)

13

14

15                                    _____

16                              JoANN ACEDO-ACOSTA

17

18

19

20

21

22

23

24

25

# EXHIBIT 4

# Manual of Operations

## SECTION 100 ADMINISTRATION

| 102.4 | Social Media Conduct and Responsibilities of Employees (/files/MOPS_102.4_1.doc) | 09/06/13 |
|---|---|---|
| 103.5 | Honorary Awards Board (/files/MOPS103.5.doc) | 10/11/11 |
| 104 | Master Memos & Daily Bulletins (/files/mops104.doc) | 03/15/12 |
| 105 | Policy Creation, Revision, Deletion (/files/MOPS105PolicyCreation_0.doc) | 01/14/15 |

## SECTION 200 PERSONNEL

| 201 | Rules of Assignment (/files/mops201_2.doc) | 07/09/12 |
|---|---|---|
| 202.4 | Reporting Time Worked Exceptions (/files/MOPS_202.4_3.doc) | 01/21/14 |
| 203 | Absences (/files/mops203_0.DOC) | |
| 203.1 | Approving Authority (/files/MOPS203.1.DOC) | 12/16/10 |
| 203.2 | Reporting Absences (/files/MOPS203.2.DOC) | 12/16/10 |
| 203.3 | Vacations (/files/MOPS203.3_1.DOC) | 12/17/10 |
| 203.4 | Sick Leave (/files/MOPS203.4.DOC) | 12/17/10 |
| 203.5 | Accident Compensation (AC) Absences (/files/MOPS203.5.doc) | 12/13/10 |
| 203.6 | Trades (/files/MOPS203.6_3.doc) | 02/08/13 |
| 203.7 | Military Leaves (/files/MOPS203.7.doc) | 12/17/10 |
| 203.8 | Holidays (/files/MOPS203.8.doc) | 12/17/10 |
| 203.9 | Court Appearances, Depositions and Interviews for Legal Actions (/files/MOPS203.9.doc) | 12/17/10 |
| 203.10 | Temporary Absences (/files/MOPS203.10.doc) | 12/30/10 |
| 203.11 | Donated Leave (/files/MOPS203.11.doc) | 12/30/10 |
| 203.12 | Light Duty (/files/MOPS203.12.doc) | 12/30/10 |
| 203.13 | Staffing Procedures (/files/MOPS203.13.doc) | 12/30/10 |

**14-02543 COT000966**
5/26/2015

| 204 | Evaluating and Counseling (/files/MOPS_204_2.doc) | 01/21/14 |
| 205 | Individual Records (/files/mops205_0.doc) | 02/08/13 |
| 208.1 | Commissioned Personnel - Physical Appearance (/files/MOPS208.1_0.doc) | 08/28/12 |
| 208.2 | Ownership and Archival of Electronic Images (/files/MOPS208.2_0.doc) | 09/06/13 |
| 208.3 | Pagers/Cell Phones (/files/MOPS208.3_1.doc) | 10/10/12 |
| 209 | Uniforms (/files/MOPS209_0.DOC) | 07/03/13 |
| 210 | Physical Requirements (/files/MOPS210.DOC) (from MOPS 209) | 03/19/12 |
| 214 | Discipline (/files/firemanuals/mops/mops_214.pdf) *from R & R Section 8* | |
| 214.1 | General (/files/firemanuals/mops/mops_214.1.pdf) | 10/14/09 |
| 214.2 | Fire Department Policy (/files/firemanuals/mops/mops_214.2.pdf) | 10/14/09 |
| 214.3 | Causes for Disciplinary Action | |
| 214.4 | Responsibilities (/files/firemanuals/mops/mops_214.4.pdf) | 10/14/09 |
| 214.5 | Administration of Discipline (/files/firemanuals/mops/mops_214.5.pdf) | 10/14/09 |
| 214.6 | Disciplinary Matrix (/files/MOPS214.6_0.doc) | 10/14/09 |
| 214.7 | Discipline Matrix Form (/files/firemanuals/mops/mops_214.7.pdf) | 10/21/10 |
| 214.8 | Disciplinary Actions Guidelines Checklist (/files/Supervisor_Disciplinary_Action_Checklist_Appendix_B.doc) | 12/18/12 |
| 214.9 | Employee Counseling Form (/files/Employee_Counseling_Form_Appendix_C.doc) | 12/18/12 |
| 214.10 | Disciplinary Review Process (/files/firemanuals/mops/mops_214.10.pdf) | 06/29/11 |
| 215 | Driver's License Policy (/files/firemanuals/mops/mops_215.pdf) | |
| 215.1 | Purpose (/files/firemanuals/mops/mops_215.1.pdf) | 02/03/09 |
| 215.2 | Definitions (/files/firemanuals/mops/mops_215.2.pdf) | 02/03/09 |
| 215.3 | Policy (/files/firemanuals/mops/mops_215.3.pdf) | 02/03/09 |
| 215.4 | Responsibilities (/files/firemanuals/mops/mops_215.4.pdf) | 02/03/09 |
| 216 | Hazing (/files/firemanuals/mops/mops_216.pdf) | 11/04/09 |
| 217 | Industrial Injuries Reporting (/files/firemanuals/mops/mops_217.pdf) | 07/17/10 |
| 218 | Equal Employment Opportunity and Affirmative Action (from R&R Section 9) (/files/firemanuals/mops/mops_218.pdf) | 11/09/09 |

| 219 | Pregnancy Policy (Currently under Revision) | 11/06/09 |
| 220 | Nursing Rooms Policy (/files/MOPS220_0.doc) | 07/19/13 |

## SECTION 300 STATION AND EQUIPMENT

| 303 | Station Facilities (/files/MOPS_303_2.doc) | 08/22/11 |
| 303.1 | General (/files/firemanuals/mops/mops_303.1.pdf) | 08/22/11 |
| 303.2 | Athletics, Diversions and T.V. Watching (/files/firemanuals/mops/mops_303.2.pdf) | 08/22/11 |
| 303.3 | Bulletin Boards (/files/firemanuals/mops/mops_303.3.pdf) | 08/22/11 |
| 303.4 | Communications (/files/firemanuals/mops/mops_303.4.pdf) | 08/22/11 |
| 303.5 | Dormitory (/files/firemanuals/mops/mops_303.5.pdf) | 08/22/11 |
| 303..6 | Wearing Apparel, Personal Locker (/files/MOPS303.6.DOC) | 08/22/11 |
| 303.7 | Floors (/files/MOPS303.7.DOC) | 08/22/11 |
| 303.8 | First Aid Kits (/files/MOPS303.8.DOC) | 08/22/11 |
| 303.9 | Sumps (/files/firemanuals/mops/mops_303.9.pdf) | 08/22/11 |
| 303.10 | Kitchen (/files/firemanuals/mops/mops_303.10.pdf) | 08/22/11 |
| 303.11 | Library (/files/firemanuals/mops/mops_303.11.pdf) | 08/22/11 |
| 303.12 | Parking (/files/firemanuals/mops/mops_303.12.pdf) | 08/22/11 |
| 303.13 | Grounds Maintenance (/files/firemanuals/mops/mops_303.13.pdf) | 08/22/11 |
| 303.14 | Tobacco Use on Fire Department Work Sites (/files/firemanuals/mops/mops_303.14.pdf) | 08/22/11 |
| 303.15 | Key Requests and Transfers (/files/firemanuals/mops/mops_303.15.pdf) | 08/22/11 |
| 303.18 | Observers (/files/MOPS303.18.doc) | 12/07/11 |
| 303.19 | Fire Central Meeting Room Use Policy (/files/firemanuals/mops/mops_303.19.pdf) | 01/07/11 |

## SECTION 400 MISCELANEOUS OPERATIONS

| 401.2 | Vehicular Accidents (/files/MOPS_401.2.doc) | 04/12/12 |
| 417 | Hazard Communication Program (/files/MOPS417.doc) (from MOP 427) | 08/31/10 |
| 419 | Fire Central Front Desk Safety Policy (/files/MOPS419.doc) | 01/26/12 |
| 420 | | 10/10/12 |

**14-02543 COT000968**

Driving Policy for Fire Department Vehicles (/files/mops420.doc)

| 429 | Tow Truck SOG's (/files/MOPS429.doc) | 02/28/11 |

## SECTION 500 CERTIFICATIONS

| 503 | Paramedic Selection Process (/files/MOPS503_0.doc) | 03/21/12 |

## SECTION 600 MEDICAL ADMINISTRATION

| 600 | Medical Administration | |
| 600.1 | EMS/Medical Regulations (/files/MOPS_600.1_0.doc) | 01/22/14 |
| 600.6 | EMS Mileage Documentation (/files/mops600.6.doc) | 11/08/12 |
| 600.7 | Medical Records Policy (/files/MOPS600.7.doc) | 09/29/11 |
| 600.8 | ALS Billing (/files/MOPS_600.8_2.doc) | 10/31/13 |
| 601 | EMS / Medical Regulations | |
| 601.7 | Pre-Hospital Medical Care Directives (/files/firemanuals/mops/mops_601.7.pdf) | 11/01/10 |
| 602 | Administrative Activities (/files/MOPS602.doc) | |
| 602.1 | Daily requirements (/files/firemanuals/mops/mops602.1.pdf) | 09/17/10 |
| 602.2 | Apparatus and Equipment Check (/files/firemanuals/mops/mops602.2.pdf) | 09/17/10 |
| 602.3 | Drug Box Checking Procedure (/files/MOPS602.3.doc) | 03/22/12 |
| 602.4 | Narcotic Ordering Policy / Procedure (/files/firemanuals/mops/mops602.4.pdf) | 09/17/10 |
| 602.5 | Station Duties (/files/firemanuals/mops/mops602.5.pdf) | 09/17/10 |
| 602.6 | Observers (/files/firemanuals/mops/mops602.6.pdf) | 09/17/10 |
| 602.8 | Incident Reports (from 619) (/files/firemanuals/mops/mops602.8.pdf) | 09/17/10 |
| 602.9 | Transport of Patients (/files/firemanuals/mops/mops_602.9.pdf) | 02/28/11 |
| 605.6 | ePCR Missing Report Protocol (/files/firemanuals/mops/mops_605.6.pdf) | 09/23/10 |
| 606.2 | Intravenous Access and Blood Sampling (/files/firemanuals/mops/mops_606.2.pdf) | 06/29/11 |
| 606.5 | Restraint Use (/files/MOP606.5_0.doc) | 05/21/13 |

14-02543 COT000969
5/26/2015

| **Tucson Fire Department**<br>**Manual Change** | Section 201<br>Assignments and Transfers |
|---|---|
| Manual of Operations<br>Page 1 of 11 | Revised: June 29, 2012 |

**201        Assignments and Transfers**

**201.1      Assignments and Transfers**

**201.1.1    Policy**

The proper placement of personnel is an important factor governing the effectiveness and efficiency of the department.  The placement process takes a multitude of issues into account.

A.  Administrative factors

    1.  The filling of vacancies caused by transfer, retirements, new companies going into service, etc.

    2.  The assignment to the field of a new class of probationary members.

    3.  The balancing of numerical strength.

    4.  The balancing of experience.

B.  Personnel factors

    1.  Special certifications and training, i.e., technical rescue, hazardous materials, etc., whereby a member may be transferred to an assignment where his/her ability may be more fully utilized.

    2.  The desire for broader experience, i.e., working in a different type of company, or special duty assignment.

    3.  A transfer may be necessary for the corrective rehabilitation of a member.

    4.  To avert or correct a personality clash between members.

    5.  To assign a member who is presently on a promotional list to an assignment where he/she may be used regularly in an acting capacity prior to being appointed.  It should be noted that the department is not required to make such assignments, but when practical, this policy will be continued.

    6.  The assignment of a member for sickness rehabilitation, i.e., a member assigned to a light or limited duty basis during which time he/she may be given a special assignment.

14-02543 COT000970

| Tucson Fire Department Manual Change | Section 201 Assignments and Transfers |
|---|---|
| Manual of Operations Page **2** of **11** | Revised:  June 29, 2012 |

7. The factors of special services and length of service are weighed carefully from the administrative standpoint.

C. The following considerations determine what action should be taken on transfer requests:

  1. Administrative needs.

  2. Seniority in Rank (across shifts)

  3. Current Specialty (HM, TRT, RRT) Certification

  4. Numerical balance of shifts.

  5. The needs of the department and the desires of the individual will be considered before final action is taken, however, when there is conflict, the interest of the Department must be the deciding factor.

D. Notification

  1. All parties involved in a transfer shall be notified prior to the time of the transfer and provided an opportunity for comment.

  2. If a member is on A.C., Vacation, or Sick Leave, the transfer will be delayed until the member's return to duty and s/he is provided the reasons for the transfer and a chance for input.

E. Oversight

  1. The Rules of Assignment Committee will periodically review assignment issues to ensure that assignments are processed consistently and efficiently throughout the Department.

  2. The Rules of Assignment Committee members

     a. Operations Assistant Chief—Chair
     b. Battalion One 'A', 'B' and 'C' shift
     c. Operations Deputy Chiefs
     d. Four Members of Local 479

**201.2**       **Filling Vacancies**

201.2.1     All initial vacancies resulting from the following conditions will be available for bid:

A. Promotion

**14-02543 COT000971**

| Tucson Fire Department Manual Change | Section 201 Assignments and Transfers |
|---|---|
| Manual of Operations Page 7 of 11 | Revised: June 29, 2012 |

**201.6**      **Voluntary "Swapping" of Positions**

**201.6.1**      No personnel initiated exchanging of positions will be honored.

**201.7**      **RRT/TRT/HM Teams (Specialty Teams)**

**201.7.1**      Members participating in a Tucson Fire Department sponsored (i.e., the member's training is funded by the department) specialty training will be required to make a one (1) year commitment to stay in a specialty team assignment.

     A. The one-year commitment starts with the first day of the assignment to a specialty team. This commitment shall include participation in training to remain current and compliant in the specialty skill.

     B. The commitment is given prior to training.

**201.7.2**      A specialty-trained member may not bid for a non-specialty position for a period of one (1) year from the date of the original bid assignment.

     A. A specialty-trained member may bid for other specialty positions that he/she is qualified for within that one (1) year period.

**201.7.3**      A specialty-training member may promote, demote, or laterally transfer, i.e., engineer to paramedic, paramedic to inspector, out of a specialty team assignment.

**201.7.4**      If a specialty team member wins a bid but is not allowed to move out of that assignment, (i.e., Specialty Assignment), the position won will be filled with a swinger until that member is released from the Specialty Assignment.

**201.7.5**      A member certified in ~~a specialty program~~ HazMat and/or TRT and assigned to a Specialty Assignment is expected to be competent in the required disciplines. If a certified member left or never worked a specialty position and later is assigned to a specialty position, the member must demonstrate competence. The member's proficiency will be determined by the his or her chain of command, given guidance by NFPA 472 – Standards for Competence of Responders to Hazardous Materials/Weapons of Mass Destruction, NFPA 1006 – Standard for Technical Rescuer Professional Qualifications and the Department's HazMat & TRT training coordinator(s).

     A. Until refreshed on the required skills and knowledge and trained to competence, the member will not take a critical role on a Special Operations team. The member's chain of command may opt to require complete attendance in the next available technician certification.

| **Tucson Fire Department**<br>Manual Change | Section 203<br>Absences |
|---|---|
| Manual of Operations<br>Page 17 of 29 | Revised:  February 21, 2012 |

4.  Make a notation of the accident in the member's file.  Place a copy of all reports and a copy of the Board of Inquiry report in the member's file.

5.  Forward a copy of the Board of Inquiry report to the Purchasing Department (Risk Management Division) and the Fire Department Personnel Officer.

6.  Place the original Board of Inquiry report in the appropriate incident file at Headquarters.

203.6        Trades

203.6.1        Voluntary Shift Trades on the Three-Shift Schedule

An employee's immediate supervisor may grant a voluntary trade with a replacement of equal qualifications.

A voluntary shift trade is a mutual agreement in which one individual is voluntarily working for another; therefore, payback of that time is the responsibility of those persons involved and will not accrue any obligation to the City.  The City will not be responsible for any monetary compensation as a result of a trade.  All time worked as a result of a trade shall be excluded from compensation of overtime.  Vacation leave for a voluntary shift trade will be authorized if a vacation slot is available.

A  Members

When a member wants to voluntarily trade, the initiating member will confirm the shift to be traded with the substituting member involved.  It is the responsibility of the members involved in the trade to be sure the trade is entered in TeleStaff.

B  Supervisor

It will be the immediate supervisor's responsibility to assure that the normal operational efficiency of their crews will be maintained.

203.6.2        Medical Leave

An employee who is on continuous medical leave to include Family Medical or Parental Leave may not take trades.  If an employee anticipates being on continuous Medical Leave, they are not to schedule trades during this time.  If an employee on continuous Medical Leave has previously scheduled trades for this time period, it is the employee's responsibility to re-schedule trades.

203.6.3        Injuries

If an employee has scheduled trades during a time when he or she will be out of work due to a work-related injury, as well as an off the job injury, it is the employee's responsibility to re-schedule these trades.  The department will not be responsible for covering trades during this time.

**14-02543 COT001000**

# EXHIBIT 5

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3

4    CARRIE FERRARA CLARK,          )
                                    )  No. CV-14-02543
5         Plaintiff,                )      TUC-CKJ
                                    )
6         vs.                       )
                                    )
7    CITY OF TUCSON,                )
                                    )
8         Defendant.                )
     _____)

9

10

11

12

13

14

15            DEPOSITION OF MICHAEL FISCHBACK

16                    May 10, 2016

17                   Tucson, Arizona

18

19

20                    Reported by:
                 Barbara Brodrick, RPR, CR
21                    CR# 50188
     _____
22          CALABRO REPORTING SERVICES, L.L.C.
                 Certified Court Reporters
23               549 North Sixth Avenue
               Tucson, Arizona  85705-8371
24          520.798.1808   800.538.6692
                 Fax:  520.620.0660
25               www.calabroreporting.com
     APPEARANCES:

1    making sure that trucks are ready to go.  If we were to

2    order trucks, the order process.  Receiving and that.

3    Day-to-day mechanical operations of the vehicles.

4            On the supply side it's making sure the Tucson

5    Fire Department has all the supplies necessary to run

6    on a day-to-day basis.

7        Q   Do you remember the years or roughly the

8    months and year that you were an assistant chief over

9    operations, training and emergency management?

10       A   I believe I started as the assistant chief in

11   May of 2012 to May of 2014, and then I would have went

12   to logistics in 2014 to the time of training.

13       Q   I'm not sure -- those dates aren't right.

14   Maybe June 2013?

15       A   It was 2011 to 2013.

16       Q   That makes sense.  In June of 2013 you went

17   over to --

18       A   Correct.

19       Q   That makes sense.  Got it.

20           This is going to sound obnoxious but it's not

21   meant to be:  Are there any positions besides fire

22   chief in TFD which you haven't held?

23       A   I haven't held various deputy chiefs

24   positions:  communications, medical.  I never held the

25   range rank of engineer.  I never held the rank of

1    Q   Thank you for your service.

2    A   Thank you.

3    Q   Your current position, deputy chief of

4  training, right?

5    A   Yes, sir.

6        (Exhibit No. 1 marked for identification.)

7    Q   Showing you what's been marked as Exhibit 1

8  for identification; do you recognize that document?

9    A   Yes, sir, I do.

10   Q   Did you author this document?

11   A   Yes, sir, I did.

12   Q   Do you need a minute to review it before I ask

13 you a couple questions about it?

14   A   Please.

15   Q   Have you had a chance to review that?

16   A   Yes, sir.

17   Q   Is there anything about this memorandum that

18 you want to add, edit, change or amend?

19   A   No, sir.

20   Q   Are you willing to swear to the truth of each

21 and every statement that's in that document that you

22 wrote?

23   A   Yes, sir.

24   Q   Why did you write this document?  Was there

25 some precipitating event, or did somebody tell you to

1      Q   Union contract?

2      A   Yes, sir.

3      Q   And federal laws, statutes, et cetera, right?

4      A   Yes, sir.

5      Q   There's also something called an emergency

6  operations manual?

7      A   Yes, sir.

8      Q   Have I covered really the sources where I

9  might find rules and regs that govern your employment?

10     A   Yes, sir.

11     Q   Are you required to follow the manual of

12  operations?

13     A   We follow it as much as we can.

14     Q   What do you mean by that?

15     A   When you say "required," the manual of ops,

16  they're policies and we use them as policies.  Policies

17  of day-to-day operations that we would follow for any

18  certain situation.

19         However, if reason permits we will go outside

20  of those occasionally.  The idea is not to as much as

21  possible because the reason they're there again is to

22  stay, especially in personnel issues, to stay as

23  balanced as we can for the organization.

24     Q   What about what would be a reason to deviate

25  from the manual of operations?

1       A   Do you want an example?

2       Q   More like a category:   In these circumstances

3   we would go outside of the manual of operations

4   because.   Stuff like that.

5       A   Constant staffing seems to be one that comes

6   up every now and then.   Constant staffing, obviously

7   for firefighters on suppression schedule we can't have

8   everyone take a day off every time they want;

9   otherwise, Christmas, New Years, certain holidays would

10   be pretty hard to staff.

11          When people are moved from one shift to

12   another, there may be times where we'd go outside the

13   given number of vacations per slots for circumstances

14   such as that to honor something that would allow us to

15   go outside what the policy would be.

16       Q   So for staffing concerns?

17       A   Yes, sir.

18       Q   And assignments and transfers?

19       A   Yes, sir.

20       Q   What gives TFD the authority to go outside the

21   manual of operations, if anything?   Is there any

22   document or anything within the policy that says:   In

23   certain circumstances you can go outside these

24   policies?

25       A   That's a good question.   I know when we were

1  personnel for the four continuously staffed ranks:

2  captain, engineer, paramedic, firefighter?

3      A   Yes, sir.

4      Q   And employees who are in swing shift are

5  covered under TFD's rules of assignment?

6      A   Yes, sir.

7      Q   If a person leaves an assigned position to go

8  into the swing pool, does that vacated position then

9  have to go into the bid tool?

10     A   I don't believe it has to go into the bid

11  tool, but it usually will.

12     Q   I apologize.  Let me back up.  What is a bid

13  tool?

14     A   The bid process -- the bid tool would be a

15  process for which for any given rank an opening occurs.

16  When that opening occurs, if it goes on the bid tool,

17  it means that anybody out there at that rank can bid on

18  that assignment.

19         Assignments are granted mostly on seniority;

20  however, there may be other factors that apply such as

21  if it's a technical spot that requires certain

22  qualifications, it may be possible a qualification

23  would trump seniority in that case.

24         But in general it's a way of managing a system

25  so the senior person who bids on that spot gets the

19

1   spot.

2       Q    What would the circumstance be where somebody

3   who leaves an assigned position to go into the swing

4   pool that their vacated spot wouldn't go into the bid

5   tool?

6       A    There could be a situation -- depending on

7   their seniority.  So a junior person, whether

8   firefighter or medic -- I'm using those examples

9   because they come up more often -- is very junior and

10  they leave to go to the swing pool, their spot is open.

11  It's possible we may have another class right behind

12  them and that would be the junior spot so that's where

13  we as managers would put another probationary employee

14  in to fulfill their probationary year.

15      Q    Any other reason why you would think where the

16  position -- strike that.

17          Any other reasons you can think why a vacated

18  assigned position wouldn't go into the bid tool?

19      A    I think it's possible for the DUI example.

20  May hold it for a while.

21      Q    Thank you.

22          (Exhibit No. 2 marked for identification.)

23      Q    This is Exhibit 2.  Do you recognize this

24  policy?

25      A    Yes, sir.

1   department and the public that we do X instead of Y, we

2   could do that.

3       Q   It's discretionary?

4       A   Yes, sir.

5       Q   To your knowledge -- and again if you're not

6   sure let me know -- has TFD ever removed a bid from the

7   bid tool before the bid was awarded?

8       A   I believe so, but I cannot give you an

9   example.

10      Q   Same question:  In the past five years has TFD

11  ever delayed a winning bidder's transfer to a later

12  date?

13      A   Yes, sir.

14      Q   I want to take you now to March 20, 2013.  Did

15  you participate in a telephone call with Carrie Clark,

16  my client, Deputy Chief Rodriguez and HR manager JoAnn

17  Acedo?

18      A   Yes, sir, I did.

19      Q   I probably don't need to refresh your

20  recollection about that phone call.  Would you tell us

21  everything that you recall about that?

22      A   Yes, sir.

23      Q   Go ahead.

24      A   I don't remember what time of day it was.  I

25  remember I was at my desk and the phone rang and it was

1    Ms. Clark had called.  I answered the phone.

2         I remember that she had been trying to get

3    ahold of Chief Rodriguez about her assignment, I

4    believe it was several times that day.  I knew that we

5    had been working with Ms. Clark on her assignments and

6    just as a coincidence just before the phone rang I saw

7    Chief Rodriguez walk right by my office.

8         I asked her to stay there.  I went out.  I saw

9    Ms. Acedo.  I said, "Carrie's on the phone concerning

10   her assignment."  I felt it was best if the three of us

11   talked to her concerning her assignment.

12        They came in.  We talked on the phone.  What I

13   remember of that is that she had brought up that

14   Station 9 was not a good place for her and her needs at

15   the time.

16        As we discussed it, Chief Rodriguez and I

17   agreed she was correct, this is not a good place for

18   her to be, so we were quickly working on what the

19   alternative would be, to put her somewhere that would

20   meet her needs for what she needed to do, plus our

21   needs to have a response system out there that responds

22   to the public.

23        I don't remember exactly what was said but I

24   know during that conversation it was pretty emotional

25   because she asked us if we were out of our friggin

25

1    minds on some of the things we were suggesting.

2         We were hung up on twice.  Each time we called

3    her back to try to work with her to find a station.

4    And just through brainstorming that evening we came up

5    with a solution that we felt was best for everybody and

6    that was an assignment to Station 6.

7    Q    Pretty much everything -- is that everything

8    you remember about the call?

9    A    Yes, sir.

10   Q    Where was Carrie when she called you?

11   A    I believe she was at Station 9.

12   Q    But you're not sure?

13   A    No, sir.

14   Q    Why do you believe she was at nine?

15   A    I believe she was assigned to Station 9 that

16   evening and that's why this had come up, that Station 9

17   would not work.

18   Q    And I apologize for my ignorance.  Where is

19   nine?

20   A    Wilmot and 22nd.

21   Q    During that call did anybody tell Carrie that

22   the only assignment they had available for her that

23   evening was Station 9?

24   A    I believe that did take place, but I believe

25   the context of that is:  When you were assigned, the

1   only opening we had was Station 9.  I believe that was

2   earlier in the day when staffing was done.  Staffing is

3   generally done obviously first thing in the morning.

4       Q   So somebody did tell her:  The only assignment

5   we have for you tonight is Station 9, in context?

6           MR. McCRORY:  Objection to form.

7       A   I believe what it was is:  When you were

8   assigned the only opening we had was nine.

9           And I believe it was Chief Rodriguez -- we had

10   Telestaff up on my computer.  We were looking at it as

11   quick as we can to see what can we do, because she was

12   right.  When we looked at it and she explained what the

13   issues there, we agreed, this is not a good station for

14   her to be at.

15       Q   (By Mr. Jacobson)  Do you recall what her

16   explanation was of the issues?

17       A   I do.  I don't remember exactly when I knew

18   about the locking door issue, but I'm inclined to

19   believe I knew about it when that phone call took place

20   because she said there are two private room, they both

21   were lockable, but one of them was the EC office -- the

22   captain's office.  The other one was the battalion

23   chief's office, and it wouldn't be appropriate for her

24   to go knocking on the door during various times of the

25   night to say, "I have to express breast milk."

1       And she was right on that, no, we can't do

2   that, have people get up, exit their office, go back

3   and get in their office.

4       Q   You said Carrie was pretty emotional during

5   the call?

6       A   In my opinion, yes, sir.

7       Q   What led you to believe that, other than the

8   statement, "Are you out of your friggin minds?"

9       A   The loud tone of voice, the hang-ups.  I

10  believe that was out of frustration.

11      Q   Somebody eventually called Carrie and said

12  that she could work at Station 6; is that right -- to

13  your recollection?

14      A   My recollection is that evening that, "Six

15  would be the best place for you to go."  I don't

16  remember if we called her later or not.

17      Q   Do you know what slot she filled at Station 6?

18  Was it a paramedic or firefighter slot?

19      A   This was a firefighter slot.

20      Q   Do you recall -- during this conversation with

21  Ms. Clark, do you recall JoAnn Acedo saying she had a

22  partial list of stations that met the requirements for

23  expressing milk and that Station 9 met those

24  requirements?

25      A   Yes, sir.

1    technical piece this meets it on what investigation or

2    inspection was done but it doesn't meet it by our

3    standards for what we would want for our employees.

4        Q    Following the March 20 phone call, Carrie

5    received a verbal counseling which is documented on an

6    Employee Counseling Form, correct?

7        A    Yes, sir.

8            (Exhibit No. 3 marked for identification.)

9        Q    Do you recognize that document?

10       A    Yes, sir.

11       Q    Is that your signature on the bottom left?

12       A    Yes, sir, it is.

13       Q    And who made the decision to issue this

14   counseling?

15       A    I did.

16       Q    Who wrote the narrative in the Details section

17   in the middle of that page?

18       A    I did.

19       Q    Anything you want to add, edit, amend or

20   change in the narrative section?

21       A    No, sir.

22       Q    What time was it that Carrie allegedly hung up

23   the first time on you?

24       A    I do not know.

25       Q    What was being discussed with Carrie by staff

1    when she hung up the first time?

2        A   I do not remember.

3        Q   Was the first hang-up in the beginning of the

4    call, middle of the call, end of the call?

5        A   I don't remember.

6        Q   And I think you said that after the first

7    hang-up Carrie called back, right?  You called back.  I

8    apologize.  That was your testimony.

9        A   I remember we called Carrie.

10       Q   How did you know that she was no longer on the

11   line the first time?

12       A   I suspect we were talking and there was no

13   answering back.  I don't remember if I looked at the

14   phone and could see that there was no one there or a

15   combination of both.

16       Q   Sometimes when the line goes dead it's a rapid

17   beeping or the light on the phone goes off:  We're not

18   connected any more, right?

19           After the first hang-up and you're connected

20   with Carrie, did somebody say:  Why did you hang up on

21   us?

22       A   Not that I remember.

23       Q   I have the same set of questions about the

24   second hang-up.  What was being discussed the second

25   time Carrie hung up?

1      A   I don't remember.

2      Q   What time was it that Carrie hung up the

3  second time?

4      A   I don't remember.

5      Q   Was it in the beginning, middle or end of the

6  call?

7      A   I want to say it's toward the later part of

8  the call, but I don't remember for sure.

9      Q   And after the second hang-up, staff called

10  Carrie back, right?

11      A   Yes, sir.

12      Q   How long did it take for staff to call Carrie

13  back?

14      A   I don't remember.  I believe it was pretty

15  quick, personally.

16      Q   So I'm wondering, other than the existence of

17  a line that's dead, no one on the other line, what

18  evidence do you have that she hung up?

19      A   I can't give you that answer other than I

20  believe there was something on the phone also that led

21  us to believe she hung up.

22          The other piece is when we called back she

23  answered, which led me to believe that line had been

24  hung up.

25      Q   Are there any explanations for why a line

1  would go dead, like somebody lost connectivity on a

2  cell phone?

3      A   Certainly.

4          MS. SAAVEDRA:   Form.

5      Q   (By Mr. Jacobson)   Isn't it possible that

6  Carrie didn't actually hang up on you, that something

7  happened to the connection for whatever reason?

8          MR. McCRORY:   Form.

9      A   Possible, but I don't believe it's probable

10  that that happened.

11      Q   (By Mr. Jacobson)   What evidence do you have

12  that it was probable that it happened?

13      A   Tone of voice.   Anger.   Her being upset with

14  not liking the answers as we were trying to work with

15  her.   That led me to believe she got upset and she hung

16  up.

17      Q   What were you saying to her that she didn't

18  like?   Because it appears to me that you agreed with

19  her that Station 9 wasn't appropriate.

20      A   We did.

21      Q   What was being said to her that she didn't

22  like?

23          MR. McCRORY:   Objection to form.

24      A   I believe it was trying to move forward to

25  find an assignment for her that would work.   At first

1    she did not like the idea of Station 6.  I don't know

2    that both hang-ups would have been in relation to that,

3    but I believe one of them could have been in relation

4    to going to Station 6.  It's a long way from her home.

5         However, with the information we had we felt

6    that was the best option.

7         Q    (By Mr. Jacobson)  Do you remember who was

8    present on March 26, 2013, if anybody, when you gave

9    Ms. Clark that counseling?

10        A    I remember Deputy Chief Rodriguez being there

11   and Capt. Sloan Tamietti.  I belief Chief Nied was

12   there too, but I don't remember that for sure.

13        Q    The spelling is S-l-o-a-n T-a-m-i-e-t-t-i?

14        A    Yes, sir.

15        Q    When you gave Carrie the verbal counseling

16   memorandum, did she ask you for a list of stations

17   which were in compliance with federal law for nursing

18   mothers, or words to that effect?

19        A    I believe she asked for a list.

20        Q    Did you provide that list to her?

21        A    No, sir.

22        Q    Why not?

23        A    I believe I did not have that list on my

24   possession, but I had seen the list.

25        Q    Would it refresh your recollection if you had

1   a list or had seen the list but it was being revised by

2   OEOP?

3       A   That's what I believed was going on.

4       Q   So that would be the reason why you didn't

5   give her the list is because you believed it was being

6   revised by OEOP?

7       A   Yes, sir.  We were working on it pretty quick,

8   as a matter of fact.

9       Q   To your knowledge before March 2013 did TFD

10  have a list of approved stations for nursing mothers?

11      A   To my knowledge.

12      Q   To your knowledge to this day does TFD have a

13  policy for nursing mothers?

14      A   No, sir.

15      Q   Do you recall during the March 26, 2013,

16  meeting with Ms. Clark, did she ask you why she

17  couldn't work at Station 12?

18      A   Yes, sir.

19      Q   And what was the conversation around that; if

20  you know?

21      A   The conversation around it was I had seen the

22  list and to me ironically one of the stations that was

23  not approved for nursing mothers was Station 12.

24          I did not know for sure that it was Ms. Clark

25  who had gone to the OEOP but thought it most likely was

1   with what we were working on.   And I said that a

2   complaint had been filed and it's not even on the list

3   of approved stations right now.

4           She said, "I did not file a complaint."

5           I apologized to her for insinuating that she

6   had filed a complaint and I looked at Sloan Tamietti

7   and I said, "I apologize for making that remark."

8       Q   I'd like to take you back to October of 2012.

9   Shifting gears a little bit.

10          You were the assistant chief of operations at

11  that point in time; does that sound about right?

12      A   Yes, sir.

13      Q   Were you aware of a circumstance at the end of

14  October 2012 when Paramedic Jeff Todd who was assigned

15  to Paramedic 12C, so that's Station 12, shift C for the

16  record, when he offered to switch temporarily with Ms.

17  Clark to help her?

18      A   I don't believe I knew about that at the time.

19  I know about it now obviously, but I don't believe at

20  the time.

21          I would though, we also have an ROA document

22  and one of the things we have in there is there will be

23  no voluntarily shifting of assignments between

24  personnel.

25      Q   ROA meaning rules of assignment?

1    Q   Was that Andrew Grimes?

2    A   Yes, sir.

3    Q   Do you know how Firefighter Grimes felt about

4  being bumped from Engine 6?

5    A   I don't believe he liked it too much.

6    Q   How do you know that?

7    A   I heard through the rumor mill.  I did not

8  hear firsthand from Firefighter Grimes, but I had heard

9  that he had either asked for a meeting with labor or

10  talked to labor about his rights to be able to stay

11  there.

12    Q   Do you know why Carrie was sent to Station 6?

13  Strike that.

14        When Carrie was at Station 6 was she filling a

15  temporary vacancy?

16    A   It's complicated, but I will explain if that's

17  all right.

18        A paramedic assessment unit has a paramedic

19  rank on it that can run the ALS equipment, that being a

20  heart monitor, the drug box and has capabilities that

21  exceed an EMT.  Engine 6 is and was a paramedic

22  assessment unit.

23        On the other two shifts due to staffing it's

24  staffed with a captain, an engineer, a medic and a

25  firefighter.

1        On C shift, where Ms. Clark was at the time,

2    we had a captain who was a medic so that captain could

3    fulfill that role.  And we had an engineer and two

4    firefighters.

5        Firefighter Grimes had never bid on that spot

6    so he never won it formally for it to be his.  It was

7    one of those cases that I mentioned earlier where

8    somebody filled a spot as a member of a swing pool

9    there.  So he filled it and stayed there which left him

10   with a single supervisor until either he bid somewhere

11   else that he wanted or chose to go back on swing.

12        On the night that Ms. Clark had called us, the

13   concern came up when it was brought up that she had

14   taken the medic truck out of service -- I don't

15   remember exactly what was said now, but she had taken

16   it out of service.

17        Chief Rodriguez and myself looked at each

18   other because we were thinking a similar thing, it's a

19   balance for what's best for the employee and best for

20   public service.

21        We are a time organization we have a response

22   model that we are expected to meet for the public who

23   is paying our salary when we're out there.  So we both

24   realized at the same time that this medic truck is

25   being put out of service, that truck is out of service

1    and now we have to respond for anyone who would call

2    for something from somewhere else.

3         So what we had decided to do was to pull

4    Firefighter Grimes from Engine 6, since he didn't

5    technically bid that spot.  It had always been held by

6    a firefighter, but Ms. Clark is the medic.  She could

7    be the PAU medic.

8         The station ran an average of 1.79 calls every

9    24 hours, which means the likelihood of her expressing

10   milk and a call happening at the same time is greatly

11   lessened which increases our availability for public

12   response.

13        Even if she is now, we have the captain as a

14   medic for a backup to be the PAU medic which keeps

15   Engine 6, which is a PAU response model, keeps our

16   employee working, also gives her a private place that's

17   quiet where she can do what she needed to do.

18        So I would say from administrative management

19   rights that seemed to us at the time and seemed to me

20   to be the best way to be able to have a public response

21   model, plus do the best for our employee who has needs.

22        Q   The captain was Capt. Ted McDonough, right?

23        A   Yes, sir.

24        Q   M-c-D-o-n-o-u-g-h.  That's because Capt.

25   McDonough had a paramedic certification?

## Deponent's Correction Sheet/Signature Page

**Case:**  Carrie Ferrara Clark vs City of Tucson
Case No. CV-14-02543 TUC-CKJ

**Deposition Of:**  Michael Fischback

| Page | Line | Correction | Reason for Correction |
|------|------|------------|----------------------|
| 24 | 9 | THEN MS. ACEDO, NOW MS. ACOSTO | NAME CHANGE |
| 34 | 12 | I THOUGHT REFERENCE WAS TO AT THAT | MISUNDERSTOOD |
|  |  | TIME, NOT THIS TIME. WE DO HAVE A | QUESTION |
|  |  | POLICY FOR THIS NOW |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  | \ |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

I have read the deposition taken **May 10, 2016.** Having made the corrections, knowing the penalties of perjury, the foregoing is a true and correct transcript of my testimony.

Deponent: _____

Date: ___6-8-2016_____

**Calabro Reporting Services, L.L.C.**
549 North Sixth Avenue
Tucson, Arizona 85705-8371
**520.798.1808**

# EXHIBIT 6

## PERSONNEL ACTION REQUEST

### I. GENERAL INFORMATION

| HR PARF #: 56290 | Dept. / Div. | | Fire / Medical | | Proposed Org# | 3022 |
|---|---|---|---|---|---|---|
| **Employee Name** | | **Last** | | **First** | | **Middle** |
| | | Ferrara | | Carrie | | A. |
| **Social Security #** | | | **Employee #** | 48197 | **Effective Date** | 01/02/11 |
| **Dept. Contact** | Kenneth R. Lee | | **Title** | Department H. R. Manager | **Phone #** | 837-7008 |

### II. ACTION REQUESTED

| 1st Action | PRMPC 4A | 3rd Action | | Downtown Allowance | | Disciplinary Action |
|---|---|---|---|---|---|---|
| Perm. Promotion ▼ | | | ▼ | | ▼ | ▼ |
| **2nd Action** | | **Hiring** | | **2nd Language Pay** | | |
| ▼ | | | ▼ | | ▼ | |

**OTHER ACTION/COMMENTS/EXPLANATION OF ACTION** (Attach separate sheet for longer explanation)

To fill vacancy created by the creation of two new Paramedic Units.  Employee is eligible for Paramedic Cert Pay.

### III. EMPLOYEE RECORD CREATED OR CHANGED AS FOLLOWS:

| | **Current Record** | | **Proposed Record** | |
|---|---|---|---|---|
| **Department/Division** | Fire / Operations | | Fire / Medical | |
| **Org #/Position #/Program Code\*** | 3021 / 0000739 | | 3022 / 0007025 ✓ | |
| **Fund/Agency/Org. #** | 001 / 301 / 3021 | | 001 / 301 / 3022 ✓ | |
| **Pay Location / Work Location** | 3021 | | 3022 | |
| **Job Title/Code** | Firefighter / 6401 | | Paramedic / 6411 | |
| **Grade/Step/Hourly Rate** | 401 / 2 / $14.37 | | 404 / 6 / $18.83 ✓ | |
| **Status** | Select one ▼ | | Select one ▼ | |
| | Select one ▼ | Select one ▼ | Select one ▼ | Select one ▼ |
| **Anniversary Date** | 7/5/2007 | | 1/2/2011 | |

### IV. APPROVAL TO FILL VACANCY AND PREVIOUS INCUMBENT INFORMATION

| **Vacancy (Title)** | Paramedic | | |
|---|---|---|---|
| **Previous Incumbent** | None | | |
| **Class Title/Class #** | Paramedic / 6411 | | |
| **Last Date Paid** | NA | | |
| **Department Director Signature** | Pat Kelly | **Date** | 1-4-11 |
| **Budget Analyst Signature** | | **Date** | |
| **City Manager Signature** | | **Date** | |

### V. EMPLOYEE SIGNATURE: Separation / Voluntary Demotion

| **Employee Signature/Date:** | | ☐ Employee is | Eligible for reinstatement on the eligibility list |
|---|---|---|---|
| **Last Date Worked:** | | ☐ Is Not | or re-employment per Civil Service Commission Rules & Regulations |

### VI. DISCIPLINARY ACTION

| (See Instructions Tab) | **City Attorney Signature** | | **Date** | |
|---|---|---|---|---|
| **Date Action Served:** | | **By Whom:** | | |
| **# Days Suspended:** | | **How Served:** | | |

### VII. APPROVAL: Final Selection & All Other Personnel Actions

| **Department Director Signature** | Pat Kelly | **Date** | 1-4-11 |
|---|---|---|---|
| **City Manager Signature** | | **Date** | |
| **Equal Opportunity Office Signature** | Luis-ulla | **Date** | 1/6/11 |
| **Human Resources Signature** | V. Maez | **Date** | 01.14.11 |

\*Positions charged to Federal or State Funds require a Program Code.  See Program Code Tab for specific Fund # requiring a program code.

# EXHIBIT 7

1

**JACOBSON LAW FIRM**
2730 EAST BROADWAY BLVD., SUITE 160

2
TUCSON, ARIZONA 85716
TELEPHONE (520) 885-2518

3
FACSIMILE (520) 844-1011

4
jeff@jhj-law.com
Jeffrey H. Jacobson, PCC #65402; SB#019502

5
Attorney for Plaintiff

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9
CARRIE FERRARA CLARK,                    No. CV-14-02543-TUC-CKJ

10
                   Plaintiff,
                                         **PLAINTIFF'S RESPONSES TO**
11
vs.                                      **DEFENDANT'S FIRST SET OF**
                                         **REQUESTS FOR ADMISSION**
12
CITY OF TUCSON,

13
                   Defendant.

14

15          Plaintiff Carrie Ferrara Clark, through undersigned counsel, hereby submits her

16   responses to Defendant City of Tucson's Requests of Admissions to Plaintiff.

17                              **General Objections**

18          1.      Plaintiff makes the following general objections with respect to each and

19   every item of Defendant's Requests for Admissions. These objections are not waived, even

20   if some objectionable documents are made available to Plaintiff, nor does Plaintiff, by

21   producing any responsive documents, waive objection to their admission into evidence on

22   the grounds of relevance, materiality or other proper ground for objection.

23          2.      Plaintiff objects to each and every request for admission as unduly

24   burdensome and oppressive, to the extent that it seeks information and/or the production of

25   materials that have already been made available to Plaintiff, including without limitation,

26   information and documents Plaintiff has received as part of Plaintiff Response in this case.

                                            1

**RFA #6**: As of July 12, 2012, you were assigned to work "swing shift."

    ADMIT__X__    DENY_____

RFA #7: All TFD commissioned fire employees are required to participate in the department's fitness assessment and medical examination program, including an annual health examination.

    ADMIT_____    DENY__X__

    Plaintiff lacks sufficient information to either admit or deny request for admission number seven.  Further, any applicable City of Tucson or Tucson Fire Department policies speak for themselves.  For these reasons, Plaintiff denies request for admission number seven.

RFA #8: You were stationed at Station 12 from October 2012 to December 2012 whenever other paramedics from that Station were not on duty.

    ADMIT___    DENY__X__

    Plaintiff admits in part and denies in part.  Plaintiff admits that she was stationed at Station 12 from October 2012 to December 2012, but lacks sufficient information to either admit or deny the remaining allegations in request for admission number eight and therefore denies the same.

RFA #9: You never filed a formal complaint with the City of Tucson's Office of Equal Opportunity Programs alleging you were not provided a room with privacy to express milk or that you were not provided break times to express your milk

    ADMIT_____    DENY__X__

    For her response to request for admission number nine, Plaintiff states that she attempted to file a formal complaint with the City of Tucson's Office of Equal Opportunity Programs with these allegations, but was denied the opportunity to do so by Martina Macias.  Therefore, Plaintiff denies request for admission number nine.

//
//
//
//

4

RFA #10: In an interview with Martina Macias, Senior Equal Opportunity Specialist you said you wanted to be assigned to Station 12 because it was close to your mother' house, which made it easier for her to pick up your expressed milk for your son.

ADMIT___                DENY_____

Plaintiff objects to request for admission number ten insofar as she made many statements during her interview with Ms. Macias and all of her statements must be judged in context.  Without waiving said objection, Plaintiff admits that she said she wanted to be assigned to Station 12 because it was close to her mother's house, making it easier for her to pick up Plaintiff's expressed breast milk for her son.

RFA #11: On January 16, 2013, you told Martina Macias with City of Tucson's Office of Equal Opportunity Programs that you no longer needed to be assigned to Station I because your son was already eating food.

ADMIT___                DENY_____

Plaintiff objects to request for admission number 11 insofar as she made many statements during her interview with Ms. Macias and all of her statements must be judged in context.  Plaintiff further objects as this statement is not exactly what she said to Ms. Macias during their meeting.  Without waiving said objection, Plaintiff admits that she used words to this effect during her meeting with Ms. Macias.

RFA #12: Your pay and benefits were not changed or impacted in any way as a result of being reassigned to Station 6.

ADMIT___                DENY_X___

RFA #13: You never had to express milk in a bathroom while at work.

ADMIT_X___              DENY_____

RFA #14: Every station you worked at from October 2012 to March 2013 had a room available for you to express your milk where you could have privacy and be unobserved.

ADMIT___                DENY_____

Plaintiff objects to this request for admission as irrelevant and not reasonably calculated to lead to admissible evidence.  Without waiving said objection, Plaintiff admits request for admission number 14.

5

DATED this 6th day of July, 2015.

**JACOBSON LAW FIRM**

*/s Jeffrey H. Jacobson*

_____

Jeffrey H. Jacobson
Attorney for Plaintiff

Original emailed this 6th day
of July, 2015, to:

Michael W.L. McCrory
Michelle Saavedra
Principal Assistant City Attorneys
Office of the City Attorney, Civil Division
255 W. Alameda, 7th Floor
Tucson, Arizona 85701

# EXHIBIT 8

1   Michelle R. Saavedra
    Michael W.L. McCrory
2   Principal Assistant City Attorneys for
    MICHAEL G. RANKIN
3   City Attorney
    P.O. Box 27210
    Tucson, AZ 85726-7210
4   Michelle.Saavedra@tucsonaz.gov
    State Bar No. 25728
5   Pima County Computer No. 66163
    Michael.McCrory@tucsonaz.gov
6   State Bar Computer No. 3899
    Pima County Computer No. 37268
    Telephone: (520) 791-4221
7   Fax: (520) 623-9803
    *Attorneys for Defendant City of Tucson*

8

9                    **IN THE UNITED STATES DISTRICT COURT**

10                      **FOR THE DISTRICT OF ARIZONA**

11   CARRIE FERRARA CLARK,              No.  4:14-CV-02543-TUC-CKJ

12                Plaintiff,                  **DECLARATION OF**
                                             **JOANN ACOSTA**
13   vs.

14   CITY OF TUCSON,                      (Hon. Cindy Jorgenson)

15                Defendant.

16

17        Pursuant to 28 U.S.C. §1746, I, JoAnn Acosta, declare and state as follows:

18        1.      I make this Declaration based on my personal knowledge.

19        2.      I am currently employed as the Human Resources Manager at the Tucson

20   Fire Department ("TFD") and have been so employed since August, 2012.

21        3.      My duties include supervising the proper documentation for employee

22   actions, benefits and leave including documentation required for requesting a light duty

23   assignment due to medical condition resulting from a work-related or non-work related

24   injury or illness.

25        4.      From July 23, 2012 through October 21, 2012, Carrie Clark was out on

26   Family Medical Leave ("FML") for the birth of her first child.

27        5.      When a firefighter or paramedic is on the initial one year of probation, the

28   employee is assigned to a single station under a single command staff.  That assignment is

1  not a permanent assignment and once the probationary period is completed, the employee

2  is usually assigned to swing shift until the employee can bid for a permanent assignment at

3  a single station.

4      6.      During the times material to this case, Carrie Clark had different

5  assignments. In each of these assignments, Carrie Clark was supervised by and reported to

6  different chains of command:

7          a.      Carrie Clark was promoted to paramedic on January 2, 2011. At that

8  time and pursuant to standard policies, she was assigned to Station 4 one year while on

9  probation. The assignment was not a permanent assignment. She went on light duty for

10 the birth of her first child in December 2011, shortly before her one year at Station 4

11 ended. In anticipation of the end of Carrie Clark's probationary period, the paramedic

12 position at Station 4 was put out for bid prior to Carrie Clark going on maternity leave. As

13 of January 2012, her full time assignment was as a swing shift paramedic while she was

14 temporarily assigned to light duty.

15         b.      Prior to and from her return to work on October 27, 2012, following

16 the birth of her first child through November 13, 2012, Carrie Clark was a paramedic

17 assigned to C shift/swing shift. Her first assignment was to Station 12 on October 27,

18 2012, and then to Station 21 on October 29, 2012. Plaintiff was then assigned to PM12

19 "C" from November 5, 2012 to January 6, 2013. During this time, Carrie Clark's chain of

20 command was BC Brian Stevens, BC Pat Quinn, DC Ed Nied, AC Mike Fischback and

21 FC Jim Critchley.

22         c.      Carrie Clark then resumed swing shift assignments to various stations

23 through March 13, 2013; during this time period, her captain, battalion chief and deputy

24 chief level supervisors varied with the specific station assignment.    Above these

25 supervisors were AC Mike Fischback and FC Jim Critchley.

26         d.      She was temporarily assigned as a paramedic/firefighter at Station 6

27 from March 20, 2013 until she went on light duty on June 16, 2014, for the birth of her

28

1   second child.   During this time, Carrie Clark's chain of command was Captain Ted
2   McDonough, BC Tim Nofs, DC Ed Nied, AC Michael Fischback and FC Jim Critchley.

3          e.   From June 16, 2014 she remained on light duty until August 22,
4   2014, when she went on FML for the birth of her second child.  Prior to going on FML,
5   she was on light duty assigned to Fire Prevention.

6          f.   Carrie Clark returned from FML on November 24, 2014, to her new
7   position as a Fire Inspector in Fire Prevention.  Carrie Clark remained in that position
8   through April 2016, when she was reassigned.  During this time, Carrie Clark's chain of
9   command was Captain Phillip Morgan, Captain Ken Brouillette, DC Mike Carsten, AC
10   Laura Baker and FC Jim Critchley.

11       7.   When Carrie Clark returned to work in November 2014, the City's Human
12   Resources Department initially did not correctly process her return in a timely manner,
13   which resulted in leave accruals not being calculated correctly.  This was later corrected.

14       8.   When Carrie Clark went on light duty for her second pregnancy, she was
15   required to provide information from her personal doctor regarding her release for light
16   duty that included any type of physical restrictions.  The restrictions would also determine
17   the extent to which she could perform the standard exercise that is required for
18   commissioned personnel.  This is required of all TFD employees who go on light duty.
19   Carrie Clark was not treated differently regarding documentation for a medical condition
20   than other male and female employees who request light duty assignment.  This includes
21   other female commissioned personnel who request light duty due to pregnancy.

22       9.   Carrie Clark was instructed not to leave the location of her work at Fire
23   Central for exercising because there were adequate facilities at Fire Central where she
24   could exercise, there was no reason for her to leave the building to exercise and her
25   supervisors needed to be able to monitor when she was at work.  Most light duty personnel
26   typically do not exercise.  If they are assigned to Fire Central and chose to work out, they
27   must work out at that location.  The same policy applies to personnel assigned to the
28   Public Safety Academy, who must work out at that facility.  They can chose not to work

1   out during work hours, and then be free to go anywhere else. All light duty personnel are
2   subject to the same policy.

3      10.   When Gordon Clark ("G. Clark") was transferred he retained his rank as a
4   captain. His rate of pay was reduced because the rate for captains who are on regular four
5   or five day shifts is adjusted to be higher so that it is comparable to the pay an Operations
6   captain receives that includes automatic overtime and calculation over a distinct pay
7   period.

8      11   TFD moved other personnel to comply with the City's AD on nepotism
9   including suppression personnel.

10     12.   I was aware that Carrie Clark was reassigned from Fire Prevention to field
11  operations in April 2016, by Chief Critchley. As part of that reassignment, she was first
12  assigned to refresher training at the Public Safety Academy. This is standard procedure
13  for any fire suppression personnel who have been assigned to field operations for 6 months
14  or more whether it was for military deployment, light duty or some other reason.

15     13.   When Carrie Clark was at the refresher training course, she raised for the
16  first time her claim that she could not perform the essential functions of a regular duty
17  firefighter because of a hernia related to her pregnancy.

18     14.   I was not aware that Carrie Clark had any medical condition that limited her
19  work performance at the time she was reassigned to field operations or before she raised
20  the issue when she was at the refresher training course.

21     15.   Once she provided the appropriate documentation from her personal doctor,
22  she was reassigned to light duty.

23     16.   While Carrie Clark was on the 8-hour schedule for her light duty
24  assignment, she was compensated for holidays in the same manner as all other similarly
25  situated 8-hour shift personnel.

26     17.   The 24 hour shift for captains in field operations is calculated based on a
27  different work period and includes automatic overtime and holiday pay and shift
28  differential pay in their base compensation for the pay period. The compensation for the 8

4

1    hour shift captains does not include the same automatic overtime, holiday pay and shift

2    pay in each pay period. The hourly wage for captains has therefore been adjusted to be

3    lower for the 24 hour shift than the 8 hour shift because the 24-hour captain work 2912

4    hours per year and the 8-hr captains work 2080 hours per year.

5    18.    When Carrie Clark was working at Fire Central across from my office, I

6    asked her to stop by my office on June 15, 2016, to complete her paperwork for her

7    requested voluntary demotion to firefighter and participation in the $150 paramedic

8    certification pay. She left the building without stopping at my office.

9    19.    On June 27, 2016, I again asked Carrie Clark to stop by my office. Carrie

10    Clark again did not. I could not assume that she wished to participate in the Paramedic

11    Pay program because it required her to perform paramedic duties on certain occasions

12    when she demoted to firefighter.

13    20.    Carrie Clark finally submitted her form for the $150 paramedic certification

14    pay on July 8, 2016 through her light duty supervisor. She was paid as of the next pay

15    period. That was consistent with other special payments such as second language pay and

16    is paid on the first pay period after submission of appropriate forms.

17    21.    Had Carrie Clark completed the forms when requested by me, she would

18    have received the $150 paramedic pay at the start of her demotion to firefighter. *(See*

19    Attachment 1, Emails regarding Carrie Clarks' paramedic assignment pay)

20    22.    TFD compensates employees for attendance at a deposition only when that

21    attendance is required on behalf of the City. It does not compensate employees for

22    attendance at depositions in personal matters or attendance that is voluntary on the part of

23    the employee.

24    I state under penalty of perjury that the foregoing is true and correct.

25    Executed on August 17, 2017.

26

27    JoAnn Acosta

28

5

# ATTACHMENT 1

**Carrie Clark - Re: Demotion**

| | |
|---|---|
| **From:** | JoAnn Acosta |
| **To:** | Carrie Clark |
| **Date:** | 6/27/2016 10:31 AM |
| **Subject:** | Re: Demotion |
| **Cc:** | Angela Scott;  Mike Garcia |

Thank you Carrie for coming in.  The demotion is effective this 6/26/16 as you saw on the PARF you signed. If you would like to be in the $150 Club, please submit the form. Please let me know if you have any questions.

Thanks,
JoAnn

> > > JoAnn Acosta 6/22/2016 5:38 PM > > >
Hi Carrie,

I have not heard from you after your call on Monday.  As I mentioned, the documents are here waiting for you to sign. I will be out tomorrow and possibly Friday so if you come by, please check in with Angela.

Again, if you have changed your mind and wish to withdraw your request, please let me know so I can advise the Fire Chief.

Thanks,
JoAnn

> > > JoAnn Acosta 6/15/2016 5:28 PM > > >
Carrie,

Since you left for the day without coming by and you are scheduled to be off tomorrow, please see Angela on Friday.  She will have the paperwork you need to sign.

If you have changed your mind and wish to withdraw your request, please let me know so I can advise the Fire Chief.

Thank you,
JoAnn

> > > JoAnn Acosta 6/15/2016 2:20 PM > > >
Carrie,

When you have a minute today, please come see me to complete your demotion paperwork.

Thank you,
JoAnn

**Clark 1002**

Carrie Clark - Fwd: Carrie Clark Paramedic Assignment Pay Form

**From:**        Chris Conger
**To:**          Clark, Carrie
**Date:**        8/16/2016 5:19 PM
**Subject:**     Fwd: Carrie Clark Paramedic Assignment Pay Form
**Attachments:** MX-M453U_20160708_154849.pdf

>>> Chris Conger 07/08/16 3:42 PM >>>

JoAnn,

Carrie asked me to send this PM assignment pay form to you.  We will deliver the original next week.

Thanks
Chris



# PARAMEDIC ASSIGNMENT PAY FORM

**DATE:**

**TO:** JoAnn Acosta      **FROM:**
HR Manager
Fire Administration      **EMPLOYEE #:**

**SUBJECT:** Paramedic Assignment Pay Program for 2016

Paramedic assignment pay of one hundred fifty dollars ($150.00) a month will be paid to commissioned Fire personnel who have promoted to and remain in the classification of paramedic. Additionally, paramedic assignment pay will be paid to commissioned Fire personnel in non-paramedic classifications who have completed initial probation and possess a current National/State certification (EMT-P), and are available to work one 24-hour shift per month as a paramedic.

I am requesting to participate in the Paramedic Assignment and Incentive Pay program. With this memorandum, I verify that I meet the above requirements.

Listed below is pertinent information regarding my status:

State Paramedic Certification Number: P- _59455_

CEP Expiration Date: _10 / 2017_

ACLS Expiration Date: _2018_

CPR Expiration Date: _4 / 2018_

Current TFD Assignment: _firefighter_

Signature: _Carrie Clark_      Date: _7/8/16_

DO NOT forget to fill out the information on the top right corner: Date, From, and Employee #. In order to assure that you will receive or continue to receive your assignment pay in a timely manner, we must be able to identify you with the right corner information, typed or legibly handwritten. Thanks in advance for your compliance.

**Clark 1004**

**From:** Nate Weber
**To:** cferrara17
**Subject:** Fwd: Demotion
**Date:** Tue, Aug 30, 2016 5:38 pm
**Attachments:** Gulotta, Joe.vcf (449)

Sent from my iPhone

Begin forwarded message:

> **From:** "Joe Gulotta" <Joe.Gulotta@tucsonaz.gov>
> **Date:** August 30, 2016 at 4:06:05 PM MST
> **To:**
> **Subject: Re: Demotion**
>
> Nate, there was not a lot of *"miscommunication, misinformation, and an inconsistent process"*.
> Like I said already, had Carrie simply met with JoAnn on April 15th when she was asked to
> instead of avoiding communicating with her she would not have miss a pay period ($69.23). This
> is on Carrie, not Fire HR.
>
> Joe Gulotta
> Assistant Chief
> (520) 837-7017(office)
> (520) 791-3231 (fax)
> joe.gulotta@tucsonaz.gov
>
> >>> Nate Weber                                    8/30/2016 3:20 PM >>>
> Chief, she wasn't told about needing to fill out the form to "remain" in the "yearly" $150 paramedic
> assignment until 6/27. She was directed to Angela Scott and resubmitted her completed form in
> 7/8. This was before the end of the pay period with time for processing, so therefor she should
> have received it on her 7/14 pay check without losing this pay.
> She should have been kept in or replaced in this program as quickly and easily as she was
> involuntarily taken out.
> Please retro pay her for this time and assignment pay, as there was lots of miscommunication,
> misinformation, and an inconsistent process.
> Thank you-
> Nate Weber
> TFFA 479
>
> Sent from my iPhone
>
> On Aug 30, 2016, at 10:51 AM, Joe Gulotta <Joe.Gulotta@tucsonaz.gov> wrote:
>
> > Nate, these dates support exactly what Fire Payroll did. E-mail dated April 15th
> > Carrie was working in the office across the hall from JoAnn and was asked to stop
> > by to make arrangements for the completing the demotion paperwork. Carrie left
> > the building without stopping in. JoAnn again reached out to Carrie to complete the
> > paperwork. JoAnn asked her on April 27th to submit a form if she was still
> > interested in being in the $150. Again no communication from Carrie to JoAnn
> > about her interest in remaining in the $150 club. We can not assume that a
> > paramedic demoting from the rank is interested in this benefit. The form came in on

**Clark 1005**

Thanks,
JoAnn
>>> JoAnn Acosta 6/22/2016 5:38 PM >>>
Hi Carrie,

I have not heard from you after your call on Monday.  As I mentioned, the documents are here waiting for you to sign. I will be out tomorrow and possibly Friday so if you come by, please check in with Angela.

Again, if you have changed your mind and wish to withdraw your request, please let me know so I can advise the Fire Chief.

Thanks,
JoAnn
>>> JoAnn Acosta 6/15/2016 5:28 PM >>>
Carrie,

Since you left for the day without coming by and you are scheduled to be off tomorrow, please see Angela on Friday.  She will have the paperwork you need to sign.

If you have changed your mind and wish to withdraw your request, please let me know so I can advise the Fire Chief.

Thank you,
JoAnn
>>> JoAnn Acosta 6/15/2016 2:20 PM >>>
Carrie,

When you have a minute today, please come see me to complete your demotion paperwork.

Thank you,
JoAnn

<Gulotta, Joe.vcf>

**Clark 1006**

July 8th and was processed for the next payroll period. That is consistent with how we process these and other special pays (second language...)

The e-mails below show that JoAnn reached out to Carrie multiple times to help with this transition. The request on April 15th was prior to the pay period Carrie demoted. Had she simply stopped in to see JoAnn she could have completed the $150 club paperwork when she signed her demotion paperwork. Instead she deliberately avoided JoAnn. Carrie's actions greatly contributed to her gap in this benefit.

Joe Gulotta
Assistant Chief
(520) 837-7017(office)
(520) 791-3231 (fax)
joe.gulotta@tucsonaz.gov

>>> Nate Weber                 8/29/2016 8:47 PM >>>
Chief,
To hopefully save you some time tomorrow, I got these emails from Carrie tonight. It seems she may have been notified of demotion paperwork and pm assignment pay on 6/27 and was referred to Angela Scott. Carrie submitted her paramedic assignment pay form on 7/8, this falls within the same pay period of which she demoted and was notified and therefore should have been eligible to receive her pm assignment pay.
She should be reimbursed the pm assignment pay she did not receive. The allowance was turned off from payroll the day she demoted and could have been turned back on just as easily. As I said before, I think it would have been appropriate and a courtesy to reach out to her & other employees with possibly a phone call notifying them of this potential loss of money and requirement for the "yearly" form to be resubmitted. It doesn't seem right to just assume they do not want to stay in it & take their pay away without contacting them first, after they had already submitted their form for the year.
I do agree that a "demotion checklist" might be helpful in assisting with this process & keeping it consistent.
Thanks for the discussion today.
Thank you-
Nate Weber
TFFA 479

Sent from my iPhone

Begin forwarded message:

> **From:** "Carrie Clark" <Carrie.Clark@tucsonaz.gov>
> **Date:** August 29, 2016 at 7:51:34 PM MST
> **To:** <Nweber@tucsonfirefighters.org>
> **Subject: Fwd: Re: Demotion**

>>> JoAnn Acosta 06/27/16 10:31 AM >>>
Thank you Carrie for coming in. The demotion is effective this 6/26/16 as you saw on the PARF you signed. If you would like to be in the $150 Club, please submit the form. Please let me know if you have any questions.

**Clark 1007**

# EXHIBIT 9



# MEMORANDUM

**DATE:** 12/15/11

**FROM:** Paul McDonough
Battalion Chief
Battalion 1, C-Shift

**TO:** Jim Critchley
Fire Chief
Tucson Fire Department

## SUBJECT:   FINAL PROBATION INTERVIEW

On **12/15/11, Carrie A. Clark** was interviewed for the position of **Paramedic**

The interview board consisted of:

> CHAIR:    **Battalion Chief Paul McDonough**
> MEMBER:  **Captain Edward Lopez**
> MEMBER:  **Captain Richard L'Heureux**

The board found: Paramedic Carrie Clark to have a competent and proficient knowledge base. Additionally, the board noted her dedication as a Paramedic for the Tucson Fire Department.

Individual's performance was:   ☒ SATISFACTORY      ☐ UNSATISFACTORY

Reschedule Board:   ☐ Yes   ☒ No

Reschedule Date: **N/A**

Concurrence: _____
                           Assistant Chief

(Original to Human Resources Manager)

Promotional Interview

**14-02543 COT000589**