# EXHIBIT 10

1            IN THE UNITED STATES DISTRICT COURT

2                     DISTRICT OF ARIZONA

3

4   CARRIE FERRARA CLARK,     )
                              )
5         Plaintiff,          )
                              )
6   v.                        ) NO. 4:14-CV-02543-TUC-CKJ
                              )
7   CITY OF TUCSON,           )
                              )
8         Defendant.          )

9

10

11

12

13          VIDEOTAPED DEPOSITION OF CARRIE FERRARA CLARK

14                      Tucson, Arizona

15                      May 25, 2016
                        10:12 a.m.

16

17

18

19

20

21

22

                     COLLEEN KELLY, RPR
23                    CR #50386 (AZ)
              EATON, GREEN & WILLIAMS, INC.
24                549 North Sixth Avenue
                  Tucson, AZ  85705
25            (520)623-0593    800-759-9022

1    A.   This was a memo that Chief McDonough asked

2    me to write to formally request the situation going

3    on with Station 12.

4    Q.   Is everything in that true and correct?

5    A.   Yes, it is.

6    Q.   And did you do that on the date that is

7    noted at the top?

8    A.   Probably.  I would say either -- depending

9    on what time I sent it.  Maybe I wrote it the night

10   before.  But I would say that's probably very

11   accurate.

12   Q.   Let me show you Exhibit 4 and ask if you are

13   familiar with that document?

14   A.   Yes.

15   Q.   And this is not something you prepared; is

16   that correct?

17   A.   Correct.

18   Q.   Do you recognize the name Martina -- Marty

19   Macias?

20   A.   I do.

21   Q.   Do you recall talking with her on January 7,

22   2013?

23   A.   I do.

24   Q.   When did you review this last?

25   A.   This particular?

1    Q.   Yeah.

2    A.   That I can't tell you.   I think I have maybe

3  only seen this one and reviewed it once.

4    Q.   You're -- you're referring to throughout the

5  document, this is the report of what you told Ms.

6  Macias.   Is there anything in this document that you

7  believe is an inaccurate reflection of what you told

8  Ms. Macias?

9    A.   Do you mind if I browse through it real

10  quick?

11    Q.   Yes, please do.   And with any of the

12  exhibits, if you want to take time and go through

13  them, that's fine.

14    A.   Okay.

15        MR. JACOBSON:   Mike, do you want to go off

16  the record, so we're not wasting tape?

17        MR. McCRORY:   Sure.

18        THE VIDEOGRAPHER:   Going off the record.

19  The time is 10:19.

20        (Recess taken from 10:19 a.m. to 10:21 a.m.)

21        THE VIDEOGRAPHER:   We are back on the record

22  at 10:21.

23    Q.   (By Mr. McCrory)   Ms. Clark, you've had a

24  chance to look at Exhibit 4; is that correct?

25    A.   That's correct.

1    Q.   And is there anything in there -- and,

2    again, I'm not asking you to testify regarding what

3    Ms. Macias has said or her opinions, but with respect

4    to what she relates as you saying to her, is all that

5    true and accurate?

6    A.   Correct.

7    Q.   Would you take a look at Exhibit 5?  And

8    this is 5, and also the next one are also

9    Ms. Macias's record of your conversations.

10   A.   Uh-huh.

11   Q.   Do you want to go off the record?

12   A.   If you don't mind, yes.

13        THE VIDEOGRAPHER:  Going off the record at

14   10:22.

15        (Recess taken from 10:22 a.m. to 10:29 a.m.)

16        THE VIDEOGRAPHER:  We are back on the record

17   at 10:29.

18   Q.   (By Mr. McCrory)  And would you -- you have

19   now had a chance to look at Exhibit 6; is that

20   correct?

21   A.   Correct.

22   Q.   Is that the first one?

23   A.   Five.

24   Q.   Five.  Okay.  And that's dated January 7,

25   2013?

1    A.   January 16th, Exhibit 5.

2    Q.   Is that also a memorandum from Martina

3    Macias?

4    A.   Correct, it is.

5    Q.   And Ms. Macias was an employee of the City's

6    office of economic equal opportunity programs?

7    A.   Yes.

8    Q.   Office of Equal Opportunity Programs?

9    A.   Yes.

10    Q.   Which is under the initial -- or at that

11    time was under the initials OEOP?

12    A.   Correct.

13    Q.   That's a separate independent office from

14    the Tucson Fire Department?

15    A.   Yes.

16    Q.   And they take complaints about

17    discrimination or workplace problems?

18    A.   Yes.

19    Q.   And you contacted her on this date; correct?

20    A.   On January 7th.

21    Q.   On January 7th.  Also on Exhibit 5, on

22    January 16th?

23    A.   Yes.  This was a follow-up we did.

24    Q.   And is everything in there that you related

25    to her a correct representation of what you told her?

1    A.   Yes.   I think there were a few other little

2    pieces I might have said during it, but nothing is

3    incorrect, I just think there might have been a few

4    little pieces that were left out.

5    Q.   Okay.   Did you also provide her documents?

6    A.   I did.

7    Q.   And those are the ones referred to on pages

8    two and three?

9    A.   Yes.

10    Q.   Would you take a look at Exhibit 6?

11    A.   Uh-huh.

12    Q.   And you had a chance to review that exhibit?

13    A.   Correct.

14    Q.   That's also to Ms. Macias?

15    A.   That's correct.

16    Q.   That has a date of March 8, 2013?

17    A.   Yes.

18    Q.   Did you talk with Ms. Macias on March 8,

19    2013?

20    A.   Yes.   She phoned -- phoned me at home and we

21    spoke on the phone.

22    Q.   We are going to go into them in more detail

23    later on.

24    A.   Okay.   Sure.

25    Q.   Is everything that she relates you said to

1  her correct -- true and correct?

2      A.   Yes, with the exception I think there was a

3  few things I might have elaborated on a little bit

4  further, but...

5      Q.   And I understand this may not be a complete

6  record.

7      A.   Okay.

8      Q.   My questions are really whether everything

9  in here is accurate --

10     A.   Yes.

11     Q.   -- not whether you may have said more.

12     A.   Sure.

13     Q.   Okay.

14          And Exhibit 8?

15     A.   Seven.

16     Q.   Is that also a record from Ms. Macias?

17     A.   It is.

18     Q.   And did you talk to Ms. Macias on March 12,

19  2013?

20     A.   I did.

21     Q.   And is that a true and correct

22  representation of what you told Ms. Macias?

23     A.   The only thing I think that was possibly

24  heard wrong is when -- the fourth paragraph down,

25  when I was talking about --

1     Q.   We're on page two?

2     A.   Page two, yes.

3          In the middle of that, yeah, right there,

4 when I was talking about Chief Baker, she quoted

5 "easy truck" and it's EC, the initials EC, not easy.

6     Q.   Okay.  Anything else?

7     A.   Not that I saw.

8     Q.   Let me show you Exhibit 8.

9          Are you familiar with that document?

10    A.   I am.

11    Q.   And is that a complaint you filed with the

12 Arizona Civil Rights Division?

13    A.   Yes.

14    Q.   Is that your signature on the bottom?

15    A.   Yes.

16    Q.   Is everything in that document true and

17 correct?

18    A.   Yes.

19    Q.   Let me show you Exhibit 9.

20         Are you familiar with Exhibit 9?

21    A.   Yes.

22    Q.   Is that a memorandum that you sent to Tim

23 Nofs, Battalion Chief, on July 27, 2013?

24    A.   Yes.

25    Q.   Is everything you stated in there true and

1   to the City.

2        A.   Uh-huh.

3        Q.   Is that correct?

4        A.   Yes.

5        Q.   And the first part of that has, starting on

6   page one, Factual Basis for the Claim, which goes

7   through page six.

8             Would you take a moment to review that?

9        A.   Of course.

10            MR. McCRORY:  We can go off the record.

11            THE VIDEOGRAPHER:  Going off the record at

12   10:35.

13        (Recess taken from 10:35 a.m. to 10:38 a.m.)

14            THE VIDEOGRAPHER:  Back on the record at

15   10:38.

16        Q.   (By Mr. McCrory)  With respect just to the

17   factual basis of the claim on pages one through six,

18   are all the facts set forth in that document true and

19   correct?

20        A.   Yes.

21        Q.   Let me show you Exhibit 12.

22             Is that a memorandum that you wrote to

23   Chief Tim Nofs on June 19th, 2014?

24        A.   Yes.

25        Q.   And is everything in there true and correct?

1    A.   Yes.

2    Q.   And you authored that document?

3    A.   I did.

4    Q.   Let me show you Exhibit 13.

5         Can you describe what that document is?

6    A.   This was the complaint I filed with the City

7    Manager's office, a wrongful conduct complaint.

8    Q.   And is everything in there -- did you write

9    the pages --

10   A.   I did.

11   Q.   -- that are attached to that?

12        And is everything in there true and

13   correct?

14   A.   It is.

15   Q.   Let me show you Exhibit 14.

16        Are you familiar with Exhibit 14?

17   A.   I am.

18   Q.   Is Exhibit 14 an interview you had with

19   Matthew Larsen on April 29, 2015?

20   A.   Yes.

21   Q.   And was that interview in response to a

22   complaint that you had filed with the City's OEOP

23   office?

24   A.   Yes.

25   Q.   And Matthew Larsen works with the City's

1        A.    Very.

2        Q.    And it was something you weren't

3  particularly comfortable discussing with everybody?

4        A.    Correct.

5        Q.    Given that, you knew that you would be

6  coming back on swing shift?

7        A.    Yes.

8        Q.    And that you would have to go to different

9  places?

10       A.    Yes.

11       Q.    That's what a swing shift does?

12       A.    Correct.

13       Q.    And you talked to Paul McDonough prior to

14  coming back about some of those issues; correct?

15       A.    Correct.

16       Q.    When you did come back, what were you

17  expecting in terms of what the facility would have

18  for expressing milk?

19       A.    Well, what I had asked him before was if

20  there was any long-term openings, if somebody's

21  injured, if somebody's off for a while, that I could

22  stay in one spot.   Because switching trucks midday

23  every other day just -- it seemed like that was going

24  to be a little bit more of a hassle, you know,

25  lugging everything around.

1          I didn't really know what I expected.  I

2   just knew that I needed a private room.  And what I

3   meant at that time by a private room was my own dorm

4   room.  So that way I was away from everybody.  I

5   didn't want everybody knowing what I was doing.

6          So my expectation, I guess if that's what

7   you're asking, was to basically just be somewhere

8   where I had my own dorm room.

9   Q.   When you did return, you -- let me show you

10  Exhibit 22.

11          Are you familiar with Exhibit 22?

12  A.   I'm sure I have seen it.  I can't say that I

13  am familiar with it.

14  Q.   Did you provide Answers, facts that would be

15  responding to the Interrogatories?

16  A.   Yes.

17          MR. JACOBSON:  Object.  Hold on.  I'm going

18  to object.  It's really close to the privilege line.

19          MR. McCRORY:  I know it's really close.

20          MR. JACOBSON:  It's really close to the

21  privilege line.  So I'm going to ask to strike that

22  answer.

23  Q.   (By Mr. McCrory)  Let me ask you to take a

24  look at Interrogatory Number 2.

25  A.   On the first page or?

1     Q.    Yeah.

2           Did you review these Interrogatories

3     before they were sent to the City to determine

4     whether they were true and correct?

5     A.    Yes.

6     Q.    Okay.  Are they true and correct?

7     A.    I would have to read through each one again,

8     but I --

9     Q.    Okay.  Would you do so?

10    A.    Sure.

11          MR. McCRORY:  We can go off the record.

12          THE VIDEOGRAPHER:  Going off the record at

13    11:04.

14          (Recess taken from 11:04 a.m. to 11:06 a.m.)

15          THE VIDEOGRAPHER:  Back on the record at

16    11:06.

17    Q.    (By Mr. McCrory)  Have you had a chance to

18    review the Plaintiff's Responses to Defendant's First

19    Set of Non-Uniform Interrogatories and Request for

20    Production of Documents?

21    A.    Yes.

22    Q.    And are all the facts stated therein true

23    and correct?

24    A.    Yes.

25    Q.    Would you look at number 2, that says --

1    there's a question about whether any station that you

2    were assigned to, excluding a captain's room or -- a

3    captain's room, where -- state each and every station

4    where you were assigned there was not a room

5    available that allowed you privacy and the ability to

6    express milk unobserved.

7              And you state the only two stations were

8    Stations 7 and 9; is that correct?

9         A.   Can you tell me which --

10        Q.   Number 2.

11        A.   Oh.   Which page?   Sorry.

12        Q.   Page three.

13        A.   Can you ask me what you were asking me

14   again?   I'm sorry.

15        Q.   Are Stations 7 and 9 the only stations that

16   you were assigned to that did not have a -- what you

17   considered an acceptable private room for expressing

18   milk?

19        A.   Yes.

20        Q.   And Station 7 had a room that was a dorm

21   room; is that correct?

22        A.   They had one room that was made -- so they

23   added a medic truck and then they built like a

24   makeshift, so it was a dorm style with two beds in

25   it.   All the other rooms were single dorm rooms.

1    correct?

2        A.   Against their will, I'm sure I could have.

3        Q.   Or the chief or the captain could have said

4    that's what they have to do; correct?

5        A.   Sure.

6        Q.   So it's possible that Station 7 could have

7    served as a place where you could have expressed milk

8    unobserved in a closed room?

9        A.   With the exceptions you said, yes.

10        Q.   With Station 9 there was a study room,

11    wasn't there?

12        A.   Yes.

13        Q.   And you could have used that study room as a

14    place that was closed and you could have expressed

15    milk unobserved; correct?

16        A.   Well, that room had a door with a window in

17    it.

18        Q.   And you could have covered up the window;

19    correct?

20        A.   Okay.   Yeah.

21        Q.   So that room, that station also had a place

22    that physically could have met your needs?

23        A.   It could have.   The issue with that is if --

24    the study is technically where you do reports, where

25    you do --

1   constantly, excuse me, found with MRSA, fecal matter,

2   other types of disease, you know, type organisms that

3   you don't want to contract.

4           So I would never take my equipment and

5   set it up in a room where I'm expressing milk for a

6   child without cleaning a room that somebody just sat

7   in with possibly dirty hands, if someone's sitting on

8   the desk, if they happen to have blood, you know, on

9   their pants that they didn't know about it, they're

10  sitting on the desk, I'm supposed to put my equipment

11  here.

12          So a lot more goes into it than just

13  walking into a room and doing my thing.

14      Q.   These are private rooms where people are

15  living, not their working quarters; correct?

16      A.   The study is technically a working quarter.

17      Q.   But the dorm rooms would be places they were

18  living?

19      A.   Correct.

20      Q.   And Station 9 also had dorm rooms?

21      A.   They have curtains.  They're not -- I

22  wouldn't consider them a dorm room.  It's the

23  makeshift style beds, divided by a curtain.  There's

24  no walls that go to the ceiling.  You basically have

25  a curtain.  Most of them don't even have like a desk

37

1  surface to set anything on.

2      Q.   Isn't there a curtain that completely covers

3  the entrance out to the hall, so that the room that

4  you're in is -- you can't be observed from the hall

5  or any other place?

6      A.   I mean, it's not like ceiling to floor

7  curtains. But there's a curtain, yes, that you can

8  pull across.

9      Q.   And you can pull it across so it's clear

10 that people shouldn't enter, or you could put a sign

11 up saying not to enter?

12     A.   I could.

13     Q.   So you could have used a dorm room in

14 Station 9?

15     A.   I wouldn't say it's free from intrusion.  I

16 mean, people walk by, and the curtains can -- you

17 know, they move, you know.  So I didn't even change

18 in those rooms most times when I was there.

19     Q.   Could have done something to hold the

20 curtain in place?

21     A.   Sure.

22     Q.   Okay.  And then there's the study that you

23 were -- you could have used the study but that had

24 other people using it?

25     A.   Correct.  And a window.

1     Q.   And those people could have been asked to

2   leave; correct?

3     A.   Sure.

4     Q.   Was there any time you were denied time to

5   express milk?

6     A.   I don't believe I was ever told, no, you

7   can't go pump.  Circumstances permitted me from doing

8   it, getting a call, or something like that.  Having

9   to go to an in-service for a new gurney when I needed

10   to, but, you know.

11     Q.   And was that just a temporary delay in when

12   you would pump?

13     A.   It was a few hours. But that was probably

14   one of the more significant situations that happened.

15   But, like I said, I put work first, and we went and

16   did what we did and I did what I had to do later.

17     Q.   But there wasn't any time that somebody

18   actually said you can't have time to go pump?

19     A.   No.

20     Q.   You've also alleged claims against Tucson

21   Fire, that there was sexual discrimination and

22   retaliation; is that correct?

23     A.   Yes.

24     Q.   And we went through Exhibit, I believe it

25   was Number 8.  It was your -- a complaint you filed

```
1    equipment in and out of different stations.
2         Q.    Did you know how long that would be open?
3         A.    I did not.    When I initially -- I spoke to
4    Chief McDonough before I sent the e-mail, and asked
5    if there were any openings at that time, and they
6    mentioned Station 20.
7              It was being filled by another swing
8    paramedic at the time.    Initially I was told it was
9    until Andy Pashos came back from deployment.    But
10   actually there was like a second part to that that
11   kind of changed that whole situation.
12        Q.    Do you know if he extended his deployment?
13        A.    He did extend his deployment.    But the
14   difference -- and I don't recall exactly how it
15   played out, but Andy Pashos was on C shift, there was
16   another paramedic on B shift.    Somehow they bid to
17   each other's -- I don't remember if there was a
18   redeployment or someone -- everyone else bid.
19             So the B shift medic actually won Andy
20   Pashos's spot.    And as the end of the year came up,
21   this other paramedic had already put in his vacation
22   request for the following year, so when it came
23   closer to December, he was waiting to be transferred
24   shifts.
25             And I worked with him one day, and he
```

54

1    Q.   And at that point you had a conversation

2 with Jeff Todd?

3    A.   Correct.

4    Q.   And from that you decided that you would

5 prefer to stay at Station 12 rather than Station 20?

6    A.   Because of what -- the events of that day.

7 It wasn't just I just decided that day.  I had ran

8 into -- that was the first day I was away from my

9 child.  That was the first day I realized the milk

10 issue.  My mom, like I said, came by three different

11 times on that day, and that was kind of the first

12 time I realized this isn't -- this isn't going like I

13 thought it was going to go.  There's an issue here.

14        And I was talking about that with Jeff

15 Todd.  He was a friend of mine.  And that's when he

16 kind of mentioned his side of the story and offered

17 up, you know, I've been thinking about leaving here.

18 And that's how that whole situation transpired.

19    Q.   Did he tell you whether he had any problems

20 with anybody at that station?

21    A.   He had briefly talked about having personnel

22 issues with the captain that was there at the time.

23 These were issues from months before.  We didn't go

24 into a lot of details about that.  He just told me

25 that he didn't really care to work for that captain.

1          There was some dealings or something with
2     an evaluation.  He was thinking about leaving for
3     that reason.  And so that's when he said, well, maybe
4     if I leave here, I can just go out to swing, take
5     your spot on swing, and they can leave you here for a
6     while.
7          Q.   Let me ask you to go back to Exhibit 2.
8     Exhibit, yeah, 2.
9          A.   (Witness complies.)
10         Q.   That shows that on the 27th you were
11    assigned to Station 12; is that correct?
12         A.   Yes.
13         Q.   But your next day of work would have been
14    the 29th?
15         A.   Yes.
16         Q.   Did you store up any milk in between the
17    27th and the 29th?
18         A.   Best I could.
19         Q.   Were you able to store up much?
20         A.   I don't recall exactly how much.  But I
21    definitely pumped the entire shift.  What my mom
22    didn't take that same day, I brought home with me.  I
23    pumped after every time I nursed my baby at home.
24    And then I pumped throughout the night on the 28th,
25    when I wasn't nursing my child, to try and save it up

1        A.   He said, seems like a good idea, you know,

2    to me.  He saw no problem with it.  We talked

3    multiple times about it.  He said he was going to

4    talk to Chief Rodriguez about it.  This whole memo

5    came about because he said go ahead and send it up to

6    me in a memo and we'll see what we can do.

7        Q.   Why would he talk to Chief Rodriguez about

8    it?

9        A.   Chief Rodriguez at the time was the Deputy

10   Chief of Operations, who was above Chief McDonough.

11   He was my battalion chief, my supervisor.  And then

12   Chief Rodriguez technically oversees operations.

13       Q.   And what was Chief McDonough's position at

14   that time?

15       A.   He felt -- he agreed that --

16       Q.   No.  What area did he cover?

17       A.   Oh, well, he was the Battalion 1 Chief.

18       Q.   Okay.

19       A.   And I was technically a Battalion 1 swinger.

20   So he was my -- so he -- yeah.

21       Q.   Was Station 12 in Battalion 1?

22       A.   No.

23       Q.   So he couldn't make an assignment to Station

24   12 anyway, on a temporary basis?

25       A.   He can, actually.  Those kind of things

1  don't have to go through a Deputy Chief.  They can --

2  battalion chiefs -- battalion staffing is done at

3  Battalion 1 headquarters. So like Captain L'Heureux

4  was our staffer, and then if he had an issue --

5  L'Heureux could even assign somebody temporarily

6  somewhere.  If we're talking pumping --

7       Q.   Without the approval of the battalion chief

8  for that area?

9       A.   Depending on the situation.  If it's a few

10  shifts, if somebody's off for a tour, Captain

11  L'Heureux can absolutely plug somebody in without

12  having to obtain approval.

13           If it comes to bumping somebody else,

14  displacing somebody, something else that might fall

15  within a rule, then it has to be higher up.

16       Q.   You understood that there was an issue with

17  moving Jeff Todd, didn't you?

18       A.   At the time of this situation -- what do you

19  mean, an issue with moving him?

20       Q.   There was a management issue?

21       A.   Not at the time, I did not.  Jeff did not

22  express that there was any sort of situation going

23  on.  I don't believe I knew that there was an issue

24  about saying he was being moved until Nied and

25  Rodriguez told that to me.

1     Q.   You were aware, even on November 9th, that

2  the policy was that positions could not be swapped by

3  individual staff member firefighters; correct?

4     A.   I do understand.  But the way I --

5     Q.   And you knew that at the time you were

6  writing this memo?

7        MR. JACOBSON:  Objection, form and

8  foundation.

9          You've got to let her finish her answer.

10    Q.   (By Mr. McCrory)  Correct?

11    A.   I had a little bit more to say about it

12  than --

13    Q.   But did you know that when you were writing

14  this memo?  I understand that you think there were

15  exceptions to that and we'll get into that.

16          What I'm asking is whether you understood

17  at that time the standard policy that they would not

18  recognize swaps from individuals?

19    A.   I know that it says in the manual no

20  member-initiated swapping of positions.

21    Q.   And did you know that at the time when you

22  started -- when you wrote this memo to Paul McDonough

23  in Exhibit 3?

24    A.   Yes.

25    Q.   Did you think that there were alternatives

1        A.   Okay.

2        Q.   And you say that's proper and they can do

3    that?

4        A.   Right.

5        Q.   So what in this conversation on November

6    13th shows bias or prejudice by either Ed Nied or Rob

7    Rodriguez?

8             MR. JACOBSON:   Objection.   Form and

9    foundation.

10       A.   There's a lot more to that conversation than

11   just that piece of it.

12       Q.   (By Mr. McCrory)   Okay.   Tell me about it.

13       A.   There was more talk about -- I think it was

14   Nied that said, well, I don't understand what the

15   problem is.   I've seen women before, you know,

16   pumping and stuff on the job.

17             Like I said, they downplayed pretty much

18   the whole situation.   No, this is just a convenience

19   issue.   I mean, when we walked out of that room, my

20   chief said I felt they were very insensitive.

21       Q.   Who is that?

22       A.   McDonough.   Paul McDonough.

23       Q.   Was it unreasonable for Chief Nied to talk

24   to you about having seen a number of women previously

25   deal with this without problem?

1      A.    It was -- I think it's an ignorant statement

2   to make because no two women are going to have the

3   same experience.   And as a man that hasn't been

4   through it, he may not understand that.   So if I was

5   trying to explain something to you that I have never

6   been through, and you know that I don't understand

7   it, it's a little bit frustrating to deal with, you

8   know.

9              Maybe he meant good by it, maybe he

10  didn't.   I don't know what his intention was.   All I

11  can tell you is the way that that conversation went

12  was not very nice.

13     Q.    You didn't want to be questioned about --

14     A.    I didn't want to be compared to other women

15  because I'm not the other women, they're not me, they

16  haven't been in my situation, and they're two totally

17  different things.

18     Q.    Okay.   But you just said that -- you just

19  accused him of making an ignorant statement, that he

20  should have asked questions, and yet you're

21  complaining that he asked questions.

22              So I don't understand what's the problem

23  with him asking you why you're different than the

24  other women who didn't have a problem.

25              MR. JACOBSON:   Objection, form and

1    foundation.

2        A.    You asked, I think, if it was inappropriate,

3    or I don't remember what word you used.   And I said

4    it was more just on the ignorant side of him not

5    understanding what it is.

6        Q.    (By Mr. McCrory)  So he's trying to find out

7    why you're different from the other women.   What's

8    wrong with that?

9            MR. JACOBSON:   Objection, form and

10   foundation.

11       A.    I don't know if that's what he was trying

12   find out, or if he's trying to say, well, they did

13   it, why can't you?  You can take it different ways.

14       Q.    (By Mr. McCrory)  So if you don't know, then

15   you can't make any judgments that's an indication of

16   bias or prejudice?

17       A.    And I also can't make a judgment that it's

18   not.

19       Q.    Was it unreasonable for him to raise whether

20   this was convenience, given that you had already

21   raised that yourself as one of the factors?

22       A.    They didn't raise that.   Basically that was

23   their only conclusion of it.  And I don't think that

24   that was appropriate because there was a lot of other

25   issues discussed besides that one.

1    Q.   And do you think that was because you are a

2  woman or because of your individual situation?

3    A.   That I don't know.  That you'd have to ask

4  them.

5    Q.   Didn't you just say that you were much

6  different than others and not like the others and

7  didn't want to be compared with the others?

8        MR. JACOBSON:  Objection, form and

9  foundation.

10           That's not what she testified to.

11    Q.   (By Mr. McCrory)  Your situation was very

12  different?

13    A.   As far as I know, yes.

14    Q.   So it would be reasonable for them to

15  inquire into that?

16        MR. JACOBSON:  Objection, form and

17  foundation.

18    A.   Inquiring is one thing, comparing is a

19  different one.

20    Q.   (By Mr. McCrory)  And you didn't think you

21  should be compared to any of the other women?

22    A.   I don't.

23    Q.   Anything else in that conversation that in

24  any way indicates that Chief Nied was biased or

25  prejudiced against women?

1   taken sick leave to not go in.

2       Q.   On March 20th did you take sick leave that

3   evening shift that you were scheduled to go to

4   Station 9?

5       A.   Yes, I did.

6       Q.   Was there any other time that you took sick

7   leave to avoid going to a specific station?

8       A.   I can't say a specific station, but I can

9   say that I took it with the anticipation of there not

10  being one the next day.

11      Q.   But you didn't know which station you would

12  be assigned to the next day?

13      A.   Correct.

14      Q.   Correct.  And then --

15      A.   But judging by what was open, nothing the

16  night before was open that would have been able to

17  accommodate.  So not knowing if someone was going to

18  call in sick or where an opening would have been the

19  next day, the next morning, it was more, you know,

20  easier for me to just, okay, I just won't go in

21  because I don't want to go through the we're going to

22  move somebody kind of thing.

23      Q.   When you decided not to go in and take sick

24  leave, did you communicate to anybody the reason why

25  you were doing that?

1      A.   I did.

2      Q.   And who did you communicate that to?

3      A.   Captain L'Heureux, Rick L'Heureux.

4      Q.   And what did you tell him?

5      A.   I said after I had gotten off the phone the

6  first time with Chief Fishback, Chief Rodriguez and

7  Joanne, I called Captain L'Heureux, and I said --

8      Q.   Now are you referring to March 20th?

9      A.   Yes.

10     Q.   Okay.  I want to go back before that, the

11  period from October to March 20th.

12     A.   Okay.

13     Q.   During any of those times, you said there

14  were less than six times when you took sick leave

15  instead of coming in?

16     A.   Okay.

17     Q.   As I understand it, you didn't know exactly

18  which stations were open, you looked at those and

19  decided rather than worry about which one it was, you

20  were going to sick leave?

21     A.   Or leave.

22     Q.   Take leave?

23     A.   Correct.

24     Q.   Did you communicate to anybody on those

25  occasions the reason why you were taking leave?

1    A.   No.   Usually because I'm on swing, I could

2    put in for a vacation on my own from home.

3    Q.   And I believe in one of the memos it talks

4    about you relayed that you didn't tell all of the

5    staffers who would make the assignments about your

6    need to express milk; is that correct?

7    A.   I personally did not, no.

8    Q.   Do you know if they all knew?

9    A.   That I don't.  I know some of them did, and

10   I can also tell you that not every one of those

11   people worked there every day.  So some days there

12   was an extra duty person, some days there was a swing

13   person.  So there's not always consistently the same

14   people doing that position.

15   Q.   So there might be somebody doing the

16   assignment of swing shifts who had no idea you needed

17   a place to express milk?

18   A.   Correct.

19   Q.   Going back to the conversation you had with

20   Ed Nied and Rob Rodriguez on November 13th.

21   A.   Uh-huh.

22   Q.   As I understand it, you left feeling that

23   they had been unfair to you?

24   A.   Correct.

25   Q.   But you can't specify any specific comment

```
 1   you to stations where you have to use the bathroom to

 2   pump.

 3              First of all, did you ever go to a

 4   station where you had to use the bathroom to pump?

 5        A.   No.

 6        Q.   What stations did he assign you to where

 7   that would have had to occur?

 8        A.   Station 9 and Station 7.

 9        Q.   And it continues to say when she asks to be

10   assigned to another station, he would sometimes do

11   that, but has been complaining to others that he does

12   not understand why you need special accommodations.

13              Who were the others that you were told

14   that he had been complaining to?

15        A.   So a captain at Station 1, one random point

16   during the day I was working down there said, so,

17   Captain L'Heureux's really going out of his way to

18   accommodate you.

19        Q.   Who is that captain?

20        A.   Chris Pena.  P-E-N-A.

21              And I tried to kind of avoid, you know,

22   whatever.  I mean, I don't want to talk about it with

23   people that I don't need to talk about it with.

24        Q.   When Captain Pena said that it appeared Rick

25   L'Heureux was going out of his way for you --
```

1      A.   Uh-huh.

2      Q.   -- did he say that Rick L'Heureux was

3  complaining about that?

4      A.   That was his statement.  Just as simple as

5  that.  He didn't say Captain L'Heureux is complaining

6  to me.  But I don't -- I mean, is that what you're

7  asking --

8      Q.   Yeah.

9      A.   -- if he said that word? No.

10     Q.   So do you know whether Captain L'Heureux

11  complained to anybody else about how he had to assign

12  you?

13     A.   I know that when my husband spoke to him

14  about it, this was I think the whole Station 7

15  situation, and it was with my husband, it was with --

16     Q.   Station 7?

17     A.   Correct.  When I was assigned to medic 47.

18     Q.   Okay.

19     A.   He had made the statement to my husband, I

20  don't know the context of the whole conversation, but

21  he made the comment, I don't know why she needs

22  special accommodations, or something to that effect.

23           When he assigned me to medic 47, that

24  chief there interjected, was like, she can't come

25  here.  And they somehow got on the phone with

1   L'Heureux, with Chief Quinn, was his name, and they

2   went back and forth about me being assigned to medic

3   47.   And he didn't say to me, because I wasn't there,

4   but --

5       Q.   Do you know why Captain Quinn said that you

6   couldn't go there?

7       A.   Chief Quinn?

8       Q.   Chief Quinn.

9       A.   Because medic 47 was a dorm-style room that

10  I shared with another guy.   And that was the only

11  room I would have had available.

12      Q.   So that was unrelated to your expressing

13  milk that he didn't want to share a room with a

14  female?

15      A.   No.   He knew I needed to pump.   He knew that

16  whole situation.   And they knew that I wasn't going

17  to have a private dorm room, I was going to be in a

18  dorm shared with another employee, and that that

19  wasn't suitable.

20      Q.   Were you sharing it with a male or sharing

21  it with a female?

22      A.   I would have been sharing it with a male.

23      Q.   When did this occur?

24      A.   I don't remember the exact day.

25      Q.   Was this before the March 20th?

1    A.   I believe it would -- yeah, it had to have

2    been.  It was when I eventually -- I worked -- they

3    swapped me to Medic 20 that day, so it would have

4    been in January or in February or March.  I don't

5    know if there's actually a few times I was assigned

6    to 20.  So I can't tell you specifically, without

7    looking back.

8        Q.   But you did, in fact, work at Station 7 one

9    time; right?

10       A.   One time I did, on Medic 7.

11       Q.   What did you do to pump at that time?

12       A.   Medic 7 I had my own dorm room.  I had a

13   private dorm room.

14       Q.   Other than the comments to your husband,

15   Gordon Clark, and Chris Pena, do you know of any

16   other comments or complaints by Rick L'Heureux?

17       A.   I don't know specifically if I can tie them

18   back to him, but he being the one that staffs me, I

19   just heard chatter that people knew that I was

20   being -- that there was a situation going on with me,

21   that they were trying to accommodate me.  And, like I

22   said, I can't tell you that they said, oh, Captain

23   L'Heureux told me this, except for Captain Pena.

24       Q.   If you would take a look at the second page

25   of that.

1   best not to bump anybody out.

2       Q.   Who were the mutual friends that you were

3   talking about?

4       A.   That were at 20 that day?

5       Q.   Uh-huh.

6       A.   Geez.

7       Q.   Or were they at 20 that day?  Or was this

8   some other conversation?

9       A.   No.  Somebody said something to me when I

10  got to 20, and I can't remember -- I'd have to look

11  at the roster and tell you who it was and then --

12      Q.   Anybody else who you specifically know got

13  mad because they had to accommodate you?

14      A.   Well, I said Andrew Grimes, and when I got

15  to 6.

16      Q.   Anybody else beside Joe Nielson and Andrew

17  Grimes?

18      A.   Not that I can think of.

19      Q.   You said you were going to -- not going in

20  the morning shift on March 20th?

21      A.   Correct.

22      Q.   But you were told to see what was available

23  for the afternoon shift?

24      A.   Sort of, yes.

25      Q.   What was available for the morning shift?

1      A.   8 and 9.

2      Q.   8 and 9.

3           When did you start to call Chief

4    Rodriguez?

5      A.   Around noon-ish.   I'd have to look at the

6    time, you know, specifically, but it was around

7    noon-ish.   Because I logged onto TeleStaff and saw

8    that I had been reassigned back to Station 9.   So I

9    called Chief Rodriguez, I think, both times.

10     Q.   Why did you call Chief Rodriguez?

11     A.   Because he was the next up in the chain of

12   command.   McDonough was off, who would have been my

13   supervisor, and Chief Rodriguez, as he oversees

14   operations, I went to him because I felt liking

15   because I was assigned to 9 again, that there was

16   either a not understanding, you know, of the

17   situation or what I needed, and so I wanted to

18   address it with him.

19     Q.   When was the first time you were assigned to

20   9?

21     A.   I don't recall the date.   It was one of

22   these times I talked to Martina, I told her it was

23   two weeks before that.   So it was sometime probably

24   January, February.

25     Q.   Did you go to 9 on that occasion?

1       A.    Sure.

2       Q.    So it's not true you never talked to him

3   that day?

4       A.    Well, I never got through to him.  I mean,

5   he got on the phone eventually, but I called him for

6   five hours and couldn't get ahold of him.

7       Q.    Do you know if he was in headquarters?

8       A.    I know he was gone part of the day.  And

9   then another part of the day I talked to Veronica,

10  who's one of the HR assistants down there, and I

11  asked her, I said, do you know if Chief Rodriguez is

12  there, and she said, yeah, I can see him.  And then

13  Joanne got back from whatever they were teaching at

14  the academy, and she said, yeah, he's here, I just

15  saw him.

16      Q.    What time was that?

17      A.    Before -- it was probably close to 2:00.

18      Q.    What happened on the phone call?

19      A.    So I got through to Chief Fishback, put me

20  on hold, got Rodriguez, put me on hold, got Joanne.

21  Basically, the first thing Joanne, I had never met

22  her never talked to her, had said, she's like:

23  What's the issue?  I said, well, I have been assigned

24  to Station 9 and I can't work there.

25      Q.    Did you have a problem with her asking that?

```
1        A.   I just -- for never meeting her and her

2   being our HR director, who I thought was there to

3   help us, it seemed a little bit condescending to me.

4        Q.   Were you emotional before you started the

5   call?

6             MR. JACOBSON:  Objection, form and

7   foundation.

8        A.   No.

9        Q.   (By Mr. McCrory)  Were you frustrated?  Were

10  you upset that it was so late in the day?

11       A.   It was a little bit annoying that I hadn't

12  gotten through to anybody and it was so much later in

13  the day.  But I wasn't, by any means, like angry when

14  I talked to them.  I was actually relieved to finally

15  get ahold of somebody and try and rectify the

16  situation.

17       Q.   Okay.  And so Joanne asked you what the

18  issue was?

19       A.   Uh-huh.  Correct.

20       Q.   And you thought that was inappropriate?

21       A.   I thought the way she asked it was

22  inappropriate.  There was no, hi, Carrie, I'm Joanne

23  from HR.  Like I said, never met her, didn't know

24  anything about her.  First thing was just:  What's

25  the issue?
```

1      Q.   Okay.  Then what happened?

2      A.   So I explained to them the situation.  I

3  said, you know, I've been assigned to Station 9.  And

4  shortly thereafter --

5      Q.   What did you explain to them?

6      A.   That I was assigned to Station 9 and that I

7  wasn't able to work there.

8      Q.   What did you explain about why you weren't

9  able to work there?

10      A.   Well, at that point that was all I really

11  said.  And Chief Rodriguez said, well, Carrie, that's

12  the only thing we have available for you tonight.

13           And I said, well, you know, I guess you

14  guys don't understand, you know, I'm pumping, I have

15  to do this at work, and I need a room to do it in, a

16  private room.

17           And I don't remember the exact, you know,

18  sequence of how everything happened.  But some of the

19  things that were said, Joanne began with, well, you

20  know, Station 9 is approved per this, you know, list,

21  or she said, per your law, Station 9 is approved.

22  She asked me at one point how often are you pumping,

23  and I said every --

24      Q.   Do you think there was anything improper in

25  her telling you that it was approved?

1     A.   Everything about what she said was the tone.

2   She was just very condescending to me the whole

3   conversation.   There was a lot more tactful way to

4   explain, I guess, what she was trying to say, but

5   there was absolutely no tact in how she spoke with

6   me.

7     Q.   What about Chief Rodriguez when he told you

8   this was the only thing available?

9     A.   He just said it.   There wasn't really

10   anything behind, like, you know, from his tone.

11     Q.   Did you explain earlier that, in fact,

12   probably if you look at the staffing, that could have

13   been the only opening for that particular time slot?

14     A.   Yes.

15          So Joanne went on to ask me, you know,

16   how often are you pumping?   I said every three to

17   four hours.   And she said, well, that seems excessive

18   to me.

19     Q.   How did it come up -- how did that question

20   come up?

21     A.   Because we talked about me needing to pump,

22   and we talked about -- she said Station 9 was

23   approved because EC and the chief have their own room

24   and I can ask to use their room.   And I said that

25   that wasn't appropriate.   I do this throughout the

1    night.   I can't ask somebody to leave their room, you

2    know, blah, blah, blah.   And --

3        Q.   Okay.   Let me just ask some questions about

4    that.

5        A.   Okay.

6        Q.   Was it appropriate for Joanne and for

7    Rodriguez to inquire about, first of all, what your

8    problem was at 9?

9            MR. JACOBSON:   Objection, form and

10   foundation.

11       A.   They can ask me.

12       Q.   (By Mr. McCrory)   Okay.   Was it appropriate

13   to ask why you -- what the problem was with the

14   captain's room?

15           MR. JACOBSON:   Form and foundation.

16       A.   They didn't ask me what the problem was.   I

17   was told you can use that room.

18       Q.   (By Mr. McCrory)   Okay.   And then you

19   responded that you would have to pump during the

20   night?

21       A.   Correct.   And I didn't think it was

22   appropriate to ask -- wake up somebody to leave their

23   room.

24       Q.   And was it appropriate for them to ask you

25   how often that would occur?

```
 1        A.   I don't recall saying that.  I don't

 2   recall -- ask me that again, please.

 3        Q.   Did you tell her that you didn't need 20 to

 4   30 minutes every two or three hours?  Did you correct

 5   her at all and say it didn't interfere with your

 6   work?

 7        A.   I did tell them that it didn't interfere

 8   with my work.

 9        Q.   Okay.  Did you tell them it wasn't that much

10   of a time issue?

11        A.   Well, she said, you know, how long does it

12   take start to finish, and that's when I explained it.

13   And then when she said, well that seems, you know,

14   excessive blah, blah, blah, I can't have trucks out

15   of service, I believe at some point I told them I'm

16   pumping for like 15 minutes.

17             So this isn't -- you know, I don't know

18   if I went back and said, no, I'm not out of service,

19   because I don't think I understood that that's how

20   they understood it, if that makes sense.

21        Q.   Did you tell them they were out of their

22   fricking minds if they thought you would wake up a

23   chief or a captain?

24        A.   One time I said that.  And it was shortly

25   after she said, well, Station 9 is appropriate, and
```

1   you can use EC and BC, and you can wake them up when
2   you need to use it.   And at that point I was in tears
3   and I was upset.   And that's when I said, you're out
4   of your fricking mind if you think that that's
5   appropriate.   That's not appropriate.
6       Q.   Was that in the early part of the
7   conversation?
8       A.   Yeah, it was towards the beginning part of
9   it.
10      Q.   Why were you so upset?
11      A.   Because the series of questions that had
12  preceded that were what you're doing is excessive,
13  and this and that.   And so it upset me.   I didn't
14  feel like I needed to be chastised by an HR manager.
15      Q.   I thought you talked about that the first
16  questions were about Station 9 being the only thing
17  open and then a discussion of whether -- why that was
18  on the list, whatever list, and why that wasn't
19  available, why that wasn't acceptable was because
20  there were captains there.
21      A.   Right.
22      Q.   Is that when you responded to that?
23      A.   No.   It came up again.
24      Q.   Okay.
25      A.   Chief Fishback and Rodriguez didn't say much

1      Q.    Did you tell -- explain the circumstances

2    when you got the discipline.

3      A.    Explain which circumstances?

4      Q.    Your version of what the call was.

5      A.    I did.

6      Q.    And who gave you the discipline?

7      A.    Chief Fishback.

8      Q.    And what did he say when you explained that?

9      A.    He said, I understand.  He said, you were

10    right, but the conversation was ugly.

11            And I said I disagreed with how she

12    treated me.  And he made something to the reference

13    of, well, that's your opinion.  I said, okay, I

14    thought mine mattered, but, you know, I guess not.

15    And then we went on to talking about other things

16    besides the discipline.

17      Q.    What did you understand he meant by you were

18    right?

19      A.    That Station 9 was not appropriate.

20      Q.    Was there discussion of overtime and trades

21    during that conversation?

22      A.    There was.

23      Q.    What was that discussion?

24      A.    So during that conversation he made a

25    statement that I can't remember the time frame that

1    he said you're going to be assigned to Station 6 from

2    here on -- and I can't remember if he said August,

3    or I can't remember which date he gave.

4              And we were talking about a list of

5    stations because he had a list of stations.  I'd

6    asked to see it.  He said we couldn't have it because

7    they didn't agree with it.  And so -- I said, so I'm

8    working at Station 6.  I said, what about -- what

9    about trades and overtime?  And he said, well, I

10   haven't thought about that.  I'll have to get back to

11   you.  Never got back to me.

12       Q.   Did he ever say you couldn't do a trade?

13       A.   No.

14       Q.   Did he ever say you couldn't do overtime?

15       A.   No.

16       Q.   Did you ever put your name on the list for

17   overtime after that?

18       A.   One time at my own -- because I was going to

19   get it at my own station, Station 6.

20       Q.   Is that the time when your husband was doing

21   the trade?

22       A.   Yeah.

23       Q.   Okay.  And what happened the one time you

24   put in for overtime?

25       A.   So I had not worked any overtime because of

1    the situations.  So  this is what they call a zero,

2    meaning zero hours.  My relief at Station 6, another

3    medic, was going to be off.  So I decided I can put

4    in for overtime and I'll get it because I've got the

5    lowest number.  So I put in, and I called the

6    staffing person and I said, can I work at Station 6?

7    And I believe it was a female staffing captain.  And

8    I kind of told her the situation, and she was like,

9    yeah, you have the lowest number anyway, so that's

10   fine.  And I worked there.

11        Q.   So you actually worked that overtime shift?

12        A.   That one time.  And it was actually -- it

13   was like November of -- but that wasn't during when I

14   was pumping.  It was like November.

15        Q.   So the one time you put your name on the

16   list, you did work the overtime; correct?

17        A.   Correct.  But it was after the time frame of

18   my son turning a year old.

19        Q.   And prior to that you hadn't put your name

20   on the overtime list?

21        A.   Correct.

22        Q.   And as you just explained, there's a list

23   for overtime, everybody in the fire department can

24   put their name on there and you're ranked by the

25   number, I think it's the overtime hours you have, and

1    you had zero, so that's why you had the least number

2    of overtime hours, you would then be at the top of

3    the list?

4        A.    Correct.

5            MR. McCRORY:  I want to take a short break.

6            THE VIDEOGRAPHER:  Going off the record at

7    2:51.

8            (Recess taken from 2:51 p.m. to 3:01 p.m.)

9            THE VIDEOGRAPHER:  We're back on the record

10   at 3:01.

11       Q.    (By Mr. McCrory)  Going back to the

12   conversation with Chief Rodriguez and Fishback and

13   Joanne Acosta.  Is there anything else in that

14   conversation, any other specific comments which you

15   believe show that there was sex discrimination?

16           MR. JACOBSON:  Objection, form and

17   foundation.

18           MR. McCRORY:  What's the objection?

19           MR. JACOBSON:  You're asking her for a legal

20   conclusion.

21           MR. McCRORY:  No, I'm not asking for legal

22   conclusions.  Everybody can have their own general

23   opinion of sex discrimination.  When she filed a

24   complaint, she knew about sex discrimination.

25           MR. JACOBSON:  Okay.  I lodged my objection.

1      Q.    Do you consider that an adverse employment

2   action?

3      A.    I think any time you transfer duties, it's

4   an adverse action.

5      Q.    Even though you could have been assigned

6   further away than 16 while you were on swing shift,

7   and even though you had all that uncertainty?

8      A.    I'm sorry, even though I could have what?

9      Q.    Be assigned further than Station 6.

10     A.    Yeah.  There's not many places further than

11  6, but, I guess I understood I could have been sent

12  anywhere.

13     Q.    And with respect to your duties, although

14  you were technically in a firefighter position, you

15  remained in that; correct?

16     A.    Correct.

17     Q.    There was no change in your pay?

18     A.    No.

19     Q.    You continued to act as medic, when

20  necessary; correct?

21     A.    Correct.

22     Q.    In your position as a swing shift medic,

23  were you always assigned only to a medic truck?

24     A.    Not always.

25     Q.    Sometimes you were assigned to a fire engine

1    me up and say, are you acting paramedic?  It's just,

2    I don't know -- I don't know how to explain that one.

3        Q.    Did the "acting" refer to the fact that you

4    weren't permanently stationed at Station 6?

5        A.    Did the wording change because of that?

6        Q.    Yes.

7        A.    Is that what you're saying?

8              Acting on the job means you're acting in

9    another position.  So, you know, I was a firefighter,

10   technically, by the opening there, but I'm a

11   paramedic put there.  So I guess that's kind of why

12   we worded it that way.

13       Q.    The third bullet point is that you no longer

14   had access to opportunities for earning overtime pay.

15              And I believe you testified earlier that

16   you didn't put your name on the list; is that

17   correct?

18       A.    Correct, because I had never heard back that

19   if I could or not.

20       Q.    But, in any event, you can't say whether you

21   would or would not have gotten overtime; correct?

22       A.    I can't say where I would have gotten it or

23   if it would have been an appropriate place that I

24   would have been able to go to.  But I was waiting on

25   a response and I never got one.

1    Q.    Did you ever follow up and ask for a

2    response?

3    A.    Not with Chief Fishback.

4    Q.    Anybody else?

5    A.    I talked to my Chief McDonough about the

6    situation.

7    Q.    Chief?

8    A.    Paul McDonough.

9    Q.    When did you talk to him about it?

10    A.    When it came time that I was supposed to

11    work that trade that I had.

12    Q.    And was that about trades or overtime?

13    A.    Well, it -- essentially it was about both,

14    because I had asked Chief Fishback about both.

15    Q.    When was that?

16    A.    I don't know.  I'd have to look at a

17    calendar.

18    Q.    He wasn't your chief when you were at

19    Station 6, was he?

20    A.    Not technically.  Chief Nofs was.

21    Q.    So you didn't speak with anybody in your

22    regular chain of command?

23    A.    Well, Chief McDonough knew about the whole

24    situation from the get-go, which is why I spoke to

25    him about it.  Nofs also knew a lot of the situation,

1    but because McDonough was initially involved in it,

2    which is why I asked him.

3        Q.   Knew about which situation?

4        A.   Everything with the rooms, the pumping,

5    everything that was going on.

6        Q.   When you contacted McDonough about the --

7    actually start, when did you first contact him about

8    overtime or trade -- were they both at the same time?

9        A.   So unless I look at a calendar, I can't tell

10   you actually if -- actually if Nofs was my chief at

11   the time.  Because I don't remember when I worked

12   that trade.  I'd have to honestly look at a calendar.

13   I worked at Station 19.  The trade -- I agreed to the

14   trade before I think I had even come back to work.

15            So I didn't know any of this situation

16   was going to happen.  I didn't agree upon a trade

17   after I was in this situation.  I agreed upon the

18   trade before this.

19       Q.   Was this after your second pregnancy?

20       A.   No.

21       Q.   This was the first one?

22       A.   This was during the first one.

23       Q.   And shortly after you returned to work or --

24       A.   The trade?

25       Q.   Yeah.

1      A.    Had been -- he had asked me for the trade a

2  long time ago.

3      Q.    "He" is?

4      A.    The person I did the trade with.

5      Q.    And that is who?

6      A.    Mike Murphy.  He's another paramedic.

7            So he had contacted me about doing a

8  trade, I don't recall exactly when.  And he needed me

9  to work a certain day for him, and I believe it was

10 in the beginning of 2013.  I can't -- I don't recall

11 if it was after I went to 6 or before.  That I don't

12 know.

13            I'm thinking it was before, which is

14 probably why I spoke to McDonough.  But, like I say,

15 without looking at a calendar, I can't tell you.

16            And that was coming up.  And so I called

17 Chief McDonough and said, what am I supposed to do?

18 I haven't heard back from Chief Fishback.  I'm

19 supposed to work this trade.  They never told me what

20 I'm supposed to do.  And he said, okay, let me make a

21 phone call.

22     Q.    Where were you going to work the trade at?

23     A.    Station 19.

24     Q.    Okay.

25     A.    And I knew enough that they had their own

1    bedrooms.

2              And so he called me back and said, yeah,

3    Chief Rodriguez said that's fine, you can work your

4    trade, or you have to work the trade.

5        Q.   Okay.

6        A.   So I said, okay.  And I had told, you know,

7    him, I said, I never heard back from them about

8    anything.

9              And I had talked to Sloan Tamietti, who's

10   our union guy.  And I had asked him, too, I said, did

11   you ever get a list of the stations.  And he said

12   I --

13       Q.   Let's not get off the subject.

14             MR. JACOBSON:  Well --

15             MS. SAAVEDRA:  She wasn't posed a question.

16             MR. JACOBSON:  She was answering and giving

17   testimony.

18             MR. McCRORY:  She was going off the subject.

19             MR. JACOBSON:  Well, I understand.  But then

20   you can move to strike it, but don't interrupt it.

21   It's improper.

22             MS. SAAVEDRA:  I think in order to get

23   through this deposition, we're going to have stop her

24   at some point, Jeff, otherwise we're going to be here

25   all day.

```
 1    work.  And he said some comments were made, you know,

 2    about it and --

 3        Q.   What kind of comments?

 4        A.   Just that -- basically that people thought,

 5    you know, it was ridiculous and --

 6        Q.   Who?  Which people?

 7        A.   I don't know specifically.  I mean, I'm

 8    assuming people he was working with.  I didn't ask

 9    specific names.  I didn't really honestly at that

10    point care.  I didn't really want to talk about it.

11    You know, he was a friend of mine.  He wasn't calling

12    me to harass me.  He was just basically telling me --

13        Q.   What was his name?

14        A.   Mike Grinnell.  He's retired now.

15        Q.   Anybody else you talked to?

16        A.   I can't remember off the top of my head.

17    I'd have to think about it.  But I don't remember

18    anything off the top of my head that I can remember.

19        Q.   Would you take a look at Exhibit 10?

20        A.   (Witness complies.)  Okay.

21        Q.   Is that the September 18th memorandum?

22        A.   Yes.

23        Q.   This is actually in your response there had

24    been follow-up to your memo that complained you had

25    been mocked; correct?
```

1    A.   That wasn't what my memo was about.   My memo
2    was requesting that Station 6, I mentioned that as
3    being one of the reasons I wanted to stay at 6, but
4    it wasn't a memo about being mocked.
5    Q.   But, nonetheless, that was taken seriously
6    by TFD and you were talked to by Chief Rodriguez and
7    Chief Olsen?
8    A.   Correct.
9    Q.   And was Ms. Acosta there?
10   A.   No.
11   Q.   Those two chiefs talked to you because they
12   were concerned about that; correct?
13   A.   That's what they said.
14   Q.   Well, do you have any reason to think they
15   weren't concerned?
16   A.   No.  But I don't -- you know, I don't know
17   either way.  I mean, that's what they told me they
18   came out there for.
19   Q.   And they wanted you to identify anybody who
20   had mocked or joked about your situation?
21   A.   They asked me about the situation and asked
22   if I wanted to, you know, file a complaint.  And I
23   explained the situation because my captain was off
24   that day and he was in there.
25        But I don't recall them saying tell me

1    specifically what happened.  Because I did explain

2    the situation, because, like I said, my captain

3    wasn't there and I wanted him to hear it.  So I told

4    the situation.

5        Q.    And what did you tell them?

6        A.    That pretty much what I just told you, I was

7    in the office on the computer and Sieminski came in

8    and said what he said and came out and was talking to

9    Captain Weber and Weber asked what happened and I

10   walked off.

11       Q.    Did you tell them those two names?

12       A.    I did.

13       Q.    Did you tell them any other names?

14       A.    That was all that was involved at that day.

15       Q.    Did they ask you for any other names?

16       A.    I don't recall them asking for other names.

17   I recall them saying, you know, do you want to file a

18   complaint.  And that's when I said no, that's not

19   what I'm trying to do.  I'm just trying to explain to

20   you the recourse of this situation and blah, blah,

21   blah.

22       Q.    What did you want them to do?

23       A.    I wasn't looking for them to do anything.  I

24   was actually trying to explain part of the other

25   reason I wanted to stay at 6.

230

1   confusing area.

2        THE VIDEOGRAPHER:   That concludes the

3   deposition.   The time is 4:34.

4

5        (The deposition was adjourned at 4:34 p.m.;

6        to be continued.)

7

8

9

10          CARRIE FERRARA CLARK

11

12

13

14

15

16

17

18

19

20

21

22

23   RECEIVED

24   JUL 1 3, 2016

25   EATON, GREEN & WILLIAMS

# EXHIBIT 11

| | |
|---|---|
| **From:** | Gordon Clark |
| **To:** | McDonough, Paul |
| **Date:** | 10/21/2012 7:20 PM |
| **Subject:** | Carrie Clark Return to Shift |

Chief McDonough,

As we have been discussing, I am returning to work from maternity leave this coming Saturday, October 27th. I would like to fill the Paramedic spot at Station 20 until Andy Pashos returns from his deployment. I am aware that another member has been in that spot temporarily. With that said, I would like to give that member the consideration of completing the tour there. For those final two shifts of this tour if you could please place me at PM12 on Saturday, October 27, and PAU21 on Monday October 29, that would be much appreciated and helpful. I have checked with both those medics and the openings will be there. I appreciate your willingness to help accommodate me with the opportunity to be able to maintain my need to routinely pump in order to continue my body's production of milk for my son. Thank you for all the assistance and support you have always given me, and especially now. If you have any questions or need any additional information, please let me know. Thanks again.

Sincerely and Respectfully,

Carrie Clark

**14-02543 COT000336**

# EXHIBIT 12



# MEMORANDUM

**DATE:**     November 9, 2012

**TO:**  Paul McDonough          **FROM:**     Carrie Clark
Battalion Chief                          Paramedic
Battalion 1'C'                           Swing Battalion 1'C'

**SUBJECT:**      REQUEST FOR TEMPORARY ASSIGNMENT TO PM12

I appreciate your continued communications and willingness to help me and my new baby as I return to duty from my maternity leave. As we discussed, I would like to remain at Paramedic 12 during the period of time that I will be pumping milk at work. As you are aware, my husband or mother have needed to come to the station each day since my return to work to pick up more milk from me to feed my son, because I am unable to produce enough milk to supply my son for the 24 hours I am away. Station 12 has best met my family's needs to get milk from me while I am at work and my son has run out. Additionally, as we discussed, pumping breast milk is very personal and of a very private nature to me, and I am not always comfortable discussing it with other people. I have felt comfortable pumping while at work at Station 12 because I have had the support of two other mothers who work there as well. Coworkers can hear the pump even from behind closed doors and are obviously aware of what it is that I am doing. I have already explained my situation and have gained comfort and acceptance from the members of Station 12. I do not want to have to do this again at a different station everytime I have to be moved. Being a six person station, with two of the other five members being mothers themselves, gives me more comfort than I feel any other station would. I have already been able to decon a temporary locker and refridgerator storage spaces at Station 12 for my milk. Possible contamination of the pump if I had to bring it in and out of a different station everyday concerns me for my young son with an unestablished immune system. I have already been experiencing some stress and anxiety about my assignment situation that is contributing to my decrease in milk production, and as a result a loss in weight to my son, and decline in his health as of late.

Initially we discussed me going to Paramedic 20 upon my return. My decision to go to Paramedic 20 was based primarily on not displacing any other members, and bringing as little attention to this very private situation for me. When I worked with Paramedic Jeff Todd he told me that he had been considering leaving Paramedic 12 for some time. He asked me if he was able to switch with me, if I would want to be at Station 12 rather than Station 20. As you are aware, I told him that I would rather be at 12, and he sent a memo through his chain of command stating such. Of course I am aware that members do not have the power to switch assignments and this would be a management decision, but based on the fact that this was a temporary situation, I didn't think it would be a problem. When you asked where I would like to be, I let it be known to you that I would rather be at 12, and I am appreciative of you placing me there now. My placement at Paramedic 12 would not displace any other members since Paramedic Todd was granted his request to be assigned to swing. So to reiterate, I would like to stay at Paramedic 12 until I am done pumping milk at work. I appreciate your efforts for me, and thank you again for your consideration on such a very sensitive and important subject to me.

14-02543 COT000339

# EXHIBIT 13

Michelle R. Saavedra
Michael W.L. McCrory
Principal Assistant City Attorneys for
MICHAEL G. RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
Pima County Computer No. 66163
Michael.McCrory@tucsonaz.gov
State Bar Computer No. 3899
Pima County Computer No. 37268
Telephone: (520) 791-4221
Fax: (520) 623-9803
*Attorneys for Defendant City of Tucson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK, | No.  4:14-CV-02543-TUC-CKJ |
| Plaintiff, | **DECLARATION OF** |
| vs. | **ROBERT L. RODRIGUEZ** |
| CITY OF TUCSON, | (Hon. Cindy Jorgenson) |
| Defendant. | |

Pursuant to 28 U.S.C. §1746, I, Robert L. Rodriguez, declare and state as follows:

1.     I make this Declaration based on my personal knowledge and to the best of my recollection.

2.     I was employed by the Tucson Fire Department ("TFD") from June 28, 1982, to December 28, 2015, in various capacities.

3.     From the summer of June, 2011 until August 2014, I was Deputy Chief in Operations with responsibility for the fire stations and staff roughly in the area west of Alvernon.  During this time, there were two Deputy Chiefs who were responsible for Operations, DC Ed Nied ("DC Nied") and myself.  DC Nied was responsible for the stations generally east of Alvernon, which included Station 12 and I was responsible for the stations generally west of Alvernon, which included Station 20.

4.     In early November, 2012, DC Nied consulted with me regarding the request from Carrie Clark ("Clark") and Jeff Todd ("Todd") to switch their paramedic positions so that Clark could work at Station 12 while she was expressing milk.  That request was contrary to TFD policy in that member initiated exchanges would not be honored.  We had a bid system of assignments primarily based on seniority, and prior to adopting that policy there had been conflicts where members wanted to exchange positions that circumvented bid assignments.  The policy was applied to males and females and the denial of the request was not related to Clark's condition or her need to express milk.

5.     In addition, the paramedic position at Station 12 had also been put out for bid and another paramedic had won the position through our standard process.

6.     DC Nied, Battalion Chief Paul McDonough ("BC McDonough") and I met with Clark about her request to go to Station 12.  We told her that the position had been bid out.  We offered to assign her to Station 20 because there was a long term position available while the regular assigned person was on military deployment.  This assignment seemed ideal in that Station 20 was a newer facility with individual (private) sleeping quarters.  Additionally, it would also have been an increase in pay since that station had a special operations position for which Clark was qualified.  She did not want to go to Station 20.  We discussed her possibly going to Station 16, but she didn't want to go there because of a personal conflict with the captain at that station.  We were able to work with both that paramedic, Scott Billings, and with Clark to arrange for her to remain at Station 12 through the end of the year.

7.     During that same month, November 2012, I became aware that BC McDonough and Captain Richard L'Heureux were doing everything they could to accommodate Clark's preferences for swing shift stations.  It was my understanding that they were successful in meeting her preferences.

8.     I recall meeting with Clark, Deputy Chief Michael Fischback ("DC Fischback") and TFD Human Resources Manager JoAnn Acosta ("Acosta") on March 20,

2013.  I had been out during the day and was called into an office where Clark was on the telephone with DC Fischback and Acosta.

9.     Clark's initial problem was that she didn't want to be assigned to Station 9. Clark raised the issue that there wasn't a private room for her to express milk at Station 9. We quickly determined that Station 9 was the only open swing shift assignment that was open at that time.  The suggestion was made that she could use the EMS captain's room, but Clark, DC Fischback and I agreed that would be impractical since the captain's room not only serves as sleeping quarters, it is also the EMS captain's office.  I suggested that she be given a swing shift assignment to Station 8 where we could move another person, but she didn't want to move anyone and hung up on us.

10.    We called her back and continued the discussion of her problems finding the right station.  Clark told us that it took her about 45 minutes to pump and she had to do it every few hours so she couldn't be waking up the captain all through the night.  We agreed that would not work.  None of us considered the study room that is also available at Station 9.

11.    Clark also told us that on a couple of occasions she had taken paramedic trucks out of service to express milk.  That and the amount of time she said she needed to spend pumping caused all three of us to become concerned that she was not available for emergency response calls.  A truck taken out of service means any emergency response must come from a longer distance and will take a little longer time.  In responding to public emergencies, even a very short delay can significantly affect public safety.  Acosta asked her about whether she could really be available for calls and whether she was fit for duty.  This was said in the context of determining whether she had a medical condition that required us to place her in another position where she wouldn't affect public safety.

12.    Clark was very emotional during the telephone call.  On two occasions, she hung up on us.  While we were talking, the line suddenly had no one on it.  There was nothing wrong with our phone.  We called back each time and Clark didn't say that anything happened on her end.  She also at one point said to us that "you are out of your

3

friggin' minds." That comment was rude and unprofessional and is not an acceptable way to talk to superiors or the HR Manager.

13.     DC Fischback and I discussed how to resolve Clark's problems following the telephone call. We decided that it was best for everyone for her to go to Station 6. The captain on the shift she would be assigned was certified as a paramedic and thus if she could not respond to a call because she was expressing milk, the crew could respond short-handed but would still have a medic on scene. Station 6 had the lowest level of calls of any station which would also reduce the possibility of a call coming in when Clark could not respond. The slot at Station 6 was one that was occupied by a firefighter, but Clark could be assigned to the slot as a paramedic with no change in her rank, pay or duties.

14.     When Clark told us that she had taken trucks out of service, she said it was with the approval of her chiefs. I followed up with the five battalion chiefs whom had worked on the same shift as Clark during this time frame, since I was concerned that anyone would authorize that. None of the five battalion chiefs I contacted said that she obtained permission to take a truck out of service.

15.     Commissioned personnel may also arrange a trade with another employee. A trade is where the person working the trade, firefighter A, will take a shift for another employee who is regularly assigned to different shift, firefighter B. In theory, the person who receives the time off from the trade, firefighter A, will later return the trade and work a shift for the other person, firefighter B. The amount of time A works on B's shift is not included in the calculation of A's hours for overtime compensation. Trades have to be of equal rank. TFD recognizes that employees have the right to trade and allows them, but does not participate in arranging or enforcing trades. TFD policy requires that a supervisor approve a voluntary trade with a replacement of equal qualifications. (*See* Attachment 1, Manual of Operations, §203.6.1).

////

////

4

16.     It was brought to my attention that Capt. Gordon Clark ("G. Glark") had worked one shift and was in the process of working another for Paramedic Clark.  I told the shift supervisor that was not allowed under the policy — nor the labor contract.  A male captain once brought to my attention that a male firefighter was trading with someone who held a different rank.  I told him that was contrary to the policy and labor contract and should be stopped.

17.     TFD issued its new policy regarding nursing rooms in July, 2013.   In August, I became aware that Clark had said that TFD members were mocking and joking about her causing the policy.  I had not heard any such comments prior to Clark's complaint.  I went with Assistant Chief of Operations Brad Olson to Station 6 to talk to Clark about her concerns.  At that meeting, it was clear to me that she did not want to tell on any other members.  She would not give us names and did not want the matter pursued as a complaint.  We did not have enough information from that meeting to pursue any further investigation.  We assured her that we would investigate and take action on any harassment that she reported, and we thanked her for bringing the matter of expressing milk in the fire service workplace to our attention.   We emphasized this would be a positive thing not just for her but for all the TFD mothers who will follow.

18.     TFD policies are often referenced by TFD members by the name of the person who caused the policy to be adopted because it is easier to convey (and recall) names rather than manual numbers.  The practice is most often used in a good-natured manner, even if the reference originated by way of some negative action or circumstance.  Sometimes it can even be a compliment to that individual.  For example, a male TFD captain was responsible for changing how equipment was stored on fire trucks by insisting that the arrangement for tools and equipment be the same on all trucks.  After that, when a truck was fitted or the method of storage mentioned, it was referred to as being "Coulterized."  The standardization of arrangement of equipment and tools has been a great benefit to all of us in TFD because on any given shift, any number of personnel can

1    work on a truck they are not normally assigned but still perform quickly, efficiently and

2    safely.

3        I state under penalty of perjury that the foregoing is true and correct.

4        Executed on May 5, 2017.

5

6                                Robert L. Rodriguez

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

# ATTACHMENT 1

| **Tucson Fire Department**<br>Manual Change | Section 203<br>Absences |
|---|---|
| Manual of Operations<br>Page 17 of 29 | Revised:  February 21, 2012 |

4.  Make a notation of the accident in the member's file.  Place a copy of all reports and a copy of the Board of Inquiry report in the member's file.

5.  Forward a copy of the Board of Inquiry report to the Purchasing Department (Risk Management Division) and the Fire Department Personnel Officer.

6.  Place the original Board of Inquiry report in the appropriate incident file at Headquarters.

203.6        Trades

203.6.1      Voluntary Shift Trades on the Three-Shift Schedule

An employee's immediate supervisor may grant a voluntary trade with a replacement of equal qualifications.
A voluntary shift trade is a mutual agreement in which one individual is voluntarily working for another; therefore, payback of that time is the responsibility of those persons involved and will not accrue any obligation to the City.  The City will not be responsible for any monetary compensation as a result of a trade.  All time worked as a result of a trade shall be excluded from compensation of overtime.  Vacation leave for a voluntary shift trade will be authorized if a vacation slot is available.

A   Members

When a member wants to voluntarily trade, the initiating member will confirm the shift to be traded with the substituting member involved.  It is the responsibility of the members involved in the trade to be sure the trade is entered in TeleStaff.

B   Supervisor

It will be the immediate supervisor's responsibility to assure that the normal operational efficiency of their crews will be maintained.

203.6.2      Medical Leave

An employee who is on continuous medical leave to include Family Medical or Parental Leave may not take trades.  If an employee anticipates being on continuous Medical Leave, they are not to schedule trades during this time.  If an employee on continuous Medical Leave has previously scheduled trades for this time period, it is the employee's responsibility to re-schedule trades.

203.6.3      Injuries

If an employee has scheduled trades during a time when he or she will be out of work due to a work-related injury, as well as an off the job injury, it is the employee's responsibility to re-schedule these trades.  The department will not be responsible for covering trades during this time.

# EXHIBIT 14

INTERVIEW

| | |
|---|---|
| Date: | January 7, 2013 |
| To: | Intake File |
| From: | Martina Macias, Sr. Equal Opportunity Specialist |
| Re: | Carrie Clark - Tucson Fire Department |

On January 7, 2013, Martina Macias conducted an intake interview with Carrie Clark at the Office of Equal Opportunity Programs (OEOP). Clark provided the following information:

She has been a Paramedic with the Tucson Fire Department for two years. She was a Firefighter for 3 ½ years. She did her probationary year at two Stations, was on Swing for the next two years, and when she became a paramedic she was assigned to Station 4 for one year; that ended in December 2011. Her immediate supervisor is Chief Paul McDonough (McDonough).

Clark went on light duty in January 2012. She was on maternity leave for 3 months; that ended on October 27, 2012. She has been assigned to Swing on C Shift since then. She is supervised through Battalion 1, and can be assigned to any Station. Before Clark returned to work, she talked to McDonough about filling a temporary assignment somewhere so that when she was nursing or pumping breast milk at work, she would always be assigned to the same station. To make it easy for her to pump breast milk at work, McDonough was going to let her fill a temporary vacancy at Station 20, which is at First and River.

When Clark returned to work on October 27th she was assigned to Station 12. That day, she was working with Paramedic Jeff Todd (Todd). They talked at length about her baby and how her mother had to come to the Station to pick up breast milk for her baby. Todd told her he had been thinking about leaving Station 12, and wondered if their supervisors would let her go to Station 12 and let him go on Swing for her. Clark telephoned McDonough and told him she was back at work and had no idea her son was going to need so much milk, and that her mother had to pick it up from her.

Clark wants to work at Station 12 because it is close to her mother's home and it would be more convenient for her to pick up Clark's breast milk. She also said that Station 12 has two women there, and private rooms where Clark can pump breast milk in private.

On Sunday, October 28th, Todd wrote a memorandum to his Chief, Brian Stevens (Stevens), his Captain, Trish Tracey (Tracey), and Gordon Clark, Carrie Clark's husband. Todd mentioned Carrie Clark's situation regarding pumping breast milk at work, and asked if he could take her spot on Swing or at Station 20 where she was going to be for a few weeks, and let her fill his spot at Station 12. Clark believes that Stevens forwarded Todd's memorandum to Chief Ed Nied (Nied).

On November 1, 2012, Carrie Clark saw that Todd's spot at Station 12 was up for bid through the computer system. Carrie Clark bid for the spot that day. She knows that bids are won based on seniority. She spoke with McDonough and told him she thought maybe they were going to let her fill the spot for a little while, and asked him why no one had talked to her about that.

14-02543 COT000355

McDonough said he would talk to Chief Rob Rodriguez (Rodriguez) and find out what was going on. Rodriguez telephoned Carrie Clark (she could not recall the date) and told her they could wait to see who won the bid and see if they would postpone going to the Station and let her stay there, or they could retract the bid. However, he said that it looked like Scott Billings (Billings), from Station 16, was going to win the bid because of his seniority. Rodriguez said that if Carrie Clark and her husband were friends with Todd, they might explain the situation to him and ask if he would be willing to wait to go to Station 12. Rodriguez stated that in that way they would not have to do it through administration, but they could do it as friends. That night, Gordon Clark worked with Billings and talked to him about the situation.

The rules, as Carrie Clark understands them, are that if an individual chooses to go on Swing, their spot does not have to be bid on. It is at management's discretion to fill the spot with a probationary paramedic, leave it open, or do anything else they want. If an individual is promoted or retires, the spot has to be bid for. In this case, Todd's position did not have to go to bid.

On November 13, 2012, Chiefs Nied, Rodriguez, and McDonough met with Carrie Clark. Nied asked her to explain her situation, and said he had not known she wanted to go to Station 12 before they put Todd's position up for bid. He said he had just seen Todd's memorandum to Stevens. Nied told Carrie Clark that Todd had not asked to leave Station 12, but had been removed. Carrie Clark responded that it was untrue and that Todd had left voluntarily because of a personality conflict with the Captain at Station 12. Nied asked if she would consider going to Station 16. Carrie Clark responded that the captain there, Max Parks (Parks) hated her. Nied then said that Parks had called Nied and told him it was not right, that Carrie Clark should not be able to go to Station 12, and that she could not do so. Nied also told Carrie Clark that they could not swap people's positions, by putting her at Station 12 and Billings on Swing. Clark asked why not, if at the end of 2012 they had bumped Rob Lewis (Lewis) out of his Station (9 or 11?) and put Decastro in his place at Station 13 after Decastro got a DUI. They responded that Decastro's situation was different because it had been done within the Battalion. One of the Chiefs stated that it sounded as if her request was just a convenience for her mother. Carrie Clark said it was not; that convenience was accommodating someone for a DUI, and her situation was about her child's well-being. When they suggested her going to Station 20, Carrie Clark responded that that would not help because it was a 45-minute drive from where she lives. Later that afternoon, Nied and Rodriguez called Carrie Clark and told her they had decided to assign her to Station 12 for one more tour, which was five shifts, and that on December 5th, she would continue on Swing and be wherever she was assigned. Carrie Clark then emailed McDonough and asked if she would schedule her at Station 12 during times when other employees from that Station were not on duty. He agreed, and this was done until the end of December 2012. Since January 4, 2013, Clark has been back on Swing. On Sunday, January 6, she worked at Station 12 because one of the men from that Station was off duty.

Carrie Clark is not aware of any other employee, within the past month, who has been denied or approved a request to swap assignments with someone else. However, in 2004 Captain Chad Dorris (Dorris) got a DUI and they assigned him to Swing at Station 17. She does not know who made that decision, but knows of the assignment because she was dating Dorris at the time. She does not remember if someone else was bumped when Dorris was moved. In 2008, Engineer

14-02543 COT000356

Ron Valencia (Valencia) got a DUI and was placed as a Firefighter and moved to Station 17 as well. She does not remember whose position he was placed in. Assistant Chief, Mike Mckendrick might have been the one who made the decision to move Valencia. About two years ago Firefighter Casey Tribolet (Tribolet) had a personality conflict with someone at his Station. He was moved from Station 20 and placed at Station 13, possibly taking Firefighter Ron Karulski's place.

(Carrie Clark was asked to produce copies of everything she referred to during this intake interview. Specifically, Macias asked for any and all emails, requests, a time-line of everything that has happened, and a list of everyone whose schedule she indicated had been adjusted because the employee received a DUI. Macias explained to Clark that after this information was reviewed, she would discuss it with OEOP Director, Liana Perez, and Macias would let Clark know if she had a basis for filing a discrimination complaint.)

14-02543 COT000357

# EXHIBIT 15

## INTAKE INTERVIEW

| | |
|---|---|
| DATE: | JANUARY 16, 2013 |
| TO: | FILE |
| FROM: | SR. EQUAL OPPORTUNITY SPECIALIST, MARTINA MACIAS |
| RE: | CARRIE CLARK V. TUCSON FIRE DEPARTMENT |

On January 16, 2013, Martina Macias interviewed Carrie Clark (Clark) at the Office of Equal Opportunity Programs (OEOP). She provided the following information:

She is a Paramedic with the Tucson Fire Department. She gave examples of what she believes are incidents of males being treated more favorably than she, because she is female.

In 2012, Captain Ray Dashiel (Dashiel), who was assigned at Station 9, bid out of Station 9's Engine 9, and won a bid at Station 8 on Engine 8. Dashiel's Station 9 spot was opened for bidding. On August 10, 2012, Captain Chad Dorris (Dorris) won Dashiel's spot at Station 9 on Engine 9. Instead of placing Dorris at Station 9 on Engine 9, the department assigned Captain Brad DeCastro (DeCastro), who had gotten a DUI on July 27, 2012, to that spot on August 14, 2012. DeCastro had finished probation, and was on Swing Shift. Clarks assumes that DeCastro was placed at Station 9 because of the DUI. Someone else who had gotten a DUI had told Clark that when someone receives a DUI, they are allowed to go to and from work, but they have to have a permanent work address, a permanent place where they report to work every day. DeCastro was in Dorris' spot until October 13, 2012. During the time that DeCastro was in Dorris' spot at Station 9, Dorris was at Station 11. Clark heard that Dorris then wanted to assume the spot he had won at Station 9. Clark thinks that when a change is made for a DUI incident, a less senior employee is the one whose spot is taken. Regardless of an employee's position when they receive a DUI, they must be assigned to a permanent work location.

On October 10, 2012, Captain Rob Lewis (Lewis) won a spot at Station 13, and moved out of his Station (possibly 9 or 11). That spot had been vacated by Ed Stevens (Stevens), who had won a bid at another location. Lewis worked at Station 13 on the October 11th and 13th, and on October 17th the department moved Lewis, who was the least senior person at Station 13, to Station 11, and moved DeCastro to his spot at Station 13 so that Dorris could assume his spot at Station 9. Lewis was at Station 11 until December 3, 2012. Chiefs of Operations Ed Nied (Nied) and Rob Rodriguez (Rodriguez) were the decision-makers in DeCastro's moves.

In 2008, Engineer Ron Valencia (Valencia) got a DUI, and was demoted to Firefighter at Station 17. Valencia is no longer a department employee. Clark's understanding of department policy is that if someone is a driver and gets a DUI, they are temporarily demoted because they can not operate a vehicle at work. He might have been moved to Station 17 because there was an opening for a firefighter, or because there was the less senior person who could be moved out. Chief Mike Mckendrick (Mckendrick), now retired, was one of the individuals who made the decision regarding where to place Valencia.

Firefighter Casey Tribolet (Tribolet), from Battalion 1 had a personality conflict with someone at his Station, # 20. Station 20 is a specialty Station, which means one has to have HazMat, and Technical Rescue certifications to be placed there. Tribolet was moved from Station 20 to

Engine 13, Station13 on December 28, 2010, possibly taking Firefighter Ronald Karulski's (Karulski) place. Karulski was a probationary Firefighter in Battalion 3 until January 7th. Karulski was moved from Station 13 to 20; however, he had no specialty Station certifications. He only spent about three weeks there, and then the spot was put up for bid. Karulski then went on Swing Shift, which is what happens after all probationary terms are served in the department.

Clark's point regarding the above-referenced arrangements is that they were swapping people to accommodate DeCastro. Clark wants to be temporarily moved to a Station closer to her mother's home, so her mother will have a shorter distance to travel to get to Clark and pick up breast milk for Clark's baby. In October 2012, Clark asked to swap spots with Paramedic Jeff Todd (Todd), who was at Station 12, because he offered to go to Station 20 so Clark could go to Station 12. Chief Nied told Clark that Todd could not go to Station 20 because he did not have the required certifications. Todd had also offered to go on Swing Shift to help Clark.

Scott Billings (Billings) was going to leave Station 16 to go to Station 12 when he won a bid there. Clark had worked at Station 16 during her probationary year in January 2008. The captain at Station 16, Max Parks (Parks), does not like Clark. When Parks learned that Clark and Todd were trying to switch Stations in 2012, he called Chief Nied and told him that Clark should not be able to go to Station 12 or to his Station, 16. Clark knows that Parks does not like her because on the first day of her probationary assignment under Parks, Parks told her that he did not want a probationary Firefighter, and he did not want a girl. No one heard what Parks said to her, and she did not report it to the OEOP. When Clark met with Chiefs Nied and Rodriguez in 2012 about being assigned to Station 12, Nied told her about Parks' telephone call, and that he had said he did not want her at Station 16.

In May 2011, Paramedic Brett Bradshaw (Bradshaw) was at Station 1. As part of a work improvement plan from around April 30 to June 1, 2011, he was moved to Paramedic Linda Schauf's (Schauf) spot at Station 15. Schauf told Clark that she did not want to go to Station 1 because she had been at Station 15 for a long time. Nied and Rodriguez were the Chiefs at that time. The switch lasted for over one month, and was done so that Bradshaw's work improvement plan could be evaluated by a different captain.

During Clark's meeting with Chiefs Nied and Rodriguez in 2012, Nied told Clark that the department did not swap people's position, and she argued that they did. They also told her that they understood her situation with having to pump breast milk and asked if she had thought about giving milk to her mother ahead of time. Clark responded that she would do so if it were possible. The Chiefs responded that they understood. They went on to speak with her about other possible solutions, such as taking more time off work, but Clark rejected their ideas because she had no more leave time available. They also asked if she would consider going to Station 16, where Billings spot was available; Clark responded that she could not because Parks did not like her. That was when Nied mentioned Parks' telephone call to him. Clark wanted to go to Station 12 because it is the Station closest to her mother's residence, and because there are two other women at Station 12, which made Clark feel comforted. A lot of Stations do not have private rooms, and many sleeping quarters are divided by a curtain. Thus far, Clark has not had to pump breast milk in a bathroom at work.

During Clark's OEOP interview she produced memorandums concerning the following:

- A memorandum from Jeff Todd (Todd) dated October 28, 2012, to Captain Trish Tracy, Chief Stevens, and Clark's husband. Todd directed the memorandum to Stevens, saying that he knew that Carrie Clark needed to be "on this side of town," and asked if he and

**14-02543 COT000334**

Clark could switch spots so Clark could go to Station 12, and he could go on Swing Shift or to Station 20. There was no memorandum response to Todd's memorandum.

- An October 21, 2012, memorandum that Carrie Clark wrote to Chief Paul McDonough (McDonough), asking if she could fill a spot indefinitely, where someone else was going to be gone for a while. Because she was on Swing Shift, she wanted a permanent spot, temporarily at either Station 20 or 12.
- A November 9, 2012, memorandum from Carrie Clark to McDonough reiterating everything that had transpired since Todd's memorandum. Clark's memorandum was a few days prior to her meeting with Chiefs Nied and Rodriguez. In the November 9th memorandum, Clark acknowledged that McDonough had really been trying to help her with her situation, and why Station 12 was the best fit for her and that Station 20 was not going to work for her. She also stated that she understood that the department could not switch people's positions, but that it was up to management's discretion.
- Documentation from the Department of Labor Wage & Hour Division addressing breast-feeding at work.

After reviewing the City of Tucson Chapter 10 Internal Complaint form, Clark stated that she no longer needed to be assigned to Station 12 to be closer to her mother's home because her baby was already eating food. She indicated that she was no longer sure whether she was going to file a complaint, but took a complaint form with her.

14-02543 COT000335

# EXHIBIT 16

## TELEPHONE CALL

| | |
|---|---|
| DATE: | MARCH 12, 2013 |
| TO: | FILE |
| FROM: | SR. EQUAL OPPORTUNITY SPECIALIST, MARTINA MACIAS |
| RE: | CARRIE CLARK V. TUCSON FIRE DEPARTMENT |

On March 12, 2013, Carrie Clark telephoned the OEOP and asked if she could drop off her complaint form and a summary, and said that she did not have time to stay and talk. Macias let her know that she would need to talk with Clark, and that the OEOP was planning to make an appointment with her because they were looking into the situations at each of the Stations she had previously mentioned.

Macias asked Clark if she would prefer to send her information by fax or email so she would not have to make a trip to the OEOP office. Clark responded that it would be easier if she did not have to make an additional trip to the office, because she lives on the other side of town.

Clark also stated that she does not necessarily think that there is someone being "vindictful," as far as not putting her at the Stations that accommodate her with a private room. She was referring to the people who staff employees every day, and clarified that it is someone different every day. Clark said that she does not think that there is someone who is intentionally putting her where there is not a private room. Not everyone who staffs knows her situation; she does not feel like she should have to tell everybody her private business. If the department had accommodated her in the first place, in October 2012, to be at Station 12, her current assignments would not be an issue. She did not disagree that she was aware, in October 2012, that the department was not going to place her at Station 12. Clark agreed that when she last visited the OEOP on January 16, 2013, she told Macias that she no longer needed to go to Station 12 because her son was already eating food. Clark also stated, during today's telephone conversation, that on January 16th, she told Macias that she would think about whether to file a complaint.

Clark added that the Stations are regularly swabbed by an entity equivalent to the Health Department. They find MRSA and fecal matter in the Stations. Every time Clark takes her pumping equipment to work, it takes her about 30 to 40 minutes to decontaminate the room she will be using at the Station. Because she is on Swing Shift, she could be moved to another Station part way through a day. If this happens, she has to go through this same process again at the next Station. She said this is "a huge inconvenience," for her. She has no choice about being on Swing Shift, the only way she could get off of Swing Shift is if a permanent spot opens, she bids on it, and she is the most senior person who bids. That has not happened recently. She bid for, but did not win a spot at Station 12, and the only other spots that have gone open for bid were places that did not have private rooms; such as Stations 8 and 9. Clark stated that she has been at those Stations, and there are no offices, dorm rooms, or conference rooms she can use; there are only rooms with curtains that divide one's bed from the bed of the person next to

14-02543 COT000328

them. The only private rooms are bedrooms. She stated that none of the Stations have a conference room or anything like that.

Clark further stated that she is not aware of any female Tucson Fire Department employees who have gotten DUI's. Clark asked someone who had a DUI, about the requirement that the employee have a permanent work address. That person told her that an employee who has a DUI is allowed to go to and from work, but they have to have a work address of where they are going.

Clark further stated that another person was disciplined for "like fighting at work." He was moved because of that. She is not aware of women who fought at work.

She also stated that she is the only woman, "...in history..." who has been in the situation she is in regarding breast feeding. She clarified that she is the only one who has been on Swing Shift while breast-feeding. For example, there is another woman permanently assigned at Station 12 who is currently breast-feeding. Eight or nine years ago, Chief Laura Baker (Baker) was allowed to stay in a spot so that she could have a private room and be on an 'easy' truck so that she could express milk whenever she needed. Baker was a Captain at Station 9 on an EC truck. There is a spot at Station 9 for the Chief and for the EC Captain. Those two have a private room, separate from where everyone else sleeps. Therefore, when Baker was at Station 9, she had a private room, because only those two people at that Station have a private room.

Clark's problem is that Chief Nied (last year) told her that they did not switch people. Clark responded to him that they had done it before. Chief Nied responded that that was different. Nied, "...talked in a circle, it made no sense about what was different and even the other Chief, Rodriguez interrupted him..." and said that was not quite what happened. Rodriguez said that the switch had been done because it was within a battalion and it was based on seniority. This did not make sense to Clark.

Clark wants a bedroom with a door that closes. A bedroom is the only option Clark has at work; there is no other private room or conference room. She plans to have another child, and can not say whether she will be in the same situation and still on Swing Shift. She would like something in place, so that the next time a female returns to work and is pumping breast milk; they will not have to explain to fifteen different guys what it means to pump at work. If every Station would identify the room that meets the requirements for someone who needs to either breastfeed or pump milk, wherever they would send her on her Swing assignments, she would have no problem with wherever she was assigned.

14-02543 COT000329

# EXHIBIT 17

---

### CITY OF TUCSON
### OFFICE OF EQUAL OPPROTUNITY PROGRAMS AND INDEPENDENT POLICE REVIEW

---

**DATE:** March 22, 2013

**FROM:** Matthew Larsen, Investigator
Office of Equal Opportunity Programs

**TO:** File

**SUBJECT:** American Fair Labor Standards Act Section 7 Compliance

---

This memorandum will serve to document the inspections conducted at 21 Tucson Fire Department stations on March 11 and 21, 2013. The purpose of the inspections was to attempt to verify compliance with Section 7 of the American Fair Labor Standards Act which was amended on March 23, 2010 when the Patient Protection and Affordable Care Act was signed into law. In part, this provision states *"Employers are also required to provide a place other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used to express breast milk."* During these inspections I was accompanied by JoAnn Acedo, Human Resources Manager for Tucson Fire Department on March 11 and by Tucson Fire Department Captain Mike Ward on March 21.

Our Inspections yielded the following results:

**Stations in compliance:**

**Station 1** – Station 1 does contain a room which meets all standards. This is room # 102 and is called the Captains Conference Room.

**Station 4** – Station 4 does contain a room which meets all standards. This room is labeled as room # 130.

**Station 5** – Station 5 does contain a room which meets all standards. This room is not labeled or marked. The room is the first door on the right when entering the dorm area from the day room.

**Station 6** – Station 6 does contain a room which meets all standards. This is room # 113A and is an un-assigned dorm room.

**Station 7** – Station 7 does contain a room which meets all standards. This is room # 121B and is called the Study Room. Furthermore all bunk rooms in this station also meet the standard.

**Station 8** – Station 8 does contain a room which meets all standards. This room is called the Study / Probationary Fire Fighter Room.

**Station 11** – Station 11 does contain a room which meets all standards. This room is called the Study Room.

**Station 13** – Station 13 does contain a room which meets all standards. This room is labeled as room 12.

**Station 14** – Station 14 does contain a room which meets all standards. This room is called the Study Room and does contain a bed but it is used only as an overflow. *If the room is used for sleeping quarters the station would be out of compliance.

CITY OF TUCSON
OFFICE OF EQUAL OPPROTUNITY PROGRAMS AND INDEPENDENT POLICE REVIEW

**Station 15** – All dorm rooms at this station are private and have individual locking doors.

**Station 16** – Station 16 contains two rooms which meet all standards. These rooms are off of the workout room and neither is labeled or numbered.

**Station 17** – Station 17 does have a room which meets all standards. This room is called the Study Room.

**Stations not in compliance:**

**Station 3** – Station 3 does not contain a room which meets physical requirements with the exception of the dorm rooms which do not have locking doors. Adding locks to dorm room doors would bring the station in to compliance.

**Station 9** – Station 9 does not contain a room which meets all physical standards. The dorm rooms have curtains as doors and can not be secured. The station does have a study room which would require a new door and lock to meet standards.

**Station 10** – Station 10 does not contain a room which meets all standards. The Study room would require a lock on the back door to meet all standards.

**Station 12** – Station 12 does contain a private room called the Study Room, but that room can not be secured. Adding a lock to this room would bring the station in to compliance.

**Station 18** – Station 18 does not contain a room which meets all standards. Locks being placed on all (4) dorm rooms would bring the station in to compliance.

**Station 19** – Station 19 does not contain a room which meets physical requirements with the exception of the dorm rooms which do not have locking doors. Adding locks to dorm rooms would bring the station in to compliance.

**Station 20** – Station 20 does contain a private room, Room 103, but that room can not be secured. Adding a lock to this room would bring the station in to compliance.

**Station 21** - Station 21 does contain a private room, Room 103, but that room can not be secured. Adding a lock to this room would bring the station in to compliance.

**Station 22** – Station 22 does not contain a room which meets all standards. Adding locks to dorm rooms would bring the station in to compliance.

# EXHIBIT 18



# MEMORANDUM

**DATE:** March 26, 2013

**TO:** Jim Critchley, Fire Chief
Tucson Fire Department

**FROM:** Robert Barton, Program Manager
Office of Equal Opportunity Programs

### SUBJECT: Paramedic Carrie Clark – Tucson Fire Department

On March 8, 2013 Paramedic Carrie Clark contacted the Office of Equal Opportunity Programs to discuss her concerns that her special requests regarding breast feeding needs as required by the American Fair Labor Standards Act Patient Protection and Affordable Care Act (PPACA) were not being met by the Tucson Fire Department. The process to initiate a complaint/investigation was described to Paramedic Clark, which included filing a written complaint with this office. Following several requests to complete the necessary documentation, Paramedic Clark failed to initiate a formal complaint.

An informal review was conducted by OEOP regarding the information presented by Paramedic Clark, the findings of which did not reveal a prima facie case of an act or acts in violation of Chapter 10 City of Tucson Discrimination/Harassment Administrative Directive 2.05-8. Additionally, the review included an information gathering process with respect to Paramedic Clark's stated difficulties in securing Swing shift assignments at Fire Stations with rooms that meet the PPACA requirements.

An on-site inspection was conducted by OEOP investigator Matt Larsen in conjunction with TFD staff members JoAnn Acedo and Captain Mike Ward to evaluate each TFD facility related to PPACA standards. A copy of Mr. Larsen's report is attached which identifies the stations in compliance and the stations that are not in compliance.

Two areas of concern were identified by OEOP, and it is recommended that the Tucson Fire Department address these issues to alleviate potential future complaints from other Department members.

> ➤ The OEOP recommends that the Tucson Fire Department assess the feasibility of implementing a uniform process through which its employees can submit requests for work assignments that address unique circumstances related to compliance with State, Federal, or local law (Special Needs requests).
> ➤ The OEOP requests that within thirty (30) business days, the Tucson Fire Department's Human Resources Manager submit to the OEOP, a report showing the manner in which the Fire Department will correct deficiencies at the noted Fire Stations in order to comply with the PPACA standards.

If you have additional questions or concerns, please feel free to contact me.

# EXHIBIT 19

INTERVIEW

Date:   March 22, 2013

To:     Intake File

From:  Martina Macias, Sr. Equal Opportunity Specialist

Re:     Carrie Clark - Tucson Fire Department

On March 22, 2013, Program Manager Bob Barton met with Captain Rick L'heureux (L'heureux), Human Resources Manager JoAnn Acedo (Acedo), and Union Representative Chris Conger at the Office of Equal Opportunity Programs. Captain L'heureux stated the following:

His is responsible for assuring that the duty roster on C Shift A is a complete roster. This means assuring that all vacant spots are filled with Swing and extra duty personnel. Sometimes only half of a 24-hour shift needs to be filled.

Regarding Swing Paramedic Carrie Clark's (Clark) breast-feeding requirements, L'heureux has received assignment requests from her, regarding Stations where she told him she could not work. She also sometimes has other types of requests; most Swing shift personnel have preferences about where they want to be; for example, whether they prefer the East or West side of town. L'heureux tries to accommodate Swing personnel requests whenever possible. Sometimes, based on the roster, he can not grant some requests. L'heureux relies on the Rules of Assignment when deciding how to make assignments. Some of the things considered in staffing include a person's seniority. However, if there is a specialty assignment; for example, a TRT (tactical response team) or HazMat (Hazardous Materials), the person with that certification gets that spot regardless of seniority or Battalion placement. The more senior person, with the required certifications, gets the spot if they are in the district or Battalion that needs the spot filled. Staffers try to go in order of, "Specialty," "Battalion, (or district)" and "Seniority," when deciding assignments. For example, in the morning, when they have "Swingers," that they need to assign, they assign them first by district for Battalions 1, 2, 3, or 4. If the Battalion has Swingers, and there is a spot open somewhere in that Battalion, the swinger will get the spot unless things like Specialty, TRT, or HazMat come into play.

L'heureux asked Clark where she could not work, and she gave him a list of Stations where she could not work. That is the list L'heureux has been going by when making assignments for her. None of the Stations on the list are specialty Stations, so this aspect has not been a problem when putting her where she needs to be. On one occasion, L'heureux put Clark at a specialty Station, # 20. To L'heureux's knowledge, there has been no conflict regarding where she has been working, with regard to her breast-feeding needs.

If there are ever two Stations that need a paramedic, and one of the paramedics has more seniority than Clark, Clark will be assigned to the Station that meets her needs. This specific scenario has not occurred. If both Stations meet her needs, the staffer will go by seniority to make the assignment. L'heureux reiterated that he has only had the list of Stations that Clark gave him, to go by.

For the first time, this Wednesday, there were Stations that needed a paramedic, but did not meet Clark's requirements. L'heureux referred the matter to his Chief. It turned out, according to L'heureux' Chief, that the Station Clark was assigned to was one that met the requirements

1

14-02543 COT000321

for what Clark needs. It was half of a p.m. shift at Station 9. Clark ended up not going to work that night.

When L'heureux learned that the OEOP was having a fact-finding meeting with him, he checked the assignment records dating back to when Clark returned from maternity leave. He discovered that there have been no other instances where Clark called in sick or did not go to work because of one of her assignments.

On occasion, Clark has called in sick without talking to L'heureux; she has jumped the chain of command and spoken directly to her Chief instead of the staffing captain. This has been happening quite a bit.

There has not been an occasion when L'heureux has had to 'bump' someone to place Clark in their assigned location, at Clark's request. There was one time when L'heureux overlooked a specialty aspect, and he had to 'bump' a paramedic for Station 20 because Clark had the specialty certification. The bumped paramedic telephoned L'heureux and asked why he had been bumped out of Station 20, because he was senior to Clark. L'heureux responded that Clark had the specialty certification. That was the end of their conversation. L'heureux has not mentioned or discussed with any personnel, that they were being bumped because Clark had a special needs request. There has been no instance where this type of reassignment has occurred, therefore, there would not have been a time when he would have made such statements.

Last Wednesday Clark was off during the a.m. shift and was scheduled for the p.m. shift. She telephoned L'heureux, crying, and said she could not work at her assigned Station. L'heureux offered to bump someone, but Clark declined his offer and told him not to do it because the person was going to hate her for it. That was the first time that L'heureux would have had to bump someone to meet Clark's needs.

L'heureux stated that it would have been helpful, when Clark first started making her reassignment requests, if there had been some official notification giving L'heureux direction regarding Clark's needs and a list of the Stations that met those needs.

L'heureux clarified that he tries to be as transparent as possible in his job. He wants there to be justification for every switch or move he makes. He needs a reason for placing people where he does. In other words, he wants to be able to explain and justify the assignments he makes when someone questions what he has done. He likes to be able to do this by referencing specific policies or the Rules of Assignment. His goal is to be as fair as possible regardless of who it is. He tells Swingers to call him if they have a special request. He will grant their request if it does not affect someone who has the right to be where they have already been assigned. He has also let people know that they can ask someone else if they are willing to switch assignments with them.

Acedo stated that she has no knowledge of Clark making a special request regarding her breast-feeding needs. Employees have submitted special request in the past. Usually, a request is made by the employee and it is taken up the chain of command. In this case, there was never a formal or informal request made by Clark, and Acedo was unaware of Clark's situation until she received a call about it from OEOP.

L'heureux added that Carrie Clark has been assigned to Station 6 for the remainder of her current tour.

14-02543 COT000322