# EXHIBIT 28

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3

4   CARRIE FERRARA CLARK,          )
                                   )  No. CV-14-02543
5        Plaintiff,                )     TUC-CKJ
                                   )
6        vs.                       )
                                   )
7   CITY OF TUCSON,                )
                                   )
8        Defendant.                )
    _____)
9

10

11

12

13

14

15              DEPOSITION OF LAURA BAKER

16                   May 10, 2016

17                  Tucson, Arizona

18

19

20                   Reported by:
                 Barbara Brodrick, RPR, CR
21                    CR# 50188
    _____
22          CALABRO REPORTING SERVICES, L.L.C.
                 Certified Court Reporters
23                549 North Sixth Avenue
               Tucson, Arizona  85705-8371
24           520.798.1808   800.538.6692
                  Fax:  520.620.0660
25               www.calabroreporting.com
    APPEARANCES:
```

1    knowledge were those people not following the trade

2    policy?

3        A    I don't know, because I do not know the

4    specifics to that -- the incident or incidents that

5    took place.

6        Q    Do you know who might be the more appropriate

7    person to ask those questions?

8        A    At the time it was Assistant Chief Brad Olsen.

9        Q    To your knowledge how do shift trades between

10   employees work?  Let's stick with this time frame

11   around February 8, 2013.  I understand there were some

12   changes.

13       A    In my words, how a trade works is it's between

14   individuals, so the trade is between the employees.

15   And essentially one employee works for the other on

16   their shift and that employee that that person worked

17   for would work for the other person at a later time on

18   their shift.

19       Q    Essentially owes them a shift back?

20       A    Correct.

21       Q    In practice does a supervisor actually decide

22   whether or not to grant the trade or is it just between

23   employees?

24       A    At this time, yes.

25       Q    At this time what?

1    A    Today's date that's part of the policy that a
2    supervisor will approve trades.
3    Q    So as of today supervisors must approve trades
4    between employees?
5    A    To the best of my knowledge.
6    Q    Back in February of 2013 when this old policy
7    was in place, in practice, did supervisors actually
8    approve trades?
9    A    I've been removed from operations for a while.
10   Trying to reflect back when I was in the field.  I
11   don't recall, and I would have to say I don't believe
12   they did.
13        But essentially you would communicate with
14   your captain if you're going to be off a shift, so if I
15   was making a trade with another employee my captain
16   would know.
17   Q    That's fair.  When were you deputy chief over
18   operations?
19   A    May of 2014.
20   Q    For how long?
21   A    Technically through January of 2015.
22   Q    My question wasn't really what was in the
23   policy, but to your recollection back in February of
24   2013 or thereabouts what was the practice, not
25   necessarily the policy?

1   If I understand you correctly, what you're

2   saying is that in practice the shift captain would know

3   but there wasn't really a formal approval required.

4       A   So I wasn't in operations in 2013.  I'm

5   reflecting back to when I was actually in the field,

6   which would have been in 2007.  So I can only reflect

7   back to how it was then.

8           As I became the operations deputy chief, to be

9   honest again I think that the communication to your

10  supervisor was provided as far as who you're going to

11  be trading with, but I don't think we had a mechanism

12  for approval, to the best of my knowledge.  I'm not

13  sure.

14      Q   That's fair.  Thank you.

15          To your knowledge were trades determined by

16  chief officers, a battalion chief or on up, to decide

17  whether or not a trade was granted?

18      A   Are we talking 2013 or today?

19      Q   2013.

20      A   Like I stated earlier, I believe or what I

21  would recollect from when I was in the field, your

22  captain would know.  So as far as if I was a captain.

23  I would be informing my supervisor so a battalion chief

24  at that point, my practice would be that my chief would

25  know if I was taking a trade and with whom.

1   But if you're below a captain in rank, I don't

2   know that a chief would necessarily know of that trade

3   other than looking through the staffing roster.

4   Q   I'm not really talking about knowledge.   I'm

5   talking about approval authority.

6   And I get that you're going to alert your

7   chain of command.   That makes sense, but I'm talking

8   about approval authority.

9   A   Not from what I recall from back in the field

10  in '07 and I don't know that policy's changed that much

11  but I don't know because I wasn't involved in

12  operations as closely, or with any of the updated

13  policies at the time.

14  So obviously this was revised in 2013, so I'm

15  assuming there was some change from '07 when I was in

16  the field to this, but I don't know.   I do not know

17  what those changes were.

18  Q   To your recollection you don't have any memory

19  of a chief level member determining whether or not a

20  trade could go through between members?

21  A   Correct.   I don't recall that.   No.

22  Q   In your time as a chief have you been involved

23  in a situation where you had to intervene and prevent

24  members from making trades?

25  A   Subsequently, so I was a deputy chief with

1   Chief Rodriguez when I believe that Carrie and Gordon

2   had done some trades.  So I was involved, but not

3   really.  It was really under his leadership of handling

4   that.

5       Q    Other than the circumstance involving Deputy

6   Chief Rodriguez, have you been involved in any other

7   situations where you had to intervene and prevent

8   members from making trades?

9            MS. SAAVEDRA:  Form.  You can still answer if

10  you can.

11      A    Not that I recall.

12      Q    (By Mr. Jacobson)  Tell me what you recall

13  about the situation involving trades between Capt.

14  Gordon Clark and my client, Paramedic Carrie Clark,

15  where department Chief Rodriguez intervened.  Just tell

16  me what you remember.

17      A    What I recall is --

18           MS. SAAVEDRA:  Object to form before she does

19  that.

20      Q    (By Mr. Jacobson)  You can answer if you

21  remember.

22      A    What I recall is Gordon was working for Carrie

23  and I believe under the notion of a trade, essentially,

24  and based on the policy as I recall, the trades needed

25  to be between of the same rank.  And he was a captain

1    and she was a paramedic.

2         So it was addressed but I don't recall all the

3    details, when it happened or what -- what not.  I don't

4    remember what time of year that was.

5    Q    That's fair.  Do you remember why you were

6    involved since it is Deputy Chief Rodriguez' deal?

7    A    So Chief Rodriguez and myself were both the

8    operations deputy chiefs, so you're around some issues

9    going on.  It's a fairly busy job, so to speak.  So I

10   wasn't involved in all the details with it and he

11   pretty much handled it.  But I was certainly assigned

12   to operations at the time.

13   Q    Did Deputy Chief Rodriguez ask you to

14   participate in this particular issue?

15   A    I don't believe so.

16   Q    Do you know why you were involved in this

17   particular issue?  I understand you were both assigned

18   to operations, you're working in the same work space

19   but I'm wondering why you were involved in this

20   particular issue.

21   A    It was still an operational issue of which I

22   was a deputy chief along with Chief Rodriguez in

23   operations.

24   Q    So you were both deputy chiefs?

25   A    Correct.

1      Q    That's fine.  Subsequent to that December 8,

2    2014, meeting did you find out that Capt. Langejans was

3    not being truthful or candid during that meeting?

4      A    You're asking if I found out after that

5    meeting if he was or was not being truthful?

6      Q    During the meeting.

7      A    I don't recall exactly what he said in that

8    meeting, so I'm not sure.

9      Q    Did you later learn that Capt. Langejans

10   admitted that he did in fact say negative things about

11   Carrie Clark in fire prevention?

12     A    I would have to reference my memo that I sent

13   to the fire chief on my internal investigation as to

14   what Capt. Langejans stated.  That would help.  That

15   would help me.

16     Q    Do you remember what date that document is?

17     A    It should have been around February 2nd.

18     Q    2014?

19     A    2015.

20     Q    When we take a break I'll get that for you.

21          (10-minute recess)

22          (Exhibit No. 9 marked for identification.)

23     Q    Showing you what's been marked as Exhibit 9;

24   do you recognize that document?

25     A    I do.

```
 1        Q    And what is that document?
 2        A    This is my memo to the fire chief after the
 3   investigation that myself and Chief Carsten conducted
 4   regarding investigation of fire prevention workplace.
 5        Q    And that goes back to the Friday December 5th,
 6   2014, initial complaint from Capt. Clark and the Monday
 7   December 8, 2014, follow-up meeting, correct?
 8        A    That is included in here, yes.
 9        Q    Have you had a chance to review this document
10   number nine?
11        A    Yes.
12        Q    And you authored this, correct?
13        A    Correct.
14        Q    Anything you want to add, change, amend about
15   it?
16        A    No.
17        Q    Willing to swear to the truth of everything
18   you put in there?
19        A    Yes.
20        Q    So now that you've had a chance to review this
21   February 5, 2015, memorandum I'll reask the question
22   that I asked earlier:  Did you later learn that Capt.
23   Langejans admitted that he did in fact say negative
24   things about Carrie Clark?
25        A    Based on the December 8 meeting?
```

1   Capt. Langejans made about Capt. Clark?

2      A   My findings --

3         MR. McCRORY:  Capt. Carrie Clark?

4         MR. JACOBSON:  It says "Captain."  The first

5   sentence under the heading Disposition Statement on

6   page 12 of 13 on Exhibit 9.

7      Q   (By Mr. Jacobson)  Do you recall what those

8   statements were?

9      A   So I can refer to page four on the Findings.

10  That spelled out a little bit clearer what was stated

11  or presumed stated.

12     Q   Those were your findings though, correct?

13     A   Correct.

14     Q   That's fine.  After this memo on February 5th,

15  2015, or before, were you in a position to decide

16  whether or not Capt. Langejans should be disciplined as

17  a result of your findings?

18     A   Yes.

19     Q   And what was your decision?

20     A   So the deputy chief in prevention handled the

21  discipline, the major part of the discipline process,

22  then brought it to me for review.

23     Q   So you did the investigation, correct?

24     A   With Chief Carsten.

25     Q   So you and Chief Carsten did the

1   investigation, correct?

2       A   Yes.

3       Q   And you wrote up this memorandum to Fire Chief

4   Jim Critchley, correct?

5       A   Correct.

6       Q   What parts did Chief Carsten take part in the

7   disciplinary process?

8       A   He went through the matrix, the process -- the

9   matrix -- and made his recommendation to me.

10      Q   So he was like the proposing official?   He

11  proposed what discipline he believed should be imposed

12  on Capt. Langejans?

13      A   Correct.   He went through the policy, the

14  discipline policy, and looked at the matrix based on

15  our findings and utilized that matrix accordingly.

16      Q   What was his recommendation based on his

17  review of the matrix?

18      A   A written reprimand.

19      Q   What was your decision after you reviewed

20  Chief Carsten's recommendation to you?

21      A   I concurred with his recommendation.

22      Q   And that was based on the matrix?   Was that

23  based on the matrix that is Exhibit 5 or whatever

24  matrix was in effect at the time of this?

25      A   Yes.   It would have been whatever matrix was

1  in effect at that time, which looks similar to this but

2  I'd have to compare to make sure.

3      Q    Were you influenced in any way by anyone in

4  your chain of command as to what level of discipline

5  Capt. Langejans should receive?

6      A    No.

7      Q    So this was your decision essentially alone?

8      A    No.  As I stated Chief Carsten went through

9  the process, looked at the findings, took the matrix

10  and dealt with the discipline as he felt appropriate

11  and made the recommendation to myself, of which I

12  concurred with his findings and the recommendation for

13  discipline.

14      Q    At the end of the day it was your decision,

15  right?

16      A    No.  I concurred and then it goes to a

17  discipline review board who then reviews it, as stated

18  in the policy.  And then if they agree with the

19  discipline being given for that action then the

20  discipline is delivered.

21      Q    Who sits on the discipline review board?

22      A    Various personnel within the department based

23  on the rank of the person that's being disciplined,

24  including union member, and then I think up to a

25  battalion chief, as I recall.

1   violation.

2       Q   Did you ever hold an opinion as to whether or

3   not Capt. Langejans created a hostile work environment

4   in fire prevention?

5       A   Could you repeat?

6       Q   Did you ever hold an opinion as to whether or

7   not Capt. Langejans created a hostile work environment

8   in fire prevention?

9       A   I have a whole bunch of opinions; however,

10  based on findings, the investigation, there was not a

11  hostile work environment in fire prevention.

12      Q   And I know it's the way lawyers think --

13  occupational hazard -- drives my spouse and family

14  members crazy -- my question was whether or not you

15  held an opinion, not what your opinion is.

16          But I gather you did hold an opinion whether

17  Capt. Langejans created a hostile work environment in

18  fire prevention and that opinion was that he did not,

19  correct?

20          MS. SAAVEDRA:  Form.

21      Q   (By Mr. Jacobson)  Maybe I'll just move on.

22  I'll just move on.  I think you answered the question.

23          As part of your investigation or in your

24  capacity as assistant chief, do you recall receiving a

25  memo from Inspector Tom Sisterman, S-i-s-t-e-r-m-a-n,

1    far as I recall.  To my knowledge he works a four 10

2    work schedule.

3        Q    Okay.  You answered the question.  That's

4    fine.

5            At the time that you investigated -- or you

6    and Chief Carsten investigated Capt. Langejans or this

7    incident as brought to you by Capt. Clark, how many

8    investigations had you done approximately?  I won't

9    hold you to a number.

10       A    I received those memos that you just

11   described, so the investigation was not specific to

12   Capt. Langejans.

13       Q    Again, it's probably an inartfully-worded

14   question.  At the time that you did the investigation

15   that led to this February 5, 2015, memo, approximately

16   how many investigations had you done in your career?

17       A    Zero.

18       Q    Did you and/or Chief Carsten assign members of

19   the prevention section or division to attend a

20   mandatory training called Respectful Workplace

21   Training?

22       A    Yes.

23       Q    And that training was to occur on March 4,

24   2015, approximately?

25       A    Approximately, yes.

1    Q    Did everyone attend that training?

2    A    On that date?

3    Q    Yes.

4    A    No.

5    Q    Do you know how many attended and how many

6  didn't?

7    A    No, but I know I wrote down those that did not

8  and gave them to Chief Carsten to follow up on.

9    Q    Do you know what happened to any of the people

10  that did not?

11         Was there a follow-up Respectful Workplace

12  Training that occurred?

13    A    There was multiple follow-up Respectful

14  Workplace Trainings that occurred.  Not specific to our

15  department but that were given throughout the city.

16    Q    Do you know what happened to any of the people

17  who did not attend that Respectful Workplace Training

18  on March 4, 2015?

19    A    My intention was that they attended it.

20    Q    You don't know whether or not all of the

21  members of fire prevention actually eventually ended up

22  attending a Respectful Workplace Training session?

23    A    No.

24    Q    Since Capt. Langejans received his written

25  reprimand, have you received any complaints against

# Deponent's Correction Sheet/Signature Page

**Case:** Carrie Ferrara Clark vs City of Tucson
Case No. CV-14-02543 TUC-CKJ

**Deposition Of:** Laura Baker

| Page | Line | Correction | Reason for Correction |
|------|------|------------|------------------------|
| 21 | 17 | change to "exchange" | meaning of |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

I have read the deposition taken **May 10, 2016.** Having made the corrections, knowing the penalties of perjury, the foregoing is a true and correct transcript of my testimony.

Deponent: _____

Date: ____5/26/16____

**Calabro Reporting Services, L.L.C.**
549 North Sixth Avenue
Tucson, Arizona 85705-8371
**520.798.1808**

# EXHIBIT 29

| Tucson Fire Department Manuals Manual Change | Section 220 Nursing Rooms Policy |
|---|---|
| Manual of Operations Page 1 of 1 | New: July 19, 2013 |

220      Nursing Rooms

220.1    Purpose

To establish the Tucson Fire Department's nursing room policy and procedures for employees and to comply with the provisions of the American Fair Labor Standards Act (FLSA): Patient Protection and Affordable Care Act.

220.2    Background

The American Fair Labor Standards Act (FLSA): Patient Protection and Affordable Care Act requires employers to provide a reasonable break time for an employee to express breast milk for her nursing child for one year after the child's birth. In addition, Section 7 requires employers to provide a place other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which can be used to express breast milk. A full version of the Act can be obtained through this link.
(http://www.dol.gov/whd/nursingmothers/Sec7rFLSA_btnm.htm)

220.3    Policy

220.3.1  The Tucson Fire Department (TFD) will ensure that all department facilities have a nursing room that complies with the aforementioned FLSA requirements, including all fire stations.

220.3.2  A list of nursing rooms available at TFD facilities is available at TFD's Human Resources Manager's office.

220.3.3  If the frequency of breaks needed is such that a safety issue arises, re-assignment may be considered.

220.3.4  Any employee requiring the need for a temporary assignment while nursing must submit a memo request to TFD's Human Resources Manager thirty (30) days in advance. The request will be reviewed based on the department's availability.

220.3.5  Management maintains the right to assign work and schedules based on the need of the department, the employee and the execution of the department's mission which includes uninterrupted emergency service to the community.

14-02543 COT001145

# EXHIBIT 30

**From:**      JoAnn Acedo
**To:**        Brad Olson
**CC:**        Ed Nied;   Karen Tenace;   Rob Rodriguez;   Veronica Munoz
**Date:**      7/19/2013 4:40 PM
**Subject:**   Temp Assignment

Chief,

The temp assignment that was given to Carrie Clark can now be lifted because she has exhausted the one year timeframe from the birth of her baby as of today.   She now can be assigned to her normal swing shift after today.

Thanks,
JoAnn

COT002009

# EXHIBIT 31



# MEMORANDUM

**DATE:**    July 27, 2013

**TO:**   Tim Nofs            **FROM:**   Carrie Clark
          Battalion Chief              Paramedic
          Battalion 4'C'              Engine 6'C'

**SUBJECT:**        Request for continued assignment to Engine 6'C'

I am writing you to request I stay at Station 6, for at least the next few months, if not longer. As we discussed, I am still pumping milk for my son, and have not been able to fully ween my child as of yet. I have a good system set up here, and I prefer to stay in one place while pumping, so I don't have to drag my supplies throughout different stations daily. Also, I am very uncomfortable about how I am being treated after the department's release of Master Memo 32, Nursing Rooms Policy. Last week I was mocked and joked with by a department member in front of other crew members in regard to the policy, and right now it is still uncomfortable for me to have to explain this situation to everyone who thinks they need to know about it. Both my husband and I are continually told that this policy is being referred to as "The Carrie Clause," or the "Carrie Rule". The crew I am working with here at Station 6, and my immediate supervisor ( Chief Nofs) has been very supportive of my situation, and at this time I don't feel comfortable being assigned back to Swing and having to be exposed to more of the ridicule that I am experiencing. Therefore, I would respectfully ask to stay where I am at Station 6 'C.'

# EXHIBIT 32



# MEMORANDUM

DATE:   September 18, 2013

TO:   Tim Nofs
      Battalion Chief
      Battalion 4 C

FROM:   Carrie Clark
        Paramedic
        Engine 6 C

**SUBJECT:**   Response to HR Director Acedo's Memo

I am writing this memo in response to the memo I received from H.R Director Acedo on September 4th. I believe there are many inaccuracies in her memo, and I want to take this opportunity to clarify them.

On August 2, 2013, Chief Olson and Chief Rodriquez came out to Station 6 and requested to speak with me and Captain McDonough. During that conversation, the memo I sent on August 1st was brought up, and the concern of harassment was discussed. I explained the situation I had referenced in the memo to both Chiefs Olson and Rodriguez and to Captain McDonough (since he was not present when it occurred). After some discussion about the incidents, I, along with both Chiefs came to the conclusion that I would chalk this up to "people being insensitive." I explained that I never had any desire to file any type of harassment claims, and that I was just simply stating the facts of what both me and my husband had experienced since Master Memo 32 had been published. Once my husband was teleconferenced, he stated the same thing, as in we agreed that people were just insensitive to my ongoing situation, but that we had not, and did not want to pursue a harassment claim against anyone.

Next, after discussing the above events, both Chiefs Olson and Rodriguez explained that I could stay at Station 6 as a permanent assignment. Both Chiefs Olson and Rodriguez stated that I should talk to my crew, and send them a memo stating my desire to be placed at Station 6 permanently. The following week I sent that memo to Chief Rodriguez. Chief Rodriguez acknowledged receipt and gave Chief Nofs the direction to fill out the Personnel Update Form for my assignment to Station 6C.

On Aug 23rd, Chief Rodriquez called me at Station 6 and told me H.R. Director Acedo was in the room on speaker phone. Chief Rodriguez told me he had made a mistake about Station 6, and because it had never been bid for a Paramedic spot, that he would have to bid the spot, and I would go back to swing. He told me to let him know when my "need" was done, and I would be placed back on swing. At the end of the conversation, Chief Rodriguez stated I would be receiving a memo summarizing the conversation that had just taken place.

Two weeks later, on September 4th, I received a memo from H.R. Director Acedo. This memo references a conversation held on July 19th, not August 23rd. I never had a conversation with Ms. Acedo on July 19th. Additionally, the memo goes on to state that the department is required to provide me "a reasonable break time to express milk for one year." My concern with the department has never been "finding a reasonable time to express milk." My concern then, and

COT002195

still now, is that the department was not compliant with the federal law stating my work place is, "required to provide a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk."

Additionally, Ms. Acedo states in her memo that I was granted an extension of three months, which expires on October 18, 2013. If I was granted this extension of three months, why was I just notified of this on September 4th, 2013? I was just told by Chief Rodriguez on August 23rd to notify him when my "need" was done. I was never given a date of October 18th, or a timeline of three months.

The second part of Ms. Acedo's memo was a summary of the meeting I had with Chief Olson, Chief Rodriguez and Captain McDonough, and a few minute teleconference to my husband Gordon. Ms. Acedo stated that in regards to the remarks that had been made to both me and my husband, when we were asked to disclose who those members were, and what was said, both of us refrained from providing ANY information and chose not to file a claim. While I can agree that we did not choose to file a claim, I will disagree with the statement that we refrained from providing ANY information. The conclusion that was reached by those present at that meeting, is that the incidents that took place are considered by us to be "insensitive joking" by fellow members. At no time during our meeting did I ever refuse to give any details whatsoever. I openly explained the situation that took place here at my station because I wanted Chiefs Olson and Rodriguez to know that my Captain was not there that day, and he knew nothing about the remarks that were made. I also stated that when my husband worked extra duty recently, he was bombarded with questions from other members regarding my situation, the Master Memo that was published, and how and why I ended up at Station 6. When he was teleconferenced, he stated the same thing.

Lastly, the title in this memo line is "request for special assignment." I want to make sure everyone is clear that I never requested a "special assignment." I had asked to go to Station 12 back in October when an opening had occurred, and that request was denied. Since then, I had requested only to be assigned to stations that accommodate the new federal law, requiring me to have a private room to pump throughout my work day. I was told on March 20th, 2013 by Chief Fischback that I would be assigned to Station 6. He stated he would have a lock placed on the door by the next shift, and I would be assigned there throughout the remaining first year of my son's life. This assignment took place after I was assigned to Station 9 on March 20th. I had made multiple calls throughout that day to Chief Rodriquez, and never got a return phone call. I finally reached Chief Fischback at 5pm. During a conference call with Chief Fischback, Chief Rodriquez, and Ms. Acedo, I was told by Chief Rodriguez, "this is the only opening (Station 9) we have for you tonight." To which Ms. Acedo added that "my pumping seemed excessive to her," and that she thought "it seems you're not fit for duty." Ms. Acedo also told me Station 9 was appropriate for me because the Chief and EC Captain had private rooms, and I could ask them, or wake them to use their bedrooms when I needed to pump.

This past year has been one of the hardest times in my life, and mostly because of what has transpired at work. I had a child and chose to nurse him, and because I presented with a unique situation of being on swing, I feel as though I am being punished for this. This memo that was sent to me, not only had many inaccuracies, but it omitted very factual information. In the future if Ms. Acedo needs to contact me, I would appreciate it if it could be through my chain of command and not to me directly. She was very disrespectful to me back on March 20th, and that has since created a very uncomfortable working environment for me to have any dealings with her. I brought this disrespect to the attention of Chiefs Fischback, Nied and Rodriguez when I was written up for defending myself to JoAnn, and I was told, "well that's just your opinion."

COT002196

Since our policies do not allow conversations to be recorded, and I did not have three other people in the room that could vouch for me when these remarks were made to me, how am I to have anyone around to defend me when I'm treated poorly by my administrative staff? I wish I would have done more about this treatment at the time it occurred.  I would also hope that my administrative staff would take into consideration the way our Human Resources Director is choosing to treat their employees that they are supposed to be a liaison for.

This situation has been going on for almost a year now. I don't know why this had to be such a difficult thing to handle, when it seemed that a little courteous decision making in the beginning could have prevented all that has since occurred.  My desire is still to remain at Station 6, I plan to have another child, and hope I never have to experience what I just went through again in this past year.

COT002197

# EXHIBIT 33



# MEMORANDUM

**DATE:**   November 4, 2013

**TO:**   Carrie Clark
Paramedic Firefighter
Station 6, C Shift

**FROM:**   Rob Rodriguez
Deputy Chief Operations
Fire Central

**SUBJECT:**      Current Assignment Clarification

This memo serves as a recap of the conference call held today that included you, Captain Ted McDonough, Battalion Chief Tim Nofs, TFD Human Resources Manager JoAnn Acedo and me. The conference call was held in response to your e-mail reply to Chief Nofs on November 3 that read, "… I do still have a need to be at Station 6, and I would like to remain there until I finish nursing my second child."

Ms. Acedo asked two questions:

1. 'Are you nursing your second child,' to which you replied, "No."
2. 'Are you nursing your first child,' to which you clarifed that you still have the need to express breast milk for your first child.

I asked if you had any further questions, and you stated you had not received a memo as to why you could not remain in a permanent assignment on Engine 6 C Shift. The explanation was given to you in our August 23 conversation, but it was not included in Ms. Acedo's August 30, 2013, memo entitled "Request for Special Assignment". As you captured in your own memo to Chief Nofs on September 18: "… Chief Rodriguez told me he made a mistake about Station 6, and because it had never been bid for a Paramedic spot, that he would have to bid the spot, and I would go back to swing. He told me to let him know when my 'need' was done, and I would be placed back on swing. …" This information was not included in Ms. Acedo's August 30 memo, but as I reiterated today, it holds true, particularly since we have a need for swing paramedics.

Ms. Acedo stated she would again check with you in a few months (January). I asked that you bring it to our attention sooner should you no longer have the need to express breast milk; you agreed. Chief Nofs nor Captain McDonough had questions or comments. Should you have further questions or comments, please bring them to our attention via the chain of command.

Thank you

cc: TFD HR Manager JoAnn Acedo
Assistant Chief Operations Brad Olson
BN04 C Chief Tim Nofs
EN06 C Captain Ted McDonough

# EXHIBIT 34

PG-B

# CHARGE OF DISCRIMINATION  Page 1 of 2

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☒ FEPA | TOO120130000486 |
| ☐ EEOC | 35A-2013-00456C |

## Arizona Attorney General's Office Civil Rights Division and EEOC

State or Local Agency, if any

JUL 31 2013  CIVIL RIGHTS DIVISION  TUCSON OFFICE

| Name (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Mrs. Carrie A. Clark | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICE SHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME. (If more than one, list below.)

| NAME | NUMBER OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| City of Tucson, Fire Department | U | (520) 791-4512 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 300 South Fire Central Place | Tucson, Arizona 85701 | Pima |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

**FILED**

JUL 31 2013

CIVIL RIGHTS DIVISION

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA) |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☐ AGE | March 23, 2013 |
| ☒ RETALIATION  ☐ DISABILITY  ☐ GENETIC TEST RESULTS  ☐ OTHER (Specify) | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I.    **PERSONAL HARM:**    A. I was subjected to different terms and conditions of employment.

II.    **RESPONDENTS REASON FOR ADVERSE ACTION:**  A. None given.

III.    **DISCRIMINATION STATEMENT:** I believe Respondent discriminated against me because of my sex, female, condition postpartum, and because I opposed a practice made unlawful under the Arizona Civil Rights Act, as amended, and Title VII of the Civil Rights Act of 1964, as amended. The particulars are:

    A.    On or about July 5, 2007, I was hired as a Firefighter. Most recently as of January 2011, I have performed the duties as a Paramedic. My immediate supervisor is Paul McDonough ("McDonough"), Respondent's Battalion Chief.

    B.    On or about October 27, 2012, I returned to work from Family Medical ("FMLA"), maternity leave. I spoke with Chief McDonough several times about my need to have a private room/lactation room while I am scheduled to work.

    C.    On or about October 28, 2012, Paramedic Jeff Todd ("Todd") submitted a memo to his Battalion Chief requesting to help me out with my situation by opting to switch to swing shift in hopes I could be placed at his former station which would have helped out my immediate needs for myself and my newborn son. Todd's request was granted but no consideration was given to placing me into his vacated spot for a temporary amount of time. Although the rules do not require his spot to be bid, it was placed for bid immediately the

| I want this charge filed with both the EEOC and the state or local agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my complaint in accordance with their procedures. | Signature of Complainant and Date: |
|---|---|
| | *Carrie J Clark* 7/24/13 |
| I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.<br><br>*Carrie J Clark* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day, year)<br>RACHELLE L FRASIER<br>NOTARY PUBLIC - State of Arizona<br>PIMA COUNTY<br>My Comm. Expires Sept. 9, 2014    7/24/13 |

14-02543 COT000001

CHARGE OF DISCRIMINATION, PAGE 2 OF 2

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☒ FEPA | TOO120130004186 |
| ☐ EEOC | 35A-2013-00456c |

## FILED

### Arizona Attorney General's Office, Civil Rights Division and EEOC

JUL 31 2013

CASE NAME:  Carrie A. Clark  v. City of Tucson, Fire Department

CIVIL RIGHTS DIVISION
TUCSON

next day on November 1, 2012.

D. On or about November 9, 2012, I formally requested to transfer to Station 12. On or about November 13, 2012, Chief McDonough transported me to Respondent's headquarters to meet with Chief Nied and Respondent's Deputy Chief Rob Rodriguez. I was subjected to "insensitivity" and inappropriate questions and comments such as, but not limited to: "Why don't you just take more time off," and "Can't you just pump milk before and give it to your mom," "So this is just a convenience issue for your mom?"

E. Since January 2013 I was given Swing assignments to multiple locations which were not equipped with an appropriate lactation room. Respondent's scheduler, Captain L'Heureux, stated that under the TFD policy "I did not deserve any special accommodations." I was compelled to use vacation and sick leave time when I received assignments that did not have an appropriate lactation room.

F. In January 2013 I met with Respondent's EEO Investigator Marty Macias, and although she said I had a valid claim and gave me the forms to submit a formal complaint, I decided not to file at that time in fear of retaliation and in hopes that the situation would improve on its own.

G. In or about March 2013, I was again assigned to a station that was not equipped with a private room that I could use for lactation. After making numerous calls throughout the day to Chief Rodriguez, which were never returned, I eventually got a hold of Chief Fischback. I was then placed onto speaker phone with Chiefs, Fischback and Rodriguez and Respondent's HR Manager Joann Acedo ("Acedo"). I explained the situation and how Station 9 where I was assigned was not equipped with a private room, and I was told by Chief Rodriguez "well, that's the only spot open for you tonight." Acedo said per the law, station 9 was allowed because the Chief of that station has his own room, and I could just ask him to leave when I needed to pump. Acedo continued to tell me, that it seems I'm not "fit for duty," and how often I pump "seems excessive to her." I objected to Acedo's comments and at that time they told me they would call me back. I called my scheduler and told him I was not going to work at station 9 and he would have to put me down as "sick." After I received a return phone call, Chief Fischback and Rodriguez agreed station 9 would not work for me and said they would find another station.

H. I was called downtown without my supervisor being present. Initially Chief Rodriguez tried to deny my Union representative to be there with me, but eventually allowed him in. I asked Chief Fischback why I was only allowed to work at Station 6, when the other breast feeding mother works at station 12, and he stated "well, that's what happens when you file a complaint with the EEO", I stated that I had not filed a complaint, and his response was " well someone got them involved". I then asked if I would be allowed to work any trades of work overtime, and he stated, " well I hadn't thought about that, I'll have to get back to you, as of now no", my union rep then asked when they thought all the station would be compliant with the breastfeeding laws, and Chief Fischback response was " probably a long time, some of the stations, probably never".

I. On or about March 26, 2013 I was given a write-up for allegedly being disrespectful to Acedo. Since March 2013, I have worked at Station 6, located on the far Southwest boundary of the City on Wilmot off of I-10, which responds primarily to calls from the Federal and State prisons. I have been denied overtime and trades.

J. I believe and therefore allege that but for my sex, female, condition postpartum; I would not have been subjected to different terms and conditions of employment. Furthermore, but for having complained I would not have been denied overtime and trades.

Clb/3478216/

**14-02543 COT000002**

# EXHIBIT 35



# TUCSON FIRE DEPARTMENT
## PARAMEDIC
### Performance Evaluation Form

*(Instructions: Fill in text boxes first. Navigate between boxes by using the tab key or mouse. Fill in each check box. The spell check will work on the narrative field only.)*

| Name: Carrie Clark | | Employee #: 48197 | | Date: 12/23/2013 |
|---|---|---|---|---|
| Annual: ☒  6-month Probation : ☐  Special: ☐ | | Period  From: 1/3/2012  To: 1/3/2013 | | |
| CEP Cert #: 59455 | Expiration Date: 10/4/2014 | | CPR Exp. Date: 4/2014 | |

CHECK THE APPROPRIATE BOX AFTER EACH OF THE FOLLOWING CATEGORIES

| | Excellent | Exceeds Standards | Meets Standards | Improvement Needed | Does Not Meet Standards |
|---|---|---|---|---|---|
| **1. GENERAL WORK HABITS** | ☐ | ☐ | ☒ | ☐ | ☐ |

Assignments are completed promptly, accurately and with minimal supervision. Apparatus and equipment are all properly maintained. Works well with others, completes tasks with minimal direction and carries out orders promptly. Is well groomed, properly dressed and wears uniforms that are neat and well maintained. Is able and willing to act up in a higher capacity when necessary. Works to enhance the quality of life within the community and the department through actions and words.

| | | | | | |
|---|---|---|---|---|---|
| **2. PHYSICAL FITNESS** | ☐ | ☐ | ☒ | ☐ | ☐ |

Maintains adequate level of fitness necessary to accomplish emergency and non-emergency activities as may be required of assigned rank and position. Participates in daily physical fitness activities.

| | | | | | |
|---|---|---|---|---|---|
| **3. SAFETY** | ☒ | ☐ | ☐ | ☐ | ☐ |

Employs safe working practices to ensure the health and well-being of themselves, their fellow firefighters and the members of the community. Follows safety policies and procedures established by the City of Tucson and Fire Department related to the driving of apparatus, use of tools and equipment and wearing of proper safety equipment during emergency and non-emergency operations to minimize risk to self, team and the community

| | | | | | |
|---|---|---|---|---|---|
| **4. KNOWLEDGE OF POLICIES AND PROCEDURES** | ☒ | ☐ | ☐ | ☐ | ☐ |

Has a general working knowledge of TFD manuals and is familiar with the policies and procedures contained therein. Maintains current knowledge of special emergencies and special equipment. Readily complies with the Tucson Fire Department and City of Tucson policies, procedures, and administrative directives.

| | | | | | |
|---|---|---|---|---|---|
| **5. GENERAL CONDUCT** | ☐ | ☐ | ☒ | ☐ | ☐ |

Conducts self in a professional manner at all times. Recognizes that the department and each of its members serves the community and citizens of Tucson. Is loyal to the profession and its principles and values. Represents the department in such a manner as to create positive community relations. Maintains a good attitude, displays enthusiasm, teamwork and dependability. Is punctual, reliable and conscientious in use of benefits. Is courteous and responsive when dealing with the public. Supports the mission and goals of the department as directed by the fire chief. Observes normal work hours.

|  | Excellent | Exceeds Standards | Meets Standards | Improvement Needed | Does Not Meet Standards |
|---|---|---|---|---|---|
| **6. EMERGENCY OPERATIONS** | ☐ | ☐ | ☒ | ☐ | ☐ |

Provides advanced life support care for ill and injured patients. Displays expert knowledge of standing orders, radio procedures, meds relays, ALS and BLS procedures. Maintains advanced patient management equipment, monitors, airway kits and other diagnostic tools in state of readiness. Has thorough knowledge of the incident management system and is able to use command principles to manage triage, treatment or other assignments given by the incident commander at multi-casualty incidents or other large EMS incidents. Performs in a competent manner at fire and other non-EMS incidents as directed by the incident commander or assigned division/group officer. Readily follows orders, completes tasks and other assignments as directed by company officer at fire, EMS and other emergencies. Is able to function independently in a competent manner when necessary.

|  | | | | | |
|---|---|---|---|---|---|
| **7. RECORDS AND REPORTS** | ☒ | ☐ | ☐ | ☐ | ☐ |

Completes records & reports and other required documentation in a timely manner. Manages time and resources effectively meeting deadlines for completion of required tasks. Manages schedule, keeps calendar up to date, coordinates training, drills, public events and other out-of-service activities with other district captains. Completes annual OSHA requirements such as SCBA training, as well as recurring requirements such as monthly safety meetings, PPE inspection and quarterly inspection. Conducts pre-planning activities, regular drills and station classes and provides times for self study sessions for subordinates. Coordinates with the district EMS captain to ensure that subordinates maintain current EMS certifications including EMT, CEP, ACLS, PEPP, CPR and other required certifications. Supports the training mission of the department and ensures all personnel attend regular required quarterly drill and continuing education at the PSA. Conducts regular shift briefings, line-up and station meetings as necessary.

|  | | | | | |
|---|---|---|---|---|---|
| **8. APPARATUS AND EQUIPMENT** | ☒ | ☐ | ☐ | ☐ | ☐ |

Daily inspects and maintains assigned apparatus to insure a high degree of readiness. Utilizes proper procedures for obtaining apparatus and equipment repairs through Fire Maintenance. Is thoroughly familiar with all advanced life support equipment, general EMS equipment and other tools and equipment assigned to apparatus, and maintains a high level of expertise in operating that equipment. Works with district EMS captain to resolve any equipment issues with monitors, diagnostic tools, and other advanced equipment.

|  | | | | | |
|---|---|---|---|---|---|
| **9. COMMUNITY RELATIONS** | ☐ | ☐ | ☒ | ☐ | ☐ |

Interacts well with patients, their families and the general public in all areas whether in the emergency or non-emergency setting. Exhibits genuine care and concern for injured or ill patients. Displays professionalism and maintains bearing at all times when dealing with members of the community. Responds to complaints and inquiries promptly and objectively in order to minimize misunderstandings. Represents the Tucson Fire Department to the public in a manner that will promote the professional image of the department.

**ADDITIONAL COMMENTS: Carrie, you work well as part of the team concept here at Station 6. You have done a fine job working cohesively with your firefighter-partner. I appreciate the positive attitude you bring to work each shift and this is reflected in how you treat your co-workers, and the public. Continue to use your idle time to remain up-to-date with future challenges and changing conditions in the fire service, as well as EMS related topics. You have done a fine job filling the role as the PAU-paramedic on Engine 6. You are knowledgeable and proficient with ALS and BLS skills. Your patient assessments are thorough and professional. You take the initiative to assist others at the station or on calls. You maintain positive leave balances and do not abuse your leave time. I urge you to keep physical fitness at the forefront of your daily regimen. Core fitness strength training is a vital tool to maintaining good musculo-skeletal strength which will enhance; posture, physical**

**fitness health, lifting dynamics and most importantly, a proven asset to reduce low back injuries, chronic pain, lost time at work and possible career ending injuries. If you require assistance with anything please let me or one of your fellow co-workers know.**

*Discuss and confirm understanding of the following during the evaluation interview. Have employee place initials in space to the left of each policy.*

Has read and understands the department's drug and alcohol policy.
*(Manual of Operations, Section 211, Drug and Alcohol Policy)*
Has read and understands the internet use agreement and email policy.
*(COT Administrative Directive 1.08-4, Use of City Electronic Communication Systems)*
Is thoroughly familiar with the driving safety policy as well as applicable Arizona State Law.
*(Emergency Operations Manual, Section 3, Procedures for Emergency Driving; COT Occupational Health and Safety Manual, S-002, Motor Vehicle Procedures)*
Understands the department's equal opportunity (EEO) policy and procedure for complaints.
*(Rules and Regulations, Section 9, Equal Employment Opportunity and Affirmative Action)*
Has an updated personnel data form on file at Fire Headquarters.
*(Manual of Operations, Section 205, Individual Records)*

**(In the comment area below, please discuss any areas marked "Excellent" or Does Not Meet Standards".)**

Carrie, you comply with safety practices established by the Department. You wear safety equipment when under emergency conditions and are aware of surroundings, and potentially dangerous situations. Remember to always keep safety in mind even with the simple calls or around the station doing routine station assignments. You take care of routine station, apparatus and equipment maintenance with minimal supervision. You notify your immediate supervisor of any safety concerns and apparatus/equipment problems that arise and follow through with any appropriate documentation. You remain current with all required certifications; CPR, CEP, PEPP, AMLS, PHTLS, ACLS, SIMS lab and annual OSHA training and City Learn Classes.

## ANNUAL EVALUATION STEP INCREASE RECOMMENDATION
I recommend that this employee be moved from Step 6 to Step 7 of the City of Tucson Compensation Plan
N/A ☐

| Employee Name: | Carrie Clark | Employee Signature: | |
| Captain Name: | Ted McDonough | Captain Signature: | |
| BC Name: | Tim Nofs | BC Signature: | |
| DC Name: | Rob Rodriguez | DC Signature: | |

I intend ☐ / Do not intend ☒ to submit a statement.

**TUCSON FIRE DEPARTMENT**
**PARAMEDIC**
**Performance Evaluation Form**

RECEIVED
JAN 2013
City of Tucson
Fire Dept HQ

*(Instructions: Fill in text boxes first. Navigate between boxes by using the tab key or mouse. Fill in each check box. The spell check will work on the narrative field only.)*

| Name: Carrie Clark | | Employee #: 48197 | | Date: 1/30/2013 |
|---|---|---|---|---|

| Annual: ☒ | 6-month Probation : ☐ | Special: ☐ | Period | From: | To: |
|---|---|---|---|---|---|

| CEP Cert #: 59455 | Expiration Date: 3/31/2013 | CPR Exp. Date: April 2014 |
|---|---|---|

## CHECK THE APPROPRIATE BOX AFTER EACH OF THE FOLLOWING CATEGORIES

| | Excellent | Exceeds Standards | Meets Standards | Improvement Needed | Does Not Meet Standards |
|---|---|---|---|---|---|
| **1. GENERAL WORK HABITS** | ☐ | ☐ | ☒ | ☐ | ☐ |

Assignments are completed promptly, accurately and with minimal supervision. Apparatus and equipment are all properly maintained. Works well with others, completes tasks with minimal direction and carries out orders promptly. Is well groomed, properly dressed and wears uniforms that are neat and well maintained. Is able and willing to act up in a higher capacity when necessary. Works to enhance the quality of life within the community and the department through actions and words.

| | | | | | |
|---|---|---|---|---|---|
| **2. PHYSICAL FITNESS** | ☐ | ☐ | ☒ | ☐ | ☐ |

Maintains adequate level of fitness necessary to accomplish emergency and non-emergency activities as may be required of assigned rank and position. Participates in daily physical fitness activities.

| | | | | | |
|---|---|---|---|---|---|
| **3. SAFETY** | ☐ | ☒ | ☐ | ☐ | ☐ |

Employs safe working practices to ensure the health and well-being of themselves, their fellow firefighters and the members of the community. Follows safety policies and procedures established by the City of Tucson and Fire Department related to the driving of apparatus, use of tools and equipment and wearing of proper safety equipment during emergency and non-emergency operations to minimize risk to self, team and the community

| | | | | | |
|---|---|---|---|---|---|
| **4. KNOWLEDGE OF POLICIES AND PROCEDURES** | ☐ | ☐ | ☒ | ☐ | ☐ |

Has a general working knowledge of TFD manuals and is familiar with the policies and procedures contained therein. Maintains current knowledge of special emergencies and special equipment. Readily complies with the Tucson Fire Department and City of Tucson policies, procedures, and administrative directives.

| | | | | | |
|---|---|---|---|---|---|
| **5. GENERAL CONDUCT** | ☐ | ☒ | ☐ | ☐ | ☐ |

Conducts self in a professional manner at all times. Recognizes that the department and each of its members serves the community and citizens of Tucson. Is loyal to the profession and its principles and values. Represents the department in such a manner as to create positive community relations. Maintains a good attitude, displays enthusiasm, teamwork and dependability. Is punctual, reliable and conscientious in use of benefits. Is courteous and responsive when dealing with the public. Supports the mission and goals of the department as directed by the fire chief. Observes normal work hours.

14-02543 COT000587

fitness and nutrition at an optimal level. Thank you for the nutritional suggestions you have offered to the team when these discussion topics arise. Please let me know if there is anything I can do to assist you as I am one of the Department's Peer Fitness Trainers.

3. Safety - You wear appropriate protective equipment and safety gear when necessary to minimize the risk to everyone involved, and you take every opportunity to wash hands and prevent cross-contamination to other areas. You utilize the red top wipes, hand sanitizer and hand washing procedures during routine assignments and set the example for others to follow.

4. Knowledge of Policies and Procedures - You are very familiar with the policies, manuals and equipment and procedures expected by all members of this department. Remember to continue reviewing these things as you continue with your swing assignment.

5. General Conduct - You represent the department in a positive and professional manner, and you understand the importance of taking care of our customers and creating positive community relations with every interaction. You are loyal to the profession, and its principles and values, and your dedication in this area is greatly appreciated. You have a good attitude and fit in very well with the other members of the station and with completing tasks together as a team. Thank you for your commitment to this department and for honoring the values (professionalism, service, safety, teamwork, excellence and integrity) and the mission as expected of all members. You have been an asset to our team and a benefit to the community we serve.

6. Emergency Operations - Carrie, you understand and follow the administrative orders and radio procedures, and you take every opportunity to ensure we are doing what is right for our customers. Although we have not yet had any major non-EMS incidents during your assignment here, I am confident you will enthusiastically and competently complete assigned tasks in a timely manner both as a team and independently when necessary.

7. Records and Reports - You complete records, reports and all required paperwork in a timely manner. We switched to the new CityLearn this past year and you now are logged on and signed on to the system. Thank you for not hesitating to take care of this when asked about it.

8. Apparatus and Equipment - You arrive at work on time, perform the expected daily checks and maintain equipment to insure a high degree of readiness. You are thoroughly familiar with all advanced life support equipment, general EMS equipment and other tools and equipment assigned to medic 12, and you maintain a high level of expertise in operating that equipment.

9. Community Relations - This is the most important aspect of our job while conjunctively applying the expected values set forth by the Department. I appreciate your ability to cooperate and work as a team with others at the station, and for maintaining a caring and compassionate demeanor when dealing with our external customers. You interact well with others and exhibit genuine care and concern for injured or ill patients and their pets. Your compassionate nature goes one step further as you have served the community as a nurse for years in addition to volunteering at a local animal rescue organization. I received many phone calls from you on the PIO phone, during my assignment in that position, with offers to assist members of our community with the loss or injury of their animals. Your actions demonstrated your true compassionate nature for wanting to make a difference in the service we provide. Carrie, you represent the Department in a positive and professional manner and have been an asset to the team at Station 12. Thank you for your dedication and commitment to providing excellent service as part of a cooperative and enthusiastic team day in and day out.

**Discuss and confirm understanding of the following during the evaluation interview. Have employee place initials in space to the left of each policy.**

Has read and understands the department's drug and alcohol policy.
*(Manual of Operations, Section 211, Drug and Alcohol Policy)*
Has read and understands the internet use agreement and email policy.
*(COT Administrative Directive 1.08-4, Use of City Electronic Communication Systems)*
Is thoroughly familiar with the driving safety policy as well as applicable Arizona State Law.

# EXHIBIT 36



# MEMORANDUM

**DATE:** 5/22/2014

TO: Rob Rodriguez
Deputy Chief
Operations

FROM: Timothy J. Nofs
Battalion Chief
BN04 C shift

**SUBJECT:** EN06 drill on 5/22/14

On 5/22/14, at approximately 1230 pm, Captain Ted McDonough called me on the radio and asked for my response to a park on South Wilmot where EN06 crew was having a drill. EMS Captain Jim Grimes was also asked to respond to that location.

Upon arrival Captain McDonough informed me that he was conducing a hose pulling drill with crewmembers Engineer Catlin, Paramedic Clark, and Firefighter McKendrick. The drill consisted of FF McKendrick acting as Engineer (FF Mckendrick is getting ready to test for Engineer). Engineer Catlin had a simulated injury, Captain McDonough, and Paramedic Clark would pull hose and spray water on a simulated fire. The course they were using was a grass park.

After spraying some water Captain McDonough was talking about using the steps in the park to simulate a two-story house fire. Paramedic Clark stated that she did not hear that it was simulating and thought that Captain McDonough wanted her to pull the hose farther to the steps. At that point Paramedic Clark put the nozzle on the ground and walked back to the truck. Paramedic Clark was upset and feeling that she was being singled out to do this drill by herself.

Upon my arrival, Paramedic Clark was standing outside of the Engine. I spoke with her briefly and Captain Grimes arrived in his truck. I had Paramedic Clark walk back to Captain Grimes truck and sit in his vehicle where they could talk in private. Paramedic Clark has worked with Captain Grimes in the past and has a very good working relationship with him. At this time I walked over and spoke with Captain McDonough and got his version of what took place. I also spoke briefly with the crew and got their version of the drill. Captain McDonough stated that the drill was in response to a call they had the previous shift in which several incidents brought safety concerns to light. Captain McDonough's memo has the details of this incident and the drill details.

After speaking with Captain McDonough I returned to my pickup and called Deputy Chief Rodriguez to inform him of the situation and I would follow up with him when I had more details.

I then walked back to Captain Grimes truck and spoke with Paramedic Clark and had her explain the situation to me. Her main concern was that she was being singled out and made to perform a drill basically by herself and be evaluated like she was on probation. We spoke for several

COT002206

# EXHIBIT 37



# MEMORANDUM

**DATE:** 06/19/2014

**TO:** Chief Tim Nofs
Battalion Chief
Batallion 4 "C"

**FROM:** Carrie Clark
Paramedic
Engine 06 "C"

**SUBJECT:** May 22, 2014

On Thursday May 22nd, 2014, I arrived for work at my normal time of 6:30am and started my daily duties. When Captain McDonough arrived around 7:10 I told him I had tried to call and text him yesterday but never heard back from him, he mumbled something and kept walking. We had not spoken then entire morning. Later that morning we were dispatched to a " Brush Fire" off I-10 and Rita Rd. I placed my turnout pants on prior to leaving the station and placed my work gloves and a Hepa mask enroute to the call. Upon arriving on the scene, there were a few bushes burning, Tyler grabbed the redline from his side and I grabbed some joy soap and we sprayed down all the burning shrub. Captain McDonough still had not spoken a word to me. We got back into the truck and headed over to Fry's, then to Subway for lunch, even then, no words were exchanged at all between my Captain and myself. Heading back from Subway, we drove down a road stopping short of a hydrant. We sat for a few minutes until I heard Capt. McDonough tell Ron, "let's just fill up the tank", we then pulled up to the hydrant and I opened the hydrant, flushed it, and connected our 5inch line to fill up the tank. We then began to head back to the station. After we turned off onto Wilmot, we pulled into the neighborhood to the east of Wilmot. Tyler turned to me and asked " What are we doing? ", I said I had no idea. After stopping for a minute or two, Capt. McDonough said, "Put your turnouts and airpack on", so I did. At that point, Capt McDonough walked away. I walked over to the driver side of the truck where Ron was and I asked him what we were doing, he said " Pulling hose I think", and since Tyler had walked away also, I then asked " Am I doing this alone?", and Ron just shrugged his shoulders. Capt McDonough walked back over and said " Ron got hurt, so Tylers going to pump, so pull a transverse", so I stepped up on the side, pulled down the nozzle, and untwisted it so it would play out the way it should. I then asked, " where am I pulling this to? ", and Capt McDonough points to a sandbox play area. I pull the transverse until it's stretched out completely, then stood and waited for water, at that time Capt. McDonough walked down to where I was. I then asked what he wanted me to do next and he said to spray water at a dog toy that was in the sandbox. I opened the nozzle and sprayed water until it appeared I was making a huge mess of the sandbox. I then shut the nozzle down and looked to my Capt. for direction. He then looked around and eventually pointed behind us, pretty far across the park to a set of stairs, and said " ok, now you need to drag the charged hose over there and go up those stairs". At this point I was very frustrated because I felt I was being singled out completely. I asked Capt McDonough why he was making me drill by myself and that if he didn't want me on the truck anymore, then to just tell me that. He ignored what I said, and asked where my radio was. I told him it was in my pocket and I repeated myself about if he didn't want me on the truck then just to say so and I would leave, but this wasn't fair to single me out. He ignored me again. At that time, I set the nozzle down and said I would just go home sick and I walked back to the truck. Captain

McDonough called both Chief Nofs and Captain Grimes and they came to the scene shortly after. After we all arrived back at the station, we had a meeting amongst the four of us. I said to Captain McDonough that he hadn't spoken a word to me since our last call on May 20th, and because I was felling uncomfortable about that, I tried to contact him in between shifts. He never got back to me and he didn't speak to me the next shift so to just pull over on the side of the road to have me drill made me feel very singled out. I stated I had no problem drilling, but we did not drill as a crew, it was only me, and the scenario was very unrealistic so it made me feel even more like he was trying to prove I couldn't do my job. Captain McDonough said at one point, we stopped to drill so Tyler could practice engineer stuff, and at another point he said he wanted to drill after the trash fire call we had the day before. I said again that I had no problem doing a drill, but I didn't understand why there was no communication whatsoever and why I was the only one drilling.  We had never done anything like this before, and this wasn't being done as a "crew".

Chief Nofs, I know there were a lot more things brought up during this discussion, but I'm trying to keep this as condensed as possible.  If you have any other questions for me please feel free to ask me. Thanks for your time and understanding.

# EXHIBIT 38



# MEMORANDUM

**DATE:**    5/22/2014

TO:   Chief Nofs              FROM:   Ted McDonough
      Battalion Chief                 Fire Captain
      District 4, C-shift             Engine 6, C-shift

**SUBJECT:**    Drill at the park on 5/22/2014

Chief Nofs,

Following a brush fire this morning at 10:32 am in the area of Rita Road and I-10, Engine 6
stopped at a hydrant in the Rita Ranch area to top off the tank. Engine 6 stopped by the Fry's
foodstore to pick up a couple of items for station staples. It was now close to lunch time and the
crew was all in agreement to stop by Subway for lunch. Engineer Catlin had offered to pay the
bill for lunch. As Engine 6 returned home towards the station, I instructed Engineer Catlin to
turn left at Sentinel Stone Street off of Wilmot and I-10. There is nice little park at this location.

I looked back and informed FF McKendrick and FF/PM Clark that we would be doing a
transverse drill at the park in full turnouts and airpacks. I stated, "we are pulling a 150' transverse
off the engineer's side straight off and into the park on the grass and directing the stream towards
a post located on the other side of the grass and have your radios with you and on TAC-6
channel". They both acknowledged the order. This was approximately 100 to 120' total distance
from the pump panel. Engineer Catlin stopped the truck at the park, I placed Engine 6 out of
service on the computer and exited the truck to get my PPE on. I walked around the back of the
truck and stood near the grass and the pump panel. FF McKendrick was in full gear and ready to
go. Engineer Catlin placed wheel chocks and prepared to pump. FF/PM Clark walked around to
the pump panel area.

I then stated, "the scenario has suddenly changed, Ron (Engineer Catlin), stepped out of the
truck and hurt himself when he fell down, Ron you are out go sit over there (I gestured for him to
sit on the back of the truck), Tyler (FF McKendrick) you are now pumping and Carrie (FF/PM
Clark) you are pulling the transverse and I want it across the grass towards that pole over there
(gestured to a green pole on the other side of the small grass area near a playground). FF
McKendrick removed some of his PPE gear and began pumping operations. FF/PM Clark
stepped up onto the truck, placed the hose and nozzle over her shoulder and advanced the dry
hose across the park. After the hose was fully advanced, FF McKendrick charged the line.
FF/PM Clark opened the bail and directed the stream at a ride-on toy in the playground area.
FF/PM Clark closed the bail and then stated, "what do you want me to do now?" I stated, "open
the bail all the way this time and direct it towards that pole" (gestured/pointed to the
aforementioned green pole). FF/PM Clark then stated, "if you don't want me on your crew just
tell me that". I stated, "this is a drill, do you have your radio with you?" and she stated, "no". I
was holding onto the hoseline both times the nozzle was open backing FF/PM Clark up the entire
time. I then stated, "here's a scenario- what if we have a fire in a two story house and we have to
go up the stairwell to the second floor like the houses in this neighbor..." ... FF/PM Clark shut

COT002220

down the nozzle, dropped it on the grass, and walked away towards the truck. I requested that fire alarm have Battalion 4 come up on the radio. I walked over to Engine 6 on the Captain's side to set my airpack down and noticed that FF/PM Clark was talking loudly and emotionally crying on her cell phone. I walked back into the park and sat down in the shade under a ramada. Battalion 4 and EC04 arrived at the park. I remained with Chief Nofs and we drove to Station 6. Chief Nofs, Captain Grimes, FF/PM Clark and myself had a conversation in the office and following the conversation FF/PM Clark stated she wanted to use sickleave and go home for the remainder of the shift.

COT002221

# EXHIBIT 39



**DATE:** May 22, 2014

**TO:** Chief Nofs
Batallion Cl
District 4 "(

**MEMORANDUM** ~~FROM:~~ Tyler McKendrick

**SUBJECT:** 5/22/2014

Chief,

Today's events included a brush fire at 1032, from there to Fry's foods for chow staples and drinking water. From Fry's we were treated to lunch by Engineer Catlin and ate in the comfort of Air conditioning of Subway. From subway we were headed to the station, I was riding backward and noticed the truck was turning some where other than the station. At this time Captain McDonough informed us we would be packing out and pulling transverse as a drill. We were at the neighborhood park off Wilmot and Sentinel Stone. I donned my full PPE including turnouts and air pack. Captain McDonough verbally advised we would be on Tactical 6; I then turned to this channel on my radio and exited the truck. Since we were on the street I deployed cones to the front and rear of truck. At this point Captain McDonough came around the Truck in full turnouts and air pack. I stepped toward the pump panel to grab 150' transverse, Captain McDonough advised me that I would be pumping for the scenario that Engineer Catlin was injured and Firefighter/ Paramedic Clark would be pulling transverse. At this time I took off my gloves, air pack, helmet, mask, coat, and hood. Firefighter/Paramedic Clark had then pulled the 150' transverse. I helped pull the hose out of the bed. Once the hose line was extended I began to engage the throttle on the pump to achieve the desired pressure for a 150' transverse of 121 PSI. Checked the gauges for oil pressure and water temp. I heard engineer Catlin verbally question to me weather or not the bail was fully open. I then looked back to the pump panel and back again to the end of the hose line. At that time I witnessed Firefighter/ Paramedic Clark slam the nozzle on the ground and began walking back to the truck. She began to remove her gloves and helmet. Once I saw this I throttled down the truck and began to break down the hose line. I noticed Captain McDonough on the radio. As I was loading all three sections of 1 ¾" hose to the back of the truck, I Also saw Firefighter/ Paramedic Clark across the street on the phone. She was visibly up set and crying. She appeared to be yelling on the phone. The truck was still running so I couldn't tell what was being said. Once the drill was cleaned up I went to the Ramada at the park to wait. Engineer Catlin informed me he had inquired as to the physical health of Firefighter/ Paramedic Clark. We returned to the station and BN4 EC4 and Captain McDonough and Firefighter/ Paramedic Clark had a talk in the office with the door closed. Per Telestaff paramedic Clark Went home sick at 1430.

Document1    Page 1 of 1

# EXHIBIT 40

MAIL

| | |
|---|---|
| **From:** | laura.baker@tucsonaz.gov |
| **To:** | mike.carsten@tucsonaz.gov |
| **Subject:** | Re: Fwd: Payroll Issue |
| **Date:** | 22-Dec-2014 17:47 |
| **Attachments:** | TEXT.htm [Save] [Open] |
| **Message Id:** | 54985929.TFDDOM2.TFDPO1,200.20000B0.1,5BEA8.1 |

Great thank you!!

>>> Mike Carsten 12/22/2014 4:52 PM >>>

Chief,

I followed up with JoAnn, and this issue is handled. Payroll had not changed her records to reflect that she was back from her leave.

Mike

>>> Laura Baker 12/22/2014 2:49 PM >>>

Okay thank you. Please keep me in the loop.

I don't understand why she would not be getting specialty pay. Are we talking specialty pay for the Inspector Cert and Inspector education, well as Paramedic pay?

I know sometimes accruals are a pay period behind.

>>> Mike Carsten 12/22/2014 11:01 AM >>>

Chief,

Just want to keep you in the loop on this. I am going to talk to JoAnn and see what the issue is.

Mike

>>> Carrie Clark 12/22/2014 10:02 AM >>>

Hi Captain Morgan,

I spoke with Chief Carsten about this issue already, and probably mentioned it to you too, but HR/Payroll has not submitted paperwork for me to be returned to a "return to work" status, so I am not receiving any of my specialty pays, or accruing sick or vacation time. The pay period that ended 11/29/14 should have gone back to my normal pay scale, as I returned to work 11/24/14. Thank you for helping me resolve this issue.

Carrie Clark

**Clark 0798**

# EXHIBIT 41

**MAIL**

| From: | tfd_payroll.tfdpo1.tfddom2@tucsonaz.gov |
|---|---|
| To: | joann.acosta@tucsonaz.gov |
| Subject: | TADJ - PPE. 12/27/14 |
| Date: | 29-Dec-2014 07:57 |
| Attachments: | TEXT.htm [Save] [Open] |
| Message Id: | 54A1094E.TFDDOM2.TFDPO1.200.2000082.1.A47CC.1 |

Frank Sanchez - 24 hrs. OT for PPE 12/13/14 not recv'd. on CK dated 12/18/14. VZ

Wayne Cummings - Return 2 hrs. VL to his bank that was pulled incorrectly to cover PL used. VZ

Joseph Fyffe -- 001500002463 -- retroactively adding 12 hours missing ED.

Seth McKinney -- 001500002523 -- changes due to Yvette Hurley's research.

Bert Oxnam -- 001500002525 -- ILUSE corrections.

Carrie Clark -- 001500002526 -- Leave corrections per S Arnoldi.

Travis Mague -- 001500002528 -- Leave corrections per S Arnoldi.

Ed Stevens -- 001500002537 -- last-minute correction that should have been on Brian Steven's timesheet

Mario Rivas -- 001500002538 -- prematurely submitted timesheet; TADJ is to add final entry for 12/27.

Various -- -- mileage has to be paid in TADJ format.

**Clark 0795**

**ATTACHMENT**

Frank Sanchez - 24 hrs. OT for PPE 12/13/14 not recv'd. on CK dated 12/18/14.  VZ

Wayne Cummings - Return 2 hrs. VL to his bank that was pulled incorrectly to cover PL used. VZ

Joseph Fyffe -- 001500002463 -- retroactively adding 12 hours missing ED.

Seth McKinney -- 001500002523 -- changes due to Yvette Hurley's research.

Bert Oxnam -- 001500002525 -- ILUSE corrections.

Carrie Clark -- 001500002526 -- Leave corrections per S Arnoldi.

Travis Mague -- 001500002528 -- Leave corrections per S Arnoldi.

Ed Stevens -- 001500002537 -- last-minute correction that should have been on Brian Steven's timesheet

Mario Rivas -- 001500002538 -- prematurely submitted timesheet; TADJ is to add final entry for 12/27.

Various --  -- mileage has to be paid in TADJ format.

**Clark 0796**

# EXHIBIT 42

Michelle R. Saavedra
Michael W.L. McCrory
Principal Assistant City Attorneys for
MICHAEL G. RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
Pima County Computer No. 66163
Michael.McCrory@tucsonaz.gov
State Bar Computer No. 3899
Pima County Computer No. 37268
Telephone: (520) 791-4221
Fax: (520) 623-9803
*Attorneys for Defendant City of Tucson*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| CARRIE FERRARA CLARK, | No.  4:14-CV-02543-TUC-CKJ |
| Plaintiff, | **DECLARATION OF LAURA BAKER** |
| vs. | |
| CITY OF TUCSON, | (Hon. Cindy Jorgenson) |
| Defendant. | |

Pursuant to 28 U.S.C. §1746, I, Laura Baker, declare and state as follows:

1.      I make this Declaration based on my personal knowledge.

2.      I, Laura Baker, Assistant Chief (AC), have been employed by TFD since August, 1994 (23 years).

3.      The areas under my chain of command included Fire Prevention from January 31, 2010, to May 10, 2014, as a Deputy Chief (DC), then again on January 15, 2015, to present, as an Assistant Chief.   Since my assignment to AC, my areas of responsibility are Fire Prevention, Communications and Medical Administration.

4.      I did not have any personal knowledge of Carrie Clark's lawsuit at the time of her lateral transfer to Prevention, nor was I in the chain of command for Prevention at the time she lateraled.  I do not recall when I became aware of the lawsuit because I was not privy to department communications pertaining to it when it was filed.  I was not

1  directly involved in supervision/management over Carrie Clark when she was in

2  operations and the original issue came up about her expressing milk.

3      5.   I became officially involved in personnel issues that involved Carrie Clark in

4  January, 2015, when male inspectors in Prevention complained about comments they

5  alleged were made by Captain Jeff Langejans regarding Carrie Clark and Captain Gordon

6  Clark who were both working in Prevention at that time.  On January 20, 2015, I initiated

7  an investigation of those complaints.

8      6.   On February 5, 2015, I submitted a memorandum to Chief Critchley

9  summarizing the investigation, giving my findings and recommendations.  The

10  memorandum is attached as Attachment 1 and is a true and correct statement of my

11  findings and recommendations.

12      7.   In the investigation, I and DC Carsten interviewed 31 of the 32 employees in

13  Fire Prevention.  The one other employee was on FMLA.  DC Anderson and Union

14  representatives were present for several of the interviews.  The majority of the responses

15  included that the interviewee knew about the conflict between Captain Langejans and

16  Captain Clark.  Also, most have not had an issue with a supervisor or any inspectors in the

17  division.  With the exception of two, all answered "no" to the question of whether there

18  was a hostile work environment in Prevention.  One employee shook their head yes, but

19  when asked to clarify, the interviewee made the statement that "no one is talking to

20  anyone".  The other interviewee was Carrie Clark, who stated there was "a lot of tension."

21  (*See Id*.).

22      8.   Of the 31 people interviewed, five believed there was a hostile work

23  environment including four who submitted memos.  One of those only referred to his

24  interactions with Langejans.  The charges that Langejans "targeted" several members of

25  the division mostly consisted of examples where a supervisor was trying to ensure

26  accountability within the division.  (*See Id*.).

27      9.   As a result of this internal investigation Captain Langejans was disciplined.

28  The level of discipline Captain Langejans received was consistent with TFD practices.  As

2

in all such cases, the discipline was reviewed by an independent body, the discipline review board (DRB), which consists of peers, administration, and union representation, prior to being served.  The DRB concurred that the discipline was consistent with TFD policies and practices.

10.     On February 12, 2015, I along with Deputy Chief Carsten informed the staff in Fire Prevention that submitted complaints in January 2015, and included Carrie Clark, even though she did not submit a complaint, that the investigation was complete.  I informed them to stop talking about others which creates an uncomfortable environment, all would remain in the division, though some uncomfortableness and tensions, and there was not a threat in the workplace.  I also informed all will participate in mandatory "Respectful Workplace" training.  All were offered to participate in a voluntary mediation coordinated through EOPD and offered assistance through EAP (Employee Assistance Program).

11.     Following the internal investigation that I led, there was an external investigation conducted by EOPD.  This investigation was initiated by an administrative complaint filed by Carrie Clark.   The investigation by EOPD did not find any discriminatory or retaliatory actions but did recommend the department address nepotism.  EOPD did question aspects of the TFD investigation and the City Manager's Office asked TFD to address EOPD's assertion that the fire department's investigation was not thorough and failed to identify the most appropriate level of discipline for Captain Langejans.

12.     I prepared the response explaining why the investigation and the level of discipline were appropriate.  The City Manager's Office agreed with TFD's level of discipline.  My response is attached as Attachment 2 and is a true and correct statement of my findings.

13.     The direction from the City Manager's office was for the department to address nepotism.  This included transferring one family member for the Clarks and others in Operations.  Gordon Clark was notified of the decision to transfer to operations on July

3

31, 2015, and was reassigned on August 23, 2015.  Gordon Clark was chosen as the family member to move from Prevention because it fit with the succession planning for the division and he was in an assigned position as a Captain, whereas Carrie was an Inspector and there was no place to transfer her as an Inspector.  Gordon Clark was at the top of the promotion list for the next battalion chief vacancy.  Being back in operations would refresh his operational skills and provide Gordon Clark opportunity for growth as he was soon to be promoted to Battalion Chief (BC).  I wanted to transfer Gordon Clark to operations sooner than what transpired and was considering a time frame between January 2015 to June 2015, because of succession planning in the Prevention division.  I had one Captain retiring in December 2015, Gordon Clark who would be promoted, and another planning to go back to operations (in the field).  I had to delay my plans because of ongoing investigations and having to be patient with the EOPD investigation that was initiated by Carrie Clark.  I mentioned my perspective or intent to transfer Gordon Clark when he came to my office on December 5, 2014.

14.     Gordon Clark was moved from Fire Prevention after EOPD made a finding that TFD was in violation of the City's AD on nepotism.  Before that investigation, I knew Gordon Clark was the next person on the list for promotion to Battalion Chief where he would be reassigned to Operations.  I knew of the prospective promotion and consistent with my prior succession plans wanted Gordon Clark to move back into Operations as a Captain to refresh his skills in that job before being promoted to Battalion Chief.  Based on the prospective promotion, I believed that it was better for Gordon Clark and for TFD to move him instead of his wife, Carrie Clark, to comply with the City's AD.

15.     Carrie Clark continued to make repeated complaints over essentially the same conflict with Mr. Langejans and it was causing management to spend inordinate amount of time on investigations.  Carrie Clark filed a formal "Wrongful Conduct Complaint" with EOPD on March 9, 2016.  This complaint was received by Chief Critchley on March 24, 2016 and given to me for follow up.  Interviews were conducted by myself and Chief Carsten to follow up on the March 9, 2016 complaint.  Many of those

4

1   interviewed expressed their frustration at being called in for another interview for issues
2   they thought were over and in the past.  Follow up was completed and a memo was sent to
3   Chief Critchley on April 13, 2016.  That memorandum is attached as Attachment 3 and is
4   a true and correct statement of my investigation and findings.  The findings were that
5   Carrie Clark's complaints were unfounded.

6       16.   Ken Brouillette (Mr. Brouillette) gave Carrie Clark an educational
7   counseling on March 24, 2016.  The discipline focused on the need for Carrie Clark to
8   cease activity that disrupted the work place, including checking up on others and
9   questioning management's handling of discipline issues with other staff members.  She
10  was informed of the TFD policies that require respect for others and the need for her to try
11  to promote harmony with her co-workers.  She was also informed of the importance of
12  proceeding with her complaints through the proper chain of command.

13      17.   I kept Chief Critchley informed of the personnel problems in Prevention and
14  the ongoing problems caused by Carrie Clark's conduct.  Based on the circumstances
15  involving Carrie Clark, the decision was made to transfer her out of Prevention.

16      18.   The decision to reassign Carrie Clark to paramedic swing shift was based on
17  the best interest of the department and the Fire Chief's intent of providing a pleasant work
18  environment, free from misconduct and hostility where all employees can grow, learn and
19  strive to be their best.

20      19.   The reassignment of Carrie Clark has provided relief of staff hours spent on
21  investigations and follow-up on complaints.  The Prevention division seems to have less
22  tension and stress amongst the personnel.  There is improved morale and the Division is
23  functioning more efficiently.

24      20.   I did not retaliate against Carrie Clark because I was deposed in this case.  I
25  am not aware of any employment decision regarding Carrie Clark's work or assignments
26  that has been taken to retaliate for her complaint/lawsuit on expressing milk or her
27  complaints of discrimination and retaliation.

28

5

21.     In my experience, I know other female firefighters who have expressed milk and I am not aware of there being any issues.

I state under penalty of perjury that the foregoing is true and correct.

Executed on August 18, 2017.

_____
Laura Baker

# ATTACHMENT 1



# MEMORANDUM

**DATE:** February 5, 2015

**TO:** Jim Critchley
Fire Chief
Fire Central

**FROM:** Laura Baker
Assistant Chief
Fire Central

**SUBJECT:** Investigation of Fire Prevention Workplace

On Friday December 5, 2014 Captain Gordon Clark came to Assistant Chief (AC) Laura Baker's office and shared that he heard from some Inspectors that Captain Langejans made some negative statements about himself and some statements about his wife, Inspector Carrie Clark. On Monday December 8, 2014 Deputy Chief (DC) Carsten and AC Baker discussed some of the concerns Captain Clark had and DC Carsten set up a meeting with Captain Clark, Captain Langejans, DC Carsten and AC Baker. In the meeting Captain Clark and Captain Langejans shared information regarding the statements that Captain Clark heard from inspectors that were attributed to Captain Langejans. Captain Langejans reported that he was attacked in the lunchroom by Inspector Vincent and Inspector December after the "strategic planning" meeting on December 4, 2014. Captain Langejans said he is the scapegoat. He said that some inspectors claim morale is low because of Gordon and Carrie but now they are denying it. Captain Clark asked Captain Langejans what he said about "me and Carrie." Captain Langejans stated that his plate was full and he did not feel like Captain Clark was part of the team. Captain Langejans admitted to feeling like Captain Clark was not doing what he is expected to do as a Captain in the division. Captain Langejans would not state specifically what he had said. Captain Langejans did apologize to Captain Clark and Captain Clark accepted his apology. The direction from AC Baker at this point was for them to do their work. She stated that we do not have to be friends, or even like each other but we do need to be professional and do our jobs. AC Baker told them she hoped that we can move forward and all get along.

On December 17, 2014 DC Carsten met with the entire division of Inspectors (no Captains were present) at their weekly line up to discuss the state of the division and get a feel for how everyone was doing and share with them his direction and excitement of being in the division. At this meeting, he told personnel that he has an open door policy and that they are welcome to come discuss any other issues that they have.

On Wednesday January 7, 2015 Captain Clark asked to speak to AC Baker and DC Carsten. In the meeting in AC Baker's office, Captain Clark stated that people are still talking with Captain Clark about their discomfort working for Captain Langejans. Captain Clark stated he is not ok with what Captain Langejans said about him and women on the job. He stated there is tension and fear from Inspector Sisterman, Inspector Bieg and Inspector Vincent. All three of these inspectors work on Captain Langejans team. We informed Captain Clark that Captain Langejans

Page 1 of 13

COT001892

has admitted to some deficiencies and he is working with DC Carsten on those. AC Baker told Captain Clark that those inspectors needed to go to DC Carsten with their concerns and he needed to direct them that way if they came to him.

On January 14, 2015 DC Carsten received a memo, "Request for transfer" from Inspector John Vincent dated 1/13/15. DC Carsten received a memo; "Report of Wrongful Conduct" from Captain Gordon Clark dated 1/14/15 and sent on 1/15/15. DC Carsten received a hand delivered memo, "Hostile Work Environment" from Inspector Tom Sisterman dated 1/15/15. Chief Carsten received a memo, "Hostile Work Environment" from Inspector Joe Longo dated 1/15/15.

An investigation began on Tuesday January 20, 2015 to address the issues and concerns brought forward from the above listed individuals that submitted memos.

While the investigation was still ongoing, Inspector John Vincent submitted a memo addressed to AC Baker via email on 1/22/15 to Chief Carsten, dated 1/16/15. On January 30, 2015 Inspector Sisterman sent a follow up memo, "Hostile Work Environment in the Fire Prevention Division" to follow up with a mediation meeting he had on January 27, 2015 with Captain Clark, Captain Langejans, Union President Roger Tamietti, Vice President Chris Conger and himself. On February 2, 2015, Captain Clark sent a memo, "Report of Threatening and Intimidating Behavior by a Supervisor."

All memos are included in this packet.

**Timeline:**

| Date | Event |
|------|-------|
| 11/05/2014 | Team Meeting for Team 3 with Langejans, Vincent, Sisterman, Bieg, D'Auria |
| 12/1/2014 | Week of 12/1/14 Langejans met Sisterman in the Hazwaste yard |
| 12/4/2014 | Strategic Planning Meeting with Captains and Chiefs |
| 12/4/2014 | Lunch room incident with Langejans, Vincent, December and Sisterman |
| 12/5/2014 | Sisterman and Vincent informed Captain Clark of statements made by Captain Lanjeans |
| 12/5/2014 | Captain Clark informed AC Baker of statements he heard from Inspectors that Captain Langejans said about him. |
| 12/8/2014 | Captain Clark spoke with DC Carsten about the alleged statements made |
| 12/8/2014 | 1330 Meeting with Langejans, Clark, Carsten and Baker. |
| 1/7/2015 | Impromptu meeting with Clark, Carsten and Baker |
| 1/14/2015 | 1331 DC Carsten received memo, "Request for transfer" from Inspector Vincent |

COT001893

| | |
|---|---|
| 1/15/2015 | 1519 DC Carsten received a memo, "Report of Wrongful Conduct" from Captain Clark |
| 1/15/2015 | 1520 DC Carsten received a hand delivered memo, "Hostile Work Environment" from Inspector Sisterman |
| 1/15/2015 | 1614 DC Carsten received a memo, "Hostile Work Environment" from Inspector Joe Longo |
| 1/20/2015 | Interviews began of personnel in Fire Prevention Division |
| 1/26/2015 | Interviews completed of personnel in Fire Prevention Division |
| 1/26/2015 | Union set up a meeting/mediation with Langejans, Clark, R. Tamietti and Conger |
| 1/27/2015 | 1430 Union set up a meeting/mediation with Langejans, Clark, Sisterman, Vincent, R. Tamietti and Conger (Vincent refused to meet) |
| 1/28/2015 | Sisterman impromptu meet with Baker |

**The following personnel were interviewed:**
1. Tom Sisterman (1/20/15) Present were Baker, Carsten, Burke, Sloan Tamietti (Union)
2. John Vincent (1/20/15) Present Baker, Carsten, Anderson, Sloan Tamietti (Union)
3. Joe Longo (1/20/15) Present Baker, Carsten, Anderson, Sloan Tamietti (Union)
4. Gordon Clark (1/20/15) Present Baker, Carsten Anderson, Sloan Tamietti (Union)
5. Jeff Langejans (1/21/15) Present Baker, Carsten, Anderson, Clint Moss (Union)
6. Ken Brouillette (1/21/15) Present Baker, Carsten
7. Harvey Brown (1/21/15) Present Baker, Carsten
8. Chris Jurvig (1/21/15) Present Baker, Carsten
9. Phil Morgan (1/21/15) Present Baker, Carsten
10. Glenn D' Auria (1/21/15) Present Baker, Carsten
11. Brian Corrales (1/22/15) Present Baker, Carsten, Anderson
12. Jorge Loya (1/22/15) Present Baker, Carsten, Anderson
13. Jon Bieg (1/22/15) Present Baker, Carsten, Anderson
14. Dominic Cuffel (1/22/15) Present Baker, Carsten, Anderson
15. Jimmy Davis (1/22/15) Present Baker, Carsten, Anderson
16. Mike Pursley (1/22/15) Present Baker, Carsten, Anderson
17. Roland Spangle (1/22/15) Present Baker, Carsten, Anderson
18. Carl Schultz (1/22/15) Present Baker, Carsten, Anderson
19. Andrew Rico (1/22/15) Present Baker, Carsten, Anderson
20. Carrie Clark (1/22/15) Present Baker, Carsten, Anderson
21. Chris Basaldua (1/23/15) Present Baker, Carsten, Anderson
22. Nikki Sprenger (1/23/15) Present Baker, Carsten, Anderson
23. Brian Cobb (1/23/15) Present Baker, Carsten, Anderson
24. Pete December (1/23/15) Present Baker, Carsten, Anderson, Jason Christianson (Union)
25. Will Motto (1/23/15) Present Baker, Carsten, Anderson, Jason Christianson (Union)
26. Randall Tinnin (1/23/15) Present Baker, Carsten, Anderson
27. Annette Lopez (1/23/15) Present Baker, Carsten, Anderson

COT001894

28. Wayne Cummings(1/26/15) Present Baker, Carsten
29. Jimmy Hinrichs (1/26/15) Present Baker, Carsten
30. Tomaz Piotrowski (1/26/15) Present Baker, Carsten, Sloan Tamietti (Union)
31. Cathy Devine (1/26/15) Present Baker, Carsten
32. Rachel Duarte on FMLA so did not interview

**Overview:**
Those interviewed that submitted memos were asked clarifying questions from the information
we received in their memo. Some of the questions asked were:
   1. Do you feel discriminated, targeted, unsafe or harassed?
   2. Do you feel like there is a hostile work environment?
   3. Anything else you would like to add?

The personnel that did not submit memos were all asked the same questions to include the
following:
   1. Are you aware of any issues in the Prevention Division?
   2. Do you have any concerns about the division?
   3. Have you ever had an issue with a supervisor or any inspectors while in the division?
   4. Do you feel like it is a hostile work environment?
   5. Do you still enjoy your job?
   6. Do you still enjoy coming to work?
   7. Would anything prevent you from coming to work?
   8. Anything else you would like to add?

The majority of the responses included that the interviewee knew about the conflict between
Captain Langejans and Captain Clark. Also, most have not had an issue with a supervisor or any
inspectors in the division. With the exception of two, all answered no to the question regarding a
hostile work environment. One employee shook their head yes, but when asked to clarify, the
interviewee made the statement that "no one is talking to anyone." The other interviewee was
Inspector Clark who stated there was "a lot of tension."

**Findings:**
Captain Langejans did make statements about Captain Clark and Inspector Clark to several
people. The statements made at various times included comments about:
1. The promotional exam in which Carrie Clark was ranked number one. (Captain Langejans
believes it was incumbent upon Captain Clark to share information that he had pertaining to the
test with management.)
2. Captain Clark's work habits and work ethic. (Captain Langejans admitted to sharing
frustration he had about Captain Clark and his lack of help and that he did not do things that he
thought the Team 2 Captain should do.)
3. Being aware of your surroundings because Gordon and Carrie could not be trusted.
4. Expressed to Tom Sisterman that Gordon needed to go away and leave the division. (Captain
Langejans admitted to sharing this with Inspector Sisterman)
5. Giving Chief Critchley an ultimatum. Either Captain Clark leaves the division or Captain
Langejans will. (Captain Langejans says he does not recall this.)

On December 4th, there was a "lunchroom" incident. Captain Langejans went into the
lunchroom after a meeting he had with DC Carsten, AC Baker, and Captain Morgan (Captain
Clark was absent from the meeting) about the strategic plan for the division. Inspector Vincent,

COT001895

Inspector December and Inspector Sisterman were in the lunchroom. When Captain Langejans was asked what the Chiefs were here for, Captain Langejans jokingly said "getting ready to change the division." According to Inspector Vincent, Captain Langejans walked into the lunchroom after the meeting and began telling December, Vincent and Sisterman "why the Clarks are the problem with the division" and that they are the reason for poor morale. Inspector Vincent said that "Jeff had an agenda to get Gordon out before Carrie got back to work from FMLA." According to Inspector Vincent, Captain Langejans also brought up nepotism. Inspector Vincent states he told Captain Langejans that maybe he was the problem with the division, not the Clarks. According to Inspector Vincent, Captain Langejans suggested maybe he should leave the division and Inspector Vincent told him yeah maybe you should. Inspector December also said some things to Captain Langejans in the lunchroom. Inspector Sisterman witnessed some of this incident, but decided to leave the room after a short time. After, what was described as Inspector Vincent getting heated and expressing himself, ("John lost his mind" according to Inspector December and "John went off" according to Captain Langejans). Inspector December stated in his interview that Captain Langejans asked for input after the initial lunchroom incident and wanted to hear from Inspector Vincent and Inspector December. Inspector December said that Captain Langejans "didn't say much but was receptive to our input," but then Inspector December said Captain Langejans questioned their feedback.

**Tom Sisterman (1/20/15):**
Inspector Sisterman writes in his memo that he is a concerned employee. He claims a "hostile work environment" exists in the Prevention Division. He states he has sent an email to AC Baker about Captain Langejans (the only email AC Baker recalls about Captain Langejans is a year or two ago; Inspector Sisterman wanted to discuss how he documents his duties in the Fire Reporting Management System (FRMS)). He also stated he told DC Carsten in December about Captain Langejans intimidating and abusive behavior. His perspective is the issue has not been adequately addressed or investigated. Inspector Sisterman did state "he hasn't said anything" when asked if Captain Langejans has said or did anything since December 5, 2014. Inspector Sisterman stated that he left the lunchroom incident after 10 minutes.

Inspector Sisterman did state that Captain Langejans talked with him after the lunchroom incident and Captain Langejans told him that Inspector Vincent went to Captain Clark and he (Captain Langejans) thinks he might be getting in to trouble and he will be lucky if he is still his (Inspector Sisterman's) boss by next year. Captain Langejans also told Sisterman that walking out of the conversation in the lunchroom the day before was the best thing he could have done.

Inspector Sisterman was asked about the "detailed plan" that he referenced in his memo and he explained three things Captain Langejans has brought up: 1. the cheating allegations, 2. Nepotism, and 3. Giving Chief Critchley an ultimatum about leaving the division. In Inspector Sisterman's initial memo he states that the week of December 1st, in the Haz Waste yard, Captain Langejans said "he thinks it would be very easy to kill his enemies and get away with it. I know exactly what I would do, I've thought about it a lot and as long as you do the right things and don't talk to anybody about it it is easy to get away with it." Inspector Sisterman says this statement could be inferred from the context that Captain Langejans was talking about Captain Clark. When asked who Inspector Sisterman told about this, he said he spoke to Inspector Brian Corrales the next day. The next person he brought it up to was Union President Roger Tamietti on January 8, 2015. Inspector Sisterman states that he is fearful since going to Captain Clark on December 5, 2014. When asked if Captain Langejans has ever threatened him, Inspector Sisterman said no he has not threatened him. Inspector Sisterman answered yes to Prevention

COT001896

being a hostile work environment. He was asked whether this was because of actions or perceived. He stated there have not been any actions towards him, but he does not want to become Captain Langejans enemy. Inspector Sisterman believes that Captain Langejans becomes obsessed with people and felt like he has a mental illness. He stated that it has been one year since Captain Langejans was talking about Captain Clark and that he (Captain Langejans) would pretend to be Captain Clark's friend.

Inspector Sisterman was asked who he refers to in his memo when he says "several times by several different people," Captain Langejans "harassment of fellow employees" was brought to the attention of administration. Other than the names listed on the first page of his memo, Sisterman did not give any details to this statement. When asked if the "many inappropriate and discriminatory remarks about individuals in the division" were brought forward he could not give any examples except for Inspector Longo.

Inspector Sisterman was asked if Captain Langejans has done anything to him or made any actions towards him that were threatening. He said he has not done anything to him, that Captain Langejans confided in him.

### John Vincent (1/20/15):
In this interview Inspector Vincent reiterated some things he stated when DC Carsten and AC Baker met with him on January 14, 2015 at 1700. We met on this day to follow up on his memo, "request for transfer" that he sent on January 14, 2015 at 1331.

In the interview, he stated he was disappointed from the meeting that we had with him because he felt it was unreasonable to bring up demoting. In the meeting options were discussed, including opening up his position on Team 3 to the division and trying to get another member to fill it, thereby allowing him to transfer to another team. He was also told that if no one puts in then we will have to go to plan B, but he would be the tank guy until we found someone to fill his position. He was also told that he had the option to demote as well.
Inspector Vincent said Captain Langejans has put him in an uncomfortable situation by having one on one talks with him. Inspector Vincent said he bit his tongue the whole time. He is concerned that Captain Langejans will turn on him. Inspector Vincent mentioned that Captain Langejans did not want him to leave Team 3 because of how it would make him look (Captain Langejans). In regards to how Captain Langejans looks to personnel in the division, Inspector Vincent believes Captain Langejans cannot look any worse out there.

Inspector Vincent recalled the "lunchroom" incident, stating that Captain Langejans walked in telling them (December, Sisterman and Vincent) that the Clark's were the problem in the division and the reason for the poor morale. Inspector Vincent said Captain Langejans had an agenda to get Captain Clark out of the division before Inspector Clark got back from FMLA. Inspector Vincent recalls Captain Langejans saying he "teed Mike up" in reference to DC Carsten and wanting to move Captain Clark from the division. Inspector Vincent said that the lunchroom brought things to a head.

Inspector Vincent brought up a time that he was driving in Captain Langejans truck and he told him about an ultimatum that Captain Langejans was going to give Chief Critchley about leaving the division if Captain Clark is not removed from the division.

COT001897

It is Inspector Vincent's opinion that Captain Langejans tries to build alliances. He stated that he wants to get out of Team 3 since the blow up in the lunchroom.

Inspector Vincent said Captain Langejans has never done anything to him. He stated that they have had a good history since being firefighters on ladder 5. Inspector Vincent said there have not been any issues since the lunchroom incident, which was on December 4, 2014.

**Joe Longo (1/20/15):**

The interview with Inspector Longo reiterated what he stated in his memo and what he has felt while in the division and dealing with Captain Langejans.

**Gordon Clark (1/20/15):**

Captain Clark was asked to clarify who are the "many of us" he is referring to when he states Tom has expressed his "high level of stress, trouble and worry Captain Langejans' comments and actions have caused him…". He said we would have to defer to Tom but mentioned Pete December, Joe Longo, Brian Cobb, Mike Pursley, Carrie Clark and there being a lot of stress down there.

Captain Clark said that Inspector Sisterman and Inspector Vincent presented him with this information. It was not at his request.

Captain Clark shared a time that Inspector Cuffel who is on his team, went to Captain Langejans to have something deleted in FRMS and Captain Langejans questioned the assignments given to Inspector Cuffel and also made the statement that it is funny you are doing (an assignment) and not your Captain.

Captain Clark stated that Inspector December shared with him, one time when Team 3 was meeting that Captain Langejans stated, we are glad we got Carsten (as Chief), because if we got Gordon crap wouldn't get done. Inspector Vincent and Sisterman shared with him that Captain Langejans made negative statements about women on the job.

Captain Clark stated that "Captain Langejans tried to get me on board against Captain Phil Morgan when I first arrived in the division." He stopped once Captain Clark ignored his ideas.

Captain Clark states that Rachel and Annette do not want to work for Captain Langejans. Captain Clark stated that Cathy told Annette that Captain Langejans told her to be careful what she says around Carrie.

Captain Clark says Captain Langejans was his friend and that "he duped me." It is Captain Clark's opinion that Captain Langejans needs help, reconciliation and rehabilitation. Captain Clark says "I am not comfortable or safe with him down there." He also stated, I'm "scared for him to be down there with me."

Captain Clark also shared that Inspector Sisterman is afraid that Captain Langejans is going to come in and shoot everyone in the division and Inspector Vincent is afraid, and he had a thought that he would be hit by a bat when opening his garage.

Captain Clark reiterated that he does not want to be there with Captain Langejans. He also requested that we let him know if Captain Langejans was working tomorrow, Wednesday January 21, 2015. I told him we would let him know.

COT001898

**Jeff Langejans (1/21/15):**

This interview started by asking questions to clarify some of the statements that were made in the memos received from Inspector Sisterman and Inspector Clark. When asked if he "did not intend to cease his actions against Longo", as stated in Inspector Sisterman's memo, Captain Langejans denied making the statement. He stated that he had his team members (Vincent, December and Funke) coming to him about Inspector Longo's behavior. I asked if he ever said "this dog does not quit" he said no but that his last interaction with Inspector Sisterman, he made the statement that he is not a quitter.

Captain Langejans responded to issues with Inspector Pursley that he had some challenges with managing Inspector Pursley's time and that Captain Langejans just tried to assist him and give him tools to be more effective.

Captain Langejans acknowledged that he said some things that he should not have, but he believes this is a coordinated effort. He said he is one to hold people accountable. He believes some employees are one way and only care about themselves. Captain Langejans thinks employees should put in their time at work. He stated that he allowed an open relationship with his team and would allow them to vent. He stated that he allowed open conversation and inspectors would state why they think the division is f'd up (expletive). He said he feels like one of them, referring to being one of the guys. He admitted to being embarrassed about some of the things he has done.

In one memo received it was stated that Captain Langejans puts his ear to the wall to hear Captain Morgan's conversations with his personnel. Captain Langejans denies this but says that he can hear some conversations occurring in the office next to his. He denies ever stating that the division would be better if Phil was gone.

When asked about his comments regarding the inspector promotional test, Langejans said that after months of battling inspector opinions and who is not doing what, and everybody stating, "you know how Carrie is going to do" that while sitting on the interview board and Carrie answering a question verbatim, it dawned on him that he gave all the stuff (certification and promotional) to Gordon when he arrived in the division. Captain Langejans said he asked Ken what he changed on the written test, and Ken said "nothing." He only reduced the test to 61 questions and updated from the 2006 to the 2012 fire code. Captain Langejans felt that Captain Clark should have come forward and told Chief Nied that he had all the information Jeff gave him. Captain Langejans shared with Chief Nied that he felt that the test could be compromised and that it is not fair to the other sixteen individuals. Captain Langejans said he wanted to reserve his opinion until after the written test results. Captain Langejans said that he "never accused Carrie of cheating." He knows he went beyond the unwritten boundary and should not have talked to the team about Gordon having the test.

Captain Langejans shared that at their last team meeting, as he listened to his team say how f'd (expletive) the division was that Vincent, Sisterman and Funke made their fair share of statements and that Bieg did not say much. He said that at the last team meeting he wanted to get everyone to be aware of their surroundings and wanted to know there are certain things appropriate for discussion and conversation and certain things that are not. He wanted to ensure everyone was treated with the same respect. He has heard people get loud and use profanity and

COT001899

he wanted to bring awareness to this. He admits that he fell short of not drawing the line. He said that Inspector Vincent was vocal about how f'd (expletive) things were and it was gonna get worse with the Clark's there. Captain Langejans says that everything changed after the "lunchroom" incident. He says something transpired between the last team meeting, on November 5, 2014 and the "lunchroom" incident, on December 4, 2014.

Captain Langejans recalls, a time when Inspector Vincent was considering demoting and that he was not happy that the division was moving to the International Code Council (ICC) Inspector I testing and Inspector Vincent's two questions were: 1. Is it mandatory to take the test?; and 2. What happens if I don't pass? He recalls one time Inspector Vincent coming in his office and saying he did not have to take the ICC test. And Captain Langejans asked him where he heard that and his (Vincent's) response was that Gordon told him he does not have to take the test.

In the interview, Captain Langejans was asked if he recalled being in the Hazwaste yard with Inspector Sisterman and he said he remembers talking about his concerns with attitudes in the division. He said he had asked Inspector Sisterman what was going on and that things were changing. He asked Inspector Sisterman if he could trust him and he was led to believe that he could. Captain Langejans believed he could share his thoughts with Inspector Sisterman and that he could share his frustration about Gordon Clark and his lack of help. At the time Captain Langejans said he was just trying to keep up with his own work, but felt that Gordon was not performing at the level a Team 2 Captain should. Captain Langejans adamantly denies saying anything about killing Gordon. He said he has been thinking if he could have said anything like this, since DC Carsten asked him immediately when he heard the statement from Inspector Sisterman on January 15, 2015. At the time DC Carsten asked, Captain Langejans about this statement he answered with "absolutely not." The only thing that Captain Langejans expressed to Inspector Sisterman was that Captain Clark needs to go away and leave the division. In Captain Langejans' opinion, Captain Clark "did not come as advertised" and he thought that "he was going to get behind the cart and push."

Captain Langejans was asked if he ever spoke of giving Chief Critchley an ultimatum and he said "no" he does not recall making this statement.

When asked to give his view of the "lunchroom" incident Captain Langejans said he walked into the room and Vincent, December and Sisterman were eating lunch. He said chatter always starts when we (Chief's and Captains) go into room 150. So Captain Langejans said he jokingly told them that we were getting ready to change the division and this is when Inspector Vincent "went off." He said Vincent was disrespectful and that Sisterman left after 30 seconds. Captain Langejans believes he is being accused of targeting and getting rid of people because he didn't like them. Greenleaf was brought up, along with Longo, the ICC test, AC Baker, and Ken. Captain Langejans said Inspector Vincent does not like Ken and thinks this is an issue because he is a civilian. Inspector Vincent told Captain Langejans he cannot be trusted. In the lunchroom Inspector December brought up a complaint that Captain Langejans had addressed with him and his dislike for how Captain Langejans handled it. According to Captain Langejans, Inspector December remembers "the truth lies somewhere in the middle" which he took to believe that Captain Langejans thought he was half wrong or responsible for what happened with the complaint.

Captain Langejans said he had another meeting after the lunchroom incident with Inspector Vincent and he wanted to transfer teams.

COT001900

Again, Captain Langejans admitted to creating and allowing an environment where his team can vent; stating that his intent was to know where they are and what they are thinking and feeling.

When Captain Langejans was asked if he ever tried to bully or intimidate anyone in the division, he answered "no." Captain Langejans said he has never threatened or harmed anyone. He had one complaint 20 years ago when he was a firefighter that had to do with his attitude. He said he is willing to do the tough stuff as a supervisor to change behaviors.

In reference to the nepotism subject, Captain Langejans said that he and Captain Morgan had discussed it and looked at the Administrative Directive on nepotism. They believed that directly or indirectly supervising could cause questions. Captain Langejans feels like he is the target and being singled out. He stated he has "taken accountability for the things I have done wrong." He believes there is a lack of work on Captain Clark's side and that he is not being held accountable. He feels like he is the only one with courage to bring it out and he says he is not the only one with this thought.

### Carrie Clark (1/22/15):
Inspector Clark answered that she had some concerns about the division in some of the things she had heard. Inspector Clark stated that when she was on light duty, she did not know much about the prevention division but learned that Annette and Rachel had a problem working for Captain Langejans. She heard Captain Langejans would ask the support staff (Annette, Rachel) what Captain Clark was doing. When Inspector Clark came back from FMLA the week of November 24, 2014 she heard from Inspectors things that were said about her by a supervisor. She mentioned that two days ago she heard from Annette that when Annette went to cover for Cathy, Cathy told Annette "watch what you say around Carrie", Annette asked who said that and Cathy told her Captain Langejans said it.

Inspector Clark said she heard from Captain Clark the statement that Inspector Sisterman alleges he heard at the Haz Waste yard and she said that affects her the most. Inspector Clark stated Captain Langejans "seems like a retaliatory person." Inspector Clark was told by Inspectors, including Inspector Sisterman and Inspector Vincent that Captain Langejans made comments about Inspector Clark. Some of those comments pertaining to Inspector Clark were:
- Her lawsuit- "that's what we get for hiring women"
- Department should have expected this because of women
- He said she cheated
- Morale is down
- Lock computers, watch what you say

Inspector Clark denies being approached by anyone to get involved in this issue. Inspector Clark states she is trying to stay out of it. She is working on her Inspector probationary modules.

Inspector Clark states that she has only spoken to Captain Langejans two times. She stated that he has walked by her desk and never looked at her. She is under the impression that no one likes her, so is a little paranoid. Inspector Clark states she talked with Captain Langejans on Christmas Eve, they talked about kids. Inspector Clark stated one time she walked into the mailroom and Captain Langejans walked out. Inspector Clark states she feels awkward around Captain Langejans.

COT001901

When asked if it is a hostile work environment she answered yes and that there is "a lot of tension." She states that she has seen a change in Inspector Vincent and Inspector Sisterman. She said "they do not smile, they are uncomfortable."

Inspector Clark stated she is uncomfortable when Captain Langejans is around. She stated "I know he doesn't like me." She also stated she "feels like he doesn't want me or Gordon here."

Inspector Clark did state that she does not want to involve her supervisor with anything. She does not feel like she can go to Captain Morgan with the issue.

Inspector Clark shared that last week she could not get ahold of Gordon and she was paranoid. She said that if Captain Langejans was removed from the division he would be angry and "obviously got anger towards Gordon." Inspector Clark added that this is "a little worrisome" and that Captain Langejans was never the most welcoming in the field. She has always had reservations about him and she worries about retaliation. Inspector Clark believes she and Gordon were blindsided.

Inspector Clark stated "yes" she enjoys the job and when asked if she was happy in Prevention, she said she was.

## Tom Sisterman (Impromptu 1/28/15):

Inspector Sisterman came to my office wanting to follow up on the meeting he had with the union, Captain Clark and Captain Langejans. He stated that Captain Langejans admitted to some things, denied some things and partially admitted to others in relation to the memo submitted by Sisterman on 1/15/15. Inspector Sisterman said Captain Langejans admitted to continuing to pursue Inspector Longo and to telling inspectors to keep their computers locked. When asked about the statement in the Haz Waste yard he denied it flat out, but then he stated "I was angry, I might of said some things I did not mean."

Inspector Sisterman said that after the November 5th Team 3 meeting, he was concerned and he talked with Union President Roger Tamietti. Inspector Sisterman admitted to engaging in discussions that Carrie (Inspector Clark) will ruin the division. Inspector Sisterman said he believed what Captain Langejans had said about Carrie and he was concerned about the division and thought she was going to ruin it. Inspector Sisterman realized that when she came to the division she "was not the devil he said she was."

Inspector Sisterman said that Captain Langejans admitted to saying Carrie was going to ruin the division, that the Clark's were the reason for low morale and to discussions about Carrie scoring 1st on the Inspector promotional process.

I asked Inspector Sisterman if he had notes from the statement he wrote about "killing enemies" in his memo. He said he did not have any notes but he narrowed the date down. He added that he remembers exactly where they were standing in the Haz Waste yard.

I asked Inspector Sisterman if Captain Langejans has had any actions, outbursts or emotional reactions towards him and he answered "no." Inspector Sisterman stated he is scared because of what he believes is an obsession of going after people by Captain Langejans. Inspector Sisterman stated that "I am his enemy." I asked if Captain Langejans has told him that and he said "no."

COT001902

Inspector Sisterman believes Captain Langejans has a pattern of "aggression," becoming obsessed, spreading rumors, and the intent to get people fired, demoted or removed.

When asked, Inspector Sisterman says that he can do his work. He did add that he has trouble sleeping and is afraid. He stated that when Captain Langejans is not here, he feels ok, but when he is here, he is afraid to go to the bathroom, to the copy machine. He stated he is fearful from the statement Captain Langejans made in the Haz Waste yard, his obsession and campaign against people. Inspector Sisterman also added that there are times that Captain Langejans will stand in front of his cubicle for 10 minutes. He said that it is a technique to unnerve people that Captain Langejans has shared with him. He said that Captain Langejans told him he would do it to Captain Morgan. He would sit there and stare at him when they were having conversations.

I asked Inspector Sisterman if he was willing to give time for Captain Langejans to work on some of these issues of concern. Inspector Sisterman said he was of the mindset that he would tell his concerns and that the investigation would get him (Langejans) out of the division. Inspector Sisterman said that Captain Langejans knows the code well, but we have others that know the code. He added that he does 90% of the Hazardous Materials Waste Program and Captain Langejans does 10%. He also stated that he could train a new boss. He said he loves his job and has no plans to go anywhere.

## Disposition Statement:
It is clear from the interviews and accounts of witnesses that Captain Langejans made inappropriate statements and comments about Captain Clark. However, it is also clear from all the interviews and accounts of witnesses that there have not been any statements or actions to substantiate a threat in the workplace. The actions and discussions that occurred may have created an uncomfortable and stressful environment for some in the division but there is no evidence to support the allegation of threats.

It is evident from the interviews, memos submitted and impromptu office visits that Captain Clark and Inspector Sisterman perceive a threat from Captain Langejans. There has not been anything to support a threat. It appears they are focusing on statements that were made back in November and December 2014. There have not been any statements or comments made by Captain Langejans since.

In order to have a hostile work environment, certain legal requirements must be met. A hostile work environment is created by a boss or coworker whose actions, communication or behaviors make doing a job impossible; i.e. the conditions of employment had been adversely changed. This means that the behavior altered the terms, conditions, and/or reasonable expectations of a comfortable work environment for employees. Additionally, the behavior, actions or communication must be discriminatory in nature.

Thirty-one people were interviewed. Five out of the thirty-one believe there is a hostile work environment. Three of whom submitted memos and two others from the division that were interviewed. One that submitted a memo, just spoke of his experience in the division and experience with Captain Langejans. He decided to speak up after he heard others were discussing the issues they had with Captain Langejans.

The work of the division has carried on since the first report in December and throughout this investigation; those interviewed did not claim an inability to perform their work. Captain

COT001903

Langejans is alleged to have "targeted" several members in the division; the majority of the examples given were that of supervisor with the Tucson Fire Department trying to ensure accountability within the division. It is noted that communication and delivery of the message by Captain Langejans needs to improve. Moreover, Captain Langejans acknowledged that in his effort to create an environment where employees would feel free "to vent," he sometimes forgot his role as supervisor and engaged in discussion inappropriate to his rank.

**Recommendations:**
It is my recommendation to keep all members in the division. Inspector Vincent's request to transfer from Team 3 was acted on by opening his position on January 15th and asking for a volunteer. With no one putting in to fill the position by the closing date of January 22, Inspector Bieg was recruited and accepted the role to take over tanks. As of January 26, Inspector Vincent is on Team 2, under Captain Clark and will be responsible for our Multi-Agency Inspection Team (MAIT's) and inspecting private schools. He will assist in training and getting Inspector Bieg up to speed on tanks. Inspector Sisterman will be given the option to remain on Team 3 or move off of that team which will include a pay decrease of 5% specialty pay that he now receives. If Inspector Sisterman's decides to move from the role of the Hazwaste Inspector, we will seek interest from the division and fill according to our process on filling these specialty positions. Captain Clark will be informed of management's decision. Captain Clark will be informed of the succession planning of the division that was previously mentioned to him on December 5, 2015 when he came into AC Baker's office; the succession plan involves moving him back to the field to prepare for the openings in prevention at the end of the year. Captain Morgan will be retiring in December 2015 and Captain Clark is on the promotional Battalion Chief's list. Discussions about the succession planning for the division had begun prior to any of these issues brought forth. Captain Clark at that time stated he did not want to leave the division but understood the bigger picture and management needing to prepare. However, at this time, all members will remain in the division, but Captain Clark will have the option to go back to the field. Captain Langejans will receive a written reprimand for inappropriate comments and statements and his inability to keep the line between supervisors and subordinates. The training and counseling will address his creating an environment filled with negative comments about other supervisors and issues within the division.

The entire division will participate in mandatory training, "Respectful Workplace", training given by Matt Larsen at Equal Opportunity Programs Division (EOPD).

All those who have submitted memos will be offered the opportunity to participate in a voluntary mediation coordinated through Equal Opportunity Programs Division (EOPD).

All those who submitted memos and expressed concern for their safety will be offered assistance through the Employee Assistance Program (EAP).

COT001904

# ATTACHMENT 2



# MEMORANDUM

**DATE:** 08/18/2015

*Laura Baker*

**TO:** Jim Critchley
Fire Chief
Fire Central

**FROM:** Laura Baker
Assistant Chief
Fire Central

**SUBJECT:** Response to WC 1503001

The City Manager's office has directed the Tucson Fire Department (TFD) in the following two areas regarding WC 1503001:

1. The department is directed to address the Equal Opportunity Programs Division's (EOPD) assertion that the Fire Department's investigation was not thorough and failed to identify the most appropriate level of discipline for Captain Langejan's.

2. The EOPD's conclusion that City Administrative Directive (AD) 2.02-10 Nepotism, was contravened is well supported through statements and concerns expressed by members of the Prevention Section. The department is directed to take corrective action to address Nepotism.

In response to item number one, the Fire Department's investigation was thorough, interviewing the entire division except for one employee, a secretary who was on FMLA from 12/15/14 through 3/6/15. The Fire Department interviewed 31 personnel through the rank of Captain.

It is stated in the EOPD recommendations under "Appropriateness of Response by Management" that the questions asked in the department interview were narrowly focused and did not allow them to feel that they could be open or provide follow-up to their questions. I would be remiss if I did not add that the department interview did have narrowly focused questions that were always followed by an opportunity for open, safe, communication if the interviewee had anything to add or comment on. In the EOPD recommendation it states that "12 expressed that they provided more information during the EOPD interviews than they had to the Chief's due to feeling of pressure and fear they experienced during those interviews", but I did not read anything in the transcribed report asking or eliciting this response from those interviewed. Where was this information obtained?

The presumption that there was lack of follow up in our investigation is incorrect. Assistant Chief Baker and Deputy Chief Carsten had many conversations about the various dynamics going on and discussed actions to be taken or in some cases not to be taken but monitored. The TFD investigation was taken seriously and conducted thoroughly with an open, fair and consistent approach. There were certainly many feelings involved and perceptions from various

Page 1 of 3

COT001888

employees and with that in mind, the department goal was to maintain a workplace that could stay on mission, while working through the dissension amongst a handful of employees.

The TFD has a discipline matrix that serves as a policy to correct performance deficiencies and unacceptable behaviors or conduct, and motivate employees by improving work habits, behaviors and morale. There is room for interpretation but the matrix provides examples to help guide supervisors when dealing to correct performance behaviors, and unacceptable behaviors.

Assistant Chief Laura Baker and Deputy Chief Mike Carsten agreed that the violations of the Rules of Conduct by Captain Jeff Langejans put him in the "Minor Violation" category of discipline. This was a first offense and first discipline in his personnel folder. It could fall in presumptive but because of the exacerbating circumstances and the disruption to the Prevention Section, he was moved to the "Maximum Sanction."

As stated, the TFD discipline matrix is left to some interpretation. Once the discipline is recommended through channels (chain of command) a disciplinary review board (DRB), reviews the discipline to ensure that the discipline being given is consistent with the departments discipline matrix and policies. In this case, the DRB also concluded that the discipline recommended by Deputy Chief Carsten was appropriate for Captain Langejans violations to the rules of conduct. The fact that the Lead Civilian Investigator finds "that the actions of Captain Langejans, on their own warrant falling in the Intermediate Level of Discipline Matrix, factoring in the fact that he is a Supervisor makes it clear that the presumptive discipline of 1-2 day suspension is minimally appropriate," is not consistent with Assistant Chief Baker, Deputy Chief Carsten or the Disciplinary Review Committee recommendations. By definition an "Intermediate" offense involves misuse or abuse of authority, or other conduct that creates a potentially serious adverse impact on public safety or the professional image of the department or City of Tucson. Examples include, conduct or behavior that may constitute a crime, on or off duty, not involving physical injury, violence, sexual offenses or ethical misconduct; conduct that demonstrates a reckless disregard for the safety of persons or property resulting in no or minor injury and/or damage; failure to obey an order under non-emergent circumstances; hazing; unauthorized or abuse of leave; gross negligence in performing duties; loss of required professional certifications.

The actions of Captain Langejans did not involve misuse or abuse of authority or any of the other examples listed in the "Intermediate" category of offenses. As per the given discipline that Captain Langejans received the violations cited were:

City of Tucson Administrative Directive 2.02-5 II-A.11.c
Conducting themselves in a manner, on or off duty, that does not cause the City or department to question the employee's reliability, judgement, or trustworthiness in carrying out assigned responsibilities.

City of Tucson Administrative Directive 2.02-5II-A. 17
Promote harmony and cooperation among fellow workers.

Tucson Fire Department Manual of Operations Section 214.4 c iv
Always conduct oneself in a manner on and off duty that will not discredit the Department

Page **2** of **3**

COT001889

Tucson Fire Department Manual of Operations Section 214.4 c vii
Be respectful and conscientious of each member's welfare

Based on the investigation that the department conducted and the fair and consistent review the actions of Captain Langejans were not concluded to be one of unethical conduct. Captain Langejans admits to making some statements that he should have taken to the individual he had issues with or bring them through channels if appropriate. Captain Langejans actions matched the "Minor" category in the matrix which involved "inappropriate conduct or failure to meet acceptable performance standards that does not involve misuse or abuse of authority" and therefore was placed in the matrix here. It is clear from the Lead Investigator question asked of Deputy Chief Carsten (line 842-875) where he alludes to or "draws at least the possibility of ethical misconduct" that he believes Captain Langejans discipline should have fallen into the "Intermediate" category. Deputy Chief Carsten reviewed the entire discipline policy and matrix and I agreed with where Captain Langejans was placed. To this date, Captain Langejans has not participated in or been a part of the group meetings where personnel were free to express and communicate their concerns about others in the division. Captain Langejans has communicated his remorse, his failure and is willing to earn back the respect from personnel who have been affected or involved. Assistant Chief Baker believes that the discipline to Captain Langejans achieved the corrected actions necessary to improve the unacceptable behaviors or conduct.

In response to item Number two, the Nepotism within the Fire Prevention Section has been addressed and acted on. Personnel changes have been processed and will take effect the pay period of August 23, 2015. Additionally, the department is reviewing and addressing any concerns pertaining to AD 2.02-10. TFD is clarifying our department policy to be in line with the City AD.

COT001890

# ATTACHMENT 3



# MEMORANDUM

**DATE:**   April 13, 2016

**TO:**   Jim Critchley
       Fire Chief

**FROM:**   Laura Baker
       Assistant Chief

**SUBJECT:**   Response to Wrongful Conduct Complaint #WC 16-03-001

On March 9, 2016, the Equal Opportunity Programs Division (EOPD) received a Wrongful Conduct Complaint #WC 16-03-001 from Fire Inspector Carrie Clark. Following review, Martina Macias determined the allegations did not involve wrongful conduct and on March 24, 2016, routed the complaint to Fire Chief Jim Critchley. The complaint and the Administrative Directive 2.02-4 was reviewed by Assistant Chief Laura Baker.

The following interviews were conducted pertaining to this complaint:

- Inspector Carrie Clark
- Inspector Jim Hinrichs
- Inspector Dominic Cuffel
- Inspector Marc Lewis
- Inspector John Vincent
- Captain Jeff Langejans
- Secretary Rachel Duarte
- Customer Service Clerk Annette Lopez

Present at the above listed interviews were Assistant Chief Baker and Deputy Chief Mike Carsten. Each interview was taped by Executive Assistant Brittney Spangle who was also present.

The intent of the interview with Inspector Clark was to clarify questions from her filed complaint. The others were interviewed because of statements made in the complaint or information given in the interview with Inspector Clark.

Administrative Directive 2.02-4- "Right to Report Wrongful Conduct Procedures and Anti-Retaliation Provisions" " sets forth procedures for an employee or a member of the public to report or disclose mismanagement, abuse of authority, accidents or safety violations, fraud, waste, abuse, or criminal conduct on the part of a public official or city employee(s)." On March 9, 2016, Inspector Clark filed a complaint alleging violations based on "mismanagement and misconduct." After review of the complaint, interviews conducted and reflection on the information provided in the complaint, there is no evidence establishing mismanagement or misconduct. The disposition of this complaint is unfounded.

COT002745

Jim Critchley, Fire Chief
Response to Wrongful Conduct Complaint #WC 16-03-001
Page 2

The concerns included in the Wrongful Conduct Complaint #WC 16-03-001 are listed below under bullets. Below the bullet points is the disposition of each concern/complaint in bold.

- Throughout July and August of 2015, Inspector Clark met with Chief Critchley to express concerns and issues with the way Jeff Langejans was conducting himself towards Inspector Clark. Inspector Clark claims she was told multiple times by Chief Critchley, Chief Carsten and Chief Baker that Jeff Langejans was told to stop "staring" her down and to stop "writing memos" that were targeting Inspector Clark specifically.

  - **Unfounded, Chief Critchley, Chief Carsten and Chief Baker did not tell Inspector Clark this. No memos were authored by Captain Langejans "targeting" Inspector Clark.**

- As recent as February 29, 2016, Jeff Langejans continues to stare me down in an intimidating manner any chance he gets.

  - **Unfounded**, **there were no witnesses to this type of interaction that Inspector Clark states occurred. Captain Langejans does not recall this interaction she claims.**

- The claim of Jeff Langejans staring Inspector Clark down that was witnessed by Rachel Duarte is previous to the investigation handled by EOPD Investigator Matt Larsen.

  - **This allegation of Captain Langejans "staring down Inspector Clark" and witnessed by Rachel Duarte was investigated, documented, and addressed in an earlier EOPD investigation.**

- Rachel Duarte recently sent emails regarding Jeff Langejans behavior and inconsistent following of policies, and has been met with the same intimidating stares. Issues brought to the attention of different supervisors in the chain of command have allegedly been ignored.

  - **Unfounded**

- In reference to Gordon Clark and Chief Justen's talk on January 7, 2016, and the concerns mentioned, Assistant Chief Baker met with Battalion Chief (BC) Justen on January 14, 2016, to follow up.

  - **Unfounded, the information from BC Justen was not as Inspector Clark characterized. The information provided by Inspector Clark to Assistant Chief Baker (in the bathroom) was inconsistent with that communicated by BC Justen to Assistant Chief Baker. BC Justen advised Assistant Chief Baker that Captain Langejans did not tell him that Inspector Clark's "husband was a poor leader and that he was the reason for all the problems in Fire Prevention." Nor did BC Justen hear from Captain Langejans that Inspector Clark cheated on the promotional exam.**

COT002746

Jim Critchley, Fire Chief
Response to Wrongful Conduct Complaint #WC 16-03-001
Page 3

- Last week, (which would have been February 29-March 4) Marc Lewis purportedly told Inspector Clark that Jeff Langejans had spoken to him about the history between Jeff Langejans and Inspector Clark.
  - **Unfounded**

- Having to work for/around someone who multiple people complained about creating a hostile environment is not appropriate.

  - **The alleged complaints were prior to the Matt Larsen EOPD investigation. There have been no reports of hostile work environment since the initial "internal" investigation began. However, senior Inspectors are reporting a poor work environment because of the actions and behaviors of Inspector Clark.**

- Inspector Clark claims Captain Langejans wrote a memo regarding her failure to adhere to the uniform policy; Inspector Clark has documented and reported an inspector that works for Captain Langejans does not conform to the uniform policy.

  - **The memo referenced in the complaint is dated April 22, 2015, this occurred during the time frame of the earlier EOPD investigation. The documented information about Inspector D'Auria, who reports to Captain Langejans, was investigated and any issues or concerns addressed through the supervisor.**

  - Concerns about overtime (OT) opportunities within the Prevention section.

    - **Unfounded, procedures are managed by the supervisors and based on the knowledge and training of the inspectors. There are areas of specialty when it comes to working overtime opportunities.**

- Many issues have been brought forward regarding this same employee" (Glenn D'Auria) that have to deal with conflict of interest, unethical behavior along with some other questionable issues including ignoring life safety violations found at certain businesses. These concerns have also gone unrectified.

  - **These concerns that Inspector Clark submitted to her supervisor have been investigated and any issues or concerns addressed through the employee's supervisor.**

- There were allegations in the complaint about an inspector on light duty, use of Telestaff, wearing civilian clothes, use of a City vehicle, and parking.

  - **All listed issues and concerns are between the employee and their supervisor. These type issues are dealt with through the supervisors and the employee. The Prevention section has been told to put any concerns or issues in writing and give to their supervisor.**

COT002747

Jim Critchley, Fire Chief
Response to Wrongful Conduct Complaint #WC 16-03-001
Page 4

- Issues were also brought forward by other inspectors and our Fire Prevention secretaries, but our concerns continued to go ignored.
  - **Any issues brought forward by inspectors, "Fire Prevention secretaries," or anyone within the section are addressed by supervisors. After interviewing the personnel mentioned in this complaint or names brought up in Inspector Clark's interview, it was established that no one has any issues or concerns that have been ignored.**

- Selective enforcement of policies and inconsistent handling of discipline has been causing problems for some time.

  - **Unfounded, the expectations of personnel are fair, and consistent with department policies. Supervisors are expected to manage and hold their personnel accountable to the expectations of the Prevention section. Any issues or concerns brought forward or witnessed are handled through the supervisor and the employee.**

  - It was written in the complaint, "you are unable to speak with me".

  - **Unfounded, according to Inspector Clark, this was directed at the City Manager who informed Inspector Clark previously due to pending lawsuit that he would not meet with her.**

On January 11, 2016, Deputy Chief Carsten emailed to all of the Prevention section personnel, expectations of the Prevention section. These expectations were later read by Assistant Chief Baker at a Prevention line up on February 2, 2016. The Prevention section employees have been told to put any issues/concerns in writing and give the concerns/issues to their supervisor. This new complaint from Inspector Clark repeats several allegations either made pre-EOPD investigation or that were addressed during the EOPD investigation. Repetition of previously resolved issues required staff to re-interview witnesses and review documents.

Having considered all of the above, it is determined that Inspector Clark's Wrongful Conduct Complaint #WC 16-03-001, is unfounded.

Please let me know if you have any questions.

LB/bcs