# EXHIBIT 43

Case 4:14-cv-02543-CKJ   Document 116-5   Filed 08/18/17   Page 2 of 73

JEFF LANGEJANS                                        May 24, 2016
CLARK vs. CITY OF TUCSON                                         1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3

 4    CARRIE FERRARA CLARK,     )
                                )
 5              Plaintiff,      )
                                )
 6       v.                      )  No. CV-14-02543-TUC-CKJ
                                )
 7    CITY OF TUCSON,           )
                                )
 8              Defendant.      )
      _____)
 9

10

11

12

13         VIDEOTAPED DEPOSITION OF JEFF LANGEJANS
                      May 24, 2016
14                   Tucson, Arizona

15

16

17

18

19                           Prepared by:

20                           Doug Kirkpatrick, RPR
                             Certified Reporter
21                           Certification No. 50705

22

23

24

25
```



Case 4:14-cv-02543-CKJ   Document 116-5   Filed 08/18/17   Page 3 of 73

JEFF LANGEJANS                                          May 24, 2016
CLARK vs. CITY OF TUCSON                                          15

```
 1        A.    Yes.
 2        Q.    Have you ever supervised Dominick Cuffel,
 3   C-u-f-f-e-l?
 4        A.    Yes.
 5        Q.    And I apologize if I'm butchering their
 6   names.
 7              Have you ever supervised Jimmy Davis?
 8        A.    Yes.
 9        Q.    Have you ever supervised James Hinrichs,
10   H-i-n-r-i-c-h-s?
11        A.    Yes.
12        Q.    Have you ever supervised John Vincent?
13        A.    Yes.
14        Q.    And have you ever supervised my client,
15   Carrie Clark?
16        A.    No.
17        Q.    Do you follow TFD's manual of operations?
18   And I think it may have changed names recently, but
19   do you know what I'm referring to?
20        A.    Yes.
21        Q.    And do you follow TFD's manual of
22   operations?
23        A.    I try to.
24        Q.    Are you required to follow TFD's --
25        A.    We're supposed to, yeah.
```



Case 4:14-cv-02543-CKJ   Document 116-5   Filed 08/18/17   Page 4 of 73

JEFF LANGEJANS                                                May 24, 2016
CLARK vs. CITY OF TUCSON                                              41

1    on and a lot of people were concerned about a husband

2    and wife, one of them being a captain, being in the

3    same office.  And we were all kind of on eggs -- egg

4    shells with that.  And so as part of that office

5    chatter did I go out and make it my mission to tell

6    people that they were going to ruin the division?

7    Absolutely not.

8        Q.   Actually my only question to you was whether

9    or not you ever said those words or words like that.

10       A.   I can't recall that.

11       Q.   Okay.  Have you ever said the Clarks can't

12   be trusted or words to that effect?

13       A.   No.

14       Q.   Have you ever said the Clarks are the reason

15   for poor morale in the division or words to that

16   effect?

17       A.   I can't recall that.

18       Q.   Have you ever made the statement that you

19   were going to kill your enemies or words to that

20   effect?

21       A.   No.

22       Q.   Have you ever accused Carrie Clark of

23   cheating on a promotional exam?

24       A.   No.

25       Q.   Have you ever -- have you ever hinted or



Case 4:14-cv-02543-CKJ   Document 116-5   Filed 08/18/17   Page 5 of 73

JEFF LANGEJANS                                    May 24, 2016
CLARK vs. CITY OF TUCSON                                    42

1    alluded to the fact that Carrie Clark cheated on a

2    promotional exam?

3                   MS. SAAVEDRA:   Form.

4        A.    No.   I mean, I shared some things that I

5    shouldn't have shared, and I owned up to that.

6    BY MR. JACOBSON:

7        Q.    Okay.   So why don't we go into that.

8              What did you share that you shouldn't have

9    shared?

10       A.    So I had some very good relationships

11   with -- with my crew.   And I was part of the testing

12   process.   And I just -- there were red flags.   And

13   that stuff that I shouldn't have shared, and I've

14   already admitted to that, and people inferred what

15   they wanted from that.

16       Q.    So I'm interested in exactly what you

17   shared.   What did you say?

18       A.    It was in my interview.

19       Q.    I understand, but you're under oath here

20   today, so you have to answer my questions.

21       A.    Okay.

22       Q.    So what did you share that you openly admit

23   here under oath that you shouldn't have shared?

24       A.    I shared that she had answered one of the

25   questions on the oral interview word for word and



Case 4:14-cv-02543-CKJ   Document 116-5   Filed 08/18/17   Page 6 of 73

JEFF LANGEJANS                                    May 24, 2016
CLARK vs. CITY OF TUCSON                                    43

1    that no other candidate did that.

2             I had an issue with my supervisors in the

3    fact that we had talked about that during the testing

4    process.

5             And basically my chief asked me did I think

6    she cheated, and I said no, I don't know if she

7    cheated, but I'd like to see the written scores

8    because usually we get the written scores after the

9    oral interview and we can kind of see how people did

10   and it's also a way we can look at the test questions

11   to see if they're fair questions.

12            And I remember her being probably number

13   fifth on the interviews points-wise.  And when the

14   list came out, she was ranked number one.  So that

15   was a red flag to me.

16            And the fact that I had given all of the

17   promotional stuff and the certification stuff to

18   Gordon because of a change of responsibilities.  I

19   mean, that was a red flag in itself.

20       Q.   So these are the red flags that you're

21   thinking about, but I just want to make sure these

22   are the things that you shared with your supervisees;

23   correct?

24       A.   I shared that stuff with Tom Sisterman.

25       Q.   And you were supervising Tom Sisterman at



1     Q.    Have you ever said anything negative about

2  women in the fire service?

3                MS. SAAVEDRA:   Form.   What time frame?

4                MR. JACOBSON:   Ever.

5     A.    Ever?

6  BY MR. JACOBSON:

7     Q.    Yes.

8     A.    Yeah, probably early in my career.

9     Q.    Tell me about that.

10               MS. SAAVEDRA:   Form.

11    A.    I was -- I came on in '88.   And there was

12  really only a couple of females on the job at that

13  time.   And so it was quite a transition for us at

14  that time to -- to make this all work with the

15  different sexes and sleeping in a dorm room and all

16  this stuff.   And so there was a lot of resistance.

17  But, I mean, we all had our own macho opinions.   And

18  it was -- it was a boys' club.   And that's just how

19  it was.

20          And I don't know what else to say other than

21  that.   Just that we all had our own opinions about

22  females in the fire service.

23  BY MR. JACOBSON:

24    Q.    And have you ever said anything -- have you

25  ever said anything negative about pregnant women



Case 4:14-cv-02543-CKJ   Document 116-5   Filed 08/18/17   Page 8 of 73

JEFF LANGEJANS                                    May 24, 2016
CLARK vs. CITY OF TUCSON                                    47

1    being in the fire service or words to that effect?

2                MS. SAAVEDRA:  Form.  I'm going to ask

3    that you give some sort of time frame.  He's had

4    quite a lengthy career.

5    BY MR. JACOBSON:

6       Q.   Yeah.  Since the beginning of your fire

7    department career have you ever said anything

8    negative about pregnant women being in the fire

9    service?

10                MS. SAAVEDRA:  I'm going to object to

11    form and ask that you limit it to at least like the

12    last like five years or at least the time frame that

13    Carrie Clark was employed there.  Otherwise it's not

14    relevant to her claim.

15                MR. JACOBSON:  Well, I think you know,

16    Michelle, that speaking objections are not allowed.

17    So he can -- you lodge your objection and he can

18    answer.  And if I want to narrow, I'll narrow.

19    BY MR. JACOBSON:

20       Q.   But right now, have you ever said anything

21    negative about pregnant women in the fire service?

22       A.   I don't recall anything.

23       Q.   Okay.  In the last five years have you ever

24    said anything negative about pregnant women being in

25    the fire service?



Case 4:14-cv-02543-CKJ   Document 116-5   Filed 08/18/17   Page 9 of 73

JEFF LANGEJANS                                    May 24, 2016
CLARK vs. CITY OF TUCSON                                    48

1        A.    I don't think so.

2        Q.    Have you ever told any TFD member that they

3    should stay away from Carrie Clark?

4        A.    Not that I can recall.

5        Q.    Have you ever told any TFD member that they

6    should stay from Gordon Clark?

7        A.    No.

8        Q.    So if somebody had said that you said those

9    words, would you have any reason to doubt them?

10              MS. SAAVEDRA:   Form and foundation.

11       A.    I would -- I would appreciate being told

12   what I said because it may jog my memory.   But right

13   off the top of my head I can tell you that that's not

14   something I went around and -- I don't tell people to

15   stay away from people.

16   BY MR. JACOBSON:

17       Q.    Right.   But my question was if somebody

18   had -- another TFD member had said, Yeah, Captain

19   Langejans said, told me to stay away from Carrie

20   Clark or Gordon Clark, would you have any reason to

21   doubt that?

22              MS. SAAVEDRA:   Form and foundation.

23       A.    I would.

24   BY MR. JACOBSON:

25       Q.    Okay.   Even though you can't remember saying



1            DEPOSITION ERRATA SHEET

2

3  Our Assignment No. JO352539

4  Case Caption:  Clark vs. City of Tucson

5

6            DECLARATION UNDER PENALTY OF PERJURY

7            I, JEFF LANGEJANS, the witness in the above

8  deposition, do hereby declare under penalty of

9  perjury that I have read the foregoing deposition

10  taken in the above-captioned matter or the same has

11  been read to me, and the same is true and accurate,

12  save and except for changes and/or corrections, if

13  any, as indicated by me on the DEPOSITION ERRATA

14  SHEET hereof, with the understanding that I offer

15  these changes as if still under oath.

16

17            Signed on the __30th__ day of

18  _June_____, 20_16___.

19

20

21  JEFF LANGEJANS

22  

23

24

25

# EXHIBIT 44



# MEMORANDUM

**DATE:**    1/15/2015

**TO:**    Jim Critchley, Through Channels
Fire Chief
Tucson Fire Department

**FROM:**    Tom Sisterman
Fire Inspector
Fire Prevention

**SUBJECT:**    Hostile Work Environment in the Fire Prevention Division

I am writing this letter as a concerned employee. I have nothing to gain from writing this. In my career I have had zero disciplinary actions taken against me and I have had excellent reviews in all of my performance evaluations. I am writing this not as a disgruntled employee, but as an employee that has witnessed egregious behavior that I can no longer tolerate.

I am reporting a hostile work environment that exists in the Tucson Fire Prevention Division. During Captain Jeff Langejan's time at Fire Prevention he has harassed several captains and inspectors in the division. The primary victims of harassment include Mike Pursley, Brian Cobb, Joe Longo, Phil Morgan, Gordon Clark, and Carrie Clark. In most of the cases Captain Langejans sought to have the victims demoted or removed from the division. I have expressed my concerns about Jeff Langejan's intimidating and abusive behavior to my chain of command verbally. The issue has not been adequately addressed or investigated.

As far as I can remember Mike Pursley was Jeff's first victim of harassment in the Fire Prevention Division. In 2006 Mike Pursley received a head injury while working on Engine 20. Since the injury he has struggled with anxiety, depression, and memory problems. In 2010 Mike Pursley began working for Jeff. To compound Mike's problems he was going through a divorce. Mike expressed his troubles to Jeff and asked for some understanding. Jeff responded with a campaign of harassment. Jeff began micromanaging Mike's work and harassed him on a daily basis about the tiniest issues. Mike requested to be moved to a different supervisor and was allowed to change teams in early 2011.

In 2011 Jeff, then the captain of Team 2, began harassing Joe Longo. Joe was an inspector on Team 1 under the supervision of Captain Phil Morgan. Jeff began a campaign of harassment and intimidation with the stated goal of having Joe demoted or fired. Joe documented all of this behavior and approached TFD HR and Deputy Chief Laura Baker with this information. Joe requested that the harassment against him be stopped. At the time Jeff related to me that Chief Baker indeed asked him to stop pursuing Joe Longo. Jeff told me that he did not intend to cease his actions against Longo. Shortly after Jeff became the captain of Team 3. We had our first team meeting with Jeff as the captain of Team 3 at the IHOP on Grant Rd. At the meeting Jeff related to us that he intended to continue pursuing Joe Longo in a discrete manner. He said "This Dog doesn't quit" in reference to his intent to continue his actions against Joe.

Shortly after becoming the captain of Team 3 Jeff began harassing Captain Phil Morgan and spreading unsubstantiated rumors about him. Jeff would express to me almost daily how everything that was wrong with this division was because of Phil Morgan and that it would be so much better if he left. He explained to me in detail his conversations with Deputy Chief Laura Baker about Phil. He said he expressed his belief that Phil needed to be kicked out of the division on several occasions to Chief Baker and that she would reply that everybody brings something different to the division and that she had no intention of making Phil leave. He said that during one conversation he insisted that Chief Baker make Phil leave the division. He said that Chief Baker became agitated and asked him if he was "telling her how to do her job". Jeff and Phil have adjacent offices that share a wall. Jeff explained to me in detail how he would close the door to his office and press his ear against the wall so that he could listen to Phil's conversations with his employees. He shared much of the information that he gained from the eavesdropping with me.

Brian Cobb has had problems with Jeff Langejans regarding his religious faith. Brian Cobb is a Jehovah's Witness. In December 2013 Jeff had a conflict with Brian Cobb regarding Brian's religion. Brian Cobb documented this incident. Jeff related the incident to me and expressed his negative feelings for Brian's religion.

Captain Langejan's most recent and most intense hostility has been directed toward Gordon Clark and Carrie Clark. Captain Langejans has ranted to me about Gordon Clark on nearly a daily basis for most of the last year. He has made unsubstantiated allegations about Gordon and shared his detailed plans for removing him from the division. Jeff made discriminatory remarks about Carrie Clark, women in the fire service, and pregnant women in the fire service.

Jeff told me that he believed that Gordon gave Carrie the answers to the Fire Inspector promotional test. Carrie placed first on the promotional list and Jeff said there is no way she could have done that without cheating. Jeff told me that he presented this information to his chain of command and was frustrated when asked if he had any evidence to prove the allegation.

On November 5th, 2014 at 0830 hrs during our Team III meeting Jeff stated that "The Clarks" were going to ruin the division and that his agenda was to get Gordon Clark out of the division before Carrie Clark arrives. He went on to tell us that we should keep our computers locked when we are not at our desks because "The Clarks" cannot be trusted.

The week of December 1st, 2014 Jeff met me at the Tucson Fire Department Hazardous Waste Yard to take pictures of our drum truck for a powerpoint presentation. Jeff began talking about his dislike for Gordon Clark and his plans for having him removed from the division. In the middle of his rant he suddenly became quiet and gave me a strange look. He said to me that "he thinks it would be very easy to kill his enemies and get away with it." He continued on to say, "I know exactly what I would do, I've thought about it a lot and as long as you do the right things and don't talk to anybody about it it is easy to get away with it." It could be inferred from the context of the conversation that he was talking about Gordan Clark. This conversation made me fearful not only for Jeff's "enemies" but fearful for my own well being if Jeff happened to turn his hostility towards me.

The week of December 1st Jeff told me that he had a conversation with his wife about his plan and that she thought he was crazy. He told me that he was going to go directly to Chief Critchley and give him an ultimatum. He was going to tell Chief Critchley that if he doesn't transfer Gordon to another division that he will leave the division himself.

On December 4th, 2014 John Vincent, Pete December, and I were eating lunch in the Fire Prevention break room when Jeff entered and began discussing the details of his captains'

meeting that he had just adjourned. Gordon Clark was absent at this meeting. Jeff said that during the meeting he was pushing to have Gordon removed from the division. He said that as he was telling the people present in the meeting that "The Clarks" were going to ruin the division he was interrupted by Chief Baker who cut him off and then apologized for cutting him off. He said that he had "Teed Chief Carsten up perfectly" who then spoke up and agreed with Jeff that Gordon should be moved from the division. Jeff went on to tell John, Pete, and me that "The Clarks" were the reason for the poor morale in the division and that if he could remove them the division would be much better. At this point John Vincent spoke up and told Jeff that he didn't think "The Clarks" were the cause for poor morale, rather the hostility and drama that Jeff brings to the division is the cause for poor morale.

Captain Langejan's harassment of fellow employees has been brought to the attention of administration several times by several different people. This hostile activity has been taking place for several years and has not been effectively addressed. Captain Langejans has made many inappropriate and discriminatory remarks about individuals in the division. Several of the victims of the harassment belong to a protected class as defined by Title VII of the Civil Rights Act.

I am asking that Captain Langejans be removed from the Fire Prevention Division. I no longer feel safe or comfortable when coming to work. The relentless negativity and hostile work environment that Jeff has created over the last several years has caused great stress in my work and in my life. Myself and others in the division are in fear of retaliation and the possibility of violence for bringing this issue forward. I believe the administration's lack of follow up on our verbal complaints of harassment are in violation of Title VII of the Civil Rights Act. I want to remind administration that they will incur liability for the department by failing to act on a complaint of harassment.

Respectfully,

Tom Sisterman

COT001169

# EXHIBIT 45



# MEMORANDUM

DATE:     1/30/2015

TO:   Jim Critchley, Through Channels        FROM:    Tom Sisterman
      Fire Chief                                      Fire Inspector
      Tucson Fire Department                          Fire Prevention

SUBJECT:       Hostile Work Environment in the Fire Prevention Division

I want to present new information that came out from the union mediation meeting that took place on 1/27/15 at 1430hrs in Roger Tamietti's office at Fire Central . Jeff Langejans, Roger Tamietti, Chris Conger, Gordan Clark, and I were present at the meeting.

Jeff admitted to continuing to pursue Longo even after he was told not to.

Jeff admitted to telling us to keep our computers locked because "the Clarks" cannot be trusted in the the Team 3 Meeting on Nov. 5th 2015.

Jeff partially admitted to the discussion about killing his enemies. He denied it initially. I told him the burden it put on me when he told me those things. He admitted that he "was angry and may have said some things he didn't mean."

Jeff admitted to telling John, Pete, and me that he said "the Clarks" were the reason for poor morale, but insisted that he was joking. It was clear to us at the time that he was not joking.

Jeff admitted to saying that Carrie was going to ruin the division on multiple occasions.

Jeff admitted to sharing his theories about Carrie cheating, but denied using the word "cheating" (also not true, he used that word many times).

Jeff became very angry during the meeting and his body language towards me was very hostile.

I have nothing to gain from bringing this issue forward. I had a good working relationship with Jeff before I decided to speak up. I love my job and I don't want to do anything to put it at risk. I came forward because I have seen and heard things that I can no longer ignore.

The view from upstairs is different from the view downstairs. When we say we are scared we mean we are scared and it is because of things that Jeff has done and said.

Jeff has violated our trust because of his abusive behavior towards some of the people in the division. Jeff has exhibited a pattern of dishonesty when questioned about his behavior in the

COT001177

division. I insist that Jeff be removed from the division so that the people he has harmed can work in a safe and stable environment.

Respectfully,

Tom Sisterman

COT001178

# EXHIBIT 46



# MEMORANDUM

**DATE:** 01/16/15

**TO:** Chief Baker
Assistant Chief
Fire Prevention

**FROM:** John Vincent
Fire Inspector
Fire Prevention

**SUBJECT:** Follow up from our meeting on 01/07/15.

I wanted to follow up on our meeting conducted on 01/07/15 at approximatley 1700 hrs. I wanted to express my disappointement in how my request for transfer was handled. The initial solution was to place it out to bid and if nobody bid, I would be stuck working under Capt. Langejans. As an alternative I was asked if I had considered a voluntary demotion to resolve my problem with Capt. Langejans. After much thought, I find that to be an inappropriate solution to be recommended when I was requesting a transfer due to legitimate concerns with my supervisor. I feel those concerns were completely ignored. The only question I was asked was has there been any harassment towards me. My answer was no. No other direct questions were asked regarding my concerns of harassment and intimidation towards others in the division. I believe this was another attempt to ignore the problem. It seems that management has only been listening to one side of the story instead of conducting a proper investigation. It was only after others had turned in memos that my concerns are being taken seriously. We did agree that a "plan B" would be discussed if nobody bid for my current spot but that was not the initial plan.

Since other memos have been turned in with specifics, I would like to add some of my own. The following statements were made directly to me during Capt. Langejans assignment at Fire Prevention:

1) While riding in Capt. Langejans truck he stated he believed Inspector Carrie Clark cheated on the promotional exam. He believes Capt. Clark had a copy of the test and provided it to Carrie.
2) In a Team 3 meeting at FHQ, he stated the Clarks are going to ruin the division. He told us to make sure our things are locked up and to lock our computers when were not around because of the Clarks being at Fire Prevention.
3) He stated, alluding to the Clarks current lawsuit, the Fire Department should have expected these things the day they started hiring females.
4) He stated that Inspector Greenleaf admitted to some wrong doings and basically served it up on a silver platter for Capt. Langejans to recommend involuntary demotion.
5) He stated, referring to Longo, " I won't sleep or be satisfied until he's demoted or fired."
6) He stated, "It's my goal to cite another city department."
7) He stated, he was going to look into Inspector Cobb's work because he thought Inspector Cobb was fabricating inspection numbers.
8) He was upset for a long time about Inspector Longo and Inspector Bieg doing joint inspections. He was going to put a stop to it. He did not like them going out together even

COT001175

though they hey were both Fire Prevention Inspectors.

9) Longo once told me that Capt. Langejans intimidated him in the lunchroom by starring into his eyes and stating he'll make sure people don't get to stay here if he feels your not deserving of this position.

10) He stated, "It's my goal to get Gordon out of here before Carrie starts."

11) He stated he once went after a few medics in the field for not doing their jobs.

12) He stated he's the only supervisor that does anything around here and Gordon doesn't do anything.

13) He stated how he was struggling with the decision to present Chief Critchley with an ultimatum that would require the Chief to either get rid of Capt. Clark or he would leave the division.

These are just some of the statements I can remember. I do not remember the exact dates as I was not documenting these types of things since I did not think this activity would continue or escalate. My involvement started when I was in the lunch room on December 4, 2015 with Inspector December, Inspector Sisterman, and Capt. Langejans. Capt. Langejans had just walked in from his strategic planning meeting and started telling us how he was explaining to everyone in the meeting how the Clarks are the problem with the low morale in the division. I could no longer tolerate his lies and deception so I spoke up and told him he's the major problem with the division. I explained to him that nobody wants to work for him and how he creates a division between the teams and between the Inspectors and the supervisors. He stated, "well maybe I should go back out to the field." I replied, "maybe you should." We continued our converstion about nobody wanting to work for him but he had to leave due to a prior commitment. He stated he wanted to continue the conversation at a later time. A few days later I spoke with Capt. Clark and told him Capt. Langejans had an agenda to get him removed from the division. It was my understanding that other Inspectors had already talked to Capt. Clark involving Capt. Langejans desire to get him removed. Inspector Bieg told me that Capt. Langejans went to him and told him "I can't believe Vincent went behind my back and told Gordon." This displayed to me that he felt betrayed and could possibly direct some retaliation towards me due to his history in the division and cause problems with my career. This entire situation created a work environment that was not comfortable for me. That is why I tried to handle it at the lowest level by simply requesting a transfer to another team. It's administration who decided not to handle this problem at the lowest level. Please contact me with any questions regarding this memo or any questions regarding this matter.

Respectfully,


John Vincent

# EXHIBIT 47



# MEMORANDUM

**DATE:**   January 14, 2015

**TO:**   Jim Critchley, Through Channels       **FROM:**   Gordon Clark
Fire Chief                                                           Captain
Tucson Fire Department                                     Fire Prevention Section

**SUBJECT:**       Report of Wrongful Conduct

It is with great concern and disappointment that I write this letter. At the end of the work day today, Wednesday January 14, 2015, Inspector Tom Sisterman shared with me information he had prepared for a memo to send up the administrative chain of command. That memo includes that during the week of December 1, 2014 Tom was at the Tucson Fire Department Hazardous Waste Yard with Captain Jeff Langejans. Tom stated Captain Langejans began talking about his dislike for me, and his plans for having me removed from the division. Tom said Captain Langejans then paused and gave him a strange look. Captain Langejans then said that "it would be very easy to kill my enemies and get away with it, I know exactly what I would do, I've thought about it a lot and as long as you do the right things and don't talk to anybody about it is easy to get away with it." Tom said that due to the context of the conversation he felt that Captain Langejans was referring to me. Tom stated he had shared this information with Investigator Brian Corrales at the time, but was hesitant to tell me for fear of serious retaliation from Captain Langejans. Tom stated that with all of Captain Langejans' discriminatory statements and harassing actions being brought out recently by numerous members of the Prevention Section, he (Tom) felt the need to inform me, and give me warning.

Tom has expressed to many of us, and to administration, the high level of stress, trouble and worry Captain Langejans' comments and actions have caused him on a persistent basis, over a long period of time. Tom has expressed that Captain Langejans' offensive conduct has created a work environment that is hostile and intimidating. Tom has struggled with how best to cope with Captain Langejans as his direct supervisor, and has felt saying anything would jeopardize his personal and professional well-being, and employment position.

After discussing Captain Langejans' statements about killing, both Tom and I are extremely worried and stressed about the possible retaliation this may bring from Captain Langejans. We also feel that him continuing to work in the area compromises the ability of many employees to perform and feel safe in the workplace. Captain Langejans has already displayed comments and actions that do not allow the continuation of good order within the section, and do not protect the welfare of all members.

From here forward with this memo, there is a slight possibility of minor inaccuracies due to the majority of my documentation being at work, but the intent of my recollection of the facts is to be as accurate as possible.

In November there was to be an opening on Team 3, under Captain Langejans' supervision. There was no interest memos submitted. After knowing that there were not any volunteers, five different Inspectors came to me expressing their concern of being assigned under Captain Langejans, without wanting to be. Two Inspectors shared with me negative comments Captain Langejans had made about me to them. I shared this information with Chief Carsten. The week of December 1-5, 2014, I was off and out of town most of the week. When I returned to the office on Friday December 5, 2014 I was told by Inspectors Tom Sisterman, John Vincent and Pete December that Captain Langejans had made very discriminating and hostile statements about me and my wife, Inspector Carrie Clark. Those Inspectors told me that the day before in the lunch room Captain Langejans had told them that the Clarks are the reason for all the problems and the poor morale within the division (Carrie had only been to work in the division six working days at that point). I was told Inspector Vincent and Captain Langejans then began to argue after Inspector Vincent responded that Captain Langejans was the problem, not the Clarks. In addition, I was told Captain Langejans frequently made statements that he did not feel there should be women on the job; that he felt negatively towards pregnant women firefighters; that he told Team 3 to lock up your stuff because the Clarks can't be trusted; he said his goal was to get rid of Gordon before Carrie got to the division; he said he thought Gordon gave Carrie all the answers to the promotional tests to get her Inspector position by cheating; these are just some of the statements made by Captain Langejans to numerous other people.

After hearing these and many other discriminatory and harassing statements made by Captain Langejans about me and Carrie, I went up and reported this to Chief Baker, because Chief Carsten was off. First thing in the morning, Monday December 8, I went to Chief Carsten and reported the same to him. He asked if I would be willing to attempt resolution and have a discussion about the situation with him, Chief Baker and Captain Langejans. I told him I was always willing to make the effort to resolve.

In the meeting I asked Captain Langejans to tell us what negative statements he had made about me and Carrie. I asked many times and he would not answer the question. He kept asking me to tell him what I had heard. I told him I was told he made negative statements about me and Carrie. I asked him if that was true. He said he only made negative statements about me, no negative statements about Carrie. I asked him if he said that Carrie and I were the reason for all the problems and the lack of morale in the division. He said he did not say that. I told the group there were three people who told me otherwise. I asked him if he said anything about me giving Carrie promotional tests and her cheating to get her spot. He said he did not say that and that he knew better than to make an allegation like that because making statements like that could be harmful to his own career. Both Tom Sisterman and John Vincent have said Captain Langejans has made comments about Carrie cheating many times and that he said he even told Chief Nied and Chief Gulotta. In the meeting Captain Langejans told us he told Team 3 that they needed to be sure to act differently and be careful what they say because a woman (Carrie) was coming to the division. I told him that I felt that was completely inappropriate and that we are professionals and should treat all new Inspectors professionally, regardless of their gender, and that Carrie was a professional and should be treated as such. Captain Langejans then responded, "Really Gordon, now be realistic." I quickly responded that I was absolutely being realistic and that I was disappointed in another Captain, in a leadership position on this department to make such a statement.

Multiple times in the meeting he stated he made no negative comments about Carrie, did not say anything to the effect of the Clarks being the reason for low morale, or that he said Carrie cheated. I told the group I was having difficulty because many other people had told me the opposite. There were other things said during that meeting that I can elaborate on at another time.

I expressed to Chief Carsten and Chief Baker (and am reiterating here again) that Captain Langejans' statements to me and others has caused me trouble and worry, and has created a work environment that I consider to be uncomfortable, stressful, hostile and intimidating to me and others. I have also expressed, and will again, that I find his conduct and statements about women to be offensive, unfavorable, unfair, and discriminatory, and so have others expressed to me, and administration. His actions and comments have had a horrible impact on my wife. Once again she has been unjustly mistreated by a Tucson Fire supervisor. This makes me feel horrible as well to see how his actions have affected her. Also, I wish to reiterate my concern, and the concern of others for retaliation from Captain Langejans, in large part due to his history of "targeting" other employees.

These concerns with Captain Langejans conduct have been brought to administration by multiple employees, numerous times, especially since December 5th. My opinion is that response and action is overdue. Feelings of harassment, discrimination, a hostile work environment and safety concerns have all been reported. I know others have requested Captain Langejans be removed from section. I too feel that is the immediate need.

Please contact me as soon as possible to discuss the next steps. For the safety of those involved I strongly ask to be contacted and informed of any communications or actions pertaining to this matter involving anyone outside the direct recipients I am sending this to. Thank you in advance for your help and support. This memo is respectfully submitted.

COT001172

# EXHIBIT 48

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


CARRIE FERRARA CLARK,      )
                          )
      Plaintiff,          )
                          )
v.                        ) NO. 4:14-CV-02543-TUC-CKJ
                          )
CITY OF TUCSON,           )
                          )
      Defendant.          )


VOLUME III

VIDEOTAPED DEPOSITION OF CARRIE FERRARA CLARK

Tucson, Arizona
January 10, 2017
9:09 a.m.


COLLEEN KELLY, RPR
CR #50386 (AZ)
EATON, GREEN & WILLIAMS, INC.
549 North Sixth Avenue
Tucson, AZ  85705
(520)623-0593    800-759-9022

1      Q.   Why do you say it was a hostile work

2   environment?

3      A.   Because it was a very uncomfortable work

4   environment.  How he made not only me feel, but from

5   the expressions of other people how they felt, nobody

6   was comfortable around him.

7      Q.   That would be the ones you indicated?

8      A.   Yes, unless anybody else felt that way, too,

9   that I didn't know about.

10     Q.   And that's both the male and females working

11  for him?

12     A.   Working with him.

13     Q.   Working with him?

14     A.   Uh-huh.

15     Q.   Is that a yes?

16     A.   Correct.

17     Q.   So it wasn't anything based on a category of

18  people who were female, it was people who were

19  uncomfortable with him for personal reasons or issues

20  they had with him; correct?

21     A.   That I don't know.  I was the target of, you

22  know, a lot of his negativity and comments, so

23  whether that was just on me or women in general, I

24  don't know.

25     Q.   You just testified that -- you listed a

1   bunch of male names; correct?

2       A.   Correct.

3       Q.   That you said experienced a hostile work

4   environment; correct?

5       A.   I did.

6       Q.   What was different that was aimed at you?

7   Why was anything based on gender if all these men are

8   being -- are saying there's a hostile work

9   environment?

10      A.   I don't recall him saying they should have

11  expected this the day they started hiring men, he

12  said women.  He made a lot of gender-specific

13  comments.

14      Q.   Okay.  What are those gender-specific

15  comments and when were they made?

16      A.   You'd have to refer to Tom and John's memo

17  because they have outlined exactly what he told them.

18      Q.   You never heard any?

19      A.   I said that I didn't hear those comments.

20      Q.   So what did you see or hear, what evidence

21  do you have that there was anything gender-specific

22  in his hostility to you and the men in the fire

23  prevention?

24      A.   Well, I can tell you that when I'm walking

25  down the hall and the supervisor stares me down until

1  I'm out of his sight, that's hostile.  He's six five

2  and he's staring me down like he wants to fight me.

3           I mean, it was the most awkward,

4  uncomfortable thing I've ever experienced from

5  anyone, let alone a supervisor and a coworker.  And

6  it was so bad that it was to the point that somebody

7  else saw it and made a comment about it.

8      Q.   Did he do that with all women?

9      A.   I don't know.  I don't walk around there

10  with all women, so I don't know.

11      Q.   You said it was so noticeable to you that

12  somebody noticed; correct?

13      A.   Correct.  Somebody was walking --

14      Q.   But nobody noticed him doing it to the women

15  inspectors there, other than you?

16      A.   You'd have to ask everybody else.  I don't

17  know.

18      Q.   You never heard of anybody mentioning that,

19  did you?

20      A.   Not specifically to me.

21      Q.   You never saw anything that indicated he was

22  staring down other women inspectors, did you?

23      A.   No, because every time he saw me, he stared

24  me down.

25      Q.   And the comments are only those that you're

1  hearing secondhand from John Vincent and Tom

2  Sisterman; correct?

3      A.    Correct.

4      Q.    Anything else that would indicate his

5  hostility was gender-specific?

6      A.    Not that I can think of right now, but I'd

7  have to like go over everything that happened in a

8  year and a half.

9      Q.    There were other female inspectors, weren't

10  there?

11      A.    There was one.

12      Q.    There was one.  Was she treated with

13  hostility?

14      A.    She had told me that when she worked for

15  him, she didn't care to work for him.  But she wasn't

16  under his supervision, she worked on the other side

17  of the building under a different supervisor at that

18  time.

19      Q.    Did she tell you why she wasn't comfortable?

20      A.    I don't remember.

21      Q.    There were women support staff as well?

22      A.    There were a few.

23      Q.    Did you hear Jeff Langejans make any sexist

24  comments to any of the support staff?

25      A.    I didn't personally hear any sexist comments

1    to them, no.

2         Q.   Did you ever see him stare down support

3    staff or try and intimidate them with his presence?

4         A.   Like I said, if I was to ever see him, he

5    was staring me down, not necessarily other people.

6    And I tried to avoid him at all costs, so our

7    interactions were what they were, because it was

8    always directed at me.

9         Q.   So the answer to the question is, no, you

10   never saw him do it to anybody else; is that correct?

11        A.   I can't say 100 percent that I never saw it.

12   Nothing comes to mind, but I can't say 100 percent.

13        Q.   There was -- there were females superior to

14   Captain Langejans; is that correct?

15        A.   There was one.

16        Q.   There was one.

17             Did he ever show any hostility or sexual

18   hostility to Captain Baker?

19             MR. JACOBSON:  Objection, foundation.

20             MR. McCRORY:  What's the objection?

21             MR. JACOBSON:  That she observed.

22        A.   I never saw them really interact, so I don't

23   know.

24        Q.   (By Mr. McCrory)  Did he ever make any

25   sexist comments to or about Captain Baker that you

```
 1   heard?

 2        A.   Not to me personally, but I believe he did

 3   to others.

 4        Q.   What do you believe he said to others?

 5        A.   You'd have to ask.  I believe it was Tom

 6   Sisterman, and I believe that he used to keep a log

 7   of everything that Chief Baker did, where she went,

 8   how long she was gone.  I believe he had made

 9   comments that he thought she was incompetent or

10   couldn't do her job.  But you'd have to ask Tom

11   specifics because those were said to him.

12        Q.   Did Tom ever tell you anything that

13   indicated this was based on her gender, as opposed to

14   a difference about her performance?

15        A.   I didn't ask him that.

16        Q.   My question is not whether you asked him --

17        A.   Okay.

18        Q.   -- but whether he told you.

19        A.   I don't recall.

20        Q.   You don't recall him ever telling you?

21        A.   I don't recall exactly how he explained the

22   situation to me, if he said that or not.

23        Q.   When you went back in November of 2014, you

24   were initially assigned to -- under the supervision

25   of different captain; is that correct?
```

1    A.   Correct.

2    Q.   That was Phil Morgan?

3    A.   Correct.

4    Q.   Were you at any time directly under Jeff

5 Langejans' supervision as a captain?

6    A.   I don't remember what days but there was a

7 handful of days where he was the only captain in the

8 office, so technically I would say yes.

9    Q.   On any of those days did he affect your --

10 directly affect your employment in any way that was

11 negative, other than his staring at you and

12 intimidating you?

13    A.   Other than that, not necessarily, but I

14 tried to stay away from fire central as much as I

15 could.

16    Q.   There were days when there would only be one

17 captain available and technically you would be

18 supervised by that captain?

19    A.   Technically.

20    Q.   And there were days then also that you were

21 technically supervised by your husband, Captain

22 Gordon Clark?

23    A.   You could say that, but he was actually in

24 charge of fire investigators, so he didn't really

25 have a lot to do with code enforcement, which is what

1    I was doing.

2        Q.   You've alleged that Tucson Fire Department's

3    failure to act on the complaint against Jeff

4    Langejans was in retaliation for violating -- for

5    your lawsuit violating the Fair Labor Standards Act;

6    is that correct?

7        A.   Correct.

8        Q.   Okay.  Why do you say that their failure to

9    deal with the complaints of Sisterman and Vincent was

10   in retaliation for your lawsuit?

11       A.   Because a lot of their complaints had to do

12   with me, and I think at this point anything that has

13   to do with me, the department is not willing to

14   address.

15       Q.   And what do you base that on?

16       A.   The fact that I filed a lawsuit.

17       Q.   Anything else?

18       A.   A lot of things.  I mean, the fact that I

19   filed a lawsuit, the fact that I complained, the fact

20   that I brought something to their attention that they

21   didn't know about and now they had to address it.

22   Could be the fact that I'm a girl raising the issue.

23   Could be the fact they just don't like me.  There's a

24   lot of possibilities, but I don't know.  You'd have

25   to ask them why they aren't addressing things.

```
1        A.    There's been some comments that Chief
2   Critchley's made that I know you won't chalk up as
3   retaliatory but to me they were red flags.  And then
4   up until just a few weeks ago when they demoted him.
5        Q.    Two weeks ago he was returned to being
6   captain from battalion chief; correct?
7        A.    Correct.
8        Q.    He didn't pass probation; correct?
9        A.    That's what they alleged.
10       Q.    You don't believe that?
11       A.    I personally don't.
12       Q.    Do you know why he was moved from fire
13  prevention?
14       A.    I know what they told him.
15       Q.    And what did they tell him?
16       A.    They cited the nepotism rule and saying that
17  he was being moved for the nepotism rule.
18       Q.    And what did you understand that to mean?
19       A.    Our nepotism policy has said that you can't
20  be directly or indirectly supervised by a family
21  member.
22       Q.    And based on your prior testimony, isn't it
23  true that with the status of the fire prevention, as
24  you've testified, there would be times when there was
25  only one captain present; correct?
```

1      A.   That's correct.

2      Q.   So Gordon Clark -- excuse me -- was present

3  on some occasions and he would be technically

4  supervising you; correct?

5      A.   You could say technically, but it's a little

6  bit of a stretch.

7      Q.   It wasn't a stretch when you were talking

8  about Jeff Langejans.

9      A.   Well, when I was talking about Jeff

10 Langejans, is Jeff does code enforcement.  I'm not

11 going to go with a code enforcement question to

12 Gordon because Gordon didn't do code enforcement.  He

13 was doing fire investigators the majority of my time

14 there.  My supervisor changed part way through while

15 Gordon was there, and I had a civilian, so I guess I

16 was being supervised by a civilian at times, too.

17     Q.   But under the chain of command it still

18 would have been the captain if something -- some

19 emergency came up that you would go to; correct?

20     A.   Correct.

21     Q.   And in fire prevention that could be Gordon

22 Clark for you?

23     A.   It could have.

24     Q.   And that would violate the City's AD;

25 correct?

```
 1        Q.   That's a no then, that you don't have any

 2   current reason; correct?

 3             MR. JACOBSON:  Objection.  I'm going to

 4   instruct her not to answer.  You're badgering her

 5   now.  You've asked this question four or five times.

 6   I've allowed it.

 7             MR. McCRORY:  I have get to get answer.

 8             MR. JACOBSON:  That you like.

 9             I'm instructing you not to answer.

10             MR. McCRORY:  No, this is not that I like.

11   She is simply refusing to answer the question.

12             MR. JACOBSON:  I understand.

13             I'm instructing you not to answer those

14   certain questions.

15        Q.   (By Mr. McCrory)  Do you have -- do you know

16   of any retaliation against John Vincent or Tom

17   Sisterman for the complaints they made?

18        A.   You'd have to ask them personally.

19        Q.   You don't know of any?

20        A.   Not offhand, no.

21        Q.   With respect to Jeff Langejans' conduct

22   while you were at fire prevention, did he ever affect

23   your wages?

24        A.   I would say in a roundabout way because he

25   was in charge of some of the overtime and it was he'd
```

1  send out an e-mail and say you have to come talk to

2  me or go through me.  And personally I avoided

3  putting in for anything that involved having to deal

4  with him.  So my hourly wage, no, but trying to make

5  more money, yeah, I avoided it because of him.

6       Q.   Did he ever say that you couldn't apply for

7  it?

8       A.   No.

9       Q.   You did that only because you chose not to

10  deal with him?

11       A.   I didn't -- I just didn't want anything to

12  do with him.

13       Q.   Did he affect any of your benefits for

14  employment?

15       A.   Not that I know of.

16       Q.   How is the overtime determined, overtime

17  assignments determined at fire prevention?

18       A.   That's a good question.  It's supposed to be

19  by sort of like we do out in the regular field where

20  it's by hours worked, but some things apparently only

21  certain people do, some things we never hear about

22  where there's overtime opportunity.  So I don't know,

23  your guess is as good as mine.  I'm a little confused

24  on how they do that as well.

25       Q.   Do you know who -- are you saying that Jeff

1   Langejans was doing that?

2        A.   I know that one of Jeff's employees seemed

3   like he had overtime all the time and we were only

4   told of very few instances for overtime

5   opportunities.   So I don't know if there were certain

6   things apparently only he was allowed to do or he

7   knew about that we didn't.   So I don't really know

8   how they did all that.

9        Q.   Did he affect your leave, your vacation or

10   sick leave in any way?

11        A.   Not that I am aware of.

12        Q.   Not that you are aware of?

13        A.   (Witness shakes head.)

14        Q.   Did he affect any of your scheduling of your

15   work?

16        A.   Like on what days I worked, is that what

17   you're asking?

18        Q.   Or any of your schedule, your hours, what

19   days you worked.

20        A.   Not necessarily.   I think there was a few

21   times we would look, and if he was like the only one

22   working or something we'd kind of try and change our

23   schedule around having to work with him, but my

24   schedule kind of had to be what it was, so...

25        Q.   And that was again your preference, not

1  anything he directly told you to do?

2      A.   No.  Him personally, no.

3      Q.   He never told you you had to change a

4  schedule; correct?

5      A.   Not that I recall.

6      Q.   Did he have any effect on your evaluations?

7      A.   I have no idea.

8      Q.   Did he have any effect on your probationary

9  status at fire prevention?

10      A.   I have no idea.

11      Q.   Other than making you feel uncomfortable,

12  can you tell me anything he did that was adverse to

13  your employment?

14      A.   What do you mean by that?

15      Q.   Anything that made your employment worse,

16  that changed your employment conditions.

17      A.   I guess I'm still confused on what you're

18  asking.

19      Q.   Other than making you uncomfortable staring

20  at you and intimidating you, taking those out --

21      A.   Uh-huh.

22      Q.   -- did he do anything else to you that you

23  felt was wrong?

24      A.   I would say all the things he said about me

25  were wrong.  Accusing me of cheating to other people

1    was wrong.  Trying to get me investigated for

2    cheating was wrong.

3        Q.   Anything else?

4        A.   Not that I recall.

5        Q.   Did anyone else in fire management take any

6    adverse action against you with respect to your

7    employment because you filed a complaint?

8        A.   You mean the same thing, the working

9    conditions?

10       Q.   Uh-huh, yes.

11       A.   So did anybody in administration change my

12   working conditions?

13       Q.   Yes.

14       A.   Well, they removed me from fire prevention

15   which changed my working conditions.

16       Q.   And when was that?

17       A.   I got notice on April 27th and it was

18   effective on May 2nd.

19       Q.   Of what year?

20       A.   This year -- or 2016.

21            MR. McCRORY:  So that's not part of this

22   litigation; is that correct?

23            MR. JACOBSON:  Are you asking me?

24            MR. McCRORY:  Yes.

25            MR. JACOBSON:  Why don't we go off the

1  less?

2      A.   I'm sure some of the checks were.

3      Q.   Not the base salary.  Hmm?

4      A.   I'm sure some of his checks were.  I don't

5  remember every single check.  I'd have to look at it,

6  but I don't understand what you're trying to ask.

7      Q.   Some of them were -- were some of them more

8  than he made before?

9      A.   I'm sure if he worked overtime.  But, like I

10  said, I don't know.  I'd have to look at every check.

11      Q.   Other than the comments you have talked

12  about from Jeff Langejans, did anyone else make any

13  comments that you took to be hostile towards women or

14  negative towards women while you were at fire

15  prevention?

16      A.   Not that I recall.

17      Q.   When the article came out about your lawsuit

18  in August 2014, did anyone make any comments, other

19  than what you've discussed about I guess Tom

20  Sisterman relaying what Jeff said?  Did anybody else

21  make any comments?

22      A.   To me personally?

23      Q.   Yes.

24      A.   I don't remember.  That came out on like a

25  Saturday.  I think I worked for two weeks after that

1    and then I went on family medical.  I don't recall.

2        Q.   Do you recall hearing about any comments

3    other people were making during that two weeks or

4    sometime afterwards?

5        A.   Yes.

6        Q.   What did you hear?  Again, excluding the

7    Jeff Langejans that you've already testified about.

8        A.   I remember getting a phone call from one of

9    my friends who said, I don't really care what

10   happened, I like you, I know you, I support you.  You

11   know, there's a lot of bad stuff being said about you

12   right now, but just so you know, we're still your

13   friends.

14           And I want to say that I had a handful of

15   friends, I can't tell you exactly right now, that

16   told me that it was just a topic of conversation

17   everywhere they went.  One of the stations had it

18   taped on their fridge.  And then the stuff that

19   people were writing online.

20       Q.   Did you read all the stuff online?

21       A.   I did.

22       Q.   And that's by the general public?

23       A.   No.  There was at least two things from my

24   coworkers.

25       Q.   How did you know it was from coworkers?

1    Q.   You talked about it, actually, I think in

2  the last deposition.

3         Did he ever say that with respect to the

4  enforcement of the nepotism policy?

5    A.   To the nepotism policy?

6    Q.   Yeah.

7    A.   I don't remember him saying it in regards to

8  that.

9    Q.   Anything else, any other complaint?

10   A.   What do you mean?

11   Q.   Did he ever indicate that you shouldn't have

12  complained outside of the fire department?

13   A.   I believe when he said whatever it was he

14  said, he was talking about a complaint I made against

15  Captain Langejans.

16   Q.   Okay.  Did you hear anyone in fire

17  prevention make any sexual comments about women?

18   A.   Not that I recall.

19   Q.   Was there anyone you believe showed bias

20  towards working with women at fire prevention?  And

21  again excluding what you've testified about Jeff

22  Langejans.

23   A.   I know that right around when I got there or

24  right after, I don't remember exactly when all this

25  happened, but at some point, and I'd have to really

1    think about it, somebody told me that Phil Morgan,

2    who was my captain at the time, did not want to

3    supervise me.   And I believe it was Ken Brouillette

4    that told me that.

5                And I asked Captain Morgan about that in

6    a certain meeting, and he said, well, I didn't

7    exactly say that, it was kind of -- you know, I just

8    said that I didn't feel comfortable supervising you.

9    And I said, you know, why?   He was like, oh, I just,

10   you know, I just -- I've had other things happen to

11   me out in the field and I just -- you know, I just

12   didn't feel comfortable.

13               And he had gone all the way through, I

14   believe, Chief Baker to ask not to supervise me, but

15   yet they made him supervise me and it was -- it was

16   kind of an uncomfortable situation.

17       Q.   Do you have any reason to believe that was

18   because of your gender, as opposed to who you were

19   personally?

20       A.   It's possible, but you'd have to ask him.

21       Q.   It's possible, but you don't really know, do

22   you?

23       A.   I don't know for a fact.   Like I said, you'd

24   have to ask him why he didn't want to supervise me.

25       Q.   Do you know if he was uncomfortable with

1  supervising you because Gordon Clark was a captain

2  along with him in the same area?

3       A.   I don't know.

4       Q.   Could that have given him some concern?

5       A.   It could have.   But to tell me that he's had

6  experiences out in the field, I don't know.   I know

7  that he worked with Michelle Maliniak and I know that

8  he brought that up to me before that that was a big

9  issue for him.   So I don't know if he chalked me up

10  to being the same as her or if it was because of

11  Gordon.   Like I said, you'd have to ask him.

12          MR. McCRORY:   Want to take a break, short

13  break?

14          MR. JACOBSON:   Sure.

15          THE VIDEOGRAPHER:   Stand by.   This ends

16  media number one of the ongoing deposition.   We're

17  off the record at 10:35.

18          (Recess taken from 10:35 a.m. to 10:48 a.m.)

19              (Exhibit Number 23 marked.)

20          THE VIDEOGRAPHER:   This begins media number

21  two of the ongoing deposition.   We're on the record

22  at 10:48.

23       Q.   (By Mr. McCrory)  Ms. Clark, will you take a

24  look at what's marked as Exhibit 23?

25       A.   Sure.   Okay.

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 4:14-CV-02543-TUC-CKJ |
| | ) |
| CITY OF TUCSON, | ) CERTIFICATION OF NON-SIGNATURE |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

Be it known that the foregoing videotaped deposition of **Carrie Ferrara Clark, Volume III,** was taken before a certified court reporter in and for the State of Arizona, on the **10th day of January, 2017;** that the witness elected to read and sign the deposition before filing with counsel responsible for retaining the original until time of trial; that the witness was requested by mail on the **25th day of January, 2017,** to, within thirty days, read and sign said deposition.

SINCE said letter has not been returned and the witness/counsel has not contacted our office for an extension of time, being charged with the responsibility of filing the original transcript, we herewith file said deposition transcript.

DATED at Tucson, Arizona, this 2nd day of March, 2016.

Kathleen Henry
Eaton, Green & Williams, Inc.

# EXHIBIT 49



# MEMORANDUM



**DATE:** June 18, 2015

**TO:** File WC1503001

**FROM:** Martina Macias,
Sr. Equal Opportunity Specialist, EOPD

**SUBJECT:** Possible Violations of AD 2.05-8 Discrimination / Harassment

The Equal Opportunity Programs Division (EOPD) was asked by City Manager Martha Durkin to review allegations made by Tucson Fire Department, Fire Inspector Carrie Clark. Specifically, I was asked to review the allegations for any potential violations of the City of Tucson's Administrative Directive 2.05-8 Discrimination / Harassment.

I assessed the information provided by the following 33 individuals during 35 separate interviews conducted by Lead Civilian Investigator, Matthew Larsen. After my review of all of the information, my analysis revealed no information which supports a *prima facie* case of retaliation or discrimination, as outlined in the City of Tucson Discrimination/Harassment Administrative Directive 2.05-8.

**Persons Interviewed:**

**Tucson Fire Department Chief Officers:**
Jim Critchley
Laura Baker
Michael Carsten

**Tucson Fire Prevention Captains:**
Gordon Clark
Chris Jurvig
Phillip Morgan
Jeff Langejans

**Tucson Fire Code Administrator:**
Ken Brouillette

**Tucson Fire Administrative Staff:**
Catherine Devine
Annette Lopez
Rachel Duarte

**Tucson Fire Cause Investigators:**
Tomasz Piotrwoski
Jorge Loya
William Motto
Pete December
Brian Corrales

**Tucson Fire Inspectors:**
Michael Pursley
Andrew Rico
Chris Basaldua
Brian Cobb
Randall Tinnin
Dominic Cuffel
James Hinrichs
Roland Spangle
Wayne Cummings

Joseph Longo
Tom Sisterman
Glenn D'Auria
John Bieg
John Vincent
Carrie Clark
Nicole Sprenger
Carl Schultz

COT001158

# EXHIBIT 50

INTERVIEW WITH PHIL MORGAN
Interviewer: Matthew Larsen
04-24-15/10:32 am
Case # WC1503001
Page 1

1
2
3
4
5
6
7                  **INTERVIEW WITH PHIL MORGAN**
8                       **Q=Matthew Larsen**
9                       **A=Phil Morgan**
10
11

12 Q: Today is Friday, April 24, 2015. The time now is approximately 1032 hours.
13 This is Matthew Larsen with the City of Tucson's Equal Opportunity
14 Programs Division of the Human Resources Department. This interview is
15 taking place in the Equal Opportunity Program's, uh, interview room. And
16 with me this morning is...
17

18 A: Phil Morgan, P-H-I-L-I-P M-O-R-G-A-N.
19

20 Q: And, Mr. Morgan, what is your, uh, where are you currently employed?
21

22 A: I work at Tucson Fire Prevention. I'm a captain, uh, for Team 1.
23

24 Q: And who else is on Team 1? Uh, who - who is on your team?
25

26 A: Currently on my team I have Roland Spangle - do you want me to spell these
27 names out?
28

29 Q: If you could.
30

31 A: R-O-L-A-N-D S-P-A-N-G-L-E.
32

33 Q: Okay.
34

35 A: I have Brian Cobb, B-R-I-A-N C-O-B-B. I have Andy Rico, A-N-D-R-E-W
36 R-I-C-O. I have Michael Pursley, M-I-C-H-A-E-L P-E-R- or P-U-R-S-L-E-Y.
37 I have, uh, just recently transferred over Joseph Longo, J-O-S-E-P-H L-O-N-
38 G-O. And I have Carrie Clark, C-A-R-R-I-E C-L-A-R-K.
39

40 Q: Thank you, sir. Uh, and how long have you been in your position as a captain
41 in Prevention?
42

43 A: I'm coming up on five years the end of July for 2015.
44

45 Q: Okay. And how long total have you been with the Tucson Fire Department?

COT001351

4

46
47   A:   It'll be 33 years at the end of June.
48
49   Q:   And who's your supervisor?
50
51   A:   Currently it's Michael Carsten. That's M-I-C-H-A-E-L C-A-R-S-T-E-N.
52
53   Q:   I understand he has the title or position of deputy chief?
54
55   A:   He does.
56
57   Q:   Okay. Uh, Captain Morgan, can you tell me about the cohesion in your work
58        environment in Prevention?
59
60   A:   Um, I think that I have a fairly well running team. Uh, generally, uh, when we
61        have a goal for the - the - the two teams, it's usually Team 1 and Team 2. And
62        we're working to close out those inspections. It runs, uh, fairly well. Um, as
63        far as the overall Fire Prevention environment I - I perceive, um, an
64        environment that I feel free to talk in, um, to a certain extent. Um, well, it's a
65        loaded question because the department has w- when I supervise an inspector
66        that's married to a husband of one of my peers which would be Gordon Clark,
67        G-O-R-D-O-N C-L-A-R-K, I lose peer support if I have issues with that
68        particular inspector. Um, I also lose I think a little peer support when I have a
69        deputy chief that has to be a supervisor over that supervisor. So it's an
70        uncomfortable situation when as a supervisor I have to make a, um, I feel like,
71        you know, I'm - I'm looking - I'm very protective of my wife. Let's just put it
72        this way.
73
74   Q:   Mm-hm.
75
76   A:   And, um, most people I know are very protective of their spouse. So I feel like
77        in that situation it's - it's - it's an uncomfortable one from my perspective.
78
79   Q:   Okay. Uh, in general how does the rest of the division get along?
80
81   A:   Uh, when we had somewhat - I call snipers, um - um, Conrad Funke, who is
82        C-O-N-R-A-D F-U-N-K-E, is no longer an inspector. He is, uh, demoted, um,
83        back down, had a tendency to find issues with people and then would spread
84        his concerns to different management. Um, that was - that would create a lot
85        of friction sometimes between the supervisors. And I'm sure that there's other
86        people that would do that. And we actually in management finally just, you
87        know, there's so many moving parts in there, the teams have so many
88        specialties and people do so many things. It's like you cannot be supervising
89        other people's team members. You can't be making assumptions. And that's
90        what we came to the conclusion is if you have a rumor, a rumor monger, you

INTERVIEW WITH PHIL MORGAN
Interviewer: Matthew Larsen
04-24-15/10:32 am
Case # WC1503001
Page 10

| 406 | Q: | Okay. All right, sir. I appreciate your time. Anything else to add? |
| 407 | | |
| 408 | A: | No, sir. |
| 409 | | |
| 410 | Q: | All right. Thank you very much. We'll end this interview. Time now is |
| 411 | | approximately 10:56. |
| 412 | | |
| 413 | | |

414   The transcript has been reviewed with the audio recording submitted and it is an accurate
415   transcription.
416   Signed_____ *Matthew R. Larsen*          5-24-15

# EXHIBIT 51

INTERVIEW WITH KEN BROUILLETTE
Interviewer: Matthew Larsen
04-27-15/12:30 pm
Case # WC1503001
Page 1

1
2
3
4
5
6
7      INTERVIEW WITH KEN BROUILLETTE
8            Q=Matthew Larsen
9            A=Ken Brouillette
10
11
12   Q:   Today is Monday, April 27th, 2015. The time now is approximately 1230
13        hours. This is Matthew Larsen, L-A-R-S-E-N with the City of Tucson's Equal
14        Opportunity Programs Division of the Human Resources Department. This
15        interview is taking place in the Equal Opportunity Program's interview room
16        and with me this afternoon is...
17
18   A:   Ken Brouillette, B-R-O-U-I-L-L-E-T-T-E.
19
20   Q:   And Mr. Brouillette, where are you currently employed?
21
22   A:   Uh, the City of Tucson.
23
24   Q:   And is that for the Tucson Fire Department?
25
26   A:   Yes, it is.
27
28   Q:   And what division do you, uh, work in at the Tucson Fire?
29
30   A:   The Prevention division.
31
32   Q:   And what's your title?
33
34   A:   Fire Code Administrator.
35
36   Q:   How long have you been in that position, sir?
37
38   A:   Three years and two months and 22 days.
39
40   Q:   That's very precise. Uh, who's your supervisor?
41
42   A:   Uh, right now Deputy Chief Mike Carsten, C-A-R-S-T-E-N. Might be A-N,
43        I'm not too sure.
44
45   Q:   That's all right. All right, sir, uh, so as I said before the recording, I'm just

| 181 | | and get through it. |
| 182 | | |
| 183 | Q: | Okay. |
| 184 | | |
| 185 | A: | Or - or I'll change my work environment if I need to. I'm fortunate enough to |
| 186 | | have an office door that I can close if I need to. |
| 187 | | |
| 188 | Q: | Okay. |
| 189 | | |
| 190 | A: | I can - I can do that to avoid the people continually coming down to the office, |
| 191 | | which is a - a regular occurrence. I share - share an office with (Martin) |
| 192 | | Brown and, um, we constantly have people comin' in and - and wanting to |
| 193 | | talk to us and stuff about things. So, um, but no, as far as not being able to get |
| 194 | | my work done, um, no. I can definitely get it done. |
| 195 | | |
| 196 | Q: | Okay, have you ever been retaliated against for reporting misconduct or |
| 197 | | inappropriate conduct in the workplace? |
| 198 | | |
| 199 | A: | Um, it's - this city, no. |
| 200 | | |
| 201 | Q: | Okay. I should clarify. |
| 202 | | |
| 203 | A: | So no, yes. |
| 204 | | |
| 205 | Q: | In this - in this career. |
| 206 | | |
| 207 | A: | Yeah, in this career, no. |
| 208 | | |
| 209 | Q: | Okay, have you, uh, since working with Tucson Fire have you ever not |
| 210 | | reported misconduct or inappropriate conduct out of fear of retaliation? |
| 211 | | |
| 212 | A: | No. That was a good question. |
| 213 | | |
| 214 | Q: | Have you ever been warned or cautioned against reporting misconduct, uh, |
| 215 | | because someone told you that you would be retaliated against if you did? |
| 216 | | |
| 217 | A: | No, not told. |
| 218 | | |
| 219 | Q: | You wanna elaborate on that at all? Not told. |
| 220 | | |
| 221 | A: | No, I just - I just have an impression, um, we had an incident - we had a |
| 222 | | captains meeting a - a few weeks ago that the captains are in there and deputy |
| 223 | | chief's in there, um, assistant chief's in there and I'm in there. And then when |
| 224 | | the meeting was over, uh, Captain Clark wanted me to stay back. Um, and he |
| 225 | | made some, uh, references to, um, he was upset that I was talking to another |

| | | |
|---|---|---|
| 226 | | captain, and that was Captain Langejans, which I'm not too sure how to spell |
| 227 | | his last name. I think it's L-A-N-G-J-E-A-N-S or somethin', J-A-N-S. |
| 228 | | |
| 229 | Q: | I'll spell it. |
| 230 | | |
| 231 | A: | Okay. |
| 232 | | |
| 233 | Q: | It's L-A - L-A-N-G-E-J-A-N-S. |
| 234 | | |
| 235 | A: | All right, well... |
| 236 | | |
| 237 | ((Crosstalk)) | |
| 238 | | |
| 239 | Q: | Okay, sorry. |
| 240 | | |
| 241 | A: | ...I'm not gonna be able to remember that. |
| 242 | | |
| 243 | Q: | So Captain Clark asked you to stay back after a meeting. |
| 244 | | |
| 245 | A: | Yeah, 'cause he - he wanted to just talk to me. So I said, "All right, fine." So |
| 246 | | we, um, so I felt like, okay, I'll stay and talk to him. We were in there for |
| 247 | | about an hour talking about a whole bunch of different things, um, and he was |
| 248 | | tellin' me how he thought it was a bad perception that I was talkin' to Captain |
| 249 | | Langejans and I'm like, "What are you talkin' about?" He goes, "Well, it |
| 250 | | looks like your buddy - buddy." And he used the term, "Buddy - buddy." And |
| 251 | | I said - I go - I just said, "Gordon, I'm not buddy - buddy with anybody in this |
| 252 | | department. I don't socialize with anybody after hours." Um, "The only time |
| 253 | | I've ever socialized with Jeff was when he helped me move in with the dep- |
| 254 | | with Laura Baker, Captain Phil Morgan Morgan helped he and when I was |
| 255 | | brand new here and they helped, uh, me move in. After that I've never had |
| 256 | | any social activities whatsoever." Uh, then we continued to, uh, discuss, um, |
| 257 | | you know, where Prevention was going and he started talking - and then we |
| 258 | | talked about the investigation which was ongoing with the hostile work |
| 259 | | environment. |
| 260 | | |
| 261 | Q: | Mm-hm. |
| 262 | | |
| 263 | A: | And he flat out told me and I'm sure he told me in confidence that he wasn't |
| 264 | | happy with the decision that was made by - by Laura and Mike. And I said, |
| 265 | | you know, "Can we just get through this and move on?" And he said, "No, it's |
| 266 | | gonna be going to a different level." Assuming that's the reason that we're |
| 267 | | here right now. This is the next level. Not guaranteed but that's what I'm |
| 268 | | making this assumption, that's the reason I'm here right now. |
| 269 | | |
| 270 | Q: | Okay. |

Case 4:14-cv-02543-CKJ   Document 116-5   Filed 08/18/17   Page 58 of 73

INTERVIEW WITH Matthew Larsen
Interviewer: Matthew Larsen
04-27-15/12:30 pm
Case # WC1503001
Page 7



271
272  A:   I was hoping that he would accept the decision by the Fire Department. He did
273       not accept it, he obviously decided to go further with this, if this is what this is
274       for. Um, we then continued to talk and this is where I have some issues and
275       felt a little bit threatened is because, um, he just got on the Battalion Chiefs
276       list.
277
278  Q:   Mm-hm.
279
280  A:   And on the Battalion Chiefs list he's made it clear to me that he wants to
281       become the Fire Marshal of the division, which is where, uh, Deputy Chief
282       Mike Carsten is right now. And a Battalion Chief you get to be assigned to
283       that fire marshal position. He told me that - that the department made a
284       mistake putting Mike Carsten into that position 'cause he's better in
285       operations and that Gordon wanted that position and he's trying to groom
286       himself to become that position. So everything that he's telling me...
287
288  Q:   Yeah.
289
290  A:   ...is I'm feeling a little, um, it's a bad feeling knowing that - that that - that he
291       would be my boss. That Gordon Clark or Captain Clark would be my boss if
292       he goes forward and gets what he wants. So, um, I'm feeling that - that
293       Gordon's putting some pressure on - on Deputy Chief Mike Carsten right now
294       and I'm hoping he's not trying to force him out because they can just hire
295       somebody right off the Battalion Chief list to be there and he would be
296       basically what he's been trying to do for this last year or so. He would be like
297       the most qualified person to do it.
298
299  Q:   Mm-hm.
300
301  A:   So I'm - I'm sitting in this room thinking that this guy across the table from
302       me could be my boss.
303
304  Q:   Right.
305
306  A:   So I better listen to him and - and do whatever he says, so that's the only type
307       of, you know, environment I've kinda - hostile that I've had with him is when
308       he - he pulled me in afterward, not knowing - I mean, we're kinda equals right
309       now in the division...
310
311  Q:   Mm-hm.
312
313  A:   ...but I can see that he can promote up to Battalion Chief, which he's on the
314       list and get. Um, and then let me step back, I was part of -- and this is gonna
315       go on for a while, um, I was part of the hiring process for the captains and also

| | | |
|---|---|---|
| 91<br>92 | Q: | Okay. |
| 93<br>94<br>95 | A: | So the - the office environment, my understanding what - what I'm hearing and feeling is that they thought it was done with. |
| 96<br>97 | Q: | Okay. |
| 98<br>99 | A: | Um, that the employee got the associated discipline... |
| 100<br>101 | Q: | Mm-hm. |
| 102<br>103 | A: | ...and that we should move on... |
| 104<br>105 | Q: | Okay. |
| 106<br>107<br>108 | A: | ...and that we have now not moved on, we're continuing. So there's that continually frustration around the office of when is this going to end? |
| 109<br>110<br>111 | Q: | Understood, okay. Um, I'm sorry, I - I forgot to - I skipped something, do you supervise? |
| 112<br>113 | A: | Yes. |
| 114<br>115 | Q: | Uh, I understand in Prevention you guys are kinda split up into teams. |
| 116<br>117 | A: | Mm-hm. |
| 118<br>119 | Q: | Is that - do you have a specific team that you supervise? |
| 120<br>121 | A: | The - we do it by number, team 4. |
| 122<br>123 | Q: | Team 4, okay. And who is on team 4? |
| 124<br>125<br>126<br>127<br>128<br>129 | A: | I have (Martin) Brown which you did not call for a witness, um, B-R-O-W-N, Carl Schultz, S-C-H-U-L-T-Z, uh, (John) Vincent, V-I-N-C-E-N-T, (Nikki) Sprenger, S-P-R-E-N-G-E-R, and (Chris) Basaludua, B-A-S-A-L-U-D-U-A. So those are my direct people that I supervise that I'll do performance appraisals on. |
| 130<br>131 | Q: | Okay. |
| 132<br>133<br>134 | A: | Um, but then again I'm responsible for all of the inspectors when it comes to enforcing the fire code for the City. |
| 135 | Q: | Okay. |

COT001449

766    A:    ...which whatever that is. I don't know what that is, I don't know if that's
767           court or - or whatever, but...
768

769    Q:    Okay.
770

771    A:    ...um, it's pretty much made assured that it's not gonna stop till he feels justice
772           is done.
773

774    Q:    All right, sir. I appreciate your time. Uh, we'll go ahead and end the interview.
775           Time now is approximately 12:57.
776

777

778    The transcript has been reviewed with the audio recording submitted and it is an accurate
779    transcription.
780    Signed _____ *Matthew R. Larsen* _____ 5·10·15

COT001464

# EXHIBIT 52

INTERVIEW WITH NICOLE SPRENGER
Interviewer: Matthew Larsen
06-04-15/1:28 pm
Case # WC1503001
Page 1

1
2
3
4
5
6
7       INTERVIEW WITH NICOLE SPRENGER
8            Q=Matthew Larsen
9            A=Nicole Sprenger
10
11
12  Q:      Today is Thursday, June 4th, 2015. The time now is approximately 1328
13          hours. This is Matthew Larsen, L-A-R-S-E-N, with the City of Tucson's
14          Equal Opportunity Programs Division of the Human Resources Department.
15          This interview is taking place in the Equal Opportunity Programs interview
16          room, and with me this afternoon is...
17
18  A:      Nicole Sprenger, N-I-C-O-L-E. And Sprenger is S-P-R-E-N-G-E-R.
19
20  Q:      And, Ms. Sprenger, where are you currently employed?
21
22  A:      Tucson Fire Department - Fire Prevention.
23
24  Q:      And what's your job title?
25
26  A:      Fire Inspector.
27
28  Q:      How long have you been in that position?
29
30  A:      Oh, off and on since '97.
31
32  Q:      So almost about eight years then?
33
34  A:      Uh, since '97. So...
35
36  Q:      Oh, no...
37
38  A:      Almost twenty years.
39
40  Q:      Eighteen years.
41
42  A:      Yeah, eighteen years.
43
44  Q:      Sorry.
45

INTERVIEW WITH NICOLE SPRENGER
Interviewer: Matthew Larsen
06-04-15/1:28 pm
Case # WC1503001
Page 2

| 46 | A: | Yeah. |
| 47 | | |
| 48 | Q: | Forgot the ten there, okay. Wow, okay. |
| 49 | | |
| 50 | A: | I have promoted, uh, in that time and then, uh, demoted purposefully. So, |
| 51 | | yeah, that position's what I've - h- held for most of it, yeah. |
| 52 | | |
| 53 | Q: | Okay. Okay, how long total with the Tucson Fire Department? |
| 54 | | |
| 55 | A: | Uh, almost twenty-one. |
| 56 | | |
| 57 | Q: | Oh, you promoted pretty quickly? |
| 58 | | |
| 59 | A: | Mm-hm. |
| 60 | | |
| 61 | Q: | Wow, okay. And who's your supervisor? |
| 62 | | |
| 63 | A: | Uh, right now it is Ken Brouilette. And I can try to guess at spelling that. |

| 64 | | |
| 65 | Q: | You can give it a shot. And then I might correct it later 'cause h- that one's a |
| 66 | | little tricky. Go ahead. |
| 67 | | |
| 68 | A: | Yeah, B-R-O-U-I-L-E-T-T-E, I believe. |
| 69 | | |
| 70 | Q: | I think that's right. I think that's right. Anyways... |
| 71 | | |
| 72 | A: | Yeah. |
| 73 | | |
| 74 | Q: | We had a discussion, uh, before we started the recording where I told ya that |
| 75 | | you were only a witness and not under any speculation... |
| 76 | | |
| 77 | A: | Yes. |
| 78 | | |
| 79 | Q: | ...of wrongdoing yourself. And I'm just gonna ask ya some pretty basic and |
| 80 | | straightforward questions. So would you start please by telling me about the |
| 81 | | cohesion of the work environment in the Prevention Division? |
| 82 | | |
| 83 | A: | Um, I think it's cohesive. Um, I - you know, I hear things amongst other |
| 84 | | people, but I try not to get involved in any kind of rumors and stuff like that. |
| 85 | | So, ah, the people that I work with - I have no problem, ah, going to and |
| 86 | | talking to. Um, I don't feel like - you know, I've been, you know, dispelled |
| 87 | | from any - or pushed away from any one group of people or anything - or that |
| 88 | | there are any groups. |
| 89 | | |
| 90 | Q: | Okay. I understand that in prevention you guys kinda work on teams - is that |

136
137   A:          Yes.
138
139   Q:          Okay, all right. Have you ever directly heard any supervisor in the division
140               make any negative or discriminatory statements about anyone else?
141
142   A:          I haven't.
143
144   Q:          Okay. In your work environment, do you feel as if you're able to get your job
145               done?
146
147   A:          Yes.
148
149   Q:          Have you ever felt that your work environment became so toxic or so negative
150               that it made it to a point where you were unable to fulfill these central
151               functions of your job?
152
153   A:          No.
154
155   Q:          Have you ever been retaliated against for reporting any sort of misconduct or
156               inappropriate conduct at work?
157
158   A:          I don't think so. I haven't - I haven't had any major issues. So, um, I wouldn't
159               say I've been retaliated against.
160
161   Q:          Okay.
162
163   A:          You know, I hear - I hear stuff every now and then, like, you know, they're,
164               um, like, jokes, but it's not from supervisors. It's, you know, people, uh,
165               whatever - oh, so and so, you know, or you should've done this. And I can't
166               even remember specific instances in, ah, but it's just humor. And I've never
167               taken anything to mean, um, anything negative. So...
168
169   Q:          Have you ever not reported misconduct or inappropriate conduct out of fear of
170               retaliation?
171
172   A:          No.
173
174   Q:          Have you ever had anyone caution you not to report misconduct or
175               inappropriate conduct because, if you did report it, you would face retaliation?
176
177   A:          No.
178
179   Q:          Okay. Do you feel safe at work?
180

| 181 | A: | Yes. |
| 182 | | |
| 183 | Q: | And when I ask that question, I always like to c- ah, kind of expand a little bit |
| 184 | | and make sure that, um, I'm - when I ask safe, I mean in the physical, the |
| 185 | | emotional and the mental states? |
| 186 | | |
| 187 | A: | Uh, yeah. |
| 188 | | |
| 189 | Q: | Sh- just to clarify, that's yes to all of them? |
| 190 | | |
| 191 | A: | Yes, to all of them. |
| 192 | | |
| 193 | Q: | Thanks. |
| 194 | | |
| 195 | A: | Yeah. |
| 196 | | |
| 197 | Q: | That's okay. Have you ever witnessed firsthand any of your coworkers be |
| 198 | | isolated or picked on or mistreated for any reason? |
| 199 | | |
| 200 | A: | No. |
| 201 | | |
| 202 | Q: | If you were to see that one of your coworkers was being mistreated or isolated |
| 203 | | or picked on, would you know how to or feel comfortable, ah, reporting such |
| 204 | | conduct? |
| 205 | | |
| 206 | A: | Yeah. |
| 207 | | |
| 208 | Q: | And what would you do in that case? |
| 209 | | |
| 210 | A: | Well, if I thought that they were being, uh, mistreated by a supervisor, I would |
| 211 | | go straight to that supervisor and, um, I wouldn't even go to my supervisor. |
| 212 | | I'd go to that supervisor and say, "Hey, look, you know, I don't think that |
| 213 | | that's right." And, um... |
| 214 | | |
| 215 | Q: | Mm-hm. |
| 216 | | |
| 217 | A: | You know, if they don't like it, then they'd probably say, "Hey, you need to |
| 218 | | go through your chain of command" - which case I'd go back. But, I mean, I - |
| 219 | | I have a one-on-one approach, you know, whether they're gonna smack me |
| 220 | | down or not. That's just the way it is. So... |
| 221 | | |
| 222 | Q: | Okay, all right. |
| 223 | | |
| 224 | A: | I go straight to the source. |
| 225 | | |

271  A:              Okay,

272

273  Q:              Uh, we'll end the interview. Time now is approximately 1336.

274

275

276  The transcript has been reviewed with the audio recording submitted and it is an accurate

277  transcription.

278  Signed_____ *Matthew R Larsen*          6·12·15

# EXHIBIT 53

Michelle R. Saavedra
Michael W.L. McCrory
Principal Assistant City Attorneys for
MICHAEL G. RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
Pima County Computer No. 66163
Michael.McCrory@tucsonaz.gov
State Bar Computer No. 3899
Pima County Computer No. 37268
Telephone: (520) 791-4221
Fax: (520) 623-9803
*Attorneys for Defendant City of Tucson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK, | No. 4:14-CV-02543-TUC-CKJ |
| Plaintiff, | **DECLARATION OF** |
| vs. | **JULIANNE HUGHES** |
| CITY OF TUCSON, | (Hon. Cindy Jorgenson) |
| Defendant. | |

Pursuant to 28 U.S.C. §1746, I, Julianne Hughes, declare and state as follows:

1.  I make this Declaration based on my personal knowledge.

2.  I was assigned to the position of Assistant City Manager for the period of March 2015 through May 2016. During my tenure as Assistant City Manager, I was responsible for oversight of the Tucson Fire Department (TFD) and the Tucson Police Department. In this capacity I met weekly with the Fire Chief to discuss issues relating to the operation of the Fire Department; this included personnel matters.

3.  Prior to my position in the City Manager's Office, I was a Principal Assistant City Attorney for the City. My responsibilities included review of employment matters, including disciplinary issues. I am familiar with the levels of discipline used and imposed by TFD over the past fifteen years.

1
2
3
4
5
6
7
8
9
10

4.     I am aware Carrie Clark (Mrs. Clark) was part of a group of TFD employees who complained of an ongoing hostile work environment in the Fire Inspection Unit. These allegations were investigated by TFD. Mrs. Clark filed an EOPD Complaint (on or about March 25, 2015) and the subsequent investigation was conducted by Matthew Larsen. Mrs. Clark alleged an ongoing hostile work environment and harassment by Captain Jeff Langejans. Included in Mrs. Clark's complaint was her dissatisfaction with the level of discipline Captain Langejans received as a result of the TFD investigation. Mr. Larsen began his investigation on April 13, 2015 and completed interviews on June 16, 2015. The investigation included thirty-three interviews (taped and transcribed) and review of many documents.

11
12
13
14
15
16
17
18

5.     I read the entire investigative package and met with Mr. Larsen to discuss his findings and conclusions. I advised Mr. Larsen that I was familiar with the investigation conducted by TFD, that I felt it to be thorough and that Captain Langejans' discipline was consistent with TFD policy and past practices. Moreover, the discipline was reviewed by the captain's chain of command and the TFD Discipline Review Board prior to its finalization. I disagreed with Mr. Larsen's finding of an ethical violation and discussed the rationale for my determination. I then wrote a memorandum of closure and concurrence of the EOPD investigation.

19
20
21
22
23

6.     The EOPD investigation also found that the assignment of Carrie Clark to the same division where her husband, Gordon Clark was a captain violated the City's Administrative Directive on nepotism. The investigation included references to problems that had been created by this assignment. I concurred with EOPD that there was a violation of the City's AD's and that the situation had to be corrected for all of TFD.

24
25
26
27

7.     My memo was written and distributed on July 29, 2015. Included in the memo was direction to the Fire Chief to take corrective action regarding the nepotism issue and to address EOPD's contention that the Fire Department's investigation of these same allegations had not been thorough and that the level of discipline imposed on Captain

28

1  Langejans inadequate.  (Assistant Chief Laura Baker authored a memorandum on August
2  18, 2015 satisfying these instructions)

3      8.    I reviewed Assistant Chief Baker's memorandum addressing Matt Larsen's
4  finding that the investigation was not thorough and the discipline insufficient.  TFD's
5  response confirmed my earlier determination that the discipline was appropriate and
6  consistent with past practices.

7      9.    I state under penalty of perjury that the foregoing is true and correct.
8  Executed on May 9, 2017.

Julianne Hughes

3

# EXHIBIT 54



# MEMORANDUM

DATE: July 29, 2015

TO: Matthew Larsen
Lead Civilian Investigator
Equal Opportunities Program Division
Human Resources Department

FROM: Julianne Hughes
Assistant City Manager

SUBJECT: WC 1503001

This memo provides City Manager's Office closure and concurrence with the Equal Opportunities Program Division (EOPD) recommendations from their investigation into allegations of Wrongful Conduct filed by Carrie Clark on March 25, 2015. The scope of the investigation included thirty three interviews (recorded and transcribed) and review of numerous documents. A separate EEO analysis was also performed.

The City Manager's Office concurs with EEO Specialist Martina Macias that there is no evidence to support allegations of discrimination or retaliation and no violations of City of Tucson Administrative Directive 2.05-8, Discrimination/Harassment.

This office agrees that Captain Jeff Langejans violated Administrative Directive 2.02-5, Rules of Conduct Section II, A, Rule 11 (a) & (b) and Rule 17. Captain Langejans admitted to making, and regrets having made, ill-chosen comments and statements to subordinates. Members of the Prevention Division of the Tucson Fire Department also credited inappropriate comments to the captain. It should be noted that many attributions were anecdotal and some several years old. Nonetheless, supervisors are held to a higher standard and are expected to set the tone and be an example for their subordinates, not engage in conduct that calls into question their judgment and decision making. Captain Langejans' concerns about Captain Gordon Clark should have been addressed with his Chain of Command. His opinions and inferences regarding Inspector Carrie Clark were not proper topics for discussion with subordinates. The City of Tucson and the Fire Department both have procedures for addressing such matters; the captain's failure to follow these protocols allowed for disharmony, distrust, and disruption in the Prevention Division. The Department is directed to address EOPD's assertion that the Fire Department's investigation was not thorough and failed to identify the most appropriate level of discipline for Captain Langejans.

EOPD's conclusion that City Administrative Directive 2.02-10 Nepotism, was contravened is well supported through statements and concerns expressed by members of the Prevention Division. This is a relatively small and confined employee group. It is clear that the ramification of transferring Inspector Carrie Clark into a division where her husband, Captain Gordon Clark, was one of the supervisors was not fully considered. The difficulties of the situation as noted by the other supervisors exemplify the need for adherence to this policy. The Department is directed to take corrective action to address this

COT002440

To: Matthew Larsen. Lead Civilian Investigator
Equal Opportunities Program Division Human Resources Department
Subject: WC 1503001
Date: July 29, 2015
Page: 2

While some members of the Prevention Division expressed concern of retaliation, nothing in the record shows that any suffered an adverse employment action. The Report of Investigation provides specifics and acknowledges that the feelings of those expressing concern were not discounted yet when pressed for detail or more information regarding [possible] retaliation, these employees were unable to do so.

This was a comprehensive inquiry with documented findings and recommendations. Following implementation of the direction from this office, the matter is considered closed.