# EXHIBIT 55

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


CARRIE FERRARA CLARK,            )
                                 )
        Plaintiff,               )
                                 )
v.                               ) NO. 4:14-CV-02543-TUC-CKJ
                                 )
CITY OF TUCSON,                  )
                                 )
        Defendant.               )


DEPOSITION OF JAMES E. CRITCHLEY, JR.

Tucson, Arizona
June 27, 2017
9:07 a.m.


COLLEEN KELLY, RPR
CR #50386 (AZ)
KATHY FINK & ASSOCIATES, INC.
2819 East 22nd Street
Tucson, AZ  85713
Phone: (520)624-8644    Fax:(520)624-9336

1    fire prevention into operations?

2        A.   I did.

3        Q.   And why -- just tell me all the reasons why

4    you made that decision to move Carrie from fire

5    prevention to operations.

6        A.   The drama that was going on in fire

7    prevention for the past years was not healthy for

8    anybody down there.  The last -- well, I had asked --

9    I'm being required by the City Manager to cut

10   positions.  I'm doing everything I can to move people

11   into ops, to try to figure out.

12            So the SAFER grant, S-A-F-E-R, it

13   requires a certain amount of people in operations.

14   I've asked the fire prevention to make PT trucks.

15   They ask, how do we do that?  And I said, ask for

16   volunteers first.  I need -- we're short on medics, I

17   need people back out into the field, move them out

18   into the field.

19            And it's basically trying to protect

20   positions on the fire department to make sure that

21   they're part of operations.  Decisions were made.

22   They had their 12 people to go -- their eight people

23   to go on to operations.  And then I'm aware of one of

24   the Inspectors breaking down crying because of a

25   discussion that was happening with Carrie Clark.

1          And at that point, as I'm moving

2    everybody, I made the decision, well, then let's get

3    Carrie somewhere where she can be successful.  And

4    she was never -- her work habits were great in fire

5    prevention.  That wasn't the issue about that.  I

6    needed medics, and this came up, and I made the

7    decision to move Carrie, and I thought she could find

8    a place as a medic in the operations.

9        Q.    Have you now told me all the reasons why you

10   moved Carrie from fire prevention into operations?

11       A.    Yes.

12             (Exhibit Number 7 marked.)

13       Q.    (By Mr. Jacobson)   Showing you Exhibit 7.

14   This is a map that was disclosed by the City of

15   Tucson lawyers in this case.

16             Do you recognize this map?

17       A.    I do.

18       Q.    Is this an accurate depiction of the fire

19   stations within the City of Tucson or that the City

20   of Tucson runs or operates?

21       A.    I do -- or it is.

22       Q.    And as I understand it, there are 22

23   stations; is that correct?

24       A.    Correct.

25       Q.    While you have been Fire Chief, based on

Page 37

1   Weber.

2        Q.    Gotcha.

3              Did you ever talk to Josh Campbell about

4   it?

5        A.    He was out of town during this or was not

6   available to talk to me about this.

7              MS. SAAVEDRA:   Can we take a short break,

8   please?

9              MR. JACOBSON:   Sure, of course.

10             (Recess taken from 10:05 a.m. to 10:12 a.m.)

11       Q.    (By Mr. Jacobson)   We are back on the

12  record.

13             I want to transition to Gordon Clark.   Were

14  you aware that Gordon Clark had been promoted to a

15  Battalion Chief position from a Captain position?

16       A.    Yes.

17       Q.    And during -- strike that.

18             Newly promoted Battalion Chiefs serve a

19  one-year probation?

20       A.    Yes.

21       Q.    What, if anything, did you do for Gordon

22  Clark to ensure that he was successful during his

23  probationary period?

24       A.    It could go back to being at -- in a busy

25  station, so he could see all of the things that may

Page 40

1    talking about promoted to a Chief position?

2        A.   I am.

3        Q.   And while you don't have the -- you don't

4    make the decision, you do have input as to where

5    newly minted Battalion Chiefs go?

6        A.   I do.

7        Q.   At the time Gordon was promoted to Battalion

8    Chief, was there a spot open in Battalion 4 for the

9    Battalion Chief position?

10       A.   I don't remember.

11       Q.   Do you know, was a probationary Battalion

12   Chief assigned to Battalion 4?

13       A.   I don't remember.  Probably.  Remember, we

14   have lots of movement right then.  And I couldn't put

15   somebody -- they couldn't always be put in spots.

16   Somebody was going to have to be in 4, whether

17   they're senior or not.

18       Q.   During Gordon's probationary period as a

19   Battalion Chief, did you treat him the same as you

20   treated other Chiefs, Battalion Chiefs during their

21   probationary period?

22       A.   I believe I did.

23       Q.   To your knowledge, did TFD treat Gordon the

24   same during his probationary period as other

25   Battalion Chiefs during their probationary period?

Page 41

1       A.    I believe we did.

2       Q.    In the -- since you have been Fire Chief, to

3   your recollection, has any other Chief level employee

4   not passed their probationary period?

5       A.    You clarified it as since I have been Chief?

6       Q.    Yes.

7       A.    Since I've been the Fire Chief, no, but

8   since I've been a Chief officer, yes.

9       Q.    And I apologize.  Thank you.  That's one of

10  those times where --

11            So since you've been Fire Chief, has any

12  other Chief level employee not passed their probation

13  period?

14      A.    Besides Gordon, no.

15      Q.    Do you believe that TFD followed its own

16  policies and procedures regarding Gordon's

17  probationary period as a Battalion Chief?

18      A.    TFD procedures, yes.  Civil service

19  procedures, I've read the same things that he's said.

20  I expect that if you are going to be managing at a

21  Chief officer level, that it's not necessary to give

22  you a written document that says everything is going

23  well.

24      Q.    So can you clarify what you mean by that?

25  Because I kind of -- maybe I'll just parse that out,

Page 42

1  if you don't mind.

2           So do you believe that TFD followed TFD's

3  policies and procedures regarding Gordon's

4  probationary period as a Battalion Chief?

5      A.   I believe we were consistent with all the

6  Chiefs.

7      Q.   Do you believe that TFD followed City of

8  Tucson Administrative Directives regarding Gordon's

9  term as a probationary Battalion Chief?

10     A.   The -- there was not a written six-month

11  evaluation.  And I believe, I've seen it, that it's a

12  requirement for probation.

13     Q.   Okay.  So you are --

14     A.   For a probationary employee.  And we did not

15  do that.  And we do not do that for Battalion Chiefs.

16     Q.   So it's your testimony that the City of

17  Tucson requires probationary employees to receive a

18  six-month evaluation; correct?

19     A.   Yes.

20     Q.   And specific to Gordon, that did not occur

21  in this case; correct?

22          MS. SAAVEDRA:   Form.

23     A.   That did not occur because I had no reason.

24  I mean, he was doing great.

25     Q.   (By Mr. Jacobson)   Okay.  So, again, we

1    Q.   Did you promote -- sorry.

2              Well, did you choose to promote Gordon

3    Clark or was it part of a civil service requirement

4    that if he makes a list as qualified and there's an

5    open position, he gets promoted?

6    A.   I chose to promote him.   And it is on a list

7    that he was next to be done.   I have the ability to

8    pass somebody on the list, but I didn't, because I

9    thought Gordon was going to be good.

10   Q.   So did you choose to promote Gordon, knowing

11   that he would not complete his probationary period?

12   A.   No.   I promoted him because I expected him

13   to be a Chief officer.

14   Q.   And who ultimately decided that Gordon had

15   not passed his probationary period?

16   A.   I did.

17   Q.   And tell me all the reasons that Gordon did

18   not --

19              Because you made the decision, tell us

20   all the reasons that Gordon did not pass probation.

21   A.   So primarily listed, there are two issues,

22   his leadership and his communication.   And he was

23   fine through the first six months.   I saw nothing

24   going on.

25              And then he had some events that happened

1   in operations meetings where he wasn't acting like a

2   Chief Officer.  He was then counseled on that.  I was

3   not part of the counseling, but he was counseled on

4   those.  It was about communications and leadership.

5            And the communications piece is we need

6   to know, administration needs to know, City of Tucson

7   needs to know when you're not able to respond on a

8   call in a timely manner.  And there were two

9   incidents that I know of that that was a concern.  He

10  was talked to -- talked to him about it the first

11  time and then it happened again.

12           The leadership piece, he's outstanding.

13  The people that work for him love him.  He does a

14  great job.  I can't fault him on that.  But his peer

15  communication and his peer leadership and doing what

16  the Fire Chief directed him to do, that wasn't --

17  that wasn't part of.  So it's the leadership and the

18  communications that I was concerned about.

19           I didn't -- I see it happen in July, it's

20  being taken care of, I'm in an operations meeting in

21  November, about November, and I see that he still

22  won't -- he's still arguing a point, specific to PT

23  trucks.

24           That's my direction that we get PT

25  trucks, yet he is making it somebody else's.  That's

1    not what I expect out of a Chief Officer.  I need

2    them working together.  I need them moving the

3    organization forward.  Yes, taking care of your

4    people is important, but there's a lot of other

5    things that are part of it.

6             The concern through his chain of command

7    was there.  I said, we aren't going to wait until

8    January to do this.  If this is the direction

9    everybody believes, then we aren't going to wait 'til

10   January to do this, we're going to do it now and he's

11   not going to -- he's not going to complete probation.

12   So...

13             MR. McCRORY:  Do you want to just clarify

14   what a PT truck is?

15        A.   Prevention truck.

16             When I spoke about moving eight

17   inspectors out into the field, we put them on PT

18   trucks.  They were there to run emergent calls and

19   run fire alarms and to help the community, basically

20   the other firefighters, the other fire captains with

21   the great knowledge that they have, in getting them

22   out there, so that they could do preplans and all the

23   things that they've got a technical expertise on,

24   that they could help the operations.

25        Q.   (By Mr. Jacobson)  PT trucks was an

1   eight-hour shift; right?

2        A.   It is.  I apologize.  I believe that's a

3   10-hour shift.

4        Q.   Not a 24-hour shift?

5        A.   Not a 24.

6        Q.   Going back to the reasons why Gordon, why

7   you decided Gordon did not pass probation.

8             Any other reasons that we haven't talked

9   about or are those all reasons that Gordon, in your

10  calculus, did not pass probation?

11       A.   It would go back to a communications piece,

12  that I expect my Battalion Chiefs to be able to

13  communicate inside and outside the organization.

14  Gordon appropriately brought up a question on an AD.

15  This is not in his material.  He appropriately

16  brought up a question about outside employment.  He

17  didn't believe the AD should be enforced.  I said,

18  great, you're on probation -- I did not say this.

19  Mike, his Assistant Chief said, okay, research it and

20  bring it back to us.  Research it with HR and legal

21  and bring it back to us.

22             My understanding is he did not contact HR

23  about this, but he did contact another captain for a

24  legal interpretation.  That was concerning.

25             Then I got an outside employment form

1    from his district directly going against the AD.   And

2    we asked that person, why did you put it in when it

3    clearly states you can't put this in?   And that

4    person told me that his chief told him to put it in.

5         Q.   **And who was that?**

6         A.   Gordon Clark.

7         Q.   **No, I'm sorry, who was the person that put**

8    **it in?   And if you don't remember, that's fine.**

9         A.   I don't remember.   I truly don't.

10        Q.   **Have you now told me all the reasons why**

11   **Gordon did not pass probation, in your calculus?**

12        A.   Yes.

13        Q.   **When you -- how was it communicated that**

14   **Gordon did not pass probation?**

15        A.   I drove over there with Mike Garcia, we met

16   him in Battalion 3's office, I read him the

17   documents, told him about the incidents.

18             And then we advised him I was going to

19   give him the opportunity to pick shifts.   The idea is

20   I don't want it to be hard on Gordon going to people

21   that he had supervised before.   He could change

22   shifts.   I explained that I've got a Chief Officer

23   that will cover the rest of his shift.   And then, and

24   then we -- Mike and I left.   I don't believe -- I

25   don't remember who it was that covered for him.   He

Page 51

1   supervisor line, when actually I should have signed

2   it on the review.

3             But there is part of that concern about

4   does he answer to Mike or does he answer to me.

5   Ultimately everybody answers to me and this was my

6   decision for these reasons.

7        Q.    I understand.  So that's Mike Garcia's

8   signature below yours?

9        A.    It is.

10       Q.    And it's your belief that -- sorry.  Strike.

11  Go ahead.

12       A.    No, as I read this, your question that you

13  asked me, were those the only reasons?

14       Q.    Yeah.  Go ahead.

15       A.    You remember you asked me are those the only

16  reasons?

17       Q.    Yes.

18       A.    There was another issue with communication.

19  And it was the federal law enforcement visiting the

20  station that wasn't communicated.  So that was one of

21  those reasons why.

22       Q.    So now that you've had a chance to review

23  this document, it has refreshed your recollection

24  that there was one additional issue regarding a visit

25  from federal law enforcement agents to Gordon Clark

1    that was not communicated?

2        A.    And it was about the communication when an

3    entity comes onto the fire department grounds, you

4    need to let people know.   And this is while I was

5    working, we had other agencies that would come

6    interview firefighters for incidents that were

7    happening.   I don't -- I just -- we need to be

8    notified so that we can protect the men and women of

9    the fire department from that.   And we aren't

10    notified.   So that was the communication question

11    again.

12        Q.    Can you tell me what policy requires -- if

13    any, required Gordon to communicate that there was a

14    federal law enforcement agent who interviewed him at

15    the fire station?

16        A.    I do not know of the policy, but at that

17    same station, at Station 7, this was a big discussion

18    about administration protecting fire personnel, and

19    it had been for a while about you can't -- you can't

20    let people come on to do interviews on City property

21    without notification of the administration because we

22    can't protect you if we don't know it.   The union

23    supported it, everybody supported it.

24                So there isn't a direct something written

25    that I know of, but it is policy since that happened.

1    fire prevention to operations, were you aware that

2    she had filed a complaint about Captain Langejans and

3    the work environment in fire protection?

4        A.   Fire prevention, yes.

5        Q.   And at the time TFD reassigned, you

6    reassigned Carrie from fire prevention to operations,

7    were you aware that Captain Langejans had filed his

8    own complaint about Carrie and the work environment

9    in fire prevention?

10       A.   Yes.

11             (Exhibit Number 10 marked.)

12       Q.   (By Mr. Jacobson)   Showing you Exhibit 10.

13             Do you recognize this document?

14       A.   Yes.

15       Q.   It is certainly thick with details, so I'm

16   not going to ask you questions necessarily about it.

17             But did you review this memorandum from

18   then Captain Gordon Clark to yourself regarding, the

19   subject line is:   Rebuttal of December 15, 2016

20   Special Evaluation?

21       A.   I did.

22       Q.   What, if anything, did you do with this

23   memorandum when you received it?

24       A.   I read it, I considered it, and I questioned

25   specifics about it with his supervisory chain of

1    command, and I told the HR -- I told JoAnn to put it

2    in his personnel file with the -- with the special

3    evaluation.

4         Q.    So why did you ask -- first of all -- strike

5    that.

6              You said that you questioned specifics

7    about it with his chain of command; correct?

8         A.    Yes.

9         Q.    Whom did you talk to?

10        A.    Mike Garcia, primarily.

11        Q.    Anybody else?

12        A.    Jeff Thompson may have been in

13   conversations, but I didn't ask, I asked Mike.

14        Q.    And why did you ask Mike about the

15   information in this rebuttal?

16        A.    I wanted to make sure that everything was

17   consistent, that we had looked at these things, that

18   this was his understanding, or was it not Mike's

19   understanding, and that were any of these issues

20   addressed, or concerns, and did we need to change

21   anything was the discussion that we had.

22        Q.    So the purpose of that conversation was to

23   see if, as a result of this rebuttal, anything needed

24   to change regarding TFD's policies?

25        A.    Yes.  Also to see if any of Gordon's

Page 60

1    concerns were valid and did we -- that's part of the

2    consideration of he took the time to write this, I'll

3    take the time to read it and consider it and see if

4    it changes anything.

5        Q.    And what was your ultimate conclusion?

6        A.    That it did not, that everything was still

7    consistent with what we said, what I gave him the

8    special evaluation for, and the concern about the

9    leadership and the communications.

10       Q.    Did you receive any documentation or review

11   any documentation between Chief Garcia and yourself

12   regarding this rebuttal?

13       A.    I don't believe so.

14       Q.    I guess there's an issue of -- or there was

15   an issue regarding Gordon taking his truck out of

16   service.  Does that sound right, something about

17   that?

18       A.    So there is.  And the words that you use are

19   specific to -- what's your definition of out of

20   service?  Is it pushing a button that says I'm out of

21   service or is it delaying your response to such that

22   you wouldn't be able to respond in a timely manner

23   because of a decision that you made?

24            So either one of those, I believe, is out

25   of service.  And so there was an issue with that.

1    Q.   And was there any documentation that was

2    reviewed by you regarding that particular

3    out-of-service issue?

4    A.   No.

5    Q.   And so where did you get the information

6    from, unless you had firsthand knowledge of it?

7    A.   From his supervisor.

8    Q.   Mike Garcia?

9    A.   Yes.

10   Q.   And Mr. Garcia never provided you with

11   documents?

12   A.   I don't remember.

13       MR. JACOBSON:  Why don't we take a break.  I

14   believe I'm close to being done.  I just want to

15   probably wrap up with a few more questions, but we're

16   close to being done.  Let me just organize my

17   thoughts, if that's okay with you.

18       THE WITNESS:  Okay.

19       (Recess taken from 10:54 a.m. to 11:02 a.m.)

20   Q.   (By Mr. Jacobson)  We are back on the

21   record.

22   A.   Okay.

23   Q.   Were you aware that at some point before

24   Carrie was moved from fire prevention into operations

25   that both Carrie and Gordon worked in fire prevention

1   together?

2      A.   Yes.

3      Q.   And Gordon was eventually moved out of fire

4   prevention; correct?

5      A.   Yes.

6      Q.   And that was -- tell me the reasons why that

7   happened.

8      A.   So there were a few reasons.  One is he was

9   going to be promoted by the end of the year, I wanted

10  to give him -- and the openings were going to be as

11  Battalion Chiefs, not as Deputy Chiefs.  And he -- I

12  wanted him to get back into the swing of that, so I

13  thought that was a good thing for his -- to prepare

14  him to be successful out there.

15          Second, the City Manager, Assistant City

16  Manager, my boss at that time, did not like the way

17  TFD used the nepotism policy.  I believed that we

18  were in line with it.  I believed that we were okay

19  with it.  But I was ordered by the City management

20  that that, no, you're not, and you need to make

21  changes.  So that was the other -- another reason.

22      Q.   The nepotism policy that you just

23  referenced, is that enforced across TFD as a result

24  of this direction from the City Manager's office now?

25      A.   It is now.

Page 63

1      Q.    Was it immediately enforced after the City

2   was informed that -- I'm sorry, after TFD was

3   informed by the City Manager's office that TFD was

4   not in compliance with the nepotism policy?

5      A.    It was pretty close after that that I did.

6      Q.    Were you aware that Carrie received an

7   educational counseling from her supervisor, Ken

8   Brouillette, regarding TFD's rules of conduct or

9   alleged violations of that?

10     A.    At some point I was aware that she did.  I

11   don't know what the timing was.

12     Q.    Were you involved in the decision to give

13   Carrie that educational counseling?

14     A.    I was not.

15     Q.    You rendered an opinion regarding -- strike

16   that.

17            Do you recall that Carrie filed a

18   Wrongful Conduct Complaint -- I think you testified

19   to that earlier -- you're aware that she had filed a

20   Wrongful Conduct Complaint against Captain Langejans

21   and fire prevention; right?

22     A.    Yes.

23     Q.    You rendered an opinion about that and sent

24   a memorandum to EOPD about it; correct?

25     A.    Yes.

Page 64

1        Q.    Do you recall what your reasons were that
2    you didn't find that her claim was substantiated?
3            MS. SAAVEDRA:   Form.
4                Also, can you clarify what wrongful
5    conduct complaint you're referring to?
6            MR. JACOBSON:   Sure.
7            MS. SAAVEDRA:   There's two in the new
8    allegations, plus there's the others.   So can you
9    clarify?
10           MR. JACOBSON:   16-03-001.   This was a
11   Wrongful Conduct Complaint that was filed on March
12   9th, 2016, alleging, among other matters, continued
13   harassment by Captain Langejans and other policy
14   violations.
15       A.    And the question?
16       Q.    (By Mr. Jacobson)   And the question was:
17   You rendered an opinion to EOPD that TFD could not
18   substantiate the claims of mismanagement and
19   misconduct; do you recall that?
20       A.    I do.
21       Q.    Can you tell me all the reasons why you
22   found that, to your recollection?
23       A.    So that was -- the response was from the
24   Assistant Chief over the fire prevention.   I remember
25   the document.   It was one that I reviewed.   I don't

Page 67

1      A.   I do not.

2      Q.   Were you aware of the fact that Carrie asked

3  to go onto a PT truck?

4      A.   I was not.

5      Q.   And were those medics that were moved, were

6  they moved to a 10-hour shift or moved to a 24-hour

7  shift?

8      A.   10-hour shift.

9           MR. JACOBSON:  I do not have any other

10 questions for you, Chief.  Thank you for your time

11 this morning.

12          MS. SAAVEDRA:  I have some follow-up

13 questions.

14

15                    EXAMINATION

16 BY MS. SAAVEDRA:

17     Q.   Chief, was there other people that you heard

18 from in -- let me rephrase that.

19               Did you get other feedback in regards to

20 Gordon Clark during the time he was on probation that

21 you also took into consideration in your decisions to

22 fail him on probation, other than who you've already

23 discussed?

24     A.   So this goes to the communications and

25 leadership piece that I spoke of before, that I had

1   paused because I know he works at 9, but everything

2   with the -- with the interviews happened at 7.  This

3   was the interview of law enforcement.  So I was

4   trying to remember what that was.

5            But included in that was -- or around

6   that same time was a concern that Battalion 2 had

7   voiced to his chain of command about Gordon not

8   communicating with him about an incident.

9            And I don't know a lot about the

10  incident, but I know that Pat Quinn was very

11  concerned with him not doing something while he was

12  on -- while he was swinging in or while he was on a

13  trade at Fire Station Number 7.

14            So that goes to the point of

15  communication, not only up, but to peers.  And I do

16  remember something happening on that.  But I felt it

17  fell into it still that lack of communications piece

18  that I felt was hindering Gordon.  So I wasn't going

19  to make him part of management if he couldn't

20  continue that leadership that I needed, the

21  communication that I needed from a Chief Officer.

22       Q.  In regards to the City Manager directing TFD

23  to rectify the nepotism policy the way that it was

24  being followed within TFD, was there anyone else that

25  was moved, other than Gordon Clark, due to that

1    finding by the City Manager?

2        A.    So the Vaughns were separated, the dad and a

3    son, out at 17.  The Larkins were refused -- I forget

4    which Larkin wanted to be a paramed -- no, wanted to

5    be an EC and his brother was a paramedic at Station

6    22.  I believe there was another one, but those are

7    the two that I know were happening at that time.

8        Q.    Now, earlier you were asked whether you knew

9    about Carrie Clark's complaints in regards to

10   different personnel at TFD, and also her lawsuit that

11   we're here for today, before you moved her from

12   prevention out to operations.

13              Do you remember when her attorney asked

14   you about those?

15       A.    I do.

16       Q.    In regards to the complaint that she filed

17   about Captain Langejans, was it your understanding

18   that that complaint had been resolved before you

19   moved her out to operations?

20       A.    So I believed all of the complaints had been

21   resolved.  I knew that the lawsuits were still there,

22   but I believed the complaints were resolved.

23              And every time I got a complaint, I did

24   not want it to -- I wanted to make sure I got as many

25   people, HR, EOPD included in what we're doing because

Page 70

1    I don't want to do things that hurt employees, so I

2    asked everybody to it.

3              But I believed all the complaints were

4    taken care of.  I was just expecting this deposition,

5    I've been waiting for it, until it can get solved.

6    But the complaints had really nothing to do with the

7    movement to operations.

8        Q.   **Have you ever treated Carrie Clark**

9    **differently because of the complaints that she's**

10   **filed in the past or the fact that she's filed this**

11   **lawsuit?**

12             MR. JACOBSON:  Objection.  It's beyond the

13   scope of discovery.

14             Go ahead.  You can answer.  I can't

15   direct him not to answer it.

16       A.   No, not negatively.  I've never -- Carrie

17   and -- well -- no, I don't believe I have ever done

18   anything because she's complained.

19       Q.   **(By Ms. Saavedra)  And then I'll limit it to**

20   **the dates, I guess, as far as the Third Amended**

21   **Complaint.**

22             **So since --**

23             MR. McCRORY:  It was 2015.

24             MS. SAAVEDRA:  No, it goes further back.

25       Q.   **(By Mr. Jacobson)  There's new allegations**

1    in here in regards to May of 2014, so I'll start

2    there.

3              Since May of 2014 have you retaliated or

4    discriminated against Carrie Clark because of either

5    complaints she's filed or the lawsuit she's filed?

6        A.   No.

7        Q.   Same question for Gordon Clark.

8              Have you retaliated or discriminated

9    against Gordon Clark since May of 2014 as a result of

10   any complaints he may or may not have filed or this

11   lawsuit?

12       A.   No.

13       Q.   Did you ever have a time where you discussed

14   Gordon Clark's career and how he could progress in

15   his career with TFD, counseled him on that?

16       A.   I believe we've been friends since he got on

17   the Tucson Fire Department.  I remember soccer

18   tournaments in Scottsdale where we talked.  He

19   brought up weaknesses, I shared that I have the same,

20   that he can overcome it.  We've talked about

21   relationships, we've talked about business, we've

22   talked about how he could progress, we've talked --

23   yes, we've -- we've talked off duty, we've talked on

24   duty.

25              My expectations was he was going to be

Page 72

1    successful, and I still hope that he will -- that he

2    will test, he will understand what I'm -- what he

3    needs to change, why he didn't fit this first time,

4    and that he will be successful, in the same way that

5    I want Carrie Clark to be successful wherever she's

6    at and happy about working for Tucson Fire

7    Department.

8           MS. SAAVEDRA:  Okay.  I don't have anything

9    else.  Thank you.

10

11                     REEXAMINATION

12   BY MR. JACOBSON:

13      Q.   A few follow-up questions about some of

14   those questions that were asked of you.

15              Was Pat Quinn Gordon's supervisor?

16      A.    Peer.  Battalion Chief in Battalion 2,

17   Gordon Clark was assigned to Battalion 3.  Different

18   shifts, so they, I think -- I don't exactly know

19   where they were positioned, for some reason Gordon

20   was either working with or working for Pat Quinn at

21   Station 7 for that one trade.

22      Q.   The Larkins you refer to as one of the

23   people or two people who were affected by the

24   City's -- City Manager's direction to TFD to follow

25   with the nepotism policy; right?



KATHY FINK
&ASSOCIATES
ASSOCIATES | Certified Court Reporters
2819 E. 22nd Street
Tucson, Arizona 85713
Phone: (520) 624-8644  Fax: (520) 624-9336

Please make all changes or corrections on this sheet showing page number, line number and reason, if any. Make sure you *sign this form*, regardless of any corrections. Mail the signed *Original* correction sheet to the address above no later than: 8/4/17

**WITNESS: James Critchley**                    **TAKEN ON: *6/27/17***

| PAGE | LINE | CORRECTION OR CHANGE | REASON |
|------|------|----------------------|--------|
|      |      | no Changes.          |        |

Please sign here

# EXHIBIT 56



# MEMORANDUM

**DATE:**     September 22, 2015

**TO:**  Rebecca Hill
Human Resources Director
City of Tucson

**FROM:**  Carrie Clark
Inspector
Tucson Fire-Fire Prevention

**SUBJECT:**      Complaint of Retaliation

I am writing to file a Complaint of Retaliation. After I filed a complaint of Wrongful Conduct and an investigation took place, an adverse personnel action was taken against me as a result of that complaint.  The city Administrative Directives define an Adverse Personnel Action as:

"Disciplinary action including written reprimand, suspension without pay, involuntary transfer or reassignment, discharge, withholding of an appropriate salary adjustment, or other significant change in duties or responsibilities which is inconsistent with the employee's salary or classification."

Further, retaliation is defined as:

"Any adverse action taken against an employee or the employee's relative or significant-other because s/he has inquired into or complained about discrimination, cooperated in a discrimination investigation, or otherwise participated in any discrimination complaint proceeding."

1. The adverse personnel action was the involuntary transfer and reassignment of my husband, Captain Gordon Clark, which made a significant change in his duties and responsibilities, and a cut in pay.

2. The date of the adverse personnel action was effective August 23, 2015.

3. The supervisory employee(s) responsible for the adverse personnel action was someone in his chain of command responsible for ordering his involuntary transfer.

4. My husband was told his move was not the result of job performance or inappropriate work conduct. Rather the result of my original complaint/investigation, of which he was not found responsible for any wrongful conduct, poor job performance or inappropriate work conduct. Also, there have been no other actions/changes to any other department personnel other than us.

COT002828

# EXHIBIT 57



# MEMORANDUM

DATE: September 29, 2015

TO:    Carrie Clark          FROM:    Rebecca Hill
       Fire Department                Interim HR Director

**SUBJECT:    Complaint of Retaliation**

Thank you for submitting your complaint to Human Resources for processing in accordance with the Administrative Directive 2.02-4. I have reviewed the memorandum outlining your concerns and forwarded it to the Equal Opportunity Programs Division for review and determination. Martina Macias, Sr. Equal Opportunity Specialist, applied the guidelines under the Wrongful Conduct Administrative Directive, sought legal guidance from City Attorney's Office, and assessed that we do not have jurisdiction to investigate a complaint from an individual who is not the party allegedly harmed.

In addition, Administrative Directive 2.02-4 VII A states that the complaint must have been filed by the appropriate complainant within 30 calendar days of the effective date of the personnel action. The effective date, according to the complaint, was August 23, 2015. Therefore, this is no longer an actionable circumstance.

Therefore, I must decline to pursue this matter further. Please let me know if you have any questions.

Cc: Martina Macias, EOPD

COT002824

# EXHIBIT 58



# MEMORANDUM

DATE:

**TO:**   Michael Ortega          **FROM:**   Carrie Clark
City Manager                       Inspector
City Of Tucson                     Tucson Fire Department

**SUBJECT:**        Complaint of Mismanagement

I am making this report of Wrongful Conduct and Mismanagement based on the gross deviation from acceptable and recognized management practices by multiple supervisory personnel. These deviations include (but are not limited to) those involved personnel not adhering to all Tucson Fire Department, City of Tucson, and Civil Service rules and regulations, administrative directives and policies.

This original complaint started back in December of 2014. Multiple written reports and testimony have been submitted documenting the wrongful conduct and untruthfulness on the part of Captain Jeff Langejans. Recently though, it has been the lack of action the Tucson Fire Department has taken, or not taken, that has brought me to filing this claim.

In January of 2015, memos were written regarding various violations and the conduct of Captain Jeff Langejans. Those memos were not taken seriously. In January of 2015, four Inspectors and one Captain went to Chief Jim Critchley's office to explain the problems that were happening in Fire Prevention, and to let him know of our concern with the lack of any action being taken. Chief Critchley said he would look into why an investigation had not been conducted. Shortly after that meeting, an investigation was conducted by TFD. Collectively, we felt the investigation had little to do with our complaints or concerns, but seemed more just a process they were forced to go through. In the end, Captain Langejans received a written reprimand, but nothing was done to correct the hostile work environment some of us were feeling. I personally sat in Assistant Chief Baker's office and expressed my concerns about working around someone who made such derogatory, negative, and untruthful comments about me and my family, and personally attacked my character, as well as my husband's to our fellow co-workers. I was met with the response of "Well, you're just going to have to move past this. "

After taking my complaints to the City Manager's Office in March of 2015, a formal investigation was conducted by the city's EOPD. After four plus months of investigation, EOPD submitted a formal response stating there were violations of "The Rules of Conduct, Section II, A. Rule 11 (a) (c), and rule 17." They also found that the appropriateness of response by Tucson Fire management, with "their investigation was not thorough, and did not identify the appropriate level of discipline that was most appropriate." Per EOPD, minimally there should have been a 1-2 day suspension. They also stated the Nepotism policy needed to be addressed. Within days of the receiving of the City's response, Assistant Chief Baker and Deputy Chief Carsten informed my husband, Gordon Clark, via telephone that he was being removed from Fire Prevention for "Nepotism."  To this day, no other policy violations cited in the findings of the EOPD investigation have been addressed by Tucson Fire Department.

On August 3rd, I emailed Chief Critchley and asked to meet with him. We spoke in the afternoon about some of the findings from this investigation and I expressed my concerns for some of the

things Langejans had submitted to the investigation. To be more specific, Captain Langejans had submitted five separate memos through his chain of command in a matter of three weeks, and three of them were specifically about me. I told Chief Critchley how uncomfortable it made me and how I felt he was targeting me for filing the complaint against him. Chief Critchley assured me this situation was being looked into and he was waiting on his Deputy and Assistant Chiefs to make the recommendation for what should happen to Captain Langejans, and then he would let me know what was going on. He also told me not to worry about Gordon being moved from Prevention, that he had many options for him, and staying on eight hours was one of them. I told Chief Critchley how moving Gordon would disrupt our life and childcare situation, as our toddler was starting pre-school the following week, and we still have an infant still at home as well and we were not prepared for Gordon to change his schedule. He assured me again, everything would be ok for Gordon.

Approximately two weeks later, Gordon was told he was being assigned to B shift swing. There were no options given, and his schedule went from 4/10 hour shifts to 24 hour shifts, and made our life difficult having to coordinate a new childcare program.  This also resulted in a reduction of pay for Gordon of approximately $7000/year, or almost $600/month.

On August 19th, I saw Chief Critchley downstairs; I asked again why I haven't heard anything. Chief Critchley told me again that he was waiting on his staff to make a decision about Langejans. Chief Critchley then asked me what Captain Langejans had done since they disciplined him back in March. I told him the five memos that were written had been after that time; Chief Critchley said he believed those memos were written prior to that because they had specifically told Langejans to knock that behavior off and not to be doing that.  I also told Chief Critchley how Langejans was continuing to stare me down anytime I was within his sight, and how he would stand outside my cubicle talking to another employee about non work related topics, almost as to make it uncomfortable for me to leave my cubicle.  I asked Critchley to go back and look at the documents that were submitted because all the memos had been written after I filed my complaint. He said he would.  I also told him that the information Langejans was writing in his memos was untruthful and obviously meant to target me.  Further, I asked Chief Critchley why my husband was moved back to shift when he told us we would have options of Gordon staying on 4/10 hour shifts, he just hung his head and didn't respond.  I never heard anything again from Chief Critchley.

On September 17th, I and Union representative, Josh Campbell, met with Julie Hughes. She expressed that she was under the impression that discipline was going to be handed down to Captain Langejans from Chief Critchley. We both told her nothing had come of it. I also explained that the only thing that had been enforced from the entire EOPD investigation was the moving of my husband from Fire Prevention. No action to date has been taken about the original complaint filed. And no other members have been moved due to nepotism. Tucson Fire actually re-wrote the nepotism policy in October 2015 so that all the Chiefs who were in violation of the policy would be allowed to remain in their relative's direct chain of command because they are allowing for one level of separation. Julie Hughes also stated that she asked Chief Critchley back in mid-July to give her documentation on who was being moved and who was not, and why, due to the nepotism policy. She stated she had still not received that from Chief Critchley.

To this day, I still work directly with Captain Langejans, whom I have filed a complaint against. He indirectly is one of my Supervisors.  After reading the memos he sent about me, it's clear that he has an agenda to build a case against me and possibly have me disciplined or demoted like he has had others in the past.  Just the other day, October 20th, while I was walking to the printer, Captain Langejans exited his office and instead of looking away and continuing on, he proceeded to stare at me in an intimidating manner until I was no longer in his sight.  He has done this to me multiple times.

Tom Sisterman is another employee who initially submitted memos regarding the allegations against Langejans. Chief Critchley told Tom he would work to make his situation better so that he wasn't directly working for Langejans, which has still not happened.

This department and all of my chain of command know the concerns I and a few others have regarding our working environment in Fire Prevention. They have refused to address any of these issues, and instead wasted both time and money going through the EOPD investigation, only to ignore the findings and recommendations. I am unable to avoid Captain Langejans at work, and see him on a daily basis. I have deprived myself of training opportunities to avoid being in the same room as him, which I feel is unfair to me and my career development. I have a minimum of twelve years left in my career, he has less than five. My current supervisor understands the situation, and is aware I have missed out on training opportunities.

I am including this information with my original complaint, in hopes that it will be read. The amount of information included in this investigation can be difficult to navigate through.  With that said, here are a few of the excerpts from the transcripts that depict both the untruthfulness and mismanagement by both Captain Langejans and the Tucson Fire Department administration that I felt is pertinent to the complaint.


In the transcript of Assistant Chief Laura Baker:

Page 3, Line 129-132

When asked about the reason behind the struggle of cohesiveness, Chief Baker states: "Um, well it's - it's essentially focused around, um, uh, some actions by one supervisor employee that, uh, made some statements that should not have been made. And, um, from there, uh, other employees have focused their energy on making sure that, um, that employee who did wrong, uh, is affected."

This was an assumption made by Chief Baker, and an unfair one at that. No one's intention was to make sure he was "affected"; we just wanted the right thing to be done.

Page 7, Line 300-311

Matthew Larsen asked Chief Baker if she asked Langejans if he said that "Carrie Clark was going to ruin the division?" Chief Baker responded, "As I recall, he did NOT admit to, um, saying that (Carrie) was going to ruin the Division."

See Chief Carsten's transcript where he says Langejans did admit to saying that

Also see Jeff Langejans transcript where he also admitted to saying that. (Page 13, Line 573-586) And memos from both Tom Sisterman and Gordon Clark referring to 1/27/15, referencing this topic.

Page 21, Line 915-941

Chief Baker and Chief Carsten met with Captain Langejans and Captain Clark (Gordon) in early December, Chief Baker says "he (Langejans) admitted to saying some things about Gordon. Um, but denied saying anything about his wife (Carrie)."

There are multiple areas, including Langejans own transcript where he admits to a lot of these things he denied to Chief Baker.  When I initially brought my concern to Chief Carsten, he told me after talking to Langejans "He said he never said anything about you, and he has no problem with you whatsoever."

Page 23, Line 1024-1049

Matthew Larsen asked Chief Baker if she thought the tension and struggle she mentioned would ease if Captain Langejans left the division. Chief Bakers answer was, "That's a good question. Well certainly in those that are effected or have been involved in this. Driving this, I do believe so. Yes, in their worlds, absolutely. I have no doubt."

This is one big reason why we feel our concerns were not taken seriously or addressed appropriately. If the environment could be improved for a minimum of five people by moving one, why would they not make that effort? Our concerns were ignored, and still have been today. Besides the five of us who voiced concerns, there were a minimum of at least three other employees who expressed concerns about working for him or had voiced their issues with him in the past.


In the transcript of Deputy Chief Mike Carsten:

Page 12, Line 515
Matthew Larsen is talking about the meeting that was held with the Union representatives present and says "And this memo kind of lays out that (Jeff) admitted to some things and my understanding is that you conducted a follow up conversation with (Jeff) regarding some of these allegations. Is that correct?" Chief Carsten responded, "I don't recall that"
In Chief Bakers transcript, Page 12 line 537, she was asked the same question and responded "I believe that Captain – or Chief Carsten spoke with (Jeff) – followed up on some of these, uh, items."

No one ever followed up with Jeff after this meeting with our Union Reps. The biggest allegation at hand was that Langejans made a statement to Tom Sisterman about "knowing how to kill his enemies and get away with it", while talking about Gordon. No one took Tom seriously and because Langejans denied saying that, the entire situation was ignored. Tom Sisterman to this day say's he would be willingly to take a lie detector test to prove he is telling the truth. This is a serious statement to make, and for the welfare of my family, I take this very seriously.
Page 12, Line 522-
Matthew Larsen asks Chief Carsten if he recalls Langejans being asked if he made statements regarding (Carrie) Clark cheating on the inspector certification test? Chief Carsten's said he answered "No, I never accused her of cheating on the promotional exam", Chief Carsten also said he asked "Did you ever allude to or state to somebody that you accused her of cheating?" to which he gave the same answer of no.
If you read both Tom Sisterman (page 13, line 560) and John Vincent's memos that were originally written, they both state that Langejans stated multiple times that he believes (Carrie) "cheated". If you also look at Chief Baker's transcript, page 11, she states, "I can tell you my opinion is as you connect the dots essentially he was pointing to Gordon could have given Carrie uh, information." When Larsen asked Langejans if he thought I (Carrie) cheated, his response was, "I would say it's highly likely." (Page 34, Line 1495)
Page 17, Line 716
"Out of all the people we interviewed which were-was close to thirty. Thirty-one. I think only five people admitted or thought that there was a hostile work environment. Everyone else had no problem coming to work."
If you count all 31 people interviewed, your including in those numbers, Captain Langejans himself, three different Chiefs, and a few secretaries, although two of the secretaries admitted to issues with Captain Langejans. Either way, at least five people expressed concern over their working environment, and it's being laughed off as no big deal because percentage wise we are the lesser number. I'm unsure as to how many people need to feel uncomfortable before something is actually done about it.

Page 23, Line 1029
Matt Larsen asked Chief Carsten if he thought the mood had changed around Prevention for the better since the conclusion of TFD's investigation.  Chief Carsten answered "So inspector Sisterman who submitted some memos concerning Captain Langejans, um, there was virtually no communication with them. Captain Langejans supervises Inspector Sisterman with the Haz Waste Program…..(line 1056) When this really started happening there was zero conversation between those two. Um, since, there has been some communication both via email. Just, you know, that-that they're communicating, and even verbally. So to me, someone who had a fairly critical role in this process submitted memos concerning Captain Langejans, it's nice to see that they're startin to open up and have some communication."
On a daily basis Tom expresses his discontent not only with this process but with this department. He has had no choice but to have to communicate with Captain Langejans because of work related issues.  I was in the office with Tom when he told Chief Critchley that he went and bought a gun because of his fear of retaliation from Captain Langejans. Critchley said he

would help moving Tom, but that has never happened. Tom's feelings towards Langejans have not changed.

Page 27, Line 1197

Matt Larsen asked Chief Carsten about a statement he made during a class Matt was giving to TFD one day prior to the EOPD investigation. "So the statement you made on the 23rd was that, "I don't know if we could afford to lose the continuity he (Langejans) brings to the division." Matt asks if that played into the decision of only giving a written reprimand. Chief Carsten answers "absolutely not."

I would not have expected any different answer other than no to be given, but I can personally attest that I was waiting around after Matt's class to ask a question about filing a claim against Captain Langejans, and Chief Baker and Carsten stayed after at least 20-30 min talking to Matt after the class. The simple fact that this was even mentioned alluded to me that their mind was already made up and there was no way Langejans was ever being removed from Fire Prevention.


In the transcript of Chief Jim Critchley:

Page 6, Line 251

Matt Larsen asks Chief Critchley if he thinks the behavior of Captain Langejans, as Matt described, was ethical. He answered "So I don't think that, um, that is- or I do think that is of an ethical concern because …as we go through it. I was – in this case, um, that was not what was being described to me. As a matter of fact I did not believe that, uh, they were made specifically to the Clarks."

Sometime in January, I, Gordon Clark, Tom Sisterman, John Vincent, and Joe Longo all sat in Chief Critchley's office and explained exactly what was going on and what had been said. I also met with Critchley two other times on my own, and other individuals talked to him privately as well about the things going on. There was no question from our end that these comments were made about us (Clarks), or that there was anything less than unethical behavior going on. If he was being misinformed about the content of this matter, it was not coming from anyone who had voiced these concerns.


Page 12, Line 500

Chief Critchley was talking to Matt Larsen about giving EOPD a heads up about this "And I just want to give you guys a heads up that I have a feeling it's gonna come across the street. I don't want to give you- I'm not asking you to make a ruling or anything like that on me. I would just like you to know this is what's happened so far."

I have a lot of issues with this situation in particular. When I first called Matt Larsen, he basically told me, look I have seen the files and I have the heard the situation, I actually have a copy of everything here on my desk. It sounds like your department has already done everything they could; unless you have something new to tell me then this is pretty much a closed case. If EOPD is where I go as an employee to report harassment or wrongful conduct, then why is my employer allowed to get a head start on me and voice their opinion before mine is ever heard? I told Matt I had a lot of concerns with what he told me and that I felt like he may not handle the situation as fairly as he should because TFD got to him first and told him their side.  I don't believe Matt should have been privy to TFD's opinion on a matter that hadn't even been filed yet, and also, shouldn't Matt have waited to hear TFD's side during his investigation and interviews?

Page 12, Line 535

Chief Critchley say's "Um, the concern was, "let's fix what's wrong instead of moving it- moving people to another area and not addressing the problem."

This is 100% not how TFD handles personality or personnel conflicts. If there is an issue between members at a station, someone is almost always moved. I brought this up to Chief Critchley because of another situation where two members had a personality conflict, and within

days one member was moved from his station to the other side of town. I believe this situation is more severe than the one I spoke of. I'm not sure how you fix the fact that a supervisor bashed me and my husband for almost a year's time. That this same supervisor told my co-workers I was a cheater, and that my presence in the division would bring down the morale. He also told one of the secretaries not to talk to me or trust me because I have a law suit against the city (Annette Lopez verified this in her interview), and then that secretary (Cathy Devine) told the same thing to others. He set me up for failure before I ever even arrived at my new position. I came back to work after just having a baby and I'm met with this negativity and lies that I didn't deserve. This is a supervisor who looked up articles about me on the internet in front of my peers and read the negative comments to get some enjoyment out of it. How do you fix that? The damage is done and I don't deserve to work in an environment with an individual who would do such things.

In the transcript of Tom Sisterman:
Page 8, Line 335
Tom went on to describe the incident at the Haz Waste yard when Captain Langejans went on a rant about Gordon, then stated "he thinks it would be very easy to kill his enemies and get away with it. And then he went on to say that he knew exactly what he would do, he'd thought about it a lot and as long as you do the right things and don't talk to any about it – anybody about it, it's easy to get away with."
There is no doubt in my mind that Captain Langejans would deny saying such a comment, but it seems to be a stretch to say that Tom made this up all by himself. This is a very serious allegation and you cannot take these remarks lightly these days. We have a family with two small children, so of course Gordon reacted when this was told to him. Everyone else seemed to quickly dismiss this issue when Langejans denied saying it. When I asked Matt about this specific issue he said Tom's story changed. Tom added one more reference that Langejans made during that conversation that he said he left out in his original memo because his wife said there was no need to bring that other employee into this conversation. Nothing changed about Tom's story. Tom stated that he told Captain Roger Tamietti about this conversation. Tom still says he will take a lie detector to prove he is telling the truth. . I also told Matt that Roger was someone he needed to interview that had pertinent information that was relevant to this investigation. Matt never interviewed Roger Tamietti.

Page 13, Line 564
Matt Larsen asks Tom to give details about Captain Langejans attacking inspectors, Tom says "So when she became first on the list, uh, the Inspector promotional list…, um, he started spreading rumors that he thought she cheated. " Tom verifies that he heard Langejans say this. Tom also goes on to say "Um, yeah, he said a lot of things about her. Um, there, you know, there was the whole controversy with her lawsuit for the, uh, the breast milk pumping room thing, um, he talked about that a lot.."
Everyone seemed to disregard the fact that the behavior of Captain Langejans went on for quite some time. Even in Matt's conclusion of the investigation he makes reference to Langejans making a few comments that he was regretful of. He made a lot more than a few comments and I believe the only reason he was regretful is because he was caught, not because he was sorry for his actions.

Page 15, line 675
Tom continued on to talk about the lunch room incident on December 4th. "..he started talking about the meeting, said how he was trying to get Gordon out of the division before (Carrie), uh, came into the division, uh, was – started talking about how he was telling the captains that the reason for poor morale in the division was because of the Clark's and John (Vincent) became frustrated and started talking back to Jeff and said, you know, the poor morale in the division isn't because of the Clark's, it's because of you all your drama, uh, because of you constantly

COT002346

attacking people, um, so he was the first person that really kinda challenged Jeff and that – that put Jeff of more on the defensive and I think he- since then he's been a lot more careful about who he say's things to." John Vincent also verifies this statement in his transcript (Page 3, Line 124)

Captain Langejans denied multiple times that he ever said anything about Carrie or the Clark's being the reason for poor morale or ruining the division. Chief Baker also stated that she recalled him DENYING saying Carrie was going to ruin the division or saying anything about Carrie at all. He did later admit to this in the meeting on 1/27/15, and also in his own transcript.
Page 21, Line 906

Tom goes on to say how Captain Langejans routinely went after people, and the atmosphere it created in the division. He also said "Um, before all this came to a head Jeff would just waste a lot of my time. He'd come and stand in the entrance to my cubicle and would stand there for a half hour just talking. You know, I wanna do my work and he's just standing there just talking bad about people."

Again, I'm not sure why when Inspector Sisterman reported that this behavior had gone on for some time, it was eventually only decided that Langejans made some inappropriate comments and he's regretful.  I feel that no one took Sisterman's comments seriously. This was not a onetime incident, but behavior that carried on for months.



If you read the transcript of Tom Sisterman you will see a pattern of Langejans behavior that is consistent with the accusations against him. I just happened to be the next one he came after, but I also happened to be one of the only ones to stick up for myself to this extent. Anyone else before me could have changed him with similar allegations but they didn't, and probably because, like this situation, nothing ever gets done or comes of it. Most everything Tom said about Langejans, he admits himself to some extent. I believe it's easy to see through Tom's interview that everything he said had a lot of truth to it. The only one lying was Langejans. There are a lot of things that both Sisterman and Vincent said that matched up and the only one who had a different story was Langejans.

In the Transcript of John Vincent:
Page 8, Line 332

John say's "I have a problem with my Supervisor. He's the one in the wrong. I'm the one trying to do the right thing…By standing up for other people and they're telling me I should demote."

When I spoke with Chief Critchley on one occasion about the ongoing issues, he made specific reference to Tom Sisterman and said "Well he can leave anytime he wants." Just like Vincent said, why should we be the ones to leave when we are not the ones at fault? That doesn't seem to be appropriate behavior from our supervisors or Chief Officers.

Page 22, Line 453
John say's "Just because I was moved to a different team with a different supervisor. But that doesn't change the fact that, uh, Captain Langejans is still in the building. He's still a Captain. He still has the authority to, uh, to order me to do things. He still has access to all of my reporting. Everything I put in the computer he has access to. So he's still a supervisor of the division. So I still – whether it's directly or indirectly I would still have to answer to him if it came to that And I – I don't feel safe with that."

This is exactly how I feel and a few others. This seems like it was never taken into consideration that the Supervisor that I filed a complaint against and others testified to his behavior, still has

COT002347

the power to supervise us. If moving Gordon Clark out for Nepotism was such a big issue, why wasn't this even bigger. We do not feel comfortable with the power he still holds over us.

In the transcript of Jeff Langejans:
Page 13, Line 561
Langejans is talking about the lunch room incident on December 4th, he says "And so, I jokingly said, we were reorganizing the division. And then (John) Vincent went off. I mean, basically, I got accused of that I was ruining the division and – and that, you know, I was attacking people and that I was targeting people and it – it actually got my hackles up which is why, probably why I don't remember a whole lot."
If you read John Vincent and Tom Sisterman's account of this same situation you will see that Langejans left out a pertinent piece of information and chose to lie about why John was upset.  It makes no sense for John Vincent to fly off the handle for a remark of "we were reorganizing the division."
Page 13, Line 573
Langejans continues on to say "But, I do remember talking about the fact that – that, uh, I was accused that I was telling everybody that (Gordon) and (Carrie) were gonna ruin the morale of the division. And, I've said that amongst my group of my teammates."
If you read Chief Baker's transcript, on page 9, line 395, she states that Langejans "uh, he-he denied that he said the Clarks are the reason for bad morale."
 Page 13, Line 580
Langejans was asked who he has made that statement to, and he went on to say "I don't know. I mean, I – we –we talk. We have team meetings, okay? So, in our team meeting, it's kinda like bein on a fire truck. Kinda like, the – the unwritten rule out there in – in the field is you know, if – if you gotta blow off some steam or you wanna say something, you don't do it in front of the public, and you don't do it anywhere you could get in trouble. But, inside the fire truck, there's – there's some latitude, and – and I, by my mistake, I took that latitude to my team meeting in an office setting."
I've never known of an unwritten rule where we were allowed or encouraged to trash talk our fellow employees. Whether on a fire truck or not, we are taught early on about unethical behavior. Here is a Supervisor not admitting that his behavior was wrong, but just that he said it in the wrong place. I've worked with other Captains who have immediately stopped people when negative comments or rumors are brought up. That kind of behavior we are told is not permitted and supervisors are the ones who should be putting a stop to it, not encouraging it or doing it themselves.
Page 14, Line 614
Langejans states "I – it's my feeling, and I've expressed this to Chief Carsten and Chief Baker, that this is no more than a conspiracy by (Gordon) Clark to railroad me because I called him out on the carpet about not doing his work in front of our people – our, uh, supervisors."
I think it's completely inappropriate and unprofessional for Langejans to "call him out" in front of their Supervisors. They are equal rank and responsibility and if Chief Baker or Carsten had a problem with Gordon, they could address him themselves. Also, when Chief Baker was asked if Gordon was fulfilling his duties as a Captain (page 21, line 943), she responded "yes." I think the only person trying to "railroad" anyone was Langejans.
Page 15, Line 673
Langejans say's "So when Chief Baker would say, "I want this many inspections, I did that. Well, at the same time, the other Captains weren't doing that. And so, I kinda put a target on my back because the next something that ultimately came out of this is that – that I targeted people. Well, no, I held my people accountable. I held my people to the standard that is written in the A.D's and in the Fire Department Manual of Op's."
One of Langejans employees wears cowboy boots as part of his daily uniform. That is not acceptable in any of our policies. Another of his employees routinely wore a t-shirt to line up

COT002348

which is also not part of our 8-Hour personnel attire of having to wear a collared shirt. Langejans wrote a memo about me through our chain of command because I had on my tennis shoes that I wear into work in the mornings at line up still on. This is why he is said to be targeting. His team violates policy, but the memo written was only in regards to me.

Page 17, line 761
Langejans talking about Gordon say's "And basically, where I got in his crosshairs is because I challenged him because he wasn't doing what he was supposed to do. I handed him Team 2, which was, to me, they were ship –in ship shape and performing at – at the highest level of all teams, and it changed over a year's time."
All of the "teams" in Fire Prevention handle different occupancies. Some do general inspections, so do new construction; others do just schools, etc. There is no way to say nor should you say that anyone is outperforming anyone else. We function as a team, and rely on each other to get the job done on a daily basis. He also mentions in his interview that he believes his inspectors now are the best we have in the division. I don't believe it to be appropriate for a supervisor to take something that' a team effort and turn it into a competition, it causes unnecessary resentment within the division.

Page 18, Line 777
Langejans states "I'm a little taken back that I didn't – I didn't go and talk to people when this – when the department did their investigation. I didn't go and try to get people on my side. I didn't go and try to tell people what to say, but I don't think that's how he reciprocated. I think that he coordinated everything and that's why you have this – this coordinated effort of people who are all- all tied together and they're all admitting that I said this or I said this, and quite frankly, with my timeline, it basically shows that this all started when they coordinated this all together. You know the fact that (Gordon) became the Eight hour coordinator. There was a –an inspector who wanted to be the eight hour coordinator and (Gordon) talked him out of it…"
If you read through Tom Sisterman's interview, he mentions that Chris Jurvig and Ken Brouillette are Langejans buddies. If you also read both of their interviews, Ken's especially, you can see there was a lot of influence that went into what they said. Ken is a civilian employee and rarely interacts with the majority of the inspectors because he is tied up with his own workload, but when being interviewed by EOPD he brought notes. Only those of us who were directly involved brought notes to our interviews, so I found it to be suspicious that Ken knew to gather up notes and bring them for reference to his EOPD interview. Ken also made a few comments in reference to Gordon that were not true. One example is that Ken stated he was looking for another job specifically because of Gordon. Ken has applied for no less than 10 positions outside of Arizona, more specifically, in Washington, since he arrived here three years ago. I mentioned this to Chief Critchley on Aug 19, that even though Gordon had been removed from Prevention, Ken was still applying for another job in Washington, proving that his reason for leaving was a lie. Langejans was the only one who tried to coordinate anything. I still remember the day that Gordon told me three different people had approached him at work and told him that Langejans was out to get him, and had been saying awful things about us. And I filed this complaint, not Gordon, and not because of any influence from Gordon, because I am tired of this behavior not being dealt with, so I filed a complaint.
In regards to the Eight-Hour Union position,  Andy Rico came to Gordon and said he didn't think he would have the time to put into being to coordinator right now, he expressed concern because he was having his first baby, he was taking a lot of time off work, and still trying to finish up his Paramedic certification. Gordon has been a long time active member on the Union board so he said he would do it for him. Andy Rico will verify this.

Page 23, Line 1022
Matt asks Langejans if he was told by anyone in his chain of command to leave (Joe)Longo alone, he say's "yes", by Chief Baker. Matt then say's "And then after you were told by Chief

Baker to leave him alone, did you have a meeting with your team at a restaurant, may have been IHOP and tell them that, essentially, you don't care you were told, you were gonna keep goin after him so long as he's breakin the rules?" Langejans say's "I –I don't know. I don't remember- I don't remember sayin that. I may have said that. I don't remember sayin that." Even though Langejans has been told before to back off of people, he won't. This is just one example. Chief Critchley also told me that he specifically told Langejans to knock off the behavior towards me of writing memo's, but that did not stop either. This is why I do not feel comfortable even being in the same room as him.

Page 29, Line 1295

Matt asked Langejans about some of the discriminating comments he made about women shouldn't be in the fire service after 40 years old, Langejans responds "Um, y-you know, you touched on something that0that would probably be my opinion, and I don't know if I made that comment, but my opinion is there's a physical difference between men and women. And as people age, men are far more capable than women when they work, but I don't know if I put a number, like 40 on something."

When Matt Larsen taught our class on appropriate work place behavior, he made the comment of; a comment doesn't have to be made to you for you to be offended by it. Being a woman on this job, I do take offense to his comments. There is no truths to saying all men are "far more capable" than women, because everyone excels at different times in their lives, so a comment like that just should not be made, especially by a supervisor. Marty Macias only read the transcript and made the determination that there was no discrimination present. I believe this to be a discriminatory comment and to fairly be able to rule out discrimination; Ms. Macias should possibly have conducted her own interviews.

Page 44, Line 1974

Langejans say's "I have become a victim in-in what's resulted after the department disciplined me. And, so, I don't – I hope you remember this, but I wrote it down because I was shocked that-that (Carrie) would say this, and I think it goes a long way to explain, I know she likes to pretend that she's the victim, but, do you remember her –you were role playing. You tried to engage people in the class and she says, "I'm sure you've heard of us, were the Clark's."……..(line 1990) Okay, so I thought that was pretty brazen and somewhat disrespectful, but I also have documented when she's walked down the hall and she looks right into my office and looks me right in the eyes. So for her to pretend that I'm intimidating or treating her in any way that's not – that's not worthy of a city employee."

What Langejans failed to mention was that during that class Matt was asking us to introduce ourselves, when I said my name is Carrie Clark, Matt immediately says "Carrie Clark, yes, Carrie Clark", I felt embarrassed that he was calling me out like he had already heard of me so I responded with, "Yes, I'm sure you've heard of me, we're the "Clarks" "

I also avoid having to walk anywhere near his office when at all possible, but too often, I have run-ins with him in the hall. I don't pretend to be intimidated, I do feel intimidated. Here is a guy who is at least 6'5" and towers over me, and he finds the need to stare me down until I am out of his sight every time I see him, but to call me "not worthy of a city employee" is out of line, and inappropriate.

I apologize for the lengthy memo, I just feel as though my concerns have been ignored. I wanted to include as much information as possible in case this is the only thing anyone reads.  When I tried to file a Retaliation claim a few weeks back, I was told my claim was denied because it affected my husband and not me.  I was also told my time frame had expired for being allowed to file a claim. I have a huge amount of concern, stress, and disappointment every day, and my working environment has not been healthy in a very long time now. This problem cannot be ignored, and it will not go away with time like everyone had hoped.

COT002350

Thank you for taking the time to read this. I feel there is enough evidence of untruthfulness just outlined in these interview transcripts to question why nothing has been done about this. I enjoy my job, and I just want to come to work and feel comfortable every day. My environment has been so tarnished over the last year; I don't feel it's allowing me to put my focus where it needs to be, as well as others.

Thank you

COT002351

# EXHIBIT 59

AD 2.02-4, ATTACHMENT A

Complaint Tracking #:_____          Date Received:_____
Assigned to:_____

## CITY OF TUCSON
## WRONGFUL CONDUCT COMPLAINT FORM

In accordance with Administrative Directive #2.02-4, employees and members of the public who reasonably believe or have evidence of wrongful conduct on the part of a public official or city employee are encouraged to report such allegations to the City Manager's Office or other designated city official.  Wrongful conduct is defined as mismanagement, gross waste of monies or an abuse of authority, or violation of any law on the part of any city official(s) or city employees(s) that is reasonably believed to be of public concern.

Complaints must be filed within 90 calendar days of the date you became aware of the alleged violation.

I.    Complainant Information:

Name:_____Carrie Clark_____

Home Address:_____          City/State/Zip:_____

Home Phone#:_____          Alternate Phone#:_____

FOR CITY EMPLOYEES

Current Job Title: Fire Inspector    Department: Prevention

II.   Please describe the nature of your allegation, providing as much supporting detail as possible including the date and/or time frame within which the violation(s) occurred .

_____please see attached_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

COT002794

COT HR MAR 9 2016 AM 9:2

AD 2.02-4, ATTACHMENT A

III.   NAME, ADDRESS AND TELEPHONE NUMBER OF ANY PERSON(S) WHO HAVE
       DIRECT KNOWLEDGE OF THE EVENTS LISTED ABOVE:

Name: _Rachel Duarte_____

Address:_____ City/State/Zip:_____

Telephone#: _837-7079_____ Alternate#:_____

Name: _Dominic Cuffel_____

Address:_____ City/State/Zip:_____

Telephone#: _837-7111_____ Alternate#:_____

Name: _John Vincent_____

Address:_____ City/State/Zip:_____

Telephone#: _837-7125_____ Alternate#:_____

Name:_____

Address:_____ City/State/Zip:_____

Telephone#:_____ Alternate#:_____

Signature: _Carrie Clark_____ Date: _3/9/16_____

March 9th, 2016

Good afternoon,

I am writing this to file a complaint of mismanagement and misconduct.  In early 2015, I filed a complaint of misconduct against Captain Jeff Langejans. After an approximate 6 month investigation, he was found to be guilty of misconduct and some recommendations were made by OEPD to TFD regarding discipline and the failure to do a proper investigation.  Throughout July and August of 2015 I met with Chief Critchley multiple times to express my concerns and issues with the way Jeff Langejans was conducting himself toward me. I was told multiple times by Chief Critchley, Chief Carsten,  and Chief Baker that Jeff Langejans was told to stop "staring me down", and to stop "writing memos" that were targeting me specifically.  My concerns were disregarded, and as recently as Feb 29th, 2016, Jeff Langejans continues to stare me down in an intimidating manner any chance he gets.  This had also been confirmed by Rachel Duarte, a Fire Prevention secretary, who witnessed this behavior before and referenced by other inspectors in their OEPD interviews last year.   This same secretary has recently sent emails regarding Jeff Langejans behavior and inconsistent following of policies, and has been met with the same intimidating stares. She said she has brought issues regarding Jeff Langejans to the attention of different supervisors in our chain of command and has also been ignored.

On January 7th, my husband, Gordon Clark, was talking to Battalion Chief, Casey Justen (Who was Gordon's supervisor at the time), and was  told that Jeff Langejans had approached him **on duty** over at Station 1, and proceeded to tell him that my husband was a poor leader and that he was the reason for all the problems in Fire Prevention, Langejans also told Casey Justen he believed I cheated on the promotional exam for Fire Inspector and there's no way I could have been number 1. I ran into Chief Baker the next day (January 8th) and told her this information. She did everything she could to defend the situation, even telling me that it probably happened back in 2014 before this investigation had taken place. Based on some of the statements Langejans made to Chief Justen it was clear these statements were made more recently.  Chief Justen had also made a comment back in August of 2015 to one of the Fire Investigators that "Gordon isn't someone you want on your bad side". She told me she would follow up, and I've never heard back since.

I have brought a few other instances to the attention of my supervisor because I feel his intimidating behavior, and slandering of both my husband and I has not stopped.  My concerns continue to be ignored.  On Feb 29th, 2016, he was walking down the hall opposite from me, he stared at me again, without ever breaking eye contact, no matter where I tried to look, he continued to stare.

Last week one of his inspectors, who is new to Fire Prevention as of September, told me that Jeff Langejans has spoken with him, and discussed the history between Jeff Langejans and myself, in regards to the complaint I filed against him.  He has no business again, as a supervisor especially, talking about a situation to one of my peers and a subordinate to him. He so badly wants to play the victim card, that he is trying to gain sympathy and turn everyone against my husband and I. Jeff Langejans stated in his OEPD interview that he "hasn't gone out and tried to gain supporters", and that when people contact him he says "I can't talk about it". He is being untruthful, and the last 2 people to come forward with

information that he has said proves that to be untruthfulness. This is not the first lie he has told, and I outlined that in my previous complaint of mismanagement, but nothing has been done about his untruthfulness.

Regardless of having a lawsuit filed against the city, I don't feel that I should be subjected to work in an intimidating and hostile atmosphere. If we had supervisors that were doing their jobs and being held accountable for their actions, I don't feel that I would be involved in Litigation, but it's situations just like this that continue to be ignored . I worked hard to get to this position, and truly enjoy what I do. Leaving prevention is not the answer for me, but again, having to work for/around someone who multiple people complained about creating a hostile environment is not appropriate.

In regards to the memo Jeff Langejans wrote regarding my adherence to the uniform policy, I have both documented and reported one of his subordinates who did not conform at all to our uniform policy on a daily basis, wearing both civilian clothes and cowboy boots. I am including this information to show both that, he was targeting me individually and secondly, that this employee still wears cowboys boots to this day and nothing has been done by either Langejans or anyone else in our chain of command.

This same inspector, who is under the supervision of Jeff Langejans, has managed to rack up 23.5 hours of overtime, when only 2 opportunities of 4 hours or less have been offered to the rest of the division. It is not consistent or equitable as it applies to overtime opportunity, and although not every inspector is qualified for certain inspections, enough are and should be offered the same opportunity for overtime. Many issues have been brought forward regarding this same employee of Jeff Langejans that have to deal with conflict of interest, unethical behavior along with some other questionable issues including ignoring life safety violations found at certain businesses. These concerns have also gone unrectified.

We also have another inspector down here, who state's she is on light duty, although Telestaff does not reflect this, that wears civilian clothes and flip flops to work every day. She is also driving a city vehicle to and from work and parking this truck at her house, although has been told not to in the recent past. All the supervisors are aware of her flip flops, which are in clear violation of TFD policies and City Policies, but no one has addressed this issue either.

Once again, I just want to reiterate that I am not filing this report to essentially complain about another employee, I am writing this because this behavior has been addressed before but still continues and administration doesn't seem to want to address it.  Issues were also brought forward by other inspectors and our Fire Prevention secretaries, but our concerns continue to go ignored. I have had others express to me their concern over filing a formal complaint because they watched what happened in my situation and fear nothing will be done except placing a target on their back. Selective enforcement of our policies and inconsistent handling of discipline has been causing problems for some time.

Thank you again for taking the time to read this. I understand from before that you are unable to speak with me, but I have advised our Union President, Josh Campbell, about this complaint, and if you have any other questions, he can probably facilitate any communication that is needed.

Thank you!
    Respectfully,
        Carrie Clark

COT002797



# MEMORANDUM

DATE:   April 22, 2015

TO:   Mike Carsten
      Deputy Chief/Fire Marshal

FROM:   Jeff Langejans
        Captain

SUBJECT:   Response to Complaint

Today while I was in my office Carrie Clark walked by and looked right at me. I know this may seem childish but I believe it is pertinent in the fact that if I truly was creating a hostile work environmet for her she would probably avoid any eye contact with me. I feel as though she is trying to intimidate me.

On another note, Carrie came to line up out of uniform. She was wearing tennis shoes which does not meet uniform policy. She was also reading the newspaper during line up. I don't bring this up to complain, only to demonstrate her defiance and disregard to conform to department policy. This is not the behavior of someone who is intimidated by anyone and shows a lack of respect.

| Tucson Fire Department Manuals | Section 214 Discipline |
|---|---|
| Tucson Fire Department Manual of Operations | Revised: October 14, 2009 214.4 Responsibilities |

**Discipline**

214.4  Responsibilities

1.  All Members

   a.  Every member of the TFD, regardless of rank or position, is expected to behave in a professional manner, on and off duty, which reflects the department's mission, values, and purpose. Every member is responsible for observing the Rules of Conduct as listed below. Failure to do so may result in disciplinary action ranging from verbal counseling to discharge.

   b.  Shall abide by all local, state, or federal laws. Employees arrested or charged with a crime shall report the incident to their supervisor by the next working day (within 24-hours). Employees have a continuing obligation to report new developments on any matters previously reported.

   c.  Rules of Conduct

   The following list of Rules of Conduct is not all inclusive.

   All members shall:

   i.  Follow all Tucson Fire Department, City of Tucson, and Civil Service rules and regulations, administrative directives and policies.

   ii.  Effectively use their training and capabilities to provide aid to the public at all times, both on and off duty.

   iii.  Work competently and operate effectively in their assigned positions.

   iv.  Always conduct oneself in a manner on and off duty that will not discredit the Department.

   v.  Manage responsibilities and duties in an effective, considerate and cooperative manner.

   vi.  Maintain competency levels and certification in regard to the execution of their duties and responsibilities.

   vii.  Be respectful and conscientious of each member's welfare.

   vii.  Follow all safety regulations and standards.

   viii.  Maintain health and fitness standards required to perform job duties.

   ix.  Observe the work hours for their positions and assigned work location.

| **Tucson Fire Department Manuals** | Section 214 |
| --- | --- |
| | Discipline |
| Tucson Fire Department | Revised: October 14, 2009 |
| Manual of Operations | 214.4 Responsibilities |

x.   Obey the law.

xi.   Avoid misuse or abuse of department equipment and property.

xii.   Avoid conduct that may create a conflict of interest or create the appearance of personal gain or influence.

xiii.   Avoid alcoholic beverages, debilitating drugs, or any substance which could impair their physical or mental capacities while on duty.

xiv.   Report any prescription drugs that may affect performance.

xv.   Not fight.

xvi.   Not steal.

xvii.   Not engage in sexual activity while on duty.

2. Battalion Chief, Captain (Supervisors)

a. Supervisors are responsible for assigning, reviewing, and evaluating the performance of their subordinates, as well as managing leave requests, resolving grievances and maintaining proper conduct and discipline among members of the unit.

b. Supervisors shall:

i.   Keep members of the unit informed of rules, regulations and standards of conduct, and maintain discipline according to policy and established procedures.

ii.   Ensure subordinates receive education, training and counseling in an effort to preempt possible violations of rules, regulations and standards of conduct. Using the Employee Counseling Form (Appendix C) is a great tool that supervisors can use to document this form of educational counseling.

iii.   Employ non-disciplinary efforts such as verbal counseling, which shall be documented on the Employee Counseling Form (Appendix C), Work Improvement Plans, special evaluations, mentoring and remedial training, whenever possible.

iv.   Gather, analyze, and carefully consider available facts and circumstances before taking or recommending disciplinary action.

| **Tucson Fire Department Manuals** | Section 214 |
| | Discipline |
| Tucson Fire Department | Revised: October 14, 2009 |
| Manual of Operations | 214.4 Responsibilities |

      v.  Forward recommendations and Disciplinary Action Checklist to the appropriate Deputy Chief for any discipline involving a written reprimand or greater.

      vi.  Prepare to defend any disciplinary action.

      vii.  Maintain the confidentiality of personnel documents and files to the extent required by law. Employee personnel files shall be secured in a locked cabinet or desk.

3. Deputy Chief

    a.  Will ensure that proposed disciplinary packets are complete and will assist supervisors as needed.

4. Assistant Chiefs

    a.  Provide advice and assistance on proposed disciplinary actions to supervisors. They will ensure that disciplinary packets are complete and will notify the Disciplinary Review Board (DRB) Chairperson of pending discipline for all discipline involving Written Reprimand or greater.

5. Fire Chief

    a.  Oversee the administration of disciplinary actions within all units of the department and make the final determination of all levels of discipline. All discipline is the ultimate prerogative of the Fire Chief who may deviate from this matrix as conditions and circumstances warrant.

C.  Disciplinary Review Board Procedures

    1.  The function of a Disciplinary Review Board (DRB) is to review recommendations of discipline (written reprimand or greater). The DRB will review the recommendations that have been submitted up through the chain of command. The DRB will take into consideration all the facts and may investigate, interview, and research further when required. The DRB will then prepare a written recommendation to the Fire Chief, via the appropriate Assistant Chief, which will explain their findings and recommendations. The purpose of the DRB is to ensure fairness and consistency in regard to discipline throughout the department.

    2.  The following is a list of suggested steps that should be taken in conducting a Discipline Review Board. The DRB process will work as follows:

        a.  All board members should serve a minimum of two years for continuity purposes.

| **Tucson Fire Department Manuals** | Section 214 |
|---|---|
| | Discipline |
| Tucson Fire Department | Revised: October 14, 2009 |
| Manual of Operations | 214.4 Responsibilities |

    b.  To be eligible for membership on the Board, an employee must:

        i.  Be a permanent employee for a minimum of 12 consecutive months; and

        ii.  Not have any adverse actions within the past two years.

    c.  The board membership will be made up of volunteers from the following ranks appointed by the senior Operations Deputy Chief in conjunction with the Local 479 President:

        Operations Deputy Chief (plus one alternate) Chairperson
        Battalion Chief (plus one alternate)
        Captain (plus one alternate)
        Paramedic (plus one alternate)
        Inspector (plus one alternate)
        Engineer (plus one alternate)
        Firefighter (plus one alternate)
        Union Designee (plus one alternate)
        The Department's Human Resources Manger will serve in an advisory capacity.

3.  The senior Operations Deputy Chief will be the Chairperson and will be responsible for working with the Local 479 President in selecting board membership and replacing board members when needed.

4.  The board's formation will be made up of 3 board members, selected by the Operations Deputy Chief, and should be based on the individual being recommended for discipline. Members of a Disciplinary Review Board should not normally be of a lower rank than the employee under review. The Department Human Resources Manager will be present at all boards to oversee and advise.

5.  The DRB will review the discipline recommendations that were forwarded through the chain of command. The DRB will take into consideration all the facts and may review all documents related to the discipline.

6.  The board will review the employees' departmental personnel record and any other counseling submitted by supervisor to determine if the discipline is a first, second, or third similar violation in accordance with the disciplinary matrix to determine appropriate level of discipline within the matrix guidelines.

7.  The board will then determine if the submitted recommendation is consistent with the departments discipline matrix and policies.

8.  The DRB will then prepare a written recommendation to the Fire Chief of their findings via the appropriate Assistant Chief.

| Tucson Fire Department | Section 203.12 Light Duty |
|---|---|
| Manual of Operations Page **1** of **4** | Revised:  December 30, 2010 |

203.12     Light Duty

    A. In accordance with Administrative Directive 2.02-21, light duty is temporary work that is physically or mentally less demanding than normal job duties.  Light duty is intended for employees recovering from a medically documented mental or physical illness or injury sustained on-or-off-the-job, which has work restrictions, and who are expected to eventually return to unrestricted work.

       1. Assignment of light duty is not a right of employment.  As long as necessary and meaningful work is available and able to be performed, light duty is allowed with the approval of the Fire Chief.  The decision of the Fire Chief regarding light duty and assignments is not subject to grievance or appeal.

       2. In assigning light duty the employee's skills and abilities, past performance records and history of unscheduled absences may be considered.

       3. Previously approved outside employment shall be reviewed by the supervisor for possible conflict with the medical work restrictions.

203.12.1    Light Duty for On-the-Job Illness or Injury

    Employees who have temporary work restrictions resulting from an on-the-job illness or injury must have a release from the City Physician for light duty specifying the work restrictions.

203.12.2    Light Duty for Off-the-Job Illness or Injury

    Employees who have temporary work restrictions resulting from an off-the-job illness or injury must submit a light duty request, by memorandum, from the employee to the Fire Chief through channels.  The request shall include the estimated duration of light duty and a brief explanation of limitations.  The memo must be supported with a documented work status release from the attending physician that includes the work restrictions.

203.12.3    Off-the-Job Light Duty Request Evaluation

    A. Off-the-job illness or injury light duty requests will be evaluated on the following criteria:

       1. Availability of light duty work is based on the Department's needs.  If there is limited light duty work available, preference will be given to those employees who possess the required skills and abilities related to the light duty assignment.

       2. Via the routing process, supervisors will make recommendations to the Fire Chief.  The Fire Chief will have the ultimate authority to approve or deny the request.

| Tucson Fire Department | Section 203.12<br>Light Duty |
|---|---|
| Manual of Operations<br>Page **2** of **4** | Revised:  December 30, 2010 |

    3.  Employee notification of the approval or denial of the light duty request will be made by the Human Resources Manager.

    3.  Assignment of light duty is not a right of employment.  Decisions regarding light duty assignments are not subject to grievance or appeal.

203.12.4    Light Duty Assignment

    A.  A review of all sections within the Fire Department will be conducted by the Human Resources Manager to determine the availability of light duty work.  Assignments will be made based on the Department's needs and employee's skills, abilities and limitations.  Work hours for light duty assignments are Monday through Friday, 8:00 a.m. to 5:00 p.m.  The normal routine of the work unit will be followed regarding lunch hour and breaks.

    B.  The Department has limited divisions that can accommodate light duty assignments.  The following division(s) can accommodate a maximum of the following:

        Training (2)
        Cost Recovery (2)
        Logistics/Maintenance (1)
        Prevention (1)
        Emergency Management (1)
        Special projects (when required)

    C.  Once these positions are full or not acceptable due to light duty limitations the Department Human Resources Manager will coordinate with the City of Tucson Human Resources Department to find a light duty assignment within one of the City of Tucson's Departments.  The employee will have the option of accepting such an assignment or using their own leave time.

203.12.5    Light duty assignment guidelines and requirements:

    A.  Uniforms

        Light duty personnel will wear the Tucson Fire Department uniform unless restricted by cast, braces, crutches, etc.

    B.  Supervision

        Employees on light duty will be supervised by the supervisor of the work unit where the employee is assigned light duty.  Supervisors are responsible for monitoring the productivity of employees while in light duty assignments.

COT002804

| Tucson Fire Department | Section 203.12<br>Light Duty |
|---|---|
| Manual of Operations<br>Page **3** of **4** | Revised:  December 30, 2010 |

C. Evaluations

If an employee is due a performance evaluation while on a light duty assignment, the employee's normal supervisor will complete the evaluation with input from the light duty supervisor.  Work performance evaluations will address the employee's job duties while on light duty.

D. Probationary Employees

Probationary employees who are assigned to light duty in excess of three (3) consecutive weeks will have their probationary period extended by the amount of time that the employee was unable to perform all their assigned duties.

E. Absences

1. Personnel will keep the assigned supervisor informed of all requests for leave time including scheduled doctor appointments and physical therapy appointments.  For personnel with on-the-job injuries, doctor and physical therapy appointments should be scheduled during work hours if possible and will be charged AC (accident compensation) for the amount of time not at work.  For personnel with off-the-job injuries, sick leave or vacation will be used for doctor and physical therapy appointments scheduled during work hours.

2. Overtime is not paid for doctor and physical therapy appointments that occur outside the employee's work hours.  Work status reports are provided to employees at each doctor's appointment.  The employee will notify the supervisor and the Department Human Resources Manager of their work status after each doctor's appointment and provide a copy of the work status report.  Verification of physical therapy appointments will also be provided.

3. The attendance of light duty personnel will be recorded on the Time Worked Record of the assigned work unit.  For TeleStaff, the employee will be removed from their regular assignment and be placed in the assigned work unit for light duty.  Leave usage must also be recorded in TeleStaff utilizing the administrative temporary 8-hour leave codes.

F. Physical Fitness

Uniformed employees, with on-the-job injuries wishing to participate in the Department's fitness activities must have a written approval from the City Physician if their injury or illness is work related.  While on a light duty schedule, personnel will follow the Physical Fitness Program guidelines for staff uniformed personnel provided in the Manual of

COT002805

| Tucson Fire Department | Section 203.12
Light Duty |
|---|---|
| Manual of Operations
Page **4** of **4** | Revised: December 30, 2010 |

Operations, Section 7-209. Physical Fitness for personnel with an off-the-job injury is not authorized during normal working hours.

G. Training

While in a light duty assignment, attendance at continuing education (CE) classes or at the semi-annual drill (SAD) will be when the group they are normally scheduled with attends, provided work restrictions allow participation. If the employee is not able to attend on the day originally scheduled, it will continue to be the employee's responsibility to find an opportunity to attend.

203.12.6     Revocation of Light Duty

Revocation of light duty may occur for lack of performance, violation of Tucson Fire Department policies and procedures, or at the completion of a project or assignment.

| Tucson Fire Department Manuals<br>Manual Change | Section 209<br>Uniforms |
|---|---|
| Manual of Operations<br>Page **1** of **11** | Revised: 07/01/13 |

209          **Uniforms**

209.1        **General Policy and Definitions**

209.1.1      Dress uniform or Class A's  is defined as the 100 % Nomex button-up shirt, long or short sleeve, and 100% Nomex pants with the navy blue TFD 100% cotton tee shirt.  This is considered the day-to-day duty uniform. Some functions may require clip on tie.

209.1.2      Ceremonial Dress Uniform is defined as the poly/wool blend coat, pant with white long sleeve shirt with tie.  The Ceremonial Dress Uniform also includes the matching hat and patent leather shoes.

209.1.3      Uniform employees of the Tucson Fire Department are the sole individuals authorized to purchase and/or wear garments or accessories, which are included in the City/Department clothing contract.  Employees shall be required to provide Department I.D. cards to contract vendors in order to purchase said items.

209.1.4      Required uniform garments and accessories shall be maintained in good condition at all times.  Immediate supervisors shall be responsible to verify and enforce uniform condition and policy at all times.

209.1.5      Employees are prohibited from wearing uniform clothing while off duty.

209.1.6      Employees performing standby relief shall be required to wear the uniform prescribed for the on-duty members.

209.1.7      Uniforms are not required to be worn by personnel during the morning relief period.  Response to emergencies during this period however, shall require the prescribed uniform, including safety shoes and all necessary protective gear, changing from street clothes to uniforms during this time period shall not result in a delayed response.

209.2        **Uniform Standards**

The following section lists standard approved clothing items for all department personnel:

209.2.1      General Uniform Standards

A.  Shirt, Men's 100% Nomex uniform dress shirt, short sleeve Navy Blue.

B.  Shirt, Men's 100% Nomex uniform dress shirt, long sleeve Navy Blue.

C.  Shirt, Women's 100% Nomex uniform dress shirt, short sleeve Navy Blue.

D.  Shirt, Women's 100% Nomex uniform dress shirt, long sleeve Navy Blue.

COT002807

| Tucson Fire Department Manuals<br>**Manual Change** | Section 209<br>Uniforms |
|---|---|
| Manual of Operations<br>Page **2** of **11** | Revised: 07/01/13 |

E.  Men's 100% Nomex uniform trousers.

F.  Women's 100% Nomex uniform trousers.

G.  Chief officers may wear either blue Nomex or White 100% cotton button up shirt.

**209.2.2     Alternatives**

A.  Shirt, casual, polo style, white, 100% cotton, pique mesh, 4 button placket, short or long sleeve.

B.  Shirt, casual, polo style, navy blue 100% cotton, pique mesh, 4 button placket, short or long sleeve.

NOTE: As a dress-down alternative, operational personnel have the ability to wear the authorized tee shirt during approved day to day functions.  The polo shirt will be the dress-down alternative for the collared shirt.

209.3     **Uniform Inspection Policy**

A uniform inspection is to be completed by the Battalion Chief or Deputy Chief supervising uniformed members.  Inspection shall occur after March 15th and before May 1st of each year.  A uniform inspection form shall be completed by each BC or DC.  All uniformed members are required to have each of the items listed above, available and in good condition for the inspection.  (refer to "S" drive FORM for the uniform inspection form)

209.4     **Uniform Wear Policy**

The following section outlines policies for the proper wearing of each garment.  Any change in the specified policy must be approved by order of the Fire Chief.  Requests for approval of changes in policy shall be considered if a majority of personnel affected are in agreement.

209.4.1     Shirts

A.  The uniform dress shirt shall be worn by all company members when involved in public interaction activities requiring a more businesslike appearance, i.e. scheduled fire prevention and pre-plan inspections, When attending classes or visiting Fire Central (FHQ), non-TFD classes, base hospital tape reviews, scheduled public activities, funerals, etc.  All members shall maintain at least two clean uniform dress shirts at the station per shift.

B.  All personnel may wear the Navy Blue or White (Chief Officers) polo shirt in place of the dress shirt.  When approved by the company officer or their division AC or DC.

| Tucson Fire Department Manuals<br>**Manual Change** | Section 209<br>Uniforms |
|---|---|
| Manual of Operations<br>Page **3** of **11** | Revised: 07/01/13 |

209.4.2    Trousers

The 100% Nomex trouser is the sole pant available for use by Department personnel.  This trouser shall be worn as the primary garment for both routine duties and emergency responses, with the exception of fire incidents, where turnout clothing becomes the primary garment.  The 100% Nomex trouser shall be the standard for all uniformed personnel.

209.4.3    Safety Shoes

The Department recognizes and adheres to the City safety shoe program and contract.  The Department specifies shoe standards and styles, but not brand name, as determined by job hazard assessment.  Personnel should refer to City Administrative Directive 2.03-3 for program details.

209.4.4    All Weather Jackets.

A. All uniform personnel shall wear the Navy Blue/Black High viz reversible Jacket.  The jacket shall be purchased only through the Department's formal uniform clothing vendor.  Members are authorized to wear existing jackets previously approved provided the jacket is in good condition.

B. All uniform personnel shall be authorized to wear a bright yellow vinyl raincoat.  The jacket shall be purchased only through the Department's formal uniform clothing vendor.

209.4.5    Exercise Attire

Approved exercise attire shall include the following garments: navy blue cotton/nylon shorts, long and short sleeve tee shirts, sweat shirts and pants, baseball cap, and athletic shoes.  All clothing in this section except shoes shall be purchased through the Department's contract vendor for casual clothing.  Members are authorized to wear existing exercise attire previously approved provided the garment is in good condition.

209.4.6    Sleeping Attire

Approved sleeping attire shall include the TFD authorized navy blue cotton/nylon shorts and navy tee shirt.

209.4.7    Badges, Name Plates and Accessories

A. Badges

1. Uniform personnel shall display the badge only on the left breast of the dress shirt or all weather jacket.  Whichever is the outmost garment at the time.  The badge shall be displayed at all times when these garments are worn.

| Tucson Fire Department Manuals<br>**Manual Change** | Section 209<br>Uniforms |
|---|---|
| Manual of Operations<br>Page **4** of **11** | Revised: 07/01/13 |

2. Badges attached to belt clips are authorized only for uniform personnel assigned to 8-hour staff positions. This authorization shall apply to all ranks.

3. Badge Patches sewn onto Jackets are acceptable replacement for original Sun badges, additional/duplicate sun badges may only be purchased through fire supply.

B. Nameplates shall be made of metal, names shall include the first name or initial followed by the last name. Name plates shall be worn on the right side centered above the pocket. Nameplates shall be worn on the outmost garment at all times. Nameplate for Captain and below shall be silver in color. Nameplate for Chief officers shall be gold in color.

C. Approved shirt patch and accessories include the TFD patch, personal and unit citation pins, and ECAP pin. No other insignia, emblem, button, pin or other adornment shall be attached to the uniform shirt without the authorization of the Fire Chief.

D. Collar insignias may be worn on dress uniforms, Crossed bugle for Chief Officers, two bugles for Captains and single bugle for Engineers. When wearing collar insignias they are to be of equal distance from both sides of the point of the collar with the bugles facing down.

E. Caps, Formal Ceremonial Hat, Baseball cap, Boonie Hat and Beanies.

1. The authorized TFD covers may be worn by uniform personnel during routine activities as approved by the company officer. Use of the cap shall be consistent with maintaining the professional stature and dress standards of the Department and shall be worn in consideration of etiquette customary to the accessory.

2. The cap shall not be worn while off duty and shall be purchased only through the Department's contract vendor for casual uniform clothing.

3. Socks

F. Individuals wearing low top approved safety shoes or low cut safety shoes will be required to wear a Black or Navy blue sock as the outer most sock as not to see any of the white sock.

209.4.8    **Civilian Clothing**

A. Civilian clothing may be worn by staff personnel of all ranks and individuals on special duty assignments as an alternative to the standard Department uniform.

B. Sole approval for use of this option shall be by authorization of Division Assistant Chiefs for their respective divisions.

Case 4:14-cv-02543-CKJ   Document 116-6   Filed 08/18/17   Page 64 of 140

| Tucson Fire Department Manuals<br>**Manual Change** | Section 209<br>Uniforms |
|---|---|
| Manual of Operations<br>Page **5** of **11** | Revised: 07/01/13 |

C. Civilian clothing standards shall be established by Division Assistant Chiefs and shall remain consistent with the policy of maintaining the professional image of the Department at all times.

209.4.9    **Uniform Clothing issue**

A. Turnout/PPE Clothing-Original Issue
All uniform personnel shall receive the following clothing and equipment as original issued at the beginning of their academy training period:

1.  1 ea.  Turnout ensemble (coat and pants)
2.  1 ea.  Boots, leather or rubber, steel toe/shank
3.  1 ea.  Helmet, firefighting style w/faceshield
4.  1 pr.  Gloves, firefighting style, fire resistant
5.  1 pr.  Gloves, leather work
6.  2 ea.  Nomex Hood
7.  1 ea.  SCBA Mask
8.  1 ea.  SCBA Bag
9.  1 pr.  Plastic safety Glasses
10. 1ea.   Nylon webbing for rescue harness

B. Academy Recruits

Academy recruits shall be measured for and recieve the following complement of uniform clothing at the beginning of the training period:

1.  2ea.   100% Nomex Short sleeve shirt (without shoulder patch)
2.  6 ea.  Red tee shirts
3.  2 pr.  100% Nomex Navy blue trousers
4.  1 ea.  All weather jacket (without shoulder patch)
           Seasonal
5.  1 ea.  Jacket liner, Seasonal
6.  1 ea.  Black belt, no buckle
7.  1 ea.  Exercise shorts
8.  1 pr.  Safety shoes
9.  1 pr.  Sweat pants and Long sleeve shirt.

C. Academy Graduates

Academy graduates shall be issued the following clothing and equipment items at the completion of the training period:

| Tucson Fire Department Manuals<br>Manual Change | Section 209<br>Uniforms |
|---|---|
| Manual of Operations<br>Page **6** of **11** | Revised: 07/01/13 |

    1.  Uniform Vendors

        a.    2 ea.    Short sleeve, 100% Nomex shirt
        b.    4 ea.    Navy Blue tee shirts
        c.    2 pr.    100% Nomex Navy Blue trousers
        d.    1 ea.    Navy blue tie, Female crossover tie, black(optional)
        e.    5 ea.    TFD Patches
        f.    5 ea.    EMT or Paramedic Patches
        g.    1 ea.    Silver metal name Tag

    2.  Supply

        a.    1 ea.    Badge
        b.    1 ea.    ID card
        c.    1 ea.    Flashlight
        d.    1 ea.    Fanny pack
        e.    1 ea.    Ear protection
        f.    1 ea    Respirator
        g.    1 ea    Shift calendar
        h.    1 ea    Helmet sticker
        i.    1 ea    Vehicle sticker
        j.    1 ea    Station locker key

D.  Fire Inspector
    Upon promotion to the rank of Fire Inspector, the following items shall be issued:

    1.  pr.    Coveralls (Haz, Waste only)

E.  Battalion Chief

    1.  Upon promotion to the rank of Battalion Chief, the following items shall be issued by the Department:

        a.    1 ea.    White dress hat
        b.    1 pr.    Brass collar pins for ceremonial dress uniform coat
        c.    1 ea.    Brass name plate
        d.    1 set.    Gold detailing for ceremonial dress uniform coat

    2.  The following items are considered part of the optional Chief Officer uniform, but shall be provided at officer expense:

        a.    White casual polo shirt
        b.    White short or long sleeve button up dress shirt

COT002812

| Tucson Fire Department Manuals<br>**Manual Change** | Section 209<br>Uniforms |
|---|---|
| Manual of Operations<br>Page **7** of **11** | Revised: 07/01/13 |

209.4.10    **Uniform Allowance**

The Department provides a uniform clothing allowance to all uniform personnel; however, probationary firefighters' allowance shall be pro-rated after completing one year of employment. The allocation is distributed through payroll semi-annually, in April and October each year. The allowance is intended to provide for the cleaning and replacement of all personnel uniform garments with the exception of Department issued turnouts and personal protective equipment (PPE).

**209.4.11**    **Uniform Specifications**

A.  General

Uniform personnel shall be required to purchase all approved uniform clothing items without exception from vendors specified by contract with the Department/City. Any variance of this policy may be authorized only by a Division Assistant Chief. A list of vendors for uniform clothing shall be published annually by Fire Supply. Detailed specifications of all uniform related items may be requested from Fire Supply at any time.

B.  Supervisor Responsibility

Captains shall be responsible to insure that personnel under their supervision comply with uniform specifications established by the Department.

**209.4.12**    **Uniform Inspections**

A.  General

Each uniform member shall be responsible for the cleanliness and repair of all required uniform items issued by the Department and purchased by the individual. Uniforms shall be subject to inspection at any time by company and/or chief officers.

B.  Turnouts/PPE

1.  On the first shift of each month, station captains on each shift shall inspect the turnout clothing and personal protective equipment (PPE) of all individuals working at the station on that day. The form is located on the S:\Forms\Safety\Monthly Safety forms

2.  A Turnout/PPE Inspection/Replacement Form shall be completed by the captain conducting the inspection. The form shall include the names of all personnel whose equipment has been inspected. If clothing repair/replacement is not required, the form shall be kept on file at the station.

3.  A record of the inspection shall be sent to the respective DMT and to TFD Safety.

COT002813

C. Supervisor Responsibility

Captains shall be responsible to insure that all personnel under their command maintain the standards of dress required by the Department. Failure for personnel to dress appropriately may result in disciplinary action against both the supervisor and subordinate.

**209.4.13    Uniform and Accessory Replacement**

A. General

Replacement and/or addition of all required uniform clothing and accessories shall be the responsibility of the individual. Uniform items damaged in the line of duty shall be repaired or replaced by the Department as necessary. If the annual replacement budget is exceeded however, each member shall be responsible to utilize the individual clothing allowance until the beginning of the next fiscal year.

B. Damaged Uniform Clothing

The following section shall apply only to required uniform garments damaged in the line of duty.

1. Employee shall forward a written memorandum, proof and date of purchase, and garment through the chain of command to the District/Section Battalion Chief and Supply Battalion Chief.

2. The Supply Chief shall examine the garment and authorize repair or replacement based on the validity of the claim and severity of damage.

3. Once approved, the employee shall pick up a completed "Authorization to Purchase" form from the Fire Supply Office. Receipts for clothing items shall be returned to Fire Supply once the purchase is completed.

4. Clothing shall be prorated based upon the age and wear of the garment item at the time the damage occurred.

C. Turnouts/PPE

If at any time a turnout or PPE item is noted to be damaged, defective, worn out, or otherwise rendered unsafe, a Turnout/PPE Inspection/Replacement Form shall be completed by the immediate supervisor. The clothing or equipment shall be brought to Fire Supply along with the form and exchanged for new or good quality used item(s).

| **Tucson Fire Department Manuals**<br>**Manual Change** | Section 209<br>Uniforms |
|---|---|
| Manual of Operations<br>Page **9** of **11** | Revised: 07/01/13 |

D. Badges

Additional or replacement badges are the responsibility of the individual.  Opportunity for duplicate badge purchase **(Sun Badges)** is provided by the Department semi-annually immediately prior to issuance of the clothing allowance in April and October each year.  Fire Supply shall announce this opportunity by Master Memo.  Everson Ross brand badges may also be purchased throughout the year at Cash Box Jewelers.

E. Department I.D. Cards

Department I.D. Cards, which are damaged, lost, or stolen, shall be immediately reported to the immediate supervisor and the Payroll Account Clerk.  Stolen cards shall be reported to the Police Department and a copy of the police report provided to Fire Headquarters**.**  This policy shall include lost door-access swipe cards.  In addition, lost swipe cards must be reported to Fire Supply so it can be deactivated by the City Lock shop.  Replacement I D. Cards obtained through FHQ and door access swipe cards replaced through Fire Supply.

209.4.14   **Turnout Clothing**

A. Turnout Ensemble

1. The turnout ensemble consists of a matching coat and pants set.  The complete ensemble shall be worn at all times while in response to, and during fireground operations and drills.  Turnout gear shall be utilized when conditions on medical calls dictate a level of danger exists i.e. auto accident with gas leaking, or the need for extrication. Paramedic personnel shall not be required to wear turnout clothing while responding in paramedic vehicles.

2. Removal of turnout gear shall be permitted solely at the discretion of the company officer and/or command, when it is determined that personnel may operate safely with a reduced amount of protective clothing.  This regulation shall apply to all routine and emergency incidents involving any Fire Department disciplines.

3. Turnout gear shall not be worn on routine medical calls, and shall not be utilized as a put on quick option for responding on routine medical calls.

4. Personnel shall not remove the turnout liner at any time except for cleaning purposes.  Removal of the turnout liner renders the ensemble completely ineffective for protection as a primary firefighting garment.

B. Helmets

All personnel shall wear helmets as an integral part of the complete set of protective outerwear.  Policy for proper use of the helmet shall be the same as that of the previous section applying to the turnout ensemble.  Helmets may be required for additional specialized

Case 4:14-cv-02543-CKJ   Document 116-6   Filed 08/18/17   Page 69 of 140

| Tucson Fire Department Manuals<br>**Manual Change** | Section 209<br>Uniforms |
|---|---|
| Manual of Operations<br>Page **10** of **11** | Revised: 07/01/13 |

operations which do not necessarily require other turnout gear. Helmets shall not be required for personnel riding in enclosed vehicles. Face shields shall be utilized at all times unless otherwise directed by the company officer or command.

C. Boots

All personnel shall wear the Department issued knee high, steel toe/shank, Rubber/Leather boots as an integral part of the complete set of protective outerwear. Policy for proper use of firefighting boots shall be the same as that of the previous section applying to turnout ensemble.

D. Hood

All personnel shall wear the Nomex protective hood as an integral part of the complete set of protective outerwear. Policy for the proper use of the Nomex hood shall be the same as that of the previous section applying to the turnout ensemble.

E. Gloves

1. Firefighting Style

Department issued firefighting gloves are constructed of a heavy duty fire restrictive material and considered to be an integral part of the complete set of protective outerwear. The policy for proper use of the glove shall be the same as that of the previous section applying to the turnout ensemble.

2. Work Style

The Department issued work glove is a non-fire restrictive leather glove intended for routine duties as required. The glove shall not be considered for fireground operations under any circumstance. Company officers are responsible to insure the proper wearing of gloves for both routine and emergency operations.

F. Marking

All turnout clothing and related safety equipment including rescue harness, approved safety goggles, respirators, flashlights, fanny pack, etc., shall be permanently marked with the last name and employee umber of the assigned employee. Firefighting helmets shall include the employee name in reflective lettering on the back of the helmet just above the TFD decal.

209.4.15   **Eye Protection**

Approved Safety goggles or a transparent face shield shall be worn as necessary by all personnel when engaged in any activity which has the potential to cause eye damage. Activities shall include those involving excessive dust in the atmosphere, flying debris, toxic chemicals, vehicle maintenance, etc. The company officer shall insure that all personnel are utilizing the proper eye protection at all times.

| Tucson Fire Department Manuals<br>**Manual Change** | Section 209<br>Uniforms |
|---|---|
| Manual of Operations<br>Page **11** of **11** | Revised: 07/01/13 |

209.4.16   **Cleaning Methods for Structural Turnout Clothing and Nomex Hood, Firefighting Gloves and Boots**

The cleaning of turnouts, Nomex Hood, Firefighting gloves and Boots is the responsibility of the member to whom they were issued.  Cleaning instructions are stitched to the inside of the Nomex shell and to the thermal liners.  Turnouts, Hood, Firefighting Gloves and Boots should be cleaned once every three months.  If use dictates, then they should be cleaned more often than that.  They should be cleaned after any working incident that smoke or debris may have come into contact with you.  Since there is more than one type of protective garment in use cleaning instructions may vary. If you do not find cleaning instructions on the label of the garment contact Fire Supply to get cleaning instructions.

COT002817



**ADMINISTRATIVE DIRECTIVE**

| | NUMBER | PAGE |
|---|---|---|
| **SAFETY FOOTWEAR** | **2.03-3** | **1 of 4** |
| | EFFECTIVE DATE | |
| | **February 12, 2016** | |

**I.  PURPOSE**

To establish procedures for use, purchase, distribution and control of safety footwear for City personnel required for the job task as documented on the Job Hazard Assessment (JHA) or Physical Description Questionnaire (PDQ) to wear Personal Protective Equipment (PPE) including safety footwear. This Administrative Directive excludes commissioned Police and Fire personnel who are covered under department policy.

**II.  POLICY**

The wearing of safety footwear by City of Tucson permanent, non-permanent, or temporary employees, including interns and volunteers, working in areas where there is a significant risk of foot injuries due to falling or rolling objects shall be mandatory. Each department shall maintain a list of job classifications required to wear safety footwear.

All safety footwear shall meet the minimum requirements set forth. Additional protection may be required based upon a JHA by Central Safety Services. Any specialized footwear provided by the City for specific situations such as Wellington (rubber) boots will be accepted as a matter of policy. A department may require a higher standard of footwear for a specific job function at the discretion of the director.

Exceptions must be approved by Central Safety Services. Any exceptions will be based upon special situations for which City policy is not applicable.

Supervisors shall ensure that employees wear the appropriate type of safety footwear for the specific job requirements. The type of safety footwear required shall be based upon the JHA or physical exposure to a hazard of the foot. Questions regarding identification of appropriate safety footwear shall be directed to Central Safety Services. All Employees not wearing appropriate safety footwear as required for the job task as documented on the JHA, PDQ or at the departments direction while in the scope of employment shall be subject to disciplinary action.

The City shall provide a safety footwear allotment to all permanent employees required by JHA to wear protective footwear.

Each department director is responsible for control of this program, and shall ensure that employees are protected from foot hazards by wearing safety footwear.

COT002818



**ADMINISTRATIVE DIRECTIVE**

| | NUMBER | PAGE |
|---|---|---|
| **SAFETY FOOTWEAR** | **2.03-3** | **2 of 4** |
| | EFFECTIVE DATE | |
| | **February 12, 2016** | |

## III.  GENERAL

### A.  Authorization for Safety Footwear Allotment

The City will provide a voucher to any permanent employee who is required to wear safety footwear, in the allotted amount. The voucher may be used to purchase more than one pair of safety footwear at once or materials to care for safety footwear. Also if available from the vendor, employees shall be able to purchase orthopedic supplies such as insoles, etc., until the allotment is reached.

1.  Non-exempt (900 Grade) employees authorized by each department shall receive a voucher for safety footwear each fiscal year.

2.  Exempt (800 Grade) employees who do not wear safety footwear on a daily basis, but may be required by job duty or specific job hazard, will receive a voucher for the purchase of safety footwear on an as needed basis after the intial purchase.

3.  All permanent employees required to wear safety footwear shall receive a replacement pair more than once a year if:

    a.  The employee's department management determines that the footwear is sufficiently worn to warrant replacement, or

    b.  The employee's footwear are destroyed under unusual job-related circumstances, or

    c.  The employee has a medical condition which requires an earlier footwear replacement.

    Any other replacement of safety footwear during the year of issuance shall be at the employee's expense. Disputes regarding Paragraph 3.a. of this Section pertaining to the condition of safety footwear and whether replacement is warranted, may be directed to Central Safety Services for final disposition.

4.  Employees who are filling positions similar to positions defined by the department as qualifying for the safety footwear allotment may be authorized safety footwear at the discretion and expense of the department.

### B.  Non-permanent Employees, Interns, Temporary Employees and Volunteers

Employees classified as non-permanent, interns, temporary (under contract to an employment agency or similar) and volunteers, working in an assignment identified by either a JHA or PDQ as requiring safety footwear, shall be required to provide their

COT002819



**ADMINISTRATIVE DIRECTIVE**

| | NUMBER | PAGE |
|---|---|---|
| **SAFETY FOOTWEAR** | **2.03-3** | **3 of 4** |
| | EFFECTIVE DATE | |
| | **February 12, 2016** | |

own safety footwear prior to the beginning of assignment. Employee-supplied safety footwear shall meet the specifications for safety footwear and shall be inspected and approved by the Department prior to assignment.

**C.** **Safety Footwear Specifications**

    **1.** Safety footwear shall have slip resistant soles and steel or non-metallic toe protection. All footwear, at a minimum, must meet ANSI standard and ASTM F2413-05 as revised. Safety footwear may be "high" or "low" cut, as defined in the Attachment, but shall meet the current ANSI standard and ASTM standard when purchased.

    **2.** Specific positions may require safety footwear to have additional protection as determined by a JHA or PDQ. The additional features may include, but are not limited to:

        **a)** Protective steel plate in the sole of the boot (puncture resistant),

        **b)** Non-conductive footwear (EH - rated for electrical hazards),

        **c)** Static dissipating footwear,

        **d)** Chemical resistant footwear.

**D.** **Care of Safety Footwear**

Employees are responsible for maintaining their own safety footwear in a clean and sanitary manner.

**E.** **Safety Footwear Acquisition**

    **1.** The Procurement Department will establish the contract(s) for safety footwear and will provide instructions on how to order from the contract. Safety footwear shall only be purchased from vendors on contract.

    **2.** A department director, division administrator, or other delegated authority will sign an Authorization Memorandum that authorizes the purchase of safety footwear that meets the specifications noted in Section C for eligible employees.

        **a.** The Authorization Memorandum will minimally include the employee's name, employee identification number, activity number, and purchase order number.

        **b.** The eligible employee will present the Authorization Memorandum and his/her City identification to the safety footwear vendor.

COT002820



**ADMINISTRATIVE DIRECTIVE**

| | NUMBER | PAGE |
|---|---|---|
| **SAFETY FOOTWEAR** | **2.03-3** | **4 of 4** |
| | EFFECTIVE DATE | |
| | **February 12, 2016** | |

    **b.**    The eligible employee will present the Authorization Memorandum and his/her City identification to the safety footwear vendor.

    **3.**    Payments for safety footwear shall be made in accordance with the contract. The Procurement Department will provide payment instructions.

    **4.**    Employees are allowed to keep the old safety footwear for personal use but shall not wear any damaged or degraded safety footwear during work hours.

    **5.**    Employees shall not duplicate/replicate/copy, trade, sell or gamble their shoe voucher. Activity involving the illegal purchase of safety shoes shall be subject to disciplinary action up to and including discharge.

**F.**    **Quality Control**

The Procurement Department shall monitor the suppliers to assure that safety shoe quality and availability are maintained as specified in the contract with the City.

**Appendices**          Authorization to Receive Safety Footwear Memorandum

**References**          None

**Review Responsibility and Frequency**          The Director of Finance will review and revise this directive when the Annual Compensation Plan is adopted by Mayor and Council. Last review date: January 2, 2013.

**Authorized**

City Manager                                      2/16/16
                                          Date

*Emailed*
*Jan 11, 2016*

# EXPECTATIONS
# FOR FIRE
# PREVENTION INSPECTORS

1. Always wear appropriate PPE. Ensure the safety of yourself, your coworkers, and the public. Maintain all safety equipment (radio, turnouts, etc.).
2. Always wear appropriate uniform. Each member shall follow TFD Uniform policy for uniform standards, inspection and wear.
3. Do your best, and do what is right.
4. Maintain consistency and fairness with our customers.
5. Provide excellent customer service. This includes internally, treat coworkers with respect. Maintain a professional image (uniform, vehicle, and attitude).
6. Be mindful of how your actions may be perceived both on and off duty. Represent the Department, the Division and yourself professionally at all times.
7. Maintain open communications with the team, division, Chain of Command, Operations, and other City departments.
8. Keep supervisor informed of issues; attempt to resolve at lowest possible level first.
9. Mandatory attendance at Line-Up and Division training.
10. Schedule all leave in Telestaff, include on your GroupWise calendar. Notify supervisor when calling in and taking leave the day of, by 07:15. Your 4/10 days must be scheduled in Telestaff and on GroupWise a minimum of 1 month in advance. All Vacation leave must be approved by your supervisor.
11. Login/Logout: Send email with subject "Login" in morning when you arrive for work, and send email with "Logout" when you leave for the day. If beginning in the field, notify your Supervisor of such.
12. Maintain your GroupWise calendar with all daily activities reflective of your schedule.
13. Document all activities in FRMS by 10:00 AM the following business day.
14. Maintain all professional certifications (Medic, EMT, Hazmat, TRT, ICC, etc.)
15. Attend all *REQUIRED* CE's. Utilize sign up calendar when provided as to not overwhelm Training resources.
16. Maintain physical fitness standards. You are authorized 4.5 hours per week of PT. Members shall not conduct physical training at a public or private health facility while on duty.
17. Follow all City, department and division policies, procedures, and guidelines.

# EXHIBIT 60



# MEMORANDUM

**DATE:** May 4, 2016

**TO:** Jeff Langejans
Captain

**FROM:** Jim Critchley
Fire Chief

**SUBJECT:** Response to Complaint Memo submitted on March 16, 2016

The information you provided was investigated by Assistant Chief Baker and Deputy Chief Carsten. The information you submitted specific to "Violation of City of Tucson Policies", City of Tucson Code of Ethics VI. A and B was unfounded.

As a supervisor, you should be aware that the behaviors of personnel are dealt with and handled on an individual basis with their supervisor. The Prevention section is no different and each supervisor is tasked with ensuring accountability of the individuals which they supervise.

The incident on January 29, 2016 was handled and no further action will be taken.

Management of the Prevention section is directly handled by Deputy Chief Carsten. If you have any concerns, feel free to follow up through your chain of command.

COT003901

# EXHIBIT 61

**From:**      Kenneth Brouillette
**To:**         Mike Carsten
**Date:**      3/30/2016 7:51 AM
**Subject:**   Educational Counseling
**Attachments:**  MX-M503N_20160330_080206.pdf

Mike,

While conducting an educational counseling (see attached) on March 24, 2016 with Inspector Clark, she received a text message/picture during the our session.  I did not see it clearly, but she indicated it was a picture of Inspector D'Auria not wearing his uniform while conducting an inspection.

I would like to get more details on this text/photo from her.

Is it acceptable for me to ask Inspector Clark in writing an explanation of who sent the text/photo or ask for a copy of the text/picture that was sent to her?


Thanks,

Ken



# TUCSON FIRE DEPARTMENT

## Employee Counseling Form

| Employee Information | | | |
|---|---|---|---|
| Employee Name: **Carrie Clark** | | Date: **03-24-2016** | |
| Employee ID: **48197** | | Job Title: **Fire Inspector** | |
| Supervisor: **Ken Brouillette** | | Department: **Fire** | |

| Type of Counseling | | | |
|---|---|---|---|
| ☒ Educational Counseling | | ☐ Verbal Counseling | |

| Type of Offense | | | | | |
|---|---|---|---|---|---|
| ☐ Tardiness/Leaving Early | ☐ | Substandard Work | ☒ | Violation of Directive or Policy |
| ☐ Absenteeism | ☐ | Abusive Language | ☐ | Disregarding Dress Code Standards |
| ☐ Unexcused Absence | ☒ | Inappropriate Conduct | ☐ | Rudeness to Citizens/Co-workers |
| ☐ Other: _____ | | | | |

| Details |
|---|

Description of Infraction (list specific issue that requires counseling):
On March 21st I sent you an email asking for more information regarding an inspection that you conducted. Specifically, if you had the annual fire sprinkler and five year inspection reports for the fire sprinkler inspection.

Before I emailed you asking for this information, I looked in FRMS, IROL, the H drive for that occupancy and spoke to Rachel Duarte to try and locate the paperwork.

You responded back to me that you had the paperwork and that you would have Rachel scan them into FRMS. That was an acceptable answer to me and I responded back to you "Great, thanks." in an email.

Later you questioned me in my office if I was checking up on your work and I responded that I can check up on any inspector's work. You asked me why I was questioning this particular inspection. I responded that the inspection report was left at PDSD at the Fire Counter. I saw it and then tried to determine if the inspection had occurred. I noticed on the inspection report that it indicated the requirement that the annual inspection report and five year check valve report be completed prior to final. I was concerned that if an inspector had not received the actual inspection request, they may not be aware of the requirement. I checked the databases and comments from the inspection and did not see a note regarding the forms.

Ultimately, everything turned out fine for this inspection.

I explained to you that I thought you were feeling Paranoid from my actions of asking you about the inspection and the paperwork. You also asked me if you were being disciplined for a previous incident that occurred in the office. I said "No" and that I was gathering statements from the employees involved and that I needed to share them with my supervisors to determine if any additional action is necessary.

On March 22nd I was notified by my supervisor (DC Mike Carsten) that you had asked him if you were going to be disciplined. I see this as violation of the Chain of Command and possible insubordination as disregarding my statement to you. To reiterate, I was gathering statements from the employees involved and that I needed to share them with my supervisors to determine if any additional action is necessary.

Appendix C
COT002743

Expectations and Plan for Improvement:

**To "promote harmony and cooperation among fellow workers" is listed in our Rules of Conduct. This is an item that I would like you to work on obtaining. Bringing to my attention items that may be rules of conduct violations is acceptable. I am getting the perception that in our unit "New Construction" and others that you are "watching" other inspectors conduct and using criticism toward their inspection practices. This type of behavior is not acceptable to me and is not promoting harmony and cooperation among fellow workers as stated in our Rules of Conduct.**

**I know that you have verbally communicated to me concerns about other inspectors. I asked you to put those concerns in writing and you did. I have presented your concerns to their supervisors and to Deputy Chief Mike Carsten. I have informed you that the concerns are being addressed through their supervisor and Deputy Chief Mike Carsten.**

**Carrie, since you joined the New Construction Unit during your probationary year, I have noticed how well you are doing as an inspector in the field and I have not questioned the quality of your inspections. But, your criticism of other inspectors is not promoting harmony and cooperation among fellow workers in our workplace.**

**I am instructing you concentrate on your assigned tasks and work on building relationships with all employees within the division.**

**I am also instructing that you use the chain of command, which consists of me, as your supervisor, when reporting any concerns with the division and then allow me to work through the chain as necessary to conduct any form of fact gathering.**

Consequences of further infractions or if expectations are not met (include follow-up dates, if applicable):

**Consequences of discipline will occur if you do not follow my expectations.**

## Acknowledgement of Receipt of Counseling

*By signing this form, you confirm that you understand the information in this counseling. You also confirm that you and your supervisor have discussed the issue and a plan for improvement. Signing this form does not indicate that you agree with this action but that you have been advised.*

Employee Signature                                                          Date

Supervisor's Signature                                                      Date

*Copy to: Employee*
*Employee's Station File*

# EXHIBIT 62



# MEMORANDUM

**DATE:**   April 27, 2016

**TO:**   Carrie Clark

**FROM:/**   Jim Critchley
Fire Chief

**SUBJECT:**   Reassignment

In September 2014, you transferred from Operations to Fire Prevention. This was a lateral transfer from your previous rank of Paramedic to Fire Inspector. Since that time, you have expressed to me how unpleasant the work environment is to the point that you have filed several complaints with not only my office, but also with the City Manager's Office and the Equal Opportunity Programs Division. Most recently, there have been investigations and concerns brought forward by other Fire Inspectors about the environment, as well as your most recent EOPD complaint.

The Fire Department takes complaints and these types of concerns seriously. It is my goal to provide a work environment that is pleasant, free from misconduct and hostility where all employees can grow, learn and strive to be their best.

After extensive thought and a considerable amount of time spent on information received pertaining to Fire Prevention, the work environment and personnel dynamics in the Fire Prevention section, the decision has been made to reassign you to Operations. This will be a lateral transfer, to the position you held before as a Paramedic on C shift. This will be effective beginning of the next pay period May 1, 2016.

Assistant Chief Garcia will inform you of training you will be required to attend at the Public Safety Training Academy on May 2nd. You will be provided this support to be successful in the field.

C:   Mike Garcia, Assistant Chief
Laura Baker, Assistant Chief
JoAnn Acosta, Fire HR Manager
Personnel File

**Clark 0978**

# EXHIBIT 63

1  Michelle R. Saavedra
   Michael W.L. McCrory
2  Principal Assistant City Attorneys for
   MICHAEL G. RANKIN
   City Attorney
3  P.O. Box 27210
   Tucson, AZ 85726-7210
4  Michelle.Saavedra@tucsonaz.gov
   State Bar No. 25728
5  Pima County Computer No. 66163
   Michael.McCrory@tucsonaz.gov
   State Bar Computer No. 3899
6  Pima County Computer No. 37268
   Telephone: (520) 791-4221
7  Fax: (520) 623-9803
   Attorneys for Defendant City of Tucson

8

9  ## IN THE UNITED STATES DISTRICT COURT

10 ## FOR THE DISTRICT OF ARIZONA

11 | CARRIE FERRARA CLARK, | No. 4:14-CV-02543-TUC-CKJ |

12 | Plaintiff, | **DECLARATION OF** |
13 | vs. | **STEFANIE LUNDELL, M.D.** |

14 | CITY OF TUCSON, | (Hon. Cindy Jorgenson) |

15 | Defendant. |

16

17    Pursuant to 28 U.S.C. §1746, I, Stefanie Lundell, M.D., declare and state as

18 follows:

19    1.    I make this Declaration based on my personal knowledge.

20    2.    I was employed by the City of Tucson as a City Physician for the Tucson

21 Fire Department ("TFD") from 2002 to 2017.

22    3.    As a City Physician, I conducted annual health/fitness assessments of TFD

23 employees wherein various medical and physical tests were administered that evaluate the

24 employees' ability to perform the essential job functions of a commissioned TFD

25 firefighter. A health/fitness assessment could also be made at the request of TFD or an

26 individual employee to determine whether a TFD employee had any medical condition

27 that prevented him/her from being able to perform all essential functions of the job and, if

28 necessary, whether an assignment to light duty with work restrictions was warranted.

1    4.    Since the duties of a firefighter include responding to emergency situations

2    and being able to handle the equipment necessary for response, a firefighter must be able

3    to perform certain levels of physical activity as set forth under the National Fire Protection

4    Association ("NFPA") guidelines.

5    5.    After I completed a health/fitness examination, I reported to the TFD

6    whether the individual was physically able to perform the essential functions of the job.

7    For those that were able, they were certified for regular duty.  For those who were not,

8    there was a separate process to determine what restrictions on physical activity were

9    necessary due to the individual medical condition and how those may be applied to TFD

10   positions.

11   6.    When I provided this summary information to TFD, I provided information

12   on the duty status, not specific medical conditions of employees, because of the

13   restrictions on release of personal medical information under the Health Insurance

14   Portability and Accountability Act ("HIPAA").  This applied to medical information I

15   obtained for a person who was certified for regular duty and the precise medical condition

16   that is the basis of any restrictions.

17   7.    The City Attorney's Office has now provided me with a copy of the

18   Authorization for Disclosure of Protected Health Information form Carrie Clark signed on

19   June 26, 2017, which gives me the authority to discuss her medical records.  A copy of

20   that release is attached as Exhibit A.  Based on that release and my review of the relevant

21   records, I can further state the following.

22   8.    On June 5, 2015, I saw Carrie Clark for her annual health/fitness assessment.

23   As I recall, at that time based upon various laboratory results, physical tests and my

24   medical observation, she was fully able to physically perform the essential job functions of

25   a firefighter.  As I recall, she did not have any medical condition that disqualified her

26   under the NFPA guidelines, nor that would require any work restrictions.

27   9.    On June 5, 2015, Carrie Clark appeared to have a medical condition related

28   to her pregnancies.  As I recall, at the time, based upon medical and physical tests, her

2

1    medical condition did not limit her ability to perform the essential functions of a TFD
2    firefighter and the condition did not automatically disqualify her from being a firefighter
3    under the NFPA guidelines.

4       10.    On June 5, 2015, Carrie Clark told me that she would be seeing a surgeon
5    regarding her medical condition on June 8, 2015. I provided her with a copy of the
6    NPFA's guidelines relating to her reported medical condition and a copy of TFD's
7    clearance form, the Clinician's Return to Unrestricted Duty Form, which contains
8    descriptions of the 13 essential job functions a firefighter must be able to perform so she
9    could provide them to her personal physician/surgeon for her appointment.

10      11.    Some days later, Carrie Clark called me to provide an update on the situation
11   and at that time she told me in addition to the already known medical condition, she had
12   also been diagnosed with a small umbilical hernia. This medical condition does not
13   automatically disqualify a person to be a firefighter under the NFPA guidelines. Carrie
14   Clark told me her and her surgeon agreed that the small umbilical hernia could be repaired
15   when she decided to have an elective surgery for the other medical condition, and that she
16   planned to have surgery in August or September of 2015. I told Carrie Clark if her
17   symptoms changed or got worse to contact the clinic (City Physicians). After this phone
18   call, I noted that based upon this new information Carrie Clark was still fit for regular duty
19   as a firefighter. As I recall, on this date I certified that Carrie Clark was capable of
20   performing the duties of a firefighter and communicated that information to TFD. As I
21   recall, I did not provide TFD with any information regarding any of her specific medical
22   conditions.

23      12.    As I recall, the next time I saw Carrie Clark was on May 6, 2016, for her
24   annual health/fitness assessment. At the time, she brought with her a note from her
25   personal physician that stated she needed light duty and that a surgery date was pending.
26   My physical examination also convinced me that her medical condition had worsened and
27   that she was no longer, as of that date, fit for regular duty as a firefighter. Based on the
28   information she provided, her physical examination and performance of physical tests, I

3

1  agreed that she was not physically fit for regular duty. As with all other such situations,
2  the duty status is communicated to TFD. As I recall, I did not disclose to TFD the specific
3  medical conditions that prevented Carrie Clark from performing the essential functions of
4  a regular duty firefighter.

5     13.    Because Carrie Clark's medical conditions were a result of non-work related
6  conditions, she was instructed to contact TFD Human Resources and go through the
7  process necessary to get a light duty assignment. As I recall, I did not disclose the specific
8  medical conditions to TFD, consistent with the requirements of HIPAA.

9     14.    Based upon the medical information Carrie Clark provided me and my
10  physical examinations of her in June 2015 and May 2016, as I recall I did not find any
11  medical reason why she could not be assigned regular duty until May 6, 2016.

12     15.    I state under penalty of perjury that the foregoing is true and correct.
13  Executed on July 24, 2017.

Stefanie Lundell
Stefanie Lundell, M.D.

4

# EXHIBIT A

**CITY OF TUCSON-OFFICE OF THE CITY ATTORNEY**
**AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION**

I authorize Stefanie M.A. Lundell, M.D., 1099 S. Pantano Rd., #18065, Tucson, AZ 85731, to disclose Protected Heath Information (PHI) from the health records of:

Patient Name: Carrie A. Ferrara Clark          Date of Birth: ▮▮▮          SS#: ▮▮▮

Address: ▮▮▮

Telephone: _____          Medical Records/Patient#: _____

Covering period(s) of health care from January 1, 2012 to present.

**This information is to be disclosed and mailed to the name and address below:**

Name:          Office of the City Attorney, c/o Michelle Saavedra

Address:          P.O. Box 27210, Tucson, Arizona 85726-7210 Telephone: (520) 791-4221 Fax: (520) 623-9803

**Information to be disclosed: X Complete health record and itemized billing**

| | | |
|---|---|---|
| ____ Discharge Summary | ____ Progress Notes | ____ Photographs/Videotapes |
| ____ History and Physical Examination | ____ Laboratory Tests | ____ Digital/Other Images |
| ____ Consultation Reports | ____ Radiology Reports | ____ Radiology Films/Images |
| ____ Operative/Procedure Reports | ____ Itemized Bill | ____ Emergency Room |
| ____ Other (please specify): | ____ Test Results | |

**Description of Purpose for release: LITIGATION**

**I understand that this may include information relating to the following and I Agree to its release unless I indicate NO.**

YES____ NO ✓ **AIDS/HIV and other Communicable Disease/Sexually Transmitted Disease Treatment & Testing**
YES____ NO ✓ **Behavioral Health/Psychiatric /Psychotherapy/Mental Health Illness Diagnosis & Treatment**
YES____ NO ✓ **Treatment and diagnosis for alcohol and/or drug abuse**
YES____ NO ✓ **Genetic Counseling/Testing**

I understand this authorization may be revoked **in writing** at any time, except to the extent that action has been taken based upon the authorization. I must submit my written revocation to Stefanie M.A. Lundell, M.D..

**Unless otherwise revoked, this authorization will expire upon conclusion of Case No. 4:14-cv-02543.**

Stefanie M.A. Lundell, M.D., its employees, directors, and medical staff members are released from any legal liability for disclosure of my protected health information to the extent authorized by this form.

I understand that Stefanie M.A. Lundell, M.D. will not condition treatment, payment, enrollment or eligibility on obtaining this authorization, except where federal law allows such condition.

I understand that if the organization authorized to receive the health information is not a health plan or health care provider, the recipient might re-disclose the released information, and therefore, the released information may no longer be protected by HIPAA or federal privacy regulations.

A photocopy, facsimile or electronically transmitted version of this signed authorization will act as an original.

_____          _____
Signature of Patient or Legal Representative     Date          Signature of Witness          Date
Printed Name of Patient's Representative: _____
Relationship to or authority to act for the Patient: _____

*Note: If the Patient is unable to consent by reason of age or some other factor(s), state reason:*

**ALL HIGHLIGHTED QUESTIONS MUST BE ANSWERED BY PATIENT/REPRESENTATIVE**
Form: 6/2015

# EXHIBIT 64

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


CARRIE FERRARA CLARK,        )
                             )
          Plaintiff,         )
                             )
v.                           ) NO. 4:14-CV-02543-TUC-CKJ
                             )
CITY OF TUCSON,              )
                             )
          Defendant.         )






VOLUME IV

VIDEOTAPED DEPOSITION OF CARRIE FERRARA CLARK

Tucson, Arizona
June 15, 2017
9:02 a.m.






COLLEEN KELLY, RPR
CR #50386 (AZ)
KATHY FINK & ASSOCIATES, INC.
2819 East 22nd Street
Tucson, AZ  85713
Phone: (520)624-8644    Fax:(520)624-9336

Page 527

1       Q.   That's not my question, Mrs. Clark.   My

2   question is --

3            MS. SAAVEDRA:   Can you go ahead and reread

4   the question for her, please?

5            (Record read.)

6       A.   Not that I'm aware of.

7       Q.   (By Ms. Saavedra)  Did you ever request any

8   work accommodations?

9       A.   No, because I didn't need any.

10       Q.   Your Complaint states that you went to Ken

11   Brouillette about your hernia?

12       A.   Correct.

13       Q.   When did you do that?

14       A.   I don't remember.

15       Q.   Is that a true statement, that you did go to

16   him about your hernia?

17       A.   Is what true, that I mentioned it to him

18   that I had one?

19       Q.   Did you go to Ken Brouillette to talk to him

20   about your hernia?

21       A.   Yes, I did.

22       Q.   When did you do that?

23       A.   I don't remember the day.

24       Q.   What did you tell him?

25       A.   That I was diagnosed with having a hernia

 1   and that I would have to have surgery at some point

 2   to fix it.

 3       Q.   And you can't tell me when that conversation

 4   was held?

 5       A.   No.

 6       Q.   What did he tell you?

 7       A.   I don't remember his exact words.

 8       Q.   Did you ask Ken Brouillette for any work

 9   accommodations when you told him that you had a

10   hernia?

11       A.   No, because I didn't need any.

12       Q.   Did you say anything to him that would make

13   him believe that you were not able to perform your

14   duties with the fire department?

15       A.   In regards to what?

16       Q.   Your job.

17       A.   As a fire inspector?

18       Q.   As a TFD employee.

19       A.   Well, my job as a fire inspector I had no

20   issue doing.

21       Q.   Is there ever a possibility that you can be

22   called out to perform duties that you're qualified

23   for, outside of being an inspector, when you're at

24   fire prevention?

25       A.   It's never happened.

1      A.   No, because it wouldn't make sense because

2  we don't carry our turnouts with us when we're

3  working in fire prevention.  If I was called out in

4  the field, I would need my equipment.  I don't carry

5  my equipment with me.

6      Q.   Did you ever make anyone at TFD aware of the

7  fact that you were unable to perform any of the

8  duties for TFD prior to you requesting light duty?

9      A.   Just what I talked to Ken about.

10     Q.   But you didn't ask -- you didn't tell Ken

11  you were unable to do certain things; right?

12     A.   No, because as a fire spec I wasn't going to

13  have to do any of those things, so it was irrelevant.

14     Q.   So he had no reason to believe that you

15  weren't able to perform your job, full duty?

16     A.   In fire prevention, no.

17     Q.   Did you tell anyone else in TFD about your

18  hernia?

19     A.   No.

20     Q.   When's the first time you brought it to

21  anyone else's attention?

22     A.   I believe when I was getting notified that I

23  was going to be transferred out.

24     Q.   When did you realize you needed to have

25  surgery?

1   one.  If it was Josh Campbell or Jon North, I can't

2   remember who told me.

3       Q.   So what happens when you see Dr. Peate?

4       A.   They confirm that I have a hernia and that I

5   can't be put on full duty in suppression.

6       Q.   Well, you already knew you had been

7   diagnosed with a hernia; right?

8       A.   Correct.

9       Q.   So this is the first time the department

10  finds out because you scheduled an appointment to go

11  see Dr. Peate?

12          MR. JACOBSON:  Objection, form and

13  foundation.

14      A.   Not the first time they found out.  They

15  knew from whenever it was whoever I talked to, and I

16  don't remember who, that I already had this issue,

17  that I had talked about it with Ken.

18      Q.   (By Ms. Saavedra)  When you said they knew,

19  who other than Ken knew?

20      A.   I don't know.  Whoever Ken told.  And I

21  don't remember who I talked to but I know that I

22  talked to somebody.

23      Q.   Who did Ken tell?

24      A.   Again, I don't know.

25      Q.   Did you ask Ken to report it to the

Page 546

1    department?

2        A.    No.

3        Q.    Do you think it's okay for supervisors to

4    report medical issues of their subordinates to the

5    department?

6              MR. JACOBSON:  Objection, form and

7    foundation.

8        A.    I'm not asking him to report it.  You're

9    asking who I told and I'm saying who I told.  If Ken

10   was asked by somebody else, then he may have told

11   them.

12       Q.    (By Ms. Saavedra)  Are you characterizing

13   the conversation that you had with Ken not reporting,

14   just talking about it?

15             MR. JACOBSON:  Objection, form and

16   foundation.

17       A.    No.

18       Q.    (By Ms. Saavedra)  So do you believe you

19   reported a medical issue when you told Ken

20   Brouillette that you had a hernia?

21       A.    Yes.

22       Q.    Is that the proper channel for reporting

23   medical issues?

24             Are there policies that you have to

25   follow when you have a medical issue?

1      Q.    And within that chain of command, you have

2    to go up the ranks, you don't skip over and go talk

3    to the next chain of command without first starting

4    at the lower end; is that correct?

5      A.    Not always.

6      Q.    Not always?

7      A.    Not always.

8      Q.    So when you were stationed at light duty,

9    did you ever go over your first chain of command to

10   speak to other chain of command?

11     A.    Well, when it said that I'm going to report

12   to Chief Baker, that's who I reported to.

13     Q.    I understand that's what that e-mail says.

14   But I'm asking you a question.

15     A.    And I answered it.

16     Q.    Who did you report to on a daily basis?

17     A.    Chief Sharon McDonough, if she was there; if

18   not, Chief Baker.

19     Q.    How many times did you go to Chief Baker?

20     A.    I don't remember.

21     Q.    Did you go to her at all while you were on

22   light duty?

23     A.    I did talk to her a few times about things.

24     Q.    About what?

25     A.    I don't remember, stuff that transpired,

Page 571

1   demoting, going back into the field, just multiple

2   different things.

3        Q.   So to be clear, you didn't have to report to

4   Chief Baker on a daily basis?

5        A.   Well, I didn't report directly to anybody.

6   I had to send an e-mail every day when I got there,

7   and I sent that to Sharon McDonough.

8        Q.   Did Sharon McDonough ever do anything to

9   discriminate or retaliate against you while you were

10   in light duty?

11             MR. JACOBSON:  Objection, form, foundation.

12        A.   Not that I recall.

13        Q.   (By Ms. Saavedra)  Did Chief Baker

14   discriminate or retaliate against you while you were

15   at -- I mean, on light duty?

16             MR. JACOBSON:  Objection, form, foundation.

17        A.   Well, I will say that when I first started

18   there, up in fire central, I remember asking Chief

19   McDonough, I said, do I have to e-mail you every day

20   when I get here?  And she said, no.  Why would you do

21   that?  No one does that.  I said, oh, they used to

22   make us do that in fire prevention.

23             Well, Chief Baker came and told her, no,

24   I want Carrie doing that every day.  And I remember

25   Sharon McDonough came over and said, I was told that

Page 572

1   you have to send me an e-mail every day when you get

2   here and every day when you leave.  And I said, does

3   everyone else do that?  And she said, no, but you

4   have to.

5       Q.   When did this conversation occur?

6       A.   Within my first week there.

7       Q.   Anything else in regards to Chief Baker?

8       A.   Not off the top of my head I can't think of

9   anything.  I can't think of anything off the top of

10  my head.

11      Q.   I'll show you what's been marked as Exhibit

12  35.

13           Was there anyone else that you had to

14  e-mail when you got in and left besides Chief

15  McDonough?

16      A.   No.

17      Q.   Was Chief Baker cc'd on those e-mails or was

18  it just to Sharon McDonough?

19      A.   I just sent them to Sharon.

20      Q.   And that's all you were asked to do, was to

21  send it to Sharon; is that correct?

22      A.   I didn't clarify it with her but that's all

23  I ever did.

24      Q.   Okay.

25      A.   Another thing, sorry, going back to that

1   last question you asked about Chief Baker.   Another

2   one of the things that she was a part of while I was

3   down there was that whole doings with the 150 Club

4   for the paramedic pay.

5        Q.    You think she discriminated or retaliated

6   against you because of the 150 Club thing?

7             MR. JACOBSON:   Objection; form, foundation.

8        A.    I think she allowed me to be treated

9   differently, however you want to chalk that up to, I

10  was being treated differently than other employees.

11  She knew about it and she failed to do anything about

12  it.

13       Q.    (By Ms. Saavedra)  Why do you think -- why

14  do you think she's singling you out?

15       A.    Because she's involved in my lawsuit.  I

16  filed complaints against her.

17       Q.    So you think you didn't get the full $150

18  because of your lawsuit?

19       A.    I think them enforcing a policy that didn't

20  exist on me and depriving me of something that I

21  should have had is directly in regards to the lawsuit

22  I had filed.

23       Q.    Anything else?

24       A.    That's all I remember right now.

25       Q.    So looking back at the exhibit I just gave

Page 576

1   June.

2       Q.   You went to the department and started

3   inquiring about demoting; is that correct?

4       A.   Went to what department?

5       Q.   The Tucson Fire Department, anybody.  I

6   don't know who you specifically went to, I'm not

7   there yet.  But you went to somebody in TFD to start

8   inquiring about demoting; is that correct?

9       A.   I don't recall talking to anyone in TFD

10  about demoting until I had pretty much almost made

11  the decision.

12      Q.   Okay.  So who did you talk to about

13  demoting?

14      A.   I believe the first person that I mentioned

15  that I was going to demote to was Chief Sharon

16  McDonough.

17      Q.   And when did you have that conversation?

18      A.   I don't recall the day.

19      Q.   Was that a verbal or written conversation?

20      A.   Verbal.

21      Q.   And what was the conversation?

22      A.   I don't remember how it came up.  I just

23  remember bringing it up and we talked at length about

24  my decision to demote.

25      Q.   What was said?

1        A.    She tried to encourage me not to.   She said

2   that she thought I should move on and promote and

3   become a captain and all these things, and I

4   expressed my feelings about everything and --

5        Q.    I would like you to tell me what that

6   conversation was.   So what do you remember telling

7   her?

8        A.    Basically -- I need to get a tissue -- I

9   told her that my decision, it didn't come lightly.

10   When I was assigned back to a swing position to be

11   back in the field, like I wasn't comfortable going

12   back into the field.   And, I mean, to this day I'm

13   still not.

14              I -- she has also been under discipline

15   and been in the, you know, department eye for a long

16   time, so she understood how all that felt and how

17   people treat you and when they hear rumors and stuff

18   about you.   And so I expressed my -- my concerns with

19   all of it.

20              I mean, we talked a little bit about what

21   led up to this with the lawsuit.   She didn't know a

22   lot of the little stuff like about the things that

23   people had said about me, the newspaper articles,

24   that kind of thing.   So when I tried to like explain

25   all that to her, that, you know, for me it just

Page 578

1   wasn't worth it having to go back on swing or having

2   to go back -- back out where I might be working with

3   some of these people, like it was just too much for

4   me to do.

5             And as much as I didn't want to, I mean,

6   at this point of my career I felt the best thing for

7   me to do is find like a hole-in-the-wall station and

8   go out there and just essentially hide.

9       Q.   **Demoting to firefighter means you're still**

10  **going back out to the field; is that correct?**

11      A.   It did, but I was demoting into a position I

12  could bid on, which was at a station that I wasn't

13  around virtually anybody.

14      Q.   **Why did you not feel comfortable going back**

15  **to the field as a paramedic but you felt comfortable**

16  **doing so as a firefighter?**

17      A.   So that's what I'm trying to explain to you

18  is I was assigned back as a swing paramedic on the

19  shift where I'm essentially working with people who

20  were involved in this lawsuit, people that have

21  written things about me to the newspaper.  When I

22  demoted to the firefighter, I made that decision,

23  knowing that I was going to win this spot out at

24  Station 23, and that I could go out there and I

25  wouldn't have to be around anybody.

Page 581

1    completely out of luck.  And because they had taken

2    away a lot of my seniority, I now was even more

3    junior than I should have been, I had even less of a

4    chance to win any stations, let alone some of those.

5              And, no, a lot of those stations that

6    were going to be out to bid were not ones I felt

7    comfortable working at, whether they be staffed with

8    somebody in my lawsuit, somebody that's written

9    something about me, somebody that's openly talked

10   about me to other people, no, I didn't feel

11   comfortable.

12   Q.   So is it your testimony that you can't work

13   with anyone that's involved in this lawsuit?

14   A.   I didn't say that.

15   Q.   You just said that one of these people might

16   be at one of those stations, so you didn't want to

17   work there.

18              Did I misunderstand you?

19   A.   Well, what you're misunderstanding is I

20   didn't say I can't work with them, I said it makes me

21   uncomfortable.  And I don't need to put myself in

22   that kind of position every day.  I spend a lot of

23   time at work.  And it's not worth me having to work

24   with someone day-in and day-out in the same station

25   that I don't get along with or that has done

Page 582

1   something to me or that trashes me.  It's not worth

2   it for me.

3       Q.   You've had Jeff Langejans and Laura Baker as

4   part of your lawsuit at least since the Second

5   Amended Complaint; is that correct?

6       A.   Sounds right.

7       Q.   Yet you continued to work at prevention; is

8   that correct?

9       A.   I don't work for Captain Langejans.  I do

10  have to be around him and I have voiced my concern

11  about that I didn't think it was appropriate that we

12  did still have to work together, given everything

13  that he had done.

14      Q.   My question was, you still worked at

15  prevention with people that you named in your

16  lawsuit?

17      A.   For a short period of time.

18      Q.   Until you were moved out?

19      A.   Correct.

20      Q.   Show you what's been marked as Exhibit 36.

21           Have you seen these e-mails before?

22      A.   Yes, I have.

23      Q.   So the bottom e-mail JoAnn is telling you:

24  When you have a minute today, please come by and see

25  me to complete your demotion paperwork.

1   seniority as a firefighter.  And the spot at 23 only

2   has four people.  They don't really run calls with

3   other stations, they have to pretty much stay on

4   Raytheon's campus, so my probability of having to

5   interact with a lot of other people was pretty slim.

6            The spot went out to bid, nobody bid on

7   it, it was going back out to bid, and that's when I

8   decided I knew I could win that spot, so that was

9   when I made my decision to go through with my

10  demotion so that I could secure a spot where I wasn't

11  going to be on swing or didn't have to be around a

12  lot of people, so I bid for it.

13       Q.   So you decided to take a voluntary demotion

14  so that you could bid for Station 23 and be assigned

15  there?

16       A.   Well, I took the demotion for other reasons

17  but that was part of it.

18       Q.   What other reasons?

19       A.   Again, I didn't want to be back in the

20  field, I didn't want to be going station to station,

21  I didn't want to be running with crews of people that

22  don't like me, people that don't treat me nice.  A

23  whole bunch of -- a whole bunch of reasons.

24       Q.   And by voluntarily demoting, you secured

25  your spot at Station 23?



ASSOCIATES | Certified Court Reporters
2819 E. 22nd Street
Tucson, Arizona 85713
Phone: (520) 624-8644 Fax: (520) 624-9336

Please make all changes or corrections on this sheet showing page number, line number and reason, if any. Make sure you *sign this form*, regardless of any corrections. Mail the signed *Original* correction sheet to the address above no later than: 8/4/17

**WITNESS: Carrie Clark**

**TAKEN ON: *6/15/17***

| PAGE | LINE | CORRECTION OR CHANGE | REASON |
|------|------|----------------------|--------|
| 407 | 4 | "write" is "ride" | unclear annunciation. |
| 480 | 25 | "Huppard"is "D'Auria" | |
| 530 | 12 | "spec" is "inspector" | |
| 617 | 3 | "has" is "as" | |
| 583 | 21 | "PRPRS" is "PSPRS" | |
| 586 | 17 | "has" is "is" | |

*Carrie Clark*

Please sign here

# EXHIBIT 65

## TEMPORARY LIGHT DUTY WORK ASSIGNMENT FORM
### TUCSON FIRE DEPARTMENT

**Employee Name (print)** Carrie Clark     **Employee ID:** 48197

**Rank & Shift:** paramedic swing     **Supervisor's Name** Capt. Bourie

**Date of Request** 5-6-16     **Time frame Requested:**

**Section I – Commencement of Employee's Light Duty Work: To be completed by employee:**
Based on the restrictions identified by my physician, I am being assigned to Light Duty. This assignment is temporary and is not a permanent assignment. This assignment will be evaluated every 30 days and will not exceed 12 months. I will be moved from a suppression to an 80-HR pay schedule. I will work a 5/8 work schedule on holiday weeks however, if approved, I can work a 4/10 work schedule on other weeks. I will not receive Holiday Pay while I am on an 80-HR pay schedule. If I am not released to full/regular duty at six (6) months, I may be referred to the Human Resources Department for case review, evaluation and possible Reasonable Accommodation under the Americans with Disabilities Act (ADA).

**Physician's Release to Light Duty Date:** _____    **Light Duty Assignment Start Date:** 5/9/16

| SKILS AND ABILITIES | Yes | No | Computer Skills: | Yes | No |
|---|---|---|---|---|---|
| Ability to drive City vehicle | ☑ | ☐ | MS Word | ☑ | ☐ |
| Certified to drive apparatus | ☑ | ☐ | Internet Research | ☑ | ☐ |
| Certified Paramedic | ☑ | ☐ | Web Design | ☑ | ☐ |
| Prior 8-hrs experience | ☑ | ☐ | TeleStaff | ☑ | ☐ |
|     If Yes, where: prevention medical | | | Other | ☐ | ☐ |
| Computer skills MS Access | ☑ | ☐ | **Technical Writing Ability** | ☑ | ☐ |
|     MS Excel | ☑ | ☐ | **Filing, sorting and making copies** | ☑ | ☐ |
|     MS PowerPoint | ☑ | ☐ | **Data entry** | ☑ | ☐ |
| | | | **Typing (Are you proficient?)** | ☑ | ☐ |

**Other specialized skills or knowledge that would be beneficial to TFD:** _____

**Section II – Employee's Acknowledgement:**
By signing below, I am accepting the terms and conditions of the assignment, as stated above.

**Employee's Signature** _Carrie Clark_     **Date** 5/6/16

**Section III – Department's Approval:**

| | | | | |
|---|---|---|---|---|
| **Supervisor's Signature** | Date | **Assistant Chief's Signature** | Date | 5/11/16 |
| **Battalion Chief's Signature** | Date | **Fire Chief's Signature** | Date | 5/11/16 |
| **Deputy Chief's Signature** | Date | **Fire HR's Signature** | Date | 5/11/16 |

**Section IV – For Fire HR Use Only**

Is Light Duty Available: Yes ☑    No ☐

- Physician's Release to Light Duty Date: 5/6/16    • Location: Comm Fire Central
- Light Duty Assignment Start Date: 5/11/16 (5/9 vz, 5/12) 4/10 days off • Assigned Duties: Pro QA
- Scheduled Days: recv dr note 5/11 9:50    • Light Duty Supervisor: Baker
- Scheduled Start & End Times: _____    • Next Review Date: _____

COT003750

395874



**City Of Tucson**
**Human Resources**
**Medical & Leave Management**
PO Box 27210, Tucson AZ 85726-7210
Phone: (520) 791-2619 / Fax: (520) 791-4941

# WORK STATUS VERIFICATION

*This form is used when an employee is required to provide a medical clearance **PRIOR** to returning to work pursuant to Administrative Directive 2.01-7.*

## EMPLOYEE INFORMATION
### TO BE COMPLETED BY HUMAN RESOURCES

| NAME: Last, First MI | | BIRTH DATE | EMPLOYEE # |
|---|---|---|---|
| Clark, Camie | | | |
| | POSITION | | |

| DEPARTMENT | | DIVISION |
|---|---|---|

## TO BE COMPLETED BY PHYSICIAN

Medical Clearance Required By: ____City Physician    ____Employee's Physician

Date of Medical Examination: **5/6/16**
                             mm/dd/yy

### MEDICAL CLEARANCE TO RETURN TO WORK

☐ *Employee unable to work at this time. Expected return to work date is:* _____

☐ *Employee may return to work without restrictions:* ☐ Immediately    ☐ On date: _____

☒ *Employee may return to modified duty on* **5/6/16** *with the following restrictions*
until **surgery** (date):

MAY11  9:42AM

☐ No driving    ☐ No equipment operation    ☐ Reduced hours _____ hrs/day    ☒ Other – Explain Below

Other: (Please explain)
pt needs to be on light duty for
a ventral hernia. No heavy
lifting

| PHYSICIAN'S PHONE NUMBER | PHYSICIAN'S FAX NUMBER |
|---|---|
| (520) 547-2311 | (520) 547-2320 |

| PHYSICIAN'S PRINTED NAME | PHYSICIAN'S SIGNATURE | DATE |
|---|---|---|
| Michael Purkis | | 5/6/16 |

COT003751

**JoAnn Acosta - Doctor Notes**

| | |
|---|---|
| **From:** | Carrie Clark |
| **To:** | Acosta, JoAnn |
| **Date:** | 5/11/2016 9:39 AM |
| **Subject:** | Doctor Notes |
| **Attachments:** | IMG_3652.JPG; Part.002; IMG_3653.JPG; Part.004; Modified copy of IMG_3652.JPG |

COT003752

**JoAnn Acosta - Re: Doctor Notes**

| | |
|---|---|
| **From:** | JoAnn Acosta |
| **To:** | Carrie Clark |
| **Date:** | 5/11/2016 10:36 AM |
| **Subject:** | Re: Doctor Notes |
| **Cc:** | Laura Baker;  TFD_Payroll |
| **Attachments:** | Off Duty Light Duty Request Form.pdf |

**Carrie,** Thank you for the dr.'s note.  Your request for light duty has been approved effective today.  You will report to Chief Baker.  She will assign you your work hours. Initially you will work the Communications staff to get trained then your work location will be at Fire Central, Office 259.  As a reminder, This assignment is temporary and is not a permanent assignment.  This assignment will be evaluated every 30 days and will not exceed 12 months.  Your pay will be moved from a suppression pay schedule to an 80-HR pay schedule. You will work a 5/8 work schedule on holiday weeks however, if approved, you can work a 4/10 work schedule on other weeks.  You will not receive Holiday Pay while on a light duty assignment and 80-HR pay schedule. If you are not released to full/regular duty at six (6) months, you will be referred to City-HR for a case review and evaluation for a possible Reasonable Accommodation under ADA. Please refer to page 2 of the light duty request form for additional policy information.

**Chief Baker,**  Carrie's restrictions include no heavy lifting. At this time, we do not have an expected time frame.

Please let me know if either of you have any questions.

Thanks,
JoAnn

>>> Carrie Clark 5/11/2016 9:39 AM >>>

COT003753

**From:**       JoAnn Acosta
**To:**         John Gulotta;   Keith Bourie;   James Heal
**CC:**         Mike Fischback;   Mike Garcia;   Veronica Munoz
**Date:**       5/2/2016 3:51 PM
**Subject:**    Fwd: Off-the-Job Light Duty
**Attachments:**  Off Duty Light Duty Request Form.pdf; Work_Status_Verification_Form.pdf; Return to Duty.pdf

FYI Captains...

Paramedic Clark is **not** on light duty. This email has been sent to her reminding her of the procedure.   If she has questions about light duty, please refer her to the email and to contact me or Veronica.

Thank you,
JoAnn
>>> JoAnn Acosta 5/2/2016 3:47 PM >>>
Carrie,

It was brought to my attention that you may be requesting light duty for an off-the-job injury.     In order to request light duty for an off-the-job injury, you must complete the attached request form and have your chain of command approve.   You must also have a medical note from your personal physician indicating that you are placed on light duty.   The medical note must list your restrictions to include restrictions with physical training.   This is the same procedure that was in place when you were placed on light duty twice before.

The first attachment is the request form; the second attachment is Work Status Verification form that your physician can complete. Depending on how long your are placed on a light duty assignment and the medical reason, this will determine on whether or not you will need to get cleared by the City Physician. When you are seen by your personal physician to get released for full duty, the Return to Duty form (third attachment for future reference)and a new Work Status Verification form must be completed.

If you need this process expedited, please deliver the request form and medical note from your personal physician to me and I can obtain the approvals from the Deputy Chief through the Fire Chief.

If you do not submit any requests for light duty for an off-the-job injury or have notified your supervisor of an on-the-job injury, you are expected to perform the full functions of your job as Paramedic.   Please let me know if you have any questions or concerns or need additional information or assistance.

Thanks,
JoAnn

COT003754

## TEMPORARY LIGHT DUTY WORK ASSIGNMENT FORM

## TUCSON FIRE DEPARTMENT

Employee Name (print): _____          Employee ID: _____

Rank & Shift: _____          Supervisor's Name: _____

Date of Request _____          Time frame Requested: _____

**Section I – Commencement of Employee's Light Duty Work: To be completed by employee:**

Based on the restrictions identified by my physician, I am being assigned to Light Duty.  This assignment is temporary and is not a permanent assignment.  This assignment will be evaluated every 30 days and will not exceed 12 months.  I will be moved from a suppression to an 80-HR pay schedule. I will work a 5/8 work schedule on holiday weeks however, if approved, I can work a 4/10 work schedule on other weeks.  I will not receive Holiday Pay while I am on an 80-HR pay schedule. If I am not released to full/regular duty at six (6) months, I may be referred to the Human Resources Department for case review, evaluation and possible Reasonable Accommodation under the Americans with Disabilities Act (ADA).

Physician's Release to Light Duty Date: _____          Light Duty Assignment Start Date:          _____

| SKILS AND ABILITIES | Yes | No | | Computer Skills: | Yes | No |
|---|---|---|---|---|---|---|
| **Ability to drive City vehicle** | ☐ | ☐ | | MS Word | ☐ | ☐ |
| **Certified to drive apparatus** | ☐ | ☐ | | Internet Research | ☐ | ☐ |
| **Certified Paramedic** | ☐ | ☐ | | Web Design | ☐ | ☐ |
| **Prior 8-hrs experience** | ☐ | ☐ | | TeleStaff | ☐ | ☐ |
| If Yes, where: _____ | | | | Other_____ | ☐ | ☐ |
| | | | | | | |
| **Computer skills** MS Access | ☐ | ☐ | | **Technical Writing Ability** | ☐ | ☐ |
| MS Excel | ☐ | ☐ | | **Filing, sorting and making copies** | ☐ | ☐ |
| MS PowerPoint | ☐ | ☐ | | **Data entry** | ☐ | ☐ |
| | | | | **Typing** (Are you proficient?) | ☐ | ☐ |

**Other specialized skills or knowledge that would be beneficial to TFD:** _____

**Section II – Employee's Acknowledgement:**

By signing below, I am accepting the terms and conditions of the assignment, as stated above.

_____          _____

Employee's Signature                                                            Date

**Section III – Department's Approval:**

_____          _____          _____          _____

Supervisor's Signature                     Date                 Assistant Chief's Signature                  Date

_____          _____          _____          _____

Battalion Chief's Signature                Date                 Fire Chief's Signature                        Date

_____          _____          _____          _____

Deputy Chief's Signature                   Date                 Fire HR's Signature                          Date

**Section IV – For Fire HR Use Only**

Is Light Duty Available:          Yes   ☐          No   ☐

- Physician's Release to Light Duty Date: _____
- Light Duty Assignment Start Date: _____
- Scheduled Days: _____
- Scheduled Start & End Times: _____

- Location: _____
- Assigned Duties: _____
- Light Duty Supervisor: _____
- Next Review Date: _____

COT003755

## Light Duty Policy Information

Light duty is a temporary work assignment intended for employees who are recovering from a medically documented mental or physical illness or injury sustained on or off the job, which have work restrictions, and who are expected to eventually return to unrestricted work.

### Uniforms
Light duty personnel will wear the Tucson Fire Department uniform unless restricted by cast, braces, crutches, etc.

### Supervision
Employees on light duty will be supervised by the supervisor of the work unit where the employee is assigned light duty.  Supervisors are responsible for monitoring the productivity of employees while in light duty assignments.

### Evaluations
If an employee is due a performance evaluation while on a light duty assignment, the supervisor who has supervised the employee for the majority of the time will complete the evaluation.  Work performance evaluations will address the employee's job duties while on light duty.

### Absences
Fire HR will keep the assigned supervisor informed of all requests for leave time including scheduled doctor appointments and physical therapy appointments.  For personnel with on-the-job injuries, doctor and physical therapy appointments should be scheduled during work hours if possible and will be charged WC (workers compensation) for the amount of time not at work.  For personnel with off-the-job injuries, sick leave or vacation will be used for doctor and physical therapy appointments scheduled during work hours.

Overtime is not paid for doctor and physical therapy appointments that occur outside the employee's work hours.  Work status reports are provided to employees at each doctor's appointment.  The employee will notify the supervisor and the Department Human Resources Manager of their work status after each doctor's appointment and provide a copy of the work status report.  Verification of physical therapy appointments will also be provided.

The attendance of light duty personnel will be recorded on the Time Worked Record of the assigned work unit.  For Telestaff, the employee will be removed from their regular assignment and be placed in the assigned work unit for light duty.  Leave usage must also be recorded in Telestaff utilizing the administrative temporary 8-hour leave codes.

If assigned to a 4/10 work schedule, personnel must work a 5/8 work schedule on holiday weeks. When taking a 4/10 day off, you must have approval from you supervisor.

### Pay
For suppression personnel, base rate will change to reflect an 80-HR pay schedule at the beginning of the pay period. While on a 80-HR pay schedule, Holiday Pay will not be paid.

### Physical Fitness
Uniformed employees, with a on-the-job injury wishing to participate in the department's fitness activities must have a written approval from the City physician if their injury or illness is work related.  While on a light duty schedule, personnel will follow the Physical Fitness Program guidelines for staff uniformed personnel provided in the Manual of Operations, Section 7-209.  Physical Fitness for personnel with an off-the-job injury is not authorized during normal working hours.

### Training
While in a light duty assignment, attendance at continuing education (CE) classes or at the semi-annual drill (SAD) will be when the group are normally scheduled with attends, provided work restrictions allow participation.  If the employee is not able to attend on the day originally scheduled, it will continue to be the employee's responsibility to find an opportunity to attend. Attendance at Tape and Charts while on light duty is limited to two per month.

### Revocation of Light Duty
Revocation of light duty may occur for lack of performance, violation of Tucson Fire Department policies and procedures or at the completion of a project or assignment.

COT003756



# Clinician's Return to Unrestricted Duty Form

## Employee's Name: _____

Firefighting is a dynamic and physically challenging activity and all members must be fully capable to do their job safely and effectively. To that end, it is imperative that all members be able to perform the necessary job functions without restrictions that may affect the safety of themselves or others on their crew. The following list of essential job functions is taken from NFPA 1582, Standard on Comprehensive Occupational Medical Program for Fire Departments, 2013 Edition, to guide the physician in evaluating the ability of a member with specific medical conditions to perform specific job tasks.

This form ensures the Fire Department that it has a clear understanding of the types of restrictions you may have placed on the firefighter. Please check all boxes appropriately and sign below. Return this form to the firefighter. Questions can be directed to your Fire Department Human Resources Manager.

| YES | NO | |
|---|---|---|
| ☐ | ☐ | While wearing personal protective ensembles and self-contained breathing apparatus (SCBA), performing fire-fighting tasks (e.g., hose-line operations, extensive crawling, lifting and carrying heavy objects, ventilating roofs or walls using power or hand tools, forcible entry, etc.) , rescue operations, and other emergency response actions under stressful conditions while wearing PPE (personal protective equipment) and SCBA (self-contained breathing apparatus), including working in extremely hot or cold environments for prolonged time periods. |
| ☐ | ☐ | Wearing an SCBA, which includes a demand valve-type positive-pressure face piece or HEPA filter mask, which requires the ability to tolerate increased respiratory workloads. |
| ☐ | ☐ | Exposure to toxic fumes, irritants, particulates, biological (infectious) and non-biological , and/or heated gases, despite the use of personal protective ensembles and SCBA. |
| ☐ | ☐ | Depending on the local jurisdiction, climbing six or more flights of stairs while wearing fire protective ensembles weighing at least 50 lb (22.6 kg) or more and carrying equipment/tools weighing an additional 20 to 40 lb (9 to 18 kg). |
| ☐ | ☐ | Wearing fire protective ensemble that is encapsulating and insulated, which will result in significant fluid loss that frequently progresses to clinical dehydration and can elevate core temperature to levels exceeding 102.2 °F (39°C). |
| ☐ | ☐ | While wearing personal protective ensembles and SCBA, searching, finding, and rescue-dragging or carrying victims ranging from newborns up to adults weighing over 200 lb (90 kg) to safety despite hazardous conditions and low visibility. |
| ☐ | ☐ | While wearing personal protective ensembles and SCBA, advancing water-filled hose-lines up to 2 in. (65 mm) in diameter from fire apparatus to occupancy [(approximately 150 ft (50 m)], which can involve negotiating multiple flights of stairs, ladders, and other obstacles. |
| ☐ | ☐ | While wearing personal protective ensembles and SCBA, climbing ladders, operating from heights, walking or crawling in the dark along narrow and uneven surfaces, and operating in proximity to electrical power lines and/or other hazards. |
| ☐ | ☐ | Unpredictable emergency requirements for prolonged periods of extreme physical exertion without benefit of warm-up, scheduled rest periods, meals, access to medication(s), or hydration. |
| ☐ | ☐ | Operating fire apparatus or other vehicles in an emergency mode with emergency lights and sirens. |
| ☐ | ☐ | Critical, time-sensitive, complex problem solving during physical exertion in stressful, hazardous environments, including hot, dark, tightly enclosed spaces, that is further aggravated by fatigue, flashing lights, sirens, and other distractions. |
| ☐ | ☐ | Ability to communicate (give and comprehend verbal orders) while wearing personal protective ensembles and SCBA under conditions of high background noise, poor visibility, and drenching from hose-lines and/or fixed protection systems (sprinklers). |
| ☐ | ☐ | Functioning as an integral component of a team, where sudden incapacitation of a member can result in mission failure or in risk of injury or death to civilians or other team members. |

**Firefighter can perform all the above functions without restrictions.**         **Effective Date: _____**

**If the firefighter cannot perform all of the above without restrictions, indicate the specific restrictions:**

_____

_____

| | | | |
|---|---|---|---|
| **Signed:** _____ | | **Date:** _____ | |
| **Print Name:** _____ | | **Phone Number:** _____ | |

<span style="color:red">**Note to firefighter:**</span> You must return this form the City Physician, with a copy to your Fire Human Resources Office.
<span style="color:red">**You will not be able to return to work until this is done.**</span>

Rev. 2/18/15 (bcs)



**City Of Tucson**
**Human Resources**
**Medical & Leave Management**
PO Box 27210, Tucson AZ 85726-7210
Phone: (520) 791-2619 / Fax: (520) 791-4941

# WORK STATUS VERIFICATION

*This form is used when an employee is required to provide a medical clearance **PRIOR** to returning to work pursuant to Administrative Directive 2.01-7.*

## EMPLOYEE INFORMATION
## TO BE COMPLETED BY HUMAN RESOURCES

| NAME: Last, First MI | BIRTH DATE | EMPLOYEE # |
|---|---|---|
| POSITION | | |

| DEPARTMENT | DIVISION |
|---|---|

## TO BE COMPLETED BY PHYSICIAN

Medical Clearance Required By:        _____City Physician        _____Employee's Physician

Date of Medical Examination: _____
                              mm/dd/yy

**MEDICAL CLEARANCE TO RETURN TO WORK**

☐ Employee unable to work at this time.  Expected return to work date is: _____

☐ Employee may return to work without restrictions: ☐ Immediately   ☐ On date: _____

☐ Employee may return to modified duty on _____ with the following restrictions

    until _____ (date).

☐ No driving   ☐ No equipment operation   ☐ Reduced hours _____ hrs/day   ☐ Other – Explain Below

Other: (Please explain)

_____

_____

_____

| PHYSICIAN'S PHONE NUMBER | PHYSICIAN'S FAX NUMBER | |
|---|---|---|
| | | |

| PHYSICIAN'S PRINTED NAME | PHYSICIAN'S SIGNATURE | DATE |
|---|---|---|
| | | |

COT003758

# EXHIBIT 66



# MASTER MEMO

**DATE:** May 13th, 2016

**TO:** All Fire Personnel

**FROM:** Mike Garcia
Assistant Chief

JoAnn Acosta
Fire HR Manager

**SUBJECT: 2016 Seniority Within Rank Report**

Attached is the most recent Seniority in Rank. Any questions or concerns can be addressed to JoAnn Acosta through your Chain of Command. This list reflects staffing changes that will be effective by May 29th, 2016. Due to the complexities involved with the calculations, a document was needed to ensure consistency our members move through the various ranks in our Department. The following measures for calculating Seniority in Rank have been agreed upon by representative of Local 479 and Fire Administration. These generally reflect past practices, although there has not been formal direction which could allow future inconsistencies. These procedures will officially be used as a standard for TFD effective May 1st, 2016.

Seniority will be calculated as time worked within rank provided the initial probation was completed. In the job classifications of Inspector, Engineer, and Paramedic, seniority will only be calculated for time worked in each job classification. Timed worked within these classifications of equal rank (i.e. Inspector, Engineer, Paramedic) does not transfer to a previous position held within the equal rank but different classification, nor does it apply to a new position gained within the equal rank in a different classification.

> *Example:* *Firefighter from 8/19/2000 to 12/01/2006*
> *Paramedic from 12/2/2006 to 5/31/2013*
> *Engineer from 6/1/2013 to 7/1/2015*
> *Paramedic from 7/2/2015 to present*
>
> *Seniority Date for Paramedic would be 6/2/2013*

For (voluntary or involuntary) demotions, the date of rank will revert to the date they initially were promoted/assigned to that rank. The time worked in the higher rank will count towards overall seniority in the new position.

> *Example:* *Firefighter from 8/19/2000 to 12/01/2006*
> *Paramedic from 12/2/2006 to 5/31/2013*
> *Firefighter from 6/1/2013 to present*
>
> *Seniority Date for Firefighter would be 8/19/2000*

**Clark 0979**

However, if a member re-promotes to the same rank they demoted from, those years of service held at the lower rank will not count towards the seniority date in the higher rank.

Example:     Firefighter   from 08/19/2000 to 12/01/2006
             Paramedic from 12/2/2006 to 05/31/2013
             Firefighter  from 06/1/2013 to 07/1/2015
             Paramedic from 07/2/2015 to present

             Seniority Date for Paramedic would be 6/2/2013

Seniority List
Commissioned May 20

MM#     021
DATE:   05/13/16

Clark 0980

# EXHIBIT 67



# TUCSON FIRE DEPARTMENT
## CHIEF OFFICER
### Performance Evaluation Form and Performance Contract

*(Instructions: Fill in text boxes first. Navigate between boxes by using the tab key or mouse. Fill in each check box. The spell check will work on the narrative field only.)*

| Employee Name: **Gordon Clark** | Employee #: **46392** | Date: **12/14/2016** |
|---|---|---|
| Annual: ☐  Special: ☒<br>Six-Month Probation: ☐ | Rating Review Period  From: **01/10/2016**  To:<br>**12/14/2016** | |
| Classification/Department: **Battalion Chief** | Supervisor/Reviewer: | |

CHECK THE APPROPRIATE BOX AFTER EACH OF THE FOLLOWING CATEGORIES

| | Excellent | Above Standard | Meets Standards | Improvement Needed | Does Not Meet Standards |
|---|---|---|---|---|---|
| **GENERAL CONDUCT:** | ☐ | ☐ | ☐ | ☐ | ☒ |

Productive member of the Tucson Fire Department and City of Tucson Organization. Delivers completed staff work. Assignments are completed promptly, accurately and with minimal supervisor guidance. Demonstrates efforts to enhance the quality of life within the community and the department through actions and words.

| | Excellent | Above Standard | Meets Standards | Improvement Needed | Does Not Meet Standards |
|---|---|---|---|---|---|
| **FITNESS:** | ☐ | ☐ | ☒ | ☐ | ☐ |

Maintains adequate level of fitness necessary to accomplish emergency and non-emergency activities as may be required of assigned rank and position. Participates in daily physical fitness activities. Ensures subordinates participate in daily physical fitness activities and are physically capable of performing assigned duties.

| | Excellent | Above Standard | Meets Standards | Improvement Needed | Does Not Meet Standards |
|---|---|---|---|---|---|
| **SAFETY:** | ☐ | ☐ | ☒ | ☐ | ☐ |

Monitors and ensures a safe working environment to provide the health and well being of subordinates and the members of the community. Follows and enforces safety policies and procedures established by OSHA, the City of Tucson and the Tucson Fire Department related to providing a safe working environment. Ensures continued compliance with all vehicle and apparatus driving policies. Investigates and follows up on all industrial injuries and exposures to include necessary remedial action.

| | Excellent | Above Standard | Meets Standards | Improvement Needed | Does Not Meet Standards |
|---|---|---|---|---|---|
| **LEADERSHIP:** | ☐ | ☐ | ☐ | ☐ | ☒ |

Mentors and guides actions of all subordinates. Supervises and manages so as to inspire confidence of subordinates. Follows and enforces all department policies. Demonstrates supports for the mission and goals of the department as determined by the fire chief. Demonstrates loyalty to superiors and the organization. Provides guidance and resources necessary for subordinates to accomplish the mission of the organization. Demonstrates endeavors toward career development of subordinates and actively participates in developing sound candidates for promotion.

**Directs** the actions and efforts of others toward a common purpose directing, persuading, motivating, encouraging, and inspiring others to achieve organizational objective and accomplish tasks, both individually and in cooperation with others; being assertive and self confident in interactions with others; encouraging and stimulating new ideas; accepting responsibility for the actions of subordinates; inspiring others to maintain a positive outlook and attitude toward accomplishing tasks and solving problems; and being recognized and accepted as a leader by others.

COT003382

CHIEF OFFICER PERFORMANCE EVALUATION
Page 2

**Solves Problems** – this element addresses performance in: identifying problems effectively, rendering sound judgments, making decisions, and taking corrective actions; and taking initiative in originating actions to influence events rather than passively accepting or only responding to events.

**MANAGEMENT EFFECTIVENESS:** ☐ ☐ ☒ ☐ ☐

Plans, prioritizes, organizes, and schedules resources to achieve goals – This element addresses performance in: initiating and developing creative and thorough plans that are timely, feasible, logical, and supported by facts; organizing, scheduling, and deploying resources

**Resource Management** – Personnel & Equipment, Leave Management, Loss Prevention, Needs forecasting.

**DOCUMENTATION:** ☐ ☐ ☒ ☐ ☐

Completes projects, records & reports and other required documentation in a timely manner. Manages time and resources effectively meeting deadlines for completion of required tasks. Manages schedule, keeps calendar up to date, coordinates out-of-service activities within respective district. Ensures annual OSHA requirements such as SCBA training, as well as recurring requirements such as monthly safety meetings, PPE inspection and quarterly inspection are completed. Supervises district EMS captain to ensure that subordinates maintain current EMS certifications including EMT, CEP, ACLS, PEPP, CPR, and other required certifications. Conducts regular district briefings. Ensures all district personnel are up to date on department and City communications.

**COMMUNITY RELATIONS:** ☐ ☐ ☒ ☐ ☐

Interacts well with business owners and the general public in all areas whether in the emergency or non-emergency setting. Displays professionalism and maintains bearing at all times when dealing with members of the community. Responds to complaints and inquiries promptly and objectively in order to minimize misunderstandings. Represents the Tucson Fire Department to the public in a manner that will promote the professional image of the department.

**EMERGENCY OPERATIONS:** ☐ ☐ ☒ ☐ ☐

Consistently exhibits strong command presence during emergency incidents. Demonstrates thorough knowledge of the incident management system. Effectively directs fire department units, personnel and other resources to mitigate Fire, EMS and other emergencies. Demonstrates thorough knowledge of emergency policies, procedures and operating guidelines. Interacts well with other command officers, readily carries out orders from other incident commanders, reports concerns and unsafe conditions during emergency operations and supports the incident commander as part of the incident management team. Demonstrates compliance with all emergency scene requirements related to Incident Safety Officer, Accountability, Personnel Rehabilitation and Incident Documentation.

**PERSONNEL PREPAREDNESS AND CREDENTIALS:** ☐ ☐ ☒ ☐ ☐

Supports in-service training and associated documentation for all district personnel. Assures compliance with all district personnel. Assures compliance with all district personnel credential maintenance such as EMT Certification as well as mandatory OSHA and COTEU trainings. Participates in district level drills as well as department mandated PSA training. Encourages subordinates to expand their knowledge and further their careers by participating in promotional testing. Gives necessary personal attention to probationary members to ensure their success in completing the probationary process.

COT003383

CHIEF OFFICER PERFORMANCE EVALUATION
Page 3

## COMMENTS:

You are being given this special evaluation due to several significant concerns I have regarding your general conduct specifically your decision making as well as your leadership skills. For example, you placed your emergency unit out of service for personal reasons without communicating with your supervisor on more than one occasion. You also failed to communicate with your supervisor about an event where you were the focus of a federal investigation where federal law enforcement agents interviewed you for several hours while you were at work. These issues demonstrate poor leadership and conduct not conducive to a Chief Officer. Your lack of communication with your supervisor demonstrates your willingness to circumvent policy and protocol as well as your chain of command. You are not demonstrating the leadership behaviors or the decision making skills expected of a Chief Officer. Your actions continue to undermine the administration of the organization. Your attitude and behavior towards the department and City leadership is confrontational and counterproductive. As a result and your demonstrated poor performance in the areas of general conduct and leadership, you lack the skills and professionalism and failed to meet the expectations of a Chief Officer/Battalion Chief with Tucson Fire, resulting in not passing probation. You will be placed in your former classification of Fire Captain effective next pay period. I hope you will grow from this experience and use the knowledge and skills you have attained these past months to better yourself in hopes that you may want to compete again for a promotional opportunity in the future.

Employee Signature/Date: _Did not get signature_

Supervisor Signature/Date: _____  12/15/16

Reviewed by Signature/Date: _____  12/15/16

My signature acknowledges that I have received this evaluation and associated feedback from my supervisor, although I may not necessarily agree with the evaluation. Signatures only required at the end of the evaluation year.

Rev. 9/01/09 bcs

COT003384

# EXHIBIT 68



# MEMORANDUM

**DATE:** December 06, 2016

**TO:** Jeff Thompson
Deputy Chief
Operations

**FROM:** Patrick F. Quinn
Battalion Chief
BN02-C

**SUBJECT:** Lack of Action

On Tuesday November 22, 2016 I was off duty on a Take Trade while BC Gordan Clark was paying me back for 24 hours that I had previously worked for him. During the PM shift of that 24 Firefighter Anthony Tolano failed to report to duty for a PM trade that was entered and aproved on the books. It is my understanding that Captain Karnap contacted EC Bathe to notify his DMT of the problem, and Captain Bathe contacted EC01 to inform them that the spot at station 5 was still vacant as FF Tolano had not shown up for work and no one had any success in reaching him. EC01 and BC01 decided to offer ED to the FF who was already working an AM ED shift at Station Five and that individual stayed on for 12 more hours.

As we discussed in your office today, my concern with this situation has many facets, but one of the most glaring is BC Clark did not do anything. He has not to my knowledge started any disicipline or documentation of FF Tolano not showing up for work, he did not notify me of the occurance and he did not notify FF Tolano's battalion chief, Tim Cornely that his guy missed work. Nothing was done. According to Captain Bathe, he informed BC Clark of the situation and that an ED person was hired at the cost of the city to cover this vacancy and BC Clark responded minimally.

I am concerned with this lack of action because as administrators we need to hold our people accountable to the organization. It is our job to investigate and document situations that cost the city additional dollars and create a lack of accountablity within the rank and file. By BC Clark not doing anything, not investigating, not informing me, not informing BC Cornely or his own chain of command this situation has just drifted without anyone holding FF Tolano accountable.

I do not appreciate another chief officer coming into my district and not up holding the same rules, regs and A.D.'s that the rest of the chief officers expect our members to follow. This lack of leadership not only undermines the efficiency of my district, but it also undermines the integrity of the organization. We as chief officers expect our personnel to do their jobs in a comprehensive and professional manner. We as chief offiers should expect no less than the same commitment to duty from the other members of our own rank and ourselves. While I find it repulsive to suggest that another chief officer should be monitored to ensure he/she is doing their job, I do feel that through a lack of action and exhibited lack of concern for providing leadership Chief Clark has proven to be in need of guidance, modeling, and monitoring.

To be clear, I will not offer to make a trade with or ask Chief Clark for a trade in the future as I no longer trust him to follow through with required aspects of the position of Battalion Chief.

COT003857

# EXHIBIT 69

**JACOBSON LAW FIRM**
2730 EAST BROADWAY BLVD., SUITE 160
TUCSON, ARIZONA 85716
TELEPHONE (520) 885-2518
FACSIMILE (520) 844-1011
jeff@jhj-law.com
Jeffrey H. Jacobson, PCC #65402; SB#019502
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK, | No. CV-14-02543-TUC-CKJ |
| Plaintiff, | |
| vs. | **PLAINTIFF'S RESPONSES TO DEFENDANT'S THIRD SET OF NON-UNIFORM INTERROGATORIES AND FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS** |
| CITY OF TUCSON, | |
| Defendant. | |

Plaintiff Carrie Ferrara Clark, through undersigned counsel, hereby responds to Defendant City of Tucson's Third Set of Non-Uniform Interrogatories and Fourth Request for Production of Documents as follows.

### General Objections

1. Plaintiff makes the following general objections with respect to each and every item of Defendant's Non-Uniform Interrogatories and Request for Production of Documents. These objections are not waived, even if some objectionable documents are made available to Plaintiff, nor does Plaintiff, by producing any responsive documents, waive objection to their admission into evidence on the grounds of relevance, materiality or other proper ground for objection.

2. Plaintiff objects to each and every Non-Uniform Interrogatory and Request for Production of Documents as unduly burdensome and oppressive, to the extent that they

1

seek information and/or the production of materials that have already been made available to Defendant, including without limitation, information and documents Defendant has received as part of Plaintiff's disclosures in this case.

3. Plaintiff objects to each Non-Uniform Interrogatory and Request for Production of Documents to the extent that they call for information or documents subject to the deliberative process and attorney-client privileges, documents protected as attorney workproduct or by the Privacy Act, 5 U.S.C. §552a, or materials otherwise subject to other applicable privileges or immunity.

4. Plaintiff objects to Defendant's Non-Uniform Interrogatories and Requests for Production of Documents to the extent that the inquiry or request seeks to require Plaintiff to provide information not fully known at this time.

5. Plaintiff objects to each Non-Uniform Interrogatory and Request for Production of Documents to the extent that the inquiry or request seeks to require Plaintiff to provide information which is not necessary to supplement the record.

6. Without waiving the above objections, Plaintiff will provide only relevant, nonprivileged information currently available to her, subject only to requirements for supplementation of Responses.

7. Plaintiff further qualifies each and every one of her responses below with the fact that additional facts and witnesses may be discovered in the future. *See Whittaker Corp. v. Execuair Corp.,* 736 F.2d 1341, 1347 (9th Cir.1984) ("The purpose of a discovery cutoff date is to protect the parties from a continuing burden of producing evidence and to assure them adequate time to prepare immediately before trial. . . . A discovery cutoff date does not, however, affect admissibility of evidence obtained outside of the discovery process of the case in which the cutoff date is ordered.")

//

//

2

## NON-UNIFORM INTERROGATORIES ("NUI")

**NUI # 11:** Regarding Count One of the Third Amended Complaint alleging sex discrimination in violation of the Fair Labor Standards Act, 29 U.S.C. § 207(r), state separately:

a) Each station to which the Plaintiff was assigned which did not provide an appropriate lactation room as required by the above statute. For each station, state the date of each such assignment, the person you claim intentionally violated the above statute by making that specific assignment and whether you lost any wages or benefits as a result of that specific assignment;

**Plaintiff objects as this interrogatory and its unnumbered subparts is overly burdensome, overbroad, duplicative, and not reasonably calculated to lead to admissible evidence. The information and documents sought by this request are in the custody and control of Defendant as Telestaff and Shift Calendars reside on Defendant's computer systems.** *See, e.g.,* **documents Bates labeled COT002352-2354, 003081-3085.  Without waiving said objections, Plaintiff responds as follows.**

**On December 7, 2013, Plaintiff was on swing shift and Defendant had not assigned her to a station. Plaintiff took a morning VAC because of the uncertainty of where she would be assigned and the available stations where Defendant might assign her given her low seniority on the swing shift. On December 11-12, 2012, Plaintiff took a 24-hour VAC because she was on swing shift and Defendant had not assigned her to a legally-compliant station.**

**On January 23-24, 2013, Defendant assigned Plaintiff to Station 9, Medic 49, which did not have a legally-compliant lactation space. Plaintiff believes she was assigned there by Captain Rick L'Heureux. Plaintiff was reassigned that day to Station 3 (which was not legally compliant) as a fire fighter on the morning shift. Plaintiff used vacation (VAC) leave that evening of 12 hours. She worked the a.m. shift at Station 3 because she was having to budget and ration her leave time.**

**On January 25-26, 2013, Plaintiff took at 12-hour (a.m.) VAC because she was on swing shift and Defendant had not assigned her to a legally-compliant station. That**

evening, Defendant assigned Plaintiff to work at Station 19, which was not legally compliant.

On February 7, 2013, Plaintiff was on swing shift and Defendant had not assigned her to a station. Plaintiff took a morning VAC because of the uncertainty of where she would be assigned and the available stations where Defendant might assign her given her low seniority on the swing shift. Further, on February 5-6, 2017 (the shift prior to February 7, 2013), Defendant moved Plaintiff twice during her shift to two different stations.

On February 11, 2013, Defendant assigned Plaintiff to Station 7, Medic 47, which did not have a legally-compliant lactation space. Battalion Chief Pat Quinn complained to Captain Rick L'Heureux that was not an appropriate assignment because he was not going to give up his office or the EC office so Plaintiff could express her breast milk during the shift; Defendant then moved Plaintiff to Station 20, Paramedic 20.

On February 26, 2013, Plaintiff was on swing shift and Defendant had not assigned her to a station; Plaintiff took a morning VAC because of the uncertainty of where she would be assigned and the available stations where Defendant might assign her given her low seniority on the swing shift.

On March 11, 2013, Plaintiff was on swing shift and Defendant had not assigned her to a station. Plaintiff took a morning VAC because of the uncertainty of where she would be assigned and the available stations where Defendant might assign her given her low seniority on the swing shift.

On March 20, 2013, Defendant assigned Plaintiff to Station 9, Medic 49, which did not have a legally-compliant lactation space. Plaintiff took VAC for the morning shift and took sick leave for the evening shift. On March 22-23, Plaintiff took a 12-hour (morning) VAC because Defendant had moved fire fighter Andrew Grimes out of Station 6 so that Plaintiff could work there. When Plaintiff arrived for her p.m. shift, she saw a note on the dorm room door indicating that was her room; she was also told that fire fighter Grimes was upset that he had to leave Station 6.

4

b) Identify each person at TFD you hold responsible for what you allege was a pattern of hostile and belittling behavior towards you; and

**Objection. The term "hold responsible" is vague, ambiguous, and not defined. Further, this interrogatory is overly burdensome, overbroad, and not reasonably calculated to lead to admissible evidence. Plaintiff also objects because this interrogatory usurps the jury function because the ultimate question of motive is itself an issue of fact for the jury to decide.** ***See Hunt v. Cromartie*, 526 U.S. 541, 549 (1999).** **Plaintiff also objects insofar as Count One of her Third Amended Complaint alleges it is *Defendant's* actions which violate the Fair Labor Standards Act. Further, Plaintiff's burden is to prove the motive to discriminate was one of the *employer's* motives. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *see also Los Angeles Dept. of Water and Power v. Manhart,* 435 U.S. 702, 711, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) ("liability depends on whether the protected trait" "actually motivated the employer's decision" and "had a determinative influence on the outcome . . . .") Next, in *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 856-57 (9th Cir. 2002) (en banc), *aff'd* 539 U.S. 90 (2003), the Ninth Circuit concluded that the court may provide either a "single motive" or "mixed motive" jury instruction, which are not fundamentally different theories of liability, at the close of evidence. Plaintiff's theories of liability are also based on vicarious liability and negligence.**

**Without waiving said objections, Plaintiff responds as follows. These individuals were directly or indirectly involved in Defendant's adverse employment actions, including Defendant's retaliatory actions, as alleged in Plaintiff's Third Amended Complaint, had supervisory control over TFD and its employees, were empowered by Defendant to take tangible employment actions against Plaintiff, and/or had the authority or responsibility to prevent the discrimination and retaliation from happening: JoAnn Acedo, Jim Critchley, Ted McDonough, Ed Nied, Rob Rodriguez, Rick L'Heureux, Mike Fischback, Laura Baker, Mike Garcia, Joe Gulotta, Phil Morgan, and Ken Brouilette. Jeff Langejans also carried out a pattern of hostile,**

discriminatory, retaliatory, and belittling behavior towards Plaintiff and Defendant failed to take prompt, effective remedial action to end the harassment.

c) Identify each person at TFD you hold responsible for intentionally discriminating against you in violation of the above statute and for each such person state the factual basis for your allegation that the person acted with malice or with reckless indifference to your protected federal rights.

**See Plaintiff's response to Non-Uniform Interrogatory 11(b) above. The factual allegations are contained in Plaintiff's Third Amended Complaint paragraphs 11 through 180.**

**NUI # 12:** Regarding Count Two of the Third Amended Complaint alleging retaliation in violation of the Fair Labor Standards Act, 29 U.S.C. § 215, state separately:

a) each (i) act, (ii) pattern, (iii) policy or (iv) practice you allege in paragraph 188 of the Third Amended Complaint violated FLSA's anti-retaliation provision.

**Plaintiff objects as this interrogatory and its unnumbered subparts is overly burdensome, overbroad, and not reasonably calculated to lead to admissible evidence. Without waiving these objections, Plaintiff responds as follows. For all time relevant to the Third Amended Complaint, Defendant did not have any policy, plan, or procedures in place for nursing mothers (such as, for example, a workplace breastfeeding policy) despite federal law which requires all employers to offer eligible employees an appropriate location and job-protected time off from work to express breast milk for their nursing infants. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 4207, 124 Stat. 119, 577 (2010). Even the TFD Pregnancy Policy, MOPS Section 219, which was, at one time, in effect, was pulled by Human Resources Manager Joann Acedo and referred to the City Attorney's Office for review because it was completely unlawful.**

**When Plaintiff returned from maternity leave, Defendant placed her on a swing shift where she faced periods of daily uncertainty as to whether she would be assigned to a station which had a place, other than a bathroom, shielded from view and free from intrusion from coworkers and the public, to express her breast milk. An internal**

6

**investigation conducted by Defendant revealed that, in fact, 9 of 21 stations inspected were not in compliance with the Fair Labor Standards Act. See documents Bates labeled COT000371-373.**

**Even when Plaintiff received an assignment which had an acceptable space for expressing her breast milk, she was criticized and demonized multiple times by the Defendant for allegedly taking the truck she was working on out of service so that she could express her breast milk despite federal law requiring employers to provide a reasonable amount of break time to express milk as frequently as needed. On several occasions, as described in Plaintiff's response to Non-Uniform Interrogatory 11(a) above, Defendant assigned Plaintiff to stations which did not comply with federal law. When she raised these issues with Defendant, Defendant commenced a campaign of harassment, hostility, and retaliation that continues to this day.**

b) State each adverse employment action which you allege violated FLSA's anti-retaliation provision. For each separately identify the person or persons responsible for the adverse action and the factual basis for alleging that each specific action was in retaliation for the exercise of Plaintiff's FLSA rights.

**Plaintiff objects as this interrogatory and its unnumbered subparts is overly burdensome, overbroad, and not reasonably calculated to lead to admissible evidence. An adverse action in the context of a retaliation claim need not materially affect the terms and conditions of employment so long as a reasonable employee would have found the action materially adverse, which means it might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011) (applying *Burlington* standard). Without waiving said objections, Plaintiff responds as follows.**

**The adverse actions suffered by Plaintiff include, but are not limited to, the following. Not having a consistent assignment that complied with her rights under the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 4207, 124 Stat. 119, 577 (2010) and the Fair Labor Standards Act's provisions for nursing mothers.**

7

Being assigned to work at stations and assignments which were not compliant with the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 4207, 124 Stat. 119, 577 (2010) and the Fair Labor Standards Act's provisions for nursing mothers. Having to work at stations and assignments which were not compliant with the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 4207, 124 Stat. 119, 577 (2010) and the Fair Labor Standards Act's provisions for nursing mothers. Having to take leave because of uncertainty as to whether she would receive, or to avoid, assignments which were not compliant with the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 4207, 124 Stat. 119, 577 (2010) and the Fair Labor Standards Act's provisions for nursing mothers. Being treated differently than other male colleagues regarding transfers and assignments. When Captain Rick L'Heureux said to Captain Gordon Clark, "I don't think she [Plaintiff] deserves any special accommodations."

Being told by HR Manager Acedo that her "pumping seems excessive. . . ." and that Plaintiff "was not fit for duty." Receiving an Employee Counseling on or about March 26, 2013. Being assigned to Station 6, at the far southeast boundary of the City of Tucson. Being denied access to the list of stations which were allegedly approved as compliant the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 4207, 124 Stat. 119, 577 (2010) and the Fair Labor Standards Act's provisions for nursing mothers. Being deprived of overtime earning opportunities and station trades. Being told by an Assistant Chief, "well, that's what happens when you file a complaint with EEO." Taking no action when it became aware that employees were calling TFD's new nursing room policy "the Carrie Clause" when it clearly knew it was a negative reference. Taking no action when it became aware that coworkers were mocking Plaintiff's status as a nursing mother.

Being singled out by Captain Ted McDonough to perform firefighting drills on or about May 22, 2014. Being harassed by HR Manager Acedo's repeated contacts wanting to know if Plaintiff still had the same need to pump her breast milk, or words to that effect. Being threatened with insubordination and being required to prepare a

memorandum regarding the May 22, 2014, drill. Being treated differently than her male counterparts regarding her light duty assignment, and being required to provide documentation which was not required by policy.

When HR Manager Acedo (or someone on her behalf) withdrew hours from Plaintiff's leave bank on or about June 19, 2014. Being told that she could only exercise at a specific location when others on light duty were never required to do so. Being told that trades with Captain Gordon Clark were not allowed in or around June 4, 2014.

See Plaintiff's Third Amended Complaint paragraphs 92 through 124 regarding Captain Jeff Langejans' actions, threats, and other behaviors, and Defendant's failure to cure the hostile work environment caused by his harassing and intimidating conduct towards Plaintiff and Captain Gordon Clark. Failing to conclude that Captain Langejans retaliated, discriminated, and harassed Plaintiff. When Plaintiff received an undeserved performance rating from Phil Morgan in 2015.

Transferring Captain Gordon Clark from Fire Prevention to Operations (from an 8-hour to 24-hour shift schedule) and using the cover of Defendant's nepotism policy, which Defendant was not following (and still does not follow) as pretext.

When Defendant gave Plaintiff an Educational Counseling on or about March 24, 2016. When Defendant failed to substantiate Plaintiff's wrongful conduct complaint, case number 16-03-0001. When Defendant involuntarily transferred Plaintiff from Fire Prevention back into a swing shift paramedic position in Operations. When Defendant implemented a new seniority policy on May 13, 2016, but made it retroactive to May 1, 2016, the day before Defendant made its transfer of Plaintiff to Operations effective (despite the fact that Defendant informed Plaintiff of her transfer on April 27, 2016.) As a result, Plaintiff lost approximately two years of seniority which she had earned.

When Defendant ordered Plaintiff to attend its fire academy for refresher training. When, the day after Plaintiff deposed Assistant Chief Laura Baker, Defendant assigned Plaintiff to work for Assistant Chief Baker in a light-duty

assignment in an office directly across the hall from Assistant Chief Baker and where she had to report to Assistant Chief Baker. Because Plaintiff was forced into a light-duty assignment as a result of a pre-diagnosed hernia condition, she was deprived of holiday pay. When Plaintiff had to have surgery to correct her hernia condition which she would not have done if Defendant had not involuntarily transferred her out of Fire Prevention back into Operations.

When Plaintiff was not paid for being deposed by Defendant's counsel on four occasions. When Defendant found that Plaintiff's wrongful conduct complaint, case number 16-06-0001, did not meet Defendant's criteria for retaliation.

When Plaintiff demoted to a fire fighter position. When Defendant deprived her of Paramedic Assignment Pay. When Defendant decided that Gordon Clark, who had promoted to Battalion Chief, had not passed his probationary period.

**NUl # 13:** Regarding Count Three of the Third Amended Complaint alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964, state separately:

a) Each adverse employment action which you allege violated Title VII. For each separately identify the (i) date it occurred, (ii) the material term or condition of employment which was adversely affected, (iii) the person or persons responsible for the adverse action and (iv) the factual basis for alleging the action was based upon sex discrimination in violation of Title VII.

**See Plaintiff response to non-uniform interrogatories 11(a), 11(b), and 12(b).**

b) Identify each person who you allege in paragraph 196 acted with malice or with reckless indifference to Plaintiff's federally protected rights and identify the specific action(s) which each person did.

**See Plaintiff response to non-uniform interrogatories 11(a), 11(b), and 12(b).**

**NUl # 14:** Regarding Count Four of the Third Amended Complaint alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, state whether you allege there are any actions by TFD other than those described in paragraphs 20-2 and 202 which you allege were in retaliation in violation of Title VII of the Civil Rights Act of 1964. If your answer is yes, state each adverse employment action which you allege violated Title

VII. For each separately identify the (i) date it occurred, (ii) the material term or condition of employment which was adversely affected, (iii) the person or persons responsible for the adverse action and (iv) the factual basis for alleging the action was based upon sex discrimination in violation of Title VII.

**See Plaintiff response to non-uniform interrogatories 11(a), 11(b), and 12(b).**

**NUI # 15:** Regarding Count Five of the Third Amended Complaint alleging retaliation discrimination in violation of Title VII of the Civil Rights Act of 1964, state separately:

a) each (i) act, (ii) pattern, (iii) policy or (iv) practice you allege constitutes retaliation discrimination.

**See Plaintiff response to non-uniform interrogatories 11(a), 11(b), and 12(b).**

b) State each adverse employment action which you allege constituted retaliation discrimination. For each separately identify the person or persons responsible for the adverse action and the factual basis for alleging that each specific action was in retaliation for the exercise of Plaintiff's Title VII rights.

**See Plaintiff response to non-uniform interrogatories 11(a), 11(b), and 12(b).**

c) Identify each person at TFD you who you allege in paragraph 207 willfully and intentionally discriminated against you in violation of the above statute and for each such person state the factual basis for your allegation that the person intended to discriminate against you.

**See Plaintiff response to non-uniform interrogatories 11(a), 11(b), and 12(b).**

**REQUEST FOR PRODUCTION OF DOCUMENTS ("RFP")**

**RFP #7**: Provide copies of all written documents and electronic records which pertain to the supplemental allegations in the Third Amended Complaint.

**Plaintiff has either previously disclosed responsive documents or they have been disclosed as part of Plaintiff's Sixth Supplemental Disclosure.**

//
//
//
//

11

DATED this 30th day of June, 2017.

**JACOBSON LAW FIRM**

_____
Jeffrey H. Jacobson
Attorney for Plaintiff

Copy emailed this 30th day
of June, 2017, to:

Michael W.L. McCrory
Michelle Saavedra
Principal Assistant City Attorneys
Office of the City Attorney, Civil Division
255 W. Alameda, 7th Floor
Tucson, Arizona 85701

12