**JACOBSON LAW FIRM**
2730 EAST BROADWAY BLVD., SUITE 160
TUCSON, ARIZONA 85716
TELEPHONE (520) 885-2518
FACSIMILE (520) 844-1011
jeff@jhj-law.com
Jeffrey H. Jacobson, PCC #65402; SB#019502
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK,<br><br>              Plaintiff,<br><br>vs.<br><br>CITY OF TUCSON,<br><br>              Defendant. | No. CV-14-02543-TUC-CKJ<br><br>**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Cindy K. Jorgenson |

Plaintiff Carrie Ferrara Clark submits her Cross-Motion for Summary Judgment on her Third Amended Complaint as follows.

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.    SUMMARY OF ARGUMENT

Since October 27, 2012, the City of Tucson Fire Department (TFD) has subjected Plaintiff Carrie Clark to a pattern of unlawful conduct that constitutes sex discrimination and retaliation under the Fair Labor Standards Act (FLSA) and Title VII of the Civil Rights Act of 1964 (Title VII). Considering the record evidence in this case, there is no dispute of material fact that TFD lacked a policy or plan for how to comply with federal law governing nursing mothers under the Patient Protection and Affordable Care Act (PPACA). There is also no dispute of material fact that TFD could have provided Mrs. Clark with an assignment to a fire station that complied with the PPACA, but refused, so she could express breastmilk in a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public. Further, there is no dispute of material fact

1

that TFD retaliated against Mrs. Clark for raising and pursuing the lack of proper lactation space through her chain of command (all the way to the Fire Chief himself), and for filing an EEO complaint regarding TFD's discrimination. There is also no dispute that TFD failed to take steps to prevent the retaliation from continuing. Finally, there is no contested issue of material fact that TFD created a severe, pervasive, hostile work environment for Mrs. Clark by both its malfeasance and nonfeasance in this case. For these reasons, Mrs. Clark is entitled to summary judgment on all of the claims alleged in her Third Amended Complaint.

## II.     STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the party moving for summary judgment is the party that would bear the burden of persuasion at trial, "that party must support its motion with credible evidence… that would entitle it to a directed verdict if not controverted at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). The moving party may rely on "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to demonstrate the absence of an issue of material fact that would require a trial. *Id*. at 323. If there is not sufficient evidence "favoring the nonmoving party for a jury to return a verdict for that party," then there is no issue of material fact and summary judgment should be granted in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## III.    LEGAL ARGUMENT

### A.     TFD Violated Section 207(r) of the Fair Labor Standards Act When it Failed To Provide Legally Compliant Space for Mrs. Clark to Express her Breastmilk

TFD unquestionably failed to provide legally-mandated lactation facilities for Mrs. Clark to express breastmilk for her newborn son. Thus, Mrs. Clark's claim under FLSA § 207(r) succeeds as a matter of law. FLSA requires that an employer provide:

> (A) a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and
>
> (B) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

29 U.S.C. § 207(r)(1).

The application and enforceability of § 207(r) have not been widely addressed by the Courts. *Hicks v. City of Tuscaloosa*, 7:13-CV-02063-TMP, 2015 WL 6123209, at *28 (N.D. Ala. Oct. 19, 2015). However, several federal courts have held that § 207(r) creates a private cause of action for unpaid wages and overtime compensation related to an employer's failure to provide adequate break time or space for lactation. *See Id.* at 29; *Lico v. TD Bank*, 14-CV-4729 JFB AKT, 2015 WL 3467159, at *3 (E.D.N.Y. June 1, 2015) ("To be clear, damages in a private suit under § 207(r) are limited to wages lost as a result of the employer's failure to provide an adequate space for lactation"); *Mayer v. Prof. Ambul., LLC*, 211 F. Supp. 3d 408, 413 (D.R.I. 2016).

TFD admits that prior to July 19, 2013, it lacked a policy for complying with § 207(r) by providing reasonable break time and private space for lactating mothers. Exh. X. ¶ 1; PSOF 8, 45.[1] Office of Equal Opportunity Programs (OEOP) Investigator Matthew Larsen concluded that 9 of TFD's 21 fire stations, or 43%, did not have facilities suitable for the expression of breast milk, and thus were non-compliant with § 207(r). PSOF 56. TFD does not dispute that Mrs. Clark provided notice to her immediate supervisor of her need for lactation facilities prior to returning to work from maternity leave. PSOF 159, Exh. EEE ¶ 15; Doc. 87 ¶ 15. Further, TFD admits that when Mrs. Clark returned to work, she was placed on a "swing" shift, meaning that she was assigned to different stations each shift according to its staffing needs. PSOF 159; Doc 87 ¶ 14; Exh. EEE ¶ 14. As a result of Mrs. Clark's status as a "swing" paramedic, there was a high likelihood that Mrs. Clark would

---

[1] The abbreviation "PSOF" refers to Plaintiff's Statement of Facts in Support of Cross-Motion for Summary Judgment. The abbreviation "Doc." refers to the Court's docket. The abbreviation "Exh." refers to Exhibits to Plaintiffs Cross-Motion for Summary Judgment.

3

be, and she in fact was, assigned several shifts at stations that were not in compliance with §

207(r). PSOF 31, 35. Mrs. Clark was not assigned to a station with compliant facilities[2] for

lactation on at least 11 different occasions that she can specifically recall: December 7,

2012, On December 11-12, 2012, January 23-24, 2013, January 25-26, 2013, February 5-6,

2017, February 7, 2013, February 11, 2013, February 26, 2013, March 11, 2013, March 20,

2013, and March 22-23, 2013. PSOF 27. Mrs. Clark was forced to use sick leave or

vacation time on at least eight of these occasions to avoid having to work at a station where

she could not be guaranteed the private, sanitary environment to express her breastmilk that

she was legally entitled to. *Id.* These occasions, on their own, represent a significant loss of

benefits in the form of paid leave.  In addition to those she can specifically recall, Mrs.

Clark was also likely forced to take leave when assigned to other non-compliant stations on

numerous occasions.

As a result of being assigned to stations that did not have legally-mandated lactation

spaces, Mrs. Clark was forced to expend vacation and sick leave days. PSOF 28. This

expenditure of leave represents uncompensated time for which Mrs. Clark is entitled to

redress under FLSA. It is hardly a stretch to infer that TFD was laissez-faire about its

approach to her assignments knowing that she could simply expend a benefit of

employment (vacation or sick leave) if, in her "perception," (as Defendant alleges) the

station assignment was inappropriate. PSOF 49, 54. Essentially, Mrs. Clark was at TFD's

whim because there was no TFD policy to protect her.

Since TFD failed to ensure that all of its stations contained adequate spaces for

nursing mothers to express breast milk, and thus failed to comply with § 207(r), Mrs. Clark

was forced to use paid time off to cover what should have been unpaid break time to

express milk for her son. Therefore, she was forced to work a significant number of

additional hours that could have been substituted for paid time off, essentially receiving no

wages or overtime for those hours. Receiving no wage clearly falls below the federal

---

[2] Mrs. Clark was also assigned on numerous occasions to Station 12, which was technically not PPACA-compliant but at least had a sanitary space shielded from view (even though it was not private because there was no lock. PSOF 16-17, 19.

minimum wage. Under the plain text of the FLSA and federal court precedent interpreting § 207(r), Mrs. Clark is entitled to recover her lost wages and overtime for those hours, and an additional equal amount in liquidated damages. 29 U.S.C. § 216(b). As TFD has not introduced any evidence to refute the fact that Mrs. Clark was forced to use paid time off to avoid working in non-compliant stations, no genuine issue of disputed material fact exists, and Mrs. Clark's motion for summary judgment should be granted.

**B.   Ample, Unrebutted Direct Evidence Demonstrates that TFD Engaged in Prohibited Discrimination Against Mrs. Clark Due to Her Status as a Breastfeeding Mother**

In 1978, Congress amended Title VII with the Pregnancy Discrimination Act (PDA), which provides that discrimination "because of sex" or "on the basis of sex" includes discrimination on the basis of pregnancy, childbirth, or related medical conditions. 42 U.S.C. § 2000e(k). Lactation or expressing milk states a cognizable Title VII sex discrimination claim. *Harper v. Thiokol Chemical Corp.*, 619 F.2d 489 (5th Cir. 1980). PDA cases are analyzed using the same framework as other Title VII discrimination cases. *See Armstrong v. Flowers Hospital,* 33 F.3d 1308, 1312-13 (11th Cir. 1994). Title VII renders the following employer conduct unlawful:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

A plaintiff in a pregnancy discrimination case can prove a disparate treatment claim in two ways, by "direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic" or indirectly, using the *McDonald Douglas* burden shifting approach. *Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338 (2015). In this

case, there is both direct and circumstantial evidence, neither of which are rebutted or disputed.

Direct evidence is "'evidence of the conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude…sufficient to permit the fact finder to infer that the attitude was more likely than not a motivating factor in the employer's decision.'" *Everts v. Sushi Brokers LLC,* U.S. Dist. Az. (CV015-02066-PHX-JJT) (March 27, 2017) *quoting* Shelley v. Geren, 666 F.3d 599, 615-16(9th Cir. 2012). Direct evidence "requires an admission by the decision-maker that his or her actions were based on the prohibited animus. Absent such remarks, a plaintiff must show a nexus between a decision-maker's actions and a superior's discriminatory remarks." *Id.* (citing *Day v. LSI Corp.* 174 F.Supp.3d 1130, 1162(D. Ariz. 2016); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003)

Before returning to work after having her first child, Mrs. Clark called Battalion Chief (BC) Paul McDonough to secure a long-term opening that would provide her with a consistent place to pump and express her breastmilk. She called BC McDonough because she knew that TFD did not have a policy that covered employees who were nursing/breastfeeding. PSOF 7-8. The only policy that TFD had on its books as of November 6, 2009, was deemed unlawful by its HR Manager, Joann Acedo. PSOF 8. Even though Station 20 appeared to comply with federal law, and Mrs. Clark requested to be assigned there, TFD chose not to do so. PSOF 10-11, 13.

Station 12, where Mrs. Clark was working, had a private room shielded from view, though it did not have a lock on it so it would not have been completely free from intrusion from coworkers and the public. Nevertheless, Plaintiff was willing to try to make that space work. PSOF 16-17, 19. A co-worker offered to help her and asked to move to another station so that Mrs. Clark could stay at Station 12, which complied with PPACA requirements. PSOF 14-15.

BC McDonough subsequently brought Mrs. Clark to TFD headquarters to meet with Deputy Chief (DC) Ed Nied and DC Rob Rodriguez. During that meeting, DCs Nied and

Rodriguez accused her of being disingenuous with her request – they believed she simply wanted to be closer to her mother, who would pick up breastmilk from Mrs. Clark at work. They also suggested that Plaintiff should just take more time off from work and that they could not remember any other women in the past having the same issues with breastfeeding. PSOF 21. This accusation is direct evidence of discrimination. Mrs. Clark gave the deputy chiefs no reason to doubt the sincerity of her request, which was for an accommodation that was reasonable, and mandated under the law. TFD eventually denied the requests for assignment to Station 12 and put the assignment out to bid because it violated TFD's Rules of Assignment. PSOF 18, 22.

TFD, however, does not always follow its Rules of Assignment and often deviates from them. For example, TFD has accommodated employees who have received DUI convictions or other criminal charges, and for those who are on a work improvement plan. TFD has also granted assignment changes to its personnel to assist them in times of need. PSOF 24-25. Nevertheless, TFD continued to assign Mrs. Clark to non-compliant stations. PSOF 27. TFD assignment scheduler, Captain Rick L'Heureux, stated "I don't think she deserves any special accommodations" (or words to that effect) when informed of Mrs. Clark's need to be assigned to stations with appropriate space for lactation. PSOF 27. This statement strongly suggests that Captain L'Heureux's continued failure to assign Mrs. Clark to complaint stations reflected his personal, discriminatory feelings on her status as a nursing mother.

These instances represent direct evidence of decision makers within TFD regarding Mrs. Clark's legally protected need to express breastmilk with derision, and subsequently making choices that adversely affected Mrs. Clark's career. They are thus direct evidence of discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989). TFD offers no contrary evidence. As a result of the failure of TFD to provide Mrs. Clark with a consistent assignment to a station that complied with federal law, she often had to take vacation and sick leave. PSOF 28. The lack of a consistent assignment where she knew she could express her breastmilk privately, free from intrusion, caused Mrs. Clark a great deal of stress and

anxiety, which in turn affected her ability to produce an adequate supply of breastmilk for her son while she was on shift. PSOF 9, 14, 20, 28, 67. Consequently, Mrs. Clark's son did not gain weight as expected and was assessed by his doctor as being underweight. PSOF 32.

The situation reached a crescendo when on March 20, 2013, TFD assigned Mrs. Clark to another station that did not have legally-compliant lactation space. When Mrs. Clark spoke with then-Assistant Chief (AC) Michael Fischback, DC Rodriguez and HR Manager Acedo, about this problem, HR Manager Acedo told Mrs. Clark that her pumping seemed excessive and that "it seems to me that you're not fit for duty." PSOF 35-41; PSOF 159; Doc 87 ¶ 43; Exh. EEE ¶ 43. During this call, HR Manager Acedo suggested that Mrs. Clark simply wake up her Captain (EC) or BC when she needed to express breastmilk. PSOF 37-38.

These insensitive, ignorant, discriminatory statements are further direct evidence of a workplace policy or management decision relying specifically on Mrs. Clark's protected status. AC Fischback would later agree that HR Manager Acedo's suggestion was inappropriate. PSOF 39.

Nevertheless, when Mrs. Clark reacted to the ridiculousness of HR Manager Acedo's suggestion (that she simply wake up her EC or BC in the middle of the night to pump) with colorful language (but without cussing), TFD decided to formally discipline Mrs. Clark. PSOF 58-59. TFD also accused Mrs. Clark of hanging up on them during the call, though the only evidence they have of this is that their phone line suddenly went dead. PSOF 60.

HR Manager Acedo chuckled to herself during the March 20, 2013, call because TFD had no idea how to handle Mrs. Clark's simple request for legally-compliant lactation space. Ignorant as to the law at the time, she thought that it was simply a medical issue that should not be different than anything else. PSOF 45, 72. HR Manager Acedo thought that Mrs. Clark was simply upset over not receiving "special treatment" and that TFD was refusing to exercise its vested discretion over its Rules of Assignment. PSOF 24-25, 48.

The same day, with a few simple keystrokes, TFD sent an email asking the City of Tucson (City) to install a privacy lock on one of the bedroom doors at Station 6 because

that is where TFD was assigning Mrs. Clark. PSOF 50-51. When City workers were installing the lock, someone put a big note on the door that said, "Carrie Clark." OEOP Program Manager Bob Barton took that to mean that "there's going to be an uncomfortable issue with her." PSOF 55. There is no record evidence that OEOP, TFD, or any other City entity did anything to address this obvious "uncomfortable issue" TFD had to deal with because Mrs. Clark sought to enforce her rights as a breastfeeding mother.[3] And that is exactly where TFD assigned Mrs. Clark – to Station 6, on the far southeast boundary of Tucson, on Wilmot & I-10, a station which primarily services state and federal prisons. PSOF 61. Despite Mrs. Clark's inquiries about working overtime and the ability to trade shifts on her special assignment, TFD never responded. Therefore, TFD deprived Mrs. Clark of overtime and shift-trading opportunities. PSOF 63.

Five months after Mrs. Clark first raised the fact that TFD did not have adequate, legally-compliant spaces for nursing mothers, the City's Equal Opportunity Programs Division (EOPD) Investigator Matthew Larsen produced findings that 43% (or 9 of 21) of TFD's fire stations did not comply with federal law. PSOF 56. Further, TFD did not even have a process or policy in place where employees could even request assignments for unique circumstances. PSOF 56-57.

At the same meeting that TFD formally disciplined Mrs. Clark, she asked why she could not work at Station 12. AC Fischback said that Station 12 was not on TFD's list of stations that were in compliance. When Mrs. Clark pointed that out that the only other nursing mother in TFD was at Station 12, AC Fischback replied, "Well, that's what happens when you file a complaint with EEO." Mrs. Clark pointed out that she had not filed a complaint; AC Fischback retorted that someone had gotten them involved. PSOF 64. This is more direct evidence of discrimination (as well as abject reprisal.)

---

[3] That was, unfortunately, the attitude of many TFD and City employees. OEOP Program Director Barton thought this was a matter of Mrs. Clark's "perception" – not TFD's responsibility to follow federal laws prohibiting discrimination against breastfeeding mothers, providing them with private lactation spaces, and to ensure that its employees were not subjected to a hostile work environment as a result. PSOF 54.

Instead of acknowledging that not having legally-compliant nursing spaces in its stations was a problem that needed to be resolved, TFD made Mrs. Clark the scapegoat, singling her out at every possible turn. BC McDonough referred to Mrs. Clark's request as her "specific needs" and that they were working to "ensure her needs were met…" PSOF 68. When TFD issued a new Nursing Rooms Policy eight months after Mrs. Clark first raised the issue, it was widely referred to as the "Carrie Clause" or the "Carrie Rule." PSOF 70, 74. And when the Clarks brought this offensive label to the attention of management, they closed the investigation, blaming them for not 'naming names' of the offending characters (which the Clarks dispute.) PSOF 81-83. This despite the fact that on August 1, 2013 AC Brad Olson sent an email to TFD management acknowledging that calling the policy the Carrie Clause was negative. PSOF 76.

There is no dispute of material fact that TFD's ad-hoc, seat-of-its-pants approach to assigning Mrs. Clark after she returned from maternity leave was discriminatory. PSOF 68-69. Even after its Nursing Rooms Policy was in place, TFD continued to harass Mrs. Clark with uncertainty and mixed messages about her assignments. PSOF 77-78, 81, 86-87. There is plentiful direct evidence that TFD's workplace policies (or lack thereof), its practices, and its decisions relied solely on Mrs. Clark's protected characteristic. *Young, supra*, 135. S.Ct. at 1345. Further, the undisputed evidence demonstrates that Mrs. Clark was subjected to numerous adverse employment actions, defined as acts that materially affect the terms, conditions, or privileges of employment." *Weeks v. Union Pac. R.R. Co.*, 137 F. Supp. 3d 1204, 1216-17 (E.D. Cal. 2015). Summary Judgment is therefore appropriate on Mrs. Clark's Title VII claims.

### C. Direct Evidence in this Case Demonstrates TFD Subjected Mrs. Clark to a Hostile Work Environment so Severe and Pervasive that, as a Matter of Law, She has Clearly Suffered Discrimination Under Title VII

No genuine issue of material fact exists to dispute that TFD subjected Mrs. Clark to a pattern of harassment based on her status as a nursing mother that was so severe and pervasive as to constitute hostile work environment discrimination. "A claim of 'hostile environment' sex discrimination is actionable under Title VII." *Meritor Sav. Bank, FSB v.*

10

*Vinson*, 477 U.S. 57, 73 (1986). Two elements are required: 1) conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive;" and 2) the victim must "subjectively perceive the environment to be abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). Significantly, a hostile work environment need not "seriously affect employees' psychological well-being," rather, conduct that "can... detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers," is sufficient to establish a hostile work environment claim. *Id*. at 22.

An employer can be held vicariously liable for individual harassment by a supervisory employee if the employer failed to exercise reasonable care to prevent the harassment, or failed to promptly correct the harassment. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). An employee can be considered a supervisory employee for the purposes of establishing vicarious liability even if they do not directly supervise the harassed employee. An employee who can recommend that another employee suffer an adverse employment action fits within the definition of a supervisor with respect to that other employee. *Id*.  762. An employee also qualifies as a supervisor for the purposes of establishing vicarious liability if they have the apparent authority to discipline another employee; they need not have the actual authority to do so. *Llampallas v. Mini-Circuits*, Lab, Inc., 163 F.3d 1236, 1247 (11th Cir. 1998).

The record evidence in this case overwhelmingly supports the claim that Mrs. Clark suffered through a hostile work environment based on her status as a nursing mother in violation of Title VII. Mrs. Clark's decision to express breast milk for her newborn son for the first year after his birth was questioned, derided, minimized, dismissed, and ridiculed at every turn. PSOF 21, 27, 31, 36-41, 45-48, 54-55, 64, 68, 73, 74, 76, 84.

When Mrs. Clark returned to work after maternity leave for her second child, the hostile work environment discrimination worsened. In June or July 2014, Mrs. Clark promoted to a position in TFD's Fire Prevention Division (Fire Prevention). PSOF 99.

Captain Jeff Langejans then began a pattern of harassing conduct against Mrs. Clark that included telling his subordinate that it would be easy to kill his enemies, spreading negative rumors about Mrs. Clark's marriage, sharing negative comments about Mrs. Clark posted to an online article about Mrs. Clark's lawsuit, disparaging Mrs. Clark as the reason for poor morale in Fire Prevention, claiming the Clarks were ruining Fire Prevention, accusing her of cheating on her promotional test to his subordinates, and making threatening and derogatory remarks about Mrs. Clark and female firefighters generally. PSOF 98-116.

TFD admits that Fire Prevention Inspectors Tom Sisterman and John Vincent, subordinates of Captain Langejans, filed complaints which corroborated the hostile work environment in Fire Prevention created and caused by Captain Langejans' treatment of Mrs. Clark. PSOF 159; Doc 87 ¶ 113; Exh. EEE ¶ 113. While it investigated Captain Langejans' conduct, Captain Langejans received the equivalent of a slap on the wrist; he was never removed from his position or transferred to a different department. PSOF 120. When EOPD Investigator Larsen criticized TFD for letting Captain Langejans get off easy, TFD defended its actions. PSOF 123-25, 127. For these reasons, no genuine issue of material fact exists to dispute that TFD subjected Mrs. Clark to hostile work environment sex discrimination based on her status as a nursing mother.

TFD is vicariously liable for the individualized harassment that Captain Langejans directed at Mrs. Clark, as the Department failed to take steps to prevent or promptly remedy the situation. While Captain Langejans was not Mrs. Clark's direct supervisor, he outranked her and worked within the same department. PSOF 101-02. Thus, he had the authority to recommend that Mrs. Clark suffer an adverse employment action, and it was abjectly reasonable for Mrs. Clark to believe that he could subject her to an adverse employment action. Therefore, Captain Langejans was Mrs. Clark's supervisor for the purposes of establishing vicarious liability, and TFD demonstrably failed to prevent or promptly remedy his harassment of Mrs. Clark. Even after Inspectors Vincent and Sisterman lodged separate complaints against Captain Langejans and his harassment, putting TFD command on further notice in early January 2015, Langejans' harassment continued. PSOF 112.

On January 30, 2015, Inspector Sisterman wrote a memorandum directly to Chief Critchley, again decrying Captain Langejans' conduct towards Mrs. Clark. PSOF 116. Langejans' harassment continued. On February 2, 2015, Captain Gordon Clark sent a memorandum to Chief Critchley complaining of Captain Langejans' harassment of him and Mrs. Clark. PSOF 117. Langejans harassment continued. Despite these separate complaints by numerous individuals, incredibly, AC Baker concluded that TFD had insufficient evidence to discipline Captain Langejans for his harassment with anything more than a written reprimand (similar to what a TFD employee receives for being late for work), and instructed Mrs. Clark to "move past this." PSOF 119. In doing so, TFD ignored EOPD's findings and also violated its own policies regarding discipline. PSOF 123. Captain Langejans' harassment of Mrs. Clark continued. Meanwhile, the investigation into Captain Langejans' conduct resulted in Gordon Clark's transfer to a lower paying position. PSOF 128-29.

As a result of Captain Langejans' continuing harassment, on March 9, 2016, Mrs. Clark filed a wrongful conduct complaint. PSOF 133. Instead of taking this opportunity to finally meaningfully prevent Captain Langejans' harassment, TFD dismissed the complaint and instead issued Mrs. Clark an educational counseling for violating TFD policies of "harmony and cooperation among fellow workers." PSOF 134-135. Unsurprisingly, Captain Langejans' harassment of Mrs. Clark continued. TFD ignored complaints by four separate individuals, as well as Mrs. Clark's formal wrongful conduct complaint, instead enabling Captain Langejans' hostile, harassing, unethical behaviors. To make matters worse, TFD subjected the Clarks to adverse employment actions in retaliation for exercising their legal right to file wrongful conduct complaints. Not only did TFD fail to take reasonable action to prevent or remedy Captain Langejans' harassment of Mrs. Clark, it affirmatively took steps to discourage the Clarks from utilizing harassment reporting procedures in the future. Therefore, TFD is clearly vicariously liable for the Captain Langejans' harassment of Mrs. Clark beyond factual dispute.

13

The conduct that Mrs. Clark suffered both prior to and after her second maternity leave were both objectively hostile and abusive, as demonstrated by the fact that at least two other individuals who witnessed the conduct filed complaints for hostile work environment, and subjectively perceived by Mrs. Clark as hostile and abusive, as demonstrated by the fact that she lodged multiple internal and external complaints, both formal and informal. PSOF 19, 29-30, 33-34, 74-75, 120. Summary judgment is also appropriate on this claim.

> **D.** **Even Assuming, Arguendo, Direct Evidence Does Not Support Title VII Discrimination or Hostile Work Environment, No Genuine Issue of Material Fact Exists to Dispute that Mrs. Clark has Proven a Prima Facie Case Under the *McDonnell Douglas* Burden-Shifting Framework**

Where there is no direct evidence of discrimination, the Plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others similar in the ability or inability to work. *Young, supra,* 135 S. Ct. at 1354. This is not an inflexible rule. *Id.* Actions by an employer from which can be inferred, absent an explanation, that were more likely than not based on discriminatory criterion are illegal under Title VII. *Id.* The burden on the plaintiff to state a prima facie case is "not onerous." *Id., citing Texas Dept. of Community Affairs v. Burdine,* 450 U. S. 248, 253 (1981).

There is no genuine dispute that Mrs. Clark is a member of a protected class, or that she sought accommodation in the form of a consistent assignment to a station that had a place, other than a bathroom, that was shielded from view and free from intrusion from coworkers and the public so she could express her breastmilk. There is also no genuine dispute that TFD failed to accommodate her. PSOF 10-11, 13-22, 26-28, 35, 42, 45, 48, 64, 66, 74, 77-78, 81, 84, 86-87. The record evidence also shows that TFD admits that, despite its excuses to Mrs. Clark that its Rules of Assignment did not allow for what Mrs. Clark was asking, it does not, in fact, follow its Rules of Assignment, and can make exceptions based on "management rights." PSOF 23-24. TFD has deviated from its Rules of Assignment for employees who have been convicted of driving under the influence,

charged with other criminal offenses, and employees whom are on a work improvement plan. PSOF 24. TFD also prohibited Mrs. Clark from being assigned to Station 12 despite the fact that the only other nursing mother in TFD, Arianne Phaneuf, was assigned there. PSOF 64. Therefore, Mrs. Clark has established a prima facie case. Further, there is no record evidence that TFD has or can offer a legitimate, non-discriminatory reason for its disparate treatment of Mrs. Clark. PSOF 64. Any seemingly legitimate explanations that TFD fabricates for its actions *ex post facto* are betrayed as false by the unrefuted statements outlined above by TFD decision makers Rick L'Heureux, Joann Acedo, Michael Fischback, and others that raise a strong inference of discriminatory animus. For these reasons, even under the *McDonnell Douglas* burden-shifting framework, Mrs. Clark is entitled to summary judgment.

**E.    TFD Retaliated Against Mrs. Clark in Violation of Title VII Both in its Treatment of Her Husband and in Her Unfavorable Station Assignments.**

The record evidence in this case reflects that Mrs. Clark was subjected to retaliation when she complained of Captain Langejans' hostile work environment discrimination outlined above. Title VII makes it unlawful for an employer to:

> discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). It is well established that to "discriminate against" in the context of this statute refers to "distinctions or differences in treatment that injure protected individuals." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006). To establish a prima facie case for retaliation, a plaintiff must show: 1) she engaged in a protected activity; 2) her employer subjected her to an adverse employment action; and 3) a causal link exists between the protected activity and the adverse action. *Ray*, 217 F.3d at 1240; *citing Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir.1994). An adverse employment action is any "adverse treatment that is reasonably likely to deter

employees from engaging in protected activity." *Id*. at 1240. The Ninth Circuit has taken a "broad" and "expansive" approach to determining the specific types of treatment that fit within that definition. *Id*. at 1241. Retaliatory action taken against a person's fiancé is unlawful under Title VII. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011). Logically, this Supreme Court precedent also applies to a person's spouse.

Over the course of several years, TFD unlawfully retaliated against Mrs. Clark in numerous ways, including, among others: continually assigning her to non-compliant stations (PSOF 27, 33); formally disciplining her (PSOF 58-59); failing to address, discourage, or correct inappropriate, discriminatory, and harassing behavior in TFD (PSOF 55, 70, 73-74); refusing to assign her to Station 12 (PSOF 15-18, 22, 64); changing her start time while she was on light duty, forcing her to get a doctor's note to exercise, and restricting where she could exercise (PSOF 94-96); withdrawing time from her vacation bank without her consent (PSOF 97); failing to adequately and properly address the hostile work environment in Fire Prevention (PSOF 123); using its investigation into Captain Langejans to justify transferring her husband, Gordon Clark, to a lower paying, less desirable position, under a nepotism policy that TFD does not otherwise enforce (PSOF 126-129); issuing her an Educational Counseling for disturbing workplace harmony when she complained of Captain Langejans' harassment (PSOF 133-34); involuntarily transferring her from Fire Prevention to Operations and retroactively enforcing its new seniority policy to effectively strip her of two years of seniority (PSOF 135-39); transferring her to a light duty position in which she had to report to someone she had deposed the day before; (PSOF 142-44); constructively demoting her by forcing her to accept a demotion to fire fighter to avoid being placed back on swing shift in a continually hostile work environment (PSOF 149); refusing to pay her full "$150 Club" benefit (PSOF 150); and failing Gordon Clark during his probationary period in the Battalion Chief position (PSOF 152).

Regarding Gordon Clark's transfer out of Fire Prevention, Mrs. Clark filed a formal administrative complaint with the City regarding Captain Langejans' conduct. PSOF 121,

159; Doc. 87 ¶ 125; Exh. EEE ¶ 87. This constitutes protected activity within the definition of Title VII because Mrs. Clark "testified, assisted, or participated in any manner in an investigation" into allegations of hostile work environment sex discrimination. 42 U.S.C. § 2000e-3(a). TFD then turned its investigation into Captain Langejans' conduct into a finding that its nepotism policy was being violated because Mrs. Clark and Gordon Clark worked in Fire Prevention (though not in the same supervisory chain). PSOF 124-125; Doc. 87 ¶ 130; Exh. EEE ¶ 130. TFD's transfer of Gordon Clark to a lower-paying, more burdensome position is materially adverse and highly likely to discourage a reasonable employee from engaging in further protected activity. Thus, Gordon Clark's transfer constitutes an adverse employment action under Title VII.

Temporal proximity between a protected activity and an adverse employment action, coupled with employer knowledge of the protected activity, raises a strong inference of unlawful retaliation sufficient to establish causation through a theory dubbed the timing-knowledge test. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). Here, TFD's transfer of Gordon Clark was the result of Mrs. Clark's protected activity, as he was transferred as a result of the very proceeding which she instituted. PSOF 124. This clearly satisfies the timing-knowledge test and raises a strong inference of retaliatory motive, which, coupled with the egregious nature of the adverse employment action, demonstrates that TFD has violated Title VII's anti-retaliation provision.

Similarly, there can be no reasonable dispute that TFD retaliated against Mrs. Clark when she was issued an educational counseling for filing a wrongful conduct complaint against Captain Langejans' harassment. PSOF 133-134. An adverse employment action is any "adverse treatment that is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1239-40 (9th Cir. 2000). Mrs. Clark's wrongful conduct complaint is protected activity under Title VII because it reported hostile work environment discrimination. 42 U.S.C. § 2000e-3(a). Here, Mrs. Clark received an educational counseling *because* she filed a wrongful conduct complaint against Captain Langejans. PSOF 134. Clearly this would discourage her from filing wrongful

conduct complaints against him (or anyone else) in the future, for fear of being subject to progressive discipline. It is difficult to conceive of a more blatant example of conduct designed to discourage employees from filing protected complaints than literally punishing them for doing so.

TFD again retaliated against Mrs. Clark for participating in the investigation into Captain Langejans' ongoing harassment when it transferred her from Fire Prevention back into Operations. PSOF 136. Mrs. Clark's transfer out of Fire Prevention was an adverse employment action, the suspicious circumstances of which strongly suggest retaliatory motive. At the outset, TFD's transfer of Mrs. Clark transfer from Fire Prevention to Operations was a dramatic change to more arduous and less desirable job duties. In Fire Prevention, Mrs. Clark worked daily shifts from a consistent workspace and went on regularly scheduled, non-emergency inspections. In Operations, especially on swing shift, Mrs. Clark no longer had a consistent workplace, had to work 24-hour shifts, and had to engage in the physically grueling work of a paramedic; responding to emergency calls and potentially hazardous situations. A transfer to more arduous and less desirable job duties is roundly accepted as an adverse employment action. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006); *Yartzoff*, 809 F.2d at 1376.

However, a change in job duties was not the only reason that Mrs. Clark's transfer was materially and indisputably adverse. TFD did not make Mrs. Clark's transfer effective until May 2, 2016, five days after she was notified. PSOF 138. On May 13, 2016, TFD announced that it was changing its seniority policy, stating that seniority would now only be calculated for time worked in each job classification. PSOF 139. Curiously, TFD decided to retroactively enforce its new seniority policy to May 1, 2016, thus making it effective 12 days before it was announced, but one day after Mrs. Clark's transfer became effective. PSOF 139. As a result, Mrs. Clark was stripped of two years of seniority that she would have maintained had she remained in Fire Prevention, or had TFD not changed or retroactively implemented its seniority policy. PSOF 139. Instead, TFD delayed Mrs. Clark's transfer by five days, and then retroactively implemented its new seniority policy by

12 days, landing Mrs. Clark's new start date in Operations on swing shift squarely on a date that would result in her losing two years of seniority. This not only establishes, beyond reasonable dispute, that Mrs. Clark suffered an adverse employment action, but also raises a strong inference of retaliatory animus suggesting causation.

Causation is also established by the timing-knowledge test. Chief Critchley dismissed Mrs. Clark's wrongful conduct complaint on April 18, 2016, and personally made the decision to transfer her. PSOF 135-36. He also admits that at the time he decided to transfer Mrs. Clark, he was aware of not only her ongoing lawsuit, but also of her wrongful conduct complaint against Captain Langejans. PSOF 137. TFD notified Mrs. Clark that she was transferred on April 27, 2016, just nine days later. PSOF 135. Chief Critchley's admission that he personally made the decision to transfer Mrs. Clark so soon after deciding her wrongful conduct complaint satisfies the timing-knowledge test, is further evidence of discriminatory animus, and establishes causation beyond reasonable dispute.

Finally, there is little doubt from the undisputed facts of this case that Gordon Clark was demoted in retaliation for Mrs. Clark's involvement in protected activities and her lawsuit against TFD. On or about December 15, 2016, Gordon Clark was notified that TFD had decided to fail him on his probationary period for his promotion to Battalion Chief, thus resulting in a constructive demotion in title and pay back to Captain. PSOF 152. This notice came just eight shifts shy of the end of Gordon Clark's one year probationary period. PSOF 132. Further, the circumstances of Gordon Clark's demotion raise a strong inference of discriminatory animus.

First, Chief Critchley admits that TFD failed to follow City of Tucson Administrative Directives for probationary employees by failing to give Gordon Clark a 6-month written evaluation. PSOF 154. Next, Gordon Clark was given no notice that his performance or conduct was deficient before TFD made the decision to fail him on probation. PSOF 152. Finally, in the nearly five years that Chief Critchley has been TFD's Fire Chief, Gordon Clark is the only Chief-level employee TFD has failed on probation. PSOF 153. Again, it is not in dispute that Mrs. Clark participated in activity protected by

Title VII, and retaliation against Mrs. Clark's husband can be imputed as retaliation against her under the Supreme Court's holding in *Thompson*. TFD's adverse employment action against Gordon Clark resulted in a constructive demotion, lost pay, and a significant change in job duties. The suspicious circumstances that led to Gordon Clark's demotion, including a litany of examples of TFD failing to follow established City of Tucson Administrative Directives, strongly suggests retaliatory animus and, therefore, causation beyond reasonable factual dispute. As no genuine issue of disputed material fact exists on TFD's retaliation, summary judgment is appropriate.

### F.   TFD Violated Section 215 of the Fair Labor Standards Act When it Transferred Mrs. Clark to an Undesirable Location in Retaliation for Reporting That TFD Lacked Legally-Compliant Space to Express Her Breast Milk

The undisputed record evidence shows that Mrs. Clark complained to OEOP that she was not being properly accommodated for her need to express breast milk under FLSA § 207(r). PSOF 29, 33-34.  As a result of her complaint, Mrs. Clark was transferred to Station 6, an undesirable work location, and deprived of the opportunity to earn overtime pay. PSOF 61, 63. FLSA § 215 states, in relevant part:

> It shall be unlawful for any person--to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).

An employee who has complained about violations of FLSA to her employer is protected from retaliation under § 215. *Lambert v. Ackerley*, 180 F.3d 997, 1008 (9th Cir. 1999). To establish a prima facie case for retaliation under FLSA, a plaintiff must demonstrate: (1) he or she engaged in activity protected by the FLSA; (2) he or she suffered an adverse action by the employer subsequent to or contemporaneous with such employee activity; and (3) a causal connection existed between the employee's activity and the employer's adverse action. *Contreras v. Corinthian Vigor Ins. Brokerage, Inc.*, 103 F. Supp. 2d 1180, 1184 (N.D. Cal. 2000). The burden then shifts to the defendant to offer a legitimate reason for the

adverse employment action. *Id*. If the defendant is able to proffer a legitimate reason, the burden shifts back to the plaintiff to prove that the defendant's proffered legitimate reason is false and therefore mere pretext. *Id*. The term 'adverse employment action' is interpreted broadly. *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000) (in the retaliation context, lateral transfers of the same pay and status, exclusion from meetings and seminars, moving to a less desirable workspace, and disadvantageous transfers all fall within the definition of adverse employment action.)

Based upon the undisputed facts of this case, it is clear that TFD retaliated against Mrs. Clark for her complaints that she was not being accommodated as mandated by FLSA by placing her in an undesirable work location, namely Station 6. Mrs. Clark met with OEOP Specialist Marty Macias on January 7, 2013, alleging that she was not being provided with an acceptable location to express breast milk. PSOF 29-30, 34. This constitutes a protected activity within the definition of § 215(a)(3).

TFD then assigned Mrs. Clark to work at Station 6, a station located at the far southeast boundary of Tucson that primarily responds to calls from the federal and state prisons. PSOF 61, 64. Mrs. Clark's assignment to Station 6 also resulted in her being deprived of the opportunity to earn overtime hours and make trades. PSOF 63. Thus, TFD subjected Mrs. Clark to an adverse employment action when she was transferred to Station 6, as it was a less convenient and less desirable assignment, and she was also deprived of the potential to earn overtime.

When Mrs. Clark asked AC Fischback why she could not be assigned to Station 12, a more convenient assignment location that, in Mrs. Clark's experience, possessed the facilities she needed, AC Fischback responded, "well, that's what happens when you file a complaint with EEO." PSOF 64. This statement is direct evidence that Mrs. Clark's OEOP complaint was the cause of her transfer to Station 6, and renders any non-discriminatory explanation for her transfer pretextual.

While ambiguous remarks do not alone establish discrimination or retaliation, clearly unambiguous remarks do establish discriminatory intent. *Pottenger v. Potlatch Corp.*, 329

21

F.3d 740, 747 (9th Cir. 2003). Even in a vacuum, AC Fischback's statement is unambiguous, direct, certain, and represents powerful evidence of retaliation and discriminatory animus. This case, however, is worse because AC Fischback made the statement during a conversation with Mrs. Clark where they were discussing her assignments and the reason for her transfer to an undesirable work location. PSOF 64. Any attempts that TFD makes to minimize or justify AC Fischback's statement are clearly contradicted by his own words and the context in which he delivered them directly to Mrs. Clark.

Further, TFD's attempts to justify Mrs. Clark's full-time transfer to Station 6 instead of the more desirable Station 12 are obviously pretextual. Mrs. Clark was told that she was being transferred to Station 6 because it has a door that locks, while Station 12 does not. PSOF 63-64. However, it is unrefuted that the city ordered a lock installed at Station 6 after Mrs. Clark complained, and the City determined that Station 6 was not in compliance with the PPACA. PSOF 50-51. Thus, TFD's claim that it was forced to place Mrs. Clark at Station 6 because Station 12 was non-compliant falls flat, as Station 6 was only made compliant because of this case. Logically, it follows that Station 12 could also have been made compliant simply by sending an email to have a lock installed. As a result, the evidence in this case clearly and without dispute demonstrates that TFD's decision to transfer Mrs. Clark full-time to Station 6 constitutes unlawful retaliation in violation of FLSA § 215(a)(3). Her claim, therefore, prevails as a matter of law. Thus, this Court should grant Mrs. Clark's motion for summary judgment on her FLSA retaliation claim.

## IV.   CONCLUSION

No genuine issue of material fact exists to dispute that since October 27, 2012, TFD has discriminated against Mrs. Clark and retaliated against her under provisions of Title VII and FLSA. TFD lacked a policy or plan for how to provide a place in its fire stations, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public so that its employees could express their breastmilk. The chaos that followed in Mrs. Clark's life because of TFD's piecemeal, inflexible, discriminatory approach to her

assignments resulted in severe emotional distress. When Mrs. Clark raised the issue with her TFD chain of command and the City, and filed a charge of discrimination with the Arizona Civil Rights Division, TFD retaliated against her. There is also no dispute that TFD failed to take steps to prevent the retaliation from continuing. For these reasons, Mrs. Clark respectfully requests summary judgment on all of her claims and for this Court to set a further hearing on damages.

DATED this 18th day of August, 2017.

**JACOBSON LAW FIRM**

 _s/Jeffrey H. Jacobson_
Jeffrey H. Jacobson
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michelle Saavedra
Principal Assistant City Attorney
Office of the City Attorney, Civil Division
255 W. Alameda, 7th Floor
Tucson, Arizona 85701
*Attorney for Defendant*

Michael W.L. McCrory
Principal Assistant City Attorney
Office of the City Attorney, Civil Division
255 West Alameda, 7th Floor
Tucson, AZ 85701
*Attorney for Defendant*