**JACOBSON LAW FIRM**
2730 EAST BROADWAY BLVD., SUITE 160
TUCSON, ARIZONA 85716
TELEPHONE (520) 885-2518
FACSIMILE (520) 844-1011
jeff@jhj-law.com
Jeffrey H. Jacobson, PCC #65402; SB#019502
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK,<br><br>                    Plaintiff,<br><br>vs.<br><br>CITY OF TUCSON,<br><br>                    Defendant. | No. CV-14-02543-TUC-CKJ<br><br>**PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Cindy K. Jorgenson |

Plaintiff Carrie Ferrara Clark submits the following Statement of Facts in support of her Cross-Motion for Summary Judgment:

1.      Plaintiff joined the City of Tucson Fire Department (TFD) on July 5, 2007. She graduated from the Fire Academy in December 2007 and has been continually employed by TFD ever since. The highest rank she achieved was Paramedic. Exhibit (Exh.) A1, ¶ 3.

2.      Plaintiff became pregnant November or December 2011 with her first child. At the time, she was a "C" shift Paramedic assigned to Station 4 at Grant Road and I-10. Exh. A1, ¶ 5; Exh. B.

3.      Plaintiff went on light duty in or about January 2012. Plaintiff worked until mid-July 2012, approximately a few days before she gave birth to her first son, Austin Clark, on July 19, 2012. Exh. A1, ¶ 6-7.

4.      Plaintiff is a Registered Nurse. Through her training and experience, she was well aware that breastfeeding provides significant health benefits to a newborn baby. While

1

she was pregnant, she decided to make every effort to breastfeed her newborn baby. Exh. A1, ¶ 2, 8.

5.    While she was on maternity leave, Plaintiff informed Battalion Chief (BC) Paul McDonough that when she returned to work, she would be pumping breastmilk and that would need a private room for lactation while on duty. Exh. A1, ¶ 9.

6.    Plaintiff started breastfeeding her son almost immediately after he was born. Throughout Austin's first year of life, Plaintiff was dedicated to breastfeeding him and did so almost exclusively before returning to work. While she was on maternity leave and breastfeeding Austin, neither Plaintiff nor Austin experienced any significant physical or health issues related to breastfeeding. Exh. A1, ¶ 10-11.

7.    Before returning to work, Plaintiff called BC McDonough and inquired about long-term openings that would provide her with a consistent place to pump and express breastmilk. Plaintiff called BC McDonough because she knew that TFD did not have a policy that covered employees who were nursing/breastfeeding. Exh. A1, ¶ 12.

8.    In fact, at the time, TFD did not have a pregnancy policy, nor did the City have any policies or administrative directives that applied to breastfeeding mothers in the workplace. Exh. C, p. 57 ln. 21 – p. 58 ln. 8.[1] HR Manager Acedo found a TFD Pregnancy Policy on the books and pulled it because it was not lawful. *Id.* at p. 58 ln. 2-8. She was so surprised, in fact, she said "are you flipping kidding me, that, you know, the HR manager would have created this, because this is completely unlawful, in my opinion." *Id.* at p. 61 ln. 2-7; Exh. ZZ.

9.    From her own knowledge and experience as a Registered Nurse, and from the lactation nurses that she was working with, Plaintiff knew that pumping regularly and consistently was important. Without doing so, breastfeeding mothers are at higher risk for engorgement and mastasis, either of which can develop very quickly, even overnight. Mastasis is a dangerous health condition for the mother and may affect the baby as well, can be difficult to treat, and often leads to hospitalization.  The mother may need to have a

---

[1] When citing to a transcript, the Exhibit will be followed by the page and line numbers of the relevant testimony.

drain inserted into her breast to relieve pressure and could lead to the loss of breast tissue. In turn, mastasis will affect milk production and the mother's ability to breastfeed. Engorgement also affects the baby's ability to receive proper nutrition. By keeping milk in a breast and becoming engorged, the mother's production of milk is inhibited. Milk production slows down, diminishing the supply of milk to the feeding baby. Babies react to the regular flow of milk in a mother's breast.  If the flow is slow, babies do not eat as well. Plaintiff was told that it is medically necessary to pump breastmilk 8 to 12 times in a 24 hour period. Exh. A1, ¶ 13.

10.    BC McDonough told Plaintiff that Station 20 at First Avenue and River Road was going to have an opening available. Exh. B. That Station would have been acceptable to Plaintiff because it had a private room shielded from view and free from intrusion from coworkers and the public. Exh. A1, ¶ 14.

11.    On October 21, 2012, Plaintiff sent BC McDonough a follow-up email requesting to fill the Paramedic spot at Station 20. Exh. D.

12.    Plaintiff returned to TFD on October 27, 2012. Before returning to work, she had pumped breastmilk only a few times. When she was expressing breastmilk, she was feeding Austin. Exh. A1, ¶ 15.

13.    When she returned to work, Plaintiff's first two shifts were at Station 12 (Broadway Boulevard and Harrison Road) and Station 21 (Tanque Verde just west of Bear Canyon Road.) After pumping her breastmilk, Plaintiff stored it in a refrigerator until her mother could come down to the station to retrieve it and feed Austin. Exh. A1, ¶ 16; Exh. B.

14.    The first day she returned to work, Plaintiff realized that she was not producing enough milk to adequately feed Austin for the 24 hours she was going to be at work. Paramedic Jeff Todd, who was then-assigned to Station 12, told Plaintiff that he wanted to move to another station and would like to help her out by opening up his spot at that station.  Exh. A1, ¶ 17.

15.    On or about October 28, 2012, Paramedic Todd sent an email to BC Brian Stevens formally requesting a transfer from Station 12 to swing shift, knowing this would

3

help Plaintiff because Station 12 was closer to her home than Station 20. Exh. A1, ¶ 18; Exh. E.

16.    BC McDonough asked Gordon Clark, Plaintiff's husband, who had promoted to a Captain position, whether Station 12 was a better fit for Plaintiff and if she would rather be at Station 12 than at Station 20. Captain Clark said, "Absolutely." Exh. A1, ¶ 19.

17.    Station 12 had a private room shielded from view.   The private room, however did not have a lock on it so it would not have been completely free from intrusion from coworkers and the public. Nevertheless, Plaintiff was willing to try to make that space work. At the time, Station 12 had two other mothers on the same shift as Plaintiff, as well as a mother on a different shift, one of whom was also pumping breast milk. Exh. A1, ¶ 20-21.

18.    On or about October 30, 2012, BC Stevens and Deputy Chief (DC) Rob Rodriguez met with TFD's Human Resources Manager Joann Acedo regarding Paramedic Todd's temporary transfer request, which was made to help Plaintiff. TFD eventually assigned Paramedic Todd to Swing Shift, but put his spot at Station 12 out to bid, rather than allowing Plaintiff to fill the spot. TFD was not required, under its Manual of Operations (MOPS) Section 201, Rules of Assignment, to put Paramedic Todd's spot at Station 12 out to bid. Exh. A1, ¶ 22-23; Exh. F.

19.    On or about November 9, 2012, Plaintiff submitted a memorandum formally requesting a temporary assignment to Station 12 and explaining the reasons for her request. Exh. A1, ¶ 24; Exh. G.

20.    The uncertainty as to where Plaintiff was going to be working on any given shift created a significant amount of stress and anxiety in her life. As a result, she experienced a decrease in her ability produce enough breastmilk for her son. The stress and inability to maintain a consistent pumping schedule negatively affected Plaintiff's milk and volume production. The lactation nurses Plaintiff was working with explained that stress plays an important part in breastmilk production. Stress inhibits the release of oxytocin in the brain. Oxytocin is the "letdown" that brings milk to the breast. Exh. A1, ¶ 25-26.

21.    On or about November 12, 2012, BC McDonough brought Plaintiff to TFD headquarters to meet with DC Ed Nied and DC Rodriguez. During the meeting, they

accused Plaintiff of wanting an assignment out of convenience so her mom to pick up her expressed breastmilk. They also suggested that Plaintiff should just take more time off from work and that they could not remember any other women in the past having the same issues with breastfeeding. Plaintiff left the meeting without any resolution because they wanted to think about it. Exh. A1, ¶ 27.

22.    Plaintiff's request for assignment to Station 12 was denied because it violated TFD's Rules of Assignment. Exh. C, p. 64 ln. 18-23.

23.    According to DC Michael Fischback, however, TFD does not always follow its MOPS.  If reason permits, TFD can and does deviate from their policies. Staffing concerns and assignments and transfers are two specific areas where TFD goes outside of its MOPS and policies. Exh. H, p. 13 ln. 11 – p. 14 ln. 19.

24.    TFD does not always follow its Rules of Assignment and there are circumstances since 2011 where TFD has deviated from its Rules of Assignment. TFD can deviate from its Rules of Assignment based on "management rights." TFD has deviated from the Rules of Assignment for employees who have received DUI convictions or other criminal charges, and for those who are on a work improvement plan. *Id*. at p. 16 ln. 1-23, p. 20 ln. 1 – p. 23 ln. 13, p. 46 ln. 19 – p. 47 ln. 6; Exh. I, p. 17 ln. 4-7.

25.    TFD has also granted assignment changes to its personnel to assist them in times of need. Exh. I, p. 38 ln. 17 – p. 39 ln. 23.

26.    As of December 5, 2012, TFD placed Plaintiff back into a swing shift position; however, she was able to fill in at Station 12 for the majority of the month of December 2012. Exh. A1, ¶ 28.

27.    Beginning in December 2012, TFD gave Plaintiff numerous swing shift assignments to stations which were not equipped with legally-compliant spaces to express breastmilk. On many of these occasions, Plaintiff was forced to use paid vacation or sick leave in order for her to be able to express breast milk for her son. Plaintiff's husband discussed this problem with TFD's shift scheduler, Captain Rick L'Heureux. Captain L'Heureux responded, "I don't think she deserves any special accommodations." Exh. A1, ¶ 29-30, 37-43, 46, 53; Exh. XXX.

28.    Because TFD did not accommodate Plaintiff with a consistent assignment to a station that had a private room shielded from view and free from intrusion from coworkers and the public where she could express breastmilk, Plaintiff was forced to use vacation and sick leave time. Exh. XXX. This situation exacerbated Plaintiff's stress and anxiety because she never knew from shift to shift if she would be assigned to work at a station that would allow her to privately express her breastmilk. Exh. A1, ¶ 30-31.

29.    In early January 2013, Plaintiff went to the City's Office of Equal Opportunity Programs (OEOP) and met with investigator Marty Macias to discuss the discrimination she was experiencing. Exh. A1, ¶ 32; Exh. J.

30.    Ms. Macias subsequently met with Plaintiff on January 16, 2013. During that meeting, Ms. Macias told Plaintiff that she had a valid claim and gave Plaintiff a complaint form to fill out. Exh. K. Hoping that the situation would get better, and not wanting to make it worse, Plaintiff did not submit a complaint at that time. Exh. A1, ¶ 33.

31.    The situation did not get better, however, and Plaintiff continued to be assigned to stations that were not equipped with appropriate lactation space. Exh. A1, ¶ 34.

32.    During this time, Austin was not gaining weight as expected for a 4-6 month old infant. In December 2012, Austin's doctor assessed him as being underweight and increased the frequency of his visits for weight checks. Between January 2013 and April 2013, Austin gained approximately only one pound. Because of Austin's poor weight gain, it was that much more important for Plaintiff to have a regular and consistent pumping schedule. Exh. A1, ¶ 35-36.

33.    On or about March 8, 2013, Plaintiff contacted OEOP indicating that she was still having problems with getting assignments to fire stations that had an appropriate lactation space for her because Captain L'Heureux was assigning her to stations where she would have to pump in the bathroom. Exh. L.

34.    Plaintiff again contacted OEOP on March 12, 2013, and had a conversation with Ms. Macias. Exh. M.

35.    On or about March 20, 2013, after receiving another assignment that was not equipped with a legally-compliant lactation space, Plaintiff called DC Rodriguez and

Assistant Chief (AC) Mike Fischback several times, leaving messages that it was urgent she speak with them. Exh. A1, ¶ 37.

36.    Shortly before 5:00 p.m. on March 20, 2013, Plaintiff reached AC Fischback, who was joined by DC Rodriguez and HR Manager Acedo. Plaintiff explained that she had again been assigned to work at Station 9 that night and that Station 9 did not have an adequate lactation space. DC Rodriguez responded that Station 9 was, "the only thing we have open for you tonight." Exh. A1, ¶ 38-39.

37.    During this call, HR Manager Acedo told Plaintiff that "per the law," Station 9 was on an "approved list" because the Chief's combined office/bedroom and the Emergency Captain's combined office/bedroom both had closing doors. HR Manager Acedo told Plaintiff to just ask them to leave their rooms when she needed to pump. Exh. A1, ¶ 40.

38.    HR Manager Acedo admits that she suggested to Plaintiff that when she needed to express her breastmilk, she should just ask the chief or EC to leave the room. Exh. C, p. 55 ln. 3 – p. 56 ln. 12.

39.    DC Fischback agrees that it would not be appropriate for Plaintiff to have to knock on her Captain or Battalion Chief's door during various times of the night to say that she has to express her breastmilk. Exh. H, p. 26 ln. 15 – p. 27 ln. 3.

40.    During their call, Plaintiff explained that she was pumping breastmilk every 2-3 hours, including throughout the night, and that awakening her supervisors to leave their rooms so she could pump was unreasonable. HR Manager Acedo then said, "Your pumping seems excessive to me." Plaintiff told them that this was normal for a newborn baby. HR Manager Acedo replied, "Well, it seems to me that you're not fit for duty." Exh. A1, ¶ 41.

41.    HR Manager Acedo admits that she said "fit for duty" to Plaintiff during the call, and that it was in the context of questioning whether Plaintiff was, in fact, fit for duty. Exh. C, p. 52 ln. 23 – p. 55 ln. 2.

42.    Exasperated and frustrated with HR Manager Acedo's lack of understanding and her offensive comments, Plaintiff said, "You are out of your friggin' mind if you think I would awaken and ask a Chief or Captain to leave their assigned room every 2-3 hours to

pump." Both DC Rodriguez and AC Fischback then agreed that Station 9 was not an acceptable location for pumping breastmilk. Exh. A1, ¶ 42.

43.    Plaintiff was so distraught and in tears over how she was treated on that call that she took sick leave. Exh. A1, ¶ 43.

44.    According to HR Manager Acedo, her recollection of the call is that Plaintiff wanted a specific station, but that violated TFD's Rules of Assignment. Exh. C, p. 31 ln 24 – p. 32 ln. 11.

45.    HR Manager Acedo remembers "chuckling to myself" because TFD had no idea how to address Plaintiff's issues. She thought it was "just a medical condition, it's just a medical thing . . . it shouldn't be any different than anything else." Exh. C, p. 32 ln 5-12. HR Manager Acedo also said that they were "somewhat struggling" with the idea. *Id.* at ln. 19-23.

46.    HR Manager Acedo recalls that she "may have said that seems excessive, and with that I was thinking to myself in a 24-hour shift, every three to four hours in an entire tour, that could equal a whole shift. . . . And so I believe we put her on hold, and they asked me does that seem normal, . . . ." *Id.*, p. 47 ln. 10-25.

47.    HR Manager Acedo also admitted that she thought that Plaintiff possibly needed to be on light duty so she could express as much as she needed to without it interfering with TFD's business. *Id.* at p. 49 ln 3-7.

48.    HR Manager Acedo recalled that Plaintiff "was upset about not being allowed to be given special treatment and not follow the rules of assignment." *Id.* at p. 50 ln. 10-16.

49.    After the call on March 20, 2013, TFD admitted that Plaintiff had been calling in sick "every time that she wasn't at the station she wanted to be in." *Id.* at p. 50 ln. 21-24.

50.    On March 20, 2013, at approximately 5:42 p.m., DC Rodriguez sent an email to Tom Paul instructing him to install a privacy lock on one of the bedroom doors at Station 6 by March 21, 2013. Exh. N.

51.    The following day, March 21, 2013, DC Rodriguez responded that a privacy lock would be acceptable and that once TFD figured out and budgeted for a long-term

solution, "nearly all stations will need the same sort of retro-fit." Exh. N. According to HR Manager Acedo, Plaintiff was supposed to be temporarily assigned to Station 6. Exh. O.

52.    On March 22, 2013, EOPD Program Manager interviewed Captain Rick L'Heureux. Also present were HR Manager Acedo and Union Representative Conger. A detailed summary of the interview was prepared by Ms. Macias. The meeting was audio recorded. Exh. P.

53.    According to Captain L'Hereux, most people on swing shift have preferences as to where they want to be, such as the east side or west side. Exh. DDD, p. 6 ln. 1-5.

54.    At one point in the conversation, OEOP Program Director Barton says, "I know she may have her wish list of what she says are acceptable stations, and we're trying to resolve that separately so that the department has a list of what those stations mean, not just her perception, . . ." Exh. DDD, p. 9, ln. 6-10.

55.    During the OEOP inspections into what TFD stations met federal breastfeeding accommodation laws, City workers were at Station 6 putting a lock on a door that someone at the station had put a big sticky note on which said, "Carrie Clark." According to Program Manager Barton, "And so everybody at the station house is going, 'Well, we know what this is all about,' . . . So somebody had labeled the door with her name while they're changing the locks out, so I mean you can see that there's going to be an uncomfortable issue with her." *Id*. at p. 15 ln. 2-21.

56.    On March 22, 2013, five months after Plaintiff first complained of the lack of legally-compliant lactation facilities at TFD Stations, EOPD Investigator Larsen issued his finding entitled "American Fair Labor Standards Act Section 7 Compliance." Out of 21 stations evaluated, 9 stations (or 43%) did not comply with federal law and did not have "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk." Exh. Q. The same day, EOPD Program Manager and EOPD Director Liana Perez received a memorandum from Ms. Macias summarizing Investigator Larsen's findings. Exh. R.

57.    Also on March 22, 2013, a memorandum was prepared for Program Manager Barton and Director Perez. The memorandum does not indicate who authored it. The

memorandum highlights the fact that TFD did not have a uniform process through which its employees can submit requests for work assignments that address unique circumstances related to compliance with State, Federal, or local law. OEOP also recommended that HR Manager Acedo, within 30 days, submit a report to OEOP showing how TFD would correct its deficiencies to bring it in line with the Patient Protection and Affordable Care Act. Exh. S.

58.    On or about March 26, 2013, TFD summoned Plaintiff to a meeting at headquarters with DC Rodriguez and AC Fischback. Under normal TFD practice, Plaintiff's supervisor, BC McDonough, should have also been in attendance at the meeting. However, he was not there. Per the terms of City of Tucson Administrative Directives and the International Association of Fire Fighters Local 479 and City of Tucson Contract (CBA), Plaintiff asked Union Griever Sloan Tamietti to attend the meeting. TFD initially denied Union representation, but eventually allowed Union Griever Tamietti to join them. Exh. A1, ¶ 44.

59.    At the meeting, TFD formally disciplined Plaintiff in a Verbal Counseling (which was put in writing) for 'Inappropriate Conduct' and 'Rudeness to Citizens/Co-workers' saying "you're out of your friggin' mind" during the March 20, 2013, phone call. They also accused Plaintiff of hanging up twice (which Plaintiff denies.) Exh. A1, ¶ 45; Exh. H, p. 44 ln. 7-23; Exh. T

60.    According to HR Manager Acedo, the only evidence they have that Plaintiff hung up on them is that the phone line suddenly went dead. Exh. C, p. 80 ln. 20 – p. 83 ln. 10.

61.    AC Fischback then told Plaintiff that until August 2013, when Austin turned one year old, she would be assigned to work exclusively at Station 6 because the other TFD stations did not have conforming lactation spaces. Station 6 is located at the far southeast boundary of the City on Wilmot off of I-10, and primarily responds to calls from the federal and state prisons on Wilmot. Exh. A1, ¶ 46; Exh. B.

62.   During the meeting, Union Griever Tamietti asked when TFD was planning on making all of its stations compliant with federal law. AC Fischback said, "some – maybe never" or words to that effect. Exh. A1, ¶ 47.

63.   Plaintiff also asked AC Fischback for the list of approved stations because she was unsure of where she could work. Plaintiff was told that she could not have the list until it was revised because OEOP had just identified the stations that had a room with a locking door, and had not taken into account that some of those rooms were commander bedrooms. When she asked about working overtime or doing shift trades, she was told that they had not thought about that yet and would get back to Plaintiff. They never did. As a result, Plaintiff was deprived of overtime opportunities and was not able to make future shift trades with coworkers (with one exception.) TFD also never gave her the list of legally-compliant stations as they said they would. Exh. A1, ¶ 48.

64.   During the meeting, Plaintiff also asked why she could not work at Station 12. AC Fischback said that Station 12 was not on the approved list of stations that were in compliance with federal law for appropriate lactation spaces. She then pointed out that the only other nursing mother at the time in TFD, Arianne Phaneuf, was assigned to Station 12. AC Fischback replied, "Well, that's what happens when you file a complaint with EEO." Plaintiff told AC Fischback that she had not filed a complaint; he responded, "Well, someone called and got them involved." Exh. A1, ¶ 49.

65.   On March 26, 2013, OEOP Program Manager Barton sent a memorandum to Fire Chief Critchley regarding Plaintiff's complaints, Investigator Larsen's findings of non-compliance with federal law, and OEOP's recommendations to TFD. Exh. U.

66.   Because Plaintiff was assigned to Station 6, Firefighter Andrew Grimes was displaced to another assignment. When she arrived at Station 6, Plaintiff's coworkers said that Firefighter Grimes was very upset about being displaced. Plaintiff also talked to Firefighter Grimes' father, Captain Jim Grimes, and asked him to convey that she felt bad that TFD displaced his son and that it was not her choice or plan. Exh. A1, ¶ 50; Exh. H, p. 41 ln. 1 – 11.

67.    When Austin was 9 months old, in April 2013, Plaintiff started taking Domperidone at the recommendation of a lactation nurse to increase her supply of breastmilk because she was struggling to produce consistently due to the stress and anxiety from her uncertain working conditions and TFD's harassment. Exh. A1, ¶ 51.

68.    On May 21, 2013, BC McDonough prepared a memorandum at DC Rodriguez's direction regarding TFD's staffing assignments for Plaintiff. The memorandum reflects TFD's ad-hoc approach to finding station assignments that fit her "specific needs" to "ensure her needs were met more often than not." Exh. V.

69.    According to Captain L'Hereux:

It would have been nice at the beginning to have some kind of official notification or anything from either Human Resources or something that would give me direction to, hey, this person needs accommodation, these are the places they can or cannot work, and then I can go off that list, instead of piece-mealing together by word-of-mouth by Carrie or by somebody, hey, chief, this is correct. I got nothing at the beginning, I had absolutely nothing. So it was piece-meal.

Exhibit DDD, p. 17 ln. 17 – p. 18 ln. 2.

70.    On or about July 19, 2013, TFD issued a new nursing room policy. Shortly after the new policy was enacted, several of Plaintiff's coworkers told her that the policy was being referred to in TFD as the "Carrie Clause." Exh. A1, ¶ 52; Exh. W.

71.    Before July 19, 2013, TFD did not have a policy specifically for breastfeeding mothers expressing breastmilk. Exh. X.

72.    According to HR Manager Acedo, in the 12 years she has been with the City, she has no recollection of attending training specific to laws which govern breastfeeding mothers in the workplace. Exh. C, p. 9 ln. 18-22, p. 15 ln. 22 – p. 16 ln. 1. In October 2012, she was not familiar with the Patient Protection and Affordable Care Act (PPACA) and has never had any training on that law or its requirement for employers to provide suitable rooms for women who are breastfeeding or expressing breastmilk. *Id.* at p. 17 ln. 14 – p. 18 ln. 4.

73.    During one of Plaintiff's shifts at Station 6, Captain James Sieminski walked into the office she was in, threw up his hands, and said, "Oh, is this the nursing room? I

don't want to come in here if this is the nursing room." Captain Nate Weber, who was in another room, overheard Captain Sieminski's remark, came over, and asked Captain Sieminski what he meant. Captain Sieminski replied, "Oh, you haven't heard about the new nursing room policy?" Plaintiff was embarrassed and upset by this exchange, got up, and left the office. Exh. A1, ¶ 53.

74.    On July 27, 2013, Plaintiff sent a memorandum to BC Tim Nofs requesting her continued assignment to Station 6. In the memorandum, she detailed that she was still pumping breastmilk and mentioned the difficulty with moving her breastfeeding supplies from station to station. She also complained about being mocked by coworkers regarding TFD's new Nursing Rooms Policy, referred to as the "Carrie Clause" or "Carrie Rule." Exh. A1, ¶ 52; Exh. Y.

75.    Plaintiff filed her Charge of Discrimination with the Arizona Attorney General's Office, Civil Rights Division (ACRD) on July 31, 2013. Exh. A1, ¶ 56; Exh. Z.

76.    On August 1, 2013, AC Olson wrote an email to several members of TFD management acknowledging that TFD employees calling the Nursing Rooms policy by Plaintiff's name was a "negative" but was unsure how to handle it. Exh. AA.

77.    In August 2013, during her first shift at Station 6 after Austin's first birthday, HR Manager Acedo called Plaintiff and said that she was no longer going to be assigned to Station 6 and that if she wanted more time at Station 6 that she needed to formally request it. Exh. A1, ¶ 54.

78.    AC Brad Olson offered to permanently assign Plaintiff to Station 6 upon her request. After making that request, however, DC Rodriguez told Plaintiff the request was denied and the spot had to be put out to bid. Exh. A1, ¶ 55.

79.    On August 19, 2013, Defendant filed its Position Statement with the ACRD. Exh. BB.

80.    On August 20, 2013, Defendant filed a Correction to Position Statement with ACRD. Exh. CC.

81.    On August 30, 2013, HR Manager Acedo sent Plaintiff a memorandum indicating that TFD extended her "special" assignment to Station 6 for three months after

which they would reevaluate her needs. The memorandum also indicated that TFD tried to investigate the mocking and joking about the new Nursing Room policy, but because she and her husband would not 'name names,' they were closing their complaint without further action. Exh. DD.

82.    On September 10, 2013, Captain Gordon Clark submitted a memorandum to DC Baker regarding HR Manager Acedo. In the memorandum, Captain Clark refutes HR Manager Acedo's claim that he or Plaintiff refused to 'name names' because he was never asked to do so. Further, Captain Clark indicates that both he and Plaintiff provided information to Chiefs Olson and Rodriguez and Captain McDonough. Exh. EE.

83.    On September 18, 2013, Plaintiff sent a similar, but longer memorandum to BC Nofs also refuting HR Manager Acedo's claim that she refused to provide information for their investigation. Exh. FF.

84.    Despite the fact that TFD extended Plaintiff's assignment to Station 6 for three months on August 30, 2013, on October 25, 2013, HR Manager Acedo sent an email to Plaintiff on October 25, 2013, asking if Plaintiff still needed her "special assignment" at Station 6. The email continued that if Plaintiff did not respond, she would be put back on swing shift. Exh. GG.

85.    Plaintiff became pregnant again in or around October 2013. Exh. A1, ¶ 57.

86.    On November 3, 2013, Plaintiff informed TFD that she wanted to stay at Station 6. Exh. HH.

87.    On November 4, 2013, DC Rodriguez sent a memorandum to Plaintiff to "clarify" her assignment to Station 6. In his memorandum, DC Rodriguez indicates that her assignment to Station 6 in fact had to be put out to bid and that she would go back on swing shift. Exh. II.

88.    On November 12, 2013, Defendant filed a Supplement to Position Statement with ACRD. Exh. JJ.

89.    At the end of November 2013, Plaintiff miscarried. In or about December 2013, Plaintiff became pregnant and informed TFD of her pregnancy in or about January 2014. Exh. A1, ¶ 57-58.

90.    ACRD issued its Notice of Right to Sue to Plaintiff on April 24, 2014. Exh. A1, ¶ 59; Exh. KK.

91.    On or about May 22, 2014, on the way back to the station from lunch, Captain Ted McDonough ordered the truck to pull over to the side of the road and directed Plaintiff to perform firefighting drills. He did not require any of the other members of the crew to perform any drills. When Plaintiff asked why she was being singled out, Captain McDonough ignored and would not reply to her. Exh. A1, ¶ 60; Exh. LL.

92.    On May 22, 2014, Plaintiff filed a notice of claim against the City for the sex discrimination and retaliation that she had experienced since returning to work in October 2012. Exh. A1, ¶ 61; Exh. MM.

93.    On Saturday, May 31, 2014, Captain Clark worked a 24-hour trade shift for Plaintiff, and on Monday, June 2, 2014, he worked a 12-hour (p.m.) trade shift for Plaintiff. Before effecting these trades, both Captain Clark and Plaintiff had permission from AC Joe Gulotta and BC Nofs, respectively, for Captain Clark to work these shifts for Plaintiff. On June 4, 2014, TFD Deputy Chief of Operations Rob Rodriguez informed Plaintiff that these trades were not allowed pursuant to TFD's MOPS, and therefore, Captain Clark would no longer be able to work shift trades for Plaintiff. Exh. A1, ¶ 72-74; Exh. A2, ¶ 39-43.

94.    As a result of her second pregnancy, Plaintiff went on light duty on June 16, 2014. Up to the time she went on light duty, HR Manager Acedo was frequently calling and emailing Plaintiff to see if she still needed to pump breastmilk. Exh. A1, ¶ 62.

95.    On June 19, 2014, Plaintiff started her day at 6:00 a.m. in her light duty assignment, working in the fire prevention division. She planned to work a 10-hour shift; her supervisor, Ken Brouillette, was aware of and had approved her schedule. At approximately 2:40 p.m., Plaintiff left to exercise as she is required to do. Exh. NN. About 5 minutes later, HR Assistant Veronica Muñoz called and said that HR Manager Acedo said Plaintiff was not authorized to leave and could not exercise without a doctor's note. She was also told she could not start working before 7:00 a.m. Exh. A1, ¶ 63.

96.    However, there is no rule that says that a light-duty employee cannot start their shift before 7:00 a.m. Exh. C, p. 130 ln. 14-19.

97.    Plaintiff subsequently got a doctor's note which said she was authorized to engage in low-impact exercise. To Plaintiff's knowledge, TFD has never required a pregnant employee who is on a light duty assignment to provide a doctor's note in order to exercise. Exh. A1, ¶ 64.

98.    On or about June 19 or 20, 2014, at HR Manager Acedo's direction, TFD changed Plaintiff's computerized time entry for June 18, 2014, and withdrew 6 hours from her vacation time bank without her consent (instead of the 3 hours which was already there.) The three additional hours represented the one-hour differential between 6:00 a.m. and 7:00 a.m., the 1.5 hours of exercise, and a half-hour for lunch. TFD also changed her schedule to start at 7:00 a.m. TFD ultimately decided that she was only allowed to exercise at Station 1 and that she could not flex her start time to 6:00 a.m. Therefore, her schedule was 7:00 a.m. to 5:30 p.m. daily. During this time, Jason Gilmore (who was either a firefighter or engineer) was also in a light duty assignment. He was allowed to start work at 6:00 a.m. To Plaintiff's knowledge, other than what is in the TFD MOPS, TFD has never restricted the exercise location for any employee. Exh. A1, ¶ 65.

99.    In or around June or July 2014, Plaintiff competed for a position in the Fire Prevention Division (Fire Prevention). Based on the written test and oral interview, Plaintiff was ranked first on the list and was promoted to the position of Fire Inspector. Exh. A1, ¶ 66.

100.    After the promotion list was published, Fire Prevention Captain Jeff Langejans started spreading the rumor that Plaintiff could not have been ranked first on the promotion list and must have cheated on the promotional process, according to Fire Inspector Tom Sisterman. Captain Langejans also said that Captain Gordon Clark must have given Plaintiff the answers to the promotional exam. Exh. A1, ¶ 67; Exh. CCC, p. 13 ln. 547 – p. 14 ln. 606.

101.    Captain Langejans made these allegations to his chain of command through DC Nied and DC Laura Baker in an effort to discredit Plaintiff and have her and her husband removed from Fire Prevention. Exh. A1, ¶ 68.

102.    Captain Langejans admits that he raised questions about Plaintiff's performance on her promotional exam with his subordinates in a team meeting and with his chain of command, and that "It was highly likely" that Plaintiff cheated on her promotional exam. Exh. OO, p. 41 ln. 22 – p. 45 ln. 21. Captain Langejans also admits that the information he shared with his supervisees violated TFD and City Rules of Conduct. *Id*. at p. 56 ln. 10-17; Exh. PP.

103.    Captain Langejans, however, also told both AC Baker and Gordon Clark (on separate occasions) that he never said that Plaintiff cheated on her promotional test. Exh. OO, p. 56 ln. 25 – p. 58 ln. 19, p. 62 ln. 9-12; Exh. AAA, p. 18 ln. 769-774.

104.    On August 2, 2014, the *Arizona Daily Star* newspaper published an article about Plaintiff's lawsuit against TFD. Captain Langejans approached Inspector Sisterman and told him to look up the article online and read the comments being made about Plaintiff. According to Inspector Sisterman, Captain Langejans took particular enjoyment over reading the negative comments. Exh. A1, ¶ 69; Exh. QQ.

105.    Around the same time, Inspector Sisterman also told Plaintiff that Captain Langejans was spreading rumors in Fire Prevention that she was having marital problems. Exh. A1, ¶ 70.

106.    Also around the same time, Fire Inspector John Vincent told Plaintiff that Captain Langejans said that TFD should have anticipated this "the day they starting hiring females." Exh. A1, ¶ 71; Exh. CCC, p. 14 ln. 624 – p. 15 ln. 631.

107.    At one point in time, Captain Langejans told Inspector Sisterman, referring to Plaintiff and her husband, that "it would be very easy to kill his enemies and get away with it." Exh. A1, ¶ 72; Exh. CCC, p. 8 ln. 327-341; p. 22 ln. 951-986.

108.    Plaintiff gave birth to her second son, Mason Clark, on August 26, 2014. She was on leave from TFD from late September through November 2014. While she was on leave from TFD, Inspector Sisterman told Plaintiff that Captain Langejans said that women over 40 should no longer be allowed to work in fire suppression because they "look like crap," don't age well and can't do the job. Captain Langejans also told coworkers and his subordinates that Plaintiff and her husband were going to ruin Fire Prevention, he wanted

Gordon removed from Fire Prevention, and that the other inspectors should lock their computers because they "can't trust the Clarks." Exh. A1, ¶ 73-74.

109.    Plaintiff returned to work in Fire Prevention on or about November 24, 2014. Exh. A1, ¶ 75.

110.    After a December 3 or 4, 2014, supervisors meeting, Capt. Langejans approached Inspectors Sisterman, Vincent, and Pete December, and told them that he had advised the other supervisors at that meeting that Gordon Clark should be removed from Fire Prevention, that the Clarks were going to ruin Fire Prevention, and that they were the reason for poor morale in Fire Prevention. Exh. A1, ¶ 76; Exh. BBB, p. 3, ln. 118-127; p. 4 ln. 161-166; p. 6 ln. 232-233; Exh. CCC, p. 15 ln. 672 – p. 16 ln. 681.

111.    Captain Langejans later told EOPD Investigator Larsen (during his June 16, 2015, interview) that he said to his "teammates" during team meetings that Gordon and Carrie Clark were going to ruin the morale of the fire prevention division. Exh. AAA; p. 13 ln. 573 – p. 14 ln. 594. Captain Langejans, under oath, swore to the truth of his testimony to Investigator Larsen. Exh. OO p. 19, ln. 5-23.

112.    On December 5, 2014, Inspectors Sisterman, Vincent and December told Gordon Clark what Captain Langejans had said. Gordon Clark immediately notified his supervisor, DC Mike Carsten. Plaintiff also separately reported Captain Langejans' comments to DC Carsten. Inspectors Sisterman and Vincent likewise lodged a complaint against Captain Langejans. Exh. A1, ¶ 77.

113.    On January 14, 2015, Inspector Sisterman told Gordon Clark that Captain Langejans had made the "killing his enemies" statement. Fearing that Captain Langejans was unstable, Gordon sent a memorandum Fire Chief Critchley through his chain of command. Inspectors Sisterman and Vincent took their complaints to Chief Critchley as well, and an investigation was initiated. Exh. A1, ¶ 78.

114.    On or about January 27, 2015, during a meeting with Captain Langejans, Union President Roger Tamietti, and Union Vice President Chris Conger, Captain Langejans denied his statements and conduct towards Plaintiff. Exh. A1, ¶ 79.

115.    On or about January 28, 2015, during another meeting with Captain Langejans, Union President Tamietti, and Union Vice President Conger, Captain Langejans reversed course and admitted some of the statements and conduct towards Plaintiff. Exh. A1, ¶ 80.

116.    On January 30, 2015, Inspector Sisterman sent a memorandum to Fire Chief Critchley outlining the hostile work environment created by Captain Langejans in Fire Prevention. Exh. RR. Inspector Sisterman confirmed that Captain Langejans:

> a.    Admitted to telling his employees to keep their computers locked because the Clarks could not be trusted;
>
> b.    First denied saying that he would kill his enemies, then admitted that he was angry and may have said some things he did not mean;
>
> c.    Admitted that he said the Clarks were the reason for poor morale;
>
> d.    Admitted that he said, several times, that Carrie would ruin the division; and
>
> e.    Admitted that he shared his theories that Carrie cheated.

117.    On February 2, 2015, Gordon Clark sent a memorandum to Fire Chief Critchley reporting Captain Langejans' threatening and intimidating behavior towards him and Plaintiff. Exh. SS.

118.    On February 5, 2015, AC Baker issued her findings based on an investigation she conducted regarding Fire Prevention. Among her findings, AC Baker concluded "there has not been anything to support a threat," and that a hostile work environment, in her opinion, did not exist. As a result of her findings, Captain Langejans received a written reprimand. Exh. TT.

119.    In approximately February 2015, after the investigation was concluded, AC Laura Baker told Plaintiff that nobody in Fire Prevention was going to be moved, and that everyone needed to "move past this." Plaintiff told AC Baker that she was uncomfortable being around Captain Langejans and that she felt harassed and intimidated by him daily. She responded, "That's okay, you don't have to get along." Exh. A1, ¶ 81.

120.    Captain Langejans subsequently received a written reprimand, one of the lowest forms of formal discipline that TFD can impose, similar to being late for work or missing a required training class. Exh. A1, ¶ 82; Exh. UU.

121.    On or about March 21, 2015, Plaintiff filed a formal administrative complaint with the City regarding Captain Langejans' conduct. Exh. A1, ¶ 83; Exh. VV.

122.    On June 5, 2015, during Plaintiff's annual employment physical, Stephanie Lundell, M.D., one of the City of Tucson's contract physicians, diagnosed Plaintiff with a possible hernia.  At that time, Dr. Lundell informed Plaintiff that she could not be released to firefighting duties if her diagnosis was confirmed. Over the course of the next several months, Plaintiff had consultations with a number of different physicians.  Once her hernia diagnosis was confirmed, Plaintiff began exploring options for surgical repair. Exh. A1, ¶ 96; Exhibit FFF.

123.    On July 29, 2015, EOPD Investigator Matthew Larsen issued a memorandum of findings indicating the results of the EOPD's investigation into Plaintiff's allegations. Investigator Larsen found that Captain Langejans' inappropriate remarks about Plaintiff and Gordon Clark violated TFD policy. Investigator Larsen also determined that TFD's "investigation was not thorough and did not identify the level of discipline that was most appropriate for the actions of Captain Langejans." Exh. A1, ¶ 84; Exh. A2, ¶ 57-62.

124.    EOPD also concluded that because Plaintiff and her husband worked in Fire Prevention, even though Gordon Clark did not supervise Plaintiff, TFD was in violation of City Directive 2.02-10, Nepotism. Exh. A1, ¶ 85; Exh. WW.

125.    TFD does not follow the City's nepotism policy as there are many instances of family members working openly at the same stations and within the same chains of command throughout the department. For example, Captain Sloan Tamietti supervised his brother-in-law Brian Anguiz many times; Captain Brian Larkin supervised his brother Troy Larkin at the same station; and DC Jeff Thompson was in his brother Paramedic Nelson Thompson's chain of command. Exh. A1, ¶ 86; Exh. WW.

126. Gordon Clark was informed on July 31, 2015, that as a result of the EOPD investigation, he would be transferred to an Operations Shift Captain position effective August 22, 2015. Exh. A1, ¶ 87.

127. On August 18, 2015, AC Baker defended her investigation into Fire Prevention and TFD's decision on its discipline of Captain Langejans. Exh. XX.

128. On August 22, 2015, Gordon was transferred from Fire Prevention to Operations as a B shift swing Captain back in a station. No other TFD officer who worked in the same station or chain of command as their family member(s) was transferred under the City's nepotism policy. Exh. A1, ¶ 87.

129. Shift Captains earn less pay than 8-hour Captains who work in Fire Prevention, and work a less desirable 24-hour "swing" shift schedule as needed, as opposed to a consistent daily schedule. It also created a hardship for Plaintiff as August 22, 2015, was the first week of school for Austin. Exh. A1, ¶ 88.

130. To the best of Plaintiff's and Captain Clark's knowledge, no other member of TFD was transferred or disciplined as a result of EOPD's conclusions. Exh. A1, ¶ 99; Exh. A2, ¶ 68.

131. Sometime in September or October 2015, Plaintiff informed her supervisor, Ken Brouillette, that she had a hernia which would eventually require surgery. Exh. A1, ¶ 102.

132. On or about January 10, 2016, Captain Clark was promoted to the position of Battalion Chief. Exh. A1, ¶ 103; Exh. A2, ¶ 70.

133. On March 9, 2016, Plaintiff filed a wrongful conduct complaint against TFD alleging, among other matters, continued harassment by Captain Langejans and a number of other policy violations. Exh. A1, ¶ 104; Exh. GGG. On March 24, 2016, TFD sent Plaintiff a letter indicating that her complaint had been forwarded to her department chief for assessment. Exh. HHH.

134. Also on March 24, 2016, Plaintiff's supervisor, Ken Brouillette, issued an Educational Counseling to Plaintiff, citing on TFD's Rules of Conduct requiring "harmony

and cooperation among fellow workers" as the policy which Plaintiff allegedly violated. Exh. A1, ¶ 105; Exh. III.

135.   On April 7, 2016, AC Baker and DC Carsten interviewed Plaintiff regarding her wrongful conduct complaint. Exh. A1, ¶ 106. On April 13, 2016, AC Baker submitted a written response to Plaintiff's wrongful conduct complaint to Chief Critchley, which contained AC Baker's determination that the allegations in the complaint were unfounded. Exh. JJJ. On April 18, 2016, Chief Critchley sent a memorandum to EOPD regarding Plaintiff's wrongful conduct complaint, concluding that "The department was not able to substantiate the claim of mismanagement and misconduct." Exh. KKK.

136.   On April 27, 2016, TFD informed Plaintiff that she was being involuntarily transferred from her 8-hour position in Fire Prevention to a Swing Shift Paramedic position in TFD's Operations Division. Chief Critchley made the decision to transfer Plaintiff from Fire Prevention into Operations. Exhibit ZZZ, p. 29 ln. 25 – p. 31 ln. 11.

137.   At the time Chief Critchley decided to transfer Plaintiff from Fire Prevention into Operations, he was aware that Plaintiff had filed a lawsuit regarding her employment with TFD, and he was aware that Plaintiff had filed a Wrongful Conduct Complaint about the work environment in Fire Prevention. Exhibit ZZZ, p. 57 ln. 19 – p. 58 ln. 4.

138.   Despite the fact that she was notified on April 27, 2016, her transfer was not made effective until May 2, 2016. Exh. A1, ¶ 107-08; Exh. LLL.

139.   On May 13, 2016, TFD announced that it had established a new policy which provided that seniority would only be calculated for time worked in each job classification. Further, it stated, "Timed worked within these classifications of equal rank (i.e. Inspector, Engineer, Paramedic) does not transfer to a previous position held within the equal rank but different classification, . . ."  While TFD announced this new policy on May 13, 2016, it made the policy retroactive to May 1, 2016. Exh. MMM. The new policy, as written, along with Defendant's decision to retroactively apply the policy, deprived Plaintiff of approximately two years of seniority when she was involuntarily transferred to a Swing Shift Paramedic position. To the best of her knowledge, Plaintiff was the only TFD

employee adversely affected by the decision to retroactively apply the policy. Exh. A1, ¶ 107-08.

140.   Before she could return to Paramedic duties, TFD ordered Plaintiff to report to the TFD Fire Academy on May 2, 2016, for refresher training. Exh. A1, ¶ 109.

141.   Plaintiff subsequently informed TFD that she could not go back into an Operations Division position as a Paramedic because of her hernia.  Dr. Lundell confirmed this on May 6, 2016.  Nevertheless, TFD required Plaintiff to obtain a note from her private physician before it would agree to place her in a light duty position. Exh. A1, ¶ 110.

142.   On May 10, 2016, Plaintiff was present when AC Laura Baker was deposed in this case. Exh. I. The very next day, on May 11, 2016, TFD assigned Plaintiff to a light-duty position back in TFD Administration and required Plaintiff to report to AC Laura Baker.

143.   Chief Critchley, who signed off on Plaintiff's light duty assignment, gave the direction to his subordinate to "find a place where she can be successful" and not to put Plaintiff anywhere she did not want to go. Exhibit ZZZ, p. 22 ln. 21 – p. 24 ln. 8.

144.   Despite this direction, TFD assigned Plaintiff to work out of an office across the hallway from HR Manager Acedo. AC Laura Baker was either Plaintiff's first or second-line supervisor in her light-duty position. To the best of Plaintiff's knowledge, TFD had other light-duty assignments available but chose instead to assign Plaintiff to work under the person whom she had just deposed the day before. Exh. A1, ¶ 111; Exh. NNN.

145.   As a result of her forced transfer into a light-duty assignment, Plaintiff was no longer eligible to receive holiday pay for the time she was on light-duty.  Had TFD not transferred Plaintiff out of an 8-hour position, she would have been entitled to receive paid holidays.  Plaintiff lost four paid holidays as a result of being forced into a light-duty assignment. Exh. A1, ¶ 112.

146.   Defendant deposed Plaintiff for the first time on May 25, 2016. Contrary to Defendant's policies and procedures, Plaintiff was not paid or compensated for her presence at Defendant's required deposition on May 25, 2016.  Exh. A1, ¶ 113; Exh OOO, p. 1.

147.    On or about June 7, 2016, Plaintiff filed a Wrongful Conduct Complaint alleging that TFD's decision to involuntarily transfer Plaintiff to a Swing Shift Paramedic position was in retaliation for her ongoing lawsuit against TFD. Exh. PPP. On June 13, 2016, Assistant City Manager Joyce Garland sent EOPD Investigator Macias a memorandum indicating that Plaintiff's complaint did not meet the City of Tucson's criteria for retaliation. Exh. QQQ.

148.    On June 20, 2016, TFD reassigned Plaintiff to communications. Exh. A1, ¶ 115.

149.    Effective June 26, 2016, Plaintiff demoted to a firefighter position. Had Plaintiff not been involuntarily transferred to a swing shift paramedic position and remained in fire prevention, she could have delayed her hernia surgery as long as possible, and would not have needed to demote to a firefighter position. Exh. A1, ¶ 116; Exh. RRR.

150.    On June 27, 2016, HR Manager Acedo sent Plaintiff an email indicating that if she wished to be in the Paramedic Assignment Pay Program (also known as the "$150 Club") she should submit the appropriate form. Exh. RRR. The Paramedic Assignment and Incentive Pay program provides qualified CEP personnel $150 per month in exchange for maintaining their Paramedic certification and for being available to work as a Paramedic during their assigned shift or on extra duty. The $150 is divided in equal amounts over the course of two paychecks. Plaintiff submitted the $150 Club form on or about July 8, 2016, before the end of the relevant pay period. Exh. SSS. For the month of July 2016, however, TFD only paid Plaintiff one-half of her $150 Club payment, or $75. Exh. TTT. Both Plaintiff and her union representation protested and asked for the remaining $75 for July 2016 to be paid, but the City refused. Exh. A1, ¶ 117.

151.    Defendant deposed Plaintiff for a second time on October 27, 2016. Contrary to Defendant's policies and procedures, Plaintiff was not paid or compensated for her presence at Defendant's required deposition on October 27, 2016. Exh. A1, ¶ 118; Exh. OOO, p. 2.

152.    On or about December 15, 2016, Plaintiff's husband, Gordon Clark, who had previously been promoted from Captain to Battalion Chief, was informed that TFD

determined that he had failed his Battalion Chief probationary period and was being returned to his previous position of Captain. TFD failed Gordon Clark on probation without notice or an opportunity for him to respond. Exh. A1, ¶ 119; Exh. A2, ¶ 73; Exh. UUU.

153.    Chief Critchley was named TFD's Fire Chief in September or October 2011. Since then, no other Chief-level employee has not passed their probationary period.  Exhibit ZZZ, p. 13 – p. 14 ln. 5; p. 41 ln. 2-14.

154.    TFD did not follow City of Tucson Administrative Directives regarding Gordon Clark's term as a probationary Battalion Chief because it failed to give him a 6-month written evaluation which is a requirement when an employee is on probation. Exhibit ZZZ, p. 42, ln. 2 – p. 43 ln. 2.

155.    As a result of Defendant's unlawful retaliation, Gordon Clark's regular hourly rate of pay went from $29.69 per hour to $23.83 per hour. Exh. A2, ¶¶ 69, 77; Exh. VVV.

156.    Defendant deposed Plaintiff for a third time on January 10, 2017. Contrary to Defendant's policies and procedures, Plaintiff was not paid or compensated for her presence at Defendant's required deposition January 10, 2017. Exh. A1, ¶ 120; Exh. OOO, p. 3.

157.    On January 14, 2017, Captain Clark filed a Wrongful Conduct Complaint along with a rebuttal of his December 15, 2016, "Special Evaluation" to Chief Critchley. Exh. A2, ¶ 74-75; Exh. WWW.

158.    On April 6, 2017, Chief Critchley wrote a memo in response to Captain Clark's wrongful conduct complaint. Chief Critchley's memo contains reasons and rationale as to why he failed Captain Clark on probation which are different from the December 15, 2016, "Special Evaluation." Exh A2, ¶ 76; Exh. YYY.

159.    On June 2, 2017, Defendant filed its Answer to Plaintiff's Third Amended Complaint. Exh. EEE.

160.    Defendant deposed Plaintiff for a fourth time on June 15, 2017. Contrary to Defendant's policies and procedures, Plaintiff was not paid or compensated for her presence at Defendant's required deposition on June 15, 2017. Exh. A1, ¶ 118; Exh. OOO, p. 4.

161.    As a result of the actions in this case described above, Plaintiff has suffered emotional distress, anxiety, depression, guilt, frustration, insomnia, bitterness, anger, loss of libido, and loss of consortium. Exh. A1, ¶¶ 89-96; Exh. A2, ¶ 78-81; Exh. YY

DATED this 18th day of August, 2017.

**JACOBSON LAW FIRM**

_s/Jeffrey H. Jacobson_
Jeffrey H. Jacobson
*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michelle Saavedra
Principal Assistant City Attorney
Office of the City Attorney, Civil Division
255 W. Alameda, 7th Floor
Tucson, Arizona 85701
*Attorney for Defendant*

Michael W.L. McCrory
Principal Assistant City Attorney
Office of the City Attorney, Civil Division
255 West Alameda, 7th Floor
Tucson, AZ 85701
*Attorney for Defendant*