**JACOBSON LAW FIRM**
2730 EAST BROADWAY BLVD., SUITE 160
TUCSON, ARIZONA 85716
TELEPHONE (520) 885-2518
FACSIMILE (520) 844-1011
jeff@jhj-law.com
Jeffrey H. Jacobson, PCC #65402; SB#019502
Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| CARRIE FERRARA CLARK, | No. CV-14-02543-TUC-CKJ |
| Plaintiff, | |
| vs. | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| CITY OF TUCSON, | |
| Defendant. | Hon. Cindy K. Jorgenson |

Plaintiff Carrie Ferrara Clark opposes Defendant's Motion for Summary Judgment as follows. Plaintiff also incorporates, by reference, her Cross-Motion for Summary Judgment, her Separate Statement of Facts (PSOF), and Exhibits in support thereof into this Opposition. [Doc. 117 – 118-4].

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. STANDARD OF REVIEW**

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he moving party has the burden of showing that there is no genuine dispute as to any material fact." *Crane v. AHC of Glendale, LLC,* 2:14-CV-2415 JWS, 2016 WL 5363748, at *2 (D. Ariz. Sept. 26, 2016). The Court must view the evidence in the light most favorable to the non-moving party. *Ray v. Henderson*, 217 F.3d 1234, 1239-40 (9th Cir. 2000). The Court then must determine whether a genuine issue of

1

material fact exists for trial. *Id*. The Court "must not weigh the evidence or determine the truth of the matters asserted." *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d at 1130.

In *Reeves v. Sanderson Plumbing Products*, the Supreme Court re-emphasized that it is the jury's exclusive role to determine credibility, weigh the evidence, and draw legitimate inferences from the facts. 530 U.S. 133 (2000). Thus, the trial court, in reviewing a motion for summary judgment, must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 137. As the Ninth Circuit stated in *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*:

> If direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. Put another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied.

809 F.2d 626, 630-31 (9th Cir. 1987).

## II. LEGAL ARGUMENT

Defendant moves for summary judgment arguing that Plaintiff has no legal basis for a FLSA claim, that it complied with FLSA, that there is no factual or legal basis for her Title VII claim, and that there is no basis for her retaliation claims. For the reasons explained below, these arguments are legally erroneous and do not resolve contested issues of material fact. As a result, Defendant's motion for summary judgment fails in its entirety.

### A. Defendant's Argument that Plaintiff's FLSA Claim Fails Because She Did Not Lose any Pay is Unavailing

Before returning to her work after the birth of her first child, Plaintiff called Battalion Chief (BC) Paul McDonough and ask about long-term openings that would provide his with a consistent place to pump and express my breastmilk. She contacted BC McDonough because she knew that TFD did not have a nursing/breastfeeding policy. PSOF 12; PSOF 159, Exh. EEE ¶ 15; Doc. 87 ¶ 15. During their call, BC McDonough suggested that Station 20 was available. PSOF 14. She returned to work on October 27, 2012. PSOF 15. When Plaintiff returned to work, TFD placed her into its "swing" shift. This means that she was not assigned to a permanent station; she was assigned to different stations each

2

shift according to its staffing needs. PSOF 159; Doc 87 ¶ 14; Exh. EEE ¶ 14. At the time Plaintiff returned to work, TFD also did not have a policy for complying with § 207(r) by providing reasonable break time and private space, free from intrusion, for lactating mothers. In fact, it took TFD almost nine months, to July 19, 2013, before it adopted such a policy. PSOF Exh. X. ¶ 1; PSOF 8, 45.

On or about November 12, 2012, Plaintiff met with BC McDonough, DC Ed Nied, and DC Rodriguez at TFD headquarters. During the meeting, they accused Plaintiff of trying to obtain an assignment at Station 12 as just a matter of convenience because it was closer for Plaintiff's mom to pick up the expressed breastmilk. They also suggested that Plaintiff should just take more time off from work. PSOF 27.

Between December 7, 2012, and March 26, 2013, on at least ten occasions, Plaintiff had to take either vacation or sick leave to avoid either the uncertainty of not knowing whether she would be assigned to a station that did not have a legally-compliant space to express her breastmilk or to avoid having to work at a station that did not, in fact, have such a space available to her. PSOF 29-53. Sick and vacation leave are employee benefits offered by TFD. Earned and unused sick and vacation leave accrue, without limitation, to the benefit on TFD employees. Exh. OOOO; Exh. SSSS ¶ 2. TFD employees who have more than 5 years of service, but less than 10, accrue 4.5 hours of vacation leave and 4.0 hours of sick leave per pay period. *Id*.

TFD participates, through its Labor Agreement with the Tucson Fire Fighters Association, in the Sick Leave Sell-Back Program. For employees who have more than five years of continuous service, but less than 10, they can "sell back" – which means they receive wages for – up to 56 hours of unused sick leave as long as they have a minimum of 45 days of sick leave in their sick leave bank as of the first day of the pay period in which April 1 falls. *Id.* The hourly rate at which employees receive compensation for their sold-back sick leave is also included in the Labor Agreement and is higher than rate of pay for overtime, extra duty assignments, and any retirement benefits. The purpose of this is to encourage city employees to use less sick leave and be at work to increase the efficiency and productivity of city operations. *Id*.

3

Further, at the completion of their employment, TFD employees may choose to sell back their sick leave up to 288 hours at 100% of their hourly rate. Any sold-back sick leave above and beyond 288 hours is paid back to the employee at 50% of their hourly rate. *Id*. Therefore, Defendant provides a strong financial incentive to its employees to accrue, instead of use, their sick leave during the duration of their employment. Having to use her sick leave in particular came at a significant financial price for the Plaintiff in this case.

Having to take earned sick and vacation time off (with pay), Plaintiff suffered an actual loss of one of her employment benefits. In fact, Plaintiff would have taken *more* time off from work had she not been required to ration her sick and vacation leave time. PSOF 37. The loss of earned, accrued sick and vacation leave in this case clearly damaged Plaintiff. Finally, TFD's assignment of Plaintiff to Station 6 resulted in her being deprived of the opportunity to earn overtime hours and make trades. PSOF 63.

Because TFD failed to ensure that all of its stations contained adequate spaces for nursing mothers to express breast milk, and thus failed to comply with § 207(r), she was forced to use paid time off to cover what should have been unpaid break time to express milk for her son. Therefore, she was forced to work a significant number of additional hours that could have been substituted for paid time off, essentially receiving no wages or overtime for those hours. If Defendant had complied with its requirements under federal law, Plaintiff would have never needed to expend her accrued employee benefits. The loss of wages due to having to take sick leave which could have been used for another illness not caused by TFD's discrimination in this case clearly satisfies the FLSA standard.

**B.    TFD Was Not in Compliance With FLSA**

Defendant claims that Plaintiff's FLSA claims fail as a matter of law because TFD was in compliance with FLSA. As Defendant's own documents demonstrate, however, this claim is not accurate.

It is true that Plaintiff had been assigned to a swing shift position before she had a need to express breast milk. It is also true that TFD returned her to a swing shift assignment *knowing* that she would need to express her breast milk and that it needed to provide a legally-compliant space for her to do so. PSOF 12, 14. By its definition, a swing shift

4

assignment means that Plaintiff could be assigned to any station (or stations) on any given shift according to TFD's needs. DSOF 10-11. It is also true that the FLSA and § 207(r) do not require "preferential assignments or scheduling to nursing mothers." DMSJ p. 6.[1] This is irrelevant, however, because being on swing shift would not have been an issue for Plaintiff had all of TFD's stations had space for mothers expressing breast milk which complied with federal law. The record evidence establishes that TFD's station did not comply with federal law for nursing mothers expressing breast milk.

EOPD is the City of Tucson's Equal Opportunity Division. In 2013, EOPD was an independent department within the City of Tucson that reported to the City Manager that investigated wrongful conduct and discrimination claims. Exh. QQQQ, p. 25 ln 1 – p. 28 ln. 12. Five months after Plaintiff first complained that TFD did not have legally-compliant lactation facilities at its fire stations, on March 22, 2013, EOPD Investigator Larsen issued his finding entitled "American Fair Labor Standards Act Section 7 Compliance." Out of 21 stations evaluated, 9 stations (or 43%) did not comply with federal law and did not have "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk." Exh. Q. The same day, EOPD Program Manager and EOPD Director Liana Perez received a memorandum from Ms. Macias summarizing Investigator Larsen's findings. Exh. R. A March 22, 2013, memorandum also establishes that TFD did not have a uniform process through which its employees could submit requests for work assignments that address unique circumstances related to compliance with State, Federal, or local law. Exh. S.

On March 20, 2013, before EOPD Investigator Larsen even issued his findings and report, TFD sent an email asking the City of Tucson to install a privacy lock on one of the bedroom doors at Station 6 because that is where TFD was assigning Plaintiff. PSOF 50-51. Therefore, by its own admission, before March 20, 2013, Station 6 was out of compliance with federal law; the way TFD brought Station 6 into compliance with FLSA so that it could assign Plaintiff there *was to install a "privacy lock."* Exh. N. On March 21, 2013, HR

---

[1] The term DMSJ refers to Defendant's Motion for Summary Judgment, Court Document 115, followed by the relevant page number.

5

Manager Acedo sent an email to Investigator Larsen and then-Principal Assistant City Attorney Julianne Hughes stating, "FYI…PM Clark will be temp assigned to Station 6. *The dorm is private and now has a lock.*" Exh. O (emphasis added).

The attached City of Tucson work orders further undercut Defendant's arguments in this case. On or about April 8, 2013, a series of work orders was submitted to Facilities Management to install locks at fire stations 3, 9, 10, 12, 18, 19, 20, 21, and 22. Exh. VVVV. For Station 3, the 'Request' section of the form states, "IN VIOLATION OF THE HEALTHCARE REFORM ACT – FIRE STATION 3 – MUST HAVE LOCKS ON ALL DORM ROOMS AS PER DIRECTION OF THE OFFICE OF EQUAL OPPORTUNITY – FIRE 03." Exh. VVVV (COT 000358) (Emphasis in original.) The work order also indicates, "Tucson Fire approves this work order. . . ." *Id.*

The work order Request for Station 9 states, "FIRE 9 STUDY ROOM NEEDS A NEW DOOR AND LOCK ON IT TO BE COMPLIANT. DOOR CURRENTLY HAS A GLASS VIEWING WINDOW. THERE MUST BE COMPLETE PROVACY. THIS IS INSTRUCTED AS PER THE INSPECTION COMPLETED BY THE OFFICE OF EQUAL OPPORTUNITY." Exh. VVVV (COT 000359) (Emphasis in original.) As above, TFD approved the work order. *Id.* The same or similar language appears on the work orders for Stations 10, 12, and 18 through 22. Exh. VVVV. On May 13, 2013, Chief Critchley sent a memorandum indicating that "Tucson Fire has equipped all its stations with a location that can be used as a nursing room pursuant to PPACA requirements. As part of the review your office conducted with TFD's HR Manager, the following stations were not in compliance." Listing stations 3, 9, 10, 12, 18, 19, 20, 21, and 22, Chief Critchley stated, "This has been corrected." Exh. VVVV (COT 000375).

In fact, the record evidence establishes that TFD's *only* response to the independent department's finding that it was in violation of federal law was to install privacy locks. Defendant's actions, statements, and admissions betray its claim that having a door with a lock is not required under statutory requirements and under U.S. Department of Labor, Wage and Hour Division guidance.

Whether or not every station Plaintiff worked at between October 27, 2012, and March 26, 2013, had a room which complied with the law is a disputed issue of material fact. Defendant attempts to use Plaintiff's responses to Defendant's first set of Requests for Admission in support of its claim. However, Plaintiff's July 2015 responses were conditioned upon and qualified by the fact that discovery had yet to be completed and additional facts and witness may be discovered. Exh. RRRR. In fact, that is exactly what occurred in this case. Upon close inspection of her schedule and TFD's assignments, between October 27, 2012, and her assignment to Station 6 on March 26, 2013, TFD assigned Plaintiff to work at Station 9, Medic 49, Station 19, Station 7, Medic 47, none of which were legally compliant. PSOF 37, 38, 41, and 46.

Further, On November 13, 2013, DC Nied asked Plaintiff if she would go to a position in Station 16 that would be vacated, but she said she did not want to go there because of personal conflicts with the captain at that station." DC Nied stated that the position at Station 16 would be vacated; however, the Captain at Station 16, Max Parks, had already called DC Nied telling DC Nied that he did not want Plaintiff at Station 16. TFD then assigned Plaintiff to Station 12 until November 28, 2012. Plaintiff's first day on Swing shift was December 5, 2012. CSOF 25.

### C. TFD's Discriminated and Retaliated Against Plaintiff for Her FLSA and Title VII-Protected Activities

The PDA amended Title VII to include discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). When viewed as a whole in this case, the evidence yields the reasonable inference that TFD engaged in discrimination. As discussed below, there is ample, convincing direct and circumstantial evidence that would allow a jury to infer intentional discrimination.

Next, the FLSA makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding." 29 U.S.C. § 215(a)(3). Courts analyze FLSA retaliation claims using the same structure as retaliation claims brought under Title VII.

7

*Ceccorulli v. Aerotec Int'l, Inc.*, No. CV-07-1214-PHX-GMS, 2008 WL 5381595, at *2 (D. Ariz. Dec. 23, 2008). For the sake of brevity in this factually dense and complicated matter, Plaintiff combines her FLSA and Title VII discrimination and retaliation analysis below.

Plaintiffs can prove retaliation through direct or indirect evidence. "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir.1998) (citation and internal quotation and editing marks omitted). One direct evidence is advanced, the burden shifts to the Defendant to put forth legitimate, non-retaliatory reasons for its actions. If Plaintiff relies on indirect evidence, Plaintiff must proceed under the burden-shifting analysis set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). In that case, to establish a prima facie case of retaliation, a plaintiff must show: (a) that the Defendants was aware of plaintiff's participation in a protected activity; (b) that an adverse employment action was taken against plaintiff; and, (c) that the protected activity was a substantial motivating factor in the adverse employment action as to that plaintiff. *Lambert v. Ackerley*, 180 F.3d 997, 1007 (9th Cir.1999).

Direct evidence is "'evidence of the conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude…sufficient to permit the fact finder to infer that the attitude was more likely than not a motivating factor in the employer's decision.'" *Everts v. Sushi Brokers LLC,* U.S. Dist. Az. (CV015-02066-PHX-JJT) (March 27, 2017) *quoting Shelley v. Geren*, 666 F.3d 599, 615-16 (9th Cir. 2012). Direct evidence "requires an admission by the decision-maker that his or her actions were based on the prohibited animus. Absent such remarks, a plaintiff must show a nexus between a decision-maker's actions and a superior's discriminatory remarks." *Id.* (citing *Day v. LSI Corp.* 174 F.Supp.3d 1130, 1162(D. Ariz. 2016); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003).

Here, Plaintiff has present evidence from which a reasonable jury could conclude that TFD, including some of its highest-ranking members of management, were openly hostile to Plaintiff and retaliated against her for asserting her right to have workplace where

8

she could express her breastmilk that complied with federal law. As such, Defendant's summary judgment request fails.

### 1. *Direct Evidence of Discriminatory Animus*

In this case, there is ample direct evidence of discriminatory animus. TFD was aware, before Plaintiff returned back to work in October 2012, that she needed to pump and express her breast milk and was seeking a long-term opening that would provide her with the ability to do so. PSOF 12, 14. Plaintiff knew that TFD did not have a policy that covered employees who were nursing/breastfeeding. PSOF 7-8. TFD's HR manager deemed that the only policy it had was unlawful. PSOF 8. Even though Station 20 appeared to comply with federal law, and Plaintiff asked to be assigned there, TFD chose not to do so. PSOF 10-11, 13; CSOF 18, 25.

On or about November 12, 2012, BC McDonough brought Plaintiff to TFD headquarters to meet with Deputy Chief (DC) Ed Nied and DC Rob Rodriguez. During that meeting, DCs Nied and Rodriguez accused Plaintiff of simply wanting to be closer to her mother who was picking up Plaintiff's expressed breastmilk. This would later become one of Defendant's core theories of its defense; that is, Plaintiff wanted specific assignments simply out of convenience. This is a classic misdirection tactic in order to divert the court's attention from Defendant's failures to hold up its legal obligations to provide compliant breastfeeding spaces at all of its fire stations. Nevertheless, the Supreme Court has recognized that the raison d'être behind the PDA was "to guarantee women the basic right to participate fully and equally in the workforce, without denying them the fundamental right to full participation in family life." *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 276-77 (1987).

Further, TFD regularly accommodated other employees for work or off-duty related matters. PSOF 23-25. Plaintiff has presented sufficient evidence for a jury to reasonably conclude that TFD treated her less favorably than other similar non-breastfeeding employees regarding both the manner and place of her assignments. *Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338, 1344 (2015).

9

During this same meeting, BC McDonough, DC Nied, and DC Rodriguez also suggested that Plaintiff should just take more time off from work and that they could not remember any other women in the past having the same issues with breastfeeding. PSOF 21. This accusation is direct evidence of discrimination. TFD eventually denied the requests for assignment to Station 12 and put the assignment out to bid. PSOF 18, 22.

When told that Plaintiff needed to be assigned to stations with appropriate lactation space, TFD's assignment scheduler, Captain Rick L'Heureux, said, "I don't think she deserves any special accommodations" (or words to that effect). PSOF 27. Captain L'Heureux's own words and his failure to assign Plaintiff to complaint stations are direct evidence of animus and discrimination.

On March 20, 2013, TFD assigned Plaintiff to another station that did not have legally-compliant lactation space. When Plaintiff spoke with then-Assistant Chief (AC) Michael Fischback, DC Rodriguez and HR Manager Acedo about this problem, HR Manager Acedo told Plaintiff that her pumping seemed excessive and that "it seems to me that you're not fit for duty." PSOF 35-41; PSOF 159; Doc 87 ¶ 43; Exh. EEE ¶ 43. During this call, HR Manager Acedo suggested that Plaintiff wake up her Captain or Battalion Chief when she needed to express breastmilk. PSOF 37-38. AC Fischback agrees that HR Manager Acedo's suggestion was inappropriate. PSOF 39. These statements are further direct evidence of discriminatory animus and management relying specifically on Plaintiff's protected status to impact her employment. Plaintiff understandably reacted to the ridiculousness of HR Manager Acedo's suggestion. PSOF 58-59. TFD also accused Plaintiff of hanging up on them during the call, though the only evidence they have of this is that their phone line suddenly went dead. PSOF 60. During the same conversation, HR Manager Acosta said that she did not believe that Plaintiff was fit for duty. Exh. SSSS ¶ 8.

Also during the March 20, 2013, call, HR Manager Acedo chuckled to herself because TFD had no idea how to handle Plaintiff's request for legally-compliant lactation space. Ignorant as to the law at the time, HR Manager Acedo thought that it was simply a medical issue that should not be different than anything else. PSOF 45, 72. HR Manager

10

Acedo thought that Plaintiff was simply upset over not receiving "special treatment" and that TFD was refusing to exercise its discretion. PSOF 24-25, 48.

TFD subsequently formally disciplined Plaintiff for *her* (alleged) conduct during the March 20, 2013, call. PSOF 58-59. When TFD handed Plaintiff its formal disciplined Plaintiff, she asked why she could not work at Station 12. AC Fischback said that Station 12 was not on TFD's list of stations that were in compliance with federal law. When Plaintiff pointed that out that the only other nursing mother in TFD was at Station 12, AC Fischback replied, "Well, that's what happens when you file a complaint with EEO." Plaintiff pointed out that she had not filed a complaint; AC Fischback retorted that someone had gotten them involved. PSOF 64. Union Representative Sloan Tamietti later told Plaintiff that AC Fischback had said that he had misspoke and that Plaintiff had not actually filed a complaint. Exh. SSSS ¶ 10. This is more direct evidence of discriminatory animus.

When City workers came to install a lock on a door at Station 6 to make it legally compliant, someone put a big note on the door that said, "Carrie Clark." OEOP Program Manager Bob Barton took that to mean that "there's going to be an uncomfortable issue with her." PSOF 55. There is no record evidence that OEOP, TFD, or any other City entity did anything to address this obvious "uncomfortable issue" TFD had to deal with because Plaintiff sought to enforce her rights as a breastfeeding mother.[2]

Plaintiff informed TFD that she was pregnant with her second child in January 2014. PSOF 68. On May 22, 2014, TFD Captain Ted McDonough forced Plaintiff into performing a firefighter drill by herself. Defendant attempts to claim that drilling is a common practice and that Plaintiff was not singled out. Defendant's reasons why the drill occurred, however, are inconsistent and demonstrate pretext.

According to BC Nofs, the drill occurred because firefighter McKendrick "was ready to test for an engineer rank, . . ." DSOF 97. BC Nofs' memorandum, however, conflicts with Captain McDonough's Declaration, which states, in part, "I did this because the

---

[2] OEOP Program Director Barton thought this was a matter of Plaintiff's "perception" – not TFD's responsibility to follow federal laws. PSOF 54.

11

firefighter was in the process of pursuing engineer certification and I thought this experience would help him prepare for an upcoming test." DSOF Exhibit 27 ¶ 12 ln. 13-15. Before an employee can test for an engineer rank, they have to successfully complete certification class. Exh. SSSS ¶ 15. Defendant argues that too many months had passed since TFD issued its nursing room policy and Plaintiff had filed her complaint for this to fall under the temporal proximity umbrella. DMSJ at 19. Temporal proximity between a protected activity and an adverse employment action, coupled with employer knowledge of the protected activity, raises a strong inference of unlawful retaliation sufficient to establish causation through the timing-knowledge test. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). Here, just eight days before the drill, the issue of Plaintiff's physical ability to perform the duties of a firefighter were discussed over email between BC Nofs and HR Manager Acedo. HR Manager Acedo tells BC Nofs, "If Captain McDonough has documented tasks she is required to perform but cannot due to her condition, then we can request an evaluation." Exh. HHHH. Therefore, the drill was in close temporary proximity to the adverse employment action and directly related to Plaintiff's pregnancy.

These instances represent direct evidence of decision makers within TFD regarding Plaintiff's legally protected need to express breastmilk with derision, and subsequently making choices that adversely affected her career. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989). All of these events described above occurred well before Plaintiff laterally promoted into Fire Prevention. Defendant's claim that Plaintiff failed to identify any individual who retaliated against her in violation of her FLSA rights is therefore inaccurate.

Decision makers at the highest levels of TFD management were involved with and aware of Plaintiff's quest to obtain an assignment which would provide her with legally-compliant space to express her breastmilk. Defendant's attempt to parse out its retaliation for Plaintiff's protected FLSA complaints into a pre-Fire Prevention timeline is not supported by any legal standard. In other words, Defendant's actions throughout this entire case, from 2012 to the present, can be traced back to Plaintiff's decision to assert her rights to a legally-compliant breastfeeding workplace.

12

### 2. *Plaintiff has Proven a Prima Facie Case of Retaliation Under the McDonnell Douglas Burden Shifting Analysis*

Absent direct evidence of discrimination, the Plaintiff bears the initial burden of establishing a prima facie case. "To establish a claim of retaliation, a plaintiff must prove that (1) the plaintiff engaged in a protected activity, (2) the plaintiff suffered an adverse employment action, and (3) there was a causal link between the plaintiff's protected activity and the adverse employment action." *Poland v. Chertoff,* 494 F.3d 1174, 1179–80 (9th Cir.2007). Employer actions from which can be inferred, absent an explanation, that were more likely than not based on discriminatory criterion are illegal. *Young, supra,* 135 S. Ct. 1338 (2015). Plaintiff's burden to state a prima facie case is "not onerous." *Id., citing Texas Dept. of Community Affairs v. Burdine,* 450 U. S. 248, 253 (1981).

There is no genuine dispute that Plaintiff is a member of a protected class, or that she sought accommodation in the form of a consistent assignment to a station that had a place, other than a bathroom, that was shielded from view and free from intrusion from coworkers and the public so she could express her breastmilk. There is also no genuine dispute that TFD failed to accommodate her. PSOF 10-11, 13-22, 26-28, 35, 42, 45, 48, 64, 66, 74, 77-78, 81, 84, 86-87. The record evidence also shows that TFD does not follow its Rules of Assignment and can make exceptions based on "management rights." PSOF 23-24. TFD has deviated from its Rules of Assignment for employees who have been convicted of driving under the influence, charged with other criminal offenses, and employees whom are on a work improvement plan. PSOF 24. What is more important that what the Rules of Assignment cover is what TFD's Rules of Assignment *do not* consider. Exhibit F. TFD's policy on where its personnel are assigned states, "The proper placement of personnel is an important factor governing the effectiveness and efficiency of the department. The placement process takes a multitude of issues into account." *Id*. The policy then goes on to list a number of administrative and personnel factors TFD uses to assign its members. Specifically, there is no "factor" whatsoever for health, medical, or physical accommodations such as a lactating mother needing to express her breast milk.

13

Over the course of several years, TFD unlawfully discriminated and retaliated against Plaintiff the following actions: continually assigning her to non-compliant stations (PSOF 27, 33); formally disciplining her (PSOF 58-59); failing to address, discourage, or correct inappropriate, discriminatory, and harassing behavior in TFD (PSOF 55, 70, 73-74); refusing to assign her to Station 12 (PSOF 15-18, 22, 64); singling her out to perform firefighting drills while she was pregnant with her second child (PSOF 70); changing her start time while she was on light duty, forcing her to get a doctor's note to exercise, and restricting where she could exercise (PSOF 94-96); withdrawing time from her vacation bank without her consent (PSOF 97); failing to adequately and properly address the hostile work environment in Fire Prevention (PSOF 123); using its investigation into Captain Langejans to justify transferring her husband, Gordon Clark, to a lower paying, less desirable position, under a nepotism policy that TFD does not otherwise enforce (PSOF 126-129); issuing her an Educational Counseling for disturbing workplace harmony when she complained of Captain Langejans' harassment (PSOF 133-34); involuntarily transferring her from Fire Prevention to Operations and retroactively enforcing its new seniority policy to effectively strip her of two years of seniority (PSOF 135-39); transferring her to a light duty position in which she had to report to someone she had deposed the day before; (PSOF 142-44); failing to pay her to attend Defendant's depositions of her (PSOF 113, 118, 120); constructively demoting her by forcing her to accept a demotion to fire fighter to avoid being placed back on swing shift in a continually hostile work environment (PSOF 149); refusing to pay her full "$150 Club" benefit (PSOF 150); and failing Gordon Clark during his probationary period in the Battalion Chief position (PSOF 152). This list is unfortunately hardly exhaustive.

Regarding Gordon Clark's transfer out of Fire Prevention, Plaintiff filed a formal administrative complaint with the City regarding Captain Langejans' conduct. PSOF 121, 159; Doc. 87 ¶ 125; Exh. EEE ¶ 87. TFD then turned its investigation into Captain Langejans' conduct into a finding that its nepotism policy was being violated because Plaintiff and Gordon Clark worked in Fire Prevention (though not in the same supervisory

chain). PSOF 124-125; Doc. 87 ¶ 130; Exh. EEE ¶ 130. TFD's transfer of Gordon Clark to a lower-paying, more burdensome position is materially adverse and highly likely to discourage a reasonable employee from engaging in further protected activity. Thus, Gordon Clark's transfer constitutes an adverse employment action under Title VII.

An adverse employment action is any "adverse treatment that is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1239-40 (9th Cir. 2000). TFD's transfer of Gordon Clark was the result of Plaintiff's protected activity, as he was transferred as a result of the very proceeding which she instituted. PSOF 124. This satisfies the timing-knowledge test and raises a strong inference of retaliatory motive. Coupled with the egregious nature of the adverse employment action, demonstrates that TFD has violated Title VII and its anti-retaliation provision.

Similarly, there can be no reasonable dispute that TFD retaliated against Plaintiff when she was issued an educational counseling for filing a wrongful conduct complaint against Captain Langejans' harassment. PSOF 133-134. TFD again retaliated against Plaintiff for participating in the investigation into Captain Langejans' ongoing harassment when it transferred her from Fire Prevention back into Operations. PSOF 136. Plaintiff's transfer out of Fire Prevention was an adverse employment action, the suspicious circumstances of which strongly suggest retaliatory motive. At the outset, TFD's transfer of Plaintiff transfer from Fire Prevention to Operations was a dramatic change to more arduous and less desirable job duties. In Fire Prevention, Plaintiff worked daily shifts from a consistent workspace and went on regularly scheduled, non-emergency inspections. In Operations, especially on swing shift, Plaintiff no longer had a consistent workplace, had to work 24-hour shifts, and had to engage in the physically grueling work of a paramedic; responding to emergency calls and potentially hazardous situations. A transfer to more arduous, less desirable job duties is considered as an adverse employment action. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006).

However, a change in job duties was not the only reason that Plaintiff's transfer was materially and indisputably adverse. TFD did not make Plaintiff's transfer effective until

15

May 2, 2016, five days after she was notified. PSOF 138. On May 13, 2016, TFD announced that it was changing its seniority policy, stating that seniority would now only be calculated for time worked in each job classification. PSOF 139. Curiously, TFD decided to retroactively enforce its new seniority policy to May 1, 2016, thus making it effective 12 days before it was announced, but one day after Plaintiff's transfer became effective. PSOF 139. As a result, Plaintiff was stripped of two years of seniority that she would have maintained had she remained in Fire Prevention, or had TFD not changed or retroactively implemented its seniority policy. PSOF 139. Instead, TFD delayed Plaintiff's transfer by five days, and then retroactively implemented its new seniority policy by 12 days, landing Plaintiff's new start date in Operations on swing shift squarely on a date that would result in her losing two years of seniority. This not only establishes, beyond reasonable dispute, that Plaintiff suffered an adverse employment action, but also raises a strong inference of retaliatory animus suggesting causation. Causation is also established by the timing-knowledge test. Chief Critchley dismissed Plaintiff's wrongful conduct complaint on April 18, 2016, and personally made the decision to transfer her. PSOF 135-36. He also admits that at the time he decided to transfer Plaintiff, he was aware of not only her ongoing lawsuit, but also of her wrongful conduct complaint against Captain Langejans. PSOF 137. TFD notified Plaintiff that she was transferred on April 27, 2016, just nine days later. PSOF 135. Chief Critchley's admission that he personally made the decision to transfer Plaintiff so soon after deciding her wrongful conduct complaint satisfies the timing-knowledge test, is further evidence of discriminatory animus, and establishes causation.

On or about December 15, 2016, just eight shifts shy of completing his one-year probationary period for Battalion Chief, TFD notified Gordon Clark that it had decided he did not pass probation. This resulted in a constructive demotion in title and pay back to Captain. PSOF 132, 152. Further, the circumstances of Gordon Clark's demotion raise a strong inference of discriminatory animus. First, Chief Critchley admits that TFD failed to follow City of Tucson Administrative Directives for probationary employees by failing to give Gordon Clark a 6-month written evaluation. PSOF 154. Next, Gordon Clark was given

16

no notice that his performance or conduct was deficient before TFD made the decision to fail him on probation. PSOF 152. Finally, in the nearly five years that Chief Critchley has been TFD's Fire Chief, Gordon Clark is the only Chief-level employee TFD has failed on probation. PSOF 153. TFD's adverse employment action against Gordon Clark resulted in a constructive demotion, lost pay, and a significant change in job duties. The suspicious circumstances that led to Gordon Clark's demotion, including a litany of examples of TFD failing to follow established City of Tucson Administrative Directives, strongly suggests retaliatory animus and, therefore, causation. *See also* Exh. SSSS ¶¶ 5-12.

## IV. CONCLUSION

The evidence taken in the light most favorable to Plaintiff provides sufficient evidence to infer that she was discriminated against on the basis of her pregnancy and that she was retaliated against for asserting her rights under the PDA and FLSA. TFD lacked a policy or plan for how to provide a place in its fire stations, which complied with federal law for employees to express their breastmilk. When Plaintiff raised these issues, TFD commenced a campaign of retaliation against her. For these reasons, Plaintiff respectfully requests this Court deny Defendant's motion for summary judgment.

DATED this 18th day of September, 2017.

**JACOBSON LAW FIRM**

 s/Jeffrey H. Jacobson
Jeffrey H. Jacobson
*Attorney for Plaintiff*

### CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michelle Saavedra
Michael W.L. McCrory
Principal Assistant City Attorneys
Office of the City Attorney, Civil Division
255 W. Alameda, 7th Floor
Tucson, Arizona 85701
*Attorneys for Defendant*

17