WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Carrie Ferrara Clark,

            Plaintiff,

v.

City of Tucson,

            Defendant.

No. CV 14-02543-TUC-CKJ

**ORDER**

Pending before the Court is Defendant City of Tucson's Motion for Summary Judgment (DMSJ, Doc. 115) and Plaintiff Carrie Ferrara Clark's Cross-Motion for Summary Judgment (PCMSJ, Doc. 117). Both parties have filed responses (Pl's Resp. MSJ, Doc. 122; Def's Resp. CMSJ, Doc. 124) and replies (Pl's Rep. CMSJ, Doc. 127; Def's Rep. MSJ, Doc. 126). The Court grants Defendant's Motion in part and denies Plaintiff's Cross-Motion.

*Case Summary*

Plaintiff's complaint relates to her employment at Tucson Fire Department ("TFD"). Plaintiff alleges that after the birth of her first child, TFD failed to provide her appropriate accommodations for expressing breastmilk. Once she filed a complaint about the lack of facilities, this allegedly led to a series of discriminatory and retaliatory actions by TFD. Plaintiff raises six claims in her Third Amended Complaint. They include: (1) sex discrimination in violation of 29 U.S.C. § 207(r) for failing to provide a statutorily compliant space for Plaintiff to express milk; (2) retaliation in violation of 29 U.S.C. §

215 for adversely acting against Plaintiff after she reported that TFD did not have appropriate space for lactating mothers; (3) retaliation in violation of Title VII for moving Plaintiff's husband to a less desirable position in response to Plaintiff's wrongful conduct complaint pertaining to a hostile work environment; (4) retaliation in violation of Title VII for arbitrarily moving Plaintiff to inferior assignments because of Plaintiff's wrongful conduct complaints; and (5) sex discrimination in violation of Title VII of the Civil Rights Act of 1964. (Third Amended Complaint ("TAC") Doc. 87 at 20-23.) Defendant's Motion for Summary Judgment challenges the adequacy of all counts, and Plaintiff's Cross-Motion for Summary Judgment counters that all counts should be determined in her favor.

***Timeliness of Defendant's Response to Cross-Motion for Summary Judgment***

As a preliminary matter, Plaintiff argues that Defendant's Response to Plaintiff's Cross-Motion for Summary Judgment should be stricken as untimely. (Pl's Rep. CMSJ, Doc. 127 at 1.)

Defendant makes similar summary judgment arguments in both its Motion for Summary Judgment (DMSJ, Doc. 115) and its Response to Defendant's Cross Motion for Summary Judgment (Def's Resp. CMSJ, Doc. 124). Since Defendant's arguments will still be considered *via* Defendant's Motion for Summary Judgment, and Plaintiff must still show there is no genuine issue of material fact, striking the filing is of no benefit to the Plaintiff. *See Martinez v. Stanford,* 323 F.3d 1178, 1182-83 (9th Cir. 2003) (despite party's failure to timely file a response to motion for summary judgment, the moving party still has an "affirmative duty under [Fed.R.Civ.P.] 56 to demonstrate its entitlement to judgment as a matter of law").

Furthermore, the Court finds Defendant's filing useful in summarizing Plaintiff's own allegations. Plaintiff's claims are vague; they often fail to specifically allege which actions apply to which counts. Plaintiff lists instances which she believes support her claims, but at times does not clearly explain who she believes is the actor, what is the

adverse action, how there is causation, or why an action should be considered pretext.[1] And while it appears that Plaintiff would like every single factual allegation to apply to each count, the allegations must be assessed through the lens of the statutory framework—not all facts plausibly apply in the same manner to each count. Further, the Court notes the response is eight hours late and there is no prejudice to Plaintiff. The Court will consider Defendants' response.

### Standard of Review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party carries "the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). But, if the burden rests on the non-moving party, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle*

---

[1] This imbroglio is not clarified in Plaintiff's responses to non-uniform interrogatories. For instance, when asked to state the actions and actors for Count Four, Plaintiff simply refers Defendant back to the allegations in Counts One through Three. (Doc. 166-6, Exh. 69 at 138.) The lack of specificity makes it difficult for Defendant to address the claims, and difficult for the Court to separate wheat from chaff. *See e.g., Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996) (the court need not "scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."); *see also Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405 (6th Cir. 1992) ("[T]he designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies. . . [The nonmoving party's] burden to respond is really an opportunity to assist the court in understanding the facts. But if the nonmoving party fails to discharge that burden - for example, by remaining silent - its opportunity is waived and its case wagered.") (internal citations omitted).

*Corp. Secs. Litig.,* 627 F.3d 376, 387 (9th Cir. 2010).

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But, if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine. *Anderson*, 477 U.S. at 248, 250; *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c)(1); *see Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. However, "[w]here the parties file cross-motions for summary judgment, the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). In this instance, the District Court "review[s] each motion . . . separately, giving the nonmoving party for each motion the benefit of all reasonable inferences." *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 995 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 167 (2017). In addition, the court may consider Plaintiff's evidence from its cross-summary judgment motion to determine defendant's summary judgment motion, and vice versa. *See Fair Hous. Council v. Riverside Two,* 249 F.3d 1132, 1136-37 (9th Cir. 2001).

The court need consider only the cited materials, but it may consider any other materials in the record. Fed.R.Civ.P. 56(c)(3). If, after considering the arguments and materials in the record, it appears that jurors of reason could find by a preponderance of

the evidence that the defendant is liable, then the court should not grant summary judgment. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027-28 (9th Cir. 2006). If, however, jurors of reason could not determine that plaintiff is entitled to a judgment in her favor, then summary judgment is appropriate. *Id.*

### Count One: Sex Discrimination Under Fair Labor Standards Act, 29 U.S.C. § 207(r)

Plaintiff's first claim alleges that TFD did not provide appropriate accommodations for her to express milk for her child. Under § 207(r) of the Fair Labor Standards Act ("FLSA"), as amended by the Patient Protection and Affordable Care Act, employers must provide a suitable space and time for nursing for a period of one year subsequent to the birth of a child. 29 U.S.C. § 207(r). The space must be "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public." 29 U.S.C. § 207(r)(1). A plaintiff's damages are limited to "lost wages attributable to the § 207(r) violation." *Lico v. TD Bank,* No. CV 14-4729-JFB-AKT, 2015 WL 3467159 at *3 (E.D.N.Y. June 1, 2015); *Mayer v. Prof'l Ambulance, LLC,* 211 F.Supp.3d 408, 413 (D.R.I. 2016); *see also Hicks v. City of Tuscaloosa,* No. CV 13-02063-TMP, 2015 WL 6123209 at *28-29 (N.D. Ala. Oct. 19, 2015); *Frederick v. New Hampshire,* No. CV 14-403-SM, 2015 WL 5772573 at *7 (D.N.H. Sept. 30, 2015).

- ***Suitable Space***

Plaintiff claims that her station assignments upon returning from maternity leave (between October 27, 2013 and March 23, 2013) did not comport with the lactation requirements under the FLSA. (TAC, Doc. 87 at 19.) Plaintiff contends that the following facts are admissions that TFD did not comply with the statute, so there is no disputed issue of fact that Defendant violated § 207(r), and the Court should grant summary judgment in Plaintiff's favor. (PCMSJ, Doc. 117 at 3; Pl's Resp. MSJ, Doc. 122 at 5.)

First, Plaintiff notes that TFD freely admits it did not have a policy for expressing milk in place prior to July 19, 2013, nor had it implemented a procedure for employees to submit requests for space accommodations for expressing milk. (*Id.*) Furthermore, on

March 22, 2013, the Equal Opportunity Programs Division ("EOPD")[2] determined that only nine of twenty-one TFD fire stations were compliant with FLSA. (PCMSJ, Doc. 117 at 3.) The evaluation, entitled "American Fair Labor Standards Act Section 7 Compliance," stated that Stations 3, 9, 10, 12, and 18-22 did not meet FLSA standards. (Exh. Q, Doc. 118-1 at 129.) The document, however, notes that all of these stations possessed a dorm, study, or private room that *would be* in compliance *if there was a lock* on the door. (*Id.*)

As further proof of noncompliance, Plaintiff submits a series of emails between TFD staff documenting the need for—and subsequent installation of—a lock at Station 6 (Exhs. N-O, Doc. 118-1 at 121-123), work orders for the other stations listed as noncompliant in the EOPD evaluation, and a memorandum from Fire Chief Jim Critchley (Exh. VVVV, Doc. 123-1 at 106-117). All of these specifically concede that the stations are not compliant with the nursing mothers' space requirement. (*Id.* at 106-119.) Because Defendant never challenged the EOPD determination prior to the filing of the instant action, and admits noncompliance in its own correspondence, Plaintiff submits summary judgment is appropriate. (Pl's Rep. CMSJ, Doc. 127 at 4.)

Plaintiff also states that after her return from maternity leave, she was assigned to "swing shift." This meant she was not assigned to a consistent station. (Pl's Resp. MSJ, Doc. 122 at 2.) While on swing shift, she was assigned to several noncompliant stations. (*Id.*) This situation forced her to use sick leave in order to avoid working at stations where she would be unable to express milk in private. (*Id.*)

Defendant's summary judgment motion counters that Plaintiff's assignment to swing shift did not violate FLSA because §207(r) does not require preferential assignment to stations (i.e. an assignment to one station), but simply an appropriate lactating area at the assigned station. (DMSJ, Doc. 115 at 6.) Plaintiff admits she was assigned to swing shift prior to her nursing needs. (Pl's Resp. MSJ, Doc. 122 at 4.) She

---

[2] As noted in Defendant's summary judgment motion, the Office of Equal Opportunity Programs changed its name to the Equal Opportunity Programs Division during the pendency of this litigation. For consistency, the Court uses the acronym "EOPD" throughout this Order.

also concedes she is not afforded the right to preferential station assignments. (*Id.* at 4-5.) Plaintiff further professes that "being on swing shift would not have been an issue for Plaintiff had all of TFD's stations had space for mothers expressing breastmilk that complied with federal law." (*Id.* at 5.) Therefore, the contested issue here is not whether her assignment to swing shift was a violation, but rather whether the stations to which Plaintiff was assigned were adequate under the FLSA guidelines.

Defendant claims it only assigned Plaintiff to stations that complied with the requirements under the FLSA. (DMSJ, Doc. 115 at 6.) Defendant theorizes that the EOPD findings are not dispositive of Defendant's legal compliance with FLSA. (*Id.* at 2-3.) Furthermore, the EOPD's findings do not contradict Defendant's claims of legal compliance because the evaluation simply determined that the stations were noncompliant because the designated rooms did not have door locks. (*Id.*) Defendant agrees there were no locks, but contends that the spaces provided were "free from intrusion" and "shielded from view." (*Id.* at 2.) Therefore the stations were compliant with the statute despite the lack of a door lock. (*Id.* at 2.)

Plaintiff argues that Defendant needed to have a lock for compliance because the Department of Labor's ("DoL") Reasonable Break Time for Nursing Mothers states "the employer must ensure the employee's privacy through means such as signs that designate when the space is in use, *or* a lock on the door." 75 Fed. Reg. 80073-01 (emphasis added). (Pl's Rep. CMSJ, Doc 127 at 5.)

The Court finds that whether the stations Plaintiff was assigned to—both those she actually worked at and those for which she was assigned but used sick leave to avoid—violated the FLSA raises a genuine issue of material fact. To be compliant, the stations needed to provide a space "shielded from view and free from intrusion from coworkers and the public." 29 U.S.C. § 207(r)(1). The EOPD evaluation suggests that every noncompliant station did have a private space, which may or may not qualify as free from intrusion. (Exh. Q, Doc. 118-1, at 129.)

The DoL's Reasonable Break Time for Nursing Mothers indicates a variety of ways that an employer may provide appropriate space, and not all of them require a lock.

Some acceptable spaces provide neither a space designated solely for expressing milk, nor an isolated space. For example, the document states:

- "The employer is not obligated to maintain a permanent, dedicated space for nursing mothers."
- "[A]n anteroom or lounge area connected to the bathroom may be sufficient to meet the requirements of the law. For example, if there is a wall with a door separating the lounge area from the bathroom, and if there is a space for nursing mothers within the lounge that is 'shielded from view' and 'free from intrusion,' this would likely meet the requirements of the law."
- "Locker rooms that function as changing rooms (i.e., for changing in and out of uniforms) may also be adequate as long as there is a separate space designated within the room for expressing milk that is shielded from view and free from intrusion."
- "[E]mployers may provide a large room with privacy screens so that the room may be used simultaneously by several nursing employees."

75 FR 80073-01.

Plaintiff alternately contends that some stations were not appropriate because the room may have been exposed to dangerous germs. (Pl's Rep. CMSJ, Doc. 127 at 5.) The DoL's concerns with sanitation do not afford Plaintiff the right to a permanent space that she has previously sanitized, or an unshared private space. 75 FR 80073-01. Plaintiff's concerns about germs may be a factor in compliance. Again, the factual ambiguity of what is compliant prevents the Court from granting summary judgment to either party.

Finally, whether a station could have been made compliant simply from a perfunctory hand-written sign on the door or paper taped over a window is unclear.

Therefore, giving both non-moving parties all reasonable inferences, the compliance of each assigned and potentially-assigned station is a genuine issue of material fact. Summary judgment on this issue is not appropriate.

- ***Lost Wages: Minimum Wage***

Defendant's Motion for Summary Judgment argues that Plaintiff's § 207(r) claim fails as a matter of law because she cannot demonstrate that Defendant's failure to provide an appropriate space for expression of milk resulted in lost wages. (DMSJ, Doc. 115 at 5.) Plaintiff contends (1) she was assigned or had reason to believe she would be

assigned to noncompliant stations, (2) she was forced to use sick/vacation time to avoid having to express milk at locations without appropriate nursing rooms, (3) but for being forced to use the sick/vacation time, she could have sold her time back to TFD for income. Therefore, Defendant's noncompliance resulted in an actual financial loss. (Pl's Resp. MSJ, Doc. 122 at 3-4.) In support, Plaintiff cites to the Tucson Firefighters Association's Labor Agreement, which states that earned sick leave may accrue to an employee's benefit, and may be sold back at the employee's base rate of pay. (Exh. OOO, Doc. 123-1, at 119, ¶ 19.)

A violation of Section 207(r) alone does not necessarily afford a private right of action. Indeed, the DoL has stated:

> Section 207(r) of the FLSA does not specify any penalties if an employer is found to have violated the break time for nursing mothers requirement. In most instances, an employee may only bring an action for unpaid minimum wages or unpaid overtime compensation and an additional equal amount in liquidated damages. 29 U.S.C. 216(b). Because employers are not required to compensate employees for break time to express breast milk, in most circumstances there will not be any unpaid minimum wage or overtime compensation associated with the failure to provide such breaks.

75 FR 80073-01.

Here Plaintiff wishes to recover for hours scheduled but not worked because she did not have a compliant area to express milk. In the limited case law addressing this specific issue, other district courts have determined that a plaintiff may recover lost wages for missed work because there was no statutorily acceptable area for expressing milk. *See e.g., Lico*, 2015 WL 3467159, at *4 (Plaintiff who traveled home during work hours to express milk which resulted in loss in wages for failing to comply with 207(r)) stated a viable claim under 207(r)); *see Hicks*, 2015 WL 6123209, at *28 (an employee who missed work time to travel to an appropriate place to express milk states a plausible claim for lost wages); *see also Tolene v. T-Mobile, USA, Inc.*, 178 F. Supp. 3d 674, 680 (N.D. Ill. 2016) (same).

As explained above, Plaintiff is not required to be compensated for time used to express milk. In this instance, however, Defendant concedes it compensates nursing

mothers during break times. (Def's Resp. CMSJ, Doc. 124 at 3.) Therefore, any break time used to express milk would have been compensated, and any vacation/sick time used would also have constituted work time spent, and Plaintiff has stated a viable claim alleging she is entitled to compensation for unpaid minimum wages.

On the other hand, Plaintiff never alleges that anyone told her she must use sick time for expressing milk, and concedes that on more than one occasion she prematurely used sick leave before even being assigned to a station. (Pl's Resp. MSJ, Doc. 122 at 3.) Furthermore, Plaintiff's own filings show that she was willing and even desired to work at some noncompliant stations, such as Stations 12 and 20. (Exh. K, Doc. 118-1 at 112.) Yet, Plaintiff has alleged at least eleven instances where she was actually assigned to stations that were deemed noncompliant by the EOPD, and used her sick or vacation leave for at least eight of these assignments to avoid a noncompliant station. (PCMSJ, Doc. 117 at 4; Exh. 69, Doc. 116-6 at 132-33.)

Plaintiff's sick leave and vacation time are financial assets, which she allegedly spent to avoid being forced to express milk at noncompliant stations. Furthermore, Plaintiff was compensated for her time expressing milk at work, so the assigned breaks during a shift in which she was forced to expend her own sick/vacation time raises a genuine issue as to unpaid minimum wage. Given both parties' factual allegations, a reasonable juror could find for either party. Summary judgment on this issue is denied.

- ***Lost Wages: Overtime***

Plaintiff also alleges that she was forced to work additional hours that could have accrued overtime because she used vacation/sick time to avoid noncompliant stations. (Pl's Resp. MSJ, Doc. 122 at 4.) Like the other alleged lost wages, Defendant argues that because the TFD stations were compliant, she did not lose overtime because of a violation of § 207(r). (Def's Resp. CMSJ, Doc. 124 at 4.)

This appears to be a barren allegation. Unlike the loss of pay for vacation and sick leave, Plaintiff never cites to any evidence demonstrating which hours worked would

have otherwise been considered overtime.[3] *See F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (no genuine issue of material fact where claim relies only on plaintiff's conclusory, self-serving statement absent of any details or evidence in support). Plaintiff fails to allege any specific shifts she would have been able to work for overtime.

Accordingly, Plaintiff has not presented any evidence that she worked additional hours which would otherwise have been construed as overtime, and fails to raise a genuine issue of material fact. The Court grants summary judgment for the Defendant as to the matter of overtime under § 207(r).

### Count Two: Retaliation Under Fair Labor Standards Act, 29 U.S.C. § 215(a)(3)

In Count Two, Plaintiff contends that Defendant retaliated against her in violation of the FLSA's anti-retaliation provision for "her repeated and continued reports of her belief that TFD violated federal law by not providing her with an appropriate lactation room on a consistent basis." (TAC, Doc. 87 at 20.)[4] Plaintiff asserts that TFD retaliated by:

> disciplining her and relegating her to work only at Station 6 . . . [and by] maintain[ing] a pattern and practice of retaliation[,] discrimination[,] and, by the use of facially neutral employment practices and on other occasions, by the use of excessively subjective standards for selection of those to be promoted, demoted, transferred, discharged[,] or disciplined, caused adverse and discriminatory impact upon Plaintiff.

*Id.* On summary judgment, Plaintiff alleges TFD's adverse actions included: (1) being placed at Station 6, and (2) being prevented from working overtime hours at Station 6. (PCMSJ, Doc. 117 at 20.)

---

[3] The Court does not address Plaintiff's assertion that she was prevented from working overtime at Station 6 under Count One because Plaintiff's assigned time at Station 6 occurred on March 21, 2013. (Exh. R, Doc. 118-1 at 131.) Once stationed at 6, Plaintiff was provided a locked door to express milk, therefore, 29 U.S.C. § 207(r) is not applicable. That issue is appropriately addressed in Plaintiff's retaliation claim under FLSA.

[4] Plaintiff raises two counts of retaliation resulting in adverse actions against her; one for retaliation due to her complaint about lactation facilities, and one for retaliation due to her complaints about wrongful conduct and hostile work environment. The Court addresses the facts that relate to her complaints about lactation space here and events that appear to relate to her wrongful conduct complaint in the corresponding count.

Title 29 U.S.C. § 215(a)(3) prohibits an employer from discriminating against an employee because she has "filed any complaint or instituted or caused to be instituted any proceeding" under the Fair Labor Standards Act. "To state a prima facie case of retaliation, a plaintiff must show that: (1) she was engaging in a protected activity, (2) the employer subjected her to an adverse employment action, and (3) there was a causal link between the protected and the employer's action." *Xin Liu v. Amway Corp.,* 347 F.3d 1125, 1144 (9th Cir. 2003); *EEOC v. Luce, Forward, Hamilton & Scripps,* 303 F.3d 994, 1005 (9th Cir. 2002)). When an adverse action is taken for both protected and non-protected reasons, plaintiff must demonstrate the protected activity was a "substantial factor" for the adverse action. *Knickerbocker v. City of Stockton,* 81 F.3d 907, 911 (9th Cir. 1996). Protected activities are a 'substantial factor' where the adverse actions would not have been taken 'but for' the protected activities." *Contreras v. Corinthian Vigor Ins. Brokerage, Inc.*, 103 F. Supp. 2d 1180, 1184 (N.D. Cal. 2000) (quoting *Knickerbocker,* 81 F.3d 907 at 911).

A plaintiff may show retaliation through direct or indirect evidence. To establish a prima facie case of retaliation through direct evidence, plaintiff must present "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir. 1998). Direct evidence need only be minimal to show pretext, and create a genuine issue of material fact on the matter. *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001) (citing *Godwin,* 150 F.3d at 1221); *Blue v. Widnall,* 162 F.3d 541, 546 (9th Cir. 1998) ("With direct evidence, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial.").

When a plaintiff has provided direct evidence of a discriminatory motive for an employment action, the defendant must show by a preponderance of the evidence that the same conclusion would have been reached even if discrimination had not played a factor in the decision. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 228 (1989).

If presenting indirect evidence, the burden shifting analysis established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973) is used to evaluate a retaliation claim. After establishing a prima facie case of retaliation, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Walker v. City of Lakewood*, 272 F.3d 1114, 1127 (9th Cir. 2001) (citations omitted); *see Nilsson v. City of Mesa*, 503 F.3d 947, 953-54 (9th Cir. 2007).

- ***Placement at Station 6***

Plaintiff's Third Amended Complaint alleges that in January 2013, she conferred with the EOPD about filing a discrimination complaint, but chose at that time not to file and to take a "wait and see" approach. (TAC, Doc. 87 at 3, ¶¶ 36-37.) Plaintiff finally filed discrimination charges against TFD on July 31, 2013. (*Id.* at 8, ¶ 66.)

Subsequent to the conference with EOPD, Plaintiff contends she was assigned to Station 6. (PCMSJ, Doc. 117 at 21.) Plaintiff attempted to obtain an assignment to Station 12, but after speaking to BC McDonough about the trade, and formally requesting it, the position was put up to bid and given to someone else. (Exh. A1, Doc. 118-1 at 8, ¶ 22-24.) Plaintiff states that when she asked why she was not placed at Station 12 Assistant Chief ("AC") Fischback stated, "well, that's what happens when you file a complaint with EEO." (PCMSJ, Doc. 117 at 21.) Plaintiff contends this move treated her disparately than others similarly-situated because another lactating mother was placed at Station 12. (*Id.* at 15.) Plaintiff argues this is direct evidence of discriminatory animus underlying the move.

Defendant counters that Plaintiff's EOPD conference in January 2018 was never about legally compliant stations, therefore AC Fischback's response was not reflective of retaliation due to a protected act. Rather, Plaintiff was already assigned to Station 6 when she went to talk to the EOPD to complain that she was not assigned to Station 12, which was closer to her mother so that her mother could pick up breastmilk from the station. (Def's Resp. CMSJ, Doc. 124 at 12-13; Exh. J, Doc. 118-1 at 106.)

Furthermore, Defendant claims that AC Fischback's comment occurred after her assignment to Station 6, did not result in the assignment, and cannot show causation.

Defendant explains that AC Fischback was giving an honest response to Plaintiff's inquiry; TFD could not place her at Station 12 because there was no lock and the EOPD required one. (DMSJ, Doc. 115 at 14.) Moreover, Defendant alleges that TFD did not receive her request until after the assignment was already put up to bid. (Def's Rep. MSJ, Doc. 126 at 7.)

However, Defendant also notes that Plaintiff was assigned to Station 6 because DC Rodriguez and AC Fischback were worried about Plaintiff's ability to respond in the event of an emergency because of her frequent expression of milk. (Def's Resp. CMSJ, Doc. 124, 12-13.) Defendant contends that among other factors, it determined Station 6 was appropriate because she would no longer be on swing shift (which she desired), if an emergency arose another medic was available to cover if she was expressing milk, and the move to a slower station allowed Plaintiff the flexibility to express milk more. (*Id.* at 12-13.) Therefore, it is arguable that the move was actually in consideration of Plaintiff's desires, not in spite of her complaint about lactation facilities.

Plaintiff has met at her initial burden of proof by showing direct evidence of discrimination; Fischback's statement alone sufficiently demonstrates that her move to a less desirable station was more likely than not caused by her EOPD meeting. Even if the comment was made after her assignment to Station 6, it still specifically states that her EOPD involvement was the reason for the move. She has also demonstrated that her status as a lactating mother was a substantial factor in TFD's decision to assign her to Station 12.  Further, Plaintiff viably claims that the move was pretext, TFD could have installed a lock just as easily at Station 12 as Station 6. There is a genuine issue whether Plaintiff was treated differently than other lactating mothers, since at least one other mother was placed  at Station 12.

Defendant has not shown that but for her status as a lactating mother, TFD still would have moved her to Station 6 because the primary reasons she was moved were in consideration of this status. But, Defendant has raised a genuine issue whether Plaintiff's EOPD meeting constituted a protected action or simply an attempt to get an assignment that was more convenient. Since the EOPD consult related to lactation facilities, a

reasonable juror could find either. And while AC Fischback's statement is discriminatory on its face, Defendant's explanation raises ambiguity about whether the move was because of discriminatory animus. Therefore, the Court may not make the factual determinations as to whether these actions were based on retaliation, or merely in consideration of other needs of Plaintiff. Summary judgment is denied.

- ***Overtime and Trades at Station 6***

Plaintiff states her assignment to Station 6 caused her to be unable to work overtime hours and make trades. (PCMSJ, Doc. 117 at 21.) She claims she asked AC Fischback about working overtime or trade, and AC Fischback said he had not thought it through and would get back to her about it. (PSoF, Doc. 118 at 11, ¶ 63.) She claims that because she was not contacted thereafter she was prevented from working overtime and trading shifts. (Exh. 10, Doc. 116-2 at 51-52.)

Defendant presents Plaintiff's own deposition as evidence that Plaintiff requested overtime only once, which was granted, and was never denied overtime. (DCSoF, Doc. 125 at 10, ¶ 63-64; Exh. 10, Doc. 116-2 at 47-48.) Further, the only other time she was denied a trade was because she wanted to trade with her husband. (*Id.*) In this instance, the request was denied because per TFD policy, trades may only be made with employees with equal qualifications.[5] (Exh. 4, Doc. 166-1 at 71.) Therefore, Defendant asserts that Plaintiff's placement never prevented her from trading, rather her rank prevented it, and this would be no different for any other employee.

Even granting all inferences in Plaintiff's favor, the Court finds that a reasonable juror could not find that failing to follow through with a general inquiry was retaliation, or that it prevented Plaintiff from asking for specific overtime or trade. Nor has she been denied a request to trade with someone of her same status, and therefore Plaintiff does not demonstrate either adverse action or pretext. Taking Plaintiff's allegations at face value, Plaintiff has never been denied or prevented from obtaining overtime, nor was she

---

[5] Plaintiff objects to the Defendant's terms "equal qualifications" or "equal ranks," but does not contradict Defendant's notion that trading with employees of equal level is TFD's policy. Whether designated a rank or qualification, Plaintiff has presented no evidence that Mr. and Mrs. Clark were equals, or that the policy should not apply to her.

discouraged in any way from asking for clarification or reminding her supervisor of her inquiry. *See Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) (whether an action is adverse focuses on the deterrent effect of the action). Plaintiff may not make a hypothetical claim. Summary judgment for Defendant is granted as to the issue of overtime and trades under the FLSA.

### Count Four: Title VII Retaliation Against Captain Clark

Count Four of Plaintiff's Third Amended Complaint alleges that TFD retaliated against her for her Title VII lawsuit by moving her husband, Capt. Gordon Clark, from Fire Prevention to Operations, and later failing him from a probationary position as Battalion Chief. (TAC, Doc. 87 at 21.) The count alleges that the move was in retaliation for her harassment complaint against Capt. Jeff Langejans, but was instituted under the guise of nepotism. (*Id.* at 22, ¶¶ 202.) This was an adverse action because it forced Capt. Clark to work in a less desirable position for less pay. (*Id.* at 21, ¶203.)

An employer is prohibited "from retaliating against an applicant for employment because the applicant has opposed any unlawful employment practice, or has made a charge, testified, assisted, or participated in an employment discrimination investigation or proceeding." 42 U.S.C. § 2000e-3(a); *Lam v. University of Hawaii*, 40 F.3d 1551, 1558-59 (9th Cir. 1994). At summary judgment, the Court considers whether the Title VII retaliation was "materially adverse," meaning the action might "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006).

A transfer occurring after a Title VII suit "is immaterial in light of the fact that petitioner concededly was contemplating the transfer before it learned of the suit. Employers need not suspend previously planned transfers upon discovering that a Title VII suit had been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 272 (2001).

Plaintiff contends that after filing her complaint against TFD, an article was published in the *Arizona Daily Star* about the lawsuit. (PSoF, Doc. 118 at 17, ¶104.) TFD

Capt. Langejans read the article and made several discriminatory comments. (TAC, Doc. 87 at 10-11, ¶¶ 91-110.) Among them, he stated TFD should have anticipated problems once TFD started hiring women. (Exh. TT, Doc.118-2 at 77; TAC Doc. 118 at 17 ¶ 106.) In December 2014, after attending a strategic planning meeting with Chief Laura Baker (one of Capt. Clark's supervisors in Fire Prevention), Capt. Langejans stated that he was trying to get Capt. Clark removed from Fire Prevention before Plaintiff was moved into the division. (Exh. CCC, Doc. 118-2 at 146, ¶ 672-75.) Allegedly, Capt. Langejans also gave Chief Critchley an ultimatum, either Capt. Clark left or he would. (Exh. TT, Doc. 118-2 at 71.)

A formal investigation of Capt. Langejans ensued, and on January 26, 2015, Capt. Langejans admitted to making several of the derogatory and discriminatory comments. (TAC, Doc. 87 at 13, ¶ 118; PSoF, Doc. 118 at 19, ¶ 116.)

On February 5, 2015, after the investigation, AC Laura Baker issued a memorandum stating that Capt. Langejans' actions did not constitute a hostile work environment. (Exh. TT, Doc. 118-2 at 68.) Capt. Langejans was issued a written reprimand for the action. (PSoF, Doc. 118 at 20 ¶ 120.) AC Baker's memo noted that no one would be moved from Fire Prevention, however, Capt. Clark *could* be moved immediately if he desired, in accordance with a succession plan that was instituted prior to the incidents with Capt. Langejans. (Exh. TT, Doc. 118-2 at 80.) The succession plan involved moving Capt. Clark out of Fire Prevention, into Operations, and eventually a possible promotion to Battalion Chief. (*Id.*) The memo indicates that Capt. Clark was reluctant to move to Operations, but agreed he would be willing to move because he understood the shift helped management prepare for his prospective role as Battalion Chief. (*Id.*)

Plaintiff subsequently filed an administrative complaint with the City of Tucson about Capt. Langejans' actions on March 21, 2015. (PSOF, Doc. 118 at 20, ¶ 121; Exh. VV, Doc. 118-2.) After investigating Plaintiff's allegations, the EOPD determined that TFD's initial investigation was not thorough, and did not address the proper punishment level for Capt. Langejans' actions. (Exh. XX, Doc. 118-2 at 115.)  It further concluded

that Plaintiff's assignment to a division where her husband was a Captain violated the City's nepotism policy. (TAC, Doc. 87 at 14, ¶ 130.)

AC Baker responded to the EOPD determination, and said she believed Capt. Langejans was disciplined appropriately. (Exh. XX, Doc. 118-2 at 117.) AC Baker noted the next level of discipline involved misuse or abuse of authority—for instance crimes and reckless disregard for safety—and Capt. Langejans' actions did not rise to this level. (*Id*.) She further stated that in response to the EOPD's comments about the nepotism violation, TFD had made shift changes accordingly. (*Id*. at 18.)  This move occurred as of August 23, 2015. (*Id*.) AC Baker indicates that the EOPD's claim that the nepotism policy had been violated was also "supported through statements and concerns by members of the [Fire] Prevention Section." (*Id*.)

On August 22, 2015, after the EOPD issued its findings, Capt. Clark was transferred from Fire Prevention to Operations Shift Captain. (PSoF, Doc. 118 at 21 ¶ 126.) Soon thereafter, Capt. Clark was assigned to a probationary term as Battalion Chief, but after one year he failed and was returned to Captain. (Pl's Resp. MSJ, Doc. 122 at 16.) Plaintiff argues that this move was retaliatory because Capt. Clark was provided no warning about his failing performance.

- ***Protected Activity***

There is no dispute that Plaintiff engaged in protected activity when she filed an EOPD complaint against Capt. Langejans on March 21, 2015. (PSoF, Doc. 118 at 20, ¶ 121; Exh. VV, Doc. 118-2.) Furthermore, Plaintiff has shown that TFD knew of the complaint. Plaintiff must therefore show that it was because of that knowledge that Capt. Clark was moved to a less desirable position in retaliation, and that the move was materially adverse.

- ***Adverse Action: Move to Operations***

Plaintiff alleges that Capt. Clark's move to Operations was an adverse action because the field position was less desirable than Fire Prevention and paid less. (PSoF, Doc. 118. at ¶ 136.) Defendant claims there was no adverse action because the move was predetermined, and Capt. Clark had agreed to it. Furthermore, as planned, Capt. Clark

was later given a probationary period as Battalion Chief. (Exh. 55, Doc. 116-6 at 5.)

Even if the Court considered only the move to the temporarily less desirable post in Operations, Plaintiff cannot meet the requirement of materiality. "An employee does not suffer a materially adverse change in the terms and conditions of employment, and thus does not suffer an 'adverse employment action' in the context of a Title VII retaliation claim, where the employer merely enforces its preexisting policies in a reasonable manner." *Sherman v. Nat'l Grid*, 993 F. Supp. 2d 219, 228 (N.D.N.Y. 2014) (quoting *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006)); *see McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996) (a policy that is generally applicable does not constitute an adverse employment action when reasonably enforced). Here, TFD reasonably applied its policy for nepotism after the violation was brought to its attention. Simply because the reason the nepotism violation was recognized was through the EOPD's conclusions on hostile work environment does not mean it would discourage future employees from raising hostile work environment allegations.

In addition, Capt. Clark's move to Operations was not an adverse action because it was a prearranged, temporary shift in preparation for a possible promotion. *See Clark Cty. Sch. Dist.*, 532 U.S. at 272. Plaintiff offers no further evidence of why Capt. Clark's move was pretext. Plaintiff's filings do not address how discriminatory animus could be inferred when (1) Capt. Clark was not moved under AC Baker's initial memorandum, and (2) it was only after the EOPD found that the nepotism policy had been violated and the EOPD told TFD to correct the violation that Capt. Clark was moved. Plaintiff also fails to address Defendant's contention—supported by Plaintiff's own exhibits—that the move was predetermined, and Capt. Clark had agreed to it prior to any complaint about Capt. Langejans. Finally, Plaintiff never confronts the fact that the final move in the plan was to give Capt. Clark the opportunity to become Battalion Chief, a higher-ranked position than Captain. In fact, Capt. Clark was promoted to a probationary term as Battalion Chief, as planned, discussed, and agreed to by Capt. Clark.

While in some sense it is true that but-for her filing the complaint against Langejans the violation of nepotism may have gone unnoticed, this is not dispositive of

retaliation. Defendant has offered legitimate reasons for the transfer. Plaintiff does not proffer any evidence that Capt. Clark did not know of, or agree to the proposed change prior to the complaint against Langejans and fails to show pretext.

- ***Failure of Probationary Period***

However, the inquiry does not end here. Plaintiff asserts that an adverse retaliatory action occurred when Capt. Clark was terminated from his probationary position as Battalion Chief and returned to Captain, a less desirable position with reduced pay. (Pl's Resp. MSJ, Doc. 122 at 16.) Plaintiff claims that failing him from his probationary period infers discrimination because in five years as Chief, Chief Critchley had never failed someone from a probationary period. (*Id.* at 16-17.) In addition, Capt. Clark was not provided with a six-month evaluation prior to the move back to Captain as needed under the City of Tucson's Administrative Directives. (*Id.*)

"A reasonable fact finder could find from the inconsistent application of [an employment] policy that the defendants' motivation for enforcing the policy" was retaliatory). *Flores v. City of Westminster*, 873 F.3d 739, 750 (9th Cir. 2017) (quoting *Coszalter*, 320 F.3d at 978.

Chief Critchley agreed that since he became Fire Chief no one other than Capt. Clark had failed a probationary period. (Exh. ZZZ, Doc. 118-4 at 91). But, Critchley also stated that there are others who failed when he was Chief Officer. (*Id.*) Furthermore, Defendant concedes "there is a City civil service policy to a provide six month evaluation during a probationary period," but claims it was not applied to Battalion Chiefs. (DSoF, Doc. 116 at 48, ¶ 204; Exh. ZZZ, Doc. 118-4 at 91.) Therefore, Chief Critchley did not provide a six-month evaluation because it was not TFD's practice, and even if it were, at six months Capt. Clark was doing fine. (Exh. ZZZ, Doc. 118-4 at 91). It was only after six months that Chief Critchley found Capt. Clark's leadership skills subpar. (DMSJ, Doc. 115 at 25.) After that time, Capt. Clark directly undermined Critchley's orders. (*Id.*) Capt. Clark also did not disclose to his superiors that he was investigated for misuse of firearms by a federal agency. (*Id.*) Furthermore, Capt. Clark did not inspire trust with other co-workers, for one battalion chief was so skeptical about Capt. Clark's ability to

effectively perform the role of battalion chief that the battalion chief refused to trade shifts with Capt. Clark. (*Id.*)

After the defendant has shown legitimate reason for an adverse action, all presumption of discrimination drops, and the plaintiff must give a reason why the legitimate action is pretext. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004). Plaintiff has not shown pretext.

Based on the facts presented, the parties do not have a genuine issue of material fact as to whether the sequence of events was retaliatory. The application of policy was not inconsistent with other TFD employees. The six-month evaluation was not TFD's practice for Battalion Chiefs, and Plaintiff has not alleged that other Battalion Chiefs received reviews but Capt. Clark did not. In addition, even if he had been given an evaluation at six months, his performance at that time was adequate, and it was only subsequent events that caused the demotion. Furthermore, in the time Chief Critchley worked for TFD, other Battalion Chiefs have failed the probationary period. Considering both sides and taking all reasonable inferences, summary judgment is granted as to Count Four.

### Count Five: Title VII Retaliation Against Plaintiff

Plaintiff's Fifth Count alleges TFD retaliated against her for filing a complaint about Capt. Langejans' sexual harassment, and a second complaint for continued harassment. (TAC, Doc. 87 at 21-22; PSoF, Doc. 118 at 21, ¶133.)

An "[a]dverse employment action [or a] hostile work environment can . . . be the basis for a retaliation claim." *Black v. Cty & Cnty of Honolulu*, 112 F. Supp. 2d 1041, 1050 (D. Haw. 2000) (citing *Ray*, 217 F.3d at 1243). While one instance may not lead a fact finder to conclude an adverse action was discriminatory, under the totality of the circumstances, a series of actions for which plaintiff is subjected may suggest a retaliatory motive. *Id.*

"[T]his standard does *not* require a reviewing court or jury to consider the nature of the discrimination that led to the filing of the charge. . . . Rather, the standard is tied to

the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." *Burlington*, 548 U.S. at 69 (internal citations and quotations omitted).

- ***Hostile Work Environment as Basis for Retaliation Claim***

Hostile-work-environment claims "involve[] repeated conduct" and require the plaintiff to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. at 115–16 (internal quotation marks omitted). To determine if conduct is a part of the same unlawful employment practice under the hostile-work-environment doctrine, a court is to consider whether the conduct was "'sufficiently severe or pervasive,' and whether the earlier and later events amounted to the 'same type of employment actions, occurred relatively frequently, or were perpetrated by the same managers.'" *Porter v. California Dept. of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005) (quoting *Nat'l R.R. Passenger*, 536 U.S. at 116, 120).

"An employer is liable under Title VII for conduct giving rise to a hostile environment where the employee proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Kortan v. California Youth Authority*, 217 F.3d 1104, 1109 (9th Cir. 2000) (quoting *Pavon v. Swift Trans. Co.*, 192 F.3d 902, 908 (9th Cir. 1999)). The "'objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Id.* (quoting *Montero v. AGCO Corp.*, 192 F.3d 856, 860 (9th Cir. 1999)). In determining whether the alleged objectionable conduct is sufficiently severe or pervasive, "courts consider all the circumstances, including the frequency of the allegedly discriminatory conduct, its severity, and whether it unreasonably interferes with an employee's work performance." *Surrell v. California Water Service Co.*, 518 F.3d 1097, 1109 (9th Cir. 2008). "Simply causing an employee offense based on an isolated comment is not sufficient to create

actionable harassment under Title VII." *McGinest,* 360 F.3d at 1113. Rather, a plaintiff must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult" to demonstrate that it was sufficiently hostile or abusive to establish an actionable harassment claim. *Harris v. Forklift Systems*, *Inc.*, 510 U.S. 17, 21 (1993).

The Court does not address factual allegations which occurred prior to the filing of the complaint against Capt. Langejans, because these actions cannot be construed as retaliation since her complaint was non-existent. *See Burlington*, 548 U.S. at 69 (2006). Furthermore, Plaintiff has not raised a hostile work environment claim. The Court will not *sua sponte* add claims which were absent from Plaintiff's Third Amended Complaint. What remains are a few sparse comments and intimidating looks over a prolonged period that Plaintiff may have felt were offensive, but are not objectively hostile.

Plaintiff claims that insensitive statements went unaddressed by TFD, including being told she would just have to get along with Capt. Langejans (PSoF, Doc. 118 at 19, ¶ 119) and ignoring her complaint that Langejans glared at her (Exh. 1, Doc. 71-1 at 9-10.). Plaintiff further contends that issuing Capt. Langejans' a written reprimand for his behavior was inappropriate and did not sufficiently prevent further harassment and intimidation. (*Id.* at 10.)

The Court finds a reasonable person would not find Plaintiff's situation was a hostile or abusive environment, i.e., that the acts were severe or pervasive. *See e.g. Kortan v. California Youth Authority,* 217 F.3d 1104 (9th Cir. 2000) (plaintiff failed to sustain a hostile work environment claim based on: (1) a supervisor calling female employees "castrating bitches," "Madonnas," or "Reginas" on multiple occasions in the plaintiff's presence; (2) the plaintiff's supervisor calling the plaintiff "Medea;" and (3) sending her postcards at home); *Vasquez v. County of Los Angeles,* 349 F.3d 634 (9th Cir. 2003) (no racially hostile work environment claim where the supervisor made only two derogatory comments about the plaintiff in a six-month period); *Manatt v. Bank of Am.*, 339 F.3d 792, 798 (9th Cir. 2003) (conduct was not severe or pervasive even though plaintiff alleged her coworkers often made racially insensitive comments such as "China man," made derogatory comments regarding China and communism, made fun of the

plaintiff's accent, and "pulled their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians"); *but see Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1163 (9th Cir. 2017) (employer's decision to support employee who allegedly raped plaintiff went beyond simple offensive comments and was sufficiently hostile to survive summary judgment). No overtly hostile comments were made directly to Plaintiff; most comments expressed confusion, could be interpreted as factually correct, or were not comments at all. Further, Plaintiff has not sufficiently tied any perceived hostility to a specific adverse action. Summary judgment in favor of Defendant is appropriate as to Plaintiff's claim of retaliation based on hostile work environment.

- ***Other Adverse Retaliatory Actions***

As far as the Court can identify, Plaintiff has made a few other claims of retaliation that resulted in adverse employment actions. In one incident, Plaintiff claims that TFD ordered education counseling for inappropriate conduct. Plaintiff claims because it occurred close in time to her complaint against Capt. Langejans, this action was retaliatory. (PCMSJ, Doc. 117 at 17-18; PSoF, Doc. 118, at 22, ¶ 134.) Defendant agrees Plaintiff was disciplined, but states the reason for the reprimand was because she talked back to her superiors, telling them they "were out of their friggin' minds." (Exh. 3, Doc. 118-3 at 9-10; DSoF, 170-172.)

Within a month of her complaint against Capt. Langejans, Plaintiff contends Chief Critchley also involuntarily transferred Plaintiff from Fire Prevention Operations and because of a retroactive application of a seniority policy, she was stripped of seniority at her new position. (PSoF, Doc. 118 at 22, ¶¶ 137-39.) Moreover, she was the only employee affected by the policy change. (*Id.* at ¶ 139.) Defendant disputes Plaintiff's statement, arguing her transfer was voluntary, and was motivated in part because of instances of insubordination and Plaintiff's inability to get along with others in Fire Prevention. (DSoF, Doc. 116 at 41-42, ¶¶ 170-73.)

Plaintiff has demonstrated that her move to Operations in correlation with a retroactive application of seniority was an adverse action that "is reasonably likely to deter employees from engaging in protected activity." *See Ray,* 217 F.3d at 1239-40.

Furthermore, Plaintiff has presented evidence of temporal proximity between Chief Critchley's dismissal of her complaint and his determination to move Plaintiff to Operations. This could indicate retaliatory motive. *See Yartzoff*, 809 F.2d at 1376.

Furthermore, Plaintiff has shown that the retroactive amendment had a disparate impact on her, because she was the only person to lose years of seniority from the policy change. This sufficiently presents an issue of pretext. *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1092-93 (9th Cir. 2008) (An "allegation that similarly situated . . . employees were treated more favorably is itself probative of pretext.").

Summary judgment is denied as to Count Five as to these allegations.

***Count Three: Title VII Sex Discrimination Based on Lactating Status***

Under the Pregnancy Discrimination Act ("PDA"), employers may not discriminate on the basis of sex, including against an employee who is "affected by pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000(k). Discrimination because of status as a lactating mother qualifies as sex discrimination under the PDA. *See e.g., Allen-Brown v. D.C.*, 174 F. Supp. 3d 463, 478 (D.D.C. 2016).

For Title VII sex discrimination, Plaintiff must first demonstrate a *prima facie* case; alleging (1) she is a member of a protected class, (2) she was qualified for her position, (3) her employer subjected her to an adverse employment action, and (4) other individuals who were similarly-situated were treated differently. *Davis,* 520 F.3d at 1089. Like retaliation claims, sex discrimination claims are also analyzed under the *McDonnell Douglas* burden-shifting analysis. *Young v. Parcel Service, Inc.,* 135 S.Ct. 1338 (2015). Plaintiff may show discrimination through direct or circumstantial evidence. If attempting to demonstrate discrimination with circumstantial evidence, "the plaintiff must present 'specific' and 'substantial' facts showing that there is a genuine issue for trial." *Dannenbring v. Wynn Las Vegas, LLC*, 646 Fed. Appx. 556, 556 (9th Cir. 2016) (quoting *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007)); *Godwin,* 150 F.3d at 1222. Furthermore, to show an action was adverse, a plaintiff must demonstrate the action "materially affect[ed] the compensation, terms, conditions, or privileges of . . . employment." *Davis,* 520 F.3d at 1089.

In this instance, the amount of evidence necessary to defeat summary judgment is minimal. *Id.*; *see McGinest,* 360 F.3d at 1112 ("In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses."); *see also Lam,* 40 F.3d at 1564 ("[W]e require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the fact-finder, upon a full record.")

- **Captain Langejans' Imputed Actions**

First, Plaintiff appears to claim that one of the adverse actions constituting discrimination was Captain Langejans' harassment, and Defendant should be liable for this hostility. (PCMSJ, Doc. 117, at 12.) But, Plaintiff's Third Amended Complaint has only pleaded sex discrimination and retaliation. Despite the fact that Capt. Langejans was not the Clarks' supervisor and did not directly determine Capt. Clark's assignment to the field, Plaintiff contends that Capt. Langejans may be deemed a "supervisory employee" because he "can recommend that another employee suffer an adverse employment action" and therefore his discriminatory actions and attempts to get the Clarks out of Fire Prevention can be imputed to TFD. (PCMSJ, Doc. 117 at 11.) Plaintiff's conclusion that Defendant should be liable for the harassment of an employee under a discrimination claim is misguided. To explain her proposition, Plaintiff cites to *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998). In *Burlington,* the Supreme Court explains:

> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury. A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. But one co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special

province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control. . . . In that instance, it would be implausible to interpret agency principles to allow an employer to escape liability.

*Id.* at 763 (internal citations omitted). However, the District of Columbia circuit aptly explained the causation needed to impute the actions of an employee who does not have supervisory duties to the employer. The court stated:

To prevail on a subordinate bias claim, a plaintiff must establish more than mere "influence" or "input" in the decision making process. Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action. The requisite causation is present where, for instance, a review committee or other formal decisionmaker relies on a subjective evaluation or misinformation supplied by the biased low-level supervisor.

*Furline v. Morrison*, 953 A.2d 344, 356 (D.C. 2008).

Here, Capt. Langejans was not a supervisor, and Plaintiff cannot show that any discriminatory information provided by Capt. Langejans led to an adverse employment action. Plaintiff has noted that Capt. Langejans spoke to her supervisors about getting rid of her husband before she joined Fire Prevention. However, Plaintiff cannot show that Capt. Langejans provided any misinformation for which TFD relied on when moving Plaintiff out of Fire Prevention. As noted earlier, Plaintiff has not sufficiently stated a claim of hostile work environment created by TFD's response to Capt. Langejans statements. Furthermore, Plaintiff had adequate time (2 1/2 years) and multiple amendments (2) to add any additional claims of harassment or hostile work environment and failed to do so. Plaintiff has not sufficiently alleged a claim of harassment or imputed liability for Capt. Langejans' comments, and the Court will not now add claims that were nonexistent prior to summary judgment.

- ***Adverse actions***

However, Plaintiff names other alleged instances of discrimination in her Cross-

Motion for Summary Judgment:[6] (1) failing to provide Plaintiff with a permanent station assignment; (2) taking five months to create a policy for expressing milk; (3) failing to provide appropriate lactation space; (4) putting the assignment for Station 12 up for bid rather than allowing Plaintiff to trade for it; (5) enforcing the Rules of Assignment in her instance but neglecting to enforce in other cases; (6) multiple discriminatory comments by supervisors, and (7) disciplining Plaintiff when she lost her composure after repeated requests to accommodate her lactation needs. (PCMSJ, Doc. 117 at 6-8.)

Defendant breaks down each allegation and gives legitimate reasons for its actions. Specifically, (1) she was put on swing shift prior to her pregnancy, (2) the statute does not require TFD to have a policy for lactating mothers, but only an appropriate place for expressing milk, (3) the stations she was assigned to were compliant, (4) TFD was unaware of Plaintiff's desire for Station 12 before it was put up for bid, (5) TFD was following standard Rules of Assignment when it put Station 12 up for bid, (6) a few insensitive comments over a prolonged amount of time did not result in adverse action, and (7) she was disciplined for insubordination, not discrimination. (Def's Resp. CMSJ, Doc. 124.)

Plaintiff is able to show pretext through her declaration of disparate treatment for TFD's actions. *Davis,* 520 F.3d at 1092-93. Defendant argues Plaintiff's alleged instances of unequal treatment are inadmissible, but the Court finds her personal knowledge of the disparate treatment of other employees adequately meets the personal knowledge requirement for admissibility of a personal declaration. *See* Fed.R.Civ.P. 56(c)(4).

Defendant's pleadings attempt to apply Plaintiff's claims to each separate incident, however, this fails to address the incidents in their entirety. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances,

---

[6] The Court cannot discern any other specific actions alleged specifically for this count from the Third Amended Complaint or Cross-Motion for Summary Judgment. *See Single Chip Sys. Corp. v. Intermec IP Corp.*, 495 F.Supp.2d 1066, 1089 (S.D. Cal. 2007) (granting summary judgment on an issue because "[Plaintiff's] discussion . . . borders on forcing this [c]ourt to 'dig' through the exhibits to find its arguments.").

expectations, and relationships . . . [therefore] an act that would be immaterial in some situations is material in others." *Burlington*, 548 U.S. at 69 (internal quotation marks and citations omitted). In isolation, these instances may not appear malevolent. Yet, even if the Court found individually that Defendant had sound reason for acting in the way that it did, in totality, reasonable minds could differ as to whether Defendant's actions were discriminatory on the whole.

Whether or not Defendant's delay in addressing Plaintiff's need for appropriate lactation space, refusal to place Plaintiff at Station 12, arbitrary enforcement of the Rules of Assignment, inflammatory comments by supervisors, and disciplinary measures constituted discrimination is a factual determination. The Court cannot conclusively state that these occurrences did not materially affect the conditions of Plaintiff's employment or that the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 243.

Therefore, IT IS ORDERED:

1. Plaintiff's motion to strike Defendant's responsive pleading as untimely is DENIED.

2. Defendant's Motion for Summary Judgment is GRANTED IN PART.

   a. Defendant is GRANTED Summary Judgment as to the issue of overtime pay and trades.

   b. Defendant is GRANTED Summary Judgment as to the issues of hostile work environment and harassment.

   c. Defendant is GRANTED Summary Judgment on Count Four: Retaliation Under Title VII of the Civil Rights Act of 1964.

   d. Defendant is DENIED Summary Judgment on: Count One: Sex Discrimination Under Fair Labor Standards Act, 29 U.S.C. § 207(r); Count Two: Retaliation Under Fair Labor Standards Act, 29 U.S.C. § 215; Count Three: Sex Discrimination under Title VII of the Civil Rights Act of 1964; and Count Five: Retaliation Discrimination Under Title VII of the Civil Rights Act of 1964.

3. Plaintiff's Cross-Motion for Summary Judgment is DENIED.

4. The parties shall file a Joint Proposed Pretrial Order within forty-five (45) days of the date of this Order. A sample Joint Proposed Pretrial Order is attached to the Court's May 22, 2015 Order setting deadlines. (Doc. 8.)

Dated this 24th day of April, 2018.

_____

Honorable Cindy K. Jorgenson
United States District Judge