**JACOBSON LAW FIRM**
2730 EAST BROADWAY BLVD., SUITE 160
TUCSON, ARIZONA 85716
TELEPHONE (520) 885-2518
FACSIMILE (520) 844-1011
jeff@jhj-law.com
Jeffrey H. Jacobson, SB#019502
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK, | Case No. 4:14-CV-02543-TUC-CKJ |
| Plaintiff, | |
| vs. | **PLAINTIFF'S MOTIONS IN LIMINE FOR A WRITTEN JUROR QUESTIONNAIRE IN ADVANCE OF *VOIR DIRE*** |
| CITY OF TUCSON, | |
| Defendant. | Hon. Cindy K. Jorgenson |

Plaintiff Carrie Ferrara Clark respectfully submits this motion in limine seeking approval for a written juror questionnaire in advance of *voir dire*. The facts of this case have been briefed to the Court. *See* Defendant's Motion for Summary Judgment (MSJ) (Doc. 115), Plaintiff's Cross-MSJ (Doc. 117), Plaintiff's Response to Defendant's MSJ (Doc. 122), Defendant's Response to Cross-MSJ (Doc. 124) and replies (Docs. 126 and 127). On April 25, 2018, this Court granted partial summary judgment (Doc. 131).

The attached written juror questionnaire is limited in scope and will make the *voir dire* process more efficient and expedient, allowing both parties to assess quickly, and without significant Court time, any biases or prejudices a potential juror may have. Exhibit A. The issues raised in this case are sensitive in nature and a written questionnaire would provide both the Court and counsel the opportunity to explore any bias or prejudice so as to help in selecting a fair and impartial jury.

The Supreme Court has made clear that "[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 505 (1984) [*Press-Enterprise I*].

"[O]ne touchstone of a fair trial is an impartial trier of fact- 'a jury capable and willing to decide the case solely on the evidence before it.' *Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). *Voir dire* examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors." *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006).

A plaintiff's need to ferret out potential jurors' prejudices is typical of any civil case. *Deghand v. Wal-Mart Stores, Inc.,* 980 F. Supp. 1176, 1179 (D. Kan. 1997) ("It goes without question that a case directly implicating sensitive, personal, moral or religious issues may warrant written jury questionnaires."). The need for and utility of written juror questionnaires in advance of *voir dire*, especially in cases such as this, is well-articulated in the attached articles from Thomas P. Baggott, PhD, and the Honorable Roslyn O. Silver, United States District Court, District of Arizona. Exhibit B.

Moreover, Plaintiff's proposed questions reasonably relate to issues which may arise in this case. *Compare Salazar v. Continental Const. of Montana, LLC,* No. CV 11-16-BLG-CSO, 2012 WL 3100544 (D. Mont. July 30, 2012) (denying use of questionnaire where the purported questions "have seemingly no or very little relevance to how a prospective juror may view issues in this case"). In summary, Plaintiff will testify about her desire to breastfeed and her reasons for wanting to do so. Plaintiff will also testify regarding the significant trouble she had not only producing and expressing her milk on a consistent basis, but that her first-born son was demonstrating symptoms of the effects of the same.

This case is, at its core, about a mother who wanted to express her breastmilk in a clean, private setting at work – as is allowed by law. And despite the general scientific benefits that breastfeeding has on overall and long-term health, the topic of breastfeeding remains socially polarizing. Certain cultural beliefs and practices also contribute to what women consider to be normal infant feeding practices.

The proposed written jury questions attached address the issues raised in this case, and would help facilitate the jury selection process by assisting the attorneys and the Court during oral *voir dire* and the actual selection of the jury, while protecting juror privacy interests. Finally, the brevity of the questionnaire Plaintiff seeks would not expand jury

selection beyond what is already contemplated, and would therefore not cause excessive and undue delay in the proceedings.

For the reasons discussed above, Plaintiff respectfully requests an Order allowing the attached written juror questionnaire to be employed in advance of *voir dire*. This helpful pre-screening measure will facilitate and expedite jury selection in this case, allow the members of the venire panel to express their opinions on this sensitive topic in a private manner, and let counsel root out any and all applicable bias to ensure a fair trial.

DATED this 7th day of January, 2019.

**JACOBSON LAW FIRM**

 *s/Jeffrey H. Jacobson*
Jeffrey H. Jacobson
*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 7, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michelle Saavedra
Renee Waters
Principal Assistant City Attorneys
Office of the City Attorney, Civil Division
255 West Alameda, 7th Floor
Tucson, Arizona 85701
*Attorneys for Defendant*

# Exhibit A

# Proposed Juror Questionnaire
## Clark v. City of Tucson
### 4:14-cv-02543-CKJ

1. Have you ever been married to or had a life partnership with a fire fighter?

2. Are any of your close friends or relatives fire fighters?

3. Please answer the gender appropriate question:
   a. FEMALE—If you have children, have you chosen to use baby formula as opposed to your own breast milk?
   b. MALE—Have you ever assisted a female in choosing to use baby formula as opposed to her own breast milk?

4. Do you believe that female employees should stay home with their infant(s) if they determine to breast feed those infant(s)?

5. Do you agree or disagree with hiring females as fire fighters?

6. In your own opinion, is it proper for a woman to breast feed a child in public?

7. Are you in favor of giving special considerations in the workplace to women who choose to breast feed their infant(s)?

8. Are you uncomfortable sitting on a jury that will involve testimony about a woman pumping breast milk for her child?

9. Do you ever watch women's tennis or golf on television?

10. Do you work in an environment that is primarily populated by women?

11. Have you or your wife/partner decided to not have children so your wife/partner can pursue a career?

# Exhibit B

## JURY QUESTIONNAIRES:  WHY THEY SHOULD BE USED

Attorneys are often unfairly expected to be experts in the field of social psychology.  Psychology and human behavior are actually the forte of the behavioral scientist or trial consultant.  The combination of legal and behavioral art forms should result in an instrument capable of identifying biased jurors and eliminating those jurors from a prospective panel.  Ideally, the juror questionnaire would reflect the efforts of both disciplines.  The use of a suitable juror questionnaire increases the probability of fairness at trial.  Additionally, the use of the questionnaire protects the juror and his or her privacy during the selection process.

Rule 47(b)(2), Arizona Rules of Civil Procedure, states, in relevant part:  "The court shall conduct a thorough oral examination of prospective jurors."  Further, the rule states, "Nothing in this rule shall preclude the use of written questionnaires to be completed by the prospective jurors, in addition to oral examination."  Additionally, Rule 47(D) Arizona Rules of Civil Procedure states in part:  "The examination of the jurors touching their qualifications to serve shall not be restricted to the grounds of challenge for cause, but may extend to any legitimate inquiry which might disclose a basis for exercise of a peremptory challenge." (Shaw, 1999) Clearly, these rules provide a framework for the construction of a jury questionnaire that will be both legal and socially sound.  Empirical research abounds showing that increased honesty improves with anonymity.

From a juror perspective, the courtroom is an alien place.  The protocols and physical environment are very unfamiliar and often threatening.  In this threatening and frightening environment, we ask jurors to openly disclose personal information about themselves, and we commonly ask them about their deepest prejudices and personal biases.  When we ask for information in this open environment, the opportunity for gaining honest and meaningful information is substantially reduced, and in some cases entirely eliminated.  Social scientists appreciate the fact that individuals wish to fit in with their peer group.  Well-adjusted people want to be accepted and, therefore, tend to give the socially acceptable answer to questions.  For example, if an open group of people is asked, "Do you have prejudices against any races or classes of people?" the socially acceptable answer is "No".  I believe prejudice is on a continuum, and we all fall at one point or another on the scale.  If one juror is brave enough to give the socially unacceptable answer, other jurors will see the additional attention brought on that juror and hear the follow-up questions.  We therefore teach them what the "right" response to the question is if they want to be acceptable to the group.  Matters can sometimes be made worse when an attorney or judge will stay to the juror, "Surely you can put your prejudice aside and judge this case on just the evidence."  The socially acceptable answer is intrinsic to the question.  This simply causes the juror to go through the motions of being honest.

Extensive research in psychology, sociology, communications and law has examined the issue of non-disclosure by participants in surveys and trials.  Again and again, studies have found that people are willing to be more candid and to reveal more personal

information regarding sensitive questions on a self-administered written questionnaire than they are in verbal, person-to-person interviews, and in voir dire. (Spaeth, 2001)

When jurors are provided a level of privacy in their written responses on jury questionnaires, they are much more likely to be honest and revealing than their oral responses would be in the group setting of voir dire. Jurors who, in the public setting of the courtroom, might hesitate to reveal private information relative to the jury service are more likely to be candid in filling out a private questionnaire. (Krause and Bonera, 1985)

The juror, unfamiliar with the courtroom, wants to fit in and be respected by their peers. More importantly, they want the father figure, the judge, to accept them. Like a father figure, the judge is all-powerful and sets the example of behavior. "Judges usually do not realize they are seen by jurors as both powerful and fair, and this attitude on the part of jurors creates an expectation in their minds that they should say they can be fair and impartial, whether or not this is true. Jurors want to be accepted and approved of by the judge. They want to say the right things to him." (Bennett, 1977) Jurors are particularly reticent to provide personal information involving their sex lives, substance abuse, alcohol use, and carelessness. These are often the very issues that are the focus of the matter before the court and the jury. It is logical to then conclude that a jury questionnaire will be more fair to the participants at bar, risk less injury to the members of the panel, and serve to give us the "best truth".

Ten years ago, social scientists conducted research that showed jurors tended to be dishonest during voir dire for the reasons disclosed in this paper. In one of those studies, only 8% of the jurors, in open voir dire, admitted they were closely associated with anyone who had worked for a police department or law enforcement agency. During private post-trial interviews of these same jurors, 30% of the jurors admitted to having friends or relatives in the field of law enforcement. In the same study, jurors were asked if they or their friends or relatives had ever been victims of a crime. Fully one third of the jurors who should have said "yes" were untruthful during open voir dire. (Seltzer, Venuti, and Lopez, 1991)

In addition to the issues of honesty and social science, the jury questionnaire can also be used to considerably reduce the in-court time used for jury selection. In an ideal situation, the jury panel would be identified, the approved questionnaire would be mailed to them by the courts, the questionnaire would be completed by the panel member in the privacy of their own home, and the questionnaire would be returned to the trial judge on a fixed due date. The questionnaires would be maintained as part of the private record and would be shared only with the attorneys from each side. The attorneys, and their support staff, would have the opportunity of evaluating the questionnaires and making motions to strike certain jurors based on answers to the questionnaires. All of this is done with very little use of the court's time.

In summary, well-constructed jury questionnaires can be brief and time saving instruments. They can aide in the discovery of true predispositions and can assist in better guaranteeing a fair trial for all parties.

**References**

Bennett (1977).  <u>Psychological Methods of Jury Selection in the Typical Criminal Case</u>, CRIMINAL DEFENSE 11, 13 (No. 2, April)

Krauss, A. and Bonora, B. (1985).  <u>Jury Work:  Systematic Techniques</u>, 2.08 at 2-44.

Seltzer, R., Venuti, M., and Lopez, G. (1991).  Juror Honesty During the Voir Dire. <u>Journal of Criminal Justice</u>, 19 451-462.

Shaw, C.A.  (1999).  Memorandum on Motion to Request the Right to Use a Jury Questionnaire.  Superior Court of Arizona in the County of Yavapai, CV97-0294.  June, 1999.

Spaeth, J.M. (2001).  Swearing With Crossed Fingers.  <u>Arizona Attorney</u> 39-40 (January 2001)

*Thomas P. Baggott, PhD, is a litigation consultant and the President of Jury Behavior Research Corporation, a national trial consulting firm.  If you have any questions about this article or would like further information, he can be contacted through his company's website, www.juryadvisor.com, or via telephone at (520) 275-4742.  You may also write to his office at 1570 W. Calle Concordia, Tucson, AZ 85704.*

# Mind Reading, Clairvoyance and Jury Questionnaires
by
Roslyn O. Silver
U.S. District Judge
District of Arizona

It was early April 1980 at the Prescott, Arizona federal courthouse and I was trying my first jury trial as an assistant U.S. attorney.  We were about to engage in the most mysterious of all trial processes:  voir dire.  I knew only that it was a deselection process whereby I was supposed to strike the jury panelists biased in favor of the accused, while attempting to retain those biased in favor of the government.  In truth, the only certainty I had about this enterprise was the preferred pronunciation of it, *vuwah-dear*.  When the judge belted out, "Counsel, are you prepared for *vore-dire*?" I knew I was about to enter a tunnel without a light at the end of it.

The judge asked the panelists all the questions, and I was comforted that nobody said he or she was biased.  Energized with renewed verve, I began preparation for exercising my strikes.  I asked myself one intuitive question after another: Does the scowl on number seven's face mean that she doesn't like me? Is the older guy in the front row, seated third from the left and wearing an earring and a Grateful Dead tie-dye T-shirt, an aging hippie still committed to "free love" and "free crime"?  Then there was the panelist

who answered all the judge's questions in my favor, only to tell us he had a bumper sticker that read, "What Would Satan Do?"

Finally, I finished exercising my strikes.  I slumped into my chair, paralyzed as I awaited learning which jurors would serve on the panel.  As the deputy clerk called the name of the last juror, I exhaled, relieved that the drawn-out, painful ordeal was over.  But as the trial unfolded, I grew confident that the jury was predisposed in my favor.  Indeed, the jurors seemed transfixed by my every word, and I became convinced that they would sing the prosecutor's favorite one-word song, "Guilty."

In the end, my assessment of the jury was not vindicated.  The words "not guilty" reverberated throughout the courthouse, delivering, as if it were an obituary, the chilling message:  She lost!  Fortunately, because of my inexperience, I was not burdened with carrying others' expectations of me, so I quickly recovered.  But I was troubled that I might not have the knack for jury selection.  So I developed my own rational strategy for choosing jurors.

In my next several trials, to cultivate the jurors' favor, I graced each of them with a Hollywood smile and struck only those who did not smile back.  I wanted short people, theorizing that they would channel their vertical challenges into a thirst for power that they would use to convict (*and* I would never be accused on appeal of selecting persons from a suspect class).  And I also wore red, thinking that the color would heat up pro-government emotions and make "tough on crime" panelists identifiable.

The result?  I triumphed, as I so richly deserved.  Four juries returned guilty verdicts after remarkably short deliberations.  As I mused about these victories, it occurred to me that I might have been bestowed with a unique capacity to formulate foolproof jury selection techniques.  I offered to share this gift with my colleagues.  Inexplicably, no one took me up on it.

Alas, the euphoria was fleeting.  Soon, a bolt of awareness hit me when I suffered a succession of three not-guilty verdicts.  I was completely downcast and bewildered.  I had used the same strategy in the trials I lost as I had in the trials I won.  Defeated, yet I yearned for answers.  How could this have happened?  After counseling sessions with senior trial lawyers, pep talks from my colleagues, three phone calls to Miss Cleo (the television psychic) and a weekend with a shaman, I emerged from the despair with the realization that jury selection is always an elusive and humbling experience.

Over the next 14 years, I tried many jury trials.  I won some that I should have lost, and I lost some that I should have won.  After trial, I frequently learned that unanticipated verdicts occurred because some jurors' opinions and attitudes, which never surfaced during jury selection, influenced their decisions.  It is not that prospective jurors willfully failed to answer the questions.  Rather, I found they feared public disclosure of their personal and private matters, and they believed the information was off limits.

It is rare that a venire person is bold enough to bluntly reveal partiality in open court. One notable exception was the juror who was asked whether anything would interfere with his ability to be a fair and impartial juror. He responded, "Yes—I find you very obnoxious and insulting, and I could not be a fair juror in any case in which you are involved." James J. Gobert, *Jury Selection: The Law, Art, and Science of Selecting a Jury* § 909 (2d ed 1990). Setting aside the embarrassment the answer caused the lawyer, for voir dire to be effective, the juror's refreshing candor is fundamental and crucial.

Fast-forward to October 14, 1994, when I became a federal judge responsible for the same selection process that flummoxed me as a trial lawyer. At first I adopted the popular and traditional system used by most federal judges. I accepted suggestions from the lawyers but assumed the responsibility for asking almost all of the questions, allowing the lawyers only limited participation.

However, at about that time, the late District Court Judge Richard Bilby and Maricopa County Superior Court Judge Michael Dann, both well-respected pioneers in jury reform, suggested that I incorporate the use of questionnaires into my voir dire. *See* Michael Dann, "Free the Jury," 23 LITIGATION at 5 (Fall 1996). Simply put, they emphasized that written questions mailed to jurors before trial generated far more candid and meaningful information than the judge-dominated, in-court voir dire. Jeffrey T. Frederick, *Mastering Voir Dire and Jury Selection* 122 (1995).

Though some courts have used juror questionnaires since 1975, they were not yet in vogue when I was appointed. *Id* at 146. True to federal tradition, because questionnaires were described as "innovative", I did not warm to the idea. Recognizing that the Ninth Circuit already had plenty of reasons to reverse me, I was not eager to give them more. So I took the easy way out and adopted the traditional approach.

Happily, change has begun. Today, many judges have at least experimented with using questionnaires, and now there is a rich lode of publications addressing their effectiveness and offering guidance for their use in trials. *See, e.g.,* "Symposium on Selection and Function of the Modern Jury," 40 *Am. U. L. Rev.* 665 (1991); Dennis Bilecki, "A More Efficient Method of Jury Selection for Lengthy Trials," 73 *Judicature* 43 (June/July 1989). Soon I became a convert—even a questionnaires addict.

As I have learned, jurors are more likely to disclose sensitive and personal information when asked *in advance*, and when answers are prepared *in writing* and *in private*. There are various types of questionnaires. The first is the "general jury questionnaire", which, as the name suggests, seeks general background information. Its primary purpose is to determine whether the juror is qualified and able to serve. *See* 28 U.S.C. § 1866 (c) (providing "[t]hat any person…may be excused by the court…upon showing of undue hardship or extreme inconvenience, for such period as the court deems necessary"). The venire also is asked for some minimal background information such as age, occupation, residence, number of children, prior jury experience, and prior litigation experience. V. Hale Starr & Mark McCormick, *Jury Selection* § 11.01 (3d ed. 2001).

A more comprehensive form of questionnaire also has gained acceptance, called a "supplemental" or "special questionnaire." *Id*. The five constituent parts of this type of questionnaire are (1) the introduction; (2) background information; (3) knowledge of witnesses, lawyers, and parties; (4) awareness of the litigation; and (5) case-relevant opinions. Frederick, *supra* at 123. The introduction contains enough information to educate the jurors about the selection process, as well as provides a brief explanation of the case. On occasion other information is included, such as the reasons for the questionnaire, concerns about media issues, and explanations of juror privacy. *Id*.

Background information is the same as typically called for during in-court voir dire, such as name, age, employment, education, and marital and residential status. Sometimes the questionnaire identifies the witnesses, lawyers, and parties, though I prefer to ask questions about this information in the courtroom. The last phase is designed to root out jurors' knowledge, experience, attitudes and opinions about the particular case.

These questions are all carefully tailored to inspire the venire to disclose in writing, fully and confidently, all relevant information, even if personal and private. Questionnaires have very practical value as well in reducing some of the burdens of the jury administration office. Pre-screening by early strikes reduces the number of jurors who must appear for the trial, and the monetary and procedural benefits occur without jeopardizing the requirements of random selection or altering the representativeness of the resulting jury panel. Bilecki, *supra* at 43.

Once the completed questionnaires are returned, a conference is held with the lawyers. We study the answer and identify venire persons who will be unavailable for trial at the designated times and dates, or who demonstrate indisputable bias or prejudice. Those jurors remaining at the end of the conference are told to appear the following day for trial.

At trial, I inform the panel members of their responsibilities as jurors, introduce the lawyers, identify potential witnesses, and describe the legal principles that will apply. Then, in open court, every juror briefly introduces herself and relates her employment status. This feature is essential to the lawyer's evaluation of the beliefs, attitudes, and opinions held by each juror, often visible only by nonverbal communications such as body movement, eye contact, facial expressions, and shrugs not apparent in the questionnaire answers. Frederick, *supra* at 33-34. In fact, in one of my trials this proved extremely valuable. After introducing himself as instructed, the venireman, instead of sitting down, spontaneously added that he "appreciated this opportunity to inform everyone" that he "knew that jurors were not required to follow the law if they did not like it."

In the final segment of the voir dire, the lawyers are allowed approximately five to 15 minutes of general questions asked of the entire panel. This is followed by *in camera* questions of each juror who, in open court or in questionnaire answers, displayed any bias or partiality. The entire courtroom process is completed in two hours or less.

Celebrity and otherwise high-profile cases pose their own unique challenges, including the preparation of elaborate questionnaires. Frederick, *supra* at 130, evaluates the questionnaires used in the Marion Barry, Imelda Marcos, Oliver North, and *In re Exxon-Valdez* trials. Further, he gives helpful advice for developing questions, such as keep them simple, seek complete answers, and ensure that the format is easy to follow. *Id* at 140-47. One high-profile case I tried taught me that loading the questionnaire with numerous questions does not always produce a flawless jury. Despite the nearly 100 written questions, a selected juror belatedly was excused because during trial it became evident that he was mentally or emotionally challenged. His aberrant behavior was undetected during voir dire because his questionnaire answers were neutral, and he had been completely passive during the in-court questioning.

There are compelling reasons for using questionnaires in trials in which sensitive issues predominate. Even if they are only indirectly related to the trial issues, attitudes on race, nationality, politics, religion, medicine, and sex can have a palpable influence on the verdict. It is beyond peradventure that the venire's written answers, prepared in private, are much more effective than in-court questioning in unearthing the beliefs and opinions of venire on these topics—information that may be vital to a fair trial. *See Jury Trial Innovations* 62 (G Thomas Munsterman, Paula L. Hannaford & G. Marc Whitehead eds., 2000).

During my first trial using questionnaires, it became evident early on that the race of some of the parties and witnesses might influence the verdict. Counsel jointly requested that I ask a series of questions they believed would identify jurors who were prejudiced. Initially, I declined because I thought that the venire panel would be offended by such questions. Further, I was concerned that some jurors would feign prejudice just to ensure they would be excused. I was wrong on both deductions. *See* Alexander Pope's *Thoughts on Various Subjects*: "A [person] should never be ashamed to own [she] has been in the wrong, which is but saying, in other words that [she] is wiser today than [she] was yesterday."

First, I incorrectly assumed that jurors would fabricate a prejudice as a pretext in order to be excused. This conclusion became apparent because all the jurors who disclosed their prejudice gave a detailed explanation of the reasons for it, as required by the questionnaire. Indisputably, these jurors fully revealed their racial beliefs and attitudes because they were comfortable that the answers would not be disclosed to the public. Luckily, only a small percentage of venire persons disclose their prejudice, ranging in level from mild to substantial. But they almost uniformly include fresh expressions of anger and hostility against the group in question.

One such answer was given in a criminal case charging the defendant with illegally entering the United States. The questionnaire asked the juror whether she disagreed with policies requiring permission from the government before authorization is given to enter. She responded, "Don't think they should be allowed in my country!" Her follow-up answers were very offensive and even more clearly illustrated her racism.

Unquestionably, the answers of all these jurors unearthed entrenched vestiges of racism.  I was profoundly affected by these responses, and I became firmly committed to using questionnaires in all trials where race or nationality is an issue.  *But see United States v. Barnes*, 604 F 2d 121 (2d Cir.1979), *cert. denied*, 446 U.S. 907 (1980) (questions concerning the religious and ethnic background of the jurors precluded because there was no evidence that a particular group was biased or that the questions would have identified racial prejudice).

Indirect answers demonstrating bias also have strengthened my resolve that, despite the probing of personal issues, the questions must be asked.  One of the more memorable and amusing responses was given in a sexual abuse prosecution.  The questionnaire began with a neutral rendition of the facts, followed by this question: "Given that this case involves allegations of rape, is there anything about your nature that would make it impossible to sit as a juror in this case?"  The venire person answered, "No—I feel pretty strongly that rapists should be sterilized.  Other than that, no."

An unanticipated bonus has emerged from my use of questionnaires.  Some answers are inspirational, imaginative and humorous.  Many were prompted by the question, "If you could do anything in the world today, other than jury duty, what would that be?"  One highly motivated juror answered, "Find a cure for cancer and bring peace to the world."  Less virtuous, one woman answered, "Just about anything!"

Other memorable responses were given in a suit between two insurance carriers.  The question asked whether lawsuits between insurance companies should be tried.  The prospective juror responded, "Not really…we are asked to take money from one *voulcher* and give it to the other."  He was also asked whether he had any negative opinions of insurance agencies, and he responded, "Yes!  I may not have spelled *voulcher* right, but that is how I regard them."

Here is my favorite.  Again, the prospective juror was asked what he would rather do than serve on a jury.  His answer was, "Make love".  My entire staff was delighted with his response and looked forward to meeting this handsome young hunk.  The courtroom deputy read his name, and forward walked a gentleman in his late 70s with a twinkle in his eyes.  Some conjectured that his answer might be wishful thinking, hoping that, as a powerful federal judge, I would grant his request.

Some judges continue to find questionnaires objectionable for various legal reasons.  One concern is whether the court has authority to use questionnaires and, particularly, whether they are prohibited by the Constitution or statutes.  The answer is no. Starr & McCormick, *supra* §§ 11.01, 11.02.  Another concern is whether questionnaires shift control of voir dire from the trial judge to the lawyers or the clerk of the court.  *Jury Trial Innovations, supra* at 63.  In *United States v. Wellington,* 754 F. 2d 1457 (9th Circ. 1985), the court, interpreting 28 U.S.C. § 1866(c), held that the "use of questionnaire sent by the district court to the prospective jurors did not constitute an unconstitutional delegation of judicial power to the court clerk."  Also, there continues to

be a tension between the jurors' right to privacy of personal information and the public's right to know.  Addressing this issue in part, the Supreme Court held in *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984), that protecting the privacy of a venire person by conducting questioning *in camera* is permitted only if the court explored alternatives to such proceedings and determined the juror had a compelling privacy interest outweighing the presumption favoring public access to judicial proceedings.

Additionally, the acceptable breadth allowed to probe jurors' personal secrets and experiences has been debated in a number of cases.  For example, in *United States v. Padilla-Valenzuela*, 896 F. Supp. 968, 971 (D. Ariz. 1995), the court emphatically declined all the questions in the questionnaire, finding that they violated juror privacy rights.

Other notable decisions have held that personally intrusive questions are to be more carefully scrutinized to ensure that they have clear relevancy to the matters at issue.  In *United States v. Barnes*, 604 F. 2d 121, 140 (2d Circ. 1979), the court held that juror questions are impermissible if they are "too remote from the issues in the case to warrant the intrusion into the potential jurors' private thoughts."  *See also United States v. Taylor*, 562 F. 2d 1345 (2d Cir. 1977) (barring questions related to educational backgrounds of children); *United States v. Hamling*, 481 F. 2d 307, 314 (9th Cir. 1973), (excluding many "cumulative and argumentative" questions related to "biases and prejudices concerning 'obscenity' and sex."); *Florida v. Thaylor*, 528 So. 2d 67 (Fla. 1989) (rejecting the questionnaire in part because it included questions that might have permitted inquiry "unconnected" with the case and the qualifications of the jurors).

While the debate goes on, jury questionnaires are increasingly an accepted means of collecting vital information.  They save money.  They save time.  They save the judge from having to read minds or predict the future.  And, best of all, they promote justice.