**JACOBSON LAW FIRM**
2730 EAST BROADWAY BLVD., SUITE 160
TUCSON, ARIZONA 85716
TELEPHONE (520) 885-2518
FACSIMILE (520) 844-1011
jeff@jhj-law.com
Jeffrey H. Jacobson, SB#019502
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARRIE FERRARA CLARK,<br><br>             Plaintiff,<br><br>vs.<br><br>CITY OF TUCSON,<br><br>             Defendant. | Case No.  4:14-CV-02543-TUC-CKJ<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* NUMBER 9**<br><br>Hon. Cindy K. Jorgenson |

Plaintiff Carrie Ferrara Clark responds and objects to Defendant's *Motion in Limine* 9 (Doc. 151). For the reasons discussed below, Defendant's *Motion in Limine* 9 should be denied.

### I.   Austin Clark's Medical Treatment

Austin Clark's health as a newborn is directly related to the issues presented in this case. Plaintiff is expected to testify that she was having difficulty feeding Austin after she returned to work from maternity leave, and that as a result, Austin's health was of concern to Dr. Radomsky. He will also testify as to Plaintiff's need to express her milk for her son continuously, even while she was on-shift and working. Pumping her breastmilk regularly and consistently was important. Without doing so, breastfeeding mothers are at higher risk for engorgement and mastasis, either of which can develop very quickly, even overnight. Mastasis is a dangerous health condition for the mother and may affect the baby as well, can be difficult to treat, and often leads to hospitalization. In turn, mastasis will affect milk production and the mother's ability to breastfeed. Engorgement also affects the baby's ability to receive proper nutrition. By keeping milk in a breast and becoming engorged, the

1

mother's production of milk is inhibited. Milk production slows down, diminishing the supply of milk to the feeding baby. Babies react to the regular flow of milk in a mother's breast. If the flow is slow, babies do not eat as well. Plaintiff was told that it is medically necessary to pump breastmilk 8 to 12 times in a 24 hour period.

The uncertainty as to where Plaintiff was going to be working on any given shift created a significant amount of stress and anxiety in her life. As a result, she experienced a decrease in her ability produce enough breastmilk for her son. The stress and inability to maintain a consistent pumping schedule negatively affected Plaintiff's milk and volume production. Stress plays an important part in breastmilk production. Stress inhibits the release of oxytocin in the brain, the "letdown" that brings milk to the breast.

During this time, Austin was not gaining weight as expected for a 4-6 month old infant. In December 2012, Dr. Radomsky assessed him as being underweight and increased the frequency of his visits for weight checks. Between January 2013 and April 2013, Austin gained approximately only one pound. Because of Austin's poor weight gain, it was that much more important for Plaintiff to have a regular and consistent pumping schedule. Therefore, Dr. Radomsky's testimony regarding Austin's health, and the factors that led to him being underweight, are relevant and material to the issues presented in this case. They provide context and texture as to Plaintiff's state of mind and her reaction to the discrimination she was experiencing.

This evidence is also relevant because Defendant intends to call Arianne Phaneuf as an alleged comparator. Dr. Radomsky's testimony is key to Plaintiff's argument that Ms. Phaneuf is not a similarly-situated comparator employee.

## II.   Comparator Employees

Plaintiff intends on calling three TFD employees regarding how Defendant handled their employment status after their involvement with the judicial system affected their ability to operate a vehicle. First, Defendant argues that the witnesses "should be precluded because the facts and circumstances surrounding their situations were not disclosed." As they are all TFD employees, Defendant is well aware of their employment status as a result of their exposure to the judicial system. Defendant is in the best position to know and

understand precisely what occurred with Josue Camarena, John Valenzuela, and Brad DeCastro. Plaintiff need not disclose information that is already known to the Defendant.

All three of these TFD employees experienced contact with law enforcement and the judicial system which led to arrests, investigations, and convictions. As such, they were precluded from being able to perform the full range of their duties and obligations. Nevertheless, TFD accommodated them. For example, Mr. Camarena was moved from a paramedic truck to a fire engine to accommodate the fact that he could not drive. John Valenzuela, who was arrested by law enforcement, was moved from a position in Operations (24-hour shifts in a fire station) to an 8-hour administrative position. Finally, Brad DeCastro was also arrested for DUI. Mr. DeCastro was in a swing shift position at the time; after the DUI, Defendant moved Mr. DeCastro to a long-term station assignment to accommodate him.

The ADA Amendments Act of 2008 (ADAAA) expanded the definition of disability to include employees with conditions requiring work-related restrictions similar to those needed by pregnant women. For example, someone who, because of a back impairment, has a 20-pound lifting restriction that lasts for several months would be an individual with a disability under the ADA entitled to reasonable accommodation, absent undue hardship. 29 C.F.R. pt. 1630 app. §1630.2(j)(1)(viii). The same individual would be an appropriate comparator for Pregnancy Discrimination Act purposes to a woman who has a similar restriction due to pregnancy. Similarly, pregnant employees may require other kinds of workplace adjustments similar to accommodations provided to individuals with disabilities. In other words, given that each of the three male employees suffered from an inability to perform certain functions of their job and were accommodated, whereas Plaintiff had a legally-protected disability, expressing breastmilk after pregnancy, but was not accommodated. How other male employees on different types of leave and/or employment restrictions were treated differently than Plaintiff is valid comparator evidence. *See Ensley-Gaines v. Runyon,* 100 F.3d 1220 (6th Cir. 1996)(Under second clause of PDA, comparators need only be similarly situated in the ability to work); *Raciti-Hur vs. Homan,* 1999 U.S. App. LEXIS 9551, *9-10 (6th Cir. 1999)("same supervisor test" not applicable to comparators under second clause of PDA); *Tysinger v. Police Department of City of*

*Zanesville,* 463 F.3 569 , 573-74 (6th Cir. 2006)(Comparators must be similarly situated in all relevant respects, but in a PDA case this simply means "their ability or inability to work"); and *Int'l Union v. Johnson Controls,* 499 U.S. 187, 204-205 (1991)("the second clause [of the PDA] could not be clearer: it mandates that employees 'shall be treated the same for all employment-related purposes' as nonpregnant employees similarly situated with respect to their ability to work.'") Therefore, by the facts and the weight of applicable case law, all three of these employees are 'similarly situated,' and Plaintiff should be allowed to introduce evidence of the accommodations afforded them by Defendant.

### III. Testimony from Diana Benson

Plaintiff will withdraw Diana Benson as a witness in this case.

### IV. Testimony from Union Representatives

Defendant objects to the testimony of Sloan Tamietti, Jon North, and Roger Tamietti at trial. As a preliminary matter, Defendant's "cumulative" argument is not a valid basis for a motion *in limine* on a contested material issue. Plaintiff does not intend on calling so many witnesses who will say the same thing such that it becomes wasteful time. Second, as described below, at the meetings these three Union representatives attended, they may have heard admissions of supervisors that are crucial to the case. In other words, they may have heard or seen something that Plaintiff does not recall or was not aware of. Their testimony in this regard is absolutely not cumulative. Each person is taken in turn below.

<u>Sloan Tamietti</u>: During counsel's meet-and-confer period, Defendant failed to confer, or attempt to confer, with Plaintiff regarding its objections to Sloan Tamietti's testimony. Therefore, Defendant's *in limine* request to preclude his testimony should be denied as a violation of L.R.Civ. 7.2(l) ("No opposed motion in limine will be considered or decided unless moving counsel certifies therein that the movant has in good faith conferred or attempted to confer with the opposing party or counsel in an effort to resolve disputed evidentiary issues that are the subject of the motion. . . .")

Even assuming, arguendo, the Court does not reject Defendant's objection to Sloan Tamietti, he is a relevant, material witness in this case. Mr. Tamietti was the International Association of Fire Fighters Local 479 (Union) C Shift Union Griever at the time Plaintiff returned to work from maternity leave in 2012. Mr. Tamietti was present for the March 20,

4

2013, telephone conference which led to the Defendant issuing Plaintiff a disciplinary letter. See Doc. 87, ¶¶ 39-54. Mr. Tamietti took notes of that meeting and had a follow-up discussion with Deputy Chief Rodriguez about the meeting.

Mr. Tamietti was also present for the meeting on March 26, 2012, when Defendant gave Plaintiff her disciplinary letter on March 26, 2012. During the meeting, Mr. Tamietti heard Assistant Chief Fischback tell Plaintiff, "well, that's what happens when you file a complaint with EEO." Doc 87 ¶ 58-59. Mr. Tamietti was also present when Assistant Chief Fischback, when asked when TFD's stations would become compliant with federal law for nursing mothers, said "a long time, some stations maybe never" or words to that effect. Mr. Tamietti also met with Assistant Chief Mike Fischback after Plaintiff left the meeting. Initially, Assistant Chief Fischback told Mr. Tamietti that he "misspoke" when he accused Plaintiff of filing a complaint with the EEOC.

<u>Jon North</u>: Mr. North was Plaintiff's Union representative when Deputy Chief Mike Carsten interviewed Plaintiff regarding an allegation that she came into work on a day off, Caeser Chavez Day, in March 2016. Mr. North was also a witness to the April 2016 meeting when then-Chief Critchley informed Plaintiff that she was being moved out of Fire Prevention into a Swing Shift Paramedic position. Mr. North became the Union's Vice President in 2016 and, as such, was privileged to and knowledgeable of personnel issues and aware of Defendant's inconsistent application of its own policies.

<u>Roger Tamietti</u>: Mr. Tamietti was the Union President when Plaintiff returned to work from maternity leave in 2012 and, as such, had direct, first-hand knowledge of the issues Plaintiff was having with obtaining a secure, private space to pump at Defendant's fire stations. Mr. Tamietti is expected to testify regarding numerous conversations he had with then-Chief Critchley attempting to resolve the issue. Mr. Tamietti was aware of and involved with the discipline that Plaintiff received after the March 20, 2013, telephone conference referenced in the Third Amended Complaint (Doc. 87, ¶¶ 39-54.)

Mr. Tamietti met with Plaintiff almost daily regarding the issues Plaintiff was having in Fire Prevention. He has knowledge of and was involved with the Defendant's March 2016 educational counseling given to Plaintiff, aware of Plaintiff's wrongful conduct complaint while she was in Fire Prevention, and the Defendant's decision to move her from

Fire Prevention back into Operations. Mr. Tamietti is also expected to testify to his experience knowing and working with Plaintiff as an emotional distress damages witness.

**V.     Other Witnesses**

Defendant mischaracterizes the nature and substance of the testimony of Josh Campbell, Chris Conger, and Martin "Harvey" Brown. As described below, each person has relevant, material evidence, would not be duplicative or cumulative, and has first-hand knowledge of material issues in controversy in this case.

<u>Josh Campbell</u>: Mr. Campbell has been involved with Plaintiff's employment matters since 2015 when he succeeded Roger Tamietti as Union President. Mr. Campbell was aware of the complaint Plaintiff filed with EOPD and was present for several meetings to try to resolve issues in Fire Prevention. Mr. Campbell also spoke with then-Chief Critchley on multiple occasions about Plaintiff's employment. Plaintiff was not present for these meetings, so she cannot testify to them.

Once the Department moved Plaintiff out of Fire Prevention and back into Operations, Mr. Campbell met with then-Chief Critchley to see if Defendant would move her to a PT truck instead of going back into the field.

Mr. Campbell was also directly involved with Plaintiff's hernia condition and was working with her as Defendant ignored her condition and required her to report back to Operations with just two days notice. Mr. Campbell would testify that he advised Plaintiff to see Dr. Peate.

Mr. Campbell is expected to testify that, when Plaintiff was assigned to light duty and told to work across the hall from JoAnn Acedo, then-Chief Critchley told Mr. Campbell that Plaintiff was specifically placed in that office because TFD "needed to keep an eye on" Plaintiff.

Mr. Campbell is aware of the issues related to the Defendant taking away Plaintiff's 150 Club pay, and was directly involved with the seniority list issue. In May 2016, the Defendant enacted a new seniority list policy and made it retroactive to the day before Plaintiff was reassigned back to Operations, resulting in the loss of two years of seniority for Plaintiff. Mr. Campbell is expected to testify as to his interactions with Plaintiff and the Defendant, and his meetings with TFD administration regarding the seniority issue. Finally,

each time she was notified that she was being deposed, Plaintiff consulted with Mr. Campbell regarding TFD policy that she should be considered on duty and paid for her time. As Union President, Mr. Campbell has direct knowledge of these issues and participated in many conversations and meetings, as Plaintiff's advocate, where Plaintiff was not present. Mr. Campbell has knowledge of the content and substance of Defendant's policies. Defendant's compliance – or lack thereof - with its policies, rules, and customs is relevant. It is well-settled that an employer's failure to follow its own rules or policies is evidence of discriminatory intent. See, e.g., *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011); *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1214 (9th Cir. 2008).

Chris Conger: Mr. Conger was the first Union representative Plaintiff talked with regarding the issues she was having getting the Defendant to provide her with a private space to express her breastmilk. Mr. Conger had numerous conversations with TFD's management officials, such as Assistant Chief Brad Olson regarding her situation. Mr. Conger served as a witness when EOPD interviewed TFD's shift scheduler, Captain Rick L'Heureux, regarding Plaintiff's complaint and his statement, "I don't think she deserves any special accommodations."

Mr. Conger also spoke to Assistant Chief Olsen about the volume of emails that TFD's HR Manager, JoAnn Acedo, was sending to Plaintiff regarding the status of her milk expression timetable and her placement at Station 6. Mr. Conger also served as Plaintiff's supervisor when she was placed on light duty in communications. As such, Mr. Conger is competent to testify to her work ethic and performance, both of which Plaintiff anticipates Defendant will attempt to attack at trial. Finally, Mr. Conger was directly involved in meetings to advocate for Plaintiff when Defendant improperly took the 150 Club pay away from Plaintiff.

Marvin "Harvey" Brown: Mr. Brown is a first-hand witness to the issues in Fire Prevention which led to the Defendant giving Plaintiff an educational counseling and eventually reassigning her from Fire Prevention into Operations. Mr. Brown will testify regarding the substance of the complaints brought forth by Plaintiff regarding Fire Prevention. He will also testify that the issues Plaintiff raised with management regarding

7

building safety were legitimate and ultimately went ignored. Should the Court allow Nikki Sprenger to testify on behalf of Defendant, Mr. Brown would testify as a rebuttal witness that Ms. Sprenger was a substandard fire inspector, suffered from numerous complaints from business owners, and therefore had a motive to fabricate about Plaintiff in order to ingratiate herself to Fire Prevention's managers.

## VI. Testimony of Dr. Patricia Haynes

Plaintiff disclosed Dr. Haynes as a treating psychologist in this case but has not obtained Dr. Haynes's records. Plaintiff also did not supply a HIPAA authorization to Defendant for it to separately obtain Dr. Hayne's records. Defendant, however, never contacted Plaintiff seeking disclosure of the records or production of the HIPAA authorization. Defendant never once requested plaintiff to produce Dr. Haynes's records. Further, Plaintiff never indicated that she would not produce the requested and promised documents. With two and a half months before trial, these records can still be obtained, with leave of court, without prejudice to the Defendant.

## VII. Conclusion

For the reasons discussed above, Defendant's motion *in limine* number 9 should be denied.

DATED this 22nd day of January, 2019.

**JACOBSON LAW FIRM**

 *s/Jeffrey H. Jacobson*
Jeffrey H. Jacobson
*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

    I hereby certify that on January 22, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michelle Saavedra
Renee Waters
Principal Assistant City Attorneys
Office of the City Attorney, Civil Division
255 West Alameda, 7th Floor
Tucson, Arizona 85701
*Attorneys for Defendant*