1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3    Carrie Ferrara Clark,           )
                                     )
4             Plaintiff,             )
                                     )   CV-14-2543-TUC-CKJ
5         vs.                        )
                                     )   Tucson, Arizona
6    City of Tucson,                 )   February 4, 2019
                                     )   10:14 a.m.
7             Defendant.             )
     _____ )

8                REPORTER'S TRANSCRIPT OF PROCEEDINGS

9                     MOTIONS IN LIMINE

10
             BEFORE:  THE HONORABLE CINDY K. JORGENSON
11               UNITED STATES SENIOR DISTRICT JUDGE

12   APPEARANCES
     For the Plaintiff:
13        Jacobson Law Firm
          By:  JEFFREY H. JACOBSON, ESQ.
14        2730 East Broadway Blvd., Suite 160
          Tucson, Arizona 85716
15
     For the Defendant:
16        City of Tucson Attorney's Office
          By:  MICHELLE R. SAAVEDRA, ESQ.
17        Civil Division
          PO Box 27210
18        Tucson, AZ 85726-7210;

19        Iafrate & Associates
          By:  RENEE J. WATERS, ESQ.
20        649 North 2nd Avenue
          Phoenix, Arizona 85003
21
     Cheryl L. Cummings, RDR-CRR-RMR
22   Official Court Reporter
     Evo A. DeConcini U.S. Courthouse
23   405 West Congress, Suite 1500
     Tucson, Arizona 85701
24   (520)205-4290

25   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription

```
1                    P R O C E E D I N G S
2         (Proceedings commenced at 10:14 a.m., as follows:)
3              THE CLERK:  CV-14-2543, United States -- I'm sorry,
4    Clark vs. City of Tucson on, for a motion in limine hearing.
5              Counsel, please state your appearances.
6              MR. JACOBSON:  Good morning, your Honor.  Jeffrey
7    Jacobson on behalf of Carrie Clark who is present in the
8    courtroom today.
9              THE COURT:  Good morning.
10             MS. SAAVEDRA:  Good morning, your Honor.  Michelle
11   Saavedra on behalf of the City of Tucson.
12             THE COURT:  Good morning.
13             MS. WATERS:  Renee Waters also on behalf of the City
14   of Tucson.
15             THE COURT:  Good morning.  And this is the time --
16   well, we're almost on time that the Court has set for a
17   hearing, the parties' motions in limine.  I have reviewed them
18   and we'll give both sides obviously an opportunity to talk
19   about them.
20             And I suggest we go issue by issue so there will
21   be -- if you want to stay seated at counsel table you can, but
22   just make sure you talk into these microphones so we can hear
23   both sides.
24             So first one -- well, are there any preliminary
25   matters that either side wants to talk about before we get
```

1  started on the motions in limine?

2           MR. JACOBSON:  Not from the plaintiff, Judge.

3           MS. SAAVEDRA:  None from us, your Honor.

4           THE COURT:  Okay.  And when is our trial date?

5           MR. JACOBSON:  April 1st.

6           THE COURT:  April 1st.

7           MR. JACOBSON:  I think.  Do you have that, Sandy?

8           THE CLERK:  I do, yes.

9           THE COURT:  April 1st.  Okay.  And just so I can

10  know, how long do you think the case will take to try.  Maybe

11  you already told me.

12          MR. JACOBSON:  I think it's set for eight days.

13          THE COURT:  Eight days.  Okay.

14          I will do -- normally a juror questionnaire, my

15  practice is if the case is going to be lengthy, like two to

16  three weeks, I'm not sure I would need a juror questionnaire

17  just for the length of the trial.  And it's not my practice,

18  I'll tell you, normally to do a questionnaire.  But given the

19  issues in this case it might be appropriate, but let me hear

20  first, Mr. Jacobson.  I appreciate the briefing on the issue,

21  particularly Judge Silver's article which I haven't read.

22          When did she write that?

23          MR. JACOBSON:  It's been a while.

24          THE COURT:  It's been a while.  Anyway, so I've read

25  those materials.

1          So Mr. Jacobson, do you want to be heard on your

2   motion in limine, which is Document 154, which is a request

3   for a written juror questionnaire in advance of voir dire.

4   And again, there are two ways we can do this.  If I decided to

5   do a questionnaire, we could mail it out to the jurors,

6   prospective panel members, and then get it back.  Or we could

7   do it the morning of and have jurors be down on the first

8   floor, fill out the materials, answer some questions for us.

9   Give both sides a chance to review it and then decide if we're

10  going to excuse some people or ask some additional questions

11  of certain people based on the responses we get that morning.

12  So there's, you know, both of those models.

13          Or what my normal practice is, is to tell the panel

14  right up front any sensitive issues they can come up to

15  sidebar.  I mean, we just hear all sorts of things up here at

16  sidebar, and they can share it with the lawyers at sidebar,

17  and then we'll move on from there.  So that's another way to

18  do it.

19          So Mr. Jacobson, go ahead.

20          MR. JACOBSON:  Thank you, Judge.  It's not my

21  practice to regurgitate what I already put in the pleadings.

22          I will note that we did have this discussion during

23  the status conference about a juror questionnaire.  It is not

24  a juror questionnaire that's proposed to be in lieu of voir

25  dire.  It's in addition to voir dire.  I'm comfortable having

1    the veneer panel prepare it that morning; short 10 or 11

2    questions.  None of them really require a great deal of

3    thought or preparation or research or anything like that.  So

4    I'm pretty comfortable with having the veneer panel do it in

5    advance.

6            And I can address the motion to strike the

7    defendant's response at this time because I did not file a

8    reply in this case given the timing of this hearing.

9            THE COURT:  All right.  Go ahead.

10           MR. JACOBSON:  So, Judge, what happened in this case

11   was that we discussed the juror questionnaire during the

12   status conference.  I didn't believe, given that counsel was

13   clear that I was going to be filing a proposed juror

14   questionnaire, that I needed to meet and confer with the

15   defense counsel, with them -- with defense counsel in advance

16   to show them all of my questions.  If I misunderstood the

17   Court's intent regarding the juror questionnaire, it was

18   inadvertent.

19           But the response misapprehends certain things.  If

20   the defense wanted to propose it's own juror questionnaire, it

21   should have filed a motion in limine to do so.  If it disputed

22   some of the questions that I was proposing in my motion in

23   limine, it should have done so in its response.  Instead, what

24   the response does is basically say, well, look, he didn't --

25   he didn't file -- he didn't meet and confer with us so he's in

 1   violation of that rule.

 2         I note a couple of things about that argument.

 3   Rule 8(b)(1)(a) of the Rules of Civil Procedure state that in

 4   responding to a pleading, a party must state in short and

 5   plain terms its defenses to each claim asserted against it.

 6   Further, with very limited exceptions, a party is required to

 7   raise every defense in its first responsive pleading and the

 8   defenses not so raised are deemed waived.  So if the defense

 9   really wanted to complain about the fact that I didn't meet

10   and confer, it had an obligation to raise that in its

11   response.  And having failed to do so, it has now waived that

12   argument.  The defense ignored that claim, ignored that plain

13   rule, and filed its own juror questionnaire which it

14   characterizes as a prototype questionnaire.  I don't know

15   where that language came from.

16         But substantively, Judge, I outlined in my -- I

17   outlined the fact that there were certain -- in my motion to

18   strike, that the way they've characterized certain questions,

19   we don't really have a problem with.  Proposed Questions 3, 4,

20   5, 6, 7, 8, and 10 are just rewording of the proposed juror

21   questionnaire.  That's fine.  I outlined all that in my motion

22   to strike.  But I would ask that we be allowed to prepare a

23   proposed juror questionnaire, that defendant's prototype

24   questionnaire either be stricken or adopted per my motion to

25   strike.

1          THE COURT:  All right.  I'm going to deny the motion

2   to strike because I think it is helpful for me to hear,

3   because this is an issue in dispute, whether to even have a

4   questionnaire.  I think it's helpful to hear from both sides

5   what would be appropriate questions.

6          So let me just hear from Ms. Saavedra, Ms. Waters.

7          MS. WATERS:  Yes, your Honor.

8          The City does not necessarily want a questionnaire;

9   however, we don't oppose there being a questionnaire.  Our

10  position is, though, if there's going to be a questionnaire,

11  it should be one that includes questions that have been agreed

12  to by both sides.  So the reason that we proposed a prototype

13  questionnaire in our response was to be sure that if there's

14  going to be one issued, it includes sensitive inquiries that

15  might be important to us that plaintiff didn't include in her

16  own.

17         Whether we add back in plaintiff's questions or

18  reword some of the questions I think is all up for reasonable

19  discussion.  And I don't think it's beyond the capability of

20  the parties to confer with one another and submit to the Court

21  a jointly proposed questionnaire.  If there are questions that

22  we can't agree to, we can propose that separately for a

23  ruling, but I think for the most part the parties are not --

24  there's not a substantial dispute here.

25         And finally, your Honor, we put it in a

1  questionnaire format mostly for the ease of the Court and, I

2  confess, only because my state court experience has been that

3  judges there prefer that we submit a questionnaire that could

4  actually be used rather than a list of questions.  So if we

5  overstepped by submitting a prototype questionnaire, I

6  certainly apologize to the Court, but it was designed to make

7  it easier to use and provide a format that we can adapt once

8  we agree on the set questions.

9           THE COURT:  Thank you.  What do you think about the

10  little summary of the background of case, Mr. Jacobson?  If

11  we're going to use the questionnaire, should we tell the jury

12  a little bit about it?  It's page 2.  I don't know if you've

13  had a chance to think about that.

14           MR. JACOBSON:  I haven't had a chance, Judge, but I

15  think in our joint pretrial order we had an agreed upon

16  summary of the case.

17           THE COURT:  Okay.  Nature of the action.  I'm trying

18  to get a sense of -- I mean, breastfeeding is very common in

19  our society.  This isn't some strange, bizarre thing that

20  we're asking the panel about.  But do you think that

21  realistically individual jurors are going to be really -- some

22  of them or any of them are going to be really appalled at

23  being asked a question of, If you have children -- If you're a

24  woman, if you have children, did you breastfeed or not?  Is

25  that going to be something that's, like, How dare you ask me

 1   that?  It's none of your business.  What's your sense,

 2   Mr. Jacobson?

 3           To me, I see it both ways.  What's the big deal?

 4   But on the other hand, maybe some people -- I mean, when

 5   you're asking somebody, they're in a very unfamiliar setting,

 6   in a courtroom.  They could feel, perhaps, very uncomfortable.

 7   Obviously that's a very personal, private part of a person's

 8   life.  It's very relevant.  I'm sure both sides want to know

 9   if any individual juror actually breastfed, did not

10   breastfeed.  For example, if a woman didn't breastfeed, maybe

11   she'll feel it's a stigma to not breastfeeding, and I

12   shouldn't have to explain that and that's nobody's business.

13   So I'm just trying to, in my own mind, figure out because I

14   think it's relevant.  I think both sides want to know this

15   information.  And want to know also if male jurors, their

16   thoughts.  If they're married or not and have children, what

17   they think about this.  I think it would be helpful for both

18   sides.

19           So do you think it's something that's just so

20   intrusive that we should have a questionnaire?

21           MR. JACOBSON:  I do, Judge.  And the jury consultant

22   that we have was adamant that we should ask for the proposed

23   jury questionnaire.  The lawyers that I have spoken with that

24   have tried other cases all suggested a juror questionnaire.

25   Because, you know, unfortunately, as much as we want to

```
 1   believe that this is an issue that society has finally just
 2   accepted, it's common, it's cool, everybody has moved on, I
 3   don't think that that is necessarily true of all generations.
 4   And I think there are still some stigmas, some attitudes
 5   around that I want to know about.
 6              THE COURT:  And what about, Ms. Waters, what do you
 7   think?  The average juror, male or female, what do you think
 8   they're going to think about this line of questioning?
 9              MS. WATERS:  I guess my personal opinion is it's the
10   lawyer's job to make the jury comfortable enough with the
11   topic that they answer the questions honestly.
12              THE COURT:  Maybe it's the judge's job.
13              MS. WATERS:  Well, I think providing them the
14   opportunity to have the sidebar helps create the atmosphere
15   where they're comfortable to answer the questions.  So my
16   opinion is it's a necessary part of trying a case, it's a
17   skill, and it's possible to do.
18              And in terms of breastfeeding, it's a sensitive
19   issue but it's not -- it's not up in the realm of sexual
20   assault or any number of other things that we have to ask
21   jurors about.  So is it likely to lead to some measure of
22   awkwardness or people feeling like we're infringing on their
23   personal decisions and life choices, of course; but I can't
24   imagine what we ask them about that doesn't fall into that
25   category.  Which is why we said all along we can go either way
```

1  on the questionnaire.  We don't think it's necessary, but we

2  don't oppose it.

3          THE COURT:  Let me take, for example, I'm looking at

4  No. 5 on the City's perspective:  If you have a baby, did you

5  or your wife choose to use formula rather than breastfeeding.

6  Say they say yes, would you want to know why?

7          MS. WATERS:  I think then we follow up and ask why.

8  So I don't believe the questions in the questionnaire

9  alleviate the Court or the attorneys of the obligation to

10  follow up on these answers because obviously there has to be

11  some follow up.

12          THE COURT:  So we could do that at sidebar?

13          MS. WATERS:  We could.

14          THE COURT:  Okay.  So we talked about expressing

15  breast milk, that issue, breastfeeding.  But then I really

16  think that we could probably handle the other questions about

17  anybody's relationship with the fire department, that I can do

18  in a group setting, if people have any ties to the fire

19  department.  I do that all the time in criminal cases with

20  ties to law enforcement.  We hear all about it.  It doesn't

21  necessarily mean you're automatically excluded if you have

22  friends who are on the fire department or you worked there at

23  some point or worked for another fire department.  It's just

24  something for counsel to know.  And if you want to exercise

25  your peremptory strike against that person if they're

```
1    otherwise fair and impartial, then you can certainly do that.
2    So I'm not inclined to put those kinds of questions in a
3    questionnaire.
4              MR. JACOBSON:  And, Judge --
5              THE COURT:  Yes.
6              MR. JACOBSON:  -- maybe I can even be a little more
7    clear.  I'm not even necessarily married to the concept of it
8    as a questionnaire; I just think these questions need to be
9    asked at some point during voir dire.  I proposed it a juror
10   questionnaire just for efficiency's sake, but I'm not married
11   to the concept of it being proposed as a juror questionnaire
12   that has to be mailed out or -- I just think these questions
13   or some version of them, however they're worded, needs to be
14   asked in this case to identify -- especially there's evidence
15   in this case of a number of comments that were made over
16   social media, comments that were made to the newspaper after
17   an article came out about this case that suggests very
18   strongly that attitude and beliefs about woman pumping in the
19   workplace, breastfeeding in public are still -- we're not
20   there yet.
21             THE COURT:  I was wondering about your question,
22   Mr. Jacobson, Do you ever watch women's tennis or golf on
23   television?
24             MR. JACOBSON:  I asked my juror consultant about
25   that as well, Judge, and he said that there is research on
```

1  this specific question which is why he asked me to ask it

2  specifically, about attitudes about gender and women in

3  general.  And remember, we have a female firefighter, so in

4  this case we have a female who is in a traditional or what is

5  deemed to be a traditional male role.  So the application of

6  gender to sports is direct there.

7         THE COURT:  Okay.  All right.  Well, I'll take this

8  under advisement.  If I decide this is a good idea, then I'll

9  probably direct counsel to attempt to come up with some

10 mutually agreeable questions.  I'm thinking we're going to

11 have a lot of people with children on the panel, so it's not

12 like some of my questions, If you've ever been convicted a

13 crime come on up.  Well, sometimes we have maybe 15 people

14 that have been convicted of DUI, but it's not one of those

15 where we're going to get a very few responses.  We can get a

16 lot of responses on these questions.  And I don't know if -- I

17 think that cuts maybe in favor of having a questionnaire.  It

18 does take more time when you've got to read 65 different

19 things that morning before we forge ahead with voir dire; so

20 whether that's worth the time and energy, I don't know.

21        Were you going to say something, Ms. Waters?

22        MS. WATERS:  I did want to suggest if we're going to

23 do a questionnaire, because of the number of responses

24 involved this might be an instance where it would make sense

25 to mail it out ahead of time so that we could go through the

 1   answers before the jury comes in rather than the lawyers

 2   trying to read through all the questionnaires when we have

 3   people sitting and waiting.

 4          THE COURT:  Right.  Now, what do you think a little

 5   summary would be appropriate, Mr. Jacobson, if we're going to

 6   mail it to them or not?

 7          MR. JACOBSON:  I think that's fine, Judge.  And I

 8   think the proposed -- the language that we have in the joint

 9   pretrial order is perfectly fine.

10          THE COURT:  All right.  So I think I heard

11   adequately, especially with the briefing, from both sides on

12   that issue.

13          So let's go ahead and move to the motions in limine

14   regarding witness testimony.  So we'll start with you,

15   Mr. Jacobson.  Let's see, this is Document 152.  The first

16   is -- I'm sure I'll mispronounce this, Ariane Phaneuf,

17   P-h-a-n-e-u-f.

18          MR. JACOBSON:  Judge, I think now that I've read the

19   City's response to my motion in limine, I understand a little

20   better or I have some clarity as to what Ms. Phaneuf's

21   testimony would be, and I don't have a problem with

22   Ms. Phaneuf testifying.  As long as it stays within the

23   boundaries that the City has articulated, I see the relevance

24   based on the explanation.  I didn't see it in the way it was

25   framed in the previous pleadings, but I understand it now so

1    I'm comfortable with Ms. Phaneuf.

2            THE COURT:  All right.  And anything further that

3    the defense wants to talk about on that issue?

4            MS. SAAVEDRA:  No, your Honor.

5            THE COURT:  All right.  So the minute entry will

6    reflect that plaintiff's motion in limine as to Ms. Phaneuf is

7    withdrawn.

8            And obviously as we go through these, if anything

9    happens during trial that changes some of these issues,

10   certainly let me know.  But don't just assume things.  Come on

11   up to sidebar and say we anticipate this is going to happen or

12   that's going to happen.  Because sometimes things change

13   during trial as to the relevance of certain evidence or

14   admissibility of certain evidence.  So these are preliminary

15   rulings based on what the Court knows and the parties know

16   now.  But obviously trials are very fluid.  Things could

17   change.

18           All right.  So Mr. Jacobson, your next one is Nikki

19   Sprenger, S-p-r-e-n-g-e-r.

20           MR. JACOBSON:  And Judge, Ms. Sprenger and

21   Mr. Vincent sort of dovetail together.

22           THE COURT:  Talk about both of them.

23           MR. JACOBSON:  Judge, they're just not relevant or

24   material to the issues in this case.  Most of what occurred in

25   fire prevention has already been adjudicated in summary

1   judgment.  You've basically said, hey, we did not allege

2   hostile work environment; and even if we did, you found that

3   it would have been a hostile work environment in fire

4   prevention.  Ms. Sprenger and Mr. Vincent are expected to

5   testify to just those issues.  In fact, the City in this case

6   wants its cake and to eat it as well.  They said, well, it

7   wasn't a hostile work environment, but we want to dirty up

8   Ms. Clark with testimony from Ms. Sprenger and Mr. Vincent to

9   say she was disruptive and she was a problem and she was, you

10  know, she -- we didn't get along with her.  Well, that's

11  precisely the issues that you adjudicated to say, well, no

12  way, that's not what applies.  The educational counseling in

13  fire prevention is certainly fair game, but the educational

14  counseling is essentially the boundaries which are set forth

15  in the document it itself.

16          So if the chief gave her an educational counseling

17  based on factors which were not articulated in the document,

18  that's a problem for the government, for the City, so I would

19  say that Ms. Sprenger and Mr. Vincent are only going to kick

20  the door open to issues you have already adjudicated on

21  summary judgment.  And that would be complete patently unfair

22  to the plaintiff and would require me to put on a whole bunch

23  of other witnesses to dispute what Ms. Sprenger and

24  Mr. Vincent are saying.

25          THE COURT:  All right.  Thank you.

1          So let's see, who's going to talk about that.

2          MS. SAAVEDRA:  That's me, your Honor.

3          THE COURT:  Ms. Saavedra.  Go ahead.

4          MS. SAAVEDRA:  Thank you.

5          Perhaps plaintiff misunderstands again the purpose

6   of us calling the witnesses.  The hostile work environment

7   dealt with an earlier environment that Carrie Clark alleged

8   she was subjected to mainly dealing with Captain Langejans and

9   the multiple complaints she had about him and her husband's

10  complaints about him and other employees' complaints about him

11  as a captain.

12          The issues that these witnesses are going to be

13  called about are the issues that occurred in fire prevention

14  much later on, issues that the Court has not disposed of in

15  the motion for summary judgment.  The City understands that

16  plaintiff is claiming that the complaint she filed in March of

17  2016 was the basis for some retaliation that occurred

18  afterwards.  Our understanding is also that the retaliation or

19  the discrimination, because we don't know which yet, was the

20  educational counseling that she received from Ken Brouilette

21  in March of 2016 and her transfer from fire prevention back

22  out to operations in I believe it was April of 2016.  Our

23  understanding is that those are the bases of her

24  discrimination slash retaliation claims in fire prevention

25  that have -- that have survived the summary judgment motions,

 1   in which case that's why these witnesses are relevant.

 2            And Nikki and John Vincent are being called to

 3   discuss a specific incident that occurred.  Just as our

 4   response to the motion in limine set forth, we intend to have

 5   them testify about a specific incident that occurred between

 6   Carrie Clark and Nikki Sprenger which John Vincent was

 7   initially part of and witnessed firsthand.  This incident was

 8   also documented by Carrie Clark herself, and we have

 9   documentation to that effect which we also intend to produce

10   during the trial.  This incident was one of the factors that

11   Chief Critchley specifically testified to in his deposition as

12   part of the basis he wanted -- as part of the basis for him

13   deciding to transfer Carrie Clark back out to operations in

14   April of 2016.

15            THE COURT:  What was the date of the incident?

16            MS. SAAVEDRA:  March 11th, 2016, is my

17   recollection --

18            THE COURT:  Okay.

19            MS. SAAVEDRA:  -- of the incident date.

20            THE COURT:  All right.  Do you need both to bring

21   this out to the jury?  You need both these people,

22   Ms. Sprenger and Mr. Vincent?

23            MS. SAAVEDRA:  Yes, your Honor, because it puts the

24   incident in context.  It first began with a discussion between

25   Carrie Clark and John Vincent, a discussion of Carrie Clark

1  criticizing Nikki's work to John Vincent.  Nikki overhearing

2  it; Nikki then becoming a part of that conversation; and then

3  additional comments that Carrie Clark made to Nikki which John

4  witnessed.  So it's corroborates Nikki's side of the story.

5        Because there are going to be two versions of the

6  story, and the jury needs to determine who is more credible.

7  And John Vincent's testimony is not going to be based upon

8  hearsay; it's going to be based upon firsthand observations

9  that he made.  And again, a lot of this case, your Honor, is

10  going to come down to who does the jury believe.  And both

11  witnesses are necessary in order for the City to establish

12  that this was -- this incident was, in fact, one of the

13  reasons Chief Critchley transferred her back out to operations

14  in addition to other reasons that the jury is going to hear.

15        THE COURT:  All right.  I'm going to go ahead and

16  overrule that motion in limine and allow Ms. Sprenger and

17  Mr. Vincent to testify regarding the March 11th, 2016,

18  incident.  I don't think it's going to take too much time.  I

19  don't think we're going to have a mini-trial on something

20  that's not really relevant and appears to me to be relevant

21  testimony for the defense to present.

22        MR. JACOBSON:  Judge, may be given leave to depose

23  Mr. Vincent?  Because he was not listed in any witness

24  statement, he's nowhere to be found, so I didn't have notice

25  that Mr. Vincent was going to be called as a witness.

 1            THE COURT:  Oh, okay.  Well, you listed him.

 2            MR. JACOBSON:  What?

 3            THE COURT:  You listed him.

 4            MR. JACOBSON:  I understand, but not for this

 5   purpose.  Well --

 6            THE COURT:  Let's see, you listed him as a lay

 7   witness in your third supplemental disclosure.

 8            MR. JACOBSON:  For the Langejans stuff.

 9            THE COURT:  Okay.

10            MR. JACOBSON:  Not for this.

11            THE COURT:  Okay.  So do you think you need to talk

12   to him?

13            MR. JACOBSON:  I would like to.  I have no idea what

14   he's going to say.

15            THE COURT:  All right.  Is there any objection to

16   that short deposition of Mr. Vincent?

17            MR. JACOBSON:  Yeah, it's going to be very short,

18   Judge.

19            MS. SAAVEDRA:  No, your Honor.  We don't object to

20   that.

21            THE COURT:  Okay.  All right.  Then the minute entry

22   will reflect that Mr. Jacobson may speak to Mr. Vincent

23   through deposition about his proposed testimony in this case.

24            Okay.  So then we have Ken Brouilette,

25   B-r-o-u-i-l-e-t-t-e.  Do you --

1          MR. JACOBSON:  Nothing in addition to what I've

2     argued, Judge.

3          THE COURT:  Okay.

4          MR. JACOBSON:  That was more along the lines of

5     making sure that Mr. Brouilette's testimony is consistent with

6     the tone and spirit and rulings in the summary judgment order.

7     So it's just limiting, hey, let's keep it to what we're

8     arguing in this case.

9          THE COURT:  All right.  So does the defense want to

10    be heard about that issue?

11         MS. SAAVEDRA:  No, your Honor.

12         THE COURT:  Okay.  So Mr. Brouilette may testify

13    consistent with the Court's order regarding the remaining

14    claims here.

15         Wayne Peate.  Dr. Peate, P-e-a-t-e.

16         MR. JACOBSON:  I don't think there's any issue as to

17    what -- he's listed as a custodian of record, but I don't

18    think there's any issue -- we don't intend on raising any

19    foundational issues or anything like that at this point.

20         THE COURT:  Okay.

21         MR. JACOBSON:  Ms. Lundell can testify to the

22    documents.  To the extent that Dr. Peate treated Ms. Clark for

23    any issues related to this case, I don't have a problem with

24    him testifying to that.  But if he's going to express any

25    expert testimony or any opinion about Ms. Clark's conditions,

1  I do have a problem with that.

2          THE COURT:  All right.  So what about that,

3  Ms. Saavedra?

4          MS. SAAVEDRA:  Your Honor, I think there were

5  multiple witnesses in the motion in limine that he brought up.

6  The rule applies only to experts, and none of these witnesses

7  were listed as expert witnesses so that rule doesn't apply.

8  So I don't know why he would believe that we were going to

9  call them to testify as experts in this case.  We've never

10 intended nor disclosed them as experts.

11         THE COURT:  Okay.  So he's just going to talk about

12 as a custodian of records?

13         MS. SAAVEDRA:  If needed, your Honor.  The motion in

14 limine, when we were told it was going to be filed, I think we

15 were pretty up front why we listed him as a witness.  So

16 again, my response is his moot because we only intend to call

17 him as a custodian of record if needed.

18         THE COURT:  And hopefully counsel can work that out,

19 and we don't need custodians of record coming into court.

20 Right?

21         MR. JACOBSON:  I'm not aware of any issues with any

22 foundational -- with any documents as to foundation or

23 anything, Judge.  That would be a surprise.

24         MS. SAAVEDRA:  Well, I won't agree to that at this

25 moment, your Honor.

1              THE COURT:  Of course.

2              MS. SAAVEDRA:  But I think as far as custodians of

3    record go, I think we will be able to agree to that.

4              THE COURT:  Okay.  Obviously, stipulations on

5    undisputed matters are encouraged by the Court to save time.

6    And as a judge, I'm sure you all know this, I'm very

7    sympathetic to the jury and them sitting here for two weeks.

8    So the more you can do to marry your case down to what they

9    need to hear and decide, that would be greatly encouraged.  So

10   I'm going to deny the motion in limine to Dr. Peate as moot

11   given the fact that he's only a fact witness to talk about the

12   records from the office.

13             And then you have a footnote with all these other

14   folks.  You're just asking -- I'm looking at the bottom

15   of page 8 of your motion in limine, defendant also includes

16   this catch-all phrase to its narrative for the following

17   witnesses.

18             MR. JACOBSON:  Yeah, that actually relates to

19   Mr. Brouilette's testimony, Judge.

20             THE COURT:  Okay.

21             MR. JACOBSON:  But it's basically, you know, if

22   they're going to disclose the nature and subject of testimony

23   and then deviate from that, I'm going to object to that at

24   trial.

25             THE COURT:  Okay.  All right.  And then we have Jeff

1    Langejans, L-a-n-g-e-j-a-n-s.  This again is a cite to the

2    expert witness disclosure requirement.  He's not an expert

3    witness so given the defense response, I'll go ahead and deny

4    that motion as moot.

5              And then we have the juror questionnaire.  I think

6    that's it for your motion in limine.

7              MR. JACOBSON:  Yes, Judge.  Most of the other things

8    we were able to come to -- mostly other anticipated motions in

9    limine we were able to come to agreement on and that was the

10   stipulation filed, Doc 153.

11             THE COURT:  Okay.  Great.

12             Now, defense motion in limine, the first one is lack

13   of a specific policy for expressing milk at work.  So let me

14   hear from either Ms. Waters or Ms. Saavedra on that issue.

15             MS. SAAVEDRA:  Thank you, your Honor.

16             It's undisputed that the City did not have a

17   specific policy or procedure that addressed nursing mothers

18   prior to July of 2013 after it was brought to the City's

19   attention that they needed to have something to that effect or

20   they decided they wanted to have something to that effect.

21             However, the federal law doesn't require that a

22   policy or a procedure be in place.  And during the dispositive

23   motions in the matter, plaintiff kind of inferred that the

24   fact the City didn't have this policy and procedure somehow

25   meant they were not within the legal requirements of federal

1   law or they were legally required to have a policy.  And that

2   is just going mis- -- it's just going to mislead the jury.

3   It's going to confuse the jury as to what is required under

4   the law.  And that's exactly why we filed this motion in

5   limine, is to make sure that the jury isn't given that

6   argument or testimony to that effect is not brought out during

7   the trial.

8          I believe plaintiff conceded to that in their

9   response, but they went on to provide the Court with the

10  additional arguments as to what they plan to do with the fact

11  that the City didn't have the policy or this procedure in

12  place.  And I do want to address those arguments, your Honor,

13  and make a record that we do seek to preclude those arguments

14  as well.  And we would have filed a motion in limine to do so

15  had we known that plaintiff intended to make these arguments

16  to the jury.

17         The plaintiff says that this is evidence of

18  discrimination in this case.  But that's the not case.  The

19  plaintiff relies upon various cases, three cases, that are

20  completely distinguishable from our case.  In these three

21  cases you're dealing with airlines, airlines that had an

22  internal policy that was alleged to have been in violation of

23  the Age Discrimination Employment Act.  The plaintiffs in

24  those cases were raising issues as to that specific policy and

25  how it applied to them as far as them bidding down to a lower

1  position so that they could remain with the company past the

2  age of 60, because under federal law they had to retire at the

3  age of 60 as pilots.  As you can see, completely

4  distinguishable from our case.

5         There's no allegation in this case that Carrie Clark

6  was discriminated against because of a policy in place at the

7  time.  The policy that plaintiff brings up in the motion in

8  limine -- or, response to the motion in limine was actually

9  pulled because the TFD HR manager realized that it was not in

10 compliance with the law.  That policy was never disclosed

11 during litigation of this case because it's not relevant.

12         THE COURT:  This is the pregnancy --

13         MS. SAAVEDRA:  Yeah, we had a pregnancy policy that

14 was clearly not in compliance with the current law.  The

15 TPD -- TFD, sorry, the TFD HR manager pulled it.  It didn't

16 apply to Carrie.  It never applied to her.  There's no

17 allegation it applied to her.  So the fact that there was this

18 policy prior to her coming back with her child and then there

19 wasn't a policy is not evidence of discrimination in this

20 case, nor has there ever been an allegation that she was

21 discriminated against because of a policy that was in place.

22 So I just wanted to make sure that that argument is also

23 precluded in this trial because there's just no evidence and

24 legally no factual basis for that.

25         THE COURT:  All right.  Mr. Jacobson.

1            MR. JACOBSON:  Judge, we never intended to argue

2    that the City was required legally to have a policy.  That

3    was --

4            THE COURT:  What are they required to do legally?

5            MR. JACOBSON:  Well, they're required to follow the

6    law, and the absence of a policy is evidence of

7    discrimination.  And the law is very clear on that, Judge.

8    You can try to distinguish it all day of the week, every day.

9            THE COURT:  Are you going to ask for a jury

10   instruction about that if it's so clear?

11           MR. JACOBSON:  I am looking into jury instructions,

12   Judge.  Those are due on March 1st.

13           THE COURT:  Okay.  I'm just -- so as long as you

14   adequately --

15           MR. JACOBSON:  But the absence of a policy, TFD is a

16   policy-driven organization.  Everything is in a policy.  The

17   manuals --

18           THE COURT:  Pages and pages.

19           MR. JACOBSON:  It is stacks and stacks and stacks as

20   a chain-of-command, paramilitary-type organization.  And I

21   expect that the City is going to make a number of arguments

22   using both policy as sword and shield.  So I think I should be

23   allowed to ask, well, there was no policy was there?  You're

24   aware of the law.  What's the policy here?  What should

25   Ms. Clark have done that she didn't do?  What was her path to

1   getting relief?  I think those questions are very fair game.

2            THE COURT:  So the City agrees there was no written

3   policy?  Nothing written down about -- for individual

4   employees to figure out what to do or for the employer to

5   figure out what to do in the situations; is that right?  There

6   was nothing written down.

7            MS. SAAVEDRA:  As far as a nursing mother?

8            THE COURT:  Right.

9            MS. SAAVEDRA:  That's correct.  Obviously, we have

10   policies for someone that wants to request accommodations at

11   work, who wants to request a certain duty, who wants to

12   request leave, we have those types of policies, yes.  But

13   there's not one that specifically addresses just a nursing

14   mother.

15            THE COURT:  So do you have an objection to the jury

16   finding that out?

17            MS. SAAVEDRA:  Your Honor, we don't have an

18   objection to that fact coming out.  What we have an objection

19   to is plaintiff arguing to the jury or inferring to the jury

20   that somehow we were legally required to have a policy or the

21   lack of a policy was the basis of her sex discrimination claim

22   because there's no evidence of that.

23            MR. JACOBSON:  I think that's fair argument, Judge.

24   There's nothing -- in fact, the case law says it's fair

25   argument.

1          THE COURT:  Okay.  Let me take that under advisement

2     and take a look at that issue.  So the fact that there is not

3     a policy, that could certainly come out as a fact.  And I'll

4     think about the how the parties can then react to that fact

5     and argue it.  So that's the motion in limine -- this is

6     Document 147, by the way, for the defense

7          Now, you wouldn't want to bring out the fact,

8     Mr. Jacobson, that the pregnancy policy was withdrawn, would

9     you?  That's kind of far afield, isn't it, from your case?

10         MR. JACOBSON:  Well, Judge, I don't know.  It

11    certainly goes to the knowledge of the law.  Because if

12    Ms. Acosta Acedo is going to say that we follow the law, I

13    certainly want to be able to say that she had the ability to

14    pull policies that are relevant, propose policies that are

15    relevant, she could identify policies that were legal and not

16    legal.  And this is, I think, directly on point for that.  I

17    agree that the pregnancy policy itself may not have helped

18    Ms. Clark in this case, but I think it's relevant to show

19    other matters.

20         THE COURT:  So is Ms. Acedo Acosta going to be a

21    witness?  HR manager.

22         MR. JACOBSON:  Yes.

23         THE COURT:  Okay.  All right.  I'll think about

24    that.  Again, that's kind of related to how the Court is going

25    to allow both sides to talk about the lack of a policy.

1           Then the second one, Carrie Clark's testimony

2    pertaining to preferential station assignment because of her

3    lactating status.

4           MS. SAAVEDRA:  Your Honor, we filed this -- first we

5    asked counsel if he would agree to it and he wouldn't.  We

6    filed it because it's clear in the summary judgment order and

7    it's clear under the law that she's not entitled to

8    preferential treatment or entitled to choose what station she

9    gets to go to just because she was a lactating mother, and

10   obviously we don't want the jury to hear any sort of inference

11   or argument to that effect.  I think he conceded to that so I

12   think it should be granted.

13          THE COURT:  All right.  Mr. Jacobson.

14          MR. JACOBSON:  Judge, we strongly disagree with that

15   characterization in the first place.  We wouldn't argue that

16   Carrie was entitled to some sort of preferential treatment.

17   That's exactly the attitude that the City had all this time;

18   that she's not entitled to any preferential treatment, which

19   is the nature of the case in the first place.  They refused to

20   find her an accommodation whatsoever to address it because, as

21   I argue in my response, most of TFD stations were not

22   compliant with federal law for lactating mothers and because

23   there was no policy or procedure for how to manage the needs

24   of lactating employees.  So this is not about preferential

25   treatment.  We don't intend on arguing that Carrie was

1    entitled to some sort of preferential treatment.  She was

2    entitled to what she's entitled to under the law; that's not

3    preferential.  That's their characterization.

4          THE COURT:  All right.  I'm going to overrule that

5    motion in limine in the sense that I will allow plaintiff to

6    talk about her requests to be assigned to particular stations

7    and why.  The use of the word "preferential," I don't get the

8    sense plaintiff is going to use that word, but just in order

9    to comply with the law that she was requesting to be moved to

10   different locations.

11         So I'll deny that motion in limine.  That's No. 2.

12   So plaintiff can't offer testimony on this issue.

13         3.  Francis Kunz, K-u-n-z, her experience as

14   Carrie's mother and her experiences with Carrie's two sons.

15   So go ahead.  Yes, Ms. Saavedra.

16         MS. SAAVEDRA:  Your Honor, we understand that she

17   was also listed to testify about damages that Ms. Clark -- or,

18   Mrs. Clark allegedly suffered as a result of the incident, and

19   we didn't object to that.

20         Our motion in limine specifically addressed this

21   witness coming in and testifying to the jury about being a

22   mother in general or being a mother to Carrie or to testify

23   about her personal experiences with Carrie Clark's children

24   because they're just not relevant to the issues in this case.

25   It's a waste of time.  It will confuse the jury as to what the

1  relevancy -- what the issues are in this case.  I don't

2  believe plaintiff's response even addressed our argument.  All

3  plaintiff argued was she was a damage witness and she should

4  be able to come in and speak to the emotional damage in this

5  case.  And we've never objected to that.  I don't know how to

6  respond without knowing what plaintiff's position is on what

7  we actually filed.

8          THE COURT:  All right.  We're waiting to hear from

9  you, Mr. Jacobson.

10          MR. JACOBSON:  Hey, Judge, what happened with Carrie

11  and what happened with her mom, they have long -- the City has

12  long argued that the only reason that Carrie wanted certain

13  station assignments was to make it more convenient for her

14  mother.  So if they're going to argue that and then seek to

15  exclude Ms. Kunz as a witness because it's not relevant is

16  disingenuous.

17          THE COURT:  Is the City going to argue that?

18          MS. SAAVEDRA:  Your Honor, there's evidence that

19  Carrie Clark said that so it's going to come out in evidence.

20          THE COURT:  So you want to bring out that that was

21  the reason.  Okay.  So then why wouldn't --

22          MR. JACOBSON:  Why wouldn't Ms. Kunz be relevant?

23          THE COURT:  So you agree that Ms. Kunz can at least

24  talk about those facts.

25          MS. SAAVEDRA:  Well, your Honor, he's saying -- if

 1   plaintiff counsel is saying he's going to call Ms. Kunz to

 2   rebut that Carrie requested the station to be closer to her

 3   mom, then obviously we don't object to that.  But that's not

 4   what he's saying he's going to call her for.

 5            THE COURT:  So your client asked for the station to

 6   be closer to her mother or is that an issue in dispute?

 7            MR. JACOBSON:  That is somewhat of an issue in

 8   dispute, Judge.  The entire experience, right -- so you have

 9   to put this argument in context.

10            Ms. Clark was trying to express fresh milk for her

11   son.  She was having a hard time doing so.  The stress of the

12   way she was being treated by TFD was affecting her.  All of it

13   comes into play.  Her son's health as it relates to the fact

14   that she couldn't properly -- express the proper volume at the

15   time, why she was having all these struggles emotionally with

16   not having any certainty as to where as she was going to work,

17   the effect it had on her son and her mother, in fact, because,

18   you know, you've got to put a sick, screaming baby into a car

19   seat who's hungry and drive to God knows where, what ends of

20   the earth in the City, all of that is relevant.  I mean, if

21   they're going to make her mother an issue in this case, I

22   think I'm entitled to tell the entire story.  And they want to

23   limit it because they know that that has -- that is going to

24   affect the damages in this case.

25            THE COURT:  Well, let's see how this comes out at

1  trial.  I'll go ahead and take the expansiveness or lack
2  thereof of the testimony of Ms. Kunz, I'll take that under
3  advisement.  I just want to see how the case develops.
4  Certainly she can testify as to damages and what she observed
5  regarding Ms. Clark, but whether I'm going to allow her to
6  talk about and given opinions as to the request to be at
7  particular stations for particular reasons, I'll go ahead and
8  take that under advisement.

9          So Mr. Jacobson, do you have an expert witness who
10 is going to link the health of the child with the inability to
11 accommodate your client?

12         MR. JACOBSON:  The doctor who treated Austin Clark
13 is listed as a witness, and my client who is an RN is going to
14 testify about her experience and her knowledge.  I'm not
15 offering it as expert testimony, just as to her experience and
16 her knowledge; as well as the doctor as to what he did, how he
17 treated, what his diagnosis and impressions were.

18         THE COURT:  So he is going to opine that there was a
19 link between the child's health and Ms. Clark's difficulty in
20 having a place to properly --

21         MR. JACOBSON:  Oh, I think that's clear from the
22 record.  I don't know that that's -- I mean --

23         THE COURT:  That's an expert, right?  That's
24 something outside the normal province of the jury.  I don't
25 know if this is an issue or not.

1          MR. JACOBSON:  I don't think he's a treating

2    physician, Judge, so I don't see it as him offering expert

3    testimony about in general things.  I mean, he's going to talk

4    about this specific instance, his knowledge.  I'm not treating

5    it as expert testimony.  I didn't think of it as expert

6    testimony.  We had discussed the lactation expert who would

7    have testified differently, but that was withdrawn.

8          THE COURT:  Okay.  So he's a fact witness?

9          MR. JACOBSON:  He's a fact witness.

10          THE COURT:  Defense agree with that?

11          MS. SAAVEDRA:  Your Honor, I would like to address

12    Austin's doctor.  It's actually --

13          THE COURT:  It's coming up.

14          MS. SAAVEDRA:  It's coming up.  If Mr. Jacobson

15    wants to argue it now, the City would like to respond to that

16    argument.

17          THE COURT:  I think I brought it up.  Let's wait

18    till we get there.

19          MS. SAAVEDRA:  Okay.

20          THE COURT:  So the next one, Carrie Clark's

21    testimony about other employee's assignments or the alleged

22    reason for the assignments.

23          MS. SAAVEDRA:  Yes.  So Carrie has testified in her

24    deposition that she knew about one person, Brad DeCastro, and

25    that came up when she was being asked whether or not

1    Chief Nied advised her that, You're not allowed to swap

2    positions.  And during her deposition her response to that

3    question was that she brought up Brad DeCastro and this DUI he

4    allegedly had as a reference to Chief Nied.

5         Now, no other questions in regards to Brad DeCastro

6    or any of these other people that have been listed to testify

7    about their alleged criminal arrests or investigations or

8    alleged convictions, none of the specifics about that came up

9    during her deposition.  The City did not ask her any questions

10   about that, and her counsel never asked her any questions

11   about that, and we most certainly would have objected based on

12   foundation if he had done so.

13        So I want to address first his argument that he

14   thinks we -- that plaintiff counsel believes we waived our

15   objection.  We did not.  First of all, he references a rule

16   that, again, doesn't apply.  He references a rule that deals

17   with waiver of notices of depositions, then he cites some

18   other cases that deal with the appropriate rule, which is

19   Rule 32(d)(3)(A).  But if you read those cases, they're

20   distinguishable from what happened here because, again, she

21   wasn't questioned about the specifics in her deposition; there

22   was no waiver of those objections to be brought up at trial.

23   So I don't think that that was a good argument on plaintiff's

24   part as far as allowing her to move forward.

25        The City has provided you with proof, your Honor,

```
 1    based upon her own statements to Marty Macias that she has no
 2    personal knowledge about Brad DeCastro or any of these other
 3    witnesses that she intends to call at trial to establish that
 4    they had some sort of criminal arrest or criminal
 5    investigation or convictions or that this somehow affected
 6    their assignments at TFD.  We have no idea -- and that goes
 7    into another motion in limine.  We have no idea who made the
 8    decision where they were going to be assigned, we have no idea
 9    where they were initially assigned.
10             This motion in limine specifically addressed Carrie
11    Clark's ability to testify to things because they are hearsay
12    and they are based upon her speculation, things that she heard
13    from other people, not based on firsthand knowledge, not a
14    statement against interest under the rule like plaintiff's
15    counsel would like you to believe.  There's no evidence that
16    these individuals ever made a statement to Mrs. Clark about
17    any of these factual situations.  So that rule doesn't even
18    apply.  She can't even establish any of the criteria under
19    that rule.
20             THE COURT:  How many people are we talking about?
21             MS. SAAVEDRA:  There are three.
22             THE COURT:  Three.  Okay.  Well, let me --
23             MS. SAAVEDRA:  Would you like to know their names?
24             THE COURT:  No, that's okay.
25             You agree your client can talk about that.  That
```

```
 1   would be all hearsay, what she heard as to what happened to
 2   other people.
 3          MR. JACOBSON:  Well, technically, I believe so.
 4   Now, Judge, I want to point out a couple of things.
 5          She cites to a statement that Ms. Clark gave to
 6   Marty Macias in 2013.  At the time she gave the statement to
 7   Marty Macias that was accurate.  That was five years ago.  The
 8   arguments that this is hearsay from stuff that she heard in
 9   other places is incomplete at best because the City knows that
10   it has a telestaff system that records and time stamps every
11   move and the reasons why for those moves.  So in other
12   words --
13          THE COURT:  How is it relevant?  Are we going to get
14   into the little mini-trial about three guys' DUI allegations?
15          MR. JACOBSON:  I'm not interested -- I'm not
16   interested in whether or not he actually committed DUI.  I'm
17   interested in the fact that you had male employees who were --
18   who had -- I'm searching for it -- disabilities, for lack of a
19   better term, related to their employment that were
20   accommodated by the employer for stuff that was allegedly
21   pretty serious, right?  If it's a DUI, they're accommodating
22   him because he can't drive a vehicle without a -- without an
23   ignition interlock device.  So they're treating males who
24   have, for lack of a better term, disabilities related that
25   affect their employment, they're accommodating them.  They're
```

```
 1   going out of their way, they're making exceptions to the rules
 2   of assignment to the policies that they cite as a sword and a
 3   shield.  But when it came time to putting Carrie at a station
 4   that had a locking door on it or had privacy, all hell breaks
 5   loose.
 6            THE COURT:  Well, was it during the same period of
 7   time?
 8            MR. JACOBSON:  Yeah.
 9            THE COURT:  And we're talking about three people?
10            MR. JACOBSON:  Yeah.
11            THE COURT:  Who have been subpoenaed for trial?
12        (Attorney-client discussion.)
13            MR. JACOBSON:  I apologize, Judge.  My client tells
14   me Mr. DeCastro was at the same time.  The other two gentleman
15   were before Ms. Clark's situation.
16            THE COURT:  So you're just proposing that
17   Mr. DeCastro's -- what happened to him would be relevant in
18   this case?
19            MR. JACOBSON:  Well, I would say all three of them
20   are relevant.  The fact that these other two occurred before
21   Carrie's situation doesn't obviate the facts underlying the
22   accommodations that the City made.
23            THE COURT:  How many people at the fire department?
24   How many employees are we talking?
25            MR. JACOBSON:  It's under 700, Judge.
```

```
 1            THE COURT:  I can imagine there's all sorts of,
 2   well, things going on in the personnel arena.  Things --
 3            MR. JACOBSON:  And again, I'm not interested in
 4   adjudicating whether or not he did or did not do what he was
 5   accused of doing.  It's not an alleged DUI, it was a DUI, so
 6   I'm not interested in that.  I'm interested in the
 7   accommodation argument to say the City can choose and did, in
 8   fact, choose to accommodate three males who had these issues
 9   that were related to their employment.  But when it came time
10   to accommodating a woman who was expressing breast milk, it
11   was chaos.
12            THE COURT:  All right.  Well, I'm going to, on just
13   the limited issue of whether Ms. Clark can testify about that,
14   I will grant that motion in limine because that appears to be
15   based on hearsay.  But it appears to me it's relevant how
16   other people with obviously different issues from Ms. Clark,
17   but other people that asked for accommodations, how they were
18   treated by the fire department.  I'll allow some limited, you
19   talked about three at the most --
20            MR. JACOBSON:  Yes, your Honor.
21            THE COURT:  -- people.  So I'll allow some limited
22   inquiry.  But obviously you have to follow the Rules of
23   Evidence.  You can't --
24            MR. JACOBSON:  And, Judge, what I would ask is if I
25   could allow Ms. Clark to try to establish foundation.  If I
```

```
 1  can't establish foundation, I can't establish foundation.
 2  That's true of any issue.
 3              THE COURT:  And I guess you can do that outside the
 4  presence of the jury.
 5              Yes, Ms. Saavedra.
 6              MS. SAAVEDRA:  Your Honor, I wanted to address the
 7  three witnesses themselves before you make a ruling on that.
 8  That's part of another motion in limine that we haven't
 9  addressed yet.
10              THE COURT:  Okay.
11              MS. SAAVEDRA:  I was just addressing Carrie
12  testifying to these things that are hearsay.
13              THE COURT:  Okay.  That's testimony from other
14  employees' alleged crimes or involvement with the judicial
15  system and the alleged effect on their work assignments.  So
16  do you want to talk about that now since it's so tied in?
17              MS. SAAVEDRA:  Sure, your Honor.
18              THE COURT:  So these are the three people, the same
19  three people -- I already forgot the name.  Mr. Brad DeCastro
20  and two other people that apparently had issues with drinking
21  and driving and were somehow accommodated by the fire
22  department.  Go ahead.
23              MS. SAAVEDRA:  I don't know, your Honor.  Part of my
24  motion in limine is the fact that none of these facts or
25  circumstances have been disclosed in this case.  There's one
```

1    thing I did not raise in my motion in limine because I didn't
2    realize it until preparing for today's argument, is that
3    another basis to preclude these witnesses would be late
4    disclosure.

5              If you recall, plaintiff moved to amend their
6    complaint and file a third amended complaint.  I believe it
7    was in February of 2017.  The Court granted leave to amend and
8    plaintiff filed her third amended complaint in March of 2017.
9    At that time, your Honor issued an order which extended the
10   discovery deadline for those new claims that arose in the
11   third amended complaint.  Well, according to plaintiff, these
12   three witnesses have always related to her initial complaint
13   where she alleged she was discriminated against or retaliated
14   against because of her denial of the assignment to Station 12.
15   So they were not disclosed until this extended deadline of
16   June 30th, 2017, so there was late disclosure of those
17   witnesses.

18             THE COURT:  So they were specifically listed,
19   though?

20             MS. SAAVEDRA:  No, your Honor, they were not listed
21   as witnesses until June 30th of 2015.

22             MR. JACOBSON:  So they were.  The answer is yes,
23   Judge.  They were disclosed.

24             MS. SAAVEDRA:  If you could show me which
25   disclosure.  I have a copy of the disclosure they were

1    disclosed in with me if you'd like to see one.

2             MR. JACOBSON:  In 2015 they were disclosed.

3             MS. SAAVEDRA:  No, your Honor.  If you would like to

4    provide proof of that --

5             THE COURT:  Luckily, the docket is not cluttered

6    with all the disclosure that takes place between the parties.

7             MS. SAAVEDRA:  I did print out a copy of the

8    relevant disclosure where they were disclosed.

9             THE COURT:  So it's the City's position that the

10   names of these people and what their proposed testimony is has

11   never been disclosed, either initially when the case was filed

12   or after the third amended complaint.

13            MS. SAAVEDRA:  No, they were disclosed after the

14   third amended complaint --

15            THE COURT:  Oh, okay.

16            MS. SAAVEDRA:  -- was filed on the discovery

17   deadline that your Honor extended for the new claims.  So

18   technically it was late disclosure for those witnesses.

19            Their names did come up during the summary judgment

20   motions, and plaintiff used her own hearsay and speculative

21   testimony about them as facts in her personal -- in her

22   cross-motion for summary judgment and her response to our

23   motion for summary judgment.  But their names and testimony

24   were not listed until June 30th of 2017.  I just want to make

25   a record of that, your Honor, because I did not raise that in

1     my motion in limine.

2               THE COURT:  And what happened after they were listed

3     by Mr. Jacobson?  Did you say, We need to talk to these

4     people.  Who are these people?

5               MS. SAAVEDRA:  We did not say that, your Honor.  Nor

6     did Mr. Jacobson disclose any information in regards to those

7     people.

8               THE COURT:  So these three names were just listed in

9     June of 2017, but not a summary of what their anticipated

10    testimony was or anything like that.

11              MS. SAAVEDRA:  Well, a general summary, your Honor.

12    And I did bring it because I want to read to you the general

13    disclosure --

14              THE COURT:  Okay.

15              MS. SAAVEDRA:  -- of what they were going to testify

16    about.

17              MR. JACOBSON:  Judge, I'm really -- I know you may

18    be interested in this, but, you know, Judge, this argument was

19    waived because they did not raise it in their motions in

20    limine.  And the law is very clear.  This is the kind of --

21    this is the kind of -- I'm not going to say it.  If you had an

22    argument about it, you argue it.  Don't come at me with this

23    when I haven't had an opportunity to prepare, to review any of

24    the documents to rebut these arguments, when I don't have my

25    documents with me.  It's kind of, sneak attack is really

1  unnecessary, Judge, and unfair and I'm objecting for the

2  record.

3      THE COURT:  All right.  I'll go ahead and hear it,

4  though.

5      Go ahead.  Do you want to read the summary?

6      MS. SAAVEDRA:  Yes, your Honor.  I'm moving on from

7  the fact that I raised they're late disclosed.  I believe

8  that's what he's addressing with your Honor.  I'm moving on

9  from that.  I'm moving on to the basis for the motion in

10  limine that I did address with the Court.

11      THE COURT:  Okay.  Go ahead.

12      MS. SAAVEDRA:  So these witnesses were disclosed in

13  very general terms.  I don't know how to say his first name,

14  but Mr. Camarena was disclosed to be expected to testify to

15  his experience at work after being convicted of driving under

16  the influence, his assignments, and any administrative action

17  that was taken as a result.  So there was that very general

18  disclosure, but nothing, no facts to support this have ever

19  been disclosed.

20      So the City -- and plaintiff argues that because

21  we're the City and these are our City employees, we should

22  have all the information so he doesn't have to disclose it.

23  But your Honor, I think the Federal Rules of Civil Procedure,

24  the disclosure rule, the spirit of that rule is to make sure

25  that parties don't walk into trial and be ambushed by

 1   information they weren't provided during disclosure.  If

 2   plaintiff wanted to use these underlying facts and

 3   circumstances to prove her case, she should have disclosed

 4   them in the disclosure in the almost five years of litigation

 5   of this case.  We have no idea whether or not the fact that

 6   they were -- other than Brad DeCastro, there was a disclosure

 7   of his DUI report, but nothing with regards to what happened

 8   with that.

 9          Other than that, there's been no disclosure of what

10   the criminal investigations entailed, what they were arrested

11   for, what the conviction was, how that was communicated to the

12   fire department or the City, what actions the City took, what

13   the TFD administration took.  We have no idea where they were

14   originally assigned or where they were assigned later on or

15   the reason for the assignment.  There's been no evidence that

16   these witnesses requested -- and I want to go back,

17   your Honor, to the burden of plaintiff under a sex

18   discrimination claim.

19          They have to present evidence to the jury to show

20   the jury that these people were similarly situated and that

21   they were treated more favorably than plaintiff.  Well, they

22   don't have the evidence to present to the jury other than,

23   yeah, they had a DUI and they were moved to the station.

24   There's no evidence as to why that decision was made.  There's

25   no evidence to show that connection that they requested this.

Her whole claim is based upon the fact that she requested a specific station and/or requested to be swapped with Jeff Todd so she could work at Station 12 and TFD denied her that.  To show they're similarly situated she has to prove not only factually the circumstances similar, which I don't know why we're comparing DUIs and other criminal convictions to a lactating mother, the argument was that it's their ability to work, but there's not even evidence this has affected their ability to work.  That hasn't come in during the litigation of the case.

But moving back to her being able to prove they were treated more favorably, she has to present evidence to the jury that they requested a specific station and was denied that station or they requested to be swapped with a person and they were denied that request.  There's no evidence of that in this case.  None.  And that's exactly why we're moving to preclude these witnesses, because there's been no evidence disclosed to support what Mr. Jacobson is saying they're going to come and testify about.

THE COURT:  So Mr. Jacobson, for example, never deposed some personnel person or asked them about the three employees and what happened to them and why were they treated this way or that way?

MS. SAAVEDRA:  No, your Honor.

THE COURT:  Okay.  All right.  Mr. Jacobson.

1           MR. JACOBSON:  Judge, we did ask Mr. Fischback who

2    was an assistant chief, I believe, at the time that we deposed

3    him about how the department handles DUIs in cases like this.

4    It's exactly this kind of, Do as I say not as I do, that

5    drives me crazy in this case.  They say don't ambush us, but

6    they ambush us when it comes to Mr. Vincent's testimony and

7    the City ambushes us when it comes to late disclosure

8    argument.  In fact, the disclosure rules are about notice.

9    They were on notice precisely what -- they knew exactly what I

10   was arguing.

11          Mr. DeCastro was on a swing shift just like Carrie

12   was.  Mr. DeCastro got a DUI for which there is no policy, yet

13   they accommodated him.  They put him, a male, in a position --

14   in a long-term assignment to accommodate his condition.  When

15   it came to Carrie they didn't do that.  So this argument about

16   we didn't disclose the DUI, it's not about the DUI.  It's

17   about what they did with it.  So why would I need to ask him

18   anything about -- asking him anything about his DUI is

19   collateral.  It's not relevant.  The fact of the conviction,

20   the fact that he had a condition that affected his employment

21   that they made an accommodation for under the same set of

22   circumstances is what's relevant.

23          THE COURT:  And what about the other two people?

24          MR. JACOBSON:  Judge, Mr. Camarena, I argue this in

25   my response, Document 162.  Mr. Camarena was moved from a

```
 1    paramedic truck to a fire engine to accommodate the fact that
 2    he could not drive.  And Mr. Valenzuela was moved from a
 3    24-hour operation shift to an eight-hour administrative
 4    position.
 5              THE COURT:  And so that information was disclosed by
 6    you prior to your filing your motion in limine or response?
 7              MR. JACOBSON:  Judge --
 8              THE COURT:  I mean, I know you're saying the City
 9    has all those records --
10              MR. JACOBSON:  I apologize, Judge.  I'm not prepared
11    to argue the disclosure.  I don't have it with me.
12              THE COURT:  Oh.
13              MR. JACOBSON:  And they didn't argue that in the
14    motion in limine.
15              THE COURT:  Okay.
16              MR. JACOBSON:  But they have it.  Clearly they
17    have -- they have a document with them here today.  They knew
18    what they were -- they knew what I was disclosing them for.
19              THE COURT:  All right.  Well, let me think about
20    that one.
21              MS. SAAVEDRA:  Your Honor, can I just say one thing?
22              THE COURT:  Sure, go ahead.
23              MS. SAAVEDRA:  Because you're taking that under
24    advisement, the City would request to be able to depose these
25    witnesses if they are going to be allowed to come and testify
```

1    and also provide any late disclosure that would rebut her

2    claims as to these witnesses.

3              THE COURT:  Yes.  Absolutely.  If I do allow these,

4    it would be the three people, right?  I'll give the government

5    an opportunity to depose these people.

6              MR. JACOBSON:  And I assume, Judge, I'll be able to

7    ask questions at the deposition as well.  It's a standard

8    deposition.

9              THE COURT:  Yes.

10             MR. JACOBSON:  Okay.

11             THE COURT:  And obviously if I allowed that limited

12   discovery to occur and we get new information based on that,

13   that could -- if I decide to let it in, I could change my mind

14   depending on what type of information would be developed

15   through the discovery.

16             Now, Diana Benson's testimony, plaintiff withdraws

17   Ms. Benson from the case, right?  So that's moot,

18   Mr. Jacobson?

19             MR. JACOBSON:  Yes.

20             THE COURT:  Testimony from union representatives,

21   Sloan Tamietti, T-a-m-i-e-t-t-i, Jon North, and Roger

22   Tamietti.  Plaintiff claims all three individuals were present

23   and personally observed important events.

24             So let's see, Ms. Saavedra, do you want to be heard

25   regarding that part of your motion in limine?

1          MS. SAAVEDRA:  Yes, your Honor.  I guess I need to

2    take each one in turn.

3          THE COURT:  Okay.

4          MS. SAAVEDRA:  As a general matter, the City moved

5    to preclude these witnesses because we understood that these

6    witnesses were going to be called to testify about meetings or

7    interviews that they would have sat in on with plaintiff, and

8    that was the only reason we thought they were going to be

9    called to testify which would have just been cumulative.  And

10   it would have been hearsay because they didn't participate in

11   anything that was going on; they were just basically there

12   as moral support for plaintiff during these interviews and

13   meetings.  But in response to the motion in limine for each

14   witness, plaintiff has now set forth other testimony that

15   these witnesses are now going to be called to testify to, none

16   of which were disclosed, your Honor during the disclosure or

17   in the joint report for this case, for that matter, which the

18   Court can bring up and look at.

19          So again, I don't want to waste the Court's time,

20   but all of the items that are listed for Sloan Tamietti now as

21   far as him testifying to notes he took on March 20th during

22   some meeting that happened, any follow-up conversations he had

23   with Deputy Chief Rodriguez, any alleged meetings that he had

24   with AC Mike Fischback after plaintiff left the meeting, none

25   of this has been disclosed.

```
 1              MR. JACOBSON:  Judge, again --

 2              THE COURT:  Hold on a second.  Let her finish.

 3              MS. SAAVEDRA:  Jon North, he was never disclosed to

 4    testify about an interview regarding plaintiff coming in on

 5    her day off.  Nor was he disclosed to testify about his

 6    alleged knowledge of personnel issues in general about TFD.

 7    His wasn't disclosed -- his knowledge in regards to TFD's

 8    inconsistent application of its own policies because he took

 9    over I guess in 2016, that's never been disclosed either.

10              Roger Tamietti, never disclosed to talk about

11    numerous conversations he allegedly had with Chief Critchley

12    about plaintiff's alleged attempt to secure private space to

13    pump.  He was never disclosed to talk about daily

14    conversations he had with her.  Nor was he disclosed to talk

15    about his experience about knowing and working with plaintiff

16    as an emotional distress damage witness, which obviously if he

17    could testify to those things, the City is got going to

18    object, but he was never disclosed to talk about these

19    matters, your Honor.

20              That's really what I have to say, your Honor.  I

21    don't know how plaintiff wants to respond to that.

22              THE COURT:  All right.  Go ahead, Mr. Jacobson.

23              MR. JACOBSON:  Well, No. 1, Judge, once again

24    ambush.  There was no argument that we didn't disclose them

25    for the matters.  No. 1.  So they waived that argument.
```

1          No. 2, they didn't disclose Sloan Tamietti during

2    the meet and confer period as a witness that they were going

3    to file a motion in limine regarding.  So what they do, Judge,

4    what the City does is talk out of both sides of their mouth on

5    these issues.  Don't ambush us, but yet we're going to argue

6    thing that we didn't argue in our motion in limine.  They

7    didn't meet and confer with us about this.  Well, they didn't

8    meet and confer.

9          The other problem I have, Judge, the rules do not

10   require me or any party to disclose every single fact or

11   argument I'm going to make as to every single witness.  I'm

12   required to disclose the topics, I'm required to disclose the

13   nature of the testimony.  They all knew who these people were.

14   They're their employees.  They've done their own

15   investigation.  They know everything about these cases, about

16   these witnesses.  So this concept that they -- that they're --

17   these are not outside witnesses.  These are not witnesses that

18   I'm bringing in that are not their own employees.  They know

19   everything about what these witnesses are to going say.  They

20   know more about what the witnesses are going to say than I do

21   because they've interviewed them.

22          So as far as Sloan Tamietti goes, they waived the

23   right to argue because they didn't meet and confer on Sloan

24   Tamietti.  Each one of these people has relevant, material

25   information about the facts and circumstances of this case

```
 1    which I have outlined in my responses, Judge.  This, They
 2    didn't disclose every single fact that every single thing
 3    they're going to testify to, show me a rule where that is
 4    required.
 5              THE COURT:  All right.  Let me take a look -- do you
 6    want to be heard?
 7              MS. SAAVEDRA:  Yes, your Honor.  All I want to say
 8    is that the City could not address the testimony that
 9    plaintiff is now saying they were going to testify to because
10    we had no knowledge.  We had no notice that -- plaintiff's
11    counsel was planning to call these witnesses to testify to
12    these things.  And that's exactly why I wanted to address it
13    today because we couldn't raise it in our motion in limine.
14    We didn't know.
15              THE COURT:  Okay.  So now these people haven't been
16    disposed?
17              MS. SAAVEDRA:  No, your Honor.  And just for the
18    record, the City has not interviewed these witnesses.
19              THE COURT:  Okay.  And we're talking about the three
20    or there are others also, right?
21              MS. SAAVEDRA:  There is more to come, your Honor.
22              THE COURT:  Josh Campbell, Chris Conger, Martin
23    Brown.
24              So Mr. Jacobson, you're making the same argument as
25    to the additional witnesses?
```

1          MR. JACOBSON:  Yes, Judge.

2          THE COURT:  That they are fact witnesses.

3          MR. JACOBSON:  Yeah, absolutely.

4          And for example, Mr. Brown, he testified -- he -- he

5    witnessed the specific incident between Nikki Sprenger and

6    Ms. Clark.  So if Mr. Vincent is allowed to testify to it,

7    then Mr. Brown should be allowed to testify to it.

8          THE COURT:  Is that something that you've disclosed?

9    I mean, the City has an idea of what you would call them for?

10          MR. JACOBSON:  Judge, again this nondisclosure

11   argument was never raised in any motion in limine.  I don't

12   have any of my disclosure statements.  There were at least

13   eleven disclosure statements from the City.  There were at

14   least I think five or six from us.  I haven't reviewed that in

15   preparation for this.

16          THE COURT:  Okay.

17          MR. JACOBSON:  So I can't answer your question

18   candidly, Judge.

19          THE COURT:  Here it says Martin "Harvey" Brown is

20   expected to testify regarding plaintiff's light duty

21   assignment in 2014 and his experience working in fire

22   prevention.  He had no personal involvement in plaintiff's

23   light duty assignment, and any testimony regarding her

24   assignment would be hearsay.  I'm just looking at

25   Document 151, page 5.  His experiences in fire prevention are

 1  irrelevant to the issues and should be precluded.

 2          So one way to handle these when these witnesses come

 3  up, I think it would be much better to have it done before

 4  trial, so have you ever -- well, that's what you need to look

 5  at, whether you've given the City a summary of, for example,

 6  of what Mr. Brown would say.

 7          MR. JACOBSON:  I'm sure we've given them a summary,

 8  Judge.

 9          THE COURT:  But does it include those things?

10          MR. JACOBSON:  Judge, I can't tell you what --

11          THE COURT:  Okay.

12          MR. JACOBSON:  -- specifically.  Because like the

13  City argues, right, it only becomes relevant if the other side

14  makes it relevant.  In some cases, right?  The fact that

15  Mr. Brown witnessed the interaction between Ms. Sprenger and

16  Ms. Clark only becomes relevant if Ms. Sprenger is allowed to

17  testify.  It only becomes relevant if that matter is in the

18  trial.  I mean, we're talking about years of interaction

19  between dozens of witnesses.

20          THE COURT:  Right.  What about Chris Conger?  I'm

21  looking at the bottom of page 4.

22          MR. JACOBSON:  Sorry, Judge, we're on motion in

23  limine No. 9?

24          THE COURT:  Document 151, No. 6.  The following

25  witnesses should be precluded because they had no personal

```
 1   involvement and their testimony would be hearsay.  So I guess
 2   many these City employees, fire department employees were not
 3   deposed probably.  And whether or not you gave a summary of
 4   what you anticipated --
 5            MR. JACOBSON:  Judge, even if I deposed them on
 6   these issues, you know, -- in other words, -- Judge, I have
 7   outlined what I anticipate these people to testify to.
 8            THE COURT:  So you're saying -- I mean, some of the
 9   objections are foundational, but you're saying you feel you
10   can meet the adequate foundational grounds?
11            MR. JACOBSON:  Yeah.  Yeah, if I can't -- if I
12   can't -- if I can't establish foundation it's not coming in,
13   period.  I'm clearly aware of that rule.  And that's --
14            THE COURT:  So they are raising some of those issues
15   now.  Now would be a better time to resolve these issues than
16   in the middle of a trial where we have Mr. Campbell being
17   sworn in as a witness.  And the City saying, for example, he's
18   expected to testify -- I'm just looking at their motion, the
19   bottom of page 4 of Document 151:  Defendants claim he has no
20   personal involvement in any of these decisions.  Lacks
21   foundation to testify about the City's policy regarding its
22   employee taking leave for depositions related to personal
23   matters.
24            MR. JACOBSON:  I have six paragraphs in my
25   responsive document on page 162 about his direct knowledge of
```

1   things.

2          THE COURT:  Well, let me do this:  Let me take a

3   look at what both sides have filed and see if I need more

4   information or if I have sufficient briefing to rule on this

5   pretrial.  Because some of this may depend on how the trial

6   develops and how relevant -- but you are saying, Mr. Jacobson,

7   you can establish adequate foundation?

8          MR. JACOBSON:  Yes.

9          THE COURT:  And it wouldn't be hearsay.  People just

10  coming in and saying this is how things are.

11         MR. JACOBSON:  For example, Mr. Critchley told

12  Mr. Campbell specifically regarding the 150 pay issue that the

13  reason -- I'm sorry -- Mr. Campbell interacted with the fire

14  chief about why Carrie was placed in an assignment to work

15  across the hallway from the HR director, in that specific

16  location.  And Mr. Critchley, Fire Chief Critchley told

17  Mr. Campbell the reason why she's there is because they needed

18  to keep an eye on her.  So that's not hearsay.  That's, you

19  know, -- he has direct knowledge of that statement.

20         THE COURT:  So let me take that whole issue then to

21  these various witnesses under advisement.

22         MS. SAAVEDRA:  Your Honor?

23         THE COURT:  Yes, Ms. Saavedra.

24         MS. SAAVEDRA:  All I want to say because I know

25  you're going to take it under advisement, the City's motion in

1  limine I used the verbiage from plaintiff's joint report.  If

2  you compare what I'm asking to preclude, it's the language

3  that they used in the joint report.  That's what I addressed

4  in my motion in limine.

5        The things I'm bringing up today are things that

6  were then brought up in response to my motion in limine that

7  we had no notice of.  So there are two distinct things here:

8  the City is moving to have things we knew about precluded

9  versus now we want to preclude additional things he's saying

10  they're going to testify to.  So I would just remind the court

11  that's what we're dealing with.

12        THE COURT:  Yes.  Okay.  All right.

13        And then testimony of psychologist Patricia Haynes.

14  Plaintiff has listed Dr. Haynes as a witness, expected to

15  testify about the treatment of plaintiff and the therapy

16  sessions.  So is that what you're planning on doing,

17  Mr. Jacobson?

18        MR. JACOBSON:  Well, Judge, I think the City is

19  correct here, you know, in terms of -- in terms of the fact

20  that we didn't disclose -- we didn't provide HIPPA

21  authorization and we did not disclose those documents.  I

22  don't have them myself so, I mean, I think in that regard I

23  think the City is correct.  Unless the Court orders -- unless

24  the Court orders us to, you know, produce that during this --

25  extended discovery phase, I don't think we met our requirement

1    there.  I concede on that point.  That was fair.

2         THE COURT:  That was just an oversight?  You don't

3    have to tell me why.

4         All right.  Let me take another look, but I'm

5    inclined to sustain the defense objection.  Do you want to be

6    heard further on that precluding Dr. Haynes?

7         MS. SAAVEDRA:  No, your Honor.

8         THE COURT:  Okay.

9         MS. SAAVEDRA:  I believe we have two more to

10   address.

11        THE COURT:  We have plaintiff and husband spousal

12   privilege issue.

13        MR. JACOBSON:  Fundamentally, Judge, we didn't

14   disagree with that.  We thought it was too broad the way it

15   was proposed to us during the meet and confer period.  I

16   believe that it should be essentially a question-by-question

17   basis.  If it was something that we objected to during

18   deposition practice and something that the Court ruled on was

19   spousal privilege, we're not going ask those questions.

20        THE COURT:  So you're saying there could be some

21   conversations that would not fall within the spousal

22   privilege?

23        MR. JACOBSON:  Yes, because as the Court ruled, if

24   those conversations were held in the presence of third parties

25   or --

1           THE COURT:  Right.

2           MR. JACOBSON:  -- or disclosed to other people, then

3    yes.  And in fact, that was the Court's order.

4           THE COURT:  I distinctly remember that.  I mean,

5    obviously if these are conversations in the presence of other

6    people, there's no privilege.

7           Yes.

8           MS. WATERS:  So, your Honor, our motion in limine is

9    designed specifically to address not those communications.

10          THE COURT:  Right.

11          MS. WATERS:  That we agree and that the Court

12   indicated previously are not privileged.  Our concern is with

13   the disclosure during trial of conversations that do not fall

14   into that category but that do actually fall under the heading

15   of a legitimate spousal privilege.  So there were a number of

16   specific incidences, communications or questions that this

17   Court did address in an order on spousal communication.

18   However, in addition to those specific communications, what

19   this Court did with its order is it clearly delineated those

20   kinds of conversations that were simply between spouses versus

21   the kinds of conversations that were no longer privileged

22   because they've been divulged to third parties.

23          So the City concern is not with the later, it's with

24   the idea that plaintiff and her husband might try to testify

25   to the former; that is to say, a communication between just

```
 1   the two of them that might cover a topic not specifically
 2   considered by this Court but that falls under the heading of
 3   the kinds of communications that plaintiff worked vehemently
 4   to prevent the City from inquiring about even when it was
 5   material and relevant to her claims.  So we're just making
 6   sure we're not suddenly going to be hearing about
 7   communications that actually are privileged whether covered by
 8   the order or not.
 9            THE COURT:  You wouldn't do that, would you,
10   Mr. Jacobson?
11            MR. JACOBSON:  I can't think of anything
12   specifically that would come up in that regard.  We've briefed
13   this with the Court and -- and, again, substantively I agree
14   with defendant's position.  In fact, I might say we violently
15   agree on that position.
16            THE COURT:  Not violently.  Enthusiastically.
17            MR. JACOBSON:  It's a joke.
18            THE COURT:  I'm going to grant that motion in
19   limine.
20            MR. JACOBSON:  I just thought that it should be
21   handled on a question-by-question basis.  In other words, if
22   something comes up -- I mean, we agree to that stuff, but
23   if --
24            THE COURT:  Well, let me know.  If something --
25            MR. JACOBSON:  I'll withdraw that.  We agree.
```

 1          MS. WATERS:  Just to clarify, your Honor, for

 2    purposes of not prejudicing, confusing the jury, making a mess

 3    of the transcript, I'm going to suggest that if the plaintiff

 4    or her husband is about to discuss a marital communication, it

 5    should be handled at sidebar before the question is asked,

 6    before any kind of answer is given.  We should not be placed

 7    in the position of having to object in front of the jury on an

 8    issue we dealt with before trial.

 9          THE COURT:  Absolutely.

10          MR. JACOBSON:  As long as I'm aware of it, Judge.

11    If something -- I agree completely.

12          THE COURT:  Well, talk to your client and her

13    husband.

14          MR. JACOBSON:  She's here and she's hearing it, but

15    there's a lot going on.

16          THE COURT:  So I will grant that portion of the

17    motion in limine.

18          What else do we have?

19          MS. SAAVEDRA:  Still have City's motion in limine

20    No. 5 and we still have Austin Clark's pediatrician that we

21    haven't addressed.  Also 6 and 7.

22          THE COURT:  Carrie Clark's testimony about an

23    alleged -- No. 5 -- an alleged note put on a door at

24    Station 6.  So you want to preclude that whole incident?

25          MS. SAAVEDRA:  Your Honor, let me put some context

1    to this.  We're not moving to preclude the note itself or the

2    fact that there was a note or the content of the note.  It

3    said "Carrie Clark."  What we're seeking to preclude is the

4    statement that was made by Bob Barton to Captain L'Heuruex

5    during his interview where Bob Barton expressed an opinion

6    about this note based on what -- he didn't personally see the

7    note.  Bob Barton did not personally see the note.  He based

8    this opinion to Captain L'Heuruex on what Matt Larsen saw,

9    what Matt Larsen allegedly heard from TFD employees that were

10   there at Station 6 at the time the note was there, and then

11   what Matt Larsen's response to those employees were.

12           It was an opinion that Bob Barton provided to

13   Captain L'Heuruex, and then he asked L'Heuruex if he agreed

14   with that, if there would be an uncomfortable issue for Carrie

15   Clark, and Captain L'Heuruex agreed with Bob Barton's opinion.

16   We're asking that those statements be precluded because

17   they're based upon hearsay upon hearsay, things other people

18   said and he heard about from other people.  And plaintiff has

19   used these comments in the -- in the dispositive motion part

20   of this trial to insinuate that the City then somehow had

21   knowledge she was going to be dealing with this uncomfortable

22   situation at Station 6 and we should have done something

23   about.  That's what we're asking to preclude.  Not the content

24   of the note itself, the fact that it was there.  They're going

25   to testify about that.  That's not what we're asking be

1   precluded.  We're asking that the opinion of Bob Barton and

2   then L'Heuruex's agreement with that opinion be precluded.

3             THE COURT:  Mr. Jacobson.

4             MR. JACOBSON:  I don't see -- I don't see the

5   evidentiary problem with Mr. L'Heuruex testifying to his

6   opinion of that.  I mean, it's the effect on the listener.  So

7   even if it's a hearsay statement, it's not offered for the

8   truth.  The truth is coming in obviously.  The note was there.

9   It did say her name on it.  So it is being offered for the

10  effect of the listener which is Mr. L'Heuruex who is the

11  scheduler.

12            THE COURT:  Why is it relevant?

13            MR. JACOBSON:  Because he was the one who was

14  scheduling Ms. Clark to work at certain stations.  He was the

15  one who was aware.  Who was the one -- Mr. L'Heuruex was the

16  one who said, well, I don't think she deserves any kind of

17  special accommodations very early on.

18            THE COURT:  But how is it relevant -- are you saying

19  that impacted his scheduling?

20            MR. JACOBSON:  Yeah.

21            THE COURT:  Once he heard Mr. Barton?

22            MR. JACOBSON:  Well, that's what I would pursue.

23            THE COURT:  Well, did you pursue that in a

24  deposition?  You want to pursue it at trial?

25            MR. JACOBSON:  I don't remember -- I don't remember

1   if I pursued -- we did not depose Mr. L'Heuruex.

2           THE COURT:  So you're just kind of speculating that

3   maybe because he received this -- Mr. Barton made these

4   comments, that that effected what Mr. L'Heuruex did with your

5   client?

6           MR. JACOBSON:  Yeah.  Yeah.  And if it didn't, I

7   mean, if it didn't, it didn't.  Right?  If Mr. L'Heuruex gets

8   up and testifies it had nothing to do with his scheduling,

9   then I live with that testimony.

10          THE COURT:  Well, why can't we have that figured out

11  before trial?

12          MS. SAAVEDRA:  Your Honor, may I add to that?

13          THE COURT:  Yes.

14          MS. SAAVEDRA:  This note appeared on the door when

15  they were putting locks on Station 6 because that's where

16  Carrie was being assigned.  Captain L'Heuruex did not provide

17  any assignments after this note appeared, so that's incorrect

18  to say it's somehow related to the assignments.

19          And secondly, plaintiff, in response to my motion in

20  limine, stated that Captain L'Heuruex should be able to

21  testify about a note he saw.  Well, he in fact did not see the

22  note.  Neither one of them saw the note.  It's completely

23  speculative.

24          THE COURT:  Go ahead.

25          MR. JACOBSON:  I understand, Judge.

1            THE COURT:  And again, things may change, but at

2    this point I'm going to sustain -- or, grant that motion in

3    limine relating to the note on the door.

4            MR. JACOBSON:  So just so I'm clear, Judge, because

5    the way it was presented in the motion in limine was that --

6            THE COURT:  The note can come out.  The fact that

7    there was a note on the door with your client's name on it.

8    But the fact that Bob Barton made a comment, it just doesn't

9    seem to be relevant to the case.

10            MR. JACOBSON:  The interaction between Barton and

11    L'Heuruex.

12            THE COURT:  Right.

13            MR. JACOBSON:  That's fine.

14            THE COURT:  It just doesn't seem from what I heard

15    so far that that's relevant in this trial.  Again, things can

16    change.  But at this point I'll grant the defense motion in

17    limine as to the testimony of Bob Barton about the note to

18    Rick L'Heuruex.

19            There's no issue about claimed retaliation against

20    Captain Clark.  Plaintiff's husband is not a party to this

21    case.  That issue is moot.

22            MS. WATERS:  So I think we're on to motions in

23    limine 6 and 7 which --

24            THE COURT:  Right.

25            MS. WATERS:  -- were included in a single motion

1    because both stem from this Court's order on summary judgment.

2            And if I might briefly preface that by saying our

3    big concern in this case is the introduction to the jury

4    through testimony or even just questions about extraneous

5    issues that this Court has already disposed of that run the

6    risk of prejudicing the jury or that are designed to elicit

7    sympathy or just to confuse the issues.  So what we're aiming

8    for with motions in limine 6 and 7 is to make sure that what

9    gets presented to the jury is strictly related to the claims

10   that are still pending and that extraneous information is not

11   introduced that would add confusion or chaos to the decisions

12   that they have to make.

13           So it does appear that plaintiff has agreed with

14   motion in limine No. 6 with respect to any allegation about

15   retaliation against plaintiff's husband.  So --

16           THE COURT:  Is that right, Mr. Jacobson?

17           MR. JACOBSON:  Yeah, Judge.  That's fine.

18           MS. WATERS:  So we certainly accept that concession.

19           Nowhere is our concern about extraneous matters

20   being introduced more prevalent than with respect to

21   Captain Langejans.  So as we indicated -- and our concern here

22   is about defining the exact parameters of what can and can't

23   be introduced with respect to Captain Langejans and the

24   allegations related to him.  So our understanding from the

25   Court's order is that plaintiff will be allowed to claim that

1   she was retaliated against because she made a complaint

2   against Captain Langejans, and the alleged retaliation is

3   limited to her educational counseling, and that she was

4   involuntarily transferred from fire prevention which stripped

5   her of seniority.

6          It's our understanding that Captain Langejans'

7   testimony is related to those two specific retaliatory acts

8   and not related to any of the underlying claims that led

9   plaintiff to make her complaint.  So that is to say I think

10  that plaintiff is entitled to ask whether she made a complaint

11  about Captain Langejans.  If she's allowed to ask that, I

12  believe the City has to be allowed to ask whether the

13  complaint was sustained.  And other than that, nobody should

14  be going into detail about the nature of the complaint, the

15  basis for the complaint, otherwise we spend enormous trial

16  time going into the collateral issue about a complaint and the

17  basis thereof that this Court has already disposed of.

18          THE COURT:  Mr. Jacobson.

19          MR. JACOBSON:  The last part I disagree with.  They

20  had me agreeing up until that very last part.  I think that

21  Ms. Clark should be allowed to testify to the reasons why she

22  lodged the complaint.

23          THE COURT:  Would this be -- what -- give me a

24  little summary.

25          MR. JACOBSON:  Things that Mr. Langejans said about

 1   her, things that -- the way she was being treated by
 2   Captain Langejans in the workplace, you know, some -- I would
 3   say some fairly serious allegations.  I don't intend on
 4   getting into the truth of that.  I don't intend on exploring
 5   much about it, just what was the nature of the complaint and
 6   why did you complain?  Was there as investigation and what did
 7   that investigation yield?  I mean, I think those are proper
 8   questions.  I'm not interested in a mini-trial over whether or
 9   not those things were true or not because the Court's excluded
10   that in summary judgment.
11          THE COURT:  So what was the result of the
12   investigation?
13          MR. JACOBSON:  The result of the investigation was
14   that it was unfounded, and Ms. Clark was given an educational
15   counseling.
16          THE COURT:  So then all that would come out.
17          MR. JACOBSON:  The educational counseling would.
18   That was part of the order.
19          THE COURT:  And that it was unfounded.
20          MR. JACOBSON:  Yes.  Absolutely.
21          THE COURT:  So, now the City wants to limit it to
22   the two specific retaliatory acts, the counseling and the move
23   from fire prevention.
24          MR. JACOBSON:  That's fair.  That's fair.  I agree
25   with that.

1          THE COURT:  The loss of seniority.

2          MR. JACOBSON:  I agree with that, Judge.  That's

3    fair because that's what your order outlined in 131.

4          THE COURT:  So the hostile work environment, I mean,

5    your client wouldn't be going into all those details.

6          MR. JACOBSON:  Not at all.

7          THE COURT:  As background.

8          MR. JACOBSON:  Not at all.  That would be a patent

9    violation of the Court's order.  But I think she should be

10   allowed to testify as to the nature of why she filed the

11   complaint.  What her complaint was about.

12         THE COURT:  And then if she does that, then the City

13   would be able to bring out that it was unfounded.

14         MR. JACOBSON:  Yes.  Absolutely.

15         THE COURT:  And then we'd move on?  Would that work?

16         MS. WATERS:  I don't think so, your Honor.  And this

17   goes really to the core of our concern and the reason why we

18   filed the motion in limine.  In order for plaintiff to

19   establish the elements of her claim as a legal matter, all she

20   needs to be able to show the jury is that she filed a

21   complaint.

22         THE COURT:  Right.

23         MS. WATERS:  And that contemporaneous with the

24   filing of the complaint or shortly thereafter she experienced

25   adverse employment actions that she claims are retaliatory.

1    The basis for her complaint is not material in any way

2    whatsoever.  But introducing that evidence is highly likely to

3    confuse the jury, to prejudice the jury against the City.

4    It's inappropriate.  And if plaintiff is allowed to do it,

5    then we are forced to go through the entire -- there was an

6    investigation, and it was found unfounded, and we do end up

7    having a mini-trial because we can't be put in the position of

8    being concerned that a juror in the box is going to find

9    against us for acts that aren't actually part of plaintiff's

10   remaining claims.

11          So in terms of actually being able to prove the

12   elements of her case, she only needs to be -- she only needs

13   to be allowed to tell the jury that there was a complaint

14   filed.  And for purposes of fairness and completion, the City

15   should be allowed to then elicit the limited testimony that

16   the complaint was unfounded.

17          And to clarify, your Honor, the educational

18   counseling, and this may have just been a little bit of a

19   misspeak, but so we don't confuse the issues the educational

20   counseling that Ms. Clark received was not for filing an

21   unfounded complaint.  It was for a separate issue but does

22   comprise part of her retaliation claim for the filing of the

23   complaint itself.

24          THE COURT:  All right.  So I am inclined to grant

25   that motion in limine and preclude plaintiff from talking

 1  about the underlying complaint that Ms. Clark filed against

 2  Captain Langejans.

 3            MS. WATERS:  Langejans.

 4            THE COURT:  Langejans.

 5            MR. JACOBSON:  And that's fine, Judge.  I just ask

 6  that the Court instruct counsel not to essentially argue --

 7            THE COURT:  Yeah.

 8            MR. JACOBSON:  -- well, we don't know what that

 9  complaint was about, or essentially she was a whiner or a

10  complainer about this stuff, and she filed frivolous

11  complaints.  Because that would be inappropriate given that we

12  weren't allowed to discuss the nature --

13            THE COURT:  Right.  Of course.

14            MR. JACOBSON:  -- of it.

15            THE COURT:  And so that way neither side will

16  characterize it.

17            And if you want me to give the jury an instruction

18  during trial it's just not relevant, I can certainly do that.

19  It's just a steppingstone to this cause of action, but it's

20  not relevant and don't speculate.

21            And do you mind if we allow the jurors to ask

22  questions during trial?  I know it's required in state court,

23  but in federal court it's not.  I mean, I normally allow it if

24  both sides agree.  It's kind of an interesting way to see into

25  the minds of the jury during trial.

```
 1            MR. JACOBSON:  I always liked it, Judge, when we did
 2  our criminal trials and the jurors were allowed to ask
 3  questions.
 4            THE COURT:  Any objection?
 5            MS. WATERS:  Your Honor, the City is amenable to it.
 6  I imagine we'll spend a lot of time saying we're not allowed
 7  to tell you that.  But I do also find it interesting and it
 8  gives us a small amount of feedback.
 9            THE COURT:  As long as we don't get one incredibly
10  prolific juror who decides he or she is also counsel and needs
11  to get actively involved.
12            All right.  So I will grant motion in limine he
13  reagent -- the defense motion in limine related to Captain L.
14            Oh, testimony pertaining to the plaintiff's son's
15  medical treatment.  So defense is requesting that that not be
16  allowed.
17            MS. SAAVEDRA:  Yes, your Honor.  If I may address
18  that?
19            We filed our motion in limine originally to just
20  address the fact that Austin Clark's health itself was not
21  relevant to this trial because it's a nonissue.  The City
22  never had knowledge that he was experiencing health problems.
23  Carrie Clark never brought that to anyone's attention at TFD
24  or the City.  There's no claim related to his health problems.
25  So we originally brought the motion in limine to preclude him
```

1   from testifying about those things because they're just not

2   relevant to the issues in the case or the issues that the jury

3   is going to be asked to decide.

4          In filing that motion, we now discover that

5   plaintiff wishes to call this doctor to now testify about all

6   the things that he originally was going to use nurse Noreen

7   Carver to testify about.  And I don't know if your Honor

8   remembers, at the status conference the City raised it would

9   be filing a motion in limine in regards to Noreen Carver

10  because she was not disclosed as an expert pursuant to the

11  rules.

12         When we brought that to plaintiff's counsel

13  attention, he conceded and withdrew her as a witness, but now

14  apparently plaintiff is going to attempt to slide in these

15  opinions that were originally going to be Nurse Carver's

16  opinions by asking plaintiff's son treating physician.  Now,

17  he's never been disclosed as an expert.  He's only ever been

18  disclosed to testify about Austin Clark's health issues and to

19  testify consistent with the medical records that were provided

20  by him.  Nothing in those records reference anything about

21  engorgement, mastitis, or any medical issues related to

22  breasts.  He's never been disclosed to testify about any of

23  the things that plaintiff included in his response to our

24  motion in limine.  The City has never been under the

25  impression that Mrs. Clark was claiming any medical issues in

1  regards to her breasts.

2         And as a result of that, your Honor, the parties

3  agreed that they would not bring up her breast augmentation

4  surgery during the trial because it was not relevant.  One of

5  the things I just want to bring to the Court's attention is if

6  she's now going to claim that she had some medical issues in

7  regards to her breasts, that then opens up the door and the

8  City would like to withdraw that stipulation because it does

9  open up the door to go into what effect, if any, that would

10  have on her ability to produce milk or breastfeed her son.

11         Again, it's very difficult for the City to address

12  the responses in the motion in limine off the hand here

13  because these are issues we didn't know existed until we saw

14  the responses.  But we've never been put on notice that this

15  doctor was going to speak to any of these opinions put forth

16  in his response, your Honor.

17         THE COURT:  All right.  Mr. Jacobson.

18         MR. JACOBSON:  Well, Judge, first of all, the

19  concept that Austin's health is not relevant in this case is

20  ridiculous.  It is directly material and relevant to

21  Ms. Clark's state of mind.  It's directly relevant and

22  material to precisely why she was so concerned.  It goes to

23  damages in this case because Austin's medical condition

24  exacerbated her stress about having stations and the reason

25  why she was -- the very reasons why she was as adamant about

1    having a legally compliant lactation space.

2            The City did know about it.  Did know about Austin

3    Clark's medical conditions.  Ms. Clark wrote a lengthy e-mail

4    to Paul McDonough about Austin's medical conditions after one

5    of her appointments so that's not a true statement.  And

6    essentially, we're not offering him as an expert.  We're

7    offering him to testify as to his personal knowledge about the

8    records and about his -- about his knowledge of his treatment

9    of Ms. Clark.  And we are not using him as some sort of

10   end-around for an expert.  He's not offering global expert

11   testimony.  He's offering testimony about precisely what his

12   experience was treating Austin, and, so, for example, what are

13   some of the causes based on your training and experience.

14   What could be some of the causes of --

15           THE COURT:  Isn't that expert testimony?

16           MR. JACOBSON:  What?

17           THE COURT:  Isn't that expert testimony?  Testimony

18   that would intend to inform the jury that's outside the normal

19   scope of knowledge from an expert, a doctor, even though he's

20   also a treating doctor.  He's going to give -- is he going to

21   give an opinion that the -- what opinions -- have those been

22   disclosed?

23           MR. JACOBSON:  Other than what's in the medical --

24   other than -- other than what's in the medical records and

25   that he's going to testify to his treatment of Austin, I don't

1    believe they have been, Judge.

2            THE COURT:  So he would opine that as a result of

3    Ms. Clark's inability to pump breast milk, that the child

4    suffered healthwise?  Something like that?

5            MR. JACOBSON:  Yes, yes.

6            THE COURT:  So he's going to make that direct link?

7            MR. JACOBSON:  Yes.

8            THE COURT:  And is that in the medical records?

9            MR. JACOBSON:  His weight loss is, Judge.  I'm not

10   sure, I'd have to go back through the precise records and see

11   exactly what he wrote on any given day because those --

12   they're pretty voluminous records.  I don't remember if he

13   said --

14           THE COURT:  So he's going to say the lack of weight

15   gain of the child is directly related to your client's

16   inability to adequately pump --

17           MR. JACOBSON:  Yeah, if -- yes, because these are

18   things that he told -- that Ms. Clark told him during his

19   treatment of -- why is he under weight?  Well, I'm having

20   trouble feeding.

21           THE COURT:  Was this baby also being bottle-fed at

22   the same time?

23           MR. JACOBSON:  At some point in time he was

24   bottle-fed.  He was supplemented.  Yeah, he was being

25   supplemented with formula.  He couldn't tolerate the formula

```
 1   so he had -- he had all sorts of health issues related to
 2   being able to get adequate nutrition early on.
 3            THE COURT:  Well, you know what?  It's noon and I
 4   have a noon meeting.  Sorry to say.  So do you want to come
 5   back this afternoon and we can further discuss -- because I
 6   don't want to rush into this.  I want to give both sides an
 7   opportunity to discuss further.
 8            MR. JACOBSON:  Does the Court have further questions
 9   about it?  I mean, I will agree to limit -- I will agree not
10   to have Dr. Radomsky testify to anything that would be
11   considered an expert opinion outside of the scope of his
12   treatment.
13            THE COURT:  I guess I need to know a little more
14   about that.
15            MS. SAAVEDRA:  Your Honor, we do want to say some
16   more.  It seems as though we have a disagreement about what an
17   expert opinion is, and we should get this clarified before we
18   go to trial.
19            THE COURT:  All right.  I have a 2:00.  Are counsel
20   available at 2:30?
21            MS. SAAVEDRA:  Yes, your Honor.
22            THE COURT:  Mr. Jacobson?
23            MR. JACOBSON:  I will make myself available.
24            THE COURT:  Great.  Because it's all fresh in our
25   minds, so let's keep going.  So let's have you come back at
```

1  2:30 and we can discuss further the motion in limine.

2         Thank you.  We'll stand at recess.

3      (Proceedings recessed at 12:01 p.m.)

4      (Proceedings commenced at 2:30 p.m., as follows:)

5         THE COURT:  No, we can just say we're back on the

6  record.  Counsel is present.  Ms. Clark is present.  I'll give

7  you a chance to set up here.

8         So I think the last thing we were discussing was the

9  testimony of the doctor for Ms. Clark's son and what the

10  parameters of that testimony would be and if that person's a

11  fact witness or an expert.  So first, let me look to see

12  what's in the pretrial statement about -- the pretrial order

13  about that.

14         All right.  That's on page 9 of the pretrial order.

15  I don't have the docket number here.  This is Dr. Radomsky, is

16  that who we were talking about?

17         MR. JACOBSON:  Yes, Judge.

18         THE COURT:  He's expected to testify regarding his

19  treatment of Austin, his observations of Austin's health

20  during Austin's first year of life, his assessments and his

21  directions to plaintiff regarding her feeding of Austin.

22         City's objections:  Not relevant, confuses or

23  misleads the jury in this matter.  There is no evidence anyone

24  at TFD knew or should have known of any medical treatment

25  Austin received, his health condition or any directions

 1   plaintiff was allegedly given regarding the feeding of Austin.

 2   Regardless, this evidence is irrelevant to the legal issues

 3   and/or alleged damages in this matter.

 4          So let's see, was it you, Ms. Waters -- no,

 5   Ms. Saavedra was talking about that.  So go ahead.

 6          MS. SAAVEDRA:  Yes, your Honor.  So I wanted to

 7   start off with plaintiff averring to you that this doctor was

 8   going to testify to the causal link between Austin Clark's

 9   underweight and the plaintiff's alleged stress that she

10   suffered as a result of what she's alleging in this case.  I

11   did bring copies of the medical records which consists of

12   86 pages.  I did go through so I could highlight for you

13   which pages actually pertain to the time frame that's relevant

14   to this case.

15          If you recall, plaintiff is alleging -- she's

16   admitted that from October 2013 to December -- I'm sorry,

17   October 2012 to December 2012 she was assigned to Station 12.

18   So the issue in this trial is was she assigned to stations or

19   was she worried that she was going to be assigned to stations

20   that were not adequate between the time frame of January 2013

21   to March of 2013.  Because if you recall, she was assigned to

22   Station 6 after that.  So it's a very limited time period that

23   we're talking about.

24          If you go through and look at these medical records,

25   there's very limited amount of these records that are relevant

1  to that point in time.  I even went back to include the time

2  from the time he was born, which was July 19th of 2012 up

3  through April 18th of 2013.  And I would like to supplement

4  the record with this as an exhibit, and we can file it later

5  on, your Honor, to make sure it's an exhibit in the docket.

6  But I do have a copy for plaintiff as well as you, your Honor.

7  Would you like me to give that to you now?

8         THE COURT:  Sure.  I could take a look.

9         MR. JACOBSON:  Judge, I might be able to -- I might

10  be able to resolve some of the concerns here.

11         THE COURT:  Okay.  Go ahead.

12         MR. JACOBSON:  I reviewed -- I went back and I

13  reviewed the City's objections to -- and analysis of what I

14  had proposed in its response to the motion in limine what

15  Dr. Radomsky would be testifying to and I see their point.  So

16  what I would propose is to limit Dr. Radomsky's testimony to

17  the records that were provided to the City in this case:  his

18  treatment of Austin, his recollection of treating Austin,

19  anything surrounding that.

20         But in terms of establishing any kind of causal link

21  to his treatment, there's nothing in the records so I don't

22  anticipate there being any testimony to it.  All the stuff

23  about mastitis and engorgement, not going to go into.

24         THE COURT:  So why do you think that's relevant, the

25  health of your -- what is the doctor going to say?  He was in

1  poor health?  He was underweight?

2         MR. JACOBSON:  So plaintiff went back to work on

3  October 27th, 2012.  During his November 5th visit, so the

4  very first visit, approximately nine days after Carrie goes

5  back to work, Dr. Radomsky's note indicates he has been more

6  fussy lately.  He always seems to be wanting to eat.  He will

7  occasionally arch with his feet -- feeds.  He does not spit up

8  at all.  He seems to be fussy if he is not eating or sleeping.

9  Things have worsened over the past week.  He is passing green

10  colored-foamy stools.  So, in other words, his condition had

11  worsened in the week prior to that November 5th doctor's visit

12  which coincides with when Carrie went back to work at TFD and

13  all the stress associated with it.

14         So, you know, I expect Carrie to testify that her

15  difficulty regularly expressing breast milk and the stress she

16  was having over not knowing whether she was going to be

17  assigned to a station that was compliant contributed to

18  Austin's weight loss or inability to gain the weight that a

19  pediatrician thinks he should be gaining.

20         THE COURT:  Was he underweight --

21         MR. JACOBSON:  Yes.

22         THE COURT:  -- before she went back to work?

23         MR. JACOBSON:  No.

24         THE COURT:  Is that in the records?

25         MR. JACOBSON:  Well, there's nothing in the records

1  that say he was under weight.

2       THE COURT:  Would there be?  I mean, in other

3  records subsequent, does it say he's underweight?

4       MR. JACOBSON:  Yes, yes.

5       THE COURT:  Don't they always say the weight?

6       MR. JACOBSON:  So in the records that you have

7  before you, for example, in the November -- give me a second.

8  On the November -- so on the December 17th, 2012 record, he's

9  diagnosed as underweight.  November 27th, 2012 he's diagnosed

10 as underweight.  November 5th he was not diagnosed as

11 underweight, but he was noted as having conditions worsened.

12 The assessment was inadequate calories versus other potential

13 causes.  The previous visit to that, August 10th mentions

14 nothing about being under weight or having inadequate

15 calories.

16      THE COURT:  When does the doctor's note again

17 reflect that he has normal weight?

18      MR. JACOBSON:  Well, again, I don't think that there

19 is -- I don't think that there is any -- any note that says

20 that his weight is now normal.

21      THE COURT:  Like here, I'm looking at 11-16 of 2012.

22 It says -- by then your client had gone back to work?

23      MR. JACOBSON:  Yes, Judge.

24      THE COURT:  It says nutrition, feeding success,

25 weight gain, feeding choices, human guidance.  So I don't

```
 1   know.  Anticipatory guidance, exam findings.

 2            MR. JACOBSON:  Sorry, Judge, what --

 3            THE COURT:  Oh, I was looking at 11-16-2012.  I just

 4   pulled that up.  Diet appropriate and content volume for age

 5   at the well visit.  Then I'm looking at anticipatory guidance.

 6   Well four-month-old, allergic colitis likely secondary to milk

 7   soy protein.  We discussed continuing to avoid milk and soy in

 8   mom's diet.  If things do not improve in the next a couple of

 9   weeks, we'll consider a gastroenterology evaluation.

10   Discussed growth and development.  Normal.

11            I don't know, I just think that introducing this

12   type of testimony, I'm just wondering why it would be

13   relevant.  I'm just looking at one note, for example, that

14   says that the child is -- may have allergic colitis.  We

15   discussed continuing to avoid milk and soy in mom's diet.  I

16   don't see anything here that says -- is there anything in

17   these records that says because she's unable to get the proper

18   accommodations where she works, that that's affecting the

19   child?  Or is that summarized in any of these notes?

20            MR. JACOBSON:  No, and that's not his testimony.

21            THE COURT:  Okay.

22            MR. JACOBSON:  His testimony is that he did -- he

23   did treat Austin and Austin was under weight.

24            THE COURT:  Show me the note for that.  Because I'm

25   looking at a note, 11-16 of '12 that shows that the child was
```

1    a well four-month-old.

2          MR. JACOBSON:  Look at Clark, on the bottom right,

3    Clark 1143.

4          THE COURT:  That's right.  I could have told you

5    the page number.  Clark-1163 is what I was looking at.

6          MR. JACOBSON:  And then you want to look at Clark

7    1142.

8          THE COURT:  Clark 11- --

9          MR. JACOBSON:  So 1141, 1142, and 1143.

10         THE COURT:  Okay.  That's for 12-17 of '12, so that

11   would have been a month later.  Under weight.  Mom changes to

12   her diet.  Vital signs.  Patience was seen as a nurse visit

13   and not by the physician.  Chart reviewed by me.  So let's see

14   what that says.  Here for weight check.  He is breastfed and

15   has started on ranitidine.  For Cheryl, r-a-n-i-t-i-d-i-n-e.

16   Mom has stopped dairy and soy.

17         Okay.  I'm looking at 11-5-12.  That's the same

18   weight.  Is that page 1143?

19         MR. JACOBSON:  Yes, in the middle under assessment,

20   Judge.

21         THE COURT:  Fussy baby.  Question, inadequate

22   calories versus GER versus milk protein intolerance versus

23   sleep issues.  I spent 25 minutes with the patient and his

24   mother, greater than 50 percent of which was spent in

25   counseling.  That was with the doctor.

1          So tell me again what he would -- he would testify

2     about those two notes?

3          MR. JACOBSON:  Those three notes.  Yeah, he would

4     testify about his treatment of Austin.  The fact that the baby

5     was under weight.  What his recollection of his meetings with

6     Ms. Clark were.  I don't know if he's going to recollect much.

7     This was 2012.  But this was a foundational issue.  It also

8     establishes that during the time right after she went back to

9     work that the baby was, in fact, under weight.  And that was a

10    concern for her, and the fact is that they had her back for

11    more frequent weight checks during this period of time.

12         THE COURT:  All right.  But you wouldn't have him

13    testify any further than his -- this factual rendition?

14         MR. JACOBSON:  That's correct, Judge.

15         THE COURT:  I guess it could go -- I mean, to her

16    stress and anxiety and make her very concerned if she wasn't

17    already about the issues in this lawsuit which is her ability

18    to pump her breast milk in a comfortable, appropriate

19    environment.

20         Let me hear more from the City.

21         MS. SAAVEDRA:  Thank you, your Honor.

22         Her son was actually under weight the first month of

23    his birth, and that's noted under Clark 1145.

24         THE COURT:  So he was under weight when he was born.

25         MS. SAAVEDRA:  The week -- 11 days after he was born

1  he went in for a weight check, and that's the first time that

2  this doctor notes that he is under weight.  So he was, in

3  fact, under weight before she came back to work.

4          THE COURT:  Okay.

5          MS. SAAVEDRA:  Moving along, there are visits in

6  between that time frame and -- a visit for a rash.  It's true

7  he is noted as under weight on 11-27-12.  He's then referred

8  to a GI doctor on December 4th of 2012.  If you want to refer

9  to Clark 1185.  And it's noted on this that his diagnosis is

10 under weight, blood in stool, and fussy infant.  No mention of

11 breastfeeding or expressing milk issues.  That's December 4th,

12 2012.  Then he goes back December 17th, 2012.  Sorry,

13 December 17th, 2012 on 1141.  It's noted he's under weight.

14         This is the time period she's at Station 12.  This

15 is not the time period where she's allegedly experiencing

16 stress because at this point in time she's not guessing where

17 she's going to be stationed.  We have a RFA where she admits

18 she worked at Station 12, was assigned to Station 12 from

19 October 2013 (sic) to December 2012.  So these notes, even

20 though he was under weight, are not relevant to her claims

21 because she's not claiming she was under stress during that

22 period of time.  She's claiming she was under stress

23 January 2013 to March 2013.

24         So if you look back at the medical records, and

25 there is a date where he sees the doctor on January 22nd, 2013

1  ending in 1161.

2          THE COURT:  That's what -- what's the Bates stamp

3  number?

4          MS. SAAVEDRA:  1161.  So here, this is the next date

5  after the December 17th, 2012 date.

6          THE COURT:  Yes.

7          MS. SAAVEDRA:  And here there is no mention of him

8  being under weight.  In fact, the doctor notes that his diet

9  is appropriate in content and volume for his age.  His GI is

10  normal.  All of these notes are made on the top there,

11  your Honor, under Well Fitness Infant.  So this is during the

12  time period that she alleges she was under stress and not

13  knowing what station she was going to be stationed to.

14          If you turn to the next date of service is

15  March 14th, 2013.

16          THE COURT:  And that's --

17          MS. SAAVEDRA:  I'm looking for that one, your Honor.

18  The way that these were disclosed, they're not in

19  chronological order by date, so just so you're aware of that.

20  This one is 1139.

21          THE COURT:  That was the next visit?

22          MS. SAAVEDRA:  Yes.  March 14th, 2013.  Also during

23  the relevant time frame.  And here he's being seen for a rash.

24  Again, no mention of being under weight.  No mention of any

25  breastfeeding or expressing milk issues.  And he's just there

1    to treat lesions and rashes that he had on his body.

2              So then you have the next date of service,

3    your Honor.  That's April 18th, 2013 and that's 1159.  Here

4    he's nine months old.  No concerns by the parent.  She says

5    she's still breastfeeding.  Again, the doctor notes that his

6    diet is appropriate in content and volume for his age.

7    There's no mention of him being under weight.

8              So the relevant time period here shows that she was

9    actually improving.  Again, completely devoid of any mention

10   that she was having issues breastfeeding or expressing milk or

11   any mention she was undergoing stress and that resulted in her

12   son being under weight.

13             THE COURT:  So the relevant -- she was at Station 12

14   from October of 2012 to December 2012.

15             MS. SAAVEDRA:  Correct.

16             THE COURT:  When Ms. Clark first started.  And

17   then --

18             MR. JACOBSON:  It's not true, Judge.  That's not --

19   that's not accurate, Judge.  That's factually inaccurate.

20             MS. SAAVEDRA:  I have an RFA, your Honor.

21             MR. JACOBSON:  Judge, she was assigned to Station 12

22   for one tour.  She also worked at station 7 once during that

23   time.  It's an inaccurate use of the word "assignment."  She

24   worked there but she wasn't assigned there.  She was assigned

25   there for one tour, but that's it.

1           THE COURT:  How long is a tour?

2           MR. JACOBSON:  She also worked at station 7.

3           THE COURT:  How long is a tour?

4           MR. JACOBSON:  Five shifts.

5           THE COURT:  How long is a shift?

6           MR. JACOBSON:  Twenty-four hours.

7           THE COURT:  Oh, so she was only there for five days?

8           MR. JACOBSON:  She was assigned there.  See, it's a

9    difference between being assigned and working there.  And the

10   difference is when you're assigned to a station, you know that

11   that's where you're going to be.  She worked there but only

12   because there were openings at that station on those shifts

13   available for her; otherwise, she was a swing shift paramedic

14   and they made it clear to her that she was.  So I just

15   wanted -- I wanted to clear that up, that --

16          THE COURT:  So physically, she was physically

17   located at different places even though she was assigned to

18   Station 12 from October of 2012 to December 2012?

19          MR. JACOBSON:  No, Judge, she worked at Station 12,

20   but it was the uncertainty of where she was going to work on

21   any given shift.  Other than those five shifts, she had no

22   idea where she would be working.

23          THE COURT:  So what do you do, show up for at work

24   at Station 12 and then go someplace else?

25          MR. JACOBSON:  Or they call you.  You call in in the

1    morning.  You call in the morning and say, Where am I going?

2              THE COURT:  Okay.  Is that how it works for

3    everybody?

4              MR. JACOBSON:  When you're on a swing shift.

5              THE COURT:  Okay.  And you have a stipulated

6    statement?

7              MS. SAAVEDRA:  I have an RFA where she admits she

8    was assigned to Station 12 between those dates, your Honor.

9    What she's going to say at trial, I don't know.

10             But moving on to the basis for my motion in limine.

11             THE COURT:  Okay.

12             MS. SAAVEDRA:  There is nothing in these records

13   that is relevant to the issues in this case.  And the fact

14   that he is under weight, there is no causal link.  No one can

15   testify to the causal link.  The records show that he gained

16   weight during the time period that is relevant to her claims.

17             And I think plaintiff's counsel has conceded he's no

18   longer going to ask this doctor to testify about the items

19   that he represented in his response.  But just for the record,

20   he was never disclosed as an expert, nor were those opinions.

21   And according to these records he never treated plaintiff.

22   He's a pediatrician that treated Austin.  And again, his

23   health isn't relevant to the legal issues.

24             The issues are did we provide her with an

25   appropriate space to lactate.  And there is no allegation in

1  this case that she wasn't provided the appropriate break time,

2  so this whole engorgement issue that is now being raised is

3  also something new to the City.

4           THE COURT:  I think he already said he's not going

5  to raise that issue.

6           MS. SAAVEDRA:  Okay.

7           MR. JACOBSON:  Well, I'm not going to raise it

8  through Dr. Radomsky, but the plaintiff can testify to her own

9  experience.

10          THE COURT:  Okay.  Well, yeah, my concern -- I just

11  think it creates so much confusion with the jury.  Because

12  once you start getting into the health of the child, the

13  inference is that has something to do with something the City

14  did or didn't do.  And I just don't see that link; the lack of

15  weight of the child for a certain period of time is linked to

16  the City -- the allegations against the City.  Certainly, your

17  client can testify to how she felt and her concerns and

18  physically how she felt and how that affected her relationship

19  with her infant.  But to have a doctor come in and start

20  telling us about the child and his physical condition, isn't

21  the inference going to be that that's as a result of what the

22  City did or didn't do?

23          MR. JACOBSON:  Well, it's a fact, Judge.  It's a

24  fact that he was under weight.  And if the jury -- she is

25  going to testify, plaintiff is going to testify that she was

1   under stress because of the uncertainty as to where she would

2   work on any given shift and whether she would be able to be at

3   a -- at a station that was legally compliant with federal law

4   for proper lactation facility, for a proper space for her to

5   lactate, and that that stress affected her milk production.

6          THE COURT:  Is this doctor -- he didn't evaluate

7   your client.  He's not going to say it affected her milk

8   production.

9          MR. JACOBSON:  He's not going to, my client is going

10  to say that.

11         THE COURT:  So why do you need the doctor -- what is

12  the purpose of his testimony?

13         MR. JACOBSON:  He's testifying that the baby was in

14  fact under weight during the time period.  That's it.

15         THE COURT:  So why is that relevant?

16         MR. JACOBSON:  Well, because the under weight

17  baby -- you know, if you are -- I just want to gather myself

18  for a second.

19         THE COURT:  No, take your time.

20         MR. JACOBSON:  A mother that cares about expressing

21  breast milk for her son and is committed to doing that and is

22  having trouble doing so and is unable to do so which results

23  in their being baby under weight --

24         THE COURT:  Wait.  How do we know that --

25         MR. JACOBSON:  -- lacking calories.  That's what she

1    would testify to.

2            THE COURT:  Well, that's her thought.  But we don't

3    have a medical Doctor saying that's why the baby was under

4    weight.  I mean, do you --

5            MR. JACOBSON:  No, you're correct, Judge.  But she

6    can certainly testify to her experience and her knowledge and

7    her opinion.

8            THE COURT:  Why can't you just have your client

9    testify that the baby was under weight and that concerned her

10   and that created even more stress.

11           MR. JACOBSON:  I could do that, Judge.

12           THE COURT:  Because if you bring the doctor in and

13   he starts going through these records, then that's going to

14   open the door for the City to start going through like we just

15   did and say, What about this date?  The baby was fine.  And

16   you talk about a lot of other things, like there could be lots

17   of reasons why he's under weight.

18           MR. JACOBSON:  Well, am I going -- am I going to

19   draw a foundation objection when I show -- when I show the

20   baby's -- when I show these medical records showing that the

21   baby was under weight?  Am I going to get a foundation

22   objection?

23           THE COURT:  How would that be relevant?  I mean, I'm

24   just thinking this isn't a medical -- this isn't that kind of

25   a case.  I'm just wondering why this would be relevant.  I

1 mean, I don't think if your client testifies that the baby was

2 under weight and your client had concerns and she was having

3 difficulty expressing her milk, I don't think the government

4 is going to dispute that. If there's no doctor that comes in,

5 is the government going to the say, No, your baby wasn't under

6 weight. Is the City intending to go down that road?

7 MS. SAAVEDRA: I had no knowledge of the child's

8 weight. Why would we?

9 THE COURT: Pardon me?

10 MS. SAAVEDRA: The City had no knowledge of the

11 child's weight. I don't think we have any witness that could

12 get up and testify to whether or not he was under weight.

13 THE COURT: But as far as cross-examining Ms. Clark

14 and saying, Isn't it true your baby really wasn't under weight

15 and grabbing the medical records and saying look at this note

16 and look at that note.

17 MS. SAAVEDRA: Obviously, I'm moving to preclude him

18 and preclude the records. We wouldn't bring them up at trial.

19 THE COURT: So I don't know. I just think that by

20 having the doctor actually come in and go through some of

21 these notes, which he's obviously going to be doing, he may

22 have some independent recollection, but based on what I see,

23 Mr. Jacobson, I think the probative value under Rule 403 is

24 outweighed by potential confusion for the jury and unfair

25 prejudice to the City. The concern being -- well, I may

1    revisit this, but from what I've seen so far -- can I just

2    keep a copy of these?

3         MS. SAAVEDRA:  Yes, your Honor.  That's a copy for

4    you.  We'll file a separate copy for the record.

5         THE COURT:  Based on what I've seen as far as the

6    timing, at this point I'm going to -- now, I don't know, I

7    don't see any other reason that Dr. Radomsky would need to

8    testify because I don't think he actually treated your client.

9    So unless there's something about his testimony, Mr. Jacobson,

10   related to your client's emotional distress or something like

11   that, I mean, that possibly could be relevant, but I'll go

12   ahead and grant the defense motion in limine as to

13   Dr. Radomsky.

14        MS. SAAVEDRA:  And your Honor, I'm sorry, I just

15   wanted to add on that we're not going to bring these up unless

16   plaintiff gets up and tries to testify to the causal link

17   itself, then obviously we get to impeach her or cross-examine

18   her with these records because they would then impeach what

19   she's testifying to.  So we would have to be able to let the

20   jury hear all the other reasons he could be under weight if

21   she's going to testify that that was the reason.  It's a

22   different thing for her to testify that he was under weight

23   and this caused her stress or her concern and caused her

24   additional stress.  But if she takes the next step, it opens

25   the door for her to be cross-examined on these documents.

1          THE COURT:  Yeah, whether you can cross-examine her

2    on something she didn't prepare, we can -- we can deal with

3    that evidentiary issue if and when it arises which I don't

4    think it will.

5          So anything else on the motions in limine?

6          MS. SAAVEDRA:  Your Honor, I just wanted to briefly

7    revisit the nondisclosure issues because the issues pertain to

8    not just facts in evidence that plaintiff now wants to present

9    to the jury that were never disclosed, which are those three

10   witnesses that he's saying are comparitors, but it also

11   extends to specific testimony that is now being proposed as

12   testimony of witnesses.  And I did bring copies of the

13   joint -- the joint pretrial order where plaintiff set forth

14   who was going to testify to what as well as defendant's.  And

15   I brought a copy of every single disclosure statement that

16   plaintiff has provided.  And I have a copy for the Court, I

17   have a copy for Mr. Jefferson -- for Mr. Jacobson.  Sorry, if

18   you would like to look at it.

19          But again, these witnesses the majority of the

20   witnesses were not disclosed until June 30th of 2017 as I

21   mentioned before.  And the contents of the disclosure I think

22   is important for the Court to see.  Since you are taking this

23   under advisement, I think it's important to see how the

24   witnesses were disclosed and how they were -- what plaintiff's

25   set forth as their expected testimony.  And what you'll notice

1  is he that -- it is specific enough that the City relied upon

2  what he said they were going to testify to, what plaintiff

3  counsel said they were going to testify.  We had no reason to

4  depose these witnesses or to seek further discovery or

5  disclosure regarding them because we relied upon what he said

6  they would testify to.

7        It was not until we received the responses to the

8  motion in limine that we then learned of these other issues or

9  these other facts they now want to be presented to testify

10  about.  And that's important because we had no notice of this.

11  So I would like to have the plaintiff's six disclosure

12  statements which contains most of the witnesses we're dealing

13  with and then plaintiff's initial disclosure statement which

14  is the one that has Sloan Tamietti on it.

15        THE COURT:  All right.  And do you have copies for

16  the Court?

17        MS. SAAVEDRA:  Yes, your Honor.

18        THE COURT:  Do you know, Mr. Jacobson, what counsel

19  is referring to?  What Ms. Saavedra is talking about.  Do you

20  want to look at it before she hands it to me?

21        MR. JACOBSON:  Sure, I'll look at it, Judge.  I

22  think I know what she's referring to.  I strenuously object to

23  this ambush.  This was not raised in any motion in limine.

24  This was not raised anywhere before this.  She had plenty of

25  opportunity before the trial was set, before discovery ended

```
 1  to depose witnesses.  I am not required to disclose every
 2  scintilla of information I intend to elicit from a witness.
 3          THE COURT:  Okay.  Well, I'll just see.  You would
 4  agree if it's a completely new arena --
 5          MR. JACOBSON:  Not necessarily, Judge.  That --
 6          THE COURT:  No.
 7          MR. JACOBSON:  Not necessarily.
 8          THE COURT:  I guess it depends.
 9          MR. JACOBSON:  It really depends on the
10  circumstances.  You know, when they didn't disclose John
11  Vincent anywhere, but, yet, have him show up in motions in
12  limine, they say, well, you know, okay.  Well, it was -- it
13  was harmless error.  Well, they can't have it both ways.  They
14  can't fail to produce, fail to identify a witness.  I mean, if
15  they're going to play this game, Judge, then we are going to
16  go at it with every -- I'm going to limit or I'm going to move
17  to limit every single one of their witnesses to the specific
18  details of the testimony that those witnesses are going to
19  give.  If it's not in their disclosure statement, they're not
20  testifying to it or at least that will be my position.
21          THE COURT:  All right.  Let me just see what the
22  disclosure -- I'll take a look at those.  And this is to which
23  witnesses?  This would be as to -- Ms. Saavedra.
24          MS. SAAVEDRA:  This addresses the majority of the
25  witnesses that the City did a motion in limine for and it's
```

1    motion in limine No. 9.  Specifically, the initial disclosure

2    shows Sloan Tamietti as disclosed by plaintiff.  The six

3    supplemental disclosure addresses -- I don't know how to

4    pronounce his first name, Josue Camarena, John Valenzuela,

5    Josh Campbell, Chris Conger, Martin "Harvey" Brown, Jon North,

6    Brad DeCastro, Roger Tamietti.

7            THE COURT:  Okay.  And these folks are all listed in

8    the pretrial, the joint pretrial order?

9            MS. SAAVEDRA:  Yes, your Honor.  And I think what

10   you'll notice, I think they actually mirror each other.

11   You'll see the way they were set forth in the joint pretrial

12   order is similar or the same as they were set forth in the

13   disclosure statements.

14           And as far as John Vincent goes, the reason it's

15   harmless error that the City did not disclose him is because

16   he was disclosed and actually twice by plaintiff.  You'll see

17   he was also disclosed in their sixth supplemental disclosure

18   that you have in front of you.  So they knew he was a

19   potential witness in this case.  And the City did disclose the

20   e-mail, the relevant e-mail that specifically sets forth what

21   John Vincent witnessed and what his anticipated testimony was

22   based on that e-mail.

23           MR. JACOBSON:  The City acts as if all of these

24   witnesses are a shock to them.  Sloan Tamietti was listed in

25   our initial disclosure statement.  Once again, the City is

1  talking out of both sides of their mouth, Judge, because on

2  the one hand they say, Well, John Vincent is harmless error

3  because plaintiff knew he was a witness and he listed him.  On

4  the other hand, they say, Well, all of these witnesses were

5  listed and now he's going to have a different circumstance

6  under which he's going to testify.  That makes no sense

7  whatsoever.  You can't have it both ways.  Because what I

8  noticed John Vincent for is not what the City is going to call

9  him for.

10          THE COURT:  All right.

11          MR. JACOBSON:  And I'll remind you, Judge, that

12  Sloan Tamietti was not covered under the meet and confer under

13  Rule 7.2L.  They never indicated that they would be filing a

14  motion in limine regarding restricting or having Sloan

15  Tamietti not testify.  So they failed to meet and confer test.

16  That suddenly they forget about.

17          THE COURT:  So this morning we talked about

18  depositions being taken of certain individuals.

19          MR. JACOBSON:  Yes, Judge.

20          THE COURT:  Who was that?

21          MR. JACOBSON:  John Vincent.

22          MS. SAAVEDRA:  John Vincent.

23          THE COURT:  Was that all?

24          MR. JACOBSON:  Yes.

25          THE COURT:  All right.  Well, I'll take a look at

1  this.  So the government's -- the City's reurging the request

2  to preclude or limit certain witnesses pursuant to your motion

3  in limine No. 9.  Is that which one it was?

4          MS. SAAVEDRA:  Yes, your Honor.

5          I have a suggestion to the Court.  Since neither

6  party really briefed the issue of nondisclosure and what

7  should be permitted based upon the extent of the disclosure

8  that was done in this case, I would ask that we have leave to

9  file supplemental briefs to address that issue.

10          THE COURT:  And then set this for another hearing?

11          MS. SAAVEDRA:  If the Court is inclined to do so, or

12  you can rule based on the briefs and what's been presented

13  today.

14          MR. JACOBSON:  I think, Judge, we're -- we are two

15  months out of trial.  You have jury instructions due in less

16  than a month.  There's no way we're going to be able to get

17  all of that briefed and argued, and depending on what you

18  order depositions taken within -- within those two months.  I

19  can tell you, I'm out of the country for nine days in

20  February.  And I have several other out-of-town commitments.

21  There's no way we're going to be able to get that done by

22  April 1st.

23          THE COURT:  Let me take a look at it and if I think

24  it would be helpful, I'll direct the parties to file something

25  very short simultaneously perhaps, because it wasn't raised in

```
1    more detail in the briefing.  So I'll go ahead and think about

2    whether that would be helpful for me to resolve the issue.

3              I would like the parties related to a questionnaire

4    to get together and attempt to come up with a very short

5    proposed questionnaire.  I do think the government's little

6    summary, I don't know if you -- I think the questionnaire is

7    probably a good idea.  I'm thinking of doing it the morning

8    of, having very few questions, maybe no more than ten

9    questions.  I think the government's summary was pretty good.

10   I don't know if you had a chance to look at it, Mr. Jacobson.

11             MR. JACOBSON:  Judge, I'm comfortable with the

12   summary that was in the joint pretrial statement that we

13   worked through.

14             THE COURT:  Well, I don't know if that's different.

15             MS. WATERS:  I can tell you, your Honor, it is

16   different.  I provided a much shorter summary for the

17   questionnaire than what is contained in the pretrial

18   statement, though I did fundamentally model it off the

19   pretrial statement.

20             THE COURT:  Right.  It looks like it's more user

21   friendly.  It's on page 2.  I don't know if you want to look

22   at it right now, Mr. Jacobson, or you can talk with opposing

23   counsel later.  But it's Exhibit 1, page 2, background of the

24   case.

25             MR. JACOBSON:  Judge, I apologize.  I printed out --
```

```
 1    I printed out all of the document but not the attachment.  So
 2    I'll look at it and if it's -- if we can come to an agreement
 3    on that, we will.
 4          THE COURT:  Okay.  And then I'm thinking just --
 5    this questionnaire would only be for the purpose of the
 6    breastfeeding and breastfeeding, breastfeeding in the
 7    workplace, those kinds of questions.  Not questions about City
 8    hiring women to work as fire fighters.  Do you work in an
 9    environment where more than 50 percent of your coworkers are
10    women?  Have you, your wife, decided not to have children to
11    allow your wife to pursue a career.
12          And the lactation consultant one, I can cover that.
13    I think you want to give them all a chance to talk.  Right?
14    You want to hear them talk about some things.
15          I think No. 16 is fine.  Are you uncomfortable
16    sitting on a jury that will involve testimony about
17    breastfeeding and/or pumping breast milk.
18          So I'll ask them as a group about women working at
19    the fire department.  Women returning to work after having a
20    baby, if you want me to ask if anybody is bothered by that.
21    So if we could just limit it to the breastfeeding issue.
22          Would counsel anticipate if someone said no, I
23    didn't breastfeed, would you want follow-up at sidebar?  Why
24    not?  Or if they said, yes, I did breastfeed, would you want
25    to know more detail or just that's the end?
```

1    MS. WATERS:  I can imagine a situation where we

2    would inquire, particularly in terms of needing to voir dire

3    people who maybe wanted to breastfeed but were unable for some

4    reason, that seems like an issue that is potentially relevant

5    or an experience that might color a person's -- the way they

6    view this particular case.  So I don't know that there are --

7    we would anticipate follow-up for every yes-or-no answer, but

8    certainly at least for some people, follow-up is going to be

9    necessary.  And I don't think that can be managed with

10   additional questions at the bottom.  I think that's something

11   we have to determine in the moment.

12   THE COURT:  All right.  So I'll let counsel -- how

13   much time do you think you need?  Because if you can't agree

14   on that, then I'll go ahead and formulate a questionnaire and

15   give it to you.  Ten days?  A week?

16   MR. JACOBSON:  Ten days is fine.

17   MS. WATERS:  That's fine, your Honor.

18   THE COURT:  All right.  So the minute entry will

19   reflect within ten days of today's date -- let me give a

20   specific date.  That's always better.  Today is the 4th.  How

21   about February 15th which is a week from Friday?  Counsel will

22   submit any proposed -- and if you have some questions you can

23   agree on, let me know what those are.

24   And then we'll give these questionnaires to the

25   panel that morning which leads me -- so the civil rules of

1   procedure talk about at least six, no more than twelve jurors

2   in a civil case.  Verdict has to be unanimous.  I suggest, we

3   have a two-week trial, that perhaps we have nine jurors and

4   three are alternates.  So in the event that we lose a juror,

5   we have an extra three.  But if we don't lose any of them, we

6   let them all deliberate.  Have the joy of deliberating as

7   opposed to getting kicked off the case as an alternate after

8   sitting on a trial for two weeks.  To increase -- I don't know

9   if that increases juror satisfaction.  That way if they're all

10  still, if all nine are still there, we could have them

11  deliberate.

12          MS. WATERS:  If they stick it out, they should get

13  to deliberate.  And the six and nine distinction still gives

14  us a little room for error.

15          THE COURT:  And if you want time to think about

16  that.

17          MR. JACOBSON:  I don't have a problem with nine,

18  Judge.  I just want to think about increasing that to twelve

19  because that makes it theoretically harder to reach a

20  consensus.  And since it has to be unanimous, I don't want to

21  prejudice my client by saying, Well, now we've got three more

22  in there.  I understand the fairness argument.  I get it.

23  But --

24          THE COURT:  Or we could have -- we could just excuse

25  one as an alternate and have eight.  Or excuse two and have

1   one.  There's all sorts of options.

2          And I think under the civil rules, federal, you each

3   get three peremptory challenges, so it's going to be a

4   smaller -- in civil cases -- criminal we usually call in 65

5   jurors.  So we're not going to need as many I don't think for

6   this case.  Any idea how many you think we might need based on

7   your experience in trials or your colleague's experience.

8          MS. WATERS:  I think it probably depends a little on

9   how many we are aiming to end up with.  Obviously if we're

10  looking at twelve versus nine, then we were going to need a

11  few more.  So if we take the outside range and we assume

12  twelve --

13         THE COURT:  I'm not going -- I'm not --

14         MS. WATERS:  Okay.

15         THE COURT:  Six to twelve, I'm not going to go with

16  the outer.  I don't think we need that many jurors for this

17  case.  So assuming we went with the nine.

18         MS. WATERS:  We're thinking of maybe a panel of 45

19  to start with.

20         MR. JACOBSON:  Yeah, the number I was banging around

21  in my head was 50.

22         THE COURT:  So we'll let the jury commissioner know.

23         So should we set another status conference?  Do we

24  have another one set before the trial, or do you want to just

25  let me know if we need one?

1          MR. JACOBSON:  We should probably set one after jury

2    instructions are due.

3          THE COURT:  Okay.

4          MR. JACOBSON:  I would think.  Let's do that and

5    just discuss.  And anything both sides can stipulate to, to

6    make it go smoothly with the jury is encouraged.

7          I always talk to people about settlement.  I think

8    you had settlement discussions and you don't need the Court's

9    assistance with that?

10          MR. JACOBSON:  No, Judge.  In fact as we indicated

11    during the status conference, the City has refused to engage

12    in settlement negotiations with us.  And you indicated you

13    weren't going to force us to talk.

14          THE COURT:  Right.  Okay.  Just wanted to cover

15    that.

16          So all right.  So I'll take the remaining matters

17    under advisement that we talked about earlier.

18          And if there's nothing further then we'll stand at

19    recess at this time.  Thank you.

20          MS. SAAVEDRA:  Thank you, your Honor.

21       (Proceedings concluded at 3:13 p.m.)

22

23

24

25

1                        C E R T I F I C A T E

2

3              I, Cheryl L. Cummings, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7                        Dated this 16th day of February, 2019.

8                        /s/Cheryl L. Cummings

9                        Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
                         Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25