1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3   Carrie Ferrara Clark,           )
                                     )
4           Plaintiff,               )
                                     )   CV-14-2543-TUC-CKJ
5        vs.                         )
                                     )   Tucson, Arizona
6   City of Tucson,                  )   April 1, 2019
                                     )   4:16 p.m.
7           Defendant.               )
    _____ )

8
                  REPORTER'S TRANSCRIPT OF PROCEEDINGS
9
        EXCERPT JURY TRIAL DAY ONE - DEFENSE OPENING STATEMENT
10
              BEFORE:  THE HONORABLE CINDY K. JORGENSON
11                 UNITED STATES SENIOR DISTRICT JUDGE

12  APPEARANCES
    For the Plaintiff:
13       Jacobson Law Firm
         By:  JEFFREY H. JACOBSON
14       2730 East Broadway Blvd., Suite 160
         Tucson, Arizona 85716
15
    For the Defendant:
16       City of Tucson Attorney's Office
         By:  MICHELLE R. SAAVEDRA, ESQ.
17       Civil Division
         PO Box 27210
18       Tucson, AZ 85726-7210;

19       Iafrate & Associates
         By:  RENEE J. WATERS, ESQ.
20       649 North 2nd Avenue
         Phoenix, Arizona 85003
21
    Cheryl L. Cummings, RDR-CRR-RMR
22  Official Court Reporter
    Evo A. DeConcini U.S. Courthouse
23  405 West Congress, Suite 1500
    Tucson, Arizona 85701
24  (520)205-4290

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared by Computer-Aided Transcription

P R O C E E D I N G S

(Reporter's note:  Beginning of requested proceedings commenced at 4:16 p.m., as follows:)

OPENING STATEMENT ON BEHALF OF THE DEFENDANT

MS. WATERS:  Most of life is what you make it.  The plaintiff would like you to think that this case is about the City of Tucson not following federal law.  But actually what you're going to find is that it's about the City of Tucson and the fire department specifically not doing what plaintiff wanted.  Federal law creates a floor, and cities and other employers must make sure that their actions comply with the floor.  But what Carrie requested from TFD wasn't the floor; what she requested was the ceiling.

You'll hear from a number of administrators of the Tucson Fire Department who will tell you that they made every effort to accommodate Paramedic Clark within the rules that they have to abide by.  You will hear that from one person after another.  And they will probably tell you that eventually they were frustrated themselves by the process because they felt like they were bending over backward to make Ms. Clark happy and that nothing they did was good enough.

To really understand this case, you have to appreciate two things.  First, you have to appreciate what it is like to operate within a structure like a fire department. The Tucson Fire Department, like all fire departments, police

1    agencies, is a hierarchical organization.  People exist based

2    on their rank, seniority matters, and if you're talking to

3    someone who is an officer superior to you, you do not have the

4    luxury of engaging with them the way you would with someone of

5    an equal rank.  That doesn't mean much to most people.  Most

6    people have never worked in an environment like that.  Unless

7    you've served in the military or you've worked in a similar

8    organization, it is hard to appreciate exactly what it means

9    to know that the way you engage with the person standing

10   across from you depends on whether they are above you in rank,

11   below you, or equal to you.  Those rules define the human

12   interactions that take place within the fire department.

13          You also have to appreciate that the fire department

14   is an organization with a strong union.  And most of the rules

15   that the fire department applies to its employees are the

16   result of a long negotiation process between the department

17   and union representatives.  The fact that these rules come

18   from this negotiated process means that oftentimes

19   administrators' hands are tied.  Even if they would like to

20   deviate from the rules they often cannot.  The administrators

21   you'll hear from will tell you they're fully aware that if

22   they deviate from their rules with respect to one employee,

23   they're going to upset 10 or 15 others; and in all likelihood

24   they'll have union representatives in their laps by the end of

25   the day asking why they have done whatever action they've

taken.  Now, that doesn't mean that the fire department didn't
make efforts to accommodate Ms. Clark in this case.  You'll
hear that they did.  They actually made extreme efforts.  But
they had to make those efforts and make the decisions within a
structured set of rules, and you'll hear all about those.

The plaintiff would like to make this case about TFD
not giving her what she wanted, but we have to stop and
consider what did Ms. Clark herself do and what did she not
do.  So here are a few things that's important for you to
know.

Before Ms. Clark ever came back from her maternity
leave, she contacted the Battalion 1 chief, Paul McDonough,
and she talked with him about an appropriate station
assignment for her.  She knew that she was on swing shift.
She knew that she didn't have the seniority as a paramedic to
be able to bid on a permanent station assignment and win.

You'll find out that where -- which station you are
assigned to within TFD is decided by a bidding process.  And
if someone who has more years in your rank than you have makes
a bid for that spot, they win the bid.  It is all about
seniority.  These are called the rules of assignment, and
they're one of the primary rules that have been carefully
negotiated between the department and the union representing
the firefighters.  The rules of assignment are designed to
provide transparency to the assignment process and to make it

1   fair for everyone.

2          So Ms. Clark, upon approaching the end of her first

3   maternity leave, knew that she did not have the seniority to

4   win a bid.  She contacted Paul McDonough and she asked, Is

5   there a place that I can go?  She explained to him that she

6   would need to pump breast milk when she came back to work.

7   And Battalion Chief McDonough, you'll hear, did everything he

8   could to accommodate her.  Before she ever came back from

9   maternity leave, he worked out an arrangement where she could

10  go and be permanently assigned or at least assigned for a

11  long-term period of time to Station 20.

12         Now, you'll hear that Station 20 is one of the

13  nicest, newest stations that the Tucson Fire Department has

14  available.  It has private dorm rooms for every firefighter

15  and paramedic that have locks on the doors, no windows.

16  Battalion Chief McDonough thought it would be a really perfect

17  place for Ms. Clark to go when she returned from her maternity

18  leave, and initially Ms. Clark agreed with him.  So when

19  Ms. Clark came back from her maternity leave, she had a place

20  to go.  Station 20.  She would have had a room that was hers

21  that she could have cleaned, maintained, kept her materials

22  in, that would have been a locking room, free from intrusion,

23  and no one else would have been using it.

24         But when she came back, she worked her first shift

25  at Station 12.  Station 20 is located at River Road and First

Avenue.  Station 12 is located on the far east side of Tucson.
When Ms. Clark came back and she worked a shift at Station 12,
she decided that she liked Station 12 better.  It had a female
captain, it had another female firefighter there who was also
breastfeeding or had been breastfeeding.  And most
importantly, it was close to her mother's house.  Apparently
her mother was watching her child during the day, and she was
coming to the fire station to pick up the breast milk that
Ms. Clark was pumping while she was on duty.  I imagine
Ms. Clark will tell you that her child did not do well in the
car and did not like to take long car rides across town.
Station 12 was substantially closer to her mother's house than
Station 20.

       The problem with Station 12 is that there was no
place for her there.  She had been assigned to work at
Station 12 on the swing shift when there was an opening.
Having worked there once, she went to Battalion Chief
McDonough and said, you know, I appreciate all that you did
for me on Station 20, but I'd actually rather stay on swing
shift and take my chances in the hopes that I can go to
Station 12.  That is a choice that Ms. Clark made after her
first shift back.

       Having decided that what she wanted was Station 12,
Ms. Clark started talking with another paramedic who worked
there, a fellow named Jeff Todd.  Jeff Todd was interested in

1    moving to a different station.  The new captain who came into

2    Station 12 was not someone with whom he got along.  What

3    Ms. Clark apparently did not know is that while she and Jeff

4    Todd were negotiating for some sort of trade, Jeff Todd was

5    receiving a performance evaluation from his captain that was

6    not good and that necessitated the department moving him

7    involuntarily from Station 12 to Station 9.

8          That matters for this reason:  As a general rule,

9    within the Tucson Fire Department, two individuals cannot just

10   decide to trade places.  If person A works at Station 1 and

11   person B works at Station 6 and they decide they want to swap,

12   that's not allowed.  That would violate the rules of

13   assignment.  You can imagine why.  It would be chaos, it would

14   make it difficult for the department to keep up their staffing

15   levels, and it would create situations where people arrange to

16   work with whom they liked or avoid whom they did not.  It

17   would be a disaster.  But the point for us really is simply

18   that it is not permitted.

19         So Ms. Clark thought that she had a loophole to the

20   ban on trades between employees.  She was under the impression

21   that if a permanently assigned employee went voluntarily to

22   swing shift rather than being transferred to another station,

23   that that position could be filled without going through the

24   bid process.  The bid process is the assignment process by

25   which other firefighters or paramedics have the opportunity to

 1    bid on a station.  But because of Jeff Todd's performance
 2    evaluation and the issues that he was having with his captain
 3    at Station 12, his supervisors had already decided that he
 4    needed to be moved.

 5           So when Jeff Todd requested to voluntarily go to
 6    swing shift, they denied the request and they placed him at
 7    Station 9.  They chose Station 9 because that's where the
 8    battalion chief was located, and the battalion chief would
 9    have the opportunity to evaluate his performance and
10    essentially keep an eye on Paramedic Todd until they were
11    confident that the issues he was having at Station 12 were an
12    isolated event.  So when Jeff Todd was moved to Station 9, the
13    position for the paramedic at Station 12 went to the bid
14    process.  A paramedic named Scott Billings put his name in for
15    the spot, and he was senior to Ms. Clark so he won the bid.

16           But Ms. Clark still wanted Station 12 even though
17    there was no place for her there.  So the next thing that
18    happened is Paramedic Clark's husband, a captain in the fire
19    department, called up Scott Billings, the other paramedic, and
20    said, you know, my wife really wants this spot at Station 12.
21    I'd like you to withdraw your bid.  Now, this was alarming and
22    offputting to a number of people in the fire department, and
23    this goes back to the importance in an organization like TFD
24    of rank.  For a captain to call a subordinate, a paramedic,
25    and say, I'd like you to give up that spot so my wife can have

1  it, is an abuse of power.  It is an abuse of his rank.  And

2  nobody involved in the situation had any appreciation for it

3  having happened.

4        Paramedic Billings immediately notified his

5  supervisors and asked, What's going on?  I understand I'm not

6  going to get this spot even though I won it because Captain

7  Clark is telling me his wife needs it.  It was that phone call

8  that alerted TFD administration to the fact that Ms. Clark's

9  husband had been using his rank to attempt to gain an

10 advantage over the rules of assignment for his wife.  But

11 Paramedic Billings, much to his credit, agreed that, while he

12 wanted the spot and wanted the bid, he would delay assuming

13 the spot to give Ms. Clark a little more time at Station 12

14 while they looked for another assignment for her.  Nobody

15 required him to do that.  He didn't have to.  The chiefs did

16 ask him if he was willing because everyone saw that as a good

17 temporary solution and, again, much to Paramedic Billings'

18 credit he agreed.

19        So Ms. Clark was then at Station 12, a station that

20 she believed was compliant with federal law, a station where

21 she was comfortable and the station where she most wanted to

22 be.  But at the end of 2012, it was time for Paramedic

23 Billings to fill that spot.  In the meantime, Ms. Clark never

24 reapproached Battalion Chief McDonough to ask whether the

25 opportunity at Station 20 was still available.  Instead, when

1   Paramedic Billings took the spot that he was entitled to at

2   Station 12, Ms. Clark went back on swing shift.  The way swing

3   shift staffing happens is that each day the battalion chief

4   over Battalion 1 and the captain who's stationed there look at

5   the schedule and the people they have available to work and

6   they'll tell you it's a little bit like putting pieces of a

7   puzzle in place.  And they have to do this for every shift.

8   And generally what happens is the employees have the

9   opportunity to see their schedule online, they can access it

10  via the Internet, and look to see where they're going to be

11  assigned for a particular shift.

12          Well, Chief McDonough will tell you that while he

13  was doing the staffing process each day, he would frequently

14  get calls from Ms. Clark asking him, Where are you going to

15  assign me?  I see there's an opening place at this station;

16  I'd be comfortable there.  I see there's a place at that

17  station; I really don't want to go there.  And Chief

18  McDonough, even though he didn't have to, he did everything he

19  could to accommodate those requests.  If there was an opening

20  at 12, he'd put Ms. Clark at Station 12.  If there was an

21  opening at another station where he knew she was comfortable,

22  he'd put her at that station.  He tried to avoid stations

23  where he knew she was not comfortable.  And the reasons why

24  Ms. Clark may not have been comfortable at any given station

25  were sometimes related to the facilities and sometimes they

1   were related to other issues.  We'll talk about those in a

2   minute.

3        So this goes on for a while, with Ms. Clark on swing

4   shift, with Captain McDonough and the other -- Chief McDonough

5   and the other chiefs responsible for staffing doing everything

6   that they could to place her at a station where she would be

7   comfortable.  And if she was assigned to a station that she

8   did not like, either because someone other than Chief

9   McDonough did the staffing and was not familiar with her

10  situation or because there were simply no other openings, she

11  would call in sick.  She would use sick time or vacation time

12  to avoid having to go to a station that she did not want.

13       And here we should probably talk about something you

14  were told during plaintiff's counsel's opening.  He told you

15  that 40 percent of the Tucson Fire Department stations at that

16  time were noncompliant.  I will tell you that's not true.

17  There was an investigation that you'll hear about done by the

18  human resources -- a part of the human resources division for

19  the City of Tucson.  The person doing this investigation or

20  the assessment of the fire stations did find a number of

21  stations were noncompliant; however, he'll testify here at

22  trial he did not understand the requirements of the law which

23  was relatively new when he went out and he did -- made those

24  assessments.  And he'll tell you that looking back at that

25  list today, he would not find the stations noncompliant that

1    he identified at the time.

2           There were no legally noncompliant fire stations

3    when Paramedic Clark was on swing shift.  There were fire

4    stations you'll hear that were nicer than others, fire

5    stations that offered more privacy than others.  But even

6    Station 9, the station where Paramedic Clark seemingly most

7    did not want to go, even there, there were private rooms.

8    They did not have doors, they had curtains that could be

9    secured, but there were private rooms available.  There was

10   also a study room where a piece of paper or a curtain could

11   have been placed over the window and the door locked and that

12   room utilized.

13          But TFD understood that what Paramedic Clark wanted

14   was not the floor of what the law requires.  They understood

15   that what she wanted was a greater degree of privacy than the

16   law requires.  A lock on the door, which you will not hear

17   anyone tell you is required by the law.  And a place where she

18   would not have to clean the space each time she wanted to

19   utilize it, meaning that it would not be used for a different

20   purpose, only for her -- it would only be available for her

21   usage.  And despite the fact that that is more than the law

22   requires, you'll hear that TFD worked very hard to accommodate

23   those requests.  When they discovered that they had stations

24   that did not have rooms, private rooms with locks on the

25   doors, they went out, they started putting locking on the

 1   door.  They had the door at Station 9 with the window in it,

 2   they changed the entire door over to a solid wood door with a

 3   lock.  They were making every effort to be responsive to

 4   Ms. Clark's complaints.

 5          But before that happened, before the door was

 6   changed, there was a day in March when Ms. Clark was assigned

 7   to Station 9.  She called in.  She finally got ahold of Chiefs

 8   Rodriguez and Fischback.  They had the human resources

 9   director for the Tucson Fire Department, not for the City

10   itself but specifically for the fire department, in the room

11   on the phone call.  Now, JoAnn Acosta, the human resources

12   person was fairly new in that position.  And while she had a

13   lot of experience in human resources, she did not have a lot

14   of experience with the fire department.  So it is absolutely

15   true that on the phone call with Ms. Clark, Ms. Acosta did

16   mistakenly suggest that she could use the chief's room as a

17   private space when she needed to express breast milk.

18          Very quickly Chiefs Rodriguez and Fischback said no,

19   no, no, no, that will not be appropriate because they

20   recognized, just like Ms. Clark did, that that was not a good

21   solution.  But before they could assure Ms. Clark that they

22   did not agree with that particular assessment of the

23   situation, she got angry, she got frustrated, and she said,

24   You must be out of your friggin minds, and she hung up the

25   phone on them.  They will tell you that they know she hung up

1   the phone because when they tried to call her back, she did it

2   again.  Now, in a lot of jobs, that might be bad, but perhaps

3   not so bad; however, going back to the structure of the fire

4   department, you cannot speak disrespectfully to someone of a

5   higher rank than you.  And Ms. Clark was disciplined for it.

6   It was an angry outburst.  It was not a formal discipline.  It

7   was a verbal.  And the chiefs will tell you they thought it

8   was appropriate.

9        Ms. Clark did not go to Station 9 that day.  She did

10   not go to Station 9 the entire time she was on swing shift.

11   She never worked at a noncompliant station.  She never worked

12   a single shift at a station that did not comply with federal

13   law.

14        Eventually -- or, I'm sorry, during that same

15   conversation or that same time period with Ms. Clark, Chiefs

16   Fischback and Rodriguez also learned that Ms. Clark had

17   sometimes taken a truck out of service so that she could pump

18   breast milk.  The taking of a truck out of service meant that

19   if an emergency did happen and a truck needed to be

20   dispatched, a different truck from a neighboring station area

21   would have to respond.  So it's not that no one would show up

22   to an emergency, but it would hurt the response time.  And one

23   thing that you will hear from members of the TFD

24   administration is, they track their response time very, very

25   closely.  They live and die by that response time.

So Chiefs Rodriguez and Fischback were alarmed when
they found out that Ms. Clark had sometimes taken the truck
out of service to pump breast milk.  And they realized they
needed a solution for the problem, and they wanted to find
something that would work for Carrie, for Ms. Clark, and for
the department.  And you'll hear in their testimony, these
were not men who were insensitive to her situation.  They may
have been unfamiliar with her situation, but they were not
insensitive to it.  They wanted to find the right place for
Ms. Clark, and they realized that the right place might be
Station 6.

Station 6 made sense.  There was a firefighter
opening there that had gone unfilled for a period of time
despite having been put out in the bid process.  And they
realized they could fill that spot with Paramedic Clark even
though she's a paramedic, and they could do it without having
to worry about taking a truck out of service because it so
happened that the captain assigned to Station 6 was also a
paramedic.  So they had one paramedic plus a captain who could
act as a paramedic.  So for Ms. Clark to be the second
paramedic at that station meant that even if she was
indisposed because she was pumping breast milk, they still had
two paramedics, counting the captain, who could respond to any
situation they needed to.  It was also a very experienced
captain at Station 6 with a rather experienced crew, and he'll

1   tell you that they asked him to place Carrie at Station 6 and
2   told him that they thought the station would be a good fit for
3   her and they thought that crew would be a good fit for her.
4   That captain's name is Ted McDonough.  If you're curious, yes,
5   he is the brother of Paul McDonough.

6           So Ms. Clark went to Station 6.  And she hadn't been
7   at Station 6 very long before Tucson Fire Department did issue
8   a policy related to nursing room access.  The City hadn't had
9   a policy before only because no employee had ever raised the
10  issue.  But once Ms. Clark raised it and the City worked to
11  bring all of its stations into line with what they thought was
12  appropriate, even in excess of what the law required, they
13  also issued a policy.

14          Now, Ms. Clark made a number of -- not complaints,
15  because that's not the right word.  She mentioned on more than
16  one occasion that there were people who were mocking her over
17  the nursing room policy.  Other members of the fire
18  department, not administrators, but other members who were
19  calling it the Carrie Clause or making other comments about
20  the policy and attributing it to her.  What you'll hear is
21  that every chief she mentioned that to asked for details and
22  assured her, if that's happening, we want to put a stop to it.
23  We're not going to tolerate that kind of behavior.  We're not
24  going to tolerate it from other firefighters.

25          Ms. Clark, for whatever her reasons were, never

1    provided sufficient details for those issues to be

2    investigated.  But make no mistake, they would have been.

3    They would have been investigated and they would have been

4    addressed.  And that's what you'll hear from every single

5    administrator who was aware that Ms. Clark felt singled out.

6    They wanted to help her from start to finish.

7           Maybe because of those comments, maybe for other

8    reasons, once she was at Station 6, Paramedic Clark kind of

9    isolated herself from her coworkers.  To what, if any, extent

10   that had in terms of making the situation worse or affecting

11   her perception of the events, I'm not sure, but I have to

12   think that it played a role in how she saw her place in the

13   fire department at that point.  You'll hear a lot about

14   Ms. Clark's perception of these events, how she felt she was

15   being treated, the motives that she ascribed to people whom

16   she was dealing with.  But how much of that was her perception

17   versus the reality is one of the questions you have to decide

18   in this case.  You'll hear from a number of other witnesses

19   that they wanted to do everything they could to find the right

20   place for her to make her happy.

21           After a period of time at Station 6, Ms. Clark moved

22   to a position as a fire inspector.  Shortly after moving over

23   to fire inspection, she went on her second maternity leave.

24   In November of 2014, she returned from her maternity leave and

25   she resumed her spot in fire prevention.  And I'm sorry,

1   leading up to her maternity leave, she wanted to trade shifts
2   with her husband.  And the department didn't allow that.  They
3   didn't allow it because her husband was a captain and she was
4   a paramedic.  And even though her husband was also a paramedic
5   and could fulfill her duties, they care about your rank.  And
6   so asking firefighters and paramedics to work as equals with a
7   captain creates a situation that TFD was not prepared to
8   allow.  Having one captain supervise another captain is a
9   situation that TFD was not prepared to allow.  The Clarks were
10  told those trades were inappropriate and that they would not
11  be permitted.
12          And I'm sorry, I also left out, I should address the
13  drill that went on before Ms. Clark went over to fire
14  prevention.
15          So while she was at Station 6 under the supervision
16  of Captain Ted McDonough, Ted McDonough had a firefighter who
17  wanted -- who was training to be an engineer.  And in the fire
18  department an engineer is the person who controls the
19  hydraulics of the water.  So when you actually turn the water
20  on, he's the guy who controls the pressure and, honestly, I
21  don't know what all goes into it but I can guess.
22          So Tyler McKendrick was getting ready to study --
23  or, was getting ready to take his engineer test.  The squad or
24  the crew was on the way back, Captain McDonough saw a park and
25  decided it would be a good place to permit Tyler McKendrick to

 1  have an opportunity to practice running the hydraulics on the

 2  fire engine.  So he told everyone to stop.  He made up a

 3  scenario which you'll hear is a common thing that captains do

 4  when they want to drill their crew.

 5          Drills happen all the time for a number of reasons.

 6  They might happen when you get a new crew member, they might

 7  happen when someone comes back from an injury, they might

 8  happen just because it's been a while since you've run a

 9  drill.  Captains run drills in order to see how their team

10  works together and to make sure that everyone is properly

11  fulfilling the functions that they're supposed to.  So Captain

12  McDonough made up a scenario when they stopped at the park

13  that the regular engineer had been injured which is why Tyler

14  McKendrick needed to run the hydraulics.

15          Now, McKendrick did not know that this drill was

16  going to happen, and Captain McDonough was doing it for the

17  benefit of allowing him to practice in advance of his test.

18  Part of the drill was that Carrie or Ms. Clark, along with

19  Captain McDonough, would drag the hose and Tyler would run the

20  water.  As they were dragging the hose into the park, Chief

21  McDonough indicated that he wanted to pull the hose over to a

22  particular section of the park.

23          Ms. Clark got angry, frustrated, she threw down the

24  hose, and she walked away in tears.  Captain McDonough called

25  to her asking what was wrong.  She refused to turn around, she

1   refused to acknowledge him, she just kept walking.  Captain

2   McDonough will tell you that in all the years he's been a

3   firefighter -- and it's been many, he's never had a paramedic

4   or a firefighter act that way on his crew.  He was so taken

5   aback by the behavior that he actually called his supervisors

6   and then waited in the park for them to arrive so he could

7   apprise them of the situation and someone could talk to

8   Ms. Clark and find out what was going on.

9          Now, maybe the frustration was borne of feeling like

10  she had been singled out.  Captain McDonough never had the

11  opportunity to find out.  He'll also tell you that if what he

12  had wanted was a severe discipline for the fit that Ms. Clark

13  threw that day, he could have had it.  He could have pushed

14  for a more serious discipline for that incident because of the

15  level of insubordination involved.  But he didn't.  Captain

16  McDonough, like everyone else who supervised in Ms. Clark,

17  understood that she was going through a difficult time.  And

18  while he wanted to address the behavior, he did not want to

19  belabor the point.

20         Ms. Clark went on her second maternity leave.  When

21  she returned, she went back to fire prevention.  You'll hear

22  that in fire prevention one of the things that happened was

23  that she had a disagreement with another inspector named Nikki

24  Sprenger, whom you'll hear from.  Ms. Clark apparently

25  believed that Ms. Sprenger's inspection practices or the job

1  that she was doing was inadequate.  And Ms. Sprenger overheard

2  her discussing it, she raised the issue with Ms. Clark, and

3  Ms. Clark was disciplined as a result of that interaction.

4  One of her assignments in fire prevention was not to inspect

5  her equal inspectors.

6  　　　　　The other thing that you have to appreciate as you

7  hear the evidence in this case is that for whatever reason,

8  maybe from that first phone call, Ms. Clark never warmed up to

9  JoAnn Acosta, the HR person for the Tucson Fire Department.

10  And when I say never warmed up, I am understating the matter

11  dramatically.  Ms. Clark did everything that she could to

12  avoid Ms. Acosta.

13  　　　　　You heard already about this $150 club, the $150

14  paramedic pay that plaintiff alleges she was deprived of as an

15  act of retaliation.  What you'll actually hear is that in

16  order to receive her paramedic pay, all Ms. Clark had to do

17  was fill out a form requesting it; the same form that every

18  other TFD paramedic who changes positions has to fill out.

19  Why didn't she fill it out on time?  Because she refused to go

20  to Ms. Acosta's office and pick it up from her.  As a result,

21  the form was late and her submission was therefore not active

22  until two weeks later.  So Ms. Clark missed one pay period's

23  worth of paramedic pay because she refused to go pick up a

24  piece of paper from the HR manager.

25  　　　　　Speaking of Ms. Acosta, I can't stand here and tell

you that everything every person ever said to Ms. Clark was
ideal.  Ms. Acosta will tell you that she regrets saying to
Ms. Clark your breast pumping -- your breast milk pumping
seems excessive.  Ms. Acosta will tell you that the words just
came out of her mouth because she was thinking about her own
experience when she had a child and was pumping breast milk.
She wasn't really saying it as a human resources manager,
though she should have kept that hat on.  She was saying it
based on personal experience.  If she could take it back, she
would.  Obviously she can't.  And to the extent that that
adversely affected the way Ms. Clark viewed Ms. Acosta and
made the situation more difficult, I think you'll hear that
she regrets that very much.

        But both Ms. Clark and Ms. Acosta are grownups.  And
so even after a comment like that said in error, you still
have to be able to work with people.  You still have to be
able to work out these issues.  You need to go talk about it
like an adult, not hide from the person who's responsible for
all of the human resources administration that goes on in your
office.

        You've also heard that Ms. Clark was transferred out
of fire prevention, which is true.  You'll hear Chief
Critchley, former Fire Chief Critchley talk about the
directive he was given to shrink the size of fire prevention
and about his efforts to find a place for Ms. Clark where she

 1   would really be happy, where she could excel in the fire

 2   department.  He has this infectious enthusiasm that you'll get

 3   when he takes the stand.  He tells everyone he meets if you

 4   want to be a firefighter, there's a place for you.  In fact,

 5   it doesn't matter what you want to do in life, there's a place

 6   for you at the fire department.  You want to be a lawyer, you

 7   can do it at the fire department.  He is passionate about

 8   finding a place where every person under his charge can be

 9   successful.

10          And that extended to Ms. Clark, but he'll tell you

11   that he moved her out of fire prevention and he had a number

12   of reasons for doing it.  One of them was his need to shrink

13   that division altogether.  When Ms. Clark was moved out of

14   fire prevention and told she was going back out to operations,

15   she went back on light duty.  During that time, there was an

16   issue of her -- whether she could use flex time, so she was

17   assigned to Station 1, which is where the fire department

18   headquarters is.  And there was -- she raised the issue of

19   whether she could use flex time to come in at 6 and leave

20   early and she wanted to work out at a station other than the

21   one where she was assigned.

22          The administration said no because people on light

23   duty assignments have to receive work every day from the

24   people who were supervising their light duty.  And if you're

25   here at 6, there's no one here to give you work.  Light duty

1    people are not allowed to flex their time in the way that
2    Ms. Clark tried to.

3          Firefighters are also generally required to work out
4    at the station where they're assigned.  They don't get to work
5    out at a different station.  They don't get to drive across
6    down, leave work early, drive across town and work out
7    someplace more convenient.  They don't get to go work out at a
8    nicer gym.  And you would be hard-pressed to find a nicer gym
9    than the one at Station 1.  That facility is absolutely
10   amazing.  You'll hear that it is a state-of-the-art gym and
11   the best one that TFD has.  But Ms. Clark didn't want to work
12   out there.  She wanted to work out someplace more convenient,
13   and the fire department said no, that's not within our rules.

14         So some of that probably sounds petty.  And some of
15   the rules are very specific and they sometimes require
16   responses that are not consistent with what people would do in
17   any other situation.  But what you'll hear consistently from
18   every person who testifies is that the fire department
19   administrators did everything they could for Ms. Clark.  They
20   did everything they could within the rules and they wanted her
21   to be successful.

22         Ms. Clark was the first person to bring up this law.
23   This requirement has only been in place since the passage of
24   the Affordable Care Act.  So at the time Ms. Clark brought it
25   up, it was a new requirement that the fire department had not

yet dealt with.  And they hadn't dealt with it despite the

fact that they had other women in the department who were

breastfeeding even at that time.  But Ms. Clark was the first

person to raise the issue.  She was not, however, the first

female firefighter to breastfeed on the job.  You'll hear that

there were female firefighters at TFD pumping milk on the job

long before it was cool and certainly long before there was a

law that mandated they have time to do it.  What you're going

to hear consistently throughout this trial is that the City of

Tucson is actually one of the most progressive family friendly

employers in Arizona.  The City has a paid maternity leave

law.  The City has a number of female firefighters who were

expressing breast milk on the job more than a decade ago.

One of them whom you'll hear from is Assistant Chief

Laura Baker.  Assistant Chief Baker also happens to be one of

the highest ranking female firefighters in the state of

Arizona.  And she's going to talk, along with another female

TFD employee are going to talk with you about the way the

department actually made it possible for them to both have

families, to raise their kids the way they wanted to, and to

still do the job that they love:  saving lives.  You'll hear

testimony from both of them and they'll tell you that the

people they worked with were fantastic about the situation.

They had developed good relationships with their coworkers.

So when they needed a little help, when they needed a little

1    extra time or someone to step in, they didn't have any

2    difficulty finding people who were willing and happy to help.

3    Because that's how the fire department operates.  If you make

4    yourself a home there, they will treat you like a family.

5            The first female Supreme Court Justice Sandra Day

6    O'Connor said it's good to the first woman, but you don't want

7    to be the last.  And that's something that you'll hear

8    Assistant Chief Baker takes to heart.  The Tucson Fire

9    Department has made it possible for her to have everything in

10   life and she's trying to give that back by running a camp for

11   girls trying to encourage them to pursue nontraditional

12   careers in police and fire service.  She's a great example of

13   what TFD actually does with women when they give the

14   department the opportunity to work for them.  How do we know

15   that the fire department does a great job?  They have a

16   100 percent retention rate for women who return from maternity

17   leave.  You won't find that in most industries for most

18   employers.  100 percent of the women in the last 10 years who

19   have taken maternity leave at the fire department have come

20   back at the end.  They don't quit, they don't retire.  They

21   return.  And most of them return and have another child.

22           That's one way that we know that not only does the

23   fire department not discriminate against people because

24   they're women or because they're pregnant or because they're

25   breastfeeding, the fire department actually goes above and

1    beyond to make life choices possible for its female employees.

2    So this case is not just about what Ms. Clark believes the

3    fire department should have done for her and didn't; it's

4    about what the fire department does for its female employees.

5    There may not be many, but they stay in that job until they

6    retire because the fire department makes it possible to be

7    women and to be firefighters and to have families.

8            You have a difficult job in this case.  You have to

9    try to discern the motives of people who were making

10   decisions.  In order to do that, I ask that you pay close

11   attention to all the witnesses who appear before you.  You

12   have to decide what their credibility is, what they stand to

13   gain from the lawsuit, what they stand to loose, what their

14   motivations are for testifying, what their motivations were

15   for the decisions that they made.  And I'm confident that at

16   the end of this trial, having heard from a number of TFD

17   employees as well as the administrators, the chiefs, the

18   supervisors who were responsible for doing what they could for

19   Ms. Clark, I am confident that you will conclude that the fire

20   department did what they could for Ms. Clark.  And they were

21   frustrated and upset when it wasn't good enough.

22           You'll conclude that not only did the fire

23   department meet the minimum of the law, but that they went

24   above and beyond.  Because the reality is most of life, most

25   of what happens, it's all about what we make it.  If you

1   create great relationships with your coworkers, they're going

2   to step in for you when you need help.  If you handle

3   situations you're involved in a mature, communicative way,

4   you're going to find reception on the other side.  Ms. Clark

5   did not make the best of what TFD had to offer her.  But what

6   they offered her complied with the law and more importantly

7   complied with basic standards of fairness and decency.  Thank

8   you.

9         THE COURT:  Thank you, Ms. Waters.

10         So members of the jury, we're going to take our

11   evening recess.  Please continue to follow the admonition that

12   I just gave you a little bit ago when I read to you the

13   preliminary jury instructions.  Have a good evening.

14         You can leave your items, your jury badge, I guess

15   you don't have your badges yet.  You're going to get your jury

16   badges.  You can leave those -- wear those outside of the

17   courtroom and when you come back into the courthouse, but you

18   can leave your notebooks and other materials in the jury room

19   if you like.  And we do lock the courtroom when we don't have

20   court, so you can also leave things on your chairs if you'd

21   like.  So have a good evening and we will see you tomorrow at

22   9:00.  And Sandy will show you the jury room and where you'll

23   be convening and how to get into that room.

24      (Jury panel excused at 5:03 p.m.)

25         THE COURT:  The record may reflect the absence of

1    the jury and we will stand at recess then until 9:00 tomorrow

2    morning.   Have a good evening.

3         (Proceedings concluded at 5:03 p.m.)

```
1                    C E R T I F I C A T E

2

3          I, Cheryl L. Cummings, certify that the

4  foregoing is a correct transcript from the record of

5  proceedings in the above-entitled matter.

6

7                    Dated this 5th day of April, 2019.

8                    /s/Cheryl L. Cummings

9                    Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
                     Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```