1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3   Carrie Ferrara Clark,              )
                                       )
4            Plaintiff,                )
                                       )   CV-14-2543-TUC-CKJ
5        vs.                           )
                                       )   Tucson, Arizona
6   City of Tucson,                    )   April 4, 2019
                                       )   4:30 p.m.
7            Defendant.                )
    _____  )

8
                REPORTER'S TRANSCRIPT OF PROCEEDINGS
9
        EXCERPT JURY TRIAL DAY FOUR - TESTIMONY OF EDWARD NIED
10
             BEFORE:  THE HONORABLE CINDY K. JORGENSON
11                UNITED STATES SENIOR DISTRICT JUDGE

12  APPEARANCES
    For the Plaintiff:
13        Jacobson Law Firm
          By:  JEFFREY H. JACOBSON
14        2730 East Broadway Blvd., Suite 160
          Tucson, Arizona 85716
15
    For the Defendant:
16        City of Tucson Attorney's Office
          By:  MICHELLE R. SAAVEDRA, ESQ.
17        Civil Division
          PO Box 27210
18        Tucson, AZ 85726-7210;

19        Iafrate & Associates
          By:  RENEE J. WATERS, ESQ.
20        649 North 2nd Avenue
          Phoenix, Arizona 85003
21
    Cheryl L. Cummings, RDR-CRR-RMR
22  Official Court Reporter
    Evo A. DeConcini U.S. Courthouse
23  405 West Congress, Suite 1500
    Tucson, Arizona 85701
24  (520)205-4290

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared by Computer-Aided Transcription

1                    EXAMINATION INDEX

2    WITNESSES CALLED ON BEHALF OF THE DEFENSE

3    EDWARD NIED

4          DIRECT BY MS. SAAVEDRA                    3

5          CROSS BY MR. JACOBSON                    19

6          REDIRECT BY MS. SAAVEDRA                 25

7          RECROSS BY MR. JACOBSON                  30

8
                          EXHIBIT INDEX
9
                                                    ADM
10   330                                            30

11   333 Bates 396-399                              28

12   333-1                                          30

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        P R O C E E D I N G S
 2          (Reporter's note:  Beginning of requested proceedings
 3    commenced at 4:30 p.m., as follows:)
 4               THE COURT:  All right.  The plaintiff having rested,
 5    the defendant may call its first witness.
 6               MS. SAAVEDRA:  Thank you, your Honor.  We're going
 7    to call Chief Ed Nied.  Former Chief Ed Nied.
 8               THE COURT:  Sir, you can come on in.  Walk up here
 9    to the witness stand.  And you can remain standing and the
10    clerk will swear you in as a witness.
11               EDWARD NIED, GOVERNMENT WITNESS, SWORN
12               THE CLERK:  You may be seated.  Would you state your
13    full name for the record and spell your last name?
14               THE WITNESS:  Edward Lewis Nied, Jr., N-i-e-d.
15               THE COURT:  All right.  And Ms. Saavedra, you may
16    proceed.
17               MS. SAAVEDRA:  Thank you, your Honor.
18                        DIRECT EXAMINATION
19    BY MS. SAAVEDRA:
20    Q.   Good afternoon.  Can I just refer to you as Chief Nied
21    because --
22    A.   You can just call me Ed.
23    Q.   I know you're retired, but is that okay?
24    A.   Cause just call your Ed.
25    Q.   Okay.  I'll call you Ed.
```

1       Can you please tell the jury how long you work for the

2  fire department and what is your last position?

3  A.   I worked for the fire department for about 24 years,

4  11 months; just about 25 years.  And my last position was

5  deputy chief in fire prevention.

6  Q.   And before that what was your position?

7  A.   Deputy Chief of Operations.

8  Q.   Can you tell us, as the Deputy Chief of Operations what

9  were your responsibilities?

10 A.   Basically, assisting the battalion chiefs in doing their

11 work so that they could assist their folks and on down the

12 line.

13 Q.   And in 2012 that was the position that you held?

14 A.   Yes, I believe so.

15 Q.   And if you recall, was it Chief Robert Rodriguez and you

16 were the other chief?

17 A.   Yes, ma'am.

18 Q.   At the time?

19 A.   Yes, ma'am.  Yes, ma'am.

20 Q.   And what area of Tucson were you in charge of?

21 A.   Basically, we split the city in half so that I had more

22 of the east side and he had more of the west side.

23 Q.   And was Battalion Chief Brian Stevens, did he report to

24 you?

25 A.   Yes, ma'am.

1  Q.   And did also Captain Trish Tracy report to you?

2  A.   No.

3  Q.   Well, she reported to Stevens and then Stevens reported

4  to you?

5  A.   Yes, ma'am.

6  Q.   Okay.  So I'm just going to jump right into it.

7       Do you remember in about October of 2012 when Battalion

8  Chief Brian Stevens sent a recommendation to you in regards to

9  some movement at Station 12 due to personnel issues?

10  A.   I remember it, pieces of it, yes.

11  Q.   Okay.  And I can refresh your memory with documents that

12  we have as we move along.  So if there's something that's

13  going to refresh your memory, I'll show it to you, okay?

14       Now, at the time do you remember how Battalion Chief

15  Stevens was handling the situation with Paramedic Jeff Todd?

16  A.   I don't remember the particulars, no.

17  Q.   Okay.  I'm going to go ahead and show you an e-mail that

18  was sent to you by Battalion Chief Brian Stevens to see if

19  that might refresh your memory a little bit.  So let me grab

20  that real quick.

21            MS. SAAVEDRA:  May I approach, your Honor?

22            THE COURT:  Yes.

23  BY MS. SAAVEDRA:

24  Q.   And before I approach, I'm showing you what's been marked

25  as the City's Exhibit 303 ending in Bates stamp 396 through

1  399.

2      So this was an e-mail that Battalion Chief Stevens sent

3  to you?

4  A.   Okay.

5  Q.   Is that what it appears to be in front of you?

6  A.   Yes.

7  Q.   Okay.  I'm sorry, it's Exhibit 333.

8      So in looking at that.  Do you remember that Battalion

9  Chief Stevens had sent you some recommendations in regards to

10 some movement that he thought should take place at Station 12

11 or from Station 12?

12 A.   Yes.  I remember the portion about bringing

13 Paramedic Todd over to Station 9.

14 Q.   Okay.  And in the document that was attached to that

15 e-mail, is that the document that you see there on the

16 follow-up pages?  Does that appear to be the recommendations

17 that Battalion Chief Stevens e-mailed to you?

18 A.   Yeah.  It appears in this paragraph right here that

19 that's what he's suggesting.

20 Q.   And if you look at those recommendations, I know it's

21 been a long time, if you look through the recommendations, do

22 you agree that Battalion Chief Stevens had a couple of

23 recommendations.  One was to move Captain Trish Tracy, the

24 other one was to move Jeff Todd.  I believe it's on the

25 second page that have document that you'll see.

1  A.   I do not remember anything about moving Captain Tracy,

2  but I do remember moving Paramedic Todd.

3  Q.   And I'm sorry, my question wasn't clear.  Not that she

4  was actually moved, but Battalion Chief Stevens had a couple

5  of recommendations.  If you look at page ending in 399

6  actually.  398, 399.  Stevens was recommending moving either

7  one or the other?  Not that Captain Tracy was actually moved,

8  but he presented a couple of different options.

9  A.   I can see that.

10  Q.   And ultimately it was Jeff Todd that was moved out?

11  A.   Yes, I believe that's correct.

12  Q.   Were you privy to any of the conversations that Battalion

13  Chief Stevens had with Jeff Todd?

14  A.   No.

15  Q.   Were you ever there?

16  A.   No.

17  Q.   Okay.  But he did send you a synopsis of those

18  conversations along with his recommendations?

19  A.   Correct.

20  Q.   At the time you believed that Stevens was handling the

21  situation and you really didn't get involved; is that fair to

22  say?

23  A.   That's what we try to do, yes; let the battalion chiefs

24  handle their districts.

25  Q.   And that's what you let Chief Stevens do?

1  A.   Yes.

2  Q.   But you do know that Todd was eventually moved out, and

3  the evidence -- he was first moved to swing and he bid to

4  Station 9.  Does that seem accurate with your memory?

5  A.   If that's what's in here.  I don't remember that exact

6  sequence, but --

7  Q.   Okay.  So do you recall when Jeff Todd was moved out of

8  Station 12 that that left that spot open and it was put out to

9  bid?

10  A.   Yes.

11  Q.   And at that time did you have any involvement with the

12  plaintiff, Carrie Clark?

13  A.   No.

14  Q.   When all of this was going on with Jeff Todd and the

15  Station 12 opening, you weren't in contact with Carrie at that

16  time?

17  A.   Not to my remembrance, no.

18  Q.   Okay.  So the fact that Jeff Todd's position at 12 when

19  he was moved was put out to bid, is there anything unusual

20  about that or was that consistent with how TFD would deal with

21  an open spot when someone is reassigned somewhere?

22  A.   It's a part of our rules of assignment, the Bid Tool.

23  Q.   And just explain, how does that Bid Tool work?

24  A.   Basically, when certain conditions are met, the person

25  who is leaving the station, their spot is put out to what's

1   called bid and it appears on a Bid Tool that is created within

2   the fire department.  There are rules and regulations that

3   both labor and management have agreed upon that we attempt to

4   follow as much -- as closely as possible for consistency's

5   sake and for being able to take care of everyone's needs.  And

6   then the senior-most bidder who has the qualifications for

7   that spot wins the bid.

8   Q.   Do you remember what were the dates that that bid was won

9   or who won it?

10  A.   I remember Paramedic Scott Billings won that bid.

11  Q.   Okay.  And do you remember the date that he won that bid?

12  A.   No, sorry, I do not.

13  Q.   That's okay.  I'm going to show you what's been marked as

14  City's Exhibit 330 ending in Bates stamp 2937, and I'll just

15  show it to him on here.  Just him, not the jury, please.  And

16  the document that I'm showing you, this is a daily bulletin

17  that the Tucson Fire Department puts out?

18  A.   Correct.

19  Q.   And on this document, I'm showing you a portion of it,

20  can you determine by looking at this document when Paramedic

21  Scott Billings won the bid for Station 12?

22  A.   It says November 10th of 2012.

23  Q.   And when he won the bid to 12, what happened to the

24  position that he was in?

25  A.   It goes out to bid.

1   Q.   And if you look at the document in front of you now, the

2   same document, I've just moved it down so you can see the

3   other portion of it, does to tell you what happened -- what

4   position Billings was in and what happened to that?

5   A.   He was at Paramedic 16.  And due to him winning the bid,

6   Paramedic 12C, his position went out to bid.

7   Q.   Okay.  So we knew that November 10th, 2012, Scott

8   Billings won that bid.  Do you remember receiving a phone call

9   from Scott Billings after he had won this bid?

10  A.   Yes.

11  Q.   What do you recall about that phone call that you

12  received?

13  A.   I recall that he was concerned whether he was going to be

14  able to keep the bid or not.

15  Q.   And what did he express to you the reason he had this

16  concern?

17  A.   He had a conversation that -- I believe it was with

18  Gordon Clark with regard to backing out of his bid so that

19  Carrie Clark could stay there.

20  Q.   And when Scott Billings -- Paramedic Scott Billings

21  contacted you about this, how did you respond to it?

22  A.   Basically, I told him that it was his bid to keep.  That

23  there was nothing to my knowledge -- I wasn't involved in

24  anything that would lead me to believe anything otherwise.

25  Q.   And the fact that Gordon had contacted Scott Billings,

 1  what did you feel about that?

 2  A.   Well, I felt like it was probably not the right thing to

 3  do for a couple of reasons.  No. 1, he's married to Carrie.

 4  And No. 2, it was a captain to a paramedic which is a lower

 5  role, so that could potentially put Gordon in a tough spot as

 6  well as Paramedic Billings.

 7  Q.   Do you remember Billings telling you about a comment that

 8  Gordon made to him about that he had talked to Paul McDonough

 9  and so we would see kind of what would happen?  That was the

10  gist of it?

11  A.   That was the gist of it.

12  Q.   So you do remember Billings communicating that to you?

13  A.   I remember it from the memo.

14  Q.   The memo that you wrote about the incident?

15  A.   Yes.

16  Q.   Okay.  And when Billings told you that Gordon had gotten

17  involved and that he made this comment that Paul McDonough was

18  going to take care of basically, what was the first thing that

19  you thought?

20  A.   I wasn't sure what was going on, to be honest with you,

21  because Chief McDonough was not part of the chain of command

22  in that area.  So I wasn't quite sure what was happening.

23  Q.   And the decision to place employees at different stations

24  or assignments, whose decision that?

25  A.   It's basically the employee's decision by putting their

1  name in for the bid.

2  Q.   Gotcha.  And then when someone is moved when it's not put

3  out for bid, -- we've all heard about the Tucson Fire

4  Department management rights.  You're familiar with that?

5  A.   Yes.

6  Q.   So there are occasions where the fire department will

7  move people even though they didn't bid for the position?

8  A.   Correct.

9  Q.   So that would be another way that someone would end up in

10  a different --

11  A.   Yes.

12  Q.   -- assignment?

13  A.   Yes.

14  Q.   Okay.  And in this case with Jeff Todd, he didn't bid to

15  get out of Station 12; correct?  He was moved out originally

16  and then bid for 9?

17  A.   That's my recollection, yes.

18  Q.   Okay.  So did you also receive -- and the phone call that

19  you received, this was early November 2012.  Does that seem

20  about right?

21  A.   Yes.

22  Q.   Shortly after the bid was won.

23       Do you recall also getting a phone call from Captain Max

24  Parks?

25  A.   Yes.

```
 1   Q.   Who was Captain Max Parks?

 2   A.   Captain Max Parks was the captain on Engine 16 "C" Shift

 3   at the time.  I believe he was on the engine.

 4   Q.   And that was Scott Billings' captain before he moved over

 5   to 12?

 6   A.   Yes.

 7   Q.   And what do you recall about the conversation that you

 8   and Max Parks had?

 9            MR. JACOBSON:  Judge, I'm going to object and ask

10   for a sidebar because I think I know where this is going.

11            THE COURT:  Yes.

12       (At sidebar.)

13            MR. JACOBSON:  So this memorandum alleges that Max

14   Parks told him that he didn't want to work with Carrie and

15   that he was on -- on his way to terminating Carrie during her

16   probationary period.  This is going to up a whole can of

17   worms.  I'm going have to call Max Parks in.

18            THE COURT:  He's not a witness right now.

19            MR. JACOBSON:  He's not a witness.  And it is

20   hearsay, it is not relevant to the issues in this case, and

21   they're just trying to do it to dirty up Carrie.

22            MS. SAAVEDRA:  That's not true, your Honor.  What I

23   would like to get out of this witness, and I can lead if

24   that's what you would like me to do.

25            MR. JACOBSON:  Absolutely.
```

 1            MS. SAAVEDRA:  I haven't been doing that because I'm

 2   doing direct, but I can lead him where I want him to go.

 3   Which all I want to ask him is that there was a conflict

 4   between Max Parks and her.  And so originally he had thought

 5   that 16 might be a good place to put Carrie, but because there

 6   was this conflict, he knew he would not recommend to put

 7   Carrie at 16.

 8            MR. JACOBSON:  As long as we establish it was a

 9   mutual conflict, I'm fine.

10            MS. SAAVEDRA:  That's fine.  I wasn't going to bring

11   in the almost failing probation.

12            MR. JACOBSON:  Cool.  Thank you.

13            THE COURT:  Okay.

14            MR. JACOBSON:  Thank you.

15            MS. SAAVEDRA:  Thank you.

16       (Open court.)

17            THE COURT:  And Ms. Saavedra, you may proceed.

18            MS. SAAVEDRA:  Thank you, your Honor.

19   BY MS. SAAVEDRA:

20   Q.   So Max Parks was the captain at 16?

21   A.   Yes.

22   Q.   And during your conversation with Max Parks, you

23   discovered that there was a mutual conflict between Captain

24   Max Parks and Paramedic Carrie Clark; is that correct?

25   A.   Yes.

1    Q.   And the reason I'm asking you that is because at some

2    point you thought that maybe putting -- you didn't know what

3    Carrie's needs were at the time; is that correct?

4    A.   That's correct.

5    Q.   But you thought perhaps 16 might be somewhere that she

6    could go since that was opening up with Scott Billings going

7    to 12?

8    A.   That's correct.

9    Q.   And when you discovered that there was this mutual

10   conflict, you decided that 16 wouldn't be a good place to put

11   Carrie; is that correct?

12   A.   That's correct.

13   Q.   And that's because you didn't want to cause her any

14   additional stress?

15   A.   That's correct.  If I can help it.

16   Q.   So you then contacted Gordon Clark; is that correct?

17   A.   Yes.

18   Q.   And do you remember the conversation you had with Gordon?

19   A.   No, I don't.

20   Q.   If I were to show you the memo that you prepared, would

21   that refresh your memory?

22   A.   I remember from the memo that it basically revolved

23   around -- I don't remember all the specifics, but it basically

24   revolved around the fact that he -- about what he did and

25   that's not something that -- I didn't think that was something

1    he should have done, and that he doesn't control where Carrie

2    can be and cannot be assigned.

3    Q.   Okay.  So you told him that he doesn't get to control

4    where his wife is assigned?

5    A.   That's correct.

6    Q.   Do you recall also telling him that Carrie needed to

7    submit a memo with her request up her chain of command?

8    A.   That's correct.

9    Q.   And then, do you recall that Carrie did submit a memo up

10   her chain of command requesting to go to Station 12?

11   A.   I do from the memo, but I don't remember the memo itself.

12   Q.   Okay.  You don't remember Carrie's memo?

13   A.   No.

14   Q.   You but remember she did submit one?

15   A.   Yes.

16   Q.   Do you remember as a result of Carrie submitting that

17   memo, that you, Chief Rodriguez, and Paul McDonough and Carrie

18   all met in early November 2012?

19   A.   That's correct.  We did.

20   Q.   What do you recall about that meeting that the four of

21   you had?

22   A.   Basically, it was to go over the memo and find out her

23   concerns and needs and try to help her in any way we could to

24   get an assignment or help her with her situation.

25   Q.   During that meeting, did you say anything inappropriate

1   to Carrie Clark?

2   A.   No, ma'am.

3   Q.   Did you hear Rob Rodriguez say anything inappropriate to

4   Carrie Clark?

5   A.   No, ma'am.

6   Q.   Did you start the meeting off with, Okay, Carrie, what's

7   going on here?

8   A.   I don't remember saying anything like that, no.

9   Q.   What do you recall about the demeanor of everyone during

10  that meeting?

11  A.   I recall even Chief Rodriguez pulling his chair over

12  closer and just, you know, when Carrie was upset; I believe I

13  remember that.  And him even putting his head down near where

14  she was and saying, Look, we're here to help you.  We're here

15  to try to make this work.  We're here to try to assist you in

16  any way we can.  That's what I -- that's one thing that comes

17  to my mind.

18  Q.   And do you remember there being some discussion about

19  where Carrie could be placed, like reoffering her the

20  Station 20 placement?

21  A.   I believe there were three other -- there were two

22  options.  Paul McDonough had said something about making 20

23  available in some way.  I'm not sure how that would have

24  worked.  And then I believe Station 6 came up in the

25  conversation, but I'm not -- I'm not positive about that.  But

```
 1   I remember 6 and 20 were two options.

 2   Q.    Okay.  Do you remember as a result of that meeting you

 3   contacting Billings and talking to him about postponing his

 4   time?

 5   A.    Yes.

 6   Q.    Or his movement to 12?

 7   A.    Yes.

 8   Q.    Tell the jury what you recall about that conversation

 9   with Billings.

10   A.    Basically, Scott had been trying to get to that station

11   for a long time to work with a close comrade of his, and he

12   was really looking forward to going there.  So basically I

13   said, Look, we're trying to help Carrie out.  We're trying to

14   buy some time here to see what other things may pop open, see

15   what other bids may come open, see what other avenues she may

16   be able to find to help her with her situation.  And I asked

17   him if he would delay his bid until through the holidays I

18   believe it was, and he agreed to do that.

19   Q.    Now, when you asked Paramedic Billings to do this, you

20   didn't have to ask him to do that; is that fair?

21   A.    No.

22   Q.    And when he responded that he would do it, did he give

23   you any sort of pushback?

24   A.    No.  He wanted to be part of the solution, too, I think

25   in his way if he could, and that was the one thing he could
```

1  do.  I don't think he -- I don't think he liked it.  I think

2  he wanted to get to 12.  But he was good about it and gave us

3  the time.

4  Q.   And did you feel by making this adjustment for Carrie

5  that you were trying to help her out?

6  A.   Absolutely.  It's the only reason we did.

7  Q.   And ultimately, he waited to take his position at 12 so

8  that Carrie could be there until the end of the year?

9  A.   That's correct.

10          MS. SAAVEDRA:  I don't have anything further.  Thank

11  you.

12          THE COURT:  Cross-examination.

13                     CROSS-EXAMINATION

14  BY MR. JACOBSON:

15  Q.   So Mr. Nied, at the moment you have the conversation with

16  Scott Billings, what was your understanding of the issue that

17  Carrie was having that was brought forward by this Station 12

18  bids, phone calls, all that stuff?

19  A.   The only thing I remember about the issue itself, I'm not

20  exactly sure of the time line that you're talking about, is

21  that it had something to do with extracting breast milk for

22  her newborn and --

23  Q.   What about extracting breast milk for her newborn?

24  A.   Just --

25  Q.   The need to have a space to do so; right?

1  A.   I don't remember because we have the space, and -- what I

2  remember is we had space available for that.  Other women had

3  done that in the past.  But --

4  Q.   Where was that space?

5  A.   Usually in the study.  In the safe room.  After 911 we

6  put locks on the study, on the study where the books and

7  computers are that people go in to study for promotional exams

8  and so forth and so on.  And I remember that it was that.  It

9  was also an issue with her mother picking up the milk for

10 delivery.  Those are the only two things.

11 Q.   So you didn't really explore what the issue was that

12 Carrie was having; right?

13 A.   I'm sorry?

14 Q.   So at this point you already know at the point that you

15 have this conversation with Scott Billings -- first, let's

16 talk.  When did that occur?  When did that conversation with

17 Scott Billings that you had, when he called you, when did that

18 occur?

19 A.   I don't know the exact date but after he won the bid.

20 Q.   So when did he won the bid?

21 A.   He would be the bid November 10th.

22 Q.   So after November 10th, by that time you had already

23 heard that Gordon Clark had spoken to Battalion Chief Paul

24 McDonough; and that Gordon had spoken to Scott Billings, and

25 it was so inappropriate that you called Gordon Clark, right,

1   to discuss it with him?

2   A.   Yes.

3   Q.   Right?

4        And so there was such an issue, there was a lot of stuff

5   going on that you took absolutely no action to find out what

6   the core issue was, did you?

7   A.   As I recall --

8   Q.   Yes-or-no question.  Did you take any action to find out

9   what the core issue was that was causing all this?

10  A.   Yes.

11  Q.   And you found out that it was what?

12  A.   As I stated.

13  Q.   So you -- you believed it was just an issue with her

14  expressing her breast milk.  What was the issue?

15  A.   It was the space.

16  Q.   It was the space; right?

17  A.   That you brought up.

18  Q.   So at the point that you have that conversation with

19  Scott Billings, you knew that Carrie was having an issue with

20  having a proper space to express her breast milk; right?  Yes?

21  A.   Yes.

22  Q.   Okay.  So Scott really -- and you know -- you knew or at

23  least you believed at that moment that Carrie really wanted to

24  go to Station 12; right?  Is that a fair statement?  That

25  Carrie wanted to be at Station 12; is that a fair statement?

1   A.   Yes.

2   Q.   And you believed that Carrie's desire to be at Station 12

3   was based on her pregnancy needs; right?  Because she was

4   expressing her breast milk and that's part of pregnancy;

5   right?

6   A.   I can't say whether that was it or not.

7   Q.   So you said that 12 was part of the conversation because

8   that was closer to home for her mom to pick up her breast

9   milk; right?

10  A.   That part I remember, yes.

11  Q.   And so at least part of her reason had to do with her

12  pregnancy; right?  Expressing breast milk, pumping breast

13  milk.

14  A.   Yes.

15  Q.   So at that moment when you're talking to Scott Billings

16  and you know that Carrie really wanted to be at 12 for a

17  pregnancy-related issue, you chose to allow Scott Billings to

18  have that bid so he could be with his buddy who was trying to

19  get to for a long time?

20  A.   I didn't choose it.  The rules of assignment chose it.

21  Q.   But you had the power and authority under management

22  rights to override that bid, didn't you?  As deputy chief of

23  operations, you had the power and authority to override that

24  bid; right?

25  A.   Not according to the rules of assignment.

1   Q.   Under management rights --

2   A.   Management rights, yes.

3   Q.   So under TFD policy, under the negotiated agreement with

4   the union, you had the power and authority to override Scott

5   Billings' bid.  But you chose to allow him to go there so he

6   could be with a buddy over Carrie's pregnancy needs; right?

7   A.   No, I chose to ask him to stay at 16 for a period of time

8   so we could help Carrie out as well.

9   Q.   But you had the power and authority to assign that bid or

10  assign that spot to Carrie and you didn't do it.  Instead you

11  said, no, Scott, you won that bid.  You've been trying to get

12  there for a long time so you can go be with your buddy.

13  Right?  Yes?

14  A.   I wouldn't put it that way, but yes.

15  Q.   You testified on direct that battalion chiefs manage

16  their district; right?

17  A.   Correct.

18  Q.   You and I never met before right outside the door here

19  today; right?

20  A.   Correct.

21  Q.   And you and I never talked before today; correct?

22  Correct?

23  A.   Correct.

24  Q.   But you did talk to the lawyers for the City of Tucson

25  before your testimony today; right?

1    A.    Correct.

2    Q.    How often in the last two weeks?

3    A.    None.

4    Q.    How about in the last month?

5    A.    Once.

6    Q.    And when Brian Stevens brought forward his recommendation

7    to you regarding Station 12, do we agree that Chief Stevens

8    had done a fairly thorough review of the situation there at

9    Station 12?

10   A.    Yes.

11   Q.    And he wrote a fairly thorough memo to you; right?

12   A.    Yes.

13   Q.    And would you agree that part of Battalion Chief Stevens'

14   findings were that Captain Tracy was uncomfortable and anxious

15   on calls as reported to him by other people at that station?

16   A.    I don't remember that.

17   Q.    If you would refer back to your -- that memo.  Sorry.

18   It's the -- here, why don't I do this:  Showing you -- has 54

19   been admitted?  I'm showing you I think it was Exhibit 330

20   which is the defense exhibit.  Do you see that there?

21   A.    No.

22   Q.    The e-mail from Brian Stevens to you along with the

23   report.  Do you see that in front of you?

24   A.    I see an e-mail here from Brian Stevens to myself.

25   Q.    And do you see the report that was attached to it?

1    A.    This.

2    Q.    Okay.  Yes.  That exhibit in front of you, if you would

3    turn to the page marked on bottom right COT 398.  Do you see

4    that?

5    A.    Yes.

6    Q.    So I'm going to put this on the ELMO and zoom in a little

7    bit.  Do you see there in the highlighted portion where Brian

8    Stevens wrote to you that Captain Tracy was uncomfortable and

9    anxious on calls?

10   A.    Yes.

11   Q.    And do you see there where it cites a stroke call, in

12   fact, where they felt no support and -- there were just some

13   issues there at Station 12; right?  Yes?

14   A.    Yes.

15   Q.    Okay.  And so the issues at Station 12 were not isolated

16   to Jeff Todd; right?

17   A.    No.

18   Q.    According to this memo?

19   A.    No.

20          MR. JACOBSON:  May I have a moment, Judge.

21          THE COURT:  Yes.

22          MR. JACOBSON:  I have nothing further Judge.

23          THE COURT:  All right.  Redirect.

24          MS. SAAVEDRA:  Thank you, your Honor.

25   ///

REDIRECT EXAMINATION

BY MS. SAAVEDRA:

Q.   Chief Nied, Mr. Jacobson kept pushing you as to whether or not you had looked in further to Carrie's issues, and I think you were trying to explain something to the jury when you weren't allowed to do so.  What was it you were trying to explain when he asked you about that?

A.   If I recall, it was that I was -- I don't believe that everything was being said.  Carrie, this is a very personal issue understandably so, and I don't know that I was privy to all of the information that was a concern.

Q.   And would it be fair to say that you weren't grilling her during this meeting to figure out what her situation was or what her issues were?

A.   "Grilling her"?

Q.   Grilling her.  Asking her various questions --

A.   No.

Q.   -- about what her needs were or what her issues were?

A.   We were asking appropriate questions to try to find out how best we could help.

Q.   And ultimately, I mean, what was it you were all trying to do at that meeting?

A.   Trying to find solutions.  We had numerous people involved in this.  It was not just Carrie Clark.  It was, you know, Scott Billings, Max Parks, Brian Stevens, Trish Tracy.

1  We had the other medics there.  There were a multitude of

2  things going on.  And trying to find common ground and trying

3  to find the best solution so that everyone's needs are taken

4  care of is always the goal, of course.  Sometimes that can

5  happen and sometimes that can't.

6  Q.   And I think you mentioned that under the rules of

7  assignment it wouldn't be proper for you to pull that bid; is

8  that correct?

9  A.   Correct.

10  Q.   But then management rights were brought up.  Can you

11  explain to us the difference between rules of assignment and

12  how management rights come into play?

13  A.   Management rights come into play usually for egregious

14  issues.  We try to stick very closely to the rules of

15  assignment because those were the agreed-upon rules, so we try

16  to follow that the best we could.  We try to help everybody

17  within those parameters for consistency's sake and because

18  it's what the body -- it's what the labor body wanted.  The

19  rules were created just for that purpose, so that we would

20  have mutually agreed-upon set of standards by which things

21  were put out to bid and bids were honored.

22  Q.   And I know it was emphasized that Billings got to go to a

23  station where his buddy was, but he had to bid for that

24  station; is that correct?

25  A.   Correct.

1  Q.   And in order to win that bid, he had to have a certain

2  seniority over anyone else that would want to go to that spot;

3  is that correct?

4  A.   Correct.

5  Q.   And if anyone that was senior to him had bid for it, that

6  person would have one the bid?

7  A.   Yes, had they had the proper qualifications being a

8  paramedic.

9         MS. SAAVEDRA:  I do want to move to admit the

10  exhibit that we've referred to, your Honor.  First of all, the

11  City's Exhibit 333 ending in 396 to 399 which is the exhibit

12  of the e-mail and recommendations that Battalion Chief Stevens

13  e-mailed to Chief Nied which he has up there with him.

14         MR. JACOBSON:  No objection.

15         THE COURT:  333 is admitted.

16    (Exhibit 333 Bates 396-399 entered into evidence.)

17         MS. SAAVEDRA:  And I would also like to admit, and I

18  can show it to the witness first, your Honor, Exhibit 333

19  ending in 403 to 404 which is -- I can ask the witness what it

20  is if you'd like or I can just state so for the record?

21         THE COURT:  Mr. Jacobson?

22         MR. JACOBSON:  Is counsel referring to the May 20th,

23  2013, memorandum from Deputy Chief Nied to Chief Critchley?

24         MS. SAAVEDRA:  Yes.

25         MR. JACOBSON:  No, I do not agree.

```
 1                THE COURT:  Oh.  All right.  If you want to lay

 2    foundation.

 3                MR. JACOBSON:  It's not an issue of foundation,

 4    Judge.

 5                THE COURT:  Oh, well, then me see it.  Come up to

 6    sidebar.

 7           (At sidebar.)

 8                MR. JACOBSON:  I'm going to assume that Ms. Saavedra

 9    didn't realize this, but the memo says Captain Parks stated he

10    had been working down the road of termination due to

11    performance.

12                MS. SAAVEDRA:  Well, can we move to admit it subject

13    to redaction?

14                MS. WATERS:  Is that your only issue?

15                MR. JACOBSON:  That's it.

16                MS. WATERS:  So if we redact --

17                MR. JACOBSON:  Yeah, that's fine.

18                THE COURT:  Okay.  Let's do it.

19           (Open court.)

20                THE COURT:  So the exhibit -- what number is it,

21    Ms. Saavedra?

22                MS. SAAVEDRA:  Maybe we should rename it 333-A since

23    the other one is 333.

24                THE COURT:  Okay.  We don't want to do that too

25    often, right, Sandy?
```

1              THE CLERK:  Right.

2              THE COURT:  333-A will be admitted.  Certain

3    portions of this memo are not relevant, members of the jury,

4    and are going to be redacted based on the stipulation of

5    counsel.  So 333-A which is the redacted version will be

6    admitted into evidence.

7         (Exhibit 333-A entered into evidence.)

8              MS. SAAVEDRA:  Thank you, your Honor.

9              And lastly I want to move to admit 330 ending in

10   2937.

11             THE COURT:  330, Mr. Jacobson?

12             MR. JACOBSON:  No objection.

13             THE COURT:  330 is admitted and may be published.

14        (Exhibit 330 entered into evidence.)

15             MS. SAAVEDRA:  I have nothing further, your Honor.

16             THE COURT:  Any questions --

17             MR. JACOBSON:  I do have two questions on recross.

18             THE COURT:  All right.

19             MR. JACOBSON:  Just based on those.

20             THE COURT:  Go ahead.  And then I'll ask if there

21   are any questions from the jury.

22                          RECROSS-EXAMINATION

23   BY MR. JACOBSON:

24   Q.   Your meeting, that phone call in November, you were

25   trying to find a solution for Carrie because no solution

1    existed in the fire department under its own rules; correct?

2         Don't look at them.

3    A.   Not the solution that she wished.

4    Q.   And you're telling us that Carrie's pregnancy needs were

5    not egregious enough to invoke management rights; is that what

6    you're saying?

7    A.   I wouldn't put it that way, no.

8              MR. JACOBSON:  Nothing further.

9              THE COURT:  All right.  Any questions from the jury

10   for this witness?

11             All right.  Sandy, if you can retrieve the

12   questions.

13        (At sidebar.)

14             MR. JACOBSON:  I'm okay with 12.  I'm not okay with

15   13.  I don't understand it.

16             MS. WATERS:  Oh, I think I understand it now.

17   Because someone testified yesterday -- I think she testified

18   yesterday that:  We don't get it, why do you need this?

19   Nobody else has had this problem.  I think the question is did

20   you question her request, like question her actual need for

21   some accommodation.

22             MR. JACOBSON:  Oh, okay.  How about did you believe

23   Carrie actually -- yeah.

24             MS. WATERS:  Did you doubt.

25             MR. JACOBSON:  Did you doubt.

1              MS. WATERS:  Did you cast doubt.

2              THE COURT:  That she needed accommodation.

3              MR. JACOBSON:  That's fine.

4         (Open court.)

5              THE COURT:  All right.  Sir, a couple of questions

6   from the jury.

7              When there is a change in management such as

8   captains, do the new and old captains meet and discuss

9   department personnel's performance, their concerns, and

10  et cetera.

11             THE WITNESS:  That is supposed to happen, yes.

12             THE COURT:  And did you question Carrie's need for

13  special accommodation?  In other words, did you challenge that

14  or think that --

15             THE WITNESS:  No.

16             THE COURT:  Okay.  All right.  Any follow-up

17  questions?

18             MR. JACOBSON:  No, Judge.

19             MS. SAAVEDRA:  No, your Honor.

20             THE COURT:  All right.  Any additional questions

21  from the jury?

22        (No response.)

23             THE COURT:  All right.  Thank you, sir.  You may

24  step down and be excused.

25             Let me tell you what I'm telling all witnesses about

1   the rule relating to witnesses.

2            You're not to talk about the case or your testimony

3   with any of the other witnesses or with anyone else until the

4   case is concluded.  Once the case is over, you're free to talk

5   or not talk about the case.  And unless the lawyers need you

6   to testify again, you're excused at this time.

7            Thank you.

8            THE WITNESS:  Thank you.

9            THE COURT:  You may talk to the lawyers at any time

10  about the case.

11           And members of the jury, let's go ahead and take our

12  evening recess.  Please continue to follow the Court's

13  admonition, and we'll see you tomorrow at 9:30.  9:30.  So

14  have a good evening.

15        (Jury panel excused at 5:14 p.m.)

16           THE COURT:  So we will recess then until 9:30

17  tomorrow.

18        (Proceedings concluded at 5:14 p.m.)

19

20

21

22

23

24

25

```
1                        C E R T I F I C A T E

2

3              I, Cheryl L. Cummings, certify that the

4   foregoing is a correct transcript from the record of

5   proceedings in the above-entitled matter.

6

7                          Dated this 5th day of April, 2019.

8                          /s/Cheryl L. Cummings

9                          Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
                           Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```