1               IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ARIZONA

3   Carrie Ferrara Clark,            )
                                     )
4            Plaintiff,              )
                                     )   CV-14-2543-TUC-CKJ
5        vs.                         )
                                     )   Tucson, Arizona
6   City of Tucson,                  )   April 5, 2019
                                     )   9:45 a.m.
7            Defendant.              )
    _____ )
8

                 REPORTER'S TRANSCRIPT OF PROCEEDINGS
9
       EXCERPT JURY TRIAL DAY FIVE - TESTIMONY OF PAUL McDONOUGH
10
             BEFORE:  THE HONORABLE CINDY K. JORGENSON
11                UNITED STATES SENIOR DISTRICT JUDGE

12  APPEARANCES
    For the Plaintiff:
13       Jacobson Law Firm
         By:  JEFFREY H. JACOBSON
14       2730 East Broadway Blvd., Suite 160
         Tucson, Arizona 85716
15
    For the Defendant:
16       City of Tucson Attorney's Office
         By:  MICHELLE R. SAAVEDRA, ESQ.
17       Civil Division
         PO Box 27210
18       Tucson, AZ 85726-7210;

19       Iafrate & Associates
         By:  RENEE J. WATERS, ESQ.
20       649 North 2nd Avenue
         Phoenix, Arizona 85003
21
    Cheryl L. Cummings, RDR-CRR-RMR
22  Official Court Reporter
    Evo A. DeConcini U.S. Courthouse
23  405 West Congress, Suite 1500
    Tucson, Arizona 85701
24  (520)205-4290

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared by Computer-Aided Transcription

```
 1                      EXAMINATION INDEX
 2  WITNESSES CALLED ON BEHALF OF THE DEFENSE
 3  PAUL McDONOUGH
 4       DIRECT BY MS. SAAVEDRA                    4
 5       CROSS BY MR. JACOBSON                     23
 6       REDIRECT BY MS. SAAVEDRA                  33
 7       RECROSS BY MR. JACOBSON                   38
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                        P R O C E E D I N G S

2          (Reporter's note:  Beginning of requested proceedings

3   commenced at 9:45 a.m., as follows:)

4               THE COURT:  Be seated, please.  Good morning to

5   everyone.

6               The record may reflect the presence of counsel and

7   the parties.

8               And are we ready for the jury?  I take that as a

9   resounding yes.

10              MS. SAAVEDRA:  Well, your Honor, we do need to make

11  our Rule 50 motion.

12              THE COURT:  Why don't we do that at a break.

13              MS. SAAVEDRA:  That's fine.

14              THE COURT:  All right.  Let's get the jury.

15              THE CLERK:  Please rise for the jury.

16          (Jury panel entered at 9:46 a.m.)

17              THE COURT:  And everyone may be seated.

18              Good morning to the jury.  We've made it to Friday.

19  Here we are.  All right.

20              And the plaintiff has rested, and the defense is now

21  presenting their case, and you may call your next witness.

22              MS. SAAVEDRA:  Thank you, your Honor.  The City

23  calls Chief Paul McDonough.

24              THE COURT:  Sir, if you could come right up here to

25  the witness stand.  And you can just walk right up here and
```

1    remain standing and the clerk will swear you in as a witness.

2                    PAUL McDONOUGH, DEFENSE WITNESS, SWORN

3                THE CLERK:  You may be seated.

4                         DIRECT EXAMINATION

5    BY MS. SAAVEDRA:

6    Q.   Good morning, Chief McDonough.

7    A.   Good morning.

8    Q.   Could you please tell the jury what is your current

9    position with the Tucson Fire Department and what was your

10   position in October of 2012?

11   A.   Okay.  My current position, I'm in an administrative

12   position:  The deputy chief over the 911 communication center

13   and our medical administration division.  Prior to that I was

14   a Battalion 1 in the field, a field battalion chief.

15   Q.   And I'm going to ask, maybe if you scoot over to that

16   microphone and talk more into the microphone because you're

17   a -- and a little bit louder.  The clerk is taking this down

18   as we go along.

19                THE JUROR:  Can he spell his name?

20                THE COURT:  Oh, yes.  Go ahead, could you spell your

21   name for the record.

22                THE WITNESS:  Paul McDonough, spelled P-a-u-l,

23   McDonough spelled M-c-D-o-n-o-u-g-h.

24   BY MS. SAAVEDRA:

25   Q.   And Chief McDonough, how long have you been with the

1    Tucson Fire Department?

2    A.    Twenty-nine years.

3    Q.    And you said in October of 2012 you were the battalion

4    chief of Battalion 1?

5    A.    Yes.

6    Q.    Explain, what were your responsibilities in that

7    position?

8    A.    The main responsibility was staffing for the entire

9    department.  Making sure we had the appropriate people in the

10   appropriate place at the appropriate times.  That involved

11   calling back personnel, calling in extra duty, handling

12   vacations, sick leave, things like that.  Battalion 1 is also

13   responsible for the technical rescue team and the Haz-Mat team

14   as well.

15   Q.    And when you say you are responsible for the staffing of

16   the entire department, there are two other chiefs that were

17   involved in the staffing for their stations; is that correct?

18   A.    That's correct.

19   Q.    Can you explain how that works and who those people were?

20   A.    You mean the individual, other battalion chiefs in the

21   field?

22   Q.    Yes.  The Chief Rob Rodriguez and Chief Ed Nied.

23   A.    Okay.  So they would be staff deputy chiefs like I am

24   now, and they also had rights to Telestaff.  But we would do

25   the day-to-day operations out of Battalion 1 if that makes

 1  sense.

 2  Q.   And when you say "day-to-day operations," you were the

 3  one in charge of handling all swing shift employees?

 4  A.   Yes.

 5  Q.   And do you know how many swing employees you had at that

 6  time?

 7  A.   I'm not sure.  It's in the Telestaff record.

 8  Q.   Could you give an approximate -- I believe we heard

 9  there's almost 700 employees with the fire department?

10  A.   Yes.

11  Q.   Can you give an approximate number of how many of those

12  are swing employees?

13  A.   Per day, there could be seven additional swing personal

14  depending on rank, paramedic, engineer, fire fighter and

15  captain.

16  Q.   And that's on daily basis.  Do you know how many total

17  around in that time period there were for all the shifts?  If

18  you are don't know, that's okay.

19  A.   I don't know.

20  Q.   Okay.

21  A.   It varies.  It changes.  It's not something that's

22  constant.

23  Q.   Okay.  But you said on a daily basis it was about seven

24  people you were dealing with?

25  A.   Yes.

1  Q.   And were you the one who actually would place these swing

2  people into the shifts they were going to cover?

3  A.   No.

4  Q.   Who did that for you?

5  A.   There was a staffing captain that worked for me and he

6  would do that.  And if there was an issue, he would bring my

7  attention to it.

8  Q.   And who was that staffing captain at the time?

9  A.   It was Rick L'Heureux.

10  Q.   And do you know the process or procedure he would use to

11  determine who was going to go where?

12  A.   We have a set of rules called the rules of assignment,

13  and a lot of variables play into that.  It's almost like a

14  house of cards, if you will, depending on what the type of

15  specialty training the individual has, depending on how long

16  the opening is, depending on the seniority of the person being

17  placed, depending on extra duty list, how long that is, if we

18  had people available to fill those positions after we use all

19  the swing personnel.  So it's a complicated process and it can

20  change on a moment's notice because people call in sick or

21  call in for vacations throughout the day.  So --

22  Q.   So you said it could change on a moment's notice.  So

23  it's possible that Ricky L'Heureux could go in, schedule

24  people where he sees openings, and then someone calls in and

25  he has to go back and look and see how he has to move things

1   around so everything is covered?

2   A.   Definitely.  Well said.  It happened a lot.

3   Q.   It happened a lot.

4        When is it usually done, the staffing for the shift?

5   A.   We would get there at 6:30 in the morning and go from 7

6   to 8, depending.

7   Q.   And --

8   A.   Also in the p.m.  Same time frame --

9   Q.   Okay.

10  A.   -- in the evening.

11  Q.   And was that the only responsibility that

12  Captain L'Heureux had?

13  A.   No.

14  Q.   What other responsibilities did he have in this position?

15  A.   Well, he's an executive captain.  If we had an emergency

16  call, he would respond as my assistant as far as running fire

17  scenes.  He was also the medical captain in charge of -- using

18  his medical expertise as a paramedic to be in charge of the

19  medics in the battalion.

20  Q.   So it's fair to say he wasn't standing by -- did he use a

21  board or a computer screen for the staffing?

22  A.   A computer screen.

23  Q.   So he wasn't standing by the computer screen throughout

24  the day making sure people were where they were supposed to be

25  and moving things around all day long?

1    A.    Not at all, no.

2    Q.    And you know the plaintiff, Carrie Clark?

3    A.    Yes.

4    Q.    And tell us how you know her.

5    A.    From the fire department.  She's one of our employees.

6    She was a firefighter/paramedic.  Is.  And I believe the first

7    day she interviewed, I was on her interview panel coming onto

8    the job, as a matter of fact.

9    Q.    And in October 2012, she reached out to you before coming

10   back from leave from having her first child?

11   A.    Yes.

12   Q.    Tell us about that.  What do you remember?

13   A.    Well, she wanted -- she was trying to secure a station

14   for her where she could feel comfortable based on her

15   situation, and she mentioned to me Station 20 which is in

16   Battalion 1.  It's on the northwest side of town.  And as

17   things worked out, we had a medic who assigned to that station

18   was deployed, so we had a long-term opening that was coming

19   about, and I was able to do that.  Secure that station for

20   her.

21   Q.    And did you ever speak to her husband, Gordon, about

22   arranging the Station 20 or about where she would go when she

23   came back from leave?

24   A.    I don't remember having a conversation like that, but

25   it's possible.

1   Q.   And I believe Carrie actually sent you an e-mail before

2   she returned to shift?

3   A.   Yes.

4   Q.   To discuss that you had offered her the Station 20?

5   A.   Yes.

6   Q.   So I'm going to show you what's already been admitted as

7   Plaintiff's Exhibit 8.

8   A.   There you go.  Andy Pashos was leaving.  Was being

9   deployed.

10  Q.   So that was the e-mail that she had sent you before she

11  returned?

12  A.   Yes.

13  Q.   And it looks like she sent it from Gordon's e-mail, but

14  you knew it was coming from her?

15  A.   Yes.  Because it was signed by her --

16  Q.   Okay.

17  A.   -- at the bottom.

18  Q.   And in this e-mail, she's following up on what you

19  discussed and the offer of Station 20, but it looks like she

20  didn't want to immediately go to 20 because there was someone

21  that was finishing a tour there and they had two shifts left;

22  is that correct?

23       And just for the record, you're refreshing your memory

24  with Exhibit 8.

25  A.   That's correct.

1   Q.   So she actually asked you to place her at Station 12 on

2   Saturday, October 27th, and then to PAU-21 -- which I believe

3   is Station 21; is that right?

4   A.   Yes.

5   Q.   -- on the Monday, October 29th.  So she requested that.

6        And were you able to go ahead and do that for the first

7   two shifts?

8   A.   I'm not sure if I was.  I may have.

9   Q.   Okay.

10  A.   I would have to look at the staffing record because all

11  this -- every one of these things can change on a moment's

12  notice as far as openings that occur.  Os if it was -- if it

13  was holding, we would be able to do that.

14  Q.   Okay.  Well, the evidence has been here, just to refresh

15  your memory, the evidence has been that at least the first

16  shift -- actually, I think the evidence is that she worked her

17  first shift at 12 and her second shift at 21.

18  A.   Okay.

19  Q.   Do you recall Carrie contacting you after she worked her

20  first shift at Station 12?

21  A.   I don't recall exactly when that was, but I know when she

22  worked at Station 12 she felt comfortable there.  Mentioned

23  working at Station 12.

24  Q.   Do you remember her reaching out to you and telling you

25  that she no longer wanted to go to 20 because she wanted to go

1  to 12?

2  A.   Yes.

3  Q.   Tell us what you recall about that conversation or

4  communication.  I don't know if it was through e-mail or

5  conversation.

6  A.   Well, after working at Station 12, she felt that that's a

7  place where she would feel more comfortable, and so that's

8  where she -- and she changed her mind and said I'd rather work

9  at Station 12.

10 Q.   So she told you, I no longer want Station 20?

11 A.   That's correct.

12 Q.   Can you tell us, why did you think that 20 would have

13 been a good fit for Carrie?

14 A.   She requested it, first of all.  And it was a station on

15 the northwest side of town, the outskirts of town.  It did

16 have individual rooms.  I knew the captain who was there.  The

17 call volume was not high.

18 Q.   And when -- sorry.

19 A.   Certain things would just play into that.  She asked for

20 it and it seemed like it would have been a good fit.

21 Q.   And it's a newer station?

22 A.   It's a newer station.

23 Q.   So when she contacted and you told you she wanted to be

24 assigned to 12, I believe she e-mailed you a memo requesting

25 12.  Do you remember that memo?

1  A.   Yes.

2  Q.   And that memo has been already admitted as Plaintiff's

3  Exhibit 13, so I'm going to go ahead and put that up, too.

4       So when she requested 12, at the time did you have the

5  authority to say, okay, then I will just go place you at 12?

6  A.   No, because -- well, if there was an opening each morning

7  I could do that.  However, the city's broken into a four-piece

8  pie, so there are four battalion chiefs who supervise those

9  different battalions, and Station 12 was that different

10 battalion than the one I supervised.  So for initial staffing

11 in the morning that could happen, but after that I didn't have

12 control over supervisory rights over Station 12 like I did

13 over Station 20.

14 Q.   So if I understood you correctly, as a swing employee, if

15 there was an opening at Station 12 that you were able to fit

16 or fill with the swing employee, then you could put her in

17 there?

18 A.   Yes.

19 Q.   But if it was anything more permanent than the swing

20 shift, that was out of your control?

21 A.   Yes.

22 Q.   Do you recall a meeting that you and Chief Nied and Chief

23 Rodriguez had along with Carrie Clark?

24 A.   Yes.

25 Q.   What do you recall about that meeting?

1  A.   I believe it was a conversation about Station 12 in

2  particular in relation to this memo.

3  Q.   Do you have any independent recollection of that meeting,

4  of the details?

5  A.   Not the specific details.  I do remember that it got

6  emotional.  Carrie got emotional.  We stopped the meeting for

7  a moment and then started it back up after taking a break.

8  Q.   And when you say she "got emotional," what were you

9  observing?

10 A.   She stood up, she began to cry based on the conversation

11 that was going -- the back and forth conversation.  And I was

12 there with her as her supervisor.

13 Q.   And when she started to cry, was there anything said

14 during this meeting by Rob Rodriguez -- Chief Rodriguez or

15 Chief Nied that was inappropriate or that was challenging

16 Carrie in any way?

17 A.   I wouldn't call it inappropriate or challenging.  They

18 were just stating the facts, the information.

19 Q.   Okay.

20 A.   And --

21 Q.   Explain to the jury how that -- your memory of how that

22 conversation went?

23          THE COURT:  Could we have a little foundation as to

24 time, place, if we know who was present?  Do we have a date

25 for the meeting?

1              MS. SAAVEDRA:  I don't know --

2              THE COURT:  Or a month or a year.

3              MS. SAAVEDRA:  It's the same meeting that everyone

4    has been testifying to in early November after she put the

5    request out.  So the request was submitted November 11th,

6    2012.

7    BY MS. SAAVEDRA:

8    Q.   Was that meeting after she submitted that memo?

9    A.   I believe so, yes.

10   Q.   Okay.  So maybe mid November 2012?

11   A.   Sounds about right.  I would be guessing.

12   Q.   So just explain to the jury what you remember about that

13   meeting, whether it be how Rob Rodriguez was behaving, how

14   Chief Nied was behaving, if any inappropriate comments were

15   made, or what you believe -- how believe that meeting went.

16   A.   Well, Station 12 we thought was a good fit.  I thought it

17   was a good fit.  Carrie thought it was a good fit.  We were

18   trying to put her at Station 12.  Because it was out of my

19   area of supervision, that's what brought the meeting on.  So

20   we went up together to talk to them and plead our case, if you

21   will.

22   Q.   And when Rob Rodriguez -- Chief Rodriguez and Chief Nied

23   told her -- they told her, You can't go to 12, I assume?

24             MR. JACOBSON:  Objection; leading.

25             THE COURT:  Well, sustained.  But go ahead and ask

1  it in another way.

2  BY MS. SAAVEDRA:

3  Q.   Did they tell her she could not go to 12?

4  A.   Yes, that was part of the meeting.  That's why -- that's

5  when Carrie got upset.

6  Q.   And when they told her she couldn't go to 12, were they

7  mean about it?

8  A.   They were just giving the information.

9  Q.   Okay.  What else did they discuss with her during that

10  meeting?  Were there other stations that they thought might

11  work out that they discussed with her?

12  A.   I don't remember that.  It's definitely possible.

13  Q.   Do you remember whether Station 16 was raised?

14  A.   We brought up Station 16.  I don't know if it was during

15  that meeting or at other times, but, yeah, Station 16 was

16  brought up because it was on the east side of town and it met

17  the new requested criteria.

18  Q.   And ultimately, the department decided not to place her

19  at 16 because there was a personality conflict between her and

20  the captain there?  A mutual conflict.

21  A.   Yeah.  That was something I found out from Carrie.  She

22  said there was a captain there --

23  Q.   I don't want you to go into details.  Just that they had

24  a mutual conflict there so the department decided not to place

25  here there?

1    A.    Right.

2    Q.    Do you remember whether or not Station 20 came up again

3    in this meeting in November?

4    A.    It may have.  I don't remember that but it may have.

5    Q.    Was that space at 20 that had been reserved for Carrie,

6    was that still available to her at the time of this meeting?

7    A.    It may have been, but I don't remember that either.

8    Q.    Okay.

9    A.    If there was a long-term opening, we would have filled

10   it.

11   Q.    Were you aware of the fact that Chief Nied had contacted

12   Billings after this meeting and asked him to postpone his bid

13   into 12?

14   A.    No.

15   Q.    And to the best of my knowledge, had that been

16   communicated to Carrie in early December of 2012?

17   A.    I don't remember that.

18   Q.    Did you know that Billings had given up or postponed his

19   spot at 12 in early December of 2012?

20   A.    I did not.

21   Q.    Is it unusual that you wouldn't know what Chief Nied was

22   doing with basically his -- the people in his chain of

23   command?

24   A.    Right.  It's not unusual because when you're on shift,

25   you have 24 hours on, you have 24 hours off; and then you also

 1   have a six-day break after ten days of doing that.  And so

 2   during that break or even while at work, the deputy chiefs can

 3   change the roster.  And they get new information as it comes

 4   in throughout the day, so that's common that the deputy chiefs

 5   would make changes to the roster without my knowledge.

 6           MS. SAAVEDRA:  I don't have anything further right

 7   now, your Honor.  Thank you.

 8           THE COURT:  Yes.  Cross-examination.

 9           MS. SAAVEDRA:  Well, I guess I do have one.

10   BY MS. SAAVEDRA:

11   Q.   Did you have any other involvement with Carrie Clark

12   beyond this meeting where it occurred where this discussion

13   was happening.

14   A.   No.

15   Q.   Actually, do I have more questions.  I just remember.

16        You were still the battalion chief over Battalion 1

17   between January and March of 2013?

18   A.   I believe so, yes.

19   Q.   And Rick L'Heureux was still your staffing captain that

20   was providing Carrie with assignments as a swing shift

21   employee?

22   A.   Yes.

23   Q.   So are you aware that Carrie was placed at Station 12

24   until the end of the year, but then in January she began being

25   placed where there were openings?

McDONOUGH - DIRECT

1   A.   I would have been aware of that, yes.

2   Q.   Okay.  Did Carrie ever come to you between January and

3   March of 2013 and make any complaints about where

4   Captain L'Heureux was stationing her?  And I want to narrow

5   that a little bit.  Did she come to you prior to March 20th of

6   2013?

7   A.   I do recall that happening, where she didn't like where

8   she was placed.  She would go ahead and bump it up the chain

9   of command and call me.

10  Q.   Okay.  And what do you remember about those

11  conversations?

12  A.   Just explaining why -- why things were happening the way

13  they were happening.  It's not a perfect system.  There's

14  seniority involved.  There's specialty pay involved.  There's

15  qualifications involved.  So if something happened that

16  prevented being placed at a station, it was usually by

17  circumstances of the rules of assignment.  In other words, the

18  rules of assignment were being used to place individuals.

19  Q.   And when you say she would bump it up the chain of

20  command, what did you mean by that?

21  A.   Well, if she didn't get the information or the answer

22  that she wanted from Captain L'Heureux, she would call me

23  which is within her right to do that.  She could also call

24  other shift -- other shifts also staff for our shift the

25  morning before.

1    Q.    Do you --

2    A.    So that could also happen.

3    Q.    Did you -- sorry.  I didn't mean to cut you off.

4          Do you know whether or not Carrie was contacting Rick

5    L'Heureux before she would call you up to try to work out what

6    shift she was going to work or what station she was going to

7    work at?

8    A.    I believe there were times where she did, and I believe

9    there were also times when she didn't.

10   Q.    So there were times that she would just jump over

11   Captain L'Heureux, basically, and go straight to you?

12   A.    Yes.

13   Q.    Is that appropriate in the fire department?

14   A.    It's --

15   Q.    Or would you expect employees to first go to their first

16   level of command?

17   A.    We would expect them to go to the first level of command.

18   Q.    And --

19   A.    However, you know, this was unusual.

20   Q.    Okay.  Do you recall her contacting you when she was

21   assigned to Station 9 on March 20th of 2013?

22   A.    I don't think I was working that day so I might have

23   found out about that after the fact.

24   Q.    Were you involved --

25   A.    But I'm not sure because I remember -- I remember hearing

1   about that.

2   Q.   I'm sorry.  Can you speak upset just a little bit?  I'm

3   having a hard time hearing you.

4   A.   I think I was off that day.  We'd have to look at the

5   roster.

6   Q.   Okay.  So were you involved in the phone -- you were not

7   involved in the phone call that Rob Rodriguez and Chief

8   Fischback and JoAnn had with Carrie in regards to that

9   assignment on March 20th?

10  A.   I don't think so.

11  Q.   And --

12  A.   I would say no.

13  Q.   And we know that Carrie was assigned to Station 6 as of

14  March 26th of 2013.  Did you have any -- I guess were you in

15  her chain of command after she was assigned to 6?

16  A.   No.  Station 6 is now -- that's Battalion 4 so that's the

17  third battalion that's involved at this point.  So after that

18  I would not be involved.  She would be in a different chain of

19  command.

20  Q.   And Captain L'Heureux would no longer be assigning her

21  because she's now assigned to 6; is that fair?

22  A.   That's fair.  That's correct.

23  Q.   Chief McDonough, have you worked with other Tucson Fire

24  Department women who have been expressing milk at work?

25  A.   Yes, yes.

1   Q.   And who was that?

2   A.   Worked with, she's a chief now, Sharon McDonough.

3   Q.   And how long ago was that?

4   A.   Nineteen -- I'm dating myself here.  Eighteen years ago,

5   maybe, nineteen years ago.

6   Q.   Okay.  And how did you deal with that situation?

7          MR. JACOBSON:  Objection; relevance.  Eighteen years

8   ago?

9          THE COURT:  No, overruled.  You can answer.

10         THE WITNESS:  How did I deal with it?

11  BY MS. SAAVEDRA:

12  Q.   Yes.  When you were working with her if she had the need

13  to express milk, how would you handle that situation?

14         MR. JACOBSON:  Can we have some foundation that he

15  was even a battalion --

16         THE COURT:  Yes, why don't you lay more foundation.

17  BY MS. SAAVEDRA:

18  Q.   You were not a battalion chief?

19  A.   No, I was a paramedic at that time.

20  Q.   And you were working as a coworker with another

21  paramedic?

22  A.   Yes.

23         MS. SAAVEDRA:  May I ask my question now,

24  your Honor?

25         THE COURT:  Yes.

 1  BY MS. SAAVEDRA:

 2  Q.   Tell the jury how you would handle that situation when

 3  she would have the need to express milk?

 4  A.   We would stop what we were doing and she would go

 5  somewhere private and express her milk.

 6  Q.   And when you say "somewhere private," do you know where

 7  she would go?

 8  A.   A room at a station.  One time I believe in a medic

 9  truck; in the back of the medic truck.  Different places.

10  Q.   So you guide guys made it happen?

11  A.   Yes.

12          MS. SAAVEDRA:  I have nothing further.

13          THE COURT:  Cross-examination.

14                        CROSS-EXAMINATION

15  BY MR. JACOBSON:

16  Q.   Good morning.

17  A.   Good morning.

18  Q.   Need a minute to grab some water, go ahead.

19          THE COURT:  You may proceed.

20  BY MR. JACOBSON:

21  Q.   Good morning, Chief.  May I call you chief?

22  A.   Sure.

23  Q.   Chief, Sharon McDonough was your sister-in-law at the

24  time?

25  A.   Yes, she was.

 1  Q.   And you didn't supervise her at the time?

 2  A.   No.

 3  Q.   And Sharon McDonough didn't -- didn't seek to enforce a

 4  law which required nursing mothers -- which required employers

 5  to provide a space free from intrusion from coworkers and the

 6  public to express her breast milk; right?

 7  A.   No, that was never --

 8  Q.   Because that law didn't exist 18 years ago; right?

 9  A.   I don't know.

10  Q.   There were some questions about Rick L'Heureux.  Rick

11  L'Heureux was not in Carrie's chain of command; right?

12  A.   He was actually part -- while she was on swing.

13  Q.   So did Rick L'Heureux evaluate her performance?

14  A.   The swing paramedics would have been assigned to the

15  EC captain, that's how it would have been so yes.

16  Q.   So it's your opinion the EC captain is the first level

17  supervisor?

18  A.   For swing paramedics.

19  Q.   For swing paramedics.

20  A.   Yeah.  For the medics that are assigned to stations,

21  their station captain would be assigned to that.

22  Q.   So there was a lot of testimony about -- well, let me

23  back up.

24       The fire department is paramilitary?

25  A.   Yes.

1  Q.   And your position in the summer of 2012 through mid 2013

2  was battalion chief over Battalion 1?

3  A.   Yes.

4  Q.   And at the time Carrie was a swing paramedic?

5  A.   Correct.

6  Q.   And you supervised everybody including Carrie in

7  Battalion 1; right?

8  A.   Right.

9  Q.   Showing you what's been already admitted as Exhibit 8.

10 Fourth sentence from the bottom of the paragraph starting

11 with, I appreciate your willingness.  Would you just review

12 that for a second?

13 A.   Yes, I see that.

14 Q.   Okay.  So we agree that you were willing and made your

15 best efforts to accommodate Carrie; right?

16 A.   Yes.

17 Q.   And you were aware at that time, at least as of this

18 e-mail on October 21st, that she was looking for a space to

19 routinely pump her milk for the needs of her child; right?

20 A.   Right.

21 Q.   So if you would, please tell the jury what the fire

22 department policy was at the time Carrie came back to work

23 about the assignment of mothers who were expressing breast

24 milk at work?

25 A.   I'm not sure what the official policy was or if -- as far

1   as --

2   Q.   There wasn't a policy, was there?

3   A.   Right.  But just understanding the situation and trying

4   to be supportive of all employees and all their needs.

5   Q.   Sure.

6   A.   I would do whatever I could to try to accommodate that.

7   Q.   And the record reflects that you were making your best

8   efforts; right?

9   A.   I was so I hope it does.

10  Q.   But we agree that there was no policy in place for you or

11  anybody else to follow; right?

12  A.   Right.

13  Q.   And you would agree that you were doing the best under

14  the circumstances; right?

15  A.   Right.

16  Q.   And you would agree that Carrie was doing the best under

17  the circumstances; right?

18  A.   I believe so.  She was -- she had a concern.  She brought

19  it forward.

20  Q.   And Carrie reached out to you on several occasions when

21  Captain L'Heureux or the fire department had assigned her to

22  different fire stations that did not have a space appropriate

23  where she could express her breast milk free from intrusion;

24  right?

25  A.   Right.

1   Q.   And she reached out to you because she wasn't getting the

2   relief she needed from Captain L'Heureux; right?

3   A.   Right.  He had -- he would -- he had the rules of

4   assignment.  He was applying the rules of assignment.

5   Q.   He was doing his best.

6   A.   Right.

7   Q.   In fact, Captain L'Heureux wasn't the only staffing

8   captain; right?  If he was off, somebody would fill in for

9   him?

10  A.   Right.  And there were also two other staffing captains

11  involved from the other two shifts and two other battalion

12  chiefs.  So it's a dynamic, moving process.  The entire thing

13  could change on a moment's notice.

14  Q.   That's part of what Carrie was experiencing; right?  It

15  was a dynamic, moving process, and it could change in a

16  moment's notice; right?

17  A.   Right.  And the system wasn't perfect, that's why we were

18  trying to do the outskirts, the stations that weren't as busy.

19  Q.   So there was a lot of talk about trying to accommodate

20  Carrie's needs and what Carrie wanted.  But what we haven't

21  heard is any discussion about the fire department's efforts to

22  follow the law around this time.  Were you part of any of

23  those conversations?

24  A.   I was not a part of any of those conversations.

25  Q.   When you were faced with this scenario, did you go do any

1    research into the law?

2    A.    No.

3    Q.    Did you elevate it up the chain of command or to human

4    resources and say, you guys, I need help here, what are we

5    going to do?

6    A.    Well, that's what spurred some of the meetings and the

7    conversations with Nied and Rodriguez.  They were my

8    supervisors.

9    Q.    If you would what tell us spurred some of those

10   conversations.  Go for it.

11   A.    Well, when the rules of assignment are in conflict with

12   something like this, which is a special need, we have to go

13   outside the rules which involves going up through the chain of

14   command in order to do that.

15   Q.    And which is allowed under the term management rights;

16   right?

17   A.    Correct.

18   Q.    So --

19   A.    And that's what I was doing.  I was applying management

20   rights for my position.  However, once others -- once other

21   people see that Telestaff roster, anybody can see it from any

22   station or from their home computer or from their phone, so --

23   Q.    And my thought on that, so chiefs -- so you had some

24   limited authority, fair to say?  You could assigned Carrie

25   temporarily to fill vacancies, move some pieces around, but

1   you didn't have the power or the authority to assign Carrie

2   permanently; right?

3   A.   Right.

4   Q.   That rested with Chiefs Nied and Rodriguez?

5   A.   Right.

6   Q.   And more specifically with Chief Nied because at the time

7   he was the deputy chief over that portfolio that included

8   Battalion 1?

9   A.   No.  That was -- Rodriguez had Battalion 1 and

10  Battalion 4, and Nied had Battalion 2 and Battalion 3.

11  Q.   Okay.

12  A.   So Nied got involved because Station 12 existed in

13  Battalion 3.

14  Q.   So they were kind of working together, though, as far as

15  you knew?

16  A.   As far as I knew, yes.

17  Q.   Okay.  And so Chief Nied, if I'm processing the

18  information correctly, Chief Nied could have placed Carrie

19  permanently at Station 12; right?

20  A.   That would have been under his area of responsibility,

21  yes.

22  Q.   So yes, he could have permanently placed Carrie at

23  Station 12?

24  A.   I believe so.

25  Q.   In fact, Chief Nied could have placed Carrie under

 1   essentially the rules, right, and management rights,

 2   Chief Nied could have placed Carrie permanently at any station

 3   within his portfolio and Chief Rodriguez could have done the

 4   same thing; right?

 5   A.   Right.

 6   Q.   And in fact, either Chief Nied or Chief Rodriguez could

 7   have taken Carrie offer of her swing shift, right, and put her

 8   on an "A" Shift, "B" Shift, or "C" Shift?

 9   A.   Under management rights.  Yes.

10   Q.   And Chiefs Nied or Rodriguez could have placed Carrie

11   into an eight-hour position, right, like an inspector or

12   something like that?

13   A.   Right.  And that -- that would involve what's called

14   light duty status, and that's something that the fire chief

15   that would have to get involved in.  He or she.

16   Q.   So that would have had to have been elevated to the

17   chief?

18   A.   If it were going to be under light duty, yes.

19   Q.   But Chief -- at the time Chief Critchley would have had

20   that power and authority; right?

21   A.   Right.

22        And to add to that if I may.  If there were an eight-hour

23   position where there was an opening and she was qualified and

24   there wasn't a promotional list, then that could happen as

25   well.  But if a shift person goes to staff position in a light

1   duty capacity, that imposes under permission of the department

2   head which is the fire chief.

3   Q.   And the fire chief had the authority under management

4   rights to do some of that?

5   A.   Yes.

6   Q.   We were talking about the November 2012 meeting.  Would

7   it refresh your recollection that it was November 12th, 2012,

8   somewhere around there?

9   A.   Okay.

10  Q.   And you said Carrie got emotional and started crying;

11  right?

12  A.   Right.

13  Q.   Do we agree that perception -- Carrie could have

14  certainly reasonably believed or perceived that being in a

15  meeting with two deputy chiefs and a battalion chief at

16  headquarters was pretty intimidating for somebody who never

17  had to deal with that before?

18  A.   Yes.

19  Q.   Do we agree that it's reasonable for Carrie to have

20  perceived that being questioned about her pregnancy needs, her

21  breastfeeding needs, could be inappropriate?

22  A.   And uncomfortable.  I would add it could be

23  uncomfortable.  That's why I wanted to be there.

24  Q.   And fair to say that your recollection of that

25  November 2012 meeting is a little fuzzy.  You don't remember

```
 1   everything?
 2   A.    Right.
 3              MR. JACOBSON:  May I have a moment, Judge?
 4        (Pause.)
 5   BY MR. JACOBSON:
 6   Q.    Do you have any recollection of talking to Carrie
 7   afterwards and saying that you would vouch for the
 8   incensetivity of that meeting if it ever came to pass?
 9   A.    I don't remember that.  But if she got upset and there
10   was more sensitivity that could have been shown, that would
11   have been bothered me.
12   Q.    And do you recall running into Carrie after this meeting
13   in a Costco near the freezers in the back and saying to
14   Carrie, look, boy, that was inappropriate or words to that
15   effect?
16   A.    I don't remember that, but that doesn't mean it didn't
17   happen.
18   Q.    Am I right, then, that when you were doing your best on
19   Carrie's behalf, that a policy on nursing mothers or even
20   guidance from those above you would have been helpful for you?
21   A.    Yes.
22              MR. JACOBSON:  No further questions.
23              THE COURT:  Redirect.
24              MS. SAAVEDRA:  Thank you, your Honor.
25   ///
```

1                          REDIRECT EXAMINATION

2   BY MS. SAAVEDRA:

3   Q.   Chief McDonough, did Chief Rodriguez and Chief Nied

4   during this November 2012 meeting, did they need to ask some

5   questions about Carrie's needs in order to figure out how they

6   could help her?

7   A.   Yes.

8   Q.   And during that meeting, did they ask anything

9   inappropriate?

10  A.   No.

11  Q.   And when you said that you didn't feel appropriate about

12  the meeting, is it fair to say you didn't like the fact that

13  Carrie got upset and cried?

14  A.   Right.

15  Q.   Did you mean that you felt that the chiefs acted

16  inappropriately?

17  A.   No, I didn't mean that.

18  Q.   Now, you were asked on cross, it was brought out the fact

19  that Sharon was your sister-in-law at the time that she was

20  expressing milk?

21  A.   Yes.

22  Q.   Would you have treated her any differently if she wasn't

23  your sister-in-law?

24  A.   No.

25  Q.   Are you aware of any law that requires that plaintiff be

1   assigned to a specific station?

2   A.   No.  We have our rules of assignment, and that's what we

3   use to place people --

4   Q.   And even --

5   A.   -- that involve seniority and certifications.

6   Q.   And I was talking like federal law because Mr. Jacobson

7   asked you about the federal law that we're discussing in this

8   matter.  Are you aware of any federal law that would require a

9   fire department to place a woman firefighter who is expressing

10  milk to a certain station?

11  A.   No.

12  Q.   And in fact, the fighter department does not have any

13  regulation that requires anyone at TFD to place her at a

14  specific station that she requests?

15  A.   That's correct.

16  Q.   And I think what you said just a moment ago is that that

17  would actually be contradictory to the rules of assignment

18  that the Tucson Fire Department uses?

19  A.   Right.

20  Q.   Now, even though there was not a nursing policy that the

21  fire department had, Carrie knew to go to you when she had

22  concerns; right?

23  A.   Right.

24  Q.   And she knew to bring up the fact that she wanted to be

25  at 12 because she felt more comfortable there?

1  A.    Right.

2  Q.    And even though there wasn't a policy telling you what to

3  do when she came to you with this concern, you went to your

4  superiors and set up a meeting so that you could discuss what

5  her needs were?

6  A.    Yes.

7  Q.    And you didn't need a policy to be able to do that?

8  A.    No.

9  Q.    But you knew what to do because it's common decency?

10 A.    Yeah, common decency and we're able to follow the chain

11 of command whenever we're need to move outside those rules.

12 So, yes.

13 Q.    And when you had the meeting with Chief Nied and Chief

14 Rodriguez, did you know whether or not this was the first time

15 they were hearing about Carrie's needs?

16 A.    I did not know that.

17 Q.    Their reactions during this meeting, the questions they

18 asked, did it appear to you that this was -- they were trying

19 to gather information to be able to meet her needs?

20 A.    Yes.  And now that you say that, they were trying to

21 gather information; however, some of the information they had

22 to gather could be -- could make Carrie uncomfortable to the

23 point she could get emotional about it.

24 Q.    And that's why you accompanied her?

25 A.    Yes.

 1   Q.   Carrie Clark is not the first person in the fire

 2   department to have a special need; is that it fair?

 3   A.   That's fair, yes.

 4   Q.   Do you believe that the Tucson Fire Department went

 5   outside the rules of assignment when trying to help out Carrie

 6   in figuring out where she could be placed temporary while she

 7   had this need?

 8   A.   Yes.

 9   Q.   So even though she wasn't assigned to 12, do you still

10   think they went outside those rules of assignment to try to

11   fit her needs?

12   A.   Yes.

13   Q.   When Rick L'Heureux was making assignments for the swing

14   shift employees and Carrie was part of those assignments, did

15   you know that he could go outside the rules of assignment and

16   assign her to certain stations?

17   A.   That's something that he wouldn't do.  He would -- that's

18   where I would get involved.

19   Q.   When you say he wouldn't do it, he didn't have the

20   authority to do it?

21   A.   He didn't have the authority to do it.

22   Q.   And you never told Rick L'Heureux that he could do that

23   with Carrie, that he could go outside the rules of assignment?

24   A.   No.  If he came to me with a situation, then I would give

25   him direction if we were going to go outside the rules.

1    Because there would be obviously fallout from that.

2    Q.   Okay.  Because if you went outside the rules of

3    assignment for Carrie, then like you said, other people can

4    look up the staffing and see she's going somewhere that

5    normally she wouldn't be?

6    A.   Right.  And they would question that.

7    Q.   Now, it was brought up whether or not she could have a

8    certain assignment like -- I don't remember if the wording

9    used was an administrative assignment, but you said that that

10   would be a light duty assignment.  Do you remember that

11   question?

12   A.   Yes.

13   Q.   Now, if Carrie was going to be placed on the light duty

14   assignment, she would have to request that; is that correct?

15   A.   That's correct.

16   Q.   Light duty is not something the department decides for an

17   employee; is that fair?

18   A.   That's fair.

19   Q.   And did Carrie ever request light duty?

20   A.   I don't believe so.

21   Q.   At least during this time frame that I'm referring to?

22   A.   Yeah, I don't think so.

23   Q.   Okay.  Lastly, Chief McDonough, did station -- were the

24   facilities at Station 12 in November of 2012 any different

25   than the facilities at Station 20?

1  A.   No.  I would say Station 20 was newer.

2  Q.   So even better than 12?

3  A.   Better than 12.  I was -- yeah.  I would say better than

4  12.

5  Q.   And the facilities that Carrie would have had if placed

6  at Station 16 in 2012, would that have been any different that

7  that the facilities available at Station 12?

8  A.   No.  Station 16 is more the same age as Station 12.

9  Q.   So same type of facilities?

10  A.   Same type of facilities.  A little bigger.

11  Q.   Bigger?

12  A.   Uh-huh.

13  Q.   How about the facilities of Station 6 in 2012?  Were

14  those any different than the facilities at Station 12?

15  A.   No, other than being newer, that's it an even newer.

16  Q.   Even newer and even slower?

17  A.   Yes.

18           MS. SAAVEDRA:  I have nothing further.

19           THE COURT:  Now, those were --

20           MR. JACOBSON:  I just have one question on recross.

21           THE COURT:  Okay.  Go ahead, because those questions

22  were a little beyond the original direct.  Go ahead.

23                         RECROSS-EXAMINATION

24  BY MR. JACOBSON:

25  Q.   You can actually assign somebody to a non-light duty

 1   eight-hour position, right, like being a mentor at the

 2   academy?

 3   A.   That's --

 4   Q.   Not you particularly.  I'm sorry.  I apologize, I didn't

 5   ask an artful question.

 6        The fire department under management rights, whether it's

 7   the chief or the deputy chiefs, could assign somebody to an

 8   eight-hour position for example teaching at the academy or

 9   mentoring at the academy and that's not light duty?

10   A.   Yes.

11             THE COURT:  All right.  Any questions from the jury

12   for this witness?  You can write it out.  Maybe you have.

13             Sandy, you can collect it.

14        (At sidebar.)

15             THE COURT:  So I'm going to read the first part.

16             MS. SAAVEDRA:  You can read it all of it in context.

17             THE COURT:  No objection?

18             MR. JACOBSON:  No objection.

19             THE COURT:  You can read it.

20             MS. SAAVEDRA:  So can I lead a little bit to take --

21             THE COURT:  If you want this on the record, you're

22   going to have to get closer.

23             MS. SAAVEDRA:  The March 26th meeting.

24             MR. JACOBSON:  I think it was the 20th meeting.

25             MS. SAAVEDRA:  There was no meeting on the 20th.

 1  That is a phone call.  I think they're referring to the

 2  meeting.

 3          MR. JACOBSON:  She might be confused.  I don't know.

 4          MS. SAAVEDRA:  Call down to the meeting.  Downtown

 5  to the meeting.  That's March 26th.  I mean, I can cover both.

 6  You weren't in on the phone call March 20th.  Is that unusual

 7  for them to have a conversation with Carrie without you on the

 8  phone.  You weren't present on March 26.  Is that unusual that

 9  you weren't present there on March 26th.

10          MR. JACOBSON:  Sorry, I'm read.

11          THE COURT:  Do you want this on the record, what

12  you're reading?

13          MR. JACOBSON:  Yeah, that's fine.  I have no

14  problem.

15          THE COURT:  All right.

16          MR. JACOBSON:  Yeah, you can ask it leading.  That's

17  fine.  Take her back to the March 26th.  That's fine.

18          THE COURT:  Okay.

19      (At sidebar.)

20          THE COURT:  Okay.  This is 14.

21          MS. WATERS:  Do you think --

22          MS. SAAVEDRA:  Good question.

23          THE COURT:  No objection to that question?

24          We're talking morally wrong.

25          MR. JACOBSON:  Yeah, I that's my take exactly.

1    That's my problem with the term -- with the word "wrong."

2              THE COURT:  As long as he can answer it.

3              MS. WATERS:  He can follow-up on what kind of wrong

4    he means.  Like does it violate a rule or --

5              MR. JACOBSON:  Right.  Yeah.

6              MS. WATERS:  -- violate a norm.

7              MR. JACOBSON:  Yeah.  Do you want -- I'll ask that

8    one you ask that one?

9              MS. SAAVEDRA:  That's fine.  I get the last

10   question.  He's my witness.

11             THE COURT:  I'll let her ask the questions since

12   it's her witness and you can follow-up.

13             MS. SAAVEDRA:  And I still get to ask the last

14   because I think he's been ending with recross.

15        (Open court.)

16             THE COURT:  All right, sir, some questions from the

17   jury which Ms. Saavedra will ask of you.

18   BY MS. SAAVEDRA:

19   Q.   So the first question I'm going to kind of put in

20   context, so I might not read it exactly how it is here.

21        But you testified March 20th, 2013, there was a phone

22   call between Carrie Clark, Chief Rodriguez, Chief Nied, and --

23   I'm sorry, Chief Fischback and JoAnn?

24   A.   Okay.

25   Q.   And I believe that was the day you said you weren't on

1   duty, the March 20th, 2013?

2   A.   If it had to do with an assignment at Station 9 --

3   Q.   Yes.

4   A.   -- I believe that's correct, yes.

5   Q.   Is there anything wrong or unusual by the fact that you

6   weren't involved in that conversation with Carrie Clark, the

7   fact that you weren't there or weren't involved in the

8   conversation.  Anything wrong with that?

9   A.   Well, if I wasn't there, then there would be another

10  battalion chief in my place doing staffing at that point.

11  Q.   Okay.

12  A.   Versus -- versus me.  So --

13  Q.   And Carrie was called down to downtown March 26th, 2013,

14  as a result of that conversation on March 20th?  The evidence

15  is she was receiving a verbal counseling on March 26th.

16  A.   Okay.

17  Q.   You were not present during that verbal counseling.  Is

18  there anything wrong with that?  Abnormal or uncommon is the

19  question?

20  A.   That does happen.  Ideally, it would be nice if her chain

21  of command were there with her, someone was there with her.

22  And that would be her choice if she wanted someone with her

23  for that.

24  Q.   Like if she had called the union and asked Sloan Tamietti

25  to be there with her?

1   A.   Correct.

2   Q.   Do you know if you were working on March 26th, 2013?

3   A.   I don't know.

4   Q.   Okay.

5   A.   We can check the roster.

6   Q.   Okay.  So the other question was, Do you think Carrie was

7   doing anything wrong when she was making calls or asking for

8   change in her schedule or assigned station while on swing

9   shift?

10  A.   I think at times.  If the answer wasn't given that was

11  requested, then another phone call would be made or another

12  phone call.  But it was unusual.

13            MS. SAAVEDRA:  Okay.  And then --

14            THE COURT:  Any follow-up pickup questions?  First,

15  Ms. Saavedra, do you have any questions?

16            THE WITNESS:  And I would say it was unusual because

17  of the circumstances.

18            MS. SAAVEDRA:  I think I'll reserve and wait for

19  Mr. Jacobson.

20            THE COURT:  Well, at some point we have to move

21  forward in this trial.  We can't -- but anyway, Mr. Jacobson,

22  any follow-up questions to the juror questions?  Just to the

23  juror questions, please.

24            MR. JACOBSON:  No, Judge.

25            THE COURT:  Ms. Saavedra.

1              MS. SAAVEDRA:  No, your Honor.

2              THE COURT:  Any additional questions from the jury

3    for this witness?

4         (No response.)

5              THE COURT:  All right.  Sir, the rule relating to

6    witnesses has been invoked in this case.  What that means is

7    you're not to talk about your testimony or the facts of the

8    case with any of the other witnesses and with anyone else

9    until the case is concluded.  However, you are free to talk to

10   the lawyers if they need to speak with you.  And you are

11   excused at this time.

12              Thank you.

13         (End of requested proceedings, 10:41 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, Cheryl L. Cummings, certify that the

4   foregoing is a correct transcript from the record of

5   proceedings in the above-entitled matter.

6

7                    Dated this 5th day of April, 2019.

8                    /s/Cheryl L. Cummings

9                    Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
                     Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25