1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3    Carrie Ferrara Clark,            )
                                      )
4              Plaintiff,             )
                                      )   CV-14-2543-TUC-CKJ
5         vs.                         )
                                      )   Tucson, Arizona
6    City of Tucson,                  )   April 3, 2019
                                      )   11:03 a.m.
7              Defendant.             )
     _____  )

8
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
9
       EXCERPT JURY TRIAL DAY THREE - TESTIMONY OF CARRIE CLARK
10
            BEFORE:  THE HONORABLE CINDY K. JORGENSON
11              UNITED STATES SENIOR DISTRICT JUDGE

12   APPEARANCES
     For the Plaintiff:
13        Jacobson Law Firm
          By:  JEFFREY H. JACOBSON
14        2730 East Broadway Blvd., Suite 160
          Tucson, Arizona 85716
15
     For the Defendant:
16        City of Tucson Attorney's Office
          By:  MICHELLE R. SAAVEDRA, ESQ.
17        Civil Division
          PO Box 27210
18        Tucson, AZ 85726-7210;

19        Iafrate & Associates
          By:  RENEE J. WATERS, ESQ.
20        649 North 2nd Avenue
          Phoenix, Arizona 85003
21
     Cheryl L. Cummings, RDR-CRR-RMR
22   Official Court Reporter
     Evo A. DeConcini U.S. Courthouse
23   405 West Congress, Suite 1500
     Tucson, Arizona 85701
24   (520)205-4290

25   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription

1                       EXAMINATION INDEX

2   WITNESSES CALLED ON BEHALF OF THE PLAINTIFF

3   CARRIE CLARK

4       CROSS BY MS. WATERS                  3

5       REDIRECT BY MR. JACOBSON        108

6       RECROSS BY MS. WATERS         123

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2           (Reporter's note:  Beginning of requested proceedings

3    commenced at 11:03 a.m.)

4                  THE COURT:  Be seated, please.

5                  And Sandy, you can get the jury.

6                  THE CLERK:  Please rise for the jury.

7           (Jury panel entered at 11:04 a.m.)

8                  THE COURT:  And everyone may be seated.

9                  The record may reflect the presence of the jury.

10                 So Ms. Clark is back on the record witness stand for

11   cross-examination.

12                 And you may proceed.

13                 MS. WATERS:  Thank you.

14                 CARRIE CLARK, PLAINTIFF WITNESS, PREVIOUSLY SWORN

15                              CROSS-EXAMINATION

16   BY MS. WATERS:

17   Q.   Good morning, Ms. Clark.

18   A.   Clark.

19   Q.   So my understanding is your current assignment for TFD is

20   at Station 23; is that correct?

21   A.   Yes.

22   Q.   Where is Station 23?

23   A.   23 is Valencia and Old Nogales Highway and we're on the

24   property of Raytheon.

25   Q.   How long have you been at Station 23?

1    A.    I've been at Station 23 since November of 2016 so about

2    two and a half years.

3    Q.    Okay.  Has Station 23 been a good fit for you?

4    A.    It eventually has, yes.

5    Q.    Are you happy there now?

6    A.    Yes, I am.

7    Q.    And when you went to Station 23, you demoted to take a

8    firefighter spot; is that correct?

9    A.    Yes, I did.

10   Q.    And your attorney asked you some questions yesterday

11   about the paramedic pay.  Do you remember those?

12   A.    Yes.

13   Q.    Are you currently receiving your paramedic pay even

14   though you're in a firefighter spot at Station 23?

15   A.    Yes, I am.

16   Q.    And has that been the case ever since the second pay

17   period after you took that position?

18   A.    Yes.

19   Q.    Okay.  Ms. Clark, is it fair to say that since you took

20   the spot at Station 23, let's start from the second pay period

21   going forward, okay?

22   A.    Okay.

23   Q.    Is it fair to say that since that time, the retaliation,

24   the discrimination that you have been alleging during the

25   course of this lawsuit, is it fair to say that you've suffered

1   no additional acts that you consider retaliatory since then?

2   A.   Since I went to Station 23?  Off the top of my head, I

3   can't recall right now.

4   Q.   You can't think of any?

5   A.   Nothing that's alleged I think currently.

6   Q.   Okay.  So you've been to Station 23 for a little over two

7   years and you're happy there?

8   A.   Yes.

9   Q.   So now I'd like to go back to the time period right

10  before you came back to work from your first maternity leave,

11  okay?

12  A.   Okay.

13  Q.   So you indicated that you knew that you had the need to

14  express breast milk at work when you returned; right?

15  A.   Yes.

16  Q.   And you talked about with Battalion Chief Paul McDonough

17  about that need and how the department could help you make

18  that work; is that correct?

19  A.   Yes.

20  Q.   Did you feel that Battalion Chief McDonough was

21  responsive to your request for his assistance?

22  A.   Define what you mean by "responsive"?

23  Q.   Did you think he was trying to help you?

24  A.   Yeah, he did.

25  Q.   Did you think that he was being nice to you?

1    A.    I did.

2    Q.    Before you ever returned to work, you and Battalion Chief

3    McDonough had actually reached an agreement about you going to

4    Station 20; correct?

5    A.    Correct.

6    Q.    And Chief McDonough was prepared to station you there at

7    least for a long period of time to help ease your transition

8    back to work; correct?

9    A.    I wouldn't say it was a long period of time.  It was

10   going to be a short assignment.

11   Q.    It was going to be at least through the end of the year;

12   right?

13   A.    Correct, which would have been about seven weeks.

14   Q.    Okay.  And before you went on your maternity leave, had

15   you already taken the HazMat class that you talked about

16   during your direct examination?

17   A.    Yes.

18   Q.    If you go to a station that is a designated HazMat

19   station and you have the certification, do you receive the

20   additional HazMat pay?

21   A.    I believe you actually have to be assigned there

22   permanently.

23   Q.    Okay.  Do you know whether Station 20 was a designated

24   HazMat station?

25   A.    It's not now.  I believe it might have been at the time.

1   Q.   Okay.  Was Station 20 also is a newer, slower station

2   compared to some of the others in Tucson?

3   A.   I don't recall when it was built.  It's definitely a

4   newer station.  And honestly, I don't remember the call volume

5   because every day is different.

6   Q.   So at the very at least, the assignment to Station 20

7   that you had worked out with Chief McDonough before you came

8   back to work would have given you a consistent place to go

9   through the end of the year, through the end of your first

10  couple of months back; right?

11  A.   Through the first seven weeks, yes.

12  Q.   Okay.  Where is Station 20 located?

13  A.   Station 20 is at First and River.

14  Q.   And it overlooks Rillito Park; right?

15  A.   The backside of it does, yes.

16  Q.   Does Station 20 have private dorm rooms with doors?

17  A.   Yes, it does.

18  Q.   Had you been assigned to Station 20, would you have had

19  your own room with a door during the time that you were there?

20  A.   Yes, I would have.

21  Q.   But when you came back, you worked your first shift at

22  Station 12; correct?

23  A.   Correct.

24  Q.   Where is Station 12 located?

25  A.   Station 12 is at Broadway and Harrison.

1   Q.   How far was it from your mother's house to Station 20?

2   A.   I don't know offhand.

3   Q.   Okay.  Do you remember giving testimony about this in a

4   previous deposition?

5   A.   I believe we spoke about it before.

6   Q.   If I told you that you said it was 45 minutes, would that

7   sound about right to you?

8   A.   That would sound about right.  I thought you meant

9   mileage.  Sorry.

10  Q.   Sorry.  I meant time.

11       Do you know approximately how far in time Station 12 was

12  from your mother?

13  A.   Probably around 10 minutes.  I can't -- I don't recall

14  exactly.

15  Q.   But Station 12 was substantially closer to your mom than

16  Station 20; correct?

17  A.   That's correct.

18  Q.   So before you ever came back, you had arranged with

19  Battalion Chief McDonough that you could assume the spot at

20  Station 20 through the end of the year; right?

21  A.   Correct.

22  Q.   And you had also worked out with him that you would work

23  your first shift back at Station 12 because you knew there

24  going to be openings there; is that right?

25  A.   That's not completely accurate.

1    Q.    Okay.  Tell me what I have wrong.

2    A.    Sure.  So when I was coming back to work, it was in the

3    middle of our five-shift tour.  So there were two shifts left,

4    and somebody else had already been at Station 20 for a period

5    of time before me.  So when I initially spoke with Chief

6    McDonough, we agreed that the first two shifts -- or, my first

7    two shifts which ended that tour, I would give consideration

8    to the person that was still there and fill the spots that

9    were open on the east side.

10   Q.    But so you believed you were coming back to work, and you

11   thought you had a plan through the end of the year.  Two

12   shifts at Station 12 followed by a temporary but longer term

13   assignment to Station 20; correct?

14   A.    It was -- my first shift was at 12 and my second shift

15   was at 21.

16   Q.    Okay.  Did you feel better about it, knowing where you

17   were going to be for your first shift back a little bit ahead

18   of time?

19   A.    Yes, I did.

20   Q.    When you came back and you worked the shift at

21   Station 12, at some point you decided that you preferred that

22   to the assignment at Station 20; is that right?

23   A.    That's not correct.

24   Q.    Okay.  Did you assume a spot at Station 20 that you had

25   worked out with Battalion Chief McDonough?

CLARK - CROSS

1   A.   I'm sorry, what was the question?

2   Q.   You told me I was wrong.  Did you take the spot at

3   Station 20 that you had worked out previously with Battalion

4   Chief McDonough?

5   A.   My first day back at work I was at 12.

6   Q.   Maybe I'm asking the question badly.

7        You had expected to go to 20 after those first two

8   shifts; correct?

9   A.   I had expected that, yes.

10  Q.   But at some point you decided not to take the spot at 20

11  through the end of the year; is that right?

12  A.   At some point that was decided.

13  Q.   By whom?

14  A.   Myself and Chief McDonough.

15  Q.   Chief -- you believed Chief McDonough played a role in

16  deciding you would not go to 20 after he told you, you could?

17  A.   Yeah, this happened after the November meeting downtown.

18  Q.   Okay.  Let's make sure we're getting our time line

19  correct so we don't confuse anybody.

20       Before the November meeting downtown, was there a time

21  you told Chief McDonough that you wanted to try to go to 12

22  rather than 20?

23  A.   Yes.

24  Q.   And you decided that you preferred 12 I think you said

25  for a couple of reasons; right?

1  A.    Correct.

2  Q.    You talked there being other mothers there; right?

3  A.    Yes.

4  Q.    And it was also closer to your mother who had your baby?

5  A.    Right.

6  Q.    And you said that you just generally felt more

7  comfortable at 12 than 20; is that right?

8  A.    That's fair to say.

9  Q.    In terms of the actual facilities, that is the place that

10  was available for you to express your breast milk, would you

11  agree that 12 and 20 were effectively comparable stations?

12  A.    Meaning they offered the same amount of privacy?

13  Q.    Yes.

14  A.    Yes.

15  Q.    So they offered the same amount of privacy.  They both

16  offered you a private dorm room with a door; right?

17  A.    Correct.

18  Q.    And you had time at each station when you could express

19  breast milk as you needed to?

20  A.    It's hard to say yes or no to that because it always

21  depended on the day.  If we had a lot of calls, sometimes I

22  didn't have the time I needed.  But it always depended -- that

23  varied every day so there was no way to know that.

24  Q.    At either station was there ever a captain who told you,

25  no, you can't take time to do that right now?

1  A.   No.

2  Q.   Or was that a decision that you made based on what the

3  needs of your unit were at a given time?

4  A.   That was the decision that when a 911 call came in, I

5  stopped what I was doing and I responded on the call because I

6  had no other option.  That was my obligation, was to go to on

7  a call.

8  Q.   So just to be clear you chose to fulfill your obligation;

9  right?

10  A.   Of running a call?  Yes.

11  Q.   And no one told you, you have to stop pumping now or you

12  may not pump now; correct?

13  A.   Well, since I was in my room, I don't think most people

14  knew I was pumping prior to the call.

15  Q.   But just to be clear, nobody ever -- no captain at 12 or

16  20 ever told you, Ms. Clark, you can't pump right now or you

17  must stop pumping now because we need to go run a call?

18  A.   No.

19  Q.   That's correct?

20  A.   That's correct.

21  Q.   So within the constraints of the nature of your

22  employment, you had the time that you needed at both 12 and 20

23  to pump; yes?

24  A.   Yes.

25  Q.   You had the same facilities at both 12 and 20 that you

1   would have needed to pump?

2   A.   Yes.

3   Q.   And the differences between 12 and 20 from your

4   perspective were your comfort level and the proximity of the

5   stations to your mom; is that fair?

6   A.   There were a few other reasons, but, yes, those are true.

7   Q.   Did any of those other reasons that you're alluding to

8   have anything to do with the nature of the time you were

9   provided to pump or the nature of the facilities you had to

10  pump in?

11  A.   I'm confused.  I thought we said that they were both the

12  same so there was no difference.

13  Q.   I did, too.  And I just wanted to make sure because you

14  said there were some other differences between 12 and 20.  I

15  wanted to make sure that those differences aren't related to

16  the time you had to pump or the facilities you had to pump in.

17  Is that true?

18  A.   That's true.

19  Q.   Okay.  When you decided not to take the spot at 20, you

20  understood that you would still be on swing shift; is that

21  correct?

22  A.   That's correct.

23  Q.   I understand you hoped to obtain a spot at 12; right?

24  A.   You'd have to tell me which day you're talking about

25  because it kind of changed.

1   Q.   Sure.  Shortly after you returned before your meeting

2   with the chiefs downtown when you decided not to take the spot

3   at 20 that you and Chief McDonough had talked about, it was

4   because you were hoping to get a spot at 12; correct?

5   A.   Initially, after that first day when I worked at 12 after

6   the partner that I was working with, Jeff Todd, who sent his

7   memo up offering up -- opening up that spot, I had spoke with

8   Chief McDonough about it.  And he agreed that it would be a

9   good -- a good fit and it would be less disruptive to the

10  department if I just filled a vacancy.  So I was kind of

11  waiting for his response.

12  Q.   Waiting for Chief McDonough's response?

13  A.   Correct.

14  Q.   But just to be clear, you preferred 12 to 20; right?

15  A.   I did.

16  Q.   And Chief McDonough told you that he would raise the

17  issue and find out whether it was a possibility; right?

18  A.   Yes.

19  Q.   And as far as you know, did Chief McDonough raise that

20  issue to find out whether you could go to Station 12?

21  A.   I believe he did.  I mean, you would have to ask him, but

22  I believe he did.

23  Q.   Okay.  Was that consistent with what you expected Chief

24  McDonough to do?

25  A.   Not in the time frame I would say because when the memo

1    was written by Jeff Todd, it was October 28th.  And then when

2    I saw the spot go out to bid on October -- November 1st, I

3    apologize, of 2012, I contacted Chief McDonough and said, Hey,

4    do you know what happened?  I saw the spot went out to bid.

5    And he agreed, he said, Yeah, I noticed that too.  I'll make

6    some phone calls.

7    Q.   Is it fair to say that you don't have any personal

8    knowledge about Jeff Todd's personnel issues at Station 12?

9    A.   I just know what he told me.

10   Q.   Is it fair to say that the administration did not consult

11   you about their moving -- their decision to move Jeff Todd or

12   where Jeff Todd would go after Station 12?

13   A.   No, they didn't consult me.

14   Q.   I understand that you were under the impression that Jeff

15   Todd was going to voluntarily go to swing shift; correct?

16   A.   Yes.

17   Q.   Which you believed would open that spot up, and you would

18   be able to fill it without it having to go through a bid

19   process; is that right?

20   A.   I was just hoping to fill it temporarily before it went

21   out to bid; correct.

22   Q.   And you thought that that would be made possible if Jeff

23   Todd went to swing?

24   A.   That was going to create the opening, yes.

25   Q.   And instead, the spot at Station 12 was bid; correct?

1    A.    Yes, it went out to bid.

2    Q.    Is there anything about the department putting the spot

3    at Station 12 out to bid that you think violated the rules of

4    assignment?

5    A.    When you say that there's the management discretion and

6    they can do whatever they want, then I would say ultimately

7    they can do whatever they want.

8    Q.    Well, before we even get to management discretion, there

9    are provisions for how spots are bid; right?

10   A.    Yes.

11   Q.    Was there anything about the way they bid the spot at

12   Station 12 that you believe violated the rules of assignment?

13   A.    What I was unclear on, and this was part of my

14   conversation with Chief McDonough, he used to be a deputy

15   chief of operations so he knew a lot about the rules and

16   policies.  What he told me is that per the rules of

17   assignment, when you opt to swing it's not technically covered

18   under what had to be bid and what didn't, so it fell under

19   management discretion.  And at that point they could decide,

20   basically, to do whatever they wanted with it.

21   Q.    So you were under the impression that if Jeff Todd went

22   to swing, that the normal bid process didn't have to be

23   implemented; correct?

24   A.    Correct.

25   Q.    Now, if Jeff Todd had not gone to swing but had, instead,

1   been reassigned to another station, would you expect the

2   normal bid process to be implemented?

3   A.   I would honestly have to refer to that policy because

4   there's a lot of different lists of how things happen and when

5   they bid certain things, so I honestly don't remember right

6   now.

7   Q.   Okay.  I was just curious because when you answered the

8   previous question, you were talking about the effect of him

9   deciding to go to swing.  So was that an important factor in

10  your understanding of how that spot would be handled?

11  A.   That was, like I said, per my conversation with Chief

12  McDonough, that's exactly what he told me.  Was that when you

13  opt to swing, it's not technically covered under what they

14  list of the rules of assignment for bidding and so it

15  typically defaults to management discretion and they can place

16  somebody on a promotional list or do whatever they want.

17  Q.   Okay.  So if Jeff Todd opted to swing, your belief was

18  they could fill the assignment -- fill the spot outside the

19  rules of assignment or they could put it out to bid like any

20  other spot; right?

21  A.   Correct.

22  Q.   And it turned out that regardless what happened with Jeff

23  Todd, the administration put that spot out to bid?

24  A.   Yes, they did.

25  Q.   Did you bid for that spot?

1    A.    Yes, I did.

2    Q.    Did anyone else bid for that spot?

3    A.    I believe quite a few other people bid for it.  There

4    were a couple.

5    Q.    Okay.  Who ultimately won that bid?

6    A.    Paramedic by the name of Scott Billings.

7    Q.    Did you know Paramedic Billings?

8    A.    Yes, I did.

9    Q.    Were you aware of your husband contacting Paramedic

10   Billings and asking him to withdraw his bid for that spot?

11   A.    That's not what happened, but, yes, I'm aware of that.

12   Q.    Okay.  After Paramedic Billings won the spot, you said

13   that between the time it was bid and the time you had your

14   meeting downtown in early November and the end of the year,

15   you were able to stay at Station 12 for the shifts you had

16   remaining for that year; is that correct?

17   A.    I was able to stay there when there was a vacancy there;

18   correct.

19   Q.    And were you aware that Paramedic Billings actually

20   delayed his moving to that station so that you could stay

21   there through the end of the year?

22   A.    That's actually not accurate.

23   Q.    So if we have chiefs who come in and testify that that's

24   what happened with Paramedic Billings, you believe their

25   testimony would be inaccurate?

1    A.   Yes.  That he did not stay there.  He did not offer me

2    the spot through the end of the year.

3    Q.   Okay.  Do you remember asking the chiefs in your

4    November meeting whether Paramedic Billings could delay taking

5    that spot to give you more time to work out another solution?

6    A.   I believe it was mentioned, yes.

7    Q.   Okay.  And ultimately, you were able to stay at

8    Station 12 for a longer period of time; correct?

9    A.   I was able to fill those vacancies I talked about

10   yesterday.  There were a couple vacations and then one person

11   had the last five shifts of December off, so I was able fill

12   those spots.

13   Q.   And you testified previously that you were comfortable at

14   Station 12; is that right?

15   A.   Yes.

16   Q.   I would like to talk now about -- I would like talk

17   briefly about your interactions with Chief McDonough up to the

18   point when Station 12 is put out to bid.  Okay?

19   A.   Okay.

20   Q.   I think you've indicated that you -- you acknowledge that

21   he was doing what he could to help you; correct?

22   A.   I'm sorry, up to which point?

23   Q.   Let's break this up to the point when station -- before

24   Station 12 is put out to bid.

25   A.   Okay.

1   Q.   Okay.  You would agree that Battalion Chief McDonough was

2   doing everything he could to help you?

3           MR. JACOBSON:  Objection; foundation and

4   speculation.

5           THE COURT:  No, overruled.  Go ahead.  You may

6   answer.

7           THE WITNESS:  I can't say that he was doing

8   everything because I honestly don't know.

9   BY MS. WATERS:

10  Q.   Was he taking your calls to discuss your assignments?

11  A.   I believe he was.  I know we spoke on the phone a few

12  times.

13  Q.   Was he talking with you before you returned from your

14  maternity leave about finding you a place you would be

15  comfortable?

16  A.   Yeah, we spoke one or two times before I came back to

17  work.

18  Q.   Was he responsive to the e-mails that you sent him

19  discussion your station assignment and requesting for him to

20  place you at Station 12 when it was available?

21  A.   Yes, he was.

22  Q.   Did he, in fact, encourage you in response to some of

23  your e-mails to tell to you keep up the good vibes because you

24  were doing a great job?

25  A.   Yes, he did.

 1   Q.   It sounds like Chief McDonough was fairly supportive of

 2   you?

 3   A.   It's fair to say.

 4   Q.   Now, I'd like to talk about the meeting that you had

 5   downtown with Chiefs Rodriguez, Fischback, Nied, and

 6   McDonough.

 7   A.   Okay.

 8   Q.   You said you found out about this meeting because Chief

 9   McDonough told you, you needed to go downtown for it; is that

10   correct?

11   A.   That's correct.

12   Q.   Okay.  You alleged during your direct examination that

13   one of the chiefs told you at this meeting they were confused

14   about what you wanted because they hadn't had anybody else

15   make complaints; is that right?

16   A.   Close to that, yes.

17   Q.   Okay.  Ms. Clark, you're aware that before you, there

18   were other women within the Tucson Fire Department who came

19   back from maternity leave and were breastfeeding babies and

20   also needed to pump milk while at work; is that right?

21   A.   I believe there's been a few.

22   Q.   In fact, one of the reasons you were comfortable at

23   Station 12 is because there was another mother who either was

24   breastfeeding or recently had been; is that right?

25   A.   On the shift I was working?

1   Q.   At Station 12 generally.

2   A.   There was another mother there, yes.

3   Q.   And you said that before you came back to work, you had

4   researched the law to find out, I assume, what your

5   expectation should be; is that right?

6   A.   Yes.

7   Q.   Are you aware that the law you were relying on to talk

8   about or to obtain the facilities that you needed in order to

9   pump breast milk, that it was a relatively new law at the time

10  you were able to take advantage of it?

11  A.   I don't know what I would define new.  I think two years,

12  a little over two years it had been in place.  So whether you

13  consider that new or not, it was two years.

14  Q.   Is if fair to say there probably had not been a great

15  number of breastfeeding mothers at TFD between the time the

16  law was passed and the time that you raised concerns about the

17  facilities?

18  A.   I honestly can't answer that.  I know there was another

19  female pregnant not long before me.

20  Q.   Okay.  And it sounded like you took the chief's confusion

21  about nobody else having complained as a criticism of you.  Is

22  that true?  Is that how you took it?

23  A.   It was more the tone that was used and the way it was

24  asked of me.

25  Q.   Is it possible that they were just genuinely confused

1  because they really hadn't had anyone else tell them there was

2  a problem?

3  A.   That's not the impression I got.

4  Q.   So I understand that's not your perception of the

5  conversation.  Would you agree it's fair that other people

6  involved in the conversation may have had a different

7  perception of it than you did?

8  A.   I'm sure everybody had a different perception.

9  Q.   So after the November meeting with the chiefs, you were

10  able to stay at 12 filling vacancies and/or filling Scott

11  Billings' space, and we can agree to disagree about how it

12  occurred until the end of 2012; is that right?  I'm sorry,

13  2013.

14  A.   That's correct, I stayed there through vacancies.

15  Q.   And then you said once January of 2014 rolled around, you

16  were back on a regular -- you were on swing the whole time,

17  but you were back in the swing pool and you had to check each

18  day to see what station you would be assigned to; is that

19  correct?

20  A.   That's correct, but I was also still on swing in

21  December, and I actually worked at Station 7 during the month

22  of December so I wasn't exclusively at Station 12 during that

23  time.

24  Q.   And I believe you testified on direct that when you

25  worked at Station 7 in December, you were assigned to the

1   paramedic spot that had its own dorm room; that's correct?

2   A.   Yes.

3   Q.   So I understand there are three paramedic spots at

4   Station 7; is that right?

5   A.   Three different trucks are you asking?

6   Q.   So well, we know that two paramedics share a room if

7   they're assigned to a particular truck at Station 7; right?

8           MR. JACOBSON:   Objection.   Can we get a foundation,

9   some time frame on this?

10          MS. WATERS:   I believe this is what she testified to

11  during her direct examination when she was distinguishing

12  between Truck 47 and 7.

13          THE COURT:   So do we have a date?

14          MS. WATERS:   December 2013.

15          THE WITNESS:   Okay.

16  BY MS. WATERS:

17  Q.   Is that correct?

18  A.   Right.   So there was Paramedic 47 and also Paramedic 7.

19  Q.   When you were assigned to Station 7 in December, though,

20  you were assigned to Paramedic 7 which did have a private dorm

21  room; correct?

22  A.   Correct.

23  Q.   And was that dorm room -- in terms of the facilities, was

24  that generally comparable to what you experienced at Stations

25  12 and 20?

```
 1    A.    As far as private dorm room?

 2    Q.    Yes.

 3    A.    Paramedic 7?  Yes.

 4    Q.    And I'm saying 2013 and I should be saying 2012; is that

 5    right?

 6    A.    I'm sorry yes.

 7    Q.    My fault.  Not yours.

 8          So starting in February of 2013, you were checking the

 9    Telestaff to see where you would be assigned; is that right?

10    A.    That was, like I said, that continued in December of 2012

11    and pretty much continuously until the end of March.

12    Q.    And when you were checking the Telestaff to see where the

13    openings were, you would call Battalion Chief McDonough to

14    tell him, I see there's a opening there.  Can I go there?  I'm

15    comfortable there, or different stations?

16    A.    I don't recall making maybe but a handful of calls to

17    him.  This was definitely not something I did every shift.

18    Q.    And on the occasions when you called him and told him

19    that you noticed an opening that you wanted to be assigned to,

20    did Battalion Chief McDonough assigned you to those openings?

21    A.    I honestly don't remember how each shift played out.

22    Q.    Can you think of a time that you told Battalion Chief

23    McDonough there's an opening at a particular station and I'm

24    comfortable there and he refused to assign you there?

25    A.    No.  I believe the only time I ever said that was when
```

1  there were openings at Station 12.

2  Q.   And every time you asked him for Station 12, did he

3  assign you to Station 12 if it was open?

4  A.   I believe he did but I'm not 100 percent.

5  Q.   Turning then to the other stations where you were

6  assigned, in early January of 2013 when you knew that you were

7  not going to be able to have the spot at Station 12, did you

8  go talk to Marty Macias at the OEOP Office for the City of

9  Tucson?

10 A.   I went and spoke with her but it wasn't necessarily just

11 about Station 12.

12 Q.   But is it fair to say that in terms of the time line, you

13 talked with her early January 2013 which is a point after

14 which -- yes, the point after you learned that Station 12 had

15 been assigned to Scott Billings and he had assumed that

16 opening?

17 A.   So if we're talking about January when I did contact her,

18 yes, 12 was done.  Scott had been in his spot for a period of

19 time, and I was back on swing at that point.

20 Q.   Okay.  And when you contacted Ms. Macias, you expressed

21 concerning to her about whether you would be assigned to

22 stations that you felt were not compliant with the law.  Is

23 that right?

24 A.   Yeah, I believe we talked about that.

25 Q.   And I'd like to turn your attention briefly to the law

1   that you were relying on.  Tell me if I have this right:  The

2   law requires that you have a space that is free from

3   intrusion; right?

4   A.   That's part of the wording.

5   Q.   I'm going to go through each piece.  Free from intrusion?

6   A.   Correct.

7   Q.   Shielded from public view?  Yes?

8   A.   Public view, yes.

9   Q.   Okay.  And you talked with Ms. Macias about what you felt

10  the requirement -- what you felt the law required.  Is that

11  right?

12  A.   It's probably fair.  I mean, I know we talked about how

13  it applied, yes.

14  Q.   And are you aware, Ms. Clark, that one of the results of

15  the conversation you had with Ms. Macias is that OEOP

16  conducted a review of all of the TFD stations to determine

17  which ones complied with the law and which ones did not?

18  A.   I'm aware that happened, but I talked with her four times

19  so I can't tell you after which one it happened.

20  Q.   But you do know that after you alerted OEOP to the

21  problem, they conducted an investigation of whether the

22  stations within TFD were compliant with the law; is that

23  right?

24  A.   I actually was not aware that they had conducted an

25  investigation until, kind of like Mr. Tamietti had testified,

1  till I started hearing about it through the rumor mill.

2  Q.   But as you sit here today, you know that in fact they

3  went and they visited every single TFD station to determine

4  whether the station complied with the federal law; right?

5  A.   I can hope that that's true, but I don't have any way to

6  know that they -- I wasn't there so I'm just assuming they

7  went to all the stations, yes.

8  Q.   Were you here yesterday when Mr. Larsen testified that he

9  personally went out to all the stations and conducted this

10  investigation?

11  A.   I believe Mr. Larsen said he did half of it and then

12  somebody else did the other half.

13  Q.   Okay.  So can you agree with me that as you sit here

14  today, OEOP went out and investigated all of the stations to

15  determine whether they were compliant?

16  A.   As far as I know, yes.

17  Q.   And after their investigation of the stations and review

18  of the stations, they produced a list; right?

19  A.   They came up with a list, yes.

20  Q.   Okay.  Now, you were here yesterday when Mr. Larsen

21  testified; correct?

22  A.   Correct.

23  Q.   And did you hear him say that at the time he conducted

24  this investigation, he believed that the law required a room

25  that was dedicated to a -- was a dedicated nursing room and

1  had a lock on it?

2  A.   I don't recall if he said that or not.  I don't remember

3  him using the word "dedicated."

4  Q.   "Dedicated" might be my phrasing.

5  A.   Okay.

6  Q.   But do you recall him testifying that at that time, he

7  believed that the law required a lock on a door?

8  A.   I believe he said something to that extent.

9  Q.   Okay.  At the time that you first went to OEOP in

10  January of 2013, did you believe the law required a lock on

11  the door?

12  A.   I was doing my best to interpret what "free from

13  intrusion" meant.  And I know that when I go to a restroom or

14  when I go to a dressing room, I have a lock so that no one can

15  walk in.  So that was my interpretation of what free from

16  intrusion meant.

17  Q.   And you were interpreting that as a layperson; right?

18  A.   Correct.

19  Q.   You don't have any legal training?

20  A.   No, I don't.

21  Q.   You don't have any experience reviewing case law or

22  judicial interpretation to find out what words in a statute

23  mean, do you?

24  A.   No, I don't.

25  Q.   So you were basing your belief about what the law

CLARK - CROSS

1   required just on your layperson's reading of the rules; right?

2   A.   Correct.

3   Q.   Would you agree that as a general matter, a closed door

4   is an indication to others that you should not enter without

5   knocking first?

6   A.   I personally can't agree to that.

7   Q.   You don't think a closed door means you should knock

8   before entering?

9   A.   I think it depends on what the use of that room is.

10  Q.   Well, let's say that it is someone's dorm room in a fire

11  station where they sleep.  Do you believe that a closed door

12  is an indication to others that they should knock before

13  coming in?

14  A.   I believe that would be the courteous thing to do, but I

15  can't say that everybody does it.

16  Q.   I think we can probably agree that there is social rules

17  that everyone should follow and not everyone does; right?

18  A.   Correct.

19  Q.   Outside of an exception, someone who refuses to follow

20  the basic rules of a civilized society, would you agree that a

21  closed door is generally accepted to mean that you should

22  knock before trying to enter?

23  A.   I have a hard time.  I can't fully agree to that just

24  given, you know, an example like at the fire station, our

25  bathroom doors are closed at all times.  They're weighted

1    doors and they're closed.  And people -- when one of the locks

2    was broken, people were walked in on multiple times because

3    nobody knocked or before they walked in or they didn't hear

4    them so.

5    Q.   So you're describing a community bathroom; correct?

6    A.   Fire station bathroom.

7    Q.   Used by multiple members of the fire station; right?  It

8    wasn't a dedicated bathroom for a single individual?

9    A.   Correct.

10   Q.   And it sounds like a situation where that door might be

11   closed whether there was someone in the bathroom using it or

12   not?

13   A.   Yes.

14   Q.   Okay.  The dorm rooms at fire stations, though, are not

15   community spaces; is that fair?

16   A.   Not at one time, but we do share them with other members

17   on the department.

18   Q.   Sure.  When you're off shift, someone else uses that

19   room; right?

20   A.   Correct.

21   Q.   But while you're on shift, that room is yours?

22   A.   Correct.

23   Q.   Have you ever made it a practice to barge in to other

24   firefighters' dorm rooms when the door is closed?

25   A.   I've never made it a practice, no.

1    Q.   So you indicated during your direct examination that you

2    were assigned to Station 9 and you don't believe it was

3    compliant; correct?

4    A.   That's correct.

5    Q.   And you reason you didn't believe Station 9 was compliant

6    was because while it had dedicated spaces for people assigned

7    there rather than a door, it had a curtain across the front;

8    is that correct?

9    A.   They do close with the curtain and there are also like

10   partition walls so they're not full walls.

11   Q.   Would you say it's fair that the wall starts -- the wall

12   dividing one dorm from another starts at the floor and goes to

13   within a about a foot and a half of the ceiling?

14   A.   I don't know for sure.  I would say it's probably close.

15   Q.   Okay.  And it's a solid wall between the two; correct?

16   A.   I don't know that either.

17   Q.   But in addition to the dorm rooms at Station 9, there was

18   also a study room there; is that right?

19   A.   Correct.

20   Q.   And the study room had a wooden door with a window on it

21   that locked; is that right?

22   A.   The door did not lock.

23   Q.   You don't believe the door locked did?

24   A.   The door did not lock.

25   Q.   Okay.  When you were assigned to Station 9, I understand

1    that you were told initially you could use one of the chief's

2    rooms as a place where you should express breast milk; right?

3    A.   I was told that on the phone call, yes.

4    Q.   And the two chiefs on the phone call, Fischback and

5    Rodriguez, they agreed that that was not an appropriate place

6    for you to pump; is that right?

7    A.   They agreed after it was suggested and I replied that it

8    wasn't appropriate.  And then I asked Chief Fischback if he

9    actually thought it was appropriate because he worked there as

10   well.

11   Q.   And Chief Fischback, being familiar with Station 9,

12   agreed it would not be appropriate for you to wake up a

13   captain and kick him out of his room so you could use it;

14   correct?

15   A.   I believe they just said, Yeah, we're going have to call

16   you back.

17   Q.   You understand that -- are you disputing that Chief

18   Fischback agreed that you should not be asked to kick a

19   captain out of his room in order to pump?

20   A.   I'm just saying he didn't say those words, but I can

21   imagine by how our conversation went that I would see that he

22   saw it from my way.

23   Q.   Okay.  So at the very least, you're willing to admit that

24   Chief Fischback gave every indication of agreeing with you and

25   did not insist on assigning you to Station 9; is that right?

1  A.    Correct.

2  Q.    Okay.  The person who suggested Station 9 might be

3  appropriate was JoAnn then Acedo now Acosta; is that correct?

4  A.    That's correct.

5  Q.    And this is the first time you had ever encountered

6  Ms. Acosta?

7  A.    As far as I remember, yes.

8  Q.    To avoid confusion, because I only met her after her name

9  changed, is it okay with you if I call her Ms. Acosta?

10  A.    Sure.

11  Q.    Okay.  And Ms. Acosta was an HR person.  She had never

12  been a commissioned firefighter; right?

13  A.    Yes.

14  Q.    So when she suggested you could wake up a captain and use

15  his room in order to pump, did that to you indicate that she

16  was not familiar with the way the fire station worked?

17  A.    Just judging by how that whole conversation went, I don't

18  know that I can say she wasn't familiar with it as much as I

19  felt like she was basically saying this is your option, this

20  is what you're going to do.

21  Q.    And I understand you have a perception of the

22  conversation and a perception of Ms. Acosta, and I'm really

23  not asking about that right now.  I'm asking a much narrower

24  issue which is whether you think that that indicated a lack of

25  familiarity with the fire department?

1   A.   I can't really answer that because she knew there was a

2   chief's office and a captain's office, so as far as I knew she

3   was familiar with what the stations were.

4   Q.   That's fair that you -- you don't know what her knowledge

5   base was.

6        You were aware, though, that there was this -- also this

7   study room at Station 9; right?

8   A.   Yes.

9   Q.   The study room at Station 9 did have a window?

10  A.   Yes.

11  Q.   But the window could have been covered to provide

12  privacy; is that correct?

13  A.   So it was like -- it was like a full length window on the

14  door.  I mean, it would have taken me some time to gather up

15  material to tape over the window each time I needed it, but I

16  guess in essence, yes, it can be.

17  Q.   Okay.  And had the window been taped over, the study room

18  and the area within it would have been free from public view;

19  is that right?  Shielded from public view?

20  A.   Shielded from view, yes.

21  Q.   Okay.  I'd like to show you what's been introduced as

22  Exhibit 62.  I'm going to -- there we go.  Ms. Clark, do you

23  remember seeing this exhibit yesterday when Matt Larsen

24  testified?

25  A.   Yes.

1           THE COURT:  Do you want -- here it comes.  All

2  right.

3  BY MS. WATERS:

4  Q.   Looking at the list of stations that Mr. Larsen believed

5  at the time were in compliance, which goes from the first part

6  of the first page and on to the second page, do you agree that

7  Station 12 is not in his list of stations he believed were

8  compliant?

9  A.   Correct.

10  Q.   Okay.  Do you see Station 12 on the list of stations that

11  were not in compliance?

12  A.   Yes, I do.

13  Q.   Okay.  And in looking at this, he seems to indicate that

14  Station 12 would be compliant if there were a lock on the

15  study room; is that right?

16  A.   Correct.

17  Q.   And he does not mention with respect to Station 12 the

18  privacy of the dorm rooms; is that correct?

19  A.   He does not mention the dorm rooms.

20  Q.   But you yourself were comfortable in the dorm rooms at

21  Station 12 during the time period you were allowed to be

22  there; is that correct?

23  A.   I was comfortable with who I was with, but like I said,

24  without a lock I -- I never know if somebody can walk in.

25  Q.   And once Matt Larsen issued his report and provided this

1  list, were there occasions -- was there an occasion when you

2  were told you could not go to Station 12 because Station 12

3  was on the list of noncompliant stations?

4  A.    The first time I was told that was when I was called

5  downtown to be disciplined.

6  Q.    And that was for the phone call with Chief Fischback,

7  Rodriguez, and JoAnn Acosta?

8  A.    That's correct.

9  Q.    Now, you've alleged that Chief Fischback, during that

10  disciplinary meeting told you, Well, that's what happens when

11  you file a complaint?

12  A.    That's correct.

13  Q.    Do you recall that he was specifically telling you the

14  reason you couldn't go to Station 12 was because the OEOP

15  investigation found that Station 12 was noncompliant?

16  A.    That was part of that conversation.

17  Q.    And Chief Fischback at that point was not going to assign

18  you to a station on the noncompliant list.  Is that what he

19  told you?

20  A.    I don't remember if he said that exactly.

21  Q.    When you were testifying during your direct examination

22  and you were being asked a lot of questions about the

23  facilities that you wanted, that you expected when you came

24  back to work and needed to pump, you talked about a lot about

25  your comfort level.  Do you remember that?

1   A.   Yes, I do.

2   Q.   And in fact, some of the things that you talked about

3   being disappointed in or displeased with was the fact that you

4   had to explain your situation to multiple people; correct?

5   A.   Correct.

6   Q.   And the fact -- you were concerned about your privacy;

7   right?

8   A.   Correct.

9   Q.   And your concerns about your privacy weren't just about

10  being shielded from view or free from intrusion, but they

11  went -- they went deeper and included things like you didn't

12  really want people to know what you were doing; right?

13  A.   Correct.

14  Q.   You didn't want people to hear the noise from the pump?

15  A.   Correct.

16  Q.   And you didn't want to have to explain yourself to

17  anybody you worked with; right?  To explain what you were

18  doing?

19  A.   Correct.

20  Q.   Would you agree it's fair to say that the provision of

21  law that we've been relying on to talk about the adequacy of

22  the facilities, it does not address being protected from

23  people knowing what you're doing?

24  A.   Correct.  I agree to that.

25  Q.   Would you agree that it does not guarantee that you won't

1    have to explain your needs or your situation to multiple

2    people?

3    A.    I would agree with that.

4    Q.    Would you agree that it does not guarantee that you won't

5    be asked what you're doing or be forced to provide an

6    explanation to a curious co-worker?

7    A.    It doesn't say that so I guess I can agree.

8    Q.    The law doesn't ensure absolute privacy; right?

9    A.    Could you be more specific what you mean?

10   Q.    Sure.  Would you agree that free from intrusion and

11   shielded from public view is not the same as absolute privacy?

12   A.    I think it's, like, physical privacy but maybe not

13   talking about it privacy.

14   Q.    You might still have noise carry over, right, from the

15   machine?

16   A.    Maybe.

17   Q.    You might still have to talk about it; right?

18   A.    It's possible.

19   Q.    You might still have to advocate for what you need;

20   right?

21   A.    It's possible.

22   Q.    You might still encounter a co-worker when you are

23   securing and storing the breast milk that you pumped; right?

24   A.    It's possible.

25   Q.    After you raised a concern about Station 9, you were

1    never stationed -- you never actually worked at Station 9;

2    correct?

3    A.   I never actually worked there.

4    Q.   And after you raised a concern about Station 9, you were

5    never scheduled to work there; is that correct?

6    A.   You'd have to be more specific about which time I brought

7    up Station 9.

8    Q.   After the phone call where you explained why Station 9

9    was not appropriate, you were never assigned to work at

10   Station 9; is that correct?

11   A.   I was not assigned after the March 20th phone call.  I

12   had been assigned there a few times prior.

13   Q.   But we agreed you never worked there?

14   A.   Correct.

15   Q.   And after you raised the issues to 9 with Chiefs

16   Fischback and Rodriguez, you were never assigned there again;

17   is that right?

18   A.   With Fischback and Rodriguez, yes.

19   Q.   Okay.  In January of 2013 when you were concerned about

20   where you would be stationed and where you would pump at each

21   station, is there any particular reason that you did not go to

22   TFD human resources at that time to ask them for a solution?

23   A.   I just went within my chain of command which is what I've

24   always done.

25   Q.   You indicated on your direct that prior to the March 20th

1    phone call with JoAnn Acosta, all of your experiences with

2    human resources in multiple jobs had been positive; right?

3    A.   Correct.

4    Q.   You viewed the human resources people as people who were

5    there to help you?

6    A.   Correct.

7    Q.   In 2013, if you felt you weren't getting the security

8    about your assignment that you wanted from your chain of

9    command, why not go to human resources?

10   A.   So I ended up going to the OEOP office, like I said, at

11   the recommendation of another one of the captains that I had

12   worked with.

13   Q.   Who was that?

14   A.   His name was Burt Thomas.

15   Q.   But I understand where you did go.  But I want to ask

16   again, why not go to the TFD dedicated human resources person

17   and ask if they could help you?

18   A.   Like I said, I just followed my chain of command like

19   I've always been told to do.

20   Q.   Well, OEOP wasn't your chain of command; right?

21   A.   No, they were not.

22   Q.   Okay.  And I'm not criticizing your use of them in any

23   way, but I am really curious why you didn't try going to TFD

24   human resources to see if they could help you?

25   A.   I don't recall specifically what I was thinking at the

```
1    time.  I just remember that the day I worked at Station 7 back
2    in December, this was shortly after the whole Medic 47
3    assignment, Burt Thomas was a captain at the station at the
4    time.  And he said you just need to go see what your rights
5    are and you should talk to OEOP, so I did.
6              THE COURT:  Now, getting you between questions.
7    Would now be a great time to break for lunch?
8              MS. WATERS:  Sure.
9              THE COURT:  Let's go ahead and take the lunch break.
10             Members of the jury, please continue to follow the
11   Court's admonition, and we'll see you back here at 1:15.  So
12   have a good lunch.  And you can leave your things on your
13   chairs if you like; we lock the courtroom.  Or take them back
14   to the jury room with you.  Whatever you prefer.
15             THE JUROR:  Leave them on the chairs?
16             THE COURT:  You can leave them on your chairs.
17             THE JUROR:  Or take them?
18             THE COURT:  Or you can take them back to the jury
19   room.  Whatever you like.
20        (Jury panel excused at 11:57 a.m.)
21             THE COURT:  You can step down.
22        All right.  We'll see everybody at 1:15 then.
23        (Luncheon recess.)
24             THE COURT:  Be seated, please.
25             And was there something to discuss before we bring
```

1   out the jury?

2           MS. WATERS:  If there is, I think Ms. Saavedra is

3   going to handle it.  Do you mind if I stand here, though,

4   and --

5           THE COURT:  And get organized?

6           MS. WATERS:  -- get organized while she talks to

7   you?

8           THE COURT:  No.  Go ahead, Ms. Saavedra.

9           MS. SAAVEDRA:  Thank you, your Honor.

10          At this point I just wanted to make a record and

11   also renew our motion in limine in regards to the alleged

12   three comparators:  Jose Camarena, John Valenzuela, and Brad

13   DeCastro.  Just with Sloan Tamietti's testimony, I would just

14   like to reallege my motion in limine that they're not proper

15   comparators.  What they received was discipline.  They didn't

16   choose where they wanted to go.  They were told to go.  They

17   received a reduction in pay.  And they didn't request to go to

18   a station.  That's all, your Honor.

19          THE COURT:  All right.  What do you think,

20   Mr. Jacobson?  They do seem to be not similarly situated to

21   your client, but why do you think it's still relevant based on

22   what we heard so far?

23          MR. JACOBSON:  Well, a couple of things, Judge.

24   Mr. DeCastro, Mr. Camarena, and Mr. Valenzuela haven't

25   testified yet, so we haven't heard their testimony in that

 1    regard.

 2            No. 2, it would be almost impossible to -- under the

 3    standard that the defense is essentially implying to allege

 4    there are comparators to my client because males couldn't get

 5    pregnant.  So the issue is not whether they were disciplined

 6    or not.  The issue is not whether they were criminally

 7    convicted.  That's not at controversy.  What's at controversy

 8    is how the department handled their situations because they

 9    did have a quote, unquote disabling condition even though it's

10    not the technical term.  So we oppose that and ask to move

11    forward.

12            THE COURT:  All right.  I'll deny the renewed motion

13    in limine finding -- I think that goes more to the weight of

14    the evidence, and certainly these folks can be cross-examined

15    about how they are different from Ms. Clark.

16            MS. SAAVEDRA:  Thank you, your Honor.

17            THE COURT:  Thank you.  All right.  So we'll get the

18    jury.

19            MR. JACOBSON:  While Sandy is getting the jury,

20    Judge, we did have a stipulation.  I don't know if you had a

21    chance to see it over the break.  We don't need to deal with

22    that right now, but at some point before the close of

23    plaintiff's evidence we would like the first part of that

24    stipulation read to the jury because that's what we agreed to

25    do.

1          THE COURT:  Okay.  Is that Document 153?

2          MR. JACOBSON:  No, it's brand new.

3          MS. WATERS:  It was filed this morning.

4          THE COURT:  Oh.  Okay.

5          MS. WATERS:  And the first section is headed, Facts

6   Stipulation, and that's the one we've agreed is appropriate to

7   read to the jury.  The second part is a stipulation regarding

8   the comparators.  That's just there for the benefit of the

9   parties and the Court to know what we've agreed to in terms of

10  relevant testimony to elicit.

11         THE COURT:  Okay.  And I haven't seen that yet, but

12  remind me when you want to read that first part to the jury.

13         THE CLERK:  Please rise for the jury.

14     (Jury panel entered at 1:22 p.m.)

15         THE COURT:  And everyone may be seated.

16         And the record may reflect the presence of the jury.

17         And Ms. Waters, you may continue your examination of

18  the witness.

19  BY MS. WATERS:

20  Q.  Ms. Clark, when we broke for lunch I think we were

21  talking about your experiences when you came back from your

22  first maternity leave pumping breast milk and managing your

23  station assignments; right?

24  A.  That's correct.

25  Q.  During the time you were pumping breast milk for your

1   first child at TFD, was there ever a time when you were

2   utilizing a space and someone walked in on you in the act of

3   pumping?

4   A.   No.

5   Q.   During your direct examination yesterday, you indicated

6   that one of your concerns about some of the stations was the

7   fire departments are public buildings; right?

8   A.   Yes.

9   Q.   But you would agree, wouldn't you, that after 8 p.m. fire

10  departments are no longer considered public buildings; right?

11  A.   I'm not sure if there's a time limit set.

12  Q.   Okay.  And is it fair to say that the living space where

13  you actually stay, where your dorm rooms are located in a

14  station, that that is located away from an area where the

15  public might come inside?

16  A.   I mean, it's kind of like set up as a house where the

17  bedrooms are down a different hallway, but I have had

18  instances where people have come in wanting to use the

19  restrooms, and they are using restrooms right by the dorm

20  rooms.

21  Q.   But they can't just walk into the fire station; right?

22  They have to ring the bell and someone answers the door like a

23  house?

24  A.   That's ideal, but actually people walk in all the time.

25  Q.   So in your experience, you don't have to be let in?

1   A.   To a fire station?

2   Q.   A member of the public doesn't have to be let in?

3   A.   It's different all the time.  Some people knock.  Some

4   people we found inside the station when we come back from

5   calls.  We found people in very different capacities.

6   Q.   Okay.  During your direct examination yesterday, you also

7   testified that one of the reasons you were upset about the

8   station assignments in January of 2013 is because you thought

9   it was adversely affecting your milk production; is that

10  right?

11  A.   The stress that I was under, yes, I believe was adversely

12  affecting my milk supply.

13  Q.   Were you also, in your capacity as a firefighter, on a

14  nontypical sleeping schedule?

15  A.   I have been on that same sleeping schedule for the

16  majority of my career with the exception of the time I spent

17  on light duty.

18  Q.   Would you agree that a firefighter's sleeping schedule is

19  not typical when compared to the general population?

20  A.   Correct.  We don't know when we'll be woken up at night

21  and asked to go on a call.

22  Q.   Sorry, we have a lot of pieces of paper up here.

23       So I think where we left off earlier, you had been to a

24  meeting downtown with Chiefs Rodriguez, Fischback, and Nied

25  and Chief McDonough to talk about your station assignments;

1   right?

2   A.   Correct.

3   Q.   You had submitted your memo to Chief McDonough saying

4   you'd like to stay at Station 12?

5   A.   Correct.

6   Q.   And the station had been put out to bid?

7   A.   It had more in there, but, yes, that's part of it.

8   Q.   Okay.  And is it fair to say then that your second

9   conversation with Chiefs Fischback and Rodriguez about your

10  station assignments was the telephone call in March of 2013

11  that you've previously described?

12  A.   I'm sorry, was that my second conversation with them?

13  Q.   With Chiefs Fischback and Rodriguez about your station

14  assignment situation?

15  A.   So that was the meeting like I mentioned where they had

16  disciplined me for the March 20th phone call.

17  Q.   And you indicated during your direct that you thought the

18  discipline for the March 20th phone call was unfair?

19  A.   Yes, I did.

20  Q.   Is it factually accurate that you said, You must be out

21  of your friggin' mind?

22  A.   What do you mean by "factually"?

23  Q.   Did you say that sentence on the phone call?

24  A.   Yes, I did.

25  Q.   And I understand that your position is you were directing

1  that sentence at JoAnn the HR manager, not at your chiefs;

2  correct?

3  A.   I was responding to what she had said, yes.

4  Q.   And you understand that they may have had a different

5  impression of whom that statement was directed at, don't you?

6  A.   I mean, I guess they could be confused, but to me it was

7  pretty clear.  She said the statement and I responded to what

8  she said.

9  Q.   Well, the discipline they gave you reflects that they

10 believed it was directed at them, doesn't it?

11 A.   I don't believe it says that.

12 Q.   Okay.  Let's take a look at it.

13      Ms. Clark, I'm putting up what has been admitted as

14 Plaintiff's Exhibit 24.  Can you see this?

15 A.   Yes.

16 Q.   Okay.  Is this the counseling form that you received on

17 March 26th, 2013?

18 A.   Yes.

19 Q.   Okay.  And under the section called Details, is that

20 where you would expect to find the description of the events

21 that led to your counseling?

22 A.   I would expect that to be their recollection of events,

23 yes.

24 Q.   Well, that's what we were talking about a moment ago.

25 I'd like you to reread the details listed on this counseling

1   form and tell me whether it's clear to you from this

2   particular document that your command staff believed that your

3   comment was directed not just at Ms. Acosta but at Chiefs

4   Fischback and Rodriguez as well.

5   A.   I see where you're mentioning it, but I have also stated

6   that I felt it was inaccurate.

7   Q.   And I just want to clarify the difference between your

8   perception versus what their perception may have been.  Okay?

9   A.   Okay.

10  Q.   So do you agree with me that this says, On two occasions

11  you hung up the phone while staff was still talking to you and

12  on several occasions you referred to senior staff as being out

13  of their friggin' minds?

14  A.   That's what it says.

15  Q.   And it goes on to say that, While it's understandable the

16  issues can become frustrating, TFD a structured organization

17  and professionalism is expected at all times; right?

18  A.   Yes.

19  Q.   Prior to the phone conversation where you said, You must

20  be out of your friggin mind, despite whom you say you were

21  directing it to, had you ever said that to a supervisor or on

22  a phone call with or a during a meeting with a supervisor

23  previously?

24  A.   No.

25  Q.   So is it fair to say then that you have no idea whether

1   you would have been disciplined for such a comment had you

2   said it before you came back from your maternity leave, having

3   not done it?

4   A.    I'm sorry, can you ask me that again?

5   Q.    Sure.  I will re-ask it.

6         So one of your allegations in this case is that you

7   believe you were treated differently because you raised

8   concerns about the breastfeeding facilities; right?

9   A.    Correct.

10  Q.    Okay.  And I'm asking you, given that you never said, You

11  must be out of your friggin minds, before the meeting that you

12  were verbally counseled over, is it fair to say that you have

13  no idea whether you would have been disciplined for that had

14  you said it before you went out on maternity leave?

15  A.    I have never in my career been in a situation like this

16  before, so I don't know what would have happened.

17  Q.    After the conversation where -- that resulted in this

18  verbal counseling, Chief Fischback did call you back and tell

19  you that you would be able to stay at Station 12 for five more

20  shifts; right?

21  A.    That's incorrect.

22  Q.    Okay.  I'm sorry.  Please tell me what you -- he called

23  you back; right?

24  A.    On the March 20th phone call?

25  Q.    Yes.

1    A.   Yes.  He called me back about 12, 14 minutes after we

2    hung up the first time.

3    Q.   And that was the time when he told you, you would not be

4    assigned to Station 9; correct?

5    A.   No.  At that point, that's when they told me I was going

6    to Station 6.

7    Q.   The phone call came about because you had been scheduled

8    to go to Station 9 that day, and that resulted in you calling

9    them; right?

10   A.   That's right.

11   Q.   So when Fischback called you back, partly it was to tell

12   you, you would not be assigned to Station 9; correct?

13   A.   Correct.  I had already called in sick, though, for the

14   night.

15   Q.   And in part of deciding not to assign you to Station 9,

16   Chief Fischback told you that, in fact, they had a longer term

17   assignment for you that should address the problem; right?

18   A.   He did not say that to me.

19   Q.   He didn't assign you to Station 6 on a long-term basis?

20   A.   He assigned me to Station 6, but his comment to me that

21   night on the phone was:  I'm going to send you to Station 6; I

22   don't have a lock on the door; I can have one put on; and

23   you'll stay there.  And I don't believe he gave a time frame,

24   but I think it was for the next tour or next few tours.

25   Q.   So by assigning you to Station 6, you would know where

1  you were going to be each shift for at least a period of time;

2  correct?

3  A.    Correct.

4  Q.    You would no longer have to check Telestaff each day to

5  see if you were being assigned to a station you were

6  uncomfortable with?

7  A.    Uncomfortable or that I felt didn't comply.

8  Q.    Well, and when we say that you felt didn't comply, that's

9  exactly what we're talking about; right?  Your feeling about

10 whether it complied.  Is that true?

11 A.    Well, I think it's fair to say that there had been an

12 investigation and that 42 percent of the stations weren't

13 compliant.

14 Q.    Well, including Station 12 which is the station where you

15 wanted to go; right?

16 A.    Where I had asked to stay for a short period of time.

17 Q.    And had they offered you Station 12, you would have taken

18 it; wouldn't you?

19 A.    I would have stayed there for a short period of time

20 which is what I indicated.  At that point my son was kind of

21 in a tough spot, and, yeah, I would have taken it if it had

22 been offered.

23 Q.    How, if at all, did the dorm rooms at Station 6 differ

24 from the dorm rooms at Station 12?

25 A.    They didn't until they installed a lock on one of the

1    doors at Station 6.

2    Q.   So just like Station 12, Station 6 had private dorm

3    rooms; right?

4    A.   Yes.

5    Q.   They had doors?

6    A.   Yes.

7    Q.   The doors closed?

8    A.   Yes.

9    Q.   And they did not have a dedicated room that had a lock on

10   it at Station 6 or 12 at that time; is that correct?

11   A.   Correct.

12   Q.   And Chief Fischback said he would have a lock put on a

13   door at Station 6 for you since that's where he was going to

14   assign you; correct?

15   A.   Yes.

16   Q.   Now, I'd like to pause before we talk about Station 6,

17   and I would like to go back to an incident that you described

18   during direct examination in January of 2013 that you alleged

19   occurred at Station 21.

20        You described a situation where an engineer commented

21   when he saw you putting pumped breast milk into a cooler.  Do

22   you remember testifying that?

23   A.   I testified to that, but that actually occurred at

24   Station 3?

25   Q.   And did you testify to -- I'm sorry, so you're saying it

1    was Station 3, not 21?

2    A.   Where that comment was made, yes.

3    Q.   And is it still your testimony that it happened in

4    January of 2013?

5    A.   I would have to look at the Telestaff roster.  It was one

6    of those shifts I worked at Station 3.

7    Q.   And is there anything else about your description of that

8    event from yesterday that you would like to change or amend at

9    this point?

10   A.   I don't think I'm changing what I said from yesterday.

11   Q.   You have given multiple statements to OEOP about the

12   issues you were having at TFD; right?

13   A.   Yes.

14   Q.   You've given four depositions in this case, haven't you?

15   A.   Yes, I have.

16   Q.   You've also written one declaration that was provided to

17   the Court that's also a sworn statement; is that correct?

18   A.   Correct.

19   Q.   In those three OEOP interviews, four depositions, and one

20   declaration, at any point did you talk about this incident you

21   now allege happening at Station 3?

22   A.   I don't believe so, but without reading everything I

23   don't know.

24   Q.   Would you like me to hand you your deposition transcripts

25   so you can take a look?

1   A.   If you want, it would take me quite some time to going

2   through four eight-hour interviews, a couple of intake

3   interviews.  I don't recall saying it, but like I said, I

4   can't be 100 percent certain.

5   Q.   So to the best of your recollection, despite the three

6   interviews, four depositions, and one declaration, the first

7   time you've described that incident to anyone from the City of

8   Tucson was here in this courtroom yesterday for this jury.  Is

9   that right?

10  A.   I can't be 100 percent on that either.  It's possible,

11  but I feel like I've mentioned it before.  But --

12  Q.   Ms. Clark, can you appreciate how it might be an

13  important point for us to know whether you've ever told that

14  story before yesterday?

15          MR. JACOBSON:  Object to the relevance of that

16  question, Judge.

17          THE COURT:  No, overruled.  You can answer that.

18          THE WITNESS:  I mean, I guess I can see why you're

19  asking it to me, but I don't see that it makes any huge

20  difference in what was going on from day to day.

21  BY MS. WATERS:

22  Q.   Well, if you told that story to someone in the TFD

23  command staff, the incident could have been investigated;

24  right?

25  A.   It could have, but I wasn't asking it to be investigated.

1   Q.   And if an investigation had been had and they determined

2   that someone did make an inappropriate statement like that to

3   you, they could have counseled the individual and tried to put

4   a stop to the behavior; right?

5   A.   It's possible, but I don't know what they would have done

6   at that point.

7   Q.   And if you had told the city about this particular story

8   that you've told during any one of your depositions, then

9   counsel for the City could have investigated the claim that

10  you made before trial; right?

11  A.   If that's how you conduct business, sure.  I don't know

12  what you would have done.

13  Q.   Would you agree it would have provided the time necessary

14  to track down the individuals involved in the incident and

15  investigate whether it happened?

16  A.   I'm sure it would have allowed you time, but we were

17  talking about something that happened six years ago.

18  Q.   When we're talking about something that happened

19  six years ago, what?

20  A.   One comment somebody made six years ago, so -- I remember

21  like it was yesterday, but I can't guarantee that somebody

22  else is going to come up here with senior staff sitting in the

23  room and admit to saying that.

24  Q.   Well, when you first were deposed in this case it was

25  May 25th of 2016; is that correct?

1    A.    That's correct.

2    Q.    So that was closer in time to the event that you've

3    described than today is; would you agree with that?

4    A.    I agree with that.

5    Q.    And would you agree that at the time you gave your

6    deposition in May of 2016, there was no senior staff sitting

7    in the room?

8    A.    No, I don't recall.

9    Q.    I'm sorry, you don't recall who was at your deposition?

10   A.    I don't recall any senior staff sitting in the room.

11   Q.    So the conditions you just described weren't present in

12   May of 2016; right?

13   A.    Correct.

14   Q.    So can you appreciate how it might appear that you told

15   the story you told on direct examination for the first time to

16   this jury in a way that didn't permit the City to investigate

17   it, didn't permit the City to call witnesses who would be able

18   to rebut it?

19   A.    I was just telling the truth.

20   Q.    You were deposed extensively in this case, weren't you?

21   A.    I was deposed four times for eight hours, yeah.

22   Q.    And during those depositions, you were asked questions

23   about the conditions that you claimed caused you to feel

24   discriminated against, retaliated against, aliented; right?

25   A.    Like I said, there were so many questions, different

1    questions, questions that we were focused on solely in some of

2    my depositions that I don't know we ever went through a break

3    down of each shift that I worked at every time.

4    Q.   Weren't there opportunities for you to explain the

5    circumstances that gave rise to your complaint?

6    A.   My complaints arose before the situation at Station 3 had

7    ever happened.

8    Q.   And you were deposed after the -- excuse me.

9         You were also deposed after this conversation you've

10   described at Station 3; right?

11   A.   Three and a half years later, yes.

12   Q.   But you remember the conversation like it was yesterday.

13   That's what you said just a moment ago, isn't it?

14   A.   Of course, I do.

15   Q.   So if you remember today that conversation like it was

16   yesterday, wasn't it equally fresh in your mind in May of

17   2016?

18   A.   I can't tell you what was on my mind in May of 2016.  A

19   lot has happened in my life in the last few years.

20   Q.   I can appreciate that, but the story that you told the

21   jury yesterday seemed important enough to you and relevant

22   enough to you to the claims in your lawsuit that you felt

23   compelled to tell it yesterday during your direct examination;

24   right?

25              MR. JACOBSON:  Judge, at this point it -- this topic

CLARK - CROSS

1    has been asked and answered.

2         THE COURT:  All right.  You can go ahead and answer

3    that question and then counsel can move on.

4         MS. WATERS:  Sure.

5         THE WITNESS:  Can you ask me again?

6    BY MS. WATERS:

7    Q.   Sure.  It was fresh enough in your mind and seemed

8    sufficiently relevant to your claims here to you yesterday

9    that you described the event for this jury in court yesterday

10   for the first time; right?

11   A.   As we went through each of the stations I worked with,

12   yes, I do recall it and I spoke the truth about what happened

13   that day at Station 3.

14   Q.   Now, I'd like to go back to your assignment to Station 6,

15   okay?

16        So you indicated that Chief Fischback told you, you would

17   stay at 6 for the foreseeable future.  He wasn't sure how

18   long; right?

19   A.   Correct.

20   Q.   And he told you if you needed a lock on the door, he

21   would have a lock put on the door; right?

22   A.   That's not what he told me.

23   Q.   I'm sorry, I thought you said he told you he would have a

24   door fitted with a lock?

25   A.   Correct.  He didn't say:  If you want a lock, I'll put

1  one on there.  He said, I'm going to send you to Station 6.

2  There's no room there with a lock, but by the next shift I'll

3  have a locking door.

4  Q.  So he didn't even make you ask for the lock; he was

5  proactively saying, I'm having it put on.  Right?

6  A.  That's what he told me.

7  Q.  When you went to Station 6, who was the captain there?

8  A.  His name was Ted McDonough.

9  Q.  And is he related to Paul McDonough?

10  A.  That's his brother, yes.

11  Q.  When you went to work at Station 6, did Chief Fischback

12  follow through with what he told you and have a lock fitted on

13  the door?

14  A.  Yes.  When I arrived at Station 6 the following shift,

15  that night there was a sticky note with my name on the door,

16  and then there was a lock on the door.

17  Q.  Okay.  So you did not have to do -- you didn't have to

18  pursue him, remind him, or do anything else to facilitate the

19  lock being put on the door?  It was there for you the very

20  second shift; right?

21  A.  It was there when I arrived at work.

22  Q.  Did you have a private space for the duration of the time

23  you were at Station 6 to pump breast milk as you needed to?

24  A.  Yes, I did.

25  Q.  We talked about a little earlier about the law that

```
 1    provides -- that requires an employer to provide time and

 2    appropriate space for people to pump breast milk if they're

 3    breastfeeding; right?

 4    A.   Yes.

 5    Q.   Do you also recall in the law whether there is any kind

 6    of time frame posed?

 7    A.   Are you asking me if the law states a time frame to pump?

 8    Q.   Yes.

 9    A.   I believe it does allude to a mother being allowed to

10    pump milk it says "as needed" I believe.

11    Q.   And does the law say for what duration of time an

12    employer needs to provide an appropriate space and time for

13    someone to pump breast milk?

14    A.   It says for the first year of the newborn's life.

15    Q.   And when was your first son born?

16    A.   He was born July 19th of 2012.

17    Q.   Did you have the opportunity to remain at Station 6 and

18    continue to pump breast milk for your son beyond July 19th of

19    2013?

20    A.   I did, after I requested it.

21    Q.   So the law required that TFD give you one year; right?

22    A.   Correct.

23    Q.   TFD allowed you to continue pumping breast milk as you

24    needed to and to remain at Station 6 to do that in excess of

25    one year; correct?
```

1   A.   Yes.

2   Q.   So you hit the one-year mark, and you realize that you

3   would like to continue breastfeeding your son; right?

4   A.   Yes.  Yes.

5   Q.   And as I understand it, the HR manager, JoAnn, had

6   reached out to you and asked, Your year is up, are you ready

7   to go back on swing?  Right?

8   A.   That's not exactly what the e-mail said.  I don't think

9   it was worded that kindly, but basically reached out and said

10  your year is up and, you know, you can be placed on swing.

11  Q.   And that's what prompted you to request to stay at 6 and

12  tell them:  Actually, I would really like to continue pumping

13  and breastfeeding?

14  A.   Correct.

15  Q.   That request was granted, wasn't it?

16  A.   It was.

17  Q.   And when your request was granted, did JoAnn tell you she

18  would follow-up with you to see whether your need to pump --

19  whether your need to pump continued?

20  A.   So initially in the conversation that I had with Chief

21  Rodriguez and JoAnn on that time that they called me, right

22  around the July 19th mark, Chief Rodriguez said that they

23  weren't sure what they were doing with the spot on Engine 6.

24  They were eventually going to bid it as a paramedic spot, but

25  he didn't know when.  And since it was still open, he

1   basically said I could stay there as long as I needed and to

2   contact him when I was done pumping.

3   Q.   So Chief Rodriguez said essentially the spot is yours for

4   as long as you need it to pump; right?

5   A.   Correct.

6   Q.   And then JoAnn Acosta, the HR manager, would periodically

7   follow up with you to say do you still need to pump and Let

8   you know when and if you don't?

9   A.   She was following up with me pretty regularly.

10  Q.   So by the time you requested to stay at Station 6 when

11  your year was up, had Station 6 become a comfortable place for

12  you within the fire department?

13  A.   It had.  I had settled into a routine.  I had a regular

14  shift relief in the morning so I knew about when I would be

15  heading home.  I had my room set up, you know, the way that it

16  helped me to pump.  And so, yeah, I would say that's

17  comfortable.

18  Q.   And is it fair to say that you had crew members doing

19  their part to make it an acceptable environment for you?

20  A.   I could agree to that.

21  Q.   Okay.  So as it turned out, Station 6 was a good fit for

22  your needs; is that fair to say?

23  A.   It worked out for me, yes.

24  Q.   Now, there did come a time at Station 6 when you were

25  asked to do a drill that resulted in another verbal

1   counseling; is that correct?

2   A.   That's correct.

3   Q.   And the drill was -- drill was run by the captain there,

4   Ted McDonough; is that right?

5   A.   Yes.

6   Q.   And my understanding is at the time that this drill

7   occurred, you were pregnant with your second child; is that

8   right?

9   A.   That's correct.

10  Q.   For lack of a better way to ask this, how pregnant were

11  you?

12  A.   I think I was about six months.

13  Q.   And you had indicated your partner was a guy named Tyler

14  McKendrick; is that right?

15  A.   Yes.

16  Q.   Was he the firefighter there?

17  A.   That's correct.

18  Q.   Did you know that Tyler was studying for or preparing to

19  take his engineering test to be an engineer?

20  A.   I knew it was -- eventually he would be taking it, yes.

21  Q.   What does an engineer do on the fire truck?

22  A.   They pump the water; basically control the water supply

23  panel.

24  Q.   That sounds fairly simple.  I'm guessing there's probably

25  more than goes into it than turning on your faucet at home;

1    right?

2    A.    Yeah, they go through a certification class so they can

3    learn basically the basics of what it takes to pump a fire

4    panel.

5    Q.    And after they go through the class to learn how to do

6    it, do they have to take a test to demonstrate that they were

7    able to perform the duties?

8    A.    It's part of the promotional process, yes.

9    Q.    So on the day that you did this drill, Captain McDonough,

10   you said, stopped in a park; right?

11   A.    Correct.

12   Q.    And you said that when you stopped, Tyler had no idea

13   what was going on either.  You and he were asking one another,

14   what are we doing; right?

15   A.    Yes.

16   Q.    And Captain McDonough says we're going to run a drill and

17   I'm giving you a scenario.  And the scenario is the regular

18   engineer is hurt and Tyler has to run the pump; right?

19   A.    Sort of.  I mean, the conversation went a little bit

20   differently.

21   Q.    Okay.  Was anything about that actually wrong?

22   Materially different?

23   A.    What are you asking?

24   Q.    I'm asking did -- well, we'll go through it one fact at a

25   time.

1    A.    Okay.

2    Q.    Did Captain McDonough tell you, you were stopping to run

3    a drill?

4    A.    No, he did not.

5    Q.    Once you were out of the truck and everyone wondered what

6    was going on, did there ever come a time he said, We're doing

7    a drill?

8    A.    No, he did not.

9    Q.    So you started doing the drill without any instructions?

10   A.    No, he told us to put on our equipment.

11   Q.    So he tells you to put on your equipment and at some

12   point he provides his scenario; right?

13   A.    He does.

14   Q.    And the scenario posits that your regular engineer, what

15   was his name?

16   A.    Ron.

17   Q.    Ron.  So in Captain McDonough's scenario, Ron has been

18   injured and can't do the pumping for the truck; right?

19   A.    Correct.

20   Q.    Which means that someone else has to do the pumping?

21   A.    In the scenario, yes.

22   Q.    Okay.  And he's assigning Tyler to the pumping; right?

23   A.    Yes.

24   Q.    Does it make sense to you that Captain McDonough might

25   have run a drill to allow Tyler to practice pumping the water

1    in advance of his certification test?

2    A.    I've been on many trucks where people were getting ready

3    to promote and we've practiced as a crew and I've done this

4    multiple times.   I have never in my career done it in a

5    situation that we -- like we did it.

6    Q.    But each captain makes up their own drills; right?

7    A.    That's fair to say.

8    Q.    The captains decide how often to drill?

9    A.    Correct.

10   Q.    When to drill?

11   A.    Correct.

12   Q.    How to drill?

13   A.    Correct.

14   Q.    Who does what in a drill?

15   A.    Usually, yes.

16   Q.    Okay.   So there was nothing that Captain McDonough was

17   doing that was outside his authority as a captain or outside

18   what you knew a captain could do; correct?

19   A.    As far as making us do a drill, no; he's well within his

20   rights to have his crew drill.

21   Q.    And you'd done other drills at during your time at TFD;

22   hadn't you?

23   A.    Yes, I had.

24   Q.    But during this drill there came a time when you felt

25   like it was not for Tyler's benefit but directed detrimentally

1   at you; is that right?

2   A.   Yes.

3   Q.   Did you ask Captain McDonough whether he was doing this

4   drill to single you out?

5   A.   I made reference to it after I had extended the hose

6   line and we were standing there.  Would you like me to tell

7   you?

8   Q.   Well, I remember on direct you testified that you said to

9   him, If you don't want me on this crew, just tell me that.

10  A.   More or less, yes.

11  Q.   But my question is a little different.

12       My question is, Did you ask Captain McDonough at any

13  point during this drill whether he was doing it to single you

14  out?

15  A.   No.  I think I stated I feel like -- I think I stated

16  something to the extent like I felt that he was just trying to

17  prove a point because I was pregnant and they didn't think I

18  could basically work anymore.

19  Q.   So rather than giving him the opportunity to either admit

20  that's what he was doing or deny it based on a question or a

21  conversation, you stated that's what you believed was

22  happening; right?

23  A.   Like I said, there was a brief conversation that took

24  point -- that took place after I had performed what I figured

25  was that drill:  extend the hose line, spray the water.  At

1    that point I figured the drill was over.  And then when he

2    made up the second scenario about a second fire on the second

3    story, kind of thing, that's when I became -- that's when it

4    felt to me like it was completely out -- you know, it was

5    about me.  It was about me being pregnant, and basically he

6    was going to continue to drill me until, basically, I

7    couldn't -- I couldn't do it anymore.  And I made reference to

8    that and he never answered my question.

9    Q.   Well, we've agreed, I think, you didn't ask a question.

10   You made an accusation; right?

11   A.   I said if you don't want me on the truck anymore, just

12   say so.  But putting me through this, I said, all you're

13   trying to do is wear me down.  And he never answered me.

14   Q.   And you walked away from the drill back to the truck;

15   right?

16   A.   I said what I said.  And then he asked me again, you

17   know, where's your radio?  I said it's in my pocket.  I think

18   I might have said something else.  I know I have much clearer

19   notes that I wrote right after it happened.  But basically I

20   said, you know, if this is -- this is how it's going to be,

21   then I'm just going to go homesick tonight because I don't

22   think this is right, and I set the hose down and I started to

23   walk back toward the truck.

24   Q.   Now, you had been at Station 6 and working under Captain

25   McDonough for how long at that point?

1    A.    Are we in 2013 right now?  No, we're in 2014.

2    Q.    Yeah, the drill is 2014.

3    A.    So I had been there about -- a little over a year.

4    Q.    Is it fair to say after a year with the same captain you

5    would have established some communication, some rapport with

6    him?

7    A.    Absolutely.

8    Q.    Do you have any reason to believe that if you had calmly

9    talked with Captain McDonough after the drill was over that

10   you would have received the verbal -- the educational

11   counseling that you received?

12   A.    I'm sorry, ask me that again.

13   Q.    Ultimately, you received an educational counseling for

14   the way the drill was terminated and his impression of the way

15   you handled the situation; right?

16   A.    Yes.

17   Q.    Do you have any reason to believe that if you had waited

18   until the drill was over or you were back at the station and

19   you had calmly had a conversation with him about your belief

20   that he was singling you out, do you have any reason to

21   believe that he would have issued an educational counseling

22   for that?

23   A.    I honestly had no idea.  I had actually tried to contact

24   him the day before to talk to him.

25   Q.    Okay.  And I'm really asked about the aftermath of the

1    drill.

2    A.   Okay.  I don't know what he would have done.

3    Q.   So you can't say that he would have; right?

4    A.   I just -- I don't know what he would have done.

5    Q.   Instead, because of the way the drill was handled and

6    terminated, he actually called his supervisor to come to the

7    park where the drill was taking place; right?

8    A.   Yes.

9    Q.   In your experience, had you ever seen that happen before,

10   where a captain had to call his own supervisor out to a drill

11   because he wasn't sure how to handle someone on his crew?

12          MR. JACOBSON:  Objection; calls for speculation.

13          THE COURT:  No, overruled.  You can answer that

14   question.  Go ahead.

15          THE WITNESS:  Not that I remember.  Not that I

16   recall.

17   BY MS. WATERS:

18   Q.   And his supervisor came out there to the park; right?

19   A.   Yes.

20   Q.   You decided that you would go home sick for the p.m.

21   shift because by that point you were already pretty upset and

22   you wanted to go home and compose yourself; is that fair?

23   A.   Yeah, I decided that after we had gone back to the

24   station as a crew and we talked for a while.

25   Q.   Did you know that Captain McDonough said he would be

1    happy -- fine to have you stay for the p.m. shift even after

2    this happened?

3    A.   I believe that we did talk about that in the meeting back

4    at the station.

5    Q.   And you said you thought that the discipline you received

6    was unfair; correct?

7    A.   For this drill?

8    Q.   For the drill.

9    A.   I'm not sure.

10   Q.   Did you think the educational counseling that you

11   received as a result of the way this drill was handled was

12   unfair?

13   A.   I didn't think it was necessary.  We had talked about it,

14   and at the end of that conversation at the station that night

15   with the chief involved we had kind of come to an

16   understanding about how that drill transpired and everything

17   and how everybody felt.  So to receive that over a month

18   later, I didn't think it was necessary.

19   Q.   Okay.  You didn't think it was necessary.  Does an

20   educational counseling have any effect on your pay?

21   A.   No.

22   Q.   Does it have any effect on your benefits?

23   A.   No.

24   Q.   Does it have any effect on your work duties or station

25   assignments?

 1  A.   Not as far as I know, but I don't make those decisions.

 2  Q.   Does it have any effect on your seniority?

 3  A.   No.

 4  Q.   Inherent in the name "educational counseling," seems to

 5  be that the administration just sees an issue that they would

 6  like to educate the employee about and address to make sure it

 7  doesn't continue going forward; does that seem right?

 8  A.   I would say that's probably what the intention of an

 9  educational counseling is.

10  Q.   Shortly after the drill at Station 6, you went on light

11  duty waiting for the birth of your second child; is that

12  right?

13  A.   Yes.

14  Q.   During your direct you talked about some of the

15  conditions you experienced when you were on light duty, and

16  let's call it light duty in 2014 to distinguish it.  Okay?

17  A.   Okay.

18  Q.   So when on light duty in 2014, you described some issues

19  you also thought were unfair or retaliatory against you; is

20  that right?

21  A.   Yes.

22  Q.   One of the issues you listed was that you were told you

23  had to get a doctor's note to work out.  Do you remember

24  talking about that?

25  A.   Yes.

1  Q.   And the reason you thought that was unfair, that you were

2  being targeted, is because you said that when you were on

3  light duty in 2012 you had not needed a doctor's note to work

4  out; is that right?

5  A.   Correct.

6  Q.   Okay.  Now, when you requested light duty in 2012, do you

7  remember including in your request the specific condition that

8  your only restriction was not to lift more than 20 pounds?

9  A.   I do.

10 Q.   Okay.  So in 2012 when you went on light duty, it was

11 clear from your request what, if any, restrictions you had; is

12 that right?

13 A.   I had specific restrictions for a specific issue going

14 on, so that's why my doctor wrote it that way.

15 Q.   So the human resources person or administrative person

16 who received your 2012 light duty request could have looked at

17 it and known exactly what you were or were not permitted to do

18 per your doctor's instructions; right?

19 A.   Yes.

20 Q.   Does it make sense to you that the department would want

21 to make sure that when you're on light duty, they're not

22 asking you to do things that you are restricted from doing

23 based on your need for light duty?

24 A.   Sorry, ask me that again.

25 Q.   Sure.  It was a long question.

1      When you go on light duty it's because you have a

2    particular medical or physical need; right?

3    A.   That's fair.

4    Q.   Okay.  And we can use your 2012 light duty as an example.

5    You had a medical condition that came with only one specific

6    restriction and that was not to the lift more than 20 pounds;

7    correct?

8    A.   Correct.

9    Q.   Does it make senses to you that the TFD administration

10   would want to make sure that when they have someone who is on

11   light duty because they have a medical need, that they're not

12   asking them to do things that they are restricted from doing

13   or that would be unsafe for them?

14   A.   So typically going on light duty because you're pregnant

15   doesn't necessarily mean you have a medical need.

16   Q.   Okay.  But my question is does it make sense to you that

17   when someone is on light duty, that TFD would want to make

18   sure that they're not asking you to do things that you

19   shouldn't be doing based on your light duty need?

20   A.   I mean, they could just ask us.

21   Q.   Okay.  I'll try again.

22      I'm just asking if it makes sense to you as a matter of

23   practice, policy, general basic decency that the TFD

24   administration would want to be sure they were not asking an

25   employee who had a need to be on light duty to do things that

1    were unsafe for them to do while on light duty?

2              MR. JACOBSON:  Objection; form and foundation, and

3    also been asked and answered, and also calls for speculation.

4              THE COURT:  No.  Overruled.  Go ahead.

5              THE WITNESS:  So I can and can't agree with you

6    because people go on light duty for different things and it's

7    not necessarily always a doctor putting them on light duty.

8    I've seen people go on light duty for things going on at home,

9    multiple different reasons.  So not everybody is going to have

10   restrictions put on them, so I don't think it's safe to assume

11   just because you're on light duty that there's something you

12   can't do.

13   BY MS. WATERS:

14   Q.   Well, when you put in your request for light duty, you

15   can't just say, I want light duty; right?  You have to provide

16   a reason, don't you?

17   A.   I believe so.

18   Q.   So if the reason that someone has provided, like the

19   scenario you've posited is, I need light duty because I'm

20   having some difficult family issues, then the administration

21   could reasonably read that as they have no physical

22   restrictions; couldn't they?

23   A.   I would like to think, but I'm not them so I don't know.

24   Q.   Well, I'm just following up on the scenario that you

25   posited, Ms. Clark.

1     If someone goes on light duty for a medical reason or

2  pursuant to a doctor's suggestion or recommendation for any

3  physical condition, be it a sprained ankle, pregnancy,

4  migraines, anything, doesn't it make sense to you that the

5  department would want to ensure they were not asking that

6  employee whose need they're aware of because of the light duty

7  request to do things that are not safe for them to do?

8  A.   I mean, I kind of understand what you're trying to say,

9  but I guess I don't know that a note needs to be provided for

10 such things.

11 Q.   My question is fairly simple and it is this:  Does it

12 make sense to you that the fire department administration

13 would want to be sure that they are not asking employees who

14 are on light duty to do something that is not safe for the

15 employee while they're on light duty?

16          MR. JACOBSON:  Judge, it's argumentative at this

17 point.  I ask that she just move on.

18          THE COURT:  Yeah, why don't you just go ahead and

19 ask another question.

20          MS. WATERS:  Okay.  I don't understand why I can't

21 have an answer, but okay.

22          MR. JACOBSON:  And I'll ask to strike that, Judge.

23          THE COURT:  No.  Go ahead.  Ask another question.

24 BY MS. WATERS:

25 Q.   Okay.  So when you were on light duty in 2014, you said

1   for a period of that time you were assigned downstairs in

2   Station 1 to fire prevention under Ken Brouillette; is that

3   correct?

4   A.   Yes.

5   Q.   During that time, were you comfortable with

6   Mr. Brouillette?

7   A.   I didn't really know him so I had -- I think I had maybe

8   just met him when I did the fire inspector cert.  He was

9   fairly new there so I didn't have a reason to be uncomfortable

10  with him.

11  Q.   And you said when you asked to come in at 6, he approved

12  the request to come in at 6?

13  A.   Yes.

14  Q.   It was someone in human resources or administration who

15  later said actually you can't come in at 6 while you're on

16  light duty; right?

17  A.   Yes.

18  Q.   But Mr. Brouillette was willing to let you?

19  A.   He allowed me to come in at 6, yes.

20  Q.   Okay.  And you stayed on light duty at Station 1 until

21  you left for your maternity leave for your second child; is

22  that correct?

23  A.   That's correct.

24  Q.   And when was your second child born?

25  A.   He was born August 26th of 2014.

1  Q.  When did you go back to work after the birth of your

2  second child?

3  A.  I returned to work I think it was November 24th.  Could

4  have been the 27th.  I'm not exactly sure.  It was the end of

5  November of 2014.

6  Q.  And you knew that when you came back to work, you were

7  going to go into fire prevention because you had tested for

8  and been accepted as an inspector; is that right?

9  A.  Correct.

10  Q.  Do you remember receiving an e-mail from Deputy

11  Chief Carsten either right before or as you came back from

12  your second maternity leave welcoming you to fire prevention

13  and telling you what the accommodations would be for your need

14  to express breast milk?

15  A.  Yes, I do.

16  Q.  I'm going to show you what was admitted yesterday as

17  plaintiff's Exhibit 44.  Does this e-mail help refresh your

18  memory about the date you came back from the second maternity

19  leave?

20  A.  Yes.  November 24th, 2014.

21  Q.  And who was Mike Carsten at that time?

22  A.  He was the deputy chief over fire prevention.

23  Q.  And he's the person who sent you the e-mail that we're

24  looking at; right?

25  A.  Yes.

1   Q.   Okay.  And in it he welcomes you to fire prevention and

2   says he's pleased to have you; right?

3   A.   Correct.

4   Q.   And invites you to let him know if you need anything.

5   Yes?

6   A.   Yes.

7   Q.   And tells you exactly what space is going to be available

8   in order for you to express breast milk as you need to; right?

9   A.   Yes.

10  Q.   Were you satisfied with the arrangements that Deputy

11  Chief Carsten told you about for your time at Station 1 in

12  2014 with respect to needing to express breast milk?

13  A.   I was happy that I had a private room that locked, yes.

14  Q.   You also talked on direct examination -- sorry, just so

15  we keep the continuity.

16       So you started at fire prevention after your second

17  maternity leave in October of 2014; right?

18  A.   I'm sorry, ask me that again.

19  Q.   Sure.  When with you came back from your second maternity

20  leave, you started at fire prevention in October of 2014?

21  A.   It was November.

22  Q.   I'm sorry.  I'm looking right at the number and I'm

23  misspeaking.  Thank you.

24       In November of 2014.

25  A.   That's correct.

1    Q.   And you were in fire prevention for the remainder of

2    2014, 2015, and into 2016; is that correct?

3    A.   That's correct.

4    Q.   In 2016 you received an educational counseling from Ken

5    Brouillette; right?

6    A.   Yes.

7    Q.   Did that educational counseling effect your wages at all?

8    A.   No.

9    Q.   Did it effect your benefits at all?

10   A.   No.

11   Q.   Did it affect your seniority?

12   A.   I don't know if I can answer that one completely.

13   Q.   Did the educational counseling change your seniority?

14   A.   I think in a string of events it eventually did, but as

15   it was given to me that day, no.

16   Q.   So we are going to talk about the seniority policy which

17   is what I think you're alluding to.  But to make sure that our

18   record is clear I want to be certain, you don't believe that

19   educational counseling changed your seniority, do you?

20   A.   Not as a fire inspector, no.

21   Q.   Thank you.  Now, I do understand that subsequent to that

22   educational counseling, you were moved from fire prevention

23   back to operations; is that right?

24   A.   Yes.

25   Q.   And ultimately after the move to operations, you opted to

1  demote from a firefighter position -- or, from a paramedic

2  position to a firefighter position; is that right?

3  A.   Yes.

4  Q.   Why did you opt to demote from paramedic to firefighter

5  at that time?

6  A.   There were a couple of reasons.  There were a couple of

7  reasons.

8  Q.   What were they?

9  A.   One of the biggest ones was my seniority had been

10 deducted by two years, which I think we talked about yesterday

11 dropped me 14 spots.  And at that time I hadn't been a

12 paramedic all that long so it pushed me down pretty far, so

13 the ability to win a bid at a station became a lot less

14 likely, a lot less practical.

15      Being unsure of where I was going to be going out in the

16 field was a big uncertainty for me as well.  I was

17 uncomfortable going back on swing because obviously at that

18 point a lot of people that are involved in the lawsuit still

19 worked out in the field, and I was uncomfortable putting

20 myself in the position where I may have to work with some of

21 these people.  Along with kind of what Mr. Tamietti alluded to

22 earlier, the rumors that had been going on, the things said

23 about me, collectively a lot of that stuff made me

24 uncomfortable.  So it wasn't a situation that I willingly

25 wanted to put myself into, not knowing where I was going.  And

CLARK - CROSS

1    if I wasn't able to win a bid, I would be back on swing.

2        And demoting to a firefighter, I kept my -- I -- you keep

3    your seniority from the time you come on the job.  And since I

4    came on the job in 2007, I had quite a few years by 2014 of

5    seniority.  So I was able to secure a bid at a station that I

6    felt gave me a little bit of segregation from the rest of the

7    department.  I didn't run a lot of calls.  I knew I wouldn't

8    be running a lot of calls with surrounding stations, have a

9    lot of interaction with a lot of people.  I just kind of

10   wanted to lay low since 2014 was kind of the middle of all

11   this stuff going on.

12   Q.   Okay.  So you believed that by demoting you would have a

13   better opportunity to win a bid at a spot that you found

14   desirable; right?

15   A.   That's correct.

16   Q.   And part of the reason that you believed that was because

17   of the seniority policy that we talked about yesterday; right?

18   A.   Correct.

19   Q.   So the new seniority policy that was issued, were you at

20   all involved in the negotiation of that policy?

21   A.   No, I was not.

22   Q.   Do you know who was?

23   A.   I know our union was, and I believe Chief Garcia and

24   JoAnn, and I'm not sure who else.

25   Q.   Okay.  So it was a negotiated policy between the union

1  and the TFD administration?

2  A.   Correct.

3  Q.   Do you have any idea how long they had been working on

4  that policy before it was actually issued?

5  A.   No, I don't.

6  Q.   And tell us how the seniority policy -- actually, let me

7  start over.

8       Before the seniority policy that we're talking about was

9  issued, if you were trying to figure out how much time you had

10 on the job, you could count all the time in any lateral rank;

11 is that right?

12 A.   Sort of.  So I know where I ranked in my class.  I knew

13 that, you know -- I knew where I was in my class, and I knew

14 the person above me.  So I always kind of knew who the

15 order -- how seniority went so that if we were bidding on a

16 station, if somebody would say, oh, Joe Green is bidding on

17 that station, I would know where that person ranked in

18 consideration to me, and I would have an idea if it was a bid

19 I could win or not because we always knew where we stood and

20 who was senior to us within our rank.

21 Q.   Okay.  And I'd like to start by helping the jury

22 understand how we were calculating this time before the new

23 seniority policy.  Okay?

24 A.   Okay.

25 Q.   So was your seniority based on your whole time with TFD

1  or was it based on your time at a particular rank?

2  A.   My seniority as a paramedic was based on my time in that

3  rank in where I placed on my list in regards to the paramedic

4  class that I became a paramedic with.

5  Q.   So for instance, someone who had been a firefighter for

6  ten years and a paramedic for one would be a less senior

7  paramedic than someone who had been a firefighter for five

8  years but a paramedic for six; is that right?

9  A.   I'm sorry, I didn't follow you.  I may have to write it

10 down.

11 Q.   Okay.  Under the -- before the new seniority policy,

12 would someone who had been a firefighter for ten years and a

13 paramedic for one have less seniority to bid for a paramedic

14 spot than someone who had been a firefighter for two years and

15 a paramedic for three?

16 A.   Would the person with one year be less senior than the

17 person with three years?

18 Q.   Yes.

19 A.   Yes.

20 Q.   And that was true even though the person with one year

21 had been a firefighter for ten before becoming a paramedic;

22 right?

23 A.   Correct.  When you go into the new rank which is

24 paramedic, it's all about how you placed on that promotional

25 list.

1  Q.   All right.  Now, are there lateral ranks at TFD that are

2  equal to each other in the hierarchy?

3  A.   Yes.

4  Q.   What ranks are lateral to a paramedic position?

5  A.   So you can become a paramedic, an engineer, or a fire

6  inspector and those hold the same rank.

7  Q.   And prior to the institution of the new seniority policy,

8  for purposes of calculating your seniority your time at any of

9  those three positions counted for your seniority to bid on any

10  one of those three positions if you were qualified; is that

11  right?

12  A.   I'm sorry, I think you lost me on that one again.

13  Q.   That's okay.  We'll try it as many times as it takes.

14       So you said paramedic, engineer, fire inspector were

15  lateral ranks; right?

16  A.   Correct.

17  Q.   So prior to the new seniority policy --

18  A.   Okay.

19  Q.   -- your seniority for any one of those three positions --

20  A.   Okay.

21  Q.   -- was based on the number of years you had spent in any

22  one of those three positions.  So like they would add

23  paramedic time and fire prevention time together to figure out

24  what your years were to help determine your seniority; is that

25  right?

1    A.    So each rank has a different seniority list.  So what --

2    prior to the policy coming out, I was a paramedic and I

3    transferred over to fire prevention.  If I had voluntarily

4    transferred back to wanting to be a paramedic, I would have

5    gone back to the same place that I left being a paramedic.

6    Q.    And that would have been true for you even if someone

7    else had been a paramedic the whole time while you were in

8    fire prevention; is that right?

9    A.    Yes.

10   Q.    So that if you had someone who spent one year as a

11   paramedic and two years in fire prevention, they would have

12   the same number of years calculated as someone who spent all

13   three of those years as a paramedic?

14   A.    Yes.

15   Q.    Yes?

16   A.    I believe so.

17   Q.    Okay.  Now, the new seniority policy changed how that

18   aspect of calculating seniority worked; right?

19   A.    Correct.

20   Q.    And the way that it changed it was now if you spent time

21   in a lateral rank, that would no longer count toward

22   your years for a different position within that same class?

23   A.    Correct.

24   Q.    So then if you had one person who spent a year as a

25   paramedic and two in fire prevention, someone who had spent

1    the last two years as a paramedic would have a seniority

2    advantage over the person who spent one as a paramedic and two

3    in fire prevention if bidding on a paramedic spot.  Is that

4    right?

5    A.   Yes.

6    Q.   Okay.  I know that you testified that your move back to

7    operations from fire prevention was effective May 2nd; is that

8    correct?

9    A.   Yes.

10   Q.   And the policy was issued May 13th?

11   A.   Yes.

12   Q.   And it was made retroactive to May 1st; is that right?

13   A.   That's correct.

14   Q.   And you said that had an effect on your seniority?

15   A.   Correct.

16   Q.   Do you have any idea how many other people in TFD

17   similarly had their seniority affected by that policy?

18   A.   I don't know offhand.  I know when I spoke to the union

19   about it, I was the first one they had heard from.

20   Q.   Okay.  And you have no idea who the union heard from

21   after you; right?

22   A.   No, I don't.

23   Q.   And do you have any idea whether May 1st coincided with

24   the start of a new pay period?

25   A.   I don't.  I know when I contacted the union about it,

1  what I was told by our union president was that that was not

2  the understanding that they left the meeting with.  That the

3  policy was not going to effect anyone prior.  That the policy

4  was going to start from here on out because they were trying

5  to figure out a way to change it.  But it was not supposed to

6  effect anybody except from this day forward.

7  Q.   Is that Josh Campbell that you're referring to?

8  A.   Yes.

9  Q.   And then I believe the last issue that you raised during

10  your direct examination dealt with your paramedic pay; is that

11  right?

12  A.   I believe -- I know that's one of the issues.  Yes.

13  Q.   Well, are there any issues that you discussed during your

14  direct yesterday that you believe were retaliatory or

15  discriminatory against you that you and I have not talked

16  about other that the paramedic pay?

17  A.   Allowing me to work out anywhere besides Station 1.

18  Q.   Okay.  Let's talked about that for a minute.

19       So this is when you were on light duty in 2014; correct?

20  A.   Correct.

21  Q.   And you were assigned to Station 1?

22  A.   Fire prevention, yes.

23  Q.   And Station 1 is headquarters; right?

24  A.   Correct.

25  Q.   Does Station 1 have a workout facility?

CLARK - CROSS

1   A.   Yes, they do.

2   Q.   They actually have pretty nice gym; right?

3   A.   It's nicer than most stations.

4   Q.   And you believe that you should not have been required to

5   work out at Station 1; is that right?

6   A.   I believe that I should have been allowed to work out as

7   our policy allows us.

8   Q.   Did you know other people who were on a light duty

9   assignment at Station 1 who were allowed to work out other

10   places?

11   A.   I know of other people that left all the time to work out

12   other places whether they be on eight hours or light duty.

13   Q.   Okay.  And I'm specifically asking if you knew about

14   people who were on a light duty assignment, whether they were

15   allowed to go work out other places?

16   A.   I don't recall who else was on light duty at the same

17   time as I was right now.

18   Q.   Okay.  Turning then to the paramedic pay issue.

19   A.   Okay.

20   Q.   Okay.  You missed -- when you're a paramedic and you

21   voluntarily demote to firefighter, you can keep your extra

22   paramedic pay; is that right?

23   A.   That's correct.

24   Q.   But you were told when you demoted that you needed to

25   fill out a form in order to keep the pay in light of voluntary

1  demotion; is that right?

2  A.   That's not correct.

3  Q.   You weren't told you needed to fill out a form to keep

4  the paramedic pay?

5  A.   Not until after I had demoted.

6  Q.   Would that have changed your mind about demoting, knowing

7  that you had to fill out a form?

8  A.   No.

9  Q.   Okay.  So even if you had been told before you demoted

10  that you would need to fill out a form to keep your paramedic

11  pay, you still would have demoted to firefighter; right?

12  A.   Correct.

13  Q.   All right.  So you were informed that you needed to fill

14  out a form in order to keep the paramedic pay; right?

15  A.   Yes.

16  Q.   Okay.  And did you understand that you had to submit that

17  form before the pay period closed in order to get your

18  paramedic pay for the coming pay period?

19  A.   So that was never written into any e-mail, and my form

20  was submitted within the pay period that I was notified I

21  needed a new form.

22  Q.   Are you referring to the form you submitted before your

23  demotion?

24  A.   No, I'm not.

25  Q.   When did you -- when did you believe you submitted your

 1   form post-demotion?

 2   A.   So she e-mailed, JoAnn, the HR manager, e-mailed me

 3   June -- without a calendar -- it was an e-mail that we looked

 4   at yesterday.

 5   Q.   Would you like me to pull up the e-mail?  Would that make

 6   it easier for you?

 7   A.   Yes, please.

 8   Q.   Is this the e-mail to which you're referring?  This is

 9   Plaintiff's Exhibit 53.  Ms. Clark, is this the e-mail to

10   which you are referring?

11   A.   No.  There's another e-mail that says if you would like

12   to stay in the 150 club, I need you to fill out a form.  I

13   think it was June 22nd.

14   Q.   Plaintiff's Exhibit 50.  Is this the e-mail to which you

15   are referring?

16   A.   Yes.

17   Q.   Okay.  And it looks like this top portion is the part

18   that you're talking about; is that right?

19   A.   That's correct.

20   Q.   Okay.  So when do you believe you turned in the form that

21   JoAnn Acosta was requesting from you on June 27, 2016?

22   A.   Okay.  So I went in -- I just have to talk myself through

23   this.

24        So I went in and filled out my demotion paperwork on a

25   Friday, and I believe it might have been June 25th because our

CLARK - CROSS

1   pay periods end on a Saturday.  So I believe June 26th was the

2   end of the pay period which is why she dated it that way.

3   Monday would have been June 27th, the date of this e-mail, and

4   that's when I received this e-mail saying thank you for coming

5   in.  If you would like to be in the 150 club ...

6        I was working down at fire communications at that time,

7   the 911 center, and I notified my supervisor at the time who

8   was Deputy Chief Conger that I needed to send in a new form.

9   His initial response was didn't -- didn't you do one in April?

10  And I said, yeah, JoAnn wants another one and I -- I have to

11  fill one out.  And he said all right, so I gave him the form.

12       And so our pay periods are two weeks, and I believe it

13  was the second week of this pay period he brought it down to

14  fire headquarters and turned it in for me.

15  Q.   So you believe Mr. Conger turned it in for you within --

16  within -- in time for you to receive the pay for the first pay

17  period after your demotion?

18  A.   That's correct.  He turned it in by that Friday prior to

19  the end of that pay period.

20  Q.   And you indicated on your direct examination that by the

21  second pay period after your demotion, your paramedic pay was

22  showing up on your paycheck; is that right?

23  A.   Correct.  So after the form got turned in, the pay period

24  ended, I did not receive my paramedic pay, and then the

25  following pay period I did receive it.

1   Q.   Did you bring that to anyone's attention at TFD?

2   A.   Yes, I did.

3   Q.   To whose attention did you bring that?

4   A.   So the first person I brought it to was Deputy Chief

5   Chris Conger who was my supervisor at communications.  He told

6   me that he spoke with JoAnn Acedo, Acosta, and Chief Baker

7   about it.  And then at that point I was told to go to the

8   union about it because they weren't going to change it.  And

9   so at that point I contacted the union president who was Josh

10  Campbell, and he turned me over to our other union staff

11  member, Nate Weber who is in charge of wages and benefits, and

12  he was the one that I dealt with through the majority of the

13  time.

14  Q.   Did you ever directly talk to anyone in human resources

15  about the paramedic pay?

16  A.   No, I did not.

17  Q.   Did you ever talk to anyone at payroll about the

18  paramedic pay?

19  A.   Just through my chain of command.

20  Q.   And that would have been Mr. Conger at that time?

21  A.   That's who it started with; correct.

22  Q.   Okay.  Do you remember ever being told that the form had

23  been turned in too late in order to be applied to that first

24  pay period after your demotion?

25  A.   There was a string of e-mails that I know that Nate Weber

1   had sent, and I can't remember the exact wording in there.

2   Basically, what I was told was that I avoided going to JoAnn's

3   office on June 15th; and if I wouldn't have done that, I would

4   have received the pay.  But that wasn't accurate either, so I

5   actually had made a time line with all the e-mails of the

6   events of it, and I gave it to Nate Weber.  And he took to

7   Chief Gulotta and he ultimately took it to Chief Critchley as

8   well.

9   Q.   And you didn't actually talk with Chief Gulotta or

10  Chief Critchley about the pay issue yourself.  That was

11  handled through Nate Weber; is that right?

12  A.   That's correct.

13  Q.   And I just want to be clear about what was communicated

14  to you as the reason why you did not receive the paramedic pay

15  for that first pay period.  Okay?

16  A.   Okay.

17  Q.   Were you told that it was because the form was not turned

18  in, in time?  Whether it was because you didn't go see JoAnn

19  or not, were you told that the form was not turned in, in time

20  to be effective for that first pay period after your demotion?

21  A.   I would have to look at the e-mail, but I don't recall

22  that being said.

23  Q.   Well, surely you were provided some explanation for why

24  you missed the pay; right?

25  A.   Only in the e-mail that I received from Nate Weber that

1   he forwarded me, which was the response from Chief Gulotta.

2   Q.   Okay.  And as we discussed earlier, you've been receiving

3   the paramedic pay ever since your second pay period after your

4   demotion; is that correct?

5   A.   That's correct.

6   Q.   So Ms. Clark, you have I think three distinct claims in

7   this case; is that right?  You have a claim that you weren't

8   provided appropriate facilities to express breast milk; right?

9   A.   That's correct.

10  Q.   You have a claim that when you raised the issue of

11  inadequate facilities or you filed a claim about the

12  inadequately facilities that you were retaliated against; is

13  that right?

14  A.   I believe that to be correct.

15  Q.   And you have a claim that you believe you were

16  discriminated against because you were pregnant or and/or

17  breastfeeding; is that right?

18  A.   That's correct.

19  Q.   In your direct examination, you talked a lot about how

20  you felt for the time period of 2012 through 2016.  Do you

21  recall that?

22  A.   I do.

23  Q.   And it sounded like you had a lot of things that were

24  going on in your life during that time period that weren't

25  really related to the City of Tucson; is that fair?

```
 1   A.   I don't know that that's a fair statement.

 2   Q.   Well -- and I apologize for rehashing it, but you had a

 3   dog who fell ill; right?

 4   A.   (Pause.)

 5   Q.   And your dad had a stroke; right?

 6   A.   Yes.

 7   Q.   And I note that he's here with you in court so he's okay

 8   now; right?

 9   A.   Yeah.

10   Q.   Okay.  And you said your mom was diagnosed with a fairly

11   serious health issue during that same time frame; right?

12   A.   That was last year.

13   Q.   Okay.  So that was actually last year, 2018?

14   A.   My mom, yeah.

15   Q.   Okay.  I apologize.  It wasn't clear yesterday.

16   A.   No.

17   Q.   And in addition to all of those difficult circumstances,

18   when you first went back to work at the fire department, you

19   just had your first child; right?

20   A.   Yes.

21   Q.   Which is kind of a terrifying experience, isn't it, --

22   A.   Of course.

23   Q.   -- in and of itself.

24        And you were having to leave your baby for the first time

25   with your -- I know with your mom, but you were having to
```

1   leave him for the first time all day to go back to a job;

2   right?

3   A.   Yes.

4   Q.   And after you've been pregnant and you've given birth,

5   your hormones change.  Don't they?

6   A.   They do.  They can.

7   Q.   And during this same period of time, you said you and

8   your husband were also having some marital difficulties;

9   right?

10  A.   That started in more like 2014.

11  Q.   Okay.  You were having such serious marital difficulties

12  that there came a point when you told him to and he actually

13  filed for divorce; right?

14  A.   Yes.

15  Q.   Right around the birth of your second son?

16  A.   Right after the birth of my second son.

17  Q.   With all of those things going on in your life and all of

18  those difficulties, don't you think it is possible that those

19  other difficult circumstances maybe affected the way that you

20  viewed the situation you were experiencing at the fire

21  department?

22  A.   I honestly think the situation at the fire department

23  affected the things going on in my personal life.

24  Q.   Well, we can certainly agree that the situation at the

25  fire department didn't cause things like medical issues;

1    right?

2    A.   No, I don't claim they made my mom sick.  No.

3    Q.   Okay.  And we can agree that having a new baby and then a

4    second baby are difficult, stressful, happy life-changing

5    experiences; right?

6    A.   And the most amazing times of my life.

7    Q.   So I'm just asking whether with all of the changes that

8    were happening to you all at one time if you think it's

9    possible that it affected the way you perceived the way people

10   treated you?

11           MR. JACOBSON:  Objection; misstates testimony.  "All

12   at one time."

13           THE COURT:  No, overruled.  You may answer.

14           THE WITNESS:  I know myself, you know, I'm not

15   showing it right now, but I'm a really strong person and I

16   deal with a lot really well.  But what I couldn't deal with,

17   what I had no control over was what happened at work.  I had

18   no control over that.  And so what I had to do, I didn't have

19   to, but what I did was I went home and I took it out on my

20   family.  It wasn't the other way around.

21   BY MS. WATERS:

22   Q.   Well, so I think we can probably agree there are a lot of

23   difficult things that we don't have control over; right?

24   A.   Yes.

25   Q.   Okay.  And you had a lot of difficult things happen to

```
 1   you in a pretty short span of time; is that fair?
 2   A.   It's been over the years.
 3   Q.   So from 2012 to 2016 which is the time period that's also
 4   relevant to your lawsuit, you had a lot of very difficult
 5   things happen to you during that time frame; right?
 6   A.   I mean, they weren't all difficult.  You know, there were
 7   issues.
 8   Q.   Sure.
 9   A.   And I can't say they were all difficult.  I mean, my
10   children being born, that's what I waited for my whole life.
11   You know.  It wasn't difficult, it was like I love my little
12   boys and that's all I wanted, was my two little boys.  And so
13   those were some of the most -- like I said, happiest moments
14   of my life.
15   Q.   Sure.  You would agree that you don't -- the three claims
16   that you have for the nature of the facilities you were given,
17   for your claim that you were discriminated against, and for
18   your claim you were retaliated against, would you agree that
19   you can't base a claim for those three things on how you felt?
20           MR. JACOBSON:  I'm going to object to the form of
21   that question, Judge.
22           THE COURT:  Why don't you rephrase that?
23           MS. WATERS:  Sure.
24   BY MS. WATERS:
25   Q.   You've described a number of situations, some of them
```

1    specific, some not, that you say contributed to an environment

2    that was very upsetting to you and that caused you to be

3    uncomfortable at fire station events and in your job and in a

4    place that you previously enjoyed; right?

5    A.    Yes.

6    Q.    Okay.  And some of those events had to do with things

7    like rumors about you; is that right?

8    A.    Some of them, yes.

9    Q.    Did you ever go to TFD administration and tell them that

10   there were specific things being said about you that they

11   would have been able to investigate and address?

12   A.    Yes, I did.

13   Q.    Do you have any idea whether they investigated and

14   addressed them?

15   A.    Not as far as I know.

16   Q.    Who do you believe you gave enough information to that

17   they could have investigated and addressed the issue that you

18   brought to them?

19              MR. JACOBSON:  Judge, this is beyond the scope of

20   direct.  May we approach?

21              THE COURT:  No.  Go ahead.  Overruled.  Go ahead.

22              THE WITNESS:  Ask me again.

23   BY MS. WATERS:

24   Q.    Who in the fire department administration are you saying

25   that you told, gave enough information to about people making

1   you uncomfortable in the fire department that they could have

2   investigated and addressed the issue?

3   A.   I spoke to Chief Critchley about comments that had been

4   made, people that had written comments and stuff about me

5   online that I felt were in violation of a policy that we had

6   in place for that.

7   Q.   Other than Chief Critchley, is there anyone else in the

8   fire department administration whom you provided specific

9   examples of mistreatment to that you believe could have been

10   investigated and were not?

11   A.   I don't recall asking them to investigate much.

12   Q.   Well, Ms. Clark, yesterday you described a situation that

13   sounded pretty unhappy and desperate at the fire department;

14   right?

15   A.   Which -- what are you speaking about?

16   Q.   I'm referring to your testimony that there were days you

17   didn't want to go, didn't want to get out of bed, didn't want

18   to live.

19       Do you remember talking about that yesterday?

20   A.   Yes, I do.

21   Q.   So that, to me, sounds like a fairly difficult, desperate

22   situation you were in.  Would you agree with that?

23   A.   I had days, yes, that I had very, very tough times.

24   Q.   When you went to Chief McDonough, when you were dealing

25   with Chief Fischback, later with Deputy Chief Carsten, they

```
 1  made arrangements to meet your needs; right?
 2  A.   I'm not sure what you're trying get at with that
 3  question.
 4  Q.   Well, I'm just -- I think you agreed earlier that Chief
 5  McDonough was nice to you, tried to help you, worked to meet
 6  your needs; right?
 7  A.   Yes.
 8  Q.   Chief Fischback found a spot for you at Station 6; right?
 9  A.   I don't know how that came about.
10  Q.   He was the one who informed you he was -- he was going to
11  assign you to Station 6?
12  A.   He was the one who informed me, yes.
13  Q.   You said Deputy Chief Carsten was affirmatively welcoming
14  to you when you moved into fire prevention and proactive about
15  addressing the needs that you would have to express breast
16  milk on the job; right?
17  A.   I just agreed that that was the e-mail he sent me.
18  Q.   Okay.  So you had people over those -- over that
19  four-year period, you had people who had helped you, didn't
20  you?  I'm not saying everyone did what you wanted them to do
21  all the time.  I'm just asking you to acknowledge there were
22  people at the fire department who helped you over that
23  four-year period, weren't there?
24  A.   There were times, sure.
25  Q.   There were people you could have gone to for help; right?
```

1   A.   I believe I always did what I was told to do and I went

2   within my chain of command.  I followed what I was taught to

3   do.

4             MS. WATERS:  Ms. Clark, I don't have any additional

5   questions for you.  Thank you.

6             THE WITNESS:  Thank you.

7             THE COURT:  Do you want to start now or take a

8   break?

9             Let's take an afternoon break, and then we'll start

10  with additional questioning.

11            THE CLERK:  Please rise for the jury.

12       (Jury panel excused at 2:47 p.m.)

13       (Recess from 2:47 to 3:06 p.m.)

14            THE COURT:  Be seated, please.

15            And the jury has not yet entered the courtroom.  Is

16  there a matter we need to discuss before they come out?

17            MS. SAAVEDRA:  Yes, your Honor.

18            I was told that our witnesses -- well, some of the

19  witnesses, actually plaintiff witnesses, were outside.  So I

20  went out to go look for them and I couldn't find them; we came

21  back in here.  Went back out.  I saw there were jurors walking

22  around out there.  So we went out there and one of the jurors,

23  Juror No. 6, was speaking to two of the witnesses that were

24  waiting out there in TFD uniform.  And I guess he looked at

25  their name tags and acknowledged that had their names had been

1  read in a list as witnesses and also said that he played -- he

2  believed he played golf with Tamietti's uncle.

3          THE COURT:  Oh.

4          MS. SAAVEDRA:  The TFD personnel said it seemed very

5  innocent.

6          We disclosed this to Mr. Jacobson.  And I believe

7  the parties have agreed that we would just like for the Court

8  to re-admonish the juror that they should not be interacting

9  with the witnesses or attorneys.

10          THE COURT:  Do you want me to call him in

11  specifically before we start?

12          MR. JACOBSON:  No, I'd rather not single him out,

13  Judge.  I think if we just remind the jury as a panel --

14          THE COURT:  All right.  And I know I've given this

15  instruction before, and I didn't have it in this packet which

16  I probably should have added.  You've probably seen the

17  language about, You may share the elevator with the lawyers.

18  They're not being rude when they don't say hello.  And you

19  may -- so I'll probably just tell them something like that

20  before we break, that obviously they're going to come into

21  contact throughout this trial when court isn't in session with

22  witnesses, possibly with the attorneys, and please to avoid

23  even the appearance of impropriety.  Don't have any contact,

24  not even a hello or any conversation with the -- with counsel

25  or any of the witnesses.  Something like that.  But thank you.

1          MS. SAAVEDRA:  That would be great, your Honor.

2          THE COURT:  Thank you for bringing that to my

3    attention.

4          MS. SAAVEDRA:  Thank you.

5          THE COURT:  And tomorrow I do have a 9:00 criminal

6    hearing, so we're going to start around 9:30 just for

7    scheduling purposes.

8          So Sandy.

9          THE CLERK:  Was there anything else?

10         THE COURT:  Don't invite it, Sandy.

11         MR. JACOBSON:  Well played.

12         THE COURT:  Do you want to read the stipulation?

13   Well, we'll wait till we're done with Ms. Clark's testimony.

14         We'll do that today.  Do you want to do that today?

15         MR. JACOBSON:  I think so.

16         THE COURT:  Do you want the stipulation to go to the

17   jury as an exhibit?  The stipulate of fact.  Do you want it on

18   a piece of paper?

19         MS. WATERS:  I'm thinking we can just read it into

20   the record.  It's not a detail-oriented stipulation.

21         THE COURT:  No.  So we'll just read it into the

22   record, and then I'll explain to them what a stipulation is.

23         THE CLERK:  Please rise for the jury.

24      (Jury panel entered at 3:10 p.m.)

25         THE COURT:  And everyone may be seated.

CLARK - REDIRECT

1          The record may reflect the presence of the jury.

2          And counsel, you may redirect your client.  Go

3    ahead.

4          MR. JACOBSON:  Thank you.

5                     REDIRECT EXAMINATION

6    BY MR. JACOBSON:

7    Q.   Good afternoon, Carrie.

8    A.   Good afternoon.

9    Q.   A couple of -- just a few questions for clarification.

10        Your lawsuit, do you remember how many claims you have?

11   A.   I have -- I think I actually have four.

12   Q.   So the reference to three claims is actually bundling a

13   couple of different claims together; is that fair?

14   A.   That's fair.

15   Q.   There was no intent to mislead, you; correct?

16   A.   No, I don't believe so.

17   Q.   On cross, you were asked about your experience at

18   Station 23.  Do you remember that?

19   A.   Yes.

20   Q.   And you were talking about whether you experienced any

21   retaliation, discrimination since November 2016; right?

22   A.   Correct.

23   Q.   If you wouldn't mind, I'm going pull up the time line.

24   So after November 2016, we've alleged there were two

25   depositions that occurred where you were deprived of pay;

1   correct?

2   A.   That's correct.

3   Q.   So when you were answering the question about

4   November 2016, what was in your mind?

5   A.   It was personal mistake.  I thought all depositions were

6   included as one, but in actuality separate incidents.  So I

7   apologize for that.

8   Q.   And there are no claims in this case related to your

9   experience at Station 23; right?

10  A.   No, there is not.

11  Q.   Correct?

12  A.   Correct.

13  Q.   So are you claiming in this lawsuit that you were ever

14  denied time to express your breast milk?

15  A.   I am not.

16  Q.   You were asked questions about the Scott Billings -- I

17  guess Scott Billings leaving that station and bidding for that

18  spot and winning -- sorry, winning the bid to that spot and

19  you said that's not what happened.  Do you remember that

20  exchange?

21  A.   Yes, I do.

22  Q.   Would you just mind telling the jury kind of what

23  happened relative to Scott Billings at Station 12?

24  A.   Sure.  So when the bid closed, I believe it was sometime

25  around November 10th or sometime around then.  The meeting I

CLARK - REDIRECT

1    had downtown with administration when they notified me that

2    they were going to leave me there for five more shifts, that

3    brought me through, without a calendar, the end of November.

4    And then I believe our first shift back in December was

5    December 5th, so Scott actually started on Medic 12 on

6    December 5th and he was permanently assigned to Station 12

7    starting on December 5th.  And the vacancy I filled in

8    December for those five days were not for Scott Billings.  It

9    was for -- his name was Greg.  He was the other paramedic on

10   that truck.

11   Q.   So Scott Billings delayed his entry into that spot for

12   one tour?

13   A.   That's correct.

14   Q.   You were asked questions about Battalion Chief Paul

15   McDonough.  Do you recall that series of questions?

16   A.   I believe so.

17   Q.   And you testified on cross you believed he was trying to

18   be helpful; right?

19   A.   Yes.

20   Q.   Do you know everything that Battalion Chief McDonough was

21   doing?

22   A.   No, I don't.

23   Q.   Do you know all the conversations that he was having

24   about you or about your situation?

25   A.   No, I do not.

1   Q.   Do you even know that what he was telling you was

2   necessarily true?

3   A.   No, I do not.

4   Q.   In December -- I'm sorry, in January of 2013 when you

5   were talking to OEOP, or EEO loosely defined, you were asked

6   on cross whether you talked to OEOP about what you felt the

7   law required; right?

8   A.   Yes.

9   Q.   Was there any policy or procedure in the City of Tucson

10  broadly that you could go to, to tell you what the fire

11  department's rules were relative to people who were expressing

12  breast milk on the job?

13  A.   No, there was not.

14  Q.   You were asked on cross about social norms.  Do you

15  remember that?

16  A.   Yes.

17  Q.   Tell us a little bit about whether or not social norms

18  really exist in fire departments and fire station

19  specifically?  You work there.

20  A.   I would say no.  I would say that typically the type of

21  people hired by the fire department or attracted to the fire

22  department are a lot of type A personality, so a lot of times

23  when you get a group of them together it's a little bit crazy.

24  There's not a lot of boundaries.  There's a lot of interaction

25  within stations that I think if the public knew went on would

1   be disappointed, but it's become kind of the normal, kind of,

2   behavior there.

3        And I don't necessarily, you know, fault people for how

4   they act because, you know, this job, obviously everyone deals

5   with the stress of it.  We never know what kind of calls we're

6   going to go on.  We're woken up at 2 in the morning and

7   pulling a baby out of a pool.  We see a lot of horrible

8   things.  But I can tell you it's a lot different than any

9   other job I've ever worked.

10  Q.   When you worked -- did you work at Station 5 in February,

11  2013?

12  A.   I believe I worked there, yes.

13  Q.   Was that close to your mom?

14  A.   No.  It was not.

15  Q.   Was that a place that you really wanted to work at?

16  A.   No.  It's not one of favorite spots.

17  Q.   In your experience in the fire department, do you and

18  other people, other members -- firefighters, paramedics,

19  engineers -- have preferences to where they like to work?

20  A.   Yeah.  I would say probably just about everybody does.

21  There's people that like certain parts of town to work on

22  based, kind of, on the different calls you get.  And then

23  there are certain people that have stations they love,

24  stations they hate.  I think it's pretty common for probably

25  almost anybody to have a preference on where they like to

1  work.

2  Q.   So despite the fact that Station 5 in February 2013

3  wasn't close to mom and wasn't a place that you wanted to

4  work, did you call Paul McDonough and say I don't want to work

5  there?

6  A.   No, I just went to work.

7  Q.   Same set of questions for Station 4.  Did you work at

8  Station 4 in January 2013?

9  A.   Yeah, I believe I did.

10 Q.   Where is Station 4?

11 A.   Station 4 is west of Grant and I-10.

12 Q.   Is that close to your mother?

13 A.   No, it's not.

14 Q.   Did you particularly want to work in that station?

15 A.   Not particularly.

16 Q.   And did you call Battalion Chief Paul McDonough and say I

17 don't want to work there?

18 A.   No, I did not.

19 Q.   Did you call him and say that's not convenient for me or

20 my mom?

21 A.   No, I did not.

22 Q.   Did you work at Station 1 in February of 2013?

23 A.   I believe I worked there a few times, yes.

24 Q.   And was that -- where is Station 1, headquarters?

25 A.   Fire headquarters.

1  Q.   Is that close to your mother?

2  A.   No, it's not.

3  Q.   Did you particularly want to work there?

4  A.   I personally don't like working downtown, no.

5  Q.   Did you call Battalion Chief McDonough and say I don't

6  want to work there?

7  A.   No, I did not.

8  Q.   Did you call up Battalion Chief McDonough and say switch

9  my shift, put me somewhere else?

10  A.   No, I did not.

11  Q.   You were asked a question about your sleep cycle and

12  firefighters have an abnormal sleep cycle.  Do you remember

13  that?

14  A.   I do.

15  Q.   Based on your training and experience as a registered

16  nurse, as a paramedic, as somebody who worked with lactation

17  consultants, does sleep cycle affect milk production to your

18  knowledge?

19  A.   Not to my knowledge because actually a newborn's sleep

20  cycle is probably worse than any shift I've actually worked on

21  the fire department.

22  Q.   So there was a lot of testimony about what happened at

23  Station 3 with the person who said, ewh, don't put that milk

24  in the fridge.  Do you remember that on cross?  There were a

25  lot of questions about that.

1   A.   Yes, I do.

2   Q.   Did you ever allege that as an incident in your lawsuit?

3   A.   No, I did not.

4   Q.   If you would put the time line back up, please.

5        Is that alleged anywhere on this time line?

6   A.   No, it's not.

7   Q.   But nevertheless, did it happen?

8   A.   It 100 percent happened.

9   Q.   The May 22nd drill, now, you had worked with Battalion

10  Chief -- I'm sorry, with Captain Ted McDonough at that point

11  about a little over a year, I think, was your testimony?

12  A.   That's correct.

13  Q.   Enough time to understand Captain McDonough's -- Captain

14  Ted McDonough's habits and practices as a fire captain?

15  A.   I believe I knew our typical routine of what our day's

16  were like, yes.

17  Q.   So from the time you came to work at Station 6 with

18  Captain McDonough to the time that you were six months'

19  pregnant and drilled on May 22nd, 2014, had Captain Ted

20  McDonough run a drill?

21  A.   We had never drilled as a crew.

22  Q.   Who else was there on May 22nd, 2014, for Captain Ted

23  McDonough's drill?

24  A.   It would have been Captain Ted McDonough, my firefighter

25  partner, Tyler McKendrick, and the engineer's name was Ron

 1    Catlin.

 2    Q.   And could Engineer Catlin have pulled the hose that

 3    Captain Ted McDonough made you pull?

 4    A.   I believe if the drill was intended to test Tyler's

 5    proficiency on pumping the panel, anyone could have pulled the

 6    hose.  With the scenario that was given Ron fell down and got

 7    hurt and I was the only one that could do it, then I was the

 8    only one that did it.

 9    Q.   Was Ron physically able to do it?

10    A.   Yes, he was.

11    Q.   Could Captain Ted McDonough have said the scenario is Ron

12    is hurt, but pretend that Ron is only hurt.  He's not really

13    hurt.  Because Ron wasn't hurt; right?

14    A.   He was not hurt.

15    Q.   And Ron didn't lay there on the floor writhing in pain;

16    right?

17    A.   He did not.

18    Q.   So could Ron have pulled the hose?

19    A.   Sure.  Yes.

20    Q.   Could Captain Ted McDonough pull the hose?

21    A.   Yes.

22    Q.   But he chose you to pull the hose; correct?

23    A.   Correct.

24    Q.   Did Captain Ted McDonough drill you before you were

25    pregnant?

CLARK - REDIRECT

1   A.   No, he did not.

2   Q.   You were asked questions about -- essentially speculating

3   as to why Captain McDonough called Battalion Chief Nofs.  Do

4   you remember that?

5   A.   Yes, I do.

6   Q.   So is it possible that also Captain McDonough knew that

7   he did something inappropriate and immediately called his

8   supervisor because he knew it was going to go up the chain

9   anyway and he wanted to get ahead of it?

10  A.   I guess that's possible, yes.

11  Q.   The doctor's note to exercise in 2014 when you were on

12  light duty, did anybody ask you whether or not you had any

13  physical restrictions that you needed while you were on or had

14  while you were on light duty?

15  A.   No, they did not.

16  Q.   Did anybody come up to you and say, hey, do you have the

17  same restriction that you had during your first pregnancy?

18  A.   No, they did not.

19  Q.   Were you -- strike that.

20       Are you afraid to advocate on your own behalf in the case

21  you had a physical restriction that you needed to alert the

22  fire department about?

23  A.   No.  I am not.  Especially when it comes to my baby.

24  Q.   You were asked a series of questions about the calls that

25  you made to Captain McDonough -- I'm sorry, to Battalion Chief

1    Paul McDonough in the October 2012 to March 2013 time frame.

2    Do you remember those questions on cross?

3    A.   Yes, I do.

4    Q.   If TFD had been in compliance with the law or even had a

5    policy at the time, would any of those phone calls to

6    Battalion Chief McDonough have been necessary?

7              MS. WATERS:  Objection; the question assumes

8    noncompliance with the law which is an issue for the jury to

9    decide.

10              THE COURT:  Yes, sustained.

11              Why don't you rephrase that, Mr. Jacobson.

12   BY MR. JACOBSON:

13   Q.   Okay.  If TFD had a policy in place and if you believed

14   and TFD believed that it was in compliance with the law at the

15   time, would any of those phone calls have been necessary?

16              MS. WATERS:  I'm sorry, your Honor, may we please

17   approach briefly?

18              THE COURT:  Yes.

19       (At sidebar.)

20              MR. JACOBSON:  I'm not asking a great question.

21              MS. WATERS:  I think the first problem is there was

22   a motion in limine over the lack of a policy.  I think the

23   second issue is there is no indication that the lack of a

24   policy -- there's no connection between her phone calls and

25   the lack of a policy.

1           THE COURT:  I just think it's not really helpful.

2           MR. JACOBSON:  I'll move on.

3           THE COURT:  I think it's micromanaging.

4           MS. WATERS:  Okay.

5           MR. JACOBSON:  I'll move on.  I think it's fair.  I

6    wasn't asking a good question.

7        (Open court.)

8    BY MR. JACOBSON:

9    Q.   You were asked a number of questions about whether or not

10   Tucson Fire Department -- whether it would have been

11   appropriate for Tucson Fire Department to do something or TFD

12   management to do something.  Do you remember those questions?

13   A.   Yes.

14   Q.   Do you speak for Tucson Fire Department management?

15   A.   No, I don't.

16   Q.   Can you read fire department management's minds?

17   A.   No, I can't.

18           MR. JACOBSON:  I have nothing further.

19           THE COURT:  Any questions from the jury for this

20   witness?

21           All right.  If you want to go ahead and write it

22   out.

23           And I'll see counsel at sidebar about the questions.

24        (At sidebar.)

25           MS. WATERS:  That question is totally appropriate.

1            THE COURT:  And that's question is No. 5, for the

2    record.

3            MS. WATERS:  Well, we can follow-up.

4            MR. JACOBSON:  If she may know.

5            MS. WATERS:  She may or may not know that the guy

6    who was on was deployed, and she may or may not know that he

7    extended his deployment.

8            So on the job, line of command relationship to Chief

9    Critchley whom you told about the online comment.

10            MR. JACOBSON:  I think it's asking -- I think it's

11    asking who the chain of command to Critchley or did she go

12    right to Critchley.

13            THE COURT:  Do you want me just to ask her to

14    describe the --

15            MS. WATERS:  Chain of command between her and

16    Critchley.

17            THE COURT:  Critchley when told of --

18            MS. WATERS:  And I also want --

19            MS. SAAVEDRA:  Be careful, about --

20            MS. WATERS:  Yeah, we want to be careful about the

21    online comments.

22            THE COURT:  Who told her about the online comments?

23            MS. WATERS:  So she testified that she told

24    Chief Critchley about the online comments.

25            THE COURT:  Okay.

1          (Open court.)

2          THE COURT:  All right.  Ms. Clark, do you recall

3   your testimony where you talked about telling Chief Critchley

4   about some online comments?

5          THE WITNESS:  Yes.

6          THE COURT:  Can you describe the chain of command

7   between and you and Chief Critchley at the time.

8          THE WITNESS:  I believe at that time I was in fire

9   prevention, and my -- I'm not -- I'm not exactly sure who my

10  supervisor was in fire prevention at the time.  I don't recall

11  which month I went to see him, but it was possible that it was

12  Ken Brouillette who was the civilian.  The deputy chief was

13  Mike Carsten.  And then I don't recall, I think it might have

14  been Chief Fischback was the assistant chief.  And then Chief

15  Critchley was the head chief at that time.

16         THE COURT:  All right.  Another question from the

17  jury.

18         When being assigned to Station 20 as your station

19  when coming back to work, was the department displacing

20  someone from Station 20 in order to place you there if you

21  know or was there a vacancy?

22         THE WITNESS:  That's actually a great question.  The

23  situation at 20, there was a member assigned there and he was

24  on military deployment.  So when they initially said I can

25  stay there, I was going to fill his vacancy which they felt

1    was going to be for a few weeks.

2            During the time, that member, his name was Andy, was

3    deployed.  Somehow he bid to the same station but a different

4    shift and so his shift opened up.  It was subsequently bid on

5    by another department member named Mike who had contacted me

6    at one point and said -- this is a little bit confusing.  He

7    was coming from a different shift.  I believe he was coming

8    from "B" Shift -- from "B" -- "B" Shift to "C" Shift.  So

9    technically the spot that I would have been filling at 20 was

10   Mike's, Mike Carreon, since he won that spot.

11           And he requested that he be placed there no later

12   than the end of that year, 2012, because he had already had

13   vacation dates planned for 2013 based upon the shift that he

14   won.  So technically it was Mike -- it was Andy.  It was Andy

15   Pashos' spot to start.  And then Mike Carreon won that spot.

16           Prior to me going there, it had been filled by

17   another department member for a period of time while I was on

18   maternity leave, which is why I offered those first two shifts

19   to allow that member to finish out the complete tour there so

20   they don't have to remove all their stuff for the last two

21   shifts.

22           THE COURT:  Any follow-up questions by counsel to

23   the jury questions?  Mr. Jacobson?

24           MR. JACOBSON:  No.  Thank you.

25           THE COURT:  All right.  Ms. Waters or Ms. Saavedra?

1           MS. WATERS:  Briefly.

2           THE COURT:  All right.  Go ahead.

3                        RECROSS-EXAMINATION

4   BY MS. WATERS:

5   Q.   So Ms. Clark, at the time you were first coming back from

6   maternity leave, Andy Pashos' spot at 20 was available; is

7   that correct?

8   A.   It was being filled by somebody else but it was vacated

9   by him while he was on military leave.

10  Q.   And at that time it was still Pashos' spot; right?

11  A.   I believe, but I can't tell you the exact date that the

12  spot that -- he won the other spot and then his spot went out

13  to bid and won by somebody else.

14  Q.   And where did you obtain the information about the other

15  person wanting to switch from one shift to another?

16  A.   I actually worked with him one day at that station -- I

17  think it was at Station 20 -- either, right around the time he

18  won the bid.  And he told me, yeah, I've already talked to Ron

19  and people in HR because I need to get over to "C" Shift --

20  or, I need to get to -- I can't remember how it went, because

21  I already have my vacations planned for the next year.

22  Q.   Okay.  So you're saying that you heard from the guy named

23  Mike; right?  Mike?

24  A.   Correct.

25  Q.   Okay.  That you heard from Mike that he wanted to or was

1   going to fill that spot; right?

2   A.   Well, he won the bid and then he was waiting to transfer

3   over shifts.  It takes some time before they transfer shifts.

4           MS. WATERS:  Okay.  I don't have any additional

5   questions about that.

6           THE COURT:  Any further questions from the jury for

7   this witness?

8       (No response.)

9           THE COURT:  All right.  Thank you, Ms. Clark.  You

10  may step down.

11          THE WITNESS:  Thank you.

12          THE COURT:  And Mr. Jacobson, you may call your next

13  witness.

14      (End of requested proceedings, 3:33 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                   C E R T I F I C A T E

2

3              I, Cheryl L. Cummings, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7                       Dated this 8th day of April, 2019.

8                       /s/Cheryl L. Cummings

9                       Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
                        Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```