1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3   Carrie Ferrara Clark,            )
                                     )
4             Plaintiff,             )
                                     )   CV-14-2543-TUC-CKJ
5         vs.                        )
                                     )   Tucson, Arizona
6   City of Tucson,                  )   April 2, 2019
                                     )   9:11 a.m.
7             Defendant.             )
    _____  )
8
                    REPORTER'S TRANSCRIPT OF PROCEEDINGS
9
        EXCERPT JURY TRIAL DAY TWO - TESTIMONY OF CARRIE CLARK
10
              BEFORE:  THE HONORABLE CINDY K. JORGENSON
11                 UNITED STATES SENIOR DISTRICT JUDGE

12  APPEARANCES
    For the Plaintiff:
13        Jacobson Law Firm
          By:  JEFFREY H. JACOBSON
14        2730 East Broadway Blvd., Suite 160
          Tucson, Arizona 85716
15
    For the Defendant:
16        City of Tucson Attorney's Office
          By:  MICHELLE R. SAAVEDRA, ESQ.
17        Civil Division
          PO Box 27210
18        Tucson, AZ 85726-7210;

19        Iafrate & Associates
          By:  RENEE J. WATERS, ESQ.
20        649 North 2nd Avenue
          Phoenix, Arizona 85003
21
    Cheryl L. Cummings, RDR-CRR-RMR
22  Official Court Reporter
    Evo A. DeConcini U.S. Courthouse
23  405 West Congress, Suite 1500
    Tucson, Arizona 85701
24  (520)205-4290

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared by Computer-Aided Transcription

```
 1                     EXAMINATION INDEX

 2  WITNESSES CALLED ON BEHALF OF THE PLAINTIFF

 3  CARRIE CLARK
          DIRECT BY MR. JACOBSON                          7
 4

 5
                       EXHIBIT INDEX
 6
                                                        ADM
 7      1                                                33

 8      2                                                38

 9      3                                                39

10      4                                                41

11      5                                                47

12      8                                                56

13      9                                                58

14      10                                               59

15      11                                               64

16      13                                               69

17      14                                               81

18      15                                               83

19      16                                               85

20      20                                               89

21      21                                              101

22      22                                              102

23      23                                              111

24      24                                              124

25      25                                              125
```

| | | |
|---|---|---|
| 1 | 26 | 129 |
| 2 | 27 | 131 |
| 3 | 28 | 134 |
| 4 | 29 | 135 |
| 5 | 30 | 136 |
| 6 | 31 | 138 |
| 7 | 32 | 139 |
| 8 | 33 | 140 |
| 9 | 34 | 142 |
| 10 | 35 | 144 |
| 11 | 36 | 145 |
| 12 | 37 | 146 |
| 13 | 39 | 162 |
| 14 | 40 | 165 |
| 15 | 41 | 156 |
| 16 | 42 | 170 |
| 17 | 43 | 176 |
| 18 | 44 | 178 |
| 19 | 45 | 181 |
| 20 | 46 | 187 |
| 21 | 47 | 190 |
| 22 | 48 | 192 |
| 23 | 49 | 194 |
| 24 | 50 | 199 |
| 25 | 52 | 202 |

| | | |
|---|---|---|
| 1 | 53 | 202 |
| 2 | 53 | 202 |
| 3 | 62 | 175 |
| 4 | 89 | 204 |
| 5 | 90 | 205 |
| 6 | 121 | 28 |
| 7 | 123 | 134 |
| 8 | 124 | 163 |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

```
 1                    P R O C E E D I N G S
 2        (Reporter's note:  Requested proceedings commenced at
 3   9:11 a.m., as follows:)
 4             THE COURT:  Be seated, please.
 5             Good morning to everyone.  The record may reflect
 6   the presence of counsel and parties.
 7             Anything before we bring in the jury?
 8             MR. JACOBSON:  Just one thing.  Your Exhibit 53 and
 9   my Exhibit 53 are incorrect.  I've already given our
10   Exhibit 53 to the defense to substitute in their binder.
11             THE COURT:  Oh, okay.
12             MR. JACOBSON:  So may I approach?
13             THE COURT:  Sure.  E-mail dated October 28th, 2012.
14             MR. JACOBSON:  It's not.
15             THE COURT:  Okay.
16             MR. JACOBSON:  It was my mistake, Judge.
17             THE COURT:  Okay.  All right.  So Sandy, if you can
18   get the jury.
19        (Jury panel entered at 9:14 a.m.)
20             THE COURT:  Good morning to the jury.  And everyone
21   may be seated.
22             And members of the jury, before we start with
23   testimony, let me just tell you a couple of things about the
24   exhibits and the technology here.
25             The exhibits are what we call marked for
```

1   identification.  They all have numbers.  And sometimes the

2   lawyers will show the exhibits to the witness before they're

3   actually admitted into evidence, so when they're not admitted

4   into evidence you won't see them.  So there may be a witness

5   looking at his or her screen and talking about an exhibit, and

6   you're wondering why isn't it showing up on my screen.  It's

7   because it hasn't been admitted into evidence yet.  If it is

8   admitted into evidence, you'll be able to either see it on

9   your screen and then you'll also have a hard copy of that

10  exhibit when you start your deliberations.  So I don't want

11  you to think that the only chance you'll been able to see that

12  exhibit for the duration of the trial is the moment that it's

13  on your screen.  So just so you understand that.

14         And then we have these screens up here near the --

15  in the back of the courtroom, and those will also show the

16  exhibits once they're admitted into evidence.

17         So all right, Mr. Jacobson, you may call your first

18  witness.

19         MR. JACOBSON:  Good morning, your Honor.  Plaintiff

20  calls Carrie Clark.

21         THE COURT:  All right.  Ms. Clark, if you could just

22  come up to the witness stand, and we'll have you sworn in as a

23  witness by the clerk of the Court.

24         *CARRIE CLARK*, PLAINTIFF WITNESS, SWORN

25         THE CLERK:  You may be seated.

1          THE COURT:  And Mr. Jacobson, if you could pull --

2    or Sandy, pull that monitor down a little bit.  And if we use

3    it for exhibits we can pull it back up, but it just makes it a

4    little easier to see the witness.  And then we have the two

5    microphones there.

6          Go ahead, Mr. Jacobson.

7          THE CLERK:  Would you state your full name for the

8    record and spell your last.

9          THE WITNESS:  My name is Carrie Clark, last name,

10   C-l-a-r-k.

11         THE COURT:  You may proceed.

12         MR. JACOBSON:  Thank you.

13                         DIRECT EXAMINATION

14   BY MR. JACOBSON:

15   Q.   Carrie, would you tell a little bit about yourself to the

16   jury?

17   A.   I was born and raised here in Tucson.  I'm a third

18   generation native.  I have an older brother who lives here.

19   My parents are divorced.  Both remarried.  My dad is actually

20   here.  I grew up, went to high school here.  All my family is

21   still here and I'm a native.

22   Q.   If you would, tell us a little bit about your upbringing.

23   A.   Sure.  I had a pretty typical, modest I would say

24   upbringing.  Not wealthy by any means.  My mom and stepdad

25   still live in the house I was raised in.  I spent time

1   between, you know, seeing my mom and dad growing up.  Went to

2   high school here.  Had a pretty normal childhood.  Got to do

3   some fun things.  Got to be outdoors a lot, and I think I was

4   raised by really good people.

5   Q.   How long have you been working in any facet?

6   A.   So I started my first job, paying job when I was 15.  I

7   was working in a shot clinic on Sundays at PetSmart doing

8   vaccinations for dogs and cats.  And in high school I had

9   three jobs.  I was working two retail jobs and still at

10  PetSmart and I worked ever since.

11  Q.   Are you married?

12  A.   I am married.

13  Q.   Who are you married to and tell us a little bit about

14  that.

15  A.   My husband's name is Gordon Clark.  We got married --

16  well, actually we're celebrating our eighth anniversary in a

17  few days.  He also worked for the fire department.  He's a

18  captain with Tucson Fire.

19  Q.   Do you have any children?

20  A.   We have two little boys.  My little one is four and my

21  older one is six.

22  Q.   And what are their names?

23  A.   My oldest is Austin and my little guy's name is Mason.

24  Q.   If you would, tell us about your hobbies and what you

25  enjoy doing.

1   A.    Sure.  So ever since I was a kid, I always had a love for

2   animals.  Most of my free time besides working my two jobs, I

3   volunteer at Pima Animal Care Center.  I used to walk dogs and

4   help at adoption events.  I also volunteer a lot of time at

5   the Humane Society.

6         I'm also a medical staff volunteer for the Special

7   Olympics.  And every January, February, my time is donated to

8   the Tim Tebow Foundation, The Night to Shine, the prom that

9   they put on for the special needs kids.

10        I also foster dogs for one of the local fosters in Tucson

11  so -- and I include my kids in all the stuff.  I felt it was

12  really important for them to see that we give back and also

13  raise them to be good people and want to help.

14        And so that's -- basically besides the stuff I do with my

15  kids, that's kind of what I do on my days off.

16  Q.    If you would, take us through your educational background

17  starting with high school, please.

18  A.    Okay.  So my freshman year of high school, I had applied

19  to Salpointe Catholic High School.  It was a private school.

20  I had never been there before, and I got accepted, and I was

21  really excited to go there.  I had never done anything like

22  that.  So I went there my freshman year.  It turned out to be

23  a little bit of a financial hardship for my family so I ended

24  up leaving at my freshman year.

25        And one of the girls I had played club soccer with

1   convinced me to go to Rincon High School, so I ended up going

2   there for the next two years.

3        And then in the summer before my senior year, I had

4   reconnected with some of my friends from, like, first grade

5   who had gone to Palo Verde which was the school I was supposed

6   to go to.  So I ended up going back there my senior year which

7   ended up being great because my soccer coach at the time was a

8   big advocate for us, and I ended up getting a soccer

9   scholarship to Pima College.  They had a brand new women's

10  team.  It was the second year they had had one.

11       So I played two years of soccer at Pima while I went to

12  school.  I did some time at the U of A, and ultimately I

13  graduated from Pima College with my nursing degree.

14  Q.   During your time at Pima Community College, did you

15  obtain any certifications?

16  A.   I did.  I think it was my second year in college I took

17  the EMT class and I became an EMT.  Shortly after that I went

18  through the Pima College Fire Academy, and I obtained my

19  Firefighter I and II certification.  During that time I was

20  also starting the nursing school program, and after so many

21  semesters you're able to test out to become a licensed

22  practical nurse.  So I took the NCLEX for my LPN and I

23  obtained that license during that time as well.

24  Q.   So how old were you when you obtained your EMT and

25  Firefighter I and II certifications?

A.   I think my EMT, I was initially somewhere around 19, 20
years old.  And then when I completed the Pima College Academy
I was 21 years old.  And by the time I tested for my LPN exam
I was 22, maybe going on 23.
Q.   Was that the end of your education after Pima Community
College?
A.   No.  So when I started working as a nurse, I was working
at St. Joseph's Hospital in the emergency room at the time.  I
had actually entered into a bachelor's program, and shortly
after that I was hired from the City so I had to withdraw from
that program.  But during my time here, I also obtained a
second associate's degree and also obtained my paramedic
certification.
Q.   Did you start a job in 2000 doing something?
A.   Yes.  So my first what I considered adult job, during
college I had -- after I obtained my EMT certification I was
looking through the paper trying to find a job.  And I saw
that TMC was hiring EMTs, so I applied there and I was hired
by TMC.  So I worked as an EMT for about a year or so.  I was
working in the emergency room.  And we also did transports on
the ambulance that they had for patients in, like, the cancer
care center that were going for radiology appointments or
something like that.  Ultimately, after working as an EMT for
a while, they trained me as a patient care tech so I started
working as a patient care tech.  And then at some point I

1  tested out and got my LPN license so I started working there

2  as an LPN while I finished up my nursing degree.

3  Q.   So am I correct that you are working full time while you

4  are also attending classes at Pima?

5  A.   That's correct.

6  Q.   And where were you living at the time?

7  A.   So I moved out.  Not during my first year as a college; I

8  still lived at home.  I moved out I think in the year 2000 and

9  I lived with a friend for a little while.  And toward the end

10  of 2000 I purchased my first home.

11  Q.   And did you eventually earn your registered nurse

12  license?

13  A.   I did.

14  Q.   Tell us about that.

15  A.   So I continued on through nursing school and working as

16  an LPN.  And eventually in May of 2005, I graduated Pima

17  College nursing program and eventually passed NCLEX exam and

18  became a registered nurse.

19  Q.   How old were you when you became a registered nurse?

20  A.   I believe I was 25.

21  Q.   Was TMC the only medical center you worked for in Tucson?

22  A.   No.  So after I became a registered nurse I had worked at

23  TMC for a while.  I actually ended up going over to

24  St. Joseph's Hospital, and I worked in the emergency room

25  there for the next about two and a half years.  And then

1   during that time I was hired by Tucson Fire so I left.  And

2   then after I completed my time in the academy and as a

3   firefighter, I came back to work and actually took a job at

4   UMC, now called Banner UMC, in their emergency room where I

5   worked in both the ER and the children's ER.  And I also spent

6   some time working at Tucson Heart Hospital when it was still

7   in business.

8   Q.   When were you hired by the City of Tucson?

9   A.   I was officially hired July 5th, 2007.

10  Q.   Once hired, what are you required to do to become a

11  firefighter?

12  A.   So we enter into a 22-week training academy.  It's a

13  Monday through Friday, 8 to 5 p.m. class.

14  Q.   If you would, tell us about the fire academy.

15  A.   Sure.  So it runs -- it's Monday through Friday, and

16  every day is a little bit different.  We take written

17  examinations on stuff that we're taught, and we have to pass

18  those with I believe it's an 80 percent success rate.  I think

19  you get a chance to retake it, but there are standards that

20  you pass the test or you can be fired from the academy.

21       We also had physical standards which were pretty grueling

22  at times.  We had certain practicals that we had to pass in

23  order to be signed off to graduate.  Some of those were -- we

24  have a -- like, it's called the advanced charge hose line.  So

25  it's an inch-and-three-quarter hose line, what we typically

1    use at house fires.  And they charge the hose line, and so the

2    force coming out of the hose, I can't exactly give you an

3    estimate of how strong it was, but it was strong enough to

4    kick back on you.  And you have to advance that hose

5    line through a tire keeping the hose line straight the whole

6    time.  There was also things like knot-tying that we had to

7    do.  Hose folds that we had to know.

8         There were days that we had -- we would extend a ladder

9    up onto, like, a second-story roof.  A 24-foot ladder.  We had

10   to enter full turnout gear and air packs, pick up a single

11   roof ladder, carry that up, attach it to the top, climb up it,

12   unattach it after you climb back down, carry it down with you,

13   put all the ladders back away.

14        So we had training captains that were out there that

15   watched us and graded us on each one of these things, and

16   there were quite a few.  It lasted over the 22 weeks.  We had

17   practical application of the drills, physical fitness every

18   single day.  It was tough.  It was really tough.

19   Q.   How many people started in your academy class?

20   A.   My academy started with 18 people.

21   Q.   And out of those people were women?

22   A.   Including myself, three; so me and two other women.

23   Q.   And for those of you -- for those of us who are not

24   familiar with, sort of, what firefighters do, can you describe

25   some of the common gear that's used by firefighters.  Not the

1  turnouts.  We'll talk about that in a second.

2  A.    So before responding to a typical medical call, most

3  likely we're dressed kind of like I am, but a lot of times we

4  wear T-shirts.  We have steel-toed boots.  We have our Nomex

5  pants which are fire resistant.  And a lot of times we're in

6  T-shirts.  That's for a typical 911-medical-type call.  If

7  there's anything else like a fire or any type of hazardous

8  atmosphere, then we're in our turnout gear.

9  Q.    So if you would, educate the jury on what turnout gear

10 is.

11 A.    Sure.  So turnout gear, if you ever watched like "Chicago

12 Fire" or any of those shows that portray, you know, fire

13 station life, it's either like the yellow or the black, the

14 big, bulky gear, and it's a multi-layer gear.  The outer layer

15 is designed to be fire resistant and the inner layer is

16 actually a moisture barrier designed to wick away moisture so

17 we don't get, like, steam burns or moisture burns.  They're

18 pretty heavy, pretty bulky themselves.

19     We also have our boots that we wear.  Rubber boots.

20     We have our helmets on.

21     And we have a mask that you wear that has to be completed

22 with a seal.  And if anyone has ever scuba dived, kind of like

23 your scuba tank, we have what we call the Scott air packs.  So

24 it's a backpack -- metal frame backpack, and it has an air

25 bottle on it.  And it has a regulator that comes up, and it

1   connects in our mask forming a complete seal so that we're

2   only breathing in the air in the tank if we're inside a house

3   fire.  And we want to make sure we have a good seal so we're

4   not getting any toxic atmosphere in our air stream.

5   Q.   Is there a term that's used in the fire service for when

6   you're only breathing oxygen from the Scott pack?

7   A.   Yeah, we call that going on air.

8   Q.   And how long can you be on air?

9   A.   So our bottles are designed to be 60-minute bottles, but

10  every person is going to vary in the type of work they're

11  doing.  If they're pulling hose, obviously you're going to be

12  breathing faster.  Some people just breathe faster in general.

13  So how quickly you go through that bottle is going to vary

14  from person to person.

15  Q.   And when you're in turnouts with your helmet and your

16  Scott pack and your breathing apparatus, how much does that

17  weigh approximately?

18  A.   Our air packs alone weigh about 35 pounds.  And I would

19  say turnouts are probably, depending on what you have in your

20  pocket, small tools, can probably be close to 30, 35 pounds.

21  So probably it would be fair to say about probably 70 pounds.

22  Q.   Does that include any tools you might carry?

23  A.   No.  That does not.

24  Q.   So tell us about some of the tools that firefighters use?

25  A.   So depending on the call we're dispatched to and

1   depending on the assignment we're given when we arrive on

2   scene, we can do anything from carrying chain saws, we can

3   carry in what we call the irons which is a combination of an

4   ax, like a flatheaded ax, and a Halligan tool.  Typically, we

5   use those for prying open doors locked doors to gain entry

6   into a house.  Depending if it's a second story or more, we

7   could be carrying up a folded hose over our shoulder.  So it

8   all depends on the assignment you're given and the type of

9   call you're responding to.

10  Q.   So is there one type of a hose in the fire department or

11  different kinds of hoses?

12  A.   We have multiple different kinds.

13  Q.   Would you describe the different types of hoses?

14  A.   Sure.  So in the back of the truck we have our biggest

15  one is a five-inch hose.  And it's the yellow rubber-looking

16  one.  And sometimes if you've ever seen a fire, you'll see it

17  stretched out across the road.  We connect that to a fire

18  hydrant, and then it connects to our truck, and then it's able

19  to give water to the different hose lines pulled off of that.

20      We also have two-and-a-half-inch hose in the back.  And

21  then we have our inch-and-three-quarter lines which typically

22  is what we use on house fires, bigger fires, stuff like that

23  for our quick attack because they're preconnected to the truck

24  so they flow water really easily.  We also have a wildland

25  hose which is just a small nylon-type hose.  And then we have

1  a red line which is -- would be fair to say like an oversized

2  garden hose.  It's a red rubber hose that has a high-pressure

3  stream, and typically we use that on brushfires or smaller

4  fires, something like that.

5  Q.   Fair to say the bigger the diameter the heavier the

6  hoses?

7  A.   Yes, that's correct.

8  Q.   Are there different -- transitioning back to the fire

9  academy for a second.

10      Are there different standards between men and women in

11  the fire academy?

12  A.   No, there's not.

13  Q.   So what do you mean by that?

14  A.   So we work out together, we do our drills together.  The

15  only ever segregation there is, is when we go to locker rooms

16  to change; otherwise, we do everything together.  A lot of

17  times I'm partnered up with my male coworker raising the

18  ladders.  Or we're both assigned a car fire drill or something

19  like that.  So we do absolutely everything together.

20  Q.   Was the fire academy hard?

21  A.   Personally, I believe it was extremely difficult.

22  Q.   But you stuck with it; right?

23  A.   I did.

24  Q.   Why?

25  A.   For whatever reason, I still don't know where it came

```
 1   from, this has been my childhood dream to be a firefighter.
 2   Ever since I was a little kid, it's what I wanted to do.  And
 3   I tested quite a few times before I was actually hired by
 4   Tucson Fire, and it was a dream come true for me to be hired
 5   here.
 6   Q.   And did you successfully graduate from the academy?
 7   A.   Yes, I did.
 8   Q.   When?
 9   A.   December -- sometime in December of 2007.
10   Q.   How many people graduated from the academy?
11   A.   From the eighteen that started we graduated ten.
12   Q.   And of the ten, how many -- of the ten that graduated,
13   how many were women?
14   A.   I was the only one.
15   Q.   So is my math right then, almost half of people you
16   started with didn't graduate the academy?
17   A.   That's correct.
18   Q.   How did you feel when you graduated the academy?
19   A.   It was probably one of the proudest days of my life --
20   prior to having my children.  But it was -- I mean, I just --
21   every picture I look at from my graduation day, I'm in tears
22   and my parents are in tears.  It was -- it was honestly the
23   biggest accomplishment to that day I had ever made my life,
24   and it was the most exciting day I had been waiting for, for
25   so long.
```

1    Q.   Anyone else in your family in the medical field?

2    A.   No.  My mom and stepdad do search and rescue, but it's a

3    volunteer thing.  So I'm the first in the fire service and the

4    medical field.

5    Q.   So when you graduate, what is that called?

6    A.   So once we graduate we're officially commissioned

7    personnel.  We're not civilian employees, we're commissioned.

8    Q.   Do you know how many commissioned employees were in the

9    fire service in Tucson Fire in approximately the 2013 or 2014

10   time frame?

11   A.   We've had somewhere between I would say six and seven

12   hundred.  I believe it fluctuates with retirements and

13   resignations, but somewhere between six and seven hundred.

14   Q.   And to your knowledge, how many of those were women?

15   A.   It would be fair to say I would say about five percent.

16   Like I said, give or take each year depending on if we hire

17   new women or ones retire or re-sign, but fair to say about

18   five percent.

19   Q.   And as of 2016, how many fire stations were there?

20   A.   In 2016 we had 22 fire stations.

21   Q.   After you graduated the academy, what happened next in

22   your career?

23   A.   So one of our last days in the academy you're assigned

24   your probationary station that you're going to complete your

25   probation time at and so I was assigned to Ladder 16.  And

1   about a week or so later, I started any assignment on

2   Ladder 16 on "C" Shift.  We were on different shifts.

3   Q.   Where is Ladder 16?

4   A.   Ladder 16 is near Speedway and Pantano.

5   Q.   And you've been with Tucson Fire now how many years?

6   A.   Coming up on 12 years.

7   Q.   To your knowledge, does Tucson Fire keep statistics on

8   the types of calls it handles?

9   A.   Yes, they do.

10   Q.   And what do you know about that?

11   A.   I know each year or sometime during the year they publish

12   out what our call volume is for each year, and each year

13   that's obviously been increasing.  I know we're over 80,000

14   calls that we respond to every year.  And then they break it

15   down between medical- and fire-related calls, and we have

16   routinely run about 80 percent -- maybe a little more than

17   80 percent medical calls as opposed to our fire responses.

18   Q.   Why does a person like you who is a registered nurse and

19   who had accomplished that at such a young age want to become a

20   firefighter?

21   A.   So going back it was -- like I said, I don't know why,

22   but it's always been my childhood dream.  And I am extremely

23   proud that I'm a nurse.  I love being a nurse.  But I also

24   love being a firefighter.  And one thing -- each career offers

25   me something different, but what I didn't get in the hospital

 1   that I do get out working in the field is being the first one

 2   on scene.  Being there when something actually happens.

 3   Having that critical thinking of my own that I'm able to do.

 4   I just -- I love the interaction that you get with the public.

 5   Kids look up to us.  There are so many things about it that I

 6   truly love, so I pursued it.  And to this day I love doing

 7   both.

 8   Q.   Is it different for you being an RN versus being a

 9   paramedic in the field?

10   A.   As far as my skill level, yes.  I can't be a nurse for

11   the fire department.  Thankfully, a lot of my paramedic skills

12   are interchangeable.  Not all of them obviously.  So when I'm

13   assigned, working a fire department shift I'm strictly working

14   as a paramedic.  And when I'm working in the hospital,

15   obviously I'm strictly working as a registered nurse.

16   Q.   And you completed -- did you complete your probationary

17   period and become a firefighter?

18   A.   Yes, I did.

19   Q.   You mentioned earlier that when you started you were on

20   "C" Shift; right?

21   A.   Correct.

22   Q.   Can you briefly explain the types of shifts that are in

23   the fire department?

24   A.   Sure.  So I know this one's kind of hard to follow, but

25   we have what we call a three-shift working platoon.  So we

1   have "A" Shift, "B" Shift, and "C" Shift, and you can be

2   assigned to any one of the three.  Our shifts rotate so we

3   work 10 total days a month, 24 hours at a time.  So when two

4   shifts are working opposite of each other, that third shift is

5   getting a few-day break.  And then it kind of rotates so it

6   can be -- like, I worked actually last night and today -- and

7   I'm on "B" Shift right now and today is "A" Shift.  And then

8   my shift is now going on our break, so "C" Shift will start

9   up.  And I can help to -- I can draw it down or show a

10  calendar if that would help.

11  Q.   Would it help to see or to use sort of a calendar, an

12  exhibit to educate the jury?

13  A.   I think it would probably help for you to see it.

14          MR. JACOBSON:  May I approach, your Honor?

15          THE COURT:  Yes.

16  BY MR. JACOBSON:

17  Q.   Does that work?  So I showed you a demonstrative exhibit.

18  Can you identify what that is for the jury?

19  A.   Sure.  So this is just a typical calendar of a month that

20  had already passed, so this is how our calendars are designed.

21  Blue indicates "B" Shift.  Green indicates "C" Shift.  And

22  then the red is "A" Shift.  So these shifts are 24 hours.  And

23  the reason they're kind of staggered like that is because the

24  shifts go from -- technically, 8 p.m. (sic) to 8 a.m.  So the

25  way it's coded, it kind of carries onto the next day.  So we

C. CLARK - DIRECT

1   show up the for work at 6:30.  Typically, you get relief at

2   the same time the next morning, and then you give your relief

3   to your oncoming crew, and then you're off for that 24 hours.

4   So a good example would be starting with the 7th right here --

5              THE COURT:  There might be a pointer there.

6              MR. JACOBSON:  Yeah, may I approach?

7              THE COURT:  Sure.  Has this been marked for

8   identification?

9              MR. JACOBSON:  No, it has not been marked for

10  identification.

11             THE COURT:  Do you want it to be marked?

12             MR. JACOBSON:  Yes, I will.

13             THE COURT:  So let's see --

14             MR. JACOBSON:  And I wanted to see if you had a

15  marker.

16             MS. WATERS:  Your Honor, while we're all moving

17  around, may I move so I can better see?

18             THE COURT:  Yes, you may move.  Anybody at defense

19  table can move over to see the exhibit.

20             So let's see, what number?  If we're going to mark

21  it, what number?

22             MR. JACOBSON:  What's next in line?

23             121.

24             THE COURT:  All right.  We'll have that marked as

25  121 for identification.

C. CLARK - DIRECT

1   BY MR. JACOBSON:

2   Q.   And I've handed you a pointer.

3   A.   Correct.

4   Q.   And I also handed you a blue marker.  So if you wouldn't

5   mind, just go ahead and write on there, you know, green

6   equals, blue equals, red equals.

7   A.   Okay.  So real quick, back to what I was saying, consider

8   this being yesterday, I'm on "B" Shift.  I worked last night.

9   I would get off this morning and be relieved by "A" Shift

10  which would be red.  And now I'm on my break so "C" Shift,

11  which is green, they're going to start working there every

12  other day.  And then my shift will start back six days later

13  on the 14th.

14          MR. JACOBSON:  And for the record, Ms. Clark is

15  writing on Exhibit 121.

16          THE COURT:  And Ms. Clark, if you could just put a

17  121 up in the corner somewhere so we can have that.

18          Thank you.

19          THE WITNESS:  So hopefully that explains it a little

20  bit better.  And these designations right here, the SW, that

21  means a swing shift which was what I was assigned to at that

22  time.

23  BY MR. JACOBSON:

24  Q.   So let me stop you if you don't mind.  Talk about what a

25  swing shift is.

1   A.   So once you complete probation, initially you're bumped

2   out of your assignment that you completed probation at and

3   you're placed on a swing shift.  There's other people that are

4   on a swing shift, and we can get to that later.  But basically

5   swing shift is a pool of people that don't have a designated

6   station.  And they're of each rank:  captains, engineers,

7   firefighters, and paramedics.  And if there's a vacancy

8   somewhere, someone takes a day off, they go to the pool of

9   swing personnel first to staff the openings.

10  Q.   And what is a tour?  I think you referenced it earlier,

11  but we're going to hear the term "tour" so if you wouldn't

12  educating the jury.

13  A.   Sure.  So what we consider a tour is our five shifts that

14  we work.  So for example, if I say I'm starting my tour, it's

15  going to be I'm working Sunday, Tuesday, Thursday, Saturday,

16  and Monday.  Those are my five shifts.  Five shifts count for

17  what we call a tour, and we do two of those a month.

18       And then, like I said, then you say your six-day break.

19  So on your last shift you start your one, two, three, four,

20  five, six, your six days off, and then you start your next

21  tour back.

22  Q.   This also might be a good time to explain to the jury

23  what the different assignments are in the fire department.

24  A.   Sure.  So starting with the bottom we have firefighters.

25       One of the other ranks, the next rank that you can

1  promote to basically from there is an engineer, and that's who

2  drives the trucks.

3       And also, you can also promote to a paramedic and either

4  be placed on an engine or paramedic truck.

5       And you can also, from there, be an inspector.  Those are

6  all, kind of, a lateral step-up.  And the inspectors are on a

7  Monday-through-Friday schedule, not in fire suppression, what

8  we call this, at all.

9       And then from that rank you can promote to captain.  And

10 there's a captain assigned to an engine or a ladder.  And then

11 we have some other trucks that have them by themselves, but

12 typically that's where they're assigned.

13      And then from the captain level you promote to battalion

14 chief or you can be assigned the deputy chief.  The difference

15 is one of them is on shift and one of them is on eight hours,

16 Monday through Friday.

17      And then from that rank you go to assistant chief.

18      And then we have the head chief.

19 Q.   So what kind of trucks are there.  You mentioned trucks.

20 What kind of trucks are there in fire stations or in fire

21 departments?

22 A.   So the most common that are responding to calls, you're

23 going to be engines, ladder trucks, paramedic trucks, and we

24 have rescue trucks.  And we also have a few other trucks, but

25 those are typically the ones we staff with the most personnel.

 1   Q.   So when you're assigned to a truck, what are you assigned

 2   to?

 3   A.   When you're assigned to a certain truck, you're also

 4   assigned to that station.  So you can be assigned to Medic 49

 5   and then you're assigned to Station 9.

 6   Q.   How is the fire department organized beyond the station

 7   level?

 8   A.   So we have, like I said, 22 stations throughout the city,

 9   and they're divided into four battalions.  So each battalion

10   has somewhere between I think five or six stations assigned in

11   each one.  And a battalion chief responsible for each of the

12   four battalions and they're divided up by the location in the

13   city.

14   Q.   And before I move off of Exhibit 121, how do you view

15   your daily calendar or monthly calendar?

16   A.   We've been provided with a Website called Telestaff.  So

17   when we open up Telestaff, that is what we see.  There's a

18   couple different kinds of pages that you can click on, but

19   this is how we view our calendar or assignments or see where

20   we've worked or to see if there's a vacation day available.

21             MR. JACOBSON:  I'll move for the admission of 121.

22             MS. WATERS:  No objection.

23             THE COURT:  121 is admitted.

24        (Exhibit 121 entered into evidence.)

25             MR. JACOBSON:  I'm going to move off of 121.  May I

1    just approach?

2              THE COURT:  Sure.

3    BY MR. JACOBSON:

4    Q.   After your probationary period ended, where did you go?

5    A.   I was assigned to swing shift as a "C" Shift swinger, the

6    shift I had just come off of.

7    Q.   So the term "swinger" is sort of a term of art in the

8    fire department?

9    A.   Yes.

10   Q.   What does it designate?

11   A.   I'm sorry?

12   Q.   What does that designate?

13   A.   That you're assigned in the swing pool.  That you're a

14   swing shift assignment.

15   Q.   And how long were you a "C" Shift swinger?

16   A.   I remained on swing for a little over a year after that.

17   Q.   And so what time period are we talking about?

18   A.   So I started -- officially I completed probation in

19   December of 2008, and I then I started swing shift either end

20   of December or January of 2009.  And I stayed on swing shift

21   for the entire year of 2009 and a little bit into 2010.

22   Q.   And then what happened to your career next after you --

23   you're done with "C" Shift swing?

24   A.   So I was -- while I was on swing, I applied to go into

25   the HazMat certification class.  And I was accepted into that,

1   so I came off shift to a Monday through Friday, and I attended

2   HazMat class for the next five weeks.

3   Q.   And what is HazMat?

4   A.   HazMat class, we have a station downtown designated --

5   our fire headquarters is designated our HazMat station.  We

6   have specialty equipment for different types of HazMat calls

7   we can go on.  And in order to work there or be assigned

8   there, you have to obtain your HazMat certification.  It was

9   of interest to me and so I attended the class to obtain the

10  certification.

11  Q.   And what happened next in your career?

12  A.   So after I completed HazMat class, I believe I went back

13  on swing for maybe a few weeks, and then I was accepted into

14  paramedic class.  So again, I came off shift and started

15  paramedic class I believe around March of 2010.

16  Q.   So you're already an EMT and RN.  Why did you need to go

17  to paramedic class?

18  A.   The funny thing is you can transition from paramedic to

19  RN, but you can't -- you can't transition backwards.  So like

20  everybody else, I attended the paramedic class and obtained

21  my certification and became a paramedic.

22  Q.   Does that require different skills between an RN and a

23  paramedic?

24  A.   There are some similar skills and there's also some

25  different skills.

1  Q.   Can you tell us what some of the different skills are?

2  A.   Sure.  So out in the field or acting as a paramedic,

3  we're working under the medical direction of a doctor who has

4  signed off on our standing orders.  So if we arrive on scene

5  and somebody is having a heart attack, we are authorized to

6  start treatment based on what we've been taught.  In the

7  hospital, in the emergency room, at least where I worked, when

8  somebody comes in we can do our own assessment, but then we're

9  waiting on the doctor's orders in order to start treating a

10 patient.  I know in the hospital, you know, we can give blood,

11 we can do different types of invasive procedures that I cannot

12 do as a paramedic.  There's also different medications that I

13 can give as a nurse that I can't give as a paramedic.  So

14 there's a little bit of differences, but overall it's the same

15 kind of concept.

16 Q.   Did you on obtain your paramedic certification?

17 A.   Yes, I did.

18 Q.   And at the same time, did you also earn another degree?

19 A.    I did.  So after I completed my paramedic course through

20 Pima College, with some extra classes I had taken I was able

21 to obtain a second associate degree from Pima College at the

22 time.

23 Q.   What was the next assignment after that?

24 A.   So after I completed paramedic class, I was returned to

25 swing shift.  And we have to go through a promotional process

1    prior to working as a paramedic, so I returned back to swing

2    shift as a firefighter.  But because I had a paramedic cert at

3    that time, they occasionally would use me as paramedic as

4    well.

5    Q.   And "cert" is shorthand for?

6    A.   Certification.  I'm sorry.

7    Q.   And did you take the promotional exam to become a

8    paramedic?

9    A.   Yes, I did.

10   Q.   And how did you do on the promotional exam?

11   A.   We take a promotional exam which consists of a written

12   test and an interview with the doctor that actually oversees

13   our medical administration and one of the chiefs and some

14   other people on the board.  And from there they rank you and

15   they place you on a list.  And on that particular list I

16   happened to place No. 1.

17   Q.   And what happened after you took and passed the

18   promotional exam?

19   A.   So as soon as an opening comes available for a promotion,

20   I think the City has to approve it, I was promoted sometime in

21   January of 2011 and I was assigned to Paramedic 4.

22   Q.   Was that also a probationary position?

23   A.   Yes, it was.

24   Q.   How long?

25   A.   It lasted for 12 months.

 1    Q.   And did you pass probation?

 2    A.   Yes, I did.

 3    Q.   And did you receive a performance evaluation while you

 4    are a probationary paramedic?

 5    A.   Yes, I did.

 6              MR. JACOBSON:  May I approach, your Honor?

 7              THE COURT:  Yes.

 8    BY MR. JACOBSON:

 9    Q.   I'm showing you what's been marked for identification as

10    Exhibit 1.  Do you recognize that document?

11    A.   Yes, I do.

12    Q.   And what is it?

13    A.   This is my six-month probationary evaluation as a

14    paramedic.

15    Q.   And it appears to be the same one that you received when

16    you completed your six-month probationary period?

17    A.   That's correct.

18              MR. JACOBSON:  Move for admission of Exhibit 1.

19              MS. WATERS:  No objection.

20              THE COURT:  Exhibit 1 is admitted.

21         (Exhibit 1 entered into evidence.)

22              MR. JACOBSON:  And ask to publish to the jury.

23              THE COURT:  Yes.  And how do you --

24              MR. JACOBSON:  It's electronic, Judge.

25              THE COURT:  Oh, it is.  Okay.  Great.

1          MR. JACOBSON:  Can everyone see it on their screens?

2          THE COURT:  Not yet.

3          MR. JACOBSON:  There we go.

4    BY MR. JACOBSON:

5    Q.   If you would, can you please turn to page 2 of that

6    exhibit.

7    A.   Yes.

8    Q.   And actually, go down a little further.  Let's go

9    to page 3 of that exhibit.  My apologies.

10         Who was your evaluator?

11   A.   My captain at the time was Dave Watson.

12   Q.   And you successfully completed probation?

13   A.   Yes, I did.

14   Q.   And when was that?

15   A.   Ultimately, the completion of my probation was

16   December of 2011.

17   Q.   And if you would, scroll up to page 2, please.  Right

18   there under Additional Comments.  Would you read that into the

19   record, please?

20   A.   The entire thing?

21   Q.   Yes.

22   A.   The first six months went by really fast.  We had a few

23   critical EMS calls and fires within that time frame.  I know

24   we spoke as a group after two or three calls, fire and EMS,

25   regarding the pros and cons of how the incidents were handled

1    and what we could do better next time.  I hope you continue

2    this pattern of looking back at certain calls and do a

3    self-evaluation, good or bad, of your performance.

4        Remember what we talked about when it comes to patient

5    evaluation and diagnosing.  Don't jump to conclusions.  Don't

6    jump to a final conclusion and then have blinders on as more

7    information is gathered.  Also, remember to realize the

8    reasons why you should take a patient to the hospital, not

9    look for possibilities not to.

10       You are comfortable with your medic skills and it shows.

11   Now you just need to work on taking the lead role of patient

12   care.  I'm sure that will come with time.  Stay current on TFD

13   policies and keep up the good work.  I do believe your past

14   medical foundation that you have is a huge asset to you and

15   the department.  I believe you are going to make a really good

16   and caring medic for the citizens of Tucson.

17       Don't forget to check your truck and equipment.  It

18   should be thorough and should become a routine.  Keep up on

19   the firefighter -- firefighter -- firefighter side of things

20   and do your best to make all station drills.  You do a good

21   job of not letting your outside life -- life outside of the

22   department affect your performance on the job.  I do realize

23   that sometimes it's easier said than done.  Just remember that

24   you can always bend my ear if you need to talk to someone.

25       Lastly, it has been a joy to have you around the station.

1    You show up early to work, you are courteous to others, and

2    you fit in well with the rest of the crew.  Don't change a

3    thing.

4    Q.   Was that, for you, good, constructive feedback?

5    A.   I believe it was.

6    Q.   And while you are at Medic 4, did anything important

7    happen in your life?

8    A.   So about three months after I was placed at Medic 4, I

9    got married to my husband in April.

10   Q.   So what was the date of your marriage and what's his

11   name?

12   A.   My husband again is Gordon Clark, and we got married on

13   April 9th, 2011.

14   Q.   And did you meet Gordon through the fire department?

15   A.   Not exactly.

16   Q.   What do you mean?

17   A.   Small world of Tucson.  I went to school with his younger

18   brother, and Gordon actually went to school with my older

19   brother, and ironically, Gordon's dad went to school with my

20   stepdad.  So I've known of Gordon for years and I knew his

21   brother.  And so when I was working at St. Joseph's in the

22   emergency room, Gordon was going through paramedic class.  And

23   he came in one day, and he was assigned -- I was assigned his

24   preceptor.  And we just kind of started reminiscing about our

25   junior high and brothers and everything and kind of

1    reestablished our friendship at that point.

2    Q.   And after you got married, did there come a time when you

3    decided to start a family?

4    A.   We did.  We had gotten married a little bit later in our

5    lives, more into our 30s, so we were excited to start a

6    family.  And ultimately I became pregnant with Austin, in

7    December, I believe, of 2011.

8    Q.   So that was my next question you anticipated.  Did you

9    plan to continue to work after you started a family?

10   A.   Yes, I did.

11   Q.   Why?

12   A.   I love working.  I've never -- you know, I respect

13   everyone's decision to stay home or not, but I actually -- I

14   really liked what I did, and I felt that it would be easy for

15   me to balance work life and a home life.

16   Q.   What was your next assignment after you completing your

17   paramedic probationary period?

18   A.   So early on in my pregnancy, I had a little bit of a

19   concern.  So my doctor said, you know, it would be best if I

20   went onto light duty, so I requested to go to light duty at

21   that time.  And at the end of December I started a light duty

22   assignment.

23   Q.   End of December what year?

24   A.   I'm sorry, 2011.

25            MR. JACOBSON:  May I approach, your Honor?

1              THE COURT:  Yes.

2   BY MR. JACOBSON:

3   Q.   Showing you what's been marked as Exhibit 2 for

4   identification.  Do you recognize that document?

5   A.   Yes, I do.

6   Q.   And what is it?

7   A.   This is the note I had obtained from my doctor requesting

8   I go on light duty.

9   Q.   And does it appear to be in the same condition it was

10  when you received it?

11  A.   I believe so, yes.

12             MR. JACOBSON:  Move for the admission of 2.

13             MS. WATERS:  No objection.

14             THE COURT:  2 is admitted.

15             MR. JACOBSON:  Ask to publish it to the jury?

16             THE COURT:  Yes.

17       (Exhibit 2 entered into evidence.)

18  BY MR. JACOBSON:

19  Q.   And so what is the date of this -- of this prescription,

20  essentially?

21  A.   This was December 19th of 2011.

22  Q.   And was that the document you then used to help justify

23  going on light duty?

24  A.   That's correct.

25             MR. JACOBSON:  May I approach, your Honor?

1              THE COURT:  Yes.

2    BY MR. JACOBSON:

3    Q.   Showing you what's been marked as Exhibit 3 for

4    identification.  Do you recognize this document?

5    A.   Yes, I do.

6    Q.   What is it?

7    A.   This is my request to Chief Critchley to ask or request

8    for light duty assignment.

9    Q.   What's the date of that?

10   A.   This is December 14th of 2011.

11             MR. JACOBSON:  Move for the admission of Exhibit 3.

12             MS. WATERS:  No objection.

13             THE COURT:  3 is admitted and may be published.

14             MR. JACOBSON:  Thank you.

15        (Exhibit 3 entered into evidence.)

16   BY MR. JACOBSON:

17   Q.   And everything in this memorandum regarding your request

18   for light duty true and correct?

19   A.   Yes, it is.

20   Q.   And was your request granted?

21   A.   Yes, it was.

22   Q.   When did you go on light duty?

23   A.   I would have to double-check, but I believe I started

24   around December 27th possibly.

25   Q.   Of what year?

1    A.    2011.

2    Q.    Are you familiar with the term Manual of Operations?

3    A.    Yes, I am.

4    Q.    And what is that?

5    A.    Our Manual of Operations is basically our policies that

6    have been put together so that if you have a question about

7    anything from appearance, light duty, stuff like that, you can

8    reference a policy, and we call that collectively our Manual

9    of Operations.

10   Q.    And are you required to be familiar with the Manual of

11   Operations?

12   A.    Yes, I am.

13   Q.    Is there another term that's used in the fire service for

14   the Manual of Operations?

15   A.    We call it like the Manual of Ops.

16   Q.    Or MOPs?

17   A.    MOPs, yeah.

18   Q.    Is there a policy in MOPs that you're familiar with

19   regarding light duty?

20   A.    Yes, there is.

21          MR. JACOBSON:  May I approach, your Honor?

22          THE COURT:  Yes.

23   BY MR. JACOBSON:

24   Q.    I'm showing you what's been marked or I have shown you

25   what's been marked as Exhibit 4 for identification.  Do you

1    recognize that document?

2    A.    Yes, I do.

3    Q.    And what is it?

4    A.    This is our Manual of Operations policy on light duty.

5              MR. JACOBSON:   Move the admission of 4.

6              MS. WATERS:   No objection.

7              THE COURT:   4 is admitted and may be published.

8         (Exhibit 4 entered into evidence.)

9    BY MR. JACOBSON:

10   Q.    So according to the policy, what is light duty?

11   A.    Light duty is temporary work that is physically or

12   mentally less demanding than normal job duties.

13   Q.    And where are you looking at?

14   A.    I'm sorry, I'm under 203.12, Section A.

15   Q.    Is that the section that I just crossed over?

16   A.    Yes.

17   Q.    I'm going to clear that.  You read under 203.12, light

18   duty Section A; right?

19   A.    That's correct.

20   Q.    And if you would take a look through all of the pages of

21   that light duty policy for a moment and then look up when

22   you've had a chance to review it.

23   A.    Okay.

24   Q.    Is pregnancy or the word "pregnancy" referred to anywhere

25   in this light duty policy?

 1   A.    No, it's not.

 2   Q.    And what was your light duty assignment starting at the

 3   end of December of 2011?

 4   A.    I was assigned to the medical administration division and

 5   I was given Captain Darin Wallentine as my supervisor.

 6   Q.    And what did you do in medical administration?

 7   A.    He gave me different projects to work on.  One of them

 8   was doing quality assurance on reports that we were writing

 9   out in the field.  I also spent some time out at the training

10   academy helping teach the EMT recertification class.  And I,

11   other than that, basically ran errands.  I was taking

12   certifications down to the Department of Health, basically

13   anything they asked of me at the time.

14   Q.    And did you stay into that -- in that assignment until

15   you gave birth?

16   A.    Yes, I did.

17   Q.    And what was your last day of work?

18   A.    July 16th of 2012.

19   Q.    And what was your due date?

20   A.    July 17th of 2012.

21   Q.    And when did you give birth?

22   A.    July 19th of 2012.

23   Q.    And what was your first son's name?

24   A.    Austin Michael.

25   Q.    So I'm putting up on the screen a time line of events

1   that was referred to in the opening statement.  And taking you

2   to your first entry, is that consistent with your recollection

3   that on July 19th, 2012, your son Austin was born?

4   A.   That's correct.

5              MR. JACOBSON:  Permission to publish, Judge?

6              THE COURT:  Yes.

7              THE CLERK:  It's published.

8              THE COURT:  You can look over your shoulder, and if

9   it's up there the jury is seeing it.

10             MR. JACOBSON:  Quick thinking.  Thank you, Judge.

11  BY MR. JACOBSON:

12  Q.   Did you know that you wanted to breastfeed Austin before

13  he was born?

14  A.   I did.

15  Q.   Why did you make that decision?

16  A.   You know, it had been something -- this being my first

17  baby, I didn't know much about it except for my time I spent

18  in labor and delivery during my nursing clinical.  Me and my

19  doctor discussed it at length.  I had some other friends who

20  talked to me about their experiences with it.  And

21  ultimately -- you know, I respect anyone's decisions not to,

22  but ultimately it was something that I wanted to do with my

23  son.

24  Q.   Based on your training as a nurse and a paramedic, can

25  you explain to the jury how breastfeeding works?  Milk

1  production works.

2  A.    Sure.  So basically when you're not with your child,

3  it's -- your body kind of works on a supply-and-demand system.

4  So when you have a newborn, they can nurse every hour.  They

5  can -- you know, every baby is obviously going to be a little

6  bit different, but your body makes milk to keep up with the

7  needs of your child.  So if your child is nursing often,

8  you're going to be making a lot more milk.

9       So when you're away from your child for extended periods

10  of time, you have to keep up with that same routine of the

11  frequency that your child would be eating so that your body

12  knows, it's signaled to continue that milk production.

13  Because if you start to taper off or extend the amount of time

14  that you're pumping in between what you normally would, it

15  signals your body that, oh, I guess we don't need as much and

16  your milk production will start to slow down.

17  Q.    So if your baby is not physically present, how do you

18  feed the baby?

19  A.    So you have to express your milk.  And you can either do

20  it via pump which is the most common way.  I think some people

21  are able to hand express.  I'm not.  So the most common way

22  would be via a pump.

23  Q.    How big was Austin when he was born?

24  A.    He was 9 pounds 11 ounces and just under 22 inches.  He

25  was a really big baby.

1  Q.   For those who may not know, how do you get a baby to

2  start breastfeeding?

3  A.   So Austin turned into an emergency C section which I

4  wasn't expecting, so almost immediately after he was delivered

5  and I was wheeled into recovery, they bring him over and you

6  do skin-to-skin contact.  And basically they -- the nurse

7  stands there and kind of helps, and they help the baby to

8  latch on, and then the baby knows exactly what to do.

9  Q.   And when you mean latch, what do you mean?

10 A.   I mean they form a seal, basically, you know, their mouth

11 to your breast, and they know immediately to start drinking.

12 Q.   And how did Austin do?

13 A.   He was a great -- he was great.  His latch was great.  He

14 had never had any issues with that.

15 Q.   And based on your training and your experience, do babies

16 maintain generally their weight within the first week of

17 birth?

18 A.   No, not typically.  So it's very common, especially -- so

19 when you have a breastfed baby, typically in the first week of

20 life they're going to drop anywhere between 7 to 10 percent of

21 the baby -- of the newborn weight.  They typically will gain

22 that back in a week or two.  Breastfed -- I'm sorry, formula

23 fed babies will typically drop about 5 percent.  But as far as

24 I was told, it was a very normal occurrence from what I've

25 been taught.

1    Q.   And what, if anything, happened with Austin in his first

2    week of birth afterward?

3    A.   Yeah, so we didn't -- our pediatrician that we had chosen

4    was not able to be at the hospital that day, so we saw the

5    attending physician on call that day.  And he came by to see

6    Austin at one point, and I believe Austin weighed -- this is a

7    couple of days later.  We were in the hospital for about a

8    week.  This was a couple of days later.

9         Austin's weight had gone and I can't quote exactly but to

10   nine-point-something pounds.  And the doctor at that time

11   thought that was a pretty significant drop in weight, and he

12   voiced he was concerned about it.

13   Q.   Did you follow-up with your pediatrician after leaving

14   the hospital?

15   A.   I did.

16             MR. JACOBSON:  May I approach?

17             THE COURT:  Yes.

18             MR. JACOBSON:  May I approach, Judge?

19             THE COURT:  Yes.

20   BY MR. JACOBSON:

21   Q.   Showing you what's been marked as Exhibit 5 for

22   identification.  Do you recognize that document?

23   A.   Yes, I do.

24   Q.   And what is it?

25   A.   This is appears to be the first visit we had with

1   Austin's pediatrician once we were both sent home from the

2   hospital.

3   Q.   And is that record consistent with your recollection of

4   your first visit?

5   A.   Yes, it is.

6            MR. JACOBSON:  Move for the admission of 5.

7            MS. WATERS:  No objection.

8            THE COURT:  5 is admitted and may be published.

9        (Exhibit 5 entered into evidence.)

10           MR. JACOBSON:  Just a moment, your Honor.

11           THE COURT:  Yes.

12           You can always put it up on your screen here.

13           MR. JACOBSON:  May I?

14           THE COURT:  Yes.

15           MR. JACOBSON:  Switch to the ELMO, Sandy.

16  BY MR. JACOBSON:

17  Q.   And again, is this consistent with your recollection of

18  his weight gain and loss and what was concerning?

19  A.   Yes, it is.

20  Q.   Do you remember -- what do you remember about this

21  pediatrician visit, if anything?

22  A.   The biggest thing I remember is our -- our new

23  pediatrician, the one that we're seeing here, had mentioned

24  that, you know, Austin was a very large baby.  And he wasn't

25  overly concerned about his weight loss, but he said that a lot

 1  of times with babies that are born that large, they worry

 2  about underlying conditions like diabetes that cause them to

 3  be so large.  Basically we kind of discussed what we were

 4  doing at that time and we were going to continue -- that I

 5  would be continuing to bring him for weight checks basically

 6  just to make sure everything was okay.

 7              MR. JACOBSON:  May I approach, Judge?

 8              THE COURT:  Yes.

 9              MR. JACOBSON:  Judge, may we have a moment at

10  sidebar?

11              THE COURT:  Yes.

12        (At sidebar.)

13              MR. JACOBSON:  Judge, my recollection, while we

14  excluded Dr. Radomski, we didn't exclude his records.  And we

15  wanted to talk about what was going on with Austin during this

16  time.  I'm confused as to what the --

17              THE COURT:  I think I was concerned that you were

18  going to attempt to make a link between the baby being --

19  having health issues and her --

20              MR. JACOBSON:  Not at this point.

21              THE COURT:  Okay.  At any point in the trial?

22              MS. WATERS:  If you're going to do it later, that's

23  probably --

24              THE COURT:  I didn't feel there was sufficient

25  evidence to show a link between the health of the baby and

1    breastfeeding, any breastfeeding issues.  So I'm not sure why

2    it would be relevant to go into the health of the child.

3    You've talked a little bit already about it.

4              MR. JACOBSON:  I was just laying the foundation for

5    what was going on with her at the time at Station 12 as to why

6    she wanted to stay on the east side which is an issue in the

7    case.

8              THE COURT:  If the health of the child impacted her

9    reasons for doing things --

10             MR. JACOBSON:  Right.

11             THE COURT:  -- some of her concerns --

12             MR. JACOBSON:  Right.

13             THE COURT:  I mean, certainly I think that would be

14   relevant for that purpose.  So are there health issues of the

15   child in his medical record?

16             MR. JACOBSON:  Just laying the foundation for the

17   weight issues, but I can -- I can move past that and just go

18   right to it when she gets there.

19             THE COURT:  I think it's okay if she had concerns

20   about her child's weight and therefore --

21             MR. JACOBSON:  Yeah.

22             THE COURT:  Whatever.  I mean, to show her -- why

23   she did the things she did as long as there's not -- you're

24   not intending to show there's a link between --

25             MS. SAAVEDRA:  Your Honor, if I may.

1        What I warned Mr. Jacobson about was that he's now

2    opened the door to some things he didn't want us to go into;

3    one of those -- several of those things being that there were

4    other health issues with the son.  He had GERD.  There were

5    other specialists he was seeing.  It wasn't just for --

6    there's no link to the lack of breast milk, so he's opened

7    that up.

8        There's also the fact that she's had breast

9    augmentation that could have affected her ability to produce

10   milk, so that's a possibility now of something we should be

11   able to go into.  And I believe, I want to go back and look at

12   the transcript from the hearing on this issue, but I believe

13   there were several other things that Mr. Jacobson did not want

14   us to be able to get into, and we agreed we would not get into

15   that as long as did he not go into the medical records.  So I

16   warned him that he's now opening the door, and the further he

17   goes into the medical records the wider the door becomes.  So

18   I don't know if we want to revisit the transcript before he

19   continues to go down this line.

20       THE COURT:  Even if nobody argues, there could be an

21   inference that the fire department is causing health issues

22   with the child.

23       MR. JACOBSON:  Certainly not at this point.

24       THE COURT:  Well --

25       MR. JACOBSON:  Without a doubt.  I mean, I'm not

1    inferring that at all.

2              THE COURT:  Okay.  Well, so --

3              MR. JACOBSON:  I'll move on, but I don't think she

4    would deny there were other health issues going on with

5    Austin.

6              MS. SAAVEDRA:  So you agree that's all fair game.

7              THE COURT:  Well, we can talk about that after you

8    finish your examination.

9              MS. WATERS:  We just wanted to be sure as we're

10   proceeding forward, we do feel it makes it appropriate for us

11   to discuss things we had not wanted to get into and he

12   indicated he would not be getting into.

13             MR. JACOBSON:  I'll tell you what, why don't I just

14   ask her straight out at this point, Does it have anything to

15   do with Tucson Fire?, and she'll say, No, and that will be the

16   end of it.

17             MS. WATERS:  I think that's fine generally.

18   Obviously, we have to see how this goes.  I think, again,

19   really more as a courtesy, kind of letting you know that there

20   was a potential issue here.

21             THE COURT:  All right.  So I won't issue any rulings

22   at this time.

23             MS. WATERS:  Thank you, your Honor.

24        (Open court.)

25             THE COURT:  All right.  Mr. Jacobson, you may

1    proceed.

2    BY MR. JACOBSON:

3    Q.   Generally speaking, during the first a couple of months

4    of Austin's life, was there an issue with his weight?

5    A.   Are you referring to prior to me returning to work?

6    Q.   Prior to work.

7    A.   Not after our first visit.

8    Q.   Okay.  And any information about that had nothing to do

9    with the fire department at this point; right?

10   A.   Correct.

11   Q.   Okay.  At this time were you having any issues expressing

12   your breast milk?

13   A.   No, I was not.

14   Q.   Were you out on family medical leave for the first a

15   couple of months of Austin's life?

16   A.   Yes, for the first 12 weeks.

17   Q.   And when did you decide to go back to work?

18   A.   I returned to work at the end of October which concluded

19   my 12-week family medical leave.

20   Q.   And why did you decide to go back to work?

21   A.   I was ready to go back to work.  I felt -- you know, I

22   had been at home for almost three months straight.  I remember

23   the first time I left the house to go get a cup of coffee, it

24   was like the most amazing feeling of freedom ever.  So I was

25   anxious to get back and do my job and have adult

 1   conversations.  And actually, I felt it was good for me and my

 2   son because he got time to spend with his grandma and/or my

 3   husband or me and I think it -- I was just -- I was ready.

 4   Q.   In anticipation of going back to work, did you do

 5   anything relative to your employment?

 6   A.   So knowing that I needed to pump when I was going to be

 7   at work and knowing that I was assigned to swing shift, I

 8   contacted my supervisor at the time who was Chief Paul

 9   McDonough and just kind of explained the situation, and I

10   wanted to see what was available.

11   Q.   And what was the purpose of reaching out to Battalion

12   Chief McDonough?

13   A.   He was my supervisor and he is also assigned to

14   Battalion 1 which is the fire headquarters where they do all

15   the staffing.  So reaching out to him was pretty much the only

16   option I had.

17   Q.   And what specifically, if you recall, did you indicate to

18   Battalion Chief McDonough?

19   A.   So we had just a conversation about what I was going to

20   be doing, needing to pump and that sort of thing.  And we

21   talked about if there was any openings at that time, and we

22   were trying to figure out somewhere possibly that he could

23   place me where I would have consistent access to a private

24   room to pump while I'm at work.

25   Q.   And you asked for a private space to pump why?

1   A.   I knew -- you know, living in a firehouse, working in a

2   firehouse, there's anywhere from four to seventeen people, you

3   know, living in a house.  I'm a pretty private person.  I

4   didn't really want anyone to know what I was doing.  I kind of

5   wanted to keep it private, and I knew if I had a private --

6   private dorm room that I would be able to do that.

7   Q.   Was there anything about the nature of fire stations as

8   well that concerned you?

9   A.   So knowing, you know, working at all of our stations, I

10  was aware that some of our stations don't offer private rooms.

11  Our dorm rooms are divided or closed with curtains.  And I

12  wanted just to make sure I had somewhere, being I would be

13  exposing myself multiple times a day, that I would have

14  somewhere where I would be entitled to a -- excuse me, a

15  private space.

16  Q.   Are fire stations city buildings?

17  A.   Yes, they are.

18  Q.   And is there anything about that that concerned you?

19  A.   So our stations are, like you said, City-owned buildings,

20  and we have City workers that come in and out throughout the

21  day.  There's also some of our stations, like our station out

22  in Rita Ranch, where the homeowner's associations -- at least

23  they used to, hold the meetings there in our living room.  So

24  they're not just confined to fire personal.  There could be

25  City workers in there at any time.

1    Q.    Was it important to you to be relaxed and comfortable?

2    A.    Yeah.  So one thing --

3    Q.    Why?

4    A.    Yeah, one thing with pumping that I learned from -- I was

5    attending breastfeeding support groups that were offered at

6    both St. Joe's and TMC, and one of the things they were kind

7    of teaching us about was the more stressed you get, the harder

8    your body is going to have what they call a letdown, when your

9    milk finally comes out.  So I knew, you know, that -- I was

10   trying not to put myself in any kind of stressful environment

11   so I would have the ability to pump as much breast milk as I

12   could at work.

13   Q.    Did you follow up before you came back to work with

14   Battalion Chief McDonough via e-mail?

15   A.    Yes, I did.

16            MR. JACOBSON:  May I approach?

17            THE COURT:  Yes.

18   BY MR. JACOBSON:

19   Q.    Showing you what's been marked as Exhibit 8 for

20   identification.  Do you recognize this document?

21   A.    Yes, I do.

22   Q.    And what is it?

23   A.    This is an e-mail that I had sent to Chief McDonough on

24   October 21st which is about a week before I came back to work.

25   Q.    Is this document consist with your recollection?

1   A.   Yes, it is.

2              MR. JACOBSON:  Move the admission 8.

3              MS. WATERS:  No objection.

4              THE COURT:  8 is admitted and may be published.

5        (Exhibit 8 entered into evidence.)

6   BY MR. JACOBSON:

7   Q.   I apologize for the technical difficulties.

8        And is this e-mail consistent with your recollection?

9   A.   Yes, it is.

10  Q.   And at the top, it says from Gordon Clark.  Do you see

11  that?

12  A.   Yes, I do.

13  Q.   And why does it say that?

14  A.   So back in 2012 when these initially started, City e-mail

15  accounts were only given to supervisors and a select other few

16  people.  So I didn't have a city e-mail account, so I sent it

17  from my husband's e-mail account.

18  Q.   So at the time Gordon had an e-mail account and you

19  didn't?

20  A.   Correct.

21  Q.   Turning your attention -- see if I can do this.  See the

22  fourth line from the bottom where I highlighted?  It says, I

23  appreciate.  Do you see that?

24  A.   Yes, I do.

25  Q.   If you would, please read that sentence for the jury.

1   A.   It says, I appreciate your willingness to help

2   accommodate me with the opportunity to be able to maintain my

3   need to routinely pump in order to continue my body's

4   production of milk for my son.

5   Q.   And go ahead and read the next line as well?

6   A.   Thank you for all the assistance and support you have

7   always given me and especially now.

8   Q.   So were those two sentences consistent with your

9   recollection with your discussions with Battalion Chief

10  McDonough?

11  A.   Yes, at the time.

12  Q.   And before you came back to work, did you receive

13  authorization from your physician to return to duty without

14  restriction?

15  A.   Yes, I did.

16           MR. JACOBSON:  May I approach?

17           THE COURT:  Yes.

18  BY MR. JACOBSON:

19  Q.   I'm showing you what's been marked as Exhibit 9 for

20  identification.  Do you recognize that document?

21  A.   Yes, I do.

22  Q.   And what is that document?

23  A.   This is a form that I had to have my personal physician

24  fill out in order for me to be clear to return to duty.

25  Q.   And does it appear to be in the same condition it was in

```
 1   when you received it?
 2   A.   Yes, it does.
 3            MR. JACOBSON:  Move for the admission of 9.
 4            MS. WATERS:  No objection.
 5            THE COURT:  9 is admitted and may be published.
 6        (Exhibit 9 entered into evidence.)
 7            MR. JACOBSON:  If you wouldn't mind, shrink that a
 8   little bit.
 9   BY MR. JACOBSON:
10   Q.   Did you, in fact, receive permission from your physician
11   to return to work without any restrictions?
12   A.   Yes, I did.
13   Q.   And when you say without any restrictions, what do you
14   mean?
15   A.   Meaning that what we would call I was fit for duty.
16   Q.   And did your physician find that you were capable of
17   performing all of the functions of a firefighter and paramedic
18   without restriction?
19   A.   Yes, she felt I was able to perform all those duties.
20   Q.   And when did you return back to work?
21   A.   My first shift back was October 27th, 2012.
22   Q.   And if you would, switch to the time line and to the
23   next -- the third slide down.
24        And so is that accurately reflected on the time line that
25   we have there?
```

1    A.    Yes, it is.

2    Q.    Okay.  Thank you.  Would you remove the time line?

3          And Sandy, if you would depublish, I guess.

4          You testified earlier about Telestaff; correct?

5    A.    Correct.

6              MR. JACOBSON:  May I approach?

7              THE COURT:  Yes.

8    BY MR. JACOBSON:

9    Q.    Showing you what's been marked as Exhibit 10.  Do you

10   recognize that document?

11   A.    Yes, I do.

12   Q.    What is that document?

13   A.    Besides the handwriting all around it, it is a detailed

14   account of the shifts that I worked.

15   Q.    From what date to what date if you can tell by the

16   document?

17   A.    It looks like it starts on October 21st of 2012 and it

18   goes through February 24th of 2013.

19             MR. JACOBSON:  Move for the admission of Exhibit 10.

20             MS. WATERS:  No objection.

21             THE COURT:  10 is admitted and may be published.

22        (Exhibit 10 entered into evidence.)

23   BY MR. JACOBSON:

24   Q.    Might you need to, from time to time, refer back to this

25   exhibit to discuss specific assignments you had on a specific

1   given date?

2   A.   Yes.  I would appreciate that.

3   Q.   When did you first become aware of the law requiring

4   employers to provide a place other than a bathroom, shielded

5   from view, and free from intrusion from coworkers and the

6   public?

7   A.   It was sometime before I came back to work.  I want to

8   say that me and my doctor had discussed it, and we also talked

9   about it at some of the lactation support groups that I had

10  gone to.

11  Q.   And what was your expectation based on that knowledge of

12  what would happen when you returned to work?

13  A.   I guess I was under the impression that I would be

14  provided a room free from intrusion and shielded from view of

15  any coworkers and the public.

16  Q.   What was your first shift assignment when you came back

17  to work?

18  A.   The first day I worked I worked on Paramedic 12.

19  Q.   And who was watching Austin the day that you returned

20  back to work?

21  A.   My mom was.

22  Q.   And do you recall how your first shift went?

23  A.   Yeah.  It was -- it was kind of a tough day.  I had spent

24  the night the night before at my mom's house with my son so I

25  could maximize the amount of time I got to spend with him.  I

1    left for work that morning.  I breastfed him.  I left my mom

2    some milk that I had.  I went to my shift about 6:30 in the

3    morning.  And I think I pumped once that morning, and then

4    early -- early afternoon or so my mom called me saying, hey,

5    I'm almost out of milk.  He woke up from a nap, he guzzled

6    down X amount of ounces, I'm getting short on milk.  And

7    actually at one point shortly after that she actually had to

8    come by the station to pick up milk from me to feed him his

9    next meal.  And that actually ended up happening a second time

10   that day as well.

11   Q.   Did Medic 12 have a space free from intrusion from

12   coworkers and the public to express your breast milk?

13   A.   No, it did not.

14   Q.   Where did you pump?

15   A.   I pumped in my dorm room, my private dorm room.

16   Q.   Did that have a lock or any other way to secure the room

17   to make it free from intrusion?

18   A.   No, it did not.

19   Q.   And how did that make you feel?

20   A.   I'm always worried that somebody could walk in for some

21   reason, but --

22   Q.   Did you, nevertheless, have some level of comfort at

23   Station 12?

24   A.   Yeah, I had -- we had six people assigned at Station 12,

25   and besides me there were two others that were women.  One of

1    them had been a friend for a long time, both mothers.  So when

2    I first got there we talked about my baby, and they were very

3    empathetic to me returning to work.  And I told the captain

4    who was a female that I would be pumping throughout the day.

5    And she said, you know, let me know if you need anything.  And

6    the other one was, like, I'll stand guard if you need

7    anything.  So ultimately, I felt like I had a lot of support

8    in what I was doing.

9    Q.   And how did Austin get fed on October 27th, 2012?

10   A.   So my mom essentially was picking up the milk every

11   couple of hours as I pumped it.  Basically, that was the next

12   meal.

13   Q.   At some point during that shift, did somebody else

14   approach you about your station assignment?

15   A.   Yes.  So that day I was assigned to Medic 12.  My partner

16   was a paramedic by the name of Jeff Todd who I had known for

17   quite a few years.  He asked me, obviously, about my family

18   and we talked about the kids -- or, my son at that time.  And

19   he noticed that my mom had actually come by twice that day as

20   well and kind of, I guess, understood kind of how stressed out

21   I was.

22        So he mentioned to me that he had been thinking about

23   going on swing because he had some personality conflicts at

24   that station and he wasn't sure that he wanted to stay there

25   anymore.  So he told me he was thinking about leaving

1  Station 12 and asked if maybe -- I think how it happened was,

2  you know, I've been thinking about leaving Station 12.  Maybe

3  they can let you stay here for a while.  Would that help you

4  out?  And I was, like, absolutely, but, you know, I don't know

5  that they'll let us do that.  And he was, like, well, why

6  don't we just ask.

7  Q.   And the next day, did you receive an e-mail from Jeff

8  Todd regarding his transfer request?

9  A.   I did.  We were carbon copied on the e-mail that he sent.

10          MR. JACOBSON:  May I approach, Judge?

11          THE COURT:  Yes.

12  BY MR. JACOBSON:

13  Q.   Showing you what's been marked as Exhibit 11 for

14  identification.  Do you recognize this document?

15  A.   Yes, I do.

16  Q.   Do you recall receiving this document?

17  A.   Yes, I do.

18  Q.   And how did you receive this document because is it sent

19  to you?

20  A.   No, it's not.  It was it was sent to my husband, Gordon

21  Clark's, e-mail account.

22  Q.   And it was printed and given to you?

23  A.   That's correct.

24          MR. JACOBSON:  Move for the admission of 11.

25          MS. WATERS:  No objection.

```
 1              THE COURT:  11 is admitted and may be published.

 2         (Exhibit 11 entered into evidence.)

 3              THE COURT:  And Mr. Jacobson, at some time we need

 4    to take a mid-morning break.  I don't know if this is a good

 5    time to break or if you have a few more questions before you

 6    want to break.

 7              MR. JACOBSON:  A couple more questions and I think

 8    we can take our break.

 9              THE COURT:  All right.  Great.

10    BY MR. JACOBSON:

11    Q.   Did Mr. Todd indicate to you that he was going to send

12    this e-mail?

13    A.   Not exactly, no.

14    Q.   Did you and Jeff Todd conspire to subvert the rules of

15    assignment?

16    A.   Absolutely not.

17    Q.   Did anybody ever from the fire department ever contact

18    you about this e-mail?

19    A.   No, they did not.

20              MR. JACOBSON:  I think that's a good place, Judge.

21              THE COURT:  All right.  Let's take a 15-minute

22    mid-morning break.  And members of the jury, you can leave the

23    things on your chairs if you like or take them back to the

24    jury room with you.  And we'll see you back in about

25    15 minutes.
```

```
 1              THE CLERK:  Please rise for the jury.

 2         (Jury panel excused at 10:36 a.m.)

 3              THE COURT:  All right.  So we'll stand at recess for

 4    15 minutes.

 5         (Recess from 10:36 to 10:57 a.m.)

 6              THE COURT:  Be seated, please.

 7              And Sandy, you can get the jury.

 8              MR. JACOBSON:  Do you want --

 9              THE COURT:  Yes.  Ms. Clark, you can come back up.

10         (Jury panel entered at 10:57 a.m.)

11              THE COURT:  All right.  Everyone may be seated.

12              And Mr. Jacobson, you may continue with your

13    examination.

14    BY MR. JACOBSON:

15    Q.   So we're going to re-orient you.  We're right around your

16    first shift back at work at Medic 12.

17    A.   Okay.

18    Q.   Had there been some discussions before that, before your

19    first assignment, about where you would be placed when you got

20    back in swing?

21    A.   Yes, there was.

22    Q.   And tell the jury about what the conversation was.

23    A.   Sure.  So one of the times I had talked with Chief Paul

24    McDonough, my supervisor, he had said that there was going to

25    be a temporary opening at Station 20 which would last he
```

```
 1  thought through the end of 2012, which would have been at that

 2  time six or seven weeks.

 3  Q.   And did you discuss going there at all?

 4  A.   Yes.  Prior to me returning to work I had agreed that I

 5  would be willing to fill that spot for that time.

 6  Q.   So after your first shift at Medic 12, what was your next

 7  shift if you recall?

 8  A.   The next day I was assigned to work on Engine 21 as a

 9  paramedic riding on the engine.

10  Q.   And where is Engine 21?

11  A.   Engine 21 is on the northeast side, like Tanque Verde and

12  Bear Canyon area.

13  Q.   So October 29th, 2012, you're at Engine 21.  Did that

14  have a private space that was free from intrusion from

15  coworkers and the public for you to express your breast milk?

16  A.   No, it did not.

17  Q.   Is there anything that stands out about that particular

18  shift in your mind?

19  A.   Yeah.  I do recall that day my husband was off watching

20  our son, and he was coming by to pick up milk.  And one of the

21  times he was coming by to get milk the baby was crying.  So

22  when he arrived at the station, we weren't on a call so I was

23  able -- I went into my dorm room and I actually nursed him

24  while my husband stood outside as opposed to pumping and

25  giving it to him since the baby was upset.
```

1    Q.   And was that the last shift of that tour?

2    A.   I believe it was, yes.

3    Q.   So was Jeff Todd's spot put out to bid?

4    A.   Yes.

5    Q.   So what does it mean; if you would, educate the jury

6    about putting something out to -- putting a shift or an

7    assignment out to bid?

8    A.   So administration determines when a spot is going to go

9    out to bid and they announce it via what we call a daily

10   bulletin.  And it's basically -- it's called daily bulletin

11   and it comes to the e-mail account at the end of the day.  And

12   it will be announcements, and one of the announcements

13   includes bid openings.  So it was announced via a bid opening

14   that Paramedic 12 was now out for bid.

15   Q.   And what is a bid?

16   A.   So a bid means that any paramedic within the department

17   can bid to win that spot so they would be permanently assigned

18   there.  And the bids are given based on seniority with the

19   exception of if they require a certification.

20   Q.   And how do you know that Jeff Todd's spot at Station 12

21   on "C" Shift was put out to bid?

22   A.   I saw the bid announcement via the daily bulletin.

23   Q.   And how long does an assignment go out to bid for?

24   A.   They go out to bid for 10 days.

25   Q.   Did you bid for that spot?

1    A.   I did.  I did.

2    Q.   And so what was your next day back at work after

3    October 29th, 2012?  And if you need to refer back to another

4    exhibit, you need to let us know.

5    A.   I'm going to refer to Exhibit No. 10 if that's okay.

6         My first shift back appears to be November 5th of 2012.

7    Q.   Did you work a full shift that day?

8    A.   No, I did not.

9    Q.   All right.  Did you leave for a doctor's appointment?

10   A.   So we have the option of a 24-hour shift of taking half

11   the shift off.  You can take the morning half, you can take

12   the evening half, or you can take the whole shift.  So on this

13   particular day I took the a.m. shift off, the 7 a.m. to 7 p.m.

14   shift.

15   Q.   Going back to Jeff Todd's spot at Station 12 and the bid,

16   did you discuss that assignment with Battalion Chief

17   McDonough?

18   A.   Yes.  So when the spot went out to bid, it was kind of a

19   surprise.  We were -- Chief McDonough had known we were --

20   that Jeff Todd had sent this e-mail also, so being that no one

21   had contacted me about it and the spot went out to bid, I was

22   a little bit surprised.  So I talked with Chief McDonough and

23   he mentioned to me at that time that he was actually surprised

24   that it had gone out to bid as well and was going to make some

25   phone calls.

1   Q.   As a result of that conversation with Chief McDonough,

2   did you prepare a memorandum?

3   A.   Yes, I did.

4   Q.   And did you send it via e-mail?

5   A.   Yes, I did.

6            MR. JACOBSON:  May I approach?

7            THE COURT:  Yes.

8   BY MR. JACOBSON:

9   Q.   Showing you what's been marked as Exhibit 13.  Do you

10  recognize those two pieces of paper?

11  A.   Yes, I do.

12  Q.   And are those the memorandum and the e-mail sending the

13  memorandum?

14  A.   That's correct.

15  Q.   And is this consistent with your recollection of what you

16  wrote and what you said?

17  A.   Yes, it is.

18            MR. JACOBSON:  Move for the admission of 13.

19            MS. WATERS:  No objection.

20            THE COURT:  13 is admitted and may be published.

21       (Exhibit 13 entered into evidence.)

22  BY MR. JACOBSON:

23  Q.   And if you would turn to the next page of that exhibit.

24  And if you would, starting with the word -- I'm going to

25  highlight it for you, starting with the word "additionally,"

1    right there, would you read that sentence, please?

2    A.    Additionally, as we discussed, pumping breast milk is

3    very personal and of a very private nature to me and I am not

4    always comfortable discussing it with other people.

5    Q.    Keep going.

6    A.    I have felt comfortable pumping while at work at

7    Station 12 because I have had the support of two other mothers

8    who work there as well.

9    Q.    Keep going.

10   A.    Coworkers can hear the pump even from behind closed doors

11   and are obviously aware of what it is I am doing.

12   Q.    Next sentence, please.

13   A.    I have already explained my situation and have gained

14   comfort and acceptance from the members of Station 12.

15   Q.    Next sentence.

16   A.    I do not want to have to do this again at a different

17   station every time I have to be moved.  Being a six-person

18   station with two of the other five members being mothers

19   themselves gives me more comfort than I feel any other station

20   would.  I have already been able to decon a temporary locker

21   and refrigerator storage space at Station 12 for my milk.

22   Q.    Go ahead and stop there.

23   A.    Okay.

24   Q.    What does "decon" mean?

25   A.    So basically what I'm referring to is everything in the

 1   fire station is shared.  We rotate with people every day

 2   coming in with new shifts.  They sleep in the same rooms as we

 3   do.  We eat at the same tables.  We use the same computers.

 4   It's -- it's well-known within the fire service that we have a

 5   lot of communicable diseases that are brought in and out of

 6   fire stations.  So when I would come into an area where I was

 7   bringing something as important as my breast milk for my son,

 8   including my dorm room, I would clean, Lysol, you know, decon

 9   an area that I was bringing equipment from my home so I could

10   set it up in my room and keep it in a clean space.

11   Q.   If you would, starting at the second paragraph of this

12   memorandum, please read the first few lines and I'll tell you

13   where to stop.

14   A.   Okay.  Initially, we discussed me going to Paramedic 20

15   upon my return.  My decision to go to Paramedic 20 was based

16   primarily on not displacing any other members and bringing as

17   little attention to this very private situation for me.  When

18   I worked with paramedic Jeff Todd, he told me he had been

19   considering leaving Paramedic 12 for some time.  He asked me

20   if he was able to switch with me and if I would -- if I want

21   to be at Station 12 rather than Station 20.  As you are aware,

22   I told him I would rather be at 12, and he sent a memo through

23   his chain of command stating such.

24        Of course I am aware that members do not have the power

25   to switch assignments and this would be a management decision,

1   but based on the fact that this was a temporary situation, I

2   didn't think it would be a problem.

3   Q.   That's good.  Is that consistent with your recollection

4   of what occurred?

5   A.   Yes, it is.

6   Q.   Did you also work on November 9th, 2012?

7   A.   Yes, I did.

8   Q.   And where was that?

9   A.   Paramedic 12.

10  Q.   If you would, fast forward a few days to November 13th,

11  2012, where were you working that day?

12  A.   I was also working on Paramedic 12.

13  Q.   Did anything happen that day that you recall?

14  A.   Yes.  I was contacted by Battalion Chief Paul McDonough,

15  and he told me he was going to be bringing me downtown to meet

16  two of the chiefs.

17  Q.   And did you, in fact, go down to fire headquarters?

18  A.   Yes, I did.

19       MR. JACOBSON:  Sandy, could you depublish?  Thank

20  you.

21  BY MR. JACOBSON:

22  Q.   When you got there, what happened?

23  A.   So we walked upstairs and we were led into Deputy Chief

24  Rob Rodriguez's office.  So when I sat down, chief Rodriguez

25  was in front of me, Deputy Chief Nied was sitting next to him,

 1   and my Battalion Chief, Paul McDonough, was seated next to me.

 2   Q.   So these people hold the positions of -- I'm sorry,

 3   deputy chief?

 4   A.   Deputy chief.

 5   Q.   And what is that in the hierarchy of the fire department?

 6   A.   It's a supervisor -- it's a supervisory level.  They are

 7   assigned to an eight-hour position, and those two deputy

 8   chiefs were assigned to operations, I believe, which meant

 9   they oversaw everything out in the field.  So they were kind

10   of -- kind of my supervisor's supervisor, but nonetheless a

11   supervisory position.

12   Q.   High level in the organization?

13   A.   Yes.

14   Q.   How high?

15   A.   So they're deputy chiefs.  The only one above them are

16   the assistant chief and the chief himself.

17   Q.   During the meeting did they ask you any questions?

18   A.   Yes, they did.

19   Q.   And as best as you can, tell us what questions.

20   A.   Don't quote me on who said what, I don't remember

21   exactly, but basically it kind of started out with, you know,

22   What's your problem?  Like, I don't understand what the

23   problem is.  And there were some follow-up questions as to,

24   Well, I never heard anyone else complain about this.  What's

25   your deal?  What's the issue going on with you that nobody

C. CLARK - DIRECT

1    else seemed to have?  Questions, kind of, to that extent.

2    Q.   How long did this meeting last?

3    A.   Probably close to 45 minutes.

4    Q.   Did you discuss at that meeting whether or not you felt

5    like you were being treated differently?

6    A.   I did.

7    Q.   So tell us about that.

8    A.   Okay.  We discussed the memo that was written.  They told

9    me on that date that apparently this was the first they had

10   heard there was an issue.  They knew nothing about this.  We

11   discussed Jeff Todd's position and the fact that he had left

12   Station 9.  There was a discussion about how he left

13   Station 9.

14       I also brought up reference to at that same time going on

15   that I'm -- that I'm trying to find a station placement there

16   was another captain on a different shift who was also on swing

17   shift who had received a DUI and had been given placement in

18   somebody else's position.  So I brought up that reference

19   saying, you know, if you can do this, you know, why can't you

20   do anything for me?  And basically, they just said, Well, it's

21   just different.  It's our choice.

22   Q.   Did you ask them about staying at Station 12 or your

23   assignment or anything like that?

24   A.   Yes.  So we discussed the dynamics of Station 12.  And

25   when I had -- when we talked about the memo that was sent by

 1    me, basically, you know, I said as of right now nobody is in

 2    that spot.  It's -- you know, the person who had won the bid

 3    had not taken his place yet.  He was still at his old station.

 4    And I said you know there's no one there.  It's a vacant spot

 5    that you're filling in every day with swing personnel or

 6    overtime.  And I asked if it would just be possible if they

 7    could delay placing the person who won the bid there for a

 8    period of time until I got through what I felt was a difficult

 9    time for me at that time.

10    Q.   And why did you ask -- strike that.

11         Are you familiar with what's called rules of assignment?

12    A.   Yes, I am.

13    Q.   And what is that?

14    A.   The rules of assignment, it's kind of one our policies

15    that sort of dictates how spots become open.  What they do is

16    open spots just, sort of, placing members into different

17    positions.

18    Q.   Is that the policy that controls the bidding process?

19    A.   Yes, it is.

20    Q.   So if there's a policy in place for controlling the

21    bidding process, why did you talk to the deputy chiefs about

22    delaying that placement?

23    A.   So throughout my time in the -- my career, I've seen

24    everything happen.  I've seen bids delayed.  I've seen bids

25    retracted.  I've seen swapping of people.  I've seen -- I've

1    seen things deviate from those rules of assignment.  So

2    basically, I was just questioning, you know, if they're able

3    to that, is there someway they can help me.

4    Q.   Is it your understanding that they have the authority to

5    override the rules of assignment?

6    A.   Absolutely.

7    Q.   And what is that authority based on to your knowledge?

8    A.   They have a clause called management rights which

9    reserves management the decision to pretty much override any

10   policy we have to basically make any decision that they think

11   fits the department at that time.

12   Q.   And is that an important right for management to have?

13   A.   I believe it is.

14   Q.   So what happened when you asked about delaying that bid?

15   A.   So toward the end of that conversation, basically they

16   said, you know, we'll talk about things for a little bit and

17   we'll give you a call back later.

18   Q.   What were, if anything, inappropriate about the questions

19   that were being asked of you?

20   A.   So obviously I'm in here, and I even wrote in my memo,

21   you know, this is a very private thing.  I'm not exactly

22   comfortable talking about it, let alone with three chief

23   officers, male officers present.  And it wasn't so much

24   questions like, What do you need?  It was like, What -- What's

25   wrong with you?  And, Can't you take more time off work?  And

1   why don't you just stay home longer?  And do you pump on

2   your days off?  I felt it was very inappropriate.

3   Q.   Intrusive?

4   A.   Yes.

5   Q.   And how did that meeting with these three chiefs down at

6   fire headquarters make you feel?

7   A.   Awful.  I mean, I left there in tears.  I walked out of

8   there in tears.  I was just so frustrated that this whole

9   situation, I feel like it never needed to be an issue.  And

10   now it's turned into an issue that everyone knew about, and I

11   fell like we still weren't getting anywhere.

12   Q.   Was it intimidating for you?

13   A.   Absolutely it was intimidating.  I never to that point

14   been in a chief's office before.

15   Q.   And what happens next?

16   A.   They call me back later that afternoon.

17   Q.   And what did they say, if anything, about your

18   assignment?

19   A.   They said that we're going to allow you to stay at

20   Station 12 for five more shifts, which is the tour, so five

21   more shifts, and then I would be essentially placed back on

22   swing.

23   Q.   And what was happening with your health or around that

24   time?

25   A.   So at this point it was becoming common every day that

1    the uncertainty of where I was going or what was happening

2    or -- it was pretty overwhelming to me at that point, and I

3    think the stress and everything that was under was affecting

4    my milk production and it was substantially slowing down.

5    Q.    And I want this to be clear.  There's no allegation that

6    your milk production volume had anything to do with Austin's

7    health; right?

8    A.    Not necessarily.

9    Q.    Okay.  Was it worrisome for you in terms of the volume of

10   production of your milk?

11   A.    It was for me.

12   Q.    Why?

13   A.    With our follow-up appointments and me, you know,

14   stressing about the weight checks, I felt that, you know,

15   he -- and I think my doctor did, too, he wasn't necessarily

16   gaining weight at the rate we would have hoped.  And to me, I

17   felt -- I felt like I was -- sorry, it's emotional.  I felt

18   like I was failing him as his mother.

19   Q.    What impact, if any, did the station assignment have on

20   you?

21   A.    It was an unneeded stress.  I felt like it was something

22   really easy, we could have rectified in the beginning.  And

23   now it turned into a daily -- a daily occurrence of stress:

24   me figuring out where I was going and who I was working with,

25   if I'd have time to pump, if my mom -- you know, it was

1   overwhelming.

2   Q.    And how about the way you were being treated?  What

3   affect did that have on you?

4   A.    It was extremely disheartening.  I felt that a lot more

5   consideration was given to my male counterparts for different

6   situations they were in, and that it seemed like my issue was

7   pushed on me like it was my personal problem, and it wasn't

8   something really they knew what to do with or wanted to deal

9   with.

10  Q.    We talked about MOPs earlier, remember that?  Was there a

11  nursing room policy in MOPs at this time?

12  A.    No, there was not.

13  Q.    And at the time of this occurring, was there any policy

14  in MOPs that addressed nursing mothers?

15  A.    No, there was not.

16  Q.    What were you doing, if anything, to increase your milk

17  supply?

18  A.    So I was doing just about everything.  I was still

19  attending the support groups that I was going to once a week

20  when I could.  Working -- I hired a lactation nurse to help

21  me.  I had gotten a hospital grade pump which I was told would

22  possibly help better than the one I had.  I had taken all the

23  different herbs and supplements.  I was eating the food they

24  said to eat to help milk supply.  I pretty much exhausted

25  every known remedy and suggestion that was given to me.

1   Q.   Did anything of those things help?

2   A.   Not really.

3   Q.   So why not just give him formula?

4   A.   So we tried that early on.  Were told -- I think -- I

5   think one of the nights we were in the hospital, when that

6   hospitalist had first come to us and expressed his concern

7   with his weight gain right away.  So when -- one of the

8   doctor's appointments that I had with my -- with Austin's

9   pediatrician, he had recommended some different things, trying

10  to figure out what it was that was going on.  And we weren't

11  sure if it was a calorie issue, we weren't sure if it was a

12  different issue going on, so his recommendation, we started to

13  supplement after feedings with a little bit of formula.

14  Q.   So before I go any further, if you would publish the time

15  line.  Is that November 2013 -- 2012 time line event

16  accurately represented on this time line?

17  A.   Yes, it is.

18  Q.   Thank you.  What was your next tour, if you recall, after

19  November 13th?  And again, if you have to refer back to

20  Exhibit 10, that's fine.

21  A.   So those were the five shifts that they allowed me to

22  remain at Station 12 on Paramedic 12, so for those next five

23  shifts I worked at Paramedic 12.

24  Q.   So what were those next shifts or what the dates of the

25  next shifts?

1  A.   So that would have been November 20th, 22nd, 24th, 26th,

2  and 28th.

3  Q.   And when you returned to work on November 20th, did you

4  send an e-mail to Battalion Chief McDonough?

5  A.   Yes, I did.

6          MR. JACOBSON:  May I approach?

7          THE COURT:  Yes.

8  BY MR. JACOBSON:

9  Q.   Showing you Exhibit 14 for identification.  Do you

10  recognize that document?

11  A.   Yes, I do.

12  Q.   And what is that document?

13  A.   This is an e-mail that I sent to my chief, Paul

14  McDonough, on November 20th.

15  Q.   And do you recognize that as the e-mail you sent and his

16  reply?

17  A.   Yes, I do.

18          MR. JACOBSON:  Move for the admission of 14.

19          MS. WATERS:  No objection.

20          THE COURT:  14 is admitted and may be published.

21      (Exhibit 14 entered into evidence.)

22  BY MR. JACOBSON:

23  Q.   So if you would read the e-mail you sent to Battalion

24  Chief McDonough on November 20th, 2012 into the record.

25  A.   It says, Any update on whether I will be able to swing

 1   into 12 on December 5th and 7th and then the last tour of

 2   December?

 3   Q.   That's fine.  We'll leave it with that.  And why did you

 4   send that particular e-mail?

 5   A.   So when we left the meeting with those chiefs downtown,

 6   basically at that point they said, well, you know, 20, 20 is

 7   open for the next -- I think at this point it was only about

 8   five weeks.  And I told Chief McDonough, I said, well, you

 9   know, 12 also had some openings that some of the people had

10   told me at that station they were going to be off including

11   that what I referenced here, the last tour of December.  The

12   partner I had been working with said, Hey, I'm going to be off

13   the last half of December.  Why don't you just see if they'll

14   let you stay here?  So when given the options of where I would

15   be able to fill in, I looked at the calendar, and that's why I

16   sent him that e-mail.

17   Q.   And did Chief McDonough -- Battalion Chief McDonough

18   respond at 10:36 at night?

19   A.   Yes, he did.

20   Q.   And he said, indicated -- he would look into it; right?

21   A.   Yes, he did.

22           MR. JACOBSON:  May I approach?

23           THE COURT:  Yes.

24   BY MR. JACOBSON:

25   Q.   Showing you what's been marked as Exhibit 15.  Do you

1    recognize that document?

2    A.   Yes, I do.

3    Q.   And is that a follow-up e-mail that Battalion Chief

4    McDonough sent you after the last e-mail?

5    A.   That's correct.

6              MR. JACOBSON:  Move for the admission of 15.

7              MS. WATERS:  No objection.

8              THE COURT:  15 is admitted and may be published.

9         (Exhibit 15 entered into evidence.)

10   BY MR. JACOBSON:

11   Q.   And what does Chief McDonough respond to you?

12   A.   It says, Carrie, please go there December 5th.  No

13   opening on December 7th and you're showing off on a vac.

14   Paul.

15   Q.   What does that mean?  If you could unpack that and

16   explain what that means?

17   A.   Basically, he said that he preassigned me to that opening

18   on Medic 12 so that on December 5th I was going to be assigned

19   to Medic 12 ahead of time, so I wouldn't have to wait till

20   that day.

21   Q.   How about the next line?

22   A.   The no opening of December 7th?  So at that time nobody

23   at that -- Station 12 was off that day, so he's referencing

24   there's no opening at that station.  Everyone who works there

25   is showing that they're going to show up that day.

1   Q.   And showing -- you're showing off on vac.  What is that?

2   A.   So on that day in particular, I believe I had either

3   the a.m. portion or the p.m. portion, I was off for part of

4   that shift.

5   Q.   So you took vacation?

6   A.   That's correct.

7   Q.   And that's what "vac" means?

8   A.   I'm sorry.  That's correct.

9   Q.   Did Chief McDonough send another response even later than

10  that?

11  A.   Yes, I believe he did.

12          MR. JACOBSON:  May I approach?

13          THE COURT:  Yes.

14  BY MR. JACOBSON:

15  Q.   Showing you what's been marked as Exhibit 16 for

16  identification.  Do you recognize that document?

17  A.   Yes, I do.

18  Q.   And is that the second follow-up e-mail from Chief

19  McDonough?

20  A.   Yes, it is.

21  Q.   And does that refresh your recollection about what he

22  said to you in an e-mail at about 11:41 p.m. on November 20th,

23  2012?

24  A.   Yes, it does.

25          MR. JACOBSON:  Move for the admission of Exhibit 16.

C. CLARK - DIRECT

```
 1              MS. WATERS:  No objection.
 2              THE COURT:  16 is admitted and may be published.
 3          (Exhibit 16 entered into evidence.)
 4    BY MR. JACOBSON:
 5    Q.   And what did Battalion Chief McDonough tell you on
 6    November 12th, 2012, at 11:41 p.m.?
 7    A.   It says that, You are at 12 for the 5th and 9th and you
 8    are off on a vac the 7th.
 9    Q.   And unpack that.  What does that mean?
10    A.   Basically, that means, once again, that he went in and
11    preassigned me to that opening on December -- on December 5th
12    and December 9th.  So he has already placed my name from the
13    swing pool onto Medic 12.
14    Q.   After November 28th, 2012, which was the end of your
15    tour, when did your next tour start?
16    A.   So going back to Exhibit 10.  I believe my first shift
17    back was December 5th.
18    Q.   And where did you work?
19    A.   I worked that day on Engine 12.
20    Q.   And did you, in fact, take a vacation day on
21    December 7th?
22    A.   I had a half of a vacation, yes.
23    Q.   And how about December 9th?
24    A.   I worked on Medic 12.
25    Q.   And did you work on December 13th?
```

1   A.    Yes, I did.

2   Q.    Where did you work on December 13th, 2012?

3   A.    I worked on Paramedic 7.

4   Q.    And where is that?

5   A.    Station 7 is Pima and Swan.

6   Q.    Did that assignment have a room that was private, where

7   you could express your breast milk and be free from intrusion

8   from coworkers and the public?

9   A.    Paramedic 7 did, yes.

10  Q.    And you made a distinction there when you said

11  Paramedic 7.  What do you mean?

12  A.    So at some of the stations, and 7 is one in particular,

13  they added a medic truck later on which is called

14  Paramedic 47.  And there were no dorm rooms to support that

15  additional two members, so they converted what was the weight

16  room into a makeshift dorm room that housed two people, and

17  the beds were just separated by a partition.  So there was

18  no -- I don't believe it had a lock, I don't believe there was

19  even a wall between -- I can't recollect what it looked like,

20  but it was very -- it was like sharing a room with somebody

21  else.

22  Q.    Where did you work for the rest of 2012 after your shift

23  at Medic 7?

24  A.    So for those next five shifts which would have been

25  December 20th, 22nd, 24th, and 26th, I was working on

1    Medic 12.

2    Q.    And what happened starting on your first shift of

3    January 2013?  What was going on?

4    A.    So basically, when I started that next tour, we call it,

5    I was officially -- I had been on swing already, but prior to

6    that I had been filling that vacancy at 12 for the person that

7    was off for five shifts.  So now starting back in January, I

8    went back to being assigned anywhere.

9    Q.    Now, you testified that Station 12 did not have a private

10   space to lactate, to express your breast milk that was free

11   intrusion from coworkers and the public; right?

12   A.    Yes.

13   Q.    So why did you ask to stay at Station 12 even knowing it

14   didn't comply?

15   A.    So at this point the stations besides the ones I knew for

16   sure, like Station 9, Station 8 where we had curtained-type

17   dorm rooms, stations were basically kind of equal to me.  Like

18   Medic 20, Medic 12, you've got the same private dorm room.

19   They don't lock.  They don't secure.  So the majority of the

20   stations I knew had private dorm rooms as opposed to curtains

21   or shared general areas.  And basically, Station 12 was the

22   lesser of the evil to me.  I knew that I had a support system

23   there and, you know, there were a few other things that just

24   made it the best of the worst situation.

25   Q.    What was your first shift back in 2013?

```
 1  A.   That was January 4th.

 2  Q.   And where did you work?

 3  A.   I worked that day on Engine 12.

 4  Q.   And how did you get to work that day?  I mean, how did

 5  you get to be assigned?

 6  A.   Sorry.

 7  Q.   It was a bad question.

 8  A.   Somebody was off.  I can't remember if someone called in

 9  sick or took a vacation day so there was an opening, so I was

10  plugged into the spot for the day.

11  Q.   Did you also receive that day your annual performance

12  evaluation?

13  A.   Yes, I did.

14           MR. JACOBSON:  May I approach?

15           THE COURT:  Yes.

16  BY MR. JACOBSON:

17  Q.   Showing you what's been marked as Exhibit 20.  Do you

18  recognize that document?

19  A.   Yes, I do.

20  Q.   And what is it?

21  A.   This is my annual evaluation that you're given once a

22  year.

23  Q.   And when did you receive that?

24  A.   January 4th, 2013.

25           MR. JACOBSON:  Move for the admission of 20.
```

```
 1              MS. WATERS:  No objection.
 2              THE COURT:  20 is admitted and may be published.
 3         (Exhibit 20 entered into evidence.)
 4  BY MR. JACOBSON:
 5  Q.    And who evaluated you?
 6  A.    This was the Captain at Station 12, Trish Tracy.
 7  Q.    And on the first page on the categories, how did you do?
 8  A.    I either met or exceeded standard.
 9  Q.    Turn to page 2, please.  And how about the categories
10  on page 2, 6 through 9?
11  A.    6 through 8 I met standards and 9 I exceeded standards.
12  Q.    If you would, toward the bottom where it says Additional
13  Comments, would you read those general work habits into the
14  record?
15  A.    Yes.  General work habits.  Carrie, you have been
16  assigned to Station 12 on both the engine and the medic truck
17  over the past several tours, November and December.  During
18  that time you have demonstrated the ability to work well with
19  others and to complete tasks promptly with a minimum of
20  supervision necessary.  We recently performed fire fighting
21  and on-air drills, annual proficiency, hose testing, and many
22  other scheduled station duties, and your commitment to being
23  part of our team does not go unnoticed.
24         When dealing with the public, you understand the
25  importance of providing good customer service and ensuring all
```

1   of the customer's needs are taken care of in a compassionate

2   manner.  One example of this is on Sunday, December 9th, 2012,

3   when we responded to a medical call for a two-week old baby

4   who had choked on some milk.  The baby was no longer choking

5   when we arrived on scene, but you took the time to comfort the

6   mother and provide some suggestions prior to clearing the

7   scene.

8       Physical fitness --

9   Q.   That's okay.  We can stop there.

10      Were you particularly proud of this evaluation?

11  A.   You know, I really -- I really was.

12  Q.   Why?

13  A.   So this was the first evaluation I had received in a

14  while, and it was the first one I received after coming back

15  to work, and for me particularly I felt proud that I was back

16  at work and I felt -- I was maintaining my work and home life

17  as a mom.  And I felt like, you know, despite everything I was

18  going through and the stress I was under, that somebody still

19  noticed that I was doing a good job and I was still trying my

20  best.

21  Q.   And what happened next after you received this

22  evaluation.  You were still in the swing pool; right?

23  A.   That's correct.

24  Q.   And did you know from shift to shift where you were going

25  to be?

C. CLARK - DIRECT

1    A.    No, I did not.

2    Q.    So what did you do, if anything?

3    A.    So I'm trying to recollect my memory.  I'm drawing a

4    blank.

5    Q.    What is the Office of Equal Opportunity Programs?

6    A.    The Office of Equal Opportunity Programs was an outside

7    agency that employees could go to, to discuss rights and stuff

8    that I think the City everyone had to abide by.

9    Q.    Are you a lawyer?

10   A.    No.

11   Q.    And you said that's an outside agency.  Was it still part

12   of the City of Tucson?

13   A.    Yes, it was.

14   Q.    But separate from the fire department?

15   A.    Yes, separate from Tucson Fire.

16   Q.    And is the Office of Equal Opportunity Program also known

17   as OEOP?

18   A.    Yes, it is.

19   Q.    And when did you go there, if at all?

20   A.    So I went there in early January.  I made a phone call

21   there at the recommendation of another captain who had said,

22   you know, you should -- you should really go talk to OEOP and

23   see what your rights are regarding this issue.  So I looked

24   into it.

25   Q.    Go ahead.

1          MR. JACOBSON:  May I approach?

2          THE COURT:  Yes.

3       (Pause.)

4          MR. JACOBSON:  May I approach?

5          THE COURT:  Yes.

6    BY MR. JACOBSON:

7    Q.   I'm showing you what's been marked as Exhibit 22 for

8    identification.  Do you recognize that document?

9    A.   Yes, I do.

10   Q.   And what does it appear to be?

11   A.   This is a telephone transcript of the first phone call

12   that I made to OEOP.

13   Q.   And who did you talk with?

14   A.   Her name was Marty Macias.

15   Q.   And did you meet -- I'm sorry, did you meet that day with

16   OEOP on January 7th of 2013?

17   A.   I'm not sure which day we met.  I believe the first one

18   was a phone call.  Or actually -- I can't remember if it was

19   in person or over the phone.

20   Q.   Your first contact with OEOP, what was the date of that?

21   A.   January 7th, I believe.

22   Q.   You believe January 7th, 2013?

23   A.   Sometime around there, yes.

24   Q.   Okay.  And do you remember what happened at that meeting?

25   A.   So the first meeting we had, basically I came in and she

1    was doing kind of a general intake and asked, you know, the

2    situation.  And I was trying to explain how the fire

3    department works, how our shifts work, how the stations are,

4    and that I was pumping at work.  And I kind of wanted to know

5    what my rights and stuff were.

6    Q.   And did you raise the issue of assignments and management

7    rights with her?

8    A.   I did.  I gave her some different examples of stuff that

9    I had known that was done in the past.

10   Q.   Did it appear to you based on your conversation that

11   Ms. Macias understood how TFD staffed its employees?

12   A.   No, absolutely not.

13   Q.   Was Ms. -- did you raise your breastfeeding issues with

14   Ms. Macias?

15   A.   Yes, I did.

16   Q.   And what, if anything, happened when you did that?

17   A.   I recall her saying something about, I don't want to hear

18   about your personal issues.

19   Q.   And during your meeting, did you tell her about specific

20   male employees who had their personal situations accommodated

21   by management?

22   A.   Yes, I did.

23   Q.   Did the issue of convenience come up?

24   A.   She mentioned it to me a few times.

25   Q.   So tell us about that.

1    A.   I don't remember exactly the wording, but she had asked

2    me a few times, Well, is this just a matter of convenience for

3    your mom?  And every time I said, No, absolutely that's not

4    why this -- you know, I'm raising this issue.

5    Q.   And what was that situation with conveniencing your mom

6    that she raised?

7    A.   I'm sorry, you mean like why did she ask that?

8    Q.   Yes.

9    A.   I had let her know that, you know, there was an issue

10   with me getting enough milk and my mom having to come to the

11   station to pick it up.

12   Q.   And what happened at the end of the meeting with OEOP?

13   A.   So after this first meeting she said she wanted me to

14   come back and bring her documentation that referenced all the

15   different examples I gave her.  And that she was going to talk

16   to her supervisor about it at that time and see if I had a

17   basis for a claim.

18   Q.   And if you would go to the time line, please.  Check on

19   the time line to make sure that we're in the right place.  In

20   January 2013 were you assigned to stations that did not comply

21   with federal law?

22   A.   Yes, I was.

23   Q.   And the next date, was that January 7th, 2013, that you

24   contacted OEOP?

25   A.   Yes, it was.

1    Q.    And OEOP, your understanding was that essentially to

2    discuss equal employment opportunity issues?

3    A.    Yes, it was.

4    Q.    Thank you.  You can depublish.

5          Where did you work, if at all, on January 12th, 2013?

6    A.    That day I was assigned to Paramedic 20.

7    Q.    And did Paramedic 20 have a room where you could

8    privately express your breast milk free from intrusion?

9    A.    No, it did not.

10   Q.    What was the difference between Medic 20 and Medic 12?

11   A.    As far as the stations and the dorms, nothing.  The only

12   difference was I didn't really know the crew at 20, and

13   Station 12 I had the support of the female staff or the female

14   firefighters that were assigned there.

15   Q.    Why was that important to you?

16   A.    That was a big deal for me, actually.  So each day kind

17   of how it works, you know, within the department, we sometimes

18   go out to lunch.  We go to do drills.  We do different stuff

19   and we're all committed if we go somewhere because we all have

20   to be on the truck.  And there were a bunch of different

21   occasions where it would get to be two, three hours, and I

22   needed to go back to the station to pump.  My partner at the

23   time on Medic 12 that I had worked with knew this and was

24   very, you know, respectful of it and we would go back to the

25   station.  Other times I would work other places, this was

1   something I had to basically go over with the crew each time I

2   was assigned somewhere new.  And it just actually became

3   uncomfortable talking about my pumping needs with my different

4   male coworkers each day.

5   Q.   Did you have a second meeting with OEOP on January 16th,

6   2013?

7   A.   Yes, I did.

8   Q.   And what was that for or about?

9   A.   So that was when I brought her all the follow-up material

10  that she had requested citing the difference instances I had

11  mentioned before.  So I brought her in documentation about all

12  that stuff.

13  Q.   And at the end of the meeting, did anything happen?

14  A.   Yeah, so at the end of meeting --

15  Q.   What happened?

16  A.   -- she had told me -- she gave me the complaint form and

17  she told me that she felt that I -- you know, based on what

18  I've given her I had a basis for a complaint and handed me a

19  complaint form.

20  Q.   And did you fill out the form right then and there?

21  A.   No, I did not.

22  Q.   Did you eventually fill it out?

23  A.   I did eventually fill it out.

24  Q.   Turning your attention back to Exhibit 10.  Where did you

25  work on January 23rd, 2013?

C. CLARK - DIRECT

1    A.    That day I worked on Engine 3 as a firefighter.

2    Q.    And what happened that morning, if any?

3    A.    So at one point during the morning shift I was pumping in

4    my room, and as I came out into the day room, the

5    living-room-type area, common area, the engineer was sitting

6    at the table, and I don't know him very well, and another male

7    firefighter.  I was trying to put the milk into my lunch bag

8    indiscreetly, and the firefighter noticed what I was doing and

9    asked me about it.  And said, Yeah, I'm pumping while I'm at

10   work.  And the engineer that was sitting at the table

11   overheard us and was, like, Ewh, that's disgusting.  Ewh,

12   don't talk about that crap here.  Ewh, are you're putting that

13   in our fridge?  Ewh, that's disgusting.

14   Q.    How did that make you feel?

15         And by the way, that was a female coworker?

16   A.    It was a male coworker.

17   Q.    How did that make you feel?

18   A.    It was the awful.  This is exactly the situation I had

19   actually hoped to avoid.  It embarrassed me.  I thought I was

20   doing a pretty good job of trying to keep things private, but

21   I wasn't and it was really embarrassing.

22   Q.    Did you work a full shift that day?

23   A.    No, I ended up going home that night.

24   Q.    Why?

25   A.    You know, there was a vacation open, there was a spot

1   open, and honestly, for me, it -- it was just mentally easier

2   for me.

3   Q.   Going back to Exhibit 10, can you tell the jury where you

4   worked starting for the rest of that tour on January 25th?

5   A.   On January 25th, I'm not showing on here.  I'm not sure

6   why.  So I work -- I work -- I'm not sure where I was on the

7   25th because I don't see it on here, but on the 27th I worked

8   on Engine 12, and I believe that might have been the end of

9   our tour.

10  Q.   And how about turning your attention to February 5th?

11  A.   Okay.

12  Q.   What do you recall about February 5th, if anything?

13  A.   So that was a day that my assignment was split.  That

14  morning I worked on Engine 12, and then part way through that

15  day they assigned me at some point to go to Station 5.  And I

16  worked on Engine 5 as a firefighter that night.

17  Q.   How about February 7th?  Tell us about that.

18  A.   Again, I was assigned to Engine 5, and I had a vacation

19  for part of that day.

20  Q.   And what about February 9th?  Does that day stick out to

21  you?

22  A.   It does.

23  Q.   Where were you -- where were you assigned to be

24  February 9th?

25  A.   February 9th I was assigned to Engine 12.

1    Q.   And did you notice on February 9th that you were assigned

2    to Station 12?

3    A.   No.  So basically the shift before, you start looking at

4    the openings -- or, at least I did, you would start looking at

5    the openings for the next shift, and I'd start trying to

6    figure out where I was going to be assigned, trying to figure

7    out who was off, who would go where.  It was a little

8    overwhelming but I did this everyday.  And at some point, I

9    believe it was on February 7th which would have been our shift

10   before, I was assigned to Medic 47 which was going to be that

11   shared dorm room.  So that was the first thing I noticed.

12   Q.   And what happened when you noticed that you were assigned

13   to Medic 47?

14   A.   Actually, actually looking back at this, I think I -- on

15   the 9th I noticed that I was assigned to 47 the next shift.  I

16   apologize.  So I noticed I'm assigned to Medic 47, and I

17   believe -- I believe I called Chief McDonough at that point

18   and mentioned it to him, that I was assigned there and I think

19   that was going to be an appropriate assignment.

20   Q.   And why was Medic 47 not an appropriate assignment?

21   A.   Like I said earlier, it was a converted workout space

22   that just had a shared room.  And it was going to be me and a

23   male co-worker sharing a room that night.

24   Q.   Did you eventually get moved to a different shift based

25   on Battalion Chief McDonough's efforts?

1    A.   I don't recall what role he played in it, but, yes, I was

2    eventually moved and they changed it to my assignment being

3    Paramedic 20 that shift instead.

4    Q.   Referring back to Exhibit 10, where did you work for your

5    next tour?

6    A.   So we go back to work on February 18th, so the 18th, 20th

7    and 22nd I'm assigned to Paramedic 1 which was at fire

8    headquarters downtown.  On February 24th I worked the morning

9    on Paramedic 1, and I worked that evening on Paramedic 3.

10   Q.   Did you have a physical during that time frame?

11   A.   Yes, I did.

12           MR. JACOBSON:  May I approach?

13           THE COURT:  Yes.

14   BY MR. JACOBSON:

15   Q.   Showing you what's been marked as Exhibit 21.  Do you

16   recognize this?

17   A.   Yes, I do.

18   Q.   Is that your signature at the bottom?

19   A.   Yes, it is.

20   Q.   What is this document?

21   A.   This is one of the forms that is filled out during our

22   annual physical stating whether we're fit for duty, capable of

23   performing duty, and we have to be signed off by the city

24   physician which is what this is.

25           MR. JACOBSON:  Move for the admission of 21.

C. CLARK - DIRECT

```
 1              MS. WATERS:  No objection.

 2              THE COURT:  21 admitted and may be published.

 3         (Exhibit 21 entered into evidence.)

 4    BY MR. JACOBSON:

 5    Q.   And what does this document, Exhibit 21, indicate?

 6    A.   This indicates as in Box A that's checked that I am

 7    capable of performing the duties of a firefighter.

 8    Q.   Otherwise known as fit for duty?

 9    A.   That's correct.

10    Q.   Okay.  Thank you.  You may depublish.

11         Please go back again to Exhibit 10.  What was your next

12    tour starting on March 5th, 2013?

13    A.   I apologize, but this document actually doesn't lead me

14    through March 5th that I can find.

15    Q.   Do you recall what your next tour was?

16    A.   I do not.

17    Q.   Did something happen on the next tour in early March,

18    2013, that you recall about your assignments?

19    A.   I recall there was a morning that when I was waiting to

20    be assigned, sometimes our assignments didn't take place till

21    the morning we were going to work.  You can start logging in

22    to Telestaff at about 6:00 and wait to see where you're

23    assigned.  Sometimes it can take up to 45 minutes before they

24    place you.  And at one point I logged in and I saw that I had

25    been assigned to Medic 9 for that shift.
```

1    Q.   And was Medic 9 a problem for you?

2    A.   Yeah.  Medic 9 was out of Station 9 which is where we had

3    the common doors with the curtains which is partition walls

4    that separated us.

5    Q.   And what did you do next, if anything, regarding that

6    particular assignment?

7    A.   I had called Chief McDonough that morning right away.

8    And he said as soon as he got to work, he would take a look at

9    it and call me back.

10   Q.   Did you actually also contact Ms. Macias?

11   A.   I believe later on that day I did, yes.

12   Q.   And Exhibit 22 in front of you, is that a transcript of

13   the telephone call you had when you called Ms. Macias?

14   A.   That's correct.

15   Q.   What's the date of that?

16   A.   March 8th, 2013.

17           MR. JACOBSON:  Move admission of 22.

18           THE COURT:  Any objection.

19           MS. WATERS:  No objection.

20           THE COURT:  22 admitted and may be published.

21       (Exhibit 22 entered into evidence.)

22   BY MR. JACOBSON:

23   Q.   Is this the third time you had talked to Ms. Macias about

24   these issues?

25   A.   Sounds about right.

1    Q.   And did Ms. Macias indicate she was going to do

2    something?  And if you need to refresh your recollection by

3    looking at the -- by looking at the transcript, go ahead?

4    A.   Okay.  (Pause.)  Okay.  I remember now.

5    Q.   So what do you recall what Ms. Macias said?

6    A.   So basically toward the end of our conversation she had

7    made a comment about she wasn't really sure what to do with my

8    situation.  She had never had a situation like this before,

9    and she didn't know which department handled this sort of

10   thing so she was going to have to make some phone calls.

11   Q.   If you would, please turn to page 10 of the transcript.

12   A.   Okay.

13   Q.   And drawing your attention to line 18 where I touched it

14   on there.  Did Ms. Macias --

15             MS. WATERS:  Your Honor, I'm sorry, may we approach

16   briefly?

17             THE COURT:  Yes.

18             But what about a lunch break?  Let's do this, let's

19   break for lunch just a little bit early to give you head

20   start, and I'll have you come back at 1:00.  So have a good

21   lunch.  You can leave your things on your chairs, and we'll

22   see you back at 1:00.

23             And then I'll see counsel at sidebar.

24      (At sidebar.)

25             THE COURT:  Do we need the exhibit?

1          MS. WATERS:  I'm not sure that we do.

2          THE COURT:  Okay.

3          MS. WATERS:  So essentially, your Honor, I accept

4  given the nature of the case, a certain amount of hearsay is

5  going to be necessary to allow Mr. Jacobson to elicit, so we

6  can understand Ms. Clark's perception of the events and we get

7  some context.  And I haven't been objecting to that because I

8  think to some degree it's appropriate and it speeds things

9  along.  But I do not believe that having her read another

10  person's portion of a transcript is appropriate.

11          If Mr. Jacobson wants to ask her what she remembers

12  about the conversation, and if she doesn't remember, if he

13  wants to allow her to look at it to refresh her memory but not

14  read it out loud, I think that's appropriate.  But I do not

15  think it's appropriate having her reading transcript excerpts

16  from other people.

17          MR. JACOBSON:  That's fine.  That makes sense.  I

18  was trying to speed it along.  And counsel is exactly right;

19  that's the proper way to do it, and all I was doing was trying

20  to expedite.

21          MS. WATERS:  I appreciate that.  I'm generally for

22  speeding things along.  But with respect to transcripts

23  specifically, I feel a little differently about it.

24          MR. JACOBSON:  That's fine.  Cool.

25          THE COURT:  So does this give you enough time for

1   lunch?

2           MR. JACOBSON:  What did we say?

3           THE COURT:  1:00.

4           MR. JACOBSON:  Yeah, I'm fine.  I brought my lunch.

5           THE COURT:  I'm always trying to balance moving

6   things along with --

7           MR. JACOBSON:  Yeah, I brought my lunch.

8           THE COURT:  We'll see what the jury -- if they say,

9   Oh, no, we need more time.  Usually they say, Oh, no, let's

10  keep things going.  My normal experience.  Okay.  We'll see

11  you back at 1.

12          MR. JACOBSON:  Thank you.

13      (Luncheon recess.)

14          THE COURT:  Be seated, please.

15          And Sandy, you can get the jury.

16          THE CLERK:  Your Honor, they would like to address

17  you first.

18          THE COURT:  Okay.

19          MR. JACOBSON:  Just the scheduling matter, Judge.

20          THE COURT:  Yes.

21          MR. JACOBSON:  One of our witnesses, Matt Larsen,

22  has to testify today if we can get him in.  He had some sort

23  of scheduling conflict.  So we anticipate him being here today

24  at 3.  So assuming I'm still on direct with Ms. Clark, I will

25  interrupt her direct, take Mr. Larsen.  If not Mr. Larsen,

 1  then we'll do the same thing because we have two other
 2  witnesses, Sloan Tamietti and Chris Conger, who also have
 3  scheduling matters.
 4          THE COURT:  Okay.
 5          MR. JACOBSON:  So what we won't do is we won't
 6  interrupt the defendant's cross.  But we'll try to take the
 7  three witnesses out of order to accommodate the witnesses'
 8  schedules.
 9          THE COURT:  Any objection from defense?
10          MS. WATERS:  No, your Honor.  I think we negotiated
11  it earlier.
12          THE COURT:  Okay.  Great.
13          And so I did receive information from Sandy that one
14  of the jurors wants to take the preliminary jury instructions
15  home so he can review them in depth and attempt to understand,
16  I don't know, the details.  He wants to take them home to read
17  them.  I had her write me a note so I wouldn't forget at the
18  end of the day, so that might be okay as long as I instruct
19  him don't share them with anybody else or talk to anybody else
20  about them.  Maybe not.  So just something to think about.
21          MS. WATERS:  My preliminary concern that I'm going
22  to throw out so we can all think about it, if we don't let
23  them take them home, he might make notes about them to try to
24  look them up on his own, and he may end up with commentary
25  with other circuits.

 1          THE COURT:  He can help us with resolving the final

 2    jury instructions.

 3          MS. WATERS:  Right.

 4          MR. JACOBSON:  I think, Judge, if it makes him more

 5    comfortable and he needs more time with them, that's fine.

 6          THE COURT:  Okay.  So hopefully I'll remember to do

 7    this at the end of the day, and we can just -- I can have

 8    Sandy let him know it's okay just so long as he doesn't share

 9    them with anybody else or discuss it with anybody else.

10          MR. JACOBSON:  Is that a first?

11          THE COURT:  That's a first for me.  How about you?

12          THE CLERK:  You suggested the lunch hour.

13          THE COURT:  And I think they're happy about an hour

14    for lunch.

15          THE CLERK:  No, that he reads them in his lunch hour

16    here.  Just throwing it out.

17          THE COURT:  Okay.

18       (Jury panel entered at 1:15 p.m.)

19          THE COURT:  And everyone may be seated.

20          The record may reflect the presence of the jury.

21          And Mr. Jacobson, you may continue with your

22    examination.

23    BY MR. JACOBSON:

24    Q.   So we were with the telephonic -- the phone call you had

25    with Ms. Macias from OEOP on March 8th, 2013, to refresh your

1    recollection.  Okay?

2    A.    Okay.

3    Q.    Based on that recollection of that call, did Ms. Macias

4    seem to understand what you were asking for?

5    A.    No, she did not.

6    Q.    And why do you say that?

7    A.    I don't recall word for word what happened, but basically

8    she questioned me on why I needed a private room, if I was

9    breastfeeding my child at the station, questions to that

10   extent.

11   Q.    Okay.  If you would turn to the next page, please.

12         Did she ask you whether you were trying to seek your own

13   cures for these issues within the fire department?

14   A.    I believe she did.

15   Q.    Would it refresh your recollection to review the

16   transcript?

17   A.    Yes, it would.

18   Q.    If you would, just take a look at page 11 of the

19   transcript, and you can just read the first few lines.

20   A.    Okay.  So her question was --

21   Q.    No, don't read the question.  I want you to review it and

22   refresh your recollection about it.

23   A.    Okay.

24   Q.    So did Ms. Macias ask you what or whether you were

25   seeking your own cures for this?

C. CLARK - DIRECT

1   A.   Yes, she did.

2   Q.   What did she say to your recollection or what did you

3   respond?

4   A.   Basically, she asked me when the last I had to call and

5   seek a change in my station or have to call in and ask to have

6   it rectified.

7   Q.   And did she ask you how many times it happened or how

8   often it happened?

9   A.   I believe she did, yes.

10  Q.   And how did you respond?

11  A.   I think I had mentioned that the most recent time had

12  been within the last week or two.

13  Q.   Okay.  Did you mention working with the person who does

14  scheduling?

15  A.   Yes, I did.

16  Q.   So tell us how that works in terms of how somebody on

17  swing shift actually gets scheduled.

18  A.   Okay.  So how -- was that me?

19       So when I was describing the four battalions that we

20  have, fire headquarters is assigned -- that's Battalion 1 and

21  what they call EC 1.  So the captain that's assigned to that

22  EC position, his or her job is staffing the department for

23  that day.  So when they get there in the morning, they look at

24  Telestaff and they see where the openings are and who the

25  swing personnel are and they staff them.  And if there's extra

C. CLARK - DIRECT

1  openings, they call in people for overtime.  So that's always

2  done by the same person, whoever's designated to that EC 1

3  position.

4  Q.   Who was designated as the EC 1 position at that time?

5  A.   On my shift his name was Captain Rick L'Heuruex.

6  Q.   Can you spell that?

7  A.   Last name is L-'-H-e-u- --

8  Q.   It's okay.  We'll get it.

9  A.   It's confusing.

10  Q.   Okay.  And were you -- had you been working with Captain

11  L'Heuruex on your assignments during that time?

12  A.    Initially, yeah.  I worked with both him and Chief Paul

13  McDonough.

14  Q.   Okay.  What's the next thing that happens regarding your

15  assignments?  Fast forward to March 19th.

16  A.    Okay.  So I'm off on March 19th.  That's one of my days

17  off, and I was at home with my son as usual.  And I started

18  checking Telestaff for the next day because I was going to be

19  working March 20th, and I was trying to predict where I was

20  going to work and trying to figure it out, and I noticed the

21  only had openings for Station 8 and Station 9.  And those are

22  the two stations that have that kind of the common dorm area

23  with the curtains.

24  Q.   And you're looking at the calendar.

25        How did that make you feel?

```
1   A.   This is ultimately what -- what probably stressed me out

2   the most, was trying to figure out where I was going to go,

3   and then seeing that those are going to be the only openings.

4   It was stressful trying to figure out how the next day was

5   going to play out.

6   Q.   So this -- the next day being March 20th?

7   A.   That's correct.

8          MR. JACOBSON:  May I approach?

9          THE COURT:  Yes.

10  BY MR. JACOBSON:

11  Q.   Showing you what's been marked as Exhibit 23 for

12  identification.  Do you recognize that?

13  A.   Yes, I do.

14  Q.   And what is it?

15  A.   This is the Telestaff roster for that particular shift I

16  worked on March 20th.

17         MR. JACOBSON:  Move for the admission of 23.

18         MS. WATERS:  No objection.

19         THE COURT:  23 is admitted and may be published.

20      (Exhibit 23 entered into evidence.)

21  BY MR. JACOBSON:

22  Q.   So if you would, please turn to page 3 of 5 of this

23  roster.  And using the fancy system in front of you, maybe

24  highlight it because the writing is very small.  Tell us what

25  it shows.
```

1   A.   I'll highlight it for you here, where my name is.  So

2   what this is showing is that that evening I was assigned to

3   Paramedic 49 which is right there.  My name is right there.

4   Carrie Clark.  And it shows FSPM means that I called in sick

5   for that shift that I was assigned there for the p.m.

6   Q.   And I would ask to mark this particular page as

7   highlighted as Exhibit 122.  I think the fancy system allows

8   us to print that out and --

9            THE CLERK:  It does but you've got to give me a

10  second before you do anything else.  You can keep talking but

11  it's going to take some time.  Okay.

12           MR. JACOBSON:  Absolutely.  So we'll move to mark

13  that as 122.

14           MS. WATERS:  No objection.

15           THE COURT:  All right.  It will be marked as 122.

16  BY MR. JACOBSON:

17  Q.   So you notice that you're assigned at Station 9; right?

18  A.   That's correct.

19  Q.   For March 20th?

20  A.   Correct.

21  Q.   What happens next?

22  A.   So I had taken the morning shift of that shift off.  If I

23  can backtrack just a little bit?

24       The night before when I looked, only 8 and 9 were open.

25  I took a vacation shift for the next morning.  And the next

1    morning the only openings of people calling in sick also

2    happened to be at Station 8 and 9.  So being that I had the

3    morning off, I started looking at the roster again during the

4    day to see if I was assigned for that evening shift.  And I

5    would say around 12:00ish, noonish or so, I noticed I had

6    again been assigned to Paramedic 49.

7    Q.   How much money were you making per hour at that time back

8    here in March 2013, approximately?

9    A.   I would say it was probably around 18ish dollars an hour.

10   Q.   And when you take vacation time, how does that work?

11   A.   So each pay period we accrue vacation time.  And when I

12   take a morning vacation time, it obviously deducts it from my

13   vacation bank.

14   Q.   And because you take that vacation time, you can't take

15   it another day?

16   A.   That's correct.

17   Q.   In other words, is there what's called an opportunity

18   cost to that?

19   A.   That's correct.  They put a dollar value when we take a

20   vacation shift off.

21   Q.   And do you know what the dollar value is?

22   A.   I believe it's a couple hundreds dollars for a 12-hour

23   shift.

24   Q.   And do you know where that information would be located?

25   A.   It would be on my paycheck.

1   Q.   So what happens after you -- on March 20th when your --

2   you know you're going into work in the afternoon?

3   A.   So like I said, around noon or so I noticed I had been

4   assigned to Medic 49 and at this point my chief, Paul

5   McDonough, was off that day.  So the next person in my chain

6   of command would have been Deputy Chief Rob Rodriguez.  He was

7   the D.C. over operations and one of the chiefs I had met with

8   back in November.  So I started trying to place a phone call

9   to get a hold of him to try to see what I can do for that day.

10  Q.   And did he call you back right away?

11  A.   No, he didn't.

12  Q.   What did you eventually do next?

13  A.   So I made quite a few phone calls to him.  I think I left

14  two voice mails.  And as it approached 5:00 which would have

15  been the time I was getting ready to go to work and taking my

16  son over to my mom's, I called my next line in the chain of

17  command, and that was Assistant Chief Mike Fischback.

18  Q.   What happened?  Did he pick up?

19  A.   I believe I called twice, and the second time he did pick

20  up.

21  Q.   And what happened when he picked up?

22  A.   So he answers his phone, and I said, Hey, Chief, this is

23  Paramedic Clark.  I need to talk to you about my assignment

24  tonight.  And he puts me on hold and -- he says, Hold on a

25  second.  And he comes back on the phone with Deputy Chief

1  Rodriguez, and then at some point they also bring back the HR

2  director, Joanna Acedo.  So they have me on a conference call

3  with the three of them.

4  Q.   And tell us what you remember about that discussion and

5  we'll go, you know, piece by piece.

6  A.   Okay.  So basically the first thing that's said is,

7  What's the problem, Carrie?

8       And I said, Well, I was assigned to Station 9 tonight and

9  I have to pump.

10      And Chief Rodriguez says, Well, that's all we have for

11 you tonight.

12      And I was, like, Okay.  Well, I'm trying to explain to

13 you that, you know, I'm pumping at work and I need a private

14 room, you know, to be able to do this in.

15      And at one point -- I'm trying to recollect the

16 conversation.  Basically, I go into, you know, I'm pumping,

17 like, every a couple of hours and stuff at work.

18      And the HR manager, and this is the first interaction I

19 had ever had with her.  I had never spoken to her before.

20 Says, you know -- I talk about, you know -- they're, like,

21 Well, how often are you pumping?

22      And I said, Well, I pump every three to four hours.

23      And she's, like, Well, that seems excessive to me.

24      And I'm, like, You know, it's not excessive.  I have a

25 newborn baby.  That's how often he eats.

1          And at some point during the conversation, too, she had

2    said, you know, Well -- I think I brought up having to have a

3    private room, and she said, Well, Station 9 per this law is

4    compliant.  You can just ask the chief to leave his room and

5    you can just pump in there.

6          And I said -- I was upset at this point after a few

7    things had been said, and I said, No, you're out of your

8    friggin' mind if you think that's appropriate.  That is

9    completely not appropriate for me to wake somebody up at 2:00

10   in the morning, 4:00 in the morning, and have them leave their

11   room so that I can go in there to use it.

12         And then --

13   Q.   Did Ms. Acedo, during this conversation, opine about your

14   ability to do the job?

15   A.   She did.  When we talked about the frequency of my

16   pumping, she mentioned that, you know, it seemed excessive to

17   her and then also stated that she didn't think that I was fit

18   for duty.

19   Q.   And did the conversation also include an accusation that

20   you had taken a truck or trucks out of service?

21   A.   Yes, it did.

22   Q.   Tell us about that.

23   A.   So when we were talking about how long it took me to

24   pump, she wanted to know how often I was pumping, how long it

25   took me to pump.  And she said, Well, that's concerning if

1    you're taking a truck out of service for 30 minutes every a

2    couple of hours.  And I replied, I have never taken a truck

3    out of service to pump milk.  And --

4    Q.    Had you ever taken a truck out of service?

5    A.    Absolutely not.

6    Q.    Was there any instance that you recall regarding your

7    breast milk expression that they may have gotten wrong?

8    A.    Yeah.  So I told them, I said there's only even been two

9    instances that my pumping had anything to do with work.  And I

10   said on one occasion we had -- I was just getting ready to

11   pump at the station and we got a call, and we ended up having

12   to transport the patient to the hospital so we ended up being

13   gone.  And then we got a second call on top of that, so we had

14   been gone for quite a number of hours.  And after we were

15   leaving the hospital, it had been so long since I pumped I had

16   leaked through my shirt.  My shirt was essentially wet.

17         And I told my partner, you know, I said, do you mind if

18   we run back to the station so I can change?  And he was, like,

19   Yeah, just -- you know, we'll stay out of service.  I have to

20   finish up my report anyway.  So we were leaving St. Joseph's

21   Hospital which is Broadway and Wilmot, for instance -- for

22   example, I mean.  And we stayed out of service mostly while he

23   typed the report, but until we got to Broadway and, like,

24   Pantano.  Then we went back into service.

25         And we monitor the radio the whole time, so when I say

1  "out of service," it doesn't actually mean we're not

2  responding to calls.  It just shows up on the screen as

3  unavailable, as out of service.  And then we went back into

4  service.  We went back to the station.  I changed my clothes

5  and I pumped at that time.  But the truck was never out of

6  service.

7  Q.   And when you said, You're out of your friggin' mind if

8  I'm going to wake up, you know, my chief, who were you

9  responding to?

10 A.   I was responding to the HR manager, JoAnn Acosta, in

11 regards to her comments that I had to wake my chief and ask

12 him to leave his room every a couple of hours.

13 Q.   And is Ms. -- Ms. Acosta -- Acosta, is she in your chain

14 of command?

15 A.   No, she's not.

16 Q.   And what do you mean by that?

17 A.   She's -- excuse me.  She's our HR manager so, you know,

18 she works for Tucson Fire.  But my chain of command is all

19 commissioned employees being my captains and chiefs.

20 Q.   And were you alone in the meeting?

21 A.   On the phone call?

22 Q.   Yes.

23 A.   Yes, I was.

24 Q.   And what happened next?

25 A.   So after I think -- one of the last comments was about me

C. CLARK - DIRECT

1    waking up the chiefs.  And I said, you know, you're out your

2    friggin' mind and this and that, and I directed it to Chief

3    Fischback who had worked at Station 9 the night before.  And I

4    said, Chief Fischback, do you really think this is

5    appropriate?  You work worked here.  And him and Chief

6    Rodriguez both said something to the extent of, Yeah, we're

7    going to have to call you back.  And I said, okay, and then we

8    ended that phone call.

9    Q.    And what did you do next?

10   A.    So after that phone call, I called -- I think -- I think

11   first I called my husband because I was pretty emotional at

12   that time, and -- he wasn't home so I just asked him to come

13   home.

14         I believe after that I called Captain Rick L'Heureux who

15   was the EC 1, the person in charge of staffing.  And I said

16   Captain L'Heureux, if I'm assigned to Medic 9 tonight, then

17   I'm going to have to call in sick because I can't work there.

18   Q.    So you mentioned you were pretty upset, how did that

19   exchange on March 20th make you feel?

20   A.    It was -- it was devastating.  It was probably the most

21   insulted I think I've ever been in my life.  Here, you know,

22   I'm back at work for five months.  I'm being told I'm not fit

23   for duty.  I'm being told my pumping is excessive.  And I

24   just -- I had never experienced that sort of thing before, and

25   I was shocked because, like I said, I had never met this HR

C. CLARK - DIRECT

1    manager before.  And my impression of past HR's that I've

2    worked with, they're always supportive to the employees, and I

3    felt completely insulted during this phone call.

4    Q.   What happened next?

5    A.   So after I called in to Captain L'Heureux and said if I'm

6    going to 9 I'm going to have to call in sick, I called my mom.

7    She was supposed to watch my son that night.  And I said I'm

8    not going into work tonight so Austin can just stay home with

9    me.

10   Q.   Did you eventually get a phone call from Captain -- I'm

11   sorry, from Assistant Chief Fischback?

12   A.   I did.  It was about 12, 13 minutes later.  They called

13   me back and they said you're going to go to Station 6 tonight.

14   We don't have a lock on the door.  We can get one installed by

15   next shift, but that's where you're going to be assigned from

16   here on out.

17   Q.   And where is Station 6?

18   A.   Station 6 is Wilmot, far, far south on Wilmot past the

19   federal prisons.  Kind of between like I-10 as you're heading

20   toward Sahuarita Road.

21   Q.   Was Station 6 convenient for you?

22   A.   No, it wasn't.

23   Q.   Was Station 6 convenient for your mom?

24   A.   No, it was not.

25   Q.   Did you ever complain or say I'm not going to 6 because

1    it was not convenient?

2    A.    No, I did not.

3    Q.    What was the situation at 6 when you arrived there?

4    A.    So my next shift was the following day.  I believe I was

5    off that morning, and I went into work that night.  And when I

6    showed up at work, there had been a firefighter assigned there

7    prior to me arriving, and they had told him he could stay

8    there permanently.  So when I arrived, the crew there, which

9    were people I knew from before, had said, Yeah, you know, Drew

10   is pretty pissed off that he had to leave.  You know, they

11   just called up here last shift and basically kicked him out.

12   And you know, like, just kind of sucks.  We had a good thing

13   going here, and it just kind of sucks he had to leave.

14   Q.    How did that make you feel?

15   A.    Awful again.  You know, I didn't -- I didn't want to be

16   the cause of anybody else's displacement.

17   Q.    And what was the next thing that happened after

18   March 20th or 21st?

19   A.    So --

20   Q.    Actually, before we answer that, if you would, please

21   call up the time line.  I want to make sure we're tracking

22   correctly.

23        We're looking now at March 20th, 2013.  Is that an

24   accurate representation of where we're at in the time line of

25   events and what happened on March 20th?

C. CLARK - DIRECT

1  A.    That's correct.

2  Q.    Okay.  Thank you.  You may depublish.

3        So what happens next?

4  A.    So I believe it was two or three shifts later, I'm

5  working at Station 6, and I show up to work that morning.  And

6  I get a phone call from the battalion chief, his name was Mike

7  Smith.  He happened to be working overtime.  He calls me and

8  says, Hey, I need to take you downtown for a meeting at 1:30.

9  I'll pick you up at 12:45.  And I don't know anything about

10  it.  They wouldn't tell me.

11  Q.    And where did he take you?

12  A.    He took me downtown to fire headquarters.

13  Q.    Did you ask a union representative to accompany you?

14  A.    I did.

15  Q.    And why?

16  A.    Did you say why?

17  Q.    Why.

18  A.    So any time -- so I've never had to have a union

19  representative accompany me, but I know that one of their

20  roles is basically being a neutral party where they can take

21  notes and listen to kind of what happens, and their role is to

22  make sure we're treated fairly as employees.  Since I had no

23  idea why I was going downtown, I wanted to make sure that

24  somebody went with me.

25  Q.    And what happened when you arrived?

1    A.    So when I arrived, Sloan Tamietti, who is my union rep,

2    was already there ahead of me.  He told me initially they

3    didn't want him to go to the meeting.  That he didn't need to

4    be there.  And I had asked, you know, that he accompany me

5    anyway because I just didn't know what I was walking into.  So

6    he had spoke to the chiefs beforehand, and eventually we all

7    went into the meeting together.

8    Q.    So take me to what happens when you walk into this

9    meeting.  Who are you meeting with, where is it, et cetera.

10   A.    So our meeting is held in the assistant chief's office,

11   Mike Fischback.  So when I walk in, I'm seated at the table

12   like this, and Chief Fischback is in front of me and is Deputy

13   Chief Rodriguez and Deputy Chief Nied is sitting next to him,

14   and my union rep is in a chair next to me.

15   Q.    So what happens when you get there?

16   A.    Chief Fischback hands me a piece of paper and says to

17   read it, and it's a discipline that he was giving me.

18              MR. JACOBSON:  May I approach?

19              THE COURT:  Yes.

20   BY MR. JACOBSON:

21   Q.    Showing you what's been marked as Exhibit 24 for

22   identification.  Do you recognize that?

23   A.    Yes, I do.

24   Q.    And what is that?

25   A.    This is the verbal counseling I received in regards to

1    the March 20th phone call.

2              MR. JACOBSON:  Move for the admission of 24.

3              MS. WATERS:  No objection.

4              THE COURT:  24 is admitted and may be published.

5         (Exhibit 24 entered into evidence.)

6    BY MR. JACOBSON:

7    Q.   So what were you being disciplined for?

8    A.   What they cited was that I had hung up on them twice, and

9    for using the term, You're out of your friggin' mind.

10   Q.   So let's unpack that.  Did you ever hang up on them, hang

11   up on that phone call on March 20th, 2013?

12   A.   No, I did not.

13   Q.   Did you hang up on them twice?

14   A.   No, I did not.

15   Q.   But you did use the word "friggin'"?

16   A.   Yes, I did.

17   Q.   Did you obtain your cell phone records from Verizon

18   Wireless from March 20th, 2013?

19   A.   Yes, I did.

20   Q.   Do you remember how you obtained that data?

21   A.   I believe we subpoenaed Verizon for my phone records.

22             MR. JACOBSON:  May I approach?

23             THE COURT:  Yes.

24   BY MR. JACOBSON:

25   Q.   Showing you what's been marked as Plaintiff's Exhibit 25.

1  Do you recognize those documents?

2  A.   Yes, I do.

3  Q.   And what are those documents?

4  A.   These are my cell phone records for the March 20th day.

5  Q.   What is your cell phone number?

6  A.   Mine is (520)990-6541.

7  Q.   Is that the cell number on the top left under the Verizon

8  logo?

9  A.   Yes, it is.

10            MR. JACOBSON:  Move for the admission of 25.

11            MS. WATERS:  No objection.

12            THE COURT:  25 is admitted.

13       (Exhibit 25 entered into evidence.)

14  BY MR. JACOBSON:

15  Q.   And if you would, and if you need to do the on the

16  computer, move to where the phone calls on March 20th would

17  appear.

18  A.   Do you want me to highlight them?

19  Q.   Yeah, if you would.

20  A.   I don't know how to move the screen up.  Which page do

21  you need?

22  Q.   Yeah, we can start on the second page, sorry.  We'll

23  clear those marks.

24  A.   Okay.  Are you asking for the phone call that we actually

25  made contact?

1   Q.   Yeah.

2   A.   That's going to be at 4:54 p.m.  The phone number is

3   837-7014.

4   Q.   Are you highlighting?

5   A.   Yeah.

6   Q.   And according to the Verizon Wireless records, how long

7   did that phone call last?

8   A.   It was 18 minutes.

9   Q.   And is that consistent with your recollection of that

10  phone call?

11  A.   That sounds right.

12  Q.   And what's the next phone call underneath it?

13  A.   That's my husband, Gordon Clark's phone number.

14  Q.   And you called him?

15  A.   Yes, I did.

16  Q.   And what's the next phone number underneath that?

17  A.   That is EC 1 Captain Ricky L'Heureux extension, 4515.

18  Q.   Is that consistent with your recollection of how the

19  events occurred?

20  A.   Yes, it is.

21  Q.   And what's the next phone number underneath that?

22  A.   That's my mom's cell phone, the 405-2458.

23  Q.   And what's the next line underneath that?

24  A.   That's the incoming call from Chief Fischback's

25  extension.

1    Q.    Which is?

2    A.    The 837-7014.  Do you want me to highlight it?

3    Q.    So if you would, just highlight all those phone calls?

4    A.    (Witness complied.)

5              MR. JACOBSON:  I'll move for -- I'll move to mark

6    this as Exhibit 123, and we'll wait a second before we do

7    anything with that.

8    BY MR. JACOBSON:

9    Q.    Is there anything on these records that reflect that you

10   hung up on them?

11   A.    I don't believe so.

12   Q.    Is there anything on these records that reflect that they

13   kept trying to call you back?

14   A.    No, there is not.

15   Q.    So based on your phone records, did you, in fact, hang up

16   on that phone call on March 20th, 2013, in the middle of the

17   conversation?

18   A.    No, I did not.

19   Q.    And regarding the word "friggin'", in that moment on

20   March 20th, 2013, is friggin' the word you wanted to use?

21   A.    No, it's not.

22   Q.    Is that the type of language that's typically used in the

23   fire department in your experience?

24   A.    No, the language is much worse.

25   Q.    Okay.  Can you elaborate on that?

C. CLARK - DIRECT

1   A.   It's very common at the station to hear cuss words all

2   day long.  It's kind of like a frat house setting, certain

3   stations, the mentality that's there.  So many times

4   conversations are very inappropriate.

5   Q.   What happened, if anything, when Chief Fischback said

6   you're going to 6?

7   A.   Well, I had asked, Why am I being assigned here?  Why

8   can't I work at these other stations?  You know, especially

9   the station that I had been working at, and there was another

10  female on the job who was also pumping milk.  And his response

11  was, Well, that's what happens when you file a complaint.

12  Q.   How did you respond?

13  A.   I said I've never filed a complaint.

14  Q.   And did he respond back to you?

15  A.   He said, Well, somebody got them involved.

16  Q.   And how did that make you feel?

17  A.   It felt retaliatory.

18  Q.   Did you later jot down some notes about that

19  conversation?

20  A.   I believe I did.

21          MR. JACOBSON:  May I approach?

22          THE COURT:  Yes.

23          MR. JACOBSON:  If you would -- are you ready to

24  depublish?  Are you okay?

25          THE CLERK:  Got it.

1    BY MR. JACOBSON:

2    Q.   Okay.  Do you recognize what I've shown you, identified

3    as Exhibit 26?

4    A.   Yes, I do.

5    Q.   And what is that?

6    A.   These are some notes I wrote in regards to the

7    conversation that happened and the discipline I received.

8    Q.   And do you how do you know these are your notes?

9    A.   That's my handwriting.

10   Q.   And do you -- do you recall when you wrote them?

11   A.   I believe on the date I put on top, March 26th.

12          MR. JACOBSON:  Move for the admission of 26.

13          MS. WATERS:  No objection.

14          THE COURT:  26 is admitted.

15      (Exhibit 26 entered into evidence.)

16   BY MR. JACOBSON:

17   Q.   And are these handwritten notes consistent with your

18   recollection on March 26th, 2013?

19   A.   Yes, they are.

20   Q.   And how did it feel to receive -- first of all, that

21   discipline you received, are you familiar with the discipline

22   matrix and the policy regarding discipline?

23   A.   Yes, I am.

24   Q.   And again, that's contained within the Manual of

25   Operations; right?

C. CLARK - DIRECT

1    A.    That's correct.

2    Q.    And are you sure that was considered discipline?

3    A.    Yes, I am.

4    Q.    And why are you sure of that?

5    A.    So we've been told over time the only nonformal

6    discipline is an educational counseling.  Everything else

7    above an educational counseling is considered formal

8    discipline.

9    Q.    And so how did it make you feel to receive this formal

10   discipline?

11   A.    I mean, I was upset about it.  I felt that the

12   accusations weren't true.  They weren't accurate.  And when I

13   questioned in regards to the rudeness to what I said, I asked

14   Chief Fischback, I said, What about the way JoAnn spoke to me?

15   I felt she was very inappropriate to me.  And his response

16   was, Well, that's your opinion.  We don't feel that way.

17   Q.    And if we could go back to the time line to the next

18   event.  Is this showing you these events on March 26th, 2013,

19   and are these accurate descriptions of what occurred on

20   March 26th, 2013 and consistent with the time line?

21   A.    Yes, they are.

22              MR. JACOBSON:   Thank you.  Move to depublish.

23   BY MR. JACOBSON:

24   Q.    Despite what was going on, were you still working hard to

25   do your job on a daily basis?

 1   A.   Yes, I was.

 2   Q.   In fact, did you receive some kudos within a few days of

 3   this incident?

 4   A.   Yes, I did.

 5            MR. JACOBSON:  May I approach?

 6            THE COURT:  Yes.

 7   BY MR. JACOBSON:

 8   Q.   Showing you what's been marked as Exhibit 27.  Do you

 9   recognize that?

10   A.   Yes, I do.

11   Q.   And what is it?

12   A.   This is a letter that a public -- somebody from the

13   public wrote in regards to a call that we had had with her

14   husband.

15   Q.   And is that a memorandum attached to it?

16   A.   Yes, it is.

17   Q.   And what is the memorandum?

18   A.   The subject of it is commendation, so it was it was sent

19   from Chief Critchley to those of us on the call.

20            MR. JACOBSON:  Move for 27.

21            MS. WATERS:  No objection.

22            THE COURT:  27 admitted.

23        (Exhibit 27 entered into evidence.)

24   BY MR. JACOBSON:

25   Q.   Once you're at Station 6, do things kind of stabilize for

1   you?

2   A.   For a little bit they did, yeah.

3   Q.   And while you were at Station 6, did you isolate yourself

4   from your coworkers?

5   A.   I don't feel like I did, no.

6   Q.   Did what was occurring to you at this time, though,

7   affect you?

8   A.   Of course.  I mean, at this point I was pretty worn down

9   and maybe withdrawn a little bit from everything, but --

10  Q.   And when was Austin's first birthday?

11  A.   His birthday is July 19th.

12  Q.   July 19?

13  A.   2013 is his first birthday.

14  Q.   Did you receive a call from anyone right around this

15  time?

16  A.   Yes, I did.

17  Q.   Tell us what that was about.

18  A.   So one of the days right around that day I was -- I was

19  working at Station 6, and I received a phone call from Deputy

20  Chief Rodriguez and the HR manager, JoAnn.  And basically they

21  stated your year is up, and basically we're no longer going to

22  keep you basically at Station 6 at this point.

23  Q.   And how did you reply?

24  A.   I was surprised.  I didn't know, you know, that I was

25  going to get a call like on the day of, and I was trying to

 1    explain to them both that I was still nursing my baby.  He --

 2    in this time frame, we had found out he had a milk allergy,

 3    and he actually had a really bad reaction to the formula we

 4    were trying to supplement him with, so we were told to stop

 5    that immediately.  So he was only on breast milk at this

 6    point.

 7         He also had an issue with trying to transition to cow's

 8    milk, so we couldn't do that either.  We had to avoid dairy.

 9    So I was still continuing to pump, and I had -- I had just

10    mentioned -- they said -- you know, I didn't know today was,

11    like, going to be my last day.  I said, you know, there's a

12    process basically I have to go through of weaning him off.

13    Because if I don't continue to pump, I'll suffer, you know,

14    some significant side effects from the milk.

15    Q.   Did anything else occur on July 19th, 2013?

16    A.   That was the day they issued the very first nursing room

17    policy.

18              MR. JACOBSON:  May I approach?

19              THE COURT:  Yes.

20    BY MR. JACOBSON:

21    Q.   Showing you what's been marked as Exhibit 28.  Do you

22    recognize that document?

23    A.   Yes, I do.

24    Q.   What is that document?

25    A.   This is our Manual of Operations under section 200 for

 1 | personnel.  It is the nursing room policy.

 2 | Q.   What date was it issued?

 3 | A.   July 13th, 2013.

 4 | Q.   Again, what was that date?

 5 | A.   That was my son's first birthday.

 6 |          MR. JACOBSON:  Move for the admission of 28.

 7 |          MS. WATERS:  No objection.

 8 |          THE COURT:  All right.  28 admitted.

 9 |      (Exhibit 28 entered into evidence.)

10 |          THE COURT:  And Mr. Jacobson, let me ask you, did

11 | you want to move to admit Exhibit 123?  It was the highlighted

12 | portion of 25.

13 |          MR. JACOBSON:  Thank you, yes.

14 |          MS. WATERS:  No objection.

15 |          THE COURT:  So that exhibit, 123, will be admitted.

16 |          Okay.  Go ahead.

17 |      (Exhibit 123 entered into evidence.)

18 | BY MR. JACOBSON:

19 | Q.   Did you subsequently request to stay at 6?

20 | A.   I did.

21 | Q.   Was that granted?

22 | A.   For a period of time.

23 | Q.   And a few days later, did you file a charge of

24 | discrimination with the Arizona Civil Rights division?

25 | A.   Yes, I did.

```
 1              MR. JACOBSON:  May I approach?

 2              THE COURT:  Yes.

 3   BY MR. JACOBSON:

 4   Q.   Showing you what's been marked as Exhibits 29 for

 5   identification.  Do you recognize that document?

 6   A.   Yes, I do.

 7   Q.   And what is that document?

 8   A.   This is the charge of discrimination I filed with the

 9   Attorney General's office.

10   Q.   And is that your signature on the bottom right?

11   A.   Yes, it is.

12   Q.   And is it dated July 24th, 2013?

13   A.   Yes, it is.

14              MR. JACOBSON:  Move for the admission of 29.

15              MS. WATERS:  No objection.

16              THE COURT:  29 is admitted.

17        (Exhibit 29 entered into evidence.)

18   BY MR. JACOBSON:

19   Q.   Now, did you have any help at the time that you filed

20   this document?

21   A.   No, I did not.

22   Q.   Were you represented by counsel at this time?

23   A.   No, I was not.

24   Q.   And if you would, turn to the second page of that

25   exhibit.
```

 1        And this appears to be the series of events that led up

 2   to this moment; is that fair?

 3   A.    Yes.

 4   Q.    Did you subsequently request yet another permanent

 5   assignment to Station 6?

 6   A.    Yes, I did.

 7              MR. JACOBSON:  May I approach?

 8              THE COURT:  Yes.

 9   BY MR. JACOBSON:

10   Q.    Showing you what's been marked as Exhibit 30 for

11   identification.  Do you recognize that document?

12   A.    Yes, I do.

13   Q.    And what is it?

14   A.    This is an e-mail that I had sent to Chief Rodriguez or

15   to -- I think I sent it to Chief Rodriguez requesting that I

16   stay at Station 6.

17              MR. JACOBSON:  Move for the admission of 30.

18              MS. WATERS:  No objection.

19              THE COURT:  30 is admitted.

20        (Exhibit 30 entered into evidence.)

21   BY MR. JACOBSON:

22   Q.    Now 6 by this time had a locking door on it; right?

23   A.    That's correct.

24   Q.    Now, did you install that lock?

25   A.    No, I did not.

1   Q.   Why didn't you install that lock?

2   A.   While we're -- at the fire station they're city

3   buildings.  We're not allowed to make any modifications at the

4   station.  Like, we can't even change the light bulbs.

5   Facilities has to come out and do that.

6   Q.   So you couldn't make any modifications yourself?

7   A.   That's correct.

8   Q.   You were relying on the City of Tucson to do that?

9   A.   That's correct.

10  Q.   So was your request to stay at Station 6 granted?

11  A.   Initially it was, yes.

12  Q.   What happened next?

13  A.   Let me recollect myself to where we are.  August.

14  Q.   I'm sorry.

15  A.   I was trying to recollect myself to where we are in

16  August.  Trying to think back to that month.

17  Q.   So you weren't -- were you allowed to stay at Station 6?

18  A.   I was assigned there temporarily.

19  Q.   And then what happened next?

20  A.   So the Chiefs Nofs and Chief Rodriguez had come out to

21  the station and spoke with me.  And --

22  Q.   Just tell us what happened.

23  A.   They told me that if I wanted to stay at Station 6

24  permanently, that to talk with my crew and let them know if I

25  wanted to stay there.

1    Q.   And did you stay at 6?

2    A.   I did.  I did what they asked.  I wrote them a memo and

3    stated I want to stay at Station 6.

4            MR. JACOBSON:  May I approach?

5            THE COURT:  Yes.

6    BY MR. JACOBSON:

7    Q.   Showing you what's been marked as 31.  Do you recognize

8    that document?

9    A.   Yes, I do.

10   Q.   And what is that document.  Just describe it?

11   A.   This is an e-mail from the HR manager, JoAnn.

12   Q.   To --

13   A.   Following up on my temporary assignment to Station 6.

14   Q.   Was that e-mail written to you?

15   A.   Yes, it was.

16           MR. JACOBSON:  Move for the admission of 31.

17           MS. WATERS:  No objection.

18           THE COURT:  31 is admitted.

19       (Exhibit 31 entered into evidence.)

20   BY MR. JACOBSON:

21   Q.   And what is this e-mail seeking, if you recall?

22   A.   Basically, she was e-mailing me every couple of weeks

23   asking if I still needed to be at Station 6.

24   Q.   And did you reply to that request?

25   A.   Yes, I did.

 1              MR. JACOBSON:  May I approach?

 2              THE COURT:  Yes.

 3   BY MR. JACOBSON:

 4   Q.   Showing you what's been marked as Exhibit 32.  Do you

 5   recognize that document?

 6   A.   Yes, I do.

 7   Q.   And what is that?

 8   A.   This is the -- when I made my reply to JoAnn, I sent it

 9   through my chain of command which at the time it was

10   Chief Nofs and Ted McDonough, so he could move it up to the

11   chain.

12              MR. JACOBSON:  Move for admission of 32.

13              MS. WATERS:  No objection.

14              THE COURT:  32 is admitted.

15        (Exhibit 32 entered into evidence.)

16   BY MR. JACOBSON:

17   Q.   Why did you send it to Chief Nofs instead of JoAnn Acedo?

18   A.   At this point Chief Nofs was aware of the situation, and

19   we agreed that the contact Ms. Acedo was having with me was a

20   bit excessive in nature, so we agreed that I would basically

21   keep him in the loop and forward all correspondence through

22   him so he could monitor it as well.

23   Q.   So in this e-mail you indicate that you wanted to remain

24   at 6 through the time you finish nursing your second child.

25   What's going on there?

1    A.    So at this time I was still actually pumping milk for

2    Austin, and I had actually become pregnant with my second

3    child.

4    Q.    And is that second child your son, Mason?

5    A.    No, I actually ended up miscarrying the second child.

6    Q.    Did you subsequently receive a memo from Deputy Chief

7    Rodriguez about your assignment?

8    A.    Yes, I did.

9              MR. JACOBSON:  May I approach?

10             THE COURT:  Yes.

11   BY MR. JACOBSON:

12   Q.    Showing you what's been marked as 33.  Do you recognize

13   this document?

14   A.    Yes, I do.

15   Q.    And what is that document?

16   A.    There had been a phone call that had taken place, and I

17   asked basically Chief -- Chief Rodriguez for just kind of a --

18   sent me a follow-up e-mail kind of recapping the conversation.

19   Q.    Is that the memorandum that followed that phone call?

20   A.    Yes, it is.

21             MR. JACOBSON:  Move for admission of 33.

22             MS. WATERS:  No objection.

23             THE COURT:  33 is admitted.

24        (Exhibit 33 entered into evidence.)

25   ///

C. CLARK - DIRECT

1   BY MR. JACOBSON:

2   Q.   And is 33 a fair and accurate representation of the

3   summary of the telephone call that you had on or about

4   November 4th, 2013, as you recall?

5   A.   I'm not sure if it entails the entire conversation that

6   we had.

7   Q.   But is the information contained within it accurate?

8   A.   Yes, it is.

9   Q.   And did you subsequently become pregnant again?

10  A.   Yes, I did.

11  Q.   When?

12  A.   Sometime between December and January, the end of 2013

13  and beginning of 2014.

14  Q.   And what was your assignment at that time?

15  A.   I was still assigned to Engine 6.

16  Q.   Were you on light duty?

17  A.   No, I was not.

18  Q.   Do you recall receiving an e-mail early in February 2014

19  from Ms. Acedo?

20  A.   Yes, I do.

21         MR. JACOBSON:  May I approach.

22         THE COURT:  Yes.

23  BY MR. JACOBSON:

24  Q.   Showing you what's been marked as 34.  Do you recognize

25  that document?

```
 1   A.   Yes, I do.

 2   Q.   What is that?

 3   A.   This was one of the e-mails JoAnn had sent asking if I

 4   still had a need to be at Station 6 and my reply back that I

 5   did.

 6   Q.   Appears to be accurate representation of the e-mails

 7   between you and Ms. Acedo?

 8   A.   Yes, they are.

 9            MR. JACOBSON:  Move for the admission of 34.

10            MS. WATERS:  No objection.

11            THE COURT:  34 is admitted.

12        (Exhibit 34 entered into evidence.)

13   BY MR. JACOBSON:

14   Q.   So how did you feel when you received this e-mail?

15   A.   So these e-mails became frustrating to me.  There were a

16   lot of them.  And initially, I want to say back in

17   November when I had spoke to Chief Rodriguez and JoAnn over

18   the phone and we talked about me staying at Station 6, Chief

19   Rodriguez said we don't know what we're doing with this spot.

20   We're probably eventually going to bid it as a paramedic spot,

21   but right now we're not doing that so it's going to stay open.

22   So he basically said just let me know when you're done.  Let

23   me know when you don't need to be here anymore, and we'll get

24   you back onto swing.

25   Q.   So this e-mail surprised you somewhat?
```

1   A.   Every e-mail I got asking me if I was finished yet was a

2   surprise to me.

3   Q.   And you responded to Ms. Acedo; right?

4   A.   Yes, I did.

5   Q.   And how did you respond?  Were you -- was it -- did you

6   use any curse words or were you nasty in your response?

7   A.   No, I did not.  I felt I was professional.

8   Q.   And did Ms. Acedo reply to you?

9   A.   Yes, she did.

10  Q.   And do you recall without looking at the document what

11  she said?

12  A.   So her initial e-mail to me said I'm following up on

13  Station 6.  I need to know if you still have the need to be at

14  Station 6.  And I replied yes, I do still have the same need

15  to be at Station 6.  And her reply back was something to the

16  effect of, Well, what is that need?  And you know, it had been

17  the same breastfeeding need the entire time, so I was unsure

18  why we were still discussing that.

19           MR. JACOBSON:  May I approach?

20           THE COURT:  Yes.

21  BY MR. JACOBSON:

22  Q.   Showing you what's been marked as Exhibit 35 for

23  identification.  Do you recognize that document?

24  A.   Yes, I do.

25  Q.   And is that a continuation of the same e-mail string with

1   Ms. Acedo?

2   A.   I believe it is.

3   Q.   And does that appear to be a true and accurate

4   representation of the e-mail change you were having with

5   Ms. Acedo?

6   A.   Yes, it is.

7              MR. JACOBSON:  Move for the admission of 35.

8              MS. WATERS:  No objection.

9              THE COURT:  35 is admitted.

10       (Exhibit 35 entered into evidence.)

11   BY MR. JACOBSON:

12   Q.   And did you explain what your need was?

13   A.   Yes, I did.

14   Q.   And was that request granted?

15   A.   Yes, it was.

16   Q.   And who indicated that the request was granted?

17   A.   I'd have to verify that via e-mail.  I can't remember.

18   Q.   Would it refresh your recollection to look at Exhibit 35?

19   A.   Yes.  (Pause.)  Okay.  It came from JoAnn.

20   Q.   Anything about that that was unusual to you?

21   A.   The e-mail correspondence or the granting.

22   Q.   The granting of the permission from Ms. Acedo?

23   A.   Just that I was given another time limit.

24   Q.   And did, in fact, this e-mail, was this the last of those

25   e-mails from Ms. Acedo regarding your breastfeeding needs?

C. CLARK - DIRECT

1   A.   I'm actually not sure.

2          MR. JACOBSON:  May I approach?

3          THE COURT:  Yes.

4   BY MR. JACOBSON:

5   Q.   Showing you what's been marked as 36 for identification.

6   Do you recognize that documents?

7   A.   Yes, I do.

8   Q.   And what is that e-mail?  What is that document?

9   A.   This is another e-mail that JoAnn sent me.

10  Q.   And what is the date on that e-mail?

11  A.   April 29th.

12  Q.   Do you recall receiving that e-mail?

13  A.   Yes, I do.

14  Q.   All right.

15         MR. JACOBSON:  More the admission of 36.

16         MS. WATERS:  No objection.

17         THE COURT:  36 is admitted.

18      (Exhibit 36 entered into evidence.)

19  BY MR. JACOBSON:

20  Q.   And what was this e-mail you received on April 29th,

21  2014?

22  A.   Well, this was basically another follow up asking if I

23  still needed to stay at Station 6.

24  Q.   Did you respond?

25  A.   I believe I did, yes.

```
 1              MR. JACOBSON:  May I approach?

 2              THE COURT:  Yes.

 3   BY MR. JACOBSON:

 4   Q.   Showing you what's been marked as Exhibit 37.  Do you

 5   recognize that document?

 6   A.   Yes, I do.

 7   Q.   And is this a continuation that have e-mail string with

 8   Ms. Acedo?

 9   A.   Yes, it is.

10              MR. JACOBSON:  Move for the admission of 37.

11              MS. WATERS:  No objection.

12              THE COURT:  37 admitted.

13        (Exhibit 37 entered into evidence.)

14   BY MR. JACOBSON:

15   Q.   So what happened on May 15th, 2014 according to this

16   e-mail?

17   A.   She sent me an e-mail saying that they had granted me

18   another period of time to stay there.

19   Q.   Did anything happen on May 14th, 2014; the day before you

20   received this e-mail?

21   A.   Yes.  So I was off the first part of the shift on

22   May 14th.  And when I came into work that night, my crew was

23   sitting around the dinner table, and my captain, whose name

24   was Ted McDonough, said, Hey, you know, while you were off

25   today, I just want to tell you we were -- we were talking
```

1    about pregnant women on the job and what you guys do when

2    you're pregnant and, you know, if you're working and stuff

3    like that.  And --

4    Q.   So the next day you get this e-mail, right, that you were

5    extended in operations?

6    A.   That's correct.

7    Q.   Did anything happen one week after you received this

8    e-mail on May 15th, 2014?

9    A.   Yeah.  So me --

10   Q.   So tell us what happened.

11   A.   So May 20th, I believe, we're working a normal shift, and

12   we responded to a brush fire; just a couple of weeds actually

13   that was burning on the side of road.  Put out the brush fire.

14        We went to lunch and on our way back from lunch we -- the

15   truck pulled over.  And there wasn't really any communications

16   so we were kind of wondering what we were doing.  Initially,

17   they said, Oh, we're just going to fill up the tank with some

18   water right now.  So we pulled up next to a hydrant, I got

19   out, did my part.  We filled up the tank with water.

20        We start to drive back to the station and we are on

21   Wilmot Road and all of a sudden we turn off.  And my partner

22   looks over at me and he says, What are we doing?  And I said,

23   I have no idea.  So we pull up alongside a park which is like

24   a neighborhood park; not like a City park but a small

25   neighborhood park.  We pull up alongside this park and we stop

C. CLARK - DIRECT

1   for a minute.  And again my partner is like, What -- and I was

2   like, I don't know, so we just sat there for a minute.

3   Q.   So are we talking -- what date are we talking?

4   A.   I believe this was May 20th.

5   Q.   Was there a commercial garbage truck fire that preceded

6   this?

7   A.   There was.

8   Q.   So tell us about the commercial garbage truck fire.

9   A.   Sorry.  So the shift before that, which I'm guessing

10  would have been the 18th, without looking at a calendar I'm

11  not sure, we got dispatched around lunchtime to a garbage

12  fire.  And essentially what that is, is the garbage trucks

13  that drive around picking up our trash occasionally pick up

14  something like a cigarette or something, and it starts like a

15  little smoldering fire in the back where all the trash is.  So

16  we get dispatched right around lunchtime to a garbage fire

17  along Wilmot road.

18       So we run out to the truck, and I was the one -- I was in

19  the kitchen cooking, so I stayed back for a second and I

20  turned off -- I secured the stove, turned off all the food,

21  locked the doors, and then I made my way out to the truck.  We

22  got in the truck and drove down Wilmot Road, and at that point

23  we saw the garbage truck kind of parked facing southbound on

24  Wilmot.  And what they do is they dump the garbage, basically,

25  into the middle of the road.  So our truck pulls up on scene,

1    and at that point I had most of my gear on.  I was still

2    fixing the rest of my gear.  When I went to put my mask on --

3    because there was some smoke coming up from the pile of

4    garbage.  When I went to put my mask on, one of the clips that

5    we use to tighten down our seal had flipped underneath my

6    mask, so I took a few seconds to fix it.

7         And as I walked -- I don't know if I can kind of explain

8    this to you, but as I exited my part of the fire truck and I

9    started to walk around the back of the truck, traffic had not

10   been stopped in the northbound lanes, so as I started to walk

11   around the back, with the smoke, a car was coming which

12   actually almost struck me.  So I had to backtrack my way

13   around to the other side, and at that point my partner had

14   pulled the red line hose which I had explained was kind of the

15   larger garden hose.  He had pulled the hose line down.  So I

16   went and grabbed a bottle of Joy soap.  That's typically how

17   we fight some of these fires.  We actually add the soap to the

18   water.  So while he sprayed the fire I could add the soap to

19   it.

20   Q.   And after that fire response, anybody say anything to you

21   about your role in that?

22   A.   No.

23   Q.   So then two days later I think we're now still on shift;

24   right?

25   A.   That's correct.

C. CLARK - DIRECT

1   Q.   And who was working on that fire truck or engine with you

2   that day?

3   A.   So it was the normal crew out there.   It was captain was

4   Ted McDonough, my partner, the firefighter, was Tyler

5   McKendrick, and the driver of that truck was named Ron Catlin.

6   Q.   So you're on your way back to the station.   I think I

7   interrupted you.   So what happens as you're on your way back

8   to the station?

9   A.   So like I said, we're coming back from lunch.   We pull

10  over.   Me and my partner in the back are sitting there, trying

11  to figure out what we're doing.   And then Captain McDonough at

12  one point says, Go ahead and put all your turnout gear on.

13  Okay.   So we start putting our gear on, and, you know, my

14  partner asked me, Hey, do you have any idea what we're doing?

15  And I said, No, I really don't.   So I remember getting out of

16  the truck and kind of standing there and waiting.   And then

17  Captain McDonough says, All right.   So Ron fell down and hurt

18  himself, and so now he can't pump the truck.   So Tyler is

19  going to stay back at the truck.   And Carrie, I need you to

20  pull a hose line across the field.

21  Q.   Any kind of hose line?

22  A.   I believe he said pull a transverse line.

23  Q.   And what is a transverse line?

24  A.   The transverse line is our inch-and-three-quarter hose

25  which is typically what we use to fight, like I said, house

C. CLARK - DIRECT

1    fires.  It's preconnected to the truck.

2    Q.   And who else participated -- so what did you come to

3    understand was happening?

4    A.   So at that point it was pretty clear to me that I was

5    performing this drill by myself.

6    Q.   And so how long had you been at Station 6 as of the

7    middle to end of May, 2014 at this point?

8    A.   About 14 months, a little over a year.

9    Q.   And how many times in those 14 months had Captain

10   McDonough had you drill as a team?

11   A.   Never.  Not even one time.

12   Q.   And how many times within the 14 months had Captain

13   McDonough drilled you alone?

14   A.   Never once.

15   Q.   And how about on any of the other shifts that you may

16   have been on, or were you just exclusively working with

17   Captain McDonough for the 14 months?

18   A.   I was just working with Captain McDonough for the period

19   of time.

20   Q.   So who else participated in this drill?

21   A.   Basically, it was just me.

22   Q.   Before the drill started, did Captain McDonough tell you

23   what the drill scenario was until you pulled up to this park?

24   A.   No, he did not.

25   Q.   And did you pull that transverse line?

1    A.    Yes, I did.

2    Q.    And what were you supposed to do?

3    A.    He told me, he just kind of pointed across.  Like I said,

4    there was a big grassy area and then there was like a sand

5    playground for kids.  And he said, go ahead and pull the

6    line over there toward -- it was like a pole which was part of

7    the sandbox.  And so I pulled -- I ran the hose out, I pulled

8    it out, straightened it out, and then I waited for a water

9    supply, for them to put water to the hose.  And at that point

10   I saw Captain McDonough walking toward me.

11   Q.    And what happened next?

12   A.    So he tells me to go ahead and spray water.  So I open up

13   the hose and I'm spraying essentially what I said was kind of

14   like a sandbox.  And I'm just standing there spraying water,

15   and eventually I'm making a huge mess of this playground.  So

16   I kind of looked over at him for direction, and then at that

17   point I shut the nozzle down.

18   Q.    And at this point, how are you feeling about doing this

19   drill by yourself?

20   A.    I mean, I was frustrated.  I was doing it but I was

21   frustrated because I felt -- in my mind, I knew exactly -- I

22   knew that there was concern with him about me being pregnant.

23   And he had mentioned that days earlier, so this scenario to me

24   was all about trying to see if I could still do the job.

25   Q.    And were you showing at that point?

C. CLARK - DIRECT

1   A.   I had a little belly, yeah.

2   Q.   And was everyone else on the crew watching?

3   A.   Yes, they were.

4   Q.   How did that make you feel?

5   A.   Back like when I was on probation for the first time.

6   Q.   What happened when -- what happened next when you looked

7   over at Captain McDonough?

8   A.   So I shut the water down, and at that point we're

9   standing there, and he says, Okay.  And he starts looking

10  around.  And across behind us, way back from where we had come

11  in, there was a set of stairs that led from the neighborhood

12  to the park.  And it was pretty far away.  And he looks over

13  and goes, Okay, so now you have a second-story fire going on

14  over there, and I need you to pull this hose line up those

15  stairs.

16  Q.   And how did you react?

17  A.   At that point I got pretty upset.  And I said, You know

18  what, if you don't want me on the truck, I said, just say so.

19  But don't put me threw these unrealistic drills just to see if

20  I'm going to fail.  And he basically ignored what I said, and

21  he said, Where's your radio?

22  Q.   How did you respond?

23  A.   I said it was in my pocket.

24  Q.   By the way, before you became pregnant, from the time

25  that you were done with probation to this point forward, had

C. CLARK - DIRECT

1  you ever been singled out to drill?

2  A.   Never.

3  Q.   What happened next?

4  A.   So once we started engaging in the conversation I got

5  pretty upset, and he -- I told him, I said, If you don't want

6  me here just say so.  And like I said, he ignored what I said

7  and just asked me about my radio.  And I finally said, You

8  know, I'll just go home sick tonight, and I set the hose down.

9  And at that point I was in tears, I was pretty upset, and I

10  walked back to the truck.

11  Q.   And what happened next?

12  A.   I heard over the radio that Captain McDonough had called

13  for the Battalion Chief Tim Nofs who was our supervisor over

14  there to come out to the scene.

15  Q.   And did Battalion Chief Nofs show up?

16  A.   Yes, he did.

17  Q.   Was he alone?

18  A.   No, he brought Captain Jim Grimes with him who was the EC

19  captain who worked with him at his station.

20  Q.   And what happened when Chief Nofs and Captain Grimes

21  arrived, if anything?

22  A.   So initially Chief Nofs spoke to me for a few minutes and

23  said, you know, Why don't you go sit with Captain Grimes.  He

24  knew that I worked with him in the past.  He said why don't

25  you go sit with Captain Grimes in his truck and talk to him

 1   for a little bit, and I'll talk to these guys over here.  And

 2   so I walked back to Captain Grimes' truck and sat in there and

 3   we talked for probably five or ten minutes.

 4   Q.   And did you eventually go back to Station 6?

 5   A.   We did.  They decided we would all go back to the station

 6   and finish our conversation there.

 7   Q.   And did you continue your discussion there?

 8   A.   Yes, we did.

 9   Q.   And was that the last shift of that tour that you had

10   worked?

11   A.   No.  It was not.

12   Q.   Did you go home that day?

13   A.   I did end up going home that evening.

14   Q.   And what precipitated that, if anything?

15   A.   So as we all stood at the station and discussed, kind of,

16   what happened, I was just upset.  It was kind of hard for me

17   to kind of regain my composure.  I was pretty emotional.  I

18   felt singled out and I basically felt they didn't want me

19   there.  And basically Chief Nofs said, you know, If you're

20   more comfortable going home tonight, we can let you go home.

21   And I said, I think I'd like to go home.

22   Q.   Do you recall subsequently writing a memorandum regarding

23   this incident?

24   A.   I did.

25              MR. JACOBSON:  May I approach?

```
 1              THE COURT:  Yes.

 2   BY MR. JACOBSON:

 3   Q.   Showing you what's been marked for identification as

 4   Plaintiff's Exhibit 41.  Do you recognize that document?

 5   A.   Yes, I do.

 6   Q.   Is that the memorandum that you wrote regarding the --

 7   this drill?

 8   A.   Yes, it is.

 9   Q.   Does that refresh your recollection about the date of the

10   drill?

11   A.   Yes, it does.

12   Q.   And what was the date of the drill?

13   A.   The drill was May 22nd, 2014.

14   Q.   And so the garbage truck fire would have been two days

15   before?

16   A.   That's correct.

17   Q.   May 20th, 2014?

18   A.   That's correct.

19              MR. JACOBSON:  Move for admission of 41.

20              MS. WATERS:  No objection.

21              THE COURT:  41 admitted.

22        (Exhibit 41 entered into evidence.)

23   BY MR. JACOBSON:

24   Q.   And was this a -- was this memorandum a fair and accurate

25   representation or summary of what occurred that day?
```

1   A.   Yes, it is.

2   Q.   Did something happen on -- sorry.  By the way, let's go

3   back to the time line, please.  I want to make sure that we're

4   keeping up to date on that.  Upside down.

5        And is that an accurate representation on May 22nd, 2014

6   that you were singled out to perform firefighting drills?

7   A.   Yes, it is.

8   Q.   Thank you.  Did something happen a week later on

9   May 29th, 2014?

10  A.   Yes.

11  Q.   What happened?

12  A.   So I showed up for work that day, and I believe that was

13  our first shift back after this incident had happened.  And

14  Captain McDonough called in sick.  He didn't come into work

15  that day.  And Chief Nofs, I believe, called me sometime that

16  morning and said he was going to be coming by the station.  So

17  I don't recall what time, but he showed up at the station --

18  Q.   Did it surprise you he was coming to see you at the

19  station?

20  A.   Yes, it did.

21  Q.   Okay.  What happened when he got there?

22  A.   So he comes over and he takes me outside into what we

23  call the bay; basically, like the garage where all the trucks

24  are parked.  And he said, Carrie, I've been ordered to come

25  out here and watch you put your turnout gear on to make sure

1    that it fits you.

2    Q.   So what happened next?

3    A.   So, you know, I kind of questioned, like, Why?  You know,

4    Why do you have to do this?  And he said, I am not -- I told

5    them I didn't want to do this, I didn't think this was right,

6    but he said I was ordered to come out here.  And you know, I

7    had a couple of other questions.  I said, Have you -- What if

8    someone just gains weight?  Do people -- and he said, Carrie,

9    I have never done this before.  So in front of him I had to

10   stand there and put on my full turnout gear and show them that

11   it fit me.

12   Q.   And did they fit?

13   A.   Yes, they did.

14   Q.   And did it surprise you that you were getting this

15   turnout inspection?

16   A.   Yes, it did.

17   Q.   And what about that surprised you?

18   A.   So our first shift that we work of every month, we're

19   required to go out and check all of our gear.  It has to be

20   able to fit, it can't have any holes, to make sure that our

21   gear is up to standard.  And then we have to submit a form,

22   each person at the station collectively.  We give it to our

23   captain, and then they send it in every month, and it's called

24   the station safety inspection list.

25   Q.   And had you done that for the month of May 2014?

 1   A.    Yes, I had.

 2   Q.    Going back to the time line, please.

 3         Is this an accurate representation of what happened on

 4   May 29th, 2014 that you were targeted for an excessive

 5   inspection?

 6   A.    Yes, it was.

 7   Q.    Thank you.  Did you subsequently go on light duty?

 8   A.    Yes, I did.

 9   Q.    And when was that?

10   A.    I believe my official start date was June 16th, but that

11   was my birthday so I started light duty on June 17th.

12   Q.    And what was your assignment?

13   A.    I was assigned to fire prevention as a light duty person.

14   Q.    And what is fire prevention?

15   A.    Fire prevention is a division of the fire department.

16   It's where you work a Monday-through-Friday-type schedule.

17   And you've got inspectors down there who are responsible for

18   doing code enforcement throughout the city.

19   Q.    And who were being supervised by?

20   A.    So I was assigned to -- his name was Ken Brouillette.  He

21   was our code enforcement guy.  He wasn't a firefighter.  He

22   was a civilian employee.

23   Q.    Did you work on June 18th, 2014?

24   A.    Yes, I did.

25   Q.    And what time did you start working on June 18th, 2014?

C. CLARK - DIRECT

1    A.   So I started my shift, my work that day at 6 a.m.

2    Q.   And why did you start at 6 a.m.?

3    A.   I had asked Ken, who was my supervisor, the day before if

4    I could work, you know, certain hours that would actually make

5    it easier for me with child care since I hadn't anticipated

6    coming on to light duty this soon.  And he said he saw

7    absolutely no problem with it.

8             MR. JACOBSON:  Your Honor, this may be a good --

9    it's been an hour and a half.  This may be a good time to take

10   our afternoon break.

11            THE COURT:  All right.  Let's take a 15-minute

12   afternoon break.  Please remember to follow the Court's

13   admonition, and we'll see you back in 15 minutes.

14       (Jury panel excused at 2:28 p.m.)

15            THE COURT:  Be seated, please.

16            And Sandy, you can get the jury.

17            THE CLERK:  Please rise for the jury.

18       (Jury panel entered at 2:47 p.m.)

19            THE COURT:  And everyone may be seated.

20            And the record may reflect the presence of the jury.

21            And Mr. Jacobson, you may continue with your

22   examination.

23   BY MR. JACOBSON:

24   Q.   So to re-orient you, back on June 18th, 2014.  You just

25   started your light duty assignment.  You work for Ken

1    Brouillette.  You started your day at 6 a.m.; right?

2    A.    That's correct.

3    Q.    Did you exercise on June 18th, 2014?

4    A.    Yes, I did.

5    Q.    Did you leave before the end of your shift?

6    A.    Yes, I did.

7    Q.    Is that unusual to leave before the end of your shift?

8    A.    No, it's not.

9    Q.    Why not?

10   A.    I was using -- I was actually going to leave that day

11   early anyway and had planned on using three hours of vacation

12   time.  And prior to that I was working out.

13   Q.    And is there a policy that governs physical requirements

14   in the fire -- in the fire service?

15   A.    Yes, there is.

16              MR. JACOBSON:  May I approach?

17              THE COURT:  Yes.

18   BY MR. JACOBSON:

19   Q.    Showing you what's been marked as Exhibit 39 for

20   identification.  Do you recognize that document?

21   A.    Yes, I do.

22   Q.    What is that document?

23   A.    This is out of our Manual of Operation, it's the section

24   on physical requirement.

25   Q.    And was that the physical requirements policy that was in

1    effect on June 8th -- sorry, June 18th, 2014?

2    A.   Yes, it was.

3              MR. JACOBSON:  Move for the admission of 39.

4              MS. WATERS:  No objection.

5              THE COURT:  39 admitted.

6         (Exhibit 39 entered into evidence.)

7    BY MR. JACOBSON:

8    Q.   So does this policy govern your right to -- or,

9    requirement to exercise?

10   A.   Yes, it does.

11   Q.   And does it refresh your recollection about the

12   requirement of exercising?

13   A.   Yes, it does.

14   Q.   What is the requirement?

15   A.   When you're assigned to eight hours, which I was at the

16   time, we are required to work out three days a week.  And we

17   have an hour and a half to do that each day, so up to four and

18   a half hours per week.

19   Q.   So are you referring Section 210.8.4?

20   A.   Yes, I am.

21   Q.   And is physical activity supposed to be done during

22   shifts?

23   A.   Yes, it is.

24   Q.   And regarding where to work out, what is the requirement

25   under this policy?

1   A.   I believe under this policy it states that either you'll

2   work out at your station where you're assigned or we're also

3   allowed to work out at public parks -- or, city parks, I'm

4   sorry, and pools I believe if they're closed to the public.

5   Q.   So showing you what's been marked, still the same

6   exhibit, looking at 210.8.6 which I circled.  Is that the

7   section of the policy that allows you to work out at city

8   parks or a city swimming pool with the pool is closed to the

9   public?

10  A.   That's correct.

11          MR. JACOBSON:  I'll move to admit to identify that

12  as Exhibit 124.

13          MS. WATERS:  No objection if we're moving to admit

14  it.

15          THE COURT:  All right.  124 is admitted.

16      (Exhibit 124 entered into evidence.)

17  BY MR. JACOBSON:

18  Q.   While that's rendering, this is the policy as far as you

19  understood it that applied to you as a light duty employee?

20  A.   That's correct.

21  Q.   And is there anything in this policy that addresses

22  physical requirements for pregnant employees?

23  A.   No, there is not.

24  Q.   At the time, were you aware of any policy that required a

25  pregnant employee to obtain a doctor's note before they could

1   exercise?

2   A.   No, I was not.

3   Q.   And is it, based on your experience, a frequent

4   occurrence for firefighters to work out at city parks?

5   A.   Yes, it is.

6   Q.   So were you -- did you in fact exercise on June 18th at a

7   city park or what happened?

8   A.   Yes, I did.

9   Q.   Do you remember what park you went to?

10  A.   I can't remember the name of it, but it's just off --

11  kind of near downtown.  I can't think of the name of it, but I

12  think it's off Tucson Boulevard.

13  Q.   And it's not far from fire headquarters?

14  A.   No, it's not that far.

15  Q.   And did you happen to check Telestaff the following day,

16  June 19th, 2014?

17  A.   Yes, I did.

18           MR. JACOBSON:  May I approach?

19           THE COURT:  Yes.

20  BY MR. JACOBSON:

21  Q.   Showing you what's been marked as Exhibit 40 for

22  identification.  Do you recognize these two pages of

23  documents?

24  A.   Yes, I do.

25  Q.   And what are we looking -- what are you looking at there?

1   Sorry.

2   A.   So basically, this is one way to view the hours that were

3   deducted from me for light duty vacation.  Hours that were

4   taken away from me for vacation time.

5   Q.   Are is this document essentially a different way to view

6   Telestaff?

7   A.   Yes, it is.

8            MR. JACOBSON:  Okay.  Move for the admission of 40.

9            MS. WATERS:  No objection.

10           THE COURT:  40 is admitted.

11      (Exhibit 40 entered into evidence.)

12   BY MR. JACOBSON:

13   Q.   And when you checked Telestaff on June 14th -- I'm sorry,

14   on June 19th, 2014, what happened?  What did you see?

15   A.   So when I left on June 18th, I had -- like I said, I was

16   planning to use three hours of vacation time.  I had arrive at

17   6 and I planned to leave at 1:30.  I was going to work out

18   before that, and then I was going to use vacation from 1:30 to

19   4:30, so I knew I had put in for three hours of vacation time.

20   When I logged in the following day when I got to work, I

21   noticed that six hours of vacation time -- my Telestaff had

22   been changed, and three additional hours had been deducted

23   from my vacation bank.

24   Q.   And that's reflected on the first page of Exhibit 40?

25   A.   That's correct.

1   Q.   Did you, upon finding this out, did you talk to anyone?

2   A.   Yes, I did.

3   Q.   Who did you talk to?

4   A.   Initially, I believe I talked to -- I called up to the HR

5   payroll and asked if they knew why my time had been changed.

6   Q.   Did you then talk to your supervisor?

7   A.   I did.  When he got in I talked to Ken Brouillette.

8   Q.   And what, if anything, did Mr. Brouillette tell you

9   about -- about his -- about this or his ability to change it?

10  A.   He basically said he had no power to change my Telestaff.

11  Q.   Did anything else occur on June 19th, 2014, regarding

12  your light duty assignment in fire prevention?

13  A.   Yes.  On that particular day, like I said, I had arrived

14  at work at 6.  I had worked -- my plan, I had already spoke to

15  my supervisor about it, I was going to work through the first

16  part of the day, I brought my lunch at that time, and then I

17  was going to leave.  I was going to work out, and then I was

18  going to leave early that day.  And he had no problem with it.

19       So they had asked me to come upstairs and do some filing

20  for them that particular morning, so I went upstairs like I

21  was asked, and I completed this job that they had asked of me.

22  And at that point one of the girls that was in the office I

23  was in had said, Okay, I'm done with my assignment.  I'm going

24  to go back downstairs and get ready to go work out.

25       And before I had even made it from the first floor

1    down -- the second floor down to the first floor, I had

2    received a phone call from one of the HR assistants.  Her name

3    was Veronica.  And she told me that JoAnn had called her, the

4    HR manager JoAnn had called her and advised her I was not

5    allowed to leave.  And to tell me that I'm not allowed to work

6    out, and that I'm not allowed to -- I'm not allowed to leave

7    to work out, and I'm not allowed to work out until I get a

8    note from my doctor.

9    Q.   So you're told you're not allowed to work out until you

10   get a note from your doctor; right?

11   A.   That's correct.

12   Q.   Were you aware of anybody else that had that requirement

13   placed on them?

14   A.   No, I was not.

15   Q.   Were you also told anything about your start time?

16   A.   I was told about the whole conversation that I was not

17   allowed to come in at 6 a.m.  I was not allowed to start my

18   shift before 7.

19   Q.   Did anyone give you a reason why?

20   A.   No, they didn't.

21   Q.   By the way, how did you get your assignments when you

22   first started in light duty?

23   A.   So when you're assigned to light duty, I was assigned to

24   fire prevention; and I had Ken Brouillette, the code

25   enforcement manager, as my supervisor.  My first day there he

1    brought me into a room where they did all the plan reviews,

2    and he said here's your project.  And he gave me about

3    35 accordion folders and said, I need you to go through every

4    single one of these, and we need to know if these addresses

5    still exists, if these buildings still exist.  And kind of

6    made a joke about this should probably take you through your

7    child's first birthday it was a substantial amount of work.

8    So I knew from day to day every time I came in what my

9    assignment was.

10   Q.   So how long did that project take you to complete?

11   A.   I believe it took me almost through the end of my light

12   duty.

13   Q.   Did you need to get new assignment or new work every day

14   that you showed up at work?

15   A.   No, I did not.

16   Q.   If you can find Exhibit 4 in that pile.  And I'll ask to

17   publish -- to go back to Exhibit 4 and to publish that since

18   it's already in evidence.  Is there anything in Exhibit 4, and

19   if you need to review it to refresh your recollection, please

20   let me know, that says any restrictions -- that there were

21   restrictions on somebody who is on light duty on exercising or

22   flexing time?

23   A.   You mind if I just look at it for a second?  (Pause.)

24   No, there is not.

25   Q.   So going back to the time line, we're at May 29th, and

1    then the series of events happens on June 19th that you were

2    deprived of vacation time, precluded from starting at 6 a.m.,

3    restricted to only exercise at 1, and forced to obtain a

4    doctor's note before you can exercise.  Is that an accurate

5    portrayal of what occurred on June 19th, 2014?

6    A.    That's correct.

7    Q.    Thank you.  What happened next after June 19th?  Did

8    something happen on June 30th, 2014?

9    A.    Right.  So I'm working downtown, my light duty

10   assignment.  And I was contacted by -- I had been in contact

11   with Chief Nofs who was my battalion chief when he was

12   assigned to Station 6, and he told me that the department was

13   looking to pursue discipline on me for the drill that had been

14   conducted on Engine 6 back in May.  And that he was going to

15   basically come down and have me sign a form.

16             MR. JACOBSON:  May I approach?

17             THE COURT:  Yes.

18   BY MR. JACOBSON:

19   Q.    Showing you what's been marked as 42 for identification.

20   Do you recognize that document?

21   A.    Yes, I do.

22   Q.    And what is that?

23   A.    This is the education counseling that I received in

24   regards to that May 22nd drill.

25             MR. JACOBSON:  Move for the admission of 42.

1          MS. WATERS:  No objection.

2          THE COURT:  42 is admitted.

3      (Exhibit 42 entered into evidence.)

4   BY MR. JACOBSON:

5   Q.   Is this document, is an educational document disciplinary

6   in nature?

7   A.   It's not a formal discipline, but it states at the bottom

8   it can lead to further disciplinary action.

9   Q.   And was the information contained in the supervisor's

10  comments accurate?  And if you need a second to review it,

11  please go ahead.

12  A.   (Pause.)  It's not completely accurate.

13  Q.   What's inaccurate about it?

14  A.   I do believe I had the hose bale opened all the way.  I

15  never said that I did not have my radio.  I had it in my

16  pocket the entire time.  I believe that I did complete the

17  drill, which was to pull the transverse hose and spray it

18  across to the mentioned area that he pointed out.  That part

19  was completed.  I didn't drop the hose by any means on the

20  ground.  And I didn't walk away without saying a word.  That

21  was the whole conversation that I had mentioned before, that I

22  had said, you know, If you don't want me on the truck, you

23  know, say something about it.  So there was actually a lot of

24  conversation that happened.  And then the rest is fairly

25  accurate.

1  Q.   So is this document -- even though this document is not

2  disciplinary in nature, how did it make you feel?

3  A.   I mean, it upset me because it's not -- it's not

4  accurate.

5          MR. JACOBSON:  Move for the admission -- I think

6  I've already admitted 42.  Move for admission of 42 if I

7  haven't already.

8          MS.WATERS:  I think it's been admitted.  We still

9  have no objection.

10  BY MR. JACOBSON:

11  Q.   And if you would, go to the time line.  You received this

12  counseling on what day?

13  A.   This was June 30th of 2014.

14  Q.   And is that accurately reflected on this time line

15  June 30th, counseled for 5-22 drill?

16  A.   That's correct.

17          MR. JACOBSON:  Your Honor, at this time I ask to

18  take a witness out of order as we discussed.

19          THE COURT:  Yes.  For scheduling reasons, members of

20  the jury, the attorneys have agreed that this witness may be

21  taken out of order.

22          So Ms. Clark, you can step down, and you may call

23  your next witness.

24          MR. JACOBSON:  Plaintiff calls Matthew Larsen.

25          (Testimony of Matthew Larsen not transcribed.)

```
 1              THE COURT:  All right.  Thank you, sir.  You may

 2   step down.

 3              And Mr. Jacobson, do we need Ms. Clark back up on

 4   the stand?

 5              MR. JACOBSON:  We'll recall Ms. Clark.

 6              THE COURT:  Ms. Clark, you can return to the witness

 7   stand.

 8              MR. JACOBSON:  May I have a moment just to get

 9   myself back --

10              THE COURT:  Sure, take your time.

11   BY MR. JACOBSON:

12   Q.   We're back to the summer of 2014.

13   A.   Okay.

14   Q.   You're told June 30th you're getting an educational

15   counseling for what happened on the May 22nd drill.  How are

16   things going for you around this time?

17   A.   I was pretty -- I was pretty upset about everything going

18   on:  Obviously coming to light duty sooner than I wanted; the

19   drill I felt I had been singled out for my pregnancy and

20   obviously I got upset about how I was -- how I felt; and now

21   I'm being told they wanted to pursue discipline on me.  So it

22   was -- it was pretty emotionally exhausting.

23   Q.   Who is Mary McDonald?

24   A.   Mary McDonald is a civilian employee.  She is a nurse, a

25   registered nurse that works for Tucson Fire, and she's our
```

1   prehospital director.

2   Q.   Did she work at fire headquarters?

3   A.   Yes, she did.

4   Q.   Did anything happen in August of 2014 that involved Mary

5   McDonald?

6   A.   Yeah.  There was a day that I was pretty emotionally worn

7   down, and I was sitting in my car I think at lunchtime down in

8   the parking garage.  And I was crying, I was upset, and I was

9   alone, so I was just kind of trying to let my emotion and

10  stuff out in privacy.  And she walked by and she saw me

11  through the car.  And I remember, you know, she just kind of

12  stopped and looked at me, like -- you know, kind of gave me,

13  Are you okay?

14  Q.   Was there some precipitating event that led you to go

15  into your car and want to cry in private?

16  A.   Yeah.  So shortly after we filed the notice of claim that

17  we were filing this lawsuit, the Arizona Daily Star ran an

18  article about it.  It was devastating to me to find that out.

19  I actually had really tried to keep this as private as I

20  possibly could.  And I remember receiving a phone call from my

21  attorney saying, Hey, the Daily Star just called.  They --

22  they saw your claim and they're running an article tomorrow.

23  Q.   So did you call the newspaper and seek out this

24  publicity?

25  A.   Absolutely not.

C. CLARK - DIRECT

1  Q.   And how did seeing this newspaper article affect you?

2  A.   So knowing it was coming out the next morning, I don't

3  think I slept that entire night.  I kept logging online to see

4  if the article had come up yet.  I was terrified of what it

5  was going to say because I had given no input, so I didn't

6  know what they were going to post.  And I would say 3, 4:00 in

7  the morning I saw the article come out online, and it was a

8  little bit of a relief.  It wasn't too bad either way that I

9  read it.  I didn't want, you know, really anything

10 discrediting to anybody particularly so I kind of felt, okay,

11 you know, I read it, it's okay.  And then within hours and for

12 weeks after that the online comments regarding my article were

13 just trolling.  They were just really mean and inaccurate

14 and --

15 Q.   Were there some positive comments, too?

16 A.   There were.

17 Q.   How was this situation affecting your marriage at this

18 time?

19 A.   So at this point in August, I'm about nine months'

20 pregnant.  I've obviously gone through a string of events that

21 have brought me down.  And after the stuff with the article,

22 the online -- I guess what someone could say online bullying,

23 online trolling, whatever you call it, it got me to a place

24 where I've never been before.  It's probably the deepest

25 depression I had ever sunk into.  And because I had to, you

1  know, maintain my composure at work, I was falling apart at

2  home.  And I basically pushed everyone in my life -- sorry.  I

3  had like pushed everybody away from me, including my husband.

4  I felt like I wanted to be alone.  I felt there were

5  certain days I didn't even want to -- I didn't even want to

6  live anymore, but, you know, I had a baby that I was carrying

7  so it was a really hard time.

8  Q.   Was there a time that you actually went even further with

9  those thoughts?

10  A.   So I had convinced my husband I wanted a divorce.  I

11  wanted to be alone.  I didn't want anybody with me.  I just --

12  I wanted to be alone.  And I was -- like I said, I had the

13  baby at the end of August, and at some point shortly after

14  that I had told him I wanted a divorce.  And because I had a

15  C section and so I was at home resting up, I told him to go

16  out and file for divorce and I would sign the papers, and he

17  did.

18  Q.   So gave birth to your second son, Mason; right?

19  A.   Yes, I did.

20  Q.   What date was that?

21  A.   Mason was born on August 26th of 2014.

22  Q.   And if you would call up the time line.

23       And is that showing on the time line, August 26th, 2014,

24  your son, Mason, born.  An accurate depiction of what

25  happened?

```
 1   A.    Accurate.

 2   Q.    By the way, did you work right up to the due date again?

 3   A.    Yes, I did.

 4              MR. JACOBSON:  May I approach?

 5              THE COURT:  Yes.

 6   BY MR. JACOBSON:

 7   Q.    Showing you what's been marked as Exhibit 43.  Do you

 8   recognize this document?

 9   A.    I do.

10   Q.    And what is it?

11   A.    This is our petition for divorce.  This is the divorce

12   filing.

13   Q.    And who filed?

14   A.    My husband did.

15              MR. JACOBSON:  Move for the admission of 43.

16              MS. WATERS:  No objection.

17              THE COURT:  43 is admitted.

18        (Exhibit 43 entered into evidence.)

19   BY MR. JACOBSON:

20   Q.    Did you, in fact, follow through with the divorce?

21   A.    No, we did not.

22   Q.    Did you breastfeed Mason?

23   A.    Yes, I did.

24   Q.    By the way, was your marriage perfect before this

25   happened, before you, you know, petitioned for divorce?
```

1  A.   No.  It's never been perfect.

2  Q.   So you breastfed Mason; right?

3  A.   Yes, I did.

4  Q.   When did you come back to work?

5  A.   I believe I came back November 24th or 27th of 2014.

6  Q.   And by the way, were you paid for being on maternity

7  leave when you -- after Austin was born?

8  A.   No, I was not.

9  Q.   Were you paid for being on maternity leave after Mason

10 was born?

11 A.   No, I was not.

12 Q.   To your knowledge, is there now a policy that allows for

13 some paid maternity and paternity leave?

14 A.   Yes.  There is a policy.  I believe it maybe last year

15 started, but not in the time frame when I had my children.

16 Q.   So that didn't apply to you?

17 A.   No, it did not.

18          MR. JACOBSON:  May I approach?

19          THE COURT:  Yes.

20 BY MR. JACOBSON:

21 Q.   Showing you what's been marked 44 for identification.  Do

22 you recognize that document?

23 A.   Yes, I do.

24 Q.   And what is that document?

25 A.   So when I returned from maternity leave the second time,

1    I had tested and ultimately promoted to a fire inspector on a

2    Monday-through-Friday shift.  So this was from -- his name is

3    Mike Carsten.  He was the deputy chief over fire prevention.

4    And this was my first day back to work, so he was sending me

5    an e-mail saying, basically, welcome to fire prevention.

6              MR. JACOBSON:  Move for the admission of 24.

7              MS. WATERS:  No objection.

8              THE COURT:  24 is admitted.

9              MR. JACOBSON:  44.  I'm sorry.

10             THE COURT:  44 is admitted.

11        (Exhibit 44 entered into evidence.)

12             MR. JACOBSON:  That was my fault.

13   BY MR. JACOBSON:

14   Q.   And so does this refresh your recollection as to the date

15   that you came back to work?

16   A.   Yes, it does.

17   Q.   And what date was that?

18   A.   That was November 24th of 2014.

19   Q.   And what does -- if you would, read the e-mail into the

20   record regarding your return back to work.

21   A.   Okay.  It says, Carrie, I want to welcome you back to

22   work and we are pleased to have you here in prevention.

23             THE COURT:  I think -- can't the jury read this

24   themselves?

25             MR. JACOBSON:  Yes, Judge.  I'll withdraw that and

C. CLARK - DIRECT

1   I'll ask you a question about that.

2   BY MR. JACOBSON:

3   Q.   Did the fire department at that time alert you as to

4   whether there was going to be a lactation space for you?

5   A.   Yes, they did.

6   Q.   And what did they let you know about it?

7   A.   They told me where the room was going to be, and that I

8   would be sharing that time with another civilian employee who

9   worked down at fire headquarters, and we could communicate as

10  to who needed to use the room when.

11  Q.   And did they tell you how the room got secured?

12  A.   It was a locked door and one of the secretaries held onto

13  the key.

14  Q.   And what was your -- I think you already testified to

15  this, but what was your position at the time?

16  A.   At that time I was a fire inspector.

17  Q.   So what is a fire inspector?

18  A.   So a fire inspector, we go around, we do building

19  inspections, restaurant inspections, and business inspections

20  and we're making sure that they're compliant with code -- code

21  enforcement.  For instance, we inspect to make sure exit signs

22  work and that they're lit up.  And fire extinguishers, the

23  proper amount of distance they need to be.  And exits if you

24  were to evacuate a building, stuff to that effect.

25  Q.   And did you have to -- how did you get that assignment?

1    A.    So during my time on light duty when I was pregnant the

2    first with my son, Austin, I had actually completed fire

3    inspector certification.  And the second time I was on light

4    duty when was pregnant with Mason, I redid the fire inspector

5    classes.  I attended some of the classes as a refresher.  And

6    then I'm not exactly sure which month, but sometime I think it

7    was like July or August, they ran a promotional exam so that

8    you could promote to the inspector position.  So I signed up

9    for that, I ultimately took the written examination, and went

10   through an oral board.  And then we were placed again on an

11   eligibility list and promoted as a position came available.

12   Q.    So as of the end of November 2014, you're a fire

13   inspector?

14   A.    Yes, I was.

15   Q.    Fast forward, now March 2016.  Where are you working?

16   A.    I'm still working in fire prevention.

17   Q.    What were you doing in fire prevention?  What was your

18   role?

19   A.    So at this point I had been assigned to the building

20   permits and new construction.  And the difference basically

21   with that was any sort of modifications that were done on a

22   building, if they built an addition and wanted to add a

23   sprinkler system, new exit, something like that, or brand new

24   construction, businesses have to be signed off on what's

25   called a fire final or a sprinkler final.  So basically, we

1  have to go out to these different establishments and inspect

2  that, what their plans were approved is how they actually

3  built it, and then we need to test things before we're able to

4  give them the approval to go back into business.

5  Q.   And on March 24th, 2016, did you receive an educational

6  counseling?

7  A.   Yes, I did.

8         MR. JACOBSON:  May I approach?

9         THE COURT:  Yes.

10 BY MR. JACOBSON:

11 Q.   Do you recognize this document?

12 A.   Yes, I do.

13 Q.   Is that the educational counseling you received on

14 March 24th, 2016?

15 A.   Yes, it is.

16        MR. JACOBSON:  Move for admission of 45.

17        MS. WATERS:  No objection.

18        THE COURT:  45 is admitted.

19    (Exhibit 45 entered into evidence.)

20 BY MR. JACOBSON:

21 Q.   Can you tell us what brought about what you come to

22 receive from the fire department as an educational counseling?

23 A.   Do you want me to take it by the paragraphs or just in

24 general?

25 Q.   Just tell us what happened, what you recall.

1    A.   Basically what happened, sometime in March there was --

2    out in Vail they were trying to open up a new Native Wings.

3    And what they were calling us out there for was the part of

4    their final was the $CO_2$ systems.  And so basically when you --

5    it's a little bit complicated, but when you install, like,

6    soda machines and they run off the $CO_2$ tanks, there's a

7    possibility of the tanks leaking at different points which can

8    allow $CO_2$ to leak into an establishment.  There was an

9    incident in Phoenix Fire where people were almost killed in a

10   McDonald's for a similar incident, so now it's been adopted

11   basically into the code and something we go out and enforce.

12   So I had actually sought some additional training on this the

13   $CO_2$ system because it was actually of interest to me.

14        So on this particular inspection, it was assigned to

15   another inspector by the name of John Vincent.  And he

16   contacted me and said, Hey, do you want to go with me?  I

17   don't know much about $CO_2$ systems.  You know a lot more.  So I

18   agreed to go and I had another brand new fire inspector that

19   was riding along with me, so he came along with me.  After we

20   walked into the Native Grill, we were met by the $CO_2$ company

21   in the back of the building, and the gentleman tells me almost

22   after we walked in, he said, It's not but right, but it's what

23   the plan said.

24        And I said, What do you mean?  And he said, There's no

25   $CO_2$ detectors where the actual pumps are.  They're all out

1    there where the soda fountains are.  And from my training I

2    knew that that actually wasn't accurate, so we got into a

3    little bit of a discussion about this system.  And he said,

4    you know, I even called my supervisor and said, Hey, this

5    isn't right.  And he said, Well, my supervisor said if the

6    plans were signed off, just do it like the plans say.

7         So after we completed that inspection, eventually at some

8    point in the day I made it back down to fire headquarters, and

9    I heard John Vincent -- our cubicles were pretty close

10   together.  I heard him saying something about that inspection,

11   so I went over to inquire like what -- you know, he sounded

12   kind of upset.  And I said, What's wrong?  What are you upset

13   about?  Well, that was embarrassing.  And you know, we --

14   basically, John was under the impression that the system was

15   compliant.  And I was trying to explain to him, no, actually

16   it wasn't actually compliant and here's why.  And we started

17   going over it, and I said the problem was the plans were

18   approved this way.

19        And at that point another inspector by the name of Nikki

20   Sprenger was in her cubicle which was just right here, and she

21   walks over and she says, No, you're wrong.  I approved those

22   plans and, you know, the system was right.  So it turns into

23   this petty conversation of, no, I was right.  No, you were

24   right.  And I said a few things to her.  I said, you know, you

25   haven't been trained on this, like -- the system is not right.

1    And my frustration came from the fact that my -- I empathize

2    with these businesses who are pouring all this money into what

3    we're telling them to do, and we're telling them to do the

4    wrong thing so now they're going to lose money.  They're going

5    to lose -- the opening date is going to get pushed back and

6    that kind of thing, so my frustration came out of that.

7         So me and her had a small agreement about it.  I tried to

8    tell her, Look, I'm talking about to John about this.  This

9    isn't between me and you.  And within a few minutes, I mean,

10   the conversation was over and we all just went on about our

11   day.

12   Q.   And then you received this counseling?

13   A.   Right.  So this is probably a week -- a couple of days or

14   I'm not sure, within the time frame, a week or so, I come back

15   from doing one of my inspections.  And Ken Brouillette, my

16   supervisor at the time, asked me to come talk to him in his

17   office, and he hands me this form and we read it together.

18   Q.   And were the allegations about the incident and the

19   precipitating factors of this accurate?

20   A.   I don't believe they were.

21   Q.   And why not?

22   A.   So to say that I was criticizing anybody else's work is

23   completely inaccurate because when I went out and performed

24   this inspection in particular, I didn't know who had approved

25   those plans.  I didn't know it was Nikki Sprenger who had

1    approved these plans.  I just knew the plans weren't accurate.

2    It's my duty when something like this -- business is obviously

3    upset, they're going to have a phone call about it, and it's

4    my duty I feel to notify my supervisors when this kind of

5    stuff is coming down the line.

6         In the time I had worked there, there was only a handful

7    of things that I had to bring to the attention of my

8    supervisor, but they were significant enough issues where I

9    felt there was a life safety violation or that they may be

10   receiving a phone call because the business was upset about

11   what was going on.

12   Q.   All right.  Do you have a legal obligation, as far as you

13   know, to report life safety issues with inspections?

14   A.   I absolutely do.

15   Q.   And why is that?

16   A.   So the life safety issues could not only endanger the

17   public, but it could also endanger the fire department if

18   we're responding to the buildings.  We can go as far as red

19   tagging and shutting down a business if we feel the safety

20   violations are significant enough or they're not willing to

21   make the corrections in the time that we need.

22   Q.   What is paramedic assignment and incentive pay?

23   A.   Paramedic assignment pay is what in the fire department

24   we call the 150 Club.  So basically once you receive your

25   paramedic certification, you're eligible to enroll yearly in

1   this program that they call the 150 Club.  So between the two

2   paychecks a month you're given 70 something dollars each

3   paycheck, and that's so that you attend your training classes,

4   you keep your certification current and you eligible and keep

5   yourself able to work a paramedic if they need you.

6       So for someone like me who is a firefighter or for

7   someone like my husband who is a captain but also a paramedic,

8   we're both in the 150 Club.  And at any time whether we're

9   working overtime or even my regular shift, if they need me to

10  act as a paramedic, I have to make myself available to work

11  that shift as a paramedic.

12          MR. JACOBSON:  May I approach?

13          THE COURT:  Yes.

14  BY MR. JACOBSON:

15  Q.    Showing you what's been marked as Exhibit 46.  Do you

16  recognize that document?

17  A.    Yes, I do.

18  Q.    And what document is that?

19  A.    This is the announcement of the annual time to sign up

20  for the paramedic incentive pay.  They send it out yearly, and

21  it comes with the attachment of the form which you're supposed

22  to fill out if you want to remain receiving this pay, and then

23  we send up it through our chain of command by the time noted

24  on the form.

25  Q.    And what else is included in those documents?

 1    A.    The actual paramedic assignment pay form that we're

 2    required to fill out.

 3                MR. JACOBSON:  Move for the admission of 46.

 4                MS. WATERS:  No objection.

 5                THE COURT:  46 is admitted.

 6         (Exhibit 46 entered into evidence.)

 7    BY MR. JACOBSON:

 8    Q.    And if you would, turn to the third page of that

 9    document.

10         So is that a blank form?

11    A.    That's correct.

12    Q.    Okay.  Did you stay in fire prevention?

13    A.    I did not.

14    Q.    And were you informed that you were being involuntarily

15    transferred?

16    A.    I was.  I was involuntarily transferred out of fire

17    prevention in April of 2016.

18    Q.    And so what's the difference between being in fire

19    prevention and wherever you were going?

20    A.    So like I had mentioned, when you're on eight hours is

21    what we call it, you're on a Monday-through-Friday schedule.

22    Or some people work four 10-hour days, but we refer to it as

23    an eight-hour shift.  You go home every night.  You don't work

24    weekends.  You don't work in holidays.  You work essentially

25    down at fire headquarters, and your schedules are anywhere

1  typically 7 to 5, 8 to 5, 6 to 4.  Where I work, I work out in

2  suppression, so I'm on the rotating schedule of 24-hour

3  shifts.

4  Q.   What was the effective date of the transfer back into

5  operations?

6  A.   So I was notified I was being transferred out of fire

7  prevention at the end of April, and the effective date I

8  believe was May 2nd of 2016.

9  Q.   So let's talked about the term "seniority" for a second.

10  We heard a little bit about it earlier this morning.  What is

11  that?

12  A.   So seniority is your -- where you rank within your peers

13  of equal rank.  So right now I'm a firefighter.  And depending

14  upon how many years I've been a firefighter would put me how I

15  rank against the other firefighters on the job.  When I was a

16  paramedic, I think I told you we took that promotional test

17  and they ranked us, say, 1 through 20, and that's how we were

18  promoted.  Forever we would stay in the order of our rank.  So

19  even though I was No. 1 on the list and I came on in 2007,

20  No. 2 on my list may have come on in 1995.  But because of how

21  we ranked as paramedics, I was senior to that person it.  So

22  it's depending upon basically how you rank within your own

23  either captain or an engineer, firefighter or paramedic.

24  Q.   And why is seniority important in the fire service?

25  A.   So the biggest thing with the department is you want to

1    find a station that you like, that you want to be at.  And the

2    only way you typically secure those kind of long-term, good

3    assignments is when you win a bid to that assignment.  I

4    currently have been at my station for two and a half years

5    because I won the bid there, and I like it there, and I'm

6    senior to, you know, maybe the other people that would have

7    wanted to go there.  So depending upon if you have your eyes

8    on a certain spot, it depends on where you rank within the

9    other members, the possibility of you getting that station.

10   Q.   Did something happen -- let me ask you, catch up on the

11   time line, so if you would go back to the time line.  If you

12   would go to the next slide.  Is that correct that you returned

13   to work on November 24th, 2014?

14   A.   That is correct.

15   Q.   Next slide.  And on March 24th, 2016, were you

16   disciplined for not being in harmony with others?

17   A.   That's correct.

18   Q.   And was that -- we didn't cover it under that exhibit,

19   but was that part of the reason why or the reason why you were

20   disciplined?

21   A.   That's correct.

22   Q.   And was that the language used?

23   A.   Yes.

24   Q.   Okay.  And then April 27th, about a month later, you are

25   involuntarily transferred?

1    A.    That's correct.

2    Q.    Okay.  Thank you.  Did something happen on May 13th, 2016

3    regarding seniority?

4    A.    Yes.  So.

5    Q.    So what -- so -- let me show you the exhibit.

6              MR. JACOBSON:  May I approach?

7              THE COURT:  Yes.

8    BY MR. JACOBSON:

9    Q.    Do you recognize that document?

10   A.    Yes, I do.

11   Q.    What's the title of the document at the top?

12   A.    Master Memo.  Subject, 2016 Seniority Within Rank Report.

13   Q.    What's a Master Memo?

14   A.    A Master Memo is, like, an official announcement that

15   comes out to us.  We have Master Memos and daily bulletins.

16   Daily bulletins can be more announcements of upcoming events

17   or bids going out something like that.  A Master Memo is

18   something more official that's kind of adopted into our.

19             MR. JACOBSON:  Move for admission of plaintiff's 47.

20             THE COURT:  Any objection?

21             MS. WATERS:  No objection.

22             THE COURT:  47 is admitted.

23        (Exhibit 47 entered into evidence.)

24   BY MR. JACOBSON:

25   Q.    And what is this -- what was your understanding of what

 1   this memo was announcing?

 2   A.    So basically, this was an announcement that they were

 3   going to recalculate the way they did seniority.  This was the

 4   first time I had ever heard of this so this was kind of a

 5   brand new thing.  And basically, the basis of this was that if

 6   you were lateralling between positions, for instance

 7   paramedic, inspector, and engineer, those were all equal in

 8   the level you can promote to, so if you're lateralling within

 9   a rank, you're going to lose seniority for the rank that you

10   left.  If that makes sense.

11   Q.    And to your knowledge, was the union involved in some

12   degree in this -- this manner?

13   A.    Yes, they were.

14   Q.    And when was this policy made effective?

15   A.    So we were notified of this policy of May 13th, and it

16   was backdated to be effective May 1st.

17   Q.    When did you enter back on duty as a swing shift

18   paramedic after the involuntary transfer?

19   A.    May 2nd, 2016.

20            MR. JACOBSON:  May I approach?

21            THE COURT:  Yes.

22   BY MR. JACOBSON:

23   Q.    Showing you what's been marked as Exhibit 48 for

24   identification.  What is that?  Or do you recognize that

25   document?

1   A.   Yes, I do.

2   Q.   And what is it?

3   A.   This is the -- at the time the May 2016, this was the

4   seniority list for the rank of paramedic.

5   Q.   Was that attached to this master memo?

6   A.   Yes, it was.

7            MR. JACOBSON:  Move for the admission of 48.

8            MS. WATERS:  No objection.

9            THE COURT:  48 is admitted and may be published.

10       (Exhibit 48 entered into evidence.)

11   BY MR. JACOBSON:

12   Q.   Do you see your name on this spreadsheet?

13   A.   Yes, I do.

14   Q.   And what page?

15   A.   It's page 10 of 16.

16   Q.   If we could turn to that page.  And if you would, just

17   maybe highlight where your name is at.

18   A.   (Witness complied.)

19   Q.   Okay.  Was your seniority negatively impacted by the

20   retroactive application of this policy?

21   A.   Yes, it was.

22   Q.   How so?

23   A.   I was basically deducted two years of seniority, and that

24   made me drop in the seniority rank by about 14 positions if I

25   counted that right.

1    Q.   So mechanically, maybe explain to the jury how that

2    happened.

3    A.   So because they backdated this policy to be effective

4    May 1st and it showed me entering into operations on May 2nd,

5    they basically used the new designated way to calculate

6    seniority and applied it to me who had been in fire prevention

7    for almost the last two years.  So basically, they deducted

8    two years of my seniority and bumped me down significantly to

9    where I used to rank as a paramedic.

10   Q.   Do you recall being deposed by the City of Tucson in this

11   case?

12   A.   Yes, I do.

13   Q.   How many times were you deposed?

14   A.   I was deposed four times.

15   Q.   Do you recall the date of your first deposition?

16   A.   I believe it was May 25th of 2016.

17          MR. JACOBSON:  May I approach?

18          THE COURT:  Yes.

19   BY MR. JACOBSON:

20   Q.   Showing you what's been marked as Exhibit 49.  Do you

21   recognize do you recognize that document?

22   A.   Yes, I do.

23   Q.   What is that document?

24   A.   This is our Tucson Fire Manual of Operations policy that

25   relates to court appearances, depositions and interviews.

1   Q.   And I'm sorry, where is it found?

2   A.   It's in our Manual of Operation, Section 203.

3   Q.   And to your knowledge, was this the policy in effect at

4   the time that you were deposed in this case?

5   A.   Yes, it was.

6             MR. JACOBSON:  Move for admission of 49.

7             MS. WATERS:  No objection.

8             THE COURT:  49 is admitted and may be published.

9        (Exhibit 49 entered into evidence.)

10  BY MR. JACOBSON:

11  Q.   First, were you required to appear at your deposition?

12  A.   Yes, I was.

13  Q.   Did you review this policy before you were deposed?

14  A.   Yes, I did.

15  Q.   On May 25th, 2016, were you scheduled to work?

16  A.   Yes, I was.

17  Q.   And were you paid by the City that day?

18  A.   No, I was not.

19  Q.   And were you required to show up?

20  A.   Yes, I did.

21  Q.   Showing you -- taking a look at Section 203.9.2, did you

22  seek compensation under this section of the policy?

23  A.   Are you saying did I seek a monitary compensation?

24  Q.   So what did you ask for --

25  A.   Okay, so --

1   Q.   -- under this policy?

2   A.   So since I was scheduled to work that day, I asked one of

3   the supervisors who I was working with if I would be allowed

4   to attend this deposition on duty.

5   Q.   And what was the answer?

6   A.   Initially, she thought she saw no issue with it.  And

7   then a few days later the time had been removed from my

8   Telestaff account, so they had basically gone back in and

9   deducted eight hours away from me.

10  Q.   And what did they put in the place?

11  A.   They charged me vacation time.

12  Q.   And that's the value of that vacation time, eight hours?

13  A.   I think back to probably a couple hundred dollars.

14  Q.   And why don't we go back to the time line so we catch

15  everyone up.

16       Next slide is on May 13th, 2016, were you deprived of

17  seniority; is that correct?

18  A.   That's correct.

19  Q.   And next, May 25th you were deprived of pay for your

20  deposition.

21  A.   That's correct.

22  Q.   Okay.  Did you eventually decide to voluntarily demote

23  back to the position of firefighter?

24  A.   Yes, I did.

25  Q.   No one forced you?

1  A.    No one forced me.

2  Q.    But why did you go ahead and decide to voluntarily demote

3  back to a firefighter position?

4  A.    So this was again probably one the toughest decisions I

5  had to make.  I absolutely love being a paramedic.  It goes

6  right along with being a nurse.  I loved what I did.  But the

7  accumulation of stuff that was happening, and my husband at

8  the time was on shift as a paramedic, and we kind of had --

9  Q.    Was there anything about the seniority piece of this that

10  played into your decision?

11  A.    Yeah.  So like I said, my husband being on shift, we were

12  going to have a hard time -- we were going to be opposing

13  shifts with each other.  And one thing about being on swing is

14  you never now where you're going to be.  You can't set up a

15  routine relief time.  So looking at the possibility of where I

16  might be able to try to secure a position and then calculating

17  into how much they deducted my seniority really didn't show me

18  much of a chance of winning any spots that may have been open.

19  So basically, at that time I decided that I would demote back

20  to a firefighter knowing that I at least held enough seniority

21  in the firefighter rank that I could secure a position at one

22  station.

23  Q.    By the way, regarding that seniority issue and the

24  retroactive application of the policy and the two years of

25  seniority that you lost, did you reach out to the union to

C. CLARK - DIRECT

1  advocate on your behalf?

2  A.   I did, I reach outside --

3  Q.   And was there any change as a result of the union

4  advocacy?

5  A.   No, there was not.

6  Q.   You voluntarily demote; right?

7  A.   That's correct.

8  Q.   So what happened next?

9  A.   So I decide to voluntarily demote.  There were a lot of

10  questions I had.  Like I said, it was a big decision.  I had

11  talked over with Chief Sharon McDonough who was working in

12  fire headquarters at that time.  I was kind of working with

13  her on some projects.  I had talked with her a couple of times

14  about demoting, and we came up with a bunch of questions that

15  I wanted to know before I demoted.  And we had sent those

16  questions through basically my chain of command, waiting on

17  answers before I had made my final decision, and I was also

18  waiting to hear about the calculation of what my pay was going

19  to be if I did demote because they had changed the way that

20  they calculated how much money they deducted for you when you

21  demoted.

22  Q.   And did you actually receive paperwork from Ms. Acedo

23  regarding your demotion?

24  A.   Yeah.  I actually met with -- her name is Angela Scott.

25  She works alongside JoAnn Acedo.  I can't remember the exact

1   date that I met with her, and she had all my paperwork for me,

2   and I signed it.

3   Q.   And included in the paperwork was there a 150 Club form?

4   A.   No, there was not.

5   Q.   In fact, does the fire department actually physically

6   hand you 150 Club form or the paramedic assignment pay club

7   form?

8   A.   No, they do not.

9   Q.   And why not?

10  A.   It's published every April in the announcement that comes

11  out and the form is attached.  You print it off and we send it

12  off through the chain of command.

13          MR. JACOBSON:  May I approach?

14          THE COURT:  Yes.

15  BY MR. JACOBSON:

16  Q.   Showing you what's been marked as Exhibit 50.  Do you

17  recognize the document?

18  A.   Yes, I do.

19  Q.   And big picture, what are these e-mails?

20  A.   These are a few e-mails starting at the bottom on

21  June 15th that JoAnn had sent me on one of the days I was on

22  light duty.

23  Q.   And do you recall this series of e-mails with Ms. Acosta?

24  A.   Yes, I do.

25          MR. JACOBSON:  Move for admission of Exhibit 50.

```
 1              MS. WATERS:  No objection.

 2              THE COURT:  50 is admitted.

 3         (Exhibit 50 entered into evidence.)

 4   BY MR. JACOBSON:

 5   Q.   Is this the e-mail that you received from Ms. Acosta

 6   indicating if you wanted to be in the 150 Club you had to sign

 7   the form?

 8   A.   Yes, it is.

 9   Q.   Is that an accurate statement?

10   A.   I didn't believe it to be.

11   Q.   Why?

12   A.   I had just filled out the form less than eight weeks

13   earlier indicating that I wanted to be in the 150 Club still.

14   Q.   So you filled out the form earlier?

15   A.   Correct.

16   Q.   But she's asking for another form?

17   A.   That's correct.

18   Q.   And was there some sort of issue with you delivering

19   another form to her?

20   A.   So at this point on light duty I was assigned down at

21   fire communications which is the 911 dispatch center, so

22   that's a couple of -- it's quite a bit away from fire

23   headquarters.  I was working on a project down there doing

24   quality assurance on the code arrest CPR-type calls.  So my

25   supervisor down there was deputy chief by the name of Chris
```

1    Conger.  And he made frequent trips down to fire headquarters.

2    I did not.  So after I received this e-mail indicating she

3    wanted another form, I filled out that form and I gave it to

4    my chain of command who was Deputy Chief Chris Conger to

5    delivery downtown for me.

6    Q.   And did you, in fact, get paid for the 150 Club for that

7    pay period?

8    A.   No, I did not.

9    Q.   Why not?

10   A.   I was told that I hadn't given the form in time, and so

11   they weren't going to pay me for it.

12   Q.   And which pay period -- do you recall which pay period do

13   you recall you didn't get paid for?

14   A.   I believe it was around July 8th.

15           MR. JACOBSON:  May I approach?

16           THE COURT:  Yes.

17   BY MR. JACOBSON:

18   Q.   Showing you what's been marked as Exhibit 53.  Do you

19   recognize -- I'm sorry, 52.  Do you recognize these documents?

20   A.   Yes, I do.

21   Q.   And what are they?

22   A.   These are three of my consecutive paychecks.

23   Q.   So for --

24           MR. JACOBSON:  Move for the admission of 52.

25           MS. WATERS:  No objection.

```
1              THE COURT:  50 is admitted and may be published.

2         (Exhibit 50 entered into evidence.)

3   BY MR. JACOBSON:

4   Q.    Thank you.  For each of these pages of the three

5   documents that you have in front of you, if you would walk us

6   through the pay period beginning and ending and the -- and how

7   you got paid.

8   A.    So the pay period that was ending on June 25th, I think

9   that's the one we're looking at, it shows Para Cert under

10  description, and that is the paramedic incentive pay that we

11  receive.

12  Q.    $69.23?

13  A.    That's correct.

14  Q.    Next page, please.

15  A.    So this is the pay period ending July 9th of 2016, and

16  there it shows I did not receive it.

17  Q.    And the next one.

18  A.    This is the pay period ending July 23rd of 2016, and it

19  shows once again that I received it.

20              MR. JACOBSON:  May I approach?

21              THE COURT:  Yes.

22  BY MR. JACOBSON:

23  Q.    Showing you what's been marked as 53.  Do you recognize

24  that document?

25  A.    Yes, I do.
```

1   Q.   And had what document is that?

2   A.   These are two e-mails on June 15th that JoAnn Acosta had

3   sent me.

4            THE COURT:  Yes, it was 52.  Not 50.

5        (Exhibit 52 entered into evidence.)

6            MR. JACOBSON:  It's 53.

7            THE COURT:  And is this is 53.  Wait, has this one

8   been admitted, 53?

9            MR. JACOBSON:  No.  This is the electronic version

10  of 53.  I'm going to put it on the ELMO.

11           THE COURT:  Sure.

12  BY MR. JACOBSON:

13  Q.   Is this the e-mail -- is this an e-mail that you received

14  from Ms. Acosta on June 15th, 2016?

15  A.   Yes, it is.

16           MR. JACOBSON:  Move for the admission of 53.

17           MS. WATERS:  No objection.

18           THE COURT:  53 is admitted.

19       (Exhibit 53 entered into evidence.)

20  BY MR. JACOBSON:

21  Q.   And in this e-mail, is Ms. Acosta telling you about

22  5:28 p.m. on June 15th, since you didn't come by to drop off

23  the form, you're not going get paid essentially?  Is that at

24  what she's telling you here?

25  A.   Essentially, she's referring to my paperwork, yeah, being

1    signed.  And that I needed to go follow-up with someone else.

2    Q.   And so on June 15th, 2016, was it fair to say that you

3    avoided Ms. Acosta or you ignored her?

4    A.   Absolutely not.

5    Q.   And why is that?

6    A.   So I believe it was on June 14th when I was assigned to

7    light duty.  I was notified by Deputy Chief Sharon McDonough

8    who was working down there that they had assigned me a task on

9    June 15th from 1 p.m. to 5 p.m., and I was going to be with

10   the -- it's called the PSPRS.  It's the pension system for

11   retirements.  It's the civilians that work down at fire

12   central.  I was assigned to them to do ballot counting.  So

13   that afternoon about 12:45, I went downstairs where the --

14   this pension office is.  I had never done this before so I

15   didn't know it was such a high-tech thing.  But basically we

16   were escorted into a room.  The door was locked behind us, and

17   there were three of us in the room.  And we had to validate

18   each ballet, keep track of it, number it.  There was a whole

19   system involved in it.

20        So that went on till a little bit shortly after 5 p.m.,

21   and then I returned back upstairs where my desk was at that

22   time.  And as I was walking upstairs, Deputy Chief Sharon

23   McDonough was toward the stairwell and asked me to come into

24   her office.  And at that point she had asked me if all my

25   questions that I -- we had sent regarding my demotion had been

 1   answered, and so we talked for a few minutes about that.

 2              MR. JACOBSON:  May I approach?

 3              THE COURT:  Yes.

 4   BY MR. JACOBSON:

 5   Q.   Showing you what's been marked as plaintiff's 89.

 6   Carrie, do you recognize these documents?

 7   A.   Yes, I do.

 8   Q.   And what are they?

 9   A.   This is a calendar shot from my Telestaff where it shows

10   that I was assigned to the PSPRS ballots from 1 p.m. to 5 p.m.

11              MR. JACOBSON:  Move for the admission of 89.

12              MS. WATERS:  No objection.

13              THE COURT:  89.

14              MR. JACOBSON:  89.

15              THE COURT:  89 is admitted.

16       (Exhibit 89 entered into evidence.)

17   BY MR. JACOBSON:

18   Q.   To your knowledge was, Ms. Acedo aware on June 15th,

19   2016, that you were counting PSPRS ballots?

20   A.   Yes, she was.

21              MR. JACOBSON:  May I approach?

22              THE COURT:  Yes.

23   BY MR. JACOBSON:

24   Q.   Showing you what's been marked as Exhibit 90 for

25   identification.  Do you recognize that document?

1   A.   Yes, I do.

2   Q.   What is it?

3   A.   So after I came back up from the ballot counting shortly

4   after 5, and I spoke with Chief Sharon McDonough whose name is

5   on this e-mail.  After we discussed the questions about my

6   demotion and basically what I had done downstairs, I went back

7   to my desk.

8        At that time I noticed that I had received the two

9   e-mails from JoAnn Acosta, the second one stating I had left

10  for the day without talking to her.  Being that I was still

11  there at fire headquarters, I walked back over to Chief

12  McDonough's office and I notified her about the e-mail stating

13  I had left without -- without going to see her that day.  So

14  in turn, she sent me a follow-up e-mail basically discussing

15  our questions and stated that we had both been tied up that

16  day, because we actually both been busy that day, and that was

17  the first time we were catching up.

18            MR. JACOBSON:  Move for the admission of 90.

19            MS. WATERS:  No objection.

20            THE COURT:  90 is admitted.

21       (Exhibit 90 entered into evidence.)

22  BY MR. JACOBSON:

23  Q.   And is Ms. Acosta cc'd on this e-mail from Sharon

24  McDonough to you?

25  A.   Yes, she is.

1   Q.   So Ms. Acosta was aware that you were tied up and didn't

2   avoid her on June 15th, 2016?

3   A.   We had -- I talked about that with Sharon McDonough.

4   Q.   We're in the home stretch.

5        By the way, did Ms. Acosta ever apologize to you for what

6   she said to you on March 20th, 2013, about pumping seems

7   excessive to me and maybe you're not fit for duty?

8   A.   No, she did not.

9   Q.   Has Ms. Acosta, to your knowledge, expressed any regret

10  for what she said to you on May 20th, 2013?

11  A.   No, she has not.

12  Q.   Has anyone ever told you that Ms. Acosta told them that

13  they expressed regret -- that she had expressed regret for

14  what she said on May 20th, 2013?

15  A.   No, they have not.

16  Q.   Were you subsequently deposed in this case on

17  October 27th, 2016?

18  A.   Yes, I was.

19  Q.   Were you deposed on January 10th, 2017?

20  A.   Yes, I was.

21  Q.   And were you deposed on June 15th, 2017?

22  A.   Yes, I was.

23  Q.   And for any of those dates, were you compensated or

24  allowed on to be on duty or allowed time off even though

25  you're required to attend those depositions?

1   A.   No, I was not.

2   Q.   If you would, publish the final document.  And we'll go

3   to the last three depositions.  And are those dates accurate

4   that on July 24th, 2016, October 27th, 2016, and January 10th,

5   2017, you were deprived of pay for your deposition?

6   A.   That's accurate.  And June 15th.

7   Q.   And June -- yes.  One more.  And June 15th, 2017?

8   A.   Correct.

9   Q.   And you were deprived of specialty paramedic pay or

10  paramedic specialty pay for -- is that July 24th, 2016?

11  A.   That's correct.

12  Q.   Thank you.  Was there a difference between how your

13  employer treated you before you were pregnant or during or

14  after your pregnancy?

15  A.   I believe there was.

16  Q.   And please tell the jury how the City of Tucson treated

17  you different before you were pregnant and after?

18  A.   So before I was pregnant, as a new firefighter, even as a

19  paramedic, everything, I had never -- I had never had any

20  issues.  I had never been counseled.  I had never been up to a

21  chief's office.  I was very active in the department.  I did

22  the police/fire games, I did the golf tournaments, I attended

23  the firefighter ball.  I did essentially everything that this

24  department offered because I was so excited to be here.

25       Once this issue initially came up when I returned to work

1    for the first time, the way I've been treated in this

2    department entirely has changed.  There's people that don't

3    talk to me.  There's chiefs that won't look at me.  There's

4    places, you know, I'll go where I just feel like I'm a

5    complete outcast.  And it's been -- to me, it's been a

6    completely drastic difference.

7    Q.   And I'd like to wrap up your direct examination by

8    discussing the physical and emotional toll that the City's

9    treatment of you has had.  Please tell the jury about that.

10   A.   So like I said, you know, this was the only place I

11   really wanted to be.  This was my dream.  I was so proud to be

12   here.  I was so proud to do the work I do.  And when 2012,

13   2013 started, you know, it really took me back to realize that

14   this wasn't the amazing place that I initially thought it was.

15   My pride for this job will always remain.  I will always do a

16   good job on calls.  There's nothing the citizens in this town

17   have ever done to change the way I do my job.

18        But the frustration and the embarrassment and the -- the

19   problems I would say that it's caused in my life over the last

20   six and a half years, it's really, really hard to explain in

21   depth all these things.  You know, these aren't high-paying

22   jobs.  I think we're kind of an average income-earning family.

23   And the toll -- I would say probably the biggest toll that

24   this whole thing has taken, not just on my friends but my

25   family.  I mean, my marriage, I love -- I love my husband, but

C. CLARK - DIRECT

1  our relationship has forever been changed by the stuff that

2  we've both dealt with in the situation.

3      It came to the point where there were days he was

4  frustrated about stuff, and there were days I was frustrated

5  about stuff, and we're both having to put on a professional

6  face when we come to work, so we're coming home and we're

7  fighting about the stuff and taking it out on each other.  And

8  I honestly feel like neither one of us have been, like, the

9  best parent that we should be to our kids because I feel like

10  the level of stress and everything we're under, I think we're

11  short with our kids.  And this is all they've ever known

12  because they've both been born into this while the whole

13  situation has been going on.

14  Q.   How about the Carrie, the kind of person you were

15  beforehand, before you became pregnant, returned to work, and

16  the Carrie afterwards.  What sort of things did you enjoy

17  doing?

18  A.   So you know, I think I told you my whole life has been

19  dedicated to basically volunteering with dogs and dog rescue

20  stuff like that, and I took really great pride in the amount

21  of animals I felt I helped.  And then shortly after, like, all

22  this started, and I had already had contacted an attorney so

23  obviously it was costing me a lot of money, my first dog --

24  and these dogs, and I don't mean to put so much emphasis on my

25  dogs but, these dogs have been with me before I met my husband

1    was with me, before me kids were ever born, my first dog

2    became sick.  He got diagnosed with cancer, and I lost him

3    within a few months.

4         And I have so much regret looking back because I was so

5    worried about the stuff going on at work that I feel like I

6    didn't -- I didn't pay enough attention maybe to what was on

7    in my home life, and my family suffered for it.  I don't know

8    if I could have changed my dog's outcome, but I'll never know

9    to this day.  And over the last seven months, I've lost my

10   other two.  They've both had -- another one had cancer, and

11   another one had an autoimmune disease.  And as much time as

12   I've tried to focus on my animals and all the animals that I

13   spent so much time caring about, I'm so wrapped up in this

14   situation and in this case that it's completely worn me down

15   as a person.

16        My dad had a stroke in the middle of this, and my mom got

17   diagnosed with progressive lung disease and initially was

18   given like three years to live.  And the part of me that's a

19   nurse and that cares about everybody wants so badly to take

20   care of my family.  And all I've been doing is been so

21   stressed out about this stuff that it's completely worn me

22   down in life, and I feel like I've failed at basically

23   everything that I was intended in life to do, which was to

24   take care of people because I couldn't take care of myself

25   most days.

1   Q.   Talk a little bit about that, taking care of yourself.

2   Talking about others, tell us about yourself.

3   A.   So I finally sought counseling a couple of years ago.  I

4   went as often as I could because obviously my priorities, my

5   family and me and my husband working opposite days, we don't

6   get a lot of free time.  And now that my mom is sick, I can't

7   have her do as much as she used to.  And then I think -- I

8   finally -- as against it as I was, I actually went on

9   antidepressants because I felt like I was being so horrible to

10  my kids and to my husband.

11       And the only overwhelming, you know, triggering factor is

12  all this stuff.  Like, otherwise, if you take this away, like,

13  I have a really good life.  But I don't want to have to walk

14  away because of how they treat me.  I want to do my job.  I

15  love my job.  My husband loves his job.  But it's really hard

16  when I'm driving down the road, trying to take my kids to

17  school, and I have a four-year-old saying, Are you going to an

18  attorney today?  He doesn't even know what that means, but he

19  just knows that that's where I am and that's what I'm doing.

20       And I'm trying to be a really good role model for my

21  family and my little boys especially, but I feel like my anger

22  and depression and everything has just taken over.  And

23  sometimes my own little boys don't even know what to do to

24  comfort me, and it's sad when they're four years old trying to

25  make me feel better because that's my job as their mom.

1    Q.   How about sleeping, eating, stuff like that?

2    A.   You know, after I had Mason, I really wanted to get back

3    into, you know, a good routine and establish really good

4    healthy habits with my family.  But I've been -- this stuff

5    has just been such a mess.  I dream about it, I think about

6    it, I find myself talking about it.  It affects my sleep, it

7    affects everything, and it's ultimately just consumed my life.

8    Q.   Anything else you want to tell the jury about how this

9    has affected you?

10   A.   I know my family would never get up here and say it, but

11   I know I haven't been good to them.  And I just want so badly

12   to put, you know, everything finally behind me and go back to

13   the person I was and the person I can be.  Because every time

14   I see, you know, situations that I want to be a part of, that

15   I'm too afraid to show up.  And there were days I was too

16   afraid to be out in public.  And I was wearing hats and

17   glasses so people wouldn't recognize me because I was afraid

18   of the taunting or the comments or even the lack of comments,

19   the not talking to me.

20        I found myself feeling like I understood what some of

21   these young kids go through when they become suicidal over

22   stuff as silly as online bullying.  I actually truly felt that

23   for the first time when I was reading things that people were

24   writing that were so untrue.  There no way to stop it.  I just

25   had to accept it.  And it's -- you know, this was so -- it was

1    unnecessary.  None of this.

2    Q.   Do you know how much -- approximately how much counseling

3    you had and how much you spent on it?

4    A.   I went to counseling over a few years.  I have paid out

5    of pocket --

6              MS. WATERS:  Your Honor, I'm sorry.  May we approach

7    briefly, please?

8              THE COURT:  Yes.

9         (At sidebar.)

10             MS. WATERS:  So generally we're fine with her saying

11   she went to counseling, which I believe she said.  But records

12   were never disclosed about the counseling, the costs were

13   never disclosed.  This is information we would have explored

14   certainly during discovery had we had the opportunity, but

15   these records were not provided so we didn't have the

16   opportunity.

17             MS. SAAVEDRA:  And there was a motion in limine that

18   covered this.

19             MS. WATERS:  So we've been pretty -- and we've been

20   pretty tolerant about this.  She's kind of going on at this

21   point.  And I feel like we're kind of hitting of the end of

22   what's appropriate.

23             THE COURT:  Did the motion in limine deal with not

24   being able to bring out the cost --

25             MS. SAAVEDRA:  The motion in limine addressed the

1   fact that the witness should not be allowed to testify because

2   no disclosure of -- first of all, as an expert, no disclosure

3   of records.  There's never been any disclosure of any

4   counseling she's received nor medical records in this case.

5          THE COURT:  So what's she's going to say?

6          MR. JACOBSON:  I have to establish damages.

7   There's -- they had every opportunity to explore her

8   counseling, and I believe, if memory serves, there was some

9   deposition testimony about it.  I'm not interested in what the

10  records say.

11         That's correct, there was a motion in limine about

12  the -- about the -- her therapist testifying.  And they were

13  absolutely correct that the records weren't disclosed, and

14  that was perfectly acceptable and point well-taken.  I just

15  want to find out how much she spent on it for damages.

16         MS. WATERS:  But those records would have included

17  billing records.  We can't examine the reasonableness of the

18  costs.  We can't do anything we would normally do without the

19  records.

20         THE COURT:  I'll sustain that objection for now, but

21  we can always -- she's going to be here, so we can always put

22  her back on the stand if you persuade me to change my mind.

23  You agree there's no records?

24         MR. JACOBSON:  That's true.  That's true.

25         MS. WATERS:  And while we're up here, are we about

 1    done with this line of questioning?

 2              THE COURT:  I think you asked your final, kind of

 3    wrap-up --

 4              MR. JACOBSON:  I don't want to end it on an

 5    objection.

 6              MS. WATERS:  I don't mind if you ask another

 7    question.  I just don't want another monologue about suicide.

 8              THE COURT:  Okay.  So I'll let you finish, and I'm

 9    thinking we take a five-minute break and get started.

10              MS. WATERS:  So, your Honor, actually I was under

11    the impression based on the belief that Mr. Jacobson was

12    calling Chris Conger, we would not start crossing her today.

13              MR. JACOBSON:  That's fine.

14              THE COURT:  Do you have another witness?

15              MR. JACOBSON:  No, no one here.

16              MS. WATERS:  And honestly, with her, she's kind of

17    emotional right now, and I would rather give her the

18    opportunity to regain her composure.

19              THE COURT:  Okay.

20         (Open court.)

21              THE COURT:  All right.  Mr. Jacobson, you may

22    proceed.

23              MR. JACOBSON:  May I have just a moment, your Honor?

24              THE COURT:  Yes.

25    BY MR. JACOBSON:

1   Q.   Is it especially hard for you to say some of these things

2   with family in the courtroom?

3   A.   It is.

4            MR. JACOBSON:  That's all I have, Judge.

5            THE COURT:  All right.  Members of the jury, let's

6   go ahead and take our evening recess at this time.  Please

7   continue to follow the Court's admonition.  Have a good

8   evening and we will start up tomorrow at 9:00.  So we'll stand

9   at recess in this matter at this time.

10           THE CLERK:  Please rise for the jury.

11      (Jury panel excused at 4:32 p.m.)

12           THE COURT:  The record may reflect the absence of

13  the jury.

14           Ms. Clark, you can step down.

15           And is there anything that counsel need to bring up

16  before we recess for the evening?

17           MS. WATERS:  No, your Honor.

18           THE COURT:  Okay.  And I'm just curious, have

19  counsel submitted proposes forms of verdict?  Was that --

20           MS. WATERS:  I don't think either side has because

21  we've been waiting to see how the testimony develops and what

22  charges it actually supports.

23           THE COURT:  All right.  I was just thinking about

24  that.

25           We'll stand at recess in this matter and see

1    everybody tomorrow at 9:00.

2         (Proceedings concluded at 4:33 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                     C E R T I F I C A T E

2

3            I, Cheryl L. Cummings, certify that the

4   foregoing is a correct transcript from the record of

5   proceedings in the above-entitled matter.

6

7                     Dated this 8th day of April, 2019.

8                     /s/Cheryl L. Cummings

9                     Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
                      Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```