```
 1                 UNITED STATES DISTRICT COURT

 2                     DISTRICT OF ARIZONA

 3

 4   Carrie Ferrara Clark,      )
                                )
 5               Plaintiff,     )
                                )
 6   vs.                        )   CV-14-2543-TUC-CKJ
                                )
 7   City of Tucson,            )
                                )   Tucson, Arizona
 8               Defendant.     )   April 11, 2019
     _____)   9:55 a.m.

 9

10          PARTIAL TRANSCRIPT OF JURY TRIAL – DAY NINE
             PLAINTIFF'S CLOSING AND REBUTTAL ARGUMENTS
11            BEFORE THE HONORABLE CINDY K. JORGENSON
                  UNITED STATES DISTRICT JUDGE

12

13   For the Plaintiff:
          Mr. Jeffrey H. Jacobson
14        Jacobson Law Firm
          2730 East Broadway Boulevard, Suite 160
15        Tucson, AZ  85716

16   For the Defendant:
          Ms. Michelle R. Saavedra
17        City of Tucson Attorney's Office
          Civil Division
18        P.O. Box 27210
          Tucson, AZ  85726-7210
19
          Ms. Renee J. Waters
20        Iafrate & Associates
          649 North 2nd Avenue
21        Phoenix, AZ  85003

22   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
23
                    Aaron H. LaDuke, RMR, CRR
24              Federal Official Court Reporter
                    405 W. Congress St.
25                 Tucson, Arizona  85701
```

1          P R O C E E D I N G S

2        (Proceedings were had and recorded but not transcribed.)

3          MR. JACOBSON:  We promised you at the beginning of

4   this trial that we would prove certain things to you.  We

5   would prove that the defendant, City, did certain things to

6   Carrie, that certain things occurred to Carrie, and throughout

7   this trial we have shown you a timeline of how those events

8   evolved and occurred.  The evidence has shown, ladies and

9   gentlemen, that we have kept our promises.  This case is still

10  in many ways very simple.  The City of Tucson violated federal

11  law, and when Carrie stood up for her rights, they retaliated

12  against her.  Simple.

13      Judge Jorgenson has instructed you on most of the law

14  that you're going to hear.  I want to spend a few minutes

15  going through some of that law to help you see how to apply

16  the facts to the law in this case.  And you have those jury

17  instructions in front of you, so if you would, go ahead and

18  take those out and if there's something that I say that moves

19  you or something that I say that triggers something for you,

20  you know, feel free to write it down on the instructions

21  themselves.  Those are yours to keep and to take back into the

22  deliberation room when you go there.

23      First, if you would turn to page 3 of 32 of the

24  instructions, this is the burden of proof instruction.  Now as

25  Americans, we're used to hearing about proof beyond a

1  reasonable doubt, right?  This is the scales of justice, okay?

2  This is proof beyond a reasonable doubt, okay?  Scales of

3  justice, proof beyond a reasonable doubt.

4      That's not what this case is about.  Civil jury trials

5  look different.  They are different.  The standard of proof in

6  a civil jury trial is more likely than not.  It is literally

7  this, folks.  It's 50 percent plus a feather.  Ready?  Watch

8  this.  That's it.  That's the burden of proof, 50 percent plus

9  a feather.  I'll do it again one more time.

10      Don't let the defense get up here and say that the

11  plaintiff has to climb some mountain to prove her case,

12  because that would be just dishonest, because all we have to

13  prove is preponderance of the evidence, more likely than not,

14  50 percent plus a feather.

15      Page 6 of 32, please.  Evidence in this case can be

16  direct or circumstantial.  Now you've certainly heard a lot of

17  direct evidence.  You go outside and you see it's raining.

18  Make sure everyone's there.  Page 6 of 32.

19      Evidence can be direct or circumstantial.  You go outside

20  and see it's raining.  That's direct evidence that it is in

21  fact raining and things outside are getting wet.

22  Circumstantial evidence is a little different.  It's an

23  inference of something.  If you see a turtle out in the middle

24  of a grass field on top of a post, you know the turtle had to

25  have help to get there.  Turtles don't climb up fence posts by

1  themselves.  That's circumstantial evidence.

2  Circumstantially, if you look at that turtle on a post and you

3  go, had to have gotten there somehow, that is circumstantial

4  evidence.

5      If I say to you, follow the yellow brick, you know what

6  I'm going to say next.  Now I didn't say it, but you thought

7  in your head immediately, follow the yellow brick road, okay?

8  Circumstantial evidence.  If I say red, white, and -- right?

9  You know what I'm going to say.  I'm not going to say red,

10  white, and green.  I'm going to say red, white, and blue.  You

11  can make that inference, and they are to be treated the same

12  way in this case.  No distinction between direct and

13  circumstantial evidence.

14      Page 8 of 32.  You've heard throughout the trial that we

15  have stipulated to certain facts in this case.  One of those

16  stipulations is that Mary McDonald saw Carrie Clark in August

17  of 2014 in her car, crying.  You are to assume that fact is

18  true because we've stipulated to it.  This is how you start to

19  mesh the facts in with the law.

20      Page 9 of 32.  You heard a lot of testimony in this case.

21  You heard days and days and days of the defense case in this

22  case.  Now you can choose to accept some of each person's

23  testimony, all of each person's testimony, or none of each

24  person's testimony.  If you sit there -- and you're the

25  arbiters, you are the independent judges of the witnesses and

1    their credibility in this case, and if you're sitting there

2    feeling to yourself, ah, that person's lying, right, why

3    couldn't they answer my questions, why couldn't they answer

4    your questions, then you are free to reject everything they

5    have to say.  And this in particular comes into play with Ted

6    McDonough, with this manufactured drill.  We're going to talk

7    about that in a little bit, but you can absolutely choose to

8    reject every single thing he said.  You don't have to assume

9    some of it is true.

10         Page 10 of 32.  Again, just for some clarity because

11   there was a lot of information thrown at you at one time, the

12   lawyers spent literally days working on these so that we could

13   make sure they were as clear as possible for you, and we

14   didn't always agree until the final form.  So it's important

15   that we go through these.  I understand it's tedious.  I get

16   it.  But the term "sex" includes pregnancy and

17   pregnancy-related conditions.  We don't want you walking off

18   thinking sex is anything other than gender, pregnancy, and

19   breastfeeding.

20         Now Carrie has four claims in this case.  Her first claim

21   is for Title VII.  That's disparate treatment.  She has the

22   FLSA claim, okay?  That's the Fair Labor Standards Act.  The

23   Fair Labor Standards Act is -- we're going to go through it in

24   a minute -- talks about lactation space, okay?  And then she

25   has claims under both of these for retaliation.  And they're

1  slightly different, so I want to go through each one of those

2  so that we all understand it.

3       So looking at page 11 of 32, this is the FLSA claim and

4  it's broken out into elements A, B, and C on 11 of 32.   The

5  Fair Labor Standards Act requires the defendant to provide a

6  place, other than a bathroom, shielded from view and free from

7  intrusion from coworkers and the public.

8       So remember, why is coworkers and the public important?

9  Fire stations are public buildings.   You heard Carrie testify

10  about how they go on calls and they come back and there are

11  random people there, right?   Sometimes they remember to lock

12  the doors on the outside -- we'll talk about that in a little

13  bit -- sometimes they don't.

14       City workers come in and out to fix things.   There was a

15  social club or it was like a rotary club -- it was a rotary

16  club.   It was like that.   A homeowners association comes and

17  meets at one of the fire stations, right?   So it's not just

18  the coworkers that we're concerned about.

19       Of course, you also heard testimony that there really

20  aren't any boundaries in fire stations, right?   People -- it's

21  like a family.   People come and go.   This social norms stuff

22  doesn't exist.   It is a different animal than anywhere else.

23  So a place free from intrusion from coworkers and the public,

24  that's the Fair Labor Standards Act claim.

25       Let's set that aside for a second and go to No. 12.   This

1    is the Title VII claim.  This is saying that the City of

2    Tucson treated Carrie differently because of her sex, because

3    of her gender, because of her pregnancy condition.  She was

4    treated differently than male employees when the City failed

5    to use its management rights authority when assigning Carrie

6    to fire stations between January 1st, 2013 and March 26th,

7    2013, okay?

8        January 1st, 2013 is an important date because it is the

9    date after which she was no longer allowed to fill vacancies

10   in Station 12, and it's the date at which Station 20 was no

11   longer available because the member was coming back from

12   deployment, he had switched into that spot, and he needed to

13   be on that shift because he had his vacation already set up

14   for the entire year.

15       So our claim is in that space between January and March

16   26th, 2013, because after March 26th, 2013, Carrie was

17   assigned to Station 6, where she had a locked door where she

18   could express -- a room with a locking door where she could

19   express her breast milk free from intrusion.

20       Number two, an example of sex discrimination, where she

21   was required to meet at headquarters with the three male

22   managers, right, Ed Nied, Rob Rodriguez, and Paul McDonough,

23   and she was asked inappropriate questions, and that occurred

24   on November 13th, 2012.  It's like two weeks after she came

25   back.  Remember, we looked at the timeline.  I'll put that

1  back up.  I hope everyone can see it.  I apologize.  There's

2  some stuff that's cut off on the bottom there.

3      That's November 13th, 2012; 2012; November 13th, 2012.

4  Carrie's son Austin was born July 19th.  She comes back to

5  work October 27th.  Less than two weeks later or almost

6  exactly two weeks later, she's hauled down to headquarters to

7  meet with three chiefs, a meeting which Josh Campbell

8  testified to -- I believe it was Josh or it was perhaps Nate

9  who testified that is not -- or it was Sloan Tamietti.  That's

10 not a usual type of meeting, right?  Talk about intimidation.

11 So that's -- and of course at that meeting we know Rob

12 Rodriguez asked, well, you know, why can't you just freeze

13 your milk?  Inappropriate.

14     Singling out Carrie to perform firefighting drills on May

15 22nd, 2014, up here, that is an act of sex discrimination.

16 The only reason it was done, the only reason it was done was

17 because Carrie was pregnant.  This fiction that it was because

18 of Tyler McKendrick you can reject out of hand, and we'll talk

19 more about that later.

20     And then finally, a week later being targeted for the

21 excessive inspection for her turnouts, for her PPE, right?  A

22 week after this happens, there's not enough evidence because

23 she did the drill until she said, that's it.  I'm done.  If

24 you don't want me on your crew, just tell me.  That wasn't

25 enough.  A week later, they embarrass her at her station,

1  force her to put on her turnouts even though at the first

2  shift of every month you're supposed to already have your

3  turnouts checked out and they're reported up.  One of you

4  asked that excellent question, why couldn't you have waited a

5  couple days to the next inspection?  No reason.

6      So our claim is that the sole reason for these four

7  actions that we just talked about was sex discrimination,

8  being treated differently because of her sex, because of her

9  gender, because of her pregnancy.

10     Now if you look at page 13 of 32, that gives you a

11 definition under Title VII of what an adverse employment

12 action is.  If it is materially -- if it materially affects

13 the compensation terms, conditions, or privileges of

14 employment, if it makes you feel uncomfortable to go to work,

15 if it makes you feel like I don't want to be here or I'm

16 afraid to make a complaint or how are people going to perceive

17 me or how does this affect my reputation, how does this affect

18 where I work every day, that is a term or condition of

19 employment.  That is the definition of an adverse employment

20 action.

21     And finally on page 14 of 32, under Title VII, we talk

22 about the same thing, but now here are the elements.  We have

23 to prove that she was subject to an adverse employment

24 action -- okay, those are the four things -- and that it

25 happened because of her sex.  Just another way of outlining it

1    for you.  That's the Title VII claim.

2        Now we claim our third cause of action is retaliation for

3    Title VII, okay?  Now you're going to see that retaliation for

4    Title VII and retaliation for the Fair Labor Standards Act

5    contain essentially the same allegations of fact, okay,

6    essentially that everything else on this chart other than

7    those four things that we just talked about, everything else

8    in the red was in retaliation for her either engaging in a

9    protected activity, which is complaining about the fact that

10   she was being treated differently based on her sex, or

11   complaining about the fact that she wasn't getting a space to

12   express her breast milk that complied with federal law.

13       The law allows us to argue in the alternative.  We can

14   tell you and leave it in your capable hands that you can find

15   that everything that happens after Carrie contacts EEO,

16   everything that happens after Carrie contacts the EEO on

17   January 7th, all of this is retaliation for sex

18   discrimination, for complaining about the fact that she was

19   being treated differently because of her sex, or retaliation

20   because she complained and sought a proper space to comply

21   with federal law.  You can find either one of those is true,

22   neither of those are true, or both of those are true.  You get

23   to decide.  We weren't going to choose for you and say this

24   was all because of sex discrimination, this was all because

25   she complained and wanted and forced them to come into

1  compliance with federal lactation space law.

2      So it may look similar to you, the elements, the facts

3  that you have to find that we proved, okay, and we'll go

4  through those very quickly.  And in these instructions, in 15,

5  16, and 17 of 32, okay, those three pages are all the Title

6  VII retaliation.  Pages 15, 16, and 17 all contain the Title

7  VII retaliation.

8      You're going to get a form of verdict.  You're going to

9  actually get a piece of paper, papers that say, you know,

10  basically A through K, did plaintiff prove by a preponderance

11  of the evidence this.  Did plaintiff prove by a preponderance

12  of the evidence that Carrie was disciplined for her conduct on

13  March 20th, 2013, right?  So she was disciplined for her

14  conduct during that call as an adverse employment action and

15  retaliated against.  Does that make sense?  Are we tracking?

16      All right.  Pages 18 through 22 are the FLSA retaliation.

17  Now it's up to you to decide did all of this occur because

18  they were retaliating against her because Carrie reported

19  gender discrimination, sex discrimination; did some of these

20  occur because of that; or did some of these or all of these or

21  none of these occur because Carrie sought to enforce her

22  rights under the Fair Labor Standards Act, Fair Labor

23  Standards Act.  You get to choose.

24      And the protected activities in this case, okay, that's

25  page 23 of 32.  So what are the protected activities in this

1  case?  That she reported the lack of proper lactation space on

2  January 7th, 2013 -- that's down here, contacts EEO -- to the

3  defendant's Office of Equal Opportunity Programs and that she

4  filed a written charge of discrimination on July 31st, 2013

5  with the Arizona Attorney General's Office.  You have that in

6  evidence.  And we talked here about the reasonable belief and

7  good-faith belief, and you can apply those standards.

8      And again, what is different about these retaliation

9  claims -- if you look at page 24 of 32, what is different

10 about these retaliation claims is the definition of adverse

11 employment action, okay?  So for the Title VII claim alone,

12 it's a different definition of adverse employment action.

13     If you look at -- for the purposes of the retaliation

14 claims, under Title VII and the Fair Labor Standards Act, an

15 action is an adverse employment action if a reasonable

16 employee would have found the action materially adverse, which

17 means it might have dissuaded a reasonable worker from making

18 or supporting a charge of discrimination, okay?  So if you

19 think these things occurred, if you think that any of these

20 things would have dissuaded any reasonable person from filing

21 a complaint, that's an adverse employment action.

22     So think about it, right?  All these things are going on.

23 Austin's first birthday is July 19th, 2013, right?  So Austin

24 was born July 19th, 2012.  His first birthday was July 19th,

25 2013.  The policy comes out on the day he was born, on the

1   one-year anniversary of his birth, on his birthday.  After

2   that, Carrie starts hearing things like, oh, that new policy

3   is the Carrie clause.  That policy is nipplegate.  And she

4   starts hearing these rumors.  Her and her husband start

5   hearing these rumors, and the HR manager catches wind of it.

6   Oh, we're going to investigate.  That's inappropriate.

7       So they go to Carrie after all this stuff has already

8   happened, right?  We're in July 2013.  After a lot of this

9   stuff has already happened, they say, well, tell us what

10  happened.  Well, are you kidding me?  The last time I

11  complained, the last time I said something, I was hauled down

12  to meet with three chiefs.  I was put on the phone with two

13  chiefs and the HR manager and then disciplined because I said

14  the word "friggin."

15      Would you want to file a complaint after that?  Would you

16  want to rat on your peers who said, Carrie clause, nipplegate?

17  No, of course not.  It would dissuade you.  What has happened

18  would dissuade you from complaining.  That is the prime

19  example.

20      Now, by the way, notice that Carrie clause and nipplegate

21  aren't on here, right?  We did not claim that as an adverse

22  employment action because Carrie understands the nature of the

23  fire department.  She understands the nature of what it's like

24  to work in fire stations.  There are serious things at risk

25  here.  There are serious things that are happening.  Don't let

1    the defense try to characterize these as petty.  It's part of

2    the smear campaign that I told you they were going to launch

3    against my client.

4         This is death by a thousand paper cuts.  Just a little

5    paper cut, not a big deal.  It stings for a minute.  Clean up.

6    But if you take the same spot and you keep cutting, it's a

7    gaping wound.  We'll talk about all of these in a little bit.

8         You heard several witnesses in this case come in and say

9    they did not intentionally retaliate or discriminate against

10   Carrie.  That may have superficial appeal.  I would certainly

11   argue to you and ask the witness, even if you did retaliate or

12   discriminate, would you really come in here and admit it?  But

13   nowhere in these jury instructions, ladies and gentlemen,

14   nowhere in these jury instructions is plaintiff required to

15   prove that any one person discriminated or retaliated against

16   her.  You don't see it anywhere in these jury instructions.  I

17   challenge the defense, where does it say that we have to prove

18   that Ted McDonough intentionally retaliated or intentionally

19   discriminated?  It doesn't say that.  Where does it say that

20   we have to prove that Chief Fischback has to intentionally --

21   it's got to be in here.  It's got to be in the law that Judge

22   Jorgenson has instructed you.

23        So what Carrie has to prove is in these documents, and

24   what we have proven is that they took actions, did things to

25   her not only because of her sex but because they wanted to

retaliate, because they did retaliate against her.

Setting aside a private space to express your breast milk shouldn't be an issue.  It shouldn't be something you have to complain about and ask for, and not just because it was federal law.  Getting this, as you heard from the defense witness Retired Chief, Retired Assistant Chief Brad Olson, should not be that hard.

You want to sum up the case in one word?  Avoidable.  You want to sum it up in another word?  Unnecessary.  Yet you heard in this courtroom that is precisely the position that they put Carrie in.

And what's worse, when she asked for the simple dignity of her privacy, the City of Tucson eventually complied but then retaliated against her for standing up for her rights. It was okay for Carrie to be tough.  She had to be tough to get through the fire academy.  She had to be tough to get through probation.  It was okay for Carrie to be tough, but the minute she showed some vulnerability, she became vulnerable, they pounced.

I'll be back after the defense gives its closing argument because in our system of justice the plaintiff has the burden of proof.  The evidence is clear and plain and speaks for itself.  Just remember that when you listen to the defense closing.  Don't be fooled by deception or misdirection. You'll likely hear about what the plaintiff didn't do, but you

1  know what the evidence is.  You've been sitting here for the

2  last two weeks.  You've had the opportunity to dispassionately

3  observe the witnesses, what they said and what they didn't

4  say.  They can subdue the truth, ladies and gentlemen, but

5  they can't extinguish it.

6      (Proceedings were had and recorded but not transcribed.)

7      MR. JACOBSON:  When an octopus is threatened in the

8  water, it shoots out a jet of ink which clouds the water and

9  it allows the octopus to escape from its prey.  Most of what

10 you heard just a few minutes ago and most of what you've heard

11 throughout this trial, ink in the water, and I'll give you

12 examples of that.  But first I want to talk about how you

13 should remember that we talked about in opening statement that

14 we made promises to you, and those promises are right here,

15 and we showed you those promises and we fulfilled those

16 promises.

17     Now let's talk about the promises that the City made to

18 you in its opening statement, and the City did say in its

19 closing statement that opening statement is not evidence, but

20 it's a road map.  It's what you're going to hear.  So let's

21 talk about what the City promised you you were going to hear.

22     Thank you, Sandy.

23     THE CLERK:  Sorry.  I can't see you.

24     MR. JACOBSON:  Is it up?  There we go.

25     This is a transcript or excerpts of the transcript from

1   the opening statement given to you by the City.  "Speaking of

2   Ms. Acosta, I can't stand here and tell you that everything

3   every person ever said to Ms. Clark was ideal.  Ms. Acosta

4   will tell you" -- will tell you -- "that she regrets saying to

5   Ms. Clark your breast pumping -- your breast milk pumping

6   seems excessive.  Ms. Acosta will tell you that the words just

7   came out of her mouth because she was thinking about her own

8   experience when she had a child and was pumping breast milk.

9   She wasn't really saying it as a human resources manager,

10  though she should have kept that hat on.  She was saying it

11  based on personal experience.  If she could take it back, she

12  would.  Obviously she can't."

13       So just to put you back on the timeline, we're talking

14  about the March 20th.  You heard Ms. Acosta testify.  Not only

15  did she deny saying it, she said she was never rude, never

16  unprofessional.  None of what was promised to you was

17  testified to.

18       Next excerpt:  "And to the extent that that adversely

19  affected the way Ms. Clark viewed Ms. Acosta and made the

20  situation more difficult, I think you'll hear that she regrets

21  that very much."  Now out of fairness, the transcript says, "I

22  think you'll hear," but when you put that all together,

23  bald-faced lie.

24       Next:  "But both Ms. Clark and Ms. Acosta are grownups.

25  And so even after a comment like that said in error, you still

```
 1   have to be able to work with people.  You still have to be
 2   able to work out these issues.  You need to go talk about it
 3   like an adult, not hide from the person who's responsible for
 4   all of the human resources administration that goes on in your
 5   office."
 6        Let's unpack that a little bit.  Grownups admit when
 7   they're wrong.  Grownups tell the truth.  Grownups are
 8   consistent because it's very hard to tell the truth after
 9   you've lied.  It's hard to keep track of lies.  There's been
10   one person in this case that has been consistent from day one,
11   and that's Carrie Clark.  Everybody else gave inconsistent
12   statements, and we're going to talk about that in a little
13   bit.
14        "You still have to be able to work with people.  You
15   still have to be able to work out these issues."  Well,
16   Ms. Acosta is the HR manager.  She has a higher authority.
17   She has a higher standard.  She's required.  She's a manager.
18   She's held to a higher standard.  What did she do?  Well,
19   nothing.  She doesn't think she did anything wrong.
20        Not hide from the person?  There's been no testimony
21   Carrie hid from her, none.  She was counting ballots.  That's
22   about -- that line is about the $150 club, the paramedic
23   specialty pay.  She didn't hide from her.  She was counting
24   ballots.  You heard testimony that once you're in there
25   counting ballots, you can't leave.  JoAnn could have checked
```

1  TeleStaff.  She could have checked the calendar.  She had

2  permission.  She didn't.  Instead she sent an email saying,

3  no, you left without coming to find me.  Not true.

4      Next broken promise, let's talk about Station 20.  "She

5  would have had a room that was hers that she could have

6  cleaned, maintained, kept her materials in, that would have

7  been a locking room, free from intrusion, and no one would

8  have been using it."

9      All right.  We're going to talk about this broken promise

10 in a second, but this was the entire case.  This was the

11 City's entire case and they focused on it.  They focused on it

12 from day one and they focused on it in their closing argument.

13 They want to talk about -- they want to talk about everything

14 that happened before January 2013.  They want to talk about

15 everything that happened between October 27th and January

16 2013, the whole Station 12 versus Station 20, who gets to go

17 there, Jeff Todd, Scott Billings, Mike Carreon, Station 20

18 itself.  Well, it doesn't matter.  It's irrelevant.  They are

19 arguing things that aren't part of this case, ink in the

20 water.  They want you to look at Carrie and say this case is

21 about Carrie.

22     I kept writing it down, "did things to meet plaintiff's

23 needs."  How about following the law?  How about doing things

24 to follow the law?  They did everything here to follow

25 Carrie's needs.  That's their ink in the water.  There's the

smear campaign.  They want you to believe this is all about
what Carrie wanted, except the claims in this case, the jury
instructions you have, the law, right -- we went through the
jury instructions together.  You got a PowerPoint lecture.
The law, the claims are everything that occurs between this
date and this date, her station assignments.

And we're going to talk about those station assignments
in a little bit, but everything that occurred before January
21st, 2013 is irrelevant, is material, means nothing.  They
focused for days, witness after witness, on Station 12 versus
Station 20.  Well, Station 12 wasn't on the compliant list.
Station 20, by the way, Station 20 wasn't on the compliant
list either.  Back to this promise, you know why Station 20
wasn't on the compliant list?  Station 20 wasn't on the
compliant list because it didn't have a locking room free from
intrusion.

No one else would have been using it?  That's not true
either.  Other shifts would be using that room.  Swing
personnel would be using that room.  It was not her private
dorm room that had "Carrie Clark" written on it.  It's a
common room.  Now she gets to stay there at night alone when
she's on shift.  She would have to clean it every time.
Broken promise.

No. 20, there's another one.  We're still talking about
Station 20.  "Before she ever came back from maternity leave,

1  he worked out" -- talking about Battalion Chief McDonough --

2  "an arrangement where she could go and be permanently assigned

3  or at least assigned for a long-term period of time to Station

4  20."  Broken promise, not true, misleading.  Long-term period

5  of time?  No.  The testimony was at most eight weeks.  That's

6  maybe three or four tours.

7       But Station 12 and Station 20 being equal, since they're

8  both on the noncompliant list, Carrie testified that she was

9  trying to make lemonade out of lemons.  She was trying to make

10 the best out of a bad situation.  So all this focus on Station

11 20 -- I mean, how many times did they say Station 20, Station

12 20, Station 20?  All that focus on Station 20, not relevant to

13 the claims that are in your jury instructions.  They want to

14 distract you, ink in the water.

15      Next claim, still Station 20.  "It has private dorm rooms

16 for every firefighter and paramedic that have locks on the

17 doors and no windows."  No locks on the doors until after

18 OEOP's investigation.  Station 20, no locks on the doors.  Not

19 true.

20      Now let's talk about Jeff Todd for a second.  This is all

21 part of the Station 20 drama that they're drumming up to

22 distract you.  "Jeff Todd was receiving a performance

23 evaluation from his captain that was not good and that

24 necessitated the department moving him involuntarily from

25 Station 12 to Station 9."

1    Okay.  Well, number one, Jeff Todd's evaluation wasn't

2   bad.  The testimony was that it met expectations.  It wasn't

3   as good as he wanted it to be, but the testimony was that he

4   was meeting expectations, and the testimony was that there

5   were some underlying personality conflicts there between

6   Captain Tracy and Jeff.

7    More important, that necessitated the department moving

8   him involuntarily from Station 12 to Station 9?  No.  He was

9   assigned to Station -- to swing shift.  He was assigned to

10  swing shift.  And if you'll remember, counsel when they're

11  asking the questions, he wasn't?  Wasn't he assigned to --

12  wasn't he -- no.  He was assigned to swing shift.  I believe

13  that's Plaintiff's Exhibit 116.  And then he bid and won the

14  bid to Station 9.  Not true.

15   Next:  "So when Jeff Todd requested to voluntarily go to

16  swing shift, they denied the request and placed him at Station

17  9."  Not true.  Swing shift.  He was assigned to swing shift,

18  and then he won the bid to Station 9.  You have the personnel

19  update forms.

20   Next one:  "So Ms. Clark was then at Station 12, a

21  station she believed was compliant with federal law" -- no

22  testimony, no testimony that she believed Station 12 complied

23  with federal law -- "a station where she was comfortable and

24  the station where she most wanted to be."  Not true.  She

25  wanted to be in a place where she could express her breast

1   milk in private, free from intrusion from coworkers and the

2   public.

3       And here's the other misdirection, ladies and gentlemen,

4   and this is the big one.  This is the one that's most

5   offensive.  This is the one that should get you angry.  None

6   of this, none of this from this point forward, none of that

7   would have been necessary had the Tucson Fire Department

8   complied with the law from day one.  None of it would have

9   been necessary.

10      This November 13th, 2012 meeting, whether you think those

11  were inappropriate questions or not, whether you think it was

12  intimidating or not, they follow the law, none of this happens

13  because every one of the fire stations in the fire department

14  would have complied.  They could have put her anywhere and she

15  would have had a private space to express her breast milk free

16  from intrusion from coworkers and the public.  They want to

17  distract you, blow as much ink in the water as possible to

18  confuse you, but none of this would have been necessary had

19  they followed the law.

20      And then they have the temerity to bring up Laura Baker,

21  who is paid by the City to be here, using your taxpayer

22  dollars to keep book, to make notes on everyone and everything

23  that's being testified to, come up here and say, oh, I mean

24  I'm a woman and I care about women's issues and I didn't have

25  any problems.

1      This case is not about Laura Baker.  This case is not

2  about Sharon McDonough.  This case isn't about all those

3  people.  This case is about what happened with Carrie.  And

4  when I asked Chief Baker, right, when I asked Chief Baker,

5  well, all these men that were dealing with these issues that

6  knew about your involvement in iWomen and knew how active you

7  were and how much you cared about women's issues, did any of

8  them come to you for your help?  No.  Did you go and jump in

9  and parachute in wearing your superhero costume and say, I got

10  this, we're going to do this, we're going to do what's

11  progressive?  No.  If it was progressive, it would have

12  happened well before Carrie came back from pregnancy.  She

13  wouldn't have had to stand up for her rights.

14      The next promise they made, "She would use sick time or

15  vacation time to avoid having to go to a station that she did

16  not want."  Well, that's not true.  The "she did not want"

17  part, that's not true.  There's no testimony about that.  And

18  it wasn't about what she wanted.  It wasn't a special request.

19  All she wanted was a place.  All she wanted was the federal

20  law.  How much easier can you get with this?  And it was

21  Gordon Clark that testified that she would use sick time or

22  vacation time to avoid having to go to stations.

23      "There were no legally noncompliant fire stations when

24  Paramedic Clark was on swing shift."  What?  Really?  I mean,

25  okay, so an independent watchdog department, the OEOP, does an

1   investigation.  They go out and they determine here's what you

2   need to do for compliance, okay?  Have they shown you a single

3   document other than their verbal, oh, I disagreed with that?

4   Have they showed you a single document, a single piece of

5   evidence, a single anything that shows that they actually

6   disagreed with those findings?  No.  All they did was show you

7   documentation that showed they complied with those findings.

8   They actually did what this independent watchdog agency, by

9   the way, that reports to the city manager, right, for the fire

10  chief, who is an at-will employee -- that was testified to.

11  And by the way, nothing happened with the fire stations until

12  after OEOP published its report.  Shock.  Go figure.  They

13  were so progressive that they waited until April of 2013, when

14  Carrie's asking for this before October 2012.  That's

15  progressive.

16      Next one:  "Even Station 9, the station where Paramedic

17  Clark seemingly most did not want to go" -- not true -- "there

18  were private rooms."  No, not true.  "They did not have doors,

19  they had curtains that could be secured, but there were

20  private rooms available."

21      Okay.  So let's talk about these curtains.  You have to

22  ask yourselves, yeah, would you be comfortable being naked

23  from the top up behind a curtain?  And by the way, it could

24  not be secured.  You heard testimony that firefighters are

25  not allowed to touch anything in the fire station.  They're

not allowed to make any modifications.  They can't even change

a light bulb without permission, without the City of Tucson

coming in and doing it themselves.  So she couldn't make any

modifications to secure anything.

"Study room, piece of paper, or a curtain."  Well, you're

going to see, because you'll have it in evidence, the work

order that says they actually replaced the entire door with a

locking mechanism because the one that was there for the study

room didn't have it.

Next broken promise:  "A lock on the door, which you will

not hear anyone tell you is required by the law."  That's

true.  This is true.  There's nothing in the law that says a

lock is required.  We'll get to that in a little bit.  "And a

place where she would not have to clean the space each time

she wanted to utilize it."  That's not true.  In fact, Carrie

testified each time she expressed her milk she would clean the

space first.

"Meaning that it would not be used for a different

purpose, only for her."  There was no testimony about that,

nothing.  They had plenty of opportunity to cross-examine her.

They deposed her four times.  Talk about intimidation.  Now

it's not outside the rules to do that.

"You must be out of your friggin minds, and she hung up

the phone on them.  They will tell you that they know she hung

up the phone because when they tried to call her back, she did

1   it again."  All right.  Well, that's this March 20th phone

2   call, the same phone call that JoAnn Acosta -- and by the way,

3   JoAnn Acosta, while she's denying that that ever was said,

4   Chiefs Fischback and Rodriguez, they both testified, yeah,

5   that she said that.  So somebody's not telling the truth

6   there.

7        But let's talk about this hang-up, okay?  First of all,

8   she was written up -- no.  Let's just talk about the hang-up.

9   The testimony on this is all over the place.  You have one

10  person saying hung up once, one person saying hung up and

11  called back, one person suggesting there was a phone call to

12  her house.  One person, JoAnn Acosta, said, no, we put her on

13  hold so we could have a conversation.  And I asked Chief

14  Rodriguez, you guys ever put her on hold?  No, no, we never

15  did that.

16       And yet -- and the only documentation you have, by the

17  way, are phone records, her phone records and the City's own

18  phone records.  They couldn't explain that.  Well, that's

19  because these hang-ups are fiction, never happened.  And how

20  do we know that it never happened?  Why did they do that?

21  Well, again, despite the claims of defense counsel on their

22  closing, I don't need to prove anybody intentionally did it,

23  but you don't need to be a rocket scientist, you don't need to

24  be an evil genius to see what happens, right?

25       JoAnn Acosta, the HR manager, who's spent decades in HR,

1  has the temerity to say, your breast pumping seems excessive

2  to me.  I probably would respond -- I would probably respond a

3  lot stronger than you're out of your friggin mind if I'm going

4  to wake up my chief, my supervisor, in the middle of the night

5  so I can pump my breast milk.  By the way, even Chiefs

6  Fischback and Rodriguez agreed that Station 9 was not an

7  appropriate one, so how can they say that Carrie didn't want

8  to go there?  Station 9 wasn't appropriate.  Even the chiefs

9  agreed.

10       And by the way, the adult, Carrie, has admitted, has

11  owned every -- she owns her own behavior.  She said, yeah, I

12  said it.  I was pretty angry.  I was pretty upset.  You know

13  what?  She had a right to say it.  And in the fire service,

14  far worse things are said every day by supervisors, by

15  managers to subordinates.  It's a family, type A

16  personalities, yet she's the one that gets disciplined for

17  saying friggin.  And then six days later, when Chief Fischback

18  is giving her her formal discipline or educational counseling

19  and they're talking about, well, okay, I'm at Station 6, fine.

20  What about trades?  What about that stuff?  Well, that's what

21  happens when you file a complaint.

22       How is that not retaliation?  That is classic

23  retaliation.  That is the very definition of retaliation.  We

24  are going to discipline you because you made a complaint.  And

25  when she said, well, I didn't file a formal complaint, he

said, well, somebody got EEO involved.  Somebody got them

involved.  How is that not retaliation?  How is that not

unprofessional?  It was so unprofessional that he apologized.

Did he get disciplined?  Did he get a counseling?  Nothing.

Here they claim -- in this snippet, they claim that the

angry outburst, right, it was not formal discipline.  The

education, it was formal discipline.  You heard the testimony.

You saw the matrix.  Yeah, that's formal discipline.

"She never worked at a noncompliant station.  She never

worked a single shift at a station that did not comply with

federal law."  Remember this one.  I'm going to show you in a

little bit how that's not true.

How about the next one?  "Fischback and Rodriguez also

learned that Ms. Clark had sometimes taken a truck out of

service so that she could pump breast milk."  Not true.  Never

happened.

Now when JoAnn Acosta, during this March 20th phone call,

says, well, you're pumping that often?  It seems excessive to

me.  She's thinking to herself because she's new to the fire

department, she doesn't understand the operations there.

Well, how can you pump that often and not take the truck out

of service?  And the only thing that -- the only thing that

happened, by the way, is that there was one instance -- and

Carrie testified to this.  There's one instance where it was

the end of a long call, on the way back from the hospital, she

1  had leaked onto her shirt, and they went back and while they

2  were on their way back to the station, they were out of

3  service but still monitoring the radio.  And by the way, one

4  of the chiefs, because there were so many of them, one of the

5  chiefs testified that, yeah, having a bodily fluid on your

6  shirt would be a valid reason to take a truck out of service.

7  So even if she had taken a truck out of service, it's not --

8  there's nothing wrong with it.  But of course Carrie said, I

9  never took a truck out of service to pump.  Not true.

10     More.  Let's talk about the $150 club.  Here they're

11  talking about "What you'll actually hear is that in order to

12  receive her paramedic pay, all Ms. Clark had to do was fill

13  out a form requesting it."  She did fill out a form in April

14  of 2016 to get it, "the same form that every other TFD

15  paramedic who changes positions has to fill out."  Nate Weber

16  testified, nuh-uh, nope, not true.

17     "Why didn't she fill it out on time?  Because she refused

18  to go to Ms. Acosta's office and pick it up from her."  No.

19  It's on a daily bulletin online.  You don't need to go to

20  JoAnn Acosta's office to pick it up.  You can get it online

21  and fill it out.  It wasn't in her demotion paperwork.  And of

22  course they double down on it, "because she refused to go pick

23  up a piece of paper from the HR manager."  Not true.

24     Next:  "And if you're here at 6, there's no one here to

25  give you work.  Light duty people are not allowed to flex

1  their time in the way that Ms. Clark tried to."  Yeah, not

2  true.  Not true anywhere.  Not true in any light duty policy.

3  Not true in any testimony you heard.  In fact, you heard the

4  opposite.  You heard them say, yeah -- you heard Ken

5  Brouillette say, their witness, Ken Brouillette say, no, there

6  would have been no reason for her not to come in at 6.  "And

7  if you're here at 6, there's no one here to give you work."

8  Not true.  She had a big project that lasted a long time.  She

9  got that big project on day one.

10       And you heard testimony about other males who

11  were allowed to be on light duty and come in at 6.  And I

12  asked -- by the way, I asked Laura Baker about this, their

13  cleanup hitter, right?  She is the one who came in at the end

14  of the trial and she said, you know, we're not really good

15  about -- we're not really good about assigning people

16  supervisors while they're on light duty.

17       What?  In a hierarchical chain of command organization

18  that relies on rules, relies on rules to do the job, relies on

19  rules for making life-and-death decisions, they can't figure

20  out how to assign somebody to a supervisor on light duty?

21  That's just not believable.

22       Next:  "But what you'll hear consistently from every

23  person who testifies is that the fire department

24  administrators did everything they could for Ms. Clark."

25  Well, okay.  So, first of all, not every person that -- not

1   every person that testified said that, and in fact there were

2   plenty of witnesses who said the opposite, that they could

3   have done things, and the evidence shows that they could have

4   done plenty of things.  They had the right, they had the

5   authority, and they chose not to exercise it.  Talk about

6   that.

7       Next one:  "It's about what the fire department does for

8   its female employees.  There may not be many, but they stay in

9   that job until they retire because the fire department makes

10  it possible to be women and to be firefighters and to have

11  families."

12      Well, that's not true.  You heard a list of at least

13  eight women who didn't retire from the fire department, so is

14  it true?  Is that true or not?  Is there any evidence that

15  you've heard about that?  No.  These are promises that were

16  made to you, promises that were broken, and after the broken

17  promises pile up over and over and over again, it becomes

18  dishonest.  And that's what this case is about, a lot of

19  dishonesty.

20      "Ms. Clark did not make the best of what TFD had to offer

21  her."  Not true.  "But what they offered her complied with the

22  law and more importantly complied with basic standards of

23  fairness and decency."  Not even close to true.  Basic

24  standards of fairness and decency would have said management

25  rights, we have the right to assign her to a station, fairness

1  and decency dictate we're going to put her in a place that

2  complies with the federal law or that she's comfortable with,

3  right?

4       Remember Ed Nied?  I asked him, a woman expressing breast

5  milk is not egregious enough under his egregiousness standard.

6  He said, no, I wouldn't put it that way.  Didn't work out so

7  well for him.

8       "The fact that these rules come from this negotiated

9  process means that oftentimes administrators' hands are tied."

10 Never heard any testimony about that.  "Even if they would

11 like to deviate from the rules, they often cannot."  That's

12 not true.  They testified over and over and over again that

13 they deviate from the rules.

14      "She's a great example of what TFD actually does with

15 women."  This is referring to Laura Baker.  I've covered that.

16 I've covered this about what the fire department does for

17 women to have families.

18      But let's go back to the very beginning.  Forget about

19 the timeline.  Let's talk about these noncompliant assignments

20 between January and March 2013, again what we've complained

21 about, right?  We talked about the law.  You looked at the

22 jury instructions.  We looked at them together.  So now let's

23 talk about the noncompliant assignments from January to March

24 2013.  You have this in evidence.  You have the TeleStaff

25 rosters.  You have three different versions of the TeleStaff

1   rosters.

2        So on the right are the stations not in compliance from

3   Exhibit 62, which is the OEOP report, and on the left you have

4   the stations she worked at from January 6, 2013 up to March

5   26, 2013.  All right.  So you'll see Station 12 on there a

6   lot.  That's fine.  You don't like Station 12, you think let's

7   give them -- we'll give them that point.  She wanted to be at

8   Station 12.  She felt more comfortable there.  So let's give

9   them that point.  Even though Station 12 shows up on that

10  list, let's give them that point.  How about that?  All of

11  those stations are stations she worked at that didn't comply.

12  All of those stations are stations she worked at in that time

13  that didn't comply.  So between January 1st and March 20th,

14  2013, Carrie worked 21 shifts at seven different stations of

15  which eight shifts were at noncompliant stations.  So 38

16  percent of the shifts she worked in that time frame were at

17  noncompliant stations.

18       That goes back to the promise you were made on opening

19  statement.  Again, I fully concede that opening remarks are

20  not evidence, but they are a road map and they do tell you

21  what you should expect to hear what their case is.

22       Let's talk about Carrie's leave.  From October 2012 to

23  March 2013, on at least 12 occasions between October 2012 and

24  March 2013, she took vacation, sick, or personal leave.  And

25  you can look at her pay stubs to see how much those were

1  worth.

2       Now are all of those occasions because of whatever

3  reason?  We don't know, right?  Plenty of reasons why that

4  might have happened.  But you can infer, right?  You can infer

5  the reasons.  Her husband testified that she took sick and

6  vacation and personal leave when she didn't want to work at a

7  station that was not compliant, but she couldn't do that all

8  the time.  And as I think it was either Nate Weber or Josh

9  Campbell had testified, it's not dollar for dollar.  When you

10 retire and you cash out, there's a formula.

11      Now we're not asking for a specific number here, all

12 right?  Let's talk about this.

13      We'll talk about locks for a second.  The standard is

14 free from intrusion.  No one ever said a lock.  Now I did show

15 you this lock at the beginning of the trial.  I did show that

16 to you not because the law requires it, but it's simple.  It's

17 easy.  In fact, that's what Chief Gulotta testified.  Chief

18 Gulotta testified, well, my goodness, if a lock is going to

19 satisfy our employees, then that's what we're going to do.

20      Now, okay, let's talk about it for a second.  You don't

21 leave your common sense at the door when you deliberate.  You

22 don't leave it when you come in this courtroom.  You don't put

23 it in a box.  You don't leave it at the door when you go into

24 the jury room to deliberate.  Common sense.  If you go into a

25 dressing room at Marshalls or JCPenny's, you don't close the

1   door and hope for the best.  You don't put a sign on a door,

2   naked person inside, don't come in, right?  Your house, you

3   close the door.  Do you lock it at night because you don't

4   want to be intruded upon?

5       Now some people, certainly some people are comfortable

6   doing their business in the bathroom without locking the door.

7   Okay.  Carrie testified she's more modest than that.  And

8   frankly, free from intrusion from coworkers and the public, I

9   don't need to beat this one up.

10      And I'll tell you that there is a lot of talk about

11  whether locks are required or not.  That's more ink in the

12  water.  Why?  Because that's what the City did.  That's how

13  the City fixed the problem.  That's how the City came into

14  compliance.  They actually went out and they said, we're going

15  to put locks on the doors, and then they put locks on the

16  doors.

17      And I'll tell you, ladies and gentlemen, the government

18  does not apologize or admit wrongdoing unless it absolutely

19  has to or it's forced to.  The mere fact that they took

20  corrective measures alone is an absolute admission that up to

21  this point they were in violation of the law, up to that

22  point, up to the point where they installed the locks in April

23  of 2013.

24      But look at -- I just want you to look at this visually

25  for a second.  Look at how it's clustered.  All of this red

here, this is clustered right after Carrie contacts EEO, right

after Carrie comes back from her first pregnancy.

All of this is clustered right before Carrie's son Mason

is born, right?  She's five and a half, six months, not seven

months as was argued earlier.  She's five and a half, six

months pregnant here.  All of this is clustered together.

Carrie is disciplined for not being in harmony with others.

The other person that was in that argument, Nicole

Sprenger, she wasn't disciplined.  You heard Harvey Brown

testify all the time people are very passionate about their

jobs in prevention and they argue.  And you heard that Carrie

has a legal obligation, a legal obligation to report things

that she sees that are fire safety hazards, but she gets

written up for that?

Now Ken Brouillette, I agree, was a mess.  Their witness,

by the way, he was a mess.  He says, well, I wasn't her

supervisor, but I disciplined her -- or I'm sorry.  I gave her

an educational counseling, not formal discipline, not informal

discipline.  I gave her an educational counseling because she

jumped the chain of command.

What?  If he doesn't believe that he's her supervisor,

what's he doing disciplining her for jumping chain of command?

And by the way, Chief Carsten testified, I have an open-door

policy.  So which is it?  Do you have an open-door policy

where you can go talk to people about issues that you're

having?  But yet Ken Brouillette testified that at the time he

issued the educational counseling, he was aware that Carrie

was having these issues with breastfeeding in the past and

that she had filed a complaint and that the process was

moving along.

     Transferring Carrie involuntarily, she was the only one.

While Chief Critchley is playing games with the org chart

because he had a mandate to reduce the size of fire

prevention, Carrie is the only one who gets moved to a 24-hour

shift.  Carrie is the only one who doesn't get to go home at

night to see her kids while all the other people get moved

onto an eight or ten-hour prevention truck, which Carrie

testified to she asked for.  And by the way, the prevention

numbers didn't change.  The number of people that were in

prevention didn't change, so this is a fiction that she was

transferred because of any other reason.

     And then that seniority stuff, that's ink in the water.

What a hot mess.  Mike Garcia, talk about deception, talk

about misleading, talk about being dishonest.  Mike Garcia is

testifying to a union contract that wasn't even in effect at

the time.  He was trying to justify his decision by using

language that didn't even apply, and they brought it to him

and said Carrie was the only one.  Who are the winners and

losers, right?  Inconsistent policy.  Notice how he didn't

answer my question.  Well, it was an inconsistent policy?  No,

1  it was past practice.  Ladies and gentlemen, discrimination,

2  retaliation is using an otherwise neutral practice to be

3  biased or prejudiced or to retaliate.

4      Depriving her of paramedic specialty pay, it's not about

5  the 69 bucks.  It's about the games that they're playing, this

6  paper cut after paper cut, this retaliation.  It's not one

7  thing.  You can divide and conquer these.  You can slice and

8  dice these, but you look at it and you go, that's a pattern,

9  one thing after another after another.

10      Then let's just talk about the May 22nd drill for a

11  second.

12      Sandy, if you would.

13      This email or these emails are in evidence.  On May 14th,

14  2014, Battalion Chief Nofs reaches out to the HR manager and

15  says, personnel questions for you from Station 6 and myself,

16  Station 6, not some crew members at Station 6, Station 6.  And

17  they reference the fact that she's pregnant and showing, and

18  the concern, by the way, is her ability to pull hose, lift

19  stretchers, perform functions of a firefighter and medic.

20  Pull hoses.  Their concern is her ability to pull hoses.

21      What do they make her do eight days later?  I went to the

22  manual of operations, but both the old and new say 219

23  pregnancy policy currently under review and couldn't access

24  it.  So there was no policy.  We know that.

25      Now the law does not require a policy.  I will concede

1  that.  The law does not say that any employer has to have a

2  policy, but in a policy-centric organization, you see the

3  battalion chief going for the policy.  And what about that

4  policy?  Oh, I pulled it because it was illegal.  Oh, so they

5  had an illegal policy or at least a policy the human resources

6  manager thought was illegal on the books that had been

7  reviewed by the City Attorney's Office, on the books?

8       So then they raise the issue of being evaluated, the

9  fitness for duty from Dr. Peete.  Okay.  So all of this is

10 about her pregnancy.  Ms. Acedo-Acosta replies, well, with

11 regards to her ability to perform, if Captain McDonough has

12 documented tasks she is required to perform but cannot due to

13 her condition, then we can request an evaluation.

14      The whole mess about Tyler McKendrick and the engineering

15 and running the pump was a bald-faced lie.  You should reject

16 everything that Captain Ted McDonough said because it's not

17 true.  I mean, if he's supposedly out there helping Carrie

18 with the hose, right, how is he checking on what Tyler

19 McKendrick is doing with the pump?  How is he testing him?

20 How is he teaching him?  And then when I asked him that, when

21 I confronted him with that, he said, oh, no, no.  He's an

22 experienced guy.  He knows how to run the pump.  If he knows

23 how to run the pump, why run the drill?  And by the way,

24 Carrie testified this was the only drill that she had

25 performed in the roughly 14 months she had been at Station 6.

1       This is the circumstantial evidence.  You don't need

2  Captain Ted McDonough to come in here and say, yeah, I

3  discriminated against her.  And how did they characterize him

4  in their closing?  They characterized him as simple.  In my

5  world, simple is pejorative for stupid.  And I'll tell you

6  that you don't need to be an evil genius to discriminate.  You

7  don't need to be an evil genius to retaliate.

8       This was all about her pregnancy, 100 percent about her

9  pregnancy.  He lied over and over and over again.  Did she

10  perform the drill?  Yeah, first part of it.  Yeah, she

11  performed it.  She pulled out hose.  She sprayed like he told

12  her to.  Now he's going to make her pull out hose and go all

13  the way up to the second floor.  She's done.  It's enough.

14  You want me off the truck, just tell me.

15       Did he continue to do that?  No, he certainly didn't

16  continue the drill.  So a misdirection, right?  This is about

17  Tyler McKendrick.  Look at Tyler McKendrick's memo.  Does it

18  say anything about I was testing?  No.  It doesn't say

19  anything about that.  And of course he didn't promote to

20  engineer until like years later.

21       And when they couldn't find anything on Carrie on the 522

22  drill, when they couldn't find any documented tasks that she

23  couldn't perform, what did they do?  A week later they inspect

24  her turnouts.  Chief Nofs, the same guy who wrote this email

25  to JoAnn on May 14th, Chief Nofs writes that.  He writes that

1  email and then a week after the drill, he goes and checks her

2  turnouts.  And where was Chief Nofs?  Now they don't have to

3  prove anything, that's true, but if he had a legitimate

4  purpose for doing it, why not bring him in here and have him

5  tell you that?

6       Just a moment, please.

7       Let me talk about rules for a minute.

8       I'm going to check my notes.

9       Management rights.  Let's talk about management rights

10 for a minute.  That allows, that gives them the authority, the

11 discretion to overrule just about any policy in the department

12 as long as it's for the benefit of the department or the

13 community.

14      All right.  You've heard a variety of ways that

15 management rights is interpreted.  Well, that makes sense.  It

16 is a policy of discretion, so of course people are going to

17 interpret it differently.  The point isn't how often it's

18 used.  The point, the ink in the water isn't whether we only

19 use it in egregious circumstances.  The point is they had the

20 power and authority.  They could have done it and they chose

21 affirmatively not to do it.

22      Can we blame Battalion Chief Paul McDonough?  Can we

23 blame Rick L'Heureux?  No.  They were doing their best, but

24 they were limited.  They testified that they were limited.

25 They only had so much authority they could go up to.  Paul

1   McDonough did what he could because there was no policy to

2   guide him.

3       You heard Rick L'Heureux say, if there was a policy, it

4   would have been helpful if I would have had some guidance,

5   something.  It would have been helpful, easier to do my job.

6   Nothing.  Instead they talk about this supposed list that they

7   never produced of stations that's referenced on a text message

8   where he says, oh, that's not on your list.  What?  Why should

9   there even be a list?

10      You're going to have Exhibit 92.  Those are the rules of

11  assignment.  One of the reasons -- one of the rules of

12  assignment is -- one of the reasons why people can be moved in

13  the rules of assignment, separate and apart from management

14  rights, is to prevent, to avert, or correct a personality

15  clash between members.  In other words, personality conflicts

16  are so prevalent, are so important, it actually is in their

17  own rules.  So this smear campaign that Carrie had all these

18  personality conflicts, it is so prevalent in the fire

19  department that it's in their own rules as a justification to

20  move people around.

21      So let's not forget some of the other reasons that the

22  City used management rights, right?  Josue Camarena testified

23  that after he was arrested for drunk driving, his license was

24  suspended and the fire department actually bumped another

25  firefighter more senior to him out of his spot to accommodate

1  the fact that Camarena could not drive.  That was okay under

2  management rights.

3      When John Valenzuela was arrested a second time on

4  criminal charges, he was taken off Engine 13 and placed into

5  an eight-hour assignment at fire headquarters.  Because there

6  wasn't a policy that covered his situation, the fire

7  department exercised management rights.  He was eventually

8  demoted, appealed, and even returned back to his captain

9  position.

10     Brad DeCastro, also convicted of drunk driving, again the

11 fire department bumped another employee, male, out of an

12 assignment they had bid on and won to accommodate Mr. DeCastro

13 to keep a close eye on him.  So the department follows its

14 rules when it wants to and ignores them when it doesn't.  And

15 who is responsible for following the rules, by the way?

16 Management, at least according to Matt Larsen.

17     So you can compare Carrie to the three coworkers, the

18 three male coworkers.  You can compare Carrie to herself.  You

19 can compare Carrie before she was pregnant, never had a

20 problem, great performance evaluations, superstar, to

21 afterwards.  There's your link.  There's your causal

22 connection.  All this stuff happens after she comes back,

23 says, I want a space free from intrusion to express my breast

24 milk, and they say effectively, you're right.  But it was

25 ugly.

1     Let me talk for a minute about damages.  What's emotional

2 distress worth?  What's a sleepless night worth to you?

3 What's almost losing your marriage worth to you?  Almost

4 losing your marriage because of the way you've been treated at

5 work.  Your childhood dream of becoming a firefighter ruined.

6 All the things you loved doing you no longer do anymore,

7 withdrawing from your family, from your kids.  You heard

8 testimony from Carrie, you heard testimony from Gordon, you

9 heard testimony from people in the union about how Carrie was

10 different before and after, about how it affected her.

11     You have the power and authority to address that.  You

12 have Carrie's paychecks in evidence.  You know at the highest

13 point she was making $28.39 an hour.  What's emotional

14 distress damages worth?  50 bucks an hour?  25 bucks an hour?

15 If you multiply 25 bucks an hour times 24 hours a day times

16 365 days a year times six and a half years that Carrie's been

17 dealing with this, you have a pretty high number.  It's like

18 1.4 million.

19     Now we're not asking you for that because we're asking

20 you to be intellectually honest when you go back there and

21 deliberate.  We're asking you to be intellectually honest with

22 yourselves and with each other, and we can't be intellectually

23 honest with you and look at you and say that 365 days a year,

24 24 hours a day, Carrie's experiencing that.  It waxed and

25 waned.  There were good days and bad days.

1    So you get to decide how much that's worth, and you also

2    get to decide, by the way, how much it's worth in future

3    emotional distress.  You get to say, well, you have the $150

4    club money.  You have all those benefits that she lost out on,

5    that sick time, this vacation time.  You get to look at the

6    fact that she wasn't compensated for those depositions.

7    Let's just talk about that really quick.  You have the

8    City ADs.  You have the City's policy, the TFD policy.  Look

9    there and see if it says anything about not getting paid when

10   you bring a claim, when you're the plaintiff.  Look at the

11   rules.  Look at the plain language of the rules.  And of

12   course JoAnn Acosta tried to say, well, when the City AD

13   conflicts with the department policy, generally the City AD

14   controls, so we're relying on the City AD here.  The City AD

15   doesn't help them.  It doesn't say anything there either.

16   So you get to decide how much money it's worth and you

17   get to decide the Title VII claim, the retaliation, the FLSA

18   claim, the FLSA retaliation.  If you choose to make an award,

19   you can put it on any one of those four lines.  You can put it

20   all on one line.  You can split it up between those four

21   lines.  You get to choose.  We leave that in your judicious

22   hands.

23   What will you do to serve -- what you will do will serve

24   to warn others.  They talked about money and how Carrie and

25   Gordon are going to benefit from this.  I don't see how

anybody can benefit from this.  I don't see how anyone can

benefit from their reputation being damaged the way it's been.

By the way, Gordon is not a plaintiff in this case, but they

want to keep pointing to him.

What you do will serve to warn others to obey the law and

the consequences if they don't.  Other city departments

besides the fire department are watching.  Mayor and council

are watching.  Other governments, like Marana, Oro Valley,

Sahuarita, they're watching.  It's up to you to decide how

much to award in this case and what amount of money would

accomplish those obligations.

I'll wrap up with this:  In the City of Tucson Fire

Department, you can drive drunk.  You can get a criminal

conviction for driving drunk.  You can drive drunk and put the

very people that you are sworn and took an oath to protect at

risk.  Break the law and they will accommodate you.  God

forbid you're a nursing mother.  Not only will they not give

you an accommodation, but they themselves will break the law

to punish you.

We've now been in this courthouse since last Monday, and

every day that we've been here, Judge Jorgenson and her

colleagues on the bench in other courtrooms have been holding

people who have broken the law accountable.  In this

courthouse, we don't reward breaking the law.  We hold those

who break the law accountable, and that's what we're asking

1  you to do.

2  (Proceedings were had and recorded but not transcribed.)

3  (Court adjourned at 1:21 p.m.)

1                    C E R T I F I C A T E

2

3           I, Aaron H. LaDuke, do hereby certify that I

4   reported the foregoing proceedings to the best of my skill

5   and ability, and that the same was transcribed by me via

6   computer-aided transcription, and that the foregoing pages

7   of typewritten matter are a true, correct, and complete

8   transcript of all the proceedings had, as set forth in the

9   title page hereto.

10          Dated this 15th day of April, 2019.

11

12

13                      _____s/Aaron H. LaDuke_____
                        Aaron H. LaDuke, RMR, CRR
14                      Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25