Michelle R. Saavedra (State Bar No. 25728)
Renee J. Waters (State Bar No. 031691)
Principal Assistant City Attorneys for
MICHAEL G. RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
Michelle.Saavedra@tucsonaz.gov
Renee.Waters@tucsonaz.gov
Telephone: (520) 791-4221
Fax: (520) 623-9803

## FARHANG & MEDCOFF
### ATTORNEYS

4801 East Broadway Boulevard, Suite 311
Tucson, Arizona 85711
T: 520.214.2000
F: 520.214.2001

Ali J. Farhang (#019456) (PAN 65507)
afarhang@farhangmedcoff.com
Roberto C. Garcia (#026246) (PAN 66152)
rgarcia@farhangmedcoff.com
Robert A. Bernheim (#024664) (PAN 66050)
rbernheim@farhangmedcoff.com

Attorneys for Defendant City of Tucson

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

|  |  |
|---|---|
| CARRIE FERRARA CLARK,<br><br>                Plaintiff,<br><br>        v.<br><br>CITY OF TUCSON<br><br>                Defendants. | Case No. 4:14-CV-02543-TUCV-CKJ<br><br>**REPLY IN SUPPORT OF DEFENDANT'S ALTERNATIVE MOTION FOR: (1) JUDGMENT AS A MATTER OF LAW (RENEWED), (2) NEW TRIAL, OR (3) REMITTITUR**<br><br>Assigned to the Honorable<br>Cindy K. Jorgenson |

Starting with a misrepresentation of Defendant City of Tucson's (the "City") Rule 50(a) Motion for Judgment as a Matter of Law during trial, and continuing thereafter with

FARHANG & MEDCOFF
ATTORNEYS

1  a series of equally unavailing arguments, Plaintiff Carrie Ferrara Clark's ("Clark")

2  Opposition to Defendant's Alternative Motion for Judgment as a Matter of Law (Renewed),

3  New Trial, or Remittitur (Doc. 304) ("Opposition") offers not one good reason to deny any

4  part of the City's Motion.  In fact, Clark concedes—as she must—that the Court should

5  reduce the jury's verdict by no less than $1.6 million as required by the statutory damages

6  cap for Title VII claims. 42 U.S.C. § 1981a(b)(3). (Doc. 304 at 32).  Her acknowledgment

7  of the Title VII damages cap is merely an effort to salvage a part of the jury's verdict by

8  taking a small reduction rather than face a larger reduction, new trial, or judgment in the

9  City's favor.  This Court, however, should correct the excessive verdict by granting the City

10  judgment as a matter of law, or alternatively granting a new trial or remitting the majority

11  of the jury's damages award.

12  **I.     The City Preserved the Issues Raised in its Rule 50(b) Motion, Which Collectively Support Judgment as a Matter of Law on All of Clark's Claims.**

13

14  **A.     The City sufficiently asserted four of its arguments in its pre-verdict motion for judgment as a matter of law and is permitted to include purely legal arguments even if not included in the Rule 50(a) motion.**

15

16  Clark begins her attack on the motion for judgment as a matter of law with the

17  erroneous claim that the City only raised one of its five arguments in its pre-verdict Rule

18  50(a) motion and that the City's other four arguments are all waived.  (Doc. 304 at 2-3).

19  While Clark correctly summarizes the five issues raised in the City's Rule 50(b) motion, in

20  an effort to circumvent the merits of the Rule 50(b) motion, she incorrectly summarizes the

21  City's four arguments raised during the Rule 50(a) motion during trial.  Given Clark's

22  citation to the correct portion of the trial transcripts for the Rule 50(a) motion, the City lacks

23  a reasonable explanation for Clark's mistaken waiver argument.

24  The Court must liberally construe Rule 50's requirements when evaluating the

25  sufficiency of a Rule 50(a) motion, and "[t]echnical precision is unnecessary." *See Dillon*

26  *v. Mountain Coal Co.*, 569 F.3d 1215, 1221-22 (10th Cir. 2009) (internal quotation

27  omitted).  The motion need only apprise the court and opposing counsel of the moving

28  party's position. *Id.* at 1222.  "Rule 50(b) may be satisfied by an ambiguous or inartfully

FARHANG & MEDCOFF
ATTORNEYS

00611016.1

- 2 -

made motion under Rule 50(a)."  *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (internal quotation omitted).  Furthermore, there need not be a "[s]trict identity of issues" between the Rule 50(a) and Rule 50(b) motions as long as the issues are "closely related" enough to put the opposing party on notice of deficiencies.  *Howard v. Walgreen Co.*, 605 F.3d 1239, 1243 (11th Cir. 2010) (holding that Rule 50(a) motion on the "protected conduct" element of discrimination case sufficient to raise Rule 50(b) arguments on protected conduct, lack of adverse action, and lack of causal connection).[1]

During the Rule 50(a) motion at trial, the City first argued that Clark did not elicit sufficient evidence to demonstrate a violation of § 207(r) of the FLSA because the evidence was that all of the stations had compliant rooms free from intrusion and public view.  (Doc. 255 at 2:16-25).  This matches the City's second basis for its Rule 50(b) motion.  (Doc. 281 at 6-10).  Clark concedes this argument was not waived.  (Doc. 304 at 3).

Second, the City argued that, with respect to the retaliation claims, "[t]here's been no causal connection, no evidence of the causal connection presented" to connect the alleged retaliatory acts to the protected conduct.  (Doc. 255 at 3:1-12).  This causal connection analysis is part of the retaliatory intent required to prove a retaliation claim.  *See Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).  Whenever a plaintiff lacks direct evidence of retaliatory intent, as Clark does in current case, the plaintiff can still prove retaliatory intent with indirect or circumstantial evidence of intent by establishing a causal connection between the adverse action and the protected conduct.  *Id.* (noting that direct evidence of retaliatory intent is rare).  Clark well knows that all of her evidence is indirect and that causal connection is part of the retaliatory intent analysis.  (*See, e.g.*, Doc. 122 at 16:25-17:19 (discussion of proximity in time as evidence of discriminatory animus to demonstrate causation in Clark's Opposition to the City's motion for summary judgment); Doc. 131 at 12-13 (discussion of discriminatory motive in Court's Order on motions for summary judgment)).  Indeed, even the discussion about comparators, listed by the City as

---

[1]   Even if any of these issues had not been raised in the Rule 50(a) motion, this Court could still consider them because these deficiencies demonstrate the existence of plain error that would result in a manifest miscarriage of justice.  *Go Daddy*, 581 F.3d at 961.

FARHANG & MEDCOFF
——— ATTORNEYS ———

00611016.1

- 3 -

1    a separate argument, is part of the larger retaliatory intent framework.  *See Nicholson v.*

2    *Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012); *Cohen v. Fred Meyer, Inc.*, 686 F.2d

3    793, 796 (9th Cir. 1982).  This argument matches the City's fourth basis for its Rule 50(b)

4    motion.  (Doc. 281 at 13-16).

5        Third, the City noted none of the allegedly retaliatory conduct was "actually adverse"

6    for purposes of retaliation.  (Doc. 255 at 3:13-17).[2]  Again, Clark knew the City's factual

7    and legal basis for arguing there was insufficient evidence of actually adverse conduct, so

8    this was sufficient to place her on notice of the deficiency.  (Doc. 115 at 9:25-10:7, 12:3-

9    10, 15:1-4, 16:17-17:4, and 19:12-14 (City's summary judgment arguments regarding lack

10    of actually adverse conduct)).  This matches the City's third basis for its Rule 50(b) motion.

11    (Doc. 281 at 10-13).

12        Fourth, the City said Clark's three putative comparators for her Title VII claim were

13    not proper comparators, and that Clark did not offer any other evidence to support her claim

14    for discrimination on the basis of sex.  (Doc. 255 at 3:18-4:19).  The City specifically stated,

15    "So we don't think there's actually been any evidence that they were actually similarly

16    situated, so I don't think there has been any evidence presented that she was treated less

17    favorably or they were treated more favorably than her because of sex."  (*Id.* at 4:5-9

18    (emphasis added)).  This matches the City's fifth basis for its Rule 50(b) motion.  (Doc. 281

19    at 16-19).

20        Thus, the only issue raised in the Rule 50(b) renewed motion for judgment as a matter

21    of law that was not raised as part of the Rule 50(a) motion during trial is whether there is a

22    private cause of action under 29 U.S.C. § 207(r).  (Doc. 281 at 4-6).  The City challenged

23    the existence of a private cause of action in its motion for summary judgment, putting Clark

24    fairly on notice of that issue.  (Doc. 115 at 5).  And the City did not have to re-assert that

25    issue during the Rule 50(a) motion to preserve it for the purpose of the Rule 50(b) motion

26    because it is a purely legal question that does not depend on the sufficiency of the evidence.

27

---

28    [2]    The transcript shows the term "actually diverse" in one place, which is an apparent transcription error.  The next sentence correctly shows the term "actually adverse."

00611016.1

FARHANG & MEDCOFF
—— ATTORNEYS ——

1   *See Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004); *Shockley v. Arcan,*

2   *Inc.*, 248 F.3d 1349, 1361 (Fed. Cir. 2001) (considering after entry of the verdict whether a

3   statute provided a private cause of action despite absence of a pre-verdict motion).

4   In another attempt to bypass the Rule 50(b) motion entirely, Clark claims that the

5   City's Rule 50(a) motion during trial did not contain sufficient detail regarding the

6   supporting facts and law. (Doc. 304 at 3-4). Again, a Rule 50(a) motion need only be

7   specific enough to put the opposing party on notice of deficiencies so it can attempt to

8   correct them. *See Howard*, 605 F.3d at 1243. Clark knew exactly what law and facts were

9   relevant during the City's Rule 50(a) motion. The only specific argument she attacks on

10  this ground is whether the jury's implicit incorporation of a requirement under § 207(r) that

11  lactation spaces have locking doors creates a subjective, ADA-like standard, presumably

12  because she admits this issue came up during the Rule 50(a) motion. (Doc. 304 at 4).

13  For these reasons, the Rule 50(b) motion for judgment as a matter of law is

14  procedurally proper, and the Court may consider all of the substantive arguments therein.

15        **B.**    **Clark's arguments regarding her § 207(r) rights as a basis for a**

16  **retaliation claim, waiver of excessive FLSA damages, and jury instructions are all irrelevant.**

17  Clark ends her Opposition to the renewed motion for judgment as a matter of law by

18  arguing (1) that a violation of § 207(r) can be the proper basis for asserting an FLSA

19  retaliation claim; (2) that the City has waived arguments about an award of $50,000 for

20  unpaid wages for a § 207(r) violation because it did not make it part of the Rule 50(a)

21  motion; and that the City did not submit a limiting jury instruction regarding damages.

22  (Doc. 304 at 7-8). These arguments do not make any sense because the City did not

23  challenge the general sufficiency of asserting a § 207(r) violation as the basis the of an

24  FLSA retaliation claim (there just is no private right of action available), and the City did

25  not argue that amount of damages awarded as unpaid wages under § 207(r) as an issue in

26  either of the Rule 50(a) or 50(b) motions. It is unclear how exactly Clark thinks the City

27  could have raised the excessiveness of the jury's FLSA damages award before the jury

28  returned the verdict where that figure first appeared. But the City was not required to raise

FARHANG & MEDCOFF
ATTORNEYS

00611016.1

- 5 -

1  excessiveness of the jury's verdict in Rule 50(a) or 50(b) motions to preserve that issue for

2  a Rule 59 motion.  *See Nassar v. Jackson*, 779 F.3d 547, 552 (8th Cir. 2015) (stating that it

3  would have been premature to raise excessiveness of damages in a Rule 50(a) motion before

4  the jury returns its verdict).

5  Finally, the City is not challenging the jury instructions, nor does it waive its

6  arguments by not challenging the jury instructions.  The City's only reference to a jury

7  instruction was the incorrect law Clark provided the jury during closing, when she

8  suggested that because the jury instructions were silent about intent, she did not have the

9  burden of proving intentional retaliation or discrimination.  (Doc. 281 at 15 n.12).  There

10  was nothing inherently wrong with the instructions because retaliatory intent was implicitly

11  included, but the retaliation instructions did not use the specific word "intent."  (Doc. 233

12  at 15 ("The anti-retaliation protection in Title VI provides that it is unlawful to for an

13  employer to retaliate against an individual because she [engaged in protected conduct].");

14  *id.* at 16-17 (stating elements of retaliation include that "Plaintiff was subjected to the

15  adverse employment action because of her participation in a protected activity")).  Had

16  Clark not explicitly advised the jury to ignore intent, the instructions would have themselves

17  been fine.

### C.  There is no private cause of action to enforce § 207(r).

19  The only response offered to the City's arguments about the lack of a private FLSA

20  cause of action under § 207(r) was that this Court already ruled on this issue and that some

21  courts have found a private cause of action exists.  (Doc. 304 at 6).  Clark does not offer

22  any further substantive discussion.  The City reincorporates its previous arguments on the

23  availability of a private action, lack of § 207(r) damages, and lack of Article III standing.

24  (Doc. 281 at 4-6).

### D.  There is insufficient evidence of an FLSA violation.

26  To shore up her FLSA claim, Clark argues she offered evidence that the stations

27  where she was assigned were not compliant with § 207(r) according to the City's Office of

28  Equal Opportunity Programs ("OEOP").  (Doc. 304 at 4-5).  She does not identify any other

FARHANG & MEDCOFF
—— ATTORNEYS ——

00611016.1

- 6 -

1      evidence to indicate that the stations were noncompliant.[3]  She does not respond to the

2      City's arguments that Clark demanded facilities with features like a door lock, specific

3      sanitary standards, and an unshared space.  (Doc. 281 at 6-7).  Clark's personal, subjective

4      standards are not evidence, and this Court already ruled against her on the sanitary standards

5      and unshared space.  (Doc. 131 at 8).  And the City's OEOP investigator testified that his

6      own assumption that § 207(r) required door locks was the only reason that the OEOP listed

7      any station other than Station 9 as noncompliant.  (Doc. 261 at 7:14-19, 10:6-9, 13:15-14:9).

8      OEOP's list is irrelevant if the only basis for listing rooms as compliant was a mistaken

9      interpretation of law, but Clark asserts the OEOP list concludes any specific inquiry about

10     compliant spaces.  *Cf. Dionne v. Shalala*, 209 F.3d 705, 709 n.8 (8th Cir. 2000) (holding an

11     inadvertent mistake of law is not evidence of discriminatory intent).  Thus, whether § 207(r)

12     requires door locks is the only question at issue for FLSA liability.

13         As the City has argued, while the presence of a lock is probably determinative that a

14     room is "free from intrusion," the absence of a lock just leaves open the question of whether

15     the other circumstances of the lactation space still render it "free from intrusion."  Clark's

16     testimony was that no one ever walked in on her expressing milk.  (Doc. 207 at 45:20-46:4,

17     61:22-63:1).  She cannot reasonably argue that the lactation spaces were not free from

18     intrusion when no one ever intruded on her.

19     / / /

20     / / /

21     / / /

---

22    [3]      In response to the new trial motion, Clark does identify the absence of a

23 breastfeeding mother policy as substantive evidence of an FLSA violation (Doc. 304 at 7, 10), but the absence of a policy is not evidence without any requirement to maintain a formal

24 policy.  *See, e.g.*, *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 953 (7th Cir. 2002) (absence of discrimination policies not evidence of deliberate indifference to harassment);

25 *Gooding v. Walgreens Home Care, Inc.*, 2013 WL 3338568, at *7 (D. Conn. July 2, 2013) (lack of maternity leave policy not evidence of pregnancy discrimination).  The FLSA

26 requires compliant conditions, not the creation of specific policies.  This Court, furthermore, granted the City's motion *in limine* to preclude discussion suggesting that the lack of a

27 nursing policy was violation of the law.  (Doc. 176 at 1:17-22).
      Clark further mentions the subsequent installation of door locks as evidence, but

28 subsequent remedial measures are not direct evidence of culpable conduct.  Fed. R. Evid. 407.

FARHANG & MEDCOFF —— ATTORNEYS

006611016.1

### E. The purported comparators are not comparable.[4]

The cases cited by Clark state that comparators only have to be similarly situated with a plaintiff in "their ability or inability to work." (Doc. 304 at 30). It is unclear why Clark thinks she was similarly situated in the ability or inability to work when the putative comparators were not permitted to drive, while Clark admitted that she was cleared for "return to work without any restrictions" concerning her fitness for duty during the relevant times she was expressing milk. (Doc. 208 at 58:10-19). Unlike the comparators, Clark was not legally or physically unable to drive or complete her other job duties—she just needed time and space to express breastmilk on a regular basis. Clark confirmed that she was not "afraid to advocate on [her] own behalf in the case [she] had a physical restriction that [she] needed to alert the fire department about," so she presumably would have told the City about any physical inability she had when not on light duty status. (Doc. 207 at 117:20-23). She also suggests her request for preferential treatment is equivalent to the City imposing work changes on the comparators against their wills as a form of discipline. Vaguely drawing the parameters of similarly situated employees to cover anyone who wants or needs management to make an exception to a policy or take any number of discretionary actions does not create a class of similarly situated people. Employees desiring special treatment and employees who are unable to complete certain job duties by operation of law are not work ability classifications that can establish a discernable group of similarly situated employees for comparison. Clark's theory would literally allow her to claim she was discriminated against if management denied her anything she requested for any reason, improperly giving her "an unconditional most-favored-nation status." *See Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1350 (2015).

---

[4]    Clark never discussed the comparators in conjunction with arguments about the renewed motion for judgment as a matter of law.  She instead only discusses them in conjunction with her arguments against the motion for new trial. (Doc. 304 at 29-30). Thus, her argument that the City "opened the door" to this by saying she was treated the same as everyone else does not make sense vis-à-vis the Rule 50(b) motion because that motion was based on the evidence offered up through the close of Clark's primary case.  Moreover, Clark does not identify any part of the trial record where this supposed opening of the door occurred.

1    While this Court did rule in part against the City's Motion in Limine No. 9 and
2 allowed Camarena, Valenzuela, and DeCastro to testify as putative comparators, the City
3 renewed that motion *in limine* on the third day of trial. (Doc. 207 at 43:10-44:15). At that
4 point, this Court expressed doubt about whether they were appropriate comparators. (*Id.* at
5 43:19-22). Clark convinced this Court to still permit their testimony because they had not
6 yet testified about their similar "disabling condition[s]." (*Id.* at 43:23-44:11). This Court
7 found that this issue went more to the weight of the evidence and ruled that the comparators
8 could testify about how they were similar or different to Clark. (*Id.* at 44:12-15). Once
9 they testified, it became even clearer that they are not adequate comparators, as detailed in
10 the City's Motions. (Doc. 281 at 16-19, 21-22).

11    At this point, Clark cannot meet the standards she advances in her own Opposition.
12 (Doc. 304 at 30 (arguing comparators only need to similarly situated in their ability to
13 work)). She did not suffer from a "disabling condition" like the comparators because,
14 regardless of how one describes the "disabling conditions" of the comparators, she
15 expressly admitted that she had <u>no restrictions</u> on her fitness for duty or ability to work.
16 (Doc. 208 at 58:10-19). Thus, the comparators were not similarly situated, the Court should
17 have granted the City's motion *in limine* to exclude their testimony, and Clark's only
18 purported evidence of discrimination on the basis of sex does not exist.

### F. Clark waived any substantive arguments regarding lack of retaliatory intent evidence and any Rule 50(b) arguments regarding comparators.

Apart from asserting that the City waived arguments by not raising them in a pre-
verdict Rule 50(a) motion, Clark does not respond to the City's substantive arguments about
the absence of any "adverse employment actions" to support the retaliation claims, the lack
of evidence concerning retaliatory intent (including lack of direct evidence or of any nexus
between retaliatory actions and protected activity), and the lack of evidence of disparate
treatment because Clark used improper comparators. (Doc. 281 at 10-19). Even though
Clark admits that the City raised the issue of improper comparators during its pre-verdict
Rule 50(a) motion, she still only discusses comparators in response to the motion for new

FARHANG & MEDCOFF
—— ATTORNEYS ——

00611016.1

- 9 -

1  trial.  (Doc. 304 at 2, 29-30).  This Court may treat her failure to respond to these arguments

2  as a waiver.  *See* LRCiv 7.2(i); *Bonn v. Capital One, N.A.*, 2012 WL 13044087, at \*2 (D.

3  Ariz. Oct. 22, 2012); *Currie v. Maricopa County Cmty. College Dist.*, 2008 WL 2512841,

4  at \*2 n.1 (D. Ariz. June 20, 2008).  Accordingly, Clark waived any substantive response to

5  judgment as a matter of law on the retaliation claims, and the Court should summarily grant

6  the City judgment as a matter of law.

## II.  The City is Entitled to a New Trial on any Issues that Survive the Rule 50(b) Motion.

9  The jury's $3.8 million verdict is plainly unjust.  It is the product of some

10  combination of jury confusion and/or passion or prejudice; there is no evidence to establish

11  either that the City is liable or that Clark's compensatory damages approached a fraction of

12  what the jury awarded in its verdict.  Even if there was "substantial evidence" sufficient to

13  allow the jury to award some amount of compensatory damages, "the verdict is contrary to

14  the clear weight of the evidence," imposes an excessive amount of "compensation," and

15  amounts to a miscarriage of justice, thus the Court should order a new trial.  *See Murphy v.*

16  *City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990); *Peacock v. Bd. of Regents of Univs.*

17  *& State College of Ariz.*, 597 F.2d 163, 165 (9th Cir. 1979).

### A.  The $3.8 million verdict was grossly excessive.

19  Clark strangely accuses the City of "pejoratively categoriz[ing] the jury's verdict as

20  punitive, though it offers *absolutely no evidence* to support this unilateral label."  (Doc. 304

21  at 9).  Lack of evidence is precisely the point.  There was absolutely no evidence presented

22  to the evidence which could possibly justify the $3.8 million verdict as a form of

23  compensatory damages.  A damages award must not be permitted to stand if it is "grossly

24  excessive or monstrous," if the "evidence clearly does not support the damages award," or

25  if it "could only have been based on speculation or guesswork."  *Blanton v. Mobil Oil Corp.*,

26  721 F.2d 1207, 1216 (9th Cir. 1983).

27  The jury heard evidence of a missed paramedic pay payment of $69.23, the loss of a

28  few hours of vacation time without any evidence for the value of that time, the loss of

FARHANG & MEDCOFF
—— ATTORNEYS ——

00611016.1

1   seniority without any evidence of its value, and wholly unquantified emotional distress

2   damages.  As the City has explained, this evidence could support a few hundred thousand

3   dollars of compensatory damages, *at most*.  Clark's effort to suggest that the entirety of the

4   damage stems from emotional distress does not match her own closing arguments, wherein

5   she provided a formula for calculating $1.4 million damages award and then conceded it

6   was **not an "intellectually honest" amount**—with no arguments ever offered to account

7   for the $2.4 million differential between the proffered damages formula and the jury's

8   verdict.  (Doc. 253 at 107:11-13).  The only possible conclusion is that most or all of the

9   jury's damages verdict was intended to punish the City and/or deter other governments, just

10  as Clark explicitly requested during her closing arguments.  (Doc. 253 at 108:15-109:18).

11          Unlike the motion for judgment as a matter of law, this Court does not give all

12  benefits of the doubt to Clark's evidence.  With respect to the motion for a new trial, this

13  Court must independently weigh the evidence presented and assess witness credibility.

14  *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987).[5]

15          *Lambert v. Ackerley*, 180 F.3d 997 (9th Cir. 1999), is not crucial to the City's

16  position, and the City only cited *Lambert* for the proposition that a grossly excessive award

17  is grounds for a new trial, not as evidence of a comparable damages award.  (Doc. 281 at

18  21).  Many other cases affirm that a court may order a new trial due to a grossly excessive

19  award.  *See, e.g.*, *Herrington v. Sonoma County*, 834 F.2d 1488, 1503-06 (9th Cir. 1987)

20  (ordering new trial on damages due to grossly excessive damages award that was not

21  supported the evidence); *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d

22  1356, 1360 (9th Cir. 1986).  However, the City regrets any confusion caused by not

23  identifying that its citation was to the partially concurring and dissenting opinion in

24

25  _____
     [5]      Clark cites *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir.
26  1987), for the proposition that the Court "must consider the evidence of damages in a light
     most favorable to the prevailing party" when reviewing a jury's damages award for
27  excessiveness.  (Opposition at 8).  *Seymour* discusses the standard when there is **no** basis to
     believe that passion and prejudice affected jury's outcome on **liability**.  *See Snyder v.*
28  *Freight, Constr., Gen. Drivers, Warehousemen & Helpers, Local No. 287*, 175 F.3d 680,
     689 (9th Cir. 1999) (discussing *Seymour*).  Here, passion or prejudice affected **both** liability
     and damages, so *Seymour* does not apply.

FARHANG & MEDCOFF
——— ATTORNEYS ———

00611016.1

1 *Lambert*. Moreover, although Clark implies the \$75,000 of emotional distress damages

2 awarded in *Lambert* justifies the \$3.8 million award here, *Lambert* involved worse

3 emotional distress—unless this Court believes Clark's ridiculous accusations that the City

4 is responsible for the declining health of her parents, the malnourishment of her son, the

5 deaths of her pets, and the destruction of her relationships with her husband and children,

6 among other farfetched claims. In *Lambert*, each plaintiff was fired for objecting to their

7 employer's failure to pay overtime, and the \$75,000 each received for emotional distress

8 compares appropriately to distress one would expect after getting fired and losing out on

9 lost wages averaging \$116,167 apiece (\$697,000 shared among six plaintiffs). 180 F.3d at

10 1002. Clark, on the other hand, was never fired and provided evidence of losing out on, at

11 most, \$69.23 in wages, three hours of vacation time, and the unknown value of her reduction

12 in seniority, meaning that, if the Court were to believe that the jury did not impose a punitive

13 damages award, the bulk of the \$3.8 million award was for Clark's emotional distress. The

14 words "emotional distress" are not an invitation to print money out of thin air. Moreover,

15 even if the Court believed the verdict represents the jury's considered evaluation of the

16 value of Clark's emotional distress damages and not an improper award of punitive

17 damages, the verdict is still monstrous and shocking, necessitating a new trial.

18 Clark's primary response to the excessive damages argument is to state with no

19 support that the new trial motion is just a challenge to the sufficiency of the evidence and

20 to recount all of her evidence offered on liability, the majority of which focused on a review

21 of the allegedly adverse actions. (Doc. 304 at 9-18). Lack of evidence of liability, though

22 an issue addressed in the City's Rule 50(b) motion, is not one of the City's arguments for

23 the motion for new trial.

24 Filtering out the white noise of non-damages evidence and focusing on the damages

25 themselves, Clark's arguments do not suggest she suffered anything other than minimal

26 pecuniary damages and "garden-variety" emotional distress. Specifically, she mentions that

27 a coworker saw her crying in a car without any context, her lifelong dream of being a

28 firefighter (which she still is), and other general emotional distress without related

FARHANG & MEDCOFF
—— ATTORNEYS ——

00611016.1

1  pecuniary damage. (Doc. 304 at 15 and 21-24). Clark asserts her testimony "established

2  severe emotional distress with physical manifestations," yet she is unable to identify a single

3  physical manifestation of injury allegedly caused by her emotional distress. (*Id.* at 21).

4  Instead, she tries to convince the Court that "physical manifestations" equates to a change

5  of lifestyle and/or in her relations with other people. (*Id.* at 22-24 (mentioning less

6  involvement in charitable and department activities, decline in marital relations, not being

7  "the best mother she could be," deaths of dogs, parents' health, newspaper coverage of case,

8  fear of going out in public, and use of disguises)). She is wrong. All of this constitutes, at

9  best, "garden-variety" emotional distress,[6] which is not sufficient to justify $3.8 million in

10  compensatory damages. *See Townsend v. Bayer Corp.*, 774 F.3d 446, 467 (8th Cir. 2014);

11  *McIntosh v. Geithner*, 2011 WL 2160919, at \*18 (E.D. Cal. Jun. 1, 2011); *Quinby v. WestLB*

12  *AG*, 2008 WL 3826695, at \*3-4 (S.D.N.Y. Aug. 15, 2008).

**B.  Clark improperly conflates the "sufficiency of the evidence" standard used in Rule 50 and 56 motions with the "verdict against the clear weight of the evidence" standard under Rule 59.**

15  By devoting nine pages of her brief to a discussion about the "sufficiency of the

16  evidence," Clark seeks to have this Court apply the more jury-deferential standard used in

17  motions for summary judgment and for judgment as a matter of law to its consideration of

18  the City's motion for a new trial. (Doc. 304 at 9-18). This ignores the purpose of and the

19  legal standard applicable to a motion for new trial. Under Rule 50 and 56, a trial court

20  merely needs to be assured that there is a sufficient factual and legal basis for the claims to

21  continue to the jury or sustain the jury's verdict, and the court does not attempt to assess

22  witness credibility or weigh the evidence. Under a Rule 59 motion for new trial, however,

23  trial courts do assess witness credibility and weigh competing evidence. *See Experience*

24  *Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014) (comparing

25  "legally sufficient basis" standard for renewed motion for judgment as a matter of law under

26  Rule 50(b) and trial court's abuse of discretion standard under Rule 59 that permits trial

FARHANG & MEDCOFF
ATTORNEYS

---

28  [6]  The City's Motion for New Trial contains an analysis of cases describing what constitutes "garden variety" emotional distress. (Doc. 281 at 20-21, 29).

court to weigh evidence, assess credibility, and even raise concerns about verdict *sua sponte*).  Clark implicitly recognizes this later in her Opposition when she argues that she was "articulate, poised, forthright in her testimony, consistent, and persuasive":  a statement that refers solely to her self-perceived credibility.  (Doc. 304 at 21).

Furthermore, Clark's arguments and related appellate citations about the deference given to the fact-finder's award of damages (Doc. 304 at 19-20), such as *Harper v. City of Los Angeles*, 533 F.3d 1010 (9th Cir. 2008), and *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041 (5th Cir. 1998), conflate the standard for a trial court's review of the jury's verdict under Rule 59 with the appellate court's review of a jury's verdict or of a trial court's determination of damages.  *See Harper*, 533 F.3d at 1028-29 (appeals court gives deference to jury's verdict but still reviews damages award for gross excessiveness and lack of evidence); *Migis*, 135 F.3d at 1046 (appeals court reviews damages awarded after bench trial for abuse of discretion).  Clark's citation to *Greisen v. Hanken* is irrelevant because the only damages issue raised on appeal was whether there was sufficient evidence of causation for the claimed damages, not evidence supporting the amount of damages awarded.  925 F.3d 1097, 1115-16 (9th Cir. 2019).

**C.  The examples of other large emotional damages awards are not comparable to this case, and determinations within the jury's province are not immune to judicial review when clearly excessive.**

In an effort to paint the $3.8 million verdict as a reasonable award of compensatory damages for emotional distress, Clark cites to a series of other cases with large emotional damages components.  (Doc. 304 at 18-21).  These examples are not remotely comparable with Clark's case.  Moving one step further, Clark argues that because the jury as trier-of-fact has primary responsibility to determine the amount of damages, this somehow means that this Court is not permitted to review whether the verdict was "grossly excessive" or "against the weight of the evidence."  (Doc. 304 at 19-20).  Juries are not free to award damages that have no basis in law or fact, and Rule 59 explicitly empowers the Court— which had an equal opportunity with the jury to listen to all testimony and view the other evidence presented at trial—to review the verdict and grant a new trial.  Fed. R. Civ.

FARHANG & MEDCOFF
——— ATTORNEYS ———

006110016.1

- 14 -

59(a)(1). General principles of deference to the jury's determinations do not excuse a baseless verdict with excessive damages or a verdict that was the result of passion or prejudice. Clark's interpretation would turn Rule 59's language into a nullity.

None of the cases Clark cites in support of large emotional damages awards are comparable to her case. *Harper v. City of Los Angeles* involved awards of $5 million to the plaintiff police officers involved in the arrests of several gang members who were accused of planting evidence by one of the gang members (a known criminal with a reputation of lying who gave other conflicting statements) as part of his plea deal, hastily and one-sidedly investigated by the L.A.P.D., publicly arrested and paraded in front of the media and thereafter subjected to ongoing, intense media scrutiny, and prosecuted by a district attorney who was not sure there was probable cause but moved forward with prosecution after being pressured by the L.A.P.D. 533 F.3d at 1015-21. Knowing the full context of *Harper*, it is evident that Clark—who did not lose her "dream" firefighter job or get demoted; suffered little or no actual loss of wages; and was only subjected to minimal media attention after she precipitated the attention herself, without action by the City, when she filed the present, public lawsuit—did not suffer any emotional distress remotely comparable to what the *Harper* officers endured.

In *Passantino v. Johnson & Johnson Consumer Products, Inc.*, the plaintiff, an 18-year veteran with the corporation, was a sales manager who was consistently rated the top person in her division yet watched time-and-again as male coworkers were promoted ahead of her and then suffered repeated instances of overt sexual harassment by her boss and two coworkers. 212 F.3d 493, 499-500 (9th Cir. 2000). She specifically was informed that she was unlikely to be promoted because she was a woman, and specifically was warned by the corporation's EEO officer against filing a formal complaint because it could have "many ramifications." *Id.* at 500-01. After she filed an EEOC complaint, the corporation took away several of her job responsibilities and accounts, excluded her from managers meetings, offered her demotions, and discouraged her from applying for higher paying jobs, among other things. *Id.* at 502-03. Due to her emotional distress, she suffered physical

FARHANG & MEDCOFF
——— ATTORNEYS ———

00611016.1

- 15 -

ailments including stomach problems, rashes, and headaches that all required professional medical attention, and she sought counseling from her pastor. *Id.* at 503. The jury returned a verdict that awarded \$2.1 million in lost back and front pay, \$1 million for emotional distress, and punitive damages. *Id.* at 504. Clark now argues that her case, in which she suffered little or no wage loss; was not demoted; was allowed virtually unlimited, paid time to express milk; and alleged only garden-variety emotional distress without any corroborating medical or psychological evidence similar to what appeared in *Passantino*, justifies an award of emotional distress damages 3.8x greater than what Passantino received.

In *Larson v. Nanos*, two plaintiffs were awakened in the middle of the night at their trailer, seized at gunpoint, handcuffed, detained for 15-20 minutes, and had their home searched by sheriff's deputies responding to a 911 call alleging domestic violence with shots fired, despite the plaintiffs complying with all commands, not holding any weapons, and not appearing to be injured or in any distress. 2016 WL 4592184, at \*1-3 (D. Ariz. June 21, 2016). The plaintiffs provided evidence that the incident stirred the wife's preexisting PTSD and required psychological treatment, caused her to lose her job and take another job that required less human interaction, and caused her to feel unsafe in her own home, while the husband felt insecure at home and humiliated for not being able to protect the wife. *Id.* at \*6-7. Ultimately, the jury awarded emotional distress damages of \$750,000 to the wife and \$500,000 to the husband. *Id.* at \*7. Clark evidently thinks her situation was more harrowing than being detained at home in the middle of the night and having guns in her face, to the point that she would be entitled to 5x the emotional distress damages that Ms. Larson received.

The decision in *Osorio v. Source Enterprises, Inc.*, does not offer much detail about the \$4 million award for compensatory damages, apart from indicating that the plaintiff was fired from her job, defamed in some manner, and suffered approximately \$370,000 in lost back and front pay. 2007 WL 683985, at \*2, \*5 (S.D.N.Y. Mar. 2, 2007). It is unclear whether the plaintiff only sustained the garden-variety emotional distress present in Clark's case or if she suffered any physical manifestations related to her emotional distress or

00611016.1

1    sought any related medical or psychological treatment.  At the very least, being fired and

2    defamed and suffering $370,000 in lost wages is significantly more serious than Clark's

3    situation, so one would expect an accompanying increase in emotional distress damages.

> **D.    Clark's efforts to put on an improper hostile work environment case after the Court resolved that claim on summary judgment prejudiced the jury.**

6    Doubling down in response to the City's arguments about putting on a de facto

7    hostile work environment case after this Court dismissed that claim (Doc. 281 at 23-24),

8    Clark instead insists that it is appropriate for the jury to aggregate the individually alleged

9    adverse events and "collectively view the discrete incidents alleged to determine if they

10   collectively meet the standard of 'adverse employment action.'" (Doc. 304 at 30-31).  Clark

11   cites to three cases to support this incorrect statement of law, but her authorities do not

12   support this argument.  *Aydelotte v. Town of Skykomish*, 757 F. App'x 582, 584 (9th Cir.

13   2018), just states that there was a genuine dispute precluding summary judgment whether

14   the destruction of fence, receipt of traffic tickets, threats to tow vehicle, exclusion from

15   public meeting, and an instruction to remove protest signs were adverse actions retaliating

16   against exercise of First Amendment rights.  Each of those events arguably constituted an

17   adverse event on its own.  In *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003),

18   the Ninth Circuit distinguished minor but actionable retaliatory acts that can infringe on

19   First Amendment rights from other minor acts that are not reasonably expected to deter

20   protected conduct and do not support a claim.  In *Thomas v. County of Riverside*, 763 F.3d

21   1167, 1169 (9th Cir. 2014), the Ninth Circuit said some actions might have greater

22   materiality in context with other actions rather than viewed in isolation, but it still affirmed

23   summary judgment on some of the alleged acts.  Although *Thomas* allows the Court to

24   consider surrounding context, each "adverse action" must otherwise stand on its own.

25   Actions that do not meet the threshold must be excluded.  Clark's repeated reference to

26   conduct that this Court ruled did not support a claim should not have come in.

27   In any event, aggregated or not, Clark's discussion about co-workers' rumors, which

28   Clark identified as the "prime example" of retaliation that were part of a "smear campaign"

FARHANG & MEDCOFF
——— ATTORNEYS ———

00611016.1

1  amounting to "death by a thousand paper cuts," are not even examples of conduct

2  attributable to the City; that evidence would only be relevant to a hostile work environment

3  claim. (Doc. 253 at 29:9-30:15). All of this occurred during closing, meaning Clark

4  essentially told the jury to forget everything about the 11 alleged acts of retaliation and go

5  all in on based on rumors. If these arguments were not important and prejudicial, why did

6  Clark call them the "prime example" of retaliation?

### E.  Clark's prejudicial arguments that the City indirectly harmed her parents, children, marriage, and pets are not evidence that can support the jury's excessive verdict.

9  There was never any evidence establishing the relevance or causation necessary to

10  permit testimony or arguments about Clark's marital problems, her child's malnourishment,

11  her miscarriage, her ailing parents, and the deaths of her dogs. This Court precluded Clark

12  from attempting to bring in undisclosed experts or expert testimony concerning her son's

13  malnourishment and its alleged relation to her emotional distress, but she spoke extensively

14  about malnourishment anyway. (Doc. 170 at 74:14-98:4). The Court also stopped Clark

15  from continuing to refer to undisclosed evidence of the effects of the alleged emotional

16  distress after an extended soliloquy on these issues. (Doc. 208 at 209:18-215:9).

17  Nevertheless, Clark still attempts to use some of this improper evidence[7] as support for the

18  jury's verdict. (Doc. 304 at 23-24). These prejudicial comments are unjustifiable and call

19  into serious question the fundamental fairness of the case. *See Bird v. Glacier Elec. Coop.,*

20  *Inc.*, 255 F.3d 1136, 1148 (9th Cir 2001). The repeated references to the indirect decline

21  and death of Clark's pets is particularly improper and prejudicial given that, in a more

22  egregious counterfactual scenario that assumes the City directly killed the pets in Clark's

23  presence, she would be unable to recover emotional distress damages for their deaths as a

24  matter of law. *See Kaufman v. Langhofer*, 223 Ariz. 249, 253 (App. 2009) (affirming

25  majority position that infliction of emotional distress claims related to killing pets are not

26  permitted because pets are personal property). Because these arguments should never have

27  been made to the jury at all, they do not aid Clark in justifying the excessive verdict. This

28

[7]  Clark does not appear to justify her discussion of her son's malnourishment.

1  obvious error affected the City's substantial rights and caused a miscarriage of justice,

2  justifying a new trial.

3        **F.**     **Clark's improper sandbagging on damages, including specific damages**

4                  **figures and her plea for the jury to punish the City, warrant a new trial.**

5       In response to the City's arguments that she engaged in sandbagging during closing

6  arguments to avoid having the City respond to her damages arguments, Clark first cites

7  carefully selected authorities to suggest that "sandbagging" only applies when a party

8  intentionally remains silent regarding trial error in the hope of preserving the issue for

9  appeal.  (Doc. 304 at 25-26).  The City obviously referred to sandbagging in a broader,

10  colloquial sense, specifically in connection with closing arguments.  The City could have

11  cited a large number of cases involving sandbagging plaintiffs discussing damages for the

12  first time during rebuttal closing arguments.  *See, e.g.*, *Smith v. Hill*, 409 So. 2d 141, 142

13  (Fla. Dist. Ct. App. 1982) (reversing and remanding for new trial on damages where

14  plaintiff did not mention specific damages figures in initial closing argument and then

15  argued for specific amounts of compensatory and punitive damages during improper

16  rebuttal closing); *Malanowski v. Jabamoni*, 772 N.E.2d 967, 973 (Ill. App. Ct. 2002)

17  (affirming trial court's refusal to allow plaintiff to discuss damages for the first time during

18  rebuttal closing); *Shaw v. Terminal R.R. Ass'n of St. Louis*, 344 S.W.2d 32, 36-37 (Mo.

19  1961) (reversing and remanding for new trial where plaintiff saved as discussion about

20  damages until rebuttal closing).  The principle is the same—a plaintiff cannot "rebut"

21  arguments concerning damages if they were never discussed during the initial closing

22  argument and if the defendant did not open the door to discussing damages in its own

23  closing arguments.

24       Clark's discussion of damages was the very <u>last</u> thing the jury heard before receiving

25  their instructions, and the damages discussion included references to almost losing her

26  marriage, having her dream career "ruined," withdrawing from her family, a proffered

27  mathematical formula for calculating more than a million dollars emotional distress

28  damages, the explicit call to punish the City and send a message to other municipalities, and

FARHANG & MEDCOFF
—— ATTORNEYS ——

00611016.1

1   the suggestion that the City condones criminal misconduct by its employees.  (Doc. 248 at

2   106:18-109:18).  All of these arguments should have been excluded because they were not

3   raised in the initial closing arguments (in addition to triggering the jury to act out of passion

4   or prejudice).  Nor did the City "open the door" to damages by discussing them in its own

5   closing arguments; the City merely ended its closing arguments by wrapping up its

6   discussion of legitimate reasons for the City's actions by saying, "There were reasons, and

7   plaintiff should not get any damages"  (*Id.* at 65:19-20).  Using the word "damages" one

8   time during the entire closing argument without any further discussion any specific damages

9   components or calculations does not open the rebuttal closing to cover anything Clark wants

10  to hold until the end.

11          Clark next attempts to distinguish the example case cited in the City's Motion, *Nash*

12  *v. City of San Bernardino*, 2011 WL 13213919 (C.D. Cal. Aug. 9, 2011), to suggest it is an

13  errant, standalone decision based on an improper request for a specific damages amount

14  during rebuttal closing, which she claims did not happen here.  (Doc. 304 at 27).  But that

15  is not an accurate description of Clark's own rebuttal damages arguments because she did

16  include a reference to a formula with a specific damages figure.  (Doc. 248 at 106:18-

17  109:18).  Accordingly, Clark's conduct is identical to the plaintiff in *Nash*, and the result

18  should be the same: a new trial.

19          Misstating the record yet again to suggest that the City never objected to her

20  sandbagging the discussion of damages in the rebuttal closing until now, Clark accuses the

21  City of engaging in its own sandbagging by raising it for the first time now.  (Doc. 304 at

22  28).  As Clark well knows, the City explicitly raised the issue between the City's own

23  closing arguments and Clark's rebuttal closing arguments.  (Doc. 248 at 66:17-67:15, 68:18-

24  71:11, 72:2-77:17).  At that time, Clark's primary response was to say "baloney" five times

25  and assert, "I get to argue what I want to argue in the order I want to argue it."  (*Id.* at 66:24-

26  67:6, 69:4-7, 69:13-14).  After a short break, Clark added, incorrectly, "You're allowed to

27  argue whatever the evidence supports, whatever the testimony was, at any point during your

28  closing arguments."  (*Id.* at 74:20-22).  And lest there be any confusion that Clark's

FARHANG & MEDCOFF
ATTORNEYS

006110016.1

1   sandbagging was a deliberate plan from the start, one need only compare the length of her

2   initial closing arguments to her rebuttal closing arguments, which were approximately twice

3   as long. (*Compare id.* at 18:11-32:13 (initial arguments), *with id.* at 77:24-109:18 (rebuttal

4   arguments). Clark's sandbagging presents another reason why a new trial is necessary.

### G. The cumulative error here closely resembles *Lampkins* and justifies a new trial.

7   Clark's response to cumulative error as a basis for a new trial essentially just asserts

8   that there was no error whatsoever. (Doc. 304 at 32). She does not attempt to distinguish

9   *Lampkins v. Mitra QSR KNE, LLC*, 2019 WL 2357444 (D. Del. Jun. 4, 2019). It is evident

10  here that the jury was confused when it treated the two retaliation claims as identical and

11  awarded what obviously are excessive, punitive damages. All the errors collectively

12  amount to a miscarriage of justice which can only be fixed via a new trial.

### H. Clark failed to respond to and therefore waived her response to arguments that the "comparator" evidence was unduly prejudicial.

15  The City's Motion for New Trial asserts that the "comparator" evidence regarding

16  three other firefighters was unduly prejudicial because Clark portrayed them as evidence

17  that the City condones criminal activity and treated her worse than it treats criminals. (Doc.

18  281 at 21-22). The Court may treat Clark's failure to respond to the City's arguments

19  regarding undue prejudice from the "comparator" evidence as a waiver and may order a

20  new trial on this basis alone. *See* LRCiv 7.2(i); *Bonn*, 2012 WL 13044087, at *2; *Currie*,

21  2008 WL 2512841, at *2 n.1. The most likely reason Clark does not attempt to justify these

22  prejudicial comments and evidence is because they are unjustifiable and call into serious

23  question the fundamental fairness of the case. *See Bird v. Glacier Elec. Coop., Inc.*, 255

24  F.3d 1136, 1148 (9th Cir 2001).

25  / / / /

26  / / / /

27  / / / /

28  / / / /

FARHANG & MEDCOFF
— ATTORNEYS —

00611016.1

III.  **If the Court does not Render Judgment as a Matter of Law or Order a New Trial, it Must Remit the Damages Award.**

A.  **Clark Admits Remittitur is Required for Her Title VII Claims.**

One thing appears undisputed at this point:  the Court must reduce the jury's verdict to account for the statutory damages cap of $300,000, applied collectively to Counts I and II at a minimum.  (Doc. 304 at 32).  *See* 42 U.S.C. § 1981a(b)(3).  By her own admission, the verdict cannot exceed $2.2 million.  As explained in the City's other arguments, though, this is just an effort to salvage the lion's share of the verdict damages when Clark should not receive anything and, ignoring liability, she has not provided any evidence to justify damages exceeding $150,000.

B.  **The Statutory Damages Cap Should Apply to the FLSA Retaliation Claim too.**

Although Clark agrees that the statutory Title VII damages cap applies to her Title VII claims, she does not respond to the City's argument that it should also apply to her FLSA retaliation claim because jury's verdict awards identical damages for identical conduct on both claims.  (Doc. 281 at 27-28).  As with other waived issues, the Court may treat Clark's failure to respond to the issue of applying the Title VII damages cap to the FLSA retaliation claim as a waiver and may remit the associated damages award on this basis.  *See* LRCiv 7.2(i); *Bonn*, 2012 WL 13044087, at *2; *Currie*, 2008 WL 2512841, at *2 n.1.  Allowing Clark to recover damages without limit under the FLSA retaliation claim when the jury attributed the same conduct to both retaliation claims undermines the purpose of the statutory damages cap.  Absent a new trial with a more clearly delineated verdict, the cap should apply to both retaliation claims as well as the Title VII claim.

C.  **The Jury Awarded Duplicative Damages for the Retaliation Claims.**

This Court need only look at the face of the jury's verdict to understand that the jury awarded duplicative damages on the two retaliation claims.  The verdicts for both retaliation claims list the same 11 allegedly adverse actions as being caused by retaliation for two different forms of protected conduct and then awards identical damages amounts.  Nor can

00611016.1

Clark blame the equal damages awards for both retaliation claims on pure happenstance based on a fair determination of her damages incurred for each type of retaliation. The jury's instructions and the verdict form required the jury to make specific findings of causation for each claimed adverse employment action, effectively giving the jury the choice of saying each action was caused by FLSA retaliation, Title VII retaliation, or neither. (Doc. 233 at 16-17 and 20-22). The jury departed from those options and found all 11 of the allegedly adverse events were caused by retaliation for exercising her FLSA rights, and also by retaliation for exercising her Title VII rights.

The first challenge Clark brings to the City's arguments about duplication of damages is to suggest that the City failed to bring the issue to the Court's attention during trial. (Doc. 304 at 32-33). It's unclear how Clark believes the City could have brought this to the Court's attention before the jury returned its verdict. No legal standard requires the City to be clairvoyant. *See Nassar*, 779 F.3d at 552.

Next, Clark believes that the only way to avoid this situation is to challenge the jury instructions before they are submitted to the jury. (Doc. 304 at 33). But there was nothing inherently wrong about the jury instructions—the jury just interpreted them in an unexpected, incorrect way. *See Experience Hendrix LLC v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 847-48 (9th Cir. 2014) (explaining that jury did not follow instructions on determining damages). The City is not challenging the instructions actually given even if they arguably could have been clearer.

Clark's suggestion that the verdict does not award duplicate damages because the two retaliation claims are listed separately on the verdict form is facially ridiculous and defies common sense. (Doc. 34 at 33-34). The jury's verdict inappropriately determined that Title VII retaliation and FLSA retaliation were each the "sole cause" of the same 11 events and then awarded identical damages two times. (Doc. 234 at 5-7, 12-13).[8] She

---

[8]    The verdicts on the two retaliation claims directly conflict with each other because Title VII retaliation and FLSA retaliation cannot both be the "but-for" cause of the same allegedly retaliatory actions. *See Univ. of Tex. Sw. Med. Ctr. v. Nasser*, 570 U.S. 338, 362-63 (2013) (plaintiff must establish but-for causation for Title VII retaliation claim). The City recognizes there is confusion in the Ninth Circuit about whether to apply "but for"

1   insists that the City incorrectly assumes:

> that all acts of retaliation were motivated by both her FLSA protected acts and her Title VII protected acts; both the evidence and logic strongly imply that some adverse actions were motivated by her breastfeeding complaints and some by her sex discrimination complaints (and perhaps some retaliation was motivated by both protected activities).

(Doc. 304 at 34).   To be clear, it's **jury's** verdict—not the City—that states all acts of retaliation were motivated by both sets of protected acts.   (Doc. 234 at 5-7, 12-13).   That is why the verdict cannot stand unaltered.   After throwing in a perfunctory maxim that verdicts must be upheld if supported by substantial evidence, Clark again fails to identify any evidence that would remotely justify the amount of damages awarded, as explained above. (Doc. 304 at 34).

The recent opinion in *Kaffaga v. Estate of Steinbeck*, ___ F.3d ___, 2019 WL 4252241 (9th Cir. Sept. 9, 2019), does not aide Clark's arguments either.   (Doc. 310).   In *Kaffaga*, a jury awarded suspiciously identical damages for breach of contract and slander of title claims, which combined equaled the damages awarded on a tortious interference claim.   2019 WL 4252241, at * 6.   There was separate evidence that could support separate damages awards under each claim.   *Id.* at *6-7.   Here, to the contrary, the jury awarded identical damages arising from the same 11 adverse acts under two retaliation claims that each required but for causation.   As such, this case is more like *Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612 (1993), which *Kaffaga* tried to distinguish.   *Kaffaga*, 2019 WL 4252241, at *6 (explaining that *Khoury* involved tort and contract claims based on the same evidence).   For these reasons, this Court should remit the duplicative damages.

/ / / /

/ / / /

---

causation or "mixed motive" causation analysis for FLSA claims.   *See Avila v. L.A. Police Dep't*, 758 F.3d 1096, 1101 n.3 (9th Cir. 2014) (not deciding whether "but for" causation required on FLSA claim); *id.* at 1107 n.3 (Vinson, J, dissenting) (mixed motive standard still current law in Ninth Circuit under *Knickerbocker* but may change in light of *Nasser*); *McBurnie v. City of Prescott*, 511 F. App'x 624, 624 n.2 (9th Cir. Mar. 13, 2013) (stating *Knickerbocker* case enunciated mixed motive standard but also required proof of but-for causation).   Regardless, the jury's instructions here required but for causation on both retaliation claims.   (Doc. 233 at 16-17, 20-22).

00611016.1

FARHANG & MEDCOFF
—— ATTORNEYS ——

1
2

**C.    The Jury Awarded Impermissible Punitive Damages, which Clark Does Not and Cannot Deny.**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

Apart from saying that the constitutional arguments are a "duplicate argument," Clark does not respond to the City's arguments about punitive damages and their related due process limitations at all.  (Doc. 281 at 28-29, 31-32).  The law on this issue is undeniable.  *See* 42 U.S.C. § 1981a(b)(1) (punitive damages against governmental bodies prohibited under Title VII); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 260-63 (1981) (municipalities generally immune from punitive damages unless expressly allowed by statute); *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 939 (11th Cir. 2000) (FLSA does not authorize punitive damages).  Punitive damages awards must also comply with constitutional due process limits.  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568-69 (1996).  Punitive damages are rarely constitutional if they exceed a single-digit ratio of the compensatory damages, and in most cases, the constitutional limit is 4:1 or less.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003).  Moreover, the Ninth Circuit usually imposes the Title VII damages cap (here, $300,000) as a legislatively approved range of damages that protects against arbitrary awards.  *See Arizona v. ASARCO LLC*, 773 F.3d 1050, 1055-58 (9th Cir. 2014).

18

19

20

21

22

23

24

25

Clark agreed before trial that there was no need for a jury instruction on punitive damages because punitive damages are not appropriate in this case.  The jury only heard minimal evidence of "garden-variety" emotional distress and of $69.23 in unpaid wages.  Absent physical injuries, loss of employment, or some other extraordinary circumstance that was not present in this case, the top end of compensatory damages for emotional distress is usually no more than $125,000.  *See Quinby v. WestLB AG*, 2008 WL 3826695, at *3-4 (S.D.N.Y. Aug. 15, 2008).  There is simply <u>no</u> evidence to support $3.8 million in compensatory damages.

26

27

28

The jury presumably would have returned a verdict with compensatory damages supported by the evidence if Clark had contained herself to arguments within the reasonable scope of compensatory damages, but instead she plowed forward with closing arguments

FARHANG & MEDCOFF
—— ATTORNEYS ——

00611016.1

1  asking the jury to punish the City and deter other municipalities. Punishment and deterrence

2  have nothing to do with compensation—they are earmarks of punitive damages. *See Exxon*

3  *Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008). Punitives are the only rational explanation

4  for the jury's multimillion-dollar verdict in this case. Thus, the verdict, not supported by

5  the clear weight of the evidence, awards punitive damages that are not allowed at all in this

6  case and which exceed constitutional due process limitations. This Court should remit any

7  portion of the verdict that exceeds the typical value range for "garden-variety" emotional

8  distress damages—worth, at most, $150,000—because the remainder is all impermissible

9  punitive damages.

10  Without remittitur, the jury's verdict is both plainly excessive and an

11  unconstitutionally large punitive damages award. The jury should never have considered

12  punitive damages or any award of damages premised in any way on punishing the City or

13  deterring other governments and entities.

## CONCLUSION

15  This Court now has the opportunity to correct a wildly inappropriate jury verdict that

16  was the result of Clark's improper and prejudicial arguments and evidence. The outlandish

17  $3.8 million verdict is wholly unsupported by the evidence offered in this case and

18  demonstrates a runaway jury conditioned by Clark to punish the City based on unrelated

19  and/or highly prejudicial evidence. This Court should grant the City judgment as a matter

20  of law. Barring that relief, this Court should order a new trial or remit the damages to no

21  more than $150,000.

22  DATED this 20th day of September 2019.

23  FARHANG & MEDCOFF

24  By /s/ Robert A. Bernheim
25  Ali J. Farhang
     Roberto C. Garcia
26  Robert A. Bernheim

27  Attorneys for Defendant City of Tucson

28

00611016.1

- 26 -

1

**CERTIFICATE OF SERVICE**

2

        I hereby certify that on September 20, 2019, I electronically transmitted the attached

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a
Notice of Electronic Filing to the following CM/ECF registrants:

4

Michelle R. Saavedra

5

Renee J. Waters
Tucson City Attorney's Office

6

P.O. Box 27210

7

Tucson, Arizona 85726
Michelle.Saavedra@tucsonaz.gov

8

Renee.Waters@tucsonaz.gov

9

*Attorneys for Defendant*

10

Jeffrey H. Jacobson
JACOBSON LAW FIRM

11

2730 East Broadway Blvd., Suite 160

12

Tucson, AZ 85716
Jeff@jacobsonlawfirm.net

13

*Attorney for Plaintiff*

14

/s/ Jane L. Cebula

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FARHANG & MEDCOFF
ATTORNEYS

00611016.1