**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Carrie Ferrara Clark, | No. CV-14-02543-TUC-CKJ |
| Plaintiff, | **ORDER** |
| v. | |
| City of Tucson, | |
| Defendant. | |

Pending before the Court is Defendant's Alternative Motion for: (1) Judgment as a Matter of Law (renewed); (2) New Trial; or (3) Remittitur. (Doc. 281). Plaintiff filed a Response (Doc. 304) and Defendant a Reply (Doc. 313). Oral argument was held on October 30, 2019. (Doc. 322).

After due consideration and for the reasons outlined below, the Court finds that Defendant is entitled to judgment as a matter of law for Plaintiff's claims relating to Title VII. The Court finds that Defendant is also entitled to judgment as a matter of law, in part, for Plaintiff's claims relating to the Fair Labor Standards Act ("FLSA"). Further, the Court finds that a new trial is warranted as to damages connected to Plaintiff's FLSA claims if Plaintiff declines to accept the Court's proposed remittitur.

## 1. Factual and Procedural Background

Plaintiff has been an employee of the City of Tucson Fire Department ("TFD") since 2007. In July 2012, Plaintiff gave birth to her first son, Austin Clark, and decided to breast feed while on maternity leave and to pump breast milk when she returned to work. Plaintiff

breast fed Austin while on maternity leave and contacted her superiors at TFD to ensure she would have a proper place to pump and express breastmilk when she returned to work. Upon her return to work, Plaintiff believed that the lactation spaces she was being provided were not legally compliant and initiated the underlying lawsuit in 2014.

A ten-day jury trial was held in April 2019. (Docs. 255, 261, 282, 284, 293, 294, and 296). The jury found in favor of Plaintiff and awarded Plaintiff $50,000.00 in compensatory damages for her Title VII Disparate Treatment claim, $1,850,000.00 in compensatory damages for her Title VII Retaliation claim, $50,000.00 in compensatory damages for her Fair Labor Standards Act claim, and $1,850,000.00 in compensatory damages for her Fair Labor Standards Act Retaliation claim. (Doc. 234). Although the jury awarded Plaintiff $50,000.00 in compensatory damages for her Title VII Disparate Treatment claim and $1,850,000.00 in compensatory damages for her Title VII Retaliation claim, 42 U.S.C. § 1981a(b)(3) includes a statutory cap on damages in the amount of $300,000.00, which Plaintiff has acknowledged. *See* (Doc. 304, pg. 32) ("Plaintiff concedes that the jury's verdict on her Title VII claims should be reduced to the statutory cap of $300,000").

### 2. Judgment as a Matter of Law

Defendant argues that it is entitled to judgment as a matter of law ("JMOL") on five issues and raises these issues as a renewed judgment as a matter of law ("RJMOL"). Plaintiff disputes this and argues that Defendant failed to raise any of these issues, excluding one, at trial and is now prohibited from raising these issues after trial. Ordinarily, "to preserve a challenge to the sufficiency of the evidence to support the verdict in a civil case, a party must make two motions. First, a party must file a pre-verdict motion pursuant to Fed.R.Civ.P. 50(a). Second, a party must file a post-verdict motion for judgment as a matter of law or, alternatively, a motion for a new trial, under Rule 50(b)." *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007) (internal citations omitted). The requirement that a Rule 50 motion be made pre-verdict in order to raise a motion post-verdict "is to be strictly observed . . . failure to comply with it precludes a later challenge

to the sufficiency of the evidence on appeal." *Saman v. Robbins*, 173 F.3d 1150, 1154 (9th Cir. 1999).

At trial, Defendant orally moved for judgment as a matter of law and raised a myriad of issues, among them the following: (1) whether the FLSA requires a lock on doors for compliance; (2) whether there was testimony that supported a retaliation claim; (3) whether Plaintiff was subjected to any adverse employment actions; (4) whether comparator testimony offered by Plaintiff was proper; and (5) whether there was any evidence presented that Plaintiff was treated less favorably because of her sex. (Doc. 255, pg. 2-3).

In contrast, Defendant's RJMOL raises five specific issues: (1) whether 29 U.S.C. § 207(r) provides a private cause of action; (2) whether there was sufficient evidence to support a finding that Defendant met its FLSA requirements; (3) whether Plaintiff suffered any adverse employment actions; (4) whether there was any evidence of retaliatory intent; and (5) whether Defendant discriminated against Plaintiff on the basis of sex. (Doc. 281, pg. 4-16).

As is evident, the issues raised by Defendant in its oral JMOL do not perfectly mirror the issues raised by Defendant in its RJMOL. The threshold question, then, is whether Defendant should be permitted to raise issues in its RJMOL that weren't originally raised in its JMOL. To make such a determination, the purpose of the requirement must be examined. A JMOL exists as a precursor to an RJMOL for two reasons:

> The first is to preserve the sufficiency of the evidence as a question of law. A subsequent motion for a [RJMOL] will then allow the district court to reexamine its decision not to direct a verdict as a matter of law rather than to engage in an impermissible reexamination of facts found by the jury. The second purpose of a motion for a directed verdict is to call the claimed deficiency in the evidence to the attention of the court and to opposing counsel at a time when the opposing party is still in a position to correct the deficit. These purposes are served when a party, after the close of evidence and before the commencement of jury deliberations, clearly points out a claimed evidentiary deficiency to court and counsel and makes a request, however denominated, that the court determine the evidence to be insufficient as a matter of law.

*Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d 1426, 1428-29 (9th Cir. 1986) (internal

citations omitted). *See also Howard v. Walgreen Co.*, 605 F.3d 1239, 1243 (11th Cir. 2010) (quoting *Nat'l Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545, 1549 (11th Cir. 1986)) ("[T]he purpose of requiring the grounds asserted in a Rule 50(b) motion to align with those asserted in a Rule 50(a) motion 'is to avoid making a trap of the motion for judgment notwithstanding the verdict, either at the trial stage or on appeal. When a claimed deficiency in the evidence is called to the attention of the trial judge and of counsel before the jury has commenced deliberations, counsel still may do whatever can be done to mend the case. But if the court and counsel learn of such a claim for the first time after verdict, both are ambushed and nothing can be done except by way of a complete new trial. It is contrary to the spirit of our procedures to permit counsel to be sandbagged by such tactics or the trial court to be so put in error.'").

Although the requirement that a party move for JMOL after the presentation of its evidence is strictly enforced, courts "are generally more liberal about what suffices as a motion for a directed verdict after the close of all the evidence. Fed.R.Civ.P. 50(b) may be satisfied by an ambiguous or inartfully made motion for a directed verdict or by an objection to an instruction for insufficient evidence to submit an issue to the jury." *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989) (internal citations omitted). "Absent such a liberal interpretation, 'the rule is a harsh one.'" E.*E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (citing *Nat'l Indus., Inc..*, 781 F.2d at 1549.

At trial, Defendant orally moved for JMOL and stated the following:

> We'll make our Rule 50 motion. Just that the evidence has been that all of the stations had a compliant room that was free from intrusion and free from the public's view. The only issue was whether or not a lock was required. The law doesn't require a lock, not by the letter of the law. Not in any case law interpretation of the law has there been a requirement for the lock. And the testimony has been that there was a space at every station perhaps except for Station 9 where there was a study room that the window could have easily been covered and that would have also met requirements.
>
> As far as the retaliation, there's been -- for both retaliation counts, there's been a lot of testimony about specific actions that have occurred over the four-year period -- four-year period of time, many of which is not disputed

that those things occurred. There's been no causal connection, no evidence of the causal connection presented. There hasn't been any testimony to connect that any of the these actions occurred because of these complaints that were filed. The time line itself is not enough to establish that causal connection, so we don't think that the jury actually has any evidence to connect those other than the time line that has been presented to them over and over again. Nor has there been evidence that any of these actions were actually [adverse] under the letter of the law. None of the actions affected her pay or benefits other – you know, so I don't think that all of the actions have been determined or have been presented as being actually adverse.

As far as the Title 7 discrimination claim, we heard from the alleged three comparators who we still, your Honor, move they were not actually comparators. Their circumstances were very factually different. Their changes in assignments were due to disciplinary action. It's not something that they requested. They weren't assigned to a station that they requested or wanted. In addition to being moved, they were subjected to pay reduction and a couple of them testified they also had conditions of employment. I think it's evident that they didn't want their assignments that they were moved to just by the fact that as soon as they were able to get out of that assignment they did. So we don't think that there's actually been any evidence that they were actually similarly situated, so I don't think there has been any evidence presented that she was treated less favorably or they were treated more favorably than her because of her sex. I think the other Title 7 allegation -- actually, I think that's all I heard about the Title 7 discrimination. I don't know if there's another one. I can address if Mr. Jacobson can point out what the other discrimination claim is. That's what I think the only one that's been somewhat presented, but I can address that if he brings something else up.

So basically our motion is that we don't think that there's been sufficient evidence presented for which the jury can go back and deliberate on.

(Doc. 255, pg. 2-4).

While Defendant's oral JMOL raises a multitude of issues, "[s]trict identity of issues . . . is not required. So long as they are 'closely related,' such that opposing counsel and the trial court may be deemed to have notice of the deficiencies asserted by the moving party, the purposes of the rule will be satisfied." *Howard*, 605 F.3d at 1243(quoting *Nat'l Indus., Inc.*, 781 F.2d *at* 1549).

Given the rationale behind the requirement and the relatively liberal application, the

Court will address whether Defendant properly raised each issue in its RJMOL in its JMOL separately.

### A. Fair Labor Standards Act

Plaintiff concedes that Defendant raised this issue during its oral JMOL at trial and, therefore, the Court will not address whether Defendant has now properly raised this issue in its RJMOL. *See* (Doc. 304, pg. 3) ("The sole issue that Defendant raised in both its motion for JMOL during trial and its post-trial renewed JMOL, whether the evidence supports a finding that Defendant failed to satisfy FLSA requirements, fails as a matter of law.").

### B. Adverse Actions

In Defendant's JMOL, Defendant, while discussing Plaintiff's retaliation claims, states:

> The time line itself is not enough to establish that causal connection, so we don't think that the jury actually has any evidence to connect those other than the time line that has been presented to them over and over again. **Nor has there been evidence that any of these actions were actually [adverse] under the letter of the law**.

(Doc. 255, pg. 3) (emphasis added).

It is apparent that Defendant raised the issue, at trial, of whether there had been any evidence advanced that the actions taken against Plaintiff were "adverse." Plaintiff contends that Defendant only raised three arguments in its JMOL whereas it raised five in its RJMOL. *See* (Doc. 304, pg. 2-3) ("At trial, in its brief oral Motion for Judgment as a Matter of Law (JMOL), Defendant raised three arguments . . . Defendant's renewed JMOL raises five arguments . . . ."). Plaintiff's interpretation of Defendant's oral JMOL is rather restricted. Although the law is clear that any issues raised in a post-trial RJMOL must have been raised previously in a JMOL, there is no requirement that the issues must identically mirror each other. Defendant unambiguously argued that Plaintiff advanced no evidence that any actions taken against Plaintiff "were actually adverse under the letter of the law."

(Doc. 255, pg. 3). This is sufficient to place Plaintiff on notice of the alleged deficiency asserted by Defendant and, therefore, meets the requirements of Rule 50.

### C. Retaliatory Intent

When discussing Defendant's alleged retaliatory intent, Defendant, it its JMOL, stated:

> There's been no causal connection, no evidence of the causal connection presented. There hasn't been any testimony to connect that any of the [sic] these actions occurred because of these complaints that were filed.

(Doc. 255, pg. 3).

This argument unambiguously states Defendant's argument and position that Plaintiff failed to meet her burden with respect to Defendant's alleged retaliatory intent and Defendant meets the requirements of Rule 50 for this issue.

### D. Sex Discrimination

With respect to Defendant's argument that Plaintiff failed to provide sufficient evidence that Plaintiff was discriminated against based upon her gender, Defendant, in its JMOL, stated:

> So we don't think that there's actually been any evidence that they were actually similarly situated, so I don't think there has been any evidence presented that she was treated less favorably or they were treated more favorably than her because of her sex.

(Doc. 255, pg. 4).

It is also evident that Defendant raised the issue that Plaintiff failed to meet its evidentiary burden regarding alleged gender discrimination. Admittedly, the issue was raised almost tangentially within a separate argument relating to comparator employees, but "[t]echnical precision is unnecessary. A rigid application of the rule is in order only if such application serves either of the rule's rationales—protecting the right to trial by jury or ensuring an opposing party has sufficient notice of an alleged error so that it may be cured before the party rests its case. *Id.* We consider whether the grounds stated in the motion are sufficiently specific on a case-by-case basis. See id. at 1504." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1228-29 (10th Cir. 2000), aff'd,

532 U.S. 588 (2001). Defendant meets the requirements of Rule 50 for this issue.

### E. Private Right of Action

The last issue is whether Defendant adequately preserved its argument relating to 29 U.S.C. § 207(r) and whether it provides for a private right of action. Defendant concedes that it failed to raise this issue in its oral JMOL at trial. *See* (Doc. 313, pg. 4) ("[T]he only issue raised in the Rule 50(b) renewed motion for judgment as a matter of law that was not raised as part of the Rule 50(a) motion during trial is whether there is a private cause of action under 29 U.S.C. § 207(r).").

Despite this, Defendant contends that since this is a legal question that does not depend on the sufficiency of the evidence, it was not required to assert it during its JMOL. In support, Defendant cites *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1361 (Fed. Cir. 2001). *Shockley* is distinguishable. There, the Federal Circuit discusses the Fourth Circuit's policy of applying "a rarely utilized exception, allow[ing] a party to make a Rule 50(b) motion despite failure to file a Rule 50(a) motion where: (1) the basis for the Rule 50(b) motion is a purely legal issue; and (2) the opposing party had notice of the defect and an opportunity to correct the error." *Shockley*, 248 F.3d at 1361.

No such corollary exception is recognized in this Circuit. In *Helionetics, Inc. v. Paige & Assocs., Corp.*, plaintiff Helionetics failed to raise an issue during its JMOL and subsequently raised that issue in its RJMOL. The district court prohibited that issue from being raised in its RJMOL because it failed to raise it in its JMOL. Like Defendant, Helionetics argued that since the issue was a purely legal one and did not address the sufficiency of the evidence presented, that it was allowed the skirt the requirements of Federal Rule of Civil Procedure 50(b).

The Ninth Circuit rejected this argument and held:

A motion for JMOL made after the verdict cannot be entertained unless the moving party requested JMOL prior to the submission of the case to the jury. *Herrington v. County of Sonoma*, 834 F.2d 1488, 1500 (9th Cir.1987), amended on other grounds, 857 F.2d 567 (9th Cir.1988), cert. denied, 489 U.S. 1090 (1989); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1345–46 (9th Cir.1985). **Even assuming that the issue raised**

**by Helionetics was purely legal, this requirement is "strictly observed."**
Id. at 1346. Here, Helionetics moved for judgment as a matter of law for the
first time after the verdict was rendered. Therefore, the district court properly
denied the Rule 50(b) motion. Helionetics attempts to skirt this requirement
by arguing that the issue raised by its motion is "purely legal" and "does not
address the sufficiency" of the evidence presented by either side. Helionetics'
attempted end-run must fail. Since Helionetics did not raise the issue in any
way before submission of the case to the jury, these cases do not afford any
relief to Helionetics.

100 F.3d 962 (9th Cir. 1996) (emphasis added); *see also Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 n.9 (9th Cir. 2009) ("The determination of qualified immunity at step two is strictly a legal question of whether, even though the facts alleged by the plaintiff make out a constitutional violation, that constitutional right was not clearly established. That issue could have been raised by a motion under Rule 50(a), as was done in *Torres*, 548 F.3d at 1210. However, without the requisite Rule 50(a) motion, this purely legal issue could not be revived under Rule 50(b).").

Since Defendant failed to raise this issue in its JMOL, it cannot now raise this issue in its RJMOL even if it is a "purely legal issue." Furthermore, even if Defendant had raised this issue in its JMOL, the Court has already addressed this issue in its Order addressing the parties' cross-motions for summary judgment.

There, the Court wrote:

A violation of Section 207(r) alone does not necessarily afford a private right of action . . . Plaintiff is not required to be compensated for time used to express milk . . . however, Defendant concedes it compensates nursing mothers during break times. Therefore, any break time used to express milk would have been compensated, and any vacation/sick time used would also have constituted work time spent, and Plaintiff has stated a viable claim alleging she is entitled to compensation for unpaid minimum wages.

(Doc. 131, pg. 9-10).

Ultimately, Defendant properly preserved four issues raised in its RJMOL by raising them in its JMOL. The Court will next turn to Defendant's RJMOL.

…

### 3. Renewed Judgment as a Matter of Law

When evaluating an RJMOL, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150-51, (2000) (internal citations and quotations omitted).

An RJMOL "is appropriate when the evidence permits only one reasonable conclusion. The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *LaLonde v. Cty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (internal citations omitted).

Defendant raises four specific issues in its RJMOL that it raised in its JMOL at trial and the Court will address the merits of each issue individually.

### A. Fair Labor Standards Act

Defendant argues that it is entitled to judgment as a matter of law on the issue of whether it provided Plaintiff with a suitable space to express breast milk in compliance with §207(r) of the FLSA.

More specifically, Defendant argues:

Aspirational, non-legal requirements aside, the only evidence Clark introduced at trial regarding whether the stations where Clark was assigned had lactation spaces that were "free from intrusion" is Clark's own testimony that, despite expressing breast milk in multiple stations over more than one year, not one single person ever intruded into any space that she used. Clark's own experience is dispositive of the question submitted to the jury. Given the evidence presented, a reasonable juror, unmoved by passion or prejudice and applying the FLSA's standards only, could find only in the City's favor.

(Doc. 281, pg. 8) (internal citations omitted); (Doc. 313, pg. 7) ("[Plaintiff] cannot reasonably argue that the lactation spaces were not free from intrusion when no one ever intruded on her.").

Although Defendant's conclusion may be correct, its reasoning is flawed. That Plaintiff achieved a desired result is not dispositive evidence of compliance.

The relevant statute provides, in pertinent part:

> (r)Reasonable break time for nursing mothers
> (1) An employer shall provide—
> (A) a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and
> (B) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

29 U.S.C. § 207(r).

As is evident, section (r)'s requirements are unambiguous. Employers must provide a reasonable break time for nursing mothers to express breast milk and a place, other than a bathroom, that is shielded and free from intrusion with which to do so.

Plaintiff rejects Defendant's position and alleges that "Defendant raised this exact issue in its Motion for Summary Judgment. The issue was fully briefed by the parties. The court expressly rejected Defendant's argument regarding 29 U.S.C. § 207(r)." (Doc. 304, pg. 6). Plaintiff's tenuous grasp of the relevant summary judgment standard aside, the Court did not "expressly reject[] Defendant's argument regarding 29 U.S.C. § 207(r)" when adjudicating the parties' cross motions for summary judgment. In the Court's April 24, 2018 Order addressing the parties' summary judgment motions, the Court wrote: "giving both non-moving parties all reasonable inferences, the compliance of each assigned and potentially-assigned station is a genuine issue of material fact. Summary judgment on this issue is not appropriate." (Doc. 131, pg. 8). The Court's finding that there was a genuine issue of material fact is not analogous to a ruling that Plaintiff definitively established that TFD stations were not compliant.

In support of her argument that Defendant violated the FLSA, Plaintiff relies heavily upon an investigation conducted by the Office of Equal Opportunity Programs ("OEOP"). *See* (Doc. 304, pg. 4) ("Defendant completely ignores that its own independent watchdog agency, the Office of Equal Opportunity Programs (OEOP) inspected and evaluated each and every fire station in Tucson and concluded that nine of the 21 stations (or 43%) as of March 2013 did not comply with the FLSA"); *id.* at 5 ("As discussed in OEOP's findings, Stations 9, 12, 20, and 21 were not in compliance with the FLSA because they did not have a place, other than a bathroom, shielded from view and free from intrusion from coworkers and the public for employees to express breast milk"); (Doc. 84, pg. 3) ("Office of Equal Opportunity Programs (OEOP) Investigator Matthew Larsen concluded that 9 of TFD's 21 fire stations, or 43%, did not have facilities suitable for the expression of breast milk, and thus were non-compliant with § 207(r).").

The OEOP is a branch of the Tucson City Manager's Office and is responsible for implementing and enforcing equity policies for the City of Tucson. In March 2013, OEOP inspector Matthew Larsen ("Mr. Larsen") conducted an inspection at twenty-one Tucson Fire Department stations in order to verify compliance with Section 7 of the FLSA. At the time Mr. Larsen conducted his inspection, the break-time mandate for nursing mothers codified in section 207(r) of the FLSA was new and Mr. Larsen testified that he could not rely upon any established legal guidance or interpretation. *See* (Doc. 261, pg. 6) ("It was a relative[ly] new law at this point, so there was not anywhere where we could find it had been tried; and by that I mean tested. There had been no rulings on it, no interpretations offered, so kind of going really what we had to go off of was the letter of what was actually written . . . .").

Based upon his interpretation of § 207(r), Mr. Larsen determined that TFD Stations 1, 4, 5, 6, 7, 8, 11, 13, 14, 15, 16, and 17 were compliant, but that Stations 3, 9, 10, 12, 18, 19, 20, 21, and 22 were not in compliance. *See* (Doc. 304-1, pg. 29-30). Excluding Station 9, Mr. Larsen believed that the non-compliant stations could be brought to compliance with the addition of a lock for any unsecured doors. *See e.g., id.* at 32 ("Must install locks on all

dorm room doors per the office of equal opportunity's inspection report."). Although Mr. Larsen determined that some stations at Tucson Fire were not in compliance due to the lack of a lock, nowhere within section 7(r) of the FLSA is there a requirement that a door must have a lock.

At trial, Mr. Larsen acknowledged that, at the time of his investigation, if he had been aware that a lock was not a requirement under the FLSA, he would have determined that every TFD station, excluding Station 9, complied with federal law.

> Q. Let me rephrase my question, Mr. Larsen. At the time that you did these inspections, if you had knowledge that a lock was not required, would you agree that the fire stations were compliant with the federal law?
> A. With the exception of one, yes.
> Q. And which one would that be?
> A. I believe it was Station 9[1] . . . .

(Doc. 261, pg. 13-14).

However, Defendant failed to explore *why* Mr. Larsen believed that all TFD stations, excluding Station 9, were compliant with § 207(r). Both parties appear to rely upon Mr. Larsen's testimony as dispositive. Plaintiff states in her briefing that Defendant's "own independent watchdog agency, the Office of Equal Opportunity Programs (OEOP) inspected and evaluated each and every fire station in Tucson and concluded that nine of the 21 stations (or 43%) as of March 2013 did not comply with the FLSA." (Doc. 304, pg. 4). Similarly, Defendant argues that Mr. Larsen "testified that his own assumption that § 207(r) required door locks was the only reason that the OEOP listed any station other than Station 9 as noncompliant . . . whether § 207(r) requires door locks is the only question at issue for FLSA liability." (Doc. 313, pg. 7). Even if the FLSA does not require locks for § 207 (r) compliance, TFD stations may have not been compliant.

In addition to Mr. Larsen's testimony on the OEOP's report, the parties presented testimonial evidence pertaining to the 207(r) compliance of TFD stations.

---

[1] Plaintiff testified that she never worked at Station 9 so whether Station 9 complied with the FLSA is immaterial. (Doc. 207, Pg. 39-40) ("Q. After you raised a concern about Station 9, you were never stationed -- you never actually worked at Station 9; correct? A. I never actually worked there.").

For example, Plaintiff testified that multiple stations that she was assigned to were not compliant with federal law:

> Q. Did Medic 12 have a space free from intrusion from coworkers and the public to express your breast milk?
> A. No, it did not.
> Q. Where did you pump?
> A. I pumped in my dorm room, my private dorm room.
> Q. Did that have a lock or any other way to secure the room to make it free from intrusion?
> A. No, it did not.

(Doc. 208, pg. 61).

> Q. Now, you testified that Station 12 did not have a private space to lactate, to express your breast milk that was free intrusion from coworkers and the public; right?
> A. Yes.
> Q. So why did you ask to stay at Station 12 even knowing it didn't comply?
> A. So at this point the stations besides the ones I knew for sure, like Station 9, Station 8 where we had curtained-type dorm rooms, stations were basically kind of equal to me. Like Medic 20, Medic 12, you've got the same private dorm room. They don't lock. They don't secure.

*Id.* at 87

Similarly, Battalion Chief Robert Rodriguez testified that "some stations that are newer than others and other stations that have been remodeled; the majority being more current than old. But there were certainly those stations that were unacceptable because they had not been remodeled." (Doc. 284, pg. 15).

In contrast, Defendant presented testimony that TFD stations were compliant with federal law. For example, Chief Michael Fischback testified that, based on his interpretation of § 207(r), TFD's stations were in compliance because they contained a private room that was free from intrusion. See (Doc. 281-1, pg. 6-7) ("[T]hey said that you had to have a lockable door, and my understanding was all you needed was a private place where someone could be in a private place without threat of somebody coming in and disturbing them. And it had worked that way previously for us.").

Ultimately, the evidence presented was conflicting and the jury found that

Defendant violated the FLSA by failing to provide Plaintiff with a place free from intrusion. (Doc. 234, pg. 8). When considering a motion for judgment as a matter of law, the Court "must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). Viewing the evidence in the light most favorable to Plaintiff, the evidence does not permit "only one reasonable conclusion . . . contrary to the jury's verdict." *Id.* Defendant's request for judgment as a matter of law on this issue is denied.

## B. Adverse Employment Actions

Next, Defendant alleges that it is entitled to judgment as a matter of law regarding whether Plaintiff suffered any adverse employment actions. In this Circuit, "an adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1237 (9th Cir. 2000). An employee engages in protected activity when she takes action to oppose an unlawful employment practice, such as filing a complaint with the Equal Employment Opportunity Commission ("EEOC"). *See Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 525 (9th Cir. 1994); *Nilsson v. City of Mesa*, 503 F.3d 947, 954 n. 5 (9th Cir. 2007).

Here, the jury determined that Plaintiff was subjected to eleven adverse employment actions ranging from being given an educational counseling and being involuntarily transferred between units, to the deprivation of vacation time, seniority, and compensation. *See* (Doc. 233, pg. 16-17). However, "[n]ot every employment decision amounts to an adverse employment action. For example, mere ostracism in the workplace is not enough to show an adverse employment decision." *Strother v. S. California Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir. 1996), as amended on denial of reh'g (Apr. 22, 1996), as amended on denial of reh'g (June 3, 1996).

An adverse employment action must rise above a trivial harm and ordinarily, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities,

or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) ("Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion."); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("Transfers of job duties and undeserved performance ratings, if proven, would constitute adverse employment decisions . . . .") (internal citations and quotations omitted).

Plaintiff alleges that she suffered a litany of adverse employment actions. However, many do not rise to the level of an adverse employment action and the Court will address each alleged adverse employment action separately.

### i. *Educational Counselings*

Plaintiff alleges that she was improperly given an educational counseling on three separate occasions for various infractions. The jury determined that all three incidents amounted to an adverse employment action. (Doc. 234). Despite the jury's finding, it is well established that "written warnings . . . are not adverse employment actions where they do not materially affect the terms and conditions of employment." *Sanchez v. California*, 90 F. Supp. 3d 1036, 1056 (E.D. Cal. 2015); *see also Hoang v. Wells Fargo Bank, N.A.*, 724 F. Supp. 2d 1094, 1104 (D. Or. 2010) ("[S]ince the letter did not implement any materially adverse change in the terms and conditions of [plaintiff's] employment, it was not itself an adverse employment action.").

At trial, Plaintiff testified that these educational counselings did not affect her wages, benefits, or seniority. (Doc. 207, pgs. 73, 82); *see also* (Doc. 208, pg. 130) (Plaintiff's testimony that an educational counseling is "nonformal discipline."); (Doc. 207, pg. 74) (Plaintiff testifying that the intention of an educational counseling is for administration to educate an employee about a specific issue). Given Plaintiff's testimony, the three educational counselings were nothing more than written warnings that did not materially affect the terms and conditions of Plaintiff's employment and, therefore, are not

adverse employment actions. *See Weeks v. Union Pac. R.R. Co.*, 137 F. Supp. 3d 1204, 1219 (E.D. Cal. 2015) (finding that since a disciplinary notice resulted in "no loss of seniority, no loss of pay, and no discipline" it was not an adverse employment action).

### ii. *Precluding Plaintiff's Start-Time, Restricting Plaintiff's Ability to Exercise, and Requiring a Doctor's Note*

Plaintiff alleges that she suffered three adverse employment actions when Defendant restricted her start-time, ability to exercise, and required her to furnish a doctor's note to utilize sick leave. Generally, "[e]mployment actions which do not result in changes in pay, benefits, seniority, or responsibility . . . are insufficient to sustain a retaliation claim." *Jernigan v. Alderwoods Grp., Inc.*, 489 F. Supp. 2d 1180, 1200 (D. Or. 2007). While prohibiting Plaintiff from starting her day at a certain time and restricting her ability to exercise may be obstacles, those obstacles were minor and "[n]ot every employment decision amounts to an adverse employment action." *Strother v. S. California Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir. 1996), as amended on denial of reh'g (Apr. 22, 1996), as amended on denial of reh'g (June 3, 1996). Plaintiff presented no evidence that any of these employment actions materially affected Plaintiff's job and they cannot be properly categorized as adverse employment actions.

### iii. *Deprivation of Vacation Time and Wages*

Plaintiff alleges that the following three incidents involving a deprivation of her vacation time and wages constitute adverse employment actions: the lack of compensation for being deposed on four separate occasions, the deprivation of specialty pay in the amount of $69.23, and the deprivation of 3 hours of vacation time. The Ninth Circuit has previously recognized that "an adverse employment action exists where an employer's action negatively affects its employee's compensation." *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004). While a deprivation or reduction in a plaintiff's salary is often held to be an adverse employment action, the amount in question, while not dispositive, is not irrelevant. The Court finds guidance in the Supreme Court's definition of an adverse employment action as an action that "constitutes a **significant** change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a **significant** change in benefits." *Burlington*, 524 U.S. at 761 (emphasis added).

Therefore, while a *significant* change in an employee's benefits is an adverse employment action, an insignificant change is not. *Compare Howard v. Washington*, 254 F. App'x 576, 578 (9th Cir. 2007) (finding that plaintiff whose salary was cut by $9,000.00 was subjected to an adverse employment action), and *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002) (employer's reduction of employee's guaranteed monthly base salary by $1,000 constituted an adverse employment action), *with Molina v. Los Angeles Cty., Dep't of Mental Health*, 58 F. App'x 311, 315 (9th Cir. 2003) (unpublished) (finding that the loss of one-hour's pay did not rise to the level of an adverse employment action).

Here, Plaintiff was deprived of specialty pay amounting to $69.23 and improperly deprived of 3 hours of vacation time. Given the relative insignificance of the amounts complained about, these incidents do not amount to adverse employment actions. However, Plaintiff's lack of compensation for being deposed on four separate occasions is a different matter. Plaintiff testified that she was either "charged" vacation time or completely deprived of her pay when she attended four separate depositions. (Doc. 208, pg. 195). Plaintiff also testified that the value of eight hours of vacation time amounted to "a couple hundred dollars." *Id.* If Plaintiff was only deprived of compensation on one occasion, this would likely be an insignificant change in her benefits. However, Plaintiff was deprived of compensation and charged vacation time on four separate occasions, which amounted to hundreds of dollars, if not more. This amounts to a significant change in Plaintiff's benefits and viewing the evidence presented most favorably to Plaintiff, the Court finds that the jury properly determined that this was an adverse employment action.

### iv. Involuntary Transfer

In April 2016, Plaintiff was involuntarily transferred from her position as an inspector in the fire prevention department to field operations as a paramedic. (Doc. 208,

pg. 187-88). When asked about the difference between the two departments, Plaintiff testified that her position at fire prevention had a very predictable eight-hour shift, Monday-through-Friday, and that her new position at operations had a twenty-four-hour shift. (Doc. 208, pg 187-88). In addition to the difference between shifts, the two positions had significantly different job duties. In fire prevention, Plaintiff was tasked with inspecting new building constructions for compliance with fire codes. (Doc. 208, pg. 180-81). As a paramedic, Plaintiff was tasked with performing emergency medical services and "fire suppression, fire prevention and emergency response activities." (Doc. 118-2, pg. 39).

While it has been previously held that a lateral transfer can constitute an adverse employment action, that characterization is generally reserved for those transfers that tangibly affect an employee's benefits, wages, or career prospects. *See Ray*, 217 F.3d at 1241 ("While mere ostracism by co-workers does not constitute an adverse employment action, a lateral transfer does.") (internal citations and quotations omitted); *Firestine v. Parkview Health Sys., Inc.*, 388 F.3d 229, 235 (7th Cir. 2004) ("Transfers that quantitatively affect benefits or wages or that significantly reduce an employee's career prospects may constitute adverse action"); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 n.6 (9th Cir. 1994) (Finding that a shift transfer was "just barely" characterizable as an adverse employment action because it did not involve a demotion or a change in job duties); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 919 (9th Cir. 1996) (declining to characterize an involuntary transfer to a different department, with no change in compensation, as an adverse employment action).

If the only change that occurred from this involuntary transfer was a switch from an eight-hour shift to a twenty-four-hour swing shift, this transfer could not properly be characterized as an adverse employment action. However, this transfer involved more than just a mere change in an hourly shift, but a significant change in Plaintiff's job duties and "a material change in the terms and conditions of a person's employment" is an adverse employment action. *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000); *see also Yartzoff*, 809 F.2d at 1376 ("Transfers of job duties and

undeserved performance ratings, if proven, would constitute" an adverse employment action). Since Plaintiff's involuntary transfer from fire prevention to operations necessitated a substantial change in her job duties, and viewing the evidence presented most favorably to Plaintiff, the Court finds that the jury properly determined that this was an adverse employment action.

### v. Deprivation of Seniority

On May 13, 2016, Defendant announced that it would recalculate how it determined seniority, causing Plaintiff to lose approximately two years of seniority. (Doc. 208, pg. 192). Seniority at TFD is important as it dictates an employee's station assignment. (Doc. 208, pg. 188-89). An employment decision that erases two years of seniority and effectively eliminates Plaintiff's ability to choose her own station is an action that significantly changes the "terms and conditions" of employment and can be characterized as an adverse employment action. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). By May 2016, Plaintiff had filed her lawsuit against Defendant and Defendant was clearly aware that the new seniority policy would impact Plaintiff negatively. (Doc. 296, pg. 41-42). Viewing the evidence presented most favorably to Plaintiff, the Court finds that the jury properly determined that this was an adverse employment action.

### C. Retaliatory Intent

In order to prove that retaliation was a motivating factor behind an adverse employment action, the Plaintiff must prove: (1) she had engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action. *Nilsson*, 503 F.3d at 954.

Despite the jury's finding, even viewing all of Plaintiff's eleven enumerated allegedly adverse employment actions in the light most favorable to Plaintiff, only three can be properly considered an adverse employment action and the Court will determine whether the three actions were motivated by retaliatory intent.

...

### i. Deposition Pay

The Ninth Circuit has outlined three ways to show that retaliation was a substantial or motivating factor behind an adverse employment action:

> First, a plaintiff can introduce evidence regarding the proximity in time between the protected action and the allegedly retaliatory employment decision, from which a jury logically could infer [that the plaintiff] was terminated in retaliation for his speech. Second, a plaintiff can introduce evidence that his employer expressed opposition to his speech, either to him or to others. Third, the plaintiff can introduce evidence that his employer's proffered explanations for the adverse employment action were false and pre-textual.

*Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (internal citations and quotations omitted).

Here, Plaintiff was deprived of pay when she attended four mandatory depositions relating to her pending lawsuit. According to Section 203 of TFD's Manual of Operations, employees are ordinarily paid when appearing in court or for a deposition. (Doc. 296, pg. 23); (Doc. 118, pg. 25); Doc. 208, pg. 193-95). Plaintiff was not paid or compensated for attending four depositions, even though it is TFD policy to be compensated. Plaintiff's union raised the issue with TFD management and management decided not to compensate Plaintiff even though employees are, based on TFD policy, ordinarily compensated for attending a deposition. (Doc. 293, pg. 53-54). Even if it could be assumed that the policy did not cover lawsuits initiated against TFD by a TFD employee, which would create a situation where TFD was seemingly funding an adverse litigant, that notion was dispelled when Plaintiff's union president Josh Campbell testified that a prior TFD employee who had a lawsuit pending against the city was compensated for his attendance at trial or a deposition in that case. *Id.*

Construing the evidence in a light most favorable to Plaintiff, the evidence does not permit only one conclusion and the jury had sufficient evidence to conclude that Plaintiff was retaliatorily deprived of pay and vacation time for her attendance at four mandatory depositions. Defendant's request for judgment as a matter of law on this issue will be

denied.

### ii. Lateral Transfer

Here, Plaintiff was subject to an involuntary lateral transfer that entailed a significant change in her job duties. At trial, Chief Critchley testified that he transferred Plaintiff to take advantage of her paramedic and nursing background. (Doc. 294, pg. 132). Despite Chief Critchley's explanation, the effect of this lateral transfer was to deprive Plaintiff of a stable Monday through Friday shift and cause Plaintiff a great deal of uncertainty. (Doc. 207, pg. 83). Construing the evidence in a light most favorable to Plaintiff, the evidence does not permit only one conclusion and the jury had sufficient evidence to conclude that Plaintiff was retaliatorily transferred. Defendant's request for judgment as a matter of law on this issue will be denied.

### iii. Loss of Seniority

The next question is whether Plaintiff's loss of seniority was based upon a retaliatory motive. Trial testimony established that the seniority policy was the product of negotiations between the union and TFD administration. (Doc. 207, pg. 84-85). However, given the effect on Plaintiff's seniority, it is unclear as to why it was implemented and why Plaintiff was the only employee to lose her seniority.

When an adverse employment action is based on protected and unprotected activities, the Court must apply the "dual motive" test described in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). "Under the dual motive test, a plaintiff must show that her protected activities were a substantial factor in the complained of adverse employment action. Protected activities are a substantial factor where the adverse actions would not have been taken but for the protected activities. In dual motive cases, it is the defendant's affirmative burden to prove that it would have taken the adverse action if the proper reason alone had existed." *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996) (internal citations and quotations omitted).

It is not evident that Defendant established that it would have implemented the seniority policy at a different date so not to affect Plaintiff's seniority. Although there was

evidence at trial establishing that the policy was negotiated between the Union and TFD administration, (Doc. 207, pg. 84-85), the timing of the policy, especially pertaining to Plaintiff, appears suspect. Plaintiff was notified of the new seniority policy on May 13, 2016 and the policy was backdated to be effective on May 1, 2016. After her involuntary transfer, Plaintiff began her position as a swing-shift paramedic on May 2, 2016. (Doc. 208, pg. 191). Given that Defendant was aware that the application of the seniority policy would negatively affect Plaintiff and given that Plaintiff "was the only loser as a result of the retroactive application" of the new seniority policy, it is not entirely clear whether the policy would have been implemented when it was implemented if not for Plaintiff's engagement in a protected activity. (Doc. 296, pg. 54).

Construing the evidence in a light most favorable to Plaintiff, it is unclear whether the policy was implemented for non-nefarious reasons. "A judgment as a matter of law is appropriate when the evidence permits only one conclusion." *Price v. Kramer*, 200 F.3d 1237, 1244 (9th Cir. 2000). In this case the jury had sufficient evidence to conclude that Defendant implemented the seniority policy in order to retaliate against Plaintiff for her engagement in a protected activity and Defendant's request for judgment as a matter of law on this issue will be denied.

### D. Sex Discrimination – Title VII

Defendant next argues that Plaintiff was not the victim of sex discrimination. At trial, Plaintiff alleged that she was the victim of sex discrimination and presented, at trial, three male TFD employees who were allegedly treated more favorably than her. Those three male employees were under investigation for various criminal infractions including driving under the influence. The Court previously determined that these employees would be permitted to testify when addressing the parties' motions in limine, as their testimony would be relevant. (Doc. 176). At trial, the Court once again reconsidered the issue but determined that since the testimony was relevant, any objection went to the weight of the evidence and not its admissibility. (Doc. 207, pg. 44).

In order to bring a proper Title VII claim for sex discrimination, Plaintiff must,

among other things, establish that "similarly situated individuals outside [her] protected class were treated more favorably." *Chuang*, 225 F.3d at 1123. However, not only must Plaintiff establish this, Plaintiff must also establish that these individuals are similarly situated "in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). "[W]hether two employees are similarly situated is ordinarily a question of fact." *Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 885 n.5 (9th Cir. 2007). Generally, the Ninth Circuit determines that "individuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), as amended (Jan. 2, 2004).

The evidence presented at trial relating to these three male employees permits only one reasonable conclusion: that they were not similarly situated to Plaintiff in all material respects. The three comparator employees were male firefighters with pending criminal charges. Those employees were involuntarily provided various station assignments as part of TFD's disciplinary action. *See* (Doc. 282, pg. 4-5). None of the three male employees requested a specific assignment and all were transferred involuntarily. In contrast, Plaintiff requested a specific assignment that would accommodate her breast pumping needs. The evidence presented at trial is clear: three male employees were involuntarily transferred as a disciplinary measure and were not provided a specific station assignment based upon their own personal preference.

According to guidance note issued by the EEOC, employees who are similarly situated to a lactating mother would be those with "similarly limiting medical conditions." EEOC Guidance No. 915.003, 2015 WL 4162723, at *8. If the three male employees that Plaintiff presented as comparator employees had, for example, broken legs, and specifically requested a station assignment that would better accommodate their non-ambulatory status and TFD provided them with that accommodation while denying Plaintiff's request, Plaintiff could properly assert that those employees were similarly situated in all material respects. However, the evidence presented at trial clearly shows that the three male employees were not similarly situated to Plaintiff in all material respects

and judgment as a matter of law will be granted on Plaintiff's Title VII claims for disparate treatment and retaliation.

### 4. Motion for a New Trial

Defendant raises numerous issues in support of its request for a new trial. The Court finds Defendant's first issue regarding a grossly excessive jury verdict to be sufficient and will not address, in detail, the merits of the remaining issues.

### A. Grossly Excessive Verdict

After a two-week jury trial, Plaintiff was awarded $3,800,000.00. "A verdict based on the bias, passion, or sympathy of the jury cannot be permitted to stand." *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1115 (9th Cir. 2012). "Beyond obvious bias or passion, a verdict will also not be sustained on appeal if it is 'grossly excessive' or 'monstrous.'" *Id.* (*quoting Baldwin v. Warwick*, 213 F.2d 485, 486 (9th Cir. 1954)).

Plaintiff argues that courts routinely uphold "similar awards in employment discrimination or similar cases." (Doc. 304, pg. 18). In support, Plaintiff cites *Harper v. City of Los Angeles* 533 F.3d 1010, 1029 (9th Cir. 2008). *Harper* is clearly distinguishable. In *Harper*, three former Los Angeles Police Department officers who were wrongfully implicated in an ongoing corruption scandal were investigated and convicted. Those officers were later acquitted, but suffered severe physical, mental, and career consequences.

As outlined in *Harper*:

> Each officer testified about the adverse physical and emotional effects of the media attention and his loss of reputation. Harper developed high blood pressure and intestinal problems; he began to drink frequently and heavily and became paranoid. Ortiz became suicidal and experienced heartburn, back and neck pain, and anxiety attacks. Liddy gained 100 pounds, was hospitalized for chest pains, and developed high blood pressure and anxiety.

> The Officers also testified as to the adverse effect the experience had on their personal and professional lives. Harper had to work lower-paying security jobs; his house was searched in front of his girlfriend and her young daughter; he was told he was put on a hit-list by a gang member shot and framed by Perez; and even after he was cleared of all charges and returned to the LAPD

he was unable to work on the street because of the publicity and had to take a desk job. Ortiz was also told he was on a hit-list; his family broke apart when his wife left him because of the negative publicity, and his teenage stepdaughter ran away, attempted suicide and was placed in a psychiatric ward. Liddy lost his career, filed for bankruptcy, and the negative publicity had significant adverse effects on his young children. This testimony is substantial evidence from which the jury could find that the harm to each officer justified an identical damage award.

*Harper v. City of Los Angeles*, 533 F.3d 1010, 1029 (9th Cir. 2008).

After suing the City of Los Angeles, the officers were each awarded $5,000,000.00 in compensatory damages. The corruption investigation caused a far greater negative impact on the lives of Officers Harper, Ortiz, and Liddy than Defendant's treatment of Plaintiff. While Plaintiff testified that she was "emotionally worn down," (Doc. 208, pg. 173), the officers in *Harper* developed severe physical symptoms, suicidal ideations, had their lives jeopardized, and lost their careers.

In contrast, Plaintiff testified that she attended counseling sessions, but the records of those sessions were never disclosed and no expert testified regarding her mental health or related damages. (Doc. 208, pg. 213). Similarly, Plaintiff testified that the incidents at TFD created relationship issues with her husband, nearly culminating in divorce. (Doc. 293, pg. 105-06). However, Plaintiff also testified that the problems with her marriage, and other emotional stressors, were exacerbated by comments by anonymous internet users and not due solely to actions by TFD. (Doc. 208, pg. 174-75).

Setting aside the horrific consequences that the investigation had on their personal lives, Officers Harper, Ortiz, and Liddy objectively suffered far greater career consequences than Plaintiff. With respect to her employment, Plaintiff presented evidence that a small amount of money was wrongfully withheld, a small amount of vacation time was deducted, and that she was deprived of some seniority. A multi-million-dollar verdict for compensatory damages appears appropriate and commensurate with the severe financial consequences suffered by Officers Harper, Ortiz, and Liddy. Plaintiff's hardships, while not insignificant, clearly do not rise to the level of that in *Harper*.

Plaintiff cites another case to support her jury award, *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041 (5th Cir. 1998). Not only is *Migis* distinguishable, it undermines Plaintiff's argument. There, plaintiff Melissa Migis alleged that she was wrongfully terminated from her job due to her pregnancy. At trial, Migis testified regarding the emotional suffering she endured due to the termination.

> The evidence of mental anguish testimony in the pending case consisted solely of Migis's testimony. She testified that her termination, which came without warning, was "a major inconvenience," and that she suffered low self-esteem "not only from not having worked but from getting terminated and not offered a position that I thought I was qualified for...." With her new baby she suffered financial hardships. She stated that she suffered "almost what I would call stress attacks or anxiety attacks," marital hardship, and "major stress," as well as "lot[s] of crying, sleeplessness."

*Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1046 (5th Cir. 1998).

Migis was later awarded compensatory damages based upon her testimony and that award was later contested. On appeal, the Fifth Circuit upheld the award and reasoned that "Migis's testimony of anxiety, sleeplessness, stress, marital hardship and loss of self-esteem was sufficiently detailed to preclude [it] from holding that the district court abused its discretion in its award of compensatory damages." *Id.* Like Plaintiff, Migis suffered from stress, anxiety, and marital hardship. Unlike Plaintiff, Migis was terminated from her position, an undeniably more severe career consequence than any of Plaintiff's alleged adverse employment actions. Given that Migis and Plaintiff experienced similar hardships in their personal lives, and that Migis experienced an objectively more severe career consequence, the amounts awarded to the two parties would reasonably be expected to be comparable. However, Migis was awarded a *total* of $5,000.00 in compensatory damages by the court for her mental anguish. In comparison, the jury in this case awarded Plaintiff a staggering *760 times* that amount, or $3,800,000.00.

There is an abundance of additional examples demonstrating the gross excess of the jury's verdict in this case. For example, in *Lambert v. Ackerley*, 180 F.3d 997, 1011 (9th Cir. 1999), multiple employees were terminated in retaliation for lodging complaints

relating to overtime pay. Those employees testified regarding the emotional impact the illegal terminations had taken upon their lives. They were eventually awarded $75,000 each for emotional distress damages, which the Ninth Circuit found to be neither "grossly excessive or monstrous." *See also Higgins v. Assmann Elecs., Inc.*, 217 Ariz. 289, 295 (Ariz. Ct. App. 2007) (Plaintiff was fired and suffered emotional distress including post-traumatic stress disorder, which required therapy and was awarded $300,000.00, which was deemed to be an amount that did not shock the conscience of the court).

In another case, *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988), a jury's $300,000.00 award for emotional distress and psychological damage was upheld because Plaintiff provided evidence that he suffered from "severe and malignant insomnia, anxiety, suicidal fantasies, quiet and severe depression and anxiety." *Id.* In addition, Plaintiff provided an expert witness who corroborated Plaintiff's damages and testified that plaintiff "suffered from permanent psychological damage and would require treatment for several years." *Id.*

Plaintiff clearly suffered emotionally, as she effectively described to the jury. However, the jury verdict was staggering in comparison to other similar cases and is more consistent with a punitive damages award. It is true that a court should "not lightly cast aside the solemnity of the jury's verdict." *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 844 (9th Cir. 2003). However, the established case law shows that for more serious cases, compensatory damages related to emotional distress never reach the amounts awarded by the jury in this case, especially given the emotional distress testimony provided by Plaintiff. Therefore, the Court can only conclude that the jury's verdict was not to compensate, but to punish the Defendant.

In hindsight, even Plaintiff's counsel indirectly acknowledged the grossly excessive nature of the jury's verdict. During closing argument, he stated:

> What's emotional distress damages worth? 50 bucks an hour? 25 bucks an hour? If you multiply 25 bucks an hour times 24 hours a day times 365 days a year times six and a half years that Carrie's been dealing with this, you have a pretty high number. It's like 1.4 million. **Now we're not asking you**

**for that because we're asking you to be intellectually honest when you go back there and deliberate.** We're asking you to be intellectually honest with yourselves and with each other, and we can't be intellectually honest with you and look at you and say that 365 days a year, 24 hours a day, Carrie's experiencing that. It waxed and waned. There were good days and bad days.

(Doc. 235, pg. 45) (emphasis added).

Plaintiff's attorney directly acknowledged that a $1,400,000.00 award would be unreasonable because "[t]here were good days and bad days." *Id.* However, generally, an excessive damages awards is insufficient to necessitate a new trial unless there is also evidence that passion and prejudice influenced the jury's verdict.

Here, not only was there a grossly excessive jury verdict, it is clear that the passion of the jury was inflamed, and a new trial is necessary. *Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 905 (9th Cir. 2000), as amended (Aug. 11, 2000). When discussing the impact the case was having on her personal life, Plaintiff testified that she was undergoing a multitude of difficulties in her personal life, as discussed in counsel's briefing. *See* (Doc. 208). While these experiences were traumatic and undoubtedly contributed to Plaintiff's distress, the evidence does not establish that Defendant directly caused them.

Furthermore, during Plaintiff's closing argument, Plaintiff's counsel argued the following:

What will you do to serve -- what you will do will serve to warn others . . . What you do will serve to warn others to obey the law and the consequences if they don't. Other city departments besides the fire department are watching. Mayor and council are watching. Other governments, like Marana, Oro Valley, Sahuarita, they're watching. It's up to you to decide how much to award in this case and what amount of money would accomplish those obligations.

(Doc. 235, pg. 46-47).

It is clear that Plaintiff advocated for punitive damages and that the jury's award reflected this sentiment. Plaintiff's closing argument was not a call for compensatory

- 29 -

damages for the allegedly retaliatory actions Plaintiff endured but was a call advocating for punishment of TFD. Plaintiff counsel's rhetoric advocating for punishment and a warning to other government agencies was a request for punitive damages, which are not available in this case. Punitive damages "are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974).

The final jury instructions and verdict forms did not discuss punitive damages. (Doc. 233). Given Plaintiff's rhetoric at closing and the actual verdict amount, the jury's award was most certainly for punitive and not compensatory damages. Otherwise, the verdict would more closely mirror the verdicts in cases discussed *herein* with more extreme facts. Ordinarily, "a verdict which can be characterized as grossly excessive or monstrous will not be sustained on appeal." *Plumbers & Steamfitters Union, Local No. 598 v. Dillion*, 255 F.2d 820, 824 (9th Cir. 1958). This verdict is grossly excessive. However, despite the meritorious nature of Defendant's Motion for a New Trial as to damages, before a new trial is ordered, the Court will determine whether the case is appropriate for a remittitur.

### 5. *Remittitur*

When the court, after viewing the evidence concerning damages in a light most favorable to the prevailing party, determines that the damages award is excessive, it has two alternatives. It may grant defendant's motion for a new trial or deny the motion conditional upon the prevailing party accepting a remittitur. *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983). Remittitur is a device used to correct an excessive verdict and must reflect "the maximum amount sustainable by the proof." *D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982). This jury verdict is based upon Plaintiff's emotional distress damages and "[j]udgments regarding noneconomic damages are notoriously variable." *Forsyth v. City of Dallas, Tex.*, 91 F.3d 769, 774 (5th Cir. 1996). Generally, "courts are required to maintain some degree of uniformity in cases involving similar losses." *Shaw v. United States*, 741 F.2d 1202, 1209 (9th Cir. 1984). Applying that concept to jury verdicts, the Court will compare the

verdict amount to awards in similar cases in this District.

Examining relevant employment discrimination jury verdicts in the District of Arizona reveals that very few ever cross the $1,000,000.00 threshold. For example, in the following employment discrimination cases, a plaintiff, or a group of plaintiffs, were awarded at least $1,000,000.00 in damages:

- $1,000,000.00 was awarded in *Adams v. Arizona Senate*, 2019 WL 4200710. This case involved allegations of race and sex discrimination, retaliation, and equal pay. Unlike the Plaintiff, Talonya Adams, was denied salary increases commensurate with her experience and was later terminated from her position.
- $2,425,000.00 was awarded in *Amaya v. City of Tempe*, 2005 WL 3954723. This case involved a class of twelve City of Tempe employees suing the City of Tempe Public Works Department claiming that they were subjected to a hostile work environment. The employees were allegedly subjected to severe racial discrimination and were regularly referred to as "'stupid Mexicans,' 'a bunch of tacos' and 'spics,' among other derogatory names." After reporting the harassment, the employees were subjected to discipline, without cause, and were segregated and "given worse working conditions than non-Hispanic employees." The twelve employees were awarded amounts of $175,000.00 to $475,000.00 each.
- $2,900,750.00 was awarded in *Sorkilmo v. Qwest Corp.*, 2005 WL 3954736. Here, Kimberly Sorkilmo suffered sexual harassment and suffered severe emotional distress and was later terminated after lodging a complaint. Ms. Sorkilmo was awarded $600,00.00 in compensatory damages, $200,750.00 in back pay, and $2,100,000.00 in punitive damages. This award was later reduced to $500,750.00 pursuant to the Title VII damages cap.
- $8,000,000.00 was awarded in *EEOC v. Alliedsignal*, 1999 WL 1823235. This case involved a class of nearly 350 employees alleging they were terminated from their employment based on their age.

As is evident, an award of this magnitude and involving these facts is unprecedented. Two of the four multimillion-dollar verdicts involved a large class of employees, one of which numbered in the hundreds. The other two single plaintiff cases both involved plaintiffs who were terminated from their positions and had significant claims of lost wages. Here, Plaintiff was awarded an amount in excess of what was awarded to a class of twelve and was awarded an amount approximately half of what was awarded

to a class of hundreds. Considering the facts of this case, the jury's verdict was clearly excessive. Plaintiff's damages involved no significant lost wages and were predicated almost exclusively upon her emotional distress damages.

Furthermore, Plaintiff advanced two theories of retaliation at trial, one based on the FLSA and the other on Title VII. Even though two discrete theories were advanced, the underlying conduct for both theories is identical. On the section of the verdict form entitled: "Title VII Retaliation," eleven allegedly adverse employment actions are listed. In a later section of the verdict form entitled: "Fair Labor Standards Act Retaliation," those exact eleven allegedly adverse employment actions are identically listed. Plaintiff advanced two separate theories of liability for identical conduct. Although the jury found that Plaintiff was subjected to multiple adverse employment actions, it improperly awarded a duplicative award based upon that identical conduct.

A duplicative damages award is found if a plaintiff advances multiple theories of liability comprised of identical conduct. *See Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293, 295 (8th Cir. 1989) ("In instances where a party's claims are simply alternative theories seeking relief for the same injury, that party is not entitled to a separate compensatory damage award under each legal theory. On the contrary, he is entitled only to one compensatory damage award if liability is found on any or all of the theories involved.") (internal citations and quotations omitted). The Supreme Court has also held that "the courts can and should preclude double recovery by an individual." *Gen. Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 333 (1980). "Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed." *Conway v. Icahn & Co.*, 16 F.3d 504, 511 (2d Cir. 1994).

Given the identical amounts awarded to Plaintiff for her distinct legal causes for retaliation, it is apparent that the jury's award was duplicative. Plaintiff should not be permitted to collect twice for identical conduct. In addition, the parties acknowledge that Title VII provides a statutory cap for damages in the amount of $300,000.00. *See* (Doc. 304, pg. 32); (Doc. 281, pg. 27). Therefore, the jury's total verdict should properly be in

the amount of $2,200.000.00. However, even considering this reduction, the verdict was clearly excessive, and against the clear weight of the evidence. The Court concludes that a remittitur is appropriate and grants remittitur in the amounts described below and adjusting for the Court's finding that Defendant is entitled to judgment as a matter of law on some of Plaintiff's claims:

- Title VII Disparate Treatment: $0.00
- Title VII Retaliation: $0.00
- Fair Labor Standards Act: $ 50,000.00
- Fair Labor Standards Act Retaliation: $ 200,000.00

Accordingly, IT IS ORDERED:

1. Defendant's Motion for Judgment as a Matter of Law (Doc. 281) is **granted in part and denied in part**.

    a. Defendant's request for judgment as a matter of law relating to Plaintiff's Fair Labor Standards Act claims is **granted in part and denied in part**.

        i. Defendant's request for judgment as a matter of law on whether it satisfied the FLSA's requirements is **denied**.

        ii. Defendant's request for judgment as a matter of law on whether Plaintiff was subjected to adverse employment actions and retaliation is **granted** as to Plaintiff's claims relating to: educational counselings, start-time, ability to exercise, requiring a doctor's note, deprivation of specialty pay, and deprivation of vacation time, but **denied** as to Plaintiff's claims relating to: deprivation of deposition pay, involuntary transfer, and loss of seniority.

    b. Defendant's request for judgment as a matter of law relating to Plaintiff's Title VII claims is **granted** as to the underlying disparate treatment claim and the related retaliation claims.

2. Defendant's Motion for Remittitur is **granted** in the amounts provided above.

Plaintiff has thirty (30) days with which to accept or decline the Remittitur.

3.  If Plaintiff declines to accept the remittitur, Defendant's Motion for a New Trial will be **granted** as to damages on her FLSA claims.

Dated this 24th day of February, 2020.

Honorable Cindy K. Jorgenson
United States District Judge